Stacy L. Fode, Esq. (SBN 199883)
sfode@nfclegal.com
Nana J. Yee, Esq. (SBN 272783)
nyee@nfclegal.com
**NUKK-FREEMAN & CERRA, P.C.**
550 West C Street, Suite 910
San Diego, CA 92101
Telephone: 619.292.0515
Facsimile: 619.566.4741

Attorneys for Defendant
AMERIS BANK

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK BYRNE, an individual,<br><br>              Plaintiff,<br><br>vs.<br><br>AMERIS BANK, a Georgia corporation,<br><br>              Defendant. | Case No. 8:24-cv-01989-MWC (JDEx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT AMERIS BANK'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT AS TO EACH OF PLAINTIFF'S CLAIMS**<br><br> Judge: Hon. Michelle Williams Court<br> Date: February 13, 2026<br> Time: 1:30 p.m.<br> Place: Courtroom 6A<br><br>Discovery Cut-Off: November 28, 2025<br>Pretrial Conference: May 22, 2026<br>Trial Date: June 1, 2026 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................... iv

I. INTRODUCTION ....................................................................................... 1

II. STATEMENT OF FACTS ........................................................................... 2

   A. Byrne Was a Self-Directed Entrepreneur Who Operated Independently and Was Unaccustomed to Working Under Supervision ................................... 2

   B. Byrne Sold His Company to Ameris for $186 Million ............................. 3

     1. The LTIP Agreement confers broad discretion to Ameris's Compensation Committee, which delegated authority to LaHaise. .............................. 3

     2. The LTIP Plan and Award Agreement explicitly required GAAP-compliant calculations. ................................................................................... 4

     3. Byrne signed an employment agreement, acknowledged his job duties, and received substantial compensation as CEO of the Balboa Division. .................... 5

   C. Byrne Was Familiar With and Acknowledged Ameris's Anti-Retaliation and Other Lawful Policies and Practices .............................................. 6

   D. Byrne Allocated, Received, and Accepted Over $5.6 Million Under the 2022 LTIP Without Complaint ........................................................ 6

   E. Byrne Raised Baseless Challenges to Ameris's LTIP Calculations Only After the 2023 Q1 LTIP EBT Fell Short of the Projected Target ...................... 7

     1. In 2023, Byrne began challenging Ameris's LTIP calculations, claiming Ameris strayed from past practices. .................................................. 7

     2. Byrne's repeated LTIP calculation revisions in 2023 were promptly addressed by Ameris's CFO, CSO, and accounting personnel, whose responses were based on GAAP and accounting controls. ............................................ 8

     3. Byrne continued to regurgitate the same baseless LTIP calculation claims in 2024. ...................................................................................... 9

   F. Byrne's Performance Declined in 2023 and 2024, Marked by Strained Professional Relationships, Negative Attitude, and Disengagement ................ 10

     1. The Balboa Division underperformed in 2023 under Byrne. ...................... 10

2.  Between 2023 and 2024, Byrne's relationships with his superiors and colleagues were strained and unproductive.........................................................11

G. Ameris's Efforts to Retain Byrne as CEO Were Unsuccessful Due to Byrne's Negativity and Disengagement...............................................................................12

H. Byrne's Termination ...............................................................................................13

III. LAW AND ARGUMENT ...........................................................................................14

A. Summary Judgment Standard..................................................................................14

B. Ameris is Entitled to Summary Judgment on Byrne's Claim for Failure to Pay All Wages at Termination (Count III) ...............................................................15

1.  An LTIP Cash Award is not a wage.................................................................15

2.  An LTIP Cash Award is not an earned, unpaid wage. ....................................16

3.  Ameris did not violate the labor code, willfully or otherwise.........................18

C. Ameris is Entitled to Summary Judgment on Byrne's Retaliation Claim (Count II). ..................................................................................................................19

1.  Bryne did not make any protected disclosure under § 1102.5(b). ...................20

2.  Bryne did not engage in protected activity under § 1102.5(c). .......................23

3.  There is no evidence of causation. ...................................................................23

4.  The undisputed evidence shows that Ameris terminated Byrne for legitimate, independent reasons. ....................................................................24

D. Ameris is Entitled to Summary Judgment on Byrne's Wrongful Termination and Unfair Competition Claims (Counts I & IV).....................................................24

E. Byrne Cannot Recover Punitive Damages. ............................................................25

IV. CONCLUSION............................................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*Alonzo v. Maximus, Inc.*,
    832 F. Supp. 2d 1122 (C.D. Cal. 2011)....................................................15, 19

*Amaral v. Cintas Corp. No. 2*,
     163 Cal. App. 4th 1157 (2008)...........................................................................18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................................14

*Aquino v. Super. Ct.*,
    21 Cal. App. 4th 847 (1993)..............................................................................25

*Arauz v. M.A.C. Cosms., Inc.*,
    No. 2:22-CV-01663-DC-CSK, 2025 WL 2021112 (E.D. Cal. July 18, 2025).............25

*Batres v. HMS Host USA, Inc.*,
    No. SACV1001458CJCAJWX, 2012 WL 13049884 (C.D. Cal. Sept. 25, 2012).........25

*Beckman v. Umpqua Bank*,
    No. CIVS06-1205 RRBGGH, 2007 WL 2418686 (E.D. Cal. Aug. 24, 2007)..............17

*Carter v. Escondido Union High Sch. Dist.*,
    148 Cal. App. 4th 922 (2007).......................................................................21, 22

*Dauth v. Convenience Retailers, LLC*,
    No. C 13-00047 MEJ, 2013 WL 5340396 (N.D. Cal. Sept. 24, 2013).........................21

*Fitzgerald v. El Dorado Cnty.*,
    94 F. Supp. 3d 1155 (E.D. Cal. 2015) ..............................................................20

*Frausto v. Bank of Am., N.A.*,
    No. 18-CV-01983-LB, 2019 WL 5626640 (N.D. Cal. Oct. 31, 2019) .........................15

*Hays v. Cnty. of Los Angeles*,
    No. B291542, 2020 WL 1465826 (Cal. Ct. App. Mar. 26, 2020) ...............................22

*Hill v. Walmart Inc.*,
    32 F.4th 811 (9th Cir. 2022)..............................................................................18

*In re Oracle Corp. Sec. Litig.*,

   627 F.3d 376 (9th Cir. 2010) .........................................................................14

*Jacobs v. Coldwell Banker Residential Brokerage Co.*,

   14 Cal. App. 5th 438 (2017) .........................................................................19

*Jones v. Williams*,

   791 F.3d 1023 (9th Cir. 2025) .....................................................................14

*La v. San Mateo Cnty. Transit Dist.*,

   No. 14-CV-01768-WHO, 2014 WL 4632224 (N.D. Cal. Sept. 16, 2014) ...................21

*Love v. Motion Indus., Inc.*,

   309 F.Supp.2d 1128 (N.D. Cal. 2004)....................................................20, 23

*Lovelace v. Software Spectrum Inc.*,

   78 F.3d 1015 (5th Cir. 1996) .......................................................................21

*Magana v. Lab'y Corp. of Am.*,

   No. CV2011583PAPLAX, 2021 WL 4233901 (C.D. Cal. Aug. 16, 2021)..................25

*Miglani v. Edwards Lifesciences, LLC*,

   No. 18-CV-01983-LB, 2018 WL 6265007 (C.D. Cal. Jan. 8, 2018)............................24

*N.L.R.B. v. Electro Vector, Inc.*,

   539 F.2d 35 (9th Cir. 1976) .........................................................................15

*Neisendorf v. Levi Strauss & Co.*,

   143 Cal. App. 4th 509 (2006) .......................................................................18

*Neufeld v. Winco Holdings, Inc.*,

   No. 1:14-CV-1505 DAD-JLT, 2016 WL 815649 (E.D. Cal. Mar. 2, 2016)..................25

