1 | Stacy L. Fode, Esq. (SBN 199883)
sfode@nfclegal.com
2 | Nana J. Yee, Esq. (SBN 272783)
nyee@nfclegal.com
3 | **NUKK-FREEMAN & CERRA, P.C.**
550 West C Street, Suite 910
4 | San Diego, CA 92101
Telephone: 619.292.0515
5 | Facsimile: 619.566.4741
6 |

7 | Attorneys for Defendant
AMERIS BANK
8 |

9 | **UNITED STATES DISTRICT COURT**

10 | **CENTRAL DISTRICT OF CALIFORNIA**

11 |

12 | PATRICK BYRNE, an individual, | Case No. 8:24-cv-01989-MWC (JDEx)

13 |      Plaintiff, | **DECLARATION OF JAMES LAHAISE IN SUPPORT OF DEFENDANT AMERIS BANK'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT AS TO EACH OF PLAINTIFF'S CLAIMS**

14 | vs.

15 | AMERIS BANK, a Georgia corporation,

16 |

17 |     Defendant.

18 |

19 | | Judge: Hon. Michelle Williams Court
Date: February 13, 2026
20 | | Time: 1:30 p.m.
21 | | Place: Courtroom 6A

22 | | Discovery Cut-Off: November 28, 2025
23 | | Pretrial Conference: May 22, 2026
Trial Date: June 1, 2026
24 |

25 |

26 |

27 |

28 |

I, James LaHaise, declare as follows:

1. I am the Corporate Executive Vice President and Chief Strategy Officer at Defendant AMERIS BANK, a Georgia Corporation (hereinafter "Ameris" or "Defendant"). I have personal knowledge of the facts set forth below, and if called to do so, could and would testify competently thereto.

2. After extensive negotiations involving investment bankers and legal counsel on both sides, Ameris and Patrick Byrne ("Byrne") entered into a Stock Purchase Agreement ("SPA") on December 10, 2021, under which Ameris acquired 100% of Balboa Capital Corporation ("Balboa Capital") and the total purchase price, after post-closing adjustments, which was paid to Byrne's Revocable Trust dated February 23, 2001 and his Irrevocable Trust dated July 22, 2021, being the selling shareholders of Balboa Capital, was approximately $186 million.

3. With counsel, Byrne and Ameris negotiated and agreed to a three-year Long-Term Incentive Plan ("LTIP" or "Plan") as well as an LTIP Award Agreement. The LTIP covered annual performance periods for 2022, 2023, and 2024. The LTIP is an incentive program designed to reward participants if they are eligible and approved to be included in payouts under the Plan. For example, if the Balboa Division beats its projected profitability targets during 2022, 2023, and 2024, which Bryne was convinced it could do, it could be entitled to additional award payments for each annual performance period. A true and correct copy of the LTIP is attached to Ameris's Compendium of Exhibits ("COE") as **Exhibit 3**.

4. Pursuant to the LTIP, the Compensation Committee (the "Committee") has sole discretion to determine participant eligibility for Cash Bonus Awards in any Performance Period and may delegate its authority under the Plan. The Committee delegated that authority to me, and I was therefore empowered to determine participant eligibility and to exercise discretion over the distribution of any LTIP pool and the amounts awarded to individual employees, in consultation with Byrne while he remained employed with Ameris.

---

*PATRICK BYRNE v. AMERIS BANK*                    Case No. 8:24-01989
DECLARATION OF JAMES LAHAISE IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT                              Page 1

5.    In December 2021, Byrne executed an Employment Agreement ("Agreement") and became CEO of the Balboa Division of Ameris.  During Byrne's employment, I was his direct supervisor and conducted his annual written performance reviews. A true and correct copy of the December 10, 2021 Employment Agreement is attached to the COE as **Exhibit 8** and a true and correct copy of Plaintiff's job description is attached to the COE as **Exhibit 9**.

6.    Byrne received substantial compensation during his employment with Ameris, including $773,700.85 in 2022, over $6.6 million in 2023, and $619,838.24 for the first half of 2024.  Pursuant to his Agreement, Byrne was eligible for a quarterly bonus of $150,000, contingent upon the Balboa Division achieving the adjusted Earnings Before Tax ("EBT") targets set forth in the Pioneer 1Q21 Operating Model. Although the Balboa Division did not always meet those quarterly targets and thus a payout was not always necessary under the Agreement, Byrne nevertheless received, personally, a bonus of $150,000 for each quarter he worked at Ameris. True and correct copies of Byrne's W2s for 2022, 2023, and 2024 are attached to the COE as **Exhibits 10, 11, and 12**.

