# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

PATRICK BYRNE, an individual,

      Plaintiff,

   v.                         Case No.
                                  8:24-cv-01989-MWC(JDEx)

AMERIS BANK, a Georgia
corporation,

      Defendant.

_____

VIDEO-RECORDED DEPOSITION OF

PATRICK EUGENE BYRNE

Irvine, California

Monday, October 20, 2025

Volume 1

Reported by:
KATE SONOMA STICKEL
CSR No. 10409

Job No. 464108

Patrick Eugene Byrne                                October 20, 2025

```
 1   would still get the Balboa Capital e-mails as well?
 2        A    I believe so.  You'll have to ask, yeah, their
 3   IT department.
 4        Q    Okay.  And down here in the corner on the right
 5   corner, it says first day of employment is September
 6   13th, 1988.  Was that your first day of employment with
 7   Balboa Capital?
 8        A    It was around there.  It was -- yeah, I'm not
 9   sure if that was our incorporation date, but it was
10   quite a long way back so I'm not sure.  Yeah, that's a
11   good estimate of around there in 1988.
12        Q    Okay.  It was 1988 when you started Balboa
13   Capital; is that right?
14        A    Yes.  Yes.
15        Q    Okay.  All right.
16             If you look at the second page of Exhibit 12,
17   is that your passport at the time?
18        A    Yes.
19        Q    All right.  Then I'd like that marked as
20   Exhibit 13, please, your LinkedIn profile.
21             (Deposition Exhibit 13 was marked for
22             identification and attached hereto.)
23   BY MS. FODE:
24        Q    Would you take a moment and let me know if this
25   is a printout of your -- parts of your current LinkedIn
```

Patrick Eugene Byrne                                    October 20, 2025

1   profile or account?

2           Would you read the question back, please?

3           (Record read as follows:

4               "Q  Would you take a moment and let me

5           know if this is parts of your current

6           LinkedIn profile or account?")

7           THE WITNESS:  I'm not sure if it's current,

8   but, yeah, it looks familiar.  It's been a long time

9   since I've updated it.

10  BY MS. FODE:

11      Q   Okay.  If you would go to the second page,

12  please.  It's talking about your education, and so I

13  wanted to ask you a little bit about your education.

14          Did you attend -- it has two of the schools

15  that you attended, but I believe that you also

16  attended -- you had your undergrad at University of

17  Arizona; is that correct?

18      A   Which part?

19      Q   Why don't we do it the easy way.  Why don't you

20  run through what your post -- post high school education

21  was.

22      A   Graduated from University of Arizona in 1987,

23  and I received a bachelor's of art and bachelor's of

24  science.  I also graduated from Columbia Business School

25  and the London Business School where I got my MBA.

1      Q    And do you remember what year that was?

2      A    I don't.  I think it was around 2021.

3      Q    Okay.  I have a note --

4      A    I'm sorry.  I apologize.

5      Q    Yeah.

6      A    That was not -- yeah, that's not right.  Yeah.

7  2001.

8      Q    Okay.  2001.

9           Okay.  And was that an online program for

10 working people?

11     A    It was for working people, right, but it was on

12 campus at both schools.  Approximately a two-year

13 program.

14     Q    And did you have a specialization in your MBA

15 program?

16     A    No.

17     Q    Okay.  And was -- for your undergrad, was -- I

18 have business administration.  Was that your major?

19     A    I believe I have an economics business

20 administration and economics business in science and

21 finances.

22     Q    And do you have any professional licenses or

23 certifications?

24     A    Not at this point.

25     Q    Do you have any degrees specifically in

Patrick Eugene Byrne                                    October 20, 2025

1  accounting?

2      A    No.

3      Q    Do you have any certification or specialization

4  in accounting in your education?

5      A    Is that the same question?

6      Q    No.  But can you answer it?

7      A    Can you state the question again?

8          MS. FODE:  Will you read it back?

9          (Record read as follows:

10             "Q  Do you have any certification or

11          specialization in accounting in your

12          education?")

13  BY MS. FODE:

14      Q    I think that I'm focused on your degree, your

15  educational degree.  Did you focus at all on accounting?

16      A    The degrees were not in accounting, but there

17  were certainly a number of classes in accounting for --

18  yeah, for both undergraduate and graduate.

19      Q    Okay.

20      A    And a lot of application of accounting.

21      Q    Okay.  And when was the last time you took an

22  accounting class?

23      A    A formal accounting class?

24      Q    Yes.

25      A    It was probably with my MBA.

Patrick Eugene Byrne                                    October 20, 2025

1      Q    Do you remember a specific class or you're just

2  assuming there would be some accounting with your MBA?

3      A    Yeah, I don't recall a specific class, but my

4  job entailed a lot of accounting and a lot more when it

5  got to Ameris.

6      Q    Okay.  And for your job, you mean when you were

7  CEO of Balboa Capital?

8      A    Yes, and CEO of Balboa Capital a Division of

9  Ameris Bank.

10      Q    Okay.  And you said you don't have any

11  accounting certifications.  So just to clarify, you're

12  not a CPA or CPA-trained?

13      A    That's correct, I'm not a CPA.

14      Q    Okay.  If you'll look at the LinkedIn document

15  on the second page, it talks about experience.  And it

16  states -- there's two jobs there.  One is account

17  executive at Amplicon for less than a year, 1988 to

18  1988.  And then the second job is you're CEO of Balboa

19  Capital from July 1988 to the present at the time.

20          Are those -- is that an accurate summary of

21  your employment history before Ameris -- before you

22  worked at Ameris Bank?

23      A    Yeah.  I certainly worked at Amplicon, you

24  know, in 1988 after I graduated from University of

25  Arizona.  And then right after that, I started Balboa

1   Capital and -- until June 30th of 2024 when Ameris

2   terminated me.

3       Q   Okay.  If you would go to the first page,

4   there's a summary, which you can take a minute and read

5   the first -- I'm only going to ask you about the first

6   half of it because we already talked about your

7   education.  If you want to take a moment to read where

8   it says "About," and it says -- in fact, we can actually

9   read it together and I can ask you a couple questions.

10          It says, "As the founder and chief executive

11  officer of Balboa Capital, Patrick Byrne oversees all

12  aspects of the company's strategic direction and goals

13  while ensuring operational excellence within every

14  department."

15          Would you say that is an accurate over, you

16  know, generalization of your job as CEO of Balboa

17  Capital?

18      A   Yes.

19      Q   Okay.  And then it states, "A visionary

20  entrepreneur, Mr. Byrne launched Balboa Capital in 1988

21  with a mere $4,000, and today the company is one of the

22  largest and most respected independent financing firms."

23          Is that -- is that true that you started the

24  company with $4,000 in 1988?

25      A   I started the company by myself and shortly

Patrick Eugene Byrne                                    October 20, 2025

1  thereafter Shawn Giffin, who also worked at Amplicon, we

2  got together, and so my portion was $2,000 and his

3  portion was $2,000 so --

4      Q    And were you co-founders of the company of

5  Balboa Capital?

6      A    I'm not sure we were co-founders.  We were

7  50 percent owners after I founded Balboa Capital.

8      Q    Okay.  And how long did Shawn Giffin remain

9  your business partner?

10      A    I bought him out, you know, over -- you know,

11  over ten years ago, and in -- I believe it was -- yeah.

12  Actually, no, I would have to give an estimate.  No, I

13  eventually bought Shawn out and so I became the

14  hundred-percent owner of Balboa Capital.

15      Q    Did Shawn stay employed with Balboa Capital

16  through the Ameris acquisition?

17      A    No.

18      Q    Okay.  And when you said when you bought him

19  out over ten years ago, was that around 2015?

20      A    Yeah, I don't recall, yeah, the exact date.  I

21  thought it might be before that.

22      Q    Okay.  And the business -- your business at

23  Balboa Capital was equipment leasing?

24      A    Correct.

25      Q    And did you have an office location for the

Patrick Eugene Byrne                                    October 20, 2025

1  company?

2      A    Yes.

3      Q    And where was that?

4      A    At what point in time?

5      Q    Okay.  How about we will fast forward to 2021.

6      A    We moved the office from very close to here to

7  Costa Mesa, and I don't recall the dates of that move.

8      Q    Did that remain the office for Balboa Capital

9  while Ameris -- while you were a division of Ameris?

10     A    Yes.

11     Q    And what was that address?

12     A    I don't recall.

13     Q    Okay.  Do you -- do you consider -- going back

14 to the summary, then -- let me back up.

15          So when Ameris purchased Balboa Capital, were

16 you the hundred-percent owner of Balboa Capital at that

17 time?

18     A    Yes.

19     Q    Okay.  And then when you look at the summary --

20 I mean, I know it's a LinkedIn summary, but would you

21 consider yourself an entrepreneur, like a visionary

22 entrepreneur?

23     A    Yes.

24     Q    Okay.  And when it -- when it talks sort of

25 about your summary of overseeing all aspects of the

Patrick Eugene Byrne                                    October 20, 2025

1   company's strategic direction and goals, did you -- was

2   that your primary duty and responsibility as the CEO of

3   Balboa Capital?

4        A    Yes.

5        Q    Okay.  And when it says that you -- it says

6   that you were overseeing all aspects of the company's

7   strategic directions and goals while ensuring

8   operational excellence within every department.  Were

9   you -- were you involved in and responsible for

10  overseeing every department at Balboa Capital?

11       A    Every department did not report to me, but I

12  was -- I was responsible for, yeah, operational

13  excellence, as I put here, for all of those.  And I

14  would tend to go to areas that I felt would provide the

15  biggest lift, would bring the most earnings before taxes

16  without -- you know, but not at the expense of

17  employees.

18       Q    Okay.  So you were involved at Balboa Capital

19  in things like accounting and loan operations and things

20  like that?

21       A    Yes.

22       Q    Okay.  But at that time when you're the CEO,

23  I'm assuming that you -- that you did not have anybody

24  that you reported to?

25       A    That's correct.

1      Q    Okay.  Because it was a privately owned

2  company, correct?

3      A    It was a privately owned company, but I

4  report -- we had numerous bank lines, so the way I would

5  think about it was that, yeah, I had -- I was reporting

6  to all outside entities like our banks but also, you

7  know, a great responsibility to the employees of the

8  company.

9      Q    But sort of in the traditional employment law

10  sense, you didn't have a boss, correct?

11      A    There was -- no, there was no dotted line to

12  the bank.

13      Q    Right.  Okay.  And no performance reviews or --

14  I don't know -- raise requests or things like that, that

15  you had to do as CEO?

16      A    At some points we had performance reviews.  I

17  don't believe at the end we had -- we had any

18  performance reviews.  I'm sure I did them at one point,

19  but I myself, yeah, was evaluated based upon how well

20  the company was doing as measured by, you know, earnings

21  before taxes and the number of people that were

22  interested in buying Balboa Capital as a validation and,

23  you know, that was Ameris ultimately.

24      Q    Yeah.  Well, that's a good segue here for your

25  relationship with Ameris Bank.

 1       Q   Let me ask the question real quick.

 2           MS. ANDERSON:  Yeah, wait for her to ask the

 3  question.

 4  BY MS. FODE:

 5       Q   Let me just ask it.  It goes smoother if we --

 6  I know you have something to say, but let me ask the

 7  question first.

 8           So -- so when did your discussions with Ameris

 9  start?

10       A   I don't know exactly, but I believe it was

11  approximately five years before the ultimate sale in

12  December of 2021.

13       Q   Okay.  And did you -- did you have to go

14  through the due diligence process and have attorneys

15  involved in this five-year period?

16       A   Yes.

17       Q   Okay.  And who was your counsel during the

18  negotiations with Ameris in the sale?

19       A   Moore Van Allen.

20       Q   Is that a person or the firm?

21       A   It's the firm.

22       Q   Okay.  And who was the attorney?

23       A   Brian Mesibov.

24       Q   Okay.  And what -- and why then -- it sounds

25  like you were talking to several different companies and

Patrick Eugene Byrne                                    October 20, 2025

1      Q   Thank you.

2          All right.  So before lunch we were talking

3  about your sale of your company, Balboa Capital, to

4  Ameris in December 2021.  Do you remember us talking

5  about that briefly?

6      A   Yes.

7      Q   Okay.  So as part of the sale, you entered into

8  a stock purchase agreement that governed the terms of

9  the sale with Ameris Bank; is that correct?

10     A   That was one of the documents, yes.

11     Q   Great.  And you had counsel representing you

12 during the negotiation and confirming all the documents

13 before you signed, correct?

14     A   We had attorneys representing us as well as

15 Ameris had attorneys representing them.

16     Q   Okay.  And ultimately -- and was it the same

17 attorneys representing you in preparing the stock

18 purchase agreement as you mentioned earlier today?

19     A   I don't know who prepared the stock purchase

20 agreement.

21     Q   Who represented you in the negotiation of the

22 stock purchase agreement and the documents that

23 surrounded your sale of the company?

24     A   Moore Van Allen.

25     Q   Okay.  And when -- you, I'm assuming, reviewed

Patrick Eugene Byrne                                    October 20, 2025

1  the stock purchase agreement and then you ultimately

2  executed it, correct?

3      A    Yes.

4      Q    Okay.  And the stock purchase agreement was

5  between you, Balboa Capital Corporation, and the -- your

6  two trusts, the Patrick E. Byrne Revocable Trust Dated

7  February 23rd, 2001, and the Patrick E. Byrne

8  Irrevocable Trust Dated July 22, '21; is that correct?

9      A    That was a lot, so I don't know.  Yeah, if you

10 could show me the document, that would be helpful.

11     Q    Sure.  I can show it to you.  We don't need to

12 read the whole thing, so I'll just show you the first

13 page to confirm who -- who was part of the SPA, who

14 signed it and who was party to it.

15          What are we on?

16          MS. YEE:  Exhibit 14.

17          MS. FODE:  Okay.  It's a big one.

18          Pardon me.  I'll give it to her first.

19          (Deposition Exhibit 14 was marked for

20          identification and attached hereto.)

21 BY MS. FODE:

22     Q    Okay.  So the question is:  Who was party to

23 the stock purchase agreement?  And I'll direct your

24 attention to Bates No. Ameris 000132, the first page.

