# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4                              .
    PATRICK BYRNE,              .    Case No.:
 5                              .    8:24-CV-01989-MWC-JDEX
              Plaintiff,        .
 6                              .    Atlanta, Georgia
        v.                      .
 7                              .    November 5, 2025
    AMERIS BANK,                .
 8                              .    10:03 a.m.
              Defendant.        .
 9  . . . . . . . . . . . . .

10

11

12                  CONFIDENTIAL

13

14        VIDEOTAPED 30(b)(6) DEPOSITION OF

15                  JAMES LAHAISE

16

17            Taken by the Plaintiff

18

19

20        CANDICE EDWARDS, GA-CCR, CER, CDR
            Esquire Deposition Solutions
21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by reporter.
```



 1  deposition notice, Number 1 is Ameris' Acquisition of

 2  Balboa Capital Corporation, including but not limited

 3  to A, Ameris' decision to acquire Balboa.

 4       How did Ameris first come to -- to be known to

 5  Balboa?

 6            MS. YEE:  Okay.  Hold on, Steve.  And just

 7  again, for the record, and just for the purposes of

 8  efficiency, I'm just going to state broadly, you know,

 9  a standing objection that Defendant Ameris Bank had

10  previously served an objection to the 30(b)(6)

11  deposition notice, including to the examination topics

12  set forth within that notice.

13            I just want to put it out there.  I may give

14  specific objections when, you know, it's appropriate.

15            But other than that, you can go ahead and

16  answer.

17  BY MR. CORCORAN:

18  Q.   Would you like me to repeat the question?

19  A.   Yes, please.

20  Q.   How did Balboa first come to be known to

21  Ameris Bank?

22            MS. YEE:  Objection.  Overbroad.  Vague.

23  Ambiguous.

24            THE WITNESS:  An investment banker brought

25  the -- introduced us to the -- to the opportunity.



1   BY MR. CORCORAN:

2   Q.   What was that investment banker's name?

3   A.   Michael.  I don't recall his last name.  Michael.

4   Q.   Who at Ameris Bank first initiated or suggested

5   the acquisition of Balboa by Ameris?

6           MS. YEE:  Assumes facts not in evidence.

7   Vague.

8           THE WITNESS:  Can you ask that question

9   again?

10  BY MR. CORCORAN:

11  Q.   Sure.  Who at Ameris Bank initiated or first

12  suggested the acquisition of Balboa by Ameris?

13          MS. YEE:  Same objection.

14          THE WITNESS:  I believe I did.

15  BY MR. CORCORAN:

16  Q.   Why was Ameris interested in acquiring Balboa?

17          MS. YEE:  Overbroad.  Vague.

18          THE WITNESS:  Because it fit into our bank --

19  business banking strategy.

20  BY MR. CORCORAN:

21  Q.   Before Balboa was acquired by Ameris, what did you

22  understand to be the business of Balboa?

23          MS. YEE:  Calls for speculation.

24          THE WITNESS:  Equipment finance.

25  BY MR. CORCORAN:



 1          MS. YEE:  Objection.  Asked and answered.

 2   Document speaks for itself.

 3          THE WITNESS:  The Employment Agreement says

 4   that he is working on behalf of Ameris Bank.

 5   BY MR. CORCORAN:

 6   Q.   Fair enough, but I'm not asking about that.  I'm

 7   asking about Paragraph 3.3, the incentive program.  It

 8   states that the executive is expected to participate in

 9   the LTIP, but it doesn't say expected to participate in

10   the LTIP on behalf of Ameris Bank, correct?

11          MS. YEE:  Objection.  Unintelligible.

12   Document speaks for itself.

13          THE WITNESS:  The words do not say that.

14   BY MR. CORCORAN:

15   Q.   And this is specifically under the heading

16   Compensation and Benefits.  So from that, we can gather

17   that he would be expected to participate in the LTIP

18   with respect to compensation and benefits, correct?

19          MS. YEE:  Objection.  Assumes facts not in

