# EXHIBIT 61

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

PATRICK BYRNE, an individual,  )
                               )
          Plaintiff,           )
                               )
     vs.                       ) Case No. 8:24-cv-01989
                               )           MWC-JDE
AMERIS BANK, a Georgia corporation,)
                               )
          Defendant.           )
_____)


REMOTE DEPOSITION OF MARYELLEN SEBOLD taken on behalf of Plaintiff, at 9:00 A.M., Thursday, January 15, 2026, before Jennifer Livingston, Certified Shorthand Reporter No. 14087 of the State of California, pursuant to Notice.



THE SULLIVAN GROUP OF COURT REPORTERS
AN ESQUIRE DEPOSITION SOLUTIONS COMPANY

```
 1   APPEARANCES OF COUNSEL:

 2          FOR THE PLAINTIFF:

 3          ALLEN MATKINS
            BY:  STACEY VILLAGOMEZ, ESQ.
 4          2010 Main Street
            8th Floor
 5          Irvine, California   92614
            (213) 622-5555
 6          (213) 620-8816 (Fax)
            Svillagomez@allenmatkins.com
 7
            FOR THE DEFENDANT:
 8
            NUKK-FREEMAN & CERRA, P.C.
 9          BY:  NANA YEE, ESQ.
            550 West C Street
10          Suite 910
            San Diego, California   92101
11          (619) 842-0267
            (619) 566-4741 (Fax)
12          Nyee@nfclegal.com

13          ALSO PRESENT:

14          Patrick Byrne
            Jody Spencer
15          Deborah Dickson

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS                EXAMINATION                      PAGE

 4   Maryellen Sebold       By Ms. Villagomez                   4

 5

 6

 7

 8                       E X H I B I T S

 9   PLAINTIFF'S                                             PAGE

10   Exhibit 1     Expert report of Maryellen Sebold          13
                   dated December 5, 2025
11
     Exhibit 2     Balboa Capital long-term incentive         38
12                 plan

13   Exhibit 3     Expert report of Deborah Dickson           82
                   dated January 2nd, 2026
14

15

16

17              QUESTIONS INSTRUCTED NOT TO ANSWER

18                           None.

19

20

21

22                     INFORMATION REQUESTED

23                           None.

24

25
```

```
 1       Q.   And you reviewed this LTIP informing your
 2  opinions in this case?
 3       A.   Yes.
 4       Q.   So you're familiar with its terms?
 5       A.   Yes.
 6       Q.   I'm using shorthand "LTIP," but what does
 7  "LTIP" stand for?
 8       A.   It's a long-term cash incentive plan.
 9       Q.   And I'm going to ask this one more time.  I
10  know you mentioned this earlier.
11            You confirm that incentive plans are not
12  subject to GAAP; correct?
13            MS. YEE:  Vague.  Lacks foundation.  Misstates
14  her prior testimony.
15            THE WITNESS:  I actually didn't say that.
16  What I said is that I can't speak for other LTIPs
17  because I don't know, but what I can tell you is that
18  this LTIP was set up with reference to GAAP as well as
19  regulations -- federal and state regulations that need
20  to be followed.
21  BY MS. VILLAGOMEZ:
22       Q.   I'll turn your attention to Bates stamp Ameris
23  000227.  And you'll see half way down the page, this
24  discusses the key assumptions which it states are for
25  purposes of calculating EBT under this agreement, it
```

```
 1   provides six different key assumptions.
 2          Do you see that?
 3      A.  I do.
 4      Q.  Will you read Subdivision A into the record,
 5   please?
 6      A.  Initial direct costs will be calculated using
 7   GAAP methodology.
 8      Q.  And I'm going to walk us through the remaining
 9   just for purposes of this record.  B states, The
10   interest cost used will be 1 percent; C, There will be
11   no allocation of indirect company expenses to Balboa by
12   the company, and there will be no transfer pricing
13   between the company and Balboa; D, For the performance
14   period of this agreement, Balboa will not be charged for
15   any other cost of capital other than the 1 percent cost
16   of funds on the average outstanding balance on all
17   earning assets; E, Balboa will bear all direct costs
18   incurred in its operations, and the company will pass
19   through at actual cost without markup any discounts
20   relating to Balboa's operations that the company enjoys
21   with suppliers and vendors.
