MATTHEW SESSIONS (BAR NO. 307098)
STACEY A. VILLAGOMEZ (BAR NO. 317081)
MADISON E. LARSEN (BAR NO. 364953)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313
Fax: (949) 553-8354
E-Mail: msessions@allenmatkins.com
        svillagomez@allenmatkins.com
        mlarsen@allenmatkins.com

Attorneys for Plaintiff
PATRICK BYRNE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK BYRNE, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>AMERIS BANK, a Georgia corporation,<br><br>Defendant. | Case No. 8:24-cv-01989-MWC-JDE<br><br>ASSIGNED FOR ALL PURPOSES TO<br>Judge Michelle Williams Court<br><br>**DECLARATION OF ROBERT RASMUSSEN IN SUPPORT OF OPPOSITION TO DEFENDANT AMERIS BANK'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 13, 2026<br>Time: 1:30 p.m.<br>Ctrm: 6A<br><br>Disc. Cutoff: November 28, 2025<br>Trial Date: June 1, 2026 |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4938-1181-4278.3

DECLARATION OF ROBERT RASMUSSEN
IN SUPPORT OF OPPOSITION TO
DEFENDANT AMERIS BANK'S MOTION
FOR SUMMARY JUDGMENT

# DECLARATION OF ROBERT RASMUSSEN

I, Robert Rasmussen, declare as follows:

1. I am an individual over the age of eighteen and competent to testify. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently thereto. I submit this declaration in support of Plaintiff Patrick Byrne's ("Byrne") Opposition to Defendant Ameris Bank's ("Ameris") Motion for Summary Judgment. Unless otherwise stated, the facts set forth below are based on my personal involvement, observations, and communications in the ordinary course of my duties at Balboa Capital ("Balboa").

2. I was employed by Balboa for approximately nineteen years. During that entire period, I worked closely with Byrne. I served as Balboa's Chief Credit Officer and later as its Chief Operating Officer. In those roles, I oversaw multiple operational departments, including Credit, Portfolio Management, Information Technology, Accounting Operations, and the Business Center.

### A. Balboa Operations and Pre-Acquisition Structure

3. Prior to Balboa's acquisition by Ameris, the departments I oversaw reported through Balboa's internal management structure. Decisions regarding operations, staffing, budgeting, and workflow were coordinated internally within Balboa.

4. Before the acquisition closed, I was not informed that the departments I oversaw would no longer report through Balboa's leadership structure or that they would instead be subject to direct oversight by Ameris personnel following the transaction. I learned this for the first time approximately six to eight months after the acquisition.

### B. The LTIP and Pre-Acquisition Agreements

5. Before the acquisition, I was aware that the Long-Term Incentive Plan ("LTIP") was introduced in connection with Ameris's acquisition of Balboa and was an important component of the transaction for Balboa leadership, including Patrick

1  Byrne. Prior to the acquisition, Balboa had bonus programs, but ultimate decisions
2  regarding those bonuses were made by Byrne. Before the acquisition, I had
3  discussions regarding the LTIP with Jim LaHaise, Byrne, and Phil Silva.

4      6.    Prior to the acquisition closing, Byrne communicated to me, both
5  verbally and in writing, that my LTIP allocation would be seven percent (7%) of the
6  LTIP pool each year performance thresholds were met.  These communications
7  occurred before the transaction closed and were consistent with how the LTIP was
8  discussed internally at Balboa.

9      7.    I understood my LTIP allocation, including the allocations to Byrne
10 and Phil Silva, to be fixed as part of the pre-acquisition compensation framework.
11 At no time prior to the acquisition was I told that my LTIP allocation was
12 discretionary, subject to post-closing approval, or contingent on Ameris's later
13 determination.  No one from Ameris ever told me, either before or after closing, that
14 my LTIP percentage could be changed or revoked.

15     8.    I was also aware that fixed LTIP percentage allocations were
16 established for certain other Balboa executives prior to the acquisition, including for
17 Byrne at 62.5% and Phil Silva at 16%, and that the remaining portion of the LTIP
18 pool would be allocated based on a framework that reward those that were most
19 valuable to Balboa and that Silva and I would be consulted by that Byrne would be
20 the ultimate decision maker.  I understand that my employment agreement and LTIP
21 Award Agreement were the same as Byrne's and Silva's, except with respect to the
22 LTIP Pool percentage.

23     9.    After the acquisition, I understood that Byrne continued to make
24 recommendations regarding LTIP allocations for employees within Balboa,
25 including based on input from department heads such as myself.  Those
26 recommendations were consistent with the allocation framework that had been
27 established prior to the acquisition.  Based on my understanding, Byrne developed
28 and implemented that framework.  I did not understand Ameris to retain discretion

LAW OFFICES
**Allen Matkins Leck Gamble Mallory & Natsis LLP**

4938-1181-4278.3     -3-     DECLARATION OF ROBERT RASMUSSEN IN SUPPORT OF OPPOSITION TO DEFENDANT AMERIS BANK'S MOTION FOR SUMMARY JUDGMENT

to deny payment of earned LTIP allocations once applicable performance thresholds were met.

### C. LTIP Communications and Employee Reliance

10. Following the acquisition, Byrne communicated the LTIP to Balboa's leadership team as a significant component of post-acquisition compensation. Based on my conversations with Byrne and my own observations, the LTIP was a major incentive for retaining employees following the acquisition.

11. In my role, I observed that the LTIP was an important tool for retaining leadership and maintaining stability during the transition following the sale of Balboa.

### D. Byrne's Leadership and Performance

12. Both before and after the acquisition, Byrne remained highly involved in the management of Balboa. He consistently participated in operational discussions, strategic planning, and performance oversight.

13. At all relevant times, Byrne was the hardest-working person at Balboa that I observed. His level of involvement remained high even as operational complexity increased following the acquisition.

14. To my knowledge, Byrne never instructed me to violate accounting controls, compliance requirements, or internal procedures.

15. I participated in several telephone and Microsoft Teams calls that included Byrne, myself, and other Ameris personnel, during which Byrne openly expressed his disagreement with the manner in which the LTIP was being calculated. Based on my observations, those discussions reflected genuine disagreements regarding LTIP calculation methodology, not any effort to circumvent controls or procedures.

//

//

//

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

4938-1181-4278.3

-4-

DECLARATION OF ROBERT RASMUSSEN
IN SUPPORT OF OPPOSITION TO
DEFENDANT AMERIS BANK'S MOTION
FOR SUMMARY JUDGMENT

Docusign Envelope ID: 13F0F8EB-F705-4B88-AD39-EDF54D6EEC68

16. During the relevant period, Patrick Byrne never told me that he intended to quit or resign.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 23, 2026, at Ladera Ranch, California.

*DocuSigned by:*
*ROBERT RASMUSSEN*
ROBERT RASMUSSEN