# EXHIBIT E

Deborah Dickson                                                    January 15, 2026

--oOo--

A P P E A R A N C E S:

FOR THE PLAINTIFF:

        ALLEN MATKINS
            BY:   STACEY VILLAGOMEZ
              ATTORNEY AT LAW
        2010 Main Street, 8th Floor
        Irvine, CA 92614
        Telephone: 213-622-5555
        svillagomez@allenmatkins.

FOR THE DEFENDANT:

        NUKK-FREEMAN & CERRA
            BY:   NANA J. YEE
              ATTORNEY AT LAW
        550 West C St Suite 910
        San Diego, CA 92101
        Telephone: (619) 292-0515
        nyee@nfclegal.com

Deborah Dickson                                                          January 15, 2026

                                    INDEX

                                   --oOo--

                                                                        PAGE

EXAMINATION: MS. YEE                                                        6

Deborah Dickson                                                      January 15, 2026

INDEX

EXHIBITS

EXHIBITS          DESCRIPTION                      PAGE

Ex. 1             DOCUMENT                         8

Ex. 8             DOCUMENT                         13

Ex. 3             DOCUMENT                         14

Ex. 7             DOCUMENT                         35

Ex. 9             DOCUMENT                         72

Ex. 10            DOCUMENT                         111

THE VIDEOGRAPHER:  Hi, good afternoon.  We are now on the record.  Today's date is January 15th, 2026, and the time is 2:00 p.m.  This is the recorded video deposition of Deborah Dickson in the matter of Patrick Byrne versus Ameris bank, case No. 824-cv-01989-MWC.  This deposition is being held via Zoom conference.  My name is Ronald Cestari from Lexitas, and I'm your videographer.  This deposition is being recorded at all times, unless all counsel agree to go on or off the video record.  Would all counsel present please state their appearance, starting with the noticing attorney.

MS. YEE:  Good afternoon, Nana J. Yee on behalf of defendants, Ameris bank.

MS. VILLAGOMEZ:  Stacey Villagomez for plaintiff, Patrick Byrne.

THE VIDEOGRAPHER:  The court reporter may now introduce himself and swear in the witness.

THE COURT REPORTER:  Good afternoon.  My name is Victor Telles.  My California CSR license No. is 14695, and I will now swear in the witness.

DEBORAH DICKSON, having been first duly sworn, was examined and testified as follows:

EXAMINATION

Deborah Dickson                                          January 15, 2026

Q.   BY MS. YEE:  Good afternoon, Mr. Dickson. I know we met earlier today when you sat through Ms. Sebold's deposition.

Can you please state your full name for the record?

A    My name is Deborah Dickson.

Q    This is a remote deposition.  Can you let us know where you're located, just the city?

A    I'm located in Irvine, California.

Q    Are you in your office, or are you at home?

A    I'm in the office of Allen Matkins.

Q    Okay.  So anyone else present in the same room with you?

A    Yes, Ms. Villagomez, and a forensic CPA associate of mine, Rachel Norville.

Q    And that's everyone?

A    Yes.

Q    Can you confirm that there will be no texting, e-mailing, or receiving messages or reviewing documents, unless we talk about it during your deposition today?  I just want to make sure there's no outside influence.

A    I confirm.

Q    Do you have any documents in front of you?

A    I have a notebook with four or five of the documents printed out, so I can easily reference that.

Deborah Dickson                                          January 15, 2026

Q    Okay.  So I'm probably, during the deposition, I'm going to have the videographer help me share documents, so we can look at them together.  So you don't need to look at your documents unless, again, you know, we talk about it.

Sounds good?

A    Sure.

Q    So I assume you have been deposed many times in your capacity as an expert.  Can you give me an estimate, just best estimate, of how many times you've been deposed as an expert?

A    Over 75 times.

Q    So because you're obviously experienced, so I like to just provide some really quick ground rules just to refresh your memory.  Please always provide verbal responses, and we talk one at a time so the court reporter can take everything down.  And if you don't hear or understand a question I'm asking, just let me know, and I'll repeat or rephrase.  Your testimony is absolutely under oath, so that testimony may be used as trial.  It has the full force and effect as if you were on witness stand.

Do you understand that?

A    Yes.

Q    Have you taken any medication, alcohol, or

Deborah Dickson                                           January 15, 2026

other substance that would affect your ability to answer questions today?

A    No.

Q    If you need a break, please let me know.  But of course, I want to be respectful of everyone's time. I will try to finish it as efficiently and quickly as possible, so we don't bring you back another day.

Any questions before we begin?

A    No.  Excuse me.

Q    And for clarity purposes, you know, like Stacey did this morning during the deposition, I will also refer to the long-term incentive plan as "LTIP." And when I state "Balboa," I will try my best to make it clear, either it's Balboa Capital, Balboa Acquisition, or Balboa Division of Ameris aft Acquisition.

If anything's unclear, you know, please just let me know, and I can clarify?

A    Thank you.

MS. YEE:  So Ron is going to pull up Exhibit 1 for this deposition.  And in the meantime, you can look at it while he puts it up, but I'm just going to ask some basic questions.

(WHEREUPON, DEFENDANT'S EXHIBIT 1 WAS MARKED FOR IDENTIFICATION)

Q.    BY MS. YEE:  So have you seen this

Deborah Dickson                                                    January 15, 2026

document before, the notice of deposition?

     A     Yes.

          MS. YEE:  Ron -- sorry.  Do you know if you can give Ms. Dickson control over the document if she can --

          THE VIDEOGRAPHER:  Yes, I can do that for her.  Just give me one second.

     Q.    BY MS. YEE:  So this is a deposition notice that you've seen before; correct?

     A     Yes.

     Q     Do you recall there was some document requests attached to this document?

     A     Yes.

     Q     Can you confirm that you have provided all documents to us in response to those documents requests?

     A     All the documents I have in my possession.

     Q     So do you have any additional documents responsive that you have not produced?

     A     I don't have anything other than what I have produced.

     Q     Thank you.  Did you meet with your attorneys today to prepare for your deposition?

     A     No, other than sitting through Ms. Sebold's deposition, and they were in the room for a short while, while I ate lunch.

Deborah Dickson                                              January 15, 2026

Q     Did you prepare for your deposition by meeting with your attorneys earlier this week?

A     No.

Q     So no deposition prep work prior to your deposition today?

A     I don't recall any deposition prep.

Q     Did you prepare for your deposition yourself by reviewing some documents?

A     Yes.

Q     What documents did you review?

A     I reviewed my report.  I reviewed Ms. Sebold's report.  I reviewed the LTIP agreement and the award agreement that is attached to it.  I reviewed depositions, and I scanned through my notebook, where I have some documents printed out in case I want to refer to anything.

Q     What deposition did you review?  In preparation for your deposition.

A     I reviewed Heather Parker.  And then I worked with one of my other associates; we jointly reviewed Nicole Stokes, Mr. LaHaise, Mr. Sufhan Majid.  Let's see, Parker.  There were six, all in total. I'm not recalling the other two right at the moment.

Q     Who is the associate that reviewed it with you?

Deborah Dickson                                              January 15, 2026

A    Nathan -- Nathan.

Q    What's his last name?

A    Nathan Williams.

Q    And he's an associate in your office?

A    Yes.  He's the director of our audit, actually.

Q    Got it.  I want to get into a little bit about your prior involvement in litigation and deposition. Has the Court ever held that you were not qualified, or disqualified as an expert, to give opinions at trial, or arbitration, or any other proceedings?

A    Possibly one time.  In a -- many years ago, there was a small case I did a favor on.  Apparently, the client was not paying the bill, so the lawyers on the other side went in and filed a Daubert challenge without me knowing anything about it, and said a bunch of stuff.  And the Court wrote it all down because there was no opposition to anything, because no one knew anything about it.  So I think possibly that case.

Q    Do you know what year was that case?

A    Probably ten years ago.

Q    What's the name of that case?

A    It would be Mission Florist; very small case.

Q    So you were -- you represent the plaintiff in that case?

Deborah Dickson                                          January 15, 2026

A    Yes.

Q    So your testimony was excluded?

A    I don't know, honestly.  I didn't know anything about it until several months later.  All I knew is, I found out there had been a Daubert challenge on it, and that's the only case I'm ever aware of.

Q    So do you keep track of when courts exclude or limit your testimony in cases in which you were retained?

A    I'm not aware of any other time that has occurred.

Q    So that's the only time you mentioned; right?

A    Yes.

Q    Have you reviewed your prior testimony rulings in preparation for testifying in this case?

A    As in, all the cases I've ever testified in?

Q    Right.

A    No.

Q    So do you recall that in the case you just mentioned, the Mission Florist, I believe that's what you said.  Do you recall the Court issuing an order excluding your testimony in its entirety?

A    No.

MS. YEE:  Okay, Ron can you pulled up Exhibit 8?  I want to see if this refresh your

Deborah Dickson                                                    January 15, 2026

recollection.  I'm just trying to understand it.

(WHEREUPON, DEFENDANT'S EXHIBIT 8 WAS MARKED FOR

IDENTIFICATION)

Q.   BY MS. YEE:  Is this the case you were
referring to earlier?  If you want to take a quick
look.

A    I'm looking for my glasses.  Here we go.  I
can't see this.  Let's see, how do I make it bigger?
Yes, that would be the case.

MS. YEE:  Ron, can you go to the last page,
maybe the second-to-last page, page 4?  Keep going; keep
scrolling down.  Up a little bit; go up a little bit.

BY MS. YEE:

Q    Okay, so on this page on page 4, it starts
with "Here, Dickson failed."

Do you see that?

A    I do.

Q    So, it says you "failed to apply reliable
principles and methods to calculate in-store sales.
Dickson engaged in no independent analysis to determine
whether this was accurate.  She relied solely on Mission
Viejo Florist's unverified estimate.  With this
analytical GAAP, Dickson's calculation of in-store sales
fails to meet the requirements of Rule 702 and Daubert.
Accordingly, her conclusions regarding 'indoor' [sic]

Deborah Dickson                                                            January 15, 2026

in-store sales and lost profits are inadmissible."

        Does this refresh your memory?

    A    Yes, that's the case and was talking about.

    Q    Okay, so the Court excluded you, or prohibited you, from offering opinions at trial or to the jury in this case; right?

    A    Apparently, because I never knew anything about this till many months later.

    Q    Okay.  Understood.

        MS. YEE:  Ron, can you pull up Exhibit 3?

    (WHEREUPON, DEFENDANT'S EXHIBIT 3 WAS MARKED FOR
                    IDENTIFICATION)

    Q.    BY MS. YEE:  This is your rebuttal report dated January 2nd, 2026.

        While he's pulling it up, did you draft the rebuttal report?

    A    Yes.  My associates and I did, yes.

    Q    When you say "associate," is it Nathan or Rachel?

    A    No.  Rachel and another partner named Ryan Nguyen.

    Q    Okay.  So Ryan and Rachel helped you draft this report, or you guys worked together collaboratively?

    A    Correct.

Deborah Dickson                                        January 15, 2026

        Q    So what's the total time you spent preparing this rebuttal report?

        A    Me personally, or everyone?

        Q    Personally.

        A    Oh, a lot of time.

        Q    Do you have a best estimate?

        A    Approximately 40 hours.

        Q    And I assume this is in front of you, this Exhibit 3.  This is the final version of your report, which you produced to us on January 2nd, 2026; correct?

        A    Correct.

        Q    Were there drafts or marked-up versions before this?

        A    No, we don't keep drafts.  We just type over.

        Q    And prior to this report being finalized, did your attorneys, or plaintiff, or anyone else review this report before it was finalized?

        A    Not that I recall.

        Q    So, were all of your opinions included in this report?

        A    I have some additional opinions I would like to present today.

        Q    So are you saying some of your opinions were not included in this report?

Deborah Dickson                                                    January 15, 2026

A    What I'm saying is, subsequent to issuing this report, I made a calculation on some alternative opinions.  They're very similar to what's in this report.  I just have an alternative calculation that I would like to present.

Q    And what was the reason that they were not included before you finalized this report?

A    I had probably one week to get this report prepared.  And in reviewing the report and thinking through all the documents preparing for my deposition, I wanted to add another calculation.

Q    Are you saying that some of the opinions included in this rebuttal report, which you produced on January 2nd, 2026, may not be complete or accurate?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  No, I'm not saying that.

BY MS. YEE:

Q    Well, do you would agree with me that the purpose of the rebuttal report is to disclose all of your rebuttal opinions; correct?

MS. VILLAGOMEZ:  Objection.  Argumentative.

MS. YEE:  You can answer.

THE WITNESS:  My point is that subsequent to the preparation of this report, I thought about another calculation, and I ran that calculation, and I would

Deborah Dickson                                                    January 15, 2026

like to present that as an alternative calculation.

It's very similar to what's in this report. It's just using a couple different numbers in them.

BY MS. YEE:

Q    So you wanted to use this deposition to supplement your previously produced rebuttal report; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I don't know what to say to that.  I just have an alternative set of calculations about like to present.

BY MS. YEE:

Q    Let me ask you this:  Either your opinions are fully disclosed in the report, or you're withholding your opinions that are not disclosed.

Which is it?

MS. VILLAGOMEZ:  Objection.  Form.  Objection. Argumentative.  Asked and answered.

THE WITNESS:  I don't have an answer to that. I'm sorry.

MS. YEE:  Let the record reflect that the witness has been unable to state whether her opinions are fully disclosed in her report.

///

Deborah Dickson                                    January 15, 2026

BY MS. YEE:

Q    So if you want to go to page 15 of your rebuttal report, it has a section titled, I believe, "Documents and Information Considered."  If you want to go to page 15.  There's a list of documents that you included.

MS. VILLAGOMEZ:  The document showing on screen is not page 15.

MS. YEE:  I'm thinking -- that -- The one that I have, it actually shows 15.  I'll fix it to Exhibit 2, TO the Dickson report.

MS. VILLAGOMEZ:  Now it's showing on screen.

MS. YEE:  Did this one also say page 15 at the bottom?

MS. VILLAGOMEZ:  Yes, page 15 of 18 at the bottom.

MS. YEE:  Okay.

BY MS. YEE:

Q    You understand, Ms. Dickson, that this section is intended to list the documents and information you considered in forming your opinions; correct?

A    Yes.

Q    And sitting here today, is that list -- is this list, on page 15, intended to be a complete list of the documents and information you considered in

Deborah Dickson                                          January 15, 2026

preparation for your rebuttal report?

    A    Subsequent to this time, I completed my review
of the depositions that we discussed earlier.

    Q    So, this is not a complete list?

    A    This is complete, as long as you add the
depositions I discussed with you a few minutes ago.

    Q    But on this page it shows, and correct me if
I'm wrong, I counted, is about 24 items?

    A    I don't know.  Do you want me to count them?

    Q    I'm just telling you, it's 24 items.  That's
what I see from this list.

         And you relied on these items, right?
Whatever that's included on page 15 before you finalized
your report; correct?

    A    Yes.

    Q    Did you include everything from this list in
your expert file that you produced on January 13th,
2026?

    A    Yes.

    Q    Did that expert file include anything else
beyond the 24 items on this list?

    A    Yes, it included my report.  It included
Ms. Sebold's report.  It included another page that my
office prepared, where the balance sheets and the income
statements were reformatted to make them easier to read.

Deborah Dickson                                          January 15, 2026

They were put into normal accounting format, and it also included the alternative calculation that I would like to present.

Q    So those -- I would just call them additional or extra documents that you were just talking about, or including your expert file, were not listed on page 15 of your report; correct?

A    Well, those are documents that we prepared. At least, my own report, I prepared it.  The balance sheets and income statement reformatting, my office prepared.  So these are not documents that we received and considered.  These are additional documents that were included in the production.

Q    Okay.  So those additional documents, they are not cited anywhere in your rebuttal report; correct?

A    I would assume Ms. Sebold's report is cited in my rebuttal report.  The supplemental numbers are not. And I don't believe I cite my own report in my report. And I don't know whether I cite the reformatting of the financial statements, so the accountants can read them.

Q    It's really not a trick question.  So the expert file you produced includes materials beyond what you disclosed in your report on page 15; right?

A    Please ask the question again.

Q    So the expert file you produced on January

Deborah Dickson                                        January 15, 2026

13th, 2026 includes materials, or documents, beyond

what you disclosed in your report, on page 15 that we're

looking at?

MS. VILLAGOMEZ:  Objection.  Asked and

answered.

THE WITNESS:  Yes.

MS. YEE:  Thank you.

BY MS. YEE:

Q    Let me ask you this.  Did you receive some of

this additional documents, or new documents, extra

documents, after you finalized -- finalized and produced

your report on January 2nd, 2026?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  No.  As I explained to you, my

office prepared those documents, so it's nothing we

received.

BY MS. YEE:

Q    You just didn't list some of those in your

report?

MS. VILLAGOMEZ:  Objection.  Argumentative.

THE WITNESS:  That's correct because my

page 15 discusses documents and information that I

considered.  It doesn't discuss those items in which I

actually made a calculation or prepared a schedule

myself.

Deborah Dickson                                          January 15, 2026

Q.   BY MS. YEE:   But all these documents you've received or you produced through your expert file.

Did you receive these documents from different sources?  And by that I meant, it could be either from Ms. Espie Anderson, Mr. Byrne, himself, or other anyone else?  Can you let me know what other persons that you received these documents from?

A    It's possible that I received some documents from the law office of Allen Matkins.

Q    What about Ms. Espie Anderson?  Did you receive documents from her?

A    Yes, I think you just mentioned her name.

Q    Yes?

A    Yes, we did.

Q    Did you receive documents from Mr. Byrne, himself?

A    We asked him to send everything to his attorney first and then send to us.  So I don't know whether any documents were given directly to us.

Q    Understood.  Did Jacquie Emert send documents to you?

A    That would be the same answer.

Q    But did Jacquie Emert send documents to you directly via e-mails, or hard copies, or both?

Deborah Dickson                                    January 15, 2026

A    My answer is the same.  Which is, we asked Ms. Emert to send any documents that she thought were important to Ms. Esperanza Anderson who, in turn, would send them to us.

Q    Okay, understood.  So did you get everything you asked for?

A    Certainly in every case, there are things you would like to get that you didn't get, but I think overall, yes.

Q    Did you request all deposition transcripts in this matter before finalizing your report?

A    I requested those transcripts that the attorneys believe would be important for me to review. I am aware that there is a medical component to this case, and those types of deposition transcripts I would not request.

Q    Did you request Ms. Stokes's deposition before you finalized your report?

A    Yes, and I have reviewed it.

Q    Did you receive that before you finalized your report?

A    Yes.

Q    Same question for Jim LaHaies's?

A    Yes.

Q    Same question for Sufhan Majid?

Deborah Dickson                                    January 15, 2026

A    Yes.

Q    Same question for Heather Parker?

A    Yes.

Q    Understood.  So when you reviewed these documents, including depo transcripts, did you review them in full?  You know, I could say, just to be precise, word-for-word or did you skim them?

A    In full, word-for-word.

Q    Did you review or read anything regarding this case that's not in your file that you produced on January 13th, 2026?

A    Not that I recall.

Q    So Ms. Dickson, you would agree with me that a reader of your report, your rebuttal report, dated January 2nd, 2026, wouldn't know that you've reviewed additional materials, including but not limited to, those in your expert file beyond those listed on page 15; correct?

MS. VILLAGOMEZ:  Objection.  Form. Argumentative.

THE WITNESS:  I don't know what to say there. I mean, I'm not going to spend a ton of time talking about what someone might understand about or not understand about my report.  So I have no comment other than that.

Deborah Dickson                                          January 15, 2026

Q.    BY MS. YEE:  So you can't answer that question?

A     That's correct.

Q     Or you choose not to answer that question?

A     I cannot answer that --

MS. VILLAGOMEZ:  Objection.  Argumentative.

THE WITNESS:  I cannot answer that question.

BY MS. YEE:

Q     I'll move on.  So you were disclosed in plaintiff's initial expert disclosure; correct?

A     Yes, that's my understanding.

Q     And you were retained on, I believe, based on the initial expert disclosure, that you were retained to testify in trial regarding defendant, Ameris Bank's LTIP calculations and alleged economic damages, among other things; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I was retained to review the documents, look at the LTIP calculations, make my own LTIP calculations, review the report of opposing expert Ms. Sebold, and also review any calculations related to what are commonly described as security deposits.

BY MS. YEE:

Q     At the time of the initial expert disclosure and designation, no written expert report from you was

Deborah Dickson                                          January 15, 2026

produced by plaintiff at the time; correct?

           MS. VILLAGOMEZ:  Objection.  Form.

           THE WITNESS:  I don't know the date on the
expert disclosure.  If you could help me with that,
please.

           MS. YEE:  It's December 5th, 2025.

           THE WITNESS:  Then yes.  That's correct.

      BY MS. YEE:

      Q    So you did not provide to plaintiff, or you
know, his counsel your expert report on or before that
deadline; correct?

      A    Correct.

      Q    So the first time any written opinions or
calculations from you were disclosed was in this
document, your report, Rule 26(a)(2)(B) Expert Report of
Deborah Dickson; correct?

      A    Well, the first report that I prepared was
dated January 2nd, 2026.

      Q    Yeah, and that's the only report; right?

      A    Yes.

      Q    You understand that your rebuttal report is
limited to responding to opinions actually offered by
the opposing expert, Ms. Sebold; correct?

           MS. VILLAGOMEZ:  Objection.  Form.  Objection.
 Calls for a legal conclusion.

Deborah Dickson                                                    January 15, 2026

MS. YEE:  You can answer.

THE WITNESS:  I do not understand that.

BY MS. YEE:

Q    Do you understand your role as a rebuttal expert?

MS. VILLAGOMEZ:  Same objections.

THE WITNESS:  Again, that's a legal matter that I will leave to the attorneys.

BY MS. YEE:

Q    Based on your experience and knowledge as an expert?

MS. VILLAGOMEZ:  Same objections.

MS. YEE:  Can you answer that question.

THE WITNESS:  What is the question?

BY MS. YEE:

Q    Do you understand that your rebuttal report is limited to responding to opinions actually offered by the opposing expert, Ms. Sebold; correct?

MS. VILLAGOMEZ:  Same objections for the record.

THE WITNESS:  That would be a legal issue that I will leave to the attorneys.

BY MS. YEE:

Q    I disagree, it's not a legal issue.  Do you know that your attorney told us that because you are the

Deborah Dickson                                                    January 15, 2026

rebuttal expert, that's why your deposition should go second, and after our expert, Ms. Sebold?

MS. VILLAGOMEZ:  Objection.  Misstates facts.  Mischaracterizes the testimony.

MS. YEE:  You can answer.

MS. VILLAGOMEZ:  I'm not done.  Argumentative.

MS. YEE:  You can answer.

THE WITNESS:  I'm not aware of the conversations that occurred.

BY MS. YEE:

Q    Do you understand that rebuttal testimony is not intended to provide opinions that should have been disclosed in an initial expert report?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for legal conclusion.

THE WITNESS:  Again, that's an issue that I will leave to the attorneys.

BY MS. YEE:

Q    It's not a legal conclusion, but you refuse to answer; right?  I'm only asking, based on your knowledge and experience as an expert, which you are.  And you understand that's the scope of the rebuttal testimony?

MS. VILLAGOMEZ:  Asked and answered.

THE WITNESS:  I have no further comment in that area.

Deborah Dickson                                                    January 15, 2026

BY MS. YEE:

Q    Do you understand that rebuttal testimony is not intended to cure a failure to timely produce an expert report; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for a legal conclusion.  Asked and answered.

THE WITNESS:  Again, I'll leave that to the attorneys to deal with.

MS. YEE:  Okay.  We will just make a record that you refuse to answer these questions.  I'll move on.

MS. VILLAGOMEZ:  Objections stand.

BY MS. YEE:

Q    So you were sitting in Ms. Sebold's deposition this morning.  And you reviewed Ms. Sebold's expert report dated December 5th, 2025; correct?

