# EXHIBIT C

U.S.D.C. CENTRAL DISTRICT OF CALIFORNIA

Case No. **8:24-cv-01989-MWC**

**PATRICK BYRNE**

VS. **AMERIS BANK**

JOINT EXHIBIT **JX-324**

DATE _____ IDEN.

DATE _____ EVID.

BY _____
Deputy Clerk

# JOINT EXHIBIT 324

*Execution Version*

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement"), effective December 10, 2021, is made and entered into by Ameris Bank (the "Company"), a subsidiary of Ameris Bancorp (the "Parent"), and Patrick Byrne ("Executive").

In consideration of the mutual promises set forth below and other good and valuable consideration, the receipt and sufficiency of which the parties acknowledge, the Company and Executive agree as follows:

**1.      Employment and Term**.  The Company hereby employs Executive and Executive hereby accepts employment on the terms and conditions set forth in this Agreement. The term of employment under this Agreement shall be for the period beginning on December 10, 2021 ("Start Date"), and ending December 31, 2024  (such period of employment, the "Initial Term").  Upon the expiration of the Initial Term or any Renewal Term (defined herein), this Agreement shall be automatically renewed for an additional one-year period (each such one-year period being a "Renewal Term" and collectively with the Initial Term, the "Term"), unless the Company or the Executive has given written notice to the other of its intent not to renew this Agreement (a "Non-Renewal Notice") at least thirty (30) days prior to the expiration of the Initial Term or any Renewal Term, as the case may be.  During any Renewal Term, the terms, conditions and provisions set forth in this Agreement shall remain in effect unless modified in accordance with this Agreement.

**2.      Position, Duties, and Performance**.

2.1.      Position.  During the Term, Executive shall serve as the Chief Executive Officer of Balboa Capital Corporation. Executive shall have such responsibilities and duties as the Chief Strategy Officer of the Company may assign from time to time. Executive shall report directly to the Chief Strategy Officer of the Company.

2.2.      Performance.  Executive shall devote substantially all of Executive's working time, and use Executive's best efforts, knowledge and experience, to perform successfully Executive's duties and advance the interests of the Company and its Parent, subsidiaries and affiliates (together, the "Company Group"). Executive shall perform Executive's duties in compliance with this Agreement and all applicable laws and policies and practices of the Company Group.

2.3.      Other Activities.  During the Term, without the prior written consent of the Company, Executive shall not (i) render services of a business, professional, or commercial nature to any person or entity other than the Company Group, or (ii) engage, directly or indirectly, in any other business activity (whether or not for compensation) that might interfere with Executive's duties hereunder, create a conflict with any member of the Company Group, or violate the provisions of Section 4 below.  Executive shall be permitted to engage in civic, charitable, or community services, subject to Executive's obligations hereunder, including the provisions of Section 4 below.

2.4.      No Conflicts. Executive represents and warrants that Executive's execution of this Agreement, employment with the Company, and performance of Executive's duties hereunder will not violate any obligations Executive may have to any other employer, person, or



**EXHIBIT**
*15*
Byrne 10/20/25
ENGAD 800-631-6989

AMERIS000238



15.1

entity, including any obligations with respect to proprietary or confidential information of any other person or entity.

**3.      Compensation and Benefits.**

3.1.    <u>Base Salary</u>.  Executive's annual base salary for all services rendered hereunder (the "<u>Base Salary</u>") initially shall be $350,000, which shall be subject to an annual increase of three percent (3%) per year for each year of the Term starting as of December 31, 2022. Annual increases shall be reflected in the first pay period following December 31 of each year of the Term.   The Base Salary shall be payable in accordance with the Company's policies, procedures and practices as in effect from time to time but no less frequently than monthly.

3.2.    <u>Bonus</u>. During the Term, including the initial period of employment from the Start Date to December 31, 2021, Executive shall receive, in addition to Base Salary, a cash bonus (the "<u>Bonus</u>") of $150,000 within thirty (30) days of the end of each calendar quarter (starting with the calendar quarter beginning October 1, 2021) in which the division financial results for such quarter achieve the adjusted earnings before tax projected in the Pioneer 1Q21 Operating Model, a copy of which is attached hereto as <u>Exhibit B</u>, as measured using the methodologies in such model, regardless of what financial results may be achieved under the Company's financial reporting methodologies or requirements.

3.3.    <u>Incentive Program</u>.  Concurrent with the Start Date, the Company has established a cash bonus long term incentive program (the "<u>LTIP</u>") and the Executive is expected to participate in the LTIP.  For the avoidance of doubt, the LTIP and the Bonus are separate and distinct compensation programs.

3.4.    <u>Vacation</u>.  Executive shall be entitled to paid vacation in accordance with the policies, procedures, and practices of the Company Group as in effect from time to time.

3.5.    <u>Business Expenses</u>.  Executive shall be reimbursed for all reasonable business expenses actually incurred by Executive in performing services under this Agreement in accordance with the policies, procedures and practices of the Company Group as in effect from time to time. Any taxable reimbursement due under the terms of this Agreement shall be paid no later than December 31 of the year after the year in which the expense is incurred and shall comply with Treas. Reg. § 1.409A-3(i)(1)(iv).

3.6.    <u>Other Benefits</u>.

(a)    During the Term, Executive shall be entitled to participate in such employee benefit plans and programs as are maintained from time to time by the Company for its executive employees generally, to the extent that Executive and, if applicable, Executive's dependents are eligible to participate in accordance with the terms of such plans and programs. The Company shall not be obligated to adopt or continue any particular plan or program during the Term, and Executive's and, if applicable, Executive's dependents' participation in any such plan or program shall be subject to the provisions, rules, regulations and laws applicable thereto.

(b)    During the Term, Executive shall receive a car allowance in the amount of $1,240 per month.

AMERIS000239

15.2

4.    **Restrictive Covenants.**

4.1.    <u>Confidential Information</u>.

