ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
MATTHEW T. SESSIONS (BAR NO. 307098)
STACEY A. VILLAGOMEZ (BAR NO. 317081)
MADISON E. LARSEN (BAR NO. 364953)
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313
Fax: (949) 553-8354
E-Mail: msessions@allenmatkins.com
svillagomez@allenmatkins.com
mlarsen@allenmatkins.com

Attorneys for Plaintiff
PATRICK BYRNE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK BYRNE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AMERIS BANK, a Georgia corporation,<br><br>Defendant. | Case No. 8:24-cv-01989-MWC-JDE<br><br>ASSIGNED FOR ALL PURPOSES TO: Judge Michelle Williams Court<br><br>**PLAINTIFF PATRICK BYRNE'S OPPOSITION TO DEFENDANT AMERIS BANK'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FRCP 50(b)**<br><br>Date: October 23, 2026<br>Time: 1:30 p.m.<br>Ctrm: 6A<br><br>Trial Date: June 1, 2026 |

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 6

II. LEGAL STANDARD ........ 6

III. THE EVIDENCE SUPPORTS BYRNE'S RIGHT TO 62.54% OF THE LTIP POOL FOR 2023 AND 2024 ........ 7

A. Ameris's Integration and Parol Evidence Challenges Are Unpreserved, and Ameris Has Not Established Plain Error ........ 7

B. Ameris's Arguments Would Fail Even If Preserved ........ 10

1. Integration Clauses In Two *Non*-LTIP Agreements Do Not Bar Byrne's Evidence of the Agreed LTIP Allocation ........ 10

2. Byrne's Award Agreement and Extrinsic Evidence Support the 62.54% Allocation ........ 12

IV. AMERIS'S AUTHORITY TO ADMINISTER THE LTIP DOES NOT DEFEAT THE VERDICT ........ 14

A. Ameris's Administrative Role Did Not Permit It to Disregard the Award Agreement ........ 15

B. Evidence Showed That Ameris Never Invoked The Discretion It Now Claims ........ 16

C. The Evidence Supports Byrne's Right to a 2024 Award ........ 18

D. The Record Regarding the Disputed LTIP Cost Categories Supports the Jury's Verdict ........ 20

1. Ameris's Rule 50(a) Motion Did Not Preserve its Cost Category-Specific Arguments ........ 21

2. Staff Costs Presented a Factual Dispute for the Jury ........ 21

3. The Record Supports the Jury's Treatment of Interim Rent ........ 23

4. Sufficient Evidence Supports the Jury's Treatment of Repossessions ........ 25

5. Ameris's Own Treatment of Stipulated Judgments Supports the Verdict ........ 26

V. THE RECORD SUPPORTS THE JURY'S AWARD OF FUTURE ECONOMIC DAMAGES ........ 27

VI. CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bath v. State of California*,
105 Cal. App. 5th 1184 (2024) .......... 11

*Candari v. Los Angeles Unified School Dist.*,
193 Cal. App. 4th 402 (2011) .......... 29

*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*,
2 Cal. 4th 342 (1992) .......... 17

*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) .......... 7

*Central Building, LLC v. Cooper*,
127 Cal. App. 4th 1053 (2005) .......... 11

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,
43 Cal. 4th 375 (2008) .......... 13, 22, 23, 24

*Crestview Cemetery Ass'n v. Dieden*,
54 Cal. 2d 744 (1960) .......... 13, 26, 27

*Deluca v. Massachusetts Mut. Life Ins. Co.*,
2005 WL 1562033 (E.D. Cal. June 28, 2005) .......... 11

*E.E.O.C. v. Go Daddy Software, Inc.*,
581 F.3d 951 (9th Cir. 2009) .......... passim

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*,
631 F.3d 1058 (9th Cir. 2011) .......... 12

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) .......... 7, 9

*Jerra v. United States*,
2018 WL 1605563 (C.D. Cal. Mar. 29, 2018) .......... 9

*Krechman v. Cnty. of Riverside*,
723 F.3d 1104 (9th Cir. 2013) .......... 7

*Line One Lab'ys Inc. USA v. Wingpow Int'l Ltd.*,
2025 WL 3190864 (C.D. Cal. Oct. 29, 2025), *appeal dismissed*,
2026 WL 1493627 (9th Cir. Mar. 31, 2026) .......... 8, 9

*Locke v. Warner Bros., Inc.*,
57 Cal. App. 4th 354 (1997) .......... 18

**Page(s)**

*Masterson v. Sine*,
68 Cal. 2d 222 (1968) .......... 14

*McCollum v. XCare.net, Inc.*,
212 F. Supp. 2d 1142 (N.D. Cal. 2002) .......... 17, 18

*Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*,
69 Cal. 2d 33 (1968) .......... 11, 12

*Parker v. Twentieth Century-Fox Film Corp.*,
3 Cal. 3d 176 (1970) .......... 29

*Raymond v. Wilcox Mem'l Hosp.*,
403 F. Supp. 3d 868 (D. Haw. 2019) .......... 8

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) .......... passim

*Unique Functional Prods., Inc. v. JCA Corp.*,
2011 WL 13355974 (S.D. Cal. Jan. 7, 2011) .......... 12

*United States v. Olivas*,
150 F.4th 1107 (9th Cir. 2025) .......... 8

*Villacorta v. Cemex Cement, Inc.*,
221 Cal. App. 4th 1425 (2013) .......... 29

*Walker Prods., Inc. v. Cong*,
2026 WL 1803959 (C.D. Cal. May 20, 2026) .......... 8, 9

*Wallace v. City of San Diego*,
479 F.3d 616 (9th Cir. 2007) .......... 7, 15, 21

*Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*,
664 F. Supp. 3d 1142 (S.D. Cal. 2023) .......... 8

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) .......... 28

**Statutes**

Civ. Proc. Code § 1856(b) .......... 11

Civ. Proc. Code § 1856(g) .......... 12

**Rules**

Fed. R. Civ. P. 50(a) .......... 7, 21

Fed. R. Evid. 103(a) .......... 8

## I. INTRODUCTION

A Rule 50(b) motion must show that the verdict is not supported by sufficient evidence, viewing the record in the light most favorable to the verdict and drawing all reasonable inferences in its favor. Defendant Ameris Bank's motion does not meet that standard. Its arguments ignore evidence supporting the jury's verdict and fail to honor the jury's implicit credibility determinations.

For example, Ameris treats the "[NUMBER]%" placeholder in Plaintiff Patrick Byrne's Award Agreement as proving that he was not entitled to any award at all—ignoring the testimony and the parties' course of performance supporting that he was entitled to 62.54% of the Long Term Cash Incentive Plan ("LTIP") award pool he negotiated as a condition of Ameris acquiring his company, Balboa Capital. Ameris invokes its discretion to administer the LTIP Plan as allowing it to not pay Byrne any LTIP award and to calculate the LTIP pool however it deemed fit, while disregarding the substantive limits Byrne's Award Agreement placed on that discretion. Ameris also presents its preferred accounting methods as mandatory despite evidence that those methods departed from the express terms of the Award Agreement itself, including the parties' agreed treatment of expenses, and Balboa's historical practices. And Ameris defends withholding Byrne's 2024 award even though the contract's written terms preserved his participation following termination without cause, and ignoring that, when pressed on the stand, former Ameris Chief Strategy Officer James LaHaise could not explain why Byrne received no award for 2024 despite being eligible.

These were not gaps in evidence. They were factual disputes the jury resolved after hearing the evidence—a determination well within the province of the jury. Ameris may disagree with the inferences the jury drew, but that is not grounds for judgment as a matter of law. The motion should be denied.

## II. LEGAL STANDARD

The Court may grant judgment as a matter of law "only if there is no legally

sufficient basis for a reasonable jury to find for that party on that issue." *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1109 (9th Cir. 2013) (internal quotation omitted). The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) ("A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.").

"A renewed motion for judgment as a matter of law must be preceded by a [Rule 50(a)] motion made at trial that sets forth the specific grounds raised in the renewed motion." *Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007). The Rule 50(a) motion "must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a). A renewed Rule 50(b) motion is limited to the grounds asserted in the pre-verdict Rule 50(a) motion and their "logical extension[s]." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961–62 (9th Cir. 2009). This requirement is necessary to bring the alleged deficiencies to the attention of the opposing party while there remains an "opportunity to introduce further evidence." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003).

Unpreserved arguments are reviewed under the "extremely deferential" plain error standard: They will fail if there is "*any*" evidence to support the verdict and can only succeed if upholding the verdict "would result in a manifest miscarriage of justice." *Go Daddy*, 581 F.3d at 961–62.

## III. THE EVIDENCE SUPPORTS BYRNE'S RIGHT TO 62.54% OF THE LTIP POOL FOR 2023 AND 2024

### A. Ameris's Integration and Parol Evidence Challenges Are Unpreserved, and Ameris Has Not Established Plain Error.

Ameris argues that the LTIP Plan and Byrne's Award Agreement are fully integrated contracts and that California's parol evidence rule bars the consideration

of extrinsic evidence. Mot. at 4–7. Ameris failed to preserve this argument in a Rule 50(a) motion. Its Rule 50(a) motion argued only that the evidence did not provide that the parties agreed on a fixed LTIP allocation; it did not invoke any integration clause or argue that the parol evidence rule categorically barred proof of the agreed allocation. *See* TT6 36:10–41:12.[1] Ameris also failed to object or move to strike parol evidence as it was introduced at trial; nor did Ameris request a limiting instruction as to the purpose for which the jury could consider such evidence. *See United States v. Olivas*, 150 F.4th 1107, 1112 (9th Cir. 2025) (applying plain error review to unpreserved evidentiary challenge, stating that an evidentiary objection is preserved only if the party timely objects and states the specific ground for the objection, unless it was apparent from the context (citing Fed. R. Evid. 103(a))).

Ameris's argument that its present motion is merely a "logical extension" of what it argued in its oral Rule 50(a) motion is wrong. *See Go Daddy*, 581 F.3d at 962. Courts interpret the "logical extension" exception narrowly. *Raymond v. Wilcox Mem'l Hosp.*, 403 F. Supp. 3d 868, 877 (D. Haw. 2019). An argument is a "logical extension of another if the arguments are highly interrelated," such as if one argument is dependent upon the other. *Id.* Where two asserted arguments involve different analyses or elements, one argument is not merely a "logical extension" of another. *Line One Lab'ys Inc. USA v. Wingpow Int'l Ltd.*, 2025 WL 3190864, at *3 (C.D. Cal. Oct. 29, 2025), *appeal dismissed*, 2026 WL 1493627 (9th Cir. Mar. 31, 2026). A generalized pre-verdict argument therefore does not necessarily preserve every distinct challenge advanced after trial. *See Walker Prods., Inc. v. Cong*, 2026 WL 1803959, at *3–4 (C.D. Cal. May 20, 2026) (applying plain-error review where pre-verdict challenge to one alleged trade secret document did not preserve challenge as to others); *see also Workplace Techs. Rsch., Inc. v. Project Mgmt. Inst., Inc.*, 664 F. Supp. 3d 1142, 1164 (S.D. Cal. 2023) (noting that interpreting Rule 50(a) motions to

[1] Final Trial Transcripts are cited as "TT" with the number of the trial day. Full copies of all cited trial transcripts are attached to the Declaration of Matthew Sessions as Exhibits A–I.

preserve issues raised only in broad terms "would largely eviscerate the requirement for a party to set forth *specific grounds* in its Rule 50(a) Motion").

Ameris's integration and parol evidence argument is not a "logical extension" of Ameris's Rule 50(a) argument that the parties did not agree on any fixed percentage for Byrne's LTIP Award. Analyzing whether the evidence proves an agreed allocation is a separate analysis from whether the parties' writings legally preclude consideration of that evidence. *See Line One Lab'ys Inc. USA*, 2025 WL 3190864, at *3 (holding issue not preserved because party's Rule 50(b) argument involved different analysis than the argument raised in Rule 50(a) motion). By failing to identify the latter ground before submission to the jury, Ameris deprived Byrne of notice and an opportunity to address the asserted deficiency at trial. *Freund*, 347 F.3d at 761; *Jerra v. United States*, 2018 WL 1605563, at *6 (C.D. Cal. Mar. 29, 2018) (explaining the notice and opportunity to cure afforded by a pre-verdict motion). Ameris cannot avoid that requirement by characterizing its new theory as a logical extension of its general challenge to the allocation evidence. *See Walker Prods., Inc.*, 2026 WL 1803959, at *3–4.

And Ameris failed to object to the introduction of parol evidence at trial. *E.g.*, TT1 187:14–188:10 (Byrne discussing the purpose and negotiation of LTIP); TT2 at 22:14–24:17 (Byrne discussing negotiation of LTIP); TT2 35:15–37:20 (Byrne discussing fixed percentages of LTIP pool for his LTIP award and that of two other executives). Ameris even solicited testimony from its own witnesses regarding the parties' negotiation of the LTIP agreements. *See, e.g.*, TT3 124:12–131:2 (Ameris CFO Nicole Stokes discussing her understanding of Ameris's negotiation of LTIP terms); TT4 13:4–14:20, 16:8–27:3 (LaHaise discussing negotiation of Byrne's compensation and LTIP terms); *see also* TT6 31:9–22 (the Court noting, in granting Byrne's motion to add breach of contract cause of action, that there had been "substantial testimony" about the negotiation of the LTIP and Employment Agreement and their terms).

For these reasons, review of the unpreserved sufficiency challenge is therefore limited to whether "*any* evidence" supports the verdict. *Go Daddy*, 581 F.3d at 961–62. Here, Byrne presented testimony concerning the parties' agreement to a fixed LTIP percentage, evidence of his 2022 payment consistent with that percentage, and contemporaneous communications explaining the allocation. TT2 35:15–37:20; Sessions Decl. Ex. 372; *see* TT3 24:3–25:23, 47:23–48:11 (former Ameris EVP and CRO Rob Rasmussen discussing his percentage of the LTIP pool based upon the percentage of Balboa stock he owned before Balboa was acquired by Ameris). That evidence defeats Ameris's challenge under plain-error review. But as discussed, the challenge would also fail under the ordinary Rule 50 sufficiency of the evidence standard as well.

**B. Ameris's Arguments Would Fail Even If Preserved.**

**1. Integration Clauses In Two *Non*-LTIP Agreements Do Not Bar Byrne's Evidence of the Agreed LTIP Allocation.**

Byrne's Award Agreement contains a placeholder for his LTIP percentage allocation. Fode Decl. Ex. 546 at 2.[2] Neither that Agreement nor the LTIP Plan contain an integration clause. Fode Decl. Exs. 545, 546; *see* Mot. at 7. The reasonable conclusion, then, is that the Agreement and LTIP Plan were not fully integrated, and that extrinsic evidence is admissible to show what percentage the parties agreed on for Byrne's share of the LTIP pool.

Ameris argues extrinsic evidence is inadmissible based on integration clauses in two *other* documents—i.e., the Stock Purchase Agreement and Byrne's Employment Agreement. Mot. at 5. According to Ameris, those integration clauses cover the LTIP and Award Agreement because all the documents were part of the same transaction and because Byrne testified that they were negotiated and agreed-upon as part of the sale and Employment Agreement. *Id.* But that fails to show why

[2] "Fode Decl." refers to the Fode Declaration in support of Ameris's post-trial motions.

integration clauses in those documents govern the LTIP documents.

The fact that two of the agreements contain an integration clause, while two other contemporaneous agreements don't, indicates that the parties knew how to include integration clauses when that was their intention—and that the omission from the LTIP documents was deliberate. *See, e.g.*, *Bath v. State of California*, 105 Cal. App. 5th 1184, 1207, n.15 (2024) (use of limiting phrase in one part of contract "demonstrate[d] that the parties knew how to limit provisions to particular sections when that was their intention"); *Central Building, LLC v. Cooper*, 127 Cal. App. 4th 1053, 1061 (2005) ("The lease termination agreement expressly terminated the prior personal guaranty agreements. This action demonstrates that the parties knew how to terminate a personal guaranty when that was their intent.").

That conclusion is especially reasonable given that the Award Agreement had a placeholder for a percentage, signaling that a percentage was or would be agreed upon elsewhere. Parol evidence thus was admissible to supply consistent additional terms. *See* Cal. Civ. Proc. Code § 1856(b) (final writing may be supplemented by consistent additional terms unless the parties intended it to be a complete and exclusive statement of their agreement); *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 37 (1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible."); *Deluca v. Massachusetts Mut. Life Ins. Co.*, 2005 WL 1562033, at *5 (E.D. Cal. June 28, 2005) (finding contract was not integrated where it lacked both an integration clause and "the requisite completeness of an integrated contract").

Byrne's evidence identified the 62.54 % the parties intended. TT2 35:15–37:20 (Byrne discussing Sessions Decl. Ex. 372); TT3 24:3–25:23, 47:23–48:11 (Rasmussen). And his evidence was consistent with the Award Agreement provision

contemplating a specified percentage of the incentive pool. It was therefore admissible.[3]

### 2. Byrne's Award Agreement and Extrinsic Evidence Support the 62.54% Allocation.

The Award Agreement contemplates a specified percentage of the incentive pool but leaves that percentage unfilled. Under California law, extrinsic evidence is admissible to explain contractual language when it is relevant to a meaning to which that language is reasonably susceptible. *Pac. Gas & Elec. Co.*, 69 Cal. 2d at 37. The inquiry does not end with the face of the document: extrinsic evidence may reveal a latent ambiguity even in language that initially appears unambiguous. *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) (discussing the role of extrinsic evidence in revealing latent ambiguity).

Here, the Award Agreement describes Byrne's allocation as "[NUMBER]%." Fode Decl. Ex. 546 at 2. Byrne's interpretation gives that provision a concrete meaning: the percentage was the fixed allocation the parties had agreed upon. His evidence did not displace a different percentage stated in the writing; it explained the percentage contemplated by the provision. Ameris's position—that the unfilled provision reflected the absence of any fixed allocation—was a competing interpretation, not a self-executing basis for excluding Byrne's proof. Byrne testified that his allocation was fixed at 62.54% and that the principal participants had agreed-upon percentages. TT2 35:15–37:20; *see* Sessions Decl. Ex. 372. Rasmussen's testimony concerning his own fixed allocation provided corroboration of that agreement. TT3 24:3–25:23, 47:23–48:11.

---

[3] Moreover, even complete integration does not categorically exclude evidence offered to interpret contractual language rather than add to or contradict it. Cal. Civ. Proc. Code § 1856(g); *Unique Functional Prods., Inc. v. JCA Corp.*, 2011 WL 13355974, at *5 (S.D. Cal. Jan. 7, 2011) (permitting extrinsic evidence offered to interpret an ambiguous term regardless of complete integration). Thus, even if the Award Agreement were fully integrated, Ameris still could not obtain JMOL merely by invoking integration clauses; it would have to establish that the operative language in the contract forecloses Byrne's interpretation. Ameris fails to do so. *See* Section III.B.2, *infra*.

The parties' pre-dispute conduct also supports Byrne's position. Contracting parties' conduct after executing the contract but before a dispute arises is "one of the most reliable means" of identifying their mutual understanding of their agreement, and is admissible to resolve ambiguity. *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 752–54 (1960); *see also City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 393–94 (2008) (recognizing the interpretive significance of the parties' pre-dispute performance). Here, Byrne presented contemporaneous communications concerning the 2022 allocation and evidence of the payment he actually received, which was consistent with Byrne receiving 62.54% of the LTIP pool. TT2 35:15–37:20; Sessions Decl. Ex. 372; TT4 31:7–9 (LaHaise). That evidence gave the jury additional support for Byrne's claimed percentage.

Weighing the credibility of competing extrinsic evidence is a role reserved for the jury. *City of Hope*, 43 Cal. 4th at 395 (holding that "the jury may interpret an agreement when construction turns on the credibility of extrinsic evidence"). At summary judgment, the Court confirmed that a reasonable jury could find that "the LTIP guarantees Plaintiff's LTIP Cash Award whenever" performance thresholds were met. Dkt. 122 at 14; *see id.* at 5 n.4. That is exactly what happened here. Ameris had every opportunity to argue to the jury that the 2022 allocation represented a discretionary recommendation rather than performance of a fixed agreement. But the jury was not required to accept that explanation, and Rule 50 does not permit resolving competing evidence in Ameris's favor to override the jury's decision.

Ameris's reliance on *Masterson v. Sine*, 68 Cal. 2d 222 (1968) is misplaced. *See* Mot. at 8 (arguing that "'[i]f the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court,' a claim to have a related side agreement with respect to those terms violates the parol evidence rule" (quoting *Masterson*, 68 Cal. 2d at 228)). *Masterson* considered and *deemed admissible* extrinsic evidence of an oral agreement that a land purchase option was non-assignable, even though the written deed did not say that. *Id*. at 225,

228. Here, the LTIP expressly includes a placeholder for Plaintiff's share of the bonus pool, which the parties agreed on and was reflected in their written communications. That placeholder shows a deliberate choice by the parties to reach their agreement on Byrne's allocation separately—i.e., that it would not "certainly" have been included in the Award Agreement.

Furthermore, Ameris's reading of *Masterson* fails for another reason. *Masterson* also confirmed that "even in situations where the court concludes that it would not have been natural for the parties to make the alleged collateral oral agreement, parol evidence of such an agreement should nevertheless be permitted if the court is convinced that the unnatural actually happened in the case being adjudicated." *Id*. at 228, n.1. On that basis, *Masterson* noted: "If the court believes that the parties intended a collateral agreement to be effective, there is no reason to keep the evidence from the jury." *Id*. *Masterson* thus does not require evidence of Byrne's allocation to be excluded.

Therefore, nothing in Ameris's motion regarding Byrne's LTIP allocation warrants disturbing the jury's award.

## IV. AMERIS'S AUTHORITY TO ADMINISTER THE LTIP DOES NOT DEFEAT THE VERDICT.

Ameris next argues that the LTIP Plan and Byrne's Award Agreement give Ameris the sole authority to interpret those contracts and to resolve any disagreements. Mot. at 9. But Ameris's authority to interpret and administer the general LTIP ***Plan*** does not resolve whether its conduct complied with Byrne's ***Award Agreement*** (two separate documents) and its specific "Key Assumptions" for calculating whether Byrne's division met its Earnings Before Taxes threshold, thus triggering an LTIP award pool. *See* Fode Decl. Ex. 546 at 1–2; Fode Decl. Ex. 545.

Even before trial, the Court recognized that Ameris's compliance with the LTIP was the subject of genuine dispute and concluded that a reasonable jury could find that LaHaise's determinations were not final and binding and "that the LTIP

guarantees Plaintiff's LTIP Cash Award whenever [earnings before tax] thresholds were met." Dkt. 122 at 14. At trial, Byrne presented evidence that Ameris departed from the parties' agreed calculation requirements and course of performance and the jury credited that evidence. *E.g.*, TT5 82:21–99:11, 105:11–118:13; TT2 45:10–51:17, 83:21–94:2.

Ameris also did not preserve this argument in its oral Rule 50(a) motion. In its Rule 50(a) motion, Ameris argued that LTIP payments were discretionary. TT6 37:8–39:6. It did not argue, as it does now, that its authority to interpret the agreements made its decisions *final and binding*. Those are two different arguments: having discretion to administer the LTIP does not necessarily mean that Ameris's decisions are beyond challenge. Its general reference to discretion therefore did not identify these "specific grounds" for JMOL necessary to give Byrne notice of the finality argument Ameris now advances. *Wallace*, 479 F.3d at 631.

### A. Ameris's Administrative Role Did Not Permit It to Disregard the Award Agreement.

Ameris first relies on the LTIP Plan's administrative and finality provisions to argue that its interpretation of the LTIP controls as a matter of law. Mot. at 9–11. But those provisions must be read together with the specific requirements of Byrne's Award Agreement for calculating whether the Balboa division met its threshold for LTIP awards. The Award Agreement states that, "[p]erformance . . . *will be* measured using the annual 'EBT' of the Balboa Capital division of the Company ('Balboa'), which for this purpose *is defined as* actual annual earnings before tax as identified . . . in the Pioneer 1Q21 Operating Model . . . ." Fode Decl. Ex. 546 at 1 (emphasis added). The Award Agreement goes on to state that the Pioneer Model and the Key Assumptions "must" be used "[f]or purposes of the calculation of EBT under this Agreement and the Plan." *Id.* Byrne's Award Agreement attached the Pioneer Model, which detailed Balboa's past performance and practices and its projections. *See* Fode Decl. Ex. 546, Exhibit A; TT1 197:19–198:19; TT2 26:14–28:12. The Award

Agreement also included six "Key Assumptions." Fode Decl. Ex. 546 at 1–2. The "Key Assumptions" use mandatory language, dictating how each assumption "will be" or "will not be" calculated. *Id.*

Authority to administer the general LTIP Plan applicable to Balboa employees in general (Fode Decl. Ex. 545) did not permit Ameris to disregard the requirements in Byrne's Award Agreement (Fode Decl. Ex. 546). The same limitation applies to Ameris's reliance on the Plan's finality provision. Section 3.3 of the Plan purports to make determinations made pursuant to the Plan final and binding; it does not establish that Ameris could ignore the detailed metrics and assumptions laid out in Byrne's Award Agreement. *See* Fode Decl. Ex. 545 § 3.3. Ameris therefore cannot resolve this dispute simply by invoking its interpretive authority and ignoring the evidence that its accounting changes and nonpayment departed from the parties' agreement as reflected in Byrne's Award Agreement.

**B. Evidence Showed That Ameris Never Invoked The Discretion It Now Claims.**

The trial evidence also permitted the jury to find that Ameris never actually made the discretionary determinations it now relies on. The record showed that Ameris defended its non-payment or underpayment of bonuses on the grounds that Balboa failed to hit its performance targets, not because Ameris chose to exercise discretion.

In 2022, Byrne—not Ameris—determined the allocation of LTIP awards among Balboa employees and submitted it to Ameris for approval. TT2 36:1–37:15 (Byrne); TT3 132:18–133:15 (Stokes); TT4 30:25–31:18 (LaHaise); Fode Decl. Ex. 371. Ameris approved Byrne's recommendations without any changes—never suggesting that it was exercising discretion to underpay Byrne's bonus for the 2022 performance period. *See* TT4 29:25–31:6. For 2023, Ameris presented no evidence that the Committee or a delegee invoked discretion to deny Byrne payment. It identified no contemporaneous decision, explained no decision-making process, and

produced no documentation connecting the nonpayment to an exercise of its asserted discretionary authority. *See* TT3 218:17–219:25. Instead, Ameris claimed it was calculating the bonus target as specified by the LTIP's particular provisions for that calculation—not based on Ameris's alleged broad discretion. *See, e.g.*, TT3 69:5–72:23 (Stokes). For the 2024 LTIP performance period, LaHaise acknowledged that Byrne received nothing despite being eligible for an LTIP award and testified that he did not know why. TT4 90:16–91:8.

Identifying LaHaise as the Committee's delegee doesn't overcome the absence of evidence that Ameris invoked its alleged discretion. *See* Mot. at 11. Even if LaHaise possessed the asserted authority, the question remains whether the challenged decisions fell within it. Again, LaHaise was unable to answer for Ameris's denial of Byrne's 2024 LTIP bonus. TT4 89:23–91:8. If he had made the decision to deny Byrne bonuses based on Ameris's discretion, he would have said so.

Moreover, even assuming Ameris possessed the discretion it alleges, California law required Ameris to exercise that discretion in good faith. *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.*, 2 Cal. 4th 342, 371–73 (1992) (recognizing implied covenant of good faith and fair dealing in the exercise of contractual discretion); *see also McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1152 (N.D. Cal. 2002) (rejecting employer's argument that contract language allowed it to reassign accounts tied to employees' commissions at will). Good faith required Ameris to exercise its authority consistently with the compensation rights the bargain created. *See Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 363–64 (1997) (distinguishing a permissible discretionary decision from a refusal to exercise contractual discretion honestly and in good faith). To the extent Ameris had the discretion it claims, whether Ameris "violated the implied covenant and breached the contract" by exercising its discretion "is a question for the trier of fact." *Id.* at 367.

Byrne presented evidence that Ameris's accounting changes and withholding

of compensation defeated the rights he bargained for when Ameris acquired Balboa—namely, the right to LTIP awards based on agreed-upon criteria. *E.g.*, TT5 82:21–99:11, 105:11–118:13; TT2 45:10–51:17, 83:21–94:2. Ameris was entitled to offer a different account, but its assertion of discretion did not require the jury to accept it. Because the evidence permitted a reasonable jury to find that Ameris failed to comply with Byrne's Award Agreement, its administrative authority provides no basis for judgment as a matter of law.

### C. The Evidence Supports Byrne's Right to a 2024 Award.

Ameris next argues that Byrne did not have a right to a 2024 LTIP award. At trial, however, LaHaise, Ameris's key witness who had the authority to administer the LTIP on behalf of Ameris, testified that he did not know why Byrne received no LTIP award for 2024. TT4 28:10–20, 90:16–91:8. He confirmed that Byrne was eligible and that Ameris did pay out LTIP awards for 2024 but that, nevertheless, Byrne was not paid one. *Id.* at 90:16–91:8.

In contrast to LaHaise's lack of a justification for Ameris failing to pay Byrne a 2024 LTIP award, Byrne presented ample evidence of his entitlement to one. His Award Agreement provides that, if Byrne is terminated without cause, his LTIP awards for outstanding performance periods will be determined and paid under the Award Agreement and LTIP Plan, including that Byrne "*shall* receive such Award for each Performance Period that occurs during the year of the termination Without Cause . . . and each year thereafter." Fode Decl. Ex. 546 § 3 (emphasis added).[4]

It is undisputed that Byrne's termination was without cause. At trial, LaHaise confirmed that Byrne was terminated without cause. TT4 88:14–21, 89:23–25. Ameris's termination letter designated the termination as without cause and,

---

[4] Section 3 of the Award Agreement states: "In the event of a termination Without Cause . . . , the Award for all outstanding Performance Periods *shall be determined and paid out* in accordance with Section 4 below and the Plan, and the Participant *shall receive* such Award for the each Performance Period that occurs during the year of the termination Without Cause . . . and each year thereafter, if any." Fode Decl. Ex. 546 § 3 (emphasis added).

accordingly, confirmed his continued eligibility for a 2024 LTIP award. Fode Decl. Ex. 324 § 3.3; Fode Decl. Ex. 496 at 6 ("[N]otwithstanding the termination of your employment by the Company without Cause, you will remain eligible to participate in the Balboa Capital Long-Term Cash Incentive Plan, subject to its terms and conditions, for the 2024 calendar year performance period.").

Byrne's Award Agreement, considered together with Ameris's termination letter and LaHaise's testimony characterizing Byrne's termination as "without cause," preserved Byrne's right to a 2024 award if the Balboa division met its EBT threshold as detailed in the Award Agreement. The evidence supported a finding that the Balboa division in fact met that threshold, triggering the creation of an LTIP award pool for 2024. Phil Silva, who assumed Byrne's responsibilities as CEO after his termination, testified that Ameris accrued approximately $3.6 million for the 2024 LTIP pool and that he received approximately $1.25 million as his 2024 LTIP award. TT4 129:9–19, 130:13–24. Byrne's evidence of his entitlement to 62.54% of the LTIP pool and his expert Deborah Dickson's calculation supplied further support for the amount payable to Byrne. TT2 35:15–37:20 (Byrne discussing Sessions Decl. Ex. 372); TT3 24:3–25:23, 35:11–36:12, 47:23–48:11 (Rasmussen); TT5 114:11–116:15 (Dickson discussing Fode Decl. Ex. 180). The jury therefore had evidence of Byrne's continued entitlement to LTIP awards post-termination, that Ameris funded an LTIP pool for 2024, and that Byrne was entitled to 62.54% of that pool.

Ameris's assertion that Byrne had no right to an award until it was paid does not resolve this evidence. Mot. at 6, 11-12. That reading ignores the provision expressly preserving determination and payment of an award following Byrne's termination without cause. Fode Decl. Ex. 546 § 3. As discussed in Section IV.A–B, Ameris's administrative authority remained subject to the Award Agreement's substantive requirements, and although Ameris now characterizes its decision not to award Byrne a 2024 LTIP award as an exercise of discretion, LaHaise acknowledged that Byrne received no payment, despite being eligible, and testified that he did not

know why. Mot. at 12; TT4 90:16-91:8.

### D. The Record Regarding the Disputed LTIP Cost Categories Supports the Jury's Verdict.

Ameris challenges four components of Dickson's LTIP calculation: staff costs, interim rent, repossessions, and stipulated judgments. Mot. at 12–18. Each challenge depends on accepting Ameris's interpretation of the Award Agreement and its accounting evidence over Byrne's. But the jury heard competing testimony about the terms of the parties' agreement, the nature of the expenses, Balboa's historical practices, and Ameris's changes to those practices. Even Ameris's expert admitted that Ameris's LTIP calculations did not follow the language of at least one of the Award Agreement's Key Assumptions. TT5 214:5–217:16. That evidence permitted the jury to find that Ameris's calculations did not comply with the parties' agreement.

Byrne and Dickson explained the disputed adjustments and why Ameris's calculations departed from Balboa's past practices and the Award Agreement. TT2 83:21–84:21, 86:22–25, 87:24–91:16, 100:4–9 (Byrne); TT5 86:16–87:22, 90:11–94:22, 106:15–109:7, 111:14–113:23, 118:15–119:5 (Dickson); Exs. 178, 179, 180 (Dickson calculation schedules, admitted). Ameris offered contrary testimony, but the jury's verdict reflects that it adopted Byrne's position. Ameris has not identified any basis for overturning that verdict on a Rule 50(b) motion, where the Court must accept Byrne's evidence as true and draw reasonable inferences in his favor. *See Reeves*, 530 U.S. at 150–51.

#### 1. Ameris's Rule 50(a) Motion Did Not Preserve its Cost Category-Specific Arguments

As a threshold matter, Ameris did not identify the four category-specific challenges it now advances in its oral Rule 50(a) motion, which addressed only Ameris's general arguments regarding its alleged discretion over LTIP payments and the alleged absence of a fixed allocation or ascertainable award. TT6 37:8–39:6. Those general arguments did not identify the alleged evidentiary deficiencies Ameris

now asserts concerning each accounting category. *See Wallace*, 479 F.3d at 631 (stating that a Rule 50(a) motion must identify "the specific grounds" for JMOL to preserve arguments for post-trial Rule 50(b) motion); Fed. R. Civ. P. 50(a) (stating motion must specify "the law and facts that entitle the movant to the judgment"). Because Ameris did not raise these specific cost category arguments in its Rule 50(a) motion, the Court's review is now limited to whether any evidence supports the jury's verdict. *See Go Daddy*, 581 F.3d at 961–62. But even if preserved, Ameris's challenges to the cost categories identified in its motion would fail under the ordinary Rule 50 sufficiency of the evidence standard.

**2. Staff Costs Presented a Factual Dispute for the Jury**

Ameris argues that the salaries of former Balboa employees working in accounting, credit, information services, and marketing necessarily remained direct costs under the Award Agreement's Key Assumption (a) because those employees continued to perform work benefiting Balboa. *See* Fode Decl. Ex. 546 at 1. Ameris seeks reductions of $735,850 for 2022 and $1,139,680 for each of 2023 and 2024. Mot. at 12–14; Fode Decl. Exs. 178–180. But evidence that those employees performed work benefiting Balboa did not compel the conclusion that their salaries remained direct operating costs under the Award Agreement.

Byrne's Award Agreement provides that Balboa will bear direct costs incurred in its operations while expressly prohibiting "allocation of indirect Company expenses to Balboa by the Company." Fode Decl. Ex. 546 at 1. It does not define those categories or specify how to classify employees whose reporting relationships and responsibilities changed after the acquisition. Applying that distinction required evidence about the employees' functions, whose operations they supported, and how the parties treated comparable expenses, as well as evidence of what Ameris and Byrne intended at the time of contracting. Where contractual meaning turns on conflicting extrinsic evidence concerning the parties' intent and practice, the issue is properly resolved by the jury. *See City of Hope*, 43 Cal. 4th at 395.

Byrne presented evidence supporting classification of the challenged expenses as indirect Company overhead that, accordingly, should not have been allocated to Balboa when calculating EBT. He testified that his objection concerned employees who began reporting to Ameris while their costs continued to be charged to Balboa, and he identified accounting, marketing, information technology, and other corporate support functions as indirect overhead. TT2 83:21–84:9, 63:9–64:4, 163:13–164:5. Dickson likewise distinguished operating-level costs from corporate overhead and explained that IT, accounting, and marketing functions moved under Ameris's control in Georgia after the acquisition. TT5 98:1–99:11, 106:15–108:16. Dickson's 2022 calculations and adjustments appeared in Exhibit 178, which was admitted and published to the jury. TT5 105:11–106:10; Fode Decl. Ex. 178. Byrne further presented evidence that his view of the meaning of indirect expenses was consistent with how Ameris had presented the LTIP to him pre-acquisition. Fode Decl. Ex. 397 at 3. Rasmussen corroborated that Ameris's changed expense allocations were not what the parties had agreed upon. TT3 35:11–36:12.

Ameris's contrary testimony from its CFO, Nicole Stokes, and its accounting expert, Maryellen Sebold, presented a competing account of those expenses, including Stokes' testimony that Ameris discussed indirect costs with Byrne preacquisition and that the parties agreed that certain departments would report to her but would continue to be charged to Balboa. *See* TT3 139:3–143:12; TT5 190:7–191:24. But the jury did not need to credit Ameris's story.

Byrne's evidence gave the jury a basis to find that the charges represented indirect Company expenses, even if the employees' work continued to benefit Balboa. The question was how the expenses were classified under the parties' agreement and what the parties had agreed to, not simply whether Balboa received some benefit from the work. *See* Mot. at 13. Ameris's requested reductions depend on resolving the classification dispute in its favor. Rule 50 does not permit the Court to make that choice where the conflicting extrinsic evidence supports the jury's

contrary resolution. *See Reeves*, 530 U.S. at 150–51; *City of Hope*, 43 Cal. 4th at 395.

**3. The Record Supports the Jury's Treatment of Interim Rent**

Ameris argues that its 2023 change to the treatment of interim rent—which resulted in Ameris recognizing less income for Balboa in the LTIP EBT calculation—was required by a change in GAAP accounting standards and authorized by the Award Agreement. It therefore seeks to reduce the 2023 and 2024 LTIP damages by $432,127 for each year. Mot. at 15–16; Fode Decl. Exs. 179–180. But whether Ameris's method complied with GAAP is irrelevant.

The Award Agreement provides that the LTIP's "general premise" is to materially follow Balboa's past practices. Fode Decl. Ex. 546 at 1–2 & n.3. It only specified that GAAP compliance is required for Key Assumption (a), which applies only to initial direct costs—a separate issue. *Id.* Dickson emphasized that Key Assumption (a) was "the only place in the entire agreement where it says GAAP methodology must be used." TT5 87:4–22. At minimum, those provisions permitted a reasonable interpretation that GAAP did *not* automatically govern every other accounting calculation (such as interim rent) and that Ameris remained obligated to materially follow Balboa's historical practices, regardless of GAAP, for all assumptions besides Key Assumption (a).

The jury heard evidence supporting that interpretation. Ameris's own witnesses confirmed that the LTIP need not necessarily comply with GAAP. TT3 69:10–13 (Stokes); TT5 220:3-221:1 (Sebold). Byrne testified that the Award Agreement referred to GAAP only in Key Assumption (a) regarding initial direct costs, that interim rent was not an initial direct cost, and that the Pioneer Model used a different, cash-basis methodology that Ameris could not alter simply because of a change in GAAP standards. TT2 83:21–87:3. Dickson explained Balboa's historical treatment of interim rent and testified that Ameris changed that treatment in 2023 based on new GAAP requirements, removing approximately $1.974 million in income from Balboa's EBT calculation. TT5 112:17–113:11. She adjusted the

calculation to reflect Balboa's historical practice. *Id.* The terms of the LTIP and Byrne's testimony supported a finding that Dickson's adjustment restored the methodology contemplated by the parties' agreement.

Ameris offered competing testimony including from Stokes, who testified that, while negotiating the LTIP with Byrne, Ameris discussed the upcoming change in GAAP standards and, in her view, came to an agreement with Byrne that the new GAAP standard would be followed in the LTIP calculation even though it was not consistent with Balboa's past practices. TT3 114:16–115:17, 157:2–16. Ameris also argued that the Pioneer Model required GAAP compliance. TT2 200:15–201:2; TT5 192:23–194:21. Ameris nevertheless admits in its discussion of interim rent that the phrase "materially follow past practice" is susceptible to more than one interpretation. Mot. at 16 ("Both are plausible interpretations"). Ameris also takes the position that the Pioneer Model (which was attached to the Award Agreement) "contains no discussion of the methodology used to calculate the expenses in the spreadsheet"—a tacit concession that extrinsic evidence is necessary to resolve this dispute. *Id.* at 16, n.6. Deciding which interpretation accurately reflected the parties' agreement was the jury's function. *See City of Hope*, 43 Cal. 4th at 395.

Ameris's requested reductions would require the Court to accept Ameris's interpretation and Stokes' account of the parties' preacquisition negotiations over the interpretation supported by Byrne's and Dickson's testimony, and corroborated by Stokes' and Sebold's admissions that the LTIP calculations did not necessarily need to follow GAAP. Because the evidence permitted the jury to find that Ameris materially departed from Balboa's historical interim-rent methodology, Rule 50(b) provides no basis to disturb the verdict. *See Reeves*, 530 U.S. at 150–51.

#### 4. Sufficient Evidence Supports the Jury's Treatment of Repossessions

Ameris argues that its GAAP-based treatment of repossessions was contractually permissible and that Balboa's historical method improperly delayed

recognition of losses. Ameris seeks to reduce the 2023 and 2024 LTIP damages by $319,021 for each year. Mot. at 16–17; Fode Decl. Exs. 179–180. But showing that Ameris preferred its method, or considered it more consistent with GAAP, does not establish that the Award Agreement permitted Ameris to abandon Balboa's past practices when calculating whether the Balboa division met the EBT threshold required for LTIP awards.

As discussed above, the Award Agreement expressly invokes GAAP for initial direct costs only and separately directs the parties to materially follow past practice. Fode Decl. Ex. 546 at 1–2 & n.3; TT5 86:16–87:22; Section IV.D.3, *supra*; *see* TT3 68:16–69:4 (Stokes acknowledging that repossessions are *not* an initial direct cost). The relevant question was therefore whether Ameris's change to the treatment of repossessions complied with those contractual requirements. Whether its method complied with GAAP did not answer that question.

At trial, Dickson testified that Ameris applied the new GAAP requirements governing Ameris as a public company rather than Balboa's historical repossession methodology. TT5 111:14–113:23. Stokes admitted that, in her view, the repossessions issue "had some ambiguity to it" and that she "did not know how" Balboa had been accounting for repossessions. TT3 157:22–158:18. Sebold opined that Balboa's practice delayed recognition of losses and was "improper." TT5 194:23–196:20. The jury could credit Dickson's testimony and find that Ameris's change departed from the agreed calculation method. Sebold's criticism of and Stokes' unfamiliarity with Balboa's past practices on repossessions did not compel a finding that the parties had agreed that Ameris would replace those past practices with GAAP.

Ameris's requested reductions thus depend on resolving the competing contractual and accounting evidence in its favor. Viewing that evidence and the reasonable inferences in Byrne's favor, the jury could find that Ameris materially departed from Balboa's historical practice. *See Reeves*, 530 U.S. at 150–51. The

Court should thus deny Ameris's motion as to repossessions.

**5. Ameris's Own Treatment of Stipulated Judgments Supports the Verdict**

Ameris challenges the jury's treatment of stipulated judgments, seeking to reduce the 2023 and 2024 LTIP damages by $121,307 for each year. Mot. at 17–18; Fode Decl. Exs. 179–180. But its position must account for its own contemporaneous approval of the 2023 adjustment. *See Crestview*, 54 Cal. 2d at 753–54 (evidence of parties' subsequent conduct is "one of the most reliable means" of determining the parties' mutual intent). That approval supports Byrne's interpretation of the Award Agreement and undermines Ameris's contention that its contrary accounting treatment controls as a matter of law.

As with interim rent and repossessions, the Award Agreement only invokes GAAP for initial direct costs, while identifying "materially follow[ing] past practice" as the LTIP's general premise. Fode Decl. Ex. 546 at 1–2 & n.3; TT5 86:16–87:22. The question was therefore whether Ameris's treatment of stipulated judgments complied with the agreed calculation requirements, not simply whether Ameris considered its method preferable under GAAP.

The contemporaneous evidence supported Byrne's position. Ameris accountant Sufhan Majid's email acknowledged that Ameris's "new method" was GAAP compliant while Balboa's "old method" was not, permitting the jury to find that Ameris had changed the historical practice. TT2 88:20–89:21; Sessions Decl. Ex. 73. Dickson explained the stipulated-judgment process and testified that EBT should be adjusted by the amount of the judgments. TT5 111:14–25. She also read LaHaise's written response to Byrne's adjustment request: "We agree with your request to adjust the LTIP EBT by $554,191. And it is reflected in the final 2023 LTIP calculation." TT5 112:2–14. Dickson thus understood the adjustment she used to have been agreed upon in writing by Ameris through LaHaise. *See id.*

Ameris offered contrary testimony from Stokes and Sebold that Balboa's

method was unreliable or inconsistent with accounting guidance. TT3 152:11–154:16; TT5 185:9–186:24. But that criticism did not erase LaHaise's approval or require the jury to accept Ameris's current interpretation. *See Crestview*, 54 Cal. 2d at 753–54 (evidence of subsequent conduct is "one of the most reliable means" of determining mutual intent). The jury could consider the approval alongside the Award Agreement's direction to "materially follow past practice" and Dickson's explanation of the adjustment.

Ameris's alternative explanation—that LaHaise merely exercised delegated discretion—likewise did not compel a verdict in its favor. The approval remained evidence that the jury could weigh in determining whether the agreement required the treatment Ameris now advocates. Its significance depended on the surrounding evidence, and Rule 50 does not permit the Court to select Ameris's preferred inference from that evidence. *Reeves*, 530 U.S. at 150–51. The Court should thus deny JMOL as to stipulated judgments and Ameris's other cost-category arguments.

## V. THE RECORD SUPPORTS THE JURY'S AWARD OF FUTURE ECONOMIC DAMAGES.

Ameris claims the record contains *no* evidence supporting the future economic damages award. Ameris is wrong. There was ample evidence, including testimony from Ameris's own witnesses concerning Byrne's compensation and their plans for his continued employment.

Ameris acknowledges that this issue is reviewed only for plain error because it did not expressly challenge the sufficiency of the future-damages evidence in its Rule 50(a) motion. Mot. at 18–21. That review asks whether there was *any* evidence supporting the verdict, without weighing whether that evidence was sufficient. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1109 (9th Cir. 2001) (rejecting an unpreserved sufficiency challenge because the plaintiffs introduced evidence supporting the verdict); *Go Daddy*, 581 F.3d at 961–62. The award readily clears that threshold.

The jury found that Byrne's complaints about unpaid wages were a substantial motivating reason for his discharge. Dkt. 227, Q. 3. It was instructed that recoverable damages included "the reasonable value of wages that with reasonable probability will be lost in the future." Dkt. 223, Inst. 30. Evidence of Byrne's compensation supplied a concrete basis for assessing that loss: irrespective of the LTIP awards, Byrne's annual salary of $350,000 and his quarterly incentive bonuses of $150,000 alone totaled $950,000 in annual compensation. TT4 13:8–14:9. This evidence of Byrne's past earnings, which Ameris ignores in its Motion, allowed the jury to determine an appropriate award to compensate Byrne for his lost future compensation as a result of his wrongful/retaliatory termination.

Ameris's own witnesses also supplied evidence that Byrne's employment would have continued. Stokes testified that she told Byrne in July 2023 that she still wanted him to lead Balboa. TT3 86:17–87:13. LaHaise likewise told Byrne during his 2023 performance review that he wanted him to continue as CEO. TT3 243:11–13. And when LaHaise communicated the notice of nonrenewal of Byrne's then-current Employment Agreement, he explained that he wanted to allow "plenty of time to work through [their] long term plan together." TT3 244:11–16; Fode Decl. Ex. 95. The jury could reasonably read those statements as evidence that the existing Employment Agreement's expiration would not necessarily have ended Byrne's employment and that, absent the retaliatory discharge, he would have continued earning substantial compensation.

There was also evidence supporting future incentive compensation. For example, Ameris communicated with Byrne about the possibility of renewing the LTIP for 2025. Silva, who assumed Byrne's responsibilities after his termination, received a $1,250,000 LTIP-related bonus for 2024 and testified to discussions with Ameris management concerning a 2025 compensation agreement. TT4 130:19–24; TT5 13:7–24. The compensation paid to Byrne's successor, together with those discussions, supported an inference that incentive compensation would have

continued had Byrne remained employed. Silva's 2024 bonus provided a benchmark for future compensation, rather than an additional recovery of Byrne's 2024 LTIP award. Those facts supported an inference that Byrne would have received significant incentive compensation had his employment with Ameris continued.

Ameris's mitigation argument does not dispel this evidence. Ameris bore the burden of proving a failure to mitigate. *Villacorta v. Cemex Cement, Inc.*, 221 Cal. App. 4th 1425, 1432 (2013) (addressing the employer's burden to establish that comparable employment was available and the employee failed to use reasonable efforts to obtain it); *Parker v. Twentieth Century-Fox Film Corp.*, 3 Cal. 3d 176, 182 (1970) (affirming summary judgment for plaintiff actress where defendant failed to establish that an alternative role in a different movie was comparable to the original, bargained-for role); *see also Candari v. Los Angeles Unified School Dist.*, 193 Cal. App. 4th 402, 411 (2011) ("The employer must demonstrate the availability of comparable or substantially similar positions *before* projected earnings of alternative employment opportunities *not sought* by the discharged employee are properly considered"). Yet it presented *no evidence* establishing available comparable employment or any earnings Byrne reasonably could have obtained to offset his lost earnings. Byrne testified that he had not worked following his termination and explained that he understood his noncompetition agreements to restrict his ability to seek other employment. TT2 112:2–21, 175:18–177:12; Sessions Decl. Ex. 325 § 4.3; Fode Decl. Ex. 324 § 4.3; Fode Decl. Ex. 323 § 5.11. Ameris's argument that its noncompetition restrictions had expired does not cure Ameris's failure to carry its burden to convince the jury that Byrne could have found comparable employment with comparable compensation.

The absence of mitigation evidence did not relieve Byrne of proving future loss, but he supplied that proof through evidence of his established compensation, Ameris's stated interest in retaining him, and the prospect of continued incentive compensation. TT4 13:8–14:9, 75:24–78:15, 81:2–14, 130:19–24; TT3 86:17–87:13,

243:11–13, 244:11–16; TT5 13:7–24; Fode Decl. Ex. 95. Together, that evidence allowed the jury to assess both the amount of compensation lost and a reasonable period of continued employment. Ameris's competing view of how long Byrne would have remained employed does not establish that the record contained *no* support for the $6.3 million award, as the plain error standard requires. The Court should deny JMOL on this ground.

## VI. CONCLUSION

Ameris has not shown that the trial evidence compelled a verdict in its favor. The record supports Byrne's agreed LTIP allocation, his right to a 2024 award, his treatment of the disputed accounting categories, and his future economic loss. Ameris's competing interpretations do not establish a basis for judgment as a matter of law, and its unpreserved challenges cannot overcome the extremely deferential inquiry into whether any evidence supports the verdict. The Court should deny Ameris's renewed motion in its entirety.

Dated: September 25, 2026

Respectfully submitted,

ALLEN MATKINS LECK
GAMBLE MALLORY &
NATSIS LLP
MATTHEW T. SESSIONS
STACEY A. VILLAGOMEZ
MADISON E. LARSEN

By: */s/ Matthew T. Sessions*
MATTHEW T. SESSIONS
Attorneys for Plaintiff
PATRICK BYRNE

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the 25-page limit set by court order dated November 21, 2024.

Dated: September 25, 2026

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
MATTHEW T. SESSIONS

By: */s/ Matthew T. Sessions*
MATTHEW T. SESSIONS
Attorneys for Plaintiff
PATRICK BYRNE