ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
MATTHEW T. SESSIONS (BAR NO. 307098)
STACEY A. VILLAGOMEZ (BAR NO. 317081)
MADISON E. LARSEN (BAR NO. 364953)
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313
Fax: (949) 553-8354
E–Mail: msessions@allenmatkins.com
svillagomez@allenmatkins.com
mlarsen@allenmatkins.com

Attorneys for Plaintiff
PATRICK BYRNE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICK BYRNE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AMERIS BANK, a Georgia corporation,<br><br>Defendant. | Case No. 8:24–cv–01989–MWC–JDE<br><br>ASSIGNED FOR ALL PURPOSES TO: Judge Michelle Williams Court<br><br>**PLAINTIFF PATRICK BYRNE'S OPPOSITION TO DEFENDANT AMERIS BANK'S MOTION FOR NEW TRIAL PURSUANT TO FRCP 59**<br><br>Date: October 23, 2026<br>Time: 1:30 p.m.<br>Dept: 6A<br><br>Disc. Cutoff: November 28, 2025<br>Trial Date: June 1, 2026 |

# TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 7
II. ARGUMENT .......... 7
A. Ameris Fails To Identify Any Prejudicial Error in the Court's Rulings On Dickson's Testimony Regarding the 2024 LTIP .......... 8
1. Byrne Timely Disclosed Dickson's Calculations in a Supplemental Report Permitted Under Rule 26(e)(2) .......... 8
2. The Court Properly Denied Ameris's Objections to Dickson's Testimony Regarding the 2024 LTIP Both Before and During Trial .......... 10
3. Even If Dickson's May Report Was Improper Supplementation—and Therefore Untimely—Its Late Disclosure Was Harmless or Substantially Justified .......... 11
4. The Court Did Not Unfairly Restrict Ameris's Cross–Examination of Dickson Regarding the 2024 LTIP .......... 13
(a) The Court Permitted Questions of Dickson's Opinions, and the Jury Heard an Alternative Calculation .......... 13
(b) Ameris Extensively Examined the Assumptions and Limitations of Dickson's Analysis .......... 15
B. No New Trial Is Warranted By The Amount Of Economic Damages Awarded By The Jury .......... 16
1. The Past Economic Damages Award is Supported by the Weight of the Evidence .......... 16
(a) The Past Economic Damages Did Not Exceed the Evidence Presented at Trial .......... 16
(b) The "Clear" Weight of Evidence Does Not Support Ameris's Reading of the LTIP Calculation Requirements as the Only Proper Interpretation .......... 18
(c) Ameris Fails to Demonstrate that Dickson's Testimony Regarding the 2024 LTIP Was Speculative .......... 20

**Page**


2. The Future Economic Damages Award is Supported by the Weight of the Evidence ....21

C. Ameris Fails to Establish Any Basis for a New Trial or Remittitur of Punitive Damages ....22

1. The Degree of Reprehensibility Proven at Trial Supports the Punitive Damages Award ....23

2. The Ratio of Punitive Damages to Compensatory Damages Does Not Violate Due Process or California Law ....25

(a) The Punitive Damages Ratio Properly Includes *All* Compensatory Damages ....25

(b) The Ratio of 3.8 to 1 Falls Well Within the Constitutionally Permissible Range ....27

3. The Punitive Damages Award is Appropriate in Light of Ameris's Vast Financial Resources ....28

4. Ameris Mischaracterizes How the Punitive Damages Award Compares to Civil Penalties ....29

III. CONCLUSION ....30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Murakami*,
54 Cal. 3d 105 (1991) .......... 29

*Bigler-Engler v. Breg, Inc.*,
7 Cal. App. 5th 276 (2017) .......... 29

*Blair v. CBE Group, Inc.*,
309 F.R.D. 621 (S.D. Cal. 2015) .......... 12

*Cnty. of San Bernardino v. Walsh*,
158 Cal. App. 4th 533 (2007) .......... 29

*Collinge v. IntelliQuick Delivery, Inc.*,
No. 2:12–cv–00824–JWS, 2017 WL 3887337 (D. Ariz. Sept. 6, 2017) .......... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 16

*Fernandes v. Singh*,
16 Cal. App. 5th 932 (2017) .......... 27

*Freund v. Nycomed Amersham*,
347 F.3d 752 (9th Cir. 2003) .......... 29

*Gasperini v. Ctr. for Humanities, Inc.*,
518 U.S. 415 (1996) .......... 21

*Goodman v. Staples the Off. Superstore,* LLC,
644 F.3d 817 (9th Cir. 2011) .......... 12

*Gould v. Maryland Sound Indus., Inc.*,
31 Cal. App. 4th 1137 (1995) .......... 26

*Harper v. City of Los Angeles*,
533 F.3d 1010 (9th Cir. 2008) .......... 7, 11, 15

*In re Late Fee & Over–Limit Fee Litig.*,
741 F.3d 1022 (9th Cir. 2014) .......... 26

*Landsberg v. Scrabble Crossword Game Players, Inc.*,
802 F.2d 1193 (9th Cir. 1986) .......... 26

*Mathews v. Happy Valley Conf. Ctr., Inc.*,
43 Cal. App. 5th 236 (2019) .......... 26

*McCray v. Westrock Servs., LLC*,
No. 21–9853–DMG (RAOX), 2024 WL 4579108 (C.D. Cal. Sept. 10, 2024) .28

**Page(s)**

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) .......... 7, 16, 18

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940) .......... 7

*Morgan v. Woessner*,
997 F.2d 1244 (9th Cir. 1993) .......... 28

*Neal v. Farmers Ins. Exch.*,
21 Cal. 3d 910 (1978) .......... 22

*Pac. Mut. Life Ins. Co. v. Haslip*,
499 U.S. 1 (1991) .......... 27

*Pavao v. Pagay*,
307 F.3d 915 (9th Cir. 2002) .......... 16

*Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*,
316 F. Supp. 3d 816 (D. Del. 2018) .......... 14

*Planned Parenthood* of *Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*,
422 F.3d 949 (9th Cir. 2005) .......... 27

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) .......... 16

*Quevedo v. Trans-Pac. Shipping, Inc.*,
143 F.3d 1255 (9th Cir. 1998) .......... 12

*Riley v. Volkswagen Grp. of Am., Inc.*,
51 F.4th 896 (9th Cir. 2022) .......... 23, 27, 29

*Roby v. McKesson Corp.*,
47 Cal. 4th 686 (2009), as modified (Feb. 10, 2010) .......... 28

*Rubio v. CIA Wheel Grp.*,
63 Cal. App. 5th 82 (2021) .......... 27

*Sargon Enterprises, Inc. v. University of Southern California*,
55 Cal. 4th 747 (2012) .......... 20

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) .......... 27

*Swinton v. Potomac Corp.*,
270 F.3d 794 (9th Cir. 2001) .......... 29

*Torres v. City of Los Angeles*,
548 F.3d 1197 (9th Cir. 2008) .......... 12

**Page(s)**

*U.S. ex rel. O'Connell v. Chapman University*,
245 F.R.D. 652 (C.D. Cal. 2007) .......... 12

*United States v. Catabran*,
836 F.2d 453 (9th Cir. 1988) .......... 11

*Villacorta v. Cemex Cement, Inc.*,
221 Cal. App. 4th 1425 (2013) .......... 21

*Wechsler v. Macke Int'l Trade, Inc.*,
221 F.R.D. 619 (C.D. Cal. 2004) .......... 9

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) .......... 12

*Zhang v. Am. Gem Seafoods, Inc.*,
339 F.3d 1020 (9th Cir. 2003) .......... 27

**Statutes**

Fed. R. Evid. 611(a) .......... 7

Fed. R. Evid. 103(a) .......... 8

Cal. Civ. Code § 3294(a) .......... 22

Cal. Lab. Code § 210(a)(2) .......... 30

Cal. Lab. Code § 225.5 .......... 30

Fed. R. Civ. P. 37(c)(1) .......... 11

Fed. R. Civ. P. 59(a)(1) .......... 7

## I. INTRODUCTION

Ameris Bank received a full and fair trial. It presented its evidence, cross-examined Byrne's witnesses, argued its competing view of damages, cross-examined Byrne's experts, and asked the jury to reject Byrne's claims. The jury rejected Ameris's pitch. Ameris may disagree with the jury's findings, but none of its arguments warrant a new trial under the governing legal standards.

Ameris urges three grounds for a new trial: (1) Dickson's testimony concerning the 2024 LTIP, (2) the economic damages awards, and (3) the punitive damages award. Each follows the same pattern: Ameris cherry-picks portions of the record, recasts adverse evidentiary rulings as prejudicial error, and asks the Court to substitute Ameris's preferred factual inferences for those reasonably drawn by the jury. The arguments fail. The verdict rests on the trial evidence and the Court's instructions, and Ameris identifies neither a finding contrary to the clear weight of the evidence nor prejudicial error. Ameris's motion should be denied.

## II. ARGUMENT

Rule 59(a) permits a new trial only on grounds historically recognized in federal practice. Fed. R. Civ. P. 59(a)(1); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Those grounds include that "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Id.* (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). The trial court "may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Id.* (internal quotation omitted).

Ameris cannot satisfy that demanding standard merely by identifying evidentiary rulings it disagrees with. The Court has broad discretion over both evidentiary rulings and how witnesses are examined. Fed. R. Evid. 611(a); *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). Moreover, even an erroneous evidentiary ruling warrants a new trial only if it more probably than not

affected the verdict and thereby prejudiced Ameris's substantial rights. Fed. R. Evid. 103(a); *Harper*, 533 F.3d at 1030.

### A. Ameris Fails To Identify Any Prejudicial Error in the Court's Rulings On Dickson's Testimony Regarding the 2024 LTIP.

#### 1. Byrne Timely Disclosed Dickson's Calculations in a Supplemental Report Permitted Under Rule 26(e)(2).

Ameris argues that Dickson's May 1, 2026 supplemental report offered new opinions concerning the 2024 LTIP, rather than proper supplementation under Rule 26(e), and therefore should have been excluded. Mot. at 3. But that argument omits the reason Dickson deferred the calculation: she was awaiting complete 2024 records that Ameris's own expert identified as materials she had reviewed. Dickson expressly disclosed that gap and completed the calculation using available records after being informed that Ameris would produce no other documents.

Here are the pertinent facts. In January 2026, Dickson's initial report disclosed her LTIP methodology and applied it to the 2022 and 2023 LTIP calculations. Dkt. 117-1 at 7–12. The initial report explained that she could not complete the calculations for 2024 because Ameris had not produced the 2024 LTIP workbook. *Id.* at 7 n.11. Dickson expressly reserved supplementation if the missing workbook was produced. *Id.* at 9, ¶ 9. For good reason. In her expert report served on January 2, 2026—the same day as Dickson's initial report—Ameris's expert, Maryellen Sebold, identified 2024 LTIP workbooks among the materials she had reviewed. Dkt. 151-2 ¶ 43. Dickson nevertheless did not receive the complete 2024 LTIP workbook and was later informed that Ameris would produce no other documents. Dkt. 169-2/170 ¶¶ 3, 13; TT5 115:4–116:15, 131:1–7.[1]

Ameris emphasizes that Dickson's supplement was improper because she possessed the materials used in her May calculation when she prepared her January

[1] Final Trial Transcripts are cited as "TT" with the number of the trial day. Full copies of all cited trial transcripts are attached to the Declaration of Matthew Sessions as Exhibits A–I.

report. Mot. at 7–8. Dickson acknowledged that she could have calculated a 2024 award from the information available in January. But she explained why she "chose not to": she hoped Ameris would provide the requested data so she could "make calculations based on a full set of data." TT5 131:19–132:1. Her testimony thus distinguished the ability to estimate the award from the ability to calculate it using complete records. Once informed that no other records would be produced, Dickson completed the reserved calculation in her May 1 supplemental report using the available information and her previously disclosed methodology, carrying forward 2023 adjustments where complete 2024 data were unavailable. Dkt. 169-2/170 ¶¶ 3, 13; TT5 115:4–116:15, 131:1–7. The calculation thus addressed a previously identified gap in her analysis. It introduced no new theory, methodology, or category of damages. *Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12–cv–00824–JWS, 2017 WL 3887337, at *2 & n.13 (D. Ariz. Sept. 6, 2017) (supplementation is permissible when "substantially responsive" to criticisms and used to refine rather than adding new theories).

As to timing, the report was served on May 1, 2026, more than 30 days before the June 1 trial date. Dkt. 169-2/170. Rule 26(e)(2) requires additions or changes to an expert's report or deposition testimony to be disclosed by the deadline for pretrial disclosures under Rule 26(a)(3). Unless the Court orders otherwise, those disclosures are due at least 30 days before trial. Fed. R. Civ. P. 26(a)(3)(B); *see also* Rule 26(e)(2) (permitting additions or changes to expert disclosures through the supplemental deadline); *see Wechsler v. Macke Int'l Trade, Inc.*, 221 F.R.D. 619, 622–23 (C.D. Cal. 2004) (finding a supplemental damages report timely with pretrial disclosures). Even if the Court concludes that completing the calculation on the existing record exceeded permissible supplementation, Dickson's explanation for the timing, Ameris's advance receipt of her methodology and completed calculation, and its opportunity to respond establish substantial justification or harmlessness for the reasons discussed in Section II.A.3 below.

**2. The Court Properly Denied Ameris's Objections to Dickson's Testimony Regarding the 2024 LTIP Both Before and During Trial.**

Ameris next challenges the Court's decision to overrule its objection to Dickson's May 1 supplemental report. Mot. at 5–6. But Ameris failed to raise the issue properly. Two weeks after Byrne produced Dickson's May 1 supplemental report, Ameris filed an "objection" to the report, which Byrne opposed. Dkts. 168, 171. The Court overruled Ameris's objection as "untimely and filed without leave of court," finding it to be "functionally a sixth motion *in limine*," which, under the Court's rules, Ameris had to seek leave to file. Dkt. 174 at 9, n.4; Dkt. 22 at 3, n.6 ("Each party may file no more than five (5) motions in limine without seeking leave from the Court").

Ameris now complains that it could not have challenged the May 1 report before the April 17 motions in limine deadline. Mot. at 4. But that timing did not prevent Ameris from requesting leave to move in limine after receiving the report. Ameris instead filed its "objection"—in reality, a motion in limine—without obtaining leave, and the Court denied it. The Court's enforcement of its rules provides no basis for a new trial.

Ameris also argues that Byrne improperly introduced schedules from Dickson's supplemental report after representing that the report would not be offered into evidence. Mot. at 5. That argument is a blatant mischaracterization and overlooks the distinction presented to the Court between the report and the separately offered schedules. At the Day 0 conference, Byrne confirmed that he would not offer the report itself, and the Court reserved rulings on individual exhibits. TT0 50:24–51:13. Before Dickson testified, Byrne explained that he would offer the schedules under Rule 1006 and obtain admission before displaying them to the jury. TT4 8:6–19. Ameris expressly objected that the schedules contained "the data and the calculations from the expert report," and the Court deferred its rulings until Dickson testified and

the exhibits were presented. TT4 9:14–10:2.

To be clear, Dickson's schedules drew on Ameris's LTIP workbooks and supporting financial records. Dkt. 169-2/170 ¶ 5; Fode Decl. Ex. 174.[2] Their inclusion in Dickson's report did not itself preclude admission if they independently satisfied Rule 1006. *See* Fed. R. Evid. 1006; *United States v. Catabran*, 836 F.2d 453, 458 (9th Cir. 1988) (affirming admission under Rule 1006 of an inventory chart based on properly admitted general-ledger records available to the defendant for inspection). Moreover, Dickson explained the calculations and assumptions in her live testimony, including her use of 2023 expenses for 2024. TT5 115:22–116:15; *see id.* 96:1–97:2, 108:19–118:13. Ameris examined her about the incomplete records and alternative calculations and presented Sebold's competing analysis. TT5 130:14–140:10, 173:22–205:17. Thus, even assuming a schedule exceeded Rule 1006's scope, the jury heard both the substance of the calculation and the challenges to its reliability through witness testimony. Ameris has not shown that admitting the schedule itself, in addition to that testimony, more probably than not affected the verdict. *See Harper*, 533 F.3d at 1030.

**3. Even If Dickson's May Report Was Improper Supplementation—and Therefore Untimely—Its Late Disclosure Was Harmless or Substantially Justified.**

Even assuming the May 1 report exceeded the permissible scope of supplementation under Rule 26(e), exclusion was unwarranted because the circumstances establish that the disclosure was harmless or substantially justified. Fed. R. Civ. P. 37(c)(1) (allowing the use of an untimely disclosure that is "harmless" or "substantially justified"). When determining whether the untimeliness of a disclosure is "harmless," courts consider surprise, the ability to cure prejudice, trial disruption, the importance of the evidence, and the explanation for the timing. *Blair*

[2] "Fode Decl." refers to the Fode Declaration in support of Ameris's post-trial motions.

*v. CBE Group, Inc.*, 309 F.R.D. 621, 626 (S.D. Cal. 2015).

Ameris had every opportunity to evaluate and respond to Dickson's 2024 calculation. It knew Byrne sought 2024 LTIP compensation, had Dickson's methodology from her January report and deposition, and received her completed calculation—using Ameris's own data—about a month before trial. Dkt. 169-2/170. In opposing exclusion, Byrne expressly stated that Dickson was available for a supplemental deposition before trial if necessary. Dkt. 171 at 4. Ameris requested no supplemental deposition, limited discovery, or continuance; it chose to seek only wholesale exclusion. *See U.S. ex rel. O'Connell v. Chapman University*, 245 F.R.D. 652, 655–56 (C.D. Cal. 2007) (describing exclusion as an "extremely harsh remedy" where lesser measures could cure a deficiency).

This contrasts with Ameris's exclusion cases, all of which lacked the advance disclosure and opportunities to respond that Ameris had here. In *Goodman v. Staples the Off. Superstore, LLC*, the Ninth Circuit affirmed exclusion where the late opinions created "obvious prejudice" because the plaintiff ***had disclosed no expert reports***, and the defendant structured its defense around that absence. 644 F.3d 817, 826–27 (9th Cir. 2011). *Yeti by Molly Ltd. v. Deckers Outdoor Corp.* involved a report served roughly two years after discovery had closed, without a timely preliminary disclosure, requiring a deposition from scratch. 259 F.3d 1101, 1105–07 (9th Cir. 2001). *Quevedo v. Trans-Pac. Shipping, Inc.* involved a designation twenty days late and a report produced only after a summary judgment motion. 143 F.3d 1255, 1258 (9th Cir. 1998). And *Torres v. City of Los Angeles* turned on an unexplained exclusion that left the appellate court unable to assess substantial justification or harmlessness. 548 F.3d 1197, 1213–14 (9th Cir. 2008).

Here, the disclosure did not prevent Ameris from presenting a competing expert analysis. Sebold reviewed both reports and Dickson's deposition, attended her trial testimony, and offered competing opinions concerning Dickson's accounting adjustments. TT5 187:22–188:12, 194:11–21, 196:15–20. Those opportunities,

together with Byrne's willingness to provide a supplemental deposition and Dickson's explanation for the timing, support harmlessness or substantial justification even if the report exceeded permissible supplementation.

**4. The Court Did Not Unfairly Restrict Ameris's Cross–Examination of Dickson Regarding the 2024 LTIP**

Ameris argues that the Court permitted Byrne to present Dickson's highest 2024 LTIP calculation while improperly restricting cross-examination concerning her lower alternative calculations and the assumptions underlying her analysis. Mot. at 8–10. Ameris is incorrect.

**(a) The Court Permitted Questions of Dickson's Opinions, and the Jury Heard an Alternative Calculation**

Ameris claims that the Court erroneously prevented it from cross-examining Dickson on her 2024 LTIP calculations. That fails for two reasons.

First, Ameris examined Dickson about her alternative calculations, and it even elicited testimony concerning a lower 2024 LTIP figure: Ameris asked whether Dickson had prepared several alternative calculations because she lacked sufficient 2024 information. TT5 137:6–21. The Court overruled Byrne's objection, and Dickson acknowledged that she had. *Id.* Dickson then confirmed that her principal 2024 LTIP pool calculation was $7,747,017 and acknowledged another calculation of approximately $4.5 million. *Id.* 138:12–139:2.

Second, when the Court sustained Byrne's objections, it did so because Ameris failed to ask proper questions, despite express guidance from the Court on how to do so. For example, when Ameris's counsel repeatedly attempted to ask questions about Dickson's *report*, instead of her *opinions*, the Court sustained hearsay objections and eventually called for a sidebar. During the sidebar, the Court clarified for counsel why it was sustaining hearsay objections, and how counsel could reframe her questions: "So you can ask her what her opinions [are, but] what's in the report is not relevant. Its hearsay. *So what you have to do is ask her what her opinions are. Just*

*ask*." TT5 124:5–8 (emphasis added). Counsel instead continued asking objectionable questions.

When counsel asked about an alternative calculation of approximately $3.6 million, the Court sustained Byrne's hearsay objection. TT5 139:3–6. Counsel then asked how many calculations Dickson had performed, expressly referring to the May 1 report. *Id.* at 139:8–10. The Court explained: "If you have questions about her opinion, you can ask those questions. But for the reasons that we've already stated, *questions about the report* are not appropriate." *Id.* at 139:11–15 (emphasis added). Counsel nevertheless asked again whether Dickson had offered three calculations ranging from $3.6 million to $7.7 million and asked more questions about "changes" between Dickson's January and May reports, each time drawing another sustained hearsay objection. *Id.* at 139:17–140:10. In an earlier exchange, after Dickson explained that an exhibit identified a "total pool award," counsel requested permission to impeach without identifying an inconsistent statement. The Court responded: "No. You can ask her the next question." TT5 125:22–126:2. The Court thus permitted inquiry into Dickson's opinions and directed counsel how to proceed; Ameris simply did not frame its questions correctly in response.[3]

Ameris's Rule 613 argument and reliance on *Pernix Ireland Pain DAC v. Alvogen Malta Operations Ltd.*, 316 F. Supp. 3d 816 (D. Del. 2018), do not establish error. Mot. at 9. *Pernix* recognized that an expert's earlier report could be used to impeach him "if he testifies in this case in a manner that is inconsistent" with his earlier statements. *Id.* at 818. Ameris identifies lower calculations, but does not explain why calculations based on alternative assumptions contradict Dickson's principal opinion. Mot. at 8–9. Dickson expressly acknowledged the alternatives and confirmed the approximately $4.5 million calculation before the jury. TT5 137:16–

[3] Ameris then concluded its cross-examination with a series of questions about the interpretation of the LTIP—despite having sought and obtained an in limine order barring Dickson from testifying on that topic. Dkt. 174 at 9–10. The Court sustained Byrne's objections. TT5 140:12–143:3.

21, 138:23–139:2. The record therefore does not support Ameris's characterization that it was prevented from exposing Dickson's lower alternative calculations.

Even assuming the Court erred in restricting questions about the $3.6 million alternative, Ameris has not shown that the restriction more probably than not affected the verdict. *See Harper*, 533 F.3d at 1030. The jury already heard that Dickson prepared multiple calculations, including an approximately $4.5 million alternative, and Ameris questioned her about the incomplete 2024 data and her assumptions. TT5 130:14–140:10. Ameris's generalized claim of unequal treatment does not explain how further questioning about another alternative would have changed the verdict.

**(b) Ameris Extensively Examined the Assumptions and Limitations of Dickson's Analysis.**

Ameris also examined the assumptions and data limitations underlying Dickson's 2024 calculation. Ameris elicited that Dickson had not calculated a 2024 payment in her January report, lacked complete 2024 records, used 2023 expenses because corresponding 2024 data were unavailable, and considered an annualized alternative. TT5 115:4–116:15, 130:23–136:2. Although the Court sustained objections to particular questions, including questions that were argumentative, vague, compound, repetitive, or called for legal conclusions, the jury heard testimony addressing those limitations in Dickson's analysis. TT5 125:8–132:1, 135:2–136:12, 137:1–143:3. The Court allowed Ameris to examine methodology, assumptions, data limitations, and allocation, and also limited questioning when Ameris sought Sebold's interpretation of the LTIP Agreement or "past practice." TT5 202:22–204:8. The jury therefore heard the factual premises of Ameris's challenge that Dickson lacked complete 2024 records and used prior-year expenses in her calculation. Ameris could—and did—use that testimony to challenge her analysis; the sustained objections did not keep those limitations from the jury. Ameris's disagreement with the jury's assessment of that evidence does not establish a basis for a new trial.

Ameris also presented Sebold's competing analysis, giving the jury both its

criticisms of Dickson's assumptions and an alternative expert assessment. TT5 130:23–140:10, 173:22–205:17. Those are the means contemplated by *Daubert* for testing expert testimony that satisfies Rule 702: cross-examination and contrary evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993); *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Here, Ameris used those means to expose Dickson's reliance on incomplete 2024 information and prior-year expenses, and to present Sebold's competing analysis. TT5 130:23–140:10, 173:22–205:17. The jury was instructed that charts and summaries "are only as good as the underlying evidence that supports them" and should receive only the weight the underlying evidence deserved. TT6 107:6–17. Taken together, the advance disclosure, the testimony the jury heard, Ameris's competing expert evidence, and the Court's instructions defeat Ameris's claim that the challenged rulings concerning Dickson warrant a new trial.

### B. No New Trial Is Warranted By The Amount Of Economic Damages Awarded By The Jury

Next, Ameris challenges the jury's award of economic damages, claiming that the evidence does not support the award. Although the Court may weigh the evidence under Rule 59, the Court "may not grant [a new trial] simply because the court would have arrived at a different verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Ameris must establish that the award is contrary to the clear weight of the evidence or otherwise warrants a new trial. *See Molski*, 481 F.3d at 729. Ameris fails to do so.

#### 1. The Past Economic Damages Award is Supported by the Weight of the Evidence.

##### (a) The Past Economic Damages Did Not Exceed the Evidence Presented at Trial

Ameris first argues that the $9 million past-economic-damages award improperly exceeded Dickson's highest calculation of unpaid LTIP amounts. Mot. at

12. But Dickson's LTIP calculation was only one component of past economic loss. The jury was instructed to consider both amounts due under the contract *and* wages lost through trial, including the salary and quarterly bonuses discussed below. Dkt. 223 at Instr. 30.

Dickson calculated $12,919,270 in total underpaid LTIP bonuses for 2022 through 2024 and testified that Byrne's 62.54% share was $8,079,711. Fode Decl. Exs. 175, 178–180. Ameris also contends that allocating approximately 85% of the LTIP pool to Byrne, Silva, and Rasmussen "defies logic." Mot. at 13. But Byrne testified that the parties agreed to fixed percentages for all three, including his 62.54% share, and that he actually received approximately $5.6–$5.8 million from the $9.1 million 2022 pool. TT2 36:3–6, 36:17–37:20, 39:3–5. Ameris's disagreement with that allocation does not negate the evidence supporting it.

The $920,289 gap between Dickson's $8,079,711 calculation of Byrne's unpaid LTIP compensation and the jury's $9,000,000 award is less than one year of Byrne's $950,000 annual non-LTIP compensation. LaHaise, Byrne's former supervisor, testified that Byrne's annual non-LTIP compensation consisted of a $350,000 salary plus $150,000 quarterly bonuses, with the salary increasing 3 percent annually. TT4 13:8–14:9. Byrne's termination became effective June 30, 2024, nearly two years before trial, and he received no severance. Fode Decl. Ex. 496; TT2 111:24–112:1. Considered together with the evidence supporting continued employment discussed below, that compensation evidence easily supports the additional $920,289 awarded by the jury. Ameris's comparison of the verdict solely to Dickson's LTIP calculation therefore does not establish that the award was excessive.[4]

[4] Ameris also uses the past-economic-damages portion of its brief to repeat its Rule 50(b) motion that no evidence supported an entitlement to at least 62.54% of each year's total LTIP pool. Mot. at 12–13. It is unclear from the Rule 59 motion how the dispute about the 62.54% allocation relates to the purported excessiveness of the jury's award. Ameris does not identify a different percentage that should have been used. In any event, as explained in Byrne's opposition to the Rule 50(b) motion, the evidence supports applying Byrne's 62.54 percent allocation to the 2023 and 2024

**(b) The "Clear" Weight of Evidence Does Not Support Ameris's Reading of the LTIP Calculation Requirements as the Only Proper Interpretation.**

Ameris also argues that it had sole discretion and authority to resolve any disputes about how the LTIP pool was calculated and that it reasonably exercised that right with respect to the disputed calculations. Mot. at 13. But Ameris's authority was subject to the Award Agreement's requirements: the Pioneer Model and Key Assumptions, the prohibition on allocating indirect Company expenses to Balboa, and the direction to materially follow past practice. Fode Decl. Ex. 546 at 1–2 & n.3. As Byrne also explains in his Rule 50(b) opposition, the contractual language and trial evidence support his treatment of the disputed items. Ameris's proposed reductions assume its competing interpretation is correct; they do not establish that the verdict is contrary to the clear weight of the evidence.

***Staff-cost adjustment.*** This adjustment reflected evidence that Ameris charged Balboa for indirect Company overhead prohibited by the Award Agreement. Fode Decl. Ex. 546 at 1. Byrne identified accounting, marketing, IT, and other corporate support functions whose employees began reporting to Ameris while their costs remained allocated to Balboa. TT2 83:21–84:9, 163:13–164:5. Dickson distinguished operating costs from corporate overhead and explained that those functions moved under Ameris's control in Georgia. TT5 98:1–99:11, 106:15–108:16. Ameris's evidence that the employees continued benefiting Balboa does not resolve whether their costs constituted prohibited indirect expenses. Mot. at 13–14; TT3 139:3–15; TT5 190:13–191:12.

***Interim-rent adjustment.*** This adjustment restored income that Balboa

---

LTIP pools. TT2 36:11–37:20 TT3 23:3–24:23, 47:23–11. Ameris presented its competing interpretation of the LTIP and its asserted discretion, including through Sebold's testimony. The jury nevertheless found that Ameris failed to perform its LTIP obligations. Dkt. 227, Q. 23(a). That finding, considered with the allocation evidence, supports Dickson's calculations using the 62.54% allocation. Ameris's renewed reliance on its preferred interpretation does not establish that the finding is contrary to the clear weight of the evidence. *See Molski*, 481 F.3d at 729.

historically recognized immediately but that Ameris spread over the lease term. Although Ameris invokes generally accepted accounting principles (GAAP) to justify spreading interim rent over the lease term, the Award Agreement expressly requires GAAP only for initial direct costs while otherwise directing that the calculation materially follow past practice. Mot. at 14; Fode Decl. Ex. 546 at 1–2 & n.3; TT5 86:16–87:3. Byrne testified that interim rent was not an initial direct cost and that the Pioneer Model used a cash–basis methodology. TT2 83:21–86:22. Dickson explained that Ameris's 2023 change removed approximately $1.974 million in income and that her adjustment restored the historical treatment. TT5 112:17–113:11. Stokes acknowledged that the LTIP need not comply with GAAP, and Sebold conceded that GAAP requirements can differ from the interpretation of a contract. TT3 69:10–13; TT5 220:14–16. Ameris's reliance on ASC 842 therefore does not establish that it followed the Award Agreement's requirement to materially follow Balboa's past practice. *See* TT5 193:12–194:6.

***Repossession losses.*** Ameris and Sebold argued that Balboa's historical method delayed recognition of losses and overstated current-year earnings. Mot. at 14; TT5 195:4–196:14. But Dickson testified that Ameris replaced that method with the GAAP treatment it used as a public company. TT5 113:12–23. Ameris's calculation must be measured against the parties' agreed method, regardless of its preference for a different accounting approach. The Award Agreement's requirement to materially follow Balboa's past practice therefore supports Dickson's adjustment. Fode Decl. Ex. 546 at 1–2 & n.3; TT5 86:16–87:3, 113:12–23.

***Stipulated-judgment adjustment.*** Ameris argues that recognized, potentially uncollectible income must be weighed against Ameris's own written approval of that treatment for 2023. Mot. at 14. But Sufhan Majid, the employee responsible for preparing Balboa's LTIP calculations, distinguished Ameris's new GAAP-compliant method from Balboa's historical method. TT2 87:14–89:21; Sessions Decl. Ex. 73. LaHaise responded: "We agree with your request to adjust the LTIP EBT by

$554,191. And it is reflected in the final 2023 LTIP calculation." TT5 111:14–112:14. That approval supports Byrne's interpretation despite Stokes's and Sebold's criticisms. TT3 153:7–154:16 (Stokes); TT5 186:4–24.

Taken together, the contractual restrictions, historical-practice testimony, and Ameris's own written approvals support Byrne's calculations. And even if it were ambiguous, Ameris's competing treatment of those items does not establish a clear-weight error—so a new trial is not warranted.

**(c) Ameris Fails to Demonstrate that Dickson's Testimony Regarding the 2024 LTIP Was Speculative.**

Ameris also contends that because Dickson only used partial data regarding 2024 in rendering her opinions regarding the 2024 LTIP, her testimony was not supported by sufficient facts and the resulting verdict is against the weight of the evidence. Mot. at 15–16. But Dickson's testimony was far from speculative.

California law distinguishes uncertainty concerning the existence of damage from uncertainty concerning its amount. Once the fact of damage is established, the amount need not be calculated with absolute precision; it need only rest on a reasonable basis of computation. *Sargon Enterprises, Inc. v. University of Southern California*, 55 Cal. 4th 747, 774–75 (2012). That standard is met here.

Dickson explained both the basis and limitations of her 2024 calculation. She began with the 2024 information Ameris provided and used the available 2023 expense figures because she had not received the complete 2024 records. TT5 115:4–116:15. Her calculation expressly identified the adjustments as "Based on the Year 2023." Fode Decl. Ex. 180. Those figures came from Balboa's actual operating history, and the preceding section identifies the contractual and evidentiary support for the disputed categories. Silva's testimony that the accounting, IT, and marketing employees continued serving Balboa also provided some support for continuity in the functions underlying the overhead adjustment. TT5 9:4–13. Although that testimony did not establish identical expenses each year, it supplied context for

evaluating Dickson's use of historical figures. The jury heard her explanation, Ameris's examination concerning the incomplete data and alternative calculations, and Sebold's competing analysis. TT5 115:4–116:15, 130:14–140:10, 173:22–205:17.

**2. The Future Economic Damages Award is Supported by the Weight of the Evidence.**

Ameris also attacks the future economic damages award, arguing that *no* evidence supports *any* of the future damages. Mot. at 11. Again, Ameris is wrong: Ample evidence supports the $6.3 million future economic damages award. Among other things:

Byrne presented evidence that Ameris admitted it fired Byrne without cause, and the jury determined that Byrne's complaining about Ameris Bank's failure to pay earned wages was a substantial motivating reason to discharge Byrne. Dkt. 227, Q. 3. The jury was instructed to award, based on this finding, the "reasonable value of wages that with reasonable probability will be lost in the future." Dkt. 223 at Inst. 30. Ameris's emphasis on counsel's closing request does not answer the evidence: Instruction 30 expressly directed the jury to determine reasonably probable future wage loss, and the testimony below supplied a basis for that determination. There was no limit other than reasonableness placed on the number of years of lost wages Byrne could be awarded, and Ameris had the burden to prove Byrne's ability to mitigate his lost wages. *See Villacorta v. Cemex Cement, Inc.*, 221 Cal. App. 4th 1425, 1432 (2013).[5]

Byrne's annual non-LTIP compensation was at least $950,000, with his base salary increasing 3% annually. TT4 13:8–14:9. Byrne testified that his noncompetition agreement restricted his ability to secure comparable work after termination. TT2 112:2–21; Sessions Decl. Ex. 325. Conversely, Ameris presented

[5] Federal Rule of Civil Procedure 59 governs Ameris's request for a new trial, while California substantive law supplies the measure of recoverable damages. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996).

no evidence of Byrne's ability to mitigate.

Evidence also supported a reasonable expectation of ***long-term*** employment at Ameris. Stokes told Byrne in July 2023 that she wanted him to continue leading Balboa; LaHaise said in Byrne's 2023 review that he wanted Byrne to continue as CEO; and, when he sent Byrne the original notice of nonrenewal, LaHaise said he wanted "plenty of time to work through [their] long term plan together." TT3 86:17–87:13, 243:11–13, 244:11–16; Fode Decl. Ex. 95. The jury could therefore reasonably infer from this testimony that, absent retaliatory termination, Byrne would have continued earning at least $950,000 annually.

The evidence also supports future LTIP bonuses. Ameris's communications addressed renewal of the LTIP for 2025. TT5 13:14–24. Silva, who assumed Byrne's responsibilities after Ameris terminated Byrne, received a $350,000 base salary, $150,000 quarterly bonus, and a $1,250,000 LTIP-related bonus for 2024. TT4 124:12–130:24. Together, that evidence supported an inference that Byrne would have continued receiving incentive compensation in future years, had he remained employed.

Byrne's established compensation, his successor's compensation, and Ameris's expressed intent to retain him support continued earnings beyond December 2024 and defeat Ameris's contention that the record supports no future economic loss.

**C. Ameris Fails to Establish Any Basis for a New Trial or Remittitur of Punitive Damages.**

Ameris's challenge to the punitive damages award does not withstand scrutiny. The award is supported under the governing California factors: reprehensibility, proportionality, and the defendant's financial condition. *See Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 928–29 (1978). The jury expressly found that Ameris acted with malice, oppression, or fraud, and the record supports that finding under the clear-and-convincing standard. Cal. Civ. Code § 3294(a); Dkt. 227, Q. 28. Ameris

establishes neither a basis to disturb that finding nor a constitutional defect requiring reduction of the award.

**1. The Degree of Reprehensibility Proven at Trial Supports the Punitive Damages Award.**

Ameris mischaracterizes and ignores evidence in an attempt to minimize the reprehensibility of its conduct.

Ameris argues that its wrongful conduct was simply "a discrete incident." Mot. at 22. The jury heard ample evidence that it was not. For example, Ameris focuses only on Byrne's illegal termination and ignores Ameris's yearslong, willful withholding of his wages. Ameris underpaid Byrne—and approximately 150 other employees[6]—for at least three years (2022, 2023, and 2024). *See* TT5 117:19–118:13 (Dickson). And Ameris repeatedly ignored and failed to properly investigate Byrne's whistleblowing regarding Ameris's failure to pay wages earned. *E.g.*, TT2 65:5–24, 100:4–22; TT4 63:2–14, 90:16–91:8.

Ameris's treatment of another executive before acquiring Balboa also undermines Ameris's portrayal of Byrne's termination as an isolated event. LaHaise acknowledged that Ameris acquired a premium-finance business, retained its former owner, William Vallari, and later terminated him. TT4 94:18–95:21. Ameris then installed Vallari's former second-in-command as head of the acquired company U.S. Premium Finance. TT4 95:22–96:14. That sequence mirrored Ameris's acquisition of Balboa, its termination of Byrne, and its elevation of Silva. Byrne specifically highlighted this parallel during the punitive phase closing argument. TT8 35:5–36:1. The jury could consider that parallel alongside the evidence of retaliation against

[6] "While punitive damages cannot be used to punish a defendant for the harms to a third party, evidence of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm to the general public, and so was particularly reprehensible." *Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 901 (9th Cir. 2022) (quotations and alterations omitted); *see Arizona v. ASARCO LLC*, 773 F.3d 1050, 1059 (9th Cir. 2014) (en banc) (affirming punitive damages award, endorsing the district court's consideration of evidence that defendant was a "serial violator of antidiscrimination laws" as demonstrated through other employees' experiences).

Byrne in evaluating Ameris's claim that its conduct was merely an isolated employment decision.

As to whether Ameris's conduct resulted from intentional malice rather than mere accident, Ameris attempts to avoid the jury's finding that it acted "willfully" and with "malice, oppression, or fraud," (Dkt. 227, Q. 26, 28), by characterizing its conduct as merely an accounting or contract dispute without animus or ill intent. Mot. at 18, 21. But the jury heard evidence that:

- Ameris repeatedly manipulated the calculations to keep the division's EBT just below the threshold for qualifying for the LTIP. Sessions Decl. Ex. 76; TT3 98:5–101:25.
- Ameris repeatedly told Byrne that it had to follow GAAP in interpreting the LTIP, only to abandon that position at trial. *See* TT3 69:5–72:23 (Stokes); Sessions Decl. Ex. 532 at ¶ 3 (Stokes MSJ declaration, admitted at TT3 182:9–183:22); TT5 118:15–119:5 (Dickson); TT6 127:17–129:6 (closing).
- LaHaise, the person purportedly responsible for LTIP bonuses, could not explain why Byrne received no 2024 LTIP bonus despite being eligible for one. TT4 90:16–91:8.
- Ameris's own expert admitted that Ameris failed to follow the LTIP's language for at least one calculation. TT5 215:7–216:23 (Sebold).
- Ameris's conduct resulted in withholding millions of dollars in compensation from Byrne. *See* TT5 117:19–118:13 (Dickson).

Ameris's deliberate termination of an executive it otherwise intended to retain further supports the jury's finding of intentional malice. LaHaise testified that he did not intend to terminate Byrne's employment when he sent the March 2024 nonrenewal notice; instead, he sent Byrne standard employment documents to "replace the employment agreement." TT4 75:24–78:15, 81:2–14. Silva likewise understood that his own nonrenewal notice did not signal the end of his employment

and testified to discussions with Ameris management concerning a 2025 compensation agreement. TT5 12:11–20, 13:7–24. Ameris itself emphasized in closing that "Ameris wanted to retain him and offered him a new contract." TT6 164:4–8. Against that evidence, the jury's finding that Ameris discharged Byrne in retaliation for his complaints supports the conclusion that Ameris intentionally deprived him of an ongoing employment relationship.

Ameris's claim that the punitive award is unreasonable because Byrne's job would have ended in six months rests on a premise the jury was entitled to reject. Mot. at 21. As discussed above, there was evidence that Ameris would have retained Byrne after the initial written agreement ended. TT4 78:13–17, 81:12–14, 123:1–25. Ameris further claims that "Plaintiff's termination had nothing to do with anyone's health or safety," Mot. at 21, but the jury awarded $525,000 in past non-economic loss and $700,000 in future non-economic loss after hearing testimony of the emotional distress Ameris's actions caused Byrne. *See* Dkt. 227, at 7 (phase I verdict); TT2 115:14–116:12 (Byrne); TT3 38:8–40:25 (Rasmussen); TT5 63:5–23 (Emert); TT5 147:16–162:20 (Reading).

**2. The Ratio of Punitive Damages to Compensatory Damages Does Not Violate Due Process or California Law.**

**(a) The Punitive Damages Ratio Properly Includes *All* Compensatory Damages.**

Ameris argues that in assessing whether the punitive damages award exceeds the maximum permissible ratio, the Court must consider only Byrne's non-economic damages, not economic damages, which Ameris characterizes as sounding in contract rather than tort. Ameris fails to understand that the full amount of Byrne's compensatory damages are recoverable as both contract and tort damages and therefore properly included in the punitive damages ratio.

Punitive damages may be recoverable when the conduct constituting a contract breach also constitutes a tort or other violation of law for which punitive damages

are recoverable. *See* Restatement (Second) of Contracts § 355 (1981) (cited by *In re Late Fee & Over–Limit Fee Litig.*, 741 F.3d 1022, 1026 (9th Cir. 2014)); *Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1199 (9th Cir. 1986) ("Punitive damages may be awarded, however, if a breach of contract is also a tort.").

Two of Plaintiff's causes of action satisfy this prerequisite. Both claims independently support the entire compensatory award.

First, Plaintiff prevailed on his whistleblower retaliation claim. Dkt 227 at 2–4. "[P]unitive damages are recoverable for a violation of the whistleblower statute." *Mathews v. Happy Valley Conf. Ctr., Inc.*, 43 Cal. App. 5th 236, 267 (2019) (whistleblower statute violation "is itself an adequate basis for all compensatory damages awarded by the jury," which included both economic and noneconomic damages). *Id.*; *see* Dkt. 223 at 34 (damages jury instruction). On its own, that violation supports the entire compensatory award here.

Second, Plaintiff proved wrongful termination, which California recognizes as a tort. *Gould v. Maryland Sound Indus., Inc.*, 31 Cal. App. 4th 1137, 1147 (1995) (recognizing wrongful termination in violation of public policy as a tort). As the jury was instructed, a plaintiff can recover past and future lost wages and earnings for wrongful termination, as well as noneconomic damages. *See* Dkt. 223 at 34 (damages jury instruction). Thus, the jury's wrongful termination finding provides independent support for the entire compensatory award.

For both of these independent reasons, Ameris's request to exclude these from the punitive damages ratio as purely contract damages fails.

Moreover, Ameris characterizes the 2024 LTIP damages as contractual and therefore outside the punitive-damages denominator. Mot. at 22–23. But adding a contract theory did not foreclose recovery of the same compensation under Byrne's wrongful-termination and retaliation claims. The Court's ruling on the motion in limine expressly preserved the relevance of the 2024 LTIP to those claims. Dkt. 174 at 14. The amendment therefore supplies no independent basis to exclude the 2024

LTIP damages from the punitive-damages denominator.

Independently, even if the Court determines that particular LTIP amounts are recoverable only in contract, that would not justify Ameris's proposed exclusion of all economic damages. The denominator must still include the past and future economic losses attributable to Byrne's retaliation and wrongful-termination claims, together with his noneconomic damages.

**(b) The Ratio of 3.8 to 1 Falls Well Within the Constitutionally Permissible Range.**

There is no "bright-line ratio which a punitive damages award cannot exceed." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *accord Riley v. Volkswagen Grp. of Am., Inc.*, 51 F.4th 896, 902 (9th Cir. 2022) (explaining that the "proportionality of punitive damages must be assessed on a case-by-case basis"). Although no punitive damages ratio is binding, the Supreme Court has identified double, treble, and quadruple damages as instructive historical benchmarks and explained that single–digit multipliers are more likely to comport with due process while achieving deterrence and retribution. *State Farm*, 538 U.S. at 425; *Planned Parenthood* of *Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005); *accord Riley*, 51 F.4th at 902 (quoting *Planned Parenthood*); *Fernandes v. Singh*, 16 Cal. App. 5th 932, 943–44 (2017) ("[P]unitive damages should rarely exceed a single–digit multiplier."). The Supreme Court has also upheld an award exceeding 4:1 without finding constitutional impropriety. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23 (1991).

The ratio of Byrne's punitive damages to compensatory damages is 3.8 to 1. That is a single-digit multiplier and falls below the 4:1 proxy Ameris invokes. *State Farm*, 538 U.S. at 425. Courts have approved similar or higher ratios. *See, e.g.*, *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1044 (9th Cir. 2003) (slightly more than 7 to 1 ratio in an employment case involving wages willfully withheld); *Rubio v. CIA Wheel Grp.*, 63 Cal. App. 5th 82, 101 (2021) (3.5 to 1 in a wrongful–termination

case). Ameris's chart cannot create a constitutional problem by using only non-economic damages as the denominator and excluding economic losses attributable to retaliation or wrongful termination.

The cases Ameris cites in support of a constitutional limit of a 1:1 ratio are distinguishable on multiple grounds, including corporate management's lack of knowledge of wrongdoing, the low degree of reprehensibility, and the lack of a pattern of similar misconduct. In *Roby v. McKesson Corp.*, the court emphasized that the record "only weakly supports the jury's finding that a 'managing agent' of employer McKesson was informed" of or ratified a low level supervisor's harassment of the plaintiff. 47 Cal. 4th 686, 715 (2009), *as modified* (Feb. 10, 2010). Similarly, in *McCray v. Westrock Services, LLC*, the court reduced the punitive damages award after emphasizing the "low degree of intentional malice that can be imputed to" the defendant–employer because "[m]ost of the evidence of bad faith conduct" in the case involved a colleague whose actions could not be imputed to the company under California law. *McCray v. Westrock Servs., LLC*, No. 21–9853–DMG (RAOX), 2024 WL 4579108, at *10–11 (C.D. Cal. Sept. 10, 2024). Here, by contrast, some of Ameris's highest decision makers were directly and repeatedly involved in failing to pay Byrne his fair compensation and in the company's retaliation against him. TT2 65:5–24, 100:4–22; TT4 63:2–14, 90:16–91:8.

**3. The Punitive Damages Award is Appropriate in Light of Ameris's Vast Financial Resources.**

Federal district courts must "consider evidence of defendants' financial worth in considering the appropriateness of punitive awards under California state law...." *Morgan v. Woessner*, 997 F.2d 1244, 1259 (9th Cir. 1993). Punitive damages will not deter a defendant from further misconduct "if the wealth of the defendant allows him to absorb the award with little or no discomfort.... It follows that the wealthier the wrongdoing defendant, the larger the award of exemplary damages need be in order to accomplish the statutory objective." *Adams v. Murakami*, 54 Cal. 3d 105,

110 (1991) (internal quotations omitted). "A defendant's 'net worth' is the critical determinant of financial condition, but there is no rigid formula…." *Cnty. of San Bernardino v. Walsh*, 158 Cal. App. 4th 533, 546 (2007); *see Freund v. Nycomed Amersham*, 347 F.3d 752, 764 (9th Cir. 2003) (holding financial statement showing operating profit of $158 million was sufficient evidence of defendant's financial condition to support a punitive damages award of $1.15 million). Ten percent of the defendant's net worth generally provides a benchmark for whether an award of punitive damages is excessive. *Bigler-Engler v. Breg, Inc.*, 7 Cal. App. 5th 276, 308 (2017).

The jury heard considerable evidence of Ameris's vast financial resources, including approximately $28.1 billion in assets, $2.3 billion in retained earnings, and $110 million in net income for the first quarter of 2026 alone. TT8 23:5–14, 25:19–25, 30:14–17; Sessions Decl. Ex. 193; *see also* Sessions Decl. Ex. 192. As counsel emphasized in closing, Ameris's 2024 net income averaged approximately $1 million per day. TT8 34:14–21; Sessions Decl. Ex. 191. And the jury heard that Ameris's capital exceeded applicable regulatory requirements. TT8 26:1–11.

Considered together with the evidence of reprehensibility and the award's relationship to Byrne's compensatory damages, Ameris's financial condition supports the punitive damages amount awarded.

**4. Ameris Mischaracterizes How the Punitive Damages Award Compares to Civil Penalties.**

A comparison to civil penalties is only one guidepost for the Court to consider when evaluating a punitive damages award. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir. 2001) (finding comparison to civil penalties weighed in favor of reducing punitive damages award in employment discrimination case but declining to do so in light of other factors); *see also Riley*, 51 F.4th at 904 (explaining that the comparison to civil penalties weighed "slightly against higher punitive damages," but noting that "this factor does not require us to reduce the single digit multiplier

punitive damages determined by the jury”).

Ameris argues that the proper civil penalty for this comparison is the $10,000 civil penalty for retaliation provided for in California Labor Code section 1102.5(f), but Ameris ignores other relevant and substantial civil penalties. *See* Mot. at 24–25. For example, California Labor Code section 210 authorizes civil penalties of $200 per each failure to pay an employee’s wages, plus 25% of the amount of wages unlawfully withheld. Cal. Lab. Code § 210(a)(2); *accord* Cal. Lab. Code § 225.5. Applied as a benchmark to Dickson’s $8,079,711 calculation of Byrne’s unpaid LTIP compensation, 25% exceeds $2 million. Fode Decl. Exs. 175, 178–180. In addition, the Court awarded Byrne $116,557.80 in waiting-time penalties under California Labor Code section 203 in this very case. Dkt. 253 at 3; Cal. Lab. Code § 203. The relevant civil penalties vastly exceed the $10,000 figure Ameris cites.

The civil-penalty guidepost therefore does not support a retrial or remittitur. At most, Ameris identifies one factor it reads differently; it does not show that the punitive award is contrary to the clear weight of the evidence or constitutionally excessive.

## III. CONCLUSION

The Court should deny Ameris’s motion for new trial in its entirety, including Ameris’s requests for remittitur and a conditional new trial, and leave the jury’s verdict undisturbed.

Dated: September 25, 2026

Respectfully submitted,

ALLEN MATKINS LECK
GAMBLE MALLORY &
NATSIS LLP
MATTHEW T. SESSIONS
STACEY A. VILLAGOMEZ
MADISON E. LARSEN

By: */s/ Matthew T. Sessions*
MATTHEW T. SESSIONS
Attorneys for Plaintiff
PATRICK BYRNE

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that this brief complies with the 25-page limit set by court order dated November 21, 2024.

Dated: September 25, 2026

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
MATTHEW T. SESSIONS

By: */s/ Matthew T. Sessions*
MATTHEW T. SESSIONS
Attorneys for Plaintiff
PATRICK BYRNE