# EXHIBIT C

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| Plaintiff, | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, | ) Wednesday, June 3, 2026 |
| | ) (8:57 a.m. to 11:59 a.m.) |
| Defendant. | ) (1:03 p.m. to 4:36 p.m.) |

JURY TRIAL - DAY 2

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: T. Jackson

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff: MATTHEW THOMAS SESSIONS, ESQ.
ANDREW A. WOOD, ESQ.
MADISON LARSEN, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
2010 Main Street
8th Floor
Irvine, CA 92614

STACEY ANN VILLAGOMEZ, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
865 S. Figueroa Street
Suite 2800
Los Angeles, CA 90017

For Defendant: STACY L. FODE, ESQ.
NANA JIN YEE, ESQ.
Nukk-Freeman & Cerra
550 West C Street
Suite 910
San Diego, CA 92101

INDEX


| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PATRICK BYRNE | 10/74 | 117/124 | 183 | |
| HEATHER PARKER | 188 | 208 | 233 | |

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROSS CREASY | 237 | 250 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 1 | 192 |
| 3 | 101 |
| 7 | 17 |
| 10 | 49 |
| 17 | 103 |
| 19 | 185 |
| 49 | 52 |
| 69 | 56 |
| 73 | 87 |
| 95 | 79 |
| 100 | 69 |
| 144 | 96 |
| 190 | 67 |
| 319 | 241 |
| 325 | 165 |
| 326 | 168 |

INDEX (CONTINUED)


| EXHIBITS | RECEIVED |
|---|---|
| 333 | 137 |
| 343 | 256 |
| 346 | 30 |
| 372 | 35 |
| 375 | 34 |
| 382 | 39 |
| 389 | 43 |
| 395 | 45 |
| 398 | 46 |
| 409 | 59 |
| 414 | 128 |
| 425 | 148 |
| 437 | 64 |
| 453 | 62 |
| 467 | 152 |
| 482 | 68 |
| 483 | 219 |
| 496 | 105 |

**Los Angeles, California; Wednesday, June 3, 2026; 8:57 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

**THE CLERK:** Calling item number 1, SA CV-24-01989, Patrick Byrne versus Ameris Bank.

Counsel, please state your appearances, starting with plaintiff.

**MR. SESSIONS:** Good morning, Your Honor, Matthew Sessions on behalf of plaintiff.

**THE COURT:** Good morning.

**MR. WOOD:** Good morning, Your Honor, Andrew Wood on behalf of plaintiff.

**THE COURT:** Good morning.

**MS. VILLAGOMEZ:** Good morning, Your Honor, Stacey Villagomez for plaintiff.

**MS. LARSEN:** Good morning, Your Honor, Madison Larsen for plaintiff.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, Your Honor, Stacy Fode on behalf of defendant.

**THE COURT:** Good morning.

**MS. YEE:** Good morning, Your Honor, Nana Yee on behalf of defendant.

**THE COURT:** Good morning.

Okay. So I understand that there's an issue that we

need to talk about before the jury comes in.

**MR. WOOD:** Just extremely briefly, Your Honor --

**THE COURT:** Uh-huh.

**MR. WOOD:** -- in the minute or so before we'd like them to come in.

Just something that came up in the course of meeting and conferring over tomorrow's witnesses.

We had just raised the issue just because things took a little bit longer yesterday than we anticipated, we just preserved our right to call Ms. Parker tomorrow, if we needed to.

The defense alerted us that apparently the reason for Ms. Parker's unavailability or scheduling difficulties for her daughter's graduation, which is tomorrow, obviously we have no desire to, you know, sandbag that in any -- by any means, but we also came to learn that apparently defendants have made arrangements for Ms. Parker to now be available all day and miss the graduation party so that they can squeeze Mr. Creasy in.

And it just gives us some concern that there may be an intent to raise this with the witnesses in front of the jury to say, oh, gee, Mr. Creasy, you're missing a trip to Ireland, or gee, you know, Ms. Parker you're interrupting your festivities with your daughter, and we just think that would be, you know, unnecessarily inflammatory in front of the jury,

it's not relevant to any of their testimony.

So we just wanted to make sure that that's not going to be -- that those issues are not going to be raised.

**THE COURT:** Okay. Ms. Fode?

**MS. YEE:** Your Honor --

**THE COURT:** Ms. Yee?

**MS. YEE:** -- first of all -- yes, Your Honor. First of all if Mr. Wood had told me, you know, about his concerns I would have absolutely assured him. This is the first time I'm hearing about his concerns, but I can assure this Court --

**THE COURT:** I need you to speak into the microphone, because we're not going to be able to get a record.

**MS. YEE:** Yeah. So this is the first time Mr. Wood raised this concerns. Had he communicated this with me I would have assured him and this Court that we're not going to do that.

**THE COURT:** Okay. Thank you. All right.

**MR. WOOD:** And we appreciate that. Thank you.

**THE COURT:** Thank you. Anything else?

**MR. SESSIONS:** Nothing else, Your Honor, we're ready.

**THE COURT:** Okay. And the from the defense perspective?

**MS. FODE:** Same here. Thank you.

**THE COURT:** Okay. I thought -- I think when I left my chambers just now I think we had six of the eight jurors

back.

So Ms. Jackson, do you want me to leave so that you can go check on them and then you can call me when all the jurors are ready? Or do we know that we have them all?

**THE CLERK:** We might have them all.

**THE COURT:** I'll stay.

**THE CLERK:** Okay.

**(Pause)**

**THE COURT:** Okay, Ms. Jackson informed me that we're still missing one juror, so I'm going to leave the bench so all of you can actually speak amongst yourselves without feeling like you need to whisper. And as soon as we get our last juror I'll come back and we'll resume testimony.

**(A chorus of thank you)**

**THE COURT:** Thank you. She just came in.

**MR. SESSIONS:** Your Honor, should I proceed to the lectern?

**THE COURT:** I need to give the jury their admonition about --

**MR. SESSIONS:** Okay.

**THE COURT:** -- contact. So you can if you want to, but you'll be standing there for probably an extra 30 seconds.

**MR. SESSIONS:** Okay, Your Honor, I will enjoy sitting for the remaining time that I have.

**THE COURT:** Okay.

**(Pause)**

**THE CLERK:** All rise.

**(Jurors enter courtroom at 9:05 a.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Thank you, Ms. Jackson.

And good morning, ladies and gentlemen of the jury, I hope you had a restful evening.

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law that is presented here. So you must not learn any additional information about the case from sources outside of the courtroom.

To ensure fairness to all parties in this trial I will now ask each of you whether you have learned about or shared any information about this case outside of the courtroom, even if it was accidental. If you think that you might have done so please let me know by raising your hand. Okay, I see no raised hands.

However, if you would prefer to talk to the Court privately in response to this question, please notify a member of the court staff at the next break, and thank you so much to your careful adherence to my instructions.

So now we are going to resume with the testimony from Mr. Byrne.

Mr. Sessions, you can go ahead and make your way to

the podium, and Mr. Byrne, you can come forward.

**THE CLERK:** Please raise your right hand.

**PATRICK BYRNE, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Okay. And sir, remember to watch your step (indisc.).

**THE COURT:** Good morning.

**THE CLERK:** And I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** Patrick Byrne, B-Y-R-N-E.

**THE COURT:** Thank you. Mr. Sessions, you may proceed.

**MR. SESSIONS:** Thank you, Your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. SESSIONS:**

Q And good morning, Mr. Byrne.
A Good morning.
Q I want to pick back up, right back up from where we left off yesterday.
So at the time you sold Balboa to Ameris Bank, what was the size of the loan portfolio that Balboa had?
A It was probably 800-, 900 million.
Q And then remind us, roughly how many customers did Balboa have at that time comprising that loan portfolio?
A Twenty-five thousand approximately.
Q Sorry, did I -- was that 5,000 or 25,000?

A I'm sorry, 25,000.
Q Okay.
A Yep.
Q Thank you.
And can you give -- just give us some examples of the situations in which you would be handing out or Balboa would be giving out these loans to its customers?
A Yeah, 25,000 customers across the U.S. So you know, let's take an example of a pizza shop in Colorado, right, that the pizza oven went down, right, our whole business model was to get equipment to these folks quick. So they fill out an application, decision within an hour, and fund them the next day.
And so where typically a bank would take, you know, a week, a couple weeks, lots of information, we were there very quickly for, you know, to get that business back up to speed.
Q And did Balboa grow after it was sold to Ameris?
A It did.
Q And roughly what was the portfolio size by 2023?
A It was about $1.2 billion.
Q And are you familiar with the term loan loss?
A I am.
Q What is a loan loss?
A It's an expense item, right, so not all people pay their loans back, you're writing an average term of five years, so

you don't know, some folks don't pay their loans back and that loss or when they don't pay it back that amount is called a loan loss.

Q And is that typical in the equipment financing industry?

A It is, and specifically with the businesses that we're working with, which are smaller, you know, medium size businesses.

Q Can you explain to the jury what you mean by that?

A Smaller, midsize?

Q Yeah, why it's typical.

A Well just like anything there's certain apportion of loans that, you know, don't pay, so you make your best estimation of what's going to happen over the next five years, but you know, you just don't know, it's a projection.

Q And since we're on the subject and while it's fresh in everyone's mind, were you here in the courtroom during defendant's lawyer's opening statement yesterday?

A Yes, I was.

Q And did you hear them talk about -- make a claim that in 2023 Balboa had $40 million in loan losses?

A I did.

**MS. FODE:** Misstates the statement.

**THE COURT:** The objection is overruled.

//

//

**BY MR. SESSIONS:**

Q Sorry, could you answer the question one more time just for the record?

A Yes, I did hear that the opening statement included $40 million in losses.

Q And did you hear the statement that in 2023 Balboa operated at a loss?

A I did hear that as well.

Q Okay. And -- well first, did Balboa have $40 million in loan losses in 2023?

A It was less than that, but it was probably closer to 35 million, but it was elevated, to be fair it was elevated that year.

Q And putting aside whatever the actual number was, can you explain why it was elevated that year?

A It had to do with the trucking industry. This is kind of pre-COVID, I don't know if you remember but UPS trucks and Federal Express trucks would deliver all your goods, after that there was a lot of independent truckers that came in to fill that gap.

And so, yeah, it was going well and then COVID came -- you know, we got out of COVID and then a lot of those truckers went out of business.

But I will let you know that because these were longer loans most of these loans, because they're five-year contracts,

were on the books before the acquisition, and the due diligence that was done by Ameris they knew this.

I will also add that we did much better than most during that time period, and that was shared with Ameris that although, right, you just don't know, right, we took the bet, it didn't pay off in that instance, but we constantly were showing Ameris that we were much better than the industry average and that we were doing a lot less trucking after the acquisition.

Q And can you remind me one more time what did you say the total portfolio size was of Balboa's loans in 2023?

A It was about $1.2 billion.

Q So if the portfolio was $1.2 billion and there was $40 million even saying --

A Yeah.

Q -- in loan losses, what does that tell us about the size of the remaining performing loans?

A It means that the performing loans were well over a billion dollars.

Q And roughly what percentage was that of loans that were still being paid?

A At that point it was probably 97 percent.

Q And did Balboa in fact operate at a loss in 2023?

A No, according to their own LTIP calculations, because the biggest expense items for our company, equipment leasing

company, are loan losses and cost of funds, the one percent that we've been talking about.

So given that LTIP calculation, even with the 39 million approximately that Ameris had calculated, we still made approximately $59 million.

So once again we made $59 million even after you took out the $39 million that Ameris said that the loan losses were.

Q Let's go ahead and look at another document.

**MR. SESSIONS:** Your Honor, this is Exhibit 323, which is a preadmitted exhibit, and I'd ask for permission to publish it to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay, you may publish.

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, do you recognize this document?

A I do.

Q Can you tell the jury what this is?

A It's the stock purchase agreement, which is the agreement to buy Balboa Capital by Ameris.

Q And who drafted the stock purchase agreement?

A Ameris did.

Q And did you have any role in revising it?

A I did.

Q And did you receive compensation under the stock purchase

agreement?

A I did.

Q And did anyone other than yourself receive compensation from Ameris Bank as a result of the sale of Balboa?

A Yes, there was three people that received bonus payments that were part Of Balboa.

Q And who were those three people?

A That was Phil Silva, Rob Rasmussen, and Patrick Ontal.

**MR. SESSIONS:** Okay. Let's go ahead and take down that exhibit.

Your Honor, at this time I'd like to show on blackout to the jury another exhibit, this is not a joint exhibit, it's exhibit -- Plaintiff's Exhibit 7.

**THE COURT:** Okay, go ahead.

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, do you recognize this document?

A Yes.

Q Can you tell us what this is?

A It's the disclosure schedules, and this is affixed to the 234-page stock purchase agreement. This is hundreds of pages as well.

Q In simple terms can you explain to the jury what a disclosure schedule is?

A When somebody comes in to buy a company they're going to want to do all sorts of due diligence, which is to look through

all the books and skim through all the books and look at every single aspect of the business to make sure that, right, that we're, you know, basically telling the truth, that we're giving them, you know, what they're bargaining for.

**MR. SESSIONS:** Your Honor, at this time I would move to admit Exhibit 7 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** Yes, objection, on lack of authenticity and relevancy.

**THE COURT:** The objection is overruled, Exhibit 7 is admitted, and you may published.

**(Exhibit Number 7 received in evidence)**

**MR. SESSIONS:** Thank you, Your Honor. Is it published?

**THE COURT:** Yes, it is.

**MR. SESSIONS:** Okay, thank you, Your Honor.

**BY MR. SESSIONS:**

Q Let's go to first Schedule 8, which is on page ending in 253. Do you see Schedule 8 on the screen, Mr. Byrne?

A Yes, and it's 250 -- yeah, this is the 253-page I believe, and it -- yes, and it is the financial statements of Balboa Capital.

Q And what is this page that we're looking at on the screen right now?

A Balboa had audited financial statements for 20 years

before it was acquired, and these are the financial statements that RSM, one of the largest accounting firms in the U.S., published on Balboa after -- for the 2019 and probably 2018 periods.

Q And in simple terms so that some of us can understand, what does that mean when you say -- when you use the word audit? What exactly are you talking about?

A That's when an accounting firm will come in and, you know, audit your books and make sure that your financial statements are to conform to GAP, but also everything else is following accounting principles.

Q Okay.

**MR. SESSIONS:** And then can we go to page ending in 386?

**(Pause)**

**MR. SESSIONS:** Okay.

**MS. FODE:** Oh, objection, Your Honor, third-party privacy.

**THE COURT:** The objection is overruled.

**BY MR. SESSIONS:**

Q Mr. Byrne, can you tell us what we're seeing on the screen here?

A We're seeing the transaction bonuses for the sale of Balboa Capital.

Q And who are these individuals listed on the screen?

A Rob Rasmussen was -- I think we talked about him yesterday -- he was the chief operating officer of the company, Phil Silva was the president at the time of the acquisition, and Patrick Ontal was the head of what we call vendor sales at Balboa at time of acquisition.

Q And just very briefly for the record, can you tell us how much each individual made off of the sale of Balboa to Ameris?

A Yes. Rob Rasmussen $5.1 million, approximately, Phil Silva $11.5 million, and Patrick Ontal 268,000.

Q Thank you.

**MR. SESSIONS:** You can go ahead and take that down.

**BY MR. SESSIONS:**

Q Now, did you remain with Balboa after it was sold?

A I did.

Q Okay. Let's go ahead and look at another document.

**MR. SESSIONS:** This is -- Your Honor, Exhibit 324 and it is a preadmitted exhibit, so I would ask permission to publish it to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay, you may publish.

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, do you recognize this document?

A Yes, this is --

Q Can you tell us what it is?

A This is my employment agreement that I entered into as part of the sale with Ameris.

Q And let's go ahead and look at some of its terms.

**MR. SESSIONS:** Can we go to Section 3.1?

**BY MR. SESSIONS:**

Q Okay. Do you see Section 3.1 on the screen?

A I do.

Q Okay. Just so we don't have to read the whole thing, can you just describe to us what this section of the employment contract is conveying?

A Yeah. It's just conveying my base salary, there's a few components to my compensation, but this is the base salary.

Q And what was your base salary that you'd receive annually?

A It was 350,000.

Q Okay.

**MR. SESSIONS:** And then let's go to Section 3.2.

**BY MR. SESSIONS:**

Q Okay. What is the underlying heading next to 3.2?

A Bonus.

Q Okay. And can you read paragraph 3.2 in full?

A Sure. During the term, including the initial period of employment from the start date to December 31st, 2021, executive shall receive, in addition to base salary, a cash bonus, the bonus of $150,000 within 30 days of the end of each calendar quarter starting with the calendar quarter beginning

October 1st, 2021, in which the division financial results for such quarter achieve the adjusted earnings before taxes projected in the pioneer 1-Q '21 operating model, a copy of which is attached hereto as Exhibit B, as measured using the methodologies in such model regardless of what financial results may be achieved under the company's financial reporting methodologies or requirements.

Q Now those last few words, regardless of what financial results may be achieved under the company's financial reporting methodologies or requirements, is that similar to the language we saw in the letter of intent yesterday?

A Yes, to the T, exactly.

**MR. SESSIONS:** Yeah, let's go to Section 3.3.

**BY MR. SESSIONS:**

Q Okay. That's a short one, can you read that one for us as well?

A This is incentive program, so it's referring to the LTIP -- I'm sorry, the incentive program.

Concurrent with the start date the company has established a cash bonus long-term incentive program, the LTIP, and the executive expected -- is expected to participate in the LTIP.

For the avoidance of doubt the LTIP and the bonus are separate and distinct compensation programs.

Q All right. Well let's go ahead and talk about the LTIP.

**MR. SESSIONS:** Your Honor, at this time I'd like to

publish to the jury Exhibit 545, this is a joint and preadmitted exhibit.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay, you may publish.

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, can you tell us what this document is?

A This is The LTIP agreement, long-term incentive plan.

**MR. SESSIONS:** And if we can zoom in. Thank you so much, Ms. Perez. If we can zoom in on Section 1.1.

**BY MR. SESSIONS:**

Q Do you see that?

A Yes.

Q Okay. Can you read the words after the header, general purpose?

A The name of this plan is the Balboa long-term cash incentive plan. The purpose of the plan is to further link the interests of participants with those of the company by creating a direct relationship between key company performance measurements and individual bonus payouts.

Q Okay. Could you explain to the jury what this means when it says that the purpose of the plan is to link the interests of the participants with the company?

A Yeah. So what they're saying is, you know, we're going to get -- we're trying to align the interest of the employees with

Ameris, and in order to do so if you work hard, right, and you achieve over the threshold, then you're going to be able to share in the fruits of that hard work.

And so it's, you know, basically saying, hey, we're just trying to align everybody with the interest of the company in this sense Ameris with, you know, the work that you're doing.

Q And did you -- going back to the opening statement we heard yesterday -- did you hear Ameris's lawyer mention discretion that Ameris had to decide whether LTIP bonuses were paid or not?

A Yes, I did.

Q And before we dig into that, did Ameris have discretion whether to pay you an LTIP bonus or not if the threshold was met?

A No.

Q And then let's go ahead and look at some of the language in this plan document.

**MR. SESSIONS:** Let's go to Section 3.2.

**BY MR. SESSIONS:**

Q Okay. Can you read the words appearing after the header, authority of the committee?

A Subject to the terms of the plan and applicable laws in addition to the other express powers and authorization conferred by the plan, the committee shall have the authority to --

Q Okay. Then we don't have to read them all.
Can we go down to point D and have you read that one?
A To determine when cash bonus awards are to be granted under the plan.
Q Now, did that particular provision apply to you under your employment contract with Ameris?
A No.
Q And why not?
A Because those -- it was already agreed upon before the acquisition and in conjunction with the acquisition.
Q And who created this document that we're reading right now?
A This was created by Ameris. I think it was more of a form document, and yeah, so I think this was done with other divisions of Ameris --
Q Can you --
A -- but this didn't apply to mine.
Q Apologies.
Can you explain what you mean by that when you say this is a form document done with other divisions of Ameris?
A Well we learned that, yeah, that other people had -- I don't know, not obviously this exact plan, but this was more on a form that material of which was used in other areas of the bank.
Q Okay. Let's go ahead now and look at a specific document

for you.

**MR. SESSIONS:** Can we -- at this time, Your Honor, I'd like to publish to the jury Exhibit 546, which is a joint exhibit and is preadmitted.

**THE COURT:** Any objection?

**MS. FODE:** None. Thank you.

**THE COURT:** Okay, you may publish.

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, do you recognize this document?

A Yes.

Q Can you tell us in your own words what this is?

A This is getting more specific to the specific plan, it's called the award agreement, and yeah, so it basically spells out how -- what performance period there be, right, so '22, '23, '24, and then kind of the overall criteria by which this bonus pool and the distribution is calculated.

Q Okay. And then whose name is that near the top of the agreement?

A That is mine.

Q Okay. And do you see the paragraph that starts with the words, performance criteria?

A Yes.

Q Can you read the last sentence of that paragraph that starts with the words, for purposes of?

A For purposes of the calculation of EBT under this

agreement and the plan, defined below, the key assumptions, defined below, must be used in interpretation, in application of the pioneer 1-Q '21 operating model for purposes of the calculation of EBT, and no cost of a type not contemplated by the pioneer 1-Q '21 operating model will be allocated to Balboa.

Q Okay. And at the risk of making you explain something you already explained, but just so that we didn't forget overnight, can you briefly remind us what EBT is?

A Earnings before taxes.

Q Okay. And what does this mean in layman's terms?

A That is, you know, say, you know, revenue minus expenses gets you to earnings before taxes.

Q And then can you remind us again what the pioneer 1-Q '21 operating model is?

A That was the spreadsheet that we used to run the business and to -- that looks back four years and ahead four years, and it's used -- it was used to buy the business, it was given to Ameris to evaluate, and it basically calculates how the earnings before taxes is supposed to be calculated.

Q And just to make it easier to say, if I say pioneer operating model, will you understand that I'm referring to this?

A Yes.

Q Okay, thank you.

Let's take a look at it real quick and go down to Exhibit A of this document, which I believe is on page ending in 223.

Mr. Byrne, is this the pioneer operating model that you just referenced?

A Yes.

Q Okay. And remind us who created the pioneer operating model?

A Myself -- yeah, KBW, who was the investment bank, Heather Parker used to help me redo some of the information in here, but mainly, yeah, KBW and Balboa folk.

Q And how long did you spent preparing this model?

A You know, it was an iterative process so we'd be looking at it every month, you know, and making, you know, small tweaks to it as we saw the actuals come in.

So literally over probably started in 2018 and so by the time we sold to Ameris I think probably three, four years, but we spent hundreds if not thousands of hours on this.

Q And there's a lot of information on the screen, but I fear if we zoom out too much it'll be hard to read anything. So please let us know if you need Ms. Perez to scroll down.

But can you just briefly walk us through the type of information that we're seeing on here?

A Yeah. So top level originations, that's kind of where it all starts, that the equipment cost, right. So if you -- so the cost of the equipment is $100,000, and then that leads into

the revenue section, right, so these are the -- that's the revenue section, and then you can see provision for loan losses, and that's obviously a big item, and then SG&A, and that is just all the office expenses, the personnel expense, right, things like that sort. And then you kind of get to the bottom and you get earnings before taxes.

And then because we're incorporating the one percent, that's the total interest expense line, and then if you can see at the very bottom you get to adjusted earnings before taxes.

And if you notice on the lines for '22, '23, and '24 those are 37 million, 48 and a half million, and 57.2 million, which are the exact numbers that are in the LTIP agreement.

Q Thank you.

Okay. Let's go back to the full part of the document itself and go to page 227.

Okay. Do you see the bold words that say, key assumptions?

A Yes.

Q Okay. What does the agreement mean when it references key assumptions?

A Well these are the big items, right, these are the big items that we've got to agree upon, right, because we're projecting out and so we've got to kind of nail these down. So these are the big ones that we, right, that we agree upon.

Q Yeah. And the just help the jury understand, what do you

mean these are the items we got to agree upon, for what purpose?
A Well these are kind of the rules, these, you know, as Ms. Fode pointed out, these are kind of the goal posts, right, that we have to set down, what are the rules, because we're projecting out for three years, a lot of stuff happens in three years, so we have to nail down what -- you know, what exactly these are, right, because you can't change the rules, right, you can't move the goal post, right, you know, during -- you know, during the periods.
Q And can you go ahead and read the sentence that appears after the words, key assumptions?
A For purposes of calculating EBT under this agreement and the plan.
Q And then without having you read them all, because we're going to get to that later and I don't want to make you do it twice, what are these lettered points that are listed underneath?
A These are the key assumptions, these are the big things that we have agreed upon.
Q Okay. Perfect. And like I said we'll come back to that, but I won't make you read it all twice.
Okay. Let's take this down and now let's finally talk about your time working for Ameris.
Approximately how long were you employed at Ameris Bank?

A Two and a half years, approximately.
Q Okay. And when did you start, approximately?
A That would be upon the sale, 12/10 of 2021.
Q Okay. Let's go ahead and look at another document. This is Exhibit 346.

**MR. SESSIONS:** And, Your Honor, I would ask for permission both to admit this into evidence and to publish to the jury, it is a joint exhibit.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay, 346 is admitted, and you may publish.

**(Exhibit Number 346 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Do you recognize this document, Mr. Byrne?
A I do.
Q Okay. And briefly what is this document?
A This my job description at Ameris.
Q And who was your supervisor when you were at Ameris?
A That was Jim LaHaise.
Q Okay. And how many employees from Balboa, can you remind us, came over to Ameris with you?
A Approximately 200, I think, yeah, 187 maybe to be exact, but --
Q Okay. Perfect.

**MR. SESSIONS:** Let's go ahead and take that down.

**BY MR. SESSIONS:**

Q And now let's talk about your time chronologically at Ameris.

Can you describe your experience working there in 2022?

A Yeah, 2022 was a world wind, there was, you know, a lot going on, we're trying to integrate with a publicly held bank that is all the way across the country, and we're growing by 63 percent, and you know, there's changes, they're moving departments over unbeknownst to us.

And so yeah, it was crazy, but you know, we did a lot of work, and overall I think people were, you know, mostly satisfied, and they're -- you know, we got to the end of the year and took a deep breath, people got paid out on the bonuses, and I would say overall, I think somebody characterizes it as a honeymoon period, and yeah, so it was going well.

Q What caused the company -- I think you said it grew by 36 percent -- what caused the company to grow so much in that time?

A It's 63 percent.

Q Sixty-three percent.

A Yeah.

Q Forgive me.

A Yep. What caused us to grow? I mean we were set up,

right, we had the platform to do that, and you know, we -- everybody was, you know, kind of working hard, and we had good momentum, we had, you know, good momentum coming into the sale, I can't remember what we, you know, what we grew, but it was probably in the 30s, so yeah, we --
Q And when you -- and you mentioned that approximately 200 employees came to Balboa with you. When you were at Balboa did those employees all report to you?
A They did.
Q And did that remain the same when you got to Ameris?
A No.
Q Can you explain?
A Well you know, we had talked about the separation of duties, right, so that was disclosed to us in the accounting department there would have to be a couple people that would have to be reporting to Ameris.
But what Ameris did was they moved not only those people but all the other people -- or you know, a number of other people both in accounting, information technologies, you know, HR, marketing over to Ameris once we had been acquired, and that caused a lot of -- yeah, consternation, not only -- you know, made conflicts but also it made it a lot harder to run the business.
Q Can you explain to the jury what you mean when you say it made it a lot harder to run the business?

A Well when you report -- when somebody reports, right, to the corporate office and the corporate office, right, controls everything, it just bought this company and its ten times bigger than, right, at least in terms of employee size, right, and they know their paycheck is coming from Ameris, although they're doing some work, some of the work, same work for Balboa contracts, that they're -- you know, somebody is sending your -- is doing your reviews, setting your compensation, right, you can -- you know who -- right, if you're an employee, right, who is buttering your bread, and so if there's a conflict, right, there -- or any -- you know, any disagreement between the two you're certainly going to go to the people that are paying your, you know, your salaries, doing your, you know, controlling the resources and all that.

So in essence it was -- I had the accountability, but not the control.

Q And we're going to talk about more of that in just a minute.

First let's go ahead and look at another document.

**MR. SESSIONS:** Your Honor, this is Exhibit 375. I -- it is a joint exhibit, so I would move to admit it into evidence and ask permission to publish to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

//

**THE COURT:** Okay, Exhibit 375 and admitted, and you may publish.

**(Exhibit Number 375 received in evidence)**

**BY MR. SESSIONS:**

Q Mr. Byrne, do you recognize this document?

A I do.

Q Can you tell us what it is?

A It's my performance review for 2022.

Q And who wrote this review?

A Jim LaHaise.

Q Okay. And we'll get into the details about this review a little bit later, but just broadly speaking for the sake of time, were you satisfied with your performance in 2022?

A Yeah, I was -- yeah, yeah, we grew 63 percent, we made -- right, $63 million I think for Ameris, and so I think I delivered on my promise. So yeah, I was happy with the performance of the division and my performance.

Q And then do you see where it says, final score on this page?

A Yes.

Q Can you read the line underneath that starts with, score 4.10?

A Met and frequently exceeded expectations.

**MR. SESSIONS:** There we go, thank you.

//

**BY MR. SESSIONS:**

Q Okay. During 2022 did the Balboa Division -- I think you hinted at this earlier, but just to confirm -- did the Balboa Division hit the LTIP threshold that year?

A Yeah. Not only we hit it, we crushed it, right, we were over by $25 million, right.

Q Okay. Let's go ahead and look at an email on that.

**MR. SESSIONS:** At this time, Your Honor, I would move to admit Exhibit 372 into evidence and ask permission to publish. It is a joint exhibit.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay, Exhibit 372 is admitted, and you may publish.

**(Exhibit Number 372 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Do you recognize this email chain, Mr. Byrne?

A Yes.

Q Okay. And now let's go down to the email dated January 12th, 2023. Okay, do you see the email up on the screen?

A Yes.

Q Okay. Can you read the subject line to us?

A 2022 LTIP payouts.

Q Okay. And then who is the email from?

A Laura Rodriguez.

Q Can you tell us who Laura Rodriguez is?
A She's the head of compensation for Ameris.
Q Okay. And then can you read the first sentence of the email after the words, hi Pat?
A Per Sufhan's calculation earlier this week the final year-end 2022 LTIP pool is $9,098,045.15.
Q Okay. And then can you go up on this chain to the email dated February 2nd, 2023 at 3:55 p.m.?
Okay, do you see that email, Mr. Byrne?
A Yes.
Q Okay. Can you read the second bullet point on -- well first of all, sorry, let me back up.
Who wrote this email?
A This is from me.
Q And who are you sending it to?
A To Laura and I'm copying my boss, Jim LaHaise.
Q Okay. And then can you read the second bullet point on the screen, it starts with Phil and Rob's percentages?
A Phil and Rob's percentages were agreed to during the Balboa sales process to Ameris and equate to approximately double the percentage of options they had as a percentage of the outstanding shares at the time of the acquisition. They are aware of and are in agreement on their LTIP dollars.
Q And what are you discussing here in this second bullet point?

A So I'm just -- basically overall I'm laying out to Laura, who wasn't privy to the preacquisition discussions and agreements between myself, Rob, Phil, and Jim LaHaise, about the LTIP pool was to be distributed.
Q And can you describe to us what that agreement was in terms of how the LTIP pool was to be distributed?
A Well yeah, so to this point Rob and Phil had options, and you saw the payout previously, and so what I said to them is, hey, I'm going to just double what you had and then the remaining -- and so that was a fixed percentage, so Phil and Rob had fixed percentages and then I had a fixed percentage and I said everything else we'll distribute, right, at my discretion.
Q And what was your fixed percentage?
A 62.54 percent.
Q And how did you land on 62.54 percent as your percentage?
A I just backed into it, I doubled their, Phil and Rob's percentage and I, you know, we laid out, you know, for the employees for the rest of it, and then that's how I backed into 62.54.
Q And why did you choose that particular percentage?
A Why did I? Because it was a fixed percentage.
I'm not quite sure what, yeah, what you're asking here.
Q That's okay, Mr. Byrne --
A Yeah.

Q -- I actually -- I think I just asked my same question twice.
A Okay.
Q So that's on me.
A Okay.
Q Did you hear Ameris's lawyer say during the opening that the bonuses other Balboa employees would receive were only, you know, on average $9,000?
A Yeah, that wasn't -- yeah, that was a little bit of fuzzy math. So --
Q And can you explain what you mean by that?
A So 30 percent of the people received a 20 percent, right, a 20 percent bonus, right, based upon their base salary. So on average those people, those are the top people, right, on average their salaries are $100,000, so they received about $20,000.
The next amount of people, and yeah, you can go through and I can -- you know, it's all in here too -- the next amount, which is probably around 50 to 60 percent received 10 percent, right. So right, you get to the end of the year and your salary is $60,000, you receive $6,000.
I will also add that we paid Ameris people, right, that weren't even part of Balboa, right, including Sufhan, including Laura, including people in marketing and also including people that they had already moved over to them, so I -- yeah, so I

think it was, yeah, very much taken out of context.
Q Thank you.
And when you received the 2022 LTIP bonus for yourself do you remember how much money you received?
A 5.6 to $5.8 million.
Q And at that time did you have any reason to believe that the amount that had been calculated for the LTIP pool was incorrect?
A No.
Q Okay. Now that's 2022, let's start talking about 2023.
**MR. SESSIONS:** We'll go ahead and take this down.
And Your Honor, at this time I would move to admit into evidence Exhibit 382, and it's a joint exhibit, and I would also ask permission to publish to the jury.
**THE COURT:** Any objection.
**MS. FODE:** No objection.
**THE COURT:** Okay, Exhibit 382 is admitted, and you may publish.
**(Exhibit Number 382 received in evidence)**
**BY MR. SESSIONS:**
Q Okay. Mr. Byrne, do you recognize this email chain?
A Yes.
Q Okay. Let's start at the very beginning and go down to the email dated April 11th, 2023. Do you see that?
A Yes.

Q Okay. Who sent this email?
A This was from Sufhan.
Q And who is Sufhan?
A Sufhan would do the calculations, he worked for Ameris, but he was assigned to I think Balboa and maybe some other divisions, but he was the person that would do the LTIP calculations and send them to me.
Q Okay. So can you read the paragraph that appears after your name, Pat, starting with, please see attached?
A Please see attached the Q1 LTIP estimate. The target for quarter one was $12.1 million based upon the 2023 EBT target of 48.5 million for the year. EBT calculated was approximately 11 million for quarter one.
Q Okay. So what's happening here in this email?
A He would send me -- yeah, so for the first quarter after we finished up 2022, for the first quarter of 2023 he's sending me his estimate or Ameris's calculation, and what he's saying is that it is under for the first quarter.
Q Okay. And in layman's terms what does that mean when he says that the estimate -- what do mean when you say the estimate is under, under for what?
A For the EBT calculation, which means that there'll be no, you know, payout, but --
Q And did that surprise you?
A Yes.

Q Why?
A Because quarter one was one of the -- I think it was the best quarter that we had had, it was even better than the Q1 I think of 2022, and so yeah, it surprised me that we would be under the LTIP calculation, even though it stepped up, right, it stepped up from 37 million to 48.5 million for 2023, so.
Q So what did you do after Sufhan told you that Balboa was not meeting the threshold target at that time?
A I started to dig in and started asking for detail on, okay, how are we coming up with that calculation?
Q And did you notice any issues when you started to dig in?
A I did.
Q What were some of those issues you noticed?
A I think some of the other ones, yeah, the cost -- you know, I think the cost of funds issue, I mean sort of all the key indicator, you know, that they weren't following what was laid out for the key assumptions.
Q And when you say they weren't following the key assumptions, who are you referring to?
A Ameris Bank.
Q Okay. And then when -- if we scroll up to another email do you see one on this chain dated June 5th, 2023?
A Yes.
Q Okay. And who is this email from?
A It's from me to Jim LaHaise.

Q Okay. And can you read -- well before I ask that actually.

At this time, at this time period how was your working relationship with Jim LaHaise?

A Yeah, it was still positive.

Q And can you read the first line in the email that appears after, Hi, Jim?

A Hi, Jim, we want to point out a few items that must be added to the LTIP calculation for 2022 and Q1 of 2023.

Q Okay. So just to pause real quick before we go further, why are you mentioning both 2022 and 2023 in this email?

A Because I've gone back and I've looked, I started looking at 2023 and then I found some things actually that were the same issues for 2022.

Q And why do you say we want to point out in that sentence?

A Because it's the whole group. So for 2022 it's the whole group.

Now, my bonus was -- my individual bonus that's separate from the LTIP bonus, I was the only person that the calculation was based upon the earnings before taxes, so you know, you'll see further, right, every time it's a quarterly, you know, and Ameris is going to say that's all about me, it's not all about me, because it's a precursor to what's going to happen at the end of the year, if that makes sense.

Q So are the thresholds that you had to hit to get the

quarterly bonus the same or different as the thresholds for the annual bonus?

A They were the same.

Q Okay. Let's go ahead and go to another email.

**MR. SESSIONS:** At this time, Your Honor, I would move to admit into evidence Exhibit 389, it is a joint exhibit, and I would ask permission to publish to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay, Exhibit 389 is admitted, and you may publish.

**(Exhibit Number 389 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Another email chain. Do you recognize this one, Mr. Byrne?

A Yes.

Q Okay. Let's go to the earliest email on page ending in 1361 and 1362, I believe it's dated July 12th, 2023 at 11:15 a.m. Do you see that?

A Yes.

Q Okay. And then who is this email from?

A It's from Sufhan Majid.

Q Okay. And who was he sending it to?

A He's sending it to me.

Q Okay. And then can you go ahead and just read the email,

it's pretty short?
A Pat, attached is the LTIP calculation as of quarter two of 2023, please let us know if you have any questions in regard to the calculation.
Q And at this time had Sufhan calculated that you would be getting -- that you had hit the threshold for Q2 or had not?
A Had not.
Q Okay. And then going up to the next email dated July 13, 2023 at 11:42 a.m. Do you see that one?
A Yes.
Q Okay. And who sent this one?
A This is from me to Sufhan.
Q Okay. Can you read the second paragraph on that page, starting with, also can I?
A Also can I get the income statements and balance sheets by month for January through June and a list of all accruals as of June 30th, 2023?
Q Why did you ask for that information?
A I just want to see -- I wanted to see the calculations and I'm looking at the net charge offs and I think they are writing off loans that Ameris wrote off at inception called non-performing loans, so I don't know, just overall I am -- I'm just digging into the detail.
Q Okay. Let's go ahead and look at another email. This one is date --

**MR. SESSIONS:** This is one is also a joint exhibit, Your Honor, so I'd move to admit it into evidence as Exhibit 395, and I'd also ask permission to publish.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 395 is admitted, and you may publish.

**(Exhibit Number 395 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Do you recognize that email chain, Mr. Byrne?

A Yes.

Q Okay. Let's look at the email at the top dated July 23rd, 2023 at 5:54 p.m. Can you please read the first three lines of the email starting with, good morning?

A Good morning, Sufhan, I hope you had a great weekend. In reviewing the LTIP a few items have come to my attention.

Q And it's not clear from this page, but who wrote this email?

A That would be me.

Q Okay. Now, if we scroll down just so we can see the entirety of this particular email, there's a lot of information, without having you read it all, can you just explain some of -- to the jury what these items were that you were calling to Sufhan's attention?

A Yeah. Once again it just all comes down to the key

assumptions and they're not following the key assumptions in the LTIP.

Q Okay. And then underneath those five points can you read the sentence that starts with, I have revised?

A I have revised the calculation based upon the above and the blue tabs of the LTIP calculation June 30, 2023 spreadsheet. I have highlighted the changes in rows 147 to 152.

Q And then can you read the next sentence starting with, based on these revisions?

A Based on these revisions the LTIP target for quarter one and quarter two were met, so I ask that my bonus for quarter one and quarter two be paid out in the 7/30/23 payroll.

Q Okay. Let's go ahead and look at another email.

**MR. SESSIONS:** This one, Your Honor, is another joint exhibit, it's Exhibit 398, so I'd move to admit and ask for it to be published.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Exhibit 398 is admitted, and you may publish.

**(Exhibit Number 398 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Mr. Byrne, do you see the email on here dated July 24th, 2023 at 3:54 p.m.?

A Yes.
Q Okay. And who sent this one?
A This is from me again to Sufhan.
Q Okay.
A But it's copying, you know, David Sparacio, who is Sufhan's boss, Jim LaHaise, who's my boss, and Laura Rodriguez, who's head of compensation.
Q Okay. And then can you read the top line starting with, Sufhan, in reviewing?
A Sufhan, in reviewing LTIP for 2022 two items need to be revised.
Q Okay. And then can you read the line starting with -- that starts with, I have revised? I think it's under those two points. Yeah.
A I have revised the calculation based upon the above and the blue tabs of LTIP calculation of December 31st, 2022 spreadsheet. I have highlighted the changes in rows 147 to 164.
Q So in the last email what year were you looking at for calculations?
A 2022.
Q In the last email or --
A The last --
Q -- in this one are we looking at 2022?
A We're looking at -- I'm sorry -- this one, yeah, this is

2022. Apologies, yeah.
Q Okay. And then what was the last email addressing?
A 2023.
Q Okay, got it.
Let's go ahead and look at another exhibit.
**MR. SESSIONS:** Your Honor, this one is not a joint exhibit, so I'd ask permission to show it to the witness on blackout to the jury, it's Exhibit 10.
**THE COURT:** Go ahead.
**BY MR. SESSIONS:**
Q Okay. Mr. Byrne, do you recognize this document?
A I do.
Q Can you tell us what it is?
A It's the spreadsheet that Sufhan would send me that has the calculations for the LTIP, and this one specifically is calculating year-end of 2022.
Q And then after Sufhan sent it to you did you annotate this particular spreadsheet?
A I did.
**MR. SESSIONS:** Okay. Your Honor, at that time I'd move to admit Exhibit 10 into evidence.
**THE COURT:** Any objection?
**MS. FODE:** Yes, we would object on lack of authenticity, lack of foundation, as well as relevance.
//

**THE COURT:** The objections are overruled. Exhibit 10 is admitted, and you may publish.

**(Exhibit Number 10 received in evidence)**

**MR. SESSIONS:** Thank you very much, Your Honor.

**BY MR. SESSIONS:**

Q Okay. Can you -- we'll kind of scroll down slowly, and while we're doing it --

A Yeah.

Q -- could you explain to the jury what we're seeing? Because again, a lot of numbers here.

A Yeah. Yeah, there are a lot of numbers, and it's upside down actually, right, it's -- usually you'll see financials with revenues on top, but this starts at the bottom I guess, so as net income. But there's a lot of numbers.

In essence it's the financials for the Balboa Division, and it has month-to-date, quarter-to-date, you know, year-to-date, and if you're looking -- so what we're really looking at is C, column C, which is the actual for December of 2022, and then so you go down it's got all the, you know, provision for loan losses, it's, you know, got all this other stuff in here.

Q Right. And then let's actually go ahead and scroll down.

A Yeah.

Q Do you see this kind of rectangular with different colors on the screen?

A Yes.

Q Okay. Walk us through what this is.
A Yeah. So this is the LTIP. So calculation. And so if you look at that $56 million, yeah, right there, you know, that does all, right, that's just adding up everything, you know, that we've kind of scrolled through. And my -- what I'm doing is I'm only making a couple changes here and I'm highlighting them all. Right. So everything that you see in yellow are things that I've changed. So on the -- so for that 56 million, the only thing that I've added to that are to the left are the assets and the adjustments. And then, and then pretty much, and then, so when I do that, everything just rolls through.
Q And, you know, so did you alter at all, those -- all those numbers on the income statement that we saw up above?
A No, the hundreds of thousands of it. No, I did not.
Q Who populated those numbers?
A That was Sufhan and the Ameris accounting department.
Q Okay. And then how did you come up with these adjustments that you had highlighted in yellow?
A I got the detail from Sufhan and I made those adjustments.
Q And when you were doing those adjustments, what -- on what basis were you deciding to make them?
A Based upon what -- how the LTIP read.
Q Okay. And then if we can scroll down to like the bottom left, do you see where it says key assumptions?
A Yeah. So every time I would be sent this spreadsheet,

these key assumptions would be at the bottom, which was populated by Ameris, I'm assuming, well, yeah, by Ameris. And so you can see these are exactly off of the LTIP document.

Q Okay. And now remind us, just so you could summarize for us, when you did recalculations, did you discover that more LTIPs should have been paid or less?

**MS. FODE:** Objection. Leading.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes. It was always lower.

**BY MR. SESSIONS:**

Q What was always lower?

A The earnings before taxes was always lower and right, which meant that there was either no or reduced bonus pool for the employees.

Q So was your determination that there should have been more LTIP payment or less LTIP payment?

A More.

Q Okay. Okay. Let's go ahead and take this down.

**MR. SESSIONS:** Your Honor, at this time, I'd like to show the witness another exhibit on blackout. This is Exhibit 49.

**THE COURT:** You may proceed.

**BY MR. SESSIONS:**

Q Okay. Do you recognize this document, Mr. Byrne?

A Yes.

Q What is it?
A It's an email from, let's see, yeah. So it's to me from Sufhan.
Q Okay. And --
A And it's copying Nicole Stokes, who's the CFO, Phil Silva, who is the president, and Jody Spencer, who is the chief legal officer, who's in the audience.
Q Can you scroll down further on this email chain, Ms. Perez, the one appearing below it? Okay. So I'm sorry. Just scroll back up. Do you see the signature block on the page?
A Yes.
Q Whose signature block is that?
A Jim Lahaise.
Q And so who wrote this email?
A Jim Lahaise.

**MR. SESSIONS:** Okay. Your Honor, at this time, I'd move to admit Exhibit 49 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay. Exhibit 49 is admitted, and you may publish.

**(Exhibit Number 49 received in evidence)**

//

//

**BY MR. SESSIONS:**

Q Okay. Let's go to the email dated August 4th, 2023, at 10:30 a.m. Do you see that?

A Yes.

Q Okay. Did you send this email?

A Yes.

Q And then who did you send it to?

A Jim Lahaise.

Q Okay. Can you read the first two sentences, starting with Jim?

A Jim, I need my bonus for quarter one and quarter two to be paid out. I have been more than patient here, as the Q2 bonus has been withheld for several weeks. The Q1 bonus has been withheld for over three months.

Q So can you explain to us what you're emailing Mr. Lahaise is about at this time?

A I'm referring back to the calculation and saying, hey, we hit it and my bonus is to be paid -- my individual bonus is to be paid out 30 days after the end of the quarter. And so now, right, you know, you're late and I've waited, right, I've waited months now.

Q Okay, so let's scroll up to the top email in the chain dated August 4th, 2023 at 7:40 p.m. Do you see that one?

A Yes.

Q Okay. And is this a response from Mr. Lahaise?

A Yes, it's a response and it's copying Nicole Stokes, Phil Silva, and also the chief legal officer, Jody Spencer.
Q Okay. Can you read just the first sentence after the word Pat?
A Pat, here's our calculation.
Q So what is Mr. Lahaise sending to you in this email?
A He's sending --
**MS. FODE:** Calls for speculation. Pardon me.
**THE COURT:** The objection is overruled. You can answer if you know.
**THE WITNESS:** He's sending Ameris' calculation for the LTIP.
**BY MR. SESSIONS:**
Q Okay. And what was Mr. Lahaise's conclusion with respect to whether you had met the LTIP threshold for Q1 and Q2 2023?
A His conclusion that we had not.
Q Okay. And then if we scroll down, can you read the sentence that starts with, it's after these bullet points, I will get payroll to submit.
A Okay, so this is from Jim. I will get payroll to submit your quarterly incentive on Monday, which should bring this open issue to a close.
Q So what's happening here in this sentence?
A He's --
**MS. FODE:** Document speaks for itself.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** He's trying to pay me off and saying that even despite his contention that the LTIP was not hit, that he's still going to pay my quarterly bonus.

**BY MR. SESSIONS:**

Q So did they end up paying you your quarterly bonus for Q1 and Q2?

A They did.

**MR. SESSIONS:** Okay. Let's go ahead and take that down and look at the next email, Your Honor. I've asked to show this one on blackout as well. It is Exhibit 69.

**THE COURT:** Okay. Just one moment. Go ahead.

Q Okay. Is this another email chain, Mr. Byrne?

A Yes.

Q And who are the participants on the email chain?

A It's to me from Jim Lahaise.

Q Okay. And was this email sent to and from you while you worked at Ameris?

A Yes.

**MR. SESSIONS:** Okay. Your Honor, I'd ask for permission to admit Exhibit 69 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

//

//

**THE COURT:** Exhibit 69 is admitted and you may publish.

**(Exhibit Number 69 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Let's go to the email on here dated October 16th, 2023 at 1:44 p.m. Do you see that one? Sorry, Ms. Perez, October 16th. Technology's great when it works. Thank you so much. What's the subject line of this email?

A Q3 2023 LTIP.

Q And then who sent this email?

A It looks like Sufhan to me and Phil.

Q Okay. And can you read just the one sentence on the email?

A Pat, see attached for the quarter to date LTIP.

Q And did they determine that you would or would not be qualifying for a Q3 2023 LTIP?

A Would not.

Q Okay. And then let's scroll up to the email dated November 3rd, 2023. And who is this email from? If we need to zoom in, I know it's kind of small.

A Yeah, yeah, yeah. Right. It's from me to Sufhan, copying Laura and David Sparacio and Phil Silva.

Q Okay. And again, a lot of information here. Can you just summarize for us what you're conveying in this email?

A Yeah. Once again, I'm just conveying, went back for the

quarter three and we hit the LTIP, and I'm just laying out all my calculations and, you know, I put them into the spreadsheet and delivered them similar to what we looked at previously.

Q Okay. And then let's go up to the email dated November 15th, 2023. Do you see that one?

A Yes.

Q Okay. And is this one, who is this one from?

A This one's from me to Jim.

Q And is that Jim Lahaise?

A Jim Lahaise. Correct.

Q Okay. Can you read your full e-mail here.

A Hi, Jim. I noticed that my Q3 bonus based on hitting the LTIP target for Q3 was not in my paycheck today. This is the second consecutive quarter that my bonus has been withheld. Please remit as soon as possible. Thank you for your prompt attention to this matter.

Q Okay, then let's go up to the next e-mail dated November 16th, 2023 at 10:02 a.m. Do you see that one?

A Yes.

Q Okay. And did Mr. Lahaise write this one?

A Yes.

Q Can you read his response to you?

A Pat, your statement that we missed your quarterly bonus again is wholly inaccurate and quite counterproductive. As with your Q2 LTIP calculation, the Q3 adjustment to the

calculation you have made have not been -- have been not mutually agreed to by us. I will take a look at them and call you to discuss. Are you available early next week? Thanks.

Q What was Mr. Lahaise's response to you once you sent him the e-mail asking for your Q3 LTIP to be paid?

**MS. FODE:** Document speaks for itself.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** He's basically shutting it down and saying it's not owed, and then not even more so that it's counterproductive that I even bring it up.

**BY MR. SESSIONS:**

Q Okay. Well, let's go up to your response. If we can go to the next e-mail in the chain, which I believe is at 10:22 a.m. Okay. Can you go ahead and read your e-mail back to Jim? Excuse me, to Mr. Lahaise.

A Yeah. So I think I respond within 20 minutes, and I say, hi, Jim. I believe my statement around the quarterly bonus is accurate, and I'm sorry that you construe any view that I have that doesn't align with yours as counterproductive. I'm on vacation next week, but I'm happy to talk any time the following week if that works for you.

Q Okay. Let's go ahead and take that down, and let's go to Exhibit 409.

**MR. SESSIONS:** Your Honor, this is a joint exhibit, so I'd ask for it to be admitted and permission to publish.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 409 is admitted, and you may publish.

**(Exhibit Number 409 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Let's go to the e-mail dated November 3rd, 2023, at 11:12 a.m. Okay. Is this the same e-mail we looked at just a few minutes ago from you to Sufhan and cc'ing all these other people?

A Yes.

Q Okay. Let's go up to another e-mail, then, in this version of the chain. If we scroll up to November 3rd, 2023, at 11:29 a.m., and who sent this particular e-mail?

A It looks like Sufhan is sending it to his boss, David Sparacio, and then the chief financial officer of the company, Nicole Stokes, and then also another person in accounting, Matt Rue (phonetic).

Q Okay. And then are you on this part of the e-mail chain?

A No.

Q Okay. Can you just read the sentence that Sufhan wrote?

A Sufhan writes, Nicole, see below for LTIP adjustments proposed by Pat.

Q Okay. And then let's scroll up to the next e-mail dated November 3rd, at 9:04 a.m. Okay. Who wrote this e-mail?

A This comes directly from the chief financial officer, Nicole Stokes.
Q And who is she sending it to?
A She's sending it to me, and she's copying Jim Lahaise.
Q Okay. Can you go ahead and read her e-mail to you?
A Pat, I do not agree with these adjustments. Would you like to set up a time next week to discuss?
Q Okay. Let's go ahead and go to -- well, actually, before we go, did Ms. Stokes ever give you a reason that she did not agree with your adjustments?
A Not here.
Q Okay. And then let's go up to the next e-mail to your response, which is, I believe, the same day at 10:30 p.m.
A I just respond, sure.
Q Okay. And did you and Ms. Stokes ever meet to discuss?
A Meaning -- yeah, if you want to reach out and talk to me, yeah, I'm available, and I just -- have a good weekend.
Q And did she ever reach out, or did you ever connect on these issues with her?
A Not based upon this trail, no.
Q Okay. And why didn't you end up meeting with her?
A I just thought as the CFO of the company, she would reach out when she wanted to discuss this with me, but she never did.
Q Okay. So that was in November. Let's go back to Exhibit 69. Okay. Do you see the top of the chain, the e-mail dated

December 22, 2023?
A Yes.
Q Okay. And then who wrote this particular e-mail?
A This is coming from Jim Lahaise.
Q Okay. Can you go ahead and read the full e-mail?
A Pat, we will be remitting your Q3 incentive payment that should be in your December 30th, '23 payroll. In addition, I have included an interest payment of $1,003, 4 percent for 61 days, which is for missing the 30-day post-quarter end payment date in your employment agreement. Happy holidays, and I look forward to a great 2024. Jim.
Q So did you end up getting paid a Q3 LTIP payment?
A I did.
Q And what does it mean when they say that they'll also be paying an interest payment?
A That it was beyond the 30-day period called out for in my employment contract, so they were applying some sort of interest rate to that.
Q Okay. Let's go ahead. So that was the end of 2023. Let's turn to your review for that year.
**MR. SESSIONS:** This, Your Honor, I would ask to move into evidence. It's Exhibit 453. It's a joint exhibit, so I'd ask for it to be admitted and to publish to the jury.
**THE COURT:** Any objection?
**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 453 is admitted, and you may publish.

**(Exhibit Number 453 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Is this your performance review for 2023?

A It is.

Q And did Mr. Lahaise write this one as well?

A He did.

Q Now, stepping back, were you personally satisfied with your performance in 2023?

A I was.

Q And why were you satisfied with your performance?

A Yeah, we had a number of different things that Ameris did to slow our growth, and that happened in the first quarter. They restricted the amount of portfolios that we could buy. They didn't allow us to hire people. And so they were, in essence, slowing our growth down. So if you slow the growth down, the earnings before taxes will slow down. And so they purposely did that. Despite that, based upon our LTIP calculations, we made over $48-and-a-half million. We met the threshold. Even though the threshold was higher, it was 37 million, and then the next year, 2023, it went to 48.5 million. So we still exceeded that and made a tremendous amount of money for Ameris and created a tremendous amount of value for the Ameris shareholders.

Q Let's scroll down just a little bit on this page. Do you see where your final score is?
A Yes.
Q And what was the final score? Can you read that that Mr. Lahaise gave you?
A He gave me a three.
Q And what are the words appearing after the three?
A Met expectations.
Q Okay. And then let's scroll to the last page of this review. Okay. Are these comments from Jim Lahaise right here?
A They are.
Q Okay. Can you go ahead and read his comment?
A Sure. Pat is unhappy with the level of autonomy he has in leading the division. There are strained relationships with some leaders in the company. We would like for Pat to continue a long-term role leading divisions, so he will need to decide if he would like to continue in that role.
Q Okay. Did you agree with that characterization?
A No.
Q Okay. Can you explain why?
A Yeah. I was not unhappy with my level of autonomy. I sold the company. I wanted to have less responsibility. But also the deal was not to switch over all of these departments. Right? So it wasn't about autonomy. It was about not being charged the LTIP. And the conflicts resulted from those

departments. Right? The IT Department, Ross Creasy, you know, the Accounting Department, all the issues I had. Those were a result of the movements that they made to these departments. So it was wholly inaccurate or mischaracterization of that.

Q Thank you. Let's go ahead and talk about 2024 now. Let's look at another email.

**MR. SESSIONS:** This is a joint exhibit, Your Honor. It's Exhibit 3 -- sorry. Exhibit 437. It's a joint exhibit, so I'd ask for it to be admitted into evidence and for permission to publish.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Exhibit 437 is admitted and you may publish.

**(Exhibit Number 437 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Another email chain, Mr. Byrne. Let's start with the email dated January 10th, 2024, at 10:18 a.m. Okay. Do you see the email on the screen?

A I do.

Q And who sent this one?

A This is from Sufhan, yeah, so this comes out after the end of the year, and this is 2024. So around the 10th of the month, Sufhan would send out the LTIP calculations, and so this is for all of 2023 coming from Sufhan.

Q And what had Ameris determined in terms of whether the LTIP threshold, sorry, the EBT threshold had been met for 2023?
A Their determination based upon -- yeah, their math was that we did not hit the EBT.
Q Okay, and then going up to the email on January 15th, 2024 at 4:42 p.m., do you see that one?
A Yes.
Q Okay, and who sent this one?
A It was from me to Sufhan, David Sparacio, and Phil Silva.
Q Okay, and can you read the first sentence in the email?
A In reviewing the LTIP, a few items need to be revised.
Q Okay, and then can you tell us again what you're laying out here in this email?
A Yeah, it's almost a template at this point, but I'm laying out all the, you know, issues where they're not following the key assumptions in the LTIP.
Q And when you say it's almost a template at this point, what do you mean by that?
A I mean, they're the same arguments. I keep bringing this up in terms of, you know, they're the same arguments in terms of, yeah, not following the LTIP document.
Q And why did you feel like you had to keep raising the same arguments?
A Because, yeah, because our folks weren't being paid.
Q Let's go ahead and look at the attachment spreadsheet to

this email.

**MR. SESSIONS:** This is not a joint exhibit, Your Honor, so I'd ask for it to be shown on blackout. It's Exhibit 190.

**THE COURT:** Go ahead.

**BY MR. SESSIONS:**

Q Okay, do you recognize this spreadsheet, Mr. Byrne?

A I do.

Q Okay, can you briefly tell us what it is?

A It's what we, yeah, it's kind of what we looked at for 2022, but this is for 2023. It's the spreadsheet that's calculating the LTIP calculation.

Q And who prepared this spreadsheet originally?

A Sufhan or Ameris accounting.

Q And did you annotate it?

A I did.

Q And was this spreadsheet sent to you?

A Yes.

**MR. SESSIONS:** Okay, Your Honor, at this time I'd move to admit Exhibit 190 into evidence and ask permission to publish.

**THE COURT:** Any objection?

**MS. FODE:** No objection, Your Honor.

//

//

**THE COURT:** Okay, Exhibit 190 is admitted and you may publish.

**(Exhibit Number 190 received in evidence)**

**BY MR. SESSIONS:**

Q Okay, and then can you remind us what year is this LTIP spreadsheet for?

A This is calculating December 2023, so the performance period of 2023.

Q The entire year?

A The entire year, yes.

Q Okay. And if we scroll down to the bottom, can you walk us through what we're seeing here with the green highlights?

A Yeah, once again, my changes are in green, and I'm calculating that they have under -- they're under by about $10.5 million.

Q And can you explain what you mean when you say they're under by $10.5 million? What is under by 10.5?

A Yeah, apologies. But, yeah, so what I'm saying there in the green is that these are the areas where they have not followed the key assumptions, and I'm adding them up, and that adds up to 10.5 million. So the LTIP EBT should be increased by 10.5 million.

Q Perfect. Let's go back to the emails again.

**MR. SESSIONS:** This time, Your Honor, I would ask to admit a joint exhibit. It's Exhibit 482, and I'd ask for

permission to publish as well.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** Exhibit 482 is admitted and you may publish.

**(Exhibit Number 482 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Let's go down to the first email in this chain, dated January 31, 2024, at 11:11 a.m. Do you see that?

A Yes.

Q Okay. Who wrote this email?

A This was from me to Jim Lahaise and copying Phil Silva.

Q Okay. Can you read your first sentence in the email?

A Hi, Jim. Here's a list of items that we need to be paid on.

Q Okay. And can you read points two and three?

A 2022 LTIP, 1.457 million. 2023 LTIP, $3 million approximately.

Q And then just so we're all aware, on point one, what are security deposits?

A These are, I think it's mislabeled here, but they're nonrefundable commitment fees, I guess.

Q Okay. And then what is it that you're asking, Jim, here in this email, if you could just summarize to the jury?

A These are the amounts that need to be -- well, the LTIPs

need to be increased. I'm sorry, these are the payments. These are actually, after doing all the calculations and looking at the LTIP pool, this is what's owed on the pool.
Q And when you say the pool, is that just to you or for everyone who participates?
A That's for everyone that participates.
Q Okay. And then scrolling to, no, forgive me. We're going to the next document.

**MR. SESSIONS:** This will be -- this is a joint exhibit, Your Honor. It's Exhibit 100, and I'd move to admit it into evidence and to publish to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** Exhibit 100 is admitted, and you may publish.

**(Exhibit Number 100 received in evidence)**

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

Q Okay. Let's look at the email here dated February 5th, 2024 at 6:14 a.m. Okay. It's a long one, so I won't have you read the whole thing. But first, just who sent this email?
A This is, yeah, I sent it.
Q And it looks like there's a number of people on this email chain. Who are these people?
A Yeah, these are the executive, sort of, of Balboa

Capital. There's, you know, like ten people.

Q And how many of these people were LTIP participants?

A All of them at 20 percent.

Q Okay. And then on the email chain, can you read the paragraph that starts with the words, there is a disagreement? Let's see if we, I think it's on the next page. Yeah, there we go.

A There is a disagreement on how the LTIP is calculated, which I have been raising with executive management since April 2023. For 2023, Ameris calculates the LTIP at 46.6 million, slightly lower than the $48.5 million goal, resulting in no bonuses.

Q Why were you conveying this to those Balboa employees that we saw on the email chain?

A Well, they were expecting it. They worked hard. They received it in 2022. I've been keeping them up to date, and so this was not a surprise. But, yeah, I'm just keeping them apprised.

Q Okay. And then can you read, skipping over a paragraph to the next one, it starts with, I am sorry. Can you read that sentence?

A Yep. I am sorry I don't have better news, but hopefully this addresses your questions on the numbers.

Q Okay. And how did it feel to communicate this to those Balboa employees at that time?

A Horrible.
Q And why?
A Well, they did the work. Yeah, we earned it. Ameris made a ton of money. They probably doubled their investment. And, you know, they earned it, and they weren't being paid.
Q Okay. Now, let's go back to the last email chain, which was Exhibit 482. Okay. Now, I believe this is the same day. Do you see an email dated February 5th, 2024 at 9:50?
A Yes.
Q And then who sent this one?
A This is from Jim Lahaise to me.
Q Okay. Now, again, a lot of information here. Can you just summarize to the jury what Mr. Lahaise is saying to you in this email?
A I mean, he's basically saying, you know, go pound sand, right? Yeah, I'm not taking any of your calculations, and yes.
Q Can we just scroll through, Ms. Perez, just so we can all see the length of the email? Okay. Thank you very much. Let's go up to the email dated March 1, 2024 at 9:20 a.m. Okay. Do you see that email?
A Yes.
Q Okay. And who sent this one?
A This was from me to Jim.
Q Okay. Can you just read the first sentence of the email, starting with, we have discussed?

A Jim, we have discussed the three points below numerous times, and I've sent many emails on these topics starting approximately nine months ago.

Q Okay. And then if we can move down to a paragraph that starts with, as you said in my review. Can you read that?

A As you said in my review, you have iterated many times since the acquisition you would like me to continue as CEO. However, as I have mentioned in the review and many times before, Ameris's actions speak differently. For example, we are constantly at odds over the calculation of the LTIP, which determines the appropriate annual bonuses for our best people. You have rejected every idea that I've had for improvement since the acquisition, and you have transferred almost all my duties either to managers at Ameris, for example, accounting, credit, IT, and marketing, or to Phil, which has materially decreased my authority, duties, and responsibilities. When we started to work together, I took you for your word that you would like me to continue as CEO, but after two years, it is no longer about what you say, but what you do.

Q Okay, and then if we scroll down, can you please read the last paragraph?

A I have consistently been transparent from the time of the acquisition with you and several other members of the Ameris executive team, saying that if you don't find what I'm doing valuable, please let me know. I have added significant value

to Ameris and would like to continue doing so. However, if the feeling is not mutual, please suggest how we move forward.

Q So what are you conveying here to Mr. Lahaise?

A I'm saying, you know, I want to work here. I know I can add value. I want to be on the same team with you. But, you know, we've got to get over this LTIP issue. And what your actions are, every time I have all these reviews that are good, right, I have everybody tells me, you know, everything's going great, but then you shut me down on this LTIP. So your actions at this, right, you get in a relationship, it's give and take, right? But at some point, right, it's not about what you say, it's what you do. And so the actions are incongruent with what they're saying.

Q Thank you. Okay, let's go ahead and take that down and let's go to on blackout, Exhibit 95.

**THE COURT:** It's 10:30. Is this a good time to take our morning break?

**MR. SESSIONS:** This would be great, Your Honor.

**THE COURT:** Okay, so we're going to take a 15-minute break. Sir, you can go ahead and step down. To our jurors, we'll see you back here at 10:45. Please don't discuss the case amongst yourselves or with anyone else and don't do any research about any aspect of the case. We'll see you in 15 minutes.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE CLERK:** Court is in recess.

**(Recessed at 10:30 a.m.; to reconvene at 10:49 a.m.)**

**(Jurors present)**

**THE CLERK:** Please be seated. Mr. Byrne, can I have you come back and take a seat on the witness stand?

**(Pause)**

**THE CLERK:** All rise. This court resumes in service.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated.

Okay, Mr. Byrne, you're still under oath, okay?

**THE WITNESS:** Yes.

**THE COURT:** Okay, Mr. Sessions, you may proceed when you're ready.

**MR. SESSIONS:** Thank you so much, Your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MR. SESSIONS:**

Q Okay, so just to make sure we all remember where we left off, you had mentioned your frustration and saying that you were hoping for less responsibility when you sold to Ameris. Can you explain what you mean by that?

**MS. FODE:** Leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yeah, just that. I was working seven days a week until -- when I -- before I sold the business, and

I was all sorts of responsibility running Balboa, and so I thought what I was signing up for was less responsibility. I just wanted to run the division. There was a number of other things that I was doing before the acquisition, so what I thought I was signing up for was less responsibility. That's sort of what I wanted.

**BY MR. SESSIONS:**

Q And what were the things that you were doing before the acquisition that you thought were going to go away once you sold?

A Well, a lot of the financing, right? I had about eight bank lines and things like that, so that was supposed to be taken care of. And a lot of the other stuff like the IT portion, the marketing portion, some of these other things that I thought would be better, less stressful for me.

Q And when you say you were hoping to just run the business, what do you mean by that?

A Yeah, I just wanted to run the business. I had all, you know, there was complications that came from all these departments reporting to Ameris, so I thought that would be relieved when Ameris took over, but in fact, it was actually, it got more complicated.

Q And around this time where we left off, which was March 2024, can you just tell us what your day-to-day was like as CEO of Balboa Division?

A Yeah, so I'm getting like 200 emails a day from people, and I'm not exaggerating when I'm saying that. I've got, you know, three, you know, at least three, probably three meetings a day with various, you know, various Ameris personnel or, you know, Balboa personnel or things of that sort. So, yeah, I mean, things are hectic, and then I have the added stress of, you know, having these strained relationships with some of the Ameris folks, so.

Q And aside from having to deal with the LTIP issues, what were just typical things you would do? Like, what does the CEO of a division do on day-to-day? Like, what's your job?

**MS. FODE:** Asked and answered.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yeah, so my position has always been, you know, where can I add the most value? So that's why I always had just one person reporting to me. So it was, okay, I'm just going to go find the areas where I think I can have the most significant impact. And so, you know, that's what I do. So the sales piece was going pretty well. So, you know, let's look at the, you know, how we're collecting because there's, right, obviously an issue with some of this trucking stuff. Let's dig into how we're credit scoring the, you know, the applications and working a lot with Rob. So I was working a lot on the operations piece, you know, sort of at that time.

//

**BY MR. SESSIONS:**

Q And during Ameris' opening statement yesterday, did you hear them use the phrase that you went on strike in 2024?

A Yeah, I did.

Q And do you agree with that statement?

A No, it was a good tagline, but no, it's absolutely false.

Q Can you explain why it's false.

A Because I was, yeah, I was still fully invested in the business, right? I was, you know, not only, and they're going to make it seem as though I was only doing this calculation. No, that's not it. I was doing my job. I was, you know, showing up everywhere, and I was doing everything I could to make it great for not only Ameris, but the employees. Yeah, so, yeah, that's what I was doing.

Q Okay, well, one more thing before we go to the next document. Relatedly, did you hear the statement made in the opening statement that you supposedly said, why don't you just fire me?

A Yeah, totally taken out of context, and this would come up a few times, right? My position was always, I think when we just read it, if you think I know I'm creating value, I know I can continue to create value, but if you don't think so, then, yeah, let's just have a conversation. You know, we're all big boys here, right? We understand sometimes relationships don't work out, but don't lie to me, right? And just be straight

with me.

Q And did you want to remain as CEO of the Balboa Division?

A Yeah, yeah, I thought I was signing up for a team, but, you know, it turned out to be that, yeah, that they would isolate me and, you know, kind of cut me out of the team. And so, yeah, it doesn't feel good. But I didn't want to be there if that was the case, but they kept telling me, no, yeah, we want to be here. And, yeah, there's nothing that you'll see to suggest anything differently. I never said I was going to quit, right? You have people saying, everybody says, nobody says that I was going to quit. I wasn't going to quit. There was only six months left. Why would I do that?

Q Okay, let's go to the next exhibit.

**MR. SESSIONS:** This is not a joint exhibit, Your Honor, so I'd ask to show it on blackout. It's Exhibit 95.

**THE COURT:** Go ahead.

**BY MR. SESSIONS:**

Q Okay. Do you recognize this e-mail chain, Mr. Byrne?

A I do.

Q Okay, and who is it from?

A It is from Jim Lahaise to me.

Q Okay, and what's the subject line?

A It is a -- it's about my employment contract, but it's a non-renewal, basically a non-renewal notice.

Q Okay, and did you receive this e-mail while you worked at

Ameris?

A I did, I did.

**MR. SESSIONS:** Okay, Your Honor, at this time I'd ask to admit Exhibit 95 into evidence and to publish to the jury.

**THE COURT:** Any objection?

**MS. FODE:** None.

**THE COURT:** Okay, Exhibit 95 is admitted and you may publish.

**(Exhibit Number 95 received in evidence)**

**BY MR. SESSIONS:**

Q Okay, can you read the full sentence, can you read that full line in the e-mail?

A Yeah, so it says, Pat, attached is a non-renewal notice, want to give you plenty of time to work through our long-term plan together.

Q Were you surprised to get this non-renewal notice?

A Yeah, this was six days after my review, right, where he says, I want you to be here, right, once again. And so no advance notice, right, no advance notice, no call, right, nothing. Just, I just get this out of the blue, you know. And hey, look, I get it, it's, you know, if you don't want to non-renew me, okay, that's fine. You didn't really need to do this because the LTIP said that you only need 30 days, but even just humanely, right, just, like, can you just pick up the phone and just say, hey, this is why we're going to do this, but no, no

advance notice.

Q What as your impression -- sorry. I didn't mean to cut you off.

A Yeah, so that -- I mean, that's the thing. And then once again, it's like, okay, here we go again, six days later, two of which are, right, two of which are a weekend.

Q What was your impression of when he says, I want to work through our long-term plan together?

A Well, I mean, yeah. I mean, it appears that his long-term plan is just to get me out, I guess in retrospect. But yeah, what is our -- what is our long-term plan? We just had a -- right. We just had a review. Right. You six days later. Right. You know, you send this out to me. You don't even give me a heads up. And I don't know what is our long-term plan.

Q Okay. Let's go and take this down and let's go back to Exhibit 482, please. Okay. What's the final date on this email chain, Mr. Byrne, shown there at the top?

A May 6th of 2024.

Q Okay. And can you -- is this the same email chain we were looking at earlier where the LTIP discussion was going back and forth?

A A lot of emails. But yeah, I would imagine.

Q Okay. Can you go ahead and -- well, first, can you identify who's sending this email?

A Jim Lahaise.

Q Okay. Can you go ahead and read his email?
A Pat, we did discuss it and I did reiterate that your assumptions were not correct on the LTIP adjustments and that that matter was closed. I am confirming that you are not due and never have been due additional payments for 2022 and 2023 LTIP or the purchase price of the company.
Q Okay. So what was your understanding of what Mr. Lahaise was conveying to you at this time?
A Yeah, we've been talking months and months and months, but this is like it. This is, you know, we're shutting everything down.
Q And shutting down what? What do you mean?
A Any, you know, any consideration for, you know, the LTIPs and, you know, the discrepancies that I pointed out in the LTIP, you know, difference between the LTIP agreement and then what they've paid out on.
Q Okay. And then sticking with this time frame, do you remember yesterday Amaris's lawyer during the opening showed an email around May 9th, 2024, between you and Phil Silva?
A Yes.
Q Okay. In fact, let's pull up Amaris used. I think it was slide 32 of their presentation.

**MS. FODE:** Objection to the use of PowerPoint from the opening.

**THE COURT:** The objection is overruled.

**BY MR. SESSIONS:**

Q Okay. Do you remember this slide, Mr. Byrne?

A Yes.

Q Okay. Do you see what they wrote up top? Violation of internal controls.

A Yes.

Q Okay. Before we get into the specifics here, did you ever violate any internal controls while you were at Amaris?

A No.

Q Okay. So do you recognize this excerpt from an email chain they put up here between you and Phil Silva?

A Yes.

Q Okay. Could you just give us the background of what's going on here?

A Okay. So we get to January and there's not going to be a LTIP payout for 2023. So we get into 2024, and just as myself and Rob Rasmussen had projected the losses for -- the losses are going down. And so the LTIP, right, there's going to be a payment on the LTIP, right, Jim sends me something. Hey, yeah, it looks like, right, moving forward, we're going to just, you know, try to, you know, forget about everything for 2023, but 2024, there's going to be an LTIP payment. Well, coincidentally, right, a couple of days later, I get something from the head of Dave Sparacio, and he's saying that, no, we're coming up with another way that we're looking at the

calculation of something else, another key assumption. And, you know, this is going to lower your EBT and not only is it going to lower your EBT, it's going to do it retroactively. And so and Phil comes to me and said, oh, my God. Right. This is what Ameris kind of signed up for. This was one of the big reasons why they acquired us, but this is going to have a 20 to 25 percent hit on us. A 20 to 25 percent reduction in originations, which is going to severely lower, right, the EBT and the bonus payments. So it's just -- it's not coincidental that this occurred at the same time. So -- sorry, long story.
Q Yeah. So what are you and Phil discussing here in relation to that?
A Sorry. Long story short. Basically, I'm just suggesting like, hey, we should probably look at the way that we're potentially doing this. And I'm just, you know, suggesting, you know, just trying to brainstorm at this point.
Q Did you have any ability to change internal controls of Ameris?
A No, I don't have any -- no, I can't do that. Phil can't do that.
Q Okay. Let's go and take that down. Okay, so before we get to what happened next in your employment, let's dig into those key assumptions you keep referencing. Can we pull back up Exhibit 546, the LTIP agreement? Okay, let's look at the key assumptions. Can you please read key assumption A?

A Key assumption A. Initial direct costs will be calculated using GAAP methodology.

Q Okay, what is an initial direct cost?

A Initial direct cost is something that would be -- in this context, a direct cost would be, you know, salaries for sales type of thing for Balboa. Indirect cost would be kind of that overhead piece, right? It's sort of, you know, the marketing, the IT. It's what the corporate is going to, right, you know, support for the division.

Q Got it. And then remind us, is GAAP mentioned in any of the other, excuse me, key assumptions here?

A No, just that one.

Q Okay, and then can we look at footnote three, please? Can you read the second sentence there, starting with the general premise?

A The general premise of the LTIP is to materially follow past practice, which this calculation is maintaining.

Q Okay, and did you feel when you were raising these issues with Ameris that it was properly following this past practice requirement?

A No.

Q Okay, well, let's look at an example. Let's go back to Exhibit 482 and look at an email dated February 5th, 2024 at 9:50 a.m. We've seen this one already. Can you remind us who wrote this email?

A This is from Jim Lahaise.
Q Okay, and let's go to, it's number five under heading three. It's the sentence that starts with the accounting for interim rent. Can you read that one?
A Yes. The accounting for interim rent was changed with the effectiveness of ASC 842. The accounting change was identified in the due diligence process and its impact was reflected in the 1-Q '21 Pioneer Operating Model. Historically, average of 3.5 percent was reduced to 2 percent in the model.
Q Okay. Can you explain to the jury what interim rent is?
A Interim rent is, I guess, one of the best examples is like if you move into an apartment, right, on the 15th of the month, so you'll pay, right, the interim part would be the 15th to the 30th, and then you would have payments after that.
Q And is interim rent an initial direct cost?
A No.
Q Okay. And what is ASC 842?
A That's an accounting pronouncement, right, that determines, I think what they're saying, that determines whether the interim rent should be accounted for upfront versus kind of over time.
Q And does that have anything to do with GAAP accounting?
A Does it have to do with GAAP accounting? Yeah, ASC 842 would be part of GAAP accounting.
Q Okay. And does the Pioneer Operating Model help us

remember, does that change as GAAP changes?
A No, no, you can't change the goalposts, right, you can't.
Q Okay. And so was it your understanding at this time that key assumption A regarding applying GAAP would have applied to interim rent?
A No, no, and yeah, it's irrelevant whether it went down from 3-and-a-half percent to 2 percent because, you know, the methodology is set in the Pioneer Model.
Q And what do you make of his statement that the Pioneer Model, in the Pioneer Model it was reduced from 3.5 percent to 2 percent?
A Well, yeah, I mean, I know why it was done, but it really is irrelevant why, you know, for any purposes, because the methodology in the Pioneer Model was exactly the same, only the 3-and-a-half percent was reduced to 2 percent, but it's still on a cash basis. The methodology is still consistent. And does it really matter? It's a projection. The only thing I tell people, what's wrong with the projections? Only thing I know with projection is I know it's going to be wrong. Because, yeah, there's so many variables, right? So the methodology didn't change and the interim rent is what it is. So --
Q And help us remember with the LTIP, were you supposed to look at projections or past practices?
A Past practices, always.

Q Okay, and then what was the effect of Ameris using GAAP here on Balboa's calculated EBT?
A Coincidentally, it went down.
Q Okay, let's look at another email.

**MR. SESSIONS:** This is Exhibit 73, Your Honor. It's a joint exhibit, so I'd ask for permission to admit into evidence and to publish.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay, Exhibit 73 is admitted, and you may publish.

**(Exhibit Number 73 received in evidence)**

**BY MR. SESSIONS:**

Q Okay, Mr. Byrne, we're going to go to your email here, dated December 8th, 2023. Do you see that?
A Yes.
Q Okay, and who are you sending this to?
A I'm sending it to Sufhan.
Q Okay, and then remind us one more time, what was Sufhan's job?
A He was the accounting manager that was responsible for putting the financials together for the Balboa division.
Q Okay, can you read your paragraph there under Hi, Sufhan?
A Hi, Sufhan, I understand there was a discussion today with Jim Grant and John Edwards, among other things, around how to

handle our 900 accounts. Can you let me know what was decided here and what changes are being made on the accounting side?
Q What are 900 accounts?
A These are stipulated judgments. It's just, I guess, just high level. It's just another change in the accounting, and which, not coincidentally, lowers earnings before taxes. And I think what I'm saying here is you're not even telling me about this. You're just making changes without my even knowledge.
Q Okay, well, let's go to an email on the same chain, dated December 15th, 2023, at 10:38 a.m. Is this email from you?
A Yes.
Q Okay, and can you read the final paragraph? It starts with, therefore, for simplicity.
A Therefore, for simplicity and consistency, I recommend that we book stipulated deals as new loans, as we have done in the past, until the change in October.
Q Okay, and for clarity, are stipulated deals initial direct costs?
A No.
Q Okay, and then going to Sufhan Majid's email on December 11th, 2023, at 5:51 a.m., do you see it?
A Yes.
Q Okay, can you read the sentence from Sufhan, starting with, going forward, only the cash received?
A Going forward, only the cash received will be considered

in recoveries, which aligns with GAAP and the rest of the organization.

Q And then, nope, that's it. And then let's go to the email dated December 27th, 2023, at 8:40 a.m. Okay, and is this from Mr. Majid again?

A Yes.

Q Okay. Can you please read the portion beginning with, yep, I think we still are still.

A Yeah, so we're -- I'm still dealing with this, and even after I bring it up. So I say, yep, I think we're still researching, because the new method, recovery when cash is received, is GAAP-compliant and the old method is not. Waiting to research with David on the final decision, John stated it may be an accounting decision and not a credit decision.

Q So to clarify, did you send this email or did Mr. Majid send it?

A Mr. Majid sent it.

Q Okay, and then when he says the new method is GAAP-compliant and the old method is not, what's he referring to again?

A The stipulated judgments. The 900 accounts.

Q And then remind us, are stipulated judgments initial direct costs?

A No.

Q Okay, let's go ahead and go back to the LTIP, Exhibit 546.

Okay, can you do us a favor and read Key Assumption C?
A Key Assumption C, there will be no allocation of indirect company expenses to Balboa by the company, and there will be no transfer pricing between the company and Balboa.
Q Okay, and when it says indirect company expenses, who's the company?
A Ameris.
Q Okay, and what does that mean when it says there will be no allocation of Ameris indirect expenses to Balboa?
A Yeah, they won't allocate, like we talked about, the marketing, accounting functions, the kind of overhead that is associated with Ameris.
Q Okay, and did Ameris properly follow this key assumption?
A No.
Q Okay, and did you ever tell Ameris they weren't following this key assumption?
A Many times, as we've seen.
Q Okay, let's look at an example. Let's look at Exhibit 482 again, and we're going to go to the email dated, again, February 5th, 2024 at 9:50 a.m. from Jim Lahaise. Let me know when you see it.
A I do.
Q Okay, can you read point one from him under Heading 2? It starts with the $3,361,000.
A The $3.3 million of expenses for the full-time employees

detailed in your spreadsheet are all direct costs associated with operating the Balboa Capital Division. These employees were included in the Pioneer 1-Q 1 operating model calculation of EBT. These employees' jobs and responsibilities are in direct support of the Balboa Capital Division. They perform their daily duties based on the direction given by you or a manager within your division. No part of this amount reflects the charge of an indirect expense to the division by Ameris, and no adjustment to the LTIP is warranted.

Q Was that true when he said they perform their daily duties based on direction given by you or a manager within Balboa?

A Absolutely not. We've talked about this. No, they reported to Ameris personnel.

Q And so how did Ameris factor these employees into the LTIP calculation?

A They charged the LTIP.

Q And going back to that Key Assumption C being in there, why was that important for that key assumption to be there when you were negotiating the LTIP?

A Because it gave an accurate reflection, and so they're going against it blatantly, and so it reduces the LTIP pool, which reduces the bonuses.

Q I think you said yesterday you mentioned there was an issue here regarding fairness and accountability. Can you elaborate on what you mean by that?

A Yeah, if you want me to be responsible for something, then I have to have the control over it. If you don't want me to have responsibility for it, I'm fine with that, but you can't have your cake and eat it too, right? You just can't do that, right? That's not fair.

So if you want me to be responsible for something, right, I'll be responsible for it, but in this context, it's don't charge me for it if you don't let me control it. And you're a bank, I get it, you've got rules, it's not about that, it's just about, all right, you can do whatever you want in terms of GAAP, you can do whatever you want because that's your prerogative, it's your company. But our agreement is it's, you know, it's what's within these four corners. It's the outset, don't make me -- right, don't make me responsible for something that I can't control.

Q And what was the impact of Ameris charging these employees as if they reported to you to the EBT calculations?

A It went down, it always went down.

Q All right. Let's go back. We're already on Exhibit 546. Let's discuss key assumptions B and D. Can you just go ahead and read B to us?

A Sure. The interest cost will be 1 percent.

Q And then can you read D?

A For performance period of this agreement Balboa will not be charged for any other costs of capital other than the 1

percent cost of funds on the average outstanding balance on all earned assets.

**MR. SESSIONS:** Okay. And, Ms. Price, can you remove that highlighting just so we're -- making sure we're all looking at the right part. Okay. Thank you.

Q Okay. Can you just explain what that means, the interest cost used will be 1 percent?

A Yeah, so just look at all the, you know, assets on the balance sheet or if you think about like a mortgage, or a mortgage is $100,000 and so it's going to be, you know, $1,000, you know, per year. And so this is the big assumption, right.

It's like, okay, we have a certain cost of money when we're coming on as a private company higher, this why we do the acquisition, it's lower, it's 1 percent. Now 1 percent sounds really low, but this was right after COVID, so the bank's cost of funds was .25 percent, right, and so this was -- just, hey, I want to be fair, right, we'll set it at 1 percent and everybody thought that was great, right, at 1 percent.

And so -- and then so to D, it's you know, we have other -- we have bank lines and those are going to be paid off, right, but you know you can't charge us for anything beyond 1 percent, I just want to be super clear, right, it's going to be 1 percent total.

Q Okay. Well, let's --

A So this is kind of, yeah, drawing out those lines.

Q Thank you. And did Ameris follow these key assumptions?
A No.
**MR. SESSIONS:** Okay. Let's go ahead and look at another exhibit. This is not a joint exhibit, so I'd ask that it be shown on black out, it's Exhibit 144.
**THE COURT:** Go ahead.
**BY MR. SESSIONS:**
Q Okay. Is this another e-mail chain involving you and Ameris?
A Yes.
Q Okay. And what is this e-mail chain in regards to?
A This is to David Sparacio from Jim Lahaise. Do you want me to read it or what would you like me to do?
Q Are they talking about what -- yeah, go ahead and read it.
A David, can you update the LTIP calculation to reflect the below. I will take care of modifying the employment agreements. Also make sure we charge them the 1 percent cost of funds for Q-1 as that was the agreement.
Q So what is Jim Lahaise saying to David Sparacio here to do?
A Yeah, so this is early --
**MS. FODE:** Objection --
**THE COURT:** Go ahead, the objection? I didn't hear it.
**MS. FODE:** Calls for speculation.

**THE COURT:** Sustained.

**MR. SESSIONS:** Can we go down to the e-mail on this chain dated May 9th, 2022 at 7:37 a.m.? Okay.

**BY MR. SESSIONS:**

Q Who sent this particular e-mail?

A This is Jim Lahaise to me.

Q Okay. And can you read point 3 on the e-mail where it says issue?

A Yeah, this is -- you know, this is early on. Point 3? Oh, there it is. Point 3, issue, the $553,333 was the actual interim interest of the securitizations for the time period prior to our ability to pay them off.

Q Okay. And who wrote this issue?

A This was Jim Lahaise and this is beyond the 1 percent.

Q Okay. And then can you read the answer that's under the issue once it's pulled up or sorry, can you read where it says past response?

A My response is, you know, basically this is not how the LTIP agreement reads.

Q And then can you read further below that, the explanation -- sorry, the last sentence of the explanation where it says, this seems to be normal.

A This seems to be a normal post-closing timing that would be part of the normal operations, but we'll remove. The LTIP does define cost of funds as 1 percent allocation.

Q What was your understanding of what Mr. Lahaise was saying when he said, the LTIP does define cost of funds at 1 percent allocation?

A I don't know what, it's pretty clear, the LTIP does define cost of funds as 1 percent and although he's seemingly saying that he's throwing me a bone, he's really not because that's what it says.

Q And we've already gone through the e-mail, I won't make us do it again.

**MR. SESSIONS:** But I forgot to to do this, Your Honor, at this time, I would move to admit Exhibit 144 into evidence and to publish it.

**THE COURT:** Any objection?

**MS. FODE:** None.

**THE COURT:** Okay. Exhibit 144 is admitted and you may publish.

**(Exhibit Number 144 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Again, I won't make you read it again. I just wanted --

A Okay.

Q -- to make sure we got that into evidence.

Okay. Did Mr. Lahaise and Ameris apply the 1 percent cost of funds when calculating EBT under the LTIP?

A Specific to this, no.

Q And did they do it specific to anything else?
A Well, they did it specific in the LTIP to 1 percent, but this is -- right, this is the 553,000 was outside that scope, right, but they -- but if your point is that we -- did they ever reflect it, no, they never paid it.
Q Okay. And, of course, what was the effect that that had on EBT?
A Lowered it.
Q For the record, can you vocally say what you were describing when you did this (indicating)?
A Pushed it down.
Q Okay.

**MR. SESSIONS:** Let's go ahead and take that down and we're going to go back to 546 one more time.

Okay. Can you go to key assumption F please?

Q Okay. Can you read key assumption F to us?
A The allowance for loan loss calculations and expenses for Balboa will be the greater of A, I'm sorry, 1, actual net charge offs or 2, 1.25 percent of net investment in direct finance leases.
Q Okay. And before we ask whether Ameris applied this assumption accurately can you basically tell us what this is asking the calculation to do?
A It's asking the calculation to take in an or, right, so it's either the actual charge off, so these are the bad loans

for this period or 1.25 percent of kind of a balance sheet, but I think the key point is it's an or, it's either one or the other.

Q Okay. And did Ameris accurately apply this key assumption to the LTIP calculations?

A No.

Q Okay. Let's take a look, let's go back to Exhibit 10 again which was the spreadsheet for 2022. And then looking at the box, which you described as the LTIP calculation, do you see the sentence that starts with calc based on greater of?

A Yes.

Q Can you read that?

A Calc based on greater of, you know, a figure 10.4 million or 1.25 percent of loan growth plus actual net charge offs to maintain 1.25 percent on portfolio or actual net charge offs.

Q Okay. So who wrote this sentence that's on this spreadsheet?

A Ameris.

Q And is this the same calculation that we just saw in key assumption F?

A No.

Q How is it different?

A It's an and. So it says, we're going to have this calculation and another calculation, so it's not an or, so it's --

Q And where does --
A -- it's always higher. I'm sorry?
Q Yeah, sorry I didn't mean to interrupt you.
A Yeah.
Q Where is the and reflected in that calculation?
A Oh, I'm sorry, the plus.
Q Okay.
A But, yes, I'm sorry, it's in the parens, plus actual net charge off to maintain 1.25 percent on the portfolio, that's the plus or the and.
Q Okay.
A And if you go down to the bottom, the left, you can see that every single time as we pointed out before on -- it's 170.
Q Where at, are you --
A At line 170.
Q -- referring to the key assumption --
A Oh, it said in the green, but I was going to say line 170, yeah, after the allowance for loan loss and expenses will be the greater of, you see actual net charge off, or 1.25 percent net investment. You can just -- so you can see that it's different.
Q And did -- you mean the calculation this way as opposed to what was in key assumption F have an effect on EBT?
A It did.
Q And what was that effect?

A Lowered it.
Q Thank you.
**MR. SESSIONS:** Okay. We'll take that down.
Q Mr. Byrne, did any of the deviations from the key assumptions in the LTIP ever raise EBT?
A Not once.
Q Okay. And again, what did they all do?
A Lowered EBT and lowered the bonus pool, lowered the cash bonuses to the employees.
Q Okay. And we've seen all the e-mails, but just to summarize it, did you raise all of these concerns with the key assumptions that we just looked at to Ameris?
A Yes.
Q And who are the individuals at Ameris that you raised these concerns to?
A All the executive team, right, so Jim Lahaise who was my boss who sits on -- right, one of the top eight executives, you know, of Ameris, Nicole Stokes, the chief financial officer, you know, everybody, David Sparacia, you know, Sufhan obviously who was just doing the calculations and --
Q Anyone else before I ask my next question?
A It probably was, but yeah, I can't recall at this point.
Q Okay. So let's go ahead and look at another exhibit.
**MR. SESSIONS:** This is a joint exhibit I believe. Let's put it on black out so we confirm real quick, it's

Exhibit C -- 3, yes, thank you. This is a joint exhibit, Your Honor, so I'd move to admit Exhibit 3 into evidence and ask that it be published.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 3 is admitted and you may publish.

**(Exhibit Number 3 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. Can you tell us what this document is, Mr. Byrne?

A It's code of business conduct and ethics. The paperwork that you sign as you become an employee of Ameris.

Q And did you personally receive a copy of this document when you joined Ameris?

A I did.

Q Okay.

**MR. SESSIONS:** Let's go down to -- it's the page ending in 420 and it's section 15.

Q Do you see that?

A Yes.

Q Okay. What's the heading? Can you read that?

A Prohibition on retaliation.

Q Okay. Can you read the paragraph?

A It is the policy of the company not to allow retaliation for reports of misconduct or violations of this code by others

made in good faith by an employee, officer, or director. Further, any employee, officer or director may submit a good faith concern regarding questionable accounting or uttering matters without fear of dismissal or retaliation of any kind.

Q Okay.

**MR. SESSIONS:** Let's go to page ending in 422 and I believe we're going to pull out section 18.

Q Okay. Can you read the bold header next to 18?

A Employee complaint procedures for accounting and auditing matters.

Q Okay. Can you please read the first sentence of Section 18 for the jury?

A Any employee of the company may submit a good faith complaint regarding accounting or auditing matters to the management of the company without fear of dismissal or retaliation of any kind.

Q Okay. Now, can you please read bullet point A starting with -- underneath the heading receipt of employee complaints? I believe it starts with employees with concerns.

A Yes, got it, thank you.

Employees with concerns regarding accounting matters may report their concerns to any of their immediate supervisors, managers or other appropriate personnel, the company's external auditors or the company's general auditor.

Q Okay. And remind us who was your manager or supervisor

when you were at Ameris?
A Jim Lahaise.
Q Okay. So did you follow this procedure when you were at Ameris?
A Absolutely.
Q Okay. Now, let's go ahead and look at another documents.

**MR. SESSIONS:** This is, Your Honor, Exhibit 17, it's a joint exhibit. So I'd ask for permission to move it into evidence and publish to the jury.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 17 is admitted and you may publish.

**(Exhibit Number 17 received in evidence)**

**BY MR. SESSIONS:**
Q Do you recognize this document?
A Yes.
Q Can you tell us what it is?
A It's the employee handbook.
Q And did you receive a copy of this when you were at Ameris?
A I did.
Q Okay.

**MR. SESSIONS:** Let's go to page ending in 435 and we're going to look at the section I think it's 1-5.

Q Okay. Can you read the pink header there?
A Prohibition against whistleblower retaliation.
Q Okay. Can you read the paragraph?
A If you believe that there has been a violation of a law, rule or regulation at the company, we invite you to speak with management regarding your concerns. The company will not allow any form of retaliation against individuals who in good faith make a report, participate in any investigation or object to any or refuse to participate in any violation of law, rule or regulation. Employees who make complaints in bad faith may be subject to disciplinary action, up to and including termination of employment. All employees must cooperate with all investigations pursuant to this policy.
Q Okay. And then do you believe that when you were at Ameris you followed this policy?
A Yes, absolutely.
Q And how so?
A I mean it was in good faith. I think we've shown today that, you know, it was in good faith, it's still what I believe and, yeah, I --
Q And what is it when you say that's what I believe, what are you referring to?
A I believe it's unlawful to have somebody do the work and not get paid for it.

**MR. SESSIONS:** Thank you. Let's go ahead and take

that down.

Q Okay. Now, we're going to get to what happened next in your employment.

**MR. SESSIONS:** This is a preadmitted exhibit, Your Honor, it's 496 and I'd ask for it to be admitted into evidence and published to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** 496 is admitted and you may publish.

**(Exhibit Number 496 received in evidence)**

**MR. SESSIONS:** And apologies, I do recognize that I just said it was preadmitted and asked for it to be admitted.

**BY MR. SESSIONS:**

Q Do you recognize this e-mail?

A Yes.

**MR. SESSIONS:** Okay. Let's go down to page ending in 1796.

Q Do you recognize this letter, Mr. Byrne?

A I do.

Q Okay. What's the date on it?

A It is June 27th of 2024.

Q And who was this letter sent to?

A It was sent to me.

Q Okay. And who sent you the letter?

A I can't remember but --

**MR. SESSIONS:** You can go back to the cover e-mail.

**THE WITNESS:** Sent to my Yahoo e-mail I know that, and it was sent by I think Jody Spencer I believe -- oh, no, it was sent by Jim Lahaise, Jody Spencer who's the chief legal officer, Ben Phelps who is the HR person and it's notice of my termination which once again I didn't get advance notice of as well.

**BY MR. SESSIONS:**

Q Is Jody Spencer this chief legal officer sitting in here today?

A Yeah, yep, right there.

Q Okay.

**MR. SESSIONS:** Let's go back down to the letter.

Q Okay. Can you please read the first sentence appearing after the words, Dear Pat?

A Dear Pat, this letter shall serve as notice pursuant to Section 5.1 of the agreement that the company has terminated your employment as of June 30, 2024.

Q Were you surprised when you got this letter?

A Yes and no. I'm always surprised when somebody doesn't at least pick up the phone and call me about it, but beyond that, you know, there was -- yeah, I mean, they kept pushing back and they didn't want to pay the LTIP, so in that sense, you know, maybe wasn't a complete surprise. I guess looking back, it wasn't -- it shouldn't have been a complete surprise.

Q Now, going back to what we talked about earlier, leading up to this June 27th date, were you continually doing your job when you were working at Ameris?
A Absolutely, right.
**MR. SESSIONS:** Now, let's go to another part of this document. The attachment to this e-mail, another attachment to this e-mail and I believe it starts on page 1792.
Apologies, I had the number wrong. That's on me.
Bear with me one moment, everybody.
Apologies. Here it is.
Q Okay. Do you recognize this document?
A Yes.
Q And what's the title of this document?
A Release agreement.
Q Okay. And who sent this release agreement to you?
A Ameris in conjunction with -- well, attached to the termination notice.
Q Okay. And let's go to the first section, .1 there. It's a bit of a mouthful, it's really long, I'm just going to have you read the first sentence but it's about ten lines, so forgive me.
A In consideration for the severance payments offered to me under the agreement and deeming this release to be fair, reasonable and equitable and intending to be legally bound hereby, I, the undersigned agree to and hereby do for myself

and for each of my heirs, representatives, executors --
Q Executors.
A Executors, I apologize, administrators and assigns forever and irrevocably fully release and discharge the company, each member of the company group and their respective officers, directors, employees, agents, trustees, predecessors, successors, purchasers, investors, assigns, representatives, the released party of any and from and all complaints, judgments, claims, demands, debts, actions, or causes of action, obligation, damages, liabilities whatsoever, collectively claims, which I now have had or may have whether the same be known or unknown at law in equity or mixed in any way arising out of or relating to any matter, act, occurrence, omission, practice, conduct, policy, event or transmission that occur on or before the date of this release.
Q Okay. Did you sign this release agreement?
A I need a breather after that one.
Q Go ahead and take a drink of water.
A Well, I guess that covers it, it covers everybody.
Q Yeah, but did you sign this agreement?
A No.
Q And why didn't you sign it?
A Because it would give away my ability to go after the LTIP and for -- yeah.
Q Okay.

**MR. SESSIONS:** Let's go ahead and take that down.
Q Do you have -- what is your understanding, Mr. Byrne, just based on your observations as to why you were fired?
A They didn't want to pay the LTIP. They were pretty wise and tom foolish, you know, they didn't want to compensate the employees for the work that they did, and you know, they were focusing on expenses and not the long time kind of viability of the group and so that's why they did it.
**MR. SESSIONS:** Okay. Can we go back to the termination letter? So on Exhibit 496 and again, yeah, there we go.
Q Can you read the second -- the first part of the second paragraph that starts with as provided in?
A As provided in Section 6.2 of the agreement, termination of your employment by the company without cause, as defined in the agreement, entitles you to certain severance benefits according to the terms of the agreements, which benefits are subject to executing and not revoking a valid release, substantially in the form of attached agreement, a copy of which is included with this letter.
Q Okay. And then let's look at the last paragraph of the first page here, which I believe begins with in addition notwithstanding.
A In addition, notwithstanding the termination of your employment by the company without cause you will remain

eligible to participate in the Balboa long term incentive plan, subject to terms and conditions for the 2024 calendar year performance period.

**MR. SESSIONS:** Okay. Let's go back to the LTIP agreement, Exhibit 546. Okay. And we're going to go to Section 3.

Q Okay. Do you see the heading that says forfeiture risk?

A Yes.

Q Okay. Can you please go ahead and read that paragraph?

A If the grantee's employment ceases for any reason, other than a termination without cause, as defined in the grantee's employment agreement or resignation by the grantee for good reason, as defined by the grantee's employment agreement, including death or disability, any unearned or unpaid portion of the award is forfeited and any remaining incentive opportunities associated with this award shall be canceled.

Q Okay. So then let's read the sentence that starts with it's the last sentence of the section, it starts with in the event of a termination without cause.

A Yeah, the first, yeah, it didn't really cover it, but here's what covers my portion. In the event of a termination without cause or a resignation for good reason, the reward for all outstanding performance period shall be determined and paid out in accordance with Section 4 below in the plan and the participant shall receive such award for each performance

period that occurs during the year of the termination without cause or the resignation for good reason in each year thereafter if any.

Q Okay. And then if you go to Section 4 where it says payment, can you go ahead and read that?

A Payment. The company shall deliver to the grantee as soon as administratively practical, following completion of each performance goal certification as described in the plan, but no later than March 15th of the calendar year following the end of the quarter year to which such performing period relates, a cash payment equal to the award for that performance period subject to the terms of the plan in this agreement.

Q So remind me what did your letter say you were terminated, was it with cause or without cause?

A Without cause.

Q Okay. And then did you receive a 2024 LTIP bonus before March 15th, 2025?

A No.

**MS. FODE:** Object -- hold on. Objection in violation of the motion in limine.

**THE COURT:** The objection is overruled.

**THE WITNESS:** I did not receive a 2024 LTIP payment.

**BY MR. SESSIONS:**

Q Thank you. Did you receive any severance payment after your termination?

A No.
Q Okay. After being fired from Ameris did you ever look for another job?
A No.
Q And why not?
A I had a non-compete.

**MR. SESSIONS:** Okay. Let's go ahead and show a preadmitted exhibit, it's Exhibit 324, I'd ask for permission to show it to the jury.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** You may publish.

**MR. SESSIONS:** Okay. Can we please go to Section 4.3?

**BY MR. SESSIONS:**

Q Okay. Can you read the header on the top of the page?
A Non-competition and non-solicitation.
Q Is this what you referred to when you mentioned you had a non-compete?
A Right. So this is a clause that restricts me from opening another company, going to work for another company and, yeah.
Q Thank you.

**MR. SESSIONS:** We can go ahead and take that down.

Q Now, after you were fired and you filed this lawsuit, did Ameris file a lawsuit against you?

A They did.
Q And do you have an understanding as to what the basis of that lawsuit is or forgive me, I'm going to rephrase that. Do you have an understanding of what -- based on your observations, do you have an understanding of what their claimed basis of that lawsuit is?
**MS. FODE:** Objection, irrelevant, lacks foundation, calls for speculation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** They allege that I have proprietary information that I sent e-mails from my -- from work e-mail to my personal e-mail.
**BY MR. SESSIONS:**
Q And do you have a response to those claims?
A Yes.
Q What's your response?
A My response is first off that everybody knew that I was using this e-mail address from the very beginning from five years previous, right, the head which I think we'll hear from soon, of IT at Ameris, Ross Creasy had approved me of doing this, number one, because the system was slow and I was working on, as you can see, big spreadsheets and therefore I was calculating certain things. But more specifically closer to the -- you know, my termination, yeah, I was sending documents that are used in this -- right, in this lawsuit, right, to

prove -- to sort of prove my point as a whistleblower.

Q And help us understand the history of the lawsuits. When was this current lawsuit first filed?

A This was filed shortly after I was terminated a month or two, you know, so that would be probably June of or maybe July of 2024.

Q And when did Ameris file that separate lawsuit against you?

A I think maybe February of this year, or yeah, a couple of months ago.

Q And can you explain to us whether anything significant had happened in this case before they filed that separate lawsuit?

**MS. FODE:** Overbroad, vague and ambiguous.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yeah, there was a few timing issues or, you know, coincidences maybe. The day before Jim Lahaise announced his retirement from Ameris, about seven days after that, the Ameris tried to dismiss this lawsuit.

**BY MR. SESSIONS:**

Q And was that --

A Seven days --

Q Sorry, you can go ahead and continue.

A So there's a motion for summary judgment of which the judge ruled that they couldn't dismiss it, I don't know if I'm talking in the legal terms, but that was seven days after that

motion for summary judgment was denied, meaning that the Court was going to allow this trial to go on. And so I think Ameris thought because they filed this motion for summary judgment right before the holidays and Christmas, which may be another coincidence, I'm not sure, but they filed it right before the Christmas -- when everybody was going away, which made us work during those holidays, but anyway, the point being that we filed it and the -- this Court said that you can move forward, but maybe not coincidentally a week after this judge made -- excuse me, this judge made that ruling, this additional lawsuit was filed.

Q Thank you. Mr. Byrne, we're almost done. Just a few more questions.

Putting aside the dollar amounts here, what did it mean to you personally to lose your position at Balboa Capital?

A Yeah, obviously it wasn't great. I knew when I sold the business I sold the business, so that wasn't it. But to create so much value for Ameris to tell me that I was wrong, right, to gaslight me in front of everybody, right, in front of everybody that I work with, right, because they didn't know I was the only one that was really deep into these calculations.

Q Has being terminated from Ameris affected you emotionally?

A Yeah, I don't like to talk about it, right. Especially in court. But, yeah, it's definitely had an effect on me, yeah, to be embarrassed in front of, yeah, my peers and people that

I've worked with for 15 years, it's definitely had an effect.
Q And I'm sorry to ask two more questions on this same topic. But has it affected your physical health?
A Yeah, yeah.
Q And in what way?
A Well, first of all, I can't barely fit into my suit anymore and, yeah, I mean, yeah, yeah. You know, lack of sleep, just you know, just physical kind of pain and stuff like that.
Q Has it affected your relationship with your family?
A Yeah, you'd have to ask them, but yeah, I would definitely say they would agree that yes.
Q One final question. With the chance to sit here in front of the jury, can you please explain what you're asking them to do in this lawsuit?
A Yeah, I just want Ameris to fulfill their promises, you know, I did what I said I was going to do, I just want them to do what they said they were going to do, pay the employees what they earned and what they -- you know, what Ameris withheld, that's what I'm asking. Look back, look at the facts, but pay -- have Ameris pay what they promised to pay, you know, plain and simple. And potentially look at, you know, what they've had to -- what they put me through for all this.

**MR. SESSIONS:** Thank you. No further questions.

**THE COURT:** Okay. Thank you. Cross-examination?

**(Pause)**

**THE COURT:** You may proceed when you're ready.

**MS. FODE:** Thank you, Your Honor.

**CROSS EXAMINATION**

**BY MS. FODE:**

Q Mr. Byrne, you testified originally that Balboa Capital was founded by you in 1988 when you were just 23 years old, right?

A Yes.

Q But that wasn't exactly right, you actually had a co-founder, right, Sean Griffin.

A Yeah, I mean, it's -- if I can explain.

Q No.

A I'm sorry.

Q Actually on cross, I get to ask leading questions, that's the nature of it.

A Okay.

Q So I'm not trying to be rude, but this is my job.

A Okay. Yeah.

Q So Balboa Capital you said earlier was founded by you, but that's not a hundred percent correct, right?

A Yes, it is a hundred percent correct.

Q Mr. Sean Griffin was also a co-founder as well, correct?

A I founded the company and then shortly thereafter Sean came over.

Q All right. It's a yes or no answer, okay.

**MS. FODE:** Strike as nonresponsive.

**THE COURT:** Motion is denied.

**BY MS. FODE:**

Q And it seems to me like you want the credit for starting the company which definitely you did a lot, but to not even mention somebody else that was involved seems a little callous, correct?

**MR. SESSIONS:** Objection, argumentative.

**THE COURT:** Sustained.

Q Moving on, you talked a little bit yesterday about your education and that you have a business degree. Do you remember that testimony?

A I do.

Q Now important for this case and especially with all these e-mails that we've been seeing that you sent, you don't have any professional licenses, correct, you're not a CPA.

A I am not a CPA, correct.

Q And you don't have any degrees in accounting, correct?

A I have an MBA, but that is not in accounting, that is correct.

Q Thank you. All right. And at the time of your sale of Balboa to Ameris Bank, you were the hundred percent owner of that, correct?

A That is correct.

Q All right. And there's a lengthy process to buy the company and you had lawyers, right, to help you and represent you in that process.
A We did have lawyers, yes.
Q Okay. And the lawyers advised you before you signed all of these documents, correct?
A Yes, they did.
Q All right. And yesterday you talked a little bit, I may be summarizing about Balboa Capital the sale being almost sort of the essence of all your work, and hard work, being able to sell it. Do you remember that testimony?
A Not specifically.
Q All right. Well, would you agree that it was a culmination of your work over the years, 30 some years to be able to sell your company to Ameris Bank?
A It was a marker, I'm not sure -- yeah, I'm not sure how I -- yeah, I'm not sure your characterization is completely correct.
Q So do you remember that I took your deposition in October 20th, 2025, do you remember that, sir?
A I do.
Q Do you remember when I --
A It was an experience.
Q Hold on, hold on. Do you remember that we had to go get a court order to be able to have you sit for your deposition,

sir?

**MR. SESSIONS:** Objection, Your Honor, relevance.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And do you remember that we actually had to get two court orders for you to be able to sit for --

**THE COURT:** Ms. Fode.

Q -- without --

**THE COURT:** I already sustained that objection.

**MS. FODE:** Understood, Your Honor, moving on.

Q With regard to when I asked you a question at your deposition, your testimony there was under penalty of perjury, correct?

A Correct.

Q All right. And you remember that I asked you how much did you get paid for the company that you sold for your life's work to Ameris. Do you remember that question?

A Did you say my life's work?

Q How much you got paid for selling Balboa Capital to Ameris Bank. Do you remember that question?

A Yeah, I'm sure you probably asked me that question.

Q And do you remember you didn't remember how much you were paid for it?

A I remember I gave you a range, I didn't know the exact figure, that's my recollection.

**MS. FODE:** All right. Let's go ahead and play that for the -- let me make sure I give the transcript. This will be plaintiff's deposition 63, 6 -- line 6 through 64, line 14. So page 63, 6 through 64, 14.

**MR. SESSIONS:** Your Honor, I'm going to object on two grounds. First, I'm not sure that this is actually impeachment, and second they did not designate any portion of Mr. Byrne's deposition.

**THE COURT:** The objection is sustained.

**MS. FODE:** Okay. And for the record -- okay, understood, Your Honor.

**BY MS. FODE:**

Q Well, do you remember that you stated that you couldn't remember how much your company that -- how much you were paid for the company?

A I remember that I did not know the exact amount, yes.

Q And you couldn't recall if you were paid north of 100 million or south of 300 million, correct?

A I was trying to bring a range so I could be accurate.

Q Okay. And you testified that your -- the money, all of the money, the 186 million was directly deposited into your personal trust accounts by a wire transfer, correct?

**MR. SESSIONS:** Objection, misstates prior testimony. I'm not sure that he said that.

**THE COURT:** Okay. So let's -- I'm going to --

actually I'm going to excuse the jury four minutes early so I can talk with counsel before we break for lunch. So we are going to reconvene at 1 o'clock. Please don't discuss this case amongst yourselves or with anyone else and please don't do any research about any aspect of the case. Have a great lunch.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 11:57 a.m.)**

**THE COURT:** Sir, you can step down.

Okay. So the questions that you're asking right now about his memory about his deposition, which is not relevant. If you want to ask him leading questions about what he -- you know, the actual substance of the testimony that's fine, but right now, you're not getting any information that's relevant for the trier of fact. What he remembers testifying to at his deposition is not relevant and what he remembers, unless it's -- you need to use to refresh recollection or impeach, but that's not what you're doing right now.

**MS. FODE:** Understood, Your Honor. It's always been my understanding that you can play or if -- over objection any portion of a party's deposition for any reason.

**THE COURT:** But there's no legitimate reason to do this when he hasn't testified that he doesn't remember, he hasn't testified that your -- the premise of your question which are the questions -- the answers are really not relevant. Whether or not he remembers what he testified to at deposition

is at least at this point not relevant because you haven't laid the foundation that needs to have his memory refreshed or that you're impeaching him, he's not giving any testimony.

So while generally speaking you can play the deposition of a party for any purpose, there are other Rules of Evidence that safeguard the undue use of time and I think just playing excerpts from his deposition without a foundation for why it's relevant to the trier of fact to make any determination of fact in this case is not advisable.

**MS. FODE:** Okay. Understood, Your Honor. And just for the record it's under FRCP 32(a)(3), but understood and we'll move on to the next topic.

**THE COURT:** Well, he's here, so I mean I thought we'd talked about this in advance that we -- I don't want to use a lot of court time for things that you can get. If you've got a person on the witness stand, there's no -- I mean, under your logic you could just have him sit here and we could watch his entire deposition video and that's not going to be helpful to the trier of fact and it wastes the jury's time.

**MS. FODE:** Understood, we'll move it forward.

**THE COURT:** All right. I will see everybody back here at 1 o'clock.

**MS. FODE:** Thank you.

**MR. SESSIONS:** Thank you, Your Honor.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 11:59 a.m.; reconvened at 1:03 p.m.)**

**(Jurors present)**

**THE CLERK:** Mr. Bryne to the witness stand. Take a seat over there.

**(Pause)**

**THE CLERK:** All right. This Court resumes in session.

**THE COURT:** Thank you. Everyone can be seated. I hope everyone had a great lunch. Okay, Mr. Byrne, you're still under oath.

**THE WITNESS:** Yes.

**THE COURT:** Okay. And Ms. Fode, you may proceed.

**MS. FODE:** Thank you, Your Honor. Glasses on, give me one second.

**CROSS EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q All right, Mr. Byrne. I wanted to turn a little bit to your CEO duties when you were CEO as -- of the Balboa Division, all right? I want to turn to your job description which was already admitted into evidence, it's Trial Exhibit 346, which is a joint exhibit.

**MS. FODE:** Permission to publish?

**THE COURT:** Any objection?

**MR. SESSIONS:** No, Your Honor.

**THE COURT:** Okay. Go ahead.

**BY MS. FODE:**

Q All right, we talked a little bit previously about this Chief Executive Officer job description, but I wanted to run through a couple of points. Okay?

A Yes.

Q So if you take a look at it, I know that you talked a bit about it. But I wanted to ask if you agree that these were your job duties and descriptions, as CEO of Balboa Division?

A This was my job description that was laid out by Ameris.

Q And you understood that as the CEO of Balboa Division that your job was to ensure the finances were responsible and in order with the profitability goals, correct?

A Which bullet point is that?

Q If you look with regard to number three, oversees the Division's financial structures. As well as number four, reviews the financial results of all operations within the line of business. Do you see that there?

A Yes.

Q And did you understand that that was your job duty and description as CEO of Balboa Division?

A Yes.

Q Okay. And did you also understand that you were responsible for the overall financial health of the Division?

A Oh I guess that's under the part where it says, "taking appropriate measures to correct unsatisfactory performance and

results". Is that what you're referring to?
Q Yes.
A Yes.
Q And in addition, you had described your job description previously as being responsible for the entire division, including goals, the profits, return on investment, and overall well-being of the employees of the Division and the Ameris shareholders. Would you agree that that's your job duties overall with regard to being a CEO of Balboa Division?
A Yeah. I think it's a fair summary, where it says, "responsible for providing leadership for all aspects of the Division's operations and sales teams, with an emphasis on long-term goals, growth, profit, and return on investment". I think that's a good description.
Q And did you understand that it was also your job duties expressly stated here to work with the other executives in the Ameris company?
A Yes.
Q And would you in --
A Although it's a little bit unclear who the executive team is here. Is that the executive team of Ameris or Balboa, but yeah, you would need to work with both, so --
Q So to clarify, you would need to work with the executive team of Balboa -- of the Balboa Division but also of Ameris, which would include Jim Lahaise and Nicole Stokes, correct?

A Yep, that's correct.
Q And you also understood that it was your job as CEO to ensure the Division's compliance with all applicable rules, regulations, and standards. Did you understand that was part of your job as CEO of Balboa Division?
A I did, and I did.
Q And did you understand that Also you had received written policies and procedures of the company, Ameris, when you started with it in December of 2021?
A So just coming off this slide right now, is that --
Q yes.
A Can you state the question again, please?
Q Sure. Did you receive policies and procedures that applied to your job as CEO of the Balboa Division when you started in December of 2021?
A Yes.
Q And did you understand as CEO that you needed to treat people with kindness?
A Yes, absolutely.
Q And did you understand that you needed to have a high standard, equal dignity and teamwork --
A Okay --
Q -- to be this -- the CEO of the Balboa Division?
A Yeah, absolutely.
Q And you understood that you needed to have integrity and

honesty as CEO of Balboa Division?
A Yes.
Q Okay. And as the CEO of Balboa, did you strive to uphold Ameris' approach and these values that I just discussed?
A Yeah. I've always upheld them, whether I was at Balboa or -- Balboa or at the Ameris Division of Balboa.
Q All right. We talked a little bit about the 2022 LTIP Payout. And you covered a lot of that today with your Counsel. But I wanted to direct you to one exhibit that wasn't discussed. This is Trial Exhibit 414, which is a joint document. And if you could --

**MS. FODE:** And I'd like to ask that it be admitted and published.

**THE COURT:** Any objection?

**MR. SESSIONS:** Nope --

**THE COURT:** Okay.

MR. SESSIONS: -- no objection.

**THE COURT:** Exhibit 414 is admitted, and you may publish.

**(Exhibit Number 414 received in evidence)**

**MS. FODE:** Okay.

**BY MS. FODE:**
Q And if you'll look there, Mr. Byrne, if you go down -- scrolling down, there we go, so at the top of this email at first it's with you and Laura Rodriguez. Remind us, who Laura

Rodriguez is.
A Laura Rodriguez is the Head of Compensation for Ameris Bank.
Q Okay. And will you go to the email just below this one. And she's asking you, there's a $15,000 from the payout, the 2022 payout, that was not appropriated or given to an employee of Balboa Capital. And if you go up, she's asking if, you know, what should she do with it because the 2022 LTIP was already paid out. What should she do to it? And you say, if you go right up, please, that "she should just put the money -- give the money to you in your next payroll check". You see that there?

**MR. SESSIONS:** Objection. Compound.

**THE COURT:** Sustained. It's not a question. Do you have a question for him?

**MS. FODE:** I do.

**BY MS. FODE:**
Q If you see there, it says, "Hi, Laura, please send the $15,000 payment to me in my next payroll". Did you instruct Ms. Rodriguez to provide the leftover $15,000 to you in your payroll?
A Yeah, the context here is that we've already --
Q Sir --
A -- distributed to 140 people. And so what's happening here is Laura's first of all suggesting that I put it in

right -- take it myself, which is a small amount, you've already heard that I took $5.8 million. But more specifically, this is about Dave White, and this is Phil Silva's response to Dave White, that he didn't want to have this information. Dave White made over $3 million that year. So it wasn't, you know, a tremendous big thing for him as well. We'd already been through an extremely complex process here. And this was more about expedience, whether that -- rather than greed. She suggested it, and I eventually didn't know what to do with it, because I'd already distributed to 138 people. What was I supposed to do? The 100, you know, $15,000 divided by 138, it was just not practical. So that that's the context of what's happening here.

Q So yes, in this email you're telling Ms. Rodriguez to deposit the $15,000 into your account, correct?

A Correct.

Q Thank you. All right. And you understood, sir, that these LTIP payments were not promised? You understand that, right?

A Well -- go ahead.

**MR. SESSIONS:** No objection.

**THE COURT:** You can go ahead and answer.

A Okay. Within the context, and yeah I'll answer your question in the context of what's, what's happening here. Once it gets into the LTIP pool, you can't, you can't take it out of

it, right. So that's basically what she's saying here, is we got $15,000 left over, because Phil had some sort of dispute with Dave White and he insisted that I take -- that we take this out. So I said, you know, Laura suggested that I take it, so I took it. And so when you say once it gets into the LTIP pool, right, it has to be distributed. And that -- that's what it -- that, that -- that's basically what's going on here. And if we hit the threshold there's, right, you have to, right, you have to -- it has to go into the LTIP pool.

**MS. FODE:** So I'd like to move to Trial Exhibit 371, which is a joint exhibit, and ask that that be admitted into evidence and published.

**THE COURT:** It's already been admitted. You may publish.

**MS. FODE:** Thank you, Your Honor.

**BY MS. FODE:**

Q And if you would go to the, I can't -- right here you're directing. Do you see the exhibit in front of you, sir?

A I do.

Q And you're directing Laura Rodriguez how to divvy up the 202 LTIP, correct?

A Well I think, as I stated previously, I'm memorializing what the agreement already was materially before the acquisition. And so I'm bringing her into the loop because she wasn't part of those conversations. And so I'm explaining to

her how, you know, how this will work,
Q And at the time that you were paid your $5.6 million for the 2022 LTIP payout, you didn't raise any concerns about the payout. Is that correct, or the LTIP at that time.
**MR. SESSIONS:** Objection. Compound.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q At the time of the payout for the 2022 LTIP, you didn't raise any concerns about the LTIP, correct?
A Yeah, I was so busy doing other things and making it good for America, after making them $27 million on top of the $37 million that -- and I didn't think that, you know, Ameris would, you know, do fuzzy math on me. So no, you're right, I did not, at that point, I did not. And it was $9 million. And so, you know, I'm not, you know, not here to, you know, take every penny off the, off the table. It just seemed like, yeah why would Ameris do that? Come to find out that they did do that. But at the time --
Q And --
A -- my frame of -- my, my mindset was, okay everybody got paid, it was great, we're going to, we're going to kind of move on, and I'm going to be, you know, I'm going to try and get on the same team with Ameris.
Q And in fact you didn't make any complaints about the LTIP until June or July 2023, well after those payments in 2022 were

made, correct?
A Yeah, it was in February. But I dug in for those next couple months looking first at Q1, right after Q1 came out. So and then finding out in Q1 that there were discrepancies, I went back to 2022. And so, yeah, it took, it took me a few months to get through the detail to get all the information from Sufhan and the Accounting Department,
Q And just to make sure the answer is clear, then you did not make a complaint until 20 -- until June or July of 2023 about the LTIP, correct?
A Well I think we looked at --
Q It's not -- it's a yes or no. I'm sorry, sir, but we're, we're on cross here. Yes or no?
A Apologies, will you state the question one more time?
Q Sure. And you did not raise any concern about the LTIP until July -- June or July of 2023, correct?
A That's not correct.
Q And is your statement that you -- when -- that you made it in February of 2023?
A Nope. Before that.
Q All right. And you remember that, that I, I took your deposition and I asked you that question, correct?
A I don't remember specifically, you know, you probably asked something around that. I don't know specifically, That was quite a, quite a while ago, maybe nine months ago.

Q All right. Well let's take a moment to see if we can refresh your recollection.
A Okay.
**MS. FODE:** And for the record, this will be Plaintiff's Transcript 195 through 57.
**(Pause)**
**THE COURT:** Yeah.
**(Pause)**
**THE COURT:** Ms. Fode, could you state the pages again, please?
**MS. FODE:** Yes. And I'd like to provide a context before it. It's 194, line 18 through 195 line 8.
**THE COURT:** Any objection?
**MR. SESSIONS:** If the purpose is to refresh recollection, no objection.
**THE COURT:** Okay. But I think that she's trying to refresh recollection right now,
So you can have him read it to himself and then ask him the question again.
**MS. FODE:** Okay.
**BY MS. FODE:**
Q Sir, do you have the transcript in front of you?
A No.
Q Then we'll, we'll show you this here, okay?
**MS. FODE:** Yeah, only to Mr. Byrne.

**BY MS. FODE:**

Q All right, sir. My question was, that was the first time that you raised a concern about the 2022 LTIP calculations, was June or July 2023?

A I apologize, it just came up. So what -- whoa, where are you? Can you state that one more time?

Q Certainly. Was the first time that you raised a concern about the 2022 LTIP calculation was June or July 2023?

A I, I did state, I did state that here. But today I think we witnessed that I had concerns about the interest cost of $533,000 which was brought up in, I don't know, in 2002 for sure. I think it was May of that year. So I think when we went back, you know, subsequent to this deposition we found that that $530 -- $553,000 was not in the LTIP.

Q And you did that after you had received your 2022 payout, correct?

A No, I did it before. And it just wasn't credited to the 2020 LTIP. And maybe if you can ask the question, given the context --

Q Well --

A -- that I just gave you, again --

Q Yeah, you --

A -- I'll try to answer.

Q -- your testimony is that you were paid for June and July -- that you first made a complaint about the LTIP that you

were already paid in June or July 2023, correct?

A Yeah, I don't know if you're characterizing what I said in 2022 though. I guess that's my point, if you're characterizing that as a complaint, I guess it wasn't a complaint because Jim agreed to, but then they -- but you did -- but then Ameris didn't pay it out. So would you consider that a complaint?

Q So my question to you is, is you took the money for the 2022 payout.

A Yup, hm-mmm.

Q And you didn't say that there were any problems with the calculation, sir, until 2023, correct?

A That is correct. Yes.

Q Okay. Thank you. I want to talk to you a little bit about the charge-offs in 2023, You were -- you had some testimony here today, and I'd like to show you a couple of exhibits and walk through that. Okay?

**MS. FODE:** So first I'd like Exhibit 333, please.

**MR. SESSIONS:** Just one moment, Your Honor.

**THE COURT:** Yeah. It's not being published, it's not admitted yet, so we'll just take it one step at a time.

**MR. SESSIONS:** Thank you.

**(Pause)**

**THE COURT:** All right.

**MS. FODE:** And for the record, it's a joint exhibit. I'd ask to have it admitted and published, please.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 333 is admitted, and you may publish.

**(Exhibit Number 333 received in evidence)**

**BY MS. FODE:**

Q All right, Mr. Byrne, have you seen this document before?

A Yes.

Q And I'll represent to you that it is the 2023 LTIP payout summary.

A I think it's 2022.

Q Sorry, the next page, please. We'll go to 2023. And if you look here, sir, I'm going to point here to Ms. Ingle. Yeah. On the right hand side, it talks about the net charge offs, actual net charge offs. And you see the total there for the charge offs is 39,535,276.

A I think you said 39,000 but yeah, 39 million.

Q Thirty-nine million --

A Approximately right?

Q That's right. So approximately $39 million in charge offs for 2023. Do you see that there?

A I see it there, yes.

Q And did you understand that in 2023 your Division had approximately $39 million in charge offs?

A As I testified this morning, it was probably closer to 35

million, but yeah 39 million is here. But also -- we also -- given that -- even with that $39 million given the correct calculations, Balboa made a profit under the LTIP this year.

Q Strike the last clause as non-responsive.

**THE COURT:** Motion is denied.

**MS. FODE:** Okay.

**BY MS. FODE:**

Q And so as you see this document here today, you're saying it's 35 million, but you understood this was the official amount that Amaris informed you was the 2023 charge-offs, $39 million, correct?

A Subsequently, when I went to look at the public filings by Ameris, I realized that there were some non-performing loans, or NPLs, that were written off at inception, that Ameris tried to charge us for. And so my belief -- strong belief now, is that this is 30 -- approximately $35 million.

Q And, and where are the -- where are those documents you're talking about? Is it from the --

A They're public filing --

Q -- hold on --

A -- they're public filings.

Q Hold on, sir. Please allow me to finish my question.

**MR. SESSIONS:** Uh -- sorry.

**THE COURT:** Everybody -- everyone stopped. What is the objection?

**MR. SESSIONS:** Argumentative, Your Honor.

**THE COURT:** Okay. Sustained.

**BY MS. FODE:**

Q Sir, do you have the documents to back up the fact that you're saying that it's $35 million in charge-offs?

**MR. SESSIONS:** Objection. Argumentative.

**THE COURT:** Sustained.

**MS. FODE:** Okay.

**BY MS. FODE:**

Q And as you sit here today, are you in agreement that the document that was provided to you, when you were the CEO of Balboa Division, stated that it was $39 million in charge-offs, approximately in 2023?

A Yeah. According to this, what I'm reading right here, yes, it says 39,535,276.10.

Q And let's take a moment, because I want to clarify. Are those projections that you made in your Pioneer Model of Charge-offs? Do you know that number, sir? How much that -- how much you projected?

**MR. SESSIONS:** Objection. It's a little vague.

**THE COURT:** Sustained. And it's also compound. We can just ask them one question at a time.

**MS. FODE:** Sure.

//

//

**BY MS. FODE:**

Q Was your, was your estimates in your Pioneer Model, remember, we talked about --

A Yup.

Q -- that earlier.

A Mm-hmm.

Q Do you recall what your estimates were for charge-offs in 2023 in your Pioneer Model?

A I don't recall. But I remember my testimony this morning saying, yeah, they were elevated. But we were still, even with the elevation of these charge-offs given what had happened in the trucking industry, and what earning statements, right, that Ameria made to the public, I -- yeah, I feel that these are over -- overstated. And even if they were not overstated, still made over $50 million for Ameris that year.

Q All right, let's go back to my original question. You stated that you don't recall the amount that you had in your Pioneer Model for charge-offs. So I'm going to show you a document. I would like to --

**MR. SESSIONS:** Objection. I don't know if there was a question there, Your Honor.

**THE COURT:** There is no question.

**MS. FODE:** Right.

**THE COURT:** I need you -- the commentary needs to stop. If you have a question for him, ask a question, but

all --

**MS. FODE:** Under --

**THE COURT:** -- the commentary.

And again for the members of the jury, what the lawyers say and their questions is not evidence. Only the witnesses' answers are evidence.

**MS. FODE:** Thank you, Your Honor. So I'd like to ask that we admit and publish Joint Exhibit 546, which was admitted today.

**THE COURT:** It was already admitted so are --

**MS. FODE:** Asking to publish.

**THE COURT:** You can publish.

**MS. FODE:** Okay. I'll try to direct us to this so it will be a little easier to see. If you go to the second to last page. There we go. Will you show that one, please? Thank you.

**BY MS. FODE:**

Q All right. So, sir, if you look on the line, it says provisions for losses on direct financing leases; do you see that there?

A Yes.

Q And for those of us who don't read spreadsheets a whole lot, it looks like the blue side of it on the right is projected. Those are your projected income; is that right?

A That's correct.

Q Okay. And it looks like for 2023 do you state that the projections for the charge-offs or the loan losses was 12.6 million?
A Yes.
**MS. FODE:** Okay. Thank you. All right.
Q We talked a little bit about Mr. Silva. I'd like to ask you a couple questions here. For Mr. Silva, this is Phil Silva, did you have a close personal relationship with him?
A For about 17 years and then, yeah, for six months, no, it was a little rocky.
Q And was he your only direct report at Balboa Capital when you were CEO there?
A For a while, at least when we sold to Ameris. But Rob reported to me previously.
Q And at the end of the time before the acquisition, was Phil Silva your only direct report?
A Yes.
Q Okay. I'd like to show you an exhibit here. This is a exhibit that was admitted earlier today, Trial Exhibit 100. And do you recall seeing this exhibit earlier today?
A It's -- yeah, I would have to see it. How long is this string? Did we look --
Q We'll go down --
A -- at this exact --
Q -- to the bottom. Yeah.

A I don't know if we looked at this exact one. But there's obviously a lot of emails.
Q It looks like at the bottom of the exhibit I'll start. And for the record, it's -- the Bates number there is 1548; do you see that?
A I do.
Q Okay. So it's an email that you talked about earlier today that Phil Silva sent to some of the legacy Balboa managers; you see that there?
A Yeah. We didn't talk about this one specifically. We talked I think about the follow-up one after this. But, no, we didn't talk about this one.
Q All right. Well, do you agree with Phil Silva when he says that he -- his opinion is that Ameris is very supportive of equipment finance and hoping they'll return to these types of bonuses in 2025?
A Well, this is his opinion, and it's neither here nor there with respect to the LTIP. My opinion is different, I think as you know, stated here that they were very supportive. But it's neither here nor there because they didn't payout on the LTIP.
Q And in this email that Mr. Phillip -- Phil Silva is sending on February 1st, 2024, is he telling the Balboa -- legacy Balboa people that they would not be receiving the LTIP payout in 2023?
A Well, I think he stated that Phil reports to me, and so

he's frontrunning me. We were -- would always coordinate communications.

And right here he's trying to front-run me and get out in front of everybody and say that Ameris is supportive. Whether they are or not is really irrelevant.

So, you know, he is being disrespectful I guess to me to try to get in front of the executive members of Balboa before we had a conversation.

Q And do you see the second sentence there what Mr. Phil Silva's reasons were for saying that there would not be an LTIP payout?

A I do. And he says, after growing north of 60 percent, which is true, in '21 and '22 with very low losses, also true, 2023 was much more challenging, which was true, with the added cost of deposits, which is irrelevant because our cost of funds is one percent.

Freezes on hiring, yes, I testified this morning that there were things that Ameris did to slow the growth of Balboa, and that includes freezes on hiring.

And then also not approving things that they would in the past, which is increased scrutiny with rates and high losses primarily in trucking.

Q So Phil Silva is telling the team in part that the high loss is primarily in trucking; do you see that there?

A I do.

Q Okay. So he's saying that part of the reason for the 2023 LTIP payment that wouldn't be coming to fruition was those high losses in trucking, correct?

A But we just -- we've talked about this numerous times I believe already today, which is even despite the alleged $39 million in losses in trucking, Ameris still -- the LTIP was still positive, so we still made $48.5 million so, yes, he's confusing different areas.

And so, yeah, I agree there were high losses in trucking. There were higher losses that we had anticipated. But Ameris still was responsible and withheld payment on the LTIP.

Q And is this your email then that you sent to the team following Mr. Silva's email?

A The emails that I would send to the executive team was -- it was -- you know, it was standard knowledge about what was going on with the LTIP.

So, you know, we've been talking about it for nine months even within this group. And so, yes, this was my email after Phil had tried to front -- or did front-run me on this. And I was trying to be respectful and trying to put it in the right context.

Q And are you telling the team in essence that Ameris is not going to be giving the bonus in 2023?

A I -- well, I say that I've laid out the numbers, and mine differ from Ameris's, and that given Ameris's calculation, that

Ameris had -- has decided to withhold the bonuses from the Balboa employees.

Q And did you think that that was good leadership to be talking to the Balboa -- legacy Balboa people about your conversations with Ameris about the LTIP?

A These are people that I work with for 15 years. And when you, you know, refer to them as legacy Balboa, they're people that I know that, you know, that know me. And so, I mean, they're not surprised.

I'm trying to be cordial. I'm trying to say, hey, there's a dispute going on here, but that I think you should know kind of, you know, what's going on because Ameris is telling everybody it's GAAP, GAAP, GAAP, GAAP, GAAP.

And they have no idea because I have negotiated the, you know, as you can see, complex model, right. And so I'm probably the only one that knows what, you know, what it should be.

And so I'm giving them -- and you're going to scroll down -- I'm giving them updates like, hey, here's kind of where -- you know, here's kind of where we're at.

So I don't think that was -- you know, I tried to do it in the most respectful way possible. And I think that I did.

And so do I think it was good leadership? Yeah. Was it hard? Yeah, it was very hard to have Ameris Bank who had just bought you to go back and say, yeah, you're just wrong.

Q And doing that --
A That is very -- that was very hard. So that was -- so, yeah, that was --
Q Sending --
A -- great leadership. That was, yeah, --
Q Great leadership --
A -- to be more succinct.
Q And it was great leadership to send your email basically on top of Mr. Silva's email stating the opposite of what he just said.
A Although --

**MR. SESSIONS:** Objection, argumentative, Your Honor.

**THE COURT:** Sustained.

**THE WITNESS:** Although --

**THE COURT:** No, you don't need to answer the question. She's going to ask you another question.

**THE WITNESS:** I'm sorry, apologize.

**BY MS. FODE:**

Q And did any of these legacy Balboa people talk to you after this email?
A We would talk all the time. And you can see there's a long trail of this, right. So it's not like this was the first time that, you know, that we were -- yeah, that we were chatting about this.

It was something that we brought up in the weekly meetings

every -- right, every time something like this would come out. So it was -- you know, we were trying to be transparent with everybody.

Q And ultimately did you and Mr. Silva have a falling out over this LTIP demands that you were raising?

A I don't know if they were demands. They were the correct calculations. So did that -- was that a -- you know, as Phil would say later, was that a fracture in our relationship? Yeah, it absolutely was.

Q And do you believe that the LTIP, your focus on the LTIP, that that caused that fraction?

A Yes.

**(Pause)**

**MS. FODE:** I'd like to ask to admit -- it is -- hold on, let me make sure it's joint. But it is a new email for a new Exhibit 425.

**THE COURT:** You're moving it into evidence?

**MS. FODE:** It is a joint document, and I would ask to admit and publish.

**THE COURT:** Is there any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 425 is admitted and you may publish.

**(Exhibit Number 425 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q And this is an email, sir, from Phil Silva to you dated December 18, 2023; do you see that there?

A We're starting on December 17th.

Q Yes. And we can go down to the bottom of it so you can review it.

A Oh, yeah, why don't we go down to the bottom?

Q Okay.

A So that is from --

**MS. FODE:** You can go up --

A -- Phil Silva.

**MS. FODE:** -- so he can see it, yeah.

A Okay. We going to read that part?

**MS. FODE:** There you go.

Q So this is an email from Phil Silva to you, December 17th, 2023; do you see that there?

A I do.

Q All right. And do you remember receiving this email?

A Not specifically but, yeah, yes, I have -- yeah, I did receive this email.

Q And do you remember Mr. Silva saying these words, that he wanted you to be happy; do you remember that?

A Yes. I wanted him to be happy as well.

Q And do you see his thoughts that they do respect you -- do respect and trust you and recognize your unique talents, and

they want you to be here, I've heard it many times independently?

Do you understand that Mr. Silva was stating here that the company, Ameris, recognized your unique talents and wanted you to be here? Do --

**MR. SESSIONS:** I'll let you finish the question. Sorry.

**THE COURT:** Are you done with --

**MR. SESSIONS:** Objection, compound.

**THE COURT:** Sustained.

**MS. FODE:** Okay.

**BY MS. FODE:**

Q Do you disagree with the sentence that I just read into the record, sir?

**MR. SESSIONS:** Objection. I'm not sure if it was read into the record when the objection was sustained.

**THE COURT:** That objection is sustained so you need to start over again. We're kind of going down a vortex here.

**BY MS. FODE:**

Q Sir, do you understand that Mr. Silva is stating in his email that the bank recognized your unique talents and wanted you to be here?

A Yes. This was consistently what I would hear from the bank.

Q And do you believe or disagree with his opinion that

they're not as ill-intentioned or manipulative as you think?
A No, absolutely not. They are ill-intended and manipulative.
Q And do you disagree with his statement that you're perceiving things in the most negative way?
A I'm perceiving them as they're occurring, not what people are putting in emails and telling me verbally.
**MS. FODE:** Okay. Will you scroll up a little? Down, sorry. There we go. Further down.
Q And at the end, do you see his statement there about you are my brother and always will be?
A Yeah. I see that. And he's not my brother anymore.
Q And he says in the end, I want what is best for you and your family; do you see that?
A I see that. But he wanted best what was for -- best for him and his family.
**MS. FODE:** All right. Let's go further up in the email.
Q You sent an email on December 17th, 2023; is that your email there at Bates Number 2128, Ameris?
A Yes.
Q Okay. And what did you mean when you said I think you are drinking the Kool-Aid?
A Well, with respect to the LTIP, right, he was a big recipient of the LTIP. He made a lot of money on the sale.

And he was buying into their argument about the LTIP calculation.

And, you know, this was their mantra that you've seen in emails consistently, trying to make it seem as though I was -- you know, I was the greedy one because they wouldn't follow the calculations.

So I'm saying that, you know, this -- my calculation is right and Ameris is gaslighting me on this, and I can't believe that you can't see this, so I think you're drinking the Kool-Aid.

Q And did you ever have a conversation with Mr. Silva about your belief that he was drinking the Kool-Aid?

A We had hundreds of conversations about this.

**MS. FODE:** I'd like to now turn to another exhibit, 467, which is joint and was already admitted today.

**THE COURT:** Four, six, seven is not in evidence. Is there any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 467 is admitted and you may publish.

**(Exhibit Number 467 received in evidence)**

**MS. FODE:** Let's go down to the bottom. We'll start at the bottom. All right. If you'd go a little bit up here so we can get the date, please. All right. If you go down to the bottom, please, first. All right. That's it. Okay.

**BY MS. FODE:**

Q So it looks like here is an email from you, Mr. Byrne, to Mr. Silva, March 7th, 2024; is this an email that you sent?

A Can I see the bottom of this? Okay. So this is when Jim sends me the nonrenewal notice, okay. Thank you.

Q And it looks like is it true that you forward that email from Mr. LaHaise to Mr. Silva?

A I did, yes.

Q Okay. And why don't you read the second sentence -- I'm sorry, read the entire email into the record, please.

A Okay. It says, it looks like I'm up next. I assume you did not receive a similar nonrenewal notice and that you have already discussed it in addition to many other things you have not made me privy to with Jim.

Q All right. And what -- why did you send that email?

A I sent that because, once again, it was just strange to get a nonrenewal notice six days after Jim had sent me -- you know, done the review and said that he wanted me to stay.

And things were getting strange and I was being isolated with Phil. And so I just assumed -- and, frankly, I think -- I thought then and I think now that Phil received a heads-up on this. But, you know, I was basically -- I was speculating at the time that he did not receive the same nonrenewal notice.

Q So you were speculating at the time you sent this thinking that Phil did not get the nonrenewal notice but you did; is

that right?

**MR. SESSIONS:** Objection, argumentative.

**THE COURT:** Sustained. You don't need to answer --

**THE WITNESS:** Sorry.

**THE COURT:** -- the question.

**THE WITNESS:** Apologies.

**MS. FODE:** Let's go to the next email.

**BY MS. FODE:**

Q It looks like this is Phil Silva's response. But did you receive this email at Bates Number Ameris 001524 from Phil to you?

A I think this is after. Yeah, I think -- so if you go down, it's my apology to him; is that what we're getting to?

**MS. FODE:** Yeah. We'll go in order so it's clear, okay?

**THE WITNESS:** Okay.

**BY MS. FODE:**

Q Is this email from Mr. Silva where he says you're probably right, Pat, we shouldn't talk? Do you remember receiving this from Mr. Silva?

A I do.

Q And do you remember him saying, you owe me an apology?

A I do.

Q And I have kept you updated on everything.

A I don't agree but, yes, I read that.

Q Okay. And you want to go up then to your response. Will you read that first line to the record, please?
A Sure. You're right. I owe you an apology.
Q All right. And I won't have you read the entire thing, but it looks like at the end you say you apologize for overreacting here.
A Yeah. I didn't have any physical proof at the time and so the best thing to do was to apologize because, you know, I didn't have any -- although I had a strong suspicion and absolutely still do that he received a heads-up on this.
But I didn't have any proof to completely prove it. So I'm saying, yeah, I did jump the gun and I owed him an apology.
Q Do you know if Mr. Silva accepted your apology?
A I think if we go up, we might see that.
Q I think that's --
A Yeah, there we go.
Q You remember receiving this additional email that's, let me see, Bates Number 1525 from Mr. Silva?
A I do.
Q Did you understand that he felt that you were partner and friend for 17 years?
A Yeah. I treat him like a partner. He'll -- you know, he tries to make the case that, you know, it was like, you know, classic subordinate, right, boss-type relationship. But it wasn't like that. And, yeah, so, yeah, he was a partner.

And he also goes on to say that these dustups are fatiguing me. And they're fatiguing me as well.

Q And did you understand that Mr. Silva was wanting to discuss the continuation, for your continuation of the company?

A No. I don't think that was the intent here.

He's just trying to kind of wipe his hands of the LTIP because he knows that that's a fracture of our relationship because he says here, right, the LTIP is your fight. You negotiated, we agreed upon this. And, you know, he just wants to kind of stay away from it because he's switched sides.

Q And was Mr. Silva involved in the negotiation of the LTIP with Ameris at the inception?

A No.

Q Okay. All right. Turning to another topic, do you remember referring to Nicole Stokes as the principal?

A The principal. Oh, I know what you're referring to. Yeah, yes. Do you have an email to that effect or --

Q Let me -- I'll ask a --

A Okay.

Q -- further question. Do you recall saying that when you talk with Nicole Stokes, do you feel like you're being called to the principal's office?

A Yeah, it -- yes, I do.

Q And did you say that in a work meeting?

A I could have. But people know that I'm making, you know,

making fun of myself and making fun all the time. So it wasn't -- you know, it wasn't mean-spirited.
Q When you said that you felt like Nicole was calling you to the principal's office, did you mean that in a joking way?
A I did mean it in a joking way. And anybody that knows me knows I make, you know, a ton of jokes. And if this one was inappropriate, it wasn't, you know, it wasn't meant to be that way.
Q Okay. And why did you -- do -- why do you remember saying that you felt like you're being called to the principal's office when you talk with Nicole Stokes?
A I -- you know, I -- well, I think just this -- I'm not sure. If we look at the email to refresh my memory. I'm not quite sure.
Q And do you feel like a comment like that with the CFO of Ameris Bank was in line with upholding your -- Ameris's values of kindness and respect?
A Yeah. I think it was because anybody that knew me that would have been in that meeting would have been -- know -- knew who I was, right. And they knew that, you know, I make more fun of myself than anybody else. So it wasn't in any way disrespectful or mean-spirited.
Q You've talked about that you are bringing this lawsuit for yourself and other employees, correct?
A Correct.

Q And how many other employees do you believe you're bringing this lawsuit on behalf of?
A Well, I mean, yeah, my intent is to get the 138 approximately that were paid out for 2022 or whoever's eligible, right, you know, whoever that would be.
But I can go by -- well, I think a few of those were Ameris personnel like Sufhan and people like that. So I'm not sure that they would be. But, yeah, so it would be, you know, a large number of people.
Q As you sit here today, do you know who the it sounds like approximately 138 employees would be eligible for the payout?
A We don't have enough, right. Ameris didn't give us the information to make the calculations.
So but, you know, if I was -- my preference, strong preference would be just to have Ameris go back, see who everybody that was eligible, find out what the LTIP that they should have paid out, and pay it out based upon what we agreed upon. That's ideally what I'd like to see.
Q But as you sit here today, you don't know the people that would be entitled to additional payments, correct?
A Can I name out 138 people right now? No, I can't. Do you want me to start naming out? But I can probably name, you know, 20 to 50 if we want -- if you want to go through that.
Q And have you talked with anybody about sharing in a potential judgment or award in this lawsuit?

A No.
Q Okay. And as you sit here today, are you sure the number is 138 people?
A I don't. It's a large number. Once again, I don't know the exact number just like I don't know the exact number of the sales price. But I can tell you that it should be done. It's the right thing to do.
Q And just to wrap this questioning, you don't have an agreement with any of these people that you would pay them any amount of your judgment if --
A Absolutely not.
Q -- that was to --
A Absolutely not.
Q -- be received --
A Absolutely not. And Phil Silva, right, told me that I shouldn't talk to anybody. So I've -- you know, so I -- you know, all these people from Balboa that I knew, yeah, that, you know, I don't -- I can't talk to them and they don't want to talk to me.
So, no, there's no agreement. But absolutely not, there's no agreement.
Q And specifically no agreement with any of the witnesses that will be testifying at trial for you.
A Correct, that's zero so that would include witnesses and non-witnesses.

**(Pause)**

Q You mentioned in your direct that there -- it was -- became harder for you to do your job because the Balboa employees were reporting to Ameris directly for IT and accounting and marketing; do you remember that?

A I do.

Q And do you understand, sir, that those employees had to report to the Ameris to uphold the internal controls of the company?

A There were internal -- I think as I testified this morning, there were internal controls for a few of the accounting people.

But the accounting -- you know, these controls had nothing to do with marketing, they had nothing to do with IT, right, and they had to do -- they didn't have to do with a lot of accounting. So, yeah, that's my answer to that.

Q And were you told that those employees needed to report to Ameris people, like in accounting, for instance, were you told that for internal control reasons?

A I was told -- the only thing that I was told before the acquisition that there would be a few people -- I believe it was two, it could have been three -- that would have to do segregations of duties, right. And so those were the only people that I heard before the acquisition.

I never would have agreed to any -- you know, anything

else beyond that to have those people that were reporting to Balboa that I had in the end, I had -- right, I was accountable for, but I didn't have control over.

So my answer succinctly is there were only a couple people within the accounting area that needed to be there for, you know, SOX or, you know, purposes.

Q So if the CFO of the company was to tell you that the -- those internal controls needed to occur, they needed to report up to Ameris people, did that ever happen?

Did Ms. Nicole Stokes, the CFO, ever tell you that those people needed to report to Ameris directly?

**MR. SESSIONS:** Objection, compound.

**THE COURT:** Sustained.

**THE WITNESS:** I --

**MS. FODE:** Hold on real quick.

**THE COURT:** The objection is sustained.

**MS. FODE:** Yeah. Let me --

**THE WITNESS:** I'm so sorry.

**THE COURT:** She's going to --

**THE WITNESS:** Yeah.

**THE COURT:** She's going to ask --

**MS. FODE:** I'll restate it for you.

**THE COURT:** She's going to --

**MS. FODE:** Yeah.

**THE COURT:** -- ask you another question.

**MS. FODE:** Yeah.

**THE WITNESS:** Apologize.

**BY MS. FODE:**

Q Were you ever informed by Nicole Stokes that the Ameris personnel that you're talking about needed to report, that Balboa personnel need to report directly to Ameris?

A She told me before the acquisition that there would be a few people that needed to be -- to report to Ameris. Whether she told me whether the marketing, IT, credit, or any other department beyond that needed to, I don't recall. But I would take issue with that.

Q And ultimately was it her decision as the CFO to ensure that the internal controls were complied with?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

No, wait for the next question.

**THE WITNESS:** I was getting better.

**BY MS. FODE:**

Q Do you understand that Ms. Nicole Stokes, the CFO, that was her responsibility to uphold the accounting protocols and internal controls of a company?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

//

//

**BY MS. FODE:**

Q If you know.

**THE COURT:** The objection is sustained. Ask --

**MS. FODE:** Okay.

**THE COURT:** -- the next question, please.

**BY MS. FODE:**

Q And did you think that you took issue with having to have your people reporting to Ameris but did they still work on Balboa work on a day-to-day basis?

**MR. SESSIONS:** Objection, vague and compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did the Balboa people that you're talking about here, did they work on any Balboa matters?

A They did work on, yeah, Balboa matters sometimes, yes.

Q Okay. And did you feel that you had lost control over the accounting and IT people that now reported to Ameris?

A Was it a lot harder, yes? Control, you know, that wasn't really what I was looking for. I just didn't want those expenses to be charged to the Balboa Division.

Q And I thought earlier that you had said that you also -- that it made it harder to do your job; is that right?

A Absolutely, yeah, made it a lot harder.

Q But the Balboa people were still working on the Balboa work, correct?

A They were working on some. Whether it was a hundred percent, but that's not the issue. The issue is whether -- right, whether those expenses -- whether they reporting to Ameris and being charged to Balboa, that's all I was really trying to get at.

**(Pause)**

**MS. FODE:** All right. Going to turn to another topic.

**(Pause)**

**THE COURT:** Do you have more questions for this witness?

**MS. FODE:** I do, Your Honor.

**THE COURT:** Please proceed.

**MS. FODE:** Okay.

All right. Sir, I'm going to direct your attention to Exhibit 325.

And this is an exhibit that I would like to ask Mr. Byrne to lay the foundation. And it is not --

**THE COURT:** Go ahead.

**MS. FODE:** -- yet admitted.

**THE COURT:** Just ask him the questions.

**MS. FODE:** All right. If you could show it just Mr. Byrne.

**THE COURT:** It's only -- it's not being published. Go ahead.

**MS. FODE:** Yeah.

**BY MS. FODE:**

Q All right. Have you seen this document before?

A Yes.

Q Okay. Do you remember receiving it when you worked at Ameris Bank?

A It was with a whole bunch of other stuff but, yes, I did receive it.

**MS. FODE:** And if you'd go down to the last page.

Q And do you remember acknowledging this on December 16th, 2021?

A Not specifically but I'm sure that I did.

**MS. FODE:** Okay. I'd like to ask to admit and publish this document.

**THE COURT:** Any objection?

**MR. SESSIONS:** I just was wondering if Ms. Fode could be asked to lay a little more foundation to the relevance; otherwise no other objection.

**THE COURT:** Okay. So the objection is overruled. The Exhibit 325 is admitted and you may publish.

**(Exhibit Number 325 received in evidence)**

**MS. FODE:** We're going to go to section four.

**BY MS. FODE:**

Q All right. So this is the Ameris Bank confidential information agreement. And you just acknowledged that you

received it and acknowledged it, correct?
A Yes.
Q Okay. I'd like to direct your attention to section four. And it states employee agrees that except as required in the course of his or her employment by Ameris Bank, employee will not duplicate, remove, transfer, disclose, or utilize or knowingly allow any other person to duplicate, remove, transfer, disclose, or utilize trade secret -- such trade secrets or confidential information.
Did I read that correctly?
A You did.
Q And does this provision state that you would not duplicate or transfer Ameris's confidential information and trade secrets?
A Except as required in the course of my employment by Ameris Bank.
Q And where does it say that, sir?
A First sentence. Employee agrees that except as required in the course of his or her employment by Ameris Bank.
Q And we will talk about that in a moment.
A Okay.
Q Do you remember on section five here if we look about "C" to paragraph 5-C --
**MS. FODE:** Highlight "C." There we go.
**THE WITNESS:** Could you move it up? Thank you.

**MS. FODE:** Thank you. Okay.

**BY MS. FODE:**

Q Will you please read that into the record, sir?

A The whole paragraph?

Q Yes. Thank you.

A Okay. Upon termination of employee's employment, whether voluntary or involuntary, or upon Ameris's Bank's request to deliver to Ameris Bank without copying or summarizing all written materials and all models, mechanisms, documents, records, and tangible things and the like containing or related to such confidential information, all of which shall be in and remain the sole property of Ameris Bank for this purpose.

Written material shall be deemed to include letters, memorandums, reports, notes, notebooks, books of account, data, drawings, prints, plans, specifications, formulas, and all other documents or writing, and all copies thereof.

Q And does this state that your -- upon your termination, you would need to return copies of Ameris's confidential information?

A It does.

**MS. FODE:** And I'd like to ask for you to pull up three -- but don't publish Exhibit 326.

**THE COURT:** Go ahead.

**MS. FODE:** Okay. Only for Mr. Byrne, yeah. All right.

**BY MS. FODE:**

Q Sir, have you seen this document before?

A Is it the same one, acceptable use?

Q It's a different document. Have you seen it before?

A Was the other one labeled acceptable use as well?

Q It's -- actually the other one's a confidentiality --

A Oh, apologies.

Q Yeah.

A Apologies, okay.

Q But have you seen this one before? And let us know if you need us to scroll down.

A Yeah, if you would scroll down, that would be helpful. Could you blow it up a little bit, too, so I could see it?

Q Do you recall acknowledging -- receiving and acknowledging this document on December 16, 2021?

A Not specifically. But I don't dispute that I signed it.

**MS. FODE:** All right. I'd like to ask to admit and publish the Exhibit 326.

**THE COURT:** Any objection?

**MR. SESSIONS:** No, Your Honor.

**THE COURT:** Okay. Exhibit 326 is admitted and you may publish.

**(Exhibit Number 326 received in evidence)**

**MS. FODE:** All right.

//

**BY MS. FODE:**

Q You see that there, sir?

A I do.

Q Okay. If you would please, I'd like to direct your attention to where it says, all users accessing.

**(Ms. Fode/Ms. Speaker confer.)**

Q And do you --

**THE COURT:** I'm sorry, is that part of the same exhibit?

**MS. FODE:** Let me confer.

**(Ms. Fode/Ms. Speaker confer.)**

**THE COURT:** I just took it off the jury screen because I don't think this is part of -- this isn't part of the document that we just admitted.

**MS. FODE:** I think we need to -- okay, no worries. Page 16. All right.

**BY MS. FODE:**

Q Overall the acceptable use policy prohibited you from sending customer information or email communications to third party email systems, correct?

A I don't know. Do you want -- it's a long document. Do you want me to read the document or what would you suggest?

**THE COURT:** And what is this document that's on his screen?

**MS. FODE:** Technology is good until it doesn't work.

Do you want to pull it up in your binder?

**THE COURT:** No, we have it. I just -- the document that was just admitted as Exhibit 326 was a two-page document that just had some information about what document he was accepting.

And then on the second page it was one line of an acceptance. It didn't have the policy attached from what I could see.

**MS. FODE:** Okay. Yeah. (Inaudible) attached policy, too. Okay. All right.

**BY MS. FODE:**

Q So with regard to -- you understood as CEO of the Balboa Division that you had policies and procedures that prohibited you from disseminating confidential information, particularly customer and employee information.

**MR. SESSIONS:** Objection, compound.

**THE COURT:** Sustained.

**MS. FODE:** What was the ruling, Your Honor?

**THE COURT:** Sustained.

**MS. FODE:** All right.

**BY MS. FODE:**

Q As Balboa CEO, you understood that you were not allowed to disseminate customer information outside of the workplace, correct?

A I was to keep Balboa information, yeah, care for Balboa

information and not have it get out to people that could use it for, you know, other purposes.

Q Okay. And you forwarded Ameris documents from your Ameris work email to your personal Yahoo email account while you were employed at Ameris, correct?

A Yeah, I think it was common knowledge that I had that Yahoo account and that I did forward emails, specifically, you know, some of which were involved in this case.

Q And you had testified that you sent yourself those emails to help assist with your lawsuit today, correct?

A The answer was twofold. That was number one. Number two was to do my job and because the system was slow and that big spreadsheets, you know, you really couldn't work at them at work so I'd send them home and work on them. So those were the two reasons that I sent documents to my Yahoo email address.

Q And was there a policy or anything in writing that allowed you to do so?

A Ross Creasy, yeah, let me know that I could do this. And he was the -- he's the head IT person. I guess we'll hear from him later. But executive officer at Ameris. And --

Q And --

A -- Jim LaHaise and everybody. It was pretty much common knowledge that, right, that I would do this.

Q And when did Mr. Ross Creasy allow you or provide you permission to send the documents to your personal Yahoo

account?

A Probably in -- well, so when it was just I owned a hundred percent of Balboa so I had a lot of my personal information intertwined with Balboa.

And, you know, working on the acquisition and doing what was best for Ameris, I didn't really think about separating the two. So when I sort of thought about it, they had all my information, you know, starting in right with the acquisition.

And so they had all my personal information, all the deal documents with, you know, concerning their deal, all the deal documents concerning everybody else's deal.

So I went to Ross and said, hey, can you please, you know, there's a tremendous amount of data here, can you just give me, right, permission to, right, to download these documents.

And he, you know, I mean, Jim knew this, everybody knew this. But Ross, there's a -- you know, there's an email from Ross specifically saying that I can do this. So this was 2022. This was, you know, whatever, four years ago.

Q So your testimony is that Ross Creasy allowed you via email, he gave you permission to send your work documents to your Yahoo account.

A Well, he knew that I had -- yeah, he knew that I had these -- right, he knew I had these documents, right. Look, I -- yeah, I'm -- you know, I'm not going to do anything with these documents. I know, yeah, and I think everybody says that

I'm not doing anything with these documents. But, yeah, --

Q Do --

A -- Ross Creasy, there was a few people that said that I could do this. And it was pretty much common knowledge that I would send spreadsheets to my, yeah, to my house to work on.

Q And just to clarify, you said that Ross Creasy sent you an email that gave you the authorization.

**MR. SESSIONS:** Your Honor, objection. I think that misstates the testimony.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did Ross Creasy send you an email to allow you to send your work product to your personal Yahoo account?

A There was a couple things. I'd have to go back. And, you know, obviously this was a long time ago, right.

So specifically Ross was saying that I could have all the documents that were currently, right, on the system, right. And so that was, you know, that, you know, included PII and, you know, all the other stuff.

Subsequent to that, right, we have in the 2023 strategic plan the -- were the biggest items that we have to fix in 2023, of which Jim approved, which was the speed of the system.

So -- and the reason for the speed of the system is because everybody knows they work on a computer and it just spins, spins, spins, spins, spins, right. You can't get any

work done. And this specifically was about, you know, these big spreadsheets.

And so very common knowledge why I would do this and that I was sending them to my, you know, to my Yahoo account to work on.

Q And did you receive permission after you were terminated to send -- to maintain and keep the emails that you sent and documents to your Yahoo account?

A No.

Q And as you sit here today, do you still have the emails and documents that you sent from Ameris to your Yahoo account?

A I've always maintained that I don't want the -- you know, I don't want this information and that I'm willing to give it back.

But every time I put that out to Ameris, you know, they just want to, you know, they want to, you know, keep all this litigation going.

So I'm -- I will stand here today and say if you want that information back, then -- and you want me to destroy it, yeah, I will absolutely do that.

I don't -- have not used it for -- and I also say that I have not used it for, you know, for my purposes, other than this lawsuit.

**(Pause)**

Q And just one clarifying question. You still have all the

emails and documents that you sent to yourself.
A I do. And Ameris knows that as well because they track everything. They know exactly the emails that I sent to my Yahoo account.
That Yahoo account was in the acquisition documents. It's what I put down as my personal email address when you fill all this paperwork out.
And you can't take -- you know, you can't -- the USB port, it's locked down. And the other thing is they shut down my computer like they do everybody else's when I left. So they know exactly the documents that I have. And I -- yeah.
Q And you'll give them back you said.
A Yes.
**MS. FODE:** Okay. Great. All right.
Q You mentioned that you haven't worked since you were terminated from Ameris, correct?
A Correct.
Q And you mentioned that you have a noncompete in your employment agreement; is that right?
A That's correct.
Q And is it your understanding that the language of the noncompete or the non-solicitation was for one year.
A I believe it's beyond that. Yeah, I believe it's beyond that. I think it's for two years in fact.
**MS. FODE:** All right. Let's pull up the document.

It's Exhibit 324. It was admitted today. And we'll go to section 4.3, please.

Q Is this the employment agreement that you received from Ameris?

A Yes.

Q Okay. If you look at section 4.3, sir, subsections "A," little Roman numeral two.

A Yes.

Q Okay. It's saying during the restricted period, executive shall not whether directly or indirectly whether on executive's behalf or on behalf of or in conjunction with any other person or entity.

And Roman numeral two says, solicit or attempt to solicit any person during the preceding 12 months.

Do you understand that this was a 12-month non-solicitation or noncompete?

A That's what it says here. But there's a number of other places that this I believe comes up but -- so I don't think this is the sole area where this comes up. But this is certainly in my employment agreement.

Q Do you have another document that would show that you have a non-solicitation, noncompetition that -- other than this one?

**MR. SESSIONS:** Objection, argumentative.

**THE COURT:** Sustained.

//

**BY MS. FODE:**

Q Is -- do you have any other agreement with Ameris that shows that you have another or different noncompete?

**MR. SESSIONS:** Objection, argumentative.

**THE COURT:** Overruled. You can answer.

A The stock purchase agreement has 938 pages and I think it may address this as well. As we just went over the acceptable use policy, which is I think 20 pages, there is the confidential information, right, which is, you know, 20 pages.

So sitting here today, I -- my best recollection is there's something somewhere in all those documents that states this. But I'm not sure exactly where.

Q And if this is stating 12 years for -- or 12 months for your non-solicitation, is it correct that that would take you to June where you were terminated in June, 2024, and that would take you to June, 2025?

A Correct. That would be -- yeah, --

Q Okay.

A -- that's good math.

Q And is it your testimony that you're -- you haven't sought employment or any W-2 employment since June of 2024?

A Yes, because there was a noncompete. And the last acquisition that Ameris did, they went after that person for similar type of stuff.

So trying to do anything else when Ameris is accusing me

of doing, you know, all these other things, this just doesn't make for a great, you know, way to find a job.

Q And have you taken any other efforts to provide income other than applying for a W-2 job in the last two years?

A I -- you know, I have investments. I have made investments that, right, that takes up, you know, a bunch of my time. So but in terms of actual W-2-type employment, no.

I was hoping to get this case over with, right, and then kind of move on because it's hard to go into a job interview with, you know, the character assassination that Ameris has put forth.

**MS. FODE:** Need one moment, please, to wrap up. No further questions.

**THE COURT:** Okay. Thank you.

Any redirect?

**MR. SESSIONS:** Yes, Your Honor. Very brief.

**THE COURT:** Well, you know, it's 2:28 so I'm thinking that maybe we take our afternoon break, and we'll do redirect when we come back.

**MR. SESSIONS:** That's perfect, thank you.

**THE COURT:** Okay. Thank you.

Go -- you can go ahead and step down, sir.

**(Witness steps down.)**

And to our jurors, please don't discuss this case amongst yourselves or with anyone else. Don't do any research

on any aspect of the case. And we'll see everyone back here at 2:45.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**MS. SPEAKER:** How long is our break?

**THE CLERK:** Court is in recess.

**(Recessed at 2:29 p.m.; reconvened at 2:46 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated.

Okay, I understand that counsel need to speak with me before we resume with testimony?

**MR. WOOD:** Yes, Your Honor, we do have a scheduling concern.

So as you might recall there was discussion on Monday about the whole Mr. Creasy and Ms. Parker issue. We're concerned that we're getting late in the day, we understand that the defendant now wants to call Mr. Creasy next as part of their case in chief, and one of our questions will be if -- well any way -- the concern we have is that we've been told that Ms. Parker, while she's available today, has an extremely hard cutoff and we're not going to get her unless she goes today.

So we'd respectfully request that we be -- you know,

our original accommodation that was made before the Mr. Creasy issue came up was that we were going to take Mr. Parker -- Ms. Parker before 2 o'clock today, obviously we're past that, we understand she has more time, but we need to be sure that we get her in today, and we don't know how long, you know, their cross of, you know, Ms. Parker is going to take and things. So we would respectfully suggest that we be permitted to take Ms. parker next, and then if there's time then Mr. Creasy can go.

But for the similar reasons that we discussed on Monday, otherwise this is highly prejudicial to our ability to put on our case.

**THE COURT:** Okay. Ms. Yee?

**MR. SESSIONS:** Your Honor, thank you.

On Monday we have already addressed this issue and Your Honor allowed us to simply put on Mr. Ross after plaintiff's testimony.

**THE COURT:** Yeah, on the condition that we were going to -- that you on the defense side would make sure that you handled your examination so that we'd have time.

This examination has taken twice as much time as it really needs to, because we've got these long pauses between questions, we've got long pauses between tranches of questions, there's all sorts of whispering and conferring on the defense side.

So but for the fact that we have not had a streamline presentation of evidence, we would not be in this situation.

**MS. YEE:** Your Honor, Mr. Creasy has been here all day --

**THE COURT:** I can't hear you.

**MS. YEE:** Mr. Creasy has been here all day waiting, and he has rescheduled his flight multiple times, and he has a flight tonight, and he's ready to testify.

**THE COURT:** I understand that, but this isn't the defendant's control, and if you knew that he was here all day today then I think you should have planned the cross-examination better of Mr. Byrne.

So we -- because of the fact that -- I'm sorry, Ms. --

**MR. WOOD:** Parker.

**THE COURT:** -- Parker can only testify today, Ms. Parker is going to be next.

**MS. YEE:** Your Honor, Ms. Parker also make herself available on Monday.

**THE COURT:** Pardon me?

**MS. YEE:** Ms. Parker can also make herself available on Monday.

**THE COURT:** Have you discussed this with plaintiff's counsel?

**MS. YEE:** I haven't, but I'm going --

**THE COURT:** Okay.

**MS. YEE:** -- I told --

**THE COURT:** This has to -- this bringing things up for the first time in front of the Court and things that needed to be worked out ahead of time is not acceptable.

If you knew that she could come on Monday, why are we hearing about now when we've been talking about this since Monday?

**MS. YEE:** Your Honor, we weren't sure that if this case was going to be over by Thursday.

**THE COURT:** Okay.

**MS. YEE:** And I have informed the counsel before that Ms. Parker was only available for this week on Friday, and then this court is dark, and also on Wednesday.

**THE COURT:** Right. But this is not new information.

So how does plaintiff want to proceed?

**MR. WOOD:** We'd like to call her today, Your Honor.

**THE COURT:** Okay. So we're going to have her come testify today.

Okay. Anything else?

**MR. SESSIONS:** Nothing from us, Your Honor.

**THE COURT:** Okay.

**MS. YEE:** Thank you, Your Honor, nothing from us.

**(Pause)**

**THE CLERK:** All rise.

**(Jurors enter courtroom at 2:51 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Thank you, Ms. Jackson.

Okay, Mr. Byrne, you can come back to the witness stand. And you are still under oath, okay?

**THE WITNESS:** Yes.

**THE COURT:** Okay, Mr. Sessions, you may proceed when you're ready.

**MR. SESSIONS:** Thank you, Your Honor. Very brief.

**REDIRECT EXAMINATION**

**BY MR. SESSIONS:**

Q Mr. Byrne, is it your understanding that you are the only plaintiff in this case?

A No.

Q And what is your understanding regarding this case?

A My understanding is that --

**MS. FODE:** Overbroad.

**THE COURT:** Over --

**MR. SESSIONS:** I'll rephrase.

**THE COURT:** Okay, go ahead.

**MR. SESSIONS:** I'll rephrase anyway. Thank you, Your Honor.

**BY MR. SESSIONS:**

Q What's your understanding in regards to the relief that you're asking the jury specifically to award in this trial?

A I want them -- I want the Court I guess and the jury to decide and go back and do the proper accounting for everybody that's owed, all the employees that are owed under this LTIP agreement. I believe perhaps the legal term is injunctive relief.
Q And are you also seeking damages as to yourself?
A Yes, for every -- yeah, for all the employees based upon, you know, what the distribution was called for.
Q Okay.

**MR. SESSIONS:** And then I'd like to show the witness on blackout Exhibit 19.

**THE COURT:** Go ahead.

**MR. SESSIONS:** And, Your Honor, this is for -- and I'll ask Mr. Wood if he can turn that screen around so the jury doesn't see it -- this is for completeness, Your Honor. I believe that Exhibit 333 was admitted during Mr. Byrne's cross, but this one has an extra page on it --

**THE COURT:** Okay.

**MR. SESSIONS:** -- but I'll ask the witness to -- that's just for the Court to know -- I'm going to ask the witness to identify.

**THE COURT:** Okay, go ahead.

**BY MR. SESSIONS:**
Q Mr. Byrne, I'm going to ask Ms. Perez to scroll through all three pages and then will you let me know if you recognize

this document?
A I do.
Q Okay. And can you tell us what it is?
A 2022, 2023, and 2024 LTIP calculation, according to Ameris.
Q Okay. And then who prepared these LTIP calculations?
A Ameris.
Q Okay.

**MR. SESSIONS:** And at this time I'd move to admit Exhibit 19 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** Object to that it contains 2024.

**THE COURT:** The objection is overruled, Exhibit 19 is admitted, and you may publish.

**(Exhibit Number 19 received in evidence)**

**BY MR. SESSIONS:**
Q And then, Mr. Byrne, according to --

**MR. SESSIONS:** If we can go to the -- is this the third page?

**BY MR. SESSIONS:**
Q Mr. Byrne, what year does this particular LTIP work book pertain to?
A 2024.
Q Okay. And under the calculations here was the EBT threshold exceeded in 2024?

A Yes.

**MR. SESSIONS:** You can go ahead and take that down.

**BY MR. SESSIONS:**

Q Okay. Last sets of questions, Mr. Byrne.

Regarding the discussion of the employees that were moved to report to Ameris, did you have any control over their salaries?

A No.

Q Did you have any control over whether they would be allowed to work overtime?

A No.

Q Did you have any control over what type of expenses they were able to incur?

A No.

Q And whether they were able to get reimbursed for those expenses?

A No.

Q Okay.

**MR. SESSIONS:** Thank you. No further questions, Your Honor.

**THE COURT:** Okay, any recross?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay. Thank you very much, sir, you're excused.

Okay, the next witness?

**MR. WOOD:** Yes, Your Honor, the plaintiff would like to call Heather Parker.

**THE COURT:** Okay. Ms. Parker, is she in the hallway or can someone go get her?

**MS. YEE:** I believe so, Your Honor --

**THE COURT:** Okay.

**MS. YEE:** -- and we have someone to get her.

**(Pause)**

**THE COURT:** Okay, Ms. Parker, you're going to come around here. When you get to Ms. Jackson you'll stop, she'll swear you in, and then you'll come and have a seat on the witness stand next to me.

**THE CLERK:** Please raise your right hand.

**HEATHER PARKER, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Thank you. And ma'am, just watch your step going up.

And ma'am, I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** Heather Parker, P-A-R-K-E-R.

**THE COURT:** Thank you very much. Mr. Wood, you may proceed.

**MR. WOOD:** And Your Honor, may I have permission to treat the witness as adverse?

**THE COURT:** Yes, you may.

**MR. WOOD:** Thank you.

**DIRECT EXAMINATION**

**BY MR. WOOD:**

Q Good afternoon, Ms. Parker, it's very nice to meet you.

You have a degree in economics from Stanford University; is that right?

A Yes.

Q And you also have a master's in business administration from UCLA?

A Yes.

Q And after getting your MBA you were at Bank of America for some time; is that right?

A Yes.

Q And while working at Bank of America you were a vice president in the secondary market group; is that right?

A Yes.

Q And you moved over at some point in the early 2000s to a place called Dresdner Kleinwort Wasserstein; is that right?

A Yes.

Q Okay. And is that sometimes referred to as DKW?

A Yes.

Q Okay. And you were a vice president at DKW as well, right?

A Yes.

Q And that involved working on, you know, big ticket leasing and renewable energy partnership structures; is that right?

A Yes.
Q And after DKW you were a managing director at Lockwood Capital for a year before taking some time off to be -- to stay at home, right?
A Yes.
Q Okay. And then from 2013 to 2017 you were at a place called Go Capital?
A Yes.
Q Okay. And then you started working for Balboa Capital in January of 2018; is that right?
A Yes.
Q Now, when you started at Balboa your first role was as a controller; is that right?
A Yes.
Q And as a controller you were responsible For Balboa's financial statements?
A Yes.

**MS. YEE:** Overbroad.

**THE COURT:** Overruled.

**BY MR. WOOD:**

Q And you were then promoted to chief financial officer in early 2021 at Balboa; is that right?
A In January of 2021, yes.
Q Okay. So were you -- now Balboa was -- during your tenure there Balboa was from time to time subject to audits, right?

**MS. YEE:** Overbroad, vague.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** There were annual financial audits as well as bank audits.

**BY MR. WOOD:**

Q Okay. And during the time -- I'm talking about now, you know, when Balboa Capital was still just Balboa Capital, before it was acquired by Ameris -- Balboa Capital worked with a firm RSM US LLP to conduct audits, right?

A They did the financial audits and some agreed upon procedures.

Q And they were an independent company from Balboa, right?

**MS. YEE:** Vague.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

**BY MR. WOOD:**

Q Okay. And did you and Mr. Byrne work closely together with -- when you were working with the auditors?

A Yes.

Q Okay. I'd like to --

**MR. WOOD:** One second.

All right, I'd like to show the witness on blackout Exhibit 1.

**THE COURT:** Go ahead.

**MR. WOOD:** Which has not yet been admitted.

**THE COURT:** Go ahead.

**MR. WOOD:** And if we could show --

**BY MR. WOOD:**

Q Yeah, do you recognize this document, Ms. Parker?

A Yes, it's the independent auditor's report from RSM.

Q Okay. That's exactly what I was going to ask.

So this is an independent auditor's report of Balboa Capital for the years 2019 and 2020; is that right?

A Let me check. Here we go. Yes.

Q Okay.

**MR. WOOD:** And I'd like to go down to show where there's an attachment. There's an attachment.

**BY MR. WOOD:**

Q This is a letter from RSM that summarizes its findings; is that right?

A So at the bottom of the first page it says that -- it gives their opinion that the audited financial statements fairly represent in all material aspects the financial position of the company for December 2020 and 2019.

**MR. WOOD:** Okay. Your Honor, at the time I'd like to move to admit Exhibit 1 into evidence, and to publish it to the jury.

**THE COURT:** Any objection?

**MS. YEE:** Yes, objection to relevance and lack of authenticity.

**THE COURT:** The objections are overruled, Exhibit 1 is admitted, and you may publish.

**(Exhibit Number 1 received in evidence)**

**MR. WOOD:** Okay.

**BY MR. WOOD:**

Q And I'd just like to read down at the bottom here the part that's highlighted. It says, we believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion. Do you see that?

A Yes.

Q And so RSM had sufficient information to render its audit opinion as you understand it, right?

**MS. YEE:** Speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** According to their letter, yes.

Q Okay. Balboa Capital was audited roughly every year, right?

A Yes.

Q Okay.

**MR. WOOD:** And we can take this exhibit down.

Q Okay. And you and Mr. Byrne also worked closely on compliance issues with lenders, right?

**MS. YEE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Part of my responsibilities did involve

working with the lenders, and Pat was actively involved with that.

**BY MR. WOOD:**

Q Okay. And he was also involved in working with you on compliance issues with state agencies, right?

A Are there -- I mean I want to say that's pretty broad. I mean there were some -- I was going to say we had leases so sometimes we might have like sales or sales tax audits or property tax audits, and he would be made aware of what was going on with those audits.

Q Okay. But as to state agencies do you recall if he was involved with your work as to those audits?

A I'm trying to think beyond sales and property tax audits --

Q Okay.

A -- what that would be.

Q Okay. Would it refresh your --

**MR. WOOD:** You know, if I can refresh the witness's recollection?

**THE COURT:** I don't think she needs her recollection refreshed. If you could ask her other question.

**MR. WOOD:** Okay.

**BY MR. WOOD:**

Q All right. Part of your job responsibilities also included preparing monthly reports that were sent to Balboa's

lenders, right?
A Yes, there would be monthly reports.
Q Okay. And Balboa's lenders also required audited financial statements, right?
A Yes, that was part of the agreements.
Q Okay. And Balboa's financial statements consistently received satisfactory opinions from auditors, correct?
A During time that I was there, yes.
Q Okay. And that was from roughly 2018 until Balboa was acquired by Ameris; is that right?
A Yes. So the last RSM audit would have been for the year ending 2020, and then we were acquired at the end of 2021.
Q Okay, thank you.
All right. So let's talk about the -- what happened once Balboa became acquired by Ameris.
You were with Balboa and then you were with Ameris during that transition, right?
A Yes.
Q Okay. And during -- and that transaction closed roughly in December of 2021; is that your recollection?
A Yes.
Q Okay. So during the transition that happened, you know, post-acquisition, were you involved in helping educate employees at Ameris kind of about the processes that Balboa had been following under your purview?

A I met with various Ameris employees during that transition time.
Q And did you talk with them about the kinds of things you'd been doing at Balboa?
A In terms of accounting I -- payroll, I'm not sure if there's anything -- I mean there were over responsibilities as well, but those were some of the primary ones.
Q Yeah. So in terms of accounting and payroll you did, right?
A Yes.
Q Okay. And shortly after Ameris acquired Balboa Ameris moved Balboa's accounting team to be under the Ameris accounting team umbrella; is that right?
A They reported into the Ameris accounting team, yes.
Q Right. So they were -- so once Ameris took over they became part of Ameris's umbrella, right?
A Their -- so the Balboa accounting manager would report to an Ameris director.
Q Okay.
A Yeah.
Q And accounting wasn't the only Balboa department that moved to reporting to Ameris, right?
A Correct.
Q Okay. The credit department began reporting to Ameris, right?

A Eventually, yes.
Q And the IT department began reporting to Ameris, right?
A I wasn't involved in the detail, but generally my understanding is yes.
Q Okay. And Balboa's marketing department began reporting to Ameris, right?
A Yes.
Q Okay. Now, shortly after the acquisition you became the risk manager at the new Balboa Division, right?
A Yes.
Q And as the risk manager you reported to Pat Byrne, right?
A I had a direct line to Pat Byrne and then kind of a dotted line to the Ameris senior risk manager --
Q Right.
A -- or risk officer.
Q Yeah. So you also reported to Mike Helmus, right?
A Dual reporting, yes.
Q Right. So -- and you reported to Mike Helmus weekly, right?
A We generally had weekly one on ones.
Q Okay. Now, Mr. -- now, once you were having this dual reporting Mr. Byrne didn't conduct your performance reviews, right?
A He was part of the process, but he delegated a lot of that to Mike Helmus.

Q But Mike Helmus signed off on your performance reviews; is that right?
A I believe technically they both had to.
Q So after the acquisition you never witnessed Mr. Byrne fail to adhere to any Ameris compliance mandates, right?
A I was going to say that's very broad.
I didn't see a lot of what he did. I -- the one thing would come up with IDC and direct cost where once again I didn't witness him, but there were some indications that concerned me.
Q Okay. But you didn't personally witness anything, right?
A I didn't see him do anything in the system.
Q Okay. And before the acquisition Balboa's policy regarding charge-offs was that payments that were 120 days or more past due were charged against the allowance for credit losses, right?
A Yes.
Q Okay. And just for the jury's benefit --
A Well --
Q Oh, I'm sorry, go ahead.
A -- I was going to say, they were charged to the provision expense and then there was an adjustment made from time to time to the allowance.
Q Okay. So for the jury's benefit can you explain what a charge-off is?

A So when a customer is delinquent and they have not paid for at least 120 days past their due date, it is deemed uncollectible for accounting purposes, and so we would write off the remaining balance on the loan and so it would count as loss to the company.
Q Okay. And can you explain to the jury what an allowance for credit losses is in your understanding?
A So an allowance is an estimate of how much you think the losses are going to be.
Q Okay. So just to, you know, try to make things clear with that context.
So going back to before the acquisition, Balboa would take these payments that were 120 days or more past due, and when they would charge them off that would be against this allowance for credit losses; is that generally right?
A I would say my recollection is at that point in time it went to the provision and then we would adjust the loss, but that's more a matter of how you do it, and then after the acquisition it would go to the allowance, and then a provision -- it kind of ends up being the same, but it's just a matter of what you do first and what you do second.
Q Well so after -- so but strictly speaking, after the acquisition Ameris changed the way the Balboa Division handled charge-offs, right?
**MS. YEE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I mean there was still the 120 day charge-off, but as I mentioned, there was a little bit of mechanical difference in terms of the provision which is on the income statement versus the allowance, which is on the balance sheet, but you -- it ends up adjusting both.

**BY MR. WOOD:**

Q Yeah. So in terms of how the provision and allowance work, it changed to the Ameris method, right?

A Mechanically it did, I don't know that it necessarily -- I was going to say necessarily that process would change the result in terms of the allowance Ameris did have a model.

Q And Balboa's practices changed to that model, right?

A Ameris practices did change to that model, and I believe there was also an accounting change around that time as well in terms of what that calculation needed to be.

Q All right. So Ameris also changed Balboa's practice regarding how it charged off of repossessions, right?

A I'm trying to think.

So the other change -- I don't know if I'd necessarily say repossessions, but in terms of if we would sell a repossessed asset how they would account for this proceeds.

Q Okay. Now, did Ameris also change Balboa's practice regarding how -- I apologize. Did Ameris also change Balboa's practice regarding how it charged off stipulated judgments?

A There was a change -- prior to the acquisition we would write down the charged off deal to what we thought we could get as part of the recovery process. So like if we sold an asset or if we pursued legal means for the defaulted customers we would keep that on the balance sheet, and then after the acquisition we just wrote off the entire amount.

Q All right. So the answer then is yes, that Ameris change Balboa's practice regarding how it charged off stipulated judgments, right?

**MS. YEE:** Objection, misstates her prior testimony.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes, the change I just described did occur.

**BY MR. WOOD:**

Q Okay. And Ameris also changed Balboa's practice regarding accounting for interim rent, right?

A Well the gap changed, and that accounting -- that change to interim rent would have occurred regardless of whether or not the acquisition occurred.

Q And that was -- but it was different from the way Balboa had done it before the acquisition, right?

A It was a known difference. I mean we knew it was coming regardless of the acquisition.

Q And how initial direct costs were calculated on portfolio purchases also changed, right? And that's a yes or no

question.
A Yes, there were changes to initial direct costs.
Q All right. So now, Ms. Parker, let's focus on the year 2024. In that year Balboa exceeded the EBT threshold called for in the LTIP agreement, right?
A At the end of 2024?
Q Yes.
A I was going to say, you know, at the end of the year -- up until -- while Pat was still there I was receiving a copy of the LTIP agreement, but after he left I was no longer copied on that calculation.
Q Okay. Do you have an understanding of whether the EBT threshold was met in 2024?

**MS. YEE:** Objection, Your Honor, irrelevant, and this particular subject is, you know, was excluded.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Can you repeat the question, please.

**BY MR. WOOD:**
Q Yes. Do you have an understanding of whether the EBT threshold called for in the LTIP agreement was met in 2024?
A I believe it was.
Q Okay. And did you receive a payout from the LTIP for the year 2024?

**MS. YEE:** Third-party privacy, Your Honor.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I did receive like an extra management bonus that year.

**BY MR. WOOD:**

Q Did you -- but was -- did you receive a payout from the LTIP that year?

A I wasn't privy to what it was called, I mean I was told I was getting this management bonus.

Q Okay. So do you remember giving your deposition in this matter, Ms. Parker?

A I was going to say I remember giving a deposition, whether or not I remember the specific question you might need to refresh my memory.

Q Sure. Okay. And -- but you told the truth during that deposition, right?

A To the best of my ability.

Q Sure.

**MR. WOOD:** Your Honor, I'd like to show an excerpt -- the following excerpt from Ms. Parker's deposition, it's pages 183, line 14 to 184, line 6.

**THE COURT:** One moment. Thank you.

**MS. FODE:** Could you give the page line again?

**MR. WOOD:** Yes. It's page 183, line 14, to page 184, line 6.

**MS. FODE:** Thank you.

**THE COURT:** And I assume you're using -- you want to

use this to refresh recollection, or are you using it for impeachment?

**MR. WOOD:** Yeah, we can start with recollection, Your Honor.

**THE COURT:** Okay. Any objection?

**MS. YEE:** Objection, and the witness is here, so I'm not understanding the purpose of the --

**THE COURT:** Well he's just wanting to --

**MS. YEE:** -- using the depo.

**THE COURT:** -- use it to refresh her recollection. She's not -- he's not using it for impeachment at this point.

**MS. YEE:** That's fine, Your Honor.

**THE COURT:** So someone needs to get Ms. Parker a copy of this excerpt.

**MR. WOOD:** We can put it up on her screen, if that's --

**THE COURT:** Yes, we can do that.

**MR. WOOD:** And blacked out for the jury, of course.

**THE COURT:** It's not being published. So, Ms. Parker, there's no question pending right now. All he's asking you to do is review that, and then he's going to ask you a question.

**THE WITNESS:** Okay.

**(Pause)**

**THE WITNESS:** Okay.

**BY MR. WOOD:**

Q And having reviewed that, Ms. Parker, do you now recall whether you received a distribution as to the LTIP in 2024?

A I was going to say, as I said, I was not given the LTIP calculation at that point in time. And that is consistent with what I am reading here on the screen.

**MR. WOOD:** Okay. Your Honor, I would like --

**THE WITNESS:** I'm reading they were previously part of the quarterly risk committee meeting, and then after Pat left, that was removed.

Q But would you agree -- but would you say they were not distributed to you?

A The LTIP -- as I said, I was not part of the LTIP calculation. I did not receive a copy of it, so I can't speak to that.

**MR. WOOD:** Your Honor, I would like to use this for impeachment at this point.

**THE COURT:** Okay, go ahead.

**MR. WOOD:** Okay. All right. And if I may, Your Honor, may I skip the objections that are included in this?

**THE COURT:** Yes, please do.

**BY MR. WOOD:**

Q Thank you. Okay. All right. So the question was, were the LTIP funds from the booked LTIP accrual of December 31st, 2024, distributed? The witness responds, I would say they were

not distributed to me. They previously were a part of the quarterly risk committee meeting in that particular line item. All right. We can take this down and move on. All right. So no one ever told you what happened to those LTIP funds from 2024, did they?

A I was not. No.

Q Based on your experience at Ameris, would you agree that -- I'm sorry. Based on your experience at Balboa and Ameris, would you agree that originations are a vital part of the Balboa Division's business?

A We are a finance company, so yes.

Q And Balboa's originations declined after Mr. Byrne was fired, right?

A Wait. Can you repeat that?

Q Yeah. After Mr. Byrne was fired by Ameris, Balboa's originations declined, right?

**MS. YEE:** Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes, originations went down.

**BY MR. WOOD:**

Q Now, you don't have any personal knowledge that Mr. Byrne has used any of Ameris' confidential information to compete with Ameris, right?

A I wouldn't know.

Q And you have no information that, you know, Mr. Byrne has

started a competing company to compete with Balboa, right?
A I wouldn't know.
Q And Mr. Byrne never told you he was going to quit, right?
A Correct.
Q And in asking for revisions -- now, you understand that at some point Mr. Byrne was asking for revisions to the LTIP?
A I was going to say, I wouldn't have been involved in any of those conversations. I know there were particular things he was advocating for.
Q And in asking for those things, you thought that when he was asking for those things, Mr. Byrne truly believed that he was doing the right thing for Balboa's employees, right?

**MS. YEE:** Calls for speculation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Based on what Pat was communicating to me and to the management team, yes, he was talking about that.

**BY MR. WOOD:**

Q Yes, so you agree, right?
A Based on what -- based on the conversations, yes.
Q And you don't believe that he was requesting revisions to the LTIP solely for his own benefit, right?

**MS. YEE:** Calls for speculation.

**THE WITNESS:** Yeah, I was going to say, I wouldn't --

**THE COURT:** Hold on, hold on. Overruled. You can answer the question.

**THE WITNESS:** Okay, sorry.

**THE COURT:** That's okay.

**THE WITNESS:** I wouldn't know what he was thinking. I just know what he was telling me and the management team.

**BY MR. WOOD:**

Q And so your belief, personally, as Ms. Parker, based on that, was that you did not personally believe that he was requesting those solely for his own benefit, right?

A I received the payout in 2022, and so he was talking about that for 2023, so that would include the management team.

Q Yeah, but so to answer the question, though, you don't believe that he was requesting the revisions solely for his own benefit, right?

A I was going to say, once again, I don't know his motivations, but he was talking about the benefit of the management team.

Q Okay.

**MR. WOOD:** Thank you, Ms. Parker. That's all I have for you.

**THE COURT:** Okay, thank you very much. Ms. Yee, cross-examination.

**MS. YEE:** Yes, please. Your Honor, just for the record, she's been called in our case-in-chief as well.

**THE COURT:** Okay, thank you very much. You may proceed when you're ready.

**CROSS EXAMINATION**

**BY MS. YEE:**

Q Ms. Parker, how are you doing today?

A Fine, thanks.

Q Thank you so much for being here. Ms. Parker, counsel for Mr. Byrne earlier asked you that the reporting line changes. Do you recall that testimony and questions?

A Yes.

Q When the reporting line changes, the Balboa Division, such as IT, marketing, accounting, and credit, despite the changes, the Balboa employees' duties and job responsibilities did not change, correct?

**MR. WOOD:** Objection. Lacks foundation.

**THE COURT:** Sustained.

**MR. WOOD:** And leading.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, you're part of the accounting team at Balboa Division, correct?

A Prior to the acquisition, yes.

Q What is your understanding of the reporting line changes?

**MR. WOOD:** Objection. Vague and overbroad.

**THE COURT:** Sustained. I need to know what time frame you're talking about and which team you're talking about.

Q I'm talking about after acquisition in 2023. Did the

reporting line changes around that time?

A In 2022 or --

Q In 2022.

A So in 2022, like the Balboa accounting manager, rather than reporting to me, started reporting to the Ameris director of accounting.

Q What about the employees' jobs and duties? Did that change?

**MR. WOOD:** Objection. Lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q What is your understanding of the reason that the reporting line changed?

A Segregation of duties as a corporate -- as a federally regulated bank that was publicly traded, that was much bigger. There were more clearly defined segregation of duties. And so even though the Balboa accounting team still did accounting work for the Balboa Division as part of the segregation of duties, they reported up to the director of accounting.

Q Thank you. Mr. Parker, I want to I don't believe counsel asked you this earlier, but I just wanted to remind the jury, you know, of your current position at Ameris Bank.

**THE COURT:** Hold on. If you have a question to ask her, you can ask her a question, but I don't want these

prefatory statements in front of the questions.

**BY MS. YEE:**

Q Ms. Parker, where do you currently work at Ameris Bank and your role?

A So at Ameris Bank, I'm currently a senior vice president. I'm the director of loan operations for the equipment finance division.

Q And before that, what role did you hold at Ameris?

A I was risk manager for the equipment finance or Balboa Capital Division.

Q And before the acquisition, and I'm talking about Balboa Capital, what was your role at Balboa Capital?

A So, prior to the acquisition, I was initially hired as controller and then promoted to CFO in January of 2021.

Q Are you a CPA?

A Yes.

Q Certified public accountant?

A Certified public accountant, yes.

Q And how long have you been a CPA?

A Almost 30 years.

Q Ms. Parker, when did you first learn that Balboa Capital would be acquired by Ameris Bank?

A In August of 2021.

Q And when you learned about the acquisition, did you have any initial concerns?

A Well, there was uncertainty for me personally. A lot of times in this situation, a CFO would have their job eliminated as part of the acquisition.

Q Did you meet anyone from Ameris' team before the acquisition closed in December 2021?

**MR. WOOD:** Objection. Relevance.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** So shortly after finding out about the acquisition, some of the Ameris Bank executives came out to Balboa Capital, and in particular, I had a conversation with Nicole Stokes, the Ameris Bank CFO.

**BY MS. YEE:**

Q Who is Nicole Stokes?

A She's the chief financial officer of Ameris Bank.

Q What was your impression of that meeting?

A Well, I was really appreciative of meeting with her. You know, to me personally, one of the most meaningful things is she talked about her philosophy on employees and that if you have good employees, they would want to retain them. And although she didn't have a specific position for me at that particular moment, they would work to find something that was beneficial for both the bank and for my continued employment.

Q Did Ms. Stokes find a role for you?

A Well, after the acquisition closed in the first quarter of 2022, I met with the chief risk officer and discussed the role

of risk manager and whether or not that would be a good fit for me. And they offered me that position, and I accepted it.

Q And how did you feel about that role, that offer?

**MR. WOOD:** Objection. Relevance. Vague.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Let's talk about the risk manager role. Was this a role that existed before at Balboa Capital?

A It did not exist at Balboa Capital.

Q Was this a role that existed previously at Ameris Bank?

**MR. WOOD:** Objection. Calls for speculation.

**THE COURT:** I'm sorry. What was the objection again?

**MR. WOOD:** Speculative.

**MS. YEE:** I'm asking her personal knowledge.

**THE COURT:** Hold on. I've got the transcript here. Just one moment. I need you to ask the question again.

**BY MS. YEE:**

Q You testified earlier, Ms. Parker, that Ms. Stokes offered you a role that's called a risk manager position, correct?

**MR. WOOD:** Objection. Misstates testimony. Leading.

**THE COURT:** Overruled. Go ahead.

**THE WITNESS:** The chief risk officer offered me the position of risk manager.

Q Was this a new role?

**MR. WOOD:** Objection. Calls for speculation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q What type of role was this?

**MR. WOOD:** Objection. Vague.

**THE COURT:** Sustained.

Q Can you tell us a conversation that you had that lead to you becoming the risk manager?

**MR. WOOD:** Objection. Asked and answered and calls for hearsay.

**THE COURT:** Sustained.

Q Were you ever in a risk manager role before at Balboa Capital?

A No.

Q What's the difference between the risk manager role and your previous role as a CFO at Balboa Capital?

**MR. WOOD:** Objection. Relevance.

**THE COURT:** Sustained.

**MS. YEE:** Your Honor, I'm asking the witness about her previous role at Balboa Capital and her new role at Ameris Bank, and it will be related to her job responsibilities.

**THE COURT:** I understand, but the objection is sustained. Please ask the next question.

**BY MS. YEE:**

Q Okay. Ms. Parker, let's talk about your job at Ameris Bank since acquisition. Okay?

A Okay.
Q How long have you worked at Ameris Bank now?
A Approximately four-and-a-half years.
Q How would you describe your experience working at Ameris after acquisition?

**MR. WOOD:** Objection. Vague and relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Can you tell us about your job responsibilities at Ameris Bank?
A When I was risk manager, one of the primary responsibilities is to do a risk assessment of the division and what internal controls there are to help try to reduce those risks. There were some other responsibilities, but that was one of the primary ones. And then in my current role as director of loan operations, basically that covers once a loan is originated, it covers from onboarding it into our lease and loan system. It covers the billing and collecting. There is sales and property tax. We have a titling group. Customer service as well.
Q Do you like working at Ameris?

**MR. WOOD:** Objection. Relevance.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q Ms. Parker, does your current role at Ameris involve compliance functions?

A Well, Ameris is a federally regulated and publicly traded company, so internal controls are very important. There are certain reports and procedures and processes that we have to do to make sure we're in compliance with those regulations and with the increased, I would say, auditors' scrutiny as being a publicly traded company.

Q You testified earlier about the LTIP. Are you familiar with the LTIP, the long-term incentive plan?

A I've never seen the written documents, but I did, while Pat was there, receive the quarterly calculation prepared by the accounting group.

Q What was your --

**MS. YEE:** Your Honor, I apologize. The mic is not working.

Q What was your understanding of what the LTIP was?

**MR. WOOD:** Objection. Vague and lacks foundation.

**THE COURT:** Sustained.

Q What is LTIP?

**MR. WOOD:** Objection. Lacks foundation.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q Were you involved in preparations or calculations of the LTIP?

A I know that was done by the accounting group.

Q And you testified earlier that you received the LTIP payout in 2022, correct?

**MR. WOOD:** Leading.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you receive an LTIP distribution in 2022?

A Technically, I received it in 2023, but it was for the 2022 year.

Q Thank you for that clarification. Going into 2023, did you expect to receive the same or similar distribution from the LTIP?

A No -- I mean, we were both told not to expect it, but I also knew from reviewing the calculation that it was based on meeting certain performance goals.

**MR. WOOD:** Objection and move to strike as non-responsive and lacking foundation and hearsay.

**THE COURT:** The objections are sustained and the motion is granted, and the jury is instructed to disregard the last response.

//

//

**BY MS. YEE:**
Q Ms. Parker, do you consider LTIP as part of your compensation?
**MR. WOOD:** Objection. Vague and lacks foundation.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Did you receive a LTIP bonus in 2023?
A For the 2023 year, I did not.
Q Do you know the reasons?
**MR. WOOD:** Objection, lacks foundation, calls for speculation.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Did anyone tell you why you did not receive an LTIP bonus in 2023?
**MR. WOOD:** Objection, calls for hearsay.
**MS. YEE:** Not offered for the truth.
**THE COURT:** No, I understand. The objection is overruled.
**THE WITNESS:** Can you repeat the question, please?
**BY MS. YEE:**
Q Do you understand the reason why you did not receive LTIP payout in 2023?
**THE COURT:** That wasn't the question. The question was, did anyone tell you why you did not receive your LTIP

bonus in 2023?

**THE WITNESS:** Pat was communicating to the Balboa Division management team that we would not be receiving the LTIP that year. And one of the differences that I could see in the calculation was that there were high charge-offs in 2023.

**MR. WOOD:** Move to strike the last part of that answer as lacking foundation and speculation.

**THE COURT:** The motion is granted. The last part of the witness's answer is stricken and the jury is instructed to disregard it.

**BY MS. YEE:**

Q So what was your personal knowledge as to why there was no 2023 LTIP payout?

**MR. WOOD:** Objection, asked and answered, and lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you complain or did you discuss with anyone at Ameris that you were not receiving payout from the pool in 2023?

**MR. WOOD:** Objection, calls for hearsay.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, I'd like to direct your attention to a couple emails.

**MS. YEE:** Permission to publish Exhibit 483? It's a

joint exhibit.

**THE COURT:** Any objection?

**MR. WOOD:** No objection, Your Honor.

**THE COURT:** Okay, so are you moving it into evidence?

**MS. YEE:** Yes, please.

**THE COURT:** Exhibit 482 (sic) is admitted and you may publish.

**(Exhibit Number 483 received in evidence)**

**MS. YES:** Exhibit 483, yes.

**BY MS. YEE:**

Q Ms. Parker, can you go to Ameris 001105? It's the second page of this document.

A Okay, this screen is showing --

Q Ms. Ingle is going to show you the document. Do you see it on your screen? The email from David dated May 8th, 2024.

A I'm still seeing 1104.

Q Do you see, Ms. Parker?

A Yes, I do.

Q Do you recall receiving communication about how the Balboa Division was accounting for initial direct costs on purchased loans?

A The email from David Sparacio was forwarded to me by Pat.

Q Can you explain? I believe you explained this earlier, but just for everyone's benefit, can you explain in plain terms what initial direct costs mean?

A So initial direct costs refers to the costs that Ameris Bank would have associated with new leases and loans.
Q Can you tell us who is David Sparacio?
A So at the time, he was the controller for Ameris Bank.
Q What was your understanding of the purpose of Mr. Sparacio's email that you're reading here?
**MR. WOOD:** Objection. Speculation.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Ms. Parker, if you go to, again, Ameris 001105, and if you go to David Sparacio's email, can you please go to item number one and read that section, starting with unpurchased loans.
A Unpurchased loans, we will retroactively to January 2024 apply a deferral rate of 0.025 percent versus the 5.88 percent that was deferred in the first quarter. This will remain the new rate for future purchased loans. This is driven by the language contained in ASC 310-20, parentheses FAS 91, which prohibits deferring internal costs on purchased loans, whether purchased as a single or group of loans. The 25 basis points deferral rate represents the commissions we pay on those deals. In order to correct what has been systematically booked in the first quarter, we will book an adjusting entry to reverse the approximately $1.4 million that was over-deferred in the first quarter, resulting in increased expense.
Q If you go up one line before number one, can you read

starting from the language, as we have?
A As we have analyzed the deferral process deeper, we have decided to make the following changes to the IDC process to remain GAAP compliant.
Q What is your understanding of this email from David?
A This email describes the impact of making the change to first of all become GAAP compliant, and it has the impact both retroactive and then going forward.
Q And based on your personal knowledge and your review of this email, was Mr. Sparacio's explanation of the accounting standard and need specific to what he says here, was that accurate?
**MR. WOOD:** Objection. Calls for expert testimony and lacks foundation.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Ms. Heather, you are a CPA, correct?
A Yes.
Q And do you understand when Mr. Sparacio told Mr. Byrne that the changes to the IDC process is made is to remain, the purpose is to remain GAAP compliant?
**MR. WOOD:** Same objections.
**THE COURT:** Sustained.
//
//

**BY MS. YEE:**

Q Ms. Parker, I'd like to direct your attention to your email on Exhibit 486, and I believe this is a joint exhibit. Permission to publish, Your Honor?

**THE COURT:** If it's already been admitted, go ahead.

**MS. YEE:** Thank you.

**BY MS. YEE:**

Q Ms. Parker, may I please direct your attention to Ameris 1784? At the bottom.

A Yes.

Q Do you see the email from Mr. Byrne on May 9th, 2024 to Mr. Silva and yourself?

A Yes.

Q And if you could go to the next page, 1784. 1785. Apologies.

A Yes.

Q What does this email say? Can you please read it?

A Starting with, do we have any portfolio buys?

Q Yes, please.

A Okay. Do we have any portfolio buys in the works? If so, we need to book as individual deals and not use the code for portfolio purchases.

Q What does that mean to you, Mr. Parker?

**MR. WOOD:** Objection. Calls for speculation, lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q What was the significance of this instruction from an accounting perspective?

**MR. WOOD:** Same objections and calls for expert opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, do you recall this email?

A Yes.

Q And do you recall having any conversations with Mr. Byrne about this email?

A There were discussions in manager meetings as well as the emails with the idea that if we characterize these as individual deals, that it would get us out of or be like a loophole to avoid the new IDC rates that would be GAAP compliant.

**MR. WOOD:** Objection. Move to strike as hearsay and non-responsive.

**THE COURT:** The objection is sustained and the motion is granted and the jury is instructed to disregard the entirety of the last response.

**BY MS. YEE:**

Q Ms. Parker, let's please go to your e-mail on May 9th, 2024 as this is on page Ameris 001784.

A Okay. I see it.
Q Can you please read your e-mail into the record?
A Pat, there is still a need to designate the deals as purchases because compliance needs the original loan amount as well as the purchased amount for CRA reporting. They check a sample of contracts to ensure that the amounts they are reporting match the contract documents, specifically the invoices.

I don't see how we can recharacterize purchases because of this compliance reporting. A purchase loan is where Balboa's amount financed is different from the customer's original loan amount.
Q What was the purpose of your response?
A So in some of our discussions where Pat was bringing up -- characterizing these as individual loans, the -- I didn't think that would work because I knew that the clients department audited transactions, that they looked at our systems and they would go back and review the contract documents. And for their own regulatory reporting, they would need to know and report on the purchased amount versus the original contract amount to be compliant.
Q When you said in your e-mail I don't see how we can recharacterize purchase because of this compliance reporting, were you concerned about Mr. Byrne's directive to the team?

**MR. WOOD:** Objection, lacks foundation, hearsay,

speculation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Why did you tell Mr. Byrne that you don't see how you can -- we can recharacterize purchases because of this compliance reporting?

A The discussions that we'd been having he had suggested recharacterizing these loans as individual, the same way we would characterize our originated loans. And what I'm saying here is that it won't work because it doesn't work for the compliance department's reporting needs, as well as GAAP.

Q And why did you feel it was important to put this -- your response in writing?

**MR. WOOD:** Objection, relevance and lacks foundation, speculation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you discuss with Mr. Byrne about this conversation other than this e-mail?

A I was going to say I don't know specifically other than there were manager meetings with the Balboa management team in addition to the e-mails.

Q As a CPA, what was your opinion of what Mr. Byrne was proposing in this e-mail?

**MR. WOOD:** Objection, calls for expert opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, let's go to the e-mail above also on the same page 1782, Pat responded to you May 14th a 4:39 a.m. Can you take a look at that e-mail and let us know what Pat was asking you in that e-mail?

A So the question on the e-mail is whether embedded referral fees. So when we're talking about IDC that would be one of the costs for new loans and he was asking if it made a difference for income statement purposes on how we character it, but the GAAP language specifically allows for the deferral of these referral fees, another name for referral fees would be like seller fees.

And so from that standpoint it didn't matter from an income statement perspective whether we made the change that he's asking about in this e-mail.

Q And in this e-mail, did Mr. Byrne acknowledge your CIA compliance with point that you're mentioning in the e-mail below?

**MR. WOOD:** Objection, lacks foundation and the document speaks for itself.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In your previous e-mail, Ms. Parker, you told Mr. Byrne regarding compliance reporting, correct?

**MR. WOOD:** Objection, vague.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In your e-mail, Ms. Parker, you said, I don't see how we can recharacterize purchases because of this compliance reporting, correct?

A Yes.

**MR. WOOD:** Objection, leading, move to strike.

**THE COURT:** Sustained and the motion is granted.

**BY MS. YEE:**

Q Did Mr. Byrne ever respond to you or discuss with you regarding CIA compliance?

**MR. WOOD:** Objection --

Q In connection with these e-mails?

A He did not. He did not respond specifically to that e-mail in terms of any kind of an agreement, disagreement, or anything like that.

Q So these e-mails we just reviewed are dated May 2024 and what happened next, were there any conversations thereafter in connection with the e-mails we just discussed?

**MR. WOOD:** Objection, vague and lacks foundation insofar as it asks for communications outside of her observation.

**THE COURT:** Do you understand the question?

**THE WITNESS:** Yes.

**THE COURT:** The objection is overruled, you can answer.

**THE WITNESS:** So in terms of what happened after this, we were talking about, you know, whether there was a response, I was going to say there was -- you know, I didn't hear anything until after the month of May when we were going through month and close the first week of June.

**BY MS. YEE:**

Q What did you hear after -- in the month of June 2024?

**MR. WOOD:** Objection, hearsay.

**THE COURT:** Sustained.

Q What happened next?

**MR. WOOD:** Objection, vague.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, in connection with the e-mails that we just discussed regarding the IDC and the purchased loans, were there any other conversations between you or Mr. Byrne or anyone at Balboa or at Ameris that related to the subject we just discussed?

**MR. WOOD:** Objection, compound and calls for hearsay insofar as it's conversations other than with Mr. Byrne.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q Ms. Parker, did you discuss with Jacquie Emert regarding the IDC purchase loans?

**MR. WOOD:** Objection.

**MS. YEE:** Not offered for the truth.

**THE COURT:** What is it offered for?

**MS. YEE:** For the statement impact on the listener.

**THE COURT:** Okay. The objection to the question as phrased is sustained.

**BY MS. YEE:**

Q Did you have a conversation with Jacquie Emert regarding this subject?

**MR. WOOD:** Same objection.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you find out at any point, Ms. Parker, that Mr. Byrne incorrectly coded the transaction loans?

**MR. WOOD:** Objection, lacks foundation, calls for hearsay.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you have any independent assessment as to what happened next?

**MR. WOOD:** Objection, vague, calls for speculation, lacks foundation, calls for hearsay and potentially calls for

an expert opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Parker, if we go back to the e-mail that you were copied on on May 9th, 2024 at 9 a.m. And in that e-mail, this is Ameris 001785 and the last sentence --

**THE COURT:** What is the exhibit number for this trial?

**MS. YEE:** This is 486.

**THE COURT:** Okay.

Q And Ameris 001785 and this is the last sentence of the e-mail before thank you. The last sentence says, let's communicate this to cancel via Jacquie as soon as possible. Do you see that?

A Not yet.

I do now.

Q Who's Jacquie in this e-mail?

A So --

**MR. WOOD:** Objection, calls for speculation.

**THE COURT:** Overruled. You can answer if you know who Jacquie is.

**THE WITNESS:** So Jacquie Emert was the manager of loan operations at the time.

//

//

**BY MS. YEE:**

Q So in this e-mail Mr. Byrne is asking Phil, and was you copied on this e-mail, to communicate his directive to cancel via Jacquie, correct?

**MR. WOOD:** Objection, misstates the document. The document speaks for itself.

**THE COURT:** The question is leading, that objection is sustained.

**BY MS. YEE:**

Q What does this say to you -- what does this sentence say, Ms. Parker?

**MR. WOOD:** Objection, vague.

Q Let's communicate this to Jacquie as soon as possible.

**THE COURT:** Okay. Let's move on from this. We have the document here, she's read the sentence at least twice, you've read it twice, let's move on.

**BY MS. YEE:**

Q Did you have any conversation with Jacquie Emert?

**MR. WOOD:** Objection, calls for hearsay, asked and answered.

**THE COURT:** The objection is overruled, but the question can be answered with a yes or a no, but don't tell us what the substance of any conversation was if you had one.

**THE WITNESS:** Yes.

//

**BY MS. YEE:**
Q What was that conversation?
**MR. WOOD:** Objection, hearsay.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Was that conversation related to the IDC or the purchase loans?
**MR. WOOD:** Objection, leading.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Did Jacquie Emert tell you that if she has any concerns regarding this e-mail that we just read?
**MR. WOOD:** Objection, hearsay and leading.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Based on your personal knowledge, Ms. Parker, is it -- do you understand if Mr. Byrne violated internal controls based on the e-mails we just reviewed?
**MR. WOOD:** Objection, calls for speculation, lacks foundation, calls for expert opinion and calls for a legal opinion.
**THE COURT:** Sustained.
**MS. YEE:** Your Honor, that's all I have.
**THE COURT:** Okay. Thank you very much. Any, for lack of a better way to describe it, redirect?

**MR. WOOD:** Very briefly, Your Honor.

**THE COURT:** Go ahead.

**REDIRECT EXAMINATION**

**BY MR. WOOD:**

Q Thank you, Ms. Parker, for your patience today. Almost done.

Just a couple of quick questions, you were asked about the equipment or I'm sorry, you testified about being part of the equipment finance division. That's the new name for the Balboa Division, right?

A Yes, it's the rebrand.

Q Yeah, so it's the same thing, it's just --

A It's the same.

Q -- now called the equipment finance division, right?

A It's the same, yes.

Q Okay. I'd like to go back to Exhibit 486, the top e-mail in that chain that we were just looking at where Mr. Byrne responds.

**MR. WOOD:** If we can pull this up.

**THE COURT:** I'm sorry, this is Exhibit -- I can't talk -- Exhibit 46?

**MR. WOOD:** 486.

**THE COURT:** Oh, 486.

**MR. WOOD:** The one we were just looking at, it's the one at the very top from I believe it was May 14th. There you

go.

**BY MR. WOOD:**

Q Now, at the time of this e-mail in May of 2024, you've known Pat for or Mr. Byrne, I apologize, about six years at this point, right?

A Yes.

Q And you said you'd worked with him over those six years on audits at various times, right?

A Yes.

Q Sometimes multiple times a year.

A For both the financial and bank audits, yes.

Q And in your time with Balboa before Ameris, Balboa had never found to be out of compliance during those audits, right?

A The RSM audits had favorable opinions, yes.

Q Okay.

**MR. WOOD:** That's all I have, thank you.

**THE COURT:** Okay. Thank you. Any recross?

**MS. YEE:** No, Your Honor.

**THE COURT:** Okay. Thank you very much, Ms. Parker. You may step down, you're excused.

Okay. Next witness.

**MR. SESSIONS:** Your Honor, I don't know if defendants are still intending to call Ross Creasy at this time and if they're not, then we can move on.

**THE COURT:** Okay.

**MS. YEE:** Yes, Your Honor, we'd like to call Ross Creasy.

**THE COURT:** Okay.

**MR. WOOD:** And we do want to be sure that given Mr. Creasy's apparent restraints that we do have an opportunity to cross him before we --

**THE COURT:** Right. Will we be able to complete his testimony, the direct, the cross and the redirect?

**MS. YEE:** I believe so, Your Honor.

**THE COURT:** Within the next 27 minutes?

**MS. YEE:** Yes, I'll be quick, Your Honor.

**THE COURT:** Okay. Before we begin, I have to tell you that if we are not finished that Mr. Creasy is going to be ordered to come back here tomorrow morning at 9 a.m. to finish his testimony. Is that clear to everybody?

**MS. YEE:** Yes, Your Honor.

**THE COURT:** All right. Mr. Creasy.

Okay, sir, you can come forward and you're going to come around this way, around and Ms. Jackson has her hand up over here, she's going to swear you in and then you'll come and have a seat on the witness stand next to me.

**ROSS CREASY, DEFENSE WITNESS, SWORN**

**THE CLERK:** I'm going to ask that you state your name and spell your last name for us.

**THE WITNESS:** Yeah, Ross Creasy, C-R-E-A-S-Y.

**THE COURT:** Okay. Thank you very much. Ms. Yee, you may proceed.

**MR. SESSIONS:** Your Honor, just really fast, may I request just an explanation to the -- that Your Honor give an explanation to the jury why we're going out of order here?

**THE COURT:** Sure. So sometimes as an accommodation because if people have travel schedules and prior commitments, the parties will reach an agreement among themselves that witnesses will testify in what we call being out of order. So this witness is part of the defendant's case, the plaintiff is not calling this witness to support the plaintiff's case, the defendant needs to call this witness to support the defendant's case.

So we're taking a pause in the plaintiff's case right now in order to accommodate some scheduling issues, thanks to the agreement of the parties and the witness. And then after we're done with Mr. Creasy, we're going to continue with the presentation of evidence no behalf of the plaintiff.

But just for clarity sake, this witness is being called by the defense in support of the defense's case.

**MR. SESSIONS:** Thank you, Your Honor.

**THE COURT:** You're welcome. Okay. Ms. Yee, go ahead.

//

//

**DIRECT EXAMINATION**

**BY MS. YEE:**

Q Good afternoon, Mr. Creasy. Can you please tell everyone here what's your current position at Ameris Bank?

A I'm the chief information officer.

Q And how long have you been working at Ameris Bank?

A Almost eight years.

Q And briefly what are your responsibilities as a chief information officer?

A I'm responsible for technology, security, bank operations and fraud.

Q Does Ameris have any policies governing employees' confidential company information?

A We do. We have a confidentiality agreement, acceptable use policy and employee handbook.

**MS. YEE:** Your Honor, permission to publish Exhibit 325. This is an admitted exhibit.

**THE COURT:** Go ahead.

**BY MS. YEE:**

Q Do you recognize this document?

A I do.

Q What is it?

A It is our confidentiality agreement that every -- or that our employees sign, and you'll notice that there will be a name at the top which ties to the specific employee that

acknowledged the agreement.

Q And who's that employee?

A Patrick Byrne.

Q And if you could please go to Section 4. And this is on page Ameris 00018. Can you briefly summarize what that section is about?

A Section 4 is a summary for the employee. Really it's about maintaining the confidentiality of our data and making sure that all of our data that's Ameris, whether it's confidential, proprietary, not to be duplicated, not to be transferred, essentially not to leave the bank and the network.

Q Can you look at -- may I please direct your attention to paragraph 5(c) and let us know what that section is about.

A To summarize this, this is about when an employee is terminated, whether it's voluntary or involuntary, they are required to bring everything back, as that is the sole property of the bank. Whether that's written documents, electronic information that they might have, laptop, notebooks, account data, anything that's in their possession needs to be handed back.

Q Mr. Creasy, I'd like to show you an exhibit that's marked 326 and this is -- I believe this exhibit is already admitted.

**THE COURT:** It is.

Q What does acceptable use policy address?

A The acceptable use policy addresses really for every

teammate or every employee of the company to give them strict guidelines and rules they must follow around how to protect the -- protect the bank, protect our customers, protect our teammates in terms of data, but it also in there clearly explains things that you should not do, as well to help arm our employees of what they should and should not do in protecting our company assets.

Q And I'd like to direct your attention to Ameris 000365, same document under the section inappropriate uses.

**THE COURT:** Was this part of that exhibit?

**MS. YEE:** Yes. It's acknowledgement and the policy, it's one document, Your Honor.

**THE COURT:** Okay. Because when it was introduced I only saw the first two pages.

**MS. YEE:** I see on my screen it's a document --

**THE COURT:** I understand what's on the screen. So from plaintiff's perspective does Exhibit 326 include the actual policy as well?

**MR. WOOD:** That's our understanding, Your Honor.

**THE COURT:** Okay. Go ahead, Ms. Yee, my apologies.

**BY MS. YEE:**

Q If I may please direct your attention to bullet point number 4.

A Yeah.

Q Starting with sending customer information. Can you tell

us briefly what that section is about?

A Essentially the summary of this is, when sending customer information it needs to go in a secured encrypted way; i.e., regular mail to the person directly, not to a Gmail, not to a Yahoo account, those type of environments are not secure. And that's for account numbers, passwords, documents, the customer information, employee information, all of that must be transported via secured means.

Q And if we could please go to bullet point number 11 or the second to last one.

A Yeah.

Q Starting from sending or forwarding.

A Yeah.

Q What's that section about?

A Essentially, you know, what this is saying it's just another example of what you should not do. You should not be sending or forwarding e-mail communications to third party e-mail systems, very similar to what I mentioned above around Gmail accounts, Yahoo accounts, you should not be sending that to your, you know, personal e-mail. You need to follow our acceptable use policy, as well as our security procedures around encryption.

**MS. YEE:** Your Honor, permission to publish Exhibit 319 that was admitted earlier.

**THE COURT:** Ms. Jackson, do you have that exhibit as

admitted?

**THE CLERK:** One moment. I do not.

**THE COURT:** It's not admitted.

**MS. YEE:** Apologize, it's a joint document, it's the employee handbook, Exhibit 319.

**THE COURT:** Are you moving it into evidence?

**MS. YEE:** Yes, defendant moves into evidence.

**THE COURT:** Any objection?

**MR. WOOD:** No, Your Honor.

**THE COURT:** Okay. Exhibit 319 is admitted and you may publish.

**(Exhibit Number 319 received in evidence)**

**MS. YEE:** Thank you, Your Honor.

**BY MS. YEE:**

Q May I please direct your attention to page 43 and Section 5-18. And what is that section about?

A What?

Q Under company property.

A Yeah. What this summarizes is, you know, at separation from the company all employees must return all company information assets back to the company, whether it's in hard copy form, whether that's a credit -- a corporate credit card, a key fob to get into a building, laptop, manuals, electronic -- any -- your laptop, anything that you have in your possession that's company information, confidential information must be

returned back to the bank as that is our property.

Q Mr. Creasy, why does Ameris have these policies that we just discussed?

A You know, like we're a financial institution we're regulated, you know, our job is to make sure we protect our customers. They get loans from us, they keep their deposits with us, they provide a lot of personal information that we are required to maintain and we need to make sure that things are secured and protected on behalf of all of our customers, as well as our teammates. We take a lot of information on our teammates to make sure they are in good standing, that they can do the transactions and the work that we need them to do at the bank.

And so this is absolutely critical for us to maintain security but also protect our customer's information, our teammate's information as well as our corporate asset strategy, business document procedures, things that we -- some basis we would call your secret sauce, you know, what makes you great.

Q And following Mr. Byrne's termination, did you learn any conduct of Mr. Byrne that relates to these policies?

**MR. WOOD:** Objection, lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q When did you first learn about a violation of this policy by any employees in this case?

**MR. WOOD:** Objection, vague, compound, overbroad and lacks foundation.

**THE COURT:** Sustained.

Q What happens if confidential information was sent to employee's Yahoo or Gmail or other unsecured personal accounts?

**MR. WOOD:** Objection, vague.

**THE COURT:** Sustained.

Q As we discussed earlier, what's the consequence of a violation of these policies?

**MR. WOOD:** Objection, vague, misstates prior testimony.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Are you aware that Mr. Byrne has ever violated any policies of Ameris Bank?

**MR. WOOD:** Objection, leading, vague and lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did Ameris learn of any conduct by Mr. Byrne that's in connection with these policies?

**MR. WOOD:** Objection, lacks foundation and vague and leading.

**THE COURT:** Sustained.

//

**BY MS. YEE:**

Q Mr. Creasy, you are the chief information officer and if any potential violation or violation of the policy occurred, you will be informed, correct?

**MR. WOOD:** Objection, leading.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Mr. Byrne testified earlier that you authorized him to send work e-mails to his personal e-mail account.

**MR. WOOD:** Objection, misstates prior testimony, violates the exclusion of witnesses, lacks foundation.

**THE COURT:** The objection is sustained. It's also not a question. Do you have a question for him?

**BY MS. YEE:**

Q Did Mr. Byrne ever ask you for permission to send company documents and information to his e-mail, personal e-mail address?

A No.

Q He never did?

A No.

**MR. WOOD:** Objection, leading, move to strike.

**THE COURT:** Sustained, the motion is granted.

**BY MS. YEE:**

Q What did he ask you during the course of his employment regarding forwarding e-mails to his personal e-mail address?

**MR. WOOD:** Objection, vague and overbroad?

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did Mr. Byrne ever tell you that he intend to forward documents to his personal e-mail address?

A No, he did not. We have a policy that all employees must follow around the acceptable use policy. So even if that was asked, we would never authorize something like that.

Q Did Mr. Byrne ever report to you or your team that he was experiencing system performance problems that required him to use his personal e-mail?

**MR. WOOD:** Objection, compound.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did Mr. Byrne ever report to you that he was experiencing system performance problems?

A We always have system issues in the world of technology, no system works perfectly. We definitely had system issues with the Balboa platform. With respect to our e-mail platform, there was no performance issues with our e-mail platform, but across our entire company, even specifically in Balboa, we had system issues. Some of the issues were latency and getting information out of the system prior to the deal, it took two seconds. After the deal, some things took 8, 9 seconds in terms of getting information out of the Balboa portal 360

platform, but not our e-mail platform.

Q And as the chief information officer, are employees prohibited from sending information, confidential company information to their personal e-mail?

**MR. WOOD:** Objection, vague, asked and answered and leading.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Have any other employees at Ameris been terminated for sending company documents to their e-mail address, based on your personal knowledge?

A Yes, they have.

Q Can you give us an example?

A Yes, we had an employee sending client information to their personal e-mail. That person was terminated, but also had to sign a document acknowledging that they deleted all of that data from their personal e-mail account and wherever they stored it in that personal environment and that person was terminated.

Q As part of the termination, were there any other specific requirements that employee must comply?

**MR. WOOD:** Objection, leading.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q Can you give any other examples regarding employees that violated the policies?

A Yes, we had another employee who took a complete folder and sent that to themselves to their personal account. We also terminated that employee as well for sending confidential information to their personal account.

Q And in both of those cases, as you testified earlier, the consequence was termination, correct?

A Yes.

**MR. WOOD:** Objection, leading and move to strike.

**THE COURT:** Sustained and the motion to strike is granted and the witness' last answer is to be disregarded by the jury.

**BY MS. YEE:**

Q In both of those cases -- those examples you just gave, what was the consequence?

**MR. WOOD:** Objection, asked and answered.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q And aside from -- strike that.

When did -- we just reviewed the policy regarding returning company property under the employee handbook, what happens if an employee does not return their laptop or other accessories at the time of separation from Ameris?

**MR. WOOD:** Objection, vague, lacks foundation and I believe this is a similar question that was previously sustained.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you have any personal knowledge that Mr. Byrne never returned his company issued laptop?

**MR. WOOD:** Objection, leading and lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did Mr. Byrne return or did not return his personal -- his company issued laptop to Ameris after his termination?

**MR. WOOD:** Yeah, same objections.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Mr. Creasy, can you tell us your working relationship with Mr. Byrne during his employment at Ameris?

**MR. WOOD:** Objection, relevance, vague and lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In your personal -- based on your personal knowledge did Mr. Byrne violate any company policies?

**MR. WOOD:** Objection, lacks foundation, leading, calls for speculation and compound, vague and sorry, I believe

it calls for an expert opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q How did you first -- did you ever learn of Mr. Byrne's -- any conduct of Mr. Byrne after separation?

**MR. WOOD:** Objection, vague and lacks foundation.

**THE COURT:** Sustained. I don't understand that question at all.

**MS. YEE:** Sorry, Your Honor.

Q Did Mr. Byrne ever forward confidential information to his personal e-mail address?

**MR. WOOD:** Objection, lacks foundation.

**THE COURT:** Sustained.

Q Based on your personal knowledge and during the employment of Mr. Byrne.

**MR. WOOD:** Objection, lacks foundation.

**THE COURT:** Sustained.

**(Pause)**

**THE COURT:** Ms. Yee, do you have any other questions for this witness?

**MS. YEE:** That's all, Your Honor.

**THE COURT:** Okay. Cross-examination?

**MR. WOOD:** Yes, very briefly, Your Honor.

//

//

**CROSS EXAMINATION**

**BY MR. WOOD:**

Q Good afternoon, Mr. Creasy. It's a pleasure to meet you. All right.

**MR. WOOD:** Now, let's pull back up Exhibit 326 and I'd like to go to the organizational protocol.

Q And while -- okay, here we go. And the first bullet point here says that IT can and will establish audit trails in all situations it feels merited, does that mean it can -- I apologize, such -- it explains what this is. Can you explain what that means?

A Can you clarify the exhibit? I'd like to -- can I see the summary of this exhibit?

Q Okay.

**MR. WOOD:** So we can zoom out.

**THE WITNESS:** Can I see the first page of the exhibit?

Q Sure. This is one you were just discussing at length with Ms. Yee.

A I got it, acceptable, sorry we have multiple policies I just wanted to make sure I understood.

Q No problem.

A Yeah.

**MR. WOOD:** And let's go back down to that bullet if we can.

Q So can you explain what's meant by an audit trail here?
A Yeah, an audit trail tracks every transaction, i.e., like our e-mail system, we archive every e-mail for seven years, so even though a person sends it or receives it or deletes it, it still goes into an archive for seven years that no one has the ability to touch, move, or delete, so that's an audit trail for our e-mail system.
Q Okay.

**MR. WOOD:** And then let's go to the part of the policy that talks about personal use.

Q All right. So this says, personal use of the bank's e-mail system should be kept to a minimum. As previously stated, the bank may monitor e-mail both incoming and outgoing on a regular basis. Do you see that?
A I do.
Q And these policies we're talking about, they apply to all employees, right?
A Yeah, oh, yes, I'm sorry. I was still reading it, yes.
Q Oh, no problem. So when it says they're monitored, does that mean, you know, that would be your department that's doing the monitoring?
A No, we don't monitor e-mails. We get -- there's over 250,000 e-mails that come into our system a day. Monitoring is more -- we log the e-mails, but we don't actually look at. Those e-mails go into a compliance archive for discovery and

for audit purposes after the fact.

Q And do you have -- you have access to employee e-mails?

A Do I?

Q Yeah, does your department?

A No. Only an administrator has it, not my whole department, no.

Q So even though the policy says the bank may monitor the e-mail that's ingoing and outgoing on a regular basis, it doesn't actually do that?

**MS. YEE:** Vague, compound.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** It says we may monitor, but we don't monitor all 250,000 e-mails. That's part of the -- why we ask every employee to sign off on our three policies, because part of securing your company is not only systematic, but it's also the requirement of every employee that works at our bank.

**BY MR. WOOD:**

Q Okay. So you may monitor, but in the majority of cases you just don't, right?

**MS. YEE:** Argumentative.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Correct.

Q Okay. You testified earlier to a couple of instances in which Ameris terminated an employee for violating these policies. Do you remember that?

A Yes.
Q Are those the only two instances you're aware of?
A The ones I can recall, yes.
Q Okay. And so how -- and how long again have you been with Ameris Bank?
A Almost eight years.
Q So across the eight years you've been with Ameris Bank, you only remember a couple of those instances, right?
A I can't recall like all of them, no, I run a large organization, so I don't remember every single case, but I do know that we absolutely terminate when people send confidential proprietary information, especially when it's customer data or employee data.

**MR. WOOD:** All right. Move to strike the remainder of the answer after I can't recall as nonresponsive.

**THE COURT:** Motion is granted and the jury is instructed to disregard that portion of the response.

**BY MR. WOOD:**

Q And to your knowledge, did those cases, you know, those instances in which those employees were terminated, were those employees at the bank later, you know, sued for violating a noncompete?
A That's not my area of expertise, I can't comment on that.
Q Okay. Are you aware of any instances in which Ameris has sued an employee or a former employee for violating this

policy?

**MS. YEE:** Outside the scope of direct.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I'm responsible for technology and security, so I'm not in the best position to answer that question.

**BY MR. WOOD:**

Q Is this the first case you've been called on to testify in in which Ameris -- I'm sorry, let me rephrase that.

Have you ever been called to testify in any other cases against a former Ameris employee regarding these policies?

A No.

Q And so these policies again, you say they apply to all employees, so does that include like C-Suite executives for example?

A Absolutely, including myself.

Q So you could be fired for violating it, right?

A Absolutely.

Q And so this would have applies to Mr. Lahaise for example while he was with Ameris, right?

A Uh-huh.

Q And to your -- do you know that Mr. Lahaise just retired, right?

A I do.

Q Okay. And Ameris didn't fire him, right?

A No, he retired.
Q Yeah, and to your knowledge, Ameris has never sued Mr. Lahaise, right?
A To my knowledge.
Q Okay. And do you know an individual named David Sparacio?
**MS. YEE:** Your Honor, outside of the scope.
**THE COURT:** The objection is overruled, you can answer.
**THE WITNESS:** Yeah, I know David Sparacio, we worked together.
**BY MR. WOOD:**
Q And he's no longer with Ameris either, right?
A That's correct.
Q And he voluntarily left his role at Ameris, right, to your knowledge?
A As I understand it, he got promoted to a CFO position at another bank.
Q So he wasn't fired, to your knowledge, right?
A To my knowledge.
Q Okay. And to your knowledge, Ameris hasn't sued him, right?
A To my knowledge, yes.
**MR. WOOD:** Your Honor, I'd like to look at Exhibit 343, which -- I believe it's a joint exhibit.
**THE COURT:** Okay. And you're moving it into

evidence?

**MR. WOOD:** Yes, insofar as it's not already in evidence.

**THE COURT:** It's not in evidence. Is there any objection?

**MS. YEE:** No objection, Your Honor.

**THE COURT:** Okay. Exhibit 343 is admitted and you may publish.

**(Exhibit Number 343 received in evidence)**

**BY MR. WOOD:**

Q All right. Let's go down the chain here a little bit so the -- so you can see there's a forwarded message here. And let's look at the header to this. This is from James.Lahaise@amerisbank.com. You understand that to be from Mr. Lahaise, right?

A That is correct.

Q And the subject is the LTIP calculation, correct?

A That's correct.

Q And it's to David Sparacio, correct?

A That's correct.

Q But it's the DavidASparacio@Gmail.com, correct?

A That's correct.

Q And it's a -- it's discussing the LTIP calculation, correct?

A That's what the subject says, correct.

Q And again, neither Mr. Lahaise or Mr. Sparacio was fired from Ameris Bank, correct?
A Correct.

**MR. WOOD:** That's all I have, thank you.

**THE COURT:** Okay. Any redirect?

**MS. YEE:** No, Your Honor.

**THE COURT:** Thank you very much, Mr. Creasy, you're excused.

**THE WITNESS:** Thank you.

**THE COURT:** Thank you for waiting around all day too.

All right. It is 4:32, so we're going to end for the day. I want -- I need the jurors back here ready to be seated and to start the trial again tomorrow morning at 9 o'clock.

As I indicated before this trial started, you as jurors will decide this case based solely on the evidence presented in the courtroom. This means that after you leave here for the night, you must not conduct any independent research about this case, the matters in this case, the legal issues in the case or the individuals or other entities involved in the case.

This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information, such as television and newspapers. You also must not communicate with anyone in any way about this case and you must ignore any information about

the case that you might see while browsing the internet or your social media feeds.

With that, have a pleasant evening and we will see you tomorrow morning at 9.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 4:33 p.m.)**

**THE COURT:** Okay. Everyone can be seated. Okay. Who's on deck, who's next?

**MR. SESSIONS:** Next should be Mr. Robert Rasmussen and then after that would be Nicole Stokes.

**THE COURT:** And you think those two witnesses will take up the entire day tomorrow?

**MR. SESSIONS:** I don't think so. I mean, it just depends on how long defense's side is, but I think we have probably with Mr. Rasmussen, how long?

**MR. WOOD:** Less than 40 minutes.

**MR. SESSIONS:** Probably less than 40 minutes with Mr. Rasmussen and maybe an hour to an hour and a half with Ms. Stokes.

**THE COURT:** Okay. And then -- that's not going to take up the whole day. So who's next?

**MR. SESSIONS:** After that we would be playing the video of Sufhan Majid subject to the Court's ruling on our request to be able to do so. And then it would be Mr. Jim Lahaise.

**THE COURT:** Okay. All right. So from plaintiff's perspective, any issues that we need to talk about either tonight or tomorrow morning?

**MR. SESSIONS:** At the risk of keeping us here longer than we need to be, just one concern I want to raise that's come up through the process of testimony today, there's been a number of objections any time plaintiff has raised any evidence regarding the 2024 LTIP and counsel for defendant has cited the Court's motion in limine ruling, I'm assuming it's motion in limine No. 4, claiming that it was granted and that motion in limine was denied and the Court said that 2024 LTIP could be relevant to this case.

**THE COURT:** Right, I understand and I think it was maybe also a reference to the ruling on the motion for summary judgment. But like I said at the beginning of the case, I'm listening very, very carefully to the evidence, especially because I'm anticipating that there is going to be a motion to amend to conform to proof and so I'm making the rulings on those objections based -- in that context.

**MR. SESSIONS:** Thank you, Your Honor. And if I may ask, does the Court have a preference on the appropriate time for us to make that motion or is the Court just, you know, waiting for the plaintiff to make that motion? I just want to operate at the Court's preference.

**THE COURT:** I don't have a preference.

**MR. SESSIONS:** Okay.

**THE COURT:** Whenever you think it's appropriate and we have the evidence that we need in order to -- for you to feel comfortable bringing the motion, you should bring the motion.

**MR. SESSIONS:** Okay. Thank you, Your Honor.

**THE COURT:** Okay. And from the defense perspective, is there anything that we need to talk about this evening or are there issues that we need to talk about in the morning so we can make sure -- I need to know what time to have you come back here and I'm happy to get here as early as you want me to.

**MS. FODE:** Thank you for that, Your Honor. No, I think we've worked out the more challenging issues for today.

**THE COURT:** Okay. So why don't we all reconvene tomorrow at 8:45, like we did today. And we'll just go from there.

**MR. SESSIONS:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

**THE CLERK:** All rise. This court is adjourned.

**(Proceedings adjourned at 4:36 p.m.)**

*** * * * ***

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 4, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***