*Nordstrom Com. Cases*,

   186 Cal. App. 4th 576 (2010) .......................................................................18

*Patten v. Grant Joint Union High Sch. Dist.*,

   134 Cal.App.4th 1378 (2005) ................................................................20, 21

*Powell v. County of Orange*,

   No. 821CV00801JVSDFMX, 2022 WL 3574282 (C.D. Cal. July 7, 2022) ................19

*PATRICK BYRNE v. AMERIS BANK*        Case No. 8:24-01989
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT      Page v

*Prachasaisoradej v. Ralphs Grocery Co.*,
  42 Cal. 4th 217 (2007) ................................................................................. 18

*Robles v. Agreserves, Inc.*,
  158 F. Supp. 3d 952 (E.D. Cal. 2016) ......................................................... 23

*Sherman v. Pepperidge Farm, Inc.*,
  No. 822CV01781JWHADS, 2023 WL 5207458 (C.D. Cal. Apr. 28, 2023) ................ 21

*Silberg v. California Life Ins. Co.*,
  11 Cal. 3d 452 (1974) ................................................................................. 25

*Smith v. Level 3 Commc'ns Inc.*,
  No. C 14-05036 WHA, 2015 WL 833614 (N.D. Cal. Feb. 24, 2015) ........................ 15

*Smith v. Wells Fargo Bank, N.A.*,
  135 Cal. App. 4th 1463 (2005) ................................................................... 21

*Suarez v. Bank of Am. Corp.*,
  No. 18-CV-01202-MEJ, 2018 WL 2431473 (N.D. Cal. May 30, 2018) ...................... 19

*Tawatari-Tsuneta v. CVS Rx Servs., Inc.*,
  No. 8:22-CV-02251-AH-(JDEX), 2025 WL 1090392 (C.D. Cal. Mar. 6, 2025) ............ 23

*Tucker v. Royal Adhesives & Sealants, LLC*,
  No. 22-CV-09371-SPG-KS, 2024 WL 3915094 (C.D. Cal. Apr. 12, 2024) ................ 24

*Villiarimo v. Aloha Island Air, Inc.*,
  281 F.3d 1054 (9th Cir. 2002) ................................................................... 23

*Wentzo v. Signavio, Inc.*,
  No. CV 21-09968 TJH (JCX), 2024 WL 3191228 (C.D. Cal. Apr. 29, 2024) ........ 16, 17

**Statutes**

29 C.F.R. § 778.211 ....................................................................................... 15

8 C.C.R. § 13520 ........................................................................................... 18

Cal. Bus. & Prof. Code § 17200 ................................................................... 24

Cal. Civ. Code § 3294(a) ............................................................................... 25

Cal. Lab. Code § 1102.5 ..................................................................... 19, 24, 25

Cal. Lab. Code § 1102.5(b) ................................................................................. 20

Cal. Lab. Code § 1102.5(c) ................................................................................. 23

Cal. Lab. Code § 1102.6 ............................................................................... 19, 24

Cal. Lab. Code § 200 .......................................................................................... 15

Cal. Lab. Code § 201 ............................................................................... 15, 18, 25

Cal. Lab. Code § 201(a) ...................................................................................... 17

Cal. Lab. Code § 203 ......................................................................... 15, 18, 19, 25

Cal. Lab. Code § 203(a) ...................................................................................... 18

## I.    INTRODUCTION

In this employment lawsuit, Plaintiff Patrick Byrne ("Byrne"), a multi-millionaire former CEO, seeks to rewrite history to cast himself as a whistleblower and victim when, in reality, Byrne was the founder and 100% owner of a privately held company, Balboa Capital Corporation ("Balboa" or "Balboa Capital"), that was sold to Defendant Ameris Bank ("Ameris") in 2021 resulting in approximately **186 million dollars** paid to Byrne. During the sale, Byrne and his lawyers negotiated a lucrative employment deal for Byrne to become CEO of the Balboa Division of Ameris, including a three-year Long-Term Incentive Plan ("LTIP" or "Plan"). Now, Byrne shockingly alleges he should have been paid *more* during his time at Ameris. Byrne also contends that he was terminated in retaliation for challenging Ameris's accounting methodology for calculating the LTIP award pool. However, the undisputed evidence demonstrates that Byrne's termination had nothing to do with his unfounded accounting complaints and everything to do with the Balboa Division's uneven financial performance and Byrne's own deteriorating leadership, increasingly negative attitude, and disengagement from the business.

Before its acquisition by Ameris, Byrne operated Balboa autocratically, maintaining strict control over all core functions. After the acquisition, Byrne struggled with the transition from sole owner to Division executive within a publicly traded financial institution. He repeatedly expressed frustration when Ameris exercised appropriate and mandatory financial oversight over the Balboa Division. Over time, Byrne allowed his frustration to seep into professional relationships with senior colleagues and leaders across Ameris. Interactions became strained and contentious. Instead of demonstrating executive leadership, he openly badmouthed Ameris, its leaders, and its processes. Byrne disengaged from the Division he was expected to lead, and in the months preceding his termination, he was neither present nor performing in the manner expected of a highly compensated corporate executive.

Byrne now attempts to recast himself as a whistleblower and employee advocate, claiming that he repeatedly pursued alleged LTIP "underpayments" on behalf of himself

---

*PATRICK BYRNE v. AMERIS BANK*                                    Case No. 8:24-01989
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    Page 1

and other Balboa Division employees. The evidence demonstrates the opposite. Byrne's relentless emails contained creative but incorrect arguments regarding the LTIP calculations. However, his complaints, which started over a year prior to his termination, were focused exclusively on ***seeking millions of dollars in additional LTIP payments for himself***. Byrne's claim is personal and driven not by protected activity, but by his own greed and resentment over his loss of unilateral control over Balboa.

The undisputed facts, supported by Byrne's testimony under oath and the documentary evidence, establish that he cannot prevail on any of his causes of action. Accordingly, Ameris seeks summary judgment, or in the alternative, partial summary judgment, on each cause of action as follows: (1) Byrne's unpaid wages claim fails as a matter of law because the LTIP is a discretionary bonus and not wages. Even if deemed non-discretionary, Byrne had not "earned" any 2024 LTIP bonus at termination, as it remained subject to future calculation and distribution (if any). All undisputed 2022 and 2023 LTIP amounts were timely paid, and any alleged shortfall stems from a good-faith dispute over calculation methodology, precluding willfulness; (2) Byrne's whistleblower retaliation claim fails because he cannot show a protected disclosure, protected activity, or any causal connection to his termination. In any event, Ameris terminated Byrne for legitimate, independent reasons unrelated to his LTIP calculation complaints; (3) Byrne's wrongful termination claim fails because he cannot identify any specific statutory or constitutional provision. To the extent it relies on or derives from his Labor Code claims, it also lacks merit; (4) Byrne's Business & Professions Code claim fails for the same reason, as it is derivative of his Labor Code claims; and (5) Byrne cannot recover punitive damages as there is no evidence of malice, fraud, or oppression.

## II.    STATEMENT OF FACTS

### A. Byrne Was a Self-Directed Entrepreneur Who Operated Independently and Was Unaccustomed to Working Under Supervision

In 1988, Byrne founded Balboa Capital, an equipment leasing company, where he served as its CEO until December 2021. (Separate Statement of Undisputed Facts

["SSUF"] 1.) Byrne became the sole owner of Balboa Capital around 2015 and retained sole ownership until its sale to Ameris in December 2021. (SSUF 2.) Byrne, who is not a CPA and holds no accounting, credentials, considers himself a visionary entrepreneur. (SSUF 3.) As CEO of Balboa Capital, Byrne oversaw finance, loan operations, and the company's strategic direction, reporting to no one as it was privately owned. (SSUF 4.)

## B. Byrne Sold His Company to Ameris for $186 Million

### 1. The LTIP Agreement confers broad discretion to Ameris's Compensation Committee, which delegated authority to LaHaise.

After extensive negotiations, Ameris and Byrne executed a Stock Purchase Agreement (the "SPA") on December 10, 2021, under which Ameris acquired 100% of Balboa Capital for approximately $186 million.[1] (SSUF 5.)

With counsel, Byrne and Ameris negotiated and agreed to the LTIP and an LTIP Award Agreement (the "Award Agreement"). (SSUF 7.) The LTIP covered performance periods for 2022, 2023, and 2024. (SSUF 8.) James LaHaise, Ameris's Chief Strategy Officer ("CSO"), testified that the LTIP is an incentive program designed to reward participants if they are eligible and approved to be included in payouts under the Plan. (SSUF 9.) Put simply, if the Balboa Division beat its projected profitability targets, which Bryne was convinced it could do, it could be entitled to additional bonus award payments for each annual performance period under the Plan. (SSUF 10.)

As expressly delineated in the LTIP, Ameris's Compensation Committee (the "Committee") has broad discretion to administer the Plan, including but not limited to interpreting the Plan and applying its provisions, determining who shall participate in the Plan and the Performance Criteria used to establish the Performance Goals, adjusting or modify the calculation of a Performance Goal for a Performance Period, and the "discretion to make any and all other determinations which it determines to be necessary

---

[1] ██████████████████████████████████████████████████
████████████████████████████████████████████. (SSUF 6.)

---

or advisable for the administration of the Plan." (SSUF 11.)

The Committee may delegate all or part of its authority and powers under the Plan to one or more Ameris employees. (SSUF 12.) In this case, the Committee delegated its authority and powers to LaHaise, who—consistent with the LTIP's "recommendation"— consulted with Byrne regarding the distribution of cash bonus awards under the Plan. (SSUF 13.) All decisions made by the Committee, and its delegates, are final and binding on the Company and the Participants. (SSUF 14.)

After a Performance Period, the Committee (or its delegate) is required to review and certify whether the Performance Goals were achieved and calculate the cash bonus awards based on the Performance Formula. (SSUF 15.) No right to a cash bonus award exists until it is paid, and participation in one Performance Period does not guarantee future participation. (SSUF 16.) Byrne testified he understood that LTIP awards were not guaranteed every year, to the extent that the Balboa Division did not meet the required threshold targets and he acknowledged as much in an email to managers, writing, "*Something like this may be available next year but there are no promises and it would only occur if we are able to drive long-term profitability . . . .*" (SSUF 17.)

### 2. The LTIP Plan and Award Agreement explicitly required GAAP-compliant calculations.

Balboa is a division of Ameris, a publicly traded company governed by the Sarbanes-Oxley Act of 2002 ("SOX"), a federal law enacted to protect investors by improving the accuracy and reliability of corporate disclosures. (SSUF 18.) The Balboa Division is required to follow Generally Accepted Accounting Principles ("GAAP"), the accounting standards that govern the preparation of financial statements. (SSUF 19.) The LTIP and Award Agreement expressly state that cash bonus awards are subject to all applicable laws and required regulatory approvals. (SSUF 20.) Byrne and Ameris also agreed to key assumptions in the LTIP Award Agreement, including that "[i]nitial direct costs will be calculated using GAAP methodology." (SSUF 21, 22.)

The LTIP's primary performance criteria is the Balboa Division's annual earnings

before tax ("EBT"), as defined in the Pioneer 1Q21 Operating Model ("Pioneer Model") which includes Balboa Capital's "historical" (pre-acquisition 2017-2020) and "projected" (2021-2025) financial data. (SSUF 23.) For each year, 35% of EBT above the threshold is allocated to the LTIP bonus pool. (SSUF 24.)

### 3. Byrne signed an employment agreement, acknowledged his job duties, and received substantial compensation as CEO of the Balboa Division.

Byrne also signed an Employment Agreement (the "Agreement") to serve as CEO of the Balboa Division of Ameris from December 10, 2021 until December 31, 2024.[2] (SSUF 25.) As CEO of the Balboa Division, Byrne reported to LaHaise, marking the first time he had a supervisor since founding Balboa Capital in 1988. (SSUF 27.)

Pursuant to the Agreement, Byrne's base salary in 2022 was ▇▇▇▇, and he received a 3% increase each subsequent year. (SSUF 28.) ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇ ▇▇▇ ▇▇▇ ▇▇[3] (SSUF  29.) ▇▇▇ ▇▇ ▇▇▇▇ ▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇ (SSUF 31.) ▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (SSUF 32.)

Byrne had a written job description and acknowledged in his deposition that, because Ameris is a highly regulated, publicly traded financial institution, he was responsible, as CEO of the Balboa Division, for setting short- and long-term goals with the executive team, ensuring compliance with applicable laws and regulations, and exercising strong managerial, financial, and communication skills. (SSUF 33.)

---

[2] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇ (SSUF 26.)

[3] Although the Balboa Division did not always meet those quarterly targets, Byrne received, personally, a ▇▇▇▇ bonus each quarter he worked at Ameris. (SSUF 30.)

### C. Byrne Was Familiar With and Acknowledged Ameris's Anti-Retaliation and Other Lawful Policies and Practices

Ameris maintains anti-retaliation and whistleblower protections policies in its Code of Business Conduct and Ethics, which prohibit retaliation and provide reporting procedures. (SSUF 34.) The Code of Business Conduct and Ethics provides a procedure for employees to report concerns, prohibits whistleblower retaliation. (SSUF 35.) Byrne acknowledged these policies and was aware of the reporting avenues, and—despite raising LTIP calculation-related disputes for over a year before his termination—he never complained of retaliation during his employment. (SSUF 36.)

### D. Byrne Allocated, Received, and Accepted Over $5.6 Million Under the 2022 LTIP Without Complaint

At the close of 2022, the 2022 LTIP pool was approximately $9 million. (SSUF 37.) At **no time** during Byrne's email communications with Ameris's director of compensation, accounting personnel, or LaHaise regarding the 2022 LTIP pool did Byrne raise any concerns about Ameris's calculation methodology or dispute the 2022 pool amount. (SSUF 38.)

On February 15, 2023, Byrne received and accepted his 2022 LTIP award of over $5.6 million—more than 62% of the total pool available for distribution—per his own recommendation.[4] (SSUF 39.) Byrne testified that he made the decision on how the 2022 LTIP pool was allocated and acknowledged that no one at Ameris overturned his allocations because "there wasn't the ability, because we had already agreed upon that." (SSUF 41.)[5]

///

---

[4] Byrne later awarded himself an additional bonus of $12,150.29, which was pulled from another participating employee's 2022 LTIP bonus award allocation. (SSUF 40.)

[5] Byrne first raised issues with Ameris's LTIP calculation methodology around mid-2023 and only thereafter attempted to *retroactively* challenge Ameris's **2022** LTIP calculation and to seek additional LTIP money for 2022. (SSUF 42.)

---

*PATRICK BYRNE v. AMERIS BANK*
DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Case No. 8:24-01989

Page 6

### E. Byrne Raised Baseless Challenges to Ameris's LTIP Calculations Only After the 2023 Q1 LTIP EBT Fell Short of the Projected Target

As set forth below, Byrne's proposed revisions to the LTIP calculations challenged Ameris's established calculation methodology and focused only on accounting items such as overhead allocations, repossessions, depreciation of pre-acquisition assets, charge-offs, tax benefits, stipulated judgments, and interim rents. (SSUF 43.)

#### 1. In 2023, Byrne began challenging Ameris's LTIP calculations, claiming Ameris strayed from past practices.

In April 2023, Sufhan Majid, Ameris's Director of Accounting,[6] provided Byrne with the Balboa Division's 2023 Q1 LTIP estimate, which showed that the quarterly EBT target was not met. (SSUF 44.) Upon realizing that that the Balboa Division had failed to meet the Q1 estimated target—which threatened Byrne's LTIP payment—in or around June 2023, Byrne began a campaign of incessantly demanding changes to the LTIP calculations that were inconsistent with GAAP, Ameris's accounting controls, and the terms of the LTIP and Award Agreement. (SSUF 47.)

On **June 5, 2023,** Byrne emailed LaHaise, retroactively asserting that Ameris improperly allocated over $3 million in overhead for the Balboa Division for the **2022** LTIP and sought to "add back" those costs, arguing the Division employee salaries in certain departments should be excluded because they reported to Ameris rather than directly to him. (SSUF 48.) He made the same claims for Q1 2023, alleging improper overhead treatment, changes to repossession accounting, and excluded income that caused the LTIP target to be missed. (SSUF 49.) Byrne submitted his own revised LTIP calculations for 2022 and Q1 2023 and demanded that he be paid an additional **$1.1**

---

[6] Majid was responsible for preparation of the LTIP calculations, which included pulling data from the general ledger via reporting software, which was sent to Byrne quarterly for review. (SSUF 45.) To track the key inputs to the LTIP, Ameris maintained two cost centers for Balboa Division, i.e., cost center 890 tracks components of the LTIP while cost center 891 tracks all other Balboa related financial activity. (SSUF 46.)

*million* for 2022 and $150,000 for Q1 2023. (SSUF 50.) LaHaise responded the next day, disagreed with Byrne's revisions, and proposed discussing the issue. (SSUF 51.)

On July 24, 2023, Byrne emailed Majid claiming errors in the 2022 LTIP calculations and demanding *an additional $1,248,354 in his July 30, 2023 payroll,* with no reference to other Plan participants. (SSUF 52.) Byrne repeated that salaries for the Balboa Division Accounting, IT and Marketing departments were erroneously included in overhead and should be added back to align with the SPA and past practices. (SSUF 53.)

That same day, Byrne emailed five purported issues with the Q2 2023 LTIP: changes to repossession accounting; revision of Q2 quarterly net charge-offs; adjustment to the provision and formula; and reiterated that the Balboa Division departments overhead should be "added back," and that the depreciation for pre-acquisition assets was wrongly deducted. (SSUF 54.) Byrne argued that based on his own revised calculations, the LTIP targets for Q1 and Q2 2023 were both met and asked that his quarterly bonuses be included in his July 30 payroll. (SSUF 55.)

### 2. Byrne's repeated LTIP calculation revisions in 2023 were promptly addressed by Ameris's CFO, CSO, and accounting personnel, whose responses were based on GAAP and accounting controls.

In the following months, Byrne repeatedly raised the same LTIP issues, seeking accounting changes based on past practices, which were addressed by accounting personnel, Nicole Stokes (Ameris's CFO), and LaHaise. (SSUF 56.) For instance, David Sparacio, Ameris's Controller, explained that Byrne's position on the interim rent issue was incorrect because the LTIP requires GAAP-based calculations, while Byrne had historically used a cash-based approach. (SSUF 57.) Additionally, Majid also told Byrne that his "old method" or "past practices" were not GAAP-compliant, and Sparacio emphasized that Ameris cannot allow business units to set accounting policy, and the accounting department cannot make requested changes given the established guidance and conservative nature of the business practices. (SSUF 58.)

Both Stokes and LaHaise carefully reviewed but disagreed with Byrne's proposed

adjustments, noting that they reflected incorrect assumptions, were not compliant with GAAP, and rehashed issues previously discussed and **agreed upon** with Byrne. (SSUF 59.) Stokes testified that she spoke to Byrne various times regarding her disagreement with his requested LTIP adjustments, and she and LaHaise even flew to California in the summer of 2023 to meet with Byrne in person to address these issues. (SSUF 60.)

### 3. Byrne continued to regurgitate the same baseless LTIP calculation claims in 2024.

Ultimately, the Balboa Division did not meet the 2023 LTIP EBT, and therefore no funds were allocated to the 2023 LTIP pool. (SSUF 61.) On January 10, 2024, after the 2023 books had officially closed, Majid emailed Byrne the final 2023 LTIP calculation. (SSUF 62.) On January 15, 2024, Byrne repeated his same six objections from his complaints about the 2023 LTIP and demanded payment of **$3,037,750**, to which Sparacio responded. (SSUF 63, 64.) On January 29, 2024, Byrne sent another email to LaHaise, stating that he revised the **2022** LTIP calculation **again** and was owed $1,457,057. (SSUF 65.) Byrne testified that the dispute concerned customer security deposits, which he claimed were accounted for differently than he had done pre-acquisition. (SSUF 66.) On January 31, 2024, Byrne forwarded all his LTIP-related emails to LaHaise, demanding: **(1) $2,024,765 for security deposits; (2) $1,457,057 for the 2022 LTIP; and (3) $3,037,750 for the 2023 LTIP**. (SSUF 67.)

Byrne declined to discuss his disputes by phone; therefore, LaHaise emailed him on February 5, 2024, addressing each topic raised in Byrne's emails in reliance on Stoke's analysis and explaining, in detail, why no additional amounts were owed. (SSUF 68.) While Ameris rejected most of Byrne's incorrect assumptions and miscalculations, it made two adjustments to the 2023 LTIP EBT calculation per Byrne's request. (SSUF 69.) However, even with those adjustments, the final 2023 EBT calculation was still below the 2023 LTIP EBT threshold. (SSUF 70.)

On March 11, 2024, Byrne emailed LaHaise, stating that his position on outstanding LTIP payments had not changed. (SSUF 71.) LaHaise replied, noting nothing had

changed from his original response and invited Byrne to schedule a discussion. (SSUF 72.) Byrne responded that "unless you are presenting an offer then talking about it anymore is a waste of time." (SSUF 73.)

LaHaise also emailed Byrne on May 6, 2024, confirming he was not owed any additional 2022 or 2023 LTIP payments and that the matter was closed. That same day, Byrne emailed LaHaise asserting the Q1 ***2024*** LTIP was miscalculated, repeating previously rejected issues, and requesting payment based on his revisions. (SSUF 74.)

At the time of Byrne's termination in June 2024, the 2024 year-end LTIP pool (if any) had not yet been calculated and it was uncertain whether the Balboa Division's EBT would exceed the threshold. (SSUF 75.)

### F. Byrne's Performance Declined in 2023 and 2024, Marked by Strained Professional Relationships, Negative Attitude, and Disengagement

#### 1. The Balboa Division underperformed in 2023 under Byrne.

In 2023, after realizing that an LTIP bonus award was unlikely due to the Balboa Division's anticipated financial performance, Byrne became increasingly preoccupied with challenging Ameris's LTIP EBT calculation methodology to revise the numbers so that it would appear the target was met. This preoccupation caused Byrne to lose focus on the actual performance of the Balboa Division, which ultimately suffered, and it ultimately failed to meet the year-end target. (SSUF 76.)

In his annual performance review for 2023,[7] Byrne's performance issues were formally documented, with substantial constructive feedback from LaHaise. (SSUF 77.) The review noted that the Balboa Division did not generate a profit for 2023, and

---

[7] During his employment, Byrne was given annual performance reviews by his direct supervisor, LaHaise. (SSUF 78.) LaHaise noted in Byrne's first (2022) performance review that integrating Balboa Capital, a long-time private company, into a publicly traded financial institution was "challenging." (SSUF 79.) Likewise, Stokes testified that "it was certainly a difficult relationship [with Byrne]" and "…a progression of difficulty that started along the whole path." (SSUF 80.)

---

1    adjusted loan losses totaled approximately ██████████████████████████

2    ████████████    which prevented the Balboa Division from exceeding the 2023 LTIP EBT

3    target. (SSUF 81.) Stokes testified that she was unhappy with the ████████ in charge-

4    offs and confirmed that Byrne, as head of the Division, was responsible for those losses.

5    (SSUF 82.) LaHaise also observed that Byrne was dissatisfied with the level of autonomy

6    he had in leading the Balboa Division, which contributed to strained relationships with

7    some company leaders. (SSUF 83.) Despite these issues, LaHaise noted that Ameris

8    hoped Byrne would continue in a long-term leadership role but that Byrne would need to

9    decide whether he wished to do so. (SSUF 84.)

### 2. Between 2023 and 2024, Byrne's relationships with his superiors and colleagues were strained and unproductive.

12    Byrne's professional relationship with his supervisor, LaHaise, became strained as

13    Byrne—rather than focusing on the Balboa Division's performance—repeatedly insisted

14    on changing Ameris's LTIP calculations, despite Ameris providing reasoning and

15    confirmation that his revisions were neither GAAP-compliant nor consistent with the

16    terms of the LTIP. (SSUF 85.) LaHaise noted that, based on his interactions with

17    Byrne—including their discussions, Byrne's conduct, and his attitude—it became clear

18    that Byrne did not want to continue in his role as Division CEO. (SSUF 86.)

19    Stokes also experienced a strained work relationship with Byrne as he stopped

20    responding to her emails and phone calls, stopped attending meetings, and stopped taking

21    meeting requests from Stokes' assistant. (SSUF 87.) Byrne also failed to follow internal

22    controls and procedures and even instructed employees to process loans in a manner that

23    did not conform with established GAAP accounting controls that had been explained to

24    him.[8] (SSUF 88.) Stokes raised these concerns to LaHaise and the Chief Compliance

---

[8] For example, in or around May 2024 Sparacio advised Byrne regarding Ameris's decision to make changes to the initial direct costs ("IDC") process to remain GAAP compliant regarding purchased loans, which Byrne questioned and attempted to circumvent, suggesting that the Division recharacterize the purchased loans and "book as

Officer, Bill McKendry. (SSUF 90.)

Phil Silva, President of the Balboa Division, who had worked with and reported to Byrne for 17 years (including before the acquisition), testified that his friendship and partnership with Byrne changed over time. (SSUF 91.) Silva explained that Byrne undermined him in front of Division managers regarding LTIP observations—which Silva called "incredibly disrespectful"—and openly expressed disagreement with Ameris's 2023 EBT and LTIP calculations without sharing Ameris's explanations. (SSUF 92, 93, 97.) Nevertheless, Silva advocated for Byrne internally, as he wrote in an email to Byrne: "With regards to [LaHaise] and Ameris... I have been very clear with them and you that we are a much better company with you . . . They want you to be here if you want to be here". (SSUF 94.) According to Silva, Byrne became increasingly paranoid and "really unhappy," and was in conflict with multiple individuals across different levels of Ameris. (SSUF 95, 96.)

On March 1, 2024, Byrne emailed LaHaise claiming approximately **$6.5 million** was past due and stating, "if you don't find what I am doing valuable, please let me know . . . if the feeling is not mutual, please suggest how we move forward." (SSUF 98.) In response, LaHaise reminded Byrne that he stated during his 2023 performance review that he wanted Byrne to remain Division CEO, explained that Byrne's LTIP assumptions were incorrect and that no payments were due, and proposed a call or in-person meeting at Ameris's headquarters, including Ameris's CEO if needed. (SSUF 98.) Byrne refused LaHaise's offer. (SSUF 99.)

### G. Ameris's Efforts to Retain Byrne as CEO Were Unsuccessful Due to Byrne's Negativity and Disengagement

Because the LTIP only covered the three-year period from 2022 through 2024,

individual deals" rather than using "the code for portfolio purchases" to avoid the impact of Ameris's IDC process change, in direct violation of GAAP and Ameris's internal accounting controls and compliance requirements. (SSUF 89.)

LaHaise sent Byrne a template for a 2025 incentive plan on December 7, 2023, to allow ample time for discussion. (SSUF 100.) Thereafter, according to Byrne, they discussed the 2025 incentive plan nearly weekly for seven months but were unable to reach an agreement. (SSUF 101.)

As Byrne's Employment Agreement was set to expire at the end of 2024, LaHaise sent the required notice of non-renewal in March 2024 to both Byrne and Silva, with the intent to transition Byrne to a senior management agreement consistent with those of Ameris's other senior executives. (SSUF 102.) Byrne understood that this non-renewal notice was not a termination of his employment, but simply notice that the terms of the existing Employment Agreement would not be extended, as the parties had been negotiating a new senior management agreement since January 2024. (SSUF 103.)

On March 11, 2024, LaHaise emailed Byrne a draft senior management agreement for his review that would have continued his employment as CEO of the Balboa Division. (SSUF 104.) Byrne never signed the proposed agreement and never consulted an attorney regarding the draft. (SSUF 105, 106.)[9]

Leading up to his termination, Byrne was generally uncooperative, repeatedly claiming Ameris did not want him to continue as Division CEO. (SSUF 109.) On June 24, 2024, LaHaise emailed Byrne and Silva an agenda for a meeting the next day, which Byrne cancelled at the last minute. (SSUF 110.) Silva noted that, if Byrne had remained engaged and positive, he could have been a strong leader, but unfortunately, he had become the opposite. (SSUF 111.)

### H. Byrne's Termination

Ameris terminated Byrne's employment by formal notice sent via email on June 27, 2024, effective June 30, 2024. (SSUF 112.) Although his termination was designated

---

[9] Byrne further testified that he thought the senior management agreement "didn't seem like it was real" and that he didn't know what was "behind it." (SSUF 107.) However, the same draft agreement was also offered to and signed by Silva. (SSUF 108.)

"without cause," which would have allowed Byrne to collect severance under his Employment Agreement, Ameris had multiple legitimate reasons for its termination decision, including but not limited to: the Balboa Division's failure to meet expected financial results under Byrne's leadership; Byrne's strained and unproductive working relationships with employees across Ameris; and Byrne's failure to follow—and attempts to circumvent—internal accounting controls and processes. (SSUF 113.)

Byrne testified that he first saw the termination notice on June 28, 2024 and claimed he had not received any advance warning, call, communication, or indication that he was going to be terminated. (SSUF 114.) ***However, his testimony was directly contradicted by the undisputed record.*** Before sending the June 27 termination email, LaHaise scheduled a call with Byrne during which he personally informed Byrne of Ameris's decision. (SSUF 115.) During that call, Byrne requested that his legal counsel be copied on the termination notice and provided LaHaise his counsel's contact information that same day. (SSUF 116.) After their call, LaHaise emailed Byrne formal notice confirming the June 30 effective date of his termination. (SSUF 117.)

## III.  LAW AND ARGUMENT

### A. Summary Judgment Standard

The moving party on a motion for summary judgment bears the initial burden of production, met by "either produc[ing] evidence negating an essential element of the nonmoving party's claim…or show[ing] that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2025) (internal citation omitted). Once met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence," *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Anderson*, 477 U.S. at 252), and the nonmoving party "may not rest upon the mere allegations or denials of his pleading[.]" *Anderson*, 477 U.S. at 248.

**B. Ameris is Entitled to Summary Judgment on Byrne's Claim for Failure to Pay All Wages at Termination (Count III)**

Byrne claims Ameris willfully failed to pay his final wages in violation of California Labor Code §§ 201 and 203. (Dkt. 1, ¶¶ 31-40.) This is not supported by the undisputed facts, and this claim nevertheless fails because an LTIP award is a discretionary bonus, not wages, and therefore not subject to waiting-time penalties. Even if it were wages, his claim still fails because all undisputed amounts were timely paid, and no willful failure occurred amid a good-faith dispute over the LTIP calculation method.

### 1. An LTIP Cash Award is not a wage.

Byrne's failure-to-pay claim rests on his allegation that Ameris miscalculated the Balboa Division's earnings under the LTIP, reducing or eliminating LTIP awards to eligible employees, including himself. (Dkt. 1, ¶¶ 10-11.) However, LTIP awards are discretionary bonuses—not wages—and cannot support claims under §§ 201-203. *See*, *e.g.*, *Frausto v. Bank of Am., N.A.*, No. 18-CV-01983-LB, 2019 WL 5626640, at *5-6, 9 (N.D. Cal. Oct. 31, 2019) (holding discretionary bonuses are not wages and granting summary judgment for employer under Lab. Code §§ 201–203); *Smith v. Level 3 Commc'ns Inc.*, No. C 14-05036 WHA, 2015 WL 833614, at *2 (N.D. Cal. Feb. 24, 2015) (holding discretionary bonuses are not wages due upon termination under Lab. Code § 200); *Alonzo v. Maximus, Inc.*, 832 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (excluding discretionary bonuses from regular rate of pay for computing overtime); *N.L.R.B. v. Electro Vector, Inc.*, 539 F.2d 35, 37-38 (9th Cir. 1976) (holding discretionary bonuses are not earned wages).

In *Frausto*, the court held that a bonus is discretionary if the employer "retain[s] discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid." 2019 WL 5626640, at *6 (quoting 29 C.F.R. § 778.211). There, the court found Bank of America's "Recognition Points" were discretionary bonus because managers had discretion to veto any employee who was nominated to receive points or to adjust the awarded points. *Id.* Likewise, here, any LTIP

Cash Award was discretionary because Ameris had full discretion as to the fact of payment *and* the amount. The undisputed evidence shows that all material aspects of an LTIP cash bonus award—including eligibility, calculation, and even the existence or amount of any payment—were determined on a discretionary basis. (SSUF 11, 12, 14.) Under the LTIP and Award Agreement, Ameris's Committee has broad discretion to administer the Plan, determine participants, adjust performance calculations, and make other related determinations. (SSUF 11, 12, 14.) There was no fixed allocation formula for Byrne or anyone else, and as a result, Byrne cannot demonstrate that he earned a specific amount from the communal LTIP pool or satisfy the ascertainability requirement for a wage claim. *See Wentzo v. Signavio, Inc.*, No. CV 21-09968 TJH (JCX), 2024 WL 3191228, at *5 (C.D. Cal. Apr. 29, 2024) (incentive payments are not earned wages under Lab. Code § 200 when their value is not "ascertainable—meaning fixed by any method of calculation—at the time that they were granted"). In other words, the absence of an individualized calculation method, combined with Ameris's broad authority and discretion under the Plan, confirms that Byrne had only a *contingent* expectation, not entitlement to an earned wage. *See id*.

Although Byrne now argues that he and others[10] are owed larger LTIP Cash Awards for 2022 and 2023, he knew that the awards were subject to Ameris's discretion because ***he asked Ameris to exercise that discretion***. Indeed, Byrne testified that he was aware of another employee's LTIP share being "pull[ed] back," which ***Byrne*** then recommended be reallocated to himself, which Ameris approved. (SSUF 40.) If the Awards were non-discretionary, Byrne could not have sought reassignment of another employee's Award to himself. This confirms the LTIP Cash Awards were discretionary.

### 2.  *An LTIP Cash Award is not an earned, unpaid wage.*

Even if an LTIP Cash Award, once earned, qualifies as wages, Byrne's claim fails

---

[10] Notably, this is not a class or collective lawsuit, and Byrne has no standing to sue on behalf of others.

because there is no evidence that any earned amounts remained unpaid at the time of his termination. Whether an amount is "earned" depends on "the specific terms of the bonus plan and general contract principles." *Beckman v. Umpqua Bank*, No. CIVS06-1205 RRBGGH, 2007 WL 2418686, at \*2 (E.D. Cal. Aug. 24, 2007). Under California law, incentive payments are not earned wages until all conditions precedent are met. *Wentzo*, 2024 WL 3191228, at \*5.

Here, Byrne received and accepted his 2022 LTIP Award of over $5.6 million—an amount he personally recommended and allocated to himself—in February 2023 without disputing the calculation or raising any errors at the time. (SSUF 39.) His unqualified acceptance of the 2022 Award confirms that he understood and agreed the award was properly calculated and paid. Moreover, the Plan states all Committee decisions are "final and binding" and no right to an Award exists "until such Cash Bonus Award has been paid." (SSUF 14, 16.) Thus, Byrne is not entitled to additional LTIP funds.

The same terms apply to the 2023 LTIP. Ameris calculated the 2023 LTIP in good faith and determined the Balboa Division did not meet the 2023 EBT target, and therefore no payout was owed. (SSUF 61.) Although Byrne disputed the calculation methodology, the undisputed record shows Ameris reviewed each issue raised by Byrne, made adjustments where appropriate, and explained why no error existed. (SSUF 47-60, 63-74, 85.) Ameris rejected Byrne's proposed changes because they were based on incorrect assumptions, conflicted with the LTIP and Award Agreement, and relied on non-GAAP-compliant revisions. (SSUF 47-60, 63-74, 85.)

By June 2024, Byrne had not earned any 2024 LTIP Award because the year-end LTIP pool (if any) had not yet been calculated, was not ascertainable, and remained subject to future determination and allocation. (SSUF 75.) The LTIP and Award Agreement specify that any Cash Bonus Award is payable only when granted, but no later than March 15 of the following year, and that no right to an Award exists until payment. (SSUF 16.) Therefore, Byrne was not entitled to a 2024 LTIP Award at the time of his termination in June 2024. *See* Cal. Lab. Code § 201(a) ("If an employer discharges

---

an employee, the *wages earned and unpaid **at the time of discharge*** are due and payable immediately.") (emphasis added); *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509, 522 (2006) ("[N]othing in the public policy of [California] concerning wages . . . transforms [a] contingent expectation of receiving bonuses into an entitlement."); *Prachasaisoradej v. Ralphs Grocery Co.*, 42 Cal. 4th 217, 229 (2007) (wages are not earned until final calculations have been performed in accordance with the terms of the relevant compensation plan). In short, only wages that are earned and calculable at termination must be paid, and contingent, discretionary incentive bonuses—such as the 2024 LTIP Award—are not due until earned and calculated. Accordingly, §§ 201 and 203 do not apply to Byrne's claims, and Ameris is entitled to summary judgment.

### 3. *Ameris did not violate the labor code, willfully or otherwise.*

Labor Code § 203(a) imposes waiting time penalties only where the failure to timely pay final wages is "willful." A failure is willful if the employer intentionally withholds wages when due, but not where the employer maintains a good-faith dispute as to whether wages are due. 8 C.C.R. § 13520. A good-faith dispute includes any "defense, based in law or fact which, if successful, would preclude any recovery" by the employee, even if that defense is ultimately unsuccessful. *Id.* "[T]he operative question is simply whether, based on the state of the law when [the alleged violations occurred], [the defendant] has presented an objectively reasonable defense that is not marred by bad-faith conduct." *Hill v. Walmart Inc.*, 32 F.4th 811, 817 (9th Cir. 2022); *see also Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1204 (2008) ("So long as no other evidence suggests the employer acted in bad faith, presentation of a good faith defense, based in law or fact, will negate a finding of willfulness."); *Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 584 (2010) ("There is no willful failure to pay wages if the employer and employee have a good faith dispute as to whether and when the wages were due.").

Even assuming an LTIP Award is a wage (it is not) and Byrne was not timely paid at separation (he was), he cannot show any willful nonpayment. The undisputed record shows Ameris thoroughly reviewed Byrne's concerns, swiftly addressed any alleged

errors, and explained why they were unfounded. (SSUF 47-60, 63-74, 85.) Beyond Byrne's conclusory assertions, there is no evidence that Ameris's GAAP-compliant LTIP calculations were fraudulent or intentionally improper. *See Alonzo*, 832 F. Supp. 2d at 1133 (summary judgment appropriate on § 203 claim when the defendant presented "good faith defenses based on the language of its written bonus policies and employee manual"). On the contrary, the record—including testimony from Ameris's CFO, CSO, and accounting staff—shows Byrne was informed his proposed revisions were incorrect and non-GAAP-compliant. Accordingly, Ameris is entitled to summary judgment on Byrne's § 203 claim.

### C. Ameris is Entitled to Summary Judgment on Byrne's Retaliation Claim (Count II).

To state a claim under Labor Code § 1102.5, a plaintiff must show: (1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) a causal link between the two. *Suarez v. Bank of Am. Corp.*, No. 18-CV-01202-MEJ, 2018 WL 2431473, at *15 (N.D. Cal. May 30, 2018). Even if proven, the employer prevails if it shows by clear and convincing evidence that the action was taken for legitimate, independent reasons. *Id.*; Cal. Lab. Code § 1102.6.

Byrne contends that Ameris violated § 1102.5 by terminating him after he complained that Ameris "change[d] the Performance Formula so as deprive eligible employees of the [LTIP bonus] awards." (Dkt. 1, ¶ 25.)[11] The undisputed evidence shows, however, Byrne did not engage in protected activity and his LTIP accounting complaints were not a

---

[11] Byrne alleges retaliation under § 1102.5 without identifying the specific subsection at issue. (Dkt. 1, ¶¶ 23-30.) Given the lack of specificity, Ameris will address all potentially applicable subsections but notes that the scope of the issues to be properly addressed in a summary judgment motion is limited to the claims framed by the pleadings and a moving party seeking summary judgment is not required to go beyond the allegations of the pleading, with respect to new theories that could have been pled. *Jacobs v. Coldwell Banker Residential Brokerage Co.*, 14 Cal. App. 5th 438, 444 (2017); *Powell v. County of Orange*, No. 821CV00801JVSDFMX, 2022 WL 3574282, at *3 (C.D. Cal. July 7, 2022).

---

contributing factor in his termination. Even if he could establish a *prima facie* case, Ameris had legitimate, independent reasons for Byrne's termination.

### 1. Bryne did not make any protected disclosure under § 1102.5(b).

Section 1102.5(b) prohibits employers from retaliating against employees who disclose information, either internally or to a government agency, "if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute … or noncompliance with a local, state, or federal rule or regulation." Cal. Lab. Code § 1102.5(b). To engage in protected activity under § 1102.5(b), "[t]he employee must 'reasonably believe [ ]he was disclosing a violation of state or federal law.'" *Fitzgerald v. El Dorado Cnty.*, 94 F. Supp. 3d 1155, 1172 (E.D. Cal. 2015) (quoting *Patten v. Grant Joint Union High Sch. Dist.,* 134 Cal.App.4th 1378, 1384 (2005)). To have a reasonably based suspicion of illegal activity, the employee must identify a legal basis—some statute, rule or regulation allegedly violated. *Id.*; *see also Love v. Motion Indus., Inc.,* 309 F.Supp.2d 1128, 1135 (N.D. Cal. 2004) (holding that, absent citation to "any statute, rule or regulation that may have been violated," the plaintiff lacked a reasonable basis for his belief). Here, there is no evidence that, when Byrne disputed the LTIP calculations, he reasonably believed he was reporting a violation of any state or federal law, rule, or regulation. Although Byrne alleges that his protected activity consisted of reporting to Ameris that its alterations to the Performance Formula deprived eligible employees of earned wages in violation of the Labor Code (Dkt. 1 ¶ 25), he cannot show that he ever disclosed a violation of California law or any other state or federal statute, rule, or regulation, or that he reasonably believed he was disclosing a violation of law. To the contrary, the record shows that Byrne's complaints concerned Ameris's LTIP accounting calculations he believed were inconsistent with "past practices" or his interpretation of the LTIP. (SSUF 52, 53, 62, 63, 68.) Such complaints were not disclosures of illegal activity and do not constitute protected activity. Deviating from past practices does not violate any law, rule, or regulation, and even an alleged GAAP violation—though he does not allege in the Complaint, and it did not occur—

would not amount to unlawful activity. Courts consistently hold that GAAP disputes and contractual disagreements are not unlawful activity. *La v. San Mateo Cnty. Transit Dist.*, No. 14-CV-01768-WHO, 2014 WL 4632224, at *6 (N.D. Cal. Sept. 16, 2014) (citing *Dauth v. Convenience Retailers, LLC*, No. C 13-00047 MEJ, 2013 WL 5340396 (N.D. Cal. Sept. 24, 2013) ("GAAP regulations do not equate to state or federal statutory or regulatory law" and "GAAP does not establish mandatory procedures, but rather a "wide range of acceptable procedures" an accountant may apply when preparing a financial statement); *see also Lovelace v. Software Spectrum Inc*., 78 F.3d 1015, 1020–21 (5th Cir. 1996). In short, prevailing authority confirms that disputes over accounting practices, including GAAP, do not constitute unlawful activity.

At best, Byrne's complaints about Ameris's LTIP calculations were disclosures made "in the context of an ***internal personnel matter***" about the LTIP Agreement, which are not protected activity under § 1102.5 as a matter of law. *See Carter v. Escondido Union High Sch. Dist.*, 148 Cal. App. 4th 922, 934-35 (2007) (emphasis added); *Patten*, 134 Cal. App. 4th at 1385 (disclosures "made in an exclusively internal administrative context" about internal personnel matter did not show any belief on plaintiff's part that she was disclosing a violation of the law).[12]

Further, the record contains no evidence that, in disputing the LTIP calculations, Byrne reasonably believed he was disclosing a legal violation. In *Carter*, the court held that a teacher's report about a football coach's recommendation that a student take creatine—which resulted in the student's hospitalization—was not protected activity under § 1102.5 because it "was not motivated by his belief that a law had been

---

[12] Even if Byrne were alleging a breach of the LTIP Agreement, a purely contractual dispute cannot support a whistleblower claim absent a connection to a violation of a law, regulation, or rule. *See Sherman v. Pepperidge Farm, Inc*., No. 822CV01781JWHADS, 2023 WL 5207458, at *6 (C.D. Cal. Apr. 28, 2023); *Smith v. Wells Fargo Bank, N.A.,* 135 Cal. App. 4th 1463, 1484 (2005) ("Contractual duties are voluntarily undertaken by the parties to the contract, not imposed by state [or federal] law.")

---

broken," and that "even if [the teacher] subjectively believed that [the coach] had violated a statute or regulation . . . the record is devoid of anything that would support a conclusion that his belief was 'reasonable.'" *Carter*, 148 Cal. App. 4th at 933-35. The court noted that the teacher delayed reporting until *after* the student was hospitalized and took no further action after learning that no discipline occurred. *Id.* The court also emphasized that recommending creatine was not unlawful, and therefore the teacher had no reason to believe the conduct was illegal. *Id.* at 933-35.

Similarly, in *Hays v. Cnty. of Los Angeles*, No. B291542, 2020 WL 1465826 (Cal. Ct. App. Mar. 26, 2020), the court held that the plaintiff failed to present evidence that she reasonably believed her employer's handling of vendor contracts was unlawful. Although the plaintiff voiced concerns and believed her employer had made misrepresentations to the vendors, she never conveyed to her employer that she believed its actions were unlawful. *Id*. at *1, 8. The court held the plaintiff's complaints reflected "fairness" concerns, not illegality. *Id*. at *7. Further, the plain language of the vendors' contracts gave "no reason for [plaintiff] to believe" that her employer's decisions not to extend them were unlawful. *Id.* at *9. The court ruled the plaintiff did not engage in protected activity under § 1102.5 and affirmed summary judgment for the employer. *Id.*

The same reasoning applies here. Byrne's disputes were not based on a belief that the law was broken and no reasonable jury could find otherwise. Byrne waited months *after* the 2022 LTIP was paid—and almost six months *after* agreeing to the 2022 LTIP allocations—to dispute Ameris's calculation methodology, and months *after* learning the 2023 quarterly target was missed to raise concerns. (SSUF 38, 47, 48.) As in *Carter*, this delay indicates that Byrne was not motivated by a belief that the law had been violated. Byrne likewise took no further action after Ameris rejected his revisions, never reported Ameris to any government agency, filed no HR complaint and simply reiterated the same disputes internally. Further, Byrne never expressly told Ameris that its 2022, 2023, or 2024 LTIP calculations were unlawful or deprived employees of wages, never requested waiting-time penalties, and he disputed Ameris's 2023 LTIP calculations *before* the

Award was scheduled to be paid. Nor did Byrne have any reason to believe that Ameris's conduct was unlawful. His disputes relied on past practices, not legal violations, and he agreed to key assumptions in the Award Agreement, including the use of GAAP. (SSUF 47-60, 63-74, 85.)

The undisputed facts do not support a finding that Byrne reasonably believed he was disclosing illegal activity and he identifies no statute, rule or regulation supporting a § 1102.5 claim. *See Love*, 309 F. Supp. 2d at 1134-35 (§ 1102.5 claim fails where plaintiff cited no violation of law or regulation). As such, Byrne cannot show protected activity under § 1102.5(b).

### 2. Byrne did not engage in protected activity under § 1102.5(c).

Section 1102.5(c) protects employees who refuse to participate in conduct that would violate the law. Cal. Lab. Code § 1102.5(c). Complaints alone do not constitute a "refus[al] to participate" in an unlawful activity under § 1102.5(c). *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 1008 (E.D. Cal. 2016). Here, Byrne did not refuse to engage in any unlawful activity, nor did he show that the conduct he opposed would have violated any law or regulation. At most, Byrne disputed Ameris's LTIP calculations as inconsistent with "past practices" or his own subjective views - neither of which is unlawful. (SSUF 47-60, 63-74, 85.) In fact, the undisputed record shows that Byrne's proposed accounting changes would have violated GAAP and Ameris's internal accounting controls. Accordingly, Byrne cannot establish a claim under § 1102.5(c).

### 3. There is no evidence of causation.

Byrne cannot establish a genuine dispute of material fact as to causation. There is no evidence linking his alleged whistleblowing (his LTIP calculation complaints) to his termination, which occurred more than a year later – too long to support an inference of causation. *See, e.g., Tawatari-Tsuneta v. CVS Rx Servs., Inc.*, No. 8:22-CV-02251-AH-(JDEX), 2025 WL 1090392, at *7 (C.D. Cal. Mar. 6, 2025) (finding a seven-month lapse between the protected activity and termination to be too long, and citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002), for "citing cases holding that

four, five, and eight months were too long a period to infer causation"); *Miglani v. Edwards Lifesciences, LLC*, No. 18-CV-01983-LB, 2018 WL 6265007, at *4 (C.D. Cal. Jan. 8, 2018) ("The temporal break of almost a year . . . does not give rise to an inference of causality.") Moreover, the undisputed evidence shows that after raising his LTIP concerns, Byrne remained Division CEO, received quarterly bonuses and salary increases, and was repeatedly assured that Ameris wanted him to continue in that role. *See Miglani*, 2018 WL 6265007, at *4 (finding that plaintiff's post-complaint bonus undermined any inference of retaliation). Accordingly, no reasonable factfinder could conclude that Byrne's termination in June 2024 was causally connected to his LTIP complaints dating back to mid-2023, particularly where the alleged protected activity was followed by favorable, non-adverse employment actions. Summary judgment should therefore be granted on Byrne's whistleblower claim. *See id.* at *4-5.

### 4. The undisputed evidence shows that Ameris terminated Byrne for legitimate, independent reasons.

Even if Byrne could establish a claim under § 1102.5, the undisputed evidence shows Ameris would have terminated Byrne for legitimate, independent reasons, regardless of any LTIP calculation complaints. *See* Cal. Lab. Code § 1102.6. (SSUF 113.) Ameris is therefore entitled to summary judgment on Byrne's whistleblower claim.

### D. Ameris is Entitled to Summary Judgment on Byrne's Wrongful Termination and Unfair Competition Claims (Counts I & IV).

To state a claim for wrongful termination in violation of public policy, a plaintiff must show: (1) an employment relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm. *Tucker v. Royal Adhesives & Sealants, LLC*, No. 22-CV-09371-SPG-KS, 2024 WL 3915094, at *11 (C.D. Cal. Apr. 12, 2024). "The plaintiff bears the burden of providing the specific statutes or regulations on which his claim is based." *Id.* Meanwhile, to establish a claim under California's Unfair Competition Law ("UCL"), a plaintiff must show the defendant engaged in a

---

business practice that was unlawful, unfair or fraudulent. Cal. Bus. & Prof. Code § 17200.

Byrne's claims for wrongful termination and UCL are entirely derivative of his Labor Code claims. Because he cannot establish liability under Labor Code §§ 201-203 or 1102.5, his derivative claims fail as a matter of law. *See, e.g., Arauz v. M.A.C. Cosms., Inc.*, No. 2:22-CV-01663-DC-CSK, 2025 WL 2021112, at *8 (E.D. Cal. July 18, 2025) ("[A] derivative wrongful termination claim fails if the underlying claims fails."); *Neufeld v. Winco Holdings, Inc.*, No. 1:14-CV-1505 DAD-JLT, 2016 WL 815649, at *5 (E.D. Cal. Mar. 2, 2016) ("A common law claim for wrongful termination in violation of public policy cannot survive if it is entirely derivative of terminated statutory claims."); *Magana v. Lab'y Corp. of Am.*, No. CV2011583PAPLAX, 2021 WL 4233901, at *8 (C.D. Cal. Aug. 16, 2021) (granting summary judgment for employer on claims under Lab. Code §§ 201-203 and 1102.5 and derivative wrongful termination and UCL claims); *Batres v. HMS Host USA, Inc.*, No. SACV1001458CJCAJWX, 2012 WL 13049884, at *5 (C.D. Cal. Sept. 25, 2012) (granting summary judgment for employer on claims for failure to pay wages and derivative UCL claim). Thus, Ameris is entitled to summary judgment on Byrne's wrongful termination and UCL claims.

### E. Byrne Cannot Recover Punitive Damages.

Byrne cannot meet the stringent standard for punitive damages, which require clear and convincing evidence that the wrongdoer acted with oppression, fraud, or malice, i.e., an intent to injure or conscious disregard of the plaintiff's rights. Cal. Civ. Code § 3294(a); *see also Aquino v. Super. Ct.*, 21 Cal. App. 4th 847, 856-57 (1993); *Silberg v. California Life Ins. Co.*, 11 Cal. 3d 452, 462-63 (1974).

Here, the undisputed record shows no maliciousness or oppressive conduct by Ameris. To the contrary, Ameris addressed Byrne's LTIP concerns for over a year and ultimately terminated him for legitimate, independent reasons unrelated to his complaints. (SSUF 113.) Accordingly, Byrne's punitive damages claim fails.

///

**IV.    CONCLUSION**

For the foregoing reasons, Ameris respectfully requests that the Court grant its motion for summary judgment on all causes of action, or alternatively partial summary judgment, and for all other relief this Court deems proper.

Dated:  December 26, 2025                    **NUKK-FREEMAN & CERRA**

                              By:    */s/Stacy L. Fode*
                                     Stacy L. Fode, Esq.
                                     Nana J. Yee, Esq.
                                     Attorney for Defendant
                                     AMERIS BANK