7.    At the close of 2022, the Balboa Division exceeded the 2022 LTIP EBT threshold and the 2022 LTIP pool was approximately $9 million.  Byrne allocated over $5.6 million of this amount to himself - more than 62% of the total pool available for distribution. A true and correct copy of Plaintiff's February 15, 2023 payroll record of the 2023 LTIP payout is attached to the COE as **Exhibit 19**, and a true and correct copy of correspondence memorializing the payout is attached to the COE as **Exhibit 6.**

8.    On February 15, 2023, Byrne received and accepted his 2022 LTIP award of over $5.6 million without complaint or objections.  In fact, at no time before or right after his receipt and acceptance of the 2022 LTIP payment did Byrne raise any concerns to me about Ameris's alleged improper LTIP calculation methodology or dispute the 2022 LTIP pool amount.  A true and correct copy of Ameris's LTIP calculation for 2022 is attached to the COE as **Exhibit 4.**

///

9.     Byrne first challenged Ameris's accounting and LTIP calculation methodology only after the first quarter of 2023's LTIP EBT fell short of the projected target. In or around June 2023, Byrne began a campaign of incessantly demanding changes to the LTIP calculations that were inconsistent with Generally Accepted Accounting Principles ("GAAP"), Ameris's accounting controls, and the terms of the LTIP and Award Agreement.  Specifically, Byrne demanded that Ameris agree to his proposed revisions to the LTIP calculations to the categories such as overhead allocations, repossessions, depreciation of pre-acquisition assets, charge-offs, tax benefits, stipulated judgments, security deposits, and interim rent.  True and correct copy of the correspondences related to the above issues are attached to the COE as **Exhibits 20, 22, 30, and 34.**

10.    In response to Byrne raising alleged LTIP calculation errors, both Nicole Stokes ("Stokes"), Chief Financial Officer for Ameris, and I had numerous discussions with Byrne verbally and in writing. Ms. Stokes and I also flew to California in summer 2023, to meet Byrne in person to address his requested LTIP adjustments and revisions, and explained to him, in detail, that his proposed changes reflected incorrect assumptions, were not compliant with GAAP, and rehashed issues previously discussed and agreed upon.

11.    In 2023, Byrne became increasingly preoccupied with challenging Ameris's LTIP EBT calculation methodology in an attempt to revise the numbers so that the Balboa Division met the applicable EBT target, when in fact it did not. This preoccupation caused Byrne to lose focus on the actual performance of the Balboa Division, which ultimately suffered, and the Division failed to meet either its performance expectations or the year-end LTIP target.  A true and correct copy of Ameris's LTIP calculation for 2023 is attached to the COE as **Exhibit 33.**

12.    In his annual performance review for 2023, I formally documented Byrne's performance issues with substantial constructive feedback, noting that the Balboa Division did not generate a profit for 2023, and adjusted loan losses totaled

approximately $39.5 million, or 3.4% of average year-to-date loan balances, which prevented the Balboa Division from reaching the 2023 LTIP EBT target. I also noted in his performance review that Byrne was dissatisfied with the level of autonomy he had in leading the Balboa Division, which contributed to strained relationships with some company leaders. For example, my professional relationship with Byrne became strained when Byrne – rather than focusing on the Balboa Division's performance – repeatedly insisted on changing LTIP calculations based on incorrect assumptions, despite Ameris providing reasoning and confirmation that his revisions were neither GAAP-compliant nor consistent with the terms of the LTIP. Based on my interactions with Byrne, including our discussions, his conduct, and his attitude, it became clear that he did not want to continue in the role of Division CEO. Consistent with my observations, I noted in his 2023 Performance Review that Ameris hoped he would continue in a long-term leadership role, but that Byrne would need to decide whether he wished to do so. True and correct copies of Byrne's performance reviews in 2022 and 2023 are attached to the COE as **Exhibit 40 and 41,** and a true and correct copy of correspondence exchanged between Byrne and me are attached to the COE as **Exhibit 28 and 50**.

13.    Because Byrne's Employment Agreement was set to expire at the end of 2024, I sent the required notice of non-renewal in March 2024 to both Byrne and Phil Silva ("Silva"), Division President, along with an intent to transition Byrne to a senior management agreement consistent with those of Ameris's other seniormost executives. On March 11, 2024, four days later, I followed up by emailing Byrne a draft senior management agreement for his review, which would have continued his employment and CEO role at the Balboa Division. Byrne never signed the proposed agreement. The same draft senior management agreement was also offered to Mr. Silva and was signed by Mr. Silva. True and correct copies of exchanged correspondences are attached to the COE as **Exhibits 51 and 52**.

14.    In 2024, and despite Ameris having already fully considered, discussed, and rejected Byrne's baseless LTIP calculation-related claims, Byrne continued to argue that

his position had not changed, demanding that Ameris recalculate the LTIP payment based on Byrne's incorrect revisions.  For example, on May 6, 2024, Byrne e-mailed me, asserting that the Q1 2024 LTIP was improperly calculated, repeating the same issues Ameris had previously reviewed and rejected, and nonetheless contending that his own revisions produced an LTIP EBT exceeding the estimated target and requesting that his quarterly bonus be paid in the next payroll. True and correct copies of these correspondences are attached to the COE as **Exhibits 17, 37, and 38.**

15.    Over time, issues arose in Byrne's professional interactions with senior colleagues. Byrne's interactions with me became strained and he eventually refused to discuss the LTIP issue or meet with me, despite my documented efforts, including inviting him to meet at Ameris's headquarters to discuss the issues in person.

16.    Additionally, Ms. Stokes informed me that her working relationship with Byrne had become difficult, explaining that he did not respond to her emails or phone calls, did not attend certain meetings, and did not accept meeting requests from her assistant. As a result, communications from Ms. Stokes - intended for Byrne - were often routed through me, which created challenges in communication. In the months preceding his termination, Byrne's level of engagement and availability did not meet Ameris's expectations of a highly compensated corporate executive. Ms. Stokes also informed me that she had concerns about Byrne's failure to follow Ameris's accounting controls. By way of one example, Ms. Stokes had learned that Byrne suggested to his Division employees that purchased loans be recharacterized and booked as individual deals, rather than using the portfolio-purchase code, to avoid the impact of Ameris's Initial Direct Cost ("IDC") process change, contrary to GAAP and Ameris's internal accounting controls and compliance requirements. A true and correct copy of the exchanged correspondence is attached to the COE as **Exhibit 29**.

///

///

///

---

17.    Ultimately, I made the decision to terminate Byrne's employment, and a termination notice was sent to Byrne on June 27, 2024, with the termination effective June 30, 2024. A true and correct copy of my correspondence to Byrne is attached to the COE as **Exhibit 39**.

18.    I sent Byrne a Teams calendar invitation for a meeting on or around June 27, 2024.  I spoke with him regarding Ameris's decision to terminate his employment, effective June 30, 2024, advised that a formal termination notice would follow, and explained that his system access would end at 5 p.m. on June 30, 2024.  During the call, Byrne asked me to copy his legal counsel on the termination notice and later that day, Byrne provided his legal counsel's contact information by follow-up email. That afternoon, I sent Byrne the termination e-mail, which included a copy of Ameris's formal notice of termination and a release in accordance with his Employment Agreement.  I also advised Byrne that I had not sent the notice to his legal counsel, as it should be transmitted directly by Byrne.  Accordingly, Byrne's testimony that Ameris gave no advance warning, no call, or no prior communication before my termination email is false.  True and correct copies of the correspondences is attached to the COE as **Exhibits 53 and 54**.

19.    Although Byrne's termination was designated "without cause" which would have allowed Byrne to collect severance in exchange for signing a release per his Employment Agreement, Byrne was terminated for reasons that included, but were not limited to: the Balboa Division's failure to meet expected financial results under his leadership; Byrne's strained and unproductive working relationships with employees across Ameris; and Byrne's failure to follow - and attempts to circumvent - internal accounting controls and processes.

20.    Ameris maintains, among other things, extensive anti-retaliation policies, including specific whistleblower protections and established reporting procedures. These policies and procedures, contained in Ameris's Code of Business Conduct and Ethics, explicitly provide that Ameris does not "allow retaliation for reports of misconduct or

violations of this Code by others made in good faith by any employee, officer or director. Further, any employee, officer or director may submit a good faith concern regarding questionable accounting or auditing matters without fear of dismissal or retaliation of any kind." The Code of Business Conduct and Ethics provides a procedure for employees to report concerns. A true and correct copy of Ameris's Code of Business Conduct and Ethics is attached to the COE as **Exhibit 13**.

21.    Similarly, the Employee Handbook prohibits whistleblower retaliation and invites employees to speak with management regarding their concerns. A true and correct copy of Ameris's Employee Handbook is attached to the COE as **Exhibit 14**, and a true and correct copy of the California Employee Handbook is attached to the COE as **Exhibit 15**.

22.    Byrne was familiar with and acknowledged these policies and was aware of the avenues available for reporting retaliation.  A true and correct copy of Ameris's Employee Handbook is attached to the COE as **Exhibit 14** and a true and correct copy of Byrne's acknowledgments is attached to the COE as **Exhibit 16.**

23.    Despite raising numerous disagreements relating to the calculation methodology of the LTIP award for over a year before his termination, at no point during his employment did Byrne complain about any alleged retaliation against him.

///

///

///

///

///

///

///

///

///

///

1    Executed this ___19th___ day of December, 2025, in Atlanta, Georgia.

2

3

4                                   James LaHaise

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28