25          Who was party to the stock purchase agreement?

1    And you can look at the first page, if that will be
2    helpful.
3         A    Ameris Bank, Balboa Capital Corporation,
4    Patrick E. Byrne, The Patrick E. Byrne Revocable Trust,
5    U/T/A dated February 23rd, 2001, and the Patrick E.
6    Byrne Irrevocable Trust U/T/A dated July 22nd, 2021.
7         Q    And was the stock purchase agreement signed on
8    December 10th, 2021?
9         A    The date on the front says December 10th of
10   2021.
11        Q    Okay.  And if you'll look at the last page.
12   For the record, the Bates are Ameris 000132 through 218,
13   and if you'll go to the end at 216, you know, the Bates
14   numbers at the bottom of the document.  Let me know if
15   on that page is that your signature on Page 216?
16        A    Yes, it's my signature, except for where Phil
17   Silva is signing as the trustee for the Patrick E. Byrne
18   Irrevocable Trust U/T/A dated July 22nd, 2021.
19        Q    Okay.
20        A    Which has been redacted --
21        Q    Thank you.
22        A    -- for some reason.
23        Q    And on that -- on that -- for the record,
24   that's at Bates 217.
25             So Phil was and -- in December 2021 the trustee

Patrick Eugene Byrne                                          October 20, 2025

```
 1   for your irrevocable trust; is that correct?

 2        A    Yes.

 3        Q    Okay.  Is he still the trustee?

 4        A    No.

 5        Q    Okay.  Thank you.

 6             And then how -- how much were you -- how much

 7   did Ameris pay Balboa for the purchase of the company?

 8        A    I don't recall.  It's somewhere in these

 9   documents, I imagine.

10        Q    Do you remember -- do you have a rough estimate

11   of how much it was?

12        A    It was between -- yeah, I'd have to guess.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Patrick Eugene Byrne                                October 20, 2025

1

2

3

4

5

6

7          And then how was that amount paid?

8     A    It was paid via wire transfer, I believe, to

9 bank accounts.

10    Q    And to -- they were to your -- to your -- to

11 the company Balboa Capital's bank accounts?

12    A    No, to -- I believe to either my -- yeah,

13 personal bank account or the bank accounts of the

14 revocable trust or the irrevocable trust.

15    Q    Okay.  And then do you remember, were you and

16 other executives paid -- paid some amount as a bonus in

17 the sale of the company?

18    A    Yes.

19    Q    Do you remember how much that was?

20    A    I don't recall.

21

22    A    No, I don't recall --

23    Q    Okay.

24    A    -- the exact amount.

25

Patrick Eugene Byrne                                    October 20, 2025

1  into my either trust or individually, as far as I know.

2      Q   Okay.  And maybe then -- to clarify, then, the

3  amount that I'm curious about knowing is the amount that

4  you received and maybe that will help -- that will help

5  narrow it down if you remember the amount that you were

6  paid in connection with the sale for this bonus.

7  Because before I think you were -- you were thinking I

8  was talking about the entire pool for other people such

9  as Phil or Rob.

10     A   Okay.  Can you please state the question one

11  more time.

12     Q   Sure.  Will do.

13         So as you sit here today, do you have any

14  recollection of the amount of money that you were paid

15  in connection with the -- the sale that went to you

16  personally?

17  ████████████████████████████████████████████████████

18  ████████████████████████████████

19     Q   Okay.  Perfect.  So now I'm talking about -- as

20  I understand, you were paid -- the executives -- some

21  executives, including you, were paid an additional

22  amount in addition to the amount that you were paid for

23  the business.  Like I called it a sale bonus.  And as

24  you sit here today, do you have any recollection of the

25  amount of that sale bonus?

Patrick Eugene Byrne                                    October 20, 2025

1          A    I don't believe I received a sale bonus.

2          Q    Okay.

3          A    But there were other individuals that received

4    a sale bonus in lieu of options.

5          Q    Understood.  Okay.

6               All right.  And were you paid any other amounts

7    personally for -- in connection with the sale of the

8    business in -- in or around the end of 2021 or the

9    beginning of 2022?

10         A    There was a holdback that -- I'm not sure what

11   the exact term is, but there was a holdback that I was

12   paid in -- that was held in escrow for -- I believe it

13   was supposed to be a year, but it took much longer for

14   Ameris to execute it.  But that was in conjunction with

15   the sale, but it didn't occur when the other amounts

16   were sent to my bank accounts.

17         Q    Okay.  Okay.  And that wasn't an additional

18   payment to you in that December 2021, early 2022 time

19   frame, it sounds like?

20         A    This was in -- yeah, it must have been in 2023.

21         Q    Okay.  All right.

22              And then when the sale was completed, Balboa

23   Capital became a division of Ameris Bank, correct?

24         A    We were acquired by them.  Whether it was a

25   subsidiary or a division, you know, there was a lot of

1    back-and-forth on what that was, but we were certainly

2    acquired by -- a hundred percent acquired by Ameris

3    Bank.

4        Q    And when you talk about the back-and-forth, was

5    that the lawyers going back and forth about that?

6        A    Yeah.  Yes.

7        Q    Okay.  And then you agreed to take on the role

8    of CEO of Balboa, a Division of Ameris; is that correct?

9        A    Yes.

10       Q    Okay.  And did you request to have an

11   employment agreement with Ameris as part of the

12   transaction?

13       A    No, I didn't request that.  Ameris wanted me to

14   have an employment agreement.

15       Q    And did you have your lawyer involved in

16   negotiating and reviewing the employment agreement?

17       A    When you say "lawyer," the firm of Moore Van

18   Allen, yes.

19       Q    Yes.  Thanks for specifying.

20            This is Exhibit 15, please, I'd like to mark

21   for the record.  Thank you.  And for the record, this is

22   Ameris 238 through 259.  It's entitled "Employment

23   Agreement Executed Version."

24            (Deposition Exhibit 15 was marked for

25            identification and attached hereto.)

Patrick Eugene Byrne                                    October 20, 2025

1   able to answer it, sir, answer the question?

2       A    I did sign an employment agreement with Ameris.

3       Q    Okay.  And is the employment agreement that you

4   signed what I've marked as Exhibit 15, the one you're

5   looking at?

6       A    I don't know.  I haven't reviewed the whole

7   thing.

8       Q    Okay.  So just so we are clear, you would want

9   to review the -- you would want to read the entire

10  employment agreement before you would say if your

11  signature agreed to the -- to the employment agreement?

12  I just want to make sure I'm clear what you're asking

13  for.

14      A    I'm not quite sure what you're asking me to do

15  at this point.  I mean, yeah, would it be nice to read

16  it all?  Yes.  Do I need to read it all?  Probably not,

17  but I should probably skim it.

18      Q    Okay.  Well, then, so we make sure that the

19  record is clear since we have been talking back and

20  forth, my question is just -- you've already verified

21  that's your -- your signature at 252.  So my question

22  is:  Did you sign it and, in signing it, did you agree

23  to the employment agreement that's here as Exhibit 15?

24          So if you need to skim it to answer that

25  question, go right ahead, but I am only going to ask you

Patrick Eugene Byrne                                    October 20, 2025

1  about maybe three paragraphs of it.

2          All right.  So my question pending was:  Is

3  your signature on the employment agreement -- by your

4  signature, did you agree to the terms of the agreement

5  that we have marked as Exhibit 15?

6      A    Yes.

7      Q    Okay.  Great.

8          If you go back to the first page, which is

9  Bates No. 238, here it talks about your agreement became

10 effective December 10th, 2021.

11         Do you see that in the first paragraph?

12     A    Yes.

13     Q    And was that the effective date of the

14 agreement?

15     A    Yes.

16     Q    And in Paragraph 1, it says, "The company

17 hereby employs executive and executive hereby accepts

18 employment on the terms and conditions set forth in this

19 agreement."

20         Was this the -- the employment contract between

21 you as the executive and Ameris Bank as the company?

22     A    Yes.

23     Q    Okay.  And it says that the term of the

24 employment agreement -- I'm still looking in

25 Paragraph 1 -- shall be for the period beginning on

Patrick Eugene Byrne                                          October 20, 2025

1    December 10th, 2021, and ending December 31st, 2024.
2            Did you see that there?
3        A    Yes.
4        Q    Was that the term of the employment agreement
5    that we have here as Exhibit 15?
6        A    Yes.
7        Q    Okay.  And the second paragraph talks about the
8    position, 2.1.  Do you see that there on Page 1?
9        A    Yes.
10       Q    And it says, "During the term, executive shall
11   serve as the chief executive officer of Balboa Capital
12   Corporation," and that was your position for that -- the
13   term -- the initial term under this agreement?
14       A    Yes, that was my title.
15       Q    Okay.  And it says, "Executive shall have such
16   responsibilities and duties as the chief strategy
17   officer of the company may assign from time to time."
18   And then it says, "Executive shall report directly to
19   the chief strategy officer of the company."
20           And then who was the chief strategy officer of
21   the company that you reported to?
22       A    Jim LaHaise.
23       Q    Okay.  And so he was your supervisor under this
24   agreement and in the org chart of the company; is that
25   right?

Patrick Eugene Byrne                                    October 20, 2025

1        A    Yes.

2        Q    Okay.  And is this the first time that you had

3   had a supervisor since you worked at Balboa since 1988?

4        A    Yes.

5        ████████████████████████████████████████████████

6   ███████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ███████████████████████████████████████████████████

9   ████████████████████████████████████

10            Do you see that there?

11       A    Yes.

12       Q    Do you remember what -- what your compensation

13  was in the first year -- I guess that would be the first

14  year in 2022 at Balboa?

15       A    The first year at Balboa?

16       Q    Well, at Ameris.  I think for the clarity --

17  clarity's -- for the purpose of the record, I was still

18  going to refer to it as Balboa, but after December 2021,

19  meaning Balboa, a subsidiary of Ameris.

20            Are you comfortable with that definition?

21       A    Yes.

22       Q    And then just let me know -- thank you.  Let me

23  know if there's confusion.

24            Okay.  So -- yes, so talking about your salary

25  in 2022, do you recall what it was?

Patrick Eugene Byrne                                    October 20, 2025

1      ████████████████████████████████

2          Q   Okay.

3          A   -- base salary.

4          Q   And at any point did -- before your termination

5      in June of 2024, did your base salary increase?

6          A   I believe it did by the three percent called

7      for here in 3.1, the base salary.

8          Q   Then I want to talk briefly about your duties

9      and responsibilities in the job description, and then we

10     will come back to this.

11          So if we could please mark as Exhibit 16, the

12     job description.  Okay.  We will mark for the record,

13     please, Ameris 000235 through 237.  This is Balboa chief

14     executive officer job description.

15          (Deposition Exhibit 16 was marked for

16          identification and attached hereto.)

17     BY MS. FODE:

18          Q   Have you seen this document before, sir?

19          A   I'm not sure.

20          Q   Would you take a minute to peruse it and then

21     I'll ask a couple questions.

22          Okay --

23          A   I have a question that I'd like to talk to my

24     attorney about this document.  Is that possible?

25          MS. FODE:  You know, let me ask the questions.

1    A    I think by the title of chief executive

2    officer, that it would -- it implies that I'm

3    responsible for the entire division, which would include

4    the goals, the profit, the return on investment, and the

5    overall well-being of its employees of that division and

6    responsible to the Ameris shareholders.

7    Q    Okay.  And did you see on this first page

8    when -- it says, "Essential functions, duties, and

9    responsibilities."  The first bullet point says, "Works

10   with the executive team to establish short-term objects

11   and long-range goals and related plans and policies."

12        Did you see that?  Did I read that correctly in

13   the first bullet point?

14    A    You did.  Although, it appears it's ambiguous

15   who the executive team is.

16        MS. FODE:  Well, let's strike as nonresponsive.

17   There's no question pending.

18    Q    So my question is:  Did you understand, as the

19   CEO, that you needed to work with the executive team of

20   Ameris Bank?

21    A    I thought that, yes, I did need to work with

22   the executive team at Ameris.

23    Q    And who did you -- as you sit here today, who

24   would you have considered the executive team at Ameris

25   Bank when you were employed there?

Patrick Eugene Byrne                                    October 20, 2025

```
 1  BY MS. FODE:
 2      Q   And --
 3      A   Michael -- I can't remember his name, but he
 4  was head of governance.
 5      Q   Apologies.  I thought you were completed.
 6          So with the first page, they're listing out
 7  essential functions.  And if you look at three -- three
 8  up from the bottom, it says, "Ensures the division's
 9  compliance with all applicable laws, rules, regulations,
10  and standards."
11          Did you understand it was part of your job to
12  ensure the division's compliance with all applicable
13  rules -- laws, rules, regulations, and standards?
14          MS. ANDERSON:  Objection.  Overbroad.  Vague.
15          Go ahead.
16          THE WITNESS:  Yes, to the -- yes.  Yes.
17  BY MS. FODE:
18      Q   And did you -- on the next page, this is 236,
19  it's talking about the required knowledge, skills, and
20  competencies, and it says -- in bullet point number one
21  on the top of the page, it says, "Excellent managerial
22  and financial skills and the ability to take leadership
23  over any business operations area."
24          Do you think that that was a required skill for
25  your role as CEO of Balboa?
```

Patrick Eugene Byrne                                    October 20, 2025

1         A    Yes.

2         Q    And then it also says in bullet point

3    number two, "Superlative communication skills,

4    particularly the ability to communicate as a leader."

5              Did you think that that was a requirement to

6    effectively perform your job as CEO of Balboa?

7         A    It would be helpful.  Was it absolutely

8    necessary?  I'm not -- yeah, I'm not sure.  Do I feel

9    like -- yeah, but -- is it down here?  Yes, it is down

10   here as required knowledge, skill, and competence.

11             MS. ANDERSON:  Belated Objection.  Vague.

12   BY MS. FODE:

13        Q    And do you think that -- that the ability to

14   communicate as a leader was an important -- important

15   skill in your role as the CEO of Balboa?

16             MS. ANDERSON:  Vague as to "ability to

17   communicate as a leader."

18             THE WITNESS:  I'm not quite sure what you mean

19   by communication.  Do you want to break that down?

20   BY MS. FODE:

21        Q    The job description for your role as CEO of

22   Balboa states that you need to have the particular

23   ability to communicate as a leader.  What do you think

24   that would mean, to be able to communicate as a leader?

25        A    Good written and oral communication skills.

Patrick Eugene Byrne                                        October 20, 2025

```
1        Q    Okay.  And as a leader, was there an aspect of
2   that as CEO that you wanted to lead and show leadership
3   to your team as the CEO?
4        A    Can you say that one more time?
5             MS. FODE:  Read it back, please.
6             (Record read as follows:
7                  "Q  And as a leader, was there an aspect
8             of that as CEO that you wanted to lead and
9             show leadership to your team as the CEO?")
10  BY MS. FODE:
11       Q    It was a good readback.  Let me -- let me
12  rephrase that.
13            Did you believe, as CEO of Balboa, that you
14  needed to communicate effectively to be able to -- to
15  show leadership and to show the ability to lead your
16  whole team?
17            MS. ANDERSON:  Objection.  Vague.
18            THE WITNESS:  In terms of to show my
19  leadership, I'm not -- I mean, do I think it's important
20  to communicate effectively to prove to somebody that you
21  have leadership skills, because of that, I'm not --
22  yeah, I'm having a little bit hard time with that.
23  BY MS. FODE:
24       Q    Okay.  Well -- and I think you've given me what
25  you're -- that you do think it's important to be able to
```

1    communicate effectively as a leader.  I don't think any

2    of us are disagreeing with that, so I think we can move

3    on to the next bullet point.

4           MS. ANDERSON:  Objection.  Misstates testimony.

5           Go ahead.

6    BY MS. FODE:

7        Q    I want to make sure, then, in light of your --

8    your lawyer's objection, that -- that you agree that as

9    CEO of Balboa, which you were for -- since '88, right,

10   1988, that you -- that it was important for you to have,

11   strong -- you know, it says "superlative," but strong

12   communications skills and the ability to communicate as

13   a leader?

14       A    It's important as a leader, yeah, to have good

15   communications skills, yes.  Does it have to be

16   superlative?  I'm not sure.  Yeah.

17       Q    Okay.  And then the third bullet point is a

18   skill -- a required skill for your job as CEO of Balboa

19   is a thorough understanding of management and financial

20   practices in all areas and phases of business

21   operations.

22           Was that a skill that you thought was important

23   or you understood that was needed as CEO of Balboa?

24       A    Yes.

25       Q    Okay.  On the next page, which is 237, it talks

Patrick Eugene Byrne                                          October 20, 2025

 1  about company requirements at the top.

 2          Do you see that there, the top box?

 3      A   I'm sorry.  Where are we?

 4      Q   The top box of the last page, 237.  It says,

 5  "Ameris Bank has certain legal and regulatory

 6  obligations.  Thus, our employees must be aware of and

 7  comply with the following" -- compliance and regulatory

 8  obligations.

 9          Did you understand that the bank had -- because

10  it was a bank, that it had certain legal and regulatory

11  obligations?

12      A   Yes.

13      Q   And did you -- did you understand that, as CEO

14  of Balboa, that it was your job to make sure that those

15  rules and regulations and obligations were being upheld?

16      A   Yes.

17      Q   Okay.  They talk about corporate goals in that

18  first box, "Deliver on the Ameris Bank Mission Statement

19  and embrace the Ameris Approach."

20          Do you see that there?

21      A   Yes.

22      Q   Okay.  And do you understand -- down below it

23  talks about the mission statement.  And in particular I

24  wanted to ask you about this -- well, I guess we can

25  kind of run through some of these.  But the "Experience

Patrick Eugene Byrne                                    October 20, 2025

1    please.

2              Okay.  We will run through really quickly your

3    compensation.  We have your W-2s just so we can

4    understand the amount kind of that you made, and we will

5    go through a couple specific clauses of your agreement.

6              MS. ANDERSON:  I'm sorry.  Can you repeat that?

7    I didn't hear.

8              MS. FODE:  Oh, we are going to run through

9    just -- I'm asking just generally about the terms of his

10   position, and one of those is the compensation, which we

11   started talking about.  But I have the W-2s as well, so

12   we will just run through those in the sake of completing

13   that part of it.

14             I'd like to mark as Exhibit 17, please, Ameris

15   00006 through 10.  And for the record, this is Patrick

16   Byrne's Form W-2 Wage & Tax Statement for 2022.

17             (Deposition Exhibit 17 was marked for

18             identification and attached hereto.)

19   BY MS. FODE:

20      Q   If you would look on the first page, sir.  I

21   believe I had asked you previously what your income was

22   in 2022, and does this refresh your memory of how much

23   you made in 2022 as far as W-2 income?

24

25

Patrick Eugene Byrne                                October 20, 2025

1      Q    Understood.  And now I'd like to know your

2  total compensation for 2022.

3      A    These are all -- what you've given me here on

4  17, there's four pages here.

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ████████████████████████████████████

9          Do you recall that being your W-2 income in --

10  for 2022?

11     A    I don't recall, but this would have also been

12  bonuses.  It would have been, I would imagine, base

13  salary plus individual bonuses but not team bonuses.  I

14  don't know the exact amount, so I can't tell you exactly

15  if this is correct, but it appears to be because it's a

16  W-2.

17     Q    Okay.  So this would include your base salary

18  and your bonuses for 2022?

19     A    Yeah, at least.  There might be other

20  compensation in there as well.

21     Q    As you sit here today, can you think of

22  other -- any other compensation that would be included

23  other than a base salary and bonuses?

24     A    There was a car allowance, I believe.  I'm not

25  sure if any part of the medical insurance was included

1   here.

2        Q    Uh-huh.

3        A    And there might be some other things, but I

4   just don't know at this point.

5        Q    Okay.  And then for 2023, I have the tax --

6   it's the Form W-2 Wage & Tax Statement 2023, which is

7   Ameris 000011 through 14.

8             (Deposition Exhibit 18 was marked for

9             identification and attached hereto.)

10  BY MS. FODE:

11       Q    And will you look at your -- your -- the first

12  page of your 2023 tax return and let me know the amount

13  of the Box 1, wages, tips, and other compensation?

14       A    I'm sorry.  What is the question?

15            MS. FODE:  Can you read it back?

16            (Record read as follows:

17                 "Q  Will you look at your -- the first page

18            of your 2023 tax return and let me know the

19            amount of the Box 1, wages, tips, and other

20            compensation?")

21            ██████████████████████████████████████

22  BY MS. FODE:

23       Q    Thank you.  And do you know what this was

24  comprised of, this amount?

25       A    Not specifically.  But, similarly, it would

1  include the base salary, the individual bonuses, the car

2  allowance, and payment for what's known as the long-term

3  incentive plan, otherwise known as the LTIP.  And there

4  may be other things.  I'm just not familiar with all of

5  them.

6      Q   Okay.  Do you remember how much your LTIP --

7  and for clarity for the record, we will just refer to it

8  as LTIP.  Is that okay?

9      A   Yes.

10      Q   Okay.  Do you remember how much your LTIP

11  payout was for 2020 -- for 2022 which was paid in 2023?

12      A   For the performance period of 2022 that was

13  paid in 2023, no, I don't recall the amount -- the exact

14  amount.

15          MS. FODE:  And for Exhibit 19, the last one of

16  these W-2s.  It's produced by your office, Plaintiff

17  000035.

18          MS. ANDERSON:  This is 19?

19          MS. FODE:  This is Exhibit 19.

20          (Deposition Exhibit 19 was marked for

21          identification and attached hereto.)

22  BY MS. FODE:

23      Q   And so this would be for the year of 2024.  And

24  can you read there what your Box 1 is for wages, tips,

25  and other compensation, please, sir?

Patrick Eugene Byrne                                      October 20, 2025

1    ███████████████████████████████████████

2    ████████████████████

3        Q    Was this for -- was -- was this for the entire

4    year of while you were working at Ameris?   What period

5    of time for this -- for this time frame were you working

6    at Ameris?

7        A    Ameris terminated me on June 30th of 2024.

8        Q    So this -- was this from January 1st to June

9    30th of 2024?

10           MS. ANDERSON:   Objection.   Vague.

11           THE WITNESS:   This covers the W-2 for all of

12   2024.   I'm not sure.   Oh, this is from Ameris.   So, yes,

13   this would cover from January 1st of 2024 to June 30th

14   of 2024, according to Ameris.

15   BY MS. FODE:

16       ████████████████████████████████████

17   ███████████████████████████████████████████

18   ████████████████████████████████

19       A    I don't know specifically, but this would

20   include base salary plus individual bonus plus car

21   allowance.   There would not be an LTIP payment in here,

22   but there should be.   And I'm not sure of anything else

23   that would be comprised here.

24       Q    Okay.   And we will -- we will talk about,

25   obviously, the LTIP.   We will have that in another time.

1      I, the undersigned, a Certified Shorthand Reporter

2  of the State of California, do hereby certify:

3      That the foregoing proceedings were taken before

4  me at the time and place herein set forth; that any

5  witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand

8  which was thereafter transcribed under my direction;

9  that the foregoing transcript is a true record of the

10  testimony given.

11      Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [ X ] was [  ] was not requested.

15      I further certify I am neither financially

16  interested in the action nor a relative or employee

17  of any attorney or party to this action.

18      IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20

Dated: OCTOBER 24, 2025

21

22  _____

         *Kate Sonoma Stickel*

         KATE SONOMA STICKEL

23       CSR No. 10409

24  THE DISMANTLING, UNSEALING, OR UNBINDING OF THE ORIGINAL
    OR CERTIFIED COPY OF THIS TRANSCRIPT WILL RENDER THE
25  REPORTER'S CERTIFICATE NULL AND VOID.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

PATRICK BYRNE, an Individual,)
                             )
            Plaintiff,       ) No. 8:24-cv-01989-MWC
                             )      (JDEx)
        Vs.                  )
                             )
AMERIS BANK, a Georgia       )
corporation,                 )
                             )
            Defendant.       )
_____)

VIDEO-RECORDED DEPOSITION OF

PATRICK EUGENE BYRNE

Volume II

Monday, October 27, 2025

Irvine, California

REPORTED BY:  Amy E. Saylor, CSR No. 11560

Patrick Eugene Byrne                                    October 27, 2025

1              UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4

5    PATRICK BYRNE, an Individual,)
                                  )
6              Plaintiff,         ) No. 8:24-cv-01989-MWC
                                  )        (JDEx)
7         Vs.                     )
                                  )
8    AMERIS BANK, a Georgia       )
     corporation,                 )
9                                 )
               Defendant.         )
10   _____  )

11

12

13

14

15        Video-recorded deposition of

16        PATRICK EUGENE BYRNE, Volume II, taken

17        on behalf of the Defendants, commencing

18        at the hour of 10:03 a.m., on Monday,

19        October 27, 2025, before Amy E. Saylor,

20        CSR No. 11560, pursuant to Notice of

21        Taking Deposition.

22

23

24

25

```
 1   estimate.  I ask that you don't guess, but I am allowed

 2   to probe your memory and ask those types of questions to

 3   help to refresh your recollection.

 4          Do you understand that?

 5      A.   Yes.

 6      Q.   And your counsel will, undoubtedly, object

 7   today.  You understand that you are required to respond

 8   to my question, unless your counsel instructs you not to

 9   answer?

10      A.   Yes.

11      Q.   Okay.  With that, we will get started.  Now,

12   before we left off last week, we were talking about when

13   you started as an employee of Ameris Bank.  Do you

14   remember us talking about that briefly?

15      A.   Vaguely, yes.

16      Q.   Okay.  And we talked about your employment

17   agreement, and then we were getting into some policies

18   of the company.  Do you remember when you started as an

19   employee, as CEO of the bank, that you were -- that you

20   had certain policies and procedures of the bank that you

21   needed to comply with?

22          MS. ANDERSON:  Objection.  Vague.

23          THE WITNESS:  Yes.

24      Q.   BY MS. FODE:  Okay.  And did you understand

25   that Ameris had certain policies and regulations as a
```

Patrick Eugene Byrne                                                    October 27, 2025

1    bank that it needed to comply with?

2        A.    Yes.

3        Q.    Okay.    And do you remember, when you started as

4    an employee in December of 2021, that you received some

5    of these written policies and procedures of the bank?

6        A.    Yes.

7        Q.    Okay.    Sort of, like, as an onboarding, you

8    receive policies and procedures of the bank?

9        A.    Is that a question?

10       Q.    Yes.

11       A.    Yes.

12       Q.    Thanks.

13             All right.    So, first, let's talk about

14   Exhibit 23.    I would like to mark this.

15                    (Exhibit 23 marked.)

16       Q.    BY MS. FODE:    This is Ameris Bank Confidential

17   Information Agreement.    For the record, it's

18   AMERIS000117 through -119.

19             And if you'll look, please, sir, at the last

20   page, which at the bottom is Bates -119, it says

21   "Status, Accepted," on 12/16/2021 at 9:25 a.m.

22             Do you remember receiving the confidential

23   information agreement and accepting it online

24   December 16th, 2021?

25       A.    I don't recall specifically.

Patrick Eugene Byrne                                    October 27, 2025

1          So on the second page, it's Bates No. -118.

2    There's Paragraph No. 4 towards the top.

3          Do you see that there, sir?

4    A.    Yes.

5    Q.    Okay.  It says, "Employee agrees that, except

6    as required in the course of his or her employment by

7    Ameris Bank, employee will not duplicate, remove,

8    transfer, disclose or utilize, or knowingly allow any

9    other person to duplicate, remove, transfer, disclose,

10   or utilize such trade secret or information."

11         Did you understand that as an employee and the

12   CEO of the company, that you were prohibited from

13   removing or transferring confidential or trade secret

14   information?

15   A.    "Except for as required in the course of his or

16   her employment by Ameris Bank," yes.

17   Q.    Okay.  And did you understand -- we'll move

18   down to 5C.  I'll just ask you about this paragraph.

19         Do you see the paragraph 5 and then the C down

20   there?

21   A.    Yes.

22   Q.    Okay.  It says, "With respect to any

23   confidential information, whatever its nature and form

24   and whether obtained orally, by observation, from

25   written materials, or otherwise during or as the result

Patrick Eugene Byrne                                    October 27, 2025

1    days before my termination.

2            MS. FODE:  And I move to strike as

3    nonresponsive.  There's no question pending.

4        Q.   We're going to go through --

5        A.   And it has to do with this lawsuit and the

6    reason --

7        Q.   There's no question pending.

8            MS. ANDERSON:  There's no question pending.

9        Q.   BY MS. FODE:  I will ask you the questions.

10   You'll have a chance to respond.

11           Okay.  So you mentioned your termination.  I

12   want to get that date confirmed.  So I'd like to mark as

13   Exhibit 27 this document here, which is AMERIS001792

14   through -1795, and it appears at the first page on -1792

15   that it's an email to you on June 27th, 2024.  That's

16   sent to you by Jim LaHaise.

17                   (Exhibit 27 marked.)

18       Q.   BY MS. FODE:  Have you seen this document

19   before?

20           MS. ANDERSON:  And, wait.  Hold on one minute.

21   I need to confirm something.

22           Okay.  This is part of a Bates range that I

23   wrote to your office about on October 14th that my ESI

24   vendor said was missing.  I never heard back.  I'm not

25   going to let him answer any questions about any

Patrick Eugene Byrne                                        October 27, 2025

 1   documents that we were not able to see as part of the
 2   production.
 3           MS. FODE:  Just a reminder, under the Federal
 4   rules, the reasons that you can object and instruct
 5   him -- a client or witness not to answer are limited to
 6   those that are privileged or privacy grounds, so I want
 7   it very clear for the record.
 8           MS. ANDERSON:  My --
 9           MS. FODE:  Please don't interrupt.
10           MS. ANDERSON:  My objection stands.
11           MS. FODE:  Please don't interrupt.
12           MS. ANDERSON:  My objection stands.
13           MS. FODE:  I want it very clear for the record
14   that we will take the issue to the court.  And, for the
15   record, you're instructing your client not to testify
16   about his email that he received and attached the
17   termination letter, which is germane to the case.
18           MS. ANDERSON:  And, for the record, I sent you
19   an email -- or a letter almost two weeks ago that
20   identified missing Bates numbers that we wanted to see.
21   You never responded back.  You never corrected this
22   deficiency.  I'm not going to let him answer questions
23   about documents that we weren't -- that were
24   specifically withheld from production.
25           MS. FODE:  We disagree with your

Patrick Eugene Byrne                                          October 27, 2025

1    characterization of the record.

2         Q.   Sir, were you terminated on June 27th, 2024?

3         A.   It appears so by this email.

4         Q.   And do you recall receiving a termination

5    letter from the company?

6         A.   I remember in the morning, when I checked my

7    email, receiving, despite not having any advanced

8    warning on this, the courtesy of a call, or anything

9    like that, no previous communication or any indication

10   that I was going to be terminated.  I remember in the

11   morning, you know, checking my email and receiving a

12   notice of termination.

13        Q.   Was that the morning of June 27th?

14        A.   This document was sent at 8:21 p.m., so 8:30,

15   approximately, p.m., and so I recall receiving it the

16   morning of 6/28/2024.

17        Q.   You remember -- you're saying that you thought

18   that the email was sent the evening of the 27th, and

19   then you received it when you logged on the morning of

20   the 28th?

21        A.   No.

22             MS. ANDERSON:  Objection.  Misstates testimony.

23             THE WITNESS:  Yeah, exactly.  That's not what I

24   said.  I said I recall -- I'm not sure when it came out,

25   but this seems to suggest that it came out late evening

Patrick Eugene Byrne                                    October 27, 2025

1   on the 27th.  I recall getting an email or reading an

2   email in the morning of the next day, 6/28 of 2024.

3       Q.   BY MS. FODE:  Okay.  And do you remember what

4   time did you receive the email?

5       A.   I don't know specifically, but it was, yeah, in

6   the morning.  I would say between 6:00 and 9:00 a.m.

7   would be my best estimation.

8           MS. FODE:  Okay.  I'll mark this exhibit,

9   please, as 28, for the record.

10                    (Exhibit 28 marked.)

11      Q.   BY MS. FODE:  This is Bates No. AMERIS001148

12  through -1150, and if you would just take a minute and

13  look at that.  I'm just only going to ask you two

14  questions.

15          Is that -- is this email at Exhibit 28 an email

16  you sent to your personal Yahoo account from your work

17  account on June 27th, 2024?

18      A.   I don't know for sure.  My previous testimony

19  was that I didn't recall until the morning of the 28th,

20  but this seems to suggest that it was on the 27th that I

21  sent this, but that is certainly my -- yeah, my personal

22  email.

23      Q.   Okay.  So you did send it from your work email

24  to your personal email, Exhibit 28, but you're not --

25  you're not recalling -- independently recalling the date

Patrick Eugene Byrne                                    October 27, 2025

 1  that you sent it?

 2      A.    Yes.  I believe I sent -- yeah.  I sent this at

 3  some point.  I don't know exactly when -- yeah, when it

 4  was.

 5      Q.    Okay.  And then let's mark this as 29, please.

 6                      (Exhibit 29 marked.)

 7      Q.    BY MS. FODE:  This is AMERIS001158 to -59.  And

 8  it appears to be another email from you, sir, to -- from

 9  your work email address to your personal email Yahoo

10  account; is that correct?

11      A.    Yes.  This appears to be an email from my -- to

12  my Yahoo account.

13      Q.    Okay.  And then do you recall the date that you

14  sent this email, Exhibit 29, to your email account?

15      A.    I don't.

16      Q.    And it does say -- the last two emails have

17  said "June 27th, 2024," but do you have any reason to

18  doubt that that's not the date that you sent them to

19  yourself?

20      A.    Yeah, I just don't recall.

21      Q.    We did print the attachment, which is why it's

22  big.  This is Exhibit 30, please.

23                      (Exhibit 30 marked.)

24      Q.    Okay.  The first page is AMERIS001160

25  through -- which is the email, and then the second page

Patrick Eugene Byrne                                   October 27, 2025

```
 1        Q.    Why did you send yourself the spreadsheets
 2   we're looking at on Exhibit 32?
 3        A.    I don't know specific to this one.  I put in a
 4   lot of complaints on the LTIP, so I'm not sure when
 5   this -- I sent this to myself.
 6        Q.    And is this financial information for Balboa
 7   for the 2023 time frame?
 8        A.    Yes.
 9        Q.    Okay.  Did you tell anybody that you were
10   sending yourself the spreadsheet at Exhibit 32?
11        A.    I'm not sure about this one specifically, but
12   certainly everybody was knowledgeable that I would do --
13   yeah, send work emails -- Ameris work emails, Balboa
14   Capital emails to my Yahoo account, and the Yahoo
15   account was used in the -- for documents that are coming
16   to me personally in conjunction with the acquisition of
17   Balboa Capital by Ameris, so Ameris was well-aware of
18   this account as well.
19        Q.    Do you remember the time frame that you sent
20   yourself the spreadsheets that are at Exhibit 32?
21        A.    What is Exhibit 32?  We're just talking about
22   the spreadsheet?
23        Q.    We're talking about the balance sheet and
24   income statement.
25        A.    I don't.  There probably would have been -- no,
```

Patrick Eugene Byrne                                          October 27, 2025

1            THE VIDEOGRAPHER:  We're now going back on the
2    record.  The time is 1:02 p.m.
3        Q.   BY MS. FODE:  All right.  We're back on the
4    record after your lunch break, and the same rules that
5    we discussed earlier today apply.
6            Do you understand that?
7        A.   Yes.
8        Q.   I'd like to ask you a couple of questions,
9    switching topics here.  So was there -- I think we
10   talked about it briefly on the first day -- a long-term
11   cash incentive plan in place at the time when you
12   started at the bank.
13       A.   Yes.  It was material to why we chose Ameris as
14   the --
15       Q.   Okay.
16       A.   -- successful bidder.
17       Q.   Okay.  And you had lawyers representing you in
18   the negotiation of those terms; correct?
19       A.   Yes.
20       Q.   Okay.  And you understood that you were
21   participating in the plan as your time at the bank
22   proceeded; correct?
23       A.   I understand that we, yeah, prenegotiated the
24   splits between the LTIP pool, between myself,
25   Rob Rasmussen, Phil Silva, with the remainder to be

1   distributed to other employees, as it was done in 2023

2   for the 2022 performance period.

3       Q.   And the plan was in place for a three-year

4   period, '22 to 2024?

5       A.   Yes, starting in -- yeah, yeah, for three

6   years, '22, '23, '24.

7       Q.   Okay.  I want to show you, please -- I'll mark

8   this exhibit as 34.

9                  (Exhibit 34 marked.)

10      Q.   BY MS. FODE:  Okay.  For the record, this is

11  AMERIS000221 through -233, and the first -- the first

12  page of the document at -221 is entitled "Balboa Capital

13  Long-Term Cash Incentive Plan," and then if you'll

14  turn -- flip through to Bates No. 227.

15          MS. ANDERSON:  Well, would you give him a

16  chance to review it?

17          MS. FODE:  Yes.  Let me orient him, please,

18  Counsel.

19      Q.   At 227, it's Balboa Capital Long-Term Cash

20  Incentive Plan Award Agreement.  So I'm going to ask you

21  about both of the documents.

22          Okay.  If you want to take a minute to look at

23  them, and let me know when you've had a chance to peruse

24  them.  I'll ask you just a couple of questions.

25      A.   Okay.

Patrick Eugene Byrne                                          October 27, 2025

1     Q.    Okay.  The first portion of the document, the

2  plan is -221 through -226.  Have you seen this document

3  before?

4     A.    Yes.

5     Q.    And does this appear to be the version of the

6  LTIP plan -- final version that you negotiated with your

7  counsel?

8     A.    I'm not -- yeah, it appears to be.

9     Q.    Okay.  And then the second portion of

10  Exhibit 34, which starts at -227, the award agreement,

11  will you take a look at that document and let me know if

12  this was the final version of the award agreement?

13     A.    I'm not sure if it was the award, but, yeah, it

14  could be.

15     Q.    When you peruse through it, was there anything

16  that looked like it wasn't a final term?

17     A.    No.

18     Q.    Okay.  And then I'm just going to ask you a

19  couple of questions about the clauses in this award

20  agreement.  The first -- the first one is the third

21  paragraph down.  It says, "Performance Criteria," and it

22  references the Pioneer 1Q21 operating model attached as

23  Exhibit A.

24        Do you see that there, sir?

25     A.    No.  Which Bates stamp are you on?

Patrick Eugene Byrne                                    October 27, 2025

1    Q.   -227.

2    A.   -227.

3    Q.   It's the first page --

4         MS. ANDERSON:  I'm sorry.

5         MS. FODE:  It's okay.

6         MS. ANDERSON:  You gave me another copy.  Do

7    you want it back?

8         MS. FODE:  Sure.  Thank you.

9         Okay.  For the question that's pending, will

10   you read it back, please?

11                        (Record read.)

12        THE WITNESS:  Yes.

13   Q.   BY MS. FODE:  Okay.  And what is the Pioneer

14   1Q21 operating model?

15   A.   It was a spreadsheet that Balboa used and

16   presented to Ameris many times -- too many to count, but

17   this was -- this final version here was agreed upon to

18   form the basis for this actual earnings before taxes.

19   Q.   Okay.  And so it included earnings to date and

20   then projected earnings for the company?

21   A.   Yes.  It projected, you know, specific to what

22   we're talking about here, the earnings before taxes for

23   2022, 2023, and 2024 projected.

24   Q.   Okay.  And just, for the record, is that Bates

25   No. -233 through -234, the last two pages of the

Patrick Eugene Byrne                                    October 27, 2025

```
 1   exhibit?
 2       A.   Yes.
 3       Q.   Okay.  And then going back to -227, I want to
 4   talk to you just briefly about the key assumptions.
 5   It's about halfway down the document, and it talks about
 6   for purposes of calculating EBT under the agreement and
 7   plan.
 8            Do you see that there?
 9       A.   Yes.
10       Q.   Okay.  And it says, "Initial direct costs will
11   be calculated" -- well, let me ask a foundational
12   question.
13            Are these "key assumptions," as they're called,
14   A through F, were these the key assumptions for the LTIP
15   that you and Ameris agreed upon?
16       A.   We both signed the documents.  The key
17   assumptions were to be looked at first, and then go to
18   the 1Q1 -- Pioneer 1Q1 operating model.
19       Q.   Okay.  So the key assumptions are set forth
20   here in A through F; is that correct?
21       A.   The key assumptions are set forth there, yes.
22       Q.   Okay.
23       A.   That is correct.
24       Q.   Okay.  The first one says, "Initial direct
25   costs will be calculated using gap methodology."
```

Patrick Eugene Byrne                                    October 27, 2025

1          Did you understand that the company would use
2    gap methodology in its calculations?
3       A.    I understood that for, "A, Initial Direct
4    Cost," that the company would be using -- or had --
5    yeah, had used gap methodology.
6       Q.    Okay.  And what is "gap methodology"?
7       A.    It's accounting -- general accepted accounting
8    principles.
9       Q.    Okay.  And for the next page, it talks about
10   the performance goal, the threshold for award, and the
11   performance formula.  There's a few paragraphs there.
12      A.    I'm sorry.  What Bates are you on?
13      Q.    -228, next paragraph.  And in an effort to save
14   time there, were these the terms for the performance
15   formula, the performance goal, and the threshold for
16   award that you and the company agreed to?
17      A.    For the performance goal, yes, there would be
18   no cap on the performance.  And then for the threshold,
19   yeah, those were the EBT, or earning before taxes, that
20   we had agreed upon for 2022, 2023 and 2024.
21      Q.    Okay.  And then on the next page, -229, for
22   paragraph 5, it talks about that the -- I'm looking at
23   paragraph 5.  "The award shall be subject to and
24   governed by and shall be construed and administered in
25   accordance with the terms and conditions of the plan."

Patrick Eugene Byrne                                    October 27, 2025

 1           Did you understand that the -- that your
 2    agreement was governed by the terms and conditions of
 3    the plan?
 4       A.    Yeah.  This was what we had -- yeah, what we
 5    had negotiated up front.  Yeah, it was supposed to be
 6    what we agreed upon that was supposed to be implemented,
 7    yeah, for 2022, 2023, and 2024.
 8       Q.    Okay.  Let's go to a couple of specifics here.
 9    For Exhibit 35, please, I'd like to mark this email
10    chain and attachment.
11               (Exhibit 35 marked.)
12       Q.    BY MS. FODE:  I want to talk to you a little
13    bit about the 2022 pool.
14               MS. ANDERSON:  Objection.  Objection to this
15    document because it has a redaction and there is no
16    privilege log provided.
17               MS. FODE:  So --
18               MS. ANDERSON:  I'm not going to let him answer
19    questions about -- I identified these to you in my
20    letter on October 14th.  It's not proper to ask about
21    redacted documents.  You didn't give him the privilege
22    log.
23               MS. FODE:  Well, for the record, the redaction
24    is third-party employee information.
25       Q.    But in any event, I'll ask you about the email.

Patrick Eugene Byrne                                    October 27, 2025

1              MS. ANDERSON:  Same instruction.

2              MS. FODE:  You can just ignore the -- let me

3     make sure the record's really clear.

4              You're instructing him not to answer any

5     questions about Exhibit 35, which is Ameris -- I'm

6     sorry -- -1562 through -1565, which is an email chain

7     between him and Jim LaHaise and Laura Rodriguez during

8     his time of employment?

9              MS. ANDERSON:  Yes, because you have redacted

10    it.  It's not entirely even clear what this -- the

11    document that you're attaching to this.  If you want to

12    remove this and just ask him about the email, so remove

13    this from your exhibit, then you can ask him questions

14    about the email.

15             MS. FODE:  For the record, there's no rule that

16    you can withhold and prevent a witness from testifying

17    about a document that's redacted with or without a

18    privilege log, so that's a new rule you're creating;

19    however, in the interest of time, we'll mark the

20    transcript, and I will just question you about the

21    email, sir, just so we can move on.

22             MS. ANDERSON:  But I will respond.  There is a

23    rule, and the judge went over it on September 11th,

24    clearly, about the need -- if you have redacted, if you

25    are withholding documents, the need to provide a

Patrick Eugene Byrne                                    October 27, 2025

```
 1    privilege log.
 2              MS. FODE:  Yes.
 3              MS. ANDERSON:  That's in the Federal Rules of
 4    Civil Procedure, so I'm not entirely sure why you have
 5    chosen to ignore that.
 6              MS. FODE:  No.  It's forthcoming.  And as I've
 7    stated, this is customer -- I mean, employee
 8    information.
 9              MS. ANDERSON:  But it's been a month.
10              MS. FODE:  Let's not waste any more of the
11    transcript time with arguments about procedure.
12         Q.   So I'm just going to ask you a few questions
13    about the email chain.  So if you would start, please,
14    on -1564, the last page of the email chain.  This is --
15    we'll start at the bottom.
16              So is this an email -- for the record, it says,
17    "Laura Rodriguez emailed you at your Balboa Capital
18    email address regarding 2022 LTIP payouts on
19    January 12th, 2023."
20              Do you see that there?
21         A.   Yes.
22         Q.   And do you -- it's stating that, "Per Sufhan's
23    calculation earlier this week, the final year-end 2022
24    LTIP pool is 9 million" -- I'll just -- I'll just spare
25    you that it was about $9 million.
```

Patrick Eugene Byrne                                    October 27, 2025

1              Do you remember receiving this email about the

2    2022 LTIP pool and calculations?

3         A.   Not specifically, but it looks like I did.

4         Q.   Okay.  And do you remember the amount of the

5    LTIP pool for 2022?

6         A.   What was your date again?

7         Q.   The 2022 LTIP pool.

8         A.   Oh, yes.  I'm not sure if that's the exact

9    amount, but it looks -- yeah, it looks accurate.

10        Q.   Okay.  And so, for the record, it was

11   approximately $9 million?

12        A.   Yes.

13        Q.   And do you remember how much of the $9 million

14   you received?

15        A.   No, I don't know, specifically.

16        Q.   Okay.  And do you know if you received 5.6 --

17   approximately $5.6 million of the 2022 LTIP pool?

18        A.   Yeah, that's possible.

19        Q.   Okay.  And then if you look here, it looks like

20   Laura -- and who was Laura Rodriguez?

21        A.   I'm not sure her exact title, but she was head

22   of compensation, I believe.  So all, you know, payroll

23   stuff, you know, payouts would go through her.

24        Q.   Okay.  If you look at the third paragraph of

25   this email, it says, "I've added a column for 2022 LTIP

1    recommendation.  As you begin to populate the amounts by

2    employee, the cell at the top will show" -- I think it's

3    "you," but I think she means "your" -- "remaining money

4    is available.  Your name is at the very bottom of the

5    list."

6            Do you remember Laura asking you to populate

7    the amounts that each employee would receive from the

8    2022 LTIP pool?

9        A.    Not specifically, but -- yeah, it appears that,

10   yeah, that she was asking for my recommendation, which

11   was laid out, that that's the way it was going to work

12   for the LTIP that we all agreed upon; that there would

13   be a portion to myself, a portion to Rob, a portion to

14   Phil, and the remainder would be mine, but I also

15   included Phil and Rob on recommendations on how the

16   remaining portion of the pool will be distributed.

17       Q.    Okay.  And I think we can see that.  If you go

18   to the email before, the page before, which is

19   chronologically later, at the bottom it says, Wednesday,

20   January 18th, 2023, there's an email where you're

21   saying, "Thanks for checking in.  Phil, Rob, and I had a

22   preliminary discussion today, and we have much more to

23   do."

24            Do you remember meeting with Phil and Rob to

25   discuss the allocation of the 2022 LTIP pool?

1    A.    Yes.

2    Q.    Okay.  And if you would go to the first page of

3  Exhibit 35, Bates No. 1562, it looks like you emailed

4  Laura on February 2nd, 2023, and copied Jim LaHaise and

5  stated your recommendations for the LTIP payouts.

6          Do you see that there?

7    A.    I'm not sure they were my recommendations.  It

8  was my -- it was, you know, my -- as we had talked about

9  previously and everybody had agreed to, it was my

10  decision on -- to, you know, to distribute the remainder

11  portion, and this was laying out kind of what we had

12  agreed with previously for Laura's benefit because she

13  hadn't been a party to those talks before the

14  acquisition.

15    Q.    Okay.  So you're confirming with Laura your

16  decision about how much of the approximately 9 million

17  LTIP pool would go to each employee?

18    A.    Yeah, and they would -- yeah, some people got

19  10 percent; some people got 20 percent, but there were

20  approximately 150 people that received bonuses, which, I

21  guess, was most significant for the people that were

22  making the less -- you know, less money.  You know,

23  40 -- if someone is making $40,000 in California and

24  they get, you know, $4,000, it's significant.  So, yeah,

25  that's -- yeah, that's why we did it.

1    Q.   Okay.  And then do you remember filling in on a

2    spreadsheet how much each employee would get from the

3    remainder of the 2022 LTIP pool?

4    A.   Yes.

5    Q.   Okay.  And, for the record, I think that's what

6    is attached as Exhibit 1565, which we'll have to take it

7    up with the judge for your questioning on that.

8         So do you also remember providing -- let me ask

9    it this way:  Did anybody overturn your decision of how

10   to allocate the remainder of the 2022 LTIP pool?

11   A.   No, because there wasn't the ability to,

12   because we had already agreed upon that.

13   Q.   Okay.

14   A.   Yeah, that was agreed upon before the

15   acquisition, so, no, of course, nobody overruled me.

16   Q.   Okay.  Understood.

17        And then would you look here -- would you

18   please look at the last couple of bullet points here.

19   You're stating, "Given the high probability of the

20   downturn in the economy in 2023, we encourage the

21   mangers to use these bonuses to tamper down expectations

22   for large raises in 2023."

23        Did I state that accurately?

24   A.   I'm not sure, but I remember, you know, we're

25   trying to set expectations here.  It was very important

Patrick Eugene Byrne                                              October 27, 2025

1   for Ameris that we have raises that were no more than

2   3 percent, and at this point, you know, nobody knew, but

3   there were predictions that there was the probability of

4   a downturn, so what we were trying to do is set

5   expectations, you know, on that.  And, yeah, so that was

6   sort of what we were attempting to accomplish by this,

7   is setting lower expectations.

8       Q.   And the second clause at the end, I think, goes

9   to that same point.  "We will let everyone know that

10  something like this may be available next year, but

11  there are no promises, and it would occur -- would only

12  occur if we were able to drive long-term profitability."

13          Was that continued expectation setting for the

14  managers?

15      A.   It was setting expectations if we didn't work

16  hard and they didn't -- and we didn't hit the earnings

17  before taxes, but, we, in fact, did, and the Ameris

18  executives still decided to not pay people at earned

19  wages.

20      Q.   I understand that's your opinion.  We'll strike

21  as -- "that we did" as non-responsive.

22          But you understood that the LTIP was not

23  guaranteed each year; correct?

24      A.   It was not only guaranteed to the extent that

25  we didn't hit the earnings before taxes.  There was

Patrick Eugene Byrne                                    October 27, 2025

1    nothing else.  Everything else was guaranteed.

2        Q.   All right.  And did you raise any

3    calculation -- I mean any -- strike that.

4            Did you raise any concerns about the

5    calculations for this 2022 LTIP in this email or around

6    this time of February of 2023 before the payouts were

7    made to you and to the others?

8        A.   I don't -- I'm not -- yeah, I'm not sure.  2023

9    was a crazy year.  I was extremely busy trying to

10   integrate -- integrate everything, you know, with

11   accounting.  We grew 63 percent, trying to do the best

12   we could to come up with, you know, all the compliance,

13   you know, different things that were -- that were

14   required of us, so I didn't have -- yeah, so I didn't

15   really start to look at this.

16           And it was hard because Ameris came in and took

17   off, you know, our best people to work on their stuff,

18   so they put us behind -- behind the eight ball, where

19   previously I was able to go to anybody and ask them for

20   information.  It was much harder to get this

21   information, so --

22       Q.   So the answer, then, is, no, that you didn't

23   raise any concerns about the calculations about the 2022

24   LTIP around February 2023 or the time where this was --

25   where it was paid out?

Patrick Eugene Byrne                                    October 27, 2025

1      A.    I'm not sure, but I didn't dig into it, right,

2   because there were so many other things going on, and I

3   wasn't getting, right, the information, you know, on a

4   timely basis, and there was just too much stuff to go on

5   to really dig into it.

6      Q.    Did you ask anywhere in this email, when you're

7   explaining to Laura and copying Jim, how you're gonna

8   pay this out, the 22 LTIP pool?  Is there anything in

9   here where you're raising any concerns about the

10   calculations or the amount of the 2022 LTIP pool?

11      A.    I don't see anything here, but I do see, you

12   know, numerous complaints after this when I really start

13   to dig in.  There may be something around this time or

14   previously, but certainly I know after -- you know,

15   after this time frame that I did start to really dig in

16   and found that there were material calculations that

17   were -- that were not following the LTIP.

18      Q.    Did you -- do you remember when you first

19   raised a concern about the 2022 LTIP?

20      A.    I think I started to dig in -- it might have

21   been, yeah, the second -- second-to-third quarter, maybe

22   June, July, where I think I might have sent my first

23   email only to Jim LaHaise, to give him -- I remember an

24   email like that.  So I'm not sure if there's anything

25   before that.  There might have been, but I remember

Patrick Eugene Byrne                                    October 27, 2025

 1    specifically around that time frame sending something

 2    and detailing out how I thought that the LTIP was not

 3    congruent with what we had agreed upon.

 4            Subsequently, I found --

 5        Q.    Just so I can clarify, was that June or July

 6    2023?

 7        A.    June or July of 2023, correct.

 8        Q.    Okay.

 9        A.    That's my best recollection.

10        Q.    Thank you.

11            And then was there -- you were actually paid

12    the 5.6 million from the 2022 LTIP pool?

13        A.    You're now switching to -- from the email that

14    I sent complaining now back to how much I was paid?

15        Q.    Yes.  Thank you.

16        A.    Yes.  Yes, that is correct.

17        Q.    So you were paid approximately that amount,

18    approximately 5.6 million?

19        A.    Yes.  And Ameris profited from that much more,

20    probably in the hundreds of millions of dollars, given

21    the production that we were able to give.  So, yes,

22    5 million versus 400 million, yes, you're right, if

23    you're trying to make it seem like it was all about me.

24        Q.    I'm not trying to make anything.  I'm just

25    trying to ask the questions and move through it because

Patrick Eugene Byrne                                    October 27, 2025

1    A.   It's a snippet of part of the spreadsheet that

2  we looked at, that, right, had, you know, hundreds, if

3  not thousands, of lines, and so this represents a very

4  small portion of that, less than 1 percent.  Yeah, it --

5  you know, it appears that it gives the wrong calculation

6  on the LTIP pool.

7    Q.   So for the first page of Exhibit 36 at -738, it

8  states the booked LTIP accrual as of 12/31/2022 is

9  approximately 9.1 million.

10        Do you see that there?

11   A.   It says, "Booked LTIP accrual as of 12/31/22,

12  9.1 million."

13   Q.   Did you see that there?

14   A.   I do see it, yes.

15   Q.   And you're stating -- I believe that you're

16  stating that you don't agree with that number at this

17  time; is that correct?

18   A.   Yes, that's correct.

19   Q.   Okay.  But at the time that you deposited or

20  accepted your 5.6 -- approximately 5.6 million, was

21  there anywhere that you had noted a concern about this

22  calculation for the approximately $9.1 million pool?

23   A.   I think, as I testified previously, I didn't

24  really start to dig in because of how busy I was and the

25  requirements that, you know, that the job entailed, and

Patrick Eugene Byrne                                    October 27, 2025

1    so when I did start to dig in, I found out, and even

2    subsequently, even more, that this was not accurate by a

3    large extent.

4        Q.   Okay.  And I believe you testified that you

5    raised your concern with Jim around June or July of

6    2022; correct -- I mean 2023?

7        A.   It could have been sooner, but I remember that

8    specifically.  And I did --

9        Q.   Oh, there's no question pending.  Thank you.

10            I'd like to mark, please, as Exhibit 3-

11            MS. YEE:  -7.

12            MS. FODE:  Thank you.

13                      (Exhibit 37 marked.)

14            MS. ANDERSON:  Can I get a copy?

15            MS. FODE:  Yeah, I'm not there yet.

16            MS. ANDERSON:  Okay.

17            MS. FODE:  Your client first.

18        Q.   All right.  For the record, this is

19    AMERIS001561 -- -60 through -61.

20            Would you take a minute and look?  We'll start

21    at the last page -- the bottom of the first page and

22    then onto the last page is the email chain.  It looks

23    like Laura emailed you on February 13th, 2023, about

24    Dave white LTIP.

25            Do you see that there?

Patrick Eugene Byrne                                    October 27, 2025

```
 1        A.    Yes.
 2        Q.    Okay.  It looks like she's asking you, "Should
 3   the 15,000 that was pulled from Dave be apportioned to
 4   you?  And, if so, are you agreeable to waiting to 2/28
 5   to receive the 15K?"
 6              Do you remember Laura emailing you about this
 7   extra 15K from Dave White?
 8        A.    Yes.  I remember Phil Silva getting into a
 9   substantial argument with Dave White, where he wanted to
10   pull back his share of the LTIP, and so -- yeah.  So
11   that's what I instructed Laura to do, and it was late in
12   the process.  So, yes, I had her send it to me, because
13   you can't -- yeah, you have to use all of the LTIP pool.
14   It's mandatory that everything be distributed.
15        Q.    Okay.  So in the email -- the subsequent email
16   on Wednesday, May 10th, you're instructing Laura to pay
17   the 15,000 from Dave White to you on the next payroll;
18   correct?
19        A.    Yes, and that was because Phil Silva instructed
20   me that Dave White should not be paid, because he was in
21   a disagreement with him, and the LTIP required -- LTIP
22   pool required everything to be distributed, and so, yes,
23   that was my instructions.
24        Q.    Okay.  So then you were paid this remaining
25   15,000, it looks like, around May 15th, 2023, along with
```

```
 1   the approximately 5.6 million that you were paid?

 2       A.   It looks like there was, yeah, a couple

 3   clean-up items.  It looks like Joe De Leon -- you know,

 4   so there was a couple clean-up items, because there were

 5   150 people that were paid out here.  So there was a lot

 6   coming and going on this.

 7       Q.   Okay.  I'd like to mark, please, as Exhibit 38,

 8   an email with Bates No. AMERIS001981.

 9                    (Exhibit 38 marked.)

10       Q.   BY MS. FODE:  For the record, it looks like

11   it's one email that you had sent to Sufhan Majid on the

12   24th of July, 2023.

13            Do you see that there?

14       A.   Yes.

15       Q.   Okay.  And who's Sufhan?

16       A.   Sufhan is a controller.  I believe that is his

17   title.  He would put together the financials for Balboa,

18   I believe, and maybe a couple of other divisions of

19   Ameris.  He reported to, I guess at the time,

20   David Sparacio, and then -- who reported to Nicole.

21       Q.   And I think you said the last session that she

22   was the C.F.O.?

23       A.   Yes.

24       Q.   Okay.  So, here, it looks like you're emailing

25   Sufhan about the 2022 LTIP revisions.
```

Patrick Eugene Byrne                                    October 27, 2025

1          Do you see that there?

2     A.    Yes.

3     Q.    Okay.  And it says that you're emailing him to

4  revise two points about the 2022 LTIP.

5          And then if you look -- I'm looking at the

6  second-to-bottom line.  It says, "Based on these

7  revisions, there is 1." -- "1,248,000, approximately,

8  owed to me, so that this money" -- "so I ask that this

9  money be paid out in the 7/30/23 payroll."

10         Do you see that there?

11    A.    Yes.  This was -- I don't know if this was my

12  portion, but the point here is that, right, everybody

13  was owed -- you know, 150 other people were owed money,

14  and so I was just making the point that this was the

15  amount that -- potentially, yeah, that I was owed, which

16  actually is probably more than that, because,

17  subsequently, there were other errors, you know, that we

18  found.

19    Q.    So in addition to the, approximately,

20  5.6 million paid to you for 2022, you sought an extra

21  approximately 1.2 million based on your calculations in

22  July of 2023?

23    A.    The LTIP was, like, an earn-out portion, and so

24  it was part -- you know, it was part of kind of the

25  sale.  So, yeah, I would receive -- if I was to exceed

1   these numbers and make hundreds of millions of dollars

2   for Ameris, then, yeah, this was our agreement; that I

3   would be paid, you know, the percentage that we had all

4   agreed upon at the beginning, which was part -- part of

5   the acquisition.

6           So if this -- yeah, this is what -- I don't

7   know.  I don't know the exact calculation here, but this

8   sounds as though this is the portion that would be owed

9   to me, but there would also be a large portion owed to,

10  you know, approximately 150 other people.

11      Q.   So based on your email here at Exhibit 38, are

12  you asserting and requesting that approximately

13  $1.2 million are owed to you based on your recalculating

14  or your updating the calculations on the 2022 LTIP?

15      A.   Yeah.  As I read it today, it's not inclusive,

16  but, yeah, that's what this email says.

17      Q.   And you're asking to be paid in the July --

18  July 30th, 2023, payroll to you?

19      A.   Yeah, which would have been late -- would have

20  been late for everybody else as well.  So we -- we -- we

21  worked very hard, we earned this wage, and we weren't

22  paid, 150 other people.

23      Q.   But you never raised the specific concerns set

24  forth in this email before you were paid the payout for

25  2023 -- I'm sorry -- for 2022; correct?

Patrick Eugene Byrne                                    October 27, 2025

```
 1       A.   I started -- as I testified, I started to dig
 2   in, because I was so busy, because Ameris took our best
 3   people to go work -- right, to work under them, which
 4   was not disclosed at the acquisition.  And, yeah, there
 5   was just a lot of stuff going on, so I wasn't able to
 6   dig in until -- and then Ameris -- we grew 63 percent
 7   without adding any more people, so it was a crazy, busy
 8   year, which was incredibly profitable for Ameris.
 9   Probably made them hundreds of millions of dollars, and
10   so --
11       Q.   So my question is a little different.  It's
12   really just about the timing of your complaints about
13   these two issues that are raised here in Exhibit 38.
14       A.   Is there a question there?
15       Q.   Yeah.  That's what my question is, is the
16   timing.  And I do also want to know where in the email
17   it states that -- that you're seeking this additional
18   1.2 million for you and other employees.
19            MS. ANDERSON:  Objection.  Compound.  Also,
20   argumentative.  And asked and answered.
21            THE WITNESS:  Yeah, I believe I already
22   answered that.
23       Q.   BY MS. FODE:  So where in this email are you
24   stating that you're seeking this $1.2 million for other
25   employees, in addition to yourself?  Because you're
```

Patrick Eugene Byrne                                      October 27, 2025

1    asking for it to be transferred into your payroll on

2    7/30/23.

3         A.    I don't see it exactly here, and I think I've

4    answered, and it's -- you know, it's implied that I'm

5    asking it for everybody else, the 150 other people.

6         Q.    Well, if you -- if it was going to be paid into

7    your payroll on 7/30/23, how would it go to the other

8    people's payroll?

9         A.    This would go --

10             MS. ANDERSON:  Objection.  Argumentative.

11             THE WITNESS:  This, obviously, wouldn't go --

12    yeah, I'm not sure.  But, yeah, the other people which

13    should have been paid under the same -- yeah, under the

14    same circumstances.

15         Q.    BY MS. FODE:  All right.

16             MS. ANDERSON:  Just want you to know, you have

17    four minutes to break because I do need to go to the

18    restroom.

19             MS. FODE:  Okay.  Let me check here.  You know

20    what, I'm okay with us -- because we're --

21             MS. ANDERSON:  No.  We should stay until 1:50,

22    because we want to be prompt.  So you've got three

23    minutes now.

24             MS. FODE:  Okay.

25         Q.    You've mentioned a couple of times here these

Patrick Eugene Byrne                                    October 27, 2025

```
1   I'm just going to ask you about the email, the cover
2   email.  All right.
3                      (Exhibit 39 marked.)
4       Q.    BY MS. FODE:  If you go to the last page of the
5   email chain, we'll start at the bottom.
6       A.    We're just on the first page; correct?
7       Q.    I'm actually on page -786.
8       A.    -786, second page of the email?
9       Q.    Yes.
10      A.    I guess this is an email to me, is it?
11      Q.    Yes.
12      A.    Okay.
13      Q.    And it looks here -- I'm looking at the top of
14  this page, -786.  It looks like Sufhan emailed you,
15  David Sparacio, and Phil Silva about December 2023 LTIP.
16           Do you see that there?
17      A.    Yeah.  I see Sufhan emailing me January 8th of
18  2024.  It looks like they're trying to close out the
19  2023.
20      Q.    Yes.  So the email about that, it says --
21  Sufhan says, "Pat, attached is the final LTIP based on
22  the financials as of 12/31/2023 now that the books are
23  officially closed."
24           Do you see that there?  On January 10th, 2024,
25  it was sent.
```

1     A.   He says, "This is what we have so far," right,

2  for the LTIP, based on all the financials.

3     Q.   So my question is a little different.  My

4  question is do you see the email that's at the top of

5  the page on January 10th?  I just want to make sure

6  you're on the same page.

7     A.   Yeah, I apologize.  I wasn't on the page, but,

8  yes.

9     Q.   Do you remember seeing the email that Sufhan

10  sent saying he's closing -- the books are officially

11  closed?

12     A.   I don't recall specifically, no.

13     Q.   Okay.  As you read this email in front of you

14  does it refresh your recollection that Sufhan emailed

15  you on January 10th, 2024, stating that the books are

16  officially closed?

17     A.   I don't remember specifically, but it makes

18  sense that, you know, right around January 10th, that he

19  would be sending this out.

20     Q.   Okay.  And then if you look at your -- the

21  first page of Exhibit 39, which is Bates -785, is this

22  an email that you sent to Sufhan and David Sparacio and

23  Phil Silva on January 15th, 2024?

24     A.   It looks to be.

25     Q.   Okay.  Why don't you take a minute and review

Patrick Eugene Byrne                                    October 27, 2025

 1    it, and I'll ask you a couple of questions?

 2        A.    Okay.

 3        Q.    Okay.  So it sounds like you're saying, "In

 4    reviewing the LTIP, a few items need to be revised."

 5             So were you emailing to request that there

 6    would be some revisions to the LTIP pool and

 7    calculations?

 8        A.    Yes.

 9        Q.    Okay.  And it looks like you have six

10    paragraphs here -- or six issues that you raised with

11    revisions that you wanted to see; is that correct?

12        A.    Yes.

13        Q.    Okay.  Does this email here, Exhibit 39, does

14    this reflect your concerns about the LTIP calculations

15    at the time that you wrote it?

16        A.    Yeah, at the time, but there's probably more.

17        Q.    Okay.  At the time -- this is a January 2024 --

18    were all of your concerns included in your email and

19    your six bullet points of requests that you -- that you

20    wanted revised?

21        A.    That's what I'm asking for.  Whether that's

22    inclusive, I'm not -- yeah, I don't think that it is,

23    but at the time, this is what I sent.

24        Q.    Okay.  And do you remember in January of 2024,

25    if there were -- if there were more concerns that you

```
 1   had about the calculation of the 2023 LTIP pool?
 2       A.   I don't recall.
 3       Q.   Okay.  And I should clarify because I think
 4   that my question was not clear on it.  These concerns
 5   that you're raising here in Exhibit 39, these are about
 6   the 2023 LTIP calculations and pool?
 7       A.   Yeah, they say at the top that it's December --
 8   yeah, yeah, for the full year, it appears.
 9       Q.   Okay.  And as you sit here today, do you have
10   concerns about the calculation of the 2023 LTIP pool
11   that are not included in this email?
12       A.   I'd have to look, so I'm not -- I don't know
13   specifically, but I'd have to go back and look.  I don't
14   think we received all of the spreadsheets that we need
15   from you folks in order to do those calculations.
16       Q.   Okay.  Well, as -- is your best memory and your
17   best understanding, as you sit here today, are there
18   additional concerns that you raised about the 2023 LTIP
19   calculations while you were employed at the bank?
20       A.   I'm not sure.  I raised these.  That's what I
21   thought we were talking about.  I raised these at this
22   time, but I'm saying today, as I look at it even
23   further, there are more.
24       Q.   Okay.  So -- thank you.  Let's clarify.
25            So at the time in January 2024, you raised
```

Patrick Eugene Byrne                                October 27, 2025

 1    these six concerns.  My question is do you recall there

 2    being other concerns about the 2023 LTIP calculations

 3    that you raised while you were employed?  So before --

 4    before June of 2024.

 5         A.    I don't recall.

 6         Q.    Okay.  And now, as you sit here today, you're

 7    referencing, I believe -- I'm not trying to misstate it,

 8    but you believe that there may be more concerns that you

 9    have about the calculation of the 2023 LTIP pool; is

10    that -- did I get that right?

11         A.    Yes, there may be.

12         Q.    Okay.  But you can't recall at this time or you

13    don't know at this time what those additional concerns

14    are?

15         A.    I'd have to look, because I don't have all the

16    information.  So, yes.  And it's obviously -- as we went

17    through it today, it's pretty detailed, yeah, and as you

18    pointed out, right, yeah, I'm not -- didn't have a

19    formal degree in accounting, so -- and it takes a lot of

20    work, as you say, which I've never been compensated for.

21         Q.    So I'm just trying to put my arms around the

22    scope of your concerns, right, that you raised.  I can

23    tell that you raised these six concerns as of January of

24    2024, and I'd like to know if there are other concerns

25    that were raised about the calculations of the LTIP in

Patrick Eugene Byrne                                    October 27, 2025

```
 1   2023.  And let me just make sure the record is clear

 2   with what your response is on that.

 3       A.   Didn't I already -- yeah, that sounds similar,

 4   but, right, at the time that these six concerns I

 5   brought up, I could have brought up other concerns with

 6   the 2023, before or after this email.  I just don't

 7   recall.

 8       Q.   Okay.  And do you recall a specific email or

 9   specific written correspondence about additional

10   concerns that you raised about the 2023 LTIP?

11            MS. ANDERSON:  Objection.  Overbroad.

12            THE WITNESS:  Yeah, you'll have to -- yeah --

13   yeah.  Can you restate it?

14       Q.   I just -- I'm wondering if there's anything

15   specific in writing where you raised additional concerns

16   outside of these six concerns about the 2023 LTIP.

17       A.   Did I not?  I thought that I answered that, but

18   I thought that I said that these were the six concerns.

19   There may or may not have been other concerns outside of

20   this email, but I don't remember specifically that I had

21   sent an email on those.

22       Q.   I think that's helpful to clarify.  Okay.  And

23   then here at the second sentence to the -- to the bottom

24   of the email, it says, "I have revised the LTIP

25   calculation which results in an LTIP payout of
```

```
 1    3,037-" -- basically, 3,037,750, and then you attach
 2    some calculations.
 3            Were you requesting additional LTIP payout for
 4    2023 of about $3,000,000 in January of 2024 when you
 5    sent this email?
 6        A.   It appears so, yes.
 7        Q.   Okay.  And -- I think that's good now.  I'll go
 8    through another email which should help as well.
 9            Oh, one quick question back on 39.  So this is
10    an email exchange you're asking with Mr. Sufhan, and my
11    question was why do you not have -- why didn't you
12    include or don't you have these communications with
13    Nicole, the C.F.O.?
14        A.   Nicole is, you know, the C.F.O. of -- you know,
15    a company that has, you know, a billion dollars in
16    revenue, 5-million-dollar net worth, right, 2,000 --
17    3,000 employees.  You know, they made it pretty clear
18    that they wanted me to work with Sufhan and
19    David Sparacio, and I just figured if it was important
20    for Nicole, that they would pass it up to her.
21        Q.   Okay.
22        A.   And, you know, Phil was -- you know -- you
23    know, he was involved, and David Sparacio was Sufhan's
24    boss, so to send it to Nicole would be two steps up, I
25    guess.
```

```
 1   to, and there's no missing documents.

 2           MS. ANDERSON:  No, no.  It was ignored, but I

 3   told you we still didn't have it.  That's what my person

 4   told me.  So if you'd give us a minute to review.

 5           MS. FODE:  Okay.  Let's go off the record.

 6           THE VIDEOGRAPHER:  We're now going off the

 7   record.  The time is 2:17 p.m.

 8                       (A break was taken.)

 9           THE VIDEOGRAPHER:  We're now going back on the

10   record.  The time is 2:20 p.m.

11       Q.   BY MS. FODE:  All right.  We're back on the

12   record.  And, again, for the record, we're looking at

13   Exhibit 40.  I wanted to direct your attention to the

14   second-to-last page of this document.  It's -1781.  At

15   the very bottom, there's an email exchange between you

16   and Jim LaHaise and Phil Silva.

17           Do you see that there?

18       A.   January 31st?

19       Q.   Yes.

20       A.   To Jim from me, copying Phil?

21       Q.   Yes.

22       A.   Yes, I see that.

23       Q.   Okay.  And in the email, you're asking for

24   three -- three amounts to be paid.  So I want to just

25   walk through these.  The first is security deposits in
```

Patrick Eugene Byrne                                    October 27, 2025

1    the amount of approximately $2,000,000; the second is

2    2022 LTIP payments in approximately 1.4 million; and

3    No. 3 is the 2023 LTIP in the amount of approximately

4    $3,000,000.  And it says, "Please remit the first two

5    immediately and confirm the third will be paid out on

6    February 15th."

7            Did you send this email to Jim on January 31st?

8        A.    Yeah, it appears that I did.

9        Q.    And were you requesting that the amounts

10   enumerated in 1 through 3, that those be paid to you?

11       A.    Yeah, but implied that everybody else needed to

12   get paid, too.  There's a big, long email before this

13   and subsequently after this.

14       Q.    Okay.  Where in your email does it say -- it

15   says that payment will be paid out to -- it says,

16   "Please remit the first two immediately and confirm the

17   third will be paid out on January 15th."

18           Where does it say those will be paid out to the

19   team?

20       A.    Yeah --

21           MS. ANDERSON:  Objection.  Argumentative.

22           THE WITNESS:  It does not say that it's paid

23   out to the team, but, you know, that's -- you know, it's

24   implied, you know, that 150 other people should be paid.

25       Q.    BY MS. FODE:  Okay.

Patrick Eugene Byrne                                          October 27, 2025

1      A.   Yeah, various discussions that I had with

2  numerous people.

3      Q.   Okay.  Did you -- did you discuss with Jim that

4  you were seeking to have these three amounts of payments

5  made to you and 150 other people?

6      A.   Not here, I didn't, but I certainly even, you

7  know, had suggested that even my portion be paid out to

8  the 150 people, but, yeah, not here, I did not point

9  that out.

10     Q.   Okay.  So the first category, No. 1, it talks

11 about security deposits, and you're asking for a payment

12 of approximately $2,000,000 in security deposits.

13          What were those security deposits that you were

14 seeking payment on?

15     A.   It was a change in the accounting that -- when

16 Ameris acquired Balboa, that they changed and

17 subsequently intentionally stalled decisions on so they

18 wouldn't have to pay out.  With the acquisition -- part

19 of the acquisition, but then also moving forward, they

20 changed the way that security deposits were accounted

21 for.

22     Q.   And for security deposits, are those security

23 deposits on the customers' loans and their deals with

24 the company?

25     A.   Correct, yeah, in conjunction with a contract

Patrick Eugene Byrne                                    October 27, 2025

1    with the customer.

2        Q.    Okay.  And -- but you're seeking payment based

3    on the security deposits that were held on the

4    customer's deals?

5        A.    Specific to this, if -- the way that Ameris

6    accounted for them would decrease the amount of revenue

7    and, therefore, decrease the earnings before taxes.  So

8    as Ameris did in many other cases, they attempted -- or

9    they did change the way that the accounting was done to

10   lower the earnings before taxes that cheated, you know,

11   150 people out of the wages that they earned.

12       Q.    Was it that they didn't want to count the

13   security deposits as revenue?

14       A.    I'm not -- yeah, you know, that's a question

15   for them.  I'm not sure, but I can tell you that it did

16   affect -- it was different.  It was a different way to

17   account for it than was done by Balboa before the

18   acquisition.

19       Q.    Okay.  And then for 2022 LTIP, which we spoke

20   about before, is this -- it looks like here you're

21   asking for 1.4 -- approximately 1.4 million to be paid

22   additional payments on the LTIP, in addition to the 5.6

23   million that you were paid.

24            Is that -- is that accurate?

25       A.    I'm not sure if it is accurate, but that's what

 1      A.    From Jacquie too.  From Jacquie, that somebody
 2  told her.
 3      Q.    All right.  Let's go through.  Jim responded to
 4  your email on February 5th.
 5      A.    What Bates stamp are we on?
 6      Q.    It's the page before, so it's -1780.  Because
 7  it's an email chain, we're going to go from the bottom
 8  up.
 9      A.    Got it.
10      Q.    Okay.  So -1780, it looks like -- and you can
11  take a second -- I know you reviewed some on the break,
12  but take a second to review it.  I'm not going to ask
13  you questions throughout it, but just a couple, okay?
14          So my initial question is Jim is saying,
15  "Pat" -- this is an email of February 5th to you.
16          It says, "Pat, since you did not wish to
17  discuss these topics via conference call, below is my
18  response to your email addressed to me dated 1/31/24,"
19  with a summary -- with the subject summary of
20  "Compensation Owed."
21          Did you -- did you refuse to talk with Jim
22  about the concerns that you raised in -- per your email
23  in January 2024?
24      A.    By this time, we had talked about this numerous
25  times.  There was no movement at all, and so, you know,

```
 1    my position was not that I don't want to talk to him.
 2    It's just that I thought it would better -- there was
 3    really just nothing to talk about, so I really just
 4    wanted him to put everything down in writing in terms of
 5    what -- you know, what the position was.
 6             You know, obviously, this is pretty detailed,
 7    so it's hard -- you know, we had talked about it, you
 8    know, 10, 20, 30 -- you know, 30 times, so it didn't
 9    make any sense to talk about it anymore.  They just kept
10    saying no.  So that was more why I said, you know, I
11    didn't want to, you know, discuss it.
12       Q.   Okay.  And did you -- did you have -- had you
13    retained counsel at the time?
14       A.   No, no.
15       Q.   It also references at the bottom of his
16    email -- so now we're back on -1781.  It references at
17    the very end of his email about you staying on.  It's
18    saying, "To follow up on our conversation during your
19    2023 performance review, you stated that you may not
20    wish to continue in the role of C.E.O. of the
21    Capital" -- "Balboa Capital Division.  If this is still
22    the case, it will require considerable coordination to
23    ensure no impact to the Balboa Capital Division's
24    performance.  Please confirm back to me your plans for
25    remaining with the company by 2/8/24."
```

Patrick Eugene Byrne                                    October 27, 2025

1          Did you remember Jim asking you to confirm that

2    you wanted to stay on as C.E.O.?

3        A.    Not in our performance review.  And I sent an

4    email out to him after this.  This was absolutely

5    mischaracterized what I had said in that performance

6    review.  I said it didn't feel like Ameris wanted me to

7    stay.  They had -- right, there had been a number of

8    things that they had done that made me think that they

9    didn't want me to stay, but there was never a time where

10   I said that I was going to quit or that I -- yeah, that

11   I was going to quit or that I didn't want to be the

12   C.E.O. of Balboa.  And I did state that in a subsequent

13   email on this, and he does say, yeah -- I mean, it

14   almost -- it's almost ominous, right, because he says,

15   right, "It will take a considerable consideration to

16   ensure no impact to the Balboa Capital Division."

17          So it appears that, right, he's fishing, right.

18   He already knows -- you know, he's trying to fire me at

19   this point, unbeknownst to me.

20       Q.    Well, isn't it true, if you were going to quit,

21   then it would take substantial coordination without the

22   C.E.O. of the company; correct?

23       A.    You're correct, but I didn't say that.  I said

24   I was -- I said it didn't feel like it, but if he wanted

25   me, right, then let's talk about it.

Patrick Eugene Byrne                                    October 27, 2025

1     Q.   Yes.

2     A.   But never was it mentioned to me that anybody
3  at Ameris said that they wanted me to quit.  It was
4  always that they always wanted me, despite the fact that
5  I asked them, point blank, from the very beginning,
6  numerous people, "If you don't want me here, then you
7  just need to tell me," and they never -- and they never
8  did that.

9     Q.   Right.  And I see emails where Jim says he
10  wants you to stay on; right?

11     A.   Many; right?  You saw many of them; right?

12     Q.   Uh-huh.

13     A.   As well as other people.  Did you ever see any
14  emails where he didn't -- somebody didn't?

15         MS. ANDERSON:  Well, there's no question
16  pending.

17     Q.   BY MS. FODE:  But it's your testimony, just so
18  we're clear, that -- that you had asked Jim if -- you
19  know, "Why Don't you just fire me?"

20         MS. ANDERSON:  Objection.  Misstates the
21  testimony.

22     Q.   BY MS. FODE:  Or something to that effect?

23     A.   No.

24     Q.   Okay.

25     A.   No, no, no.  And I said to him that it felt

Patrick Eugene Byrne                                    October 27, 2025

1    like -- and I said this numerous times to him, and
2    specifically in that performance review, "It does not
3    feel like you want me here, and if you don't want me
4    here, just let me know."
5            And he would reply, "No, Pat.  We want you
6    here."
7            And then he sends out -- after the performance
8    review, he sends this out, and this is -- yeah, this is
9    twisting what I said, and I put that in an email.
10   Q.   Well, for -- so just so I'm clear, though, is
11   it your testimony you never asked why don't -- you know,
12   it's clear there's contention; right?  There's
13   consciousness, "Why don't you just let me go," or "why
14   don't we separate?"
15           Is it your testimony that you never said
16   something to that effect?
17   A.   I never said that I was going to quit.  I never
18   intimated to anybody that I was going to quit.  It was
19   contentious only because Ameris executives were, right,
20   unlawfully not paying our people, and that's the
21   contention -- that's where the contention is.  It's
22   about nothing else.  There was --
23   Q.   Do you take any responsibility for any of that
24   contentiousness?
25   A.   Do I take any responsibility for it?  I mean,

```
 1        Q.   BY MS. FODE:  If you would go up to the email
 2   before.  This one's now -- I just put the entire chain
 3   in here, in this Exhibit 40, so we can kind of walk
 4   through it, and we'll go back to some of the -- I have
 5   your other documents related to the termination, all of
 6   that.  We'll come back to that, but just so we can
 7   finish out this document.
 8           The email where -- if you would go up a couple,
 9   so we have -1780 we were just talking about.  The email
10   before -1779, it looks like you responded on March 1st,
11   and then there's an email before that from Jim,
12   March 1st, 2024, at 10:38 a.m.  I want to ask you about
13   that email, and it says, "Pat, as we discussed in the
14   review, I do want you to continue as C.E.O."
15           All right.  So --
16        A.   Can I take a break?  Do you mind if I take a
17   break?  You're going to want that question?  Is that
18   going to be your position?
19        Q.   Well, I just asked a question, so you need to
20   answer it.
21        A.   Okay.  Understood.  Okay.
22        Q.   Let's do that.
23        A.   Can you restate what we're looking at?
24        Q.   Uh-huh.  So we're at 17- --
25        A.   Yeah.  Can you give me the foundation and the
```

Patrick Eugene Byrne                                    October 27, 2025

```
 1   question again?
 2        Q.   Sure.  We're at -1778, Bates number --
 3        A.   Okay.
 4        Q.   -- and there's three emails on there, and I'm
 5   looking at the middle one from Jim to you on March 1st,
 6   2024.  Do you see that there?
 7        A.   From Jim to me, yes, but it goes on to the next
 8   page.  Is that the one?
 9        Q.   Yes.
10        A.   Okay.
11        Q.   So I just want to ask you a couple of
12   questions.  It says, "As we discussed in the review, I
13   do want you to continue as C.E.O."
14             So Jim was saying in March of 2024, that he
15   wanted you continue as C.E.O.; correct?
16        A.   Okay.  So this is on the same page.  You said
17   it goes on to another page.  You're saying March 1st of
18   2024, 10:38 a.m.?  That's what we're talking about?
19        Q.   Yeah.
20        A.   Okay.  And he does say, as he said many times,
21   "I do want you to continue as C.E.O."
22        Q.   Okay.  Thank you.
23             And then on the -- just for the sake of time,
24   I'm going to skip through a couple of sentences, and it
25   says, "Let's get on a call or plan a time for to you
```

Patrick Eugene Byrne                                    October 27, 2025

1    come to Atlanta to address your open items and align on

2    authorities, duties, and responsibilities of the Balboa

3    C.E.O. role."  I think that was the term that you were

4    using, "authorities, duties, and responsibilities of the

5    Balboa C.E.O. role."

6            "Happy to include Palmer."  Who is Palmer?

7        A.    Palmer is the C.E.O. of Ameris.

8        Q.    Okay.  So he's happy to include Palmer in that

9    discussion, if you think it's worthwhile.  "I look

10   forward to working with you through this process."

11           Do you remember receiving this email on

12   March 1st?

13       A.    Not specifically, but it looks like I did.

14       Q.    Okay.  Do you remember setting a call with Jim

15   to talk through the aligning with the C.E.O. role and

16   next steps?

17       A.    We had a lot of discussions, so I don't know

18   specifically whether I had one at this point.

19       Q.    Do you remember going to Atlanta, taking him up

20   on his offer for to you go to Atlanta and discuss

21   further?

22       A.    I'm not sure -- I don't think that I did, no.

23   I don't think that I did.

24       Q.    Okay.

25       A.    Yeah, I didn't think that -- because we had

Patrick Eugene Byrne                                    October 27, 2025

```
 1    spent so much time on this, I didn't feel like that
 2    would, you know, provide any additional benefit for
 3    either party.
 4        Q.   Okay.  And then did you discuss the issue with
 5    Palmer, as Jim offers in his March 1st email?
 6        A.   My understanding is Palmer terminated me, but
 7    I -- looks like four days later, I sent him -- or, yeah,
 8    Jim was saying -- you know, they were trying to appease
 9    me at this point and throw out little -- you know,
10    little dollars here and there, and that's what's
11    happening on the next email where they threw out
12    $300,000 on $3,000,000, so --
13        Q.   So my question is do you remember discussing,
14    you know, meeting and having a discussion with Palmer
15    and Jim about the issues?
16        A.   I had, yeah, dozens of meetings with Jim.
17    Specific to Palmer, no, I don't believe I had any
18    discussions with Palmer.
19        Q.   Okay.  And do you -- and we'll strike as
20    nonresponsive that Palmer terminated him.
21             And then do you recall that you -- that he
22    emailed again up above, saying, "Please give some time
23    in the next couple days so we can bring closure to this
24    and get a game plan for moving ahead."
25        A.   What email are you --
```

```
 1              MS. FODE:  Are we at our time?

 2              MS. ANDERSON:  Pretty much, yeah.  I mean --

 3              MS. FODE:  2:51.

 4              MS. ANDERSON:  Yeah.

 5      Q.   By MS. FODE:  Let me just finish.  The last

 6  question is -- just to confirm, did you ever go out to

 7  Atlanta after March 2024?

 8      A.   I don't recall, but I don't think so.

 9              MS. FODE:  Okay.  All right.  Yeah, we can go

10  off the record.  It looks like 2:52.

11              THE VIDEOGRAPHER:  All right.  We are now going

12  off the record.  The time is 2:52 p.m.

13                    (A break was taken.)

14              THE VIDEOGRAPHER:  We are now going back on the

15  record.  The time is 3:02 p.m.

16              MS. FODE:  All right.  We're back on the

17  record, and I'd like to now mark as Exhibit 41, please,

18  it says AMERIS001752 through -1753, and the date of the

19  cover email is March 7th, 2024.

20                    (Exhibit 41 marked.)

21      Q.   BY MS. FODE:  Mr. Byrne, was this an email that

22  you received from Jim LaHaise on March 7th, 2024, with a

23  notice -- a non-renewal notice?

24      A.   Yes.  It appears to be the same day he's asking

25  me to give him some times to come out and talk to
```

Patrick Eugene Byrne                                    October 27, 2025

```
 1   Palmer, and then the same day, he sends me a non-renewal
 2   notice.  Doesn't contact me about that, doesn't -- just
 3   sends the email out.
 4       Q.   Okay.  So you did receive the email with the
 5   non-renewal notice on July 7th, 2024?
 6       A.   The same day, it appears, that --
 7       Q.   Okay.
 8       A.   -- that that was sent out asking what times to
 9   get together for -- for getting together with Palmer.
10       Q.   Okay.  And it says in here, "Want to give us
11   plenty of time to work through our long-term plan
12   together."
13            Did you see that there?
14            MS. ANDERSON:  Oh, where?  Sorry.
15            THE WITNESS:  Yeah.  Once again, he's asking --
16       Q.   BY MS. FODE:  Okay.  And then --
17       A.   Let me finish -- let me finish.
18       Q.   No.  It's a "yes" or "no" answer.
19       A.   It's an "and" -- it's an "and" -- it says --
20   "There's a long-term plan" would suggest, once again,
21   that there's a long-term plan for me, once again, saying
22   that they want me here, even though, once again, you
23   know, they act like -- you know, they sent me out a
24   non-renewal notice, not giving me the courtesy of even a
25   call or a heads-up.  And these are some of the
```

Patrick Eugene Byrne                                    October 27, 2025

```
 1    reasons --
 2            MS. ANDERSON:  Let her ask --
 3       Q.   BY MS. FODE:  Did you understand --
 4            MS. ANDERSON:  Let her ask her question.
 5       Q.   BY MS. FODE:  Did you understand that the
 6    notice relates to your employment agreement, as the
 7    three-year time period was coming up in December of
 8    2024?
 9       A.   Yes.
10       Q.   Okay.  And did you understand that the notice
11    of non-renewal, it did not, in itself, say that your
12    employment was ending; correct?
13       A.   It says that -- they should have called me and
14    at least just gave me a heads-up on this, you know.
15    That would have been a respectful, courteous thing to
16    do, to, you know, to tell me that, if they wanted to
17    keep me long-term, of which they have always said that
18    they were going to do.  And even in this email, no
19    matter how short it is, it says that they want me to
20    work through their long-term plan together.
21       Q.   That's right.  So the company did not state
22    that your employment was being terminated on March 7th,
23    2024; correct?
24       A.   No.  They said it was -- yeah, that -- yeah, we
25    had been talking about this, now, about what would occur
```

Patrick Eugene Byrne                                    October 27, 2025

1    with my employment and Phil's employment for, at this

2    point, probably five months and not getting any real

3    answer, and then I received this notice, and,

4    apparently, Phil had received the same notice.

5        Q.    That's correct.

6            And then with regard to -- you continued to

7    work, right, after March 7th, 2024, when you received

8    this notice of non-renewal; correct?

9        A.    I did, but as I usually would, I would ask Jim,

10   you know, "Here's another reason why you say that you

11   want" -- "you want me here, but, you know, this doesn't

12   feel like it."  The same day, he sent -- yeah, he sent

13   me out the non-renewal notice, he was asking me to come

14   out to talk to him.

15       Q.    And then did you understand there was a

16   discussion about the Senior Management Agreement for

17   you for your continued employment at Balboa?  And let me

18   just go ahead -- you can go ahead and answer that, and

19   I'll mark this.

20       A.    Ask the question again?  I'm sorry, ask the

21   question again, please.

22                        (Record read.)

23            THE WITNESS:  I don't recall Jim -- yeah, I

24   know we had talked about it, and we continued to talk

25   about it until -- yeah, until they terminated me, but

Patrick Eugene Byrne                                    October 27, 2025

1    nothing was ever agreed upon.  But I think we must have

2    talked about it and asked about it every week for, at

3    least, from probably January to when I was terminated.

4        Q.    Okay.  Well, let's mark as Exhibit 42, please,

5    this is Bates No. AMERIS001754 through -1768.

6                        (Exhibit 42 marked.)

7        Q.    BY MR. FODE:  And the top, first page is an

8    email from Jim to you and Phil Silva dated the 11th of

9    March.  So three days later, providing you with,

10   "Gentlemen, attached is our Senior Management Agreement

11   for your review."

12           Did you receive that as an email and attached

13   Senior Management Agreement for your review?

14       A.    I probably did, but at this point, right, this

15   is just like a form, a letter, a form agreement, that

16   we've got nothing kind of backing this.  We'd been

17   talking about, okay, for 2025, after the LTIP ends,

18   yeah, what should it look like?

19           So just sending this out, I mean, I could have

20   got this off of, you know, Nolo Press, or something like

21   that.  This is just an agreement.  It doesn't mean

22   anything.

23       Q.    Did you understand that other executives at the

24   company utilized a Senior Management Agreement rather

25   than an employment agreement?

1      A.    Yeah, I wasn't aware of what other people had

2   outside of Balboa.

3      Q.    And did you understand that your employment

4   agreement was coming to an end in December of 2024 and

5   there needed to be another agreement in place?

6      A.    I'm not sure why there would need to be another

7   agreement in place.  We had an employment agreement.  I

8   understand that the LTIP was specific to, you know, 2022

9   to 2024 and the employment agreement was, but why there

10   would have to be another separate agreement, I'm not --

11   yeah, I'm not sure.

12      Q.    Okay.  And the LTIP was coming to a close, as

13   well, after the three-year term; correct?

14      A.    Yeah.  Certainly, the term would have to be

15   changed, but why you'd have to get a whole new document,

16   it seems a little bit inefficient.

17      Q.    Did you have a discussion with Jim after

18   receiving the Senior Management Agreement on March 11th

19   about the agreement and about next steps in your

20   employment?

21      A.    We talked, you know, and Phil would -- you

22   know, Phil was concerned, and we would talk every week

23   about, you know, what -- you know, what our status was

24   with Ameris, but nothing ever sort of came to fruition

25   on that, and then I was terminated on 6/27.

Patrick Eugene Byrne                                    October 27, 2025

1      Q.   And so when was the next time that you spoke
2   with Jim specifically about the -- the Senior Management
3   Agreement?
4      A.   You know, I don't recall specifically, but I
5   know it was kind of on our agenda on our weekly calls,
6   and so there would be emails, you know, about that being
7   on the agenda, and, you know, we talked about it pretty
8   much every time we would talk to Jim in those weekly
9   meetings and sometimes afterwards.
10     Q.   And did you ever hire an attorney to review the
11  Senior Management Agreement, or was that not something
12  you were going to consider?
13     A.   I would have considered it when it was real,
14  but to this -- to just send out a form document like
15  this didn't seem like it was real.  We didn't know what
16  was, you know, behind it.  There was no -- what the
17  compensation was going to be, what the incentives would
18  be, or anything like that.  So although I still wanted
19  to stay there, I never consulted an attorney because it
20  just wasn't at that point.
21     Q.   Okay.  And did you understand that the other
22  executives had entered into an agreement similar to that
23  in -- at Balboa?
24          MS. ANDERSON:  Objection.  Calls for
25  speculation.

Patrick Eugene Byrne                                    October 27, 2025

1              THE WITNESS:  No.  I still don't know if anyone

2    has entered into an agreement like this at Balboa.

3         Q.   BY MS. FODE:  And, at first, when you received

4    the notice of non-renewal, did you assume that Phil did

5    not receive the notice of non-renewal and accused him of

6    going behind your back with Jim?

7         A.   I did, and I apologized to him.  And, yes, I

8    just assumed that he did, and that was the wrong

9    assumption, and I apologized for it in an email that

10   you're probably going to produce next about that.

11        Q.   Briefly.  Here you go.

12             All right.  Have you seen this email before,

13   sir?

14        A.   Yes.

15        Q.   Okay.  And it's Bates AMERIS001524 to -26.  Is

16   this an email chain between you and Phil Silva on --

17   starting on March 7th, 2024?

18        A.   So starting on March 7th, yes.

19        Q.   All right.  And it says, "Assuming that you

20   didn't receive a similar non-renewal notice and that

21   you've already discussed it, in addition to many other

22   things that you have not made me privy to with Jim."

23             Did I read that correctly at the bottom?

24        A.   Are we going off the first -- are we going off

25   Bates stamp -1526?  That's after the -- oh, that's the

Patrick Eugene Byrne                                    October 27, 2025

1              Do you see that there?

2      A.    You said "without him"?

3      Q.    Did I misread it?

4              MS. ANDERSON:  Yeah, you misread it.

5              MS. FODE:  Thank you.

6              THE WITNESS:  That's what they thought.  That

7      was a Freudian slip, apparently.

8      Q.    BY MS. FODE:  No.  That's just a need for more

9      caffeine, okay.

10             It says, "I have been" -- this is Jim -- this

11     is Phil emailing you, okay?

12             "I have been very clear with them that" -- "and

13     you that we are a much better company with you?"

14             Do you see that there?

15     A.    Yes.  He does say that, as -- yeah, he has

16     always said that, as well as Jim said that, and

17     everybody else at Ameris has said it as well, at least

18     in front of me.

19     Q.    And then the second bullet point says, "They

20     want you to be here if you want to be here."

21             Do you see that there?

22     A.    I wanted to be there, and, yeah, they didn't

23     give me any indication -- at least verbally and in

24     writing that they didn't want me to be here.

25     Q.    Did you understand when Phil sent this to you

Patrick Eugene Byrne                                    October 27, 2025

1    on March 9th, 2024, that it was his understanding that

2    the company wanted you to still be there?

3         A.    It was my understanding -- well, he says, "With

4    regard to Jim and Ameris, they want you to be here."

5         Q.    Okay.

6              MS. FODE:  I'd like to mark it as Exhibit 43

7    Bates No. -1524 through -1526.

8                        (Exhibit 43 marked.)

9              MS. FODE:  And then let's mark this as 44,

10   which is AMERIS001462 through -63.

11                       (Exhibit 44 marked.)

12        Q.    BY MS. FODE:  I want to show you this email

13   chain.  On the second page, at -1463, it's an email from

14   Jim to you and Phil on December 7th, 2023, about 2024

15   budget and LTIP potential.  Do you see that there?

16        A.    Yeah.  Give me a second to read it.

17        Q.    Of course.

18        A.    Okay.

19        Q.    Okay.  If you look at the last line here, this

20   looks like it's an email that Jim sent to you and Pat

21   for a discussion that you were going to have in December

22   of 2023; is that correct?

23        A.    It was to Phil and myself, yes, about a

24   spreadsheet that was, you know, super high level, like

25   1 percent of what the 1Q21 operating model was about,

Patrick Eugene Byrne                                    October 27, 2025

 1    but it was a -- yeah, it talked about how, you know, he

 2    was deflecting on the 2023 LTIP calculation adjustments

 3    because he knows that's what we really wanted to talk

 4    about, and he's giving us the shiny ball of the 2025

 5    incentive plan, which, you know, it's super high level.

 6        Q.    Did you meet with Jim -- you and Phil meet with

 7    Jim in December of 2023?

 8        A.    I'm not sure, but these discussions, as I

 9    previously testified, you know, were, you know, on

10    agenda pretty much every week.

11        Q.    So my question is did you meet in December of

12    2023 either in person or virtually to discuss these

13    agenda items?

14        A.    Yeah.  I'm not sure exactly when we met, but

15    there was a discussion -- when you say "meet," we were

16    remote.  So, yeah, we had -- it was, most likely, on the

17    weekly meeting discussion.

18        Q.    Okay.  On the last sentence, it says, "I am

19    working on 2023 LTIP calculation adjustments, and we'll

20    bring an example of 2025 incentive plan templates so we

21    can discuss."

22            Did you understand that you were starting to

23    discuss the 2025 incentive plan template back in

24    December of 2023?

25        A.    I remember him sending this to us, and it was,

 1    like I previously testified, super high level, and, you

 2    know, we continued to talk about it and never really got

 3    a resolution all the way through, you know, seven months

 4    past this, which would be -- it would be June 30th.

 5         Q.   Okay.  So you started discussing it, though,

 6    the 2025 incentive plan template back in December of

 7    2023; correct?

 8         A.   Yeah, but it also became, really, a joke

 9    between Phil and I because nothing was ever really

10    resolved on it.  We would have it on the agenda, and it

11    would always be a reflection.  Nothing was ever resolved

12    on it.

13         Q.   And then in March of 2024, you were sent the

14    template agreement; correct?

15         A.   We were sent the -- yeah, it was -- once again,

16    it was a template, right.  It's just a form that doesn't

17    mean anything because it doesn't have any of the terms

18    in it.  Yeah, so he was sent this the same day he sent

19    the non-renewal, and he sends that -- what is that?

20    That's three months after he sends this, so we were

21    having discussions about this for three months, and

22    then, coincidentally, he sends this form document out on

23    the same day that we get the non-renewal.

24         Q.   And, again, you testified that you didn't have

25    any conversations with him about it; correct?

Patrick Eugene Byrne                                    October 27, 2025

```
 1        A.    Okay.  I'm going to need to spend some more
 2   time on this.
 3        Q.    Okay.  Let me just ask you specifically.  It
 4   looks like Phil --
 5        A.    Can I -- yeah, can I review the document?
 6        Q.    Yeah.  Just so you know, I'm going to start at
 7   the bottom, but I'm not going to ask you about all of
 8   them, for the sake of time.
 9              Have you reviewed it?
10        A.    Yes.
11        Q.    Perfect.  I wanted to ask you, if you start at
12   the bottom, at page -1548, it looks like Phil's emailing
13   a team of people, and -- including you, but, generally,
14   are these managers of Balboa?
15        A.    Yes.
16        Q.    Okay.  And it looks like Phil is emailing about
17   the 2024 bonuses.  Do you see that there?
18        A.    That's the subject line, "Follow-Up 2024
19   Bonuses."
20        Q.    Okay.  And he's saying, "As a follow-up to our
21   conversation yesterday, it is my opinion that we will
22   not be receiving additional bonuses this year like we
23   have the last two years."
24              So this is dated February 1st, 2024, and then
25   he's stating, "After going north of 60 percent in 2021
```

1    and 20-" -- I think that's a typo, but I think it should

2    be "2022" -- "with very low losses, 2023 was much more

3    challenging with the added cost of deposits, freezes on

4    hiring, increased scrutiny with rates, and high losses,

5    primarily in trucking."

6            So did you agree that 2023 was going to be a

7    worse year financially for Balboa?

8        A.   Well, he's talking about bonuses, and so he's

9    talking about the LTIP here.  The higher losses in

10   trucking would -- you know, would hit the -- would hit

11   the LTIP anyway.  The scrutiny on rates and how -- you

12   know, how we were mandated to increase those rates

13   detracted from the LTIP.  The freezes on hiring did

14   detract from the LTIP.  And when I say "detracted" I

15   mean decrease the earnings before taxes, which

16   shouldn't -- shouldn't have occurred.

17           And, also, because we have a 1 percent cost of

18   funds, the added cost of funds for Ameris had no -- had

19   no effect on that.  So he is not correct when he's

20   saying -- or trying to draw a parallel between their

21   bonuses and some of these items.

22       Q.   And is he trying to temper expectations with

23   the team?

24           MS. ANDERSON:  Objection.  Calls for

25   speculation.  Go ahead.

Patrick Eugene Byrne                                    October 27, 2025

1          THE WITNESS:  He's trying to give up because he

2    wants to stay employed at Ameris and -- yeah, gives up

3    on not wanting to fight for these individuals, and, you

4    know, 150 other -- that would be 140 other individuals

5    because Ameris chose not to pay them.

6          Q.  BY MS. FODE:  Before you had said it was 150

7    people.  Are you thinking it's 140 people?

8          A.  I thought there might be ten people here.  I

9    was just estimating.  So it's -- let's say, yeah, it's

10   over 130.

11         Q.  And would you agree that there were high losses

12   in 2023, primarily in trucking?

13         A.  I would -- yes, and I would also say that

14   Ameris knew this, right, going in, when they bought --

15   when they bought the company, our concentration in

16   trucking.  And this wasn't something that was particular

17   to Balboa.  It affects the entire industry -- and I

18   pointed out many times and showed that we were doing, in

19   trucking, much better than any other company out there.

20         Q.  But there were losses in 2023 relating to

21   trucking; correct?

22         A.  That's the business, yes.  There were losses.

23         Q.  Okay.  And do you remember the amount of losses

24   in 2023 relating -- just the amount of charge-offs, in

25   general, in 2023?

1      A.    No, but that should have all run through,

2    right, the LTIP.  So we're talking about, right, whether

3    the losses affect the LTIP.  So if the losses were

4    there, then they would have run through the LTIP.

5      Q.    And then he states, "Ameris is very supportive

6    of equipment finance, and I'm hoping we will be able to

7    return to these types of bonuses in 2025."

8          So did --

9      A.    Well --

10     Q.    Hold on.  Did you understand that there was a

11   hope that you would be returning to higher bonuses in

12   2025?

13     A.    I was aware that Ameris was very supportive,

14   because this is extremely profitable for Ameris when we

15   brought in -- I don't know -- $50,000,000 in earning

16   before taxes, which, you know, might be $400,000,000 for

17   them.  And so why wouldn't they be supportive of that,

18   if they could -- you know, if they could not pay their

19   employees as well and make their compensation higher.  I

20   understood that.  And, you know, I see Phil is trying to

21   find a way to pay them and hoping that, you know,

22   maybe -- maybe in 2025 that things will be different.

23     Q.    And then in your subsequent email on Monday,

24   February 5th, you lay out all the numbers for -- and,

25   really, your opinion on the problems with the

Patrick Eugene Byrne                                    October 27, 2025

```
 1   calculations of the LTIP; correct?
 2       A.   Yeah.  I laid out the facts.
 3       Q.   All right.  And did you think it was
 4   appropriate for you to be giving that level of your
 5   displeasure and objection to the calculations of the
 6   LTIP to the Balboa team?
 7       A.   It was very painful to do so and, right, with
 8   Phil, but Phil -- right, these guys -- it was unlawful,
 9   and he knew that, and we knew that, and Ameris knows
10   that, and they knew that.  And so, yes, I do think --
11   yeah, I did think it was appropriate.  I tried to do it,
12   you know, in a way that was trying to be respectful by
13   saying that I agree with Phil on many of his points, but
14   I did not agree on not paying, you know, these bonuses,
15   specifically to these people that we've worked with, you
16   know, on average 15 years.
17       Q.   And did you think that was a moment of good
18   leadership to undermine your president in front of the
19   leadership team of Balboa?
20            MS. ANDERSON:  Objection.  Argumentative.
21            THE WITNESS:  I thought it was the right thing
22   to do, yes.  Sometimes as a leader, you have to take a
23   stance that's -- yeah, that's not congruent.  I mean,
24   you remember, he reported to me as well.  So, yes, I did
25   think it was an outstanding, you know, moment of
```

Patrick Eugene Byrne                                           October 27, 2025

1    leadership.

2        Q.    BY MS. FODE:  Okay.  And then it looks like --

3    just skipping ahead just for the sake of time, at -1545,

4    it's the second email from the top, you're asking Phil,

5    "Do you see any significant LTIP payout this year?  Do

6    you care?"

7              Do you see that there?

8        A.    Can you tell me, -15-  --

9        Q.    Yeah, -1545, bottom of the page.

10       A.    Bottom of the page, yeah.  So on April 12th --

11   let's see.  Okay.  So this is -- this is a chain, right.

12   So now we were just talking about February, and now

13   we're going two months forward; is that correct?

14       Q.    Yes.  So I'm asking did you send this email

15   dated February 12th, 2024, to Phil?

16       A.    Yes.  This contact is two months later, I'm

17   sending this; right?  We were talking about something --

18       Q.    But my question is just "yes" or "no."  I'm

19   just authenticating it and seeing if you sent it.  So

20   you said yes to that.  And then the email before is --

21   or, I guess, in response is Phil responding back to you,

22   and he's saying, "The LTIP seems to have been the

23   impetus for the breakage of our relationship."

24             Would you agree with that?

25       A.    I'm sorry.  Can you point me to which --

Patrick Eugene Byrne                                    October 27, 2025

1        Q.    First page of -1584, at the bottom.

2        A.    Yes, ma'am.

3        Q.    It says, "The LTIP" -- at the bottom, "The LTIP

4    seems to have been the impetus for the breakage of our

5    relationship."

6              Would you agree with that?

7        A.    Yes, because he didn't want to stand up for --

8    yeah, for employees, so I feel very strongly about that,

9    and he sacrificed bonuses to -- which should have been

10   paid for his employment.

11       Q.    And do you see any -- any of your part in the

12   breakage of your relationship with Phil?

13             MS. ANDERSON:  Objection.  Argumentative.

14   Relevance.

15             THE WITNESS:  My relationship, no, I don't

16   recall anything beyond the LTIP where I had any

17   significant differences with -- with Phil or, frankly,

18   for most anybody at Ameris.

19       Q.    BY MS. FODE:  Okay.  And the next bullet point,

20   he says, "Since the purchase, our people have had

21   regular performance reviews, regular raises, paid

22   commensurate with the marketplace, and great

23   benefits/vacation."

24       A.    Where is that?  I'm sorry.

25       Q.    I'm at the bottom of -154.

Patrick Eugene Byrne                                    October 27, 2025

 1       A.    It says that's the effective date.  I think it
 2   was after that that I actually received it.
 3       Q.    Okay.  And let's go to -- did you receive, on
 4   the first page at Bates No. -95, and, for the record,
 5   it's Bates No. -95 to -100.
 6           Did you receive the final score of "Meets
 7   Expectations"?  It's right there on the first page.
 8       A.    It appears that I did, yes.
 9       Q.    Okay.  And with regard to the page -- it's
10   Bates No. -97, in the middle.  It says that the
11   Performance Objectives -- I'm looking at No. 5 where it
12   says that the -- that the -- that, "With standard FTP
13   pricing, the company did not make a profit for the
14   year."
15           Do you see that there in the middle of page 97?
16       A.    -97, No. 5?  Is that what you're pointing out?
17       Q.    Yes.
18       A.    "With standard FTP pricing," which -- I'm not
19   sure FTP pricing.
20           Oh, so -- yeah.  So I think what he's saying is
21   that given their calculations and given their loan loss
22   reserves -- I'm talking about Ameris at this point.  It
23   appears that Jim is alleging that -- and given that
24   their cost of funds -- I'm not sure how they're coming
25   up with that -- that we did not hit a profit for that

Patrick Eugene Byrne                                October 27, 2025

```
 1   year, but that has nothing to do with the LTIP.  The
 2   pricing is agreed to be at 1 percent, and the losses
 3   that they -- reserves and anything else they have, which
 4   my recollection were trumped up, you know, for 2023.  It
 5   was, you know, $40,000,000.  It's irrelevant to the
 6   LTIP.  You know, the LTIP has a very specific
 7   formulation, and those are all run through the LTIP, so
 8   I think we're talking about apples and oranges here.
 9       Q.   Right.  Because right now I'm talking about
10   your performance review that you received that was
11   judging your performance for 2023; correct?
12       A.   This is my performance review, correct.
13       Q.   Okay.  And then if you look at No. 4, that's
14   one above No. 5.  It says, "Adjusted loan losses were
15   39.5 million or 3.4 percent of average year-to-date loan
16   balances, which prevented the division from exceeding
17   the LTIP target."
18            Did you see that there?
19       A.   Well, I think, No. 1, I guess --
20       Q.   Real quick, I'm just asking you did you see --
21   did I read that correctly that you were given this
22   feedback in your performance review?
23       A.   Yes.  And I think as I previously testified,
24   this does not have to do, you know, with the LTIP.  And
25   I think if you look at No. 1, the division income before
```

1    tax was $48,000,000, or 98 percent of original

2    projections, so almost a hundred percent, and --

3         Q.    I want to ask you about the charge-offs for

4    2023.  I have in my notes that the charge-offs for 2023

5    were a total of 39.5 million.

6              Is that your recollection of the charge-offs

7    for 2023?

8         A.    My recollection is that Ameris, even though it

9    says in the LTIP agreement that we were going to use the

10   best provider of CECL reserves to calculate the loan

11   loss reserves, they used Corsinet, which was a Corsinet

12   benefit, their own calculation, which is not what is

13   spelled out in the LTIP.  And they came up with this --

14   you know, what I previously testified was a trumped up,

15   you know, amount of losses for that year.

16        Q.    And so your contention is the 39.5 million in

17   charge-offs, which actually was charged off on the

18   books, that that's not accurate; correct?

19        A.    I'd have to look at it closer, but I'm saying

20   my best recollection is that you can, you know, have

21   reserves that flow through adjusted loan losses, which

22   are projections into the future, and they used

23   projections that were too high, because the methodology

24   that they used was different from the methodology that

25   was used in the LTIP.

Patrick Eugene Byrne                                    October 27, 2025

```
 1      Q.   And when you're saying "they," are you talking
 2   about the C.F.O., Nicole and Jim, when you're talking
 3   about "they"?  That "they" decided?  Are you talking
 4   about the accounting department?
 5      A.   I apologize, but, yeah, that would be -- I'm
 6   not sure who exactly it would be, but I would imagine
 7   that the C.F.O. would have to sign off on that.
 8      Q.   Okay.  And then there's a last comment here on
 9   your performance review on the last page, -100.  It
10   says, "Jim" -- who is your boss; correct?  He wrote,
11   "Pat is unhappy with the level of autonomy he has in
12   leading the division.  There are strained relationships
13   with some leaders in the company."
14           All right.  Would you agree that --
15      A.   Where are you at?
16      Q.   I'm looking at page -100 of the performance
17   review.  Would you agree that there were strained
18   relationships with you and the leaders in the company?
19      A.   My only unhappiness was not about the level of
20   my autonomy.  It was having to do with the -- the
21   departments that were reporting to Ameris and that also
22   affected the LTIP, and any strained relationships that I
23   had was the sole result of, you know, issues with --
24   that they weren't following through on the LTIP.
25      Q.   Okay.  Understood.  But you agree there were
```

Patrick Eugene Byrne                                    October 27, 2025

1    strained relationships with the leaders in the company;

2    correct?

3        A.    There were strained relationships because they

4    were unlawfully --

5        Q.    Not "because."  I'm just asking --

6        A.    I know what you're asking.

7        Q.    I'm asking are you acknowledging that there

8    were strained relationships?

9        A.    I'm acknowledging that there were

10   relationships, because of the LTIP and because Ameris

11   chose not to pay employees unlawfully, were strained.

12       Q.    Okay.  And then the last piece of it says, "We

13   would like for Pat to continue a long-term role leading

14   the division."

15           Did you see that?  Did you understand that,

16   that they wanted you to continue leading the division?

17       A.    As I said previously, yeah, I have every

18   indication that Ameris ever told me or in writing was

19   that they wanted me to continue in a long-term

20   relationship.

21       Q.    Okay.  And it says, "So he will need to decide

22   if he would like to continue in that role."

23           Do you see that there?

24       A.    Once again, I think I --

25       Q.    But, just, sir, do you see what I just read?

1    Do you understand that it was in your performance review

2    that you will need to decide if you would like to

3    continue in that role?  Your boss put that in your

4    performance review?

5           MS. ANDERSON:  Objection.  Hearsay.  Calls for

6    speculation.  Go ahead.

7        Q.   BY MS. FODE:  Did you understand that?

8        A.   Jim put this in, and I believe I responded to

9    this because, once again, this was not what I had said.

10   I wanted to continue in the role.  I never said that I

11   would want to quit, and he put this in here, just like

12   he put it in that other email, that, for some reason, I

13   have to decide whether I want to continue.  It was

14   always I always wanted to continue.  I never said that I

15   was going to quit, so this is not --

16       Q.   And so it was in your performance review --

17   your 2023 performance review; correct?

18       A.   I believe that there's another part of the

19   performance review -- or at least an email where I say

20   that, yes, I want to stay and I want to continue in the

21   role.

22       Q.   Okay.  Are you currently employed?

23       A.   No.

24       Q.   And have you worked at all since 20- -- June of

25   2024?

Patrick Eugene Byrne                                          October 27, 2025

```
 1                    REPORTER'S CERTIFICATE

 2

 3         I, the undersigned Certified Shorthand Reporter,

 4    holding a valid and current license issued by the State of

 5    California, do hereby certify:

 6

 7         That said proceedings were taken down by me in

 8    shorthand at the time and place therein set forth and

 9    thereafter transcribed under my direction and supervision.

10

11         I further certify that I am neither counsel for

12    nor related to any party to said action nor in any way

13    interested in the outcome thereof.

14

15         The dismantling, unsealing, or unbinding of the

16    transcript will render the Reporter's certificate null and

17    void.

18

19         In witness whereof, I have subscribed my name on

20    this 31st day of October.

21

22

23    _____
          AMY E. SAYLOR, CSR #11560

24

25
```