20   evidence.  Document speaks for itself.  Calls for legal

21   conclusion.

22          THE WITNESS:  No.  He is eligible.

23   BY MR. CORCORAN:

24   Q.   If the LTIP performance threshold criteria are

25   met, Patrick Byrne and other Balboa Capital employees



JAMES LAHAISE  30(b)(6), Confidential                November 05, 2025
BYRNE vs AMERIS BANK                                                       48

 1  stand to make substantial additional cash awards to

 2  their regular salary under the LTIP, true?

 3          MS. YEE:  Objection.  Incomplete

 4  hypothetical.  Assumes facts not in evidence.

 5  BY MR. CORCORAN:

 6  Q.   You can answer.

 7  A.   There's no way for me to know what is -- until

 8  they actually perform.

 9  Q.   So my point is, if -- if they do perform, and they

10  -- the earnings before tax surpasses the threshold

11  specified in the LTIP, Patrick Byrne and the other

12  Balboa Capital employees stand to make -- stand to earn

13  additional compensation from the LTIP program, true?

14          MS. YEE:  Objection.  Overbroad.  Calls for

15  speculation.  Incomplete hypothetical and compound.

16          THE WITNESS:  The LTIP is an incentive

17  program that will pay out in the event if somebody is

18  eligible and approved to be included in the -- in -- in

19  the LTIP payment.  So they can get paid, yes.

20  BY MR. CORCORAN:

21  Q.   You'd agree that if a performance goal for

22  Balboa Capital was set and met by the LTIP terms, then

23  the incentive funds or money has to be deposited into

24  the LTIP pool, true?

25          MS. YEE:  Objection.  Vague.  Overbroad.



 1  A.   I -- I'm not aware.

 2  Q.   There is no provision for returning LTIP pool

 3  funds to Ameris Bank, correct?

 4         MS. YEE:  Objection.  Overbroad.  Vague.

 5  Assumes facts not in evidence.  Lacks foundation.

 6         THE WITNESS:  The agreement states that it is

 7  returned to the accrual pool.

 8  BY MR. CORCORAN:

 9  Q.   But not Ameris Bank?

10         MS. YEE:  Objection.  Vague.  Overbroad.

11  Document speaks for itself.

12  BY MR. CORCORAN:

13  Q.   You can answer.

14  A.   Ameris Bank is the owner of all things within the

15  company, and therefore, any accrual in the accounting

16  system is owned by Ameris Bank.

17  Q.   As part of the acquisition of Balboa Capital by

18  Ameris Bank, Patrick Byrne and Ameris Bank negotiated

19  the written LTIP, true?

20         MS. YEE:  Overbroad.

21         THE WITNESS:  Patrick Byrne was -- did

22  participate in the negotiation of the LTIP agreement.

23  BY MR. CORCORAN:

24  Q.   And Ameris Bank participated in the negotiation of

25  the LTIP agreement, true?



1  months ago.  I didn't see any value in discussing these

2  items further, so I suggest you respond in writing.

3      "After reading your responses, these items remain

4  open.  For Number 1, the purchase price was increased

5  by $2,024,765.  This sum is past due.  For Number 2,

6  the incentive pool remaining is 1,457,100" -- sorry.

7  Excuse me.  Let me start over.  "For Number 2, the

8  incentive pool remaining is $1,457,051 and is past due.

9  And for Number 3, the incentive pool is $3,037,750 and

10  is payable no later than March 15th."

11      In the next paragraph, Pat Byrne states, "During

12  my review where we didn't talk about my performance,

13  nor did I have a copy of my performance review, I let

14  you know that it didn't seem you wanted me to continue

15  as CEO."

16      Next paragraph, "If you said in my" -- strike

17  that.

18      Next paragraph, "As you said in my review and you

19  have reiterated many times since the acquisition, you

20  would like me to continue as CEO; however, as I have

21  mentioned in the review and many times before, Ameris'

22  actions speak differently.  For example, we are

23  constantly at odds over the calculation of the LTIP,

24  which determines the appropriate annual bonuses for our

25  best people."



```
 1        Thereafter, Pat states, "You have rejected every
 2   idea that I have had for improvement since the
 3   acquisition, and you have transferred almost all of my
 4   duties either to managers at Ameris (i.e. accounting,
 5   credit, IT, and marketing) or to Phil, which has
 6   materially decreased my authority, duties, and
 7   responsibilities.  When we started to work together, I
 8   took you for your word that you would like me to
 9   continue as CEO, but after two years, it's no longer
10   about what you say but what you do."
11        Next paragraph, "I have consistently been
12   transparent from the time of the acquisition with you
13   and several other members of the Ameris executive team,
14   saying that if you don't find what I am doing valuable,
15   please let me know.  I have added significant value to
16   Ameris and would like to continue doing so.  However,
17   if the feeling is not mutual, please suggest how we
18   move forward.  Thank you.  Pat."
19        Did I read that correctly?
20             MS. YEE:  Document speaks for itself.
21             THE WITNESS:  You read that correctly.  None
22   of the facts are correct.
23   BY MR. CORCORAN:
24   Q.   Thereafter, you responded by email on March 1st,
25   2024, in which you stated, "Pat, as we discussed in the
```



 1  review, I do want you to continue as CEO.  As I stated

 2  in that email, in response to your Summary of

 3  Compensation Owed, our position on the open items in

 4  the below first paragraph are that your assumptions are

 5  not correct, and no payment is due -- payments are

 6  due."

 7       Thereafter, you said, "Let's get on a call or plan

 8  a time for you to come to Atlanta to address your open

 9  items and align on the authorities, duties, and

10  responsibilities of the Balboa CEO role.  Happy to

11  include Palmer in that -- that discussion, if you think

12  that is worthwhile."

13       Who is Palmer?

14  A.   Palmer Proctor is our CEO.

15  Q.   He's the CEO of Ameris Bank, correct?

16  A.   Correct.

17  Q.   And thereafter, you write, "I look forward to

18  working with you through the process.  Thank you.

19  Jim."

20       Did I read that correctly?

21            MS. YEE:  Document speaks for itself.

22            THE WITNESS:  Yes.

23  BY MR. CORCORAN:

24  Q.   All right.  Backing up for a second, when you said

25  it would take "considerable time" to replace Pat as



```
 1  to Patrick Byrne, instead of just renewing his

 2  employment contract?

 3              MS. YEE:  Misstates his prior testimony.

 4  Assumes facts not in evidence.

 5  BY MR. CORCORAN:

 6  Q.   You can answer.

 7  A.   No.

 8  Q.   What did you discuss with Palmer Proctor about

 9  offering this document to Patrick Byrne?

10              MS. YEE:  Assumes facts not in evidence.

11  Misstates his prior testimony.

12              THE WITNESS:  I did not discuss it with

13  Palmer Proctor.  I informed him.

14  BY MR. CORCORAN:

15  Q.   You informed Palmer Proctor that you were going to

16  be sending this document to Patrick Byrne, correct?

17              MS. YEE:  Objection.  Misstates his prior

18  testimony.

19  BY MR. CORCORAN:

20  Q.   You can answer.

21  A.   Yes.

22  Q.   If you truly wanted Patrick Byrne to -- to stay

23  and remain as CEO of Balboa Capital, why didn't you

24  just renew his employment contract?

25              MS. YEE:  Objection.  Argumentative.  Assumes
```



JAMES LAHAISE  30(b)(6), Confidential                    November 05, 2025
BYRNE vs AMERIS BANK                                                          165

 1  facts not in evidence.  Vague.

 2  BY MR. CORCORAN:

 3  Q.    You can answer.

 4  A.    Because this is the document we use.

 5  Q.    At any time before sending Patrick Byrne the

 6  Notice of Non-Renewal, was there any discussion of

 7  offering him a different position within the Balboa

 8  Capital Division, other than CEO?

 9          MS. YEE:  Objection.  Assumes facts not in

10  evidence.

11          THE WITNESS:  No.

12  BY MR. CORCORAN:

13  Q.    Did Patrick Byrne's employment agreement provide

14  for automatic renewal?

15          MS. YEE:  Objection.  Document speaks for

16  itself.  Calls for a legal conclusion.

17          THE WITNESS:  Is the document in here?  Yes.

18  Take a look.  Yes.

19  BY MR. CORCORAN:

20  Q.    If his employment agreement provides for an

21  automatic renewal, why was he being sent a -- a

22  Severance Protection and Restrictive Covenants

23  Agreement?

24          MS. YEE:  Same objections.  Document speaks

25  for itself.  Calls for a legal conclusion.



```
 1              THE WITNESS:  As I previously said, this is
 2    the document we use.
 3    BY MR. CORCORAN:
 4    Q.   Well, you're the chief strategy officer, correct?
 5    A.   Yes.
 6    Q.   What was the strategy behind using this document?
 7              MS. YEE:  Objection.  Argumentative.  Vague.
 8    Overbroad.
 9    BY MR. CORCORAN:
10    Q.   You can answer.
11    A.   This document is the document we use for severance
12    and protection agreements.
13    Q.   You already told me that.  My question is, what
14    was the strategy behind using this document?
15              MS. YEE:  Objection.  Overbroad.  Vague.
16              THE WITNESS:  There's no strategy.  It's an
17    offer to an employee to provide them a severance and
18    protection document agreement.
19    BY MR. CORCORAN:
20    Q.   In terms of severance, what monetary compensation
21    was Patrick Byrne being offered or afforded through
22    this document?
23              MS. YEE:  Objection.  Document speaks for
24    itself.  Asked and answered.  Calls for a legal
25    conclusion.  Incomplete hypothetical.
```



```
 1                MR. CORCORAN:  All right.  We've been going
 2   another hour.  Why don't we take a ten-minute break?
 3                MS. YEE:  Did we?  Hold on.  Hold on.  Let me
 4   -- let me see.  When did we get on the record?  I
 5   thought it was like four --
 6                THE VIDEOGRAPHER:  Five hours, eight minutes,
 7   and 40 seconds and counting.
 8                MS. YEE:  I thought we started this
 9   particular session at four --
10                THE VIDEOGRAPHER:  28:46, at 4:11.
11                MS. YEE:  What time it is now?
12                THE VIDEOGRAPHER:  4:51.
13                MS. YEE:  So we're not one hour yet.  Let's
14   please continue.  It's been a long day already.
15   BY MR. CORCORAN:
16   Q.   Can you give me a complete list of all the reasons
17   that Patrick Byrne was terminated?
18                MS. YEE:  Objection.  Overbroad.  But you can
19   answer.
20                THE WITNESS:  I don't think I can recall all
21   of them.  But some that I can recall are his failure --
22   the -- the -- division's failure to perform to the
23   financial results the company expected; the strained,
24   unproductive relationships that Pat Byrne had developed
25   with employees throughout the company; the failure to
```



1  follow certain controls and processes, and

2  circumventing them; and he no longer made the choice.

3  He no longer wanted to be here.  Those are the ones I

4  can remember right now.

5  BY MR. CORCORAN:

6  Q.   Did you need Palmer Proctor's approval to send out

7  the notice to Patrick Byrne that his employment

8  contract would not be renewed?

9           MS. YEE:  Vague.

10          THE WITNESS:  No.

11 BY MR. CORCORAN:

12 Q.   Who made the decision not to renew Patrick Byrne's

13 employment contract?

14          MS. YEE:  Objection.  Vague.  Assumes facts

15 not in evidence.

16          THE WITNESS:  I did.

17 BY MR. CORCORAN:

18 Q.   Was anybody else involved in that decision?

19 A.   I solicited input from other leaders in the

20 company.

21 Q.   Why did you make the decision, as the chief

22 strategy officer, not to renew Patrick Byrne's

23 employment contract?

24          MS. YEE:  Objection.  Vague.  Overbroad.

25 Assumes facts not in evidence.



 1           THE WITNESS:  As I stated before, the

 2  document that the employment contract was under is no

 3  longer -- is not a document that we use.  This is the

 4  replacing document.  This -- the changing -- the

 5  Severance Protection and Restrictive Covenants

 6  Agreement is the agreement that we use.

 7  BY MR. CORCORAN:

 8  Q.   Well, the Severance Protection and Restrictive

 9  Covenants Agreement is not an employment document, is

10  it?

11           MS. YEE:  Objection.  Argumentative.

12           THE WITNESS:  I -- I don't -- I don't know

13  what it is considered --

14           MS. YEE:  Calls for a legal conclusion.

15  BY MR. CORCORAN:

16  Q.   Well, this document, the -- the Severance

17  Protection and Restrictive Covenants Agreement, does it

18  -- in any way, does it offer Patrick Byrne a -- a

19  position with Ameris Bank or Balboa Capital, and if so,

20  what would his title be?

21           MS. YEE:  Objection.  Document speaks for

22  itself.  Incomplete hypothetical.  Calls for a legal

23  conclusion.  Asked and answered.

24           THE WITNESS:  I -- I'm not sure I understood

25  that question.  Could you ask it again?



JAMES LAHAISE  30(b)(6), Confidential                        November 05, 2025
BYRNE vs AMERIS BANK                                                      177

1   Q.    Let me know when you've had a chance to look at

2   this document.

3   A.    Okay.

4   Q.    All right.  This document is an email from you,

5   James LaHaise, to Patrick Byrne, dated June 27th, 2024,

6   and the subject is:  "Notice of Termination."  And it

7   includes an attachment titled "Pat Byrne Employment

8   Agreement Released.pdf."

9        Did I read that correctly?

10            MS. YEE:  Document speaks for itself.

11            THE WITNESS:  Yes.

12   BY MR. CORCORAN:

13   Q.    And then behind that is a letter on Ameris Bank

14   letterhead dated June 27th, 2024, addressed to

15   Patrick Byrne, "Regarding employment agreement with

16   Ameris Bank (the 'Company'), dated as of December 10th,

17   2021 (the 'Agreement')."

18        And this letter states, "Dear Pat, this letter

19   shall serve as notice pursuant to Section 5.1 of the

20   agreement that the company has terminated your

21   employment as of June 30th, 2024," correct?

22            MS. YEE:  Document speak for itself.

23            THE WITNESS:  That's what the document says.

24   BY MR. CORCORAN:

25   Q.    There is no reason given for his termination in



JAMES LAHAISE 30(b)(6), Confidential                                    November 05, 2025
BYRNE vs AMERIS BANK                                                                178

```
 1   this letter, correct?

 2              MS. YEE:  Objection.  Vague.

 3              THE WITNESS:  The agree -- this document

 4   states, "Termination of your employment by the company

 5   without cause."

 6   BY MR. CORCORAN:

 7   Q.   Meaning no reason was given for his termination,

 8   correct?

 9              MS. YEE:  Objection.  Vague.  Document speaks

10   for itself.  Calls for legal conclusion.

11              THE WITNESS:  That's not what it says.  It

12   says "without cause."

13   BY MR. CORCORAN:

14   Q.   Where in here is any -- read the document and tell

15   me where there's a reason given for his termination.

16              MS. YEE:  Same objections.  Argumentative.

17              THE WITNESS:  It's not required as part of

18   the without clause -- cause.

19   BY MR. CORCORAN:

20   Q.   So my first point was actually accurate?  There is

21   no reason in this document stated as to why Patrick

22   Byrne was terminated, correct?

23              MS. YEE:  Objection.  Vague.  Form.

24              THE WITNESS:  No.

25   BY MR. CORCORAN:
```



1  Q.    Is my statement correct?

2  A.    No.

3  Q.    Where in here does it state why he was terminated?

4           MS. YEE:  Objection.  Document speaks for

5  itself.  Calls for legal conclusion.

6           THE WITNESS:  This document doesn't state --

7  it's -- it's not that.  It says, "The company is

8  terminating without cause."

9  BY MR. CORCORAN:

10 Q.    It states at the bottom, "In addition,

11 notwithstanding the termination of your employment by

12 the company without cause, you will remain eligible to

13 participate in the Balboa Capital long-term cash

14 incentive plan," doesn't it?

15          MS. YEE:  Objection.  Vague.  Document speaks

16 for itself.

17          THE WITNESS:  The document does say that.

18 BY MR. CORCORAN:

19 Q.    Do you know when Patrick Byrnes (sic) is supposed

20 to be paid any monies he is owed under the -- the 2024

21 LTIP plan?

22          MS. YEE:  Objection.  I'm going to instruct

23 him not to answer.

24          That's part of the lawsuit.

25 BY MR. CORCORAN:



JAMES LAHAISE  30(b)(6), Confidential                 November 05, 2025
BYRNE vs AMERIS BANK                                                    183

```
 1  BY MR. CORCORAN:

 2  Q.   How did the division fail to perform to your

 3  expectations?

 4  A.   It failed to meet the financial budget for that

 5  current period.

 6  Q.   Just one period?

 7           MS. YEE:  Objection.  Vague.

 8           THE WITNESS:  For the period that is being

 9  referenced there.

10  BY MR. CORCORAN:

11  Q.   Was that just one quarter?

12           MS. YEE:  Objection.  Misstates his prior

13  testimony.

14           THE WITNESS:  No.

15  BY MR. CORCORAN:

16  Q.   What was the period referenced?

17           MS. YEE:  Objection.  Asked and answered.

18  Vague.

19           THE WITNESS:  2023 or -- or -- wait.  I got

20  my year wrong.  That's not correct.  2020 -- year to

21  date, 2024.

22  BY MR. CORCORAN:

23  Q.   The second basis you mentioned was "strained,

24  unproductive relationships."  With whom did

25  Patrick Byrne have strained or unproductive
```



JAMES LAHAISE  30(b)(6), Confidential                November 05, 2025
BYRNE vs AMERIS BANK                                                    184

1  relationships?

2              MS. YEE:  Vague.  Overbroad.

3              THE WITNESS:  The ones I can think of quickly

4  is Nicole Stokes, Ross Creasy, David Sparacio, with me.

5  Those are the ones I can think of right now.

6  BY MR. CORCORAN:

7  Q.   What, if anything, did Nicole Stokes tell you

8  about how her relationship with Patrick Byrne was

9  strained?

10             MS. YEE:  Objection.  Vague.  Overbroad.

11             THE WITNESS:  There were numerous

12  conversations over long periods of time, which the

13  relationship was strained, and the conversations were

14  difficult between the -- Pat and Nicole.

15  BY MR. CORCORAN:

16  Q.   You haven't identified a single thing that

17  Ms. Nicole -- Nicole Stokes told you about how the

18  relationship was strained, though.

19      Did she tell you anything about how the

20  relationship was strained?

21             MS. YEE:  Objection.  Argumentative.

22  BY MR. CORCORAN:

23  Q.   Specific details?

24             MS. YEE:  Objection.  Argumentative.  Vague.

25  BY MR. CORCORAN:



JAMES LAHAISE  30(b)(6), Confidential                    November 05, 2025
BYRNE vs AMERIS BANK                                                    185

1  Q.    You can answer.

2  A.    So what I can think of, off the top of my head, is

3  Pat's failure to follow -- or to -- was undermining

4  controls and procedures.

5  Q.    What about Pat's failure to follow was undermining

6  controls or procedures?

7  A.    I -- I don't understand that question.  Could you

8  repeat it?

9  Q.    Sure.  What about Pat's failure to follow was

10  undermining controls or procedures?

11          MS. YEE:  Vague.

12          THE WITNESS:  So based on what I

13  understand --

14  BY MR. CORCORAN:

15  Q.    And we're just talking about Nicole Stokes right

16  now.

17  A.    Correct.

18  Q.    Please continue.

19  A.    Pat was asking employees not to perform -- or not

20  to -- to process loans in a certain manner that broke

21  controls already -- it -- it -- controls in place for

22  proper accounting.

23  Q.    How was Pat asking that the loans be processed --

24          MS. YEE:  Objection.  Overbroad.  Vague.

25  BY MR. CORCORAN:



JAMES LAHAISE  30(b)(6), Confidential                November 05, 2025
BYRNE vs AMERIS BANK                                              186

1   Q.    -- so that they would break controls that were in

2   place for proper accounting?

3           MS. YEE:  Same objections.

4   BY MR. CORCORAN:

5   Q.    What specifically was Pat asking be done?

6   A.    I don't have the specifics that they were --

7   Nicole has -- it -- it -- it -- would have the details

8   associated with it.  I just have the general knowledge.

9   Q.    All right.  Anything else that Nicole Stokes told

10  you in terms of a strained or unproductive relationship

11  with Pat Byrne?

12  A.    That's all I can think of right now.

13  Q.    All right.  Let's move on to Ross Creasy.  What,

14  if anything, did Ross Creasy tell you about having a

15  strained or unproductive relationship with Patrick

16  Byrne?

17          MS. YEE:  Vague.  Overbroad.

18          THE WITNESS:  Pat Byrne was redirecting

19  technology employees in the Balboa division without

20  coordinating with Ross Creasy, creating risk to the

21  company.

22  BY MR. CORCORAN:

23  Q.    Specifically, how was Pat Byrne redirecting

24  technology employees in Balboa?  What was he doing?

25          MS. YEE:  Objection.  Overbroad.  Vague.



JAMES LAHAISE  30(b)(6), Confidential                    November 05, 2025
BYRNE vs AMERIS BANK                                                  187

```
 1   Asked and answered.

 2            THE WITNESS:  Again, I don't have specifics,

 3   because that's not my area of expertise.  But to the --

 4   my basic knowledge is that -- that redirecting the

 5   developers who are working on security components of

 6   the technology to communication, to data integrity.  He

 7   was redirecting them to other priorities without

 8   coordinating with Ross Creasy.

 9   BY MR. CORCORAN:

10   Q.   All right.  Are there any other ways in which you

11   understand that Ross Creasy had a strained or

12   unproductive relationship with Pat Byrne?

13            MS. YEE:  Vague.

14            THE WITNESS:  That's all I --

15            MS. YEE:  Overbroad.

16   BY MR. CORCORAN:

17   Q.   All right.  Same question for David Sparacio.

18   What did David Sparacio tell you about how he had a

19   strained or unproductive relationship with Pat Byrne?

20            MS. YEE:  Overbroad.

21   BY MR. CORCORAN:

22   Q.   You can answer.

23   A.   My -- my understanding is that Pat's insistence to

24   include these changes in calculations and make

25   adjustments to our accounting system were incorrect and
```



JAMES LAHAISE  30(b)(6), Confidential                    November 05, 2025
BYRNE vs AMERIS BANK                                                   188

```
 1  causing stress for the accounting team.
 2  Q.   Did David Sparacio tell you anything else about
 3  how he had a strained or unproductive relationship with
 4  Pat Byrne?
 5          MS. YEE:  Vague.  Overbroad.
 6          THE WITNESS:  That's all I can think of right
 7  now.
 8  BY MR. CORCORAN:
 9  Q.   How did you personally have a strained or
10  unproductive relationship with Pat Byrne?
11  A.   Pat's continued discussion about items that we've
12  clearly told him and confirmed back to him that his
13  assumptions were incorrect, and there was no further
14  need to discuss those, and we needed to focus on the
15  performance of the company, is where the -- where the
16  stress in the relationship occurred.
17  Q.   Were those items with respect to the LTIP?
18          MS. YEE:  Objection.  Vague.  Overbroad.
19  Assumes facts not in evidence.
20          THE WITNESS:  No, not all of them.
21  BY MR. CORCORAN:
22  Q.   Other than the LTIP, what items did Pat Byrne
23  focus on you, where his -- focus on with you, where his
24  assumptions were incorrect?  Other than the LTIP, what
25  other items?
```



```
 1              MS. YEE:  Overbroad.

 2              THE WITNESS:  I can't think of the individual

 3  items, but they related to the accounting of revenue

 4  and expenses flowing through the income statement of

 5  the Balboa Capital Division.

 6  BY MR. CORCORAN:

 7  Q.   And that would've been related to the LTIP, true?

 8              MS. YEE:  Objection.  Argumentative.  Vague.

 9              THE WITNESS:  Not necessarily.

10  BY MR. CORCORAN:

11  Q.   Any other ways that you had a strained or

12  unproductive relationship with Pat Byrne?

13  A.   The amount of stress, as we discussed, between the

14  other executives, strained -- created strain between he

15  and I because of our constant need to discuss the same

16  thing over and over again.

17  Q.   Anything else?

18  A.   That's all I can think of right now.

19  Q.   All right.  You also told me Pat was terminated,

20  because he "failed to follow controls, procedures, or

21  was circumventing them."

22       In what ways, other than those that you've already

23  told me about, was Pat Byrnes (sic) failing to follow

24  controls, procedures, or circumventing them?

25              MS. YEE:  Vague.  Overbroad.
```



1   THE WITNESS:  Those ones we just discussed

2   are the ones I recall right now.

3   BY MR. CORCORAN:

4   Q.   Fair enough.  And you said that Pat Byrnes (sic)

5   had made the choice he no longer wanted to be here.

6   What, if anything, did Pat Byrne say to you that made

7   you think that he no longer wanted to be here?

8   A.   On three occasions, the final being on -- in

9   mid-June -- mid to late June, Pat would get frustrated

10  and always make the statement that, why don't you fire

11  me?

12  Q.   Other than that, did he do or say anything else

13  that made you believe that he'd made a choice that he

14  no longer wanted to be there?

15           MS. YEE:  Overbroad.

16           THE WITNESS:  No.  That is clear enough.

17  BY MR. CORCORAN:

18  Q.   Were there any witnesses present when Pat Byrne

19  said, why don't you fire me?

20  A.   Yes.

21  Q.   Who?

22  A.   Nicole Stokes.

23  Q.   Anybody else?

24  A.   No.

25  Q.   Were there any witnesses present when Nicole



1                    CERTIFICATE OF REPORTER

2

3          I, CANDICE EDWARDS, Certified Court Reporter

4     and Notary Public, in and for the State of Georgia do

5     hereby certify:

6              That the foregoing witness was duly sworn;

7     that the proceeding took place before me at the time

8     and place herein set forth; that the testimony and

9     proceedings were accurately captured with annotations,

10    and that the transcript is a true and complete record

11    of the proceedings.

12             I further certify that I am not related to

13    any of the parties to this action by blood or marriage

14    and that I am not interested in the outcome of this

15    matter, financial or otherwise.

16             IN WITNESS THEREOF, I have hereunto set my

17    hand this 10th day of November, 2025.

18

19

20

21    _Candice Edwards_____

22    CANDICE EDWARDS, GA-CCR, CER, CDR

23

24

25



1              CERTIFICATE OF TRANSCRIPTIONIST

2

3              I, Shawn Weber, Registered Professional

4     Reporter, do hereby certify:

5              That the foregoing is a complete and true

6     transcription of the original digital audio recording

7     of the testimony and proceedings captured in the

8     above-entitled matter.  As the transcriptionist, I have

9     reviewed and transcribed the entirety of the original

10    digital audio recording of the proceeding to ensure a

11    verbatim record to the best of my ability.

12             I further certify that I am neither attorney

13    for nor a relative or employee of any of the parties to

14    the action; further, that I am not a relative or

15    employee of any attorney employed by the parties

16    hereto, nor financially or otherwise interested in the

17    outcome of this matter.

18             IN WITNESS THEREOF, I have hereunto set my

19    hand this 10th day of November, 2025.

20

21

22

23    _____

24    Shawn Weber, RPR
      Certification No. 837572
25    Expiration: September 30, 2026