22          And finally, on the next page, Subdivision F,
23   The allowance for loan losses calculations and expenses
24   for Balboa will be the greater of (i) actual net
25   charge-offs or (ii) 1.25 percent of net investment in
```

```
 1   direct financing leases.
 2            You see these six key assumptions; correct?
 3        A.  I do.
 4        Q.  And the LTIP expressively references GAAP only
 5   with respect to Subdivision A for initial indirect cost.
 6            Do you see that?
 7            MS. YEE:  Document speaks for itself.
 8            THE WITNESS:  I see GAAP is mentioned in A
 9   specifically.
10   BY MS. VILLAGOMEZ:
11        Q.  And that's one discreet component identified
12   in the LTIP that is subject to GAAP methodology;
13   correct?
14            MS. YEE:  Document speaks for itself.  Calls
15   for a legal conclusion.  Calls for speculation.
16            THE WITNESS:  Again, I would -- I see it is
17   specifically identified in A, but I also know that there
18   is a provision within the award agreement that
19   specifically talks about following -- that the LTIP has
20   to follow.  And it's in Paragraph 9, Compliance of Legal
21   Requirements.  So the entirety of the document, the
22   agreement, and the granting of cash bonus awards will be
23   subject to all applicable federal and state laws, rules,
24   and regulations and to such approvals by any regulatory
25   or governmental agency as may be required under which
```

```
 1   GAAP would fall.  So I agree with you that it's
 2   specifically mentioned in A, but I think more broadly,
 3   it is mentioned to apply to the entire agreement.
 4   BY MS. VILLAGOMEZ:
 5        Q.   Is there another section within the LTIP that
 6   states that GAAP has to apply to everything?
 7             MS. YEE:  Vague.  Lacks foundation.  Overbroad
 8   and asked and answered.
 9             THE WITNESS:  Other than a specific
10   Paragraph 9 in the award agreement, I don't recall
11   seeing it.
12   BY MS. VILLAGOMEZ:
13        Q.   But even that Paragraph 9 doesn't use the
14   phrase "GAAP" at all, does it?
15             MS. YEE:  Document speaks for itself.
16             THE WITNESS:  That paragraph does not mention
17   any specific federal or state laws or rules or
18   regulations or approvals by regulatory or governmental
19   agencies.  There are too many to name, but my point is
20   that GAAP would fall under that.
21   BY MS. VILLAGOMEZ:
22        Q.   GAAP was specifically called out in
23   Subdivision A.
24             Do you see that?
25             MS. YEE:  Asked and answered.
```

```
 1              as follows:
 2                   "QUESTION:  Can you identify any
 3              applicable federal and state laws, rules,
 4              and regulations and approvals by any
 5              regulatory or governmental agency that
 6              requires application of GAAP to incentive
 7              plans?")
 8              MS. YEE:  Same objections.
 9              THE WITNESS:  It's a question that doesn't
10   really make sense.  I mean, what we're saying is that
11   GAAP does fall under rules and regulations, regulatory
12   or governmental agency, so it by default is -- would
13   fall under that, so your question --
14   BY MS. VILLAGOMEZ:
15       Q.   I'm asking which of those.
16            So, for example, do you know what federal law
17   requires application of GAAP to incentive plans?
18       A.   It doesn't say that it has to be all of them.
19   This is a regulatory agency.  So they have rules and
20   regulations that -- in this case, for example, this is a
21   bank.  This is a publicly-traded bank which is required
22   to follow GAAP.
23       Q.   Right.  I understand that.  But it's your
24   interpretation then that Paragraph 9 as it's drafted
25   requires that GAAP methodology would be applied to the
```

```
 1   entire LTIP?
 2              MS. YEE:  Misstates her prior testimony.
 3   Overbroad.
 4              THE WITNESS:  Yes, I do.
 5   BY MS. VILLAGOMEZ:
 6       Q.   Thank you.
 7            I would like to turn to Ameris 00228, the next
 8   page over, and I'll direct your attention to Footnote
 9   No. 3, the last sentence.
10            "The general premises of the LTIP is to
11   materially follow the past practice which this
12   calculation is maintaining."
13            Do you see that?
14       A.   I do.
15       Q.   Did you consider this language in your
16   analysis?
17       A.   Yes.  But I think you need to look at the
18   entirety of the footnote starting with the first
19   sentence which says, "Balboa has an established CECL
20   model and vendor which will apply to the Balboa Capital
21   division.  The general premise of the LTIP is to
22   materially follow past practice which this calculation
23   is maintaining."  So I do -- I do understand there's
24   language around past practice, and I assume -- I assumed
25   that that past practice had to do with Balboa's past
```

```
 1  BY MS. VILLAGOMEZ:
 2       Q.   I'm going to pull us back to Exhibit No. 1
 3  which is your expert report.  If you'll look at Page 4,
 4  Paragraph 24, it says, "Per the LTIP agreement for each
 5  year, 35 percent in EBT above the threshold is allocated
 6  to the LTIP cash pool.  Each participant receives a
 7  percentage of the incentive pool with specific
 8  percentages determined at Byrne's discretion."
 9            Do you see that?
10       A.   I do.
11       Q.   And why did you say that distributions were to
12  be made at Byrne's discretion?
13       A.   I believe -- I can't remember what document I
14  reviewed that indicated that Byrne -- it was at his
15  discretion that these allocations were to be made.  As I
16  sit here, I don't see that I've footnoted it, so I can't
17  remember as I sit here.
18       Q.   But it's your understanding as you sit here
19  that Byrne had some discretion in what each participant
20  receives a percentage of in the inventive pool?
21       A.   That's my understanding, yes.
22       Q.   Thank you.
23            And back to the LTIP -- sorry to detour --
24  back to Exhibit 2, nothing in the LTIP states that every
25  component must apply to GAAP.
```

```
 1              Your testimony is that GAAP applies to the
 2    LTIP at issue here based on Paragraph 9 of the LTIP;
 3    correct?
 4              MS. YEE:  Document speaks for itself.
 5    Misstates her prior testimony.
 6              THE WITNESS:  And just to be specific because
 7    Paragraph 9 is part of the award agreement, which is
 8    Ameris 000229, and it's that Paragraph 9 that I'm
 9    referring to.
10    BY MS. VILLAGOMEZ:
11         Q.   Thank you for that clarification.
12              I'm going to move on to the next topic.
13              So one of your principle criticisms relates to
14    the loan loss provision that was used in the LTIP
15    calculation; correct?
16         A.   Yes.
17         Q.   And you understand that --
18              Let me step back.
19              Did you review Ms. Dickson's rebuttal report?
20         A.   I did.
21         Q.   And you understand that there's essential
22    disagreements between your opinion and Ms. Dickson's
23    opinion with respect to the loan loss provision?
24         A.   I do.
25         Q.   And you would agree that the loan loss
```

```
 1   compensation for accounting, IT, and marketing.
 2           Do you recall your opinions with respect to
 3   these Paragraphs 118 to 120?
 4       A.   I do.  And this is, again, with respect to the
 5   2022 LTIP adjustment.
 6       Q.   Correct.  In your report in this section, you
 7   conclude that the accounting, IT, and marketing entries
 8   at issue should be treated as direct Balboa costs for
 9   LTIP purposes; correct?
10       A.   Yes.
11       Q.   How did you come to that conclusion?
12       A.   Well, through a number of things; one,
13   reviewing the various documents, talking with
14   Nicole Stokes and understanding how the Balboa
15   pre-acquisition was set up.  Clearly, it was a Balboa
16   entity.  And through these conversations and through
17   review of -- there were various lists that showed
18   employees, et cetera, through discussions with
19   Jim LaHaise that I came to learn as much as there were
20   certain people that were part of the Balboa team that
21   when they moved over to Ameris were still part of the
22   Balboa team and that they were -- the entirety of their
23   job was to serve Balboa interests.  And some of them did
24   not continue to report up through Mr. Byrne but instead
25   reported up to others at Ameris, but, again, if you look
```

```
 1   compensation for accounting, IT, and marketing.
 2           Do you recall your opinions with respect to
 3   these Paragraphs 118 to 120?
 4       A.   I do.  And this is, again, with respect to the
 5   2022 LTIP adjustment.
 6       Q.   Correct.  In your report in this section, you
 7   conclude that the accounting, IT, and marketing entries
 8   at issue should be treated as direct Balboa costs for
 9   LTIP purposes; correct?
10       A.   Yes.
11       Q.   How did you come to that conclusion?
12       A.   Well, through a number of things; one,
13   reviewing the various documents, talking with
14   Nicole Stokes and understanding how the Balboa
15   pre-acquisition was set up.  Clearly, it was a Balboa
16   entity.  And through these conversations and through
17   review of -- there were various lists that showed
18   employees, et cetera, through discussions with
19   Jim LaHaise that I came to learn as much as there were
20   certain people that were part of the Balboa team that
21   when they moved over to Ameris were still part of the
22   Balboa team and that they were -- the entirety of their
23   job was to serve Balboa interests.  And some of them did
24   not continue to report up through Mr. Byrne but instead
25   reported up to others at Ameris, but, again, if you look
```

```
 1              MS. YEE:  Misstates her prior testimony.
 2   Lacks foundation.
 3              THE WITNESS:  Again, I think you just said how
 4   their roles changed.  Is that what you said?
 5   BY MS. VILLAGOMEZ:
 6        Q.   Correct.
 7        A.   Okay.  Again, I'm not sure their roles
 8   changed.  They clearly had a new employer, but, again,
 9   their -- the jobs that they were doing were specific to
10   the Balboa -- I'll call it "department" within Ameris.
11        Q.   And your understanding based on your
12   discussion with Mr. LaHaise is that the reporting
13   structure did not materially change?
14              MS. YEE:  Misstates her prior testimony.
15   Vague.  Lacks foundation.
16              THE WITNESS:  That's really not what I said
17   because, again, I'm not sure of which person no longer
18   reported to Mr. Byrne instead may have reported to
19   Mr. LaHaise or somebody else, but, again, it still
20   continued to -- their function was for the benefit of
21   Balboa.  So I mean, that's the best way I can describe
22   it.
23   BY MS. VILLAGOMEZ:
24        Q.   I'll direct your attention to Paragraph 101.
25   This section starting at Paragraph 98 discusses Byrne's
```

```
 1   allegation of interim rent.
 2              Do you recall your position with respect to
 3   how you analyzed Mr. Byrne's position on interim rent?
 4        A.   I do.
 5        Q.   And can you just summarize this section for
 6   me, please?
 7        A.   Sure.  So there was request by Mr. Byrne to
 8   make adjustments to the LTIP calculation in 2023, and he
 9   was claiming that the accounting of interim rent was
10   changed which is not consistent with past practices
11   resulting in 1.974 million in reduced income.  And the
12   problem with that is that he was improperly accounting
13   for interim rent.  There's, again, another GAAP rule,
14   ASC 842, that dictates how interim rent has to be
15   treated.  If you go to Paragraph 106, it talks -- well,
16   there's various paragraphs that talk about it -- that
17   banks have to -- publicly-traded companies have to
18   follow 842.  And that is what Ameris was doing.  And in
19   doing so -- and if that was not done, Mr. Byrne's point
20   is that he would have been entitled to another
21   $1.9 million through the LTIP calculation which is not
22   proper.
23   BY MS. VILLAGOMEZ:
24        Q.   And your analysis in this regard of interim
25   rent is based on GAAP requirements; correct -- including
```