A    Yes.

Q    Do you recall that she offered four primary opinions?

A    I don't know how many she offered, but I do recall she offered opinions.

Q    So those four opinions, do you agree with me that define the limits of proper rebuttal?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I would really need you to break

Deborah Dickson                                          January 15, 2026

down your question.  I'm not sure what you're asking.

Q.   BY MS. YEE:  I'm asking about the limits of a proper rebuttal.  So in your experience and your capacity as an expert, do you understand that if one of your rebuttal opinions does not respond to one of the opinions from the opposing expert, then it is not rebuttal; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for a legal conclusion.  I don't know why we're digging into this, but go ahead.

MS. YEE:  Because it's relevant.  Please no speaking objections.  You can make your objection and she can answer.  I'd like to be efficient.  Can you answer that, Ms. Dickson?

THE WITNESS:  I'm going to need the question again, please.

BY MS. YEE:

Q    So if one of your opinions doesn't respond to the opinion of Ms. Sebold, then it is not rebuttal; correct?

MS. VILLAGOMEZ:  Calls for a legal conclusion. Form.

THE WITNESS:  I would ask the lawyers to address that issue instead of me.

///

Deborah Dickson                                            January 15, 2026

BY MS. YEE:

Q    Do you understand that you cannot provide affirmative expert opinion in your rebuttal expert report.

Do you understand that?

MS. VILLAGOMEZ:  Same objections.

THE WITNESS:  Again, that would require a legal conclusion.

BY MS. YEE:

Q    So you're not able to answer that question as a rebuttal expert?

A    I've answered it to the best of my ability.

Q    No.  I did not receive an answer.  Can you provide an answer or no?  If you say no, we're just going to move on.

A    My answer is that I believe it requires a legal conclusion to answer that.  So that would be outside the scope of an answer that I would provide for you.

Q    As an expert, isn't it your job to decide and to determine what kind of opinions you're gonna provide as a rebuttal expert?

MS. VILLAGOMEZ:  Form.  Argumentative.

THE WITNESS:  As an expert, I decide what opinions I'm going to provide.  That part is true.

Deborah Dickson                                          January 15, 2026

BY MS. YEE:

Q    Okay.  So let's go back to your rebuttal report.  Your rebuttal opinions are based, in part, on your interpretation of the LTIP agreement and the award agreement; correct?

A    I'm sorry.  The LTIP agreement and the what -- what was the other thing?

Q    It's called an award agreement.  The LTIP -- yeah, I'm just referring to the LTIP and the award agreement?

A    And the award agreement, yes.  Yes.

Q    And you're not a lawyer and not retained as a legal expert; correct?

A    Correct.

Q    So your rebuttal report concludes that the LTIP agreement does not require all parts of the LTIP calculations to follow GAAP; correct?

A    Correct.

Q    This is because you opined that only one subsection, and I believe it's subsection A, under the "Key Assumptions," in LTIP expressively references "GAAP"; correct?

MS. VILLAGOMEZ:  Form.  Document speaks for itself.

THE WITNESS:  It is my understanding, and the

assumptions on which my calculations are based, that GAAP calculations apply to initial direct costs, but not to the other calculations included in that LTIP agreement or in the LTIP award.

Q.   BY MS. YEE:  Understood.  So your opinion is not based upon an accounting standard or requirement on what the law requires Ameris to do; correct?

MS. VILLAGOMEZ:  Objection.  Form. Argumentative.  Calls for a legal conclusion.

THE WITNESS:  That's a complex question because first of all, Ms. Sebold is claiming that everything should be based on GAAP.  The GAAP is not the law; neither federal law nor state law requires GAAP. Only GAAP is required for formal financial statements for public companies.  It's not required for calculations that are made, such as a "Long-Term Cash Incentive Plan", or something along that line.

BY MS. YEE:

Q    So what's the basis for that conclusion you just told us?

A    I've been working with GAAP probably 40 years now.  I know when to apply it and when not to apply it. GAAP is used for formal financial statements.  It is not used for calculations of any type, of any nature, unless

Deborah Dickson                                          January 15, 2026

there's a specific agreement somewhere that says, "GAAP must be used in every part of that calculation."

Q    So is that conclusion also based on, besides your experience you just talked about, is it also based on the LTIP agreement in this case at issue?

A    Well, we're kind of talking about different things.  I'm talking about when GAAP might be applied and not be applied.  So perhaps you can narrow your question for me.

Q    So let me ask you this and see if this makes it narrow.  For the LTIP agreement in this case, so if GAAP doesn't apply, which is, I understand, that's your opinion and conclusion.  If GAAP doesn't apply to the LTIP-related calculations in this case, then what should apply?

MS. VILLAGOMEZ:  Objection.  Form.  Improper hypothetical.  Assumes facts.

THE WITNESS:  I'm not really sure what you're asking.  Are you asking for a standard somewhere?  What are you asking?

BY MS. YEE:

Q    Because you're saying that GAAP doesn't apply --

MS. VILLAGOMEZ:  Objection.  Misstates --

///

Deborah Dickson                                          January 15, 2026

BY MS. YEE:

Q     -- to the LTIP-related calculations, so I'm asking.  Then what applies to the calculation at issue?

MS. VILLAGOMEZ:  Form.  Misstates testimony.  Argumentative.  Asked and answered.

THE WITNESS:  What would apply to the calculation is -- are the words within the LTIP agreement plus the award agreement.  So as an expert, as CPAs, as accountants -- whether we're doing litigation support, or whether we're working with clients on other projects, tax returns, anything, we read the agreements, and we determine what the agreements say.  And then we make our calculations based on the straightforward information that is right in the agreements.

BY MS. YEE:

Q     So what does the agreement say in this case?  What should apply to the LTIP-related calculations?

A     Well, if you go to page 1 of the "Long-Term Cash Incentive Plan", let's go through those, just to see what would apply.

MS. VILLAGOMEZ:  Which exhibit?

MS. YEE:  Can you pull up Exhibit 7?

(WHEREUPON, DEFENDANT'S EXHIBIT 7 WAS MARKED FOR IDENTIFICATION)

MS. YEE:  Go ahead.

Deborah Dickson                                          January 15, 2026

THE WITNESS:  Could you ask the question one more time, please?

BY MS. YEE:

Q    So if GAAP, like you concluded, doesn't apply, then what applies, based on the LTIP agreement.  Because you mentioned that we should look at the terms in plain language of the LTIP.

What would apply to LTIP calculations?  And you said there were several places in the LTIP agreement that we can go through.

MS. VILLAGOMEZ:  Objection.  Form.  Mischaracterizes prior testimony.  Go ahead.

THE WITNESS:  May I refer you to the "Long-Term Cash Incentive Plan Award Agreement," page 1.  And you can see on page 1, there are six key assumptions, six "Key Assumptions."  Those are the calculations that I believe apply.  For instance, "Key Assumption a." says, "Initial direct costs," commonly referred to as IDC, "will be calculated using GAAP methodology."

So clearly right there, it tells me as a CPA, as an expert, as one making calculations, if I should apply GAAP there.  "B. Key Assumption" says, "The interest cost used will be 1%."  So now I know, in my calculations, that I should be looking at 1 percent, not

Deborah Dickson                                              January 15, 2026

more, not less.  Under "c." --

Q.    BY MS. YEE:  Okay.  So hold on.  Let me ask you this.  I don't want to -- I can see the document.  I think we all have the document.  But that -- we can see the six key assumptions here.

But does any of the key assumptions here -- well, anywhere in the LTIP say how, for example, interim rent, stipulated judgment, or repossessions should be determined?  Does it say it in the LTIP agreement?

A    Those specific items are not addressed in the LTIP agreement.  But I look at those as part of -- in particular, sub item "e.", which says, "Balboa," and that would mean the Balboa division when the LTIP agreement is being calculated, "will bear all direct costs incurred in its operations."  And so, what I'm looking at there is, what are the appropriate direct costs that should be included in an LTIP calculation, versus indirect costs that should not be included.

BY MS. YEE:

Q    So if GAAP doesn't apply to those items I just mentioned, so what applies?  Can you clarify that for me?

MS. VILLAGOMEZ:  Objection.  Form.  Misstates witness's testimony.

THE WITNESS:  If you look at the bottom of

Deborah Dickson                                                    January 15, 2026

page 2, of this agreement also --

         MS. YEE:  Please, can you give me the Bates range?

         THE WITNESS:  Yes.  It's AMERIS000228.

    Q.   BY MS. YEE:  Are you looking at the footnote?

    A    Yes, I see a great deal of guidance there.  In the footnote, it says -- the second sentence says, "The general premise of the LTIP is to materially follow past practice, which this calculation is maintaining."  And so, in those instances that you identified, plus a couple of others I reviewed, what was the past practice Balboa pre-acquisition versus the way that Ameris is treating the numbers, subsequent to the acquisition.

    Q    Is this the -- this "footnote 3," to -- I believe, subsection "f." under the "Key Assumptions" on page AMERIS000228, is this the only place that says -- what refers to "past practice"?

    A    I think so, but this is a pretty important sentence because it refers to not just item "f.", but it refers to the entire agreement.  It says the "general premise," "general" and "premise" of the LTIP is to "materially follow past practice."  That gives me a great deal of guidance right there.

    Q    Well, that's your interpretation; right?  That

Deborah Dickson                                          January 15, 2026

you believe because the footnote 3 talks about that, you

believe that applies to the agreement in its entirety.

That's your opinion; right?

     A     I've used to that assumption in making my

calculations.

     Q     Okay, understood.  But nowhere in this LTIP,

where it defines the "past practice," that appeared

under footnote "3"; correct?

     A     I believe that's correct.

     Q     Okay.  So let's go to your rebuttal opinion.

I believe it's rebuttal opinion A, parenthesis A, on

page 3 of your report.  And this is Exhibit 3.  So we're

going to be jumping around -- you know, jumping around a

little bit.  But this is Exhibit 3, page 3.

     A     I have Exhibit 3 or do you want page 3?

     Q     Page 3.  Exhibit 3, page 3.  It listed your

opinions, you know, your opinions "a," "b," "c," and

"d."  So we're going to look at "a" first.  So you

stated here that Ms. Sebold's "2022-2023 EBT

Calculations Are Based on Incorrect" -- what you believe

to be "Incorrect interpretation of the LTIP" because

LTIP agreement doesn't require GAAP compliance for all

provisions, except for one subsection related to initial

cause that we just looked at.

          So you concluded that you believe Ms. Sebold's

Deborah Dickson                                                          January 15, 2026

calculations are based on her incorrect interpretation

of the LTIP agreement; correct?

        MS. VILLAGOMEZ:  Objection.  Document speaks

for itself.

        THE WITNESS:  That is correct.

    BY MS. YEE:

    Q    You also just told me that your opinion is

that the LTIP requires adherence to past practices;

correct?

    A    It says the general premise of the LTIP is to

materially follow past practice.

    Q    Okay?

    A    Yes.

    Q    So tell me about -- what's -- what do you

mean -- what do you believe it to mean, "past practice"?

    A    Okay.  Past practice, in the accounting world,

would be the methodology that an entity is using to make

computations.  Even in GAAP and non-GAAP accounting,

there are different ways to make calculations.  So you

will see that -- for instance, there's cash-basis

accounting.  Cash-basis essentially means you recognize

revenue when it's physically received in the bank

account, or it means you book your expenses when they're

actually paid.

            Versus accrual-based accounting, which is part

Deborah Dickson                                              January 15, 2026

of GAAP accounting, which means you recognize revenue

when a service is performed or when something is sold.

So it's very different.  So you'll see that.  And so the

question was -- remind me the remainder of your

question.

Q    Which is, you know, based on -- because you

didn't mention past practices at several places in the

report.  So what does past practice mean to you?

A    So to clarify that, based on what I just said,

Balboa Capital, pre-acquisition, was handling some of

its accounting affairs in one manner, and my

understanding would be -- based on particular on this

footnote, that when the LTIP calculation is computed, it

should be using the same type of accounting methodology

consistently all the way through the LTIP calculation.

Versus what appears to be happening is that

Balboa Capital, pre-acquisition, computed certain items

using one methodology, and then when it was acquired by

a public company, the public company started computing

those items based on GAAP, which would be entirely

appropriate for the company to do.

But adjustments need to be made to the

calculation to convert that GAAP methodology back to the

same past practice methodology that was used before.

And once those adjustments are made, then the LTIP

Deborah Dickson                                          January 15, 2026

calculation can be looked at to determine whether the thresholds were met.

Q    Okay, let me make sure I understand.  When you say -- when you say "past practices" in your report, I'll ask you what you while you are sitting here testifying about it.

Do you mean Balboa Capital's historical practices, prior to acquisition?  I believe that's what you said.  But I just want to confirm.

A    That's correct.

Q    So you meant Balboa Capital's past practices when it was a privately held company; correct?

A    Correct.

Q    So you -- but in your report, I don't believe you identified which specific accounting practices constitute past practice; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I believe that I did.  And I can certainly testify to any of those, but I called those out in my changes, for instance.

BY MS. YEE:

Q    Well, can you just focus on your report first?  We can get to the other parts.

A    Sure.

Q    Do you see anywhere that where you define,

Deborah Dickson                                          January 15, 2026

where you identify, what is the specific accounting

practice that constitute past practice, which you

mentioned multiple times in your report?

          MS. VILLAGOMEZ:  Objection.  Form.

          THE WITNESS:  If you start in my report,

looking on page 5, you will see item-by-item where I

start to identify the past practice concept, versus what

is being used right now.

     BY MS. YEE:

     Q    Can you give me an example?  I do see, like,

several places you mention past practice, but I do not

see any specific definition, or explanation, or even

description in detail, as to what the past practice is

or was.

          MS. VILLAGOMEZ:  Objection.  Form.

          (Reporter clarification.)

          THE WITNESS:  An example of that might be

paragraph 31; that's on page 7.  You'll see right there;

that's under "Inconsistent accounting of interim rent."

     BY MS. YEE:

     Q    Yes, I see that.

     A    Right there I say:

                    "Mr. Byrne asserted that Ameris

                    changed the accounting of interim

                    rent post-acquisition, which is

Deborah Dickson                                    January 15, 2026

inconsistent with Balboa's past practices.  Per discussions with Mr. Byrne, Balboa's past practices were to recognize interim rent when cash was received.  However, Ameris's accounting method change post-acquisition recognized interim rent as lease income over the lease term."

So therefore, "This accounting change lowers revenues and therefore lowers EBT under the LTIP." There is an example for you.

Q   So your understanding of the past practices is based entirely on what Mr. Byrne told you his past practices were; correct?

MS. VILLAGOMEZ:  Objection.  Form. Mischaracterizes testimony.  Argumentative.

THE WITNESS:  That's not correct.

BY MS. YEE:

Q   But the example you just gave me, you read it. It says, "Per discussions with Mr. Byrne, Balboa's past practice" was this.

MS. VILLAGOMEZ:  Objection.  Argumentative.

BY MS. YEE:

Q   Is that correct?

Deborah Dickson                                          January 15, 2026

A     That doesn't mean that's the only thing I looked at.

Q     So what else did you look at?  Can you point it to me from this paragraph 31?

A     Sure.  For instance, on the interim rent, I reviewed the schedules related to the calculation of interim rent that I have used in my computation.  And I understand that the Bates would be AMERIS792.

Q     What document is that?

A     It's called "Account Drilldown."

Q     Does that have anything to do with the past practice?

A     Yes.  It shows the change in interim rent. The -- and you can see that schedule supports my numbers on my -- in the back of my workbook here.

Q     Does that document talks about Balboa's past practices?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  Well, you know, you're not going to find verbiage on all these.  When you look at a case, you don't necessarily see verbiage.  You see numbers. And you see how things are calculated.  And that's where you arrive at the numbers.

BY MS. YEE:

Q     So -- but you did not identify here, in your

Deborah Dickson                                    January 15, 2026

report, any documentation memorializing that practice;
right?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  My report is designed to discuss
my thought process.  It's not designed to identify every
document.

BY MS. YEE:

Q    That's not what I asked.  What did you rely
upon to determine what Balboa's past practices were?

MS. VILLAGOMEZ:  Asked and answered.

MS. YEE:  I'm not finished.  Besides your
discussion with Mr. Byrne, as we all read, under
paragraph 31.

MS. VILLAGOMEZ:  Objection.  Form.  Asked and
answered.  Argumentative.

THE WITNESS:  I relied on -- as we talked
about, the discussion with Mr. Byrne.  I also looked at
various e-mails and pieces of correspondence.  I
reviewed deposition transcripts, and I reviewed the
actuary "Accounting Drilldown" page that identifies the
calculations that relate to this.

BY MS. YEE:

Q    What transcript -- what deposition transcript
talked about the past practice?  Is it Mr. Byrne's
transcript or anyone else?

Deborah Dickson                                            January 15, 2026

MS. VILLAGOMEZ:  Objection.  Form.  Lacks foundation.

THE WITNESS:  It's going to be in more than one.  It's definitely going to be in Ms. Stokes's deposition.

BY MS. YEE:

Q    Does she talk about past practice of Balboa?

A    I don't know that you uses those terms, but I know that she definitely is addressing that because she indicates that she flew to California to discuss these items with Mr. Byrne.

Q    But you don't cite to it; you don't cite to Ms. Stokes's deposition transcript in here, at all?

A    My report was not intended to be a 100-page thesis on everything.  My report was intended to state my opinions, and show the schedules, and the computations that were required.  I'm not required to state every place that I saw something, refer to every deposition, or refer to every schedule specifically.

Q    Well, if you do not cite to anything, or you do not list it, which you didn't list Ms. Stokes's deposition transcript in your list, you know.  My understanding is that you did not consider it or relied on it; correct?

MS. VILLAGOMEZ:  Objection.  Form.  You're

Deborah Dickson                                           January 15, 2026

asking her -- objection.  Form.  Argumentative.

THE WITNESS:  It's not correct.

BY MS. YEE:

Q    Are you stating that these past practices are of Balboa Capital pre-acquisition were not GAAP-compliant?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I'm not stating that.  And what's actually very interesting is that Balboa Capital had an audit every year, as does Ameris.  And the audited financial statements done by a big, well-recognized national firm show that they were GAAP-compliant every year.

In financial statements and in GAAP statements, there are frequently more than one way to handle accounting matters, and that's evidenced by -- you'll see that in footnotes one and two in the back of formal financial statements.  You'll see where the accountants are required to identify the different GAAP procedures that are used.  And of the different GAAP procedures, how the company selects to use the procedures, which GAAP procedures they apply, and what their thought process is.

So it's -- it's not black-and-white, at all.  And so, additionally, I want to tell you that remember,

Deborah Dickson                                                      January 15, 2026

Balboa Capital pre-acquisition was a private company. And then Ameris, as you know, is a public company. And so, if the LTIP agreement requires that the calculations be made on past practices -- frequently GAAP requirements for private companies are different than GAAP requirements for public companies. And also, the GAAP requirements for private companies and GAAP companies or put into use, or required to be used, at different times.

You will find that throughout the issues that are dealt with in this particular case. I'm going to give you a couple of examples. An example would be what we call "ASC842." So that's Accounting Standards Codification, C-O-D-I-F-C-A-T-I-O-N. So you can understand the word. And so ASC842 has to do with leases. Public companies were required to implement the leasing standard in, I believe, 2019; whereas private companies, such as Balboa Capital before acquisition, were not required to implement the leasing standard until 2022.

And then another set of GAAP standards that are different here are going to be ASC606, which is going to be revenue recognition. Private companies were required to implement ASC606 in approximately 2019. And public companies were not required -- let me say -- we

Deborah Dickson                                                    January 15, 2026

reverse that.  Public companies were required to implement ASC606 in approximately 2019; whereas private companies were not required to implement it until 2023.

So there's a lot of variation with the application of GAAP.  And private companies frequently, legally, legitimately, every way possible meet their audit requirements.  They're GAAP requirements, but the requirements are different sometimes than the requirements for public companies.  So when you're trying to follow past practices for a private company, there are differences that need to be taken into account in the LTIP calculation.

BY MS. YEE:

Q    So I'm trying to -- I'm a little bit confused, but I'm trying to understand.  You seem to put these two concepts, you know, what we we're talking about, your opinions, opposite of each other.  Which by that, I meant past practices versus GAAP, to support your conclusion that GAAP doesn't cover every aspect of the LTIP calculations; correct?

MS. VILLAGOMEZ:  Objection.  Misstates testimony.  Form.

THE WITNESS:  I'm not clear on your question.  Could you restate it, please?

///

Deborah Dickson                                              January 15, 2026

BY MS. YEE:

Q    What I'm trying to say is: when we we're talking about the LTIP, and then our expert talked about that it needs to follow GAAP, which you disagreed, you seem to put those two concepts opposite of each other; past practices versus GAAP.  You even referred me to some of the language, you know, in the LTIP agreement, which you believe it should follow; past practices versus GAAP.

So I'm trying to understand.  Are those two completely different concepts, or now -- because now you're trying to say that because of this LTIP report in 2020, Balboa's past practice were actually GAAP-compliant, but in a somewhat different way.  I'm just trying to understand.

How do you put these two opposite of each other, and then you are trying to reconcile this inconsistency?

MS. VILLAGOMEZ:  Objection.  Form.  Argumentative.

THE WITNESS:  I disagree that there's any inconsistency there.  What I'm trying to explain to you is -- first of all, according to LTIP agreement, the way I understand it, none of the calculations are required to be under GAAP methodology, with the exception of the

Deborah Dickson                                         January 15, 2026

initial direct costs.  However, I am explaining that Balboa Capital, pre-acquisition, was GAAP-compliant, just so you understand that.  But the LTIP agreement calculations, themselves, do not fall under the GAAP umbrella because they're not required to, other than the IDC.

And I'm also just trying to explain to you that it can appear confusing to a non-accountant because regardless of whether you're using GAAP or you're not using GAAP, GAAP applied to private companies at different time periods, and in different ways, than it did to public companies.  And so my calculations straighten that out for us.

BY MS. YEE:

Q    So what you're trying to say is that even if Balboa Capital, pre-acquisition, was GAAP-compliant, but because the LTIP, again in your opinion, doesn't require GAAP for every single aspect of the LTIP calculations, that's why it doesn't need to follow GAAP.  It only needs to follow past practice, whatever that means.

MS. VILLAGOMEZ:  Objection.  Mischaracterizes her prior testimony.  Form.

THE WITNESS:  I'm not really clear what you said there.  But to reiterate, I believe that when making the calculations for the LTIP, I need to look at

Deborah Dickson                                                    January 15, 2026

the past practices of Balboa Capital pre-acquisition. How did they make -- make their computations to meet their numbers?  And so, the same methodology should be used after acquisition, whether it's GAAP or whether it isn't, whether -- if Balboa was computing some of these items on GAAP before acquisition.  If that was their past practice, then they needed to compute it the same way after acquisition.  If they were computing some of these pre-acquisition non-GAAP because they didn't have anything to do with GAAP, those items needed to be computed the same exact way post-acquisition.

BY MS. YEE:

Q    Well, would you agree with me, if they were already GAAP-compliant before acquisition as their past practices, then why would there be an issue of not following GAAP under the LTIP agreement?

A    That's pretty basic.  Because, again, nothing is required to be GAAP, with the exception of the IDC. And the calculations are not based on GAAP.  GAAP has nothing to do with long-term incentive plans.

Q    Okay.  I'm not just talking about any incentive plan; right?  Did you analyze whether a private company, and again, I'm talking specifically about Balboa Capital before acquisition.

Can that company, Balboa Capital, lawfully

Deborah Dickson                                                    January 15, 2026

continue post-acquisition, as part of a public bank,

using it's past practices versus GAAP?

          MS. VILLAGOMEZ:  Objection.  Calls for a legal

conclusion.

          THE WITNESS:  That would be something the

lawyers would have to deal with.

     BY MS. YEE:

     Q    So you can't answer that?

     A    Correct.

     Q    So your report assumes past practices controls

regardless of regulatory obligations; correct?

          MS. VILLAGOMEZ:  Objection.  Form.

          THE WITNESS:  I'm not sure I understand what

you mean by "controls."  Could you restate the question,

please?

     BY MS. YEE:

     Q    Because based on what you have been

testifying, as you're sitting here today, you're

focusing on the LTIP, regardless of the fact that Balboa

Division is actually part of the Ameris Bank, and that

public companies, such as Ameris, cannot knowingly not

follow GAAP accounting practices; correct?

          MS. VILLAGOMEZ:  Objection.  Form.  Compound.

Argumentative.  Improper hypothetical.

          THE WITNESS:  Well, you're completely mixing

Deborah Dickson                                          January 15, 2026

up two things.  You're trying to say that because Balboa Capital became part of a public company, that it suddenly has to follow public company GAAP rules.  That has nothing to do with the LTIP agreement.  The LTIP agreement is just a set of calculations.  It would be, for instance, if I said, "Hey, we're going to increase everybody's salary by 3 percent this year," as an example.

That has nothing to do with GAAP.  It's a calculation of what the salary increase is.  That's all this is.  This is an Excel exercise.  It doesn't roll up into any formal financial statements.  It doesn't roll up to anything related to GAAP.  GAAP is completely irrelevant to this, with the exception of IDC.

BY MS. YEE:

Q    So you're saying that the LTIP should be looked at as a standalone document, regardless who the parties are, or regardless whether it involves the public bank.

Is that what you're saying?

MS. VILLAGOMEZ:  Objection.  Form. Mischaracterizes her prior testimony.

THE WITNESS:  I'm saying that the LTIP agreement should be looked at by understanding what the past practices were.  And the past practices mean the

Deborah Dickson                                                    January 15, 2026

past accounting practices, and applying those same

practices consistently in the calculations for 2022,

2023 and ultimately, 2024.

BY MS. YEE:

Q    So you didn't perform any analysis that

identified divergence between past practices and GAAP;

correct?

MS. VILLAGOMEZ:  Objection.  Form.  Vague and

ambiguous.

THE WITNESS:  Oh, it's not necessary.  The

only reason I would need to do that would be to identify

any changes that would be necessary to convert these

numbers from GAAP to the past practices' consistent

number.

BY MS. YEE:

Q    Well, as a CPA, you're expected to

independently analyze proper accounting treatment;

correct?

MS. VILLAGOMEZ:  Objection.  Form.

Argumentative.

THE WITNESS:  I'm not sure what that has to do

with anything.  I'm sorry.

BY MS. YEE:

Q    Well, you didn't analyze how all these items

at issue should be accounted for under GAAP, and you do

Deborah Dickson                                                          January 15, 2026

not offer an alternative opinion assuming GAAP applied to all parts of the LTIP calculations; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Compound.  Argumentative.

THE WITNESS:  I did not make GAAP calculations under the LTIP agreement because it doesn't call for that in the plain language of the agreement.

BY MS. YEE:

Q    So if GAAP does apply, ultimately, your report offers no opinion that Ameris calculations were wrong; correct?

MS. VILLAGOMEZ:  Objection.  Improper hypothetical.

THE WITNESS:  I can't answer that question.

MS. YEE:  Or you can; you just won't answer it.

MS. VILLAGOMEZ:  Objection.  Argumentative.

BY MS. YEE:

Q    So, you actually mentioned this already.  So I assumed that we agree that, you know, that Ameris is a publicly-traded company, or part of a publicly-traded company, and it is a bank; correct?

A    I do know that.

Q    But your report did not analyze whether public companies, such as Ameris, are required to follow GAAP

regardless of an incentive plan; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  It was not necessary to analyze it.  Every CPA knows that every public company follows GAAP.  The SEC requirements provide for that, but that has nothing to do with this LTIP agreement.

BY MS. YEE:

Q    Let's go to your rebuttal opinion "b."  I think it's also on the same page.  So you concluded that as of the date of your report --

A    Sorry.  What page?  What page are we on?

Q    Page 3.  Your rebuttal opinion "b."  We just looked at "a," and now we're looking at "b."  Page 3 of your report, Exhibit 3.  So you concluded, "As of the date of your report, Plaintiff is due an additional" one point -- approximately 1.4 million in "underpaid cash bonus awards" for 2022 under LTIP.

That's on your report; right?

A    Correct.

Q    First of all, Ms. Sebold did not calculate any amount owed to the plaintiff, or any additional amount owed to the plaintiff or 2022; correct?

THE WITNESS:  Correct.

MS. VILLAGOMEZ:  Objection.  Lacks foundation.

///

Deborah Dickson                                                    January 15, 2026

BY MS. YEE:

Q    So your calculation assumes plaintiff was entitled to an LTIP payout; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  Yes.

BY MS. YEE:

Q    And this calculation was under -- the alleged amount was disclosed for the first time in your rebuttal report on January 2nd, 2026; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  Yes.

BY MS. YEE:

Q    And then, if you go to, on the same page, rebuttal opinion "c," you also concluded that, "As of the date of your report, Plaintiff is" also "due" 4.2, again, approximately, million, "in cash bonus awards for calendar year 2023," pursuant to the LTIP agreement; correct?

A    Correct.

Q    And defense expert, Ms. Sebold, opined that for 2023, LTIP's threshold was not met.

Do you recall that?

MS. VILLAGOMEZ:  Lacks foundation.

THE WITNESS:  Could you repeat that, please?

///

Deborah Dickson                                              January 15, 2026

BY MS. YEE:

Q    Miss Sebold's opinion is that the LTIP's threshold was not met for 2023?

A    Correct.

Q    Okay.

MS. YEE:  If you -- Ron, if you can pull up Exhibit 7, which we were just looking at earlier.  I just want to ask a couple of questions there.

BY MS. YEE:

Q    Do you recall -- and again, you can look at it when it's up.

Do you recall that the LTIP establishes performance thresholds and a bonus pool in that document I believe it's on AMERIS227 to -228.  So you can start with 227.

A    What is the question, please?

Q    So the LTIP establishes performance threshold and a bonus pool; correct?

MS. VILLAGOMEZ:  Objection.  Document speaks for itself.

THE WITNESS:  Well, it establishes the threshold and then times 35 percent of EBT, yes.

BY MS. YEE:

Q    And the bonus pool; correct?

MS. VILLAGOMEZ:  Objection.  Form.

Deborah Dickson                                    January 15, 2026

BY MS. YEE:

Q    If you look at the performance on, again, page 228 it talks about "Threshold for Award" for all three years, and then they talk about "Performance Formula."  That's where you were reading; right?  "35% of EBT," and then it says, you know, "cash bonus award pool for that Performance Period."

A    Yes, and so I just want to clarify the way you said it.  It doesn't establish a bonus pool; it establishes the opportunity to calculate a bonus pool if the threshold and all the calculations were met.

Q    Okay, just so we're clear.  I'll just read it into the record.  In the "Performance Formula, 35% of EBT above the Threshold for Award will be allocated to the Balboa Capital LTIP" or "(the plan), cash bonus award pool for that Performance Period"; correct?

A    Correct.

Q    That's what it says.

A    Yes.

MS. VILLAGOMEZ:  I just want to object that that was not accurately verbatim read into the record, but that doesn't matter.

BY MS. YEE:

Q    So the LTIP agreement does not specify how much any individual employee specifically receives;

Deborah Dickson                                          January 15, 2026

right?

MS. VILLAGOMEZ:  Objection.  Document speaks for itself.  Vague and ambiguous.  Form.

THE WITNESS:  That is my understanding.

BY MS. YEE:

Q    So, because the allocation positions are discretionary; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  That's the -- understanding that I have, based on my reading of the documents.

BY MS. YEE:

Q    But your report, you did not analyze how the cash bonus award pool would be allocated; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  Correct.

BY MS. YEE:

Q    You did not analyze whether plaintiff would receive any portion of the pool; correct?

A    I did not analyze how the pool would be allocated among plaintiff and any other place.

Q    Right.  So instead, it looks to me, again, based on your report, is that your assumption, or your opinion, is to give him the entire pool and only allocate everything to him, no one else?

MS. VILLAGOMEZ:  Objection.  Argumentative.

Deborah Dickson                                                January 15, 2026

MS. YEE:  Correct?

THE WITNESS:  That's incorrect.  I did not take the allocation any further than determining the 35 percent of the adjusted EBT.  And so, it was not my responsibility to determine how that would be allocated.

BY MS. YEE:

Q    Okay.  But if we go back to page 3 of your rebuttal report, under b -- your opinion "b." and "c." Under both sections you said, and I will read it into the record, you said, "As of the date of this report, I computed that Plaintiff is due an additional" approximately $1.4 million And then the next line, subsection "c." you said, "I calculated that Plaintiff is due" 1.2 million, again, approximately, "in cash bonus awards for the year 2023."

Do you see that?

A    I do.

Q    But you agree with me that without allocation positions, you can't calculate an individual LTIP award for plaintiff only; right?

A    Without allocation instructions, I cannot calculate how these awards will be allocated to the various individuals.

Q    Well nonetheless, you did calculate specific dollar amounts allegedly owed to plaintiff as an

Deborah Dickson                                          January 15, 2026

individual; correct?

A    I did not say plaintiff as individual.  To me, my assumption would be that is the amount that is due.  And then plaintiff, in turn, is empowered to determine how those funds are distributed among the various individuals who would, or could, or should receive them.

MS. YEE:  But the plaintiff is singular, and he's the only plaintiff in this case.  There are no other employees in this lawsuit.

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  Well, to me it appears that it's a definition of semantics.  And I am not going to take a position that it would be plaintiff, only plaintiff in a group of people.  My understanding is that it's up to plaintiff, meaning Mr. Byrne, to make the decisions as to how those funds are distributed.

BY MS. YEE:

Q    So is it your opinion that he should be receiving this amount that you allocated, and then he would decide how he wanted to allocate to other employees, if he does.

Is that what you're saying?

A    It's my understanding from reviewing the documents that the allocation of funds was up to Mr. Byrne to make those decisions.

Deborah Dickson                                                    January 15, 2026

Q    But you do agree that these amounts that you specifically listed under "b." and "c.", they should not be allocated only to plaintiff as an individual; correct?

        MS. VILLAGOMEZ:  Objection.  Form.  Misstates testimony.

        THE WITNESS:  I have no opinion on that matter.

    BY MS. YEE:

Q    You have no opinion because you were not retained to testify to give that opinion?

        MS. VILLAGOMEZ:  Objection.  Argumentative. That's totally inappropriate.

        MS. YEE:  Please, no speaking objections.  You can make your objections.  That's it.

        THE WITNESS:  That is outside the scope of what I'd been retained to calculate.

    BY MS. YEE:

Q    Okay, because you did not consider other potentially eligible employees in this calculation; correct?

A    Again, that's outside the scope of what I'd been asked to do.

Q    Okay, understood.  I want to turn to paragraph 23 of your rebuttal report.  So we're going to talk

Deborah Dickson                                          January 15, 2026

about plaintiff's request for adjustment.  So under the sections titled, "Analysis of Byrne's Requested Adjustment for 2023 and 2023 LTIP," you stated that "These are the most current and known adjustments to the 2022 EBT calculation."  And then you said later on, "but I am aware that Plaintiff may request further adjustments in the future."

Do you see that?

A    What you've got on the screen is not where I think you are.

MS. YEE:  We can go back to Exhibit 3, paragraph 23.

BY MS. YEE:

Q    If you can go to paragraph 23 of your report, I think it's on page 5.  The last sentence of that paragraph above subsection "a." says that, "I'm aware that Plaintiff may request further adjustments in the future."

Do you see that?

A    Yes.

Q    Do you know what are those potential future adjustments?

MS. VILLAGOMEZ:  Objection.  Calls for speculation.

THE WITNESS:  No, not at this time.

Deborah Dickson                                                    January 15, 2026

BY MS. YEE:

Q    So what is that based on?

A    Well, that's based on, should there be

additional documents produced, should there be other

matters that come to light as this case moves along.

There could be other areas.  I just don't know what they

are, if any, right now.

Q    So that's based on your discussion with

plaintiff or plaintiff's attorney?

         MS. VILLAGOMEZ:  Objection.  Form.  Misstates

testimony.  Argumentative.

         THE WITNESS:  Yes.

BY MS. YEE:

Q    So you don't know what type of adjustment that

could be, if any; correct?

A    Correct.

Q    So you're not assuming that plaintiff is

entitled to any adjustments he requests in the future?

         MS. VILLAGOMEZ:  Objection.  Form.

         THE WITNESS:  I have no opinion either way on

that.

BY MS. YEE:

Q    So when you wrote that statement, you are

acknowledging that your calculations were not

necessarily complete; right?

Deborah Dickson                                                    January 15, 2026

MS. VILLAGOMEZ:  Objection.  Argumentative.  Form.

THE WITNESS:  No.

BY MS. YEE:

Q    Well, you are acknowledging that additional adjustments might later be asserted; correct?

MS. VILLAGOMEZ:  Same objections.

THE WITNESS:  I'm indicating that perhaps plaintiff may request further adjustments in the future.  That's all.  Very simple.

BY MS. YEE:

Q    So as of today, those future potential adjustments do not exist in your report; correct?

A    Correct.

Q    Because as an expert, you know, you expected to provide your opinion based on known data; correct?

A    Data known at the time, correct.  And this addresses the fact that perhaps new data appears on the horizon, but I'm not aware of any right now.

Q    Okay, yeah.  Well, your opinion is not supposed to be contingent on future undefined adjustments; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Argumentative.

THE WITNESS:  I don't know.  That would

Deborah Dickson                                                  January 15, 2026

require a legal opinion.

BY MS. YEE:

Q    Well, you didn't know whether such potential adjustment would even be valid because it doesn't exist at this time; correct?

MS. VILLAGOMEZ:  Same objections.

THE WITNESS:  I've answered this multiple times.

BY MS. YEE:

Q    Well, can I get a response from the question I just stated?

A    The answer is that:  I'm aware that plaintiff may request further adjustments in the future, should new matters come to light.

Q    Well, that's not my question.  So I'm asking your calculations are subject to change based on unknown future events?

MS. VILLAGOMEZ:  Objection.  Form.  Asked and answered.  Argumentative.

THE WITNESS:  I'm not sure where we're going with this.  I've answered this a half-dozen times.

BY MS. YEE:

Q    So I just ask question.  You just answer.  You did not know whether any such adjustments would be valid; correct?

Deborah Dickson                                          January 15, 2026

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I don't know.

BY MS. YEE:

Q    Okay.  I'll move on.  So I want to turn to your rebuttal report.  Let's go to page 5, paragraph 25.  And we're going to ask about 25 and then 26.  And we're going to start with 25 first.

So you said here, plaintiff -- Plaintiff's requested adjustment is supported "by Ms. Heather Parker's deposition testimony dated November 17th, 2025"; correct?

MS. VILLAGOMEZ:  Counsel, sorry.  Once you finish this line of questioning, can we take a brief break, please?

MS. YEE:  Yes, let me just finish this line of questioning.  Thank you.

THE WITNESS:  Ask the question again, please.

BY MS. YEE:

Q    You said -- I'm just reading your paragraph 25, you said plaintiff's requested adjustment is supported by "Ms. Heather Parker's deposition testimony dated November 17th, 2025"; correct?

A    Yes.

Q    So you specifically cited page 126 of Ms. Parker's depo transcript in support of that

Deborah Dickson                                                  January 15, 2026

conclusion; correct?  Your footnote 23 cites to page 126

of Heather Parker's deposition; correct?

    A   I'm not seeing a footnote.  Now, where are you

looking?

    Q   You have to go to footnote 23, yeah.  You cite

to a deposition of Heather Parker dated November 17th,

and then page 126, if you look at footnote 23?

         THE WITNESS:  We were on the wrong page.  Got

it.  Yes, agreed.

    BY MS. YEE:

    Q   And you cite the testimony -- you probably

want to scroll up a little bit.

         You cite the testimony where she stated that

several departments "began reporting to Ameris after

acquisition."

         Credit, IT, marketing, and accounting;

correct?

    A   Yes.

    Q   You also cite to her for testimony where she

was describing herself as a "risk manager," who reported

to both plaintiff and Ameris; correct?

    A   Yes.

         MS. YEE:  So while Ron's going to pull up Ms.

Parker's depo transcript.  I believe it's Exhibit 9.

While he's doing that, I just want to ask a couple of

Deborah Dickson                                          January 15, 2026

questions and we're going to look at the transcript together, okay?

(WHEREUPON, DEFENDANT'S EXHIBIT 9 WAS MARKED FOR IDENTIFICATION)

BY MS. YEE:

Q    So you reviewed Ms. Parker's depo transcript in preparation for your rebuttal report; right?  You -- clearly -- you cite to it?

A    Yes.

Q    That transcript continues on beyond page 126; correct?

A    As I recall, it was longer than that, yes.

Q    If you go to page 127 --

THE WITNESS:  I have to wait for your person to bring that up.

Q.    BY MS. YEE:  No worries.  If you look at line -- this is 127, line 18.  She was asked,

"Based on your experience as a controller, you'd agree that because compensation for Balboa's employees in departments were reporting to Ameris is controlled by Ameris managers and not Balboa managers, or Pat Byrne, these personnel -- personnel expenses are corporate

Deborah Dickson                                    January 15, 2026

expenses and thus indirect expenses;

correct?"

So that was a question.  And her response to that question, if you go to page 128, the next page on line -- starting at line 13, and her response to that question was "No."

Do you see that?

A    Yes.

Q    But you did not cite to this particular portion of the testimony anywhere in your report or under those two paragraphs that were just read; correct?

A    Correct.

Q    So, in fact, you do not reference this testimony actually rejecting that proposition, at all, in this portion of your report; correct?

A    No, I did not.

Q    So the portion you relied on addressed reporting structure, but the portion we just reviewed addressed whether based on reporting structure, related changes, personnel costs, should be treated as corporate or indirect expenses; right?

A    Well, that's one person's opinion is all.

Q    But you do not include that in your analysis here; correct?

A    Correct.

Deborah Dickson                                      January 15, 2026

Q    Even though her testimony is directly relevant to the adjustment you were discussing in your opinion, your rebuttal report; correct?

A    Again, it's one person's opinion.

Q    Well, you chose to include the portion of her testimony that supports plaintiff's position, but not the portion that contradicts that position; right?

MS. VILLAGOMEZ:  Objection.  Argumentative. Form. Asked and answered.

THE WITNESS:  I included the part that's on page 126 and that's all.

BY MS. YEE:

Q    Well, a reader of your report wouldn't know that Ms. Parker actually expressly rejected that proposition; right?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I don't know whether they would know or not.

BY MS. YEE:

Q    Well, it is misleading by intentionally omitting that portion of her testimony; right?

MS. VILLAGOMEZ:  Objection.  Form. Argumentative. But you can answer.

THE WITNESS:  I disagree.

MS. YEE:  Well, you are advocating, not

Deborah Dickson                                                    January 15, 2026

analyzing.

MS. VILLAGOMEZ:  Same objection.

MS. YEE:  Correct?

THE WITNESS:  No.

Q.    BY MS. YEE:  So in that same paragraph --
if we want to go back to Exhibit 3, paragraph 25,
paragraphs 25 and 26.  You also stated that you
actually disagreed with certain parts of plaintiff's
requested adjustments.

Do you recall that?

A    Yes.

Q    You said "I agree that apart from the Credit
Equipment and the Credit FBL departments, these
departments represent an indirect cost."

What's your basis for that?  Why did you --
why did you exclude those two departments?  What are the
differences?

A    The differences really are, I think, he had
departments that were changed in this -- especially in
2023 were "Accounting, IT, Marketing, Credit, and Credit
FBL."  And so looking at those -- first of all, I was
looking at what's direct versus indirect to try to
identify those indirect departments that would be in
line with the LTIP agreement.

My understanding is that the credit department

Deborah Dickson                                              January 15, 2026

and credit FBL, which has to do with small loans, they are more transaction-oriented, so the work they do increases or decreases depending on the volume of activity.  But the work that's done by the accounting department, the IT department, marketing -- those are broad-based work that doesn't really increase much, other than maybe at month-end or something.  But it doesn't increase based on -- a transaction goes up and down, if there's a few more transactions in a month. They're not what we would call incremental costs. They're more just fixed costs.

So in addition to those overhead costs not being identified with the production of revenue, they're not a form of cost sales, at all.  They're really below the line, and just general SG&A expenses.  They're fixed cost.  And what happened with those departments, even though all five of these moved to Ameris, I chose not to include the credit department and the credit FBL because those are transactional expenses that go through there -- that impact revenue.

But the other departments, they moved to be under Ameris.  Ameris now has control of those departments, and the people in there.  They report to Ameris, their compensation, their hiring and firing decisions, all those kinds of things now are under

Deborah Dickson                                        January 15, 2026

Ameris.  My understanding is that Balboa, post-acquisition, did not have control over many of the functions of those people.  And furthermore, in reviewing Ms. Parker's, Ms. Heather Parker's deposition, she had been the controller at Balboa pre-acquisition.  But they found a job for her so she could stay employed, is how she described it.  And they placed her as a Risk Manager for all of Ameris.

So she's an example.  I see her in that list of employees as being charged to Balboa.  However, that certainly appears to be an indirect expense to me.  And if I go back, and I read, again, under "Key Assumption" item "c.", I see "There will be no allocation of indirect Company expenses to Balboa."

And then furthermore, if I look at -- so I see no allocation of indirect expense.  No allocation of overhead is required.  And if you look at the difference in the overhead department compensation, just for those three entities, for accounting, IT, and marketing, its $3.3 million in 2022.  And it is $5.2 million the next year.  If Balboa, post-acquisition, has no control over who is in that department and who -- what the raises are, and so forth, that shows me right there that -- well, the big increase of $2 million, which is probably what, a 40 percent increase in those departments with no

Deborah Dickson                                           January 15, 2026

control.  I would consider those indirect costs, and therefore not includable in the LTIP calculation.

Q    So in your answer just now, you mentioned a list of employees.  Is that the same thing you also listed in your report, the supporting work schedule provided by plaintiff to you?

A    Yes.

MS. VILLAGOMEZ:  I'm sorry, Nana, if we could please take a break whenever --

MS. YEE:  Can I just finish?  I just have a couple more, and then we can take a break.

MS. VILLAGOMEZ:  Okay.

BY MS. YEE:

Q    So this supporting work schedule is not listed in identified in your rebuttal report; right?

A    Correct.

Q    Well, you also did not describe this work schedule in detail in your report; correct?

A    Correct.  Like I mentioned before, my report was not designed to be overly complicated, or complex, or to cite every single thing.

Q    But you relied on --

A    I did the calculations.  I rely on all sorts of things.  I'm not going to include an entire deposition transcript with my report.

Deborah Dickson                                    January 15, 2026

Q    I'm only asking because you specifically referencing this document, this supporting work schedule in support of your conclusion under 25 and 26.  I'm just asking because I don't know what this document is.  Do you know if it was produced to defendant in discovery?

MS. VILLAGOMEZ:  Objection.

THE WITNESS:  Yes, it was produced, and I can give you Bates numbers that I'm aware of.

BY MS. YEE:

Q    Yes, can you give me the Bates number?

A    Sure, "Ameris 790."

Q    That's it?

A    Let me look.  Looks like that's the entire one.

Q    Is that the only one?  Anything else related to the supporting work schedule?

A    No.  It's several pages within that document.

Q    So you said this document was provided to you by Mr. Byrne; correct?

MS. VILLAGOMEZ:  Objection.  Misstates testimony.

THE WITNESS:  I didn't say that.

BY MS. YEE:

Q    Who provided the documents to you?

A    The documents would have come from one of the

Deborah Dickson                                                    January 15, 2026

two attorneys, either Ms. Anderson or from the office of
Allen Matkins.

Q    But you said under paragraph 26, you said, "I
reviewed the supporting work schedules provided by
Mr. Byrne."

A    Okay.  That -- well, when I say that,
frequently that will mean Mr. Byrne will provide those
to the attorneys, and then to us.

Q    But this document was not listed, on page 15,
of the documents provided or considered in your report;
right?

I don't see it.  Is it?  I'm just trying to
figure out what document it is.

A    I see it on my list.  I see it on my list.
It's about 60 percent down from the top.  It says
"Ameris0790; Spreadsheet of various employees
compensation for years 2022-2023."

Q.    BY MS. YEE:  Okay.  So that's the document
you relied on to provide that opinion for 25 and 26;
correct?

A    That plus reading of depositions, reading of
e-mails, my experience dealing with overhead
allocations, overhead direct and indirect job costing,
which would include materials, direct labor, overhead
calculations.  It includes a lot of things.

Deborah Dickson                                          January 15, 2026

MS. YEE:  Okay, thank you.  Stacey, let's do a break.  And thank you for your patience.  Can we come back in -- at 3:55?

MS. VILLAGOMEZ:  Is that enough time Debbie?  That sounds good.  Thank you.

MS. YEE:  Thank you so much.

THE VIDEOGRAPHER:  All right.  We now going off the record.  The time is 3:48 p.m.

(Break taken.)

THE VIDEOGRAPHER:  We're now going back on the record.  The time is 3:57 p.m.

BY MS. YEE:

Q    Thank you.  So I just want to remind you that you're still under oath.

Do you understand that?

A    I do.

Q    So we're still on -- before the break, I know we were talking about paragraphs 25, 26, and we're still in that section.  So you understand that whether a cost is direct or indirect, depends on the function performed, not merely the reporting line change; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  That's not necessarily true, and particularly in a lot of accounting departments and so

Deborah Dickson                                          January 15, 2026

forth.  If you read a lot of managerial accounting, the control, who has control over the employees, not just the reporting function, but the control, over them as hire/fire, the HR functions, people like Heather Parker, and others who primarily work for the company, in general.  That makes a big difference.  So it's not a black-and-white issue whatsoever.

BY MS. YEE:

Q    But Heather Parker never testified that she works for, you know, anyone else beyond Balboa; correct?

MS. VILLAGOMEZ:  Objection.  Form mischaracterizes -- excuse me.  Assumes facts.

THE WITNESS:  That's incorrect.

BY MS. YEE:

Q    Where did she say that?

A    In her deposition, she talks about how she was made the Risk Manager for Ameris, does some work for Balboa, especially right in the beginning, when she was helping during the transition.  But she was risk manager, not of Balboa, but of Ameris.  Yet, she is still on that list that is, right now, created -- showing that all charges, including hers, should be posted against Balboa.

Q    I'll just make a note that's not in her testimony.

Deborah Dickson                                           January 15, 2026

You did not dispute that, you know, all of the accounting, credit, IT, marketing employees at issue, worked a hundred percent on Balboa-related activities; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  What do you mean "I didn't dispute"?  That was not brought up.  So perhaps you have a question.

BY MS. YEE:

Q    Well, did you review Ms. Sebold's report, which state that those employees work a hundred percent on Balboa; Balboa division?

A    I don't recall.

Q    Well, you didn't conduct any time study or workload analysis to contradict that; correct?

MS. VILLAGOMEZ:  Objection.  Form. Argumentative.

THE WITNESS:  That's correct.

BY MS. YEE:

Q    You did not interview any of those employees to determine what work they actually performed; correct?

A    Correct.

Q    So your opinion treats a change in reporting line reporting to Ameris Bank, rather than Balboa Division, as to determinative of whether a cost is

Deborah Dickson                                                    January 15, 2026

indirect; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  That's a portion of what I described to you before.  That's not everything.

BY MS. YEE:

Q    But you would agree that reporting structure alone, which is what you just said, does not determine cost classification; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  As I explained before, it is a component, for sure.  And the more someone reports and has control over, or is under control of, one area, the less they are allocated directly to a department, and become more corporate employees versus specific-department employees.

BY MS. YEE:

Q    Well, you would agree that employees can functionally serve one division, even if they report to a centralized department; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for speculation.

THE WITNESS:  I can't agree with that or disagree with that.  All I'm telling you is the components and my understanding is that these employees move further and further away from being direct

Deborah Dickson                                          January 15, 2026

employees, and direct control under Mr. Byrne, who is the CEO of the Balboa Division.

And additionally, like we talked about, these employees are -- are not involved in the generation of revenue.  They're not -- their costs do not incrementally increase as revenue increases.  So you have to look at the interim -- incremental costs component of these particular departments, as well, which is sort of a generic overhead situation.

BY MS. YEE:

Q    But again, you did not independently verify those work schedules reflected, actual employees activities; right?

A    That's correct.

Q    Okay.  Let's turn to paragraph -- again in your rebuttal report, I believe it's paragraph 27 that you talk about tax benefits.

So in that paragraph, again, 27, you referred to, I think it was the second line, you talk about, "based on a special type of contract for which the IRS grants tax incentives," but you did not identify these specifics or the name of that contract; correct?

A    Correct.

Q    So what is it?

A    What is what?

Deborah Dickson                                            January 15, 2026

Q    What is that special type of contract?

A    Okay.  What they've got, as a situation here in Balboa Division is, leasing companies who lease to small entities.  I understand that leases are maybe, 40,000, 20,000, 100,000; not big pieces of equipment. The market is very, very competitive.  And along with that situation, when a leasing company, such as Balboa Capital, retains ownership of certain equipment -- and that would be under what's called "trac leasing," T-R-A-C leasing, or under equipment that has no buyout, not even a dollar buyout.

Then they retain that equipment -- they retain the ability to take depreciation.  And, as you know, under the depreciation rules, there were a lot of ways to write off the majority of that equipment, write off depreciation against those and get a lot of tax benefits.  And what happened in the industry, from my understanding is, because all these leasing companies can do that, then they use a piece of software that's called the "superTRUMP" software.  And the software computes what the tax savings are on a particular lease.

And by computing the tax savings, then they decrease the price to the customer based on those tax savings.  So what happens is they have to reduce their revenue by that amount.  And so by looking at what

Deborah Dickson                                    January 15, 2026

they're going to call a "tax benefit" -- so it's really almost a cost-of-sale number is what happens with this depreciation.

So what I did is, I noted that Mr. Byrne requested that depreciation be taken out of the calculation of the LTIP calculation, but I chose not to do that. I left depreciation in as an operating cost. But I see that based on all the software that's applied in the industry, the revenue is essentially reduced by the amount of the software calculations.  I reviewed the calculations, and I believe that it makes sense to apply that savings, the depreciation savings, to the LTIP calculation, as it's a form of reduction of revenue.

Q    But you did not attach that special type of contract for your report; correct?

A    I have the schedule.  Let me tell you what that is.

Q    You're talking about the contract, right, that you were talking about?

A    No, I have the whole superTRUMP -- I have the whole schedule that identifies --

Q    I understand.  But I want to just be clear. Is that what you referred to as a "special type of contract"?  Is that the same document, or is that a different type of document?

Deborah Dickson                                                    January 15, 2026

A    Actually, I'm -- I probably wasn't as clear there as I should have been.  An explanation is better based on what I just said, but I'm looking for the number for you because I do have it in my book somewhere.

Q    Okay, let me know when you find it.  But I just want to be clear that there is not a special type of contract, whatever that's called, whatever the title is.  That's not attached to your report, or on your list on page 15; correct?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I'm looking at -- it's actually on my list.  If you look at page 15, you will see about two thirds of the way down, you'll see "Ameris 791."  It says "SuperTRUMP spreadsheet."

BY MS. YEE:

Q    So that's the equivalent of the special type of contract you referenced in paragraph 27?

A    That's the software calculations that relate to these contracts.

Q    But is that the contract itself?

A    No, this is the spreadsheet.

Q    Okay.  So there is no -- you did not reference the specific contract that you mentioned?

A    I do not have a contract in my report.  I have

Deborah Dickson                                                    January 15, 2026

the spreadsheet that I'm providing to you.

    Q    Okay.  Again, not a trick question.  I just want to be clear.  In addition, you know, earnings before taxes for, you know, EBT is calculated before income taxes; correct?

    A    Correct.

    Q    Because by definition, EBT excludes tax benefits; correct?

    A    Well, tax benefits are different.  I'm talking about depreciation here.  So depreciation isn't -- is a -- the word I'm using is "tax benefits"; depreciation is a tax benefit, but it's an above-the-line number in every set of financial statements.  It's not a number that you have revenue, minus cost of sales, minus all other expenses, general sales and administrative expenses.  Then you go, net income before taxes, then tax provision.  You don't deduct the depreciation at the bottom.  You deduct it above the line.  That's why I've included this.

    Q    But are we still on paragraph 27, "Tax benefits," or you talking about paragraph 28, "Depreciation"?

    A    I'm talking about paragraph 27, and why I gave him the benefit on the schedule I just showed you.

    Q    But you agree that tax incentives affect

Deborah Dickson                                    January 15, 2026

after-tax result, not EBT; correct?

A    Again?  Say that again, please?

Q    You agree that tax incentives affect after-tax results, not EBT; correct?

A    Okay.  This is -- that's not the best word in my report.  And if I were to do it over, I would change the wording there.  It's really not tax incentives because states give tax incentives out.  I'm really talking about the benefit of the depreciation that's based on the superTRUMP schedule.  That is an above-the-line deduction.

Q    So you are saying the wordings you used in paragraph 27 is not accurate and do not actually reflect the basis of your opinion?

MS. VILLAGOMEZ:  Objection.  Form. Argumentative.

THE WITNESS:  I did not say that.  I said that the better wording would be the information that I just supplied to you.

BY MS. YEE:

Q    So you do not cite any accounting standard supporting these alleged adjustments claimed by Mr. Byrne, plaintiff; right?

A    The what adjustment?

Q    Accounting -- Plaintiff's requested

Deborah Dickson                                                    January 15, 2026

adjustment?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  So your question is I don't -- I didn't give you any accounting standard supporting plaintiff's adjustment; is that your question?

BY MS. YEE:

Q    Yes.

A    No, and again, I don't need to.  The accounting standard would be GAAP.  And this is not required under GAAP.  The only GAAP requirement in the LTIP is the IDC, and we're not discussing that.

Q    But there is no basis in any accounting methodology as to why EBT should be adjusted to reflect tax benefits; right?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  That's a question that doesn't make any sense.  Maybe you can try again?

Q.    BY MS. YEE:  Well, you do not cite any LTIP provision requiring tax benefits to be included in EBT; right?

A    No.  There are certain items in here that are not specified in the LTIP agreement, as we talked about.  And these are areas that have been identified, where the costing before was trying to make it consistent with the way it was produced before, versus how it's being

Deborah Dickson                                    January 15, 2026

accounted for right now.  So, let me give you the --
what I'm talking about.  So again, to materially follow
past practice, the LTIP itself does not identify every
expense where they're following past practice because it
can't.  You can't identify that in an agreement when
you're put putting together something like this.

Q    Yeah.  I'm going to go to, just in the
interest of time, going to go to paragraph 29 in your
report that talks about "Interest paid on other
borrowings."

Do you see that paragraph?

A    I do.

Q    So was this particular point, interest paid on
other borrowings, raised in plaintiff's requested
adjustments?

A    No.

Q    Okay.

A    I identified it because it seems, to me, like
a slam dunk I mean.

Q    Let me -- it's just a yes-or-no question.  But
let me ask you this.

So none of Ms. Sebold's opinions address this
issue; correct?

A    That's correct.

Q    Okay.  So let's go to paragraph 30,

"stipulated judgments."  So am I correct, and again, am I correct to say that, just based on my understanding of your testimony today, you also took the position that LTIP calculations on stipulated judgments should follow Balboa Capital's past practices; correct?

A    Correct.

MS. VILLAGOMEZ:  Objection.  Mischaracterizes testimony.

BY MS. YEE:

Q    And again, you referenced in several places here, in this paragraph, that your discussions with plaintiff, the work schedules provided by plaintiff, and I assume this is the same work schedules that we just talked about.  And you said it's Ameris, I believe, it's 709.

Is that correct?

A    No.  The stipulated judgment, I believe, has some other schedules for you.  Let me get that for you.

Q    It says, if you go to page 6, paragraph 30, you said, "I reviewed the supporting work schedules provided by Mr. Byrne."

So I'm just wondering if that's the same work schedules we just talked about, what we we're talking about, paragraph 26?

A    No.

Deborah Dickson                                         January 15, 2026

Q      It's a different work schedule?

A      Yeah, yes.

Q      So what is it?   What's this particular one?

A      This one should be -- let me look up for you.
If you look on "Ameris 0788"; it's on page 15, at the
bottom, you'll see that.

Q      -- 07, did you say, 88, the last one; right?

A      Yes, 0788.

Q      But that document, it says "Stipulated
Judgment adjustment spreadsheet."  But here you call it
differently.  You call it the "supporting work
schedules," or is that an error?

A      If you look at 788, you'll see the calculation
right there.

Q      That's not my question.  Because this is very
confusing to me.  You mentioned this work schedule in
"26."  You use that exact same wording in paragraph 30,
you talk about supporting work schedules.  Which is why
I'm asking, what is this exact document?  And you refer
me to, on page 15, what looks to be a completely
different document and title.

       Because had you intended to include this
document as a reference, you should have said either the
Bates range, or you should have quoted what exactly it
is, "Stipulated Judgment adjustment spreadsheet";

Deborah Dickson                                          January 15, 2026

correct?

    A    Well, this is a different issue than the
employees we were talking about before.

    Q    Okay, my question is --

    A    This doesn't have anything to do with
employees.

    Q    Okay, my question is -- exactly.  So this is
why the confusion that I'm having, right?  So this
supporting work schedules that you referenced only under
paragraph 30, is this an error, or is this a different
document?  Like, what is it?

    A    Okay, can you read me the sentence that you're
having trouble with please?

    Q    Are you looking at paragraph 30?

    A    I have paragraph 30.

    Q    It says, "I reviewed" -- so 1,2,3,4,5 -- if
you look starting from the bottom -- go up 1,2,3,4,5,
the fifth line.  "I reviewed the supporting work
schedules provided by Mr. Byrne and tied out his
calculation of this adjustment."

        I'm asking, what is the "supporting work
schedules" because this isn't the exact same wordings
that you used for other paragraphs that we just talked
about?

    A    As an attorney, maybe you're not familiar with

Deborah Dickson                                                    January 15, 2026

CPA lingo, but we use "work" or "workpapers" a lot as a generic term for all sorts of spreadsheets.

Q    As a reader, I'm just supposed to know that even though you use the same wordings, that you can mean completely different things?

A    Well, if you read the paragraph, I think it's pretty clear.

MS. VILLAGOMEZ:  Objection.  Argumentative.

THE WITNESS:  And, if you go to my supporting schedule, which is "Ameris 788," that's a work schedule, or a workpaper.  And right there, you can see the stipulated judgment at issue, the ones where payment has been received, the net amount to still be received, and what's included in this calculation.

MS. VILLAGOMEZ:  Nana?

THE VIDEOGRAPHER:  I think we lost her.

MS. VILLAGOMEZ:  We'll just go off the record. Oh, there she is.

MS. YEE:  Hello?  Was it just me, or was it someone else.

MS. VILLAGOMEZ:  It was just you, I believe.

MS. YEE:  That is so weird. Yeah.  I was talking the whole time, and no one's responding. I was like, "Oh my gosh, I probably offended her.  She won't say anything."  I guess we're still on the record.

Deborah Dickson                                                          January 15, 2026

THE WITNESS:  Yes, I think so.

MS. YEE:  Maybe I'll just ask the court reporter to read back the question.

(Record read.)

MS. YEE:  It's okay, Victor.  I can just reask the question.

BY MS. YEE:

Q    So Ms. Dickson, I'm just trying to understand, again, that when you use the term "supporting work schedules," based on what you just told me, it means something completely different.  And it also means something completely different for that same wording under paragraph 26.

Is that your testimony?

A    I'm not sure where we left on this, but as accountants, we use "work product," "workpaper," "spreadsheets."  We use those names interchangeably quite a bit, so that's probably what is creating some of your confusion here.

Q    Okay, thank you.  So in terms of the past practice, which I know we already got into a lot, so I want to be brief.  You mentioned "past practices" here under paragraph 30.

But you did not corroborate this past practice, alleged past practice, through testimony of

Deborah Dickson                                          January 15, 2026

any Balboa's formal accounting personnel or other
employees; correct?

        MS. VILLAGOMEZ:  Objection.  Form.

        THE WITNESS:  That's actually incorrect.
What's very interesting is, you will find throughout the
correspondence here, that Mr. James LaHaies actually
agreed to this number.

      And even Ms. Sebold states that, right in her
report, she says -- she says, "Well, while I don't
believe that the LTIP agreement threshold was met, I do
see that Mr. LaHaies agreed for the -- with the
$554,191.  So I'm okay with it," is essentially what she
said.

    BY MS. YEE:

    Q   That's your interpretation of that e-mail.
You did not talk to Mr. LaHaies; correct?

    A   Well, it's in the e-mails, and it's in your
expert's report, that she was fine with that.  I don't
know what else I can give you.

    Q   I disagree with that characterization.  What
I'm asking is, you did not speak to Mr. LaHaies,
correct?  You did not interview him?

    A   Correct.

    Q   That's your interpretation of what that e-mail
means; correct?

Deborah Dickson                                                    January 15, 2026

A    And my interpretation of your expert's report.

Q    Okay, understood.  And you did not review any contemporaneous accounting workpapers establishing that past practice; correct?

A    Well, I don't know that it was contemporaneous or not, but I do have a workpaper.  I don't know whether it was reconstructed, or whether it was contemporaneous at the time.  And that would be "Ameris 788."

Q    But your report also doesn't explain why Ameris's post-acquisition accounting treatment on this issue was incorrect; correct?

A    Well, what it does explain is that they changed the accounting.  And so right there, that indicates that they're not following past practice.

Q    But again, you did not include any analysis as to why Ameris's post-acquisition accounting treatment was incorrect.

A    It's not that Ameris's post-acquisition accounting treatment is incorrect, it's just different, you know.  Their treatment is a GAAP treatment.  That's different than private company methodologies that were used pre-acquisition.  And additionally, GAAP is not required for this calculation.

Q    Let's go to "interim rent."  I think this is paragraph 31, so if you want to go to the next page.  So

Deborah Dickson                                          January 15, 2026

again, in the interest of time, you know, I would just point out that you talk about -- you talk about Balboa Capital's past practices on line 2.  You talk about your "discussions with Mr. Byrne, Balboa's past practices." And then, Ameris's accounting method changed post-acquisition.

And those are the things that you relied on to provide this opinion; correct?

A    Yes, and you can see those all in paragraph 31.

Q    Okay.  And again, you talk about the same, again, the same term "supporting work schedules provided by Mr. Byrne."  And again, I'm just going to ask briefly that, what is this document referring to, and if you attached it to your report?

A    The document is "Ameris 792."  Let me look on page 15 for you.  It's on page 15, if you look at page 15, it's six from the bottom.

Q    Okay. So again, that's a different -- it's a different document from what you we're referring to for the other paragraph, right?  Meaning you would use the same wording?

A    That's correct.

Q    Okay, thank you.  Okay.  Let's go to the next paragraph, 32, "repossessions."  So you, again, talk

Deborah Dickson                                                          January 15, 2026

about Balboa Capital's past practices, but you did
not -- is that past practice -- I know I've asked a
similar question before, but I want to double check that
when you say past practice, you're just referring to a
general past practice of Balboa, pre-acquisition?  Or
are you actually specifically referring to a specific
time period?

A    I'm talking about their historical accounting
practices prior to acquisition.

Q    Okay.

A    And so that would include if they were doing
the LTIP agreement before acquisition, after
acquisition; the consistency should be the same.

Q    Okay.  So again, you also refer to this,
again, same wording, same language, "supporting work
schedules provided by Mr. Byrne."

So can you tell me what this document is
about?

A    Yes. So this document, I'll refer you to
"Ameris 793," and you'll see that on page 15.

Q    Okay.  So is there a reason you did not cite
to those specific documents under each paragraph of your
opinions or basis?

A    As I've described before, my report this
designed to show my final calculations and provide

Deborah Dickson                                          January 15, 2026

paragraphs as to why or why not I included these calculations.  And then, accountants and their work -- for instance, if you're preparing a financial statement, you don't cite in the financial statement to all the workpapers behind your financial statement.  You just cite -- you just present the financial statement.  That's what I'm doing here.  I'm presenting my numbers, I'm presenting text to explain what I did, and indicating that I did review and analyze supporting workpapers.

Q    You would agree that that would be confusing for the readers, especially someone who's not a CPA, or even a CPA, just any outside persons reading this report; correct?

        MS. VILLAGOMEZ:  Objection.  Form. Argumentative.

    BY MS. YEE:

    Q    Did you provide a response?

    A    That just sounded like a comment to me.

    Q    No. it was a question.

    A    Okay, what was the question?

    Q    So for an outsider, that it would be confusing for them, when you're referring to a document, but not specifically cite to the source documents; correct?

        MS. VILLAGOMEZ:  Same objection.

Deborah Dickson                                        January 15, 2026

THE WITNESS:  Question is:  Would it be confusing to an outsider?

BY MS. YEE:

Q    No.  You would agree that it would be confusing for an outsider, for any reader of this report; correct?  Without knowing the documents?

A    I would not agree.

Q    Okay.  Let's go to your rebuttal opinion "d." I believe that's the last opinion.  So there's "a," "b," "c," and then, "d."  And this is -- I think it's on the same page, page 3.  It talks about -- and your title here is "Underpaid Acquisition Proceeds."

Do you see that?

A    Yes.

Q    So you concluded that plaintiff is due, again, approximately $2 million related to "security deposits under the purchase" stock "purchase agreement"; correct?

A    Yes.

Q    So this opinion is based on a different agreement, other than the LTIP; correct?

A    This is not based on an agreement, as far as an LTIP-type of an agreement.  But my understanding, it is based on factors in the SPA, or stock purchase agreement, itself.

Q    Okay.  So let me ask you this, first of all.

The allegedly owned security deposits were not part of the lawsuit; and by that, I mean, it's not in plaintiff's complaint or pleading.

Correct?

A    Gosh, you know, it's been so long ago that I read the complaint, I don't recall.

Q    Well, I can tell you that there's no breach of stock purchase agreement-related cause of action in that complaint.

Do you recall that?

A    Generally, yes.

Q    Mr. Byrne, or plaintiff, he received approximately $180 million when he sold Balboa Capital to Ameris in December 2021.

Are you aware of that?

MS. VILLAGOMEZ:  Objection.  Form.  Lacks foundation.

THE WITNESS:  I don't know the exact amount, as some of those numbers were redacted in the documents that I was provided.

BY MS. YEE:

Q    Okay, so is it your -- so the stock purchase -- strike that.

The stock purchase agreement occurred well before plaintiff's alleged termination, wrongful

Deborah Dickson                                    January 15, 2026

termination, in June 2024; correct?

MS. VILLAGOMEZ:  Objection.  Form. Lacks foundation.

THE WITNESS:  Correct.

BY MS. YEE:

Q    The plaintiff's argument is that security deposits should have been accounted for in the evaluation of Balboa Capital, and therefore, should have increased the stock purchase price.

Is that your understanding?

A    Yes, generally.

Q    So in your view, or your opinion, how would the allegedly decreased amount, under the stock purchase agreement, be caused by plaintiff's alleged wrongful termination?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  I'm not sure that there's a connection between the two.

BY MS. YEE:

Q    Okay, understood.  So is plaintiff, again in your view, arguing that he can now revisit the stock purchase agreement, what like, four or five years later, after his execution, to claim an additional amount that he believes he should have received at the time of sale?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for

speculation.  Lacks foundation.

THE WITNESS:  My understanding is that plaintiff believes he started asking about this shortly after the acquisition.  And, in fact, I do see some evidence of e-mails that were written in around, maybe late '23, early '24, that essentially say, "I'm tired of dealing with this issue for two years.  Let's try to get it solved."

And so I believe, from what I've read, that this issue came up, and he's been trying to solve this issue with Ameris, as he believes that some of the -- what he refers to as "commitment fees" in some of the documents, were not accounted for during the final sales price.

BY MS. YEE:

Q    But do you understand that the stock purchase agreement was negotiated by those parties, again, years ago, with legal counsel or legal representation?  It was a joint process to toward a final, binding agreement.

MS. VILLAGOMEZ:  Objection.  Form.  Calls for legal conclusion.  Calls for speculation.  Lacks foundation.

THE WITNESS:  My understanding is -- because I've dealt with a lot of these.  Outside of my forensic practice, I deal with regular corporate clients.

Deborah Dickson                                          January 15, 2026

They're CEOs.  And from time to time, they're selling their companies.  And so, I work with them on the taxation and the negotiation.  And in those, I'm very familiar with various concepts that -- the ultimate sales price, on the day of acquisition, is not necessarily the final, final number.

But over a period of time, the final numbers need to be settled, whether there's a working capital adjustment, whether there's an earn-out adjustment.  So sometimes, these deals take a while to finalize.  And so, my understanding is along that line, Mr. Byrne believes that a certain amount of nonrefundable security deposits, or commitment fees, were not recognized at the time of the sale.  And so he is requesting an increase in the purchase price, essentially, to account for that.

BY MS. YEE:

Q    And you were not involved in that negotiation; right?

A    That is correct.

Q    And you are not a lawyer.  You are not a lawyer; correct?

A    Correct.

Q    Do you agree with plaintiff that the Balboa Capital, or Balboa Division after acquisition as part of Ameris, is entitled to keep security deposits from

Deborah Dickson                                                    January 15, 2026

customers and book them as income, or revenue, if they were not explicitly requested to return the deposits by the customers?

MS. VILLAGOMEZ:  Objection.  Form.  Assumes facts.

THE WITNESS:  That's a general issue.  But in speaking with Mr. Byrne, this is a different situation. He has explained to me that these were nonrefundable deposits.  In fact, that they're identified as "commitment fees."  He explained that under the contracts, they received the funds upfront --

BY MS. YEE:

Q    What did you look at?

A    -- when a deal is made.  But they wait until four to six months after a contract is terminated, and then make an accounting adjustment to adjust those commitment fees into income.

Q    But besides accepting plaintiff's position, or explanation, did you look at those underlying contracts, or languages, in there?

A    I did not have access to the contract, so I was unable to do that.

Q    Okay, well is it, in your opinion, as a CPA and an expert, right?  Is that appropriate accounting practice --

Deborah Dickson                                    January 15, 2026

MS. VILLAGOMEZ:  Objection.  Form.

BY MS. YEE:

Q    -- to keep security deposits from customers and book them as income, or revenue, if the customer did not specifically ask those to be returned?

MS. VILLAGOMEZ:  Objection.  Form.

THE WITNESS:  The question you're asking is different than the explanation I gave.

BY MS. YEE:

Q    But was it plaintiff's intention to continue to do that, based on what he explained to you, to continue that practice of keeping the security deposits as income?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for speculation.

THE WITNESS:  I want make sure that you're understanding plaintiff's explanation of this, which is different than what you're describing.

BY MS. YEE:

Q    So what is -- tell me.  What is plaintiff asking for?

A    Okay.  Plaintiff understands that under these contracts, these are not -- generally, nonrefundable deposits, which is different than refundable security deposits, which is what you are addressing.  And so, he

Deborah Dickson                                      January 15, 2026

says that in the beginning, these are commitment fees. And they book these as a form of a deposit on an asset, on their balance sheet.

And then later, when the contract is terminated, at that point in time, within four to six months, periodically, they will go through and make an accounting adjustment to move these commitment fees, from off the balance sheet into the income statement, into the revenue section.  And that is what he's asking. He said there were enough at acquisition that never were accounted for.  So he has accounted for those, and he is requesting a change in the purchase price, based on these.

    Q    But you did not independently verify the accuracy of plaintiff statement; correct?

    A    I do not have access to those contracts.

    Q    Okay.  Okay.  I want to talk a little bit about, you know -- so on January 13th, 2026, you produced, which we talked about a little bit, your expert file, which contains, you know, different folders.  And one of them is your notes that was produced as part of your expert file.

    Do you recall those notes you made, in connection with meetings relating to this case?

    A    I know that there are some notes.  You may

Deborah Dickson                                        January 15, 2026

need to ask me questions or show them to me.

Q    Let me ask some general questions.  I don't think I have any specific questions related to the notes.  But those notes reflect, again, generally speaking, you know, your meetings with plaintiff, plaintiff's counsel, and others, and whoever was present during that meeting.

Correct?

A    I guess without looking at them, I don't know.

MS. YEE:  Ron, can you pull up Exhibit 10?

(WHEREUPON, DEFENDANT'S EXHIBIT 10 WAS MARKED FOR IDENTIFICATION)

BY MS. YEE:

Q    Do you recall that one of the -- and again, you can look at it. I'm just going to ask questions, again, in the interest of time.

Do you recall one of the individuals that was present in one of the meetings is Jacquie Emert?

A    Yes.

Q    What is her role in relation to plaintiff?

A    Now or prior?

Q    Both.  You can start with prior or now.

A    I know she ran one of the departments, pre- and post-acquisition.  I don't recall what it was.  And she told me that now, she works as his assistant.

Deborah Dickson                                    January 15, 2026

Q    Okay.  So she was present at all of the meetings or just some of the meetings with you?

A    I would say one, or maybe two, and that's all.

Q    So, did she speak during those meetings?

A    Not much, if anything.

Q    Okay.  Did she provide documents, or information related to this case, to you in support of your rebuttal report?

A    If she did, it would have been that same routine, where we asked any documents go to the attorneys first, and then to us.

Q    Okay.  So you're saying either she provided those documents to former counsel, or she provided documents to new counsel; correct?

A    If she did.  And I don't know.

Q    Okay.  So do you recall that you were retained by plaintiff, and Ms. Espie Anderson, as an expert in this matter in early November 2025?

Do you recall that?

A    I recall that it was closer to November 25th, 2025.

Q    And then, do you recall you signed an engagement letter with Ms. Espie Anderson; correct?

A    I do recall that, yes.

Q    Did you also sign a new engagement letter with

Deborah Dickson                                            January 15, 2026

new counsel, Mr. -- Ms. Villagomez or Mr. Sessions's

office?

    A    Yes.

    Q    For the same case; correct?

    A    Correct.

    Q    Do you recall that the new engagement letter
was executed on December 17th, 2025?

    A    I don't recall, but that would be some time,
around the time period.

    Q    Okay.  So you signed this new engagement
letter, I guess, with new counsel.  Do you understand it
was -- actually, you signed it before the former counsel
withdrew from this case?

    A    I don't know the dates on who did what,
honestly.

    Q    Why did you feel the need to sign a new
engagement letter on, you know, December 2025?

    A    It was our understanding that Allen Matkins
became the new counsel.  Therefore, it was important for
us to obtain a new engagement letter.

    Q    Were you the one that recommended new counsel,
Allen Matkins, to Mr. Byrne?

    A    We gave a number of law firm options to
Mr. Byrne, and he ultimately selected Allen Matkins.
It's my understanding that he had his own options, and

Deborah Dickson                                               January 15, 2026

then we identified some more.

Q    So did he ask you to recommend additional new attorneys, or you recommended new attorneys on your own?

A    I don't recall that.

Q    Do you have a personal -- when I say "personal," obviously, I don't mean professional relationship, so there's a difference.  DO you have any personal relationships with any attorneys in Allen Matkins?

A    No.

Q    Do you have any personal relationship with plaintiff, Mr. Byrne, in this case?

A    No.

Q    What about Jacquie Emert?

A    No.

Q    So was that your ordinary practice to be involved in selecting legal counsel for a client, while retained as an expert, for work behind the back of the former attorney that retained you initially, to engage in new potential counsel?

        MS. VILLAGOMEZ:  Objection.  Form.

        THE WITNESS:  That sounds like an accusation. And I was never involved with any of what you just said.

    BY MS. YEE:

Q    I'm just asking about the facts.  While you

Deborah Dickson                                         January 15, 2026

were working with Mr. Byrne, and I assume Ms. Espie Anderson, were you simultaneously recommending new counsel to Mr. Byrne?

A    I don't recall.

Q    At the time of your recommendation of new counsel, were you being compensated by the plaintiff in any way related to that recommendation?

A    Never.  Absolutely not.

Q    So what percentage of your expert work is for plaintiffs versus defendants?

A    It's about 50/50 percent.

Q    Any changes in that percentage, you know, say, the last five years?

A    No.

Q    And what percentage of your expert work is for individuals versus companies?

MS. VILLAGOMEZ:  Objection.  Vague as to time.

THE WITNESS:  It's hard to say because some of our work relates to trusts, and individuals related to trusts.  A lot of it is individuals and companies mixed together.  So I can't quantify that for you.

Q.   BY MS. YEE:  Okay, fine.  Was it you, or someone else, recommended Stacey Villagomez as counsel to plaintiff?

A    As I mentioned, it was my understanding that

Deborah Dickson                                    January 15, 2026

Mr. Byrne had his own ideas, and we also identified a number of different firms that might work for them.  And that's all there was.

Q    When you say "we," was it you, or was it someone else?

A    It would be my partner, Ryan Nguyen, and me.

Q    So does Ryan have a personal relationship with Allen Matkins, in terms of any specific attorneys in the firm?

A    No.

Q    Have you previously worked with Allen Matkins?

A    We've worked with them a couple of times over the years.

Q    What about specifically with Stacey Villagomez?

A    We've worked with her a couple of times over the years.

Q    What about Matthew Sessions?

A    We've never worked with him before.

Q    So when you signed your new engagement letter with Allen Matkins, new counsel for this lawsuit, has your assignment changed at all?

A    Possibly, only with clarity.  I believe that Allen Matkins was able to provide more clarity in what our assignment would be.

Deborah Dickson                                                    January 15, 2026

Q    Can you tell me, what that assignment, or clarity, that it provided to you?

A    The assignment would be that we needed to get a report out by, I think it was, January 2nd, 2026. And our assignment was to review the LTIP agreement, make our own calculations, and identify whether, for the years '22 and '23, Mr. Byrne exceeded the thresholds. Our assignment was also to look at the commitment fees related to the nonrefundable security deposits and identify if there would be any numbers there that would be presented.  And also to review Ms. Sebold's report and create comments therein.

Q    Well, your new counsel substituted in, and the court approved the substitution, on December 29th, 2025.

When did they give you these additional assignments?

A    Probably pretty close to that date because it was not a fun time between December 29th and January 2nd.  I can tell you that.

Q    Well, even though you understood that at that point, you did not provide your initial expert report; correct?

A    I don't know how to answer that.

Q    Isn't it true that your assignment should be,

Deborah Dickson                                    January 15, 2026

as a rebuttal expert, to respond to Ms. Sebold's

opinions, as she timely produced, and disclosed, on

December 5th, 2025?

        MS. VILLAGOMEZ:  Objection.  Form.  Calls for

legal conclusion.  Assumes facts.

        THE WITNESS:  I don't have an exact answer on

that, so I can't answer that for you.

    Q.   BY MS. YEE:  How much have you billed,

to-date?

    A    The only bill that's gone out was for -- let's

see, November.  And that was about $12,000.

    Q    What about December and January?

    A    The December billing has not yet gone out.  I

checked with accounting, and it had not yet got out.

    Q    What's the estimated total amount of hours

that you worked in December and January?

    A    The "WIP," so the work-in-process for December

shows $71,000, for the month of December.  And I don't

have any idea yet on January.  I can just tell you that

it's quite a bit of time.

    Q    Understood.  You're aware that this case is

subject to a protective order; correct?

    A    Yes.

    Q    You've reviewed the protective order before

receiving confidential materials in this case?

Deborah Dickson                                            January 15, 2026

A    I think so.  And I'm just saying, "I think so" because I got a bunch of cases at one time that had those.  And so, to the best of my ability, I'm saying yes, I did review it.

Q    You understood that experts are required to sign Exhibit A, I believe it's called "acknowledgment agreement to be bound before reviewing confidential information"; correct?

A    Yes.

Q    You personally signed Exhibit A in this case; right?

A    If I signed a protective order, then yes, I personally signed it.

Q    What about your associates, or any other persons, individuals from your firm that worked on this case?

A    It would be the same answer.

MS. YEE:  I have not received a copy of that. But if it is not in your file, so will you please provide a copy to your counsel, and then I can request a copy from counsel?

THE WITNESS:  Sure.  Let me make a note.  You want the protective orders from anyone who worked on the case; right?

MS. YEE:  Yes.

Deborah Dickson                                        January 15, 2026

THE WITNESS:  Okay.

BY MS. YEE:

Q   So, just lastly, have we discussed all the opinions that you intend to offer at trial?

A   I have one more than I would like to offer.

Q   Was that opinion already included, or disclosed in your rebuttal report, or is this a different or new expert opinion?

A   I have an alternate opinion that I would like to provide also.

Q   Okay, go ahead.

A   Okay.  I provided it in the documents that I sent you, and it's very similar to my three pages at the back of my report.  So, as you know, I have Exhibit 3. Now I have an Exhibit 3A.  In my initial report, I have Exhibit 4; and now, I have Exhibit 4A.  And then in my initial report, I have Exhibit 5; and now, I have Exhibit 5A.

And the difference in those, so I don't take too much of your time, is rather than pulling the numbers in the LTIP calculation, the charge-off numbers straight off the LTIP workbook, I looked at the actual net charge-offs for the change in the balance sheet, and ran those through my adjustment instead.  And also identified that a very small part of the direct finance

Deborah Dickson                                    January 15, 2026

leases should not have been included.  And so, it's just really updated calculations based on the same format as what's in my report.

Q   Just to clarify.  You mentioned a "3A."  Is it a "3A," "4A," and "5A"?

A   Correct.

Q   And those, you know, were not included in your original rebuttal report, but you said you have provided those documents was part of your expert file; correct?

A   Correct.  Correct.

Q   But these -- I guess, you know, you call it "alternative" or "new calculations"; 3A through 5A. These are -- these were not timely disclosed; correct?

MS. VILLAGOMEZ:  Objection.  Form.  Calls for speculation.  Calls for legal conclusion.

THE WITNESS:  I don't know.

BY MS. YEE:

Q   But they were not in original report.  You just testified to that; correct?

A   Correct.

Q   So can you tell me, are these documents based on any new informations was first documented that you did not receive at the time before you finalized your rebuttal report?

A   They are not based on any new information.

Deborah Dickson                                        January 15, 2026

Q    So they were based on information you were already in possession of before you finalized your rebuttal report; correct?

A    Correct.

MS. YEE:  So I just want to state for the record that I reserve the right to depose you on these additional or new opinions.  And, you know, I also reserve the right to file a motion in limine, motion to strike or Daubert motion on these issues.

And I think that's all I have for today. Right on time.

MS. VILLAGOMEZ:  Okay, thanks Nana.  I'm also going to be forwarding this to protective order right now.

MS. YEE:  Thank you.

THE VIDEOGRAPHER:  All right.  This concludes today's deposition.  We're now going off the record. The time is 5:00 p.m.

(Deposition of DEBORAH DICKSON concluded at 5:00 P.M.)

---o0o---

Deborah Dickson                                                    January 15, 2026

I, DEBORAH DICKSON, do hereby declare under the penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____, 20___, at _____, _____.

                    (City)                          (State)


                              _____
                              DEBORAH DICKSON

Deborah Dickson                                    January 15, 2026

UNITED STATES DISTRICT COURT                    )
                                                ) ss:
CENTRAL DISTRICT OF CALIFORNIA                  )


        CERTIFICATE OF REPORTER


        I, Victor M. Telles, Certified Shorthand
Reporter, hereby certify that the witness in the
foregoing deposition was by me duly sworn to tell the
truth, the whole truth and nothing but the truth in the
within-entitled cause;
        That said deposition was taken down in
shorthand by me, a disinterested person, at the time and
place therein stated, and that the testimony of the said
witness was thereafter reduced to typewriting, by
computer, under my direction and supervision; that the
foregoing is a true record of the testimony given.
        I further certify that I am not of counsel or
attorney for either or any of the parties to the said
deposition, nor in any way interested in the event of
this cause, and that I am not related to any of the
parties thereto.



        _____
        VICTOR M. TELLES, CSR No. 14695

Deborah Dickson                                                    January 15, 2026

DEPOSITION ERRATA SHEET

CASE NAME:              BYRNE V. AMERIS
DEPOSITION DATE:       JANUARY 15TH, 2026
WITNESS NAME:          DEBORAH DICKSON

REASON CODES: 1. To clarify the record.
              2. To conform to the facts.
              3. To correct transcription errors.

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____Subject to the above changes, I certify that the
transcript is true and correct.

_____No changes have been made.  I certify that the
transcript is true and correct.

_____
DEBORAH DICKSON

Deborah Dickson                                                                January 15, 2026

**Exhibits**

**Ex 0001 Deborah Dickson 011526** 4:6 8:19,23

**Ex 0003 Deborah Dickson 011526** 4:8 14:10,11 15:9 39:12,14,15,16 58:14 66:11 75:6 120:14

**Ex 0007 Deborah Dickson 011526** 4:9 35:22,23 60:7

**Ex 0008 Deborah Dickson 011526** 4:7 12:25 13:2

**Ex 0009 Deborah Dickson 011526** 4:10 71:24 72:3

**Ex 0010 Deborah Dickson 011526** 4:11 111:10,11

**$**

**$1.4** 63:12
**$12,000** 118:11
**$180** 104:13
**$2** 77:24 103:16
**$3.3** 77:20
**$5.2** 77:20
**$554,191** 98:12
**$71,000** 118:18

**-**

**---o0o---** 122:20
**-228** 60:14

**0**

**07** 94:7
**0788** 94:5,8

**1**

**1** 8:19,23 35:18 36:14,15,25
**1%** 36:24
**1,2,3,4,5** 95:16,17
**1.2** 63:14
**1.4** 58:16
**10** 111:10,11
**100,000** 86:5
**100-page** 47:14
**126** 70:24 71:1,7 72:10 74:11
**127** 72:13,17
**128** 73:4
**13** 73:5
**13th** 19:17 21:1 24:11 110:18
**14695** 5:21
**15** 18:2,5,8,10,13,15,24 19:13 20:6,23 21:2,22 24:18 80:9 88:10,13 94:5,20 100:17,18 101:20
**15th** 5:2
**17th** 70:10,22 71:6 113:7
**18** 18:15 72:17

**2**

**2** 18:10 38:1 100:3
**20,000** 86:5
**2019** 49:17,24 50:2
**2020** 51:13
**2021** 104:14
**2022** 49:20 56:2 58:17,22 66:5 77:20
**2022-2023** 39:19 80:17
**2023** 50:3 56:3 59:17,21 60:3 63:15 66:3 75:20
**2024** 56:3 105:1
**2025** 26:6 29:16 70:11,22 112:18,21 113:7,17 117:15 118:3
**2026** 5:3 14:14 15:10 16:14 19:18 21:1,12 24:11,15 26:18 59:9 110:18 117:4
**22** 117:7
**227** 60:15
**228** 61:3
**23** 65:25 66:12,14 71:1,5,7 106:6 117:7
**24** 19:8,10,21 106:6
**25** 70:5,6,7,20 75:6,7 79:3 80:19 81:18
**25th** 112:20
**26** 70:6 75:7 79:3 80:3,19 81:18 93:24 94:17 97:13
**26(a)(2)(b)** 26:15
**27** 85:16,18 88:18 89:20,23 90:13
**28** 89:21
**29** 92:8
**29th** 117:14,19
**2:00** 5:3
**2nd** 14:14 15:10 16:14 21:12 24:15 26:18 59:9 117:4,20

**3**

**3** 14:10,11 15:9 38:15 39:1,8,12,14,15,16 55:7 58:12,13,14 63:7 66:11 75:6 103:11 120:14
**30** 92:25 93:19 94:17 95:10,14,15 97:23
**31** 43:18 45:4 46:13 99:25 100:10
**32** 100:25
**35** 60:22 63:4
**35%** 61:5,13
**3:48** 81:8
**3:55** 81:3
**3:57** 81:11
**3A** 120:15 121:4,5,12

**4**

**4** 13:11,14 120:16
**4.2** 59:15
**40** 15:7 33:22 77:25
**40,000** 86:5
**4A** 120:16 121:5

**5**

**5** 43:6 66:15 70:5 120:17
**50/50** 115:11
**5:00** 122:18,19
**5A** 120:18 121:5,12
**5th** 26:6 29:16 118:3

**3**

**3** 14:10,11 15:9 38:15 39:1,8,12,14,15,16 55:7 58:12,13,14 63:7 66:11 75:6 103:11 120:14

**6**

**6** 93:19
**60** 80:15

**7**

**7** 35:22,23 43:18 60:7
**702** 13:24
**709** 93:15
**75** 7:12
**788** 94:13 96:10 99:8
**790** 79:11
**791** 88:14
**792** 100:16
**793** 101:20

**8**

**8** 12:25 13:2
**824-cv-01989-mwc** 5:6
**88** 94:7

**9**

**9** 71:24 72:3

**A**

**ability** 8:1 31:12 86:13 119:3
**above-the-line** 89:12 90:11
**absolutely** 7:20 115:8
**accepting** 108:18
**access** 108:21 110:16

Deborah Dickson                                              January 15, 2026

**account** 40:23 45:10 50:11 107:15

**accountants** 20:20 35:9 48:19 97:16 102:2

**accounted** 56:25 92:1 105:7 106:13 110:11

**accounting** 20:1 33:6 40:16,18,21, 25 41:1,11,14 42:15 43:1,19,24 44:6,10 46:20 48:16 49:13 54:22 56:1,17 71:16 75:20 76:4 77:19 81:25 82:1 83:2 90:21,25 91:4,9, 12 98:1 99:3,10, 13,16,19 100:5 101:8 108:16,24 110:7 118:14

**accrual-based** 40:25

**accuracy** 110:15

**accurate** 13:21 16:14 90:13

**accurately** 61:21

**accusation** 114:22

**acknowledging** 67:24 68:5

**acknowledgment** 119:6

**acquired** 41:18

**acquisition** 8:14, 15 38:14 42:8 49:18 53:4,6,8,14, 24 71:15 101:9, 12,13 103:12 106:4 107:5,24 110:10

**action** 104:8

**activities** 83:3 85:13

**activity** 76:4

**actual** 85:12 120:22

**actuary** 46:20

**add** 16:11 19:5

**addition** 76:12 89:3

**additional** 9:17 15:22 20:4,12,14 21:10 24:16 58:15,21 63:11 67:4 68:5 105:23 114:2 117:16 122:7

**additionally** 48:25 85:3 99:22

**address** 30:24 92:22

**addressed** 37:10 73:17,19

**addresses** 68:18

**addressing** 47:9 109:25

**adherence** 40:8

**adjust** 108:16

**adjusted** 63:4 91:13

**adjustment** 66:1, 3 67:14 69:4 70:9, 20 74:2 90:24 91:1,5 94:10,25 95:20 107:9 108:16 110:7 120:24

**adjustments** 41:22,25 66:4,7, 17,22 67:18 68:6, 9,13,22 69:13,24 75:9 90:22 92:15

**administrative** 89:15

**advocating** 74:25

**affairs** 41:11

**affect** 8:1 89:25 90:3

**affirmative** 31:3

**aft** 8:15

**after-tax** 90:1,3

**afternoon** 5:1,13, 19 6:1

**agree** 5:9 16:18 24:13 29:22 53:13 57:20 63:18 65:1 72:19 75:12 84:6, 17,22 89:25 90:3 102:11 103:4,7 107:23

**agreed** 71:9 98:7, 11

**agreement** 10:12,13 32:4,5,6, 8,10,11,16 33:4 34:1,5,11 35:8,16 36:5,9,14 37:9,11, 14 38:1,21 39:2, 22 40:2 49:3 51:7, 23 52:3 53:16 55:4,5,24 57:6,7 58:6 59:17 61:24 75:24 91:22 92:5 98:10 101:12 103:17,20,21,22, 24 104:24 105:14, 22 106:17,19 117:5 119:7

**agreement-related** 104:8

**agreements** 35:11,12,14

**ahead** 30:10 35:25 36:12 120:11

**alcohol** 7:25

**alleged** 25:15 59:7 90:22 97:25 104:25 105:14

**allegedly** 63:25 104:1 105:13

**Allen** 6:11 22:10 80:2 113:18,22,24 114:8 116:8,11, 21,24

**allocate** 62:24 64:20

**allocated** 61:14 62:13,20 63:5,22 64:19 65:3 84:13

**allocation** 62:6 63:3,18,21 64:24 77:13,16

**allocations** 80:23

**alternate** 120:9

**alternative** 16:2, 4 17:1,10 20:2 57:1 121:12

**ambiguous** 56:9 62:3

**Ameris** 5:5,14 8:15 25:14 33:7 38:13 43:23 48:10 49:2 54:20,21 57:10,20,25 71:14,21 72:22 76:17,22,24 77:1, 8 79:11 82:17,20 83:24 88:14 93:14 94:5 96:10 99:8 100:16 101:20 104:14 106:11 107:25

**Ameris's** 44:6 99:10,16,18 100:5

**AMERIS000228** 38:4,17

**Ameris0790** 80:16

**AMERIS227** 60:14

**AMERIS792** 45:8

**amount** 58:21 59:8 64:3,19 86:25 87:10 96:13 104:18 105:13,23 107:12 118:15

**amounts** 63:25 65:1

**analysis** 13:20 56:5 66:2 73:23

83:15 99:15

**analytical** 13:23

**analyze** 53:22 56:17,24 57:24 58:3 62:12,17,19 102:9

**analyzing** 75:1

**Anderson** 22:6, 11 23:3 80:1 112:17,23 115:2

**anything's** 8:16

**Apparently** 11:13 14:7

**appearance** 5:11

**appeared** 39:7

**appears** 41:16 64:11 68:18 77:11

**application** 50:5

**applied** 34:7,8 52:10 57:1 87:8

**applies** 35:3 36:5 37:21 39:2

**apply** 13:18 33:2, 23 34:12,13,15,22 35:6,17,20 36:4,8, 17,23 37:20 48:22 57:9 87:11

**applying** 56:1

**approved** 117:14

**approximately** 15:7 49:24 50:2 58:16 59:16 63:12,14 103:16 104:13

**arbitration** 11:11

**area** 28:25 84:12

**areas** 67:6 91:23

**arguing** 105:21

**argument** 105:6

**Argumentative** 16:21 17:18 21:20 24:20 25:6 28:6 31:23 33:10 35:5 44:17,23 46:15

Deborah Dickson                                                January 15, 2026

48:1 51:20 54:24
56:20 57:4,17
62:25 65:12 67:11
68:1,24 69:19
74:8,23 83:17
90:16 96:8 102:16

**arrive** 45:23

**ASC606** 49:22,24
50:2

**ASC842** 49:13,15

**aspect** 50:19
52:18

**asserted** 43:23
68:6

**asset** 110:2

**assignment**
116:22,25 117:1,
3,5,8,25

**assignments**
117:17

**assistant** 111:25

**associate** 6:15
10:24 11:4 14:18

**associates** 10:20
14:17 119:14

**assume** 7:8 15:8
20:16 93:13 115:1

**assumed** 57:20

**assumes** 34:17
54:10 59:2 82:12
108:4 118:5

**assuming** 57:1
67:17

**assumption**
36:18,23 39:4
62:22 64:3 77:12

**assumptions**
32:21 33:1 36:16
37:5,6 38:16

**ate** 9:25

**attach** 87:14

**attached** 9:12
10:13 88:9 100:15

**attorney** 5:12

22:19 27:25 67:9
95:25 114:19

**attorneys** 9:21
10:2 15:17 23:13
27:8,22 28:17
29:8 80:1,8
112:11 114:3,8
116:8

**audit** 11:5 48:10
50:7

**audited** 48:11

**award** 10:12
32:4,8,9,11 33:4
35:8 36:14 61:3,6,
14,16 62:13 63:19

**awards** 58:17
59:16 63:15,22

**aware** 12:6,10
23:14 28:8 66:6,
16 68:19 69:12
79:8 104:15
118:21

---
**B**
---

**back** 8:7 32:2
41:23 45:15 48:17
63:7 66:11 75:6
77:12 81:3,10
97:3 114:18
120:14

**balance** 19:24
20:9 110:3,8
120:23

**Balboa** 8:13,14,
15 37:12,13 38:13
41:10,17 42:7,11
47:7 48:5,9 49:1,
18 52:2,16 53:1,5,
24,25 54:19 55:1
61:15 72:23 77:1,
5,10,14,21 82:10,
18,20,23 83:12,24
85:2 86:3,7 93:5
100:2 101:1,5
104:13 105:8
107:23,24

**Balboa's** 44:1,3,
21 45:16 46:9
51:13 72:20 98:1

100:4

**Balboa-related**
83:3

**bank** 5:5,14 40:22
54:1,20 55:19
57:22 83:24

**Bank's** 25:14

**based** 25:12
27:10 28:20 32:3
33:1,6,13 34:3,4
35:13 36:5 39:20
40:1 41:6,9,12,20
44:14 53:19 54:17
62:10,22 67:2,3,8
68:16 69:16 72:18
73:19 76:8 85:20
86:23 87:8 88:3
90:10 93:2 97:10
103:19,21,23
109:11 110:12
121:2,21,25 122:1

**basic** 8:22 53:17

**basis** 33:20 75:15
90:14 91:12
101:23

**Bates** 38:2 45:8
79:8,10 94:24

**bear** 37:14

**began** 71:14

**begin** 8:8

**beginning** 82:18
110:1

**behalf** 5:14

**believes** 105:24
106:3,11 107:12

**benefit** 87:1
89:12,24 90:9

**benefits** 85:17
86:17 89:8,9,11,
21 91:14,19

**big** 48:11 77:24
82:6 86:5

**bigger** 13:8

**bill** 11:14 118:10

**billed** 118:8

**billing** 118:13

**binding** 106:19

**bit** 11:7 13:12
39:14 50:14 71:12
97:18 110:17,19
118:20

**black-and-white**
48:24 82:7

**bonus** 58:17
59:16 60:13,18,24
61:6,9,10,15
62:13 63:15

**book** 40:23 88:4
108:1 109:4 110:2

**borrowings**
92:10,14

**bottom** 18:14,16
37:25 89:18 94:6
95:17 100:18

**bound** 119:7

**breach** 104:7

**break** 8:4 29:25
70:14 78:9,11
81:2,9,17

**briefly** 100:13

**bring** 8:7 72:15

**broad-based**
76:6

**brought** 83:7

**bunch** 11:16
119:2

**buyout** 86:10,11

**Byrne** 5:5,16
22:6,16 43:23
44:3,14,21 46:12,
17 47:11 64:15,25
72:24 79:19 80:5,
7 85:1 87:4 90:23
93:21 95:19
100:4,13 101:16
104:12 107:11
108:7 113:22,24
114:12 115:1,3
116:1 117:7

**Byrne's** 46:24
66:2

---
**C**
---

**C-O-D-I-F-C-A-T-
I-O-N** 49:14

**calculate** 13:19
58:20 61:10
63:19,22,24 65:17

**calculated** 36:19
37:14 45:22 63:13
89:4

**calculation**
13:23 16:2,4,11,
25 17:1 20:2
21:24 34:2 35:3,7
37:17 38:10
41:13,15,23 42:1
45:6 50:12 55:10
59:2,7 65:20 66:5
78:2 87:6,13
94:13 95:20 96:14
99:23 120:21

**calculations**
17:10 25:15,19,
20,21 26:14 32:17
33:1,2,3,17,25
34:14 35:2,13,17
36:8,17,22,25
39:5,20 40:1,19
46:21 49:3 50:20
51:24 52:4,12,18,
25 53:19 55:5
56:2 57:2,5,10
61:11 67:24 69:16
78:23 80:25
87:10,11 88:19
93:4 101:25 102:2
117:6 121:2,12

**calendar** 59:17

**California** 5:20
6:9 47:10

**call** 20:4 49:13
57:6 76:10 87:1
94:10,11 121:11

**called** 32:8 42:19
45:10 86:9,20
88:8 119:6

**Calls** 26:25 28:14
29:5 30:8,21
33:10 54:3 66:23

Deborah Dickson                                                    January 15, 2026

84:20 105:25 106:20,21 109:14 118:4 121:14,15

**capacity** 7:9 30:4

**capital** 8:14 41:10,17 48:5,9 49:1,18 52:2,16 53:1,24,25 55:2 61:15 86:8 104:13 105:8 107:8,24

**Capital's** 42:7,11 93:5 100:3 101:1

**case** 5:5 10:15 11:13,19,20,22, 23,25 12:6,15,19 13:4,9 14:3,6 23:7,15 24:10 34:5,11,14 35:16 45:20 49:11 64:8 67:5 110:24 112:7 113:4,13 114:12 118:21,25 119:10, 16,24

**cases** 12:8,16 119:2

**cash** 33:17 35:19 36:14 44:5 58:16 59:16 61:6,15 62:13 63:14

**cash-basis** 40:20,21

**caused** 105:14

**centralized** 84:19

**CEO** 85:2

**CEOS** 107:1

**Cestari** 5:7

**challenge** 11:15 12:5

**change** 44:6,10 45:13 69:16 81:21 83:23 90:6 110:12 120:23

**changed** 43:24 75:19 99:13 100:5 116:22

**characterization** 98:20

**charge-off** 120:21

**charge-offs** 120:23

**charged** 77:10

**charges** 82:22

**check** 101:3

**checked** 118:14

**choose** 25:4

**chose** 74:5 76:17 87:6

**cite** 20:18,19 47:12,20 71:5,11, 13,19 72:8 73:9 78:21 90:21 91:18 101:21 102:4,6,24

**cited** 20:15,16 70:24

**cites** 71:1

**city** 6:8

**claim** 105:23

**claimed** 90:22

**claiming** 33:12

**clarification** 43:16

**clarify** 8:17 37:21 41:9 61:8 121:4

**clarity** 8:10 116:23,24 117:2

**classification** 84:8

**clear** 8:14 50:23 52:23 61:12 87:22 88:1,7 89:3 96:7

**client** 11:14 114:17

**clients** 35:10 106:25

**close** 117:18

**closer** 112:20

**Codification** 49:14

**collaboratively** 14:24

**comment** 24:24 28:24 102:19

**comments** 117:12

**commitment** 106:12 107:13 108:10,17 110:1,7 117:8

**commonly** 25:22 36:18

**companies** 33:16 49:5,6,7,8, 16,18,23,25 50:1, 3,5,9 52:10,12 54:21 57:25 86:3, 18 107:2 115:16, 20

**company** 41:19, 21 42:12 48:21 49:1,2 50:10 53:23,25 55:2,3 57:21,22 58:4 77:14 82:5 86:7 99:21

**compensated** 115:6

**compensation** 72:20 76:24 77:18 80:17

**competitive** 86:6

**complaint** 104:3, 6,9

**complete** 16:14 18:24 19:4,5 67:25

**completed** 19:2

**completely** 51:11 54:25 55:13 94:20 96:5 97:11, 12

**complex** 33:11 78:20

**compliance** 39:22

**complicated** 78:20

**component** 23:14 84:11 85:8

**components** 84:24

**Compound** 54:23 57:3

**computation** 45:7

**computations** 40:18 47:17 53:2

**compute** 53:7

**computed** 41:13, 17 53:11 63:11

**computes** 86:21

**computing** 41:19 53:5,8 86:22

**concept** 43:7

**concepts** 50:16 51:5,11 107:4

**concluded** 36:4 39:25 58:9,14 59:14 103:15 122:19

**concludes** 32:15 122:16

**conclusion** 26:25 28:15,19 29:6 30:9,21 31:8, 17 33:10,20 34:3, 13 50:19 54:4 71:1 79:3 106:21 118:5 121:15

**conclusions** 13:25

**conduct** 83:14

**conference** 5:7

**confidential** 118:25 119:7

**confirm** 6:18,22 9:14 42:9

**confused** 50:14

**confusing** 52:8 94:16 102:11,22 103:2,5

**confusion** 95:8 97:19

**connection** 105:18 110:24

**considered** 18:4, 21,25 20:12 21:23 80:10

**consistency** 101:13

**consistent** 56:13 91:24

**consistently** 41:15 56:2

**constitute** 42:16 43:2

**contemporaneo us** 99:3,5,7

**contingent** 68:21

**continue** 54:1 109:10,12

**continues** 72:10

**contract** 85:20, 22 86:1 87:15,18, 24 88:8,18,21,24, 25 108:15,21 110:4

**contracts** 88:20 108:11,19 109:23 110:16

**contradict** 83:15

**contradicts** 74:7

**control** 9:4 76:22 77:2,21 78:1 82:2, 3 84:12 85:1

**controlled** 72:22

**controller** 72:19 77:5

**controls** 54:10, 14

**conversations**

Deborah Dickson                                                January 15, 2026

28:9

convert 41:23 56:12

copies 22:25

copy 119:18,20, 21

corporate 72:25 73:20 84:14 106:25

correct 9:9 14:25 15:11,12 16:20 17:7 18:21 19:7, 14 20:7,15 21:21 24:18 25:3,10,16 26:1,7,11,12,16, 23 27:18 29:4,16 30:7,20 32:5,13, 14,17,18,22 33:8 39:8,9 40:2,5,9 42:10,12,13,16 44:15,18,25 47:24 48:2 50:20 54:9, 11,22 56:7,18 57:2,11,22 58:1, 19,22,23 59:3,9, 18,19 60:4,18,24 61:16,17 62:7,13, 15,18 63:1 64:1 65:4,21 67:15,16 68:6,13,14,16,17, 22 69:5,25 70:11, 22 71:1,2,17,21 72:11 73:2,11,12, 15,24,25 74:3 75:3 78:16,18,19 79:19 80:20 81:22 82:10 83:4,15,18, 21,22 84:1,8,19 85:14,22,23 87:15 88:10 89:5,6,8 90:1,4 92:23,24 93:1,2,5,6,16 95:1 98:2,16,22,23,25 99:4,11 100:8,23 102:14,24 103:6, 17,20 104:4 105:1,4 107:19, 21,22 110:15 111:8 112:14,23 113:4,5 117:23 118:22 119:8 121:6,9,10,13,19, 20 122:3,4

correspondence 46:18 98:6

corroborate 97:24

cost 36:24 75:14 76:14,16 81:19 83:25 84:8 87:7 89:14

cost-of-sale 87:2

costing 80:23 91:24

costs 33:2 36:18 37:15,17,18 52:1 73:20 76:10,11,12 78:1 85:5,7

counsel 5:9,10 26:10 70:12 106:18 111:6 112:13,14 113:1, 11,12,19,21 114:17,20 115:3, 6,24 116:21 117:13 119:20,21

count 19:9

counted 19:8

couple 17:3 38:12 49:12 60:8 71:25 78:11 116:12,16

court 5:17,19 7:16 11:9,17 12:21 14:4 97:2 117:14

courts 12:7

cover 50:19

CPA 6:14 36:21 56:16 58:4 96:1 102:12,13 108:23

CPAS 35:9

create 117:12

created 82:21

creating 97:18

credit 71:16 75:12,13,20,25 76:1,18 83:2

CSR 5:20

cure 29:3

current 66:4

customer 86:23 109:4

customers 108:1,3 109:3

_____

**D**

_____

damages 25:15

data 68:16,17,18

date 5:2 26:3 58:10,15 59:15 63:10 117:18

dated 14:14 24:14 26:18 29:16 70:10,22 71:6

dates 113:14

Daubert 11:15 12:5 13:24 122:9

day 8:7 107:5

deadline 26:11

deal 29:8 38:7,24 54:6 106:25 108:14

dealing 80:22 106:7

deals 107:10

dealt 49:11 106:24

Debbie 81:4

Deborah 5:4,22 6:6 26:16 122:19

December 26:6 29:16 104:14 113:7,17 117:14, 19 118:3,12,13, 16,17,18

decide 31:20,24 64:20

decisions 64:15, 25 76:25

decrease 86:23

decreased 105:13

decreases 76:3

deduct 89:17,18

deduction 90:11

defendant 25:14 79:5

DEFENDANT'S 8:23 13:2 14:11 35:23 72:3 111:11

defendants 5:14 115:10

defense 59:20

define 29:23 42:25

defines 39:7

definition 43:12 64:12 89:7

department 75:25 76:5,18 77:18,22 84:13,19

departments 71:14 72:21 75:13,14,16,19,23 76:16,21,23 77:25 81:25 85:8 111:23

depending 76:3

depends 81:20

depo 24:5 70:25 71:24 72:6

depose 122:6

deposed 7:8,11

deposit 110:2

deposition 5:4,6, 8 6:3,7,20 7:1 8:11,20 9:1,8,22, 24 10:1,4,5,6,7, 17,18 11:8 16:10 17:5 23:10,15,17 28:1 29:14 46:19, 23 47:5,13,19,22 70:10,21 71:2,6 77:4 78:25 82:16 122:17,19

depositions 10:14 19:3,6 80:21

deposits 25:22 103:16 104:1 105:7 107:13,25 108:2,9 109:3,12, 24,25 117:9

depreciation 86:13,14,16 87:3, 5,7,12 89:10,11, 17,22 90:9

describe 78:17

describing 71:20 109:18

description 43:13

designation 25:25

designed 46:4,5 78:20 101:25

detail 43:13 78:18

determinative 83:25

determine 13:20 31:21 35:12 42:1 46:9 63:5 64:4 83:21 84:7

determined 37:9

determining 63:3

Dickson 5:4,22 6:1,6 9:4 13:15,20 18:11,19 24:13 26:16 30:14 97:8 122:19

Dickson's 13:23

difference 77:17 82:6 114:7 120:19

differences 50:11 75:17,18

differently 94:11

digging 30:9

direct 33:2 36:18 37:14,16 52:1

Deborah Dickson                                                    January 15, 2026

75:22 80:23,24 81:20 84:25 85:1 120:25

**directly** 22:20,25 74:1 84:13

**director** 11:5

**disagree** 27:24 51:21 74:24 84:23 98:20

**disagreed** 51:4 75:8

**disclose** 16:19

**disclosed** 17:14, 15,23 20:23 21:2 25:9 26:14 28:13 59:8 118:2 120:7 121:13

**disclosure** 25:10,13,24 26:4

**discovery** 79:5

**discretionary** 62:7

**discuss** 21:23 46:4 47:10

**discussed** 19:3, 6 120:3

**discusses** 21:22

**discussing** 74:2 91:11

**discussion** 46:12,17 67:8

**discussions** 44:2,21 93:11 100:4

**dispute** 83:1,7

**disqualified** 11:10

**distributed** 64:5, 16

**divergence** 56:6

**division** 8:15 37:13 54:20 83:12,25 84:18 85:2 86:3 107:24

**document** 9:1,4, 11,12 18:7 26:15 32:23 37:4 40:3 45:9,16 46:6 55:17 60:13,19 62:2 79:2,4,17,18 80:9,13,18 87:24, 25 94:9,19,21,23 95:11 100:14,16, 20 101:17,19 102:23

**documentation** 46:1

**documented** 121:22

**documents** 6:19, 23,25 7:3,4 9:15, 16,17 10:8,10,15 16:10 18:4,5,20, 25 20:5,8,11,12, 14 21:1,10,11,15, 22 22:1,4,8,9,12, 16,20,21,24 23:2 24:5 25:19 62:10 64:24 67:4 79:24, 25 80:10 101:22 102:24 103:6 104:19 106:13 112:6,10,13,14 120:12 121:9,21

**dollar** 63:25 86:11

**double** 101:3

**draft** 14:15,22

**drafts** 15:13,15

**Drilldown** 45:10 46:20

**due** 58:15 59:15 63:11,14 64:3 103:15

**duly** 5:23

**dunk** 92:19

───────

**E**

───────

**e-mail** 98:15,24

**e-mailing** 6:19

**e-mails** 22:25 46:18 80:22 98:17 106:5

**earlier** 6:2 10:2 13:5 19:3 60:7

**early** 106:6 112:18

**earn-out** 107:9

**earnings** 89:3

**easier** 19:25

**easily** 6:25

**EBT** 39:19 44:11 60:22 61:6,14 63:4 66:5 89:4,7 90:1,4 91:13,20

**economic** 25:15

**effect** 7:21

**efficient** 30:13

**efficiently** 8:6

**eligible** 65:20

**Emert** 22:21,24 23:2 111:18 114:14

**employed** 77:6

**employee** 61:25

**employees** 64:9, 21 65:20 72:20 77:10 78:4 80:16 82:2 83:2,11,20 84:14,15,17,24 85:1,4,12 95:3,6 98:2

**empowered** 64:4

**engage** 114:19

**engaged** 13:20

**engagement** 112:23,25 113:6, 10,17,20 116:20

**entire** 38:21 62:23 78:24 79:13

**entirety** 12:22 39:2

**entities** 77:19

86:4

**entitled** 59:3 67:18 107:25

**entity** 40:17

**equipment** 75:13 86:5,8,10,12,15

**equivalent** 88:17

**error** 94:12 95:10

**Esperanza** 23:3

**Espie** 22:6,11 112:17,23 115:1

**essentially** 40:21 87:9 98:12 106:6 107:15

**establish** 61:9

**establishes** 60:12,17,21 61:10

**establishing** 99:3

**estimate** 7:10 13:22 15:6

**estimated** 118:15

**evaluation** 105:8

**events** 69:17

**everybody's** 55:7

**everyone's** 8:5

**evidence** 106:5

**evidenced** 48:16

**exact** 53:11 94:17,19 95:22 104:18 118:6

**EXAMINATION** 5:25

**examined** 5:23

**examples** 49:12

**exceeded** 117:7

**Excel** 55:11

**exception** 51:25 53:18 55:14

**exclude** 12:7 75:16

**excluded** 12:2 14:4

**excludes** 89:7

**excluding** 12:22

**excuse** 8:9 82:12

**executed** 113:7

**execution** 105:23

**exercise** 55:11

**exhibit** 8:19,23 12:25 13:2 14:10, 11 15:9 18:10 35:21,22,23 39:12,14,15,16 58:14 60:7 66:11 71:24 72:3 75:6 111:10,11 119:6, 10 120:14,15,16, 17,18

**exist** 68:13 69:4

**expected** 56:16 68:15

**expense** 77:11, 16 92:4

**expenses** 40:23 72:25 73:1,21 76:15,19 77:14 89:15,16

**experience** 27:10 28:21 30:3 34:4 72:18 80:22

**experienced** 7:13

**expert** 7:9,11 11:10 19:17,20 20:6,22,25 22:2 24:17 25:10,13, 20,24,25 26:4,10, 15,23 27:5,11,18 28:1,2,13,21 29:4, 15 30:4,6 31:3,11, 20,22,24 32:13 35:8 36:22 51:3 59:20 68:15 108:24 110:20,22

Deborah Dickson

January 15, 2026

112:17 114:18 115:9,15 117:22 118:1 120:8 121:9

**expert's** 98:18 99:1

**experts** 119:5

**explain** 51:22 52:7 99:9,12 102:8

**explained** 21:14 84:10 108:8,10 109:11

**explaining** 52:1

**explanation** 43:12 88:2 108:19 109:8,17

**explicitly** 108:2

**expressively** 32:21

**expressly** 74:14

**extra** 20:5 21:10

---

**F**

**fact** 54:19 68:18 73:13 106:4 108:9

**factors** 103:23

**facts** 28:3 34:17 82:12 108:5 114:25 118:5

**failed** 13:15,18

**fails** 13:24

**failure** 29:3

**fall** 52:4

**familiar** 95:25 107:4

**favor** 11:13

**FBL** 75:13,21 76:1,18

**federal** 33:14

**feel** 113:16

**fees** 106:12 107:13 108:10,17

110:1,7 117:8

**figure** 80:13

**file** 19:17,20 20:6, 22,25 22:3 24:10, 17 110:20,22 119:19 121:9 122:8

**filed** 11:15

**final** 15:9 101:25 106:13,19 107:6,7

**finalize** 107:10

**finalized** 15:16, 18 16:7 19:13 21:11 23:18,20 121:23 122:2

**finalizing** 23:11

**finance** 120:25

**financial** 20:20 33:15,24 48:11, 14,18 55:12 89:13 102:3,4,5,6

**find** 45:20 49:10 88:6 98:5

**fine** 98:18 115:22

**finish** 8:6 70:13, 15 78:10

**finished** 46:11

**firing** 76:24

**firm** 48:12 113:23 116:9 119:15

**firms** 116:2

**fix** 18:10

**fixed** 76:11,15

**flew** 47:10

**Florist** 11:23 12:20

**Florist's** 13:22

**focus** 42:22

**focusing** 54:19

**folders** 110:21

**follow** 32:17 38:9,23 40:11

50:10 51:4,8 52:19,20 54:22 55:3 57:25 92:2 93:4

**footnote** 38:6,8, 15 39:1,8 41:13 71:1,3,5,7

**footnotes** 48:17

**force** 7:21

**forensic** 6:14 106:24

**form** 16:15 17:8, 17 21:13 24:19 25:17 26:2,24 28:14 29:5,24 30:8,22 31:23 32:23 33:9 34:16 35:4 36:11 37:23 42:17 43:4,15 44:16 45:18 46:3, 14 47:1,25 48:1,7 50:22 51:19 52:22 54:12,23 55:21 56:8,19 57:3 58:2 59:4,10 60:25 62:3,8,14 64:10 65:5 67:10,19 68:2,23 69:18 70:1 74:9,16,22 76:14 81:23 82:11 83:5,16 84:2,9,20 87:13 88:11 90:15 91:2,15 98:3 102:15 104:16 105:2,16,25 106:20 108:4 109:1,6,14 110:2 114:21 118:4 121:14

**formal** 33:15,24 48:18 55:12 98:1

**format** 20:1 121:2

**forming** 18:21

**Formula** 61:5,13

**forwarding** 122:13

**found** 12:5 77:6

**foundation** 47:2 58:24 59:23

104:17 105:3 106:1,22

**frequently** 48:15 49:4 50:5 80:7

**front** 6:23 15:8

**full** 6:4 7:21 24:6, 8

**fully** 17:14,23

**fun** 117:19

**function** 81:20 82:3

**functionally** 84:18

**functions** 77:3 82:4

**funds** 64:5,16,24 108:11

**future** 66:7,18,21 67:18 68:9,12,21 69:13,17

---

**G**

**GAAP** 13:23 32:17,22 33:2,13, 14,15,22,24 34:1, 7,12,13,22 36:4, 19,23 37:20 39:22 40:18 41:1,20,23 48:14,19,20,22 49:4,6,7,21 50:5, 7,18,19 51:4,6,9, 25 52:4,9,10,18, 19 53:4,6,10,16, 18,19 54:2,22 55:3,9,13 56:6,13, 25 57:1,5,9,25 58:5 91:9,10 99:20,22

**GAAP-COMPLIANT** 48:6,13 51:14 52:2,16 53:14

**gave** 44:20 89:23 109:8 113:23

**general** 38:9,21, 22 40:10 76:15 82:6 89:15 101:5

108:6 111:2

**generally** 104:11 105:11 109:23 111:4

**generation** 85:4

**generic** 85:9 96:2

**give** 7:9 9:4,7 11:10 38:2 43:10 49:12 62:23 65:11 79:8,10 90:8 91:4 92:1 98:19 117:16

**glasses** 13:7

**good** 5:1,13,19 6:1 7:6 81:5

**gosh** 96:24 104:5

**grants** 85:21

**great** 38:7,24

**ground** 7:14

**group** 64:14

**guess** 96:25 111:9 113:11 121:11

**guidance** 38:7, 24

**guys** 14:23

---

**H**

**half-dozen** 69:21

**handle** 48:16

**handling** 41:10

**happened** 76:16 86:17

**happening** 41:16

**hard** 22:25 115:18

**hear** 7:18

**Heather** 10:19 24:2 70:9,21 71:2, 6 77:4 82:4,9

**held** 5:6 11:9 42:12

Deborah Dickson                                                    January 15, 2026

**helped** 14:22

**helping** 82:19

**Hey** 55:6

**hire/fire** 82:4

**hiring** 76:24

**historical** 42:7 101:8

**hold** 37:2

**home** 6:10

**honestly** 12:3 113:15

**horizon** 68:19

**hours** 15:7 118:15

**HR** 82:4

**hundred** 83:3,11

**hypothetical** 34:17 54:24 57:13

**I**

**IDC** 36:19 52:6 53:18 55:14 91:11

**idea** 118:19

**ideas** 116:1

**IDENTIFICATION** 8:24 13:3 14:12 35:24 72:4 111:12

**identified** 38:11 42:15 56:6 76:13 78:15 91:23 92:18 108:9 114:1 116:1 120:25

**identifies** 46:20 87:21

**identify** 43:1,7 45:25 46:5 48:19 56:11 75:23 85:21 92:3,5 117:6,10

**impact** 76:20

**implement** 49:16,19,24 50:2, 3

**important** 23:3, 13 38:19 113:19

**Improper** 34:16 54:24 57:12

**in-store** 13:19,23 14:1

**inadmissible** 14:1

**inappropriate** 65:13

**incentive** 8:12 33:18 35:19 36:14 53:20,22 58:1

**incentives** 85:21 89:25 90:3,7,8

**includable** 78:2

**include** 19:16,20 73:23 74:5 76:18 78:24 80:24 94:22 99:15 101:11

**included** 15:20, 25 16:7,13 18:6 19:13,22,23 20:2, 13 33:3 37:17,18 74:10 89:19 91:19 96:14 102:1 120:6 121:1,7

**includes** 20:22 21:1 80:25

**including** 20:6 24:5,16 82:22

**income** 19:24 20:10 44:8 89:5, 16 108:1,17 109:4,13 110:8

**inconsistency** 51:18,22

**inconsistent** 43:19 44:1

**incorrect** 39:20, 21 40:1 63:2 82:13 98:4 99:11, 17,19

**increase** 55:6,10 76:6,8 77:24,25 85:6 107:14

**increased** 105:9

**increases** 76:3 85:6

**incremental** 76:10 85:7

**incrementally** 85:6

**incurred** 37:15

**independent** 13:20

**independently** 56:17 85:11 110:14

**indicating** 68:8 102:9

**indirect** 37:18 73:1,21 75:14,22, 23 77:11,14,16 78:1 80:23 81:20 84:1

**individual** 61:25 63:19 64:1,2 65:3

**individuals** 63:23 64:6 111:17 115:16,19,20 119:15

**indoor** 13:25

**industry** 86:17 87:9

**influence** 6:21

**information** 18:4,20,25 21:22 35:14 90:18 112:7 119:8 121:25 122:1

**informations** 121:22

**initial** 25:10,13,24 28:13 33:2 36:18 39:23 52:1 117:22 120:15,17

**initially** 114:19

**instance** 36:17 40:20 42:20 45:5 55:6 102:3

**instances** 38:11

**instructions** 63:21

**intend** 120:4

**intended** 18:20, 24 28:12 29:3 47:14,15 94:22

**intention** 109:10

**intentionally** 74:20

**interchangeably** 97:17

**interest** 36:24 92:8,9,13 100:1 111:16

**interesting** 48:9 98:5

**interim** 37:7 43:19,24 44:4,7 45:5,7,13 85:7 99:24

**interpretation** 32:4 38:25 39:21 40:1 98:15,24 99:1

**interview** 83:20 98:22

**introduce** 5:18

**involved** 85:4 107:17 114:17,23

**involvement** 11:8

**involves** 55:18

**irrelevant** 55:14

**IRS** 85:20

**Irvine** 6:9

**issue** 27:21,24 28:16 30:24 34:5 35:3 53:15 56:25 82:7 83:2 92:23 95:2 96:12 99:11 106:7,10,11 108:6

**issues** 49:10 122:9

**issuing** 12:21 16:1

**item** 37:12 38:20 77:13

**item-by-item** 43:6

**items** 19:8,10,12, 21 21:23 37:10,20 41:17,20 47:11 53:6,10 56:24 91:21

**J**

**Jacquie** 22:21,24 111:18 114:14

**James** 98:6

**January** 5:2 14:14 15:10 16:14 19:17 20:25 21:12 24:11,15 26:18 59:9 110:18 117:4,19 118:12, 16,19

**Jim** 23:23

**job** 31:20 77:6 80:23

**joint** 106:19

**jointly** 10:20

**judgment** 37:8 93:17 94:10,25 96:12

**judgments** 93:1, 4

**jumping** 39:13

**June** 105:1

**jury** 14:5

**K**

**keeping** 109:12

**key** 32:21 36:15, 16,17,23 37:5,6 38:16 77:12

**kind** 31:21 34:6

Deborah Dickson                                                                January 15, 2026

kinds 76:25

knew 11:18 12:5 14:7

knowing 11:16 103:6

knowingly 54:21

knowledge 27:10 28:20

**L**

labor 80:24

Lacks 47:1 58:24 59:23 104:16 105:2 106:1,21

Lahaies 98:6,11, 16,21

Lahaies's 23:23

Lahaise 10:21

language 36:7 51:7 57:7 101:15

languages 108:20

lastly 120:3

late 106:6

law 22:10 33:7,14 113:23

lawfully 53:25

lawsuit 64:9 104:2 116:21

lawyer 32:12 107:20,21

lawyers 11:14 30:23 54:6

lease 44:8 86:3, 21

leases 49:16 86:4 121:1

leasing 49:17,19 86:3,7,9,10,18

leave 27:8,22 28:17 29:7

left 87:7 97:15

legal 26:25 27:7, 21,24 28:15,19 29:6 30:9,21 31:8, 17 32:13 33:10 54:3 69:1 106:18, 21 114:17 118:5 121:15

legally 50:6

legitimately 50:6

letter 112:23,25 113:6,11,17,20 116:20

Lexitas 5:8

license 5:20

light 67:5 69:14

limine 122:8

limit 12:8

limited 24:16 26:22 27:17

limits 29:23 30:2

lingo 96:1

list 18:5,20,23,24 19:4,11,16,21 21:18 47:21,22 77:9 78:4 80:14 82:21 88:9,13

listed 20:6 24:17 39:16 65:2 78:5, 14 80:9

litigation 11:8 35:9

loans 76:1

located 6:8,9

long 19:5 104:5

long-term 8:12 33:17 35:18 36:14 53:20

longer 72:12

looked 39:24 42:1 45:2 46:17 55:17,24 58:13 120:22

lost 14:1 96:16

lot 15:5 50:4 80:25 81:25 82:1 86:14,16 96:1 97:21 106:24 115:20

lowers 44:10,11

LTIP 8:12 10:12 25:14,19,20 32:4, 6,8,9,16,21 33:3,4 34:5,11 35:7 36:5, 7,8,9 37:7,9,11, 13,17 38:9,22 39:6,21,22 40:2,8, 10 41:13,15,25 44:11 49:3 50:12, 20 51:3,7,12,23 52:3,17,18,25 53:16 54:19 55:4, 16,23 57:2,6 58:6, 17 59:3,17 60:12, 17 61:15,24 63:19 66:3 75:24 78:2 87:6,12 91:11,19, 22 92:3 93:4 98:10 101:12 103:20 117:5 120:21,22

LTIP's 59:21 60:2

LTIP-RELATED 34:14 35:2,17

LTIP-TYPE 103:22

lunch 9:25

**M**

made 16:2 21:24 33:17 41:22,25 49:4 82:17 108:14 110:23

maintaining 38:10

Majid 10:21 23:25

majority 86:15

make 6:21 8:13 13:8 19:25 25:19 29:9 30:12 35:13 40:17,19 42:3 53:2 57:5 64:15,

25 65:15 82:24 91:17,24 108:16 109:16 110:6 117:6 119:22

makes 34:10 82:6 87:11

making 36:22 39:4 52:25

manager 71:20 77:8 82:17,20

managerial 82:1

managers 72:23

manner 41:11

MARKED 8:23 13:2 14:11 35:23 72:3 111:11

marked-up 15:13

market 86:6

marketing 71:16 75:20 76:5 77:19 83:2

materially 38:9, 23 40:11 92:2

materials 20:22 21:1 24:16 80:24 118:25

Matkins 6:11 22:10 80:2 113:18,22,24 114:9 116:8,11, 21,24

matter 5:4 23:11 27:7 61:22 65:8 112:18

matters 48:16 67:5 69:14

Matthew 116:18

meaning 64:15 100:21

means 40:21,23 41:1 52:20 97:10, 11 98:25

meant 22:5 42:11 50:18

meantime 8:20

medical 23:14

medication 7:25

meet 9:21 13:24 50:6 53:2

meeting 10:1 111:7

meetings 110:24 111:5,18 112:2,4

memorializing 46:1

memory 7:15 14:2

mention 41:7 43:11

mentioned 12:12,20 22:13 36:6 37:21 43:3 57:19 78:3,19 88:24 94:16 97:22 115:25 121:4

messages 6:19

met 6:2 42:2 59:21 60:3 61:11 98:10

method 44:6 100:5

methodologies 99:21

methodology 36:20 40:17 41:14,18,23,24 51:25 53:3 91:13

methods 13:19

million 58:16 59:16 63:12,14 77:20,24 103:16 104:13

mine 6:15

minus 89:14

minutes 19:6

mischaracterizes 28:4 36:12 44:17 52:21 55:22 82:12 93:7

Deborah Dickson                                                      January 15, 2026

**misleading** 74:20

**Mission** 11:23 12:20 13:21

**Misstates** 28:3 34:24 35:4 37:23 50:21 65:5 67:10 79:20

**mixed** 115:20

**mixing** 54:25

**moment** 10:23

**month** 76:9 118:18

**month-end** 76:7

**months** 12:4 14:8 108:15 110:6

**morning** 8:11 29:15

**motion** 122:8,9

**move** 25:9 29:10 31:15 70:4 84:25 110:7

**moved** 76:17,21

**moves** 67:5

**multiple** 43:3 69:7

**N**

**named** 14:20

**names** 97:17

**Nana** 5:13 78:8 96:15 122:12

**narrow** 34:8,11

**Nathan** 11:1,3 14:18

**national** 48:12

**nature** 33:25

**necessarily** 45:21 67:25 81:24 107:6

**needed** 53:7,10 117:3

**negotiated** 106:17

**negotiation** 107:3,17

**net** 89:16 96:13 120:23

**Nguyen** 14:21 116:6

**Nicole** 10:21

**non-accountant** 52:8

**non-gaap** 40:18 53:9

**nonetheless** 63:24

**nonrefundable** 107:12 108:8 109:23 117:9

**normal** 20:1

**Norville** 6:15

**note** 82:24 119:22

**notebook** 6:24 10:14

**noted** 87:4

**notes** 110:21,23, 25 111:4

**notice** 9:1,9

**noticing** 5:12

**November** 70:10,22 71:6 112:18,20 118:11

**number** 56:14 79:10 87:2 88:4 89:12,13 98:7 107:6 113:23 116:2

**numbers** 17:3 20:17 38:14 45:14,21,23 53:3 56:13 79:8 102:7 104:19 107:7 117:10 120:21

**O**

**oath** 7:20 81:14

**object** 61:20

**objection** 16:15, 21 17:8,17 21:4, 13,20 24:19 25:6, 17 26:2,24 28:3, 14 29:5,24 30:8, 12 33:9 34:16,24 36:11 37:23 40:3 42:17 43:4,15 44:16,23 45:18 46:3,14 47:1,25 48:1,7 50:21 51:19 52:21 54:3, 12,23 55:21 56:8, 19 57:3,12,17 58:2,24 59:4,10 60:19,25 62:2,8, 14,25 64:10 65:5, 12 66:23 67:10,19 68:1,23 69:18 70:1 74:8,16,22 75:2 79:6,20 81:23 82:11 83:5, 16 84:2,9,20 88:11 90:15 91:2, 15 93:7 96:8 98:3 102:15,25 104:16 105:2,16,25 106:20 108:4 109:1,6,14 114:21 115:17 118:4 121:14

**objections** 27:6, 12,19 29:12 30:12 31:6 65:14,15 68:7 69:6

**obligations** 54:11

**obtain** 113:20

**occurred** 12:11 28:9 104:24

**offended** 96:24

**offer** 57:1 120:4,5

**offered** 26:22 27:17 29:18,20,21

**offering** 14:5

**offers** 57:10

**office** 6:10,11 11:4 19:24 20:10 21:15 22:10 80:1 113:2

**omitting** 74:21

**one's** 96:23

**operating** 87:7

**operations** 37:15

**opined** 32:19 59:20

**opinion** 30:19 31:3 33:5 34:13 39:3,10,11 40:7 52:17 57:1,10 58:8,12 59:14 60:2 62:23 63:8 64:18 65:7,10,11 67:20 68:16,20 69:1 73:22 74:2,4 80:19 83:23 90:14 100:8 103:8,9,19 105:12 108:23 120:6,8,9

**opinions** 11:10 14:5 15:20,22,24 16:3,12,20 17:13, 15,22 18:21 26:13,22 27:17 28:12 29:19,21,22 30:5,6,18 31:21, 25 32:3 39:17 47:16 50:17 92:22 101:23 118:2 120:4 122:7

**opportunity** 61:10

**opposing** 25:20 26:23 27:18 30:6

**opposite** 50:17 51:5,16

**opposition** 11:18

**options** 113:23, 25

**order** 12:21 118:22,24 119:12

122:13

**orders** 119:23

**ordinary** 114:16

**original** 121:8,18

**outsider** 102:22 103:2,5

**overhead** 76:12 77:17,18 80:22, 23,24 85:9

**overly** 78:20

**owed** 58:21,22 63:25

**owned** 104:1

**ownership** 86:8

**P**

**p.m.** 5:3 81:8,11 122:18,19

**pages** 79:17 120:13

**paid** 40:24 92:9, 13

**paragraph** 43:18 45:4 46:13 65:24 66:12,14,16 70:5, 19 75:5,6 80:3 85:15,16,18 88:18 89:20,21,23 90:13 92:8,11,25 93:11, 19,24 94:17 95:10,14,15 96:6 97:13,23 99:25 100:9,21,25 101:22

**paragraphs** 73:11 75:7 81:18 95:23 102:1

**parenthesis** 39:11

**Parker** 10:19,22 24:2 71:6 74:14 82:4,9

**Parker's** 70:10, 21,25 71:2,24 72:6 77:4

Deborah Dickson                                            January 15, 2026

part 31:25 32:3 34:2 37:11 40:25 54:1,20 55:2 57:21 74:10 104:1 107:24 110:22 120:25 121:9

parties 55:18 106:17

partner 14:20 116:6

parts 32:16 42:23 57:2 75:8

past 38:9,12,18, 23 39:7 40:8,11, 15,16 41:7,8,24 42:4,11,16 43:2,7, 11,13 44:1,3,13, 14,21 45:11,16 46:9,24 47:7 48:4 49:4 50:10,18 51:6,8,13 52:20 53:1,7,14 54:2,10 55:25 56:1,6,13 92:3,4 93:5 97:20, 22,24,25 99:4,14 100:3,4 101:1,2,4, 5

Pat 72:24

patience 81:2

Patrick 5:5,16

paying 11:14

payment 96:12

payout 59:3

people 64:14 76:23 77:3 82:4

percent 36:25 55:7 60:22 63:4 77:25 80:15 83:3, 11 115:11

percentage 115:9,12,15

perform 56:5

performance 60:13,17 61:2,4,7, 13,16

performed 41:2 81:21 83:21

period 61:7,16 101:7 107:7 113:9

periodically 110:6

periods 52:11

person 72:14

person's 73:22 74:4

personal 114:5, 6,8,11 116:7

personally 15:3, 4 119:10,13

personnel 72:24, 25 73:20 98:1

persons 22:7 102:13 119:15

physically 40:22

piece 86:19

pieces 46:18 86:5

place 38:17 47:18 62:20

places 36:9 41:7 43:11 93:10

plain 36:6 57:7

plaintiff 5:16 11:24 15:17 26:1, 9 58:15,21,22 59:2,15 62:17,20 63:11,13,20,25 64:2,4,7,8,13,15 65:3 66:6,17 67:9, 17 68:9 69:12 70:8 71:21 78:6 90:23 93:12 103:15 104:12 105:20 106:3 107:23 109:20,22 110:15 111:5,20 112:17 114:12 115:6,24

plaintiff's 25:10 66:1 67:9 70:8,20 74:6 75:8 90:25 91:5 92:14 104:3, 25 105:6,14 108:18 109:10,17 111:6

plaintiffs 115:10

plan 8:12 33:18 35:19 36:14 53:22 58:1 61:15

plans 53:20

pleading 104:3

point 16:23 45:3 58:16 92:13 100:2 110:5 117:22

pool 60:13,18,24 61:7,9,10,16 62:13,18,19,23

portion 62:18 73:10,15,17,18 74:5,7,21 84:3

position 64:13 74:6,7 93:3 108:18

positions 62:6 63:19

possession 9:16 122:2

possibly 11:12, 19 116:23

post-acquisition 43:25 44:7 53:11 54:1 77:2,21 99:10,16,18 100:6 111:24

posted 82:23

potential 66:21 68:12 69:3 114:20

potentially 65:20

practice 38:10, 12,18,23 39:7 40:11,15,16 41:8, 24 42:16 43:2,7, 11,13 44:22 45:12 46:1,24 47:7 51:13 52:20 53:7 92:3,4 97:21,25 99:4,14 101:2,4,5 106:25 108:25 109:12 114:16

practices 40:8 41:7 42:4,8,11,15 44:2,3,13,15

45:17 46:9 48:4 49:4 50:10,18 51:6,8 53:1,15 54:2,10,22 55:25 56:1,2,6 93:5 97:22 100:3,4 101:1,9

practices' 56:13

pre- 111:23

pre-acquisition 38:13 41:10,17 48:5 49:1 52:2,16 53:1,9 77:5 99:22 101:5

precise 24:7

premise 38:9,22 40:10

prep 10:4,6

preparation 10:18 12:15 16:24 19:1 72:7

prepare 9:22 10:1,7

prepared 16:9 19:24 20:8,9,11 21:15,24 26:17

preparing 15:1 16:10 102:3

present 5:11 6:12 15:23 16:5 17:1, 11 20:3 102:6 111:6,18 112:1

presented 117:11

presenting 102:7,8

pretty 38:19 53:17 96:7 117:18

previously 17:6 116:11

price 86:23 105:9 106:14 107:5,15 110:12

primarily 82:5

primary 29:18

principles 13:19

printed 6:25 10:15

prior 10:4 11:8 12:14 15:16 36:12 42:8 52:22 55:22 101:9 111:21,22

private 49:1,5,7, 17,23 50:2,5,10 52:10 53:23 99:21

privately 42:12

procedures 48:20,21,22

proceedings 11:11

Proceeds 103:12

process 46:5 48:23 106:19

produce 29:3

produced 9:18, 20 15:10 16:13 17:6 19:17 20:22, 25 21:11 22:2 24:10 26:1 67:4 79:5,7 91:25 110:19,22 118:2

product 97:16

production 20:13 76:13

professional 114:6

profits 14:1

prohibited 14:4

projects 35:11

proper 29:23 30:3 56:17

proposition 73:14 74:15

protective 118:22,24 119:12, 23 122:13

provide 7:14,15 26:9 28:12 31:2, 14,18,21,25 58:5 68:16 80:7,19

Deborah Dickson                                                                January 15, 2026

100:8 101:25
102:18 112:6
116:24 117:22
119:20 120:10

**provided** 9:14
78:6 79:18,24
80:4,10 93:12,21
95:19 100:12
101:16 104:20
112:12,13 117:2
120:12 121:8

**providing** 89:1

**provision** 89:17
91:19

**provisions** 39:23

**public** 33:16
41:19 49:2,6,16,
25 50:1,9 52:12
54:1,21 55:2,3,19
57:24 58:4

**publicly-traded**
57:21

**pull** 8:19 14:10
35:22 60:6 71:23
111:10

**pulled** 12:24

**pulling** 14:15
120:20

**purchase**
103:17,23 104:8,
22,24 105:9,13,22
106:16 107:15
110:12

**purpose** 16:19

**purposes** 8:10

**pursuant** 59:17

**put** 20:1 49:8
50:15 51:5,16
92:6

**puts** 8:21

**putting** 92:6

**Q**

**qualified** 11:9

**quantify** 115:21

**question** 7:18
20:21,24 23:23,25
24:2 25:2,4,7
27:13,14 30:1,15
31:10 33:11 34:9
36:1 41:4,5 50:23
54:14 57:14 60:16
69:10,15,23 70:17
73:3,4,6 83:8 89:2
91:3,5,16 92:20
94:15 95:4,7 97:3,
6 101:3 102:20,21
103:1 109:7

**questioning**
70:13,16

**questions** 8:2,8,
22 29:10 60:8
72:1 111:1,2,3,15

**quick** 7:14 13:5

**quickly** 8:6

**quoted** 94:24

**R**

**Rachel** 6:15
14:19,20,22

**raised** 92:14

**raises** 77:22

**ran** 16:25 111:23
120:24

**range** 38:3 94:24

**read** 19:25 20:20
24:9 35:11 44:20
46:12 61:12,21
63:9 73:11 77:12
82:1 95:12 96:6
97:3,4 104:6
106:9

**reader** 24:14
74:13 96:3 103:5

**readers** 102:12

**reading** 61:5
62:10 70:19 80:21
102:13

**reask** 97:5

**reason** 16:6
56:11 101:21

**rebuttal** 14:13,16
15:2 16:13,19,20
17:6 18:3 19:1
20:15,17 24:14
26:21 27:4,16
28:1,11,22 29:2,
23 30:3,5,7,19
31:3,11,22 32:2,3,
15 39:10,11 58:8,
12 59:8,14 63:8
65:25 70:5 72:7
74:3 78:15 85:16
103:8 112:8 118:1
120:7 121:8,24
122:3

**recall** 9:11 10:6
12:19,21 15:19
24:12 29:18,21
59:22 60:10,12
72:12 75:10 83:13
104:6,10 110:23
111:14,17,24
112:16,19,20,22,
24 113:6,8 114:4
115:4

**recalling** 10:23

**receive** 21:9
22:4,12,16 23:20
31:13 62:18 64:6
121:23

**received** 20:11
21:16 22:2,8,9
40:22 44:5 96:13
104:12 105:24
108:11 119:18

**receives** 61:25

**receiving** 6:19
64:19 118:25

**recognition**
49:23

**recognize** 40:21
41:1 44:4

**recognized** 44:7
107:13

**recollection** 13:1

**recommend**
114:2

**recommendatio
n** 115:5,7

**recommended**
113:21 114:3
115:23

**recommending**
115:2

**reconcile** 51:17

**reconstructed**
99:7

**record** 5:2,10 6:5
17:21 27:20 29:9
61:13,21 63:10
81:8,11 96:17,25
97:4 122:6,17

**recorded** 5:3,9

**redacted** 104:19

**reduce** 86:24

**reduced** 87:9

**reduction** 87:13

**refer** 8:12 10:15
36:13 47:18,19
94:19 101:14,19

**reference** 6:25
73:13 88:23 94:23

**referenced** 88:18
93:10 95:9

**references** 32:21

**referencing** 79:2

**referred** 36:19
51:6 85:18 87:23

**referring** 13:5
32:9 100:14,20
101:4,6 102:23

**refers** 38:18,20,
21 106:12

**reflect** 17:21
90:13 91:13 111:4

**reflected** 85:12

**reformatted**
19:25

**reformatting**
20:10,19

**refresh** 7:15
12:25 14:2

**refundable**
109:24

**refuse** 28:19
29:10

**regular** 106:25

**regulatory** 54:11

**reiterate** 52:24

**rejected** 74:14

**rejecting** 73:14

**relate** 46:21
88:19

**related** 25:21
39:23 45:6 55:13
73:19 79:15
103:16 111:3
112:7 115:7,19
117:9

**relates** 115:19

**relating** 110:24

**relation** 111:20

**relationship**
114:7,11 116:7

**relationships**
114:8

**relevant** 30:11
74:1

**reliable** 13:18

**relied** 13:21
19:12 46:16 47:23
73:17 78:22 80:19
100:7

**rely** 46:8 78:23

**remainder** 41:4

**remember** 48:25

**remind** 41:4
81:13

**remote** 6:7

**rent** 37:8 43:19,
25 44:4,8 45:5,7,
13 99:24

Deborah Dickson                                                          January 15, 2026

**repeat** 7:19 59:24

**rephrase** 7:19

**report** 10:11,12 14:13,16,23 15:2, 9,16,18,21,25 16:2,4,7,8,9,13, 19,24 17:2,6,14, 23 18:3,11 19:1, 14,22,23 20:7,9, 15,16,17,18,23 21:2,12,19 23:11, 18,21 24:14,24 25:20,25 26:10, 15,17,19,21 27:16 28:13 29:4,16 31:4 32:3,15 39:12 41:8 42:4, 14,22 43:3,5 46:1, 4 47:14,15 51:12 54:10 57:9,24 58:10,14,15,18 59:9,15 62:12,22 63:8,10 65:25 66:14 68:13 70:5 72:7 73:10,15 74:3,13 76:23 78:5,15,18,19,25 80:10 83:10 84:18 85:16 87:15 88:9, 25 90:6 92:9 98:9, 18 99:1,9 100:15 101:24 102:14 103:6 112:8 117:4,11,22 120:7,14,15,17 121:3,8,18,24 122:3

**reported** 71:20

**reporter** 5:17,19 7:17 43:16 97:3

**reporting** 71:14 72:21 73:18,19 81:21 82:3 83:23, 24 84:6

**reports** 84:11

**repossessions** 37:8 100:25

**represent** 11:24 75:14

**representation** 106:18

**request** 23:10,16, 17 66:1,6,17 68:9 69:13 119:20

**requested** 23:12 66:2 70:9,20 75:9 87:5 90:25 92:14 108:2

**requesting** 107:14 110:12

**requests** 9:11,15 67:18

**require** 31:7 32:16 39:22 52:17 69:1

**required** 33:15, 16 47:17 48:19 49:8,16,19,24,25 50:1,3 51:24 52:5 53:18 57:25 77:17 91:10 99:23 119:5

**requirement** 33:7 91:10

**requirements** 13:24 49:5,6,7 50:7,8,9 58:5

**requires** 31:16 33:7,14 40:8 49:3

**requiring** 91:19

**reserve** 122:6,8

**respectful** 8:5

**respond** 30:5,18 118:1

**responding** 26:22 27:17 96:23

**response** 9:15 69:10 73:3,5 102:18

**responses** 7:16

**responsibility** 63:5

**responsive** 9:18

**restate** 50:24 54:14

**result** 90:1

**results** 90:4

**retain** 86:12

**retained** 12:9 25:12,13,18 32:12 65:11,17 112:16 114:18,19

**retains** 86:8

**return** 108:2

**returned** 109:5

**returns** 35:11

**revenue** 40:22 41:1 49:23 76:13, 20 85:5,6 86:25 87:9,13 89:14 108:1 109:4 110:9

**revenues** 44:11

**reverse** 50:1

**review** 10:10,17 15:17 19:2 23:13 24:5,9 25:18,20, 21 83:10 99:2 102:9 117:5,11 119:4

**reviewed** 10:11, 12,13,19,20,24 12:14 23:19 24:4, 15 29:15 38:12 45:6 46:19 72:6 73:18 80:4 87:10 93:20 95:16,18 118:24

**reviewing** 6:19 10:8 16:9 64:23 77:4 119:7

**revisit** 105:21

**risk** 71:20 77:7 82:17,19

**role** 27:4 111:20

**roll** 55:11,12

**Ron** 8:19 9:3 12:24 13:10 14:10 60:6 111:10

**Ron's** 71:23

**Ronald** 5:7

**room** 6:12 9:24

**routine** 112:10

**Rule** 13:24 26:15

**rules** 7:14 55:3 86:14

**rulings** 12:14

**Ryan** 14:20,22 116:6,7

————————

S

————————

**salary** 55:7,10

**sale** 105:24 107:14

**sales** 13:19,23 14:1 76:14 89:14, 15 106:13 107:5

**sat** 6:2

**savings** 86:21, 22,24 87:12

**scanned** 10:14

**schedule** 21:24 45:14 47:19 78:5, 14,18 79:2,16 87:16,21 89:24 90:10 94:1,16 96:10

**schedules** 45:6 47:16 80:4 85:12 93:12,13,18,20,23 94:12,18 95:9,19, 22 97:10 100:12 101:16

**scope** 28:22 31:18 65:16,22

**screen** 18:8,12 66:9

**scroll** 71:12

**scrolling** 13:12

**Sebold** 25:21 26:23 27:18 28:2 30:19 33:12 58:20 59:20 98:8

**Sebold's** 6:3 9:23 10:11 19:23

20:16 29:14,15 39:19,25 60:2 83:10 92:22 117:11 118:1

**SEC** 58:5

**second-to-last** 13:11

**section** 18:3,19 81:19 110:9

**sections** 63:9 66:2

**security** 25:22 103:16 104:1 105:6 107:12,25 109:3,12,24 117:9

**selected** 113:24

**selecting** 114:17

**selects** 48:21

**selling** 107:1

**semantics** 64:12

**send** 22:18,19,21, 24 23:2,4

**sense** 87:11 91:17

**sentence** 38:8,20 66:15 95:12

**serve** 84:18

**service** 41:2

**Sessions** 116:18

**Sessions's** 113:1

**set** 17:10 49:21 55:5 89:13

**settled** 107:8

**SG&A** 76:15

**share** 7:2

**sheet** 110:3,8 120:23

**sheets** 19:24 20:10

**short** 9:24

**shortly** 106:3

Deborah Dickson                                            January 15, 2026

**show** 47:16 48:12
101:25 111:1

**showed** 89:24

**showing** 18:7,12
82:22

**shows** 18:10 19:7
45:13 77:23
118:18

**sic** 13:25

**side** 11:15

**sign** 112:25
113:16 119:6

**signed** 112:22
113:10,12 116:20
119:10,12,13

**similar** 16:3 17:2
101:3 120:13

**simple** 68:10

**simultaneously**
115:2

**single** 52:18
78:21

**singular** 64:7

**sitting** 9:23 18:23
29:14 42:5 54:18

**situation** 85:9
86:2,7 108:7

**skim** 24:7

**slam** 92:19

**small** 11:13,23
76:1 86:4 120:25

**software** 86:19,
20 87:8,10 88:19

**sold** 41:2 104:13

**solely** 13:21

**solve** 106:10

**solved** 106:8

**sort** 85:9

**sorts** 78:23 96:2

**sounded** 102:19

**sounds** 7:6 81:5
114:22

**source** 102:24

**sources** 22:5

**SPA** 103:23

**speak** 98:21
112:4

**speaking** 30:12
65:14 108:7 111:5

**speaks** 32:23
40:3 60:19 62:2

**special** 85:20
86:1 87:14,23
88:7,17

**specific** 34:1
37:10 42:15 43:1,
12 63:24 88:24
101:6,22 111:3
116:8

**specific-
department**
84:15

**specifically**
47:19 53:23 61:25
65:2 70:24 79:1
101:6 102:24
109:5 116:14

**specifics** 85:22

**speculation**
66:24 84:21
106:1,21 109:15
121:15

**spend** 24:22

**spent** 15:1

**spreadsheet**
80:16 88:15,22
89:1 94:10,25

**spreadsheets**
96:2 97:17

**Stacey** 5:15 8:11
81:1 115:23
116:14

**stand** 7:22 29:12

**standalone**
55:17

**standard** 33:6
34:19 49:17,19

90:21 91:4,9

**standards** 49:13,
21

**start** 43:5,7 60:14
70:7 111:22

**started** 41:19
106:3

**starting** 5:11
73:5 95:17

**starts** 13:14

**state** 5:11 6:4
8:13 17:22 33:14
47:15,18 83:11
122:5

**stated** 39:19 66:3
69:11 71:13 75:7

**statement** 20:10
67:23 102:3,4,5,6
110:8,15

**statements**
19:25 20:20
33:15,24 48:11,
14,15,18 55:12
89:13

**states** 90:8 98:8

**stating** 48:4,8

**stay** 77:6

**stipulated** 37:8
93:1,4,17 94:9,25
96:12

**stock** 103:17,23
104:8,22,24
105:9,13,21
106:16

**Stokes** 10:21

**Stokes's** 23:17
47:4,13,21

**straight** 120:22

**straighten** 52:13

**straightforward**
35:13

**strike** 104:23
122:9

**structure** 73:18,

19 84:6

**study** 83:14

**stuff** 11:17

**subject** 69:16
118:22

**subsection**
32:20 38:16 39:23
63:13 66:16

**subsequent**
16:1,23 19:2
38:14

**substance** 8:1

**substituted**
117:13

**substitution**
117:14

**suddenly** 55:3

**Sufhan** 10:21
23:25

**supertrump**
86:20 87:20 88:15
90:10

**supplement** 17:6

**supplemental**
20:17

**supplied** 90:19

**support** 35:10
50:18 70:25 79:3
112:7

**supported** 70:9,
21

**supporting** 78:5,
14 79:2,16 80:4
90:22 91:4 93:20
94:11,18 95:9,18,
21 96:9 97:9
100:12 101:15
102:9

**supports** 45:14
74:6

**supposed** 68:21
96:3

**swear** 5:18,21

**sworn** 5:23

**T**

**T-R-A-C** 86:10

**talk** 6:20 7:5,16
47:7 61:4 65:25
85:17,19 94:18
98:16 100:2,3,11,
25 110:17

**talked** 34:4
46:16,24 51:3
85:3 91:22 93:14,
23 95:23 110:19

**talking** 14:3 20:5
24:22 34:6,7
50:16 51:3 53:21,
23 81:18 87:18,19
89:9,21,23 90:9
92:2 93:23 95:3
96:23 101:8

**talks** 39:1 45:16
61:3 82:16 92:9
103:11

**tax** 35:11 85:17,
21 86:16,21,22,23
87:1 89:7,9,11,12,
17,20,25 90:3,7,8
91:14,19

**taxation** 107:3

**taxes** 89:4,5,16

**Telles** 5:20

**telling** 19:10
84:23

**tells** 36:21

**ten** 11:21

**term** 44:9 96:2
97:9 100:12

**terminated**
108:15 110:5

**termination**
104:25 105:1,15

**terms** 36:6 47:8
97:20 116:8

**testified** 5:23
12:16 82:9 121:19

**testify** 25:14

Deborah Dickson                                           January 15, 2026

42:19 65:11

**testifying** 12:15
42:6 54:18

**testimony** 7:19,
20 12:2,8,14,22
28:4,11,22 29:2
35:4 36:12 37:24
44:17 50:22 52:22
55:22 65:6 67:11
70:10,21 71:11,
13,19 73:10,14
74:1,6,21 79:21
82:25 93:3,8
97:14,25

**text** 102:8

**texting** 6:18

**thesis** 47:15

**thing** 32:7 45:1
78:4,21

**things** 23:7 25:16
34:7 45:22 55:1
76:25 78:24 80:25
96:5 100:7

**thinking** 16:9
18:9

**thirds** 88:14

**thought** 16:24
23:2 46:5 48:23

**threshold** 59:21
60:3,17,22 61:3,
11,14 98:10

**thresholds** 42:2
60:13 117:7

**tied** 95:19

**till** 14:8

**time** 5:3 7:16 8:5
11:12 12:10,12
15:1,5 19:2 24:22
25:24 26:1,13
36:2 52:11 59:8
66:25 68:17 69:5
81:4,8,11 83:14
92:8 96:23 99:8
100:1 101:7
105:24 107:1,7,14
110:5 111:16
113:8,9 115:5,17

117:19 118:20
119:2 120:20
121:23 122:11,18

**timely** 29:3 118:2
121:13

**times** 5:9 7:8,10,
12 43:3 49:9
60:22 69:8,21
116:12,16

**tired** 106:6

**title** 88:8 94:21
103:11

**titled** 18:3 66:2

**to-date** 118:9

**today** 6:2,20 8:2
9:22 10:5 15:23
18:23 54:18 68:12
93:3 122:10

**today's** 5:2
122:17

**told** 27:25 33:21
40:7 44:14 97:10
111:25

**ton** 24:22

**top** 80:15

**total** 10:22 15:1
118:15

**totally** 65:13

**trac** 86:9

**track** 12:7

**transaction** 76:8

**transaction-
oriented** 76:2

**transactional**
76:19

**transactions**
76:9

**transcript** 46:23,
25 47:13,22 70:25
71:24 72:1,6,10
78:25

**transcripts**
23:10,12,15 24:5
46:19

**transition** 82:19

**treated** 73:20

**treating** 38:14

**treatment** 56:17
99:10,16,19,20

**treats** 83:23

**trial** 7:21 11:10
14:5 25:14 120:4

**trick** 20:21 89:2

**trouble** 95:13

**true** 31:25 81:24
117:25

**trusts** 115:19,20

**turn** 23:3 64:4
65:24 70:4 85:15

**type** 15:15 33:25
41:14 67:14 85:20
86:1 87:14,23,25
88:7,17

**types** 23:15

___

**U**

___

**ultimate** 107:4

**ultimately** 56:3
57:9 113:24

**umbrella** 52:5

**unable** 17:22
108:22

**unclear** 8:16

**undefined** 68:21

**underlying**
108:19

**underpaid** 58:16
103:12

**understand**
7:18,23 13:1
18:19 24:23,24
26:21 27:2,4,16
28:11,22 29:2
30:4 31:2,5 34:12
42:3 45:8 49:15
50:15 51:10,15,24
52:3 54:13 81:15,

19 86:4 87:22
97:8 106:16
113:11

**understanding**
25:11 32:25 41:12
44:13 47:23 55:24
62:4,9 64:14,23
75:25 77:1 84:24
86:18 93:2 103:22
105:10 106:2,23
107:11 109:17
113:18,25 115:25

**understands**
109:22

**understood** 14:9
22:21 23:5 24:4
33:5 39:6 65:24
99:2 105:20
117:21 118:21
119:5

**unknown** 69:16

**unverified** 13:22

**updated** 121:2

**upfront** 108:11

___

**V**

___

**Vague** 56:8 62:3
115:17

**valid** 69:4,25

**variation** 50:4

**verbal** 7:15

**verbatim** 61:21

**verbiage** 45:20,
21

**verify** 85:11
110:14

**version** 15:9

**versions** 15:13

**versus** 5:5 37:18
38:13 40:25 41:16
43:7 50:18 51:6,9
54:2 75:22 84:14
91:25 115:10,16

**Victor** 5:20 97:5

**video** 5:4,10

**Viejo** 13:22

**view** 105:12,21

**Villagomez** 5:15
6:14 16:15,21
17:8,17 18:7,12,
15 21:4,13,20
24:19 25:6,17
26:2,24 27:6,12,
19 28:3,6,14,23
29:5,12,24 30:8,
21 31:6,23 32:23
33:9 34:16,24
35:4,21 36:11
37:23 40:3 42:17
43:4,15 44:16,23
45:18 46:3,10,14
47:1,25 48:7
50:21 51:19 52:21
54:3,12,23 55:21
56:8,19 57:3,12,
17 58:2,24 59:4,
10,23 60:19,25
61:20 62:2,8,14,
25 64:10 65:5,12
66:23 67:10,19
68:1,7,23 69:6,18
70:1,12 74:8,16,
22 75:2 78:8,12
79:6,20 81:4,23
82:11 83:5,16
84:2,9,20 88:11
90:15 91:2,15
93:7 96:8,15,17,
21 98:3 102:15,25
104:16 105:2,16,
25 106:20 108:4
109:1,6,14 113:1
114:21 115:17,23
116:15 118:4
121:14 122:12

**volume** 76:3

___

**W**

___

**wait** 72:14 108:14

**wanted** 16:11
17:5 64:20

**ways** 40:19 52:11
86:14

Deborah Dickson                                                                    January 15, 2026

**week** 10:2 16:8

**weird** 96:22

**well-recognized** 48:12

**whatsoever** 82:7

**Williams** 11:3

**WIP** 118:17

**withdrew** 113:13

**withholding** 17:14

**witness's** 37:24

**wondering** 93:22

**word** 49:15 89:11 90:5

**word-for-word** 24:7,8

**wording** 90:7,18 94:17 97:12 100:22 101:15

**wordings** 90:12 95:22 96:4

**words** 35:7

**work** 10:4 76:2,4, 6 78:5,14,17 79:2, 16 80:4 82:5,17 83:11,21 85:12 93:12,13,20,22 94:1,11,16,18 95:9,18,21 96:1, 10 97:9,16 100:12 101:15 102:2 107:2 114:18 115:9,15,19 116:2

**work-in-process** 118:17

**workbook** 45:15 120:22

**worked** 10:19 14:23 83:3 116:11,12,16,19 118:16 119:15,23

**working** 33:22 35:10 107:8 115:1

**workload** 83:15

**workpaper** 96:11 97:16 99:6

**workpapers** 96:1 99:3 102:5,10

**works** 82:10 111:25

**world** 40:16

**worries** 72:16

**write** 86:15

**written** 25:25 26:13 106:5

**wrong** 19:8 57:10 71:8

**wrongful** 104:25 105:14

**wrote** 11:17 67:23

————————

**Y**

————————

**year** 11:20 48:10, 13 55:7 59:17 63:15 77:21

**years** 11:12,21 33:22 61:4 80:17 105:22 106:7,17 115:13 116:13,17 117:7

**Yee** 5:13 6:1 8:19, 25 9:3,8 12:24 13:4,10,13 14:10, 13 16:17,22 17:4, 12,21 18:1,9,13, 17,18 21:7,8,17 22:1 25:1,8,23 26:6,8 27:1,3,9, 13,15,23 28:5,7, 10,18 29:1,9,13 30:2,11,17 31:1,9 32:1 33:5,19 34:21 35:1,15,22, 25 36:3 37:2,19 38:2,5 40:6 42:21 43:9,20 44:19,24 45:24 46:7,11,22 47:6 48:3 50:13 51:1 52:14 53:12 54:7,16 55:15 56:4,15,23 57:8,

15,18 58:7 59:1,6, 12 60:1,6,9,23 61:1,23 62:5,11, 16 63:1,6 64:7,17 65:9,14,18 66:11, 13 67:1,13,22 68:4,11 69:2,9,22 70:3,15,18 71:10, 23 72:5,16 74:12, 19,25 75:3,5 78:10,13 79:9,23 80:18 81:1,6,12 82:8,14 83:9,19 84:5,16 85:10 88:16 90:20 91:6, 18 93:9 96:19,22 97:2,5,7 98:14 102:17 103:3 104:21 105:5,19 106:15 107:16 108:12 109:2,9,19 111:10,13 114:24 115:22 118:8 119:18,25 120:2 121:17 122:5,15

**yes-or-no** 92:20

————————

**Z**

————————

**Zoom** 5:7