(a)    <u>Non-Disclosure Obligation</u>.  Except as provided in this Section 4.14.1 or with the prior written consent of an authorized officer of the Company, Executive shall not (1) disclose any Confidential Information of the Company Group to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, other than in the performance of Executive's duties pursuant to this Agreement and in accordance with any restrictions placed on its use or disclosure by the Company Group, or (2) make use of any such Confidential Information for Executive's own purposes or for the benefit of any person, firm, corporation, association or other entity, except the Company Group. As used in this Agreement, the term "<u>Confidential Information</u>" means all information which is or becomes known to Executive as a direct or indirect consequence of or through Executive's service relationship with any member of the Company Group (whether before, during or after the Term) and relates to matters such as trade secrets (including know-how, formulas, compositions, manufacturing and products processes, methodologies, technical data, designs, drawings and specifications), research and development activities, inventions, new or prospective lines of business (including analysis and market research relating to potential expansion of the business), business plans, books and records, financial or business data, customer lists, financing, vendor lists, suppliers, purchasers, potential business combinations, distribution channels, services, procedures, pricing information and any other proprietary information relating to the Company Group, in each case as they may exist from time to time and regardless as to whether or not such information is marked as confidential or proprietary; *provided, however,* that the term "<u>Confidential Information</u>" shall not include any information that is or becomes generally available to the public (other than as a result of a disclosure by Executive in violation of this Agreement or other obligation or by a person who received such information from Executive in violation of this Agreement or other obligation).

(b)    <u>Compulsory Disclosures</u>.  Except as expressly prohibited by court order, if Executive is requested or, upon the advice of Executive's counsel, required by law, rule, regulation or judicial order to disclose any Confidential Information, Executive will provide the Company with prompt written notice of any such request or requirement so that the Company may seek an appropriate protective order or waiver of Executive's compliance with the provisions of Section 4.14.1. Executive will not oppose any reasonable action by, and will cooperate with, the Company to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded to the Confidential Information, as determined by the Company in its reasonable discretion. If, failing the entry of a protective order or the receipt of a waiver hereunder, Executive is, upon the advice of Executive's counsel, compelled by law, rule, regulation or judicial order to disclose a portion of the Confidential Information, Executive may disclose without liability hereunder only that portion of the Confidential Information and only to the extent which counsel advises that Executive is legally required to disclose, and each of the parties hereto agrees to exercise such party's reasonable efforts to obtain assurance that confidential treatment will be accorded to such Confidential Information.

(c)    <u>Protected Disclosures</u>.  Executive fully understands that, notwithstanding any other provision of this Agreement (including Section 4.14.1), nothing in this Agreement prohibits Executive from (1) making any disclosure or communication required or protected by

- 3 -

AMERIS000240

JX-324-004

15.3

law or (2) reporting possible violations of law to a governmental agency or entity. Executive is not required to notify, or seek authorization from, the Company Group if Executive makes such reports. In addition, Executive understands that Executive may be entitled to immunity from liability under the Defend Trade Secrets Act, 18 U.S.C. § 1833(b) for certain disclosures of trade secrets, provided that such disclosure (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and Executive does not disclose the trade secret except pursuant to court order.

4.2.    <u>Assignment of Inventions</u>.

(a)    Executive will promptly and fully disclose to the Company all inventions, ideas, discoveries, developments, concepts, designs, improvements, software, works of authorship, trade secrets, and know-how (whether or not patentable or copyrightable), and all work product related thereto, including any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon (collectively, the "<u>Ideas</u>"), made, authored, discovered, conceived, or reduced to practice by Executive (either solely or jointly with others) during the Term (collectively, the "<u>Company Ideas</u>"). Executive agrees that, except as provided below, all such Company Ideas will be and remain the sole and exclusive property of the Company. To the extent that all worldwide rights, title and interest, including all intellectual property and proprietary rights, in and to any Company Ideas do not, by operation of law or otherwise, vest solely and exclusively in the Company or any Company Ideas are not considered works made for hire, then (1) all worldwide rights, title, and interests, including all intellectual property and proprietary rights, in and to such Company Ideas, are hereby irrevocably assigned and transferred solely and exclusively to the Company by Executive (by way of present assignment of existing and future rights), and (2) each such assignment and transfer shall be deemed effective as of the date that such Company Ideas are first created or developed or otherwise reduced to practice. On the request of any member of the Company Group, Executive will, during the Term and thereafter, without charge to the Company Group but at the expense of the Company Group, assist the Company Group in any reasonable way to vest in the Company title to all such Company Ideas, and to obtain any related patents, trademarks or copyrights in all countries throughout the world. Executive will execute and deliver any and all documents that any member of the Company Group may reasonably request to give effect to the foregoing provisions. In the event Executive fails to execute any such documents, Executive hereby appoints the Company as Executive's agent for purposes of executing any and all such documents and taking any and all other steps necessary for the Company to obtain and maintain proprietary rights in such Company Ideas.

(b)    If Executive wishes to clarify that certain Ideas that, as of the date of this Agreement, belong solely to Executive or belong to Executive jointly with others or in which Executive has an interest, and that relate in any way to any of the Company Group's actual or proposed businesses, products, services, or research and development, are not being assigned to the Company hereunder, Executive has listed such Ideas on <u>Appendix A</u> in a manner that does not violate any third party rights or disclose any confidential information. If no such Ideas are listed in <u>Appendix A</u>, then Executive represents that there are no such Ideas at the time of signing this

- 4 -

AMERIS000241

15.4

Agreement, and to the extent such Ideas do exist and are not listed on <u>Appendix A</u>, Executive hereby forever waives any and all rights or claims of ownership to such Ideas. Executive understands that Executive's listing of any Ideas on <u>Appendix A</u> does not constitute an acknowledgement by the Company Group of the existence or extent of such Ideas, nor of Executive's ownership of such Ideas.

(c)     If during the Term, Executive uses or incorporates into a product, service, process, or machine of the Company Group any Idea not assigned by this Section 4.2 of this Agreement in which Executive has an interest, then Executive will promptly so inform the Company in writing. Whether or not Executive gives such notice, Executive hereby irrevocably grants to the Company and each other member of the Company Group a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Idea and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Idea under all applicable intellectual property laws without restriction of any kind.

4.3.     <u>Non-Competition and Non-Solicitation</u>.

(a)     During the Restricted Period, Executive shall not, whether directly or indirectly, and whether on Executive's behalf or on behalf of or in conjunction with any other person or entity:

(i)     engage in, invest in, loan money to, provide services to, or otherwise be involved with (whether as an owner, investor, partner, employee, officer, director, agent, independent contractor, consultant, advisor, or otherwise) any entity (other than a member of the Company Group) that engages in the Business anywhere in the Restricted Territory; *provided, however*, that this Section 4.3(a) shall not prohibit Executive from passively investing in up to 2% of the outstanding equity securities of a publicly traded company, provided that Executive is not involved with the management or operation of such company;

(ii)     solicit or attempt to solicit any person or entity who is (or was at any time during the preceding twelve (12) months) a customer, client, supplier, vendor, licensor, licensee or any other business relation of the Company Group to cease doing business with, or alter or limit its business relationship with, any member of the Company Group, or otherwise interfere or attempt to interfere with the relationship between any such business relation and any member of the Company Group; or

(iii)     hire, engage, or attempt to hire or engage, any employee or consultant of the Company Group (or any individual who was an employee or consultant of the Company Group at any time during the preceding twelve (12) months) to terminate his, her or its employment or engagement with the Company Group, or to accept employment or engagement with any person or entity other than the Company Group.

- 5 -

AMERIS000242

JX-324-006

15.5

(b)    During the period commencing with the Start Date and ending upon the expiration of the period during which Executive would be entitled to continuation of Base Salary under Section 6.2(i) of this Agreement (assuming Executive's compliance with all applicable conditions to the receipt of such Base Salary), if applicable, but in no event prior to the date that is twelve (12) months immediately following Executive's termination of employment for any reason, Executive shall not, whether directly or indirectly, and whether on Executive's behalf or on behalf of or in conjunction with any other person or entity, solicit or attempt to solicit, any employee or consultant of the Company Group  to terminate his, her or its employment or engagement with the Company Group, or to accept employment or engagement with any person or entity other than the Company Group.

(c)    For purposes of this Section 4.3:

(i)    "Business" means the commercial equipment leasing or small business lending business.

(ii)    "Restricted Period" means the remainder of the then current Term (including, for clarity, the Initial Term and any Renewal Term); provided, however, in the event of a Termination by the Company without Cause or a Resignation for Good Reason, the Restricted Period shall end of the date that is twelve (12) months following the date of such Termination by the Company without Cause or Resignation for Good Reason.  Notwithstanding the foregoing, if Executive has not relocated out of the State of California on the date of Executive's termination, the Restricted Period shall end on such date of Executive's termination.

(iii)    "Restricted Territory" means any State in the United States, or territory outside of the United States, in which any member of the Company Group is engaged, or has taken substantial steps to engage, in the Business as of the date of Executive's termination of employment.

4.4.    Nondisparagement.

(a)    Executive agrees that during the Term and thereafter, Executive will not, directly or indirectly, orally, in writing or through any medium (including the press or other media, computer networks or bulletin boards, or any other form of communication) disparage or defame the Company, any member of the Company Group, or any of their respective directors, officers, stockholders, agents and/or employees.

(b)    Other than in connection with a termination of Executive for Cause under this Agreement, the Company will not, directly or indirectly, orally, in writing or through any medium (including the press or other media, computer networks or bulletin boards, or any other form of communication) disparage or defame the Executive.

(c)    For clarity, nothing set forth in this Section 4.4, (i) prohibits Executive or the Company from communicating, without notice to or approval by the other, with any United States federal or state government agency about a potential violation of a United States federal or state law or regulation, or (ii) shall apply to disclosures required under applicable law or in

- 6 -

AMERIS000243

15.6

connection with any legal proceedings with respect to which the Executive or any Company director, officer, stockholder, agent and/or employee, as the case may be, is a party or witness.

4.5.  Acknowledgments.  Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company and that Executive will benefit from the Company's goodwill. Executive understands and acknowledges that the Company has invested and will invest significant time and expense in developing the Confidential Information and goodwill. Executive further understands and acknowledges that because of Executive's experience with and relationship to the Company Group, Executive will have access to and learn about much or all of the Company Group's customer information, business contacts, and other business relationships. Executive further understands and acknowledges that the restrictive covenants described in this Section 4 are necessary to protect the Company's legitimate business interests in its Confidential Information, goodwill, and business relationships. Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company and that the Company would be irreparably harmed if Executive violates the restrictive covenants described in this Section 4. Executive further acknowledges the receipt and sufficiency of good and valuable consideration offered to Executive by the Company in exchange for the covenants made herein. Executive also acknowledges and agrees that these covenants will not impair Executive from becoming gainfully employed, or otherwise earning a livelihood following termination of employment with the Company. The Company would not have agreed to share the Confidential Information with Executive if Executive did not agree to this Section 4.

4.6.  Remedies.  The parties acknowledge that the damages at law to the Company Group would be an inadequate remedy for the breach by Executive of any provision of this Section 4, and agree in the event of any actual or threatened breach of this Section 4 that the Company or any member of the Company Group may seek temporary and permanent injunctive relief restraining Executive from such breach without bond or other security, and, to the extent permissible under the applicable statutes and rules of procedure, a temporary injunction may be granted immediately upon the commencement of any such suit. Nothing contained herein shall be construed as prohibiting the Company Group from pursuing any other remedies now or hereafter available at law or equity or by statute or otherwise for such breach or threatened breach of this Section 4.

**5.  Termination of Employment.**

5.1.  Termination by the Company.  The Company may terminate Executive's employment immediately at any time, with or without Cause, by written notice to Executive.

5.2.  Resignation by Executive Without Good Reason.  Executive may resign from his employment at any time and for any reason upon at least thirty (30) days' advance written notice to the Company. During such notice period, Executive shall continue to perform all of Executive's duties in accordance with the provisions hereunder. The Company shall have the option to make Executive's resignation effective at any time prior to the end of such notice period, in which case, Executive shall be paid his Base Salary through the date of resignation, inclusive

AMERIS000244

15.7

of the notice period, and such acceleration will not be deemed to constitute a termination without Cause.

5.3.    Resignation by Executive For Good Reason.  Executive may resign from his employment for Good Reason in accordance with this Section 5.3. Executive cannot resign on account Good Reason unless (i) Executive provides written notice to the Company of the existence of a condition for Good Reason within ninety (90) days after the initial existence thereof, (ii) the Company has thirty (30) days after receipt of such notice to cure the condition for Good Reason and fails to do so, and (iii) Executive terminates Executive's employment within thirty (30) days after the expiration of such cure period.

5.4.    Termination on Account of Death or Disability.  Executive's employment shall terminate automatically upon Executive's death. The Company may terminate Executive's employment upon Executive's Disability.

5.5.    For purposes of this Agreement:

(a)    "Cause" means a determination by the Company that any of the following has occurred:

i.    the willful and continued failure of Executive to perform Executive's duties with the Company or to follow the legal directives of the Board of Directors of the Parent or a more senior executive of the Company Group;

ii.    Executive's willful and continued gross negligence in connection with the Company Group's business or relating to Executive's duties with the Company or any member of the Company Group;

iii.    a material and willful violation of any of the Company's written policies, corporate governance and ethics guidelines and codes of conduct, including written policies related to discrimination, harassment or performance of illegal or unethical activities of which the Executive has actual knowledge of, or should be reasonably expected to have actual knowledge of based on his position with the Company;

iv.    Executive's reporting to work impaired by or under the influence of alcohol, or illegal drugs, or misused legal drugs or other legal substances, or Executive's engaging in the unlawful use (including being under the influence) or possession of illegal drugs on the Company's premises;

v.    Executive's being convicted of, or pleading guilty or nolo contendere to, (i) any felony or (ii) any crime involving moral turpitude which crime involving moral turpitude materially and adversely affects the Company's business;

vi.    Executive's theft, embezzlement or fraud, against the Company;

- 8 -

AMERIS000245

15.8

vii. Executive's engagement in conduct that brings or is reasonably likely to bring material negative publicity for the Company, or to cause the Company significant public disgrace, embarrassment, or disrepute;

viii. a material breach by Executive of this Agreement, provided that any breach of Section 4 of this Agreement shall be considered a material breach; or

ix. conduct by Executive that results in the removal of Executive from Executive's position as an officer or employee of a member of the Company Group pursuant to a written order by any banking or other regulatory agency with authority or jurisdiction over the Company Group, as the case may be.

(b) "Disability" means a physical or mental illness, impairment, or infirmity (other than an absence from work on an approved maternity or paternity leave) which renders Executive unable to perform the essential functions of Executive's position, including Executive's duties under this Agreement, with reasonable accommodation, for at least one hundred and twenty (120) consecutive days or for shorter periods aggregating one hundred and eighty (180) days during any three hundred and sixty-five (365) day period.

(c) "Good Reason" means the occurrence of any of the following, in each case during Executive's employment without Executive's consent:

i. a material reduction in the amount of Executive's Base Salary;

ii. a material diminution in Executive's authority, duties, or responsibilities;

iii. a change in the geographic location at which Executive must regularly perform the services to be performed by Executive pursuant to this Agreement to a location that is more than 35 miles from the current location (other than a change in such geographic location to an office or other location closer to Executive's home residence); or

iv. any other action or inaction that constitutes a material breach by the Company of this Agreement.

**6.** **Compensation and Benefits Upon Termination.**

6.1. <u>In General</u>. Upon termination of Executive's employment for any reason, Executive shall be entitled to receive (a) any accrued but unpaid Base Salary through the date of termination, (b) earned and unpaid Bonus with respect to periods prior to termination, and (c) reimbursement of any reasonable business expenses incurred through the date of termination in accordance with Section 3.4 of this Agreement (collectively, the "Accrued Benefits").

6.2 <u>Severance Upon Termination without Cause or for Good Reason.</u>  If Executive's employment is terminated by the Company without Cause or by Executive for Good Reason, subject to the provisions of Section 6.3 (Release) and Section 6.4 (Conditions), Executive shall be entitled to receive (i) 100% of Executive's Base Salary in effect on the date of termination, payable in accordance with the Company's regular payroll schedule for the longer of (A) the

- 9 -

AMERIS000246

JX-324-010

15.9

remainder of the then current Term or (B) the twelve (12)-month period following the termination of Executive's employment, (ii) a prorated portion of any Bonus that would have been earned for the year in which termination occurred, measured using the existing metrics established under Section 3.2 (prorated as necessary), provided that any such prorated Bonus will be paid in a single lump sum as described in Section 3.2 by March 15 of the calendar year following the calendar year in which such Bonus would have been earned had Executive remained in the employ of the Company, and (iii) provided Executive is enrolled in the Company's group health plan immediately prior to termination and timely elects COBRA coverage under such plan, and to the extent permitted by applicable law and without incurring any excise tax, Company shall pay to such plan or reimburse Executive (at the Company's election) an amount equal to the Company's share of the insurance premiums (which shall be based on Executive's level of coverage immediately prior to termination) for the eighteen (18) month period following the date of Executive's termination, except that such payment or reimbursement shall cease when Executive is covered under the group health plan of a subsequent employer (collectively, the "Severance Payments").

6.3     Release.  Executive's right to the Severance Payments is conditioned upon Executive executing and not revoking a valid release agreement in substantially the form attached hereto as Exhibit A (the "Release"), within the time periods set forth therein, releasing the Company Group from any and all liability. Any Severance Payments due for the period after termination and before the Release becomes effective shall be paid with the first payment after the Release becomes effective. If the period during which Executive has discretion to execute or revoke the Release straddles two (2) calendar years, the Company shall make payments conditioned on the Release no earlier than January 1st of the second (2nd) calendar year, regardless of which year the Release becomes effective.

6.4     Conditions.  Executive's right to the Severance Payments is conditioned on Executive's compliance with the provisions of Section 4, above. In the event that Executive fails to comply with such obligations, the Company's obligation to pay Executive any additional Severance Payments shall cease immediately and Executive shall promptly refund any Severance Payments previously paid by the Company. The Company's rights under this Section 6.4 shall be full recourse and shall be in addition to its rights under Section 4.6. The Company shall have the right to offset Executive's obligations under this Section 6.4 against any amounts otherwise owed to Executive from the Company or any member of the Company Group, to the extent permitted by applicable law.

6.5     No Additional Compensation or Benefits.  Executive is not entitled to receive any compensation or benefits from the Company or any other member of the Company Group upon Executive's termination of employment except as set forth in this Agreement. Moreover, the terms and conditions afforded Executive under this Agreement are in lieu of any severance payments or benefits to which Executive otherwise might be entitled pursuant to any severance plan, policy and practice of the Company Group.

7.     Notices.  All notices, requests, demands and other communications required or permitted to be given in writing pursuant to this Agreement shall be deemed given and received: (a) upon delivery if delivered personally; (b) on the next day after being deposited with a reliable overnight delivery service; or (c) upon receipt of an answer back confirmation, if transmitted by

- 10 -

AMERIS000247

15.10

facsimile, addressed to the below indicated facsimile number (if any). Notice given in another manner shall be effective only if and when received by the addressee. For purposes of notice, the addresses and facsimile number (if any) of the parties shall be as follows:

If to the Company:          Ameris Bank
                            Attn:  James A. LaHaise, Chief Strategy Officer
                            3490 Piedmont Road NE
                            Suite 1550
                            Atlanta, Georgia, 30305

If to Executive, to the address set forth on the signature page hereto or such other address on the personnel records of the Company.

Each party shall have the right to change its address for notice, and the person who is to receive notice, by the giving of fifteen (15) days' prior written notice to the other party in the manner set forth above.

**8.      Rights and Obligations Upon Termination.**

8.1.    <u>Survival</u>.   This Agreement, and all obligations of the Company and Executive hereunder, will terminate upon the termination of Executive's employment, with the following exceptions: (a) Executive's continuing obligations under Section 4; (b) the Accrued Benefits to be paid by the Company in accordance with Section 6; and (c) the relevant provisions of Sections 7 through 11 (inclusive).

8.2.    <u>Transition</u>.   In the event of termination of Executive's employment other than in connection with Executive's death, Executive agrees to cooperate with the Company Group in order to ensure an orderly transfer of Executive's duties and responsibilities.

**9.      Governing Law and Dispute Resolution.**

9.1.    <u>Governing Law</u>.   Unless and until Executive relocates out of the State of California (the "<u>Relocation</u>"), this Agreement will be governed and interpreted in accordance with the laws of the State of California, without regard to or application of choice-of-law rules or principles. Following a Relocation, this Agreement will be governed and interpreted in accordance with the laws of the State of Georgia, without regard to or application of choice-of-law rules or principles, and without regard to the place of execution or the place of performance thereof.

9.2.    <u>Venue</u>.   The parties agree that any legal proceeding, commenced by one party against the other, shall be brought in any state or federal court having proper jurisdiction within the State of California prior to a Relocation and within the State of Georgia following the Relocation. Both parties submit to such jurisdiction, and waive any objection to venue and/or claim of inconvenient forum.

AMERIS000248

15.11

**10.    Withholding and Section 409A.**

10.1.    <u>Withholding</u>.  All amounts paid under this Agreement shall be paid less all applicable tax withholdings and any other withholdings required by law or authorized by Executive.

10.2.    <u>Section 409A</u>.  The parties intend that the provisions of this Agreement comply with or be exempt from Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (collectively, "<u>Section 409A</u>"), and all provisions of this Agreement shall be construed in a manner consistent with the requirements for avoiding taxes or penalties under Section 409A. Notwithstanding the foregoing, nothing in this Agreement shall be interpreted or construed to transfer any liability for any tax (including a tax or penalty due as a result of a failure to comply with Section 409A) from Executive to any member of the Company Group or to any other individual or entity. A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination also constitutes a "Separation from Service" within the meaning of Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment," "separation from service" or like terms shall mean Separation from Service. Each installment payment required under this Agreement shall be considered a separate payment for purposes of Section 409A. If, upon separation from service, Executive is a "specified employee" within the meaning of Section 409A, any payment under this Agreement that is subject to Section 409A and would otherwise be paid within six (6) months after Executive's separation from service will instead be paid in the seventh (7th) month following Executive's separation from service (to the extent required by Section 409A(a)(2)(B)(i)).

**11.    Miscellaneous Provisions.**

11.1.    <u>Severability</u>.  In the event that any provision of this Agreement is found by a court, arbitrator or other tribunal having competent jurisdiction to be illegal, invalid or unenforceable, then such provision shall not be voided, but shall be recast so as to be enforced to the maximum extent permissible under applicable law while taking into account the original intent and effect of the provision, and the remainder of this Agreement shall remain in full force and effect. Any prohibition or unenforceability of any provision of this Agreement in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. It is expressly understood and agreed that although the Company and Executive consider the restrictions contained in Section 4 of this Agreement to be reasonable, if a final determination is made by a court of competent jurisdiction or any arbitrator or other tribunal that the time or territory or any other restriction contained in this Agreement is unenforceable against Executive, the provisions of this Agreement shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court or arbitrator or tribunal may determine or indicate to be enforceable.

11.2.    <u>Parties Bound</u>.  The terms, provisions, covenants and agreements contained in this Agreement shall apply to, be binding upon and inure to the benefit of the parties and their respective heirs, legal representatives, successors and assigns. The Company may assign this Agreement to its successors or affiliates, and upon any such assignment, the references in this

- 12 -

AMERIS000249

15.12

Agreement to the Company shall also apply to any such assignee that assumes and agrees to perform this Agreement by operation of law or otherwise, unless the context indicates to the contrary. Executive may not assign this Agreement.

11.3. <u>Entire Agreement</u>. This Agreement, together with the Stock Purchase Agreement by and between the Company, Executive, and the certain other parties thereto, dated of even date herewith supersedes all prior understandings and agreements, oral or written, between the parties with respect to the subject matter of this Agreement, and constitutes the sole agreement between the parties with respect to the subject matter hereof. Each party acknowledges that no representations, inducements, promises or agreements, oral or written, have been made by any party or by anyone acting on behalf of any party, which are not embodied in this Agreement.

11.4. <u>Amendments; Waiver</u>. This Agreement may not be modified, amended, or terminated except by an instrument in writing, signed by Executive and the Company. By an instrument in writing similarly executed, Executive or the Company may waive compliance by the other party with any specifically identified provision of this Agreement that such other party was or is obligated to comply with or perform; *provided, however*, that such waiver shall not operate as a waiver of, or estoppel with respect to, any other or subsequent failure. No failure to exercise and no delay in exercising any right, remedy, or power hereunder shall preclude any other or further exercise of any other right, remedy, or power provided herein or by law or in equity.

11.5. <u>Construction</u>. This Agreement shall be deemed drafted equally by both the Company and Executive. The headings in this Agreement are only for convenience and are not intended to affect construction or interpretation. Any references to paragraphs, subparagraphs, sections or subsections are to those parts of this Agreement, unless the context indicates to the contrary. Unless the context indicates to the contrary, (i) the plural includes the singular and the singular includes the plural; (ii) "includes" and "including" are each "without limitation"; (iii) "herein," "hereof," "hereunder" and other similar compounds of the word "here" refer to the entire Agreement and not to any particular paragraph, subparagraph, section or subsection; and (vi) all pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the entities or persons referred to may require.

11.6. <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement. Signatures delivered by facsimile or electronically shall be deemed effective for all purposes.

11.7. <u>Attorneys' Fees</u>. In any action brought by any party to enforce the terms of this Agreement or the Release, the prevailing party will be entitled to recover all reasonable attorneys' fees and reasonable costs that the prevailing party incurred in the course of the action.

11.8. <u>Executive Acknowledgements</u>. Executive acknowledges that Executive has had adequate time to consider the terms of this Agreement, has knowingly and voluntarily entered into this Agreement and has been advised by the Company to seek the advice of independent counsel prior to reaching agreement with the Company on any of the terms of this Agreement.

*[Remainder of the Page Intentionally Left Blank]*

- 13 -

AMERIS000250

15.13

15.14

IN WITNESS WHEREOF, the parties have entered into this Employment Agreement on the date first written above.

AMERIS BANCORP

By:
Name: James A. LaHaise
Title:   Chief Strategy Officer

EXECUTIVE

Patrick Byrne
Address:

*[Signature Page to Employment Agreement]*

AMERIS000251

JX-324-015

IN WITNESS WHEREOF, the parties have entered into this Employment Agreement on the date first written above.

AMERIS BANCORP


By: _____
Name: James A. LaHaise
Title:   Chief Strategy Officer



EXECUTIVE


_____
Patrick Byrne
Address:

*[Signature Page to Employment Agreement]*

AMERIS000252

JX-324-016

## APPENDIX A

### Excluded Ideas

AMERIS000253

15.16

**EXHIBIT A**

**Release Agreement[1]**

Reference is made to the Employment Agreement, dated as of _____, 2021, by the undersigned individual and Ameris Bank (the "Agreement"). Capitalized terms used but not defined in this release (this "Release") have the meanings set forth in the Agreement.

1.  In consideration for the Severance Payments offered to me under the Agreement and deeming this Release to be fair, reasonable, and equitable, and intending to be legally bound hereby, I, the undersigned, agree to and hereby do, for myself and for each of my heirs, representatives, executors, administrators, and assigns, forever and irrevocably fully release and discharge the Company, each member of the Company Group, and their respective officers, directors, employees, agents, trustees, predecessors, successors, purchasers, investors, assigns, and representatives (the "Released Parties"), of and from any and all complaints, judgments, claims, demands, debts, actions or causes of action, obligations, damages, and liabilities whatsoever (collectively, "Claims") which I now have, have had, or may have, whether the same be known or unknown, at law, in equity, or mixed, in any way arising out of or relating to any matter, act, occurrence, omission, practice, conduct, policy, event, or transaction that occurred on or before the date of this Release. I expressly acknowledge that this Release includes, but is not limited to, any Claims arising out of or related to my employment with the Company and my separation therefrom. I also release and waive any and all Claims arising under any express or implied contract, law (federal, state or local), rule, regulation, or ordinance, including, but not limited to: (a) Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, Executive Order 11246, 42 U.S.C. Section 1981, (b) the Americans with Disabilities Act, (c) the Rehabilitation Act of 1973, (d) the Family and Medical Leave Act, (e) the Pregnancy Discrimination Act of 1978, (f) the Equal Pay Act, (g) the Fair Labor Standards Act, (h) the Worker Adjustment and Retraining Notification Act of 1988, (i) the Occupational Health and Safety Act, (j) the Employee Retirement Income Security Act of 1974 (excluding claims for vested benefits), (k) the Age Discrimination in Employment Act of 1967, as amended ("ADEA") and the Older Workers Benefit Protection Act of 1990, as amended ("OWBPA") (except a claim relating to whether this release or waiver is valid under the ADEA and except for any claims under the ADEA that may arise after the date this Release is executed by me), (l) any claim under the National Labor Relations Act ("NLRA"), and (m) all related and/or comparable state and local laws (all as amended from time to time).

2.  Notwithstanding anything set forth herein to the contrary, the Release shall not release or waive (a) any rights to indemnification that arise after the date I sign the Release which I may have as an officer of the Company under the Agreement or the Company's Bylaws, (b) the Accrued Benefits and the Severance Payments, or (c) any claims I may not release as a matter of law.

3.  In the event that I decide in the future to commence, or attempt to commence, any action or litigation against the Released Parties in violation of this Release, except as it relates to the

---

[1] Note to Draft: Subject to update for changes in applicable law.

- 16 -

AMERIS000254

15.17

enforcement of any rights I may have under this Release, or any action challenging the legal sufficiency of this Release under the OWBPA or ADEA, or in connection with any charge filed with, or investigation by, the Equal Employment Opportunity Commission ("EEOC"), this will constitute a breach of this Release, and I will be obligated to repay the Company all Severance Payments paid to me and reimburse any costs expended by the Company Group to challenge such action (including, without limitation, reasonable attorneys' fees). In that event, the Release granted by me shall nonetheless remain in effect, unless otherwise modified by a court of competent jurisdiction.

4.  I acknowledge that with this document I have been advised in writing to consult with an attorney prior to executing this waiver of ADEA claims and that I have been given _____ [2] days in which to consider entering into the waiver of the ADEA claims, if any. If I decide to sign before the expiration of _____ days, I acknowledge that I am doing so knowingly and voluntarily. In addition, I acknowledge that I have been informed that I may revoke a signed waiver of the ADEA claims for up to 7 days after executing this Release and that to be effective, my revocation must be in writing, signed, dated, and delivered to the Company no later than 7 days from the date on which I sign this Release. If the 7th day falls on a weekend or holiday, my revocation must be delivered the next business day.

5.  I acknowledge that I am aware that I may hereafter discover claims or facts in addition to, or different from, those which I now know or believe to exist with respect to the subject matter covered by this Release and which, if known or suspected at the time of executing this Release, may have materially affected this Release or my decision to enter into it. Nevertheless, I hereby waive any rights, claims, or causes of action that might arise as a result of such different or additional claims or facts.

6.  I acknowledge that the Company Group expressly denies liability of any kind to me, and nothing contained in this Release will be construed as an admission of any liability or wrongdoing by any of the Released Parties.

7.  I understand that my receipt and retention of the Severance Payments are contingent not only on the effectiveness of this Release, but also on my continued compliance with Section 4 of the Agreement.  Pursuant to the Agreement, if I fail to comply with my obligations under Section 4 of the Agreement, the Company's obligation to pay any additional Severance Payments shall cease immediately and I shall promptly refund any Severance Payments previously paid by the Company.

8.  On or before my last day of employment, I will deliver to a Company representative, at a location to be determined, all Company Group property which I have in my possession, including all equipment and accessories, office equipment, account lists or client contact lists, credit cards, keys, access cards, and documents, including copies of documents.

9.  I acknowledge that the Agreement and this Release set forth the entire agreement between me and the Company and supersede all prior and contemporaneous oral and written agreements

---

[2] Note to Draft: At least 21 days if individual is age 40 or older, and at least 45 days if individual is age 40 or older and the termination is part of a group termination.

- 17 -

AMERIS000255

15.18

and discussions. After this Release becomes effective, it may be amended only by an agreement in writing signed by a duly authorized representative of the Company and by me.

10. By executing this Release, I acknowledge that I have carefully reviewed all of the provisions of this Release and all the provisions of the Agreement, have not relied on any representation or statement, oral or written, by the Company Group or any of its representatives, which is not set forth in those documents, and have had the opportunity to receive independent legal advice with respect to executing this Release.

11. I understand, acknowledge, and agree to the terms and conditions, including the releases and waivers, set forth in this Release.

12. This Release shall be interpreted and construed in accordance with the laws of the State of Georgia, excluding any conflicts or choice of law rule or principle that might otherwise refer construction or interpretation of this provision to the substantive law of another jurisdiction. Should this Release be held invalid or unenforceable in whole or in part with respect to any particular claim or circumstances, it shall remain fully valid and enforceable as to all other claims and circumstances.

13. I fully understand that, notwithstanding any other provision of this Release, nothing in this Release prohibits me from making any disclosure or communication that is required or protected by law. For example, nothing in this Release prohibits me from reporting possible violations of law to a governmental agency or entity, or requires me to seek authorization from any member of the Company Group or to notify any member of the Company Group if I do make such reports.

14. I acknowledge that I am hereby notified that I will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal and I do not disclose the trade secret except pursuant to court order.

**PLEASE REVIEW THIS RELEASE AGREEMENT CAREFULLY. IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

_____          _____
Patrick Byrne                                                              Date

- 18 -

AMERIS000256

JX-324-020

15.19

**EXHIBIT B**

**Pioneer 1Q21 Operating Model**

15.20

CONFIDENTIAL                    AMERIS000257

JX-324-021

**Project Pioneer**
**Historical and Projected Income Statement**

| $ in millions | Historical | | | | Projected | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | For the year ended December 31, | | | | For the year ending December 31, | | | | |
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Originations (by channel)** | | | | | | | | | |
| National Account Vendor Partners Channel | $166.8 | $212.3 | $217.8 | $191.9 | $282.6 | $320.2 | $352.2 | $387.5 | $426.2 |
| Small Business Direct Channel | 40.8 | 44.8 | 39.4 | 23.0 | 27.9 | 32.4 | 35.6 | 39.2 | 43.1 |
| Medium Business Direct Channel | 33.9 | 64.0 | 61.4 | 46.5 | 43.7 | 43.7 | 48.1 | 52.9 | 58.1 |
| Total Origination Volume | $241.5 | $321.2 | $318.6 | $261.5 | $354.3 | $396.3 | $435.9 | $479.5 | $527.4 |
| Average Deal Size at Origination (actual dollars) | | | | | | | | | |
| National Account Vendor Partners Channel | $37,506 | $46,947 | $46,758 | $40,146 | $49,289 | $53,365 | $57,026 | $60,687 | $64,348 |
| Small Business Direct Channel | $38,816 | $45,684 | $47,697 | $53,475 | $58,582 | $63,295 | $67,637 | $71,979 | $76,321 |
| Medium Business Direct Channel | $84,584 | $143,276 | $133,222 | $111,837 | $142,127 | $154,872 | $165,497 | $176,121 | $186,745 |
| **Income Statement** | | | | | | | | | |
| **Revenue** | | | | | | | | | |
| Gain on sale of financing transactions | $8.5 | $12.6 | $13.2 | $10.4 | $9.6 | $10.1 | $11.0 | $11.9 | $12.9 |
| Lease income, net | 26.0 | 30.3 | 33.8 | 34.0 | 39.7 | 52.5 | 64.0 | 72.9 | 79.3 |
| Gain on sale of residual interest in equipment | 4.2 | 4.6 | 3.1 | 3.5 | 3.2 | 3.2 | 3.2 | 3.2 | 3.2 |
| Other income | 9.6 | 11.6 | 11.7 | 9.9 | 10.3 | 11.8 | 13.4 | 14.8 | 15.9 |
| Gain / (Loss) on Derivatives | 0.6 | 0.4 | (0.6) | (0.1) | 0.1 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total revenues | $49.0 | $59.5 | $61.2 | $57.6 | $62.9 | $77.6 | $91.5 | $102.8 | $111.3 |
| Provision for losses on direct financing leases | 11.9 | 4.5 | 5.3 | 15.1 | 2.8 | 11.6 | 12.6 | 13.7 | 14.3 |
| **SG&A Expenses** | | | | | | | | | |
| Personnel expenses | $17.0 | $22.9 | $23.7 | $20.1 | $22.5 | $24.3 | $25.8 | $27.4 | $29.1 |
| Office expenses | 2.2 | 2.4 | 2.7 | 2.2 | 1.9 | 1.9 | 2.0 | 2.1 | 2.2 |
| Portfolio management expenses | 1.9 | 2.4 | 2.4 | 1.9 | 2.0 | 2.1 | 2.2 | 2.3 | 2.4 |
| Computer Expenses[1] | 1.4 | 1.5 | 1.8 | 2.0 | 2.2 | 2.3 | 2.4 | 2.5 | 2.6 |
| Corporate Expenses | 1.6 | 2.1 | 2.8 | 2.4 | 1.9 | 1.9 | 2.0 | 2.1 | 2.2 |
| Marketing Expenses | 0.7 | 1.5 | 2.2 | 1.4 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| Vendor Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other Expenses[2] | 5.8 | 9.3 | 8.3 | 5.8 | 10.9 | 12.6 | 13.6 | 15.0 | 16.5 |
| Total SG&A expenses | $30.7 | $42.0 | $43.9 | $35.7 | $41.8 | $45.5 | $48.4 | $51.8 | $55.4 |
| IDC Deferral / Reclassification | (13.7) | (20.5) | (20.0) | (16.3) | (20.8) | (23.1) | (25.4) | (27.9) | (30.7) |
| Total SG&A expenses (after IDC deferral) | $17.0 | $21.5 | $23.9 | $19.4 | $21.0 | $22.5 | $23.0 | $23.9 | $24.7 |
| **Earnings Before Interest & Tax (EBIT)** | $20.0 | $33.5 | $32.0 | $23.1 | $39.2 | $43.5 | $55.9 | $65.3 | $72.3 |
| Total interest expense, Adjusted[3] | 0.0 | 0.0 | 0.0 | 0.0 | 5.5 | 6.5 | 7.4 | 8.1 | 8.4 |
| Adjusted Earnings Before Tax | $20.0 | $33.5 | $32.0 | $23.1 | $33.7 | $37.0 | $48.5 | $57.2 | $63.9 |

CONFIDENTIAL

AMERIS000258

| $ in millions | Historical | | | | Projected | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | As of December 31, | | | | As of December 31, | | | | |
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| **Assets** | | | | | | | | | |
| Total Cash & Cash Equivalents | $31.1 | $42.3 | $75.5 | $46.9 | $39.6 | $38.3 | $37.4 | $38.9 | $40.1 |
| Minimum Lease Payments Receivable | 502.4 | 579.1 | 620.6 | 595.9 | 702.8 | 825.7 | 936.2 | 1,025.6 | 1,097.5 |
| Unearned Income | (69.3) | (86.6) | (93.2) | (85.1) | (98.1) | (107.8) | (113.3) | (118.6) | (129.9) |
| Residual Values | 15.2 | 16.1 | 15.4 | 15.0 | 19.4 | 22.8 | 25.8 | 28.3 | 30.3 |
| Initial Direct Costs | 19.3 | 24.9 | 25.9 | 24.0 | 27.1 | 31.0 | 34.2 | 36.9 | 40.2 |
| Allowance for Losses | (10.7) | (10.4) | (10.8) | (12.9) | (7.9) | (9.7) | (11.2) | (12.4) | (13.3) |
| Net Investment in Direct Financing Leases[1] | $456.8 | $523.1 | $558.0 | $536.9 | $643.3 | $761.9 | $871.7 | $959.7 | $1,024.7 |
| Fixed Assets | 2.2 | 1.5 | 1.4 | 1.0 | 0.8 | 0.7 | 0.8 | 0.8 | 0.8 |
| Other Assets | 14.5 | 14.8 | 20.3 | 20.6 | 26.1 | 30.9 | 35.3 | 38.9 | 41.5 |
| Total Assets | $504.7 | $581.7 | $655.1 | $605.4 | $709.8 | $831.8 | $945.2 | $1,038.4 | $1,107.2 |
| | | | | | | | | | |
| **Liabilities** | | | | | | | | | |
| Accounts Payable | $22.1 | $25.5 | $24.5 | $20.4 | $22.9 | $26.3 | $29.6 | $32.3 | $34.3 |
| Accrued Liabilities | 4.2 | 5.7 | 6.5 | 4.0 | 6.5 | 7.7 | 8.8 | 9.7 | 10.4 |
| Income Tax Payable | 13.8 | 15.7 | 16.9 | 16.9 | 16.9 | 16.9 | 16.9 | 16.9 | 16.9 |
| Current Liabilities | $40.1 | $46.9 | $48.0 | $41.3 | $46.3 | $51.0 | $55.3 | $58.9 | $61.6 |
| Equipment Loan | 0.0 | 0.0 | 0.8 | 0.6 | 0.4 | 0.3 | 0.1 | 0.0 | 0.0 |
| Note Payable - PPP | 0.0 | 0.0 | 0.0 | 3.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Warehouse Facility | 28.1 | 32.4 | 1.9 | 0.1 | 26.3 | 26.3 | 26.3 | 26.3 | 26.3 |
| Securitized Debt | 195.5 | 288.1 | 521.3 | 476.2 | 246.3 | 122.3 | 23.0 | 0.0 | 0.0 |
| Other Non-Recourse Debt | 176.2 | 145.0 | 0.0 | 0.0 | 278.9 | 501.2 | 681.5 | 757.9 | 782.1 |
| Senior Debt | 399.7 | 465.6 | 523.2 | 476.3 | 551.5 | 649.9 | 730.8 | 784.3 | 808.4 |
| Subordinated Debt | 30.0 | 30.0 | 40.0 | 40.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Total Liabilities | $469.8 | $542.4 | $611.9 | $561.1 | $648.3 | $751.1 | $836.2 | $893.2 | $920.0 |
| | | | | | | | | | |
| **Shareholders' Equity** | | | | | | | | | |
| Common Stock (8,970,000 shares outstanding) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Additional Paid In Capital | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 |
| Retained Earnings | 34.7 | 39.1 | 43.0 | 44.1 | 61.4 | 80.5 | 108.8 | 145.0 | 187.0 |
| Total Shareholders' Equity | $34.9 | $39.2 | $43.2 | $44.3 | $61.5 | $80.7 | $109.0 | $145.2 | $187.1 |
| Liabilities and Shareholders' Equity | $504.7 | $581.7 | $655.1 | $605.4 | $709.8 | $831.8 | $945.2 | $1,038.4 | $1,107.2 |
| | | | | | | | | | |
| Gross Yield[2] | 10.9% | 12.2% | 11.3% | 10.5% | 10.7% | 11.0% | 11.2% | 11.2% | 11.2% |
| | | | | | | | | | |
| CHECK | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| CHECK | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |

CONFIDENTIAL

AMERIS000259

15.22

JX-324-023