# EXHIBIT D

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, Plaintiff, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, Defendant. | ) Thursday, June 4, 2026 |
| | ) (9:04 a.m. to 12:04 p.m.) |
| | ) (1:02 p.m. to 4:37 p.m.) |

JURY TRIAL - DAY 3

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: T. Jackson

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff: MATTHEW THOMAS SESSIONS, ESQ.
ANDREW A. WOOD, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
2010 Main Street
8th Floor
Irvine, CA 92614

STACEY ANN VILLAGOMEZ, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
865 S. Figueroa Street
Suite 2800
Los Angeles, CA 90017

For Defendant: STACY L. FODE, ESQ.
NANA JIN YEE, ESQ.
Nukk-Freeman & Cerra
550 West C Street
Suite 910
San Diego, CA 92101

INDEX



| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT RASMUSSEN | 7 | 41 | 55 | 59 |
| NICOLE STOKES | 63 | | | |
| SUFHAN MAJID (VIA DEPO EXCERPTS) | 185 | | | |
| JAMES LAHAISE | 194 | 254 | | |

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NICOLE STOKES | 102/122 | 181 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 9 | 204 |
| 34 | 132 |
| 59 | 214 |
| 68 | 229 |
| 74 | 91 |
| 75 | 87 |
| 76 | 98 |
| 77 | 235 |
| 79 | 222 |
| 80 | 89 |
| 99 | 239 |
| 103 | 247 |
| 341 | 210 |

**INDEX (CONTINUED)**


| EXHIBITS | RECEIVED |
|---|---|
| 364 | 171 |
| 396 | 134 |
| 397 | 85 |
| 399 | 226 |
| 400 | 150 |
| 405 | 227 |
| 428 | 145 |
| 434 | 94 |
| 469 | 245 |
| 532 | 183 |

**Los Angeles, California; Thursday, June 4, 2026; 9:04 a.m.**

--oOo--

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Call to Order)**

**THE CLERK:** Calling item number 1, SA CV-24-01989, Patrick Byrne versus Ameris Bank.

Counsel, please state your appearances, starting with plaintiff.

**MR. SESSIONS:** Good morning, Matt Sessions on behalf of plaintiff Patrick Byrne.

**MR. WOOD:** Good morning, Andrew Wood on behalf of plaintiff.

**MS. VILLAGOMEZ:** Good morning, Stacey Villagomez on behalf of plaintiff.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, Stacy Fode appearing on behalf of defendant.

**MS. YEE:** Good morning, Nana Yee on behalf of defendant.

**THE COURT:** Good morning.

Okay, welcome back everyone, I hope everyone had a restful evening.

Good morning, ladies and gentlemen of the jury, as I

reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here. So you must not learn any additional information about this case from sources outside the courtroom.

To ensure fairness to all parties in this trial I will now ask each of you whether you have learned anything about or shared any information about this case outside of this courtroom, even if it was accidental. If you think that you might have done, so please let me know by raising your hand.

I see no raised hands; however, if you would prefer to talk to the Court privately in response to this question, please notify a member of the court staff at the next break, and thank you so much to your careful adherence to my instructions.

Okay. So we're going to resume with testimony in this case. Mr. Sessions, who's the next witness?

**MR. SESSIONS:** I'll leave that to Mr. Wood.

**THE COURT:** I always -- I am guessing on both sides, and every time I guess I guess wrong.

So Mr. Wood, who is your next witness?

**MR. WOOD:** We'll be calling Mr. Rasmussen.

**THE COURT:** Okay. Thank you. Let's go ahead and get him.

**(Pause)**

**THE COURT:** Good morning, sir. You can go ahead and come forward, come around this way, when you get to Ms. Jackson, she's in the red blazer here, you'll stop, she's going to administer the oath, and then you'll come around here and have a seat in the witness stand next to me.

**THE CLERK:** Please raise your right hand.

**ROBERT RASMUSSEN, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Thank you.

And sir, just watch your step going up.

And I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** Robert Rasmussen, R-A-S-M-U-S-S-E-N.

**THE COURT:** Thank you very much.

Mr. Wood, you may proceed when you're ready.

**MR. WOOD:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. WOOD:**

Q Good morning, Mr. Rasmussen. How are you?

A Good, thank you.

Q Good. Mr. Rasmussen, do you know a gentleman named Patrick Byrne?

A Yes.

Q And how do you know Mr. Byrne?

A Mr. Byrne hired me back in 2004 when I joined Balboa Capital.

Q And so about how long have you known Mr. Byrne?
A I've known Mr. Byrne 20 -- about 22 years.
Q Okay. And what brings your here today?
A I was subpoenaed to appear.
Q Okay. And let's -- you mentioned you were hired by Mr. Byrne. Was that your first job?
A No.
Q About how much professional experience did you have before then, just in terms of years?
A I started my career just right after graduating college. I have 35 years' experience in the industry.
Q And where did you go to college?
A I went undergraduate to Cal State Fullerton, and graduate school at Pepperdine University.
Q And what's your graduate degree in?
A Business administration.
Q Okay. And what did you do -- just generally speaking, what did you do for work after college and your MBA? I apologize.

**MS. YEE:** Compound.

**THE COURT:** Sustained.

**BY MR. WOOD:**
Q Did you work between college and your MBA?
A Yes, I did internships for a financial planner. Between my undergraduate and graduate degree? I'm sorry, I thought you

were talking before my -- I graduated from my undergrad I did internship. After I graduated from Cal State Fullerton I joined Bell Atlantic TriCon in 1988 I believe.
Q Okay. And after you graduated with your master's in business administration what did you do?
A I stayed with Bell Atlantic TriCon for probably three to four years, then I joined GE Capital, and then I went onto Rockford Industries, American Express Equipment Finance, and then onto Balboa Capital.
Q And what were you doing in those jobs?
A My primary role was in credit and risk. I had oversight of the underwriting of transactions. Basically reviewing applications that would come in to get financing for equipment for a business.
Q Okay. So take us -- you know, so generally speaking you've referenced the term, you know, equipment, equipment finance a few times, can you help the jury understand what is equipment financing, in your experience?
A Sure. So let's say a restaurant would like to get a -- order a new payment system, let's say it's maybe $10,000 and they don't have the money to put out for it, so they come to Balboa Capital to finance that payment system.
We look at their personal credit and business credit, and if we approve them we fund the manufacturer of the equipment, the $10,000, and then the customer, the restaurant pays on a

monthly basis. Let's say it's a 60-month term, they pay for 60 months to pay for the equipment.

Q Okay. And now Balboa was at some point -- so let's talk about your time at Balboa.

So there was a point at this Balboa was acquired by Ameris Bank; is that your understanding?

A Yes.

**MS. YEE:** Leading.

**THE COURT:** Sustained.

**THE WITNESS:** Oh, sorry.

**THE COURT:** It's okay.

**THE WITNESS:** I should wait a little longer.

**THE COURT:** Yeah, if you could just wait a beat so that way if there is an objection I can hear the objection and rule on it before you answer.

**THE WITNESS:** Yeah, I apologize.

**THE COURT:** There's nothing to apologize for, it's a very clumsy way of having a conversation, so -- and everybody, including me, has problems with it sometimes. So there's nothing to apologize for.

**THE WITNESS:** Thank you.

**BY MR. WOOD:**

Q And thank you for your patience, Mr. Rasmussen. I didn't realize the fact of the acquisition was in dispute.

How long were you with Balboa Capital?

A I was -- 19 years.
Q And did you work with any other companies after Balboa Capital?
A No.
Q Okay.
A Well I worked with Ameris Bank after the acquisition, but we were still called Balboa Capital, although we were Ameris Bank.
Q All right. Thank you.
So how long did you work at Balboa while it was just Balboa before it was acquired by Ameris?
A It would have been approximately 17 years.
Q Okay. And when did you leave?
A I left in March of 2024.
Q So overall between the time when it was just Balboa and the time that it was Balboa under Ameris, kind of all told, about how long were you with Balboa?
A With Balboa and Ameris combined it was about 19 years.
Q Okay. What was your first role at Balboa Capital?
A Chief risk officer.
Q And what were your responsibilities in that role?
A I oversaw the credit department primarily, the underwriting or the reviews of applications for financing, and then we would approve or decline them for financing.
Q Okay. And is there a difference between a -- you know, or

did -- is there a difference in your understanding, based on your experience in the industry, is there a different between a chief risk officer and a chief credit officer?

A Yeah. Well a chief credit officer is primarily over the -- just the credit functions, the credit underwriting.

A chief risk officer can be more expansive and involve the portfolio and risk evaluations for the business overall.

Depending on the type of entity, like a finance company like Balboa Capital, since we weren't a bank, chief risk officer was the title that was used.

In a bank risk is something different, more on the compliance side. So in a bank it's more called a credit role than a risk role for that position.

Q Did you have any other roles during your time at Balboa?

A Yes. After approximately one year I assumed the role of chief operating officer.

Q And what were your responsibilities in that role?

A In addition to the chief risk officer, I had two roles.

Q Oh, thank you.

What were your -- so across those two roles what were your responsibilities as the chief operating officer?

A Aside from the credit function I basically managed the full life of the transaction. So credit, documentation, collections, customer service, IT, accounting. I believe I named them all.

Q Okay. And what was the business center at Balboa?

A I'm sorry --

**MS. YEE:** Leading.

**THE WITNESS:** -- the business center was --

**THE COURT:** The objection is overruled, you can answer.

**THE WITNESS:** Sorry.

The business center is basically the same thing as documentation. So after the credit is approved documents are generated and then sent to customer, then the documentation team receives them back and approves the transaction to be funded. Meaning the money goes out to the manufacturer or vendor and start the loan.

**BY MR. WOOD:**

Q And what was your -- what were your responsibilities overseeing the IT department?

A I was heavily involved with the IT department, because we were -- Pat Skull (phonetic) was to be a fintech so we invested a lot of IT and I spent quite a bit of time in IT as far as development and innovation for our offerings that went out to our vendors and brokers, who are really our -- one of our customers. The manufacturers are our customer and the end user is our customer. So we were developing innovation that the vendors or brokers could use to enter applications, to get pricing.

And then we also were innovating internally so we could process business quicker, more automated, more efficient.

And then also our delivery to the customer for them to access information on their accounts. So IT is critical.

Q And what do you mean when you say innovation?

A It's developing new ideas, new automation, new software that might come out. New ideas that would -- a lot of feedback would come from our employees on how they could be more efficient, and our sales people and sales managers and operations managers. So these are things that I'd like to have, these can make my team more efficient or these can reduce our risk. That type of innovation -- that type of development, software development or system development.

Q And what do you mean my risk in that context?

A We do see risk. Meaning underwriting more efficiently, using more data, gathering more data to analyze more quickly and more efficiently and thoroughly.

Q So during your time at Balboa, prior to the acquisition, how often did you interact with Mr. Byrne?

**MS. YEE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Daily. Multiple times.

**BY MR. WOOD:**

Q And can you describe the nature of those interactions?

A Yeah --

**MS. YEE:** Overbroad.

**THE COURT:** Was there an objection?

**MS. YEE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Can I get some water real quick?

**THE COURT:** Yes, that's there for you.

**(Pause)**

**THE WITNESS:** I'm sorry.

Okay. My interactions with Mr. Byrne, it would be -- well first it would start off where I would probably get a batch of emails, probably at like 6:00 a.m., he started his days early, and ended them later, so I'm not quite sure how he did that, but I would get emails, 6:00 -- 5:00, 6:00 a.m. and then I'd start responding to them, interacting with him on either it might be ideas on IT development, ideas on new markets we could enter, portfolio questions, all facets of the business. Pat was basically involved in every department.

**BY MR. WOOD:**

Q And so would you describe him as more, you know, hands on or more hands off?

A Yeah, so --

**MS. YEE:** Leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** So there would be the mail -- I would start with the emails, and then we'd also schedule meetings.

So we'd have in-person meetings or teams meetings that would start rolling out.

So I would interact with Pat on either ad hoc meetings that were set up or scheduled meetings that we'd have on a weekly basis or monthly basis.

Many of those meetings -- we had weekly meetings with -- or monthly meetings with each team and department so he could understand that what was going on better and provide strategic input.

**BY MR. WOOD:**

Q All right. And how often did you see him actually in the office?

A Every day.

Q And did that change after COVID?

A Yes. When we had probably about 95 percent plus of our employees worked remote. We only had a skeleton crew internally to handle critical functions.

Q Okay. And so did the frequency of your interactions change after that then?

**MS. YEE:** Leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No.

**BY MR. WOOD:**

Q And who was above you -- in terms of Balboa's hierarchy before the acquisition, was there anybody above you?

**MS. YEE:** Vague and overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes, so Patrick Byrne and Phil Silva, we were basically -- I had two -- I kind of almost had dual reporting lines, we were kind of like The Three Musketeers.

**BY MR. WOOD:**

Q What do you mean by that?

A We would divide and conquer. It was -- we were very flat, there wasn't much hierarchy or levels of management in our company, so Pat would take on a certain piece of the business and really manage it, especially the treasury side of it, Phil was on sales, and I was on operations.

Q Okay. And how many employees reported to you?

A It fluctuated, but I would say like 70 plus.

Q Okay. And you said there was kind of a flat organization, so were you -- how did kind of high level decision-making work at Balboa?

A It was very collaborative. A lot of times Pat, Phil, and myself would work together. We -- every day we were either strategizing on new opportunities, primarily new opportunities or how to grow existing relationships.

So originations was a big focus for Phil Silva and Patrick Byrne also, but Patrick was also involved with all the operations facets of it.

Q Okay. And what was, you know, the general nature of the

relationship among The Three Musketeers?

A Very close. Some people referred to it within those three as a brotherhood.

Q Did you ever have an opportunity to observe whether Mr. Byrne ever interacted with other employees Balboa?

**MS. YEE:** Leading.

**THE COURT:** Overruled, you can answer.

And I'm -- I need you to say objection before you make an objection, because I'm having a hard time hearing you, and it's not getting picked up on the transcript.

**MS. YEE:** Will do, Your Honor.

**THE COURT:** Thank you.

**THE WITNESS:** Sorry, can you repeat the question?

**BY MR. WOOD:**

Q Sure.

**MR. WOOD:** Can we have the question read back? I just want to make sure it's accurate.

**THE COURT:** Did you ever have an opportunity to observe whether Mr. Byrne ever interacted with other employees?

**THE WITNESS:** Yes.

**BY MR. WOOD:**

Q And what were you observations?

A He was always interacting with other employees. He was very personable with all the employees, and he would get to know, especially ones that were involved in meetings, he'd get

to know them more on a personal side.

Q And would you describe -- based on your observations, would you describe Mr. Byrne's style as, you know, kind of if there's two extremes here, one is kind of aloof, dictatorial, one is kind of, you know, more personable. where on that spectrum would you say Mr. Byrne fell?

**MS. YEE:** Objection, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** He was very personable and treated everybody as an equal. He actually would take offense if you treated somebody poorly.

**BY MR. WOOD:**

Q And what was your perception of Mr. Byrne's work ethic during this time?

A Very strong.

Q And did that change at all -- did you observe whether that changed at all during the kind of COVID period?

**MS. YEE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No.

**BY MR. WOOD:**

Q All right. Now, did you -- was there -- did there come a time -- so we've mentioned that -- you've mentioned already that Balboa was acquired by Ameris. How did you come to learn that Mr. Byrne might be considering selling the company?

**MS. YEE:** Objection, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** He came forward to me along -- to outline that he was going to be looking to market the company or sell the company potentially if we found the right buyer.

**BY MR. WOOD:**

Q And what do you mean by right buyer?

A A buyer that would keep the Balboa legacy in place, continue going on and growing, and retaining the employees.

Q Okay. And did you have any involvement in the process of talking to potential investors -- or I'm sorry -- purchasers?

A Yes, we had a -- it's called Project Pioneer, a deck or a proposal that was put together and we went out and presented that to various investors.

Q And in preparing for, and you know, putting on those presentations, did you come to have a sense of what Mr. Byrne was looking for in a buyer?

**MS. YEE:** Calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

**BY MR. WOOD:**

Q And what was that sense?

A He was looking for a buyer that would be good for Balboa and the employees.

Q And what was your sense of what that meant?

A Having Balboa as an ongoing entity, let the -- Pat started the business in 1988 and it took -- aside from his family, I mean that was his life, and so he wanted to see that continue.
Q Okay.
A Can you -- do you want me to further elaborate?
Q Was there anything else in your mind, you know, in that sense that you know?
A Yeah, he wanted to -- obviously when you have the -- when you want -- when you have a purchaser who's going to keep the business in place and keep the operations in place that is what he was looking for so the employees had a home and it wasn't just a -- like a private equity firm coming in and just buying the portfolio or breaking the business up and Balboa would not exist and the employees would not exist any longer, or to have an equipment finance company come in and they would just buy the portfolio and most likely absorb the operations piece into their own and eliminate positions.
Q Did you have a sense of why, you know, Mr. Byrne didn't just want to keep Balboa as an independent company?
**MS. YEE:** Objection, leading.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** He wanted to see Balboa grow to what he -- the heights that he felt it was capable of doing, along with the fin tech platform we put together.
The piece that we were missing was having solid

funding and affordable funding to grow the business, and that is what -- that was one of the reasons -- main reasons I know why he sold.

**BY MR. WOOD:**

Q And did you ever get the impression, you know, personally, Mr. Rasmussen, that this was, you know, nothing -- that this was a -- like a cash out opportunity for Mr. Byrne?

**MS. YEE:** Objection, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Never.

**BY MR. WOOD:**

Q And why not?

A That wasn't Pat, he was never -- that wasn't his motive. He had so much pride and passion in the business, and I mean he never talked about ever the money or anything, he's a very humble guy who lives a very humble lifestyle, is not flashy, he doesn't want -- I guess what I'd say is he never talked about the money, he was always talking about the legacy and continuing the business.

Q Who were the possible buyers that Balboa was in touch with?

**MS. YEE:** Objection, calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I remember multiple -- I don't remember the names, but there were multiple credit equity companies. I

remember a few equipment finance companies and a few banks.

**BY MR. WOOD:**

Q And were you part of any conversations that involved which of those companies to choose?

A No.

Q All right. How much did you know about the negotiations with Ameris specifically as they proceeded?

A I got very high level information from Patrick Byrne and Phil Silva.

Q Are you familiar with the term LTIP?

A Yes.

Q And what does that mean to you?

A That's a long-term incentive plan.

Q And --

A That was part of my -- when we were purchased that was part of my employment package was a long-term incentive plan that went out for three years. I was provided a detailed spreadsheet that outlined exactly what my percentage would be and what the goals were for earnings before tax each year to achieve that goal.

Q And do you know whether the concept of an LTIP had come up with any of the other buyers you presented to?

A I --

**MS. YEE:** Objection, lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I did not hear about it at all.

**BY MR. WOOD:**

Q And when did you first come to hear that term with regards to Balboa and Ameris?

A While we were in the process of finalizing the -- before the purchase was finalized I was notified that there would be a plan. I didn't have the details on it until after the acquisition.

Q And what was your understanding of the importance of the LTIP to the overall purchase agreement?

A Very important.

Q And how did you come to have that understanding?

A That was a key part to ensure that key personnel, along with our employees, there's apportion for it, we retained all our key employees, and especially through the transition period, that's why there is a three-year window on it.

Q And what do you mean by three-year window?

A Basically if we met -- I was provided with an earnings before tax goal for year one after acquisition, year two, year three, and then my percentage that I was assigned would stay constant for those three years against the pool.

Q Okay. What do you mean by your percentage?

A So I was -- we were -- I was assigned a percentage based upon the percentage of stock that I owned -- or options that I owned, so my percent was seven percent.

Q Did your personal understanding of what the LTIP was -- how did that impact your decision of whether or not to stay on with Balboa after the acquisition?

**MS. YEE:** Objection, assumes facts in evidence, lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** It was very important.

**BY MR. WOOD:**

Q And how was it important?

A It was important for me to stay on, I was -- I had been there 17, 18 years, and you know, I'm reaching, you know, at my age I was thinking about maybe doing something different, but it was so enticing and I was so passionate about ensuring that -- about Ameris was making a good investment and that Pat fulfilled the promises that were made as far as reaching our goals that I wanted to stay on with Pat and Phil to make it happen.

Q All right. Let's go back to talking about the percentage. How did you come to understand that you were going to have a certain percentage?

A I was presented with a detailed spreadsheet from Patrick Byrne right after the acquisition -- or during the time it was signing the -- no, it was right after the acquisition.

Q And do you recall whether or not you signed, you know, any written agreements with Ameris at the time of the acquisition?

**MS. YEE:** Objection, leading, lacks foundation.

**THE COURT:** Overruled, you can answer that question with a yes or a no.

**THE WITNESS:** Yes.

**BY MR. WOOD:**

Q And did you?

A Yes.

Q And was the LTIP part of that agreement?

A Yes.

Q And you previously, you know, talked about, you know, overseeing Balboa employees before the acquisition. Did that change after the acquisition?

A Shortly thereafter after the acquisition, I can't remember the number of weeks or months, but the IT department was the first department to be moved out from underneath Balboa and reporting to Ameris leadership.

Q And had you expected that to happen?

A No.

Q Why not?

A It was never conveyed to me. I was surprised. The IT component was so critical to our success.

Q And why do you say that?

A Because the IT department was helping develop innovation or new product offerings for our customers, whether they were vendors, brokers or applicants, and then processing

efficiencies.
Q Did you observe any other changes in terms of, you know, reporting structures within Balboa Capital after the acquisition?
A Yes, accounting reporting line was moved. I don't remember the exact timeline on that, but it was moved, I think it was shortly thereafter. I can't remember the timeline for accounting.
And then after approximately a year, year and a half the reporting line for credit -- the credit didn't move entirely to Ameris, but my reporting line changed from Patrick Byrne and Phil Silva to Ameris Bank.
Q Were there any other changes?
A Marketing was also moved. That was rather immediate from what I remember, the marketing team was moved to Ameris Bank right after acquisition. That was probably actually -- that might have been the first one.
Q Do you recall any others?
A Let me think. Legal. I believe legal was moved also. Yes, legal -- the legal team.
Q Okay. And do you remember any others?
A I'm trying to go back.
**(Pause)**
A That's what I can recall right now.
Q All right. Now, going back to the IT department changes,

what was the impact of those changes on the Balboa Division?

**MS. YEE:** Objection, improper lay opinion.

**THE COURT:** The objection is overruled, you can answer.

**THE WITNESS:** The impact was significant.

**BY MR. WOOD:**

Q How so?

A It basically was like molasses, it slowed everything. So projects were taking much longer to come to fruition from starting -- start to end, became much more bureaucratic to try to get things approved to push through on the technology side.

Also one of the key developers that helped build our operating system, I believe about 50 percent of its capacity was moved to Ameris Bank.

Q And did it have any other impact?

A The ability for us to go to market was just -- just came to a crawl, it almost -- it became very frustrating, so all the initiatives to either enhance our portal, our operating system, any type of offerings whether it was offerings to our customers or our vendors or brokers or internal operations efficiencies.

So many of our operations leaders would come to me with either fixes or enhancements that would make their team more productive or drive the quality, and so they would bring initiatives to me and they would go on a list, but it felt like that list just was stuck. Very frustrating.

Q And what was understanding, if any, of whether that impacted Balboa's ability to innovate?
A It did impact it.
Q And what was your perception of what that impact was?
A We weren't able to innovate and provide new offerings and efficients (sic) with manner -- in a competitive manner because you have competitors who are bringing new offerings to your vendors or brokers or customers.
I mean we're in this age where everyone is looking for technology and ease and user interface is easy to use, and speed, everybody wants something fast, and we had to stay on that cutting edge, and we did, but when -- we kind of hit a wall.
Q So let's go onto a different topic.
Remembering -- you know, based on your role as a, you know, chief risk officer, and you know, your general roles, you know, within risk, do you have an understanding of what the term loan loss means?
A Yes.
**MS. YEE:** Objection, calls for expert opinion.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes.
**BY MR. WOOD:**
Q And what is a loan loss in your experience?
A A loan loss is a transaction that has gone bad. Basically

the customer has stopped paying on the transaction, and that's for a six-month period of time that they haven't -- they've gone to collections, when they become late after like 3 to 5 days then it can go one month -- 30 days, 60 days, 90 days, 120, and when it hits 150 -- 180 then we have to write it off because it becomes a bad loan loss.

Q Okay. And in your role in the Balboa Division of Ameris did you observe the loan losses for Balboa in 2023?

A Yes.

Q And what were your observations?

A They were higher than normal. I don't remember the exact number.

Q Okay. And did you have a perception as to why that was?

A Yeah, I believe it was primarily due to being in the market for mostly short haul delivery, local delivery with box trucks was a key part of that, from what I remember.

Q Okay. Can you explain why?

A What happened is that after COVID or right during COVID everybody stopped -- just ordered everything, nobody was really going retail so there was a surge in delivery needs, and a lot of people jumped on that bandwagon and got into the market.

So, for example, an individual might finance a truck with us to create a business during that surge, so we financed the vehicle for them. And what happened was after things leveled out, after a year or two, after COVID, the supply level was

higher but also the market dropped as far as demand, so these people were left with not enough business to pay their monthly payment and the loan went -- eventually went -- would go bad.

Q Okay. And how did the -- you know, based on your experience -- you know, from your perception in the Balboa Division, how did the level of loan loss impact Balboa Division's profitability?

**MS. YEE:** Objection, overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Well a loan loss is a cost of doing business basically, we're in the business of risk, so we take risk. That's my role is I define the level of risk that we're going to try to make acceptable based upon how we underwrite transactions, the credit quality, FICO scores, things like that, just there's still risk involved when you finance equipment.

Just like -- I guess the example I'd give you was -- well I was talking about a restaurant, so let's say a restaurant -- a restaurant has a cost of doing business too, aside from their staff and everything, so there's spoilage or bad food that goes bad, on average ten percent goes bad for a restaurant, so they -- that becomes an expense for them and the cost of doing business, they know that's going to occur.

//

//

**BY MR. WOOD:**

Q So what's the -- so in your mind what's the difference, if any, between a loan loss and the Balboa Division losing money?

A Completely different. There's no relationship.

Q And why do you say that?

A Because a loan loss is like operating -- it's an expense. So just like a restaurant might have ten percent loss of spoilage, that doesn't mean that they lost money for the year, that was the cost of them doing business, they have -- we have over a billion dollar portfolio that was generated income to -- against that type of expense.

Q All right. Let's go back to the LTIP. What was your understanding of Ameris's role, if any, in making decisions to make distributions under the LTIP?

**MS. YEE:** Objection, lacks foundation, calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I had no understanding that they would be making a decision or -- about my LTIP bonus.

**BY MR. WOOD:**

Q What was your understanding?

A My understanding was what was provided to me on my outline for the LTIP payments was that it was directly related to earnings before tax, either we hit those numbers or we didn't, and then my percentage against that earnings before tax pool,

the LTIP pool that was tied to the earnings before taxes. There would be no -- it's not discretionary, it was very black and white.
Q And what was your understanding of Mr. Byrne's role, if any, in making distribution decisions under the LTIP?
A Aside from the -- there were certain people with fixed LTIP percentages, and then there was an additional pool that was remaining aside from those fixed percentages that were -- could be used at Patrick Byrne's discretion to distribute to employees.
Q What was your observation, if any, of Mr. Byrne's work ethic after the acquisition in 2022?
A It was stronger. If anything it was stronger because he was so in tune with ensuring that this acquisition was a success.
Q And did he ever -- you know, did you ever get the sense that he was checking out?
A No.
Q What was your observation of Mr. Byrne Byrne's work ethic in 2023?
A It was very strong.
Q Was -- how did it compare to 2022?
A I would say the same.
Q And how did it compare to before Balboa was acquired?
A The same. I think he was more on top of -- he was already

on top of things across the board, but he was even more hyper on top of things after the acquisition. He really wanted to make sure that this was a success for Ameris.
Q And did you have any observations of Mr. Byrne's work ethic in 2024 before you left?
A Yes.
Q And what were you observations?
A Was the same.
Q And had they slowed down at all compared to the prior year?
**MS. YEE:** Objection, leading.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** No.
**BY MR. WOOD:**
Q Did you ever observe Mr. Byrne go on strike in 2024?
A No.
Q Did you ever get the sense he just wasn't trying as hard?
A Absolutely not.
Q Did you ever get the sense he was giving up in any way?
A No. Pat -- if you know Pat he does not quit anything, there's no quit in him.
Q And what do you mean by that?
A Meaning that he would always, no matter how difficult the situation was, he would always look to try to persevere through it and stay positive. I mean he was an inspiration to me and

the employees through very difficult times too.
Q Did Mr. Byrne ever instruct you to violate any of Ameris's accounting controls?
A No.
Q Did Mr. Byrne ever instruct you to violate any of Ameris's compliance requirements?
A No.
Q Did Mr. Byrne ever instruct you to violate Ameris's internal procedures?
A No.
Q Did there come a time -- was your -- did there ever come a time that you learned that Mr. Byrne was unhappy with the way the LTIP use was being handled?
**MS. YEE:** Objection, leading, calls for speculation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes.
**BY MR. WOOD:**
Q And what did you understand those concerns to be?
**MS. YEE:** Objection, lacks foundation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** His concern was that things were changing -- that what was agreed upon was changing.
**BY MR. WOOD:**
Q What do you mean by that?
A Well some facets that I recall were that there were

changes in cost of funds and expense allocation for -- expense allocation that Ameris would assign to Balboa. Those are two things that I remember.

Q And did you have any understanding of why Mr. Byrne was making complaints?

A Yes, because that was not what was agreed upon.

Q And did you agree with that perception?

A Yes.

Q Why?

A Because what his expectation would align with what my expectation was I provided with -- there was -- it was -- I thought it was black and white.

Q Did you -- did anybody at Ameris ever tell you that they were unhappy with Mr. Byrne?

A No.

Q Why did you leave in March of 2024?

A I left because my position was significantly reduced, and within my employment contract there was a clause that if my position was materially changed that my contract would be paid out, there'd be a certainly term of that I'd be paid out for.

Q Okay. And between the time that you left in March '24 and the time that Ameris fired Mr. Byrne in June of 2024, did you have any interactions with Mr. Byrne in that in between period?

A Yes.

Q And what were those interactions?

A We would -- I would meet him for lunch or happy hour maybe every few weeks or three weeks. We also went to a basketball game that I can recall that we did. And I'm not sure if I went to a baseball game with him, I can't remember.

Q And did you have any understanding of, you know, Mr. – of whether Mr. Byrne was thinking about quitting during that time?

**MS. YEE:** Objection --

**THE WITNESS:** No.

**MS. YEE:** -- leading.

**THE COURT:** Overruled.

**THE WITNESS:** No.

**BY MR. WOOD:**

Q Did Mr. Byrne ever give you the sense that he was thinking about leaving Balboa?

A No.

Q And had his attitude towards Balboa changed in any way during this time?

**MS. YEE:** Objection, overbroad, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No.

**BY MR. WOOD:**

Q How'd you find out that Ameris fired Mr. Byrne?

**MS. YEE:** Objection, lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** From what I recall I was contacted by

Jacquie Emert.

**BY MR. WOOD:**

Q And did you hear from anyone else?

A Yes, I believe -- Sophia Fields (phonetic) who was over our documentation team, I spoke with her. I may have spoken to a few other people who I cannot recall, but there was definitely shock if was going on.

Q And have you spoken with Mr. Byrne since the time he was fired?

A Yes.

Q And how often have you spoken with Mr. Byrne since the time he was terminated?

A I would say every couple of weeks. Sometimes it'll be like two, three times a week. I'm sorry, two, three times a month.

Q And in your perception, you know, in the period kind of immediately following the termination, what was your impression of how Mr. Byrne felt about being fired?

A He was shocked. He was humiliated, hurt. Like I said, he started this company back in 1988, and like I said, aside from his family it was his life, and he took a great deal of pride in it.

Q And did you have any other observations during that time?

A At the time that right when I saw him when he was let go, fired?

Q Yes.
A Yeah, he just seemed more down, distracted, down, bothered. I would have to say he was shocked. I haven't really seen him that way. He's gone through multiple situations and it was hard to see him that way.
Q And in the couple of years now almost that have passed since he got fired from the Balboa Division, have you had any other observations of the impact the situation has had on Mr. Byrne?
A Yes.
Q And what are those observations?
A Well I know he has become less active, more reclusive, not as jovial or happy or laughing. He's been -- I noticed he had gained weight. He just didn't seem to be very outgoing, he doesn't reach out and contact me to do much anymore, I more reach out to him. It's hard to see, hard to watch. I've never seen him like this.
Q And how does that compare to his demeanor, you know, before he was fired?
A Complete opposite. He was very upbeat, happy. Pat would laugh a lot, or he would have a conversation with people and you would always hear laughter, and just not laugher or not as much happiness.
Q And in the 22 years or so that you've known Mr. Byrne, have you observed him deal with difficult situations before?

A Yes.
Q And what were they?
A I would say one of the biggest one was he -- there was the financial crisis in 2008, it basically brought the business for its knees. We were losing our funding sources, our portfolio was becoming very delinquent, so both things were working against each other, our delinquency was rising rapidly, but he worked through that. I mean he brought everybody back up. I mean we were just meeting like daily for hours on the portfolio and trying to find new funding sources.
Where I was feeling down he gave me inspiration and brought me back up thinking that this was possible for us to get out of it.
Q And how's the impact you observed in the 2008 financial crisis, how does that impact on Mr. Byrne compared to the impact you testified observing now?
A The impact after he was fired was much more significant. I mean like he didn't let -- he persevered through things over the whatever the -- since '88 there's a lot of situations that he persevered through. He wouldn't just -- he wouldn't get down, he would find how to overcome this and would solve it, and he would stay up beat about it to try to find solutions.
This I've never seen -- honestly I've never seen him like this, as down and reclusive and not very outgoing, and to see what's happening to him physically.

Q All right.

**MR. WOOD:** Subject to any redirect, thank you very much, Mr. Rasmussen, that's all I have for you.

**THE COURT:** Okay. Thank you. Ms. Yee?

**MS. YEE:** Thank you, Your Honor.

**THE COURT:** You may proceed when you're ready.

**MS. YEE:** Thank you, Your Honor.

**(Pause)**

**CROSS EXAMINATION**

**BY MS. YEE:**

Q Good morning, Mr. Rasmussen.

A Good morning.

Q You were the chief credit officer and I believe you said chief operating officer of Balboa Capital before the acquisition, correct?

A I'm sorry, can you say your question one more time?

Q You were the chief credit officer and chief operating officer of Balboa Capital?

A I was a chief risk -- I was over the credit department, but I was a chief risk officer. That changed over time, and like I said, at one point, especially after we were acquired by Ameris, there was a -- it was asked of me if I would want to change my role back to chief credit officer because a risk officer was conflicted with what a risk officer is within the bank.

Q Thank you for that answer.

And during your employment at Balboa Capital, before the acquisition, you received stock options under Balboa Capital's stock plan; is that right?

A Yes.

Q And when Ameris acquired Balboa Capital those stock options were cashed out, correct?

A Yes.

Q And you received more than $5 million from the sale of Balboa Capital, correct?

A Well after taxes put it at about 50 percent.

Q Understood.

And you entered into an employment agreement with Ameris Bank at the time of the acquisition, correct?

A Yes.

Q You reviewed that agreement before you signed it, correct?

A Yes.

Q That agreement specified your base compensation of more than $220,000 per year, correct?

A Yes.

Q And that is subject to a three percent annual raise, right?

A That's what I recall.

Q And that percentage was specifically written into that employment agreement, correct?

A Yeah, that three percent was what I assumed was more like a cost of living adjustment to keep my salary in line.
Q Understood.
And your employment with Ameris Bank ended in March 2024, correct?
A Yes.
Q And as part of your severance package you received one year of your base salary, correct?
A Yes.
Q And in order to receive that severance package you signed a release agreement, correct?
A Yes.
Q And you reviewed that release agreement before signing it, correct?
A Yes.
So can I go into why I signed the release agreement, one of the reasons I signed it?
Q You reviewed it before you signed it, correct?
A Well I was advised that I would not get paid my bonus that was due to me until I signed it.
Q But you reviewed it --
A Yes.
Q -- carefully, correct?
A Yes, to receive my bonus.
Q You -- in fact you consulted an attorney before you signed

it, correct?
A Yes.
Q That release agreement stated that you were releasing all claims from your employment against Ameris Bank, correct?
A Yes.
Q You understood that you -- if you violated that release agreement you would have to pay the severance amount to Ameris, correct?
A That's what I recall.
**MR. WOOD:** Objection, relevance.
**THE COURT:** Sustained.
**MS. YEE:** Your Honor, it goes to bias and credibility.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q The attorney who represented you in that lawsuit, you filed a lawsuit against Ameris, correct?
A Yes.
**MR. WOOD:** Objection, relevance.
**THE COURT:** Sustained.
**THE WITNESS:** Sorry.
**BY MS. YEE:**
Q The attorney who represented you in that lawsuit also represented Mr. Byrne in this lawsuit, correct?
**MR. WOOD:** Objection, relevance.

**THE COURT:** Counsel, please approach.

**(Begin sidebar at 10:01 a.m.)**

**THE COURT:** Okay. I've already sustained the objection, so this line of questioning is not relevant, so why are you continuing to ask these questions?

**MS. YEE:** I apologize, Your Honor, but this goes to his credibility and why he's testifying here today, because he filed a lawsuit against Ameris Bank is sure that -- you know, this just goes to his bias.

**THE COURT:** So what is your offer of proof for relevancy of another lawsuit? I mean he's not a party to this one.

**MS. YEE:** That lawsuit is public records, Your Honor.

**THE COURT:** So you don't have an offer of proof.

**MR. WOOD:** If they'd like to open the door I can -- I'm happy to ask him about the lawsuit on redirect.

**THE COURT:** All right. Okay, so are you withdrawing the objection to -- on relevancy grounds?

**MR. WOOD:** Well I think the primary objection on relevance is that (inaudible) pattern (indisc.).

**THE COURT:** Right. Right. So are you saying that you don't object to the general subject matter of the other case --

**MR. WOOD:** Correct.

**THE COURT:** -- but we're getting too close to the

attorney/client privilege line?

**MR. WOOD:** Yes.

**THE COURT:** So do you understand? So I'm going to make sure that I'm understanding that.

So do you have any other questions to ask him about the attorney or do you want to just -- do you want to continue to ask him questions about the lawsuit?

**MS. YEE:** Yes, Your Honor.

**THE COURT:** Okay. So the lawsuit but not the attorney.

**MS. YEE:** Okay.

**THE COURT:** Okay?

**MS. YEE:** Understood. Thank you, Your Honor.

**THE COURT:** Okay. Thank you.

**MR. WOOD:** Thank you, Your Honor.

**(End sidebar at 10:02 a.m.)**

**THE COURT:** Okay, Ms. Yee, you may continue.

**MS. YEE:** Thank you, Your Honor.

**BY MS. YEE:**

Q Mr. Rasmussen, we were just talking about your lawsuit that you filed against Ameris Bank. Ameris filed a motion to dismiss your lawsuit, correct?

A Correct.

Q And the court granted that motion.

A I don't know if I recall that.

Q And you ended up dismissing your lawsuit against Ameris, correct?
A Yes.
Q You're pretty angry against Ameris weren't you?
**MR. WOOD:** Objection, argumentative.
**THE WITNESS:** No.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q And you're getting back at Ameris by testifying on behalf of Mr. Byrne?
**MR. WOOD:** Objection, argumentative.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Mr. Rasmussen, let's talk about the LTIP. You did not personally negotiate the LTIP with Ameris, correct?
A Correct.
Q Have you reviewed the long-term incentive plan?
A It's been a while.
Q And you understood that any LTIP award you received was subject to that plan, correct?
A Was subject to what I was provided on what our goals were, is my understanding.
Q It was Mr. Byrne who told you that you would receive 7 percent of the LTIP pool if performance thresholds were met, correct?

A Yes.
Q No one else besides Mr. Byrne ever told you that you would receive a specific percentage of the LTIP, correct?
A I believe that that was representative of what Ameris would be paying me on my LTIP based on the outline I received.
Q But you heard that from Mr. Byrne, correct?
A I was provided that spreadsheet and also the payout at 2022 aligned with the spreadsheet.
Q Mr. Byrne provided you that spreadsheet, correct?
A Yes, and Ameris Bank paid out against that spreadsheet in 2022.

**MS. YEE:** Motion to strike everything after yes.

**THE COURT:** Motion is denied.

**BY MS. YEE:**

Q You never received any document from Ameris that guaranteed you 7 percent of the LTIP pool, correct?
A As Balboa being part of Ameris, I believe that I received that from Ameris.
Q When did you receive that document?
A It was shortly thereafter after the acquisition. I can't remember the timeline. It was around the same time we had the employment agreements.
Q What was the title of that document?
A I can't recall. I'd have to pull it up. It was a very detailed spreadsheet.

Q Which you haven't reviewed recently, correct?
A I probably looked at it within the last year.
Q You mentioned that you have a specific percentage of 7 percent, is that correct?
A Yes.
Q Do you recall if there's a percentage for Mr. Byrne?
A Yes.
Q How did you learn of that percentage for Mr. Byrne?
A That came up as I was going through preparation.
Q Did you review Mr. Byrne's LTIP agreement?

**MR. WOOD:** Objection on the grounds of attorney client privilege.

**THE COURT:** The objection is overruled, but the question can be answered with a yes or no. We'll take this on a question-by-question basis. So she's asking whether or not you reviewed Mr. Byrne's LTIP agreement.

**THE WITNESS:** No.

**MR. WOOD:** And, Your Honor, I apologize. I'm not sure if I need to move to strike the answer about preparation just on the grounds of privilege.

**MS. YEE:** I'm not asking for attorney-client privilege.

**THE COURT:** Okay, we'll take that up on the break.

**MR. WOOD:** Okay.

**THE COURT:** Go ahead, Ms. Yee.

**BY MS. YEE:**

Q Are you aware that Mr. Byrne and Mr. Silva had their own LTIP award agreements?

A Mr. Silva, did you say?

Q Yes.

A Yes.

Q Have you reviewed each of their respective LTIP award agreements?

A No.

Q Mr. Rasmussen, isn't it correct that there is no LTIP percentage written into your LTIP award agreement?

**MR. WOOD:** Objection. Cumulative.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Is there a percentage written into your LTIP agreement?

**MR. WOOD:** Same objections.

**THE COURT:** Sustained.

Q Where do you see that percentage in your award agreement?

**MR. WOOD:** Same objections.

**THE COURT:** Sustained.

**MS. YEE:** I'll move on.

**THE COURT:** Thank you.

Q Is it your testimony that your LTIP award agreement was the same as Mr. Byrne and Mr. Silva's except for the percentage?

**MR. WOOD:** Objection. Vague.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** That was my understanding.

Q Yet you have never received or reviewed Mr. Byrne or Mr. Silva's LTIP award agreements?

**MR. WOOD:** Objection. Cumulative.

**THE COURT:** Sustained.

Q How did you know they were the same?

**MR. WOOD:** Objection. Cumulative.

**THE COURT:** Sustained.

Q Isn't it true that you have never seen the percentage in any of the LTIP award agreement?

**MR. WOOD:** Objection. Cumulative.

**THE COURT:** Overruled. You can answer, but I need you to move on from this area.

**THE WITNESS:** Can you repeat your question one more time?

**BY MS. YEE:**

Q Isn't it true that you have never seen any percentage in any award agreement?

A I'm not sure if I can answer. When you say an award agreement?

Q LTIP award agreement.

A I believe what it stated in there that I would be providing a percentage to be determined.

Q So it's a placeholder, correct?
A Yes, I believe the spreadsheet was what provided --
Q Sir, I'm only asking about the LTIP award agreement. There's no specific number. It's just a placeholder, correct?
A Yes, I wouldn't say correct. I know you call it a placeholder. I don't know exactly what you mean by that.
Q Because there's no specific number or percentage in that agreement.

**THE COURT:** Hold on. I don't want you to argue with him. If you have a question for him, you can ask the question.

**MS. YEE:** I'll move on, Your Honor.

Q Mr. Rasmussen, you testified earlier that your employment with Ameris ended in March 2024?
A Yes.
Q And Mr. Byrne was still employed at Ameris when you left, correct?
A Yes.
Q And Mr. Byrne remained employed for several more months after your resignation, correct?
A Several. I thought it was like in the summer of --
Q Your employment ended in March 2024?
A Yes.
Q And Mr. Byrne's employment ended in June 2024?
A Yeah, so three months, I wouldn't consider it several, but yeah.

Q Thank you for clarifying that. So you were not present during that three months at Ameris when Mr. Byrne was still there, correct?
A Yes.
Q And you have no personal knowledge of what happened at Ameris after you resigned, correct?
A Yes.
Q You've stated that Mr. Byrne was the hardest working person at Balboa that you observed, correct?
A Yes.
Q And that statement was based on what you personally observed, correct?
A Yes, and other people would comment that to me also.
Q But you can't speak to Mr. Byrne's work in that three months after you resigned, correct?
A Yes.
Q You are here today testifying on behalf of Mr. Pat Byrne, correct?
A Yes.
Q And you mentioned you've known him for more than 20 years, correct?
A Yes.
Q You consider Mr. Byrne a friend?
A Yes.
Q And you have a positive opinion of Mr. Byrne?

A I'm sorry. I don't understand what you're saying.
Q You have a positive opinion of Mr. Byrne?
A Yes.
Q You want Pat Byrne to succeed in this lawsuit?
**MR. WOOD:** Objection. Argumentative.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Will you hope the outcome of this case is favorable to Mr. Byrne?
**MR. WOOD:** Same objections.
**THE COURT:** Sustained.
**MS. YEE:** I'll move on, Your Honor.
**THE COURT:** The objection is sustained.
**BY MS. YEE:**
Q You believe Mr. Byrne was a good boss to you?
A Yes.
Q And Mr. Byrne has treated you fairly, correct?
A Yes.
Q Correct?
A Treated everybody fairly.
Q If you learned that Mr. Byrne told colleagues that your annual bonus should be zero based on your 2023 performance, would that be news to you?
**MR. WOOD:** Objection. Assumes facts not in evidence. Calls for speculation and lacks foundation.

**THE COURT:** Sustained.

Q I'll rephrase. Before today, had anyone told you Pat Byrne made negative comments about you?

A No.

Q And if he did, does learning that surprise you?

**MR. WOOD:** Same objections.

**THE COURT:** Sustained.

**MS. YEE:** That's all I have, Your Honor. Thank you.

**THE COURT:** Thank you. Any redirect?

**MR. WOOD:** Yes, briefly, Your Honor.

**THE COURT:** Okay, go ahead.

**REDIRECT EXAMINATION**

**BY MR. WOOD:**

Q Hello again, Mr. Rasmussen.

A Hello.

Q Ms. Yee asked you a question about a lawsuit that you filed against Ameris. Do you remember that?

A Yes.

Q Can you tell the jury why you felt the need to sue Ameris?

A It was due to discrimination. I was suffering from long COVID. Well, I still am in some ways. So my ability, I was on partial disability, and I think there was a high level of frustration by primarily Phil Silva against me with my performance in many ways, asking what type of medication I was taking, how is this going to get resolved, how are you going to

be able to get more work done. And I got very stressed out. That's when I looked for a way that within my employment contract that I could leave Ameris at that time. And then, in addition, I was owed my bonus for 2023, and I was told that I would only be paid my bonus if I signed the release agreement. So I did sign the release agreement because at that point I needed to get paid out, and I was kind of shot, honestly. I was on partial disability, as I mentioned, and that's why I left. And then I filed the lawsuit because I still felt that because I was under duress in signing that release agreement, that it would be null.

Q And why did you feel discriminated against?

A Because I was asked a lot of questions about my work ethic, about how I was feeling, what type of medicine I was taking, I expect more from you, you get paid enough, you expect more from you right now, constantly being pushed and pressured, and then having responsibilities taken away from me.

Q And taken away from you by who?

A It seemed like -- I felt like Phil Silva was orchestrating a lot of it.

Q And why did you feel that Phil Silva was orchestrating a lot of that?

A Because he voiced frustration with me and others quite a bit, and he's the one that pushed on me about what I was able to do and what I was not able to do.

Q And is there anything else you meant by that?

A I don't know if I can go into this further with the agreement that's been signed, but there is quite a bit that transpired. I don't know if you want me to go into detail here or if I'd be violating anything.

Q If you feel comfortable.

A It's okay for me to discuss it further?

Q If you feel comfortable doing so.

A Okay.

Q You are under subpoena.

A Yeah, so Phil Silva would constantly pressure me to also put a lot of stress on me, that he wanted to drive origination. So he was always on me on why I wouldn't approve things or do things. He would put pressure on me, my productivity levels, asking me what type of medications I'm taking. Have I seen a psychologist? Have I seen the doctor? But beyond that, he was very, I didn't like the way he was treating other employees. So that created a lot of abrasion. He was very -- he would be demeaning to other employees. Actually, I have text messages where he would call people, like call a guy, a woman or, you know, a female. He would say they're being wimpy. Straighten them out. Get them straight. I mean, I constantly had this pressure on me, especially around certain people within the company, primarily with David Sexton, who was my credit manager, and Sophia Fields, but mainly David Sexton. It was

just a combination of things where he was constantly putting pressure on me every day.

Q And did Mr. Silva make you feel discriminated against in any other way?

A Yes. Well, my disability primarily. He didn't have any understanding of it. But also, I was uncomfortable with the way he would ask me about my personal life. Every day was how are you feeling? What's going on? What are you doing? What are you taking? How are you going to get better? It was just -- just did not, it was relentless.

Q Did you mean anything else by that?

A It just was really hard. I was worn down. It was just, he just was, it was very mentally straining on me, the way that he would put down other people, too. It made me feel in a very awkward situation. He would put people down, and then to them, he would put on a different face. And it just became so exhausting to me, on top of him pressuring me and all these other things. He just wanted to get deals done, relationships through. His main motive was be productive and drive the business, no matter what.

Q Did you feel that your resignation was truly voluntary in light of that?

A No.

Q Do you remember when you came up into the courtroom today, do you remember standing over there and taking an oath to tell

the truth?
A Yes.
Q And has your friendship with Mr. Byrne led you to violate that oath in any way today?
A No.
Q Your feelings about the way Ameris treated you led you to violate that oath in any way?
A No.
Q Did the way Mr. Silva treated you lead you to violate that oath in any way?
A No.
**MR. WOOD:** No further questions, Your Honor.
**THE COURT:** Okay. Any recross? Go ahead.

**RECROSS EXAMINATION**

**BY MS. YEE:**
Q Mr. Rasmussen, you testified earlier that you believe your wages were withheld.
**MR. WOOD:** Objection. Misstates testimony.
**THE COURT:** Sustained.
Q Do you understand that Mr. Byrne was the one that said you do not deserve any 2023 bonus?
**MR. WOOD:** Objection. Lacks foundation.
**THE COURT:** Sustained.
**MR. WOOD:** Yeah, thank you.
**THE COURT:** Sustained.

Q Everything you said earlier were allegations in your lawsuit, correct?

**MR. WOOD:** Objection. Argumentative.

**THE COURT:** Sustained.

Q And that lawsuit was dismissed?

**MR. WOOD:** Objection. Asked and answered.

**THE COURT:** Sustained.

Q And because you filed that lawsuit in violation of your release agreement?

**MR. WOOD:** Objection. Argumentative. Assumes facts not in evidence.

**THE COURT:** Sustained.

Q You would like to get back at Ameris because you were not happy, correct?

**MR. WOOD:** Objection. Asked and answered, outside the scope, and it's argumentative.

**THE COURT:** Sustained.

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay. Thank you very much. Anything else from plaintiff?

**MR. WOOD:** Not with Mr. Rasmussen, Your Honor.

**THE COURT:** Okay. Okay. Sir, you can go ahead and step down. Thank you very much. You're excused.

**THE WITNESS:** Thank you, Your Honor.

**(Witness excused)**

**THE COURT:** Okay. So we're five minutes away from our morning break, so since we're in between witnesses, we'll go ahead and take the morning break. We'll take 15 minutes. We'll reconvene at 10:40.

To our jurors, please don't discuss the case amongst yourselves or with anyone else, and don't do any research about any aspect of the case, and we'll see you in 15 minutes.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 10:23 a.m.)**

**THE COURT:** Okay. Everyone can be seated. I want to go back to the issue about there was a motion to strike that was made a few minutes ago concerning, let's see, where were we?

**MR. WOOD:** If I may, Your Honor.

**THE COURT:** Yes, go ahead.

**MR. WOOD:** If we can hear the question and answer again, just to determine if we need to make that motion.

**THE COURT:** Okay. Yeah, I'm trying to get back. The transcript doesn't want to let me get back there. Here we go. Okay.

**(Pause)**

**THE COURT:** I think the question was, the attorney who represented you in that lawsuit also represented Mr. Byrne in this lawsuit.

**MR. WOOD:** I think it was a question about the LTIP,

it was a question about how he learned about the LTIP percentages, and he said, I learned it in preparation.

**THE COURT:** Okay.

**MR. WOOD:** It may be a moot point, Your Honor, now that he's off the stand, I just didn't want there being any question that we had waived privilege in any way.

**THE COURT:** Okay. So I know that dailies are being prepared. What I have here is very, very rough, and it's hard for me to navigate through the transcript because it keeps advancing. Every time someone says something, it advances. So if -- when you get the transcript that you want -- you want to renew that objection and make a motion, then we can -- we'll talk about it offline.

**MR. WOOD:** Okay. Thank you, Your Honor.

**THE COURT:** Okay? All right. Thank you, everyone. We'll see you in 10 minutes.

**MR. WOOD:** Thank you.

**MS. YEE:** Thank you.

**THE CLERK:** All rise. This Court is in recess.

**(Recessed at 10:30 a.m.; reconvened at 10:42 a.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Pause)**

**THE CLERK:** All rise. This Court resumes in service.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated.

Okay, counsel, please call your next witness.

**MS. VILLAGOMEZ:** Thank you, Your Honor. Plaintiff calls Ms. Nicole Stokes to the stand.

**THE COURT:** Okay. Thank you. Okay, Ms. Stokes, you can come forward. Come around this way. When you get to Ms. Jackson over here, you'll stop. She'll swear you in. And then you'll come around here and have a seat on the witness stand next to me.

**THE CLERK:** Please raise your right hand.

**NICOLE STOKES, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Ma'am, just watch your step going up, please. And I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** Nicole Stokes, S-T-O-K-E-S.

**THE COURT:** Thank you. Okay, you may proceed.

**MS. VILLAGOMEZ:** Thank you, Your Honor. Permission to treat Ms. Stokes as an adverse witness?

**THE COURT:** You may.

**DIRECT EXAMINATION**

**BY MS. VILLAGOMEZ:**

Q Good morning, Ms. Stokes. We have not met before. My name is Stacey Villagomez.

A Good morning.

Q You know Patrick Byrne, correct?
A I do.
Q And you're currently the chief financial officer of Ameris Bank?
A That's correct.
Q And you have served as chief financial officer of Ameris Bank since June of 2016, correct?
A That's correct, of Ameris Bank.
Q Yes, thank you. So you were Ameris Bank's chief financial officer throughout Mr. Byrne's employment with Ameris Bank, correct?
A That's correct.
Q And as chief financial officer, you report directly to Ameris's CEO, Palmer Proctor?
A Yes, that's correct.
Q And Mr. Proctor is the only person at Ameris to whom you report?
A Yes.
Q Ameris conducted the due diligence before it acquired Balboa Capital, correct?
A Yes.
Q And you were involved in evaluating Balboa Capital from a financial reporting perspective at that time?
A Myself and my team.
Q And Ameris's due diligence analysis required Balboa

Capital to produce corporate governance documents?
A Myself and my team would have been more focused on the financial records.
Q Understood. And as part of your due diligence then, Balboa gave Ameris Balboa's financial information, correct?
A I'm sorry, could you say that again?
Q As part of the due diligence, Balboa Capital gave Ameris Balboa's financial information, correct?
A The financial statements, correct.
Q Thank you. And during the due diligence process, you were personally involved, as you stated, in analyzing Balboa's financial statements?
A Again, my team as well. It was not just me. It was my team.
Q And your team was Ameris's accounting team?
A Not all of it, but yes, some of it.
Q And during that due diligence process, you were also involved in analyzing, oh, excuse me, strike this question. In your role as CFO, you're familiar with the term "generally accepted accounting principles"?
A Yes.
Q And so if I use the term GAAP, will you understand what I mean?
A Yes, ma'am.
Q And based on your review of Balboa's financial statements,

not all of Balboa's accounting records followed GAAP, correct?
A Well, they issued an audited financial statement that stated they did follow GAAP.
Q And based on all this due diligence, Ameris ultimately decided to acquire Balboa Capital, correct?
A Yes, that's correct.
Q And as part of that acquisition, Ameris also sought to retain the plaintiff in this case, Patrick Byrne, as CEO of Balboa Capital, the new Ameris division.
A I don't remember exactly what his title was, but he was retained as employed by Ameris Bank.
Q And as part of that acquisition, Ameris and Mr. Byrne negotiated a long-term incentive plan, or LTIP?
A Yes.
Q And if I call the long-term incentive plan the LTIP, will you understand what I mean?
A Yes.
Q And the terms of the LTIP were never amended during Mr. Byrne's employment, to your knowledge, correct?
A Not to my knowledge.
Q Thank you. Let's look at Exhibit 546, which has already been moved into evidence. Thank you, Ms. Perez. I'm going to ask you to scroll through this document so Ms. Stokes can see it. And do you know what this document is, Ms. Stokes?
A I apologize, can we go back to the beginning?

Q Ms. Perez, please go back to page 1 and scroll through. Have you reviewed, Ms. Stokes?
A Yes.
Q Thank you. And do you know what this document is?
A You scrolled pretty fast, but I believe it is the LTIP.
Q Okay, let's look at page 8. Do you know what this is, Ms. Stokes?
A Yes, this is the Project Pioneer, or the Pioneer Model.
Q Thank you. Ms. Perez, you can take this document down. Ms. Stokes, you know Sufhan Majid, correct?
A I do.
Q And Sufhan Majid was an Ameris employee during Mr. Byrne's tenure at Ameris?
A Yes, that's correct. I'm trying to remember if Sufhan was there when Mr. Byrne's first, with that transaction, I believe he was.
Q Thank you. And Mr. Majid's responsibility was to calculate the LTIP?
A Yes, he was an accountant on my team.
Q And you're familiar with the term earnings before taxes, yes?
A Yes, I am.
Q And if I refer to that term as EBT, will you understand what I mean?
A Yes.

Q Thank you. Balboa exceeded the EBT threshold for the LTIP in 2022, correct?
A Yes, correct.
Q And do you know by how much that threshold was exceeded?
A I do not know the exact amount of the threshold that was exceeded, not off the top of my head, no.
Q And as far as you're aware, the terms of the LTIP were never amended during Mr. Byrne's employment?
**MS. FODE:** Asked and answered.
**THE COURT:** Overruled. He can answer.
**THE WITNESS:** Can you repeat the question, please?
**BY MS. VILLAGOMEZ:**
Q As far as you're aware, the terms of the LTIP were never amended during Mr. Byrne's employment, correct?
A Yes, as I previously stated.
Q Thank you. At the end of 2022 or beginning of 2023, Ameris determined that Balboa had not been accounting for repossessions in accordance with GAAP, correct?
A That is correct.
Q And Ameris then made an accounting adjustment to conform that accounting treatment to GAAP?
A Not exactly.
Q And, Ms. Stokes, are you familiar with the term initial direct cost?
A I am. Well, did you say initial direct cost?

Q Yes.
A Yes.
Q And is a repossession an initial direct cost?
A No, it is not.
Q Thank you. Your position is that the LTIP had to be calculated using GAAP because Ameris is a publicly traded company, yeah?
A Well, Balboa Financial followed GAAP, the Pioneer Model followed GAAP, and then we followed GAAP.
Q Correct, but your position is that the LTIP had to be calculated using GAAP because Ameris is a publicly traded company?
A No.
Q Okay. Ms. Stokes, you gave a deposition in this case on November 3rd, 2025, correct?
A November. I believe that may not be -- I don't know the exact date, but it was in November.
Q And you were under oath during that deposition?
A Yes.

**MS. VILLAGOMEZ:** Your Honor, pursuant to Rule 613, I'd like to impeach the witness with her prior deposition testimony. With your permission, I'd like to read the question and answer of her deposition at page 109, lines 5 through 15.

**THE COURT:** Any objection?

**MS. FODE:** Can I look at it real quick, Your Honor?

**MS. VILLAGOMEZ:** And, Your Honor, if it would be helpful, I am happy to publish this portion of the deposition on the screens in Blackout.

**(Pause)**

**MS. FODE:** Page and line again, please.

**MS. VILLAGOMEZ:** Page 109, lines 5 through 15.

**THE COURT:** Any objection?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay. You can go ahead and read it.

**MS. VILLAGOMEZ:** Your Honor, and I don't need to read the objections, correct?

**THE COURT:** That's correct.

**MS. VILLAGOMEZ:** Thank you.

**BY MS. VILLAGOMEZ:**

Q At your deposition, Ms. Stokes, at page 109, lines 5 through 15, you stated:

"We all know that we're, Ameris Bank, is a publicly traded company that has to follow GAAP."

And, Ms. Stokes, that was your sworn testimony at the deposition, correct?

A It was, but I don't believe that was your question that you asked me.

**MS. VILLAGOMEZ:** And, Your Honor, I'd like to further impeach Ms. Stokes with page 111, lines 9 through 12 of her deposition.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Go ahead.

**MS. VILLAGOMEZ:** Thank you.

"ANSWER: Again, the LTIP calculation is based on earnings before tax, and they are part of the bank. And that's part of a publicly traded company that has to follow GAAP."

**BY MS. VILLAGOMEZ:**

Q Ms. Stokes, that was your sworn testimony at your deposition, correct?

A Yes.

Q Thank you. In your view, using a non-GAAP measure to calculate LTIP earnings would have been inconsistent with Ameris's obligation as a public company, correct?

A I apologize. I think you need to read. I'm not following the question.

Q Thank you. I'll state it more slowly. In your view, using a non-GAAP measure to calculate LTIP earnings would have been inconsistent with Ameris' obligations as a public company, correct?

A I think we're confusing our public disclosures and our public financial statements versus the LTIP calculation. So I'm not understanding your question.

Q Ms. Stokes, this is directly coming from the deposition

testimony that I just read to you.

**THE COURT:** Do you have a question for her?

**MS. VILLAGOMEZ:** No, Your Honor. I'll move on.

**THE COURT:** Thank you.

**BY MS. VILLAGOMEZ:**

Q And is it your position, Ms. Stokes, that using any other measure or a non-GAAP measure would have been inconsistent with Ameris's obligations as a public company?

A Say that one more time.

Q Your position is that using any other measure or a non-GAAP measure for publicly facing financial statements would have been inconsistent with Ameris's obligations as a public company?

**MS. FODE:** Objection. Overbroad. Vague and ambiguous.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I don't understand the question necessarily. I don't know if you're referring to within the LTIP or generally.

**BY MS. VILLAGOMEZ:**

Q Generally.

A Generally. We do have non-GAAP measures that we disclose in our financial statements.

Q Thank you. Ms. Stokes, as CFO of Ameris Bank, you regularly participated in Ameris' quarterly earnings calls,

correct?
A Correct.
Q And what is an earnings call?
A So because we're publicly traded, we issue press releases every quarter on our earnings. And then we typically, usually it's the next day, we have an earnings call. It's an open line. It's a public line where anybody can call. And we have prepared remarks, and then we'll take calls from our analysts, and it's all public.
Q Thank you. And you participated in Ameris's July 26th, 2024 earnings call?
A I'm not sure if that's the exact date, but that would probably be around the time of our second quarter of '24.
Q And would reviewing a document help refresh your recollection that you attended that earnings call?
A Sure. Just the date. I'm sure I attended it. I just am not sure of the exact date.
Q Okay. Thank you.

**MS. VILLAGOMEZ:** And, Your Honor, may I publish Exhibit 165 to the witness on Blackout to refresh her recollection regarding?

**THE COURT:** You may.

**MS. VILLAGOMEZ:** Thank you.

**BY MS. VILLAGOMEZ:**

Q Do you see this document, Ms. Stokes?

A Yes.
Q And on page 1 of the PDF under the heading Company Participants, your name appears as a participant on the call, yes?
A Yes. And, again, I was just confirming the date.
Q Thank you. During that earnings call, you discussed certain non-GAAP financial measures, correct?
A Yes.
Q And, Ms. Perez, if you could go to page 2 of the PDF, beginning on the third paragraph under Nicole Stokes. You stated on that earnings call that, quote, during this call we will discuss certain non-GAAP financial measures in reference to the company's performance, correct?
A Correct. That's not what we're highlighting, though. We're highlighting the wrong section.
Q And do you see that highlighted portion, Ms. Stokes?
A I do.
Q And did I read that correctly?
A Could you read it one more time?
A Yes. Also, during the call, we will discuss certain non-GAAP financial measures in reference to the company's performance.
**MS. FODE:** Objection. This document is late filed.
**MS. VILLAGOMEZ:** Your Honor, this is being used to refresh --

**THE COURT:** Okay. I don't want you to argue with each other. The objection is overruled. The document hasn't been published, and it's not so far being offered into evidence. Right now, we're just getting the witness's testimony.

**MS. VILLAGOMEZ:** Thank you, Your Honor.

**BY MS. VILLAGOMEZ:**

Q And Palmer Proctor was Ameris's CEO in July of 2024, correct?

A Yes.

Q And Mr. Proctor participated in this July 26th, 2024 earnings call?

A Yes.

Q Under the heading Palmer Proctor, Mr. Proctor stated, quote, you mentioned equipment finance. They had a really good quarter in terms of their charge-offs. In terms of overall charge-offs at 18 basis points for the quarter, that you can see on the slide provided, that's a low watermark on the slide. And we would probably expect that net charge-off number to normalize a bit going forward. Did I read that correctly?

**MS. FODE:** Objection. Hearsay. Lacks foundation.

**MS. VILLAGOMEZ:** Your Honor, I'm just reading --

**THE COURT:** The objection is overruled.

**MS. VILLAGOMEZ:** Thank you.

//

**BY MS. VILLAGOMEZ:**

Q Ms. Perez, if you could please turn to page 13. And here, Mr. Proctor also stated, quote, the charge-off for Balboa the second quarter was a little over $7 million. We probably -- we made a lot of changes to the credit box for Balboa throughout 2023. And overall, we do expect the charge-offs to decline compared to '23. Did I read that correctly?

A Yes.

Q So as of July 2024, Ameris was publicly reporting during these earnings calls that it had made changes to Balboa's credit box throughout 2023?

A Yes.

Q Ms. Perez, please turn to page 17. And here, Mr. Proctor also stated, quote, yes. No, Balboa is a great and equipment finance in general. It's just a great opportunity for us. It's obviously you do incur higher losses, but you've got, as we all know, much higher yields too. So net-net is an extremely profitable business to be in. Did I read that correctly?

**MS. FODE:** Objection. The document is precluded and prejudicial.

**THE COURT:** The objection is overruled.

**BY MS. VILLAGOMEZ:**

Q And, Ms. Stokes, as of July 2024, Ameris's CEO, Mr. Palmer Proctor, described Balboa Capital as a quote, great opportunity

and an extremely profitable business, correct?
A Yes.
Q Ms. Perez, you can take this down. Ms. Stokes, so you also participated in Ameris's April 28, 2023 earnings call, correct?
A Again, I'm not sure of the exact date, but that would be about the approximate timing of the first quarter.
Q Thank you. And if I could refresh your recollection with the earnings call transcript to confirm that date?
A Sure.

**MS. VILLAGOMEZ:** Your Honor, may I publish a transcript to the witness on Blackout to refresh her recollection?

**THE COURT:** Is this an exhibit?

**MS. VILLAGOMEZ:** This is not, Your Honor. This --

**THE COURT:** Okay. I just needed to know for my notes.

**MS. VILLAGOMEZ:** Thank you.

**THE COURT:** Yes, you may.

**BY MS. VILLAGOMEZ:**

Q Ms. Stokes, do you see this document on your screen?
A Yes.
Q And on the first page, your name appears as a participant on the call, correct?
A Yes, it's not on the screen, but yes.

Q And Ms. Perez, if you could go to page 2. During that earnings call, you stated, quote, during this call, we will discuss certain non-GAAP financial measures in reference to the company's performance. Did I read that correctly?

**MS. FODE:** Objection, hearsay, lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I did say that, but that's not the part you're highlighting.

**BY MS. VILLAGOMEZ:**

Q Thank you. No worries. John Edwards also participated in this earnings call, correct?

A Can we go back to the date? You said this was April of?

Q 28, 2023.

A Can we confirm the attendees? I think the attendees would say.

Q Ms. Perez, if you could please turn to --

A Oh, yes. It says right here, John Edwards. So I'm good to say yes. I'm a little bit confused on the date.

Q Okay. And, Ms. Perez, if we could go to Mr. Edwards' portion of the transcript. Thank you. And Mr. Edwards was Ameris's chief credit officer at the time?

A Yes, he was.

Q And during the earnings call, Mr. Edwards stated, quote, you know, their loss rates we looked at over the due diligence period we had. I think their high period was in the threes.

You know, the losses that we had this quarter are somewhat indicative of some of the collateral that we had, specifically some light-duty trucks that are just sort of getting a little bit hammered in the marketplace. You know, overall, we did forecast when we did due diligence an increase in our loss rate for that purpose. We expected some increase in charge-offs just because that was how we modeled it. Just remember that, you know, the division continues to perform at the higher end of the contribution and pre-tax, pre-provision, kind of that net spread is still pretty positive for the bank overall. Did I read that correctly?

A Yes.

Q Thank you. And I'd like to go back now to the previous exhibit that I had introduced to refresh the witness's recollection at Exhibit 135. And I realize I didn't ask you if I had read Mr. Proctor's statement correctly on page 17. If you could please turn to that, Ms. Perez. Ms. Stokes, I had read this into the record. It was Mr. Palmer Proctor stating, yes, no, Balboa is a great and equipment finance in general. It's just a great opportunity for us. It's obviously you do incur higher losses, but you've got, as we all know, much higher yields too. So net-net is an extremely profitable business to be in. Did I read that correctly?

**MS. FODE:** Objection, hearsay, and irrelevant and prejudicial for the previous reasons.

**THE COURT:** Is your question, did you read that correctly? Or is it your question, did he say that?

**MS. VILLAGOMEZ:** It is, did I read that correctly?

**THE COURT:** The objection is overruled.

**MS. VILLAGOMEZ:** Thank you. I'd like to move on.

**BY MS. VILLAGOMEZ:**

Q Ms. Stokes, Ameris Bank is a public company, correct?

A Correct.

Q And as a result, it needs to comply with the Sarbanes-Oxley Act or SOX?

A Yes, that's correct.

Q And under SOX, you need to certify that Ameris Bank's SEC filings are accurate, correct?

A Can you repeat the question?

Q Under SOX or the Sarbanes-Oxley Act, you need to certify that Ameris Bank's SEC filings are accurate, correct?

A Not to get technical, but under SOX, I'm certifying that our internal controls are adequate.

Q Thank you.

**THE COURT:** Counsel, I just wanted to clarify, the last exhibit that you referred to for refreshing recollection, I think you said 135, but I think it's Exhibit 165. Is that correct?

**MS. VILLAGOMEZ:** Yes. My apologies, Your Honor. It is 165.

**THE COURT:** Okay. Thank you. My apologies for interrupting you. I just wanted to make sure the record is clear.

**MS. VILLAGOMEZ:** No, I appreciate it, Your Honor.

**BY MS. VILLAGOMEZ:**

Q Ms. Stokes, as CFO, you have certified 10-Qs filed with the SEC that discuss financial measures that are not strictly in accordance with GAAP, correct?

**MS. FODE:** Overbroad. Vague and ambiguous.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I apologize. Can you repeat the question?

Q Yes. As CFO, you have certified 10-Qs filed with the SEC that discuss financial measures that are not strictly in accordance with GAAP, correct?

A No, I don't believe that's correct. So when we certify, we're certifying our financial statements. So the non-GAAP measures are used in earnings releases, press releases, and then any non-GAAP measure that's included in the MD&A section of the 10-Q or the 10-K would be explained, but the actual financials are prepared with GAAP.

Q Would it be helpful if I refreshed your recollection with the contents of the Ameris quarter one of 2023 10-Q filing?

A Sure.

**MS. FODE:** Objection. She answered the question.

**THE COURT:** She said it would be helpful. Go ahead. The objection is overruled.

**MS. VILLAGOMEZ:** Thank you. If I could have permission to publish Exhibit 154 to the witness and Blackout, please.

**THE COURT:** You may.

**MS. VILLAGOMEZ:** Thank you.

**BY MS. VILLAGOMEZ:**

Q At the top of this document on the screen, it states that this is Ameris's 10-Q for the quarterly period ended March 31, 2023, correct?

A Yes, that's correct.

Q And page 72 of this document shows your certification of this 10-Q, correct?

**MS. FODE:** Objection. Late filed document.

**THE COURT:** The objection is overruled.

Q If you could keep scrolling down a little bit, Ms. Perez. This shows your certification of the 10-Q, correct?

A Yes.

Q And at the bottom of that page, this is your signature, Nicole S. Stokes, correct?

A Yeah, it's my electronic signature, correct, on the filing.

Q Thank you.

**MS. VILLAGOMEZ:** Then I'd like to move this into

evidence and request to publish, Your Honor.

**THE COURT:** Any objection?

**MS. FODE:** Yes, objection. This is an exhibit that was late and has been stricken.

**THE COURT:** Okay. Counsel approach.

**(Begin sidebar at 11:11 a.m.)**

**THE COURT:** Okay. Go ahead, Ms. Fode.

**MS. FODE:** Yeah, this is one of the 36 documents that you expressly said were not coming in because they were late. So now she's questioning on it, which I understand your objection, but that she's also going to bring it into evidence now.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** I'm just refreshing her recollection and she said she authenticated the document. She laid the foundation. I'd just like to move it into evidence.

**THE COURT:** Well, there's a difference between moving something into evidence and refreshing recollection. You can use anything to refresh recollection.

**MS. VILLAGOMEZ:** But not move into evidence.

**THE COURT:** Well, I think that if I want, I need you to respond to Ms. Fode's argument that this document was not disclosed. It wasn't on the witness -- on the exhibit list, because if it wasn't, then it's not coming into evidence.

**MS. VILLAGOMEZ:** Understood, Your Honor. Our

understanding was that if it was -- although it was late stricken, if I had used it to refresh recollection, then I can move it into evidence, but I am okay with not moving it into evidence.

**THE COURT:** Okay. Great. Thank you.

**(End sidebar at 11:12 a.m.)**

**MS. VILLAGOMEZ:** One moment, my apologies.

**BY MS. VILLAGOMEZ:**

Q All right, Ms. Stokes, on several occasions you received emails in which Mr. Byrne expressed disagreement with Ameris's 2023 LTIP calculations, correct?

A Did you say who I received them from?

Q Yes, from Mr. Byrne, the plaintiff in this action.

A Oftentimes I was not on those emails.

Q But you did review those emails?

A They were often forwarded to me from my team, yes.

Q Thank you. And in those emails, Mr. Byrne provided reasons why he thought the LTIP calculations needed revisions?

A Yes.

Q And I'd like to direct your attention to Exhibit 397.

**MS. VILLAGOMEZ:** Your Honor, this is a joint exhibit. I would request to move this into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

//

**THE COURT:** Okay, Exhibit 397 is admitted and you may publish.

**(Exhibit Number 397 received in evidence)**

**BY MS. VILLAGOMEZ:**

Q On the first email at the bottom of the chain, dated July 12th, 2023, Mr. Majid sends the Quarter 2 2023 LTIP calculation to Mr. Byrne, correct?

A Correct.

Q Then on July 24, 2023, Mr. Byrne responds with five revisions to the LTIP calculation. If you could scroll down some, you see those five calculations numbered one through five?

A I do. If we could scroll back down so they're all on the same screen, it would be great. Fantastic. Thank you.

Q Thank you. And I'm going to push down a little bit further. In the second to last paragraph of his email, Mr. Byrne states, based on the revisions, the LTIP targets for Q1 and Q2 were met, so please include my bonus for Q1 and Q2 in the 7/30/23 -- 2023 payroll. Did I read that correctly?

A Yes.

Q And that same day, July 24, Mr. Majid forwards you the chain and states, hey, wanted to loop y'all into this request. Did I read that correctly?

A Yes.

Q Then in the top email, you respond that same day and

state, I need to look at this closer, but I don't agree with the overhead charge change he wants to make. Did I read that correctly?
A Yes, you did.
Q And you also state, doesn't matter who they report to, they are doing Balboa work and was part of his run rate pre-acquisition. Did I read that correct?
A Yes, you did.
Q And you sent this email on July 24th, 2023?
A Yes.
Q And that was the same day that you received Mr. Byrne's revisions, correct?
A Yes.
Q And you did not include Mr. Byrne on this email you sent, disagreeing with his revisions?
A Correct.
Q And seven days later, on July 31st, 2023, in this same email chain, you and Jim Lahaise visited Mr. Byrne in California to discuss the LTIP?
A Yes, that's correct.
Q And your relationship with Mr. Byrne begin to sour at the time of this visit, correct?
A The relationship had been strained prior to that.
Q And during this visit, you told Mr. Byrne that you still wanted him to lead the Balboa Division?

A I did. It was after the meeting, it was just with Mr. Byrne and myself.
Q But you did say that to Mr. Byrne?
A Only after he asked me to fire him.
Q And you also told Mr. Byrne that you still wanted him to be a part of the Ameris team, correct?
A I did.
Q And Mr. Byrne told you during that visit that he still wanted to be a part of the Ameris team also, correct?
A Correct.
Q And you testified that you believed you had made progress with Mr. Byrne during that visit in summer of 2023?
A Yes, that's correct.
Q Now, Ms. Stokes, I'm going to show you Exhibit 75.

**MS. VILLAGOMEZ:** Your Honor, this is a joint exhibit. I would request to move this into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** None.

**THE COURT:** Okay. Exhibit 75 is admitted and you may publish.

**(Exhibit Number 75 received in evidence)**

**BY MS. VILLAGOMEZ:**

Q The top e-mail on this chain is an e-mail from David Sparacio to you on January 7, 2024, correct?
A Yes.

Q And from the subject line Mr. Sparacio is forwarding you an e-mail with the subject line stating, accounting for 900 accounts. Do you see that?
A Yes.
Q And in this e-mail Mr. Sparacio states to you, FYI, more chatter from Pat on the LTIP. Did I read that correctly?
A Yes, you did.
Q And, Ms. Stokes, now I'd like to show you what has been marked as Exhibit 80 on black out. This is not a joint exhibit.
**THE COURT:** Go ahead.
Q Ms. Stokes, do you recognize this Exhibit 80?
**MS. VILLAGOMEZ:** You can stay at the top.
**THE WITNESS:** Yes. Could we actually scroll to the bottom just so I'm familiar with the entire document?
**BY MS. VILLAGOMEZ:**
Q Yes.
A Yes, thank you.
**MS. VILLAGOMEZ:** Scroll to the top, yes, please. thank you.
Q This is an e-mail dated January 16, 2024 and the sender is Nicole Stokes and the recipient David Sparacio, correct?
A Yes, that's correct.
Q And this appears to be a true and correct copy of the e-mail that you sent on this date.

A It appears so, yes.

**MS. VILLAGOMEZ:** Your Honor, I'd request to move Exhibit 80 into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 80 is admitted and you may publish.

**(Exhibit Number 80 received in evidence)**

**MS. VILLAGOMEZ:** Thank you.

Q The bottom e-mail on this chain is a January 8, 2024 e-mail from Mr. Majid to Mr. Byrne, Phil Silva, and David Sparacio, correct?

A Yes.

Q And Mr. Majid states, here's what we have so far for LTIP based on the financials, correct?

A Yes, that's correct.

Q And on the same day Mr. Byrne states --

**MS. VILLAGOMEZ:** Moving up.

Q -- thanks, Sufhan, we will submit our usual adjustments after the financials are completed. Did I read that correctly?

A Those are the same adjustments that we had discussed prior to, yes, you did read it correctly.

Q And then on January 10 Mr. Majid sends Mr. Byrne an e-mail stating, attached is the final LTIP based on the financials as of 12/31/23, now that the books are officially closed. Do you

see that?
A Yes.
Q And in the next e-mail on the same date, David Sparacio responds and states in the second sentence --
**MS. VILLAGOMEZ:** A little bit up.
Q On January 15 David Sparacio responds and states in the second sentence, the adjustments need to be directed to Jim Lahaise, so we will take no action on these. Did I read that correctly?
A That is the second part of that, yes.
Q Thank you. And Mr. Sparacio then forwards you the e-mail and states, FYI, correct?
A Correct.
Q And you respond at the very top of this e-mail, only to Mr. Sparacio stating, thank you. I also find it interesting that he does not include me on these e-mails. Did I read that correctly?
A You did.
Q Thank you. Ms. Stokes, now I'm going to show you Exhibit 74.
**MS. VILLAGOMEZ:** Your Honor, this is a joint exhibit and I would request to move this into evidence and publish.
**THE COURT:** Any objection?
**MS. FODE:** No objection.
//

**THE COURT:** Exhibit 74 is admitted and you may publish.

**(Exhibit Number 74 received in evidence)**

**BY MS. VILLAGOMEZ:**

Q Okay. Ms. Stokes, you were copied on this January 4, 2024 -- and halfway down e-mail from David Sparacio to Jim Lahaise, correct?

A Yes, can we scroll to the bottom where I can make sure --

Q Yes.

A -- I'm not on it on any prior, because there was a lot of e-mail traffic so I wanted to make sure I know what I'm looking at.

**MS. VILLAGOMEZ:** Uh-huh. You can scroll down slowly.

**THE WITNESS:** Okay. And if we can scroll forward. Oh, there's further down, thank you. Okay.

Q And that's a January 4, 2024 e-mail. Mr. Sparacio wrote, quote, Nicole mentioned that you and her discussed any possible manual adjustments to Pat's LTIP calculation. Do you see that?

A Yes.

Q You further wrote that the message was that we were not going to make any; is that right?

A That was not my e-mail. That was -- you said I said that, but that's an e-mail from David Sparacio, he said that.

Q Yes, he wrote that.

A Yes.

Q He also wrote that Mr. Byrne was quote, pounding on the interim rent issue, correct?
A Yes.
Q And he wrote that Mr. Byrne believed Ameris' position was quote, incorrect because the LTIP agreement was being inconsistently with past practices.
A Can you repeat that, I think you're taking different words and you said quote.
Q Okay. I will read it. Quote, Pat continues to pound on the interim rent issue and he's incorrect as the agreement clearly states it is based on GAAP financials, which is not consistent with his past practices as he has historically accounting for interim rent on a cash basis. Did I read that correctly?
A You did read the e-mail correctly, but the statement I disagree with.
**MS. VILLAGOMEZ:** Thank you. Your Honor, I'll move to strike everything after you did read that correctly.
**THE COURT:** Motion is granted.
**MS. VILLAGOMEZ:** Thank you.
**BY MS. VILLAGOMEZ:**
Q Now, I'm going to show you, Ms. Stokes, Exhibit 449 which has already been admitted into evidence.
**MS. VILLAGOMEZ:** And I would request permission to publish.

**THE COURT:** You may.

**MS. VILLAGOMEZ:** Thank you. And, Ms. Perez, if you could just scroll. Thank you.

Q This is an e-mail dated January 29, 2024 and it is from you to Jim Lahaise, correct?

A Yes, that's correct.

Q In that e-mail you state, for our conversation around LTIP, thanks. Did I read that correctly?

A Yes.

Q You also attached a document to this e-mail titled 2023 Pat LTIP, correct?

**MS. VILLAGOMEZ:** Oh, if you could scroll up, Ms. Perez, and just show her the attachment line of the e-mail.

Q And you see that there was an attachment here, Mr. Stokes?

A Yes.

Q Thank you. The next page is that attachment and it appears to include six revisions from Mr. Byrne regarding the fourth quarter 2023 LTIP.

A Yes, that's correct.

Q And I'll focus your attention to the bottom of the page under Mr. Byrne's six revisions is a section titled, Nicole's comments, correct?

A Correct.

Q And the first line number 1 states, if we agree to number 1 and number 6 above, the hurdle is still not met and no

payment is due on LTIP for 2023. Did I read that correctly?
A You did.
Q And line number 2 states, we never charged the $1,886,926 for MHT charge offs against the LTIP calculation. I believe the agreement shows that we should have charged for those. Did I read that correctly?
A Yes, you did.
Q And finally I believe -- at section 3, I believe the Pioneer model was included, $82,000 a quarter of auditor fees that we were never charged -- excuse me, that we never charged for the LTIP calculation. We were charged separate fees from KPMG for additional audit fees related to controls that we never charged the LTIP. We can go back to get that exact -- to get the exact amount of those invoices and charge the calculation. Did I read that correctly?
A I think you missed a word, but generally yes.
Q Okay. Thank you. Ms. Stokes, I'm now going to show you Exhibit 434.

**MS. VILLAGOMEZ:** Your Honor, this is a joint exhibit I would request to move this into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 434 is admitted and you may publish.

**(Exhibit Number 434 received in evidence)**

**BY MS. VILLAGOMEZ:**

Q And, Ms. Stokes, I'd like to direct your attention to the bottom of the page Bates labeled Ameris 2170. And this is a January 10, 2024 e-mail at 10:18 a.m. from Sufhan Majid to Mr. Byrne dated January 8, 2024, correct?

A Say that again, I missed the date.

Q This is a January 10, 2024 e-mail from Sufhan Majid to Mr. Byrne --

A Yes.

Q -- and others, correct?

A Right.

Q And this is another version of the same e-mail we just discussed which states, attached is the final LTIP based on the financials as of 12/31, 2023 now that the books are officially closed. Above that -- did I read that correctly?

A Yes, I believe you did.

Q Thank you. I believe that e-mail on page 3 is Mr. Byrne's response dated January 15, 2024 at 7:42 in which he lists six revisions to the LTIP calculation.

**MS. VILLAGOMEZ:** If you could scroll through that, Ms. Perez.

Q And do you see that, Ms. Stokes?

A Yes.

Q In the second to last paragraph of his response Mr. Byrne states, I have revised the LTIP calculation which results in a

payout of $3,037,750. Did I read that correctly?
A Yes.
Q And the next e-mail dated January 17, 2024 is an e-mail from David Sparacio to you, correct?
A If we could forward up to that where I can see it, it would be helpful. I'm sorry, I feel like it's jumping around. I'm not exactly sure what your question is. For this part, where David Sparacio forwards it to me?
Q Yes.
A Yes, that's correct.
Q Thank you. You'll see at the top of the e-mail this is marked as high importance.
A Yes.
Q And I'll read the first sentence, Mr. Sparacio states, Nicole, please see comments below on how items 1, 5 and 6 impact the LTIP calculation individually. Then he states, the current calculation is below the net income hurdle in parenthesis, $48,500,000, close parenthesis by $1,899,662. So the only scenario you described that overcomes that hurdle is accepting items 1 plus 5 plus 6. Did I read that correctly?
A Yes, you did.
Q And right after that, Mr. Sparacio states, here are the calculations and then he provides calculations, correct?
A Correct.
Q And in the first calculation he states, items 1 plus 6 and

in case of net income of $872,770 equals LTIP net income hurdle still not met. Did I read that correctly?
A Yes, you did.
Q And really quick, I'd like to show you what has been admitted into evidence and marked as Exhibit 76.
**MS. VILLAGOMEZ:** Your Honor, request to publish.
**THE COURT:** I don't think 76 has been admitted. Ms. Jackson?
**THE CLERK:** One moment, Your Honor.
**(Pause)**
**MS. VILLAGOMEZ:** Thank you, Your Honor, my apologies.
**THE CLERK:** No, not admitted.
**MS. VILLAGOMEZ:** Thank you. Your Honor, if I could please pull up Exhibit 76 on black out.
**THE COURT:** Go ahead.
**MS. VILLAGOMEZ:** And publish to the witness, thank you.
**THE COURT:** Yes.
**BY MS. VILLAGOMEZ:**
Q Ms. Stokes --
**MS. VILLAGOMEZ:** If you could scroll through this e-mail slowly. And if you could go back to the top please.
Q And, Ms. Stokes, this is an e-mail from David Sparacio to you and Sufhan Majid dated January 30th, 2024, correct?
A Yes, that's correct.

Q And this is your e-mail Nicole.Stokes@AmerisBank.com.
A Yes, it is.
Q And you recall receiving this e-mail?
A Yes, I don't know why I wouldn't have.

**MS. VILLAGOMEZ:** And, Your Honor, request to move this into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 76 is admitted and you may publish.

**(Exhibit Number 76 received in evidence)**

**MS. VILLAGOMEZ:** Thank you.

**BY MS. VILLAGOMEZ:**

Q The second e-mail from the top is an e-mail that you sent on January 30th, 2024 at 9:32 a.m.
A Yes, that's correct.
Q Thank you. You sent that e-mail to Mr. Majid and copied Mr. Lahaise and Mr. Sparacio?
A Yes.
Q And this appears to be a true and correct copy of that e-mail chain?
A Yes, I believe so.
Q And, Ms. Stokes, looking at that e-mail you wrote -- you stated, can you send me and Jim the file that supports this calculation, thanks. Did I read that correctly?

A Yes, you read it correctly.
Q And immediately below that, there's a highlighted portion which we just saw in the prior exhibit that states, items 1 plus 6 an increase of net income of $872,770 equals net income hurdle still not met. Did I read that correctly?
A Yes, you read it correctly.
Q And you were asking Mr. Majid to provide the file that supported this specific calculation, correct?
A Yes.
Q Thank you. I'd like to go back to Exhibit 434 which we were just on a moment ago.
And all right, let's look at the same e-mail that we were at on January 17, 2024 at 10:55 a.m. In Mr. Sparacio's second calculation he states, items 1 plus 5 plus 6 an increase of net income of $2,846,944 and on LTIP calculation of $331,549. Did I read that correctly?
A Yes, you did.
Q Next it states the only other way the hurdle is met is in either of those scenarios. Next item 5, an increase in net income of $1,974,174 and an LTIP calculation of $26,079. Did I read that correct?
A Yes, you did.
Q And the next one states, items 1 plus 5 an increase of net income by $2,521,438 and an LTIP calculation of $217,622. Did I read that correctly?

A Yes, you did.
Q Finally items 5 plus 6, an increase of net income of $2,299,681 and an LTIP calculation of $140,007. Did I read that correctly?
A Yes, you did.
Q Thank you. And the next e-mail on this thread --
**MS. VILLAGOMEZ:** If you could scroll up, Ms. Perez.
Q This is an e-mail dated January 25, 2024 from you to David Sparacio and copying Sufhan Majid, correct?
A Yes.
Q And you state, can you run these with the two following adjustments. Do you see that?
A Yes.
Q And the next paragraph you state, add the MHT charge offs, in parenthesis, $1,886,926 I think, close parenthesis that we didn't charge him for. I don't believe the agreement excluded those and he was never charged those, not sure why we excluded them from the calculation. Did I read that correctly?
A Yes, you did.
Q Thank you. The next sentence states, in the pro forma we included $82,000, a quarter of audit and tax professional fees, I don't believe we have charged him that and I think we can. Did I read that correctly?
A Yes, you did.
Q Thank you.

**MS. VILLAGOMEZ:** And, Ms. Perez, moving up in this e-mail thread, let's get this one and go up to the next one.

Q In this one, this is an e-mail dated January 25, 2024 from Sufhan Majid to David Sparacio and yourself, correct?

A Yes, that's right.

Q And it states, hey, Nicole, see attached. V-4 includes 328K of audit and tax professional fees and removes the MHT adjustment of 1.88 MM. I also attach the e-mail referencing back to the July 2023 adjustment for MHT if needed. Did I read that correctly?

A Yes, you did.

Q And starting on the next full paragraph or the next sections, if we add back, and then he states in bold, and underlined, items 1 plus 5 plus 6 less the audit and professional fees and no adjustments to charge offs, net income goes up by $2,529,992 and charge offs goes up 1.88 million to $43,964,694 and the LTIP is not met by approximately 611K. Did I read that correctly?

A Yes.

**MS. VILLAGOMEZ:** And then if you scroll up, Ms. Perez.

Q You respond to Mr. Majid in an e-mail dated January 25, 2024 and you say, thank you, with an exclamation point; is that right?

A Yes.

**MS. VILLAGOMEZ:** Thank you. No further questions.

**THE COURT:** Okay. Cross-examination.

**MS. FODE:** And this will be defendant's direct.

**THE COURT:** Okay. Thank you very much.

You may proceed when you're ready.

**(Pause)**

**DIRECT EXAMINATION**

**BY MS. FODE:**

Q Good afternoon, Ms. Stokes. Thank you so much for being here.

A Thank you.

Q I'm going to start at the beginning. Where are you currently employed?

A Ameris Bank.

Q And what is your position?

A I'm the chief financial officer.

Q And how long have you been in that position?

A So I was -- as mentioned earlier, chief financial officer of the bank since 2016 and then we have Ameris Bancorp and I'm the CFO of that since 2018.

Q Okay. And were you ever -- did you hold any other positions?

A At Ameris Bancorp, yes, I was the controller prior to that, 2010.

Q Okay. And what were your job duties and responsibilities

as the controller?
A So as the controller, I was responsible for the financial statements, basically the general ledger, all of the assets to make sure that everything was reconciled and to make sure that the income statement was correct.
Q And let's back up a little bit on your education. Could you tell me a little bit about your background of your education?
A Sure. I went to Stanford University and then I transferred to Auburn University where I got my bachelors of science in finance and got a job at a CPA firm and went back at night to be -- to take additional accounting classes to be eligible for the CPA exam.
Q And are you a CPA?
A I am a certified public accountant.
Q And what does that mean to be a CPA?
A So there's extra education requirements to be a CPA. And then as well, I had to pass the CPA exam and I had to have a certain number of years working under a CPA.
Q And how long has that been that you've been a CPA?
A Oh, goodness, I was pregnant with my second son, so that would have been 2001, so just 25 years.
Q And tell me, are you required to take any continuing education as a CPA.
A I am. I'm licensed in the State of Georgia, so the

requirements in Georgia is that I have to take 80 hours of CPE over a two year period with no less than 20 hours in any one year.

Q And I just have to know, have you always wanted to be an accountant?

A No, I don't know that I always wanted to be an accountant but I think my mom did, she tells me that when I -- many years ago like six and everybody else wanted a toy, I wanted a ledger from the Kmart, so I think my mom knew before I did.

Q What is the difference between an accountant and a CPA?

A So an accountant typically is -- and sometimes people maybe have an accounting, like an accounting clerk and they consider themselves an accountant or an accountant with an accounting degree, but a CPA has to be certified and then also a CPA can sign extra audit reports.

So when you hear about bigger firms like KPMG, Ernst & Young, RSM, CPA firms, you have to be a CPA to sign off on those audited financial statements.

Q And then tell me a little bit about your educational experience prior to Ameris.

A My educational or my professional?

Q Professional, thank you.

A So I've worked in public accounting for several years at a CPA firm and then I moved from there into a larger bank and worked in internal audit for several years, and then left kind

of internal audit, realized I missed the debits and credits and I got back into the accounting side. And then worked my way up from assistant controller to a controller and then moved banks, controller to CFO.
Q When did you start at Ameris?
A December of 2010.
Q And currently you are CFO. Who do you report to?
A To our CEO, Palmer Proctor.
Q So let's talk a little bit about your job duties and responsibilities as CFO.
A Okay. So I'm responsible for not only -- the controller reports to me, so I'm responsible for the financial statements to make sure that everything on the balance sheet is properly recorded, as well as the income statement to make sure that all income and expenses are reported correctly.
I also have our treasurer that reports to me that is responsible for our balance sheet management, kind of the pricing of loans, pricing of deposits and how we are margined. I also have our inner appraise data team, and I also have a director of financial reporting.
Because we are publicly traded and because we're a bank, we have financial reports that we have to provide to the banking regulator so we have to report up to the Federal Reserve, we have to report up to the FDIC. We have to report to the Georgia Department of Banking and Finance and then we

also report to the Securities and Exchange Commission because we're publicly traded. So I have a financial reporting team that's over that as well.

Q And you mentioned financial statements, what's a financial statement?

A So in general terms a financial statement is your balance sheet, which tells the condition of the company. It says all of your assets, all of your liabilities, you know, how much cash do you have, how many buildings do you have, and then also what are your liabilities, who do you owe money to. And then it also includes your income statements.

And your income statement is going to show all of your revenue and all of your expenses, and then there's a multitude of other statements that go behind it including notes that explain everything. So normally your financial statements are maybe 25 to 75 pages, depending on the complexity of the company.

Q And then how do these financial statements and financial reporting combine together?

A So the financial statements that we would prepare, so we prepare financial statements for our Board, we prepare financial statements for our external auditors and then we are audited by an outside firm, by KPMG and then on a quarterly basis we release earnings releases that would tell -- we file it with the SEC and it tells our investors how we're doing on a

quarterly basis. So we do earnings releases, investor presentations that go with the earnings release and then we also filed a 10-Q and a 10-K which is a much longer document after the earnings release that gets released and published publicly to the SEC. So every quarter our financials are updated publicly.

Q And are there other responsibilities that you have as CFO relating to the financial statements of Ameris?

A I'm also responsible ultimately for the accuracy of the financial statements, and part of that under the Sarbanes-Oxley Act is that I'm responsible for disclosure requirements. I'm also responsible for internal controls, to make sure that we have properly identified all of the risks and then also identify controls that will protect us from those risks. That's kind of what internal controls mean.

Q And does that apply to Balboa as well?

A So post-acquisition once Balboa became a part of Ameris, they did have to comply with Sarbanes-Oxley and internal controls, correct.

Q And so you spoke a little bit about these internal controls, is there anything else that you think would be helpful for us to know about internal controls?

A Absolutely. So a couple of things. One, even though Balboa was not publicly traded, they did do securitizations and because they did securitizations, they had to have audited

financial statements.

So prior to acquisition, they had audited financial statements and then those were used to create the Pioneer model that then rolled into Ameris. They did have internal controls, although because they were not publicly traded their auditor did not have to opine on the internal controls, but their auditor would have used those internal controls and reviewed them.

So one of the -- some of the conversations that we had in the due diligence with Mr. Byrne would have included the differences of internal controls being just being a private company with a securitization versus a public company and Sarbanes-Oxley that there would be some changes with internal controls.

**MS. VILLAGOMEZ:** Your Honor, I'm sorry, I'd request to move to strike, objection, that this testimony lacks foundation and it calls for expert testimony.

**MS. FODE:** Improper motion to strike.

**THE COURT:** The objection is overruled and the motion is denied.

**BY MS. FODE:**

Q Is this an important thing for companies to have internal controls because we're talking a lot about it?

A Absolutely. And for me personally as the CFO of the company when I sign that 10-Q I'm personally liable. There's

two people that are personally liable at a publicly traded company, it's a very big responsibility. It's the CFO and the CEO and if those internal controls are violated and if we have a misstatement or financials I can lose my license, I can be banned from working at a bank, I can be fined personally money and I can go to jail. It's very serious. This all came -- Sarbanes-Oxley came from kind of the Enron downfall.

Q For purposes of financial reporting responsibilities, is there a difference between public and private companies?

**MS. VILLAGOMEZ:** Objection, calls for expert testimony.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q As CFO, do you have an understanding of if Balboa as a private company had different financial reporting responsibilities of Ameris Bank, a publicly traded company?

**MS. VILLAGOMEZ:** Objection, calls for expert testimony.

**THE COURT:** Sustained. You're outside of the scope of her personal knowledge now.

**BY MS. FODE:**

Q Okay. And generally for publicly traded companies, when you were CFO and you were looking at Balboa's financials, did you note that there would be differences of how they would be impacted?

A I think this may have been part of the issue at the very beginning with the impeachment and maybe it got a little confused.

So typically GAAP is the same for public and private companies, except sometimes which is the instance here, the FASB, the Financial Accounting Standards Board that's who issues financial -- the rules about how we do -- what is GAAP. That's issued by the Financial Accounting Standards Board.

And when they issue guidance sometimes, they give a date that a public company has to comply and they give a date that a non-public company has to comply and there were two accounting rules that were in that during the Balboa acquisition where Ameris had already, because we were a public company we were already following those rules, and Balboa as a private company had another year, a month for one of them, and then a year for the other one to implement.

So it is GAAP and GAAP is the same, but sometimes it seems like it's different because there's a timing issue of new accounting guidance.

Q And are there specific laws or regulations that relate to publicly traded companies?

**MS. VILLAGOMEZ:** Objection, calls for expert testimony, calls for a legal opinion.

**THE COURT:** Sustained.

//

**BY MS. FODE:**

Q What was the practical implication of Sarbanes-Oxley or SOX at Ameris Bank?

**MS. VILLAGOMEZ:** Objection, calls for a narrative, calls for expert testimony, calls for a legal opinion.

**THE COURT:** That -- the objection to the question as phrased is sustained.

Q As CFO, was it your job to ensure that Sarbanes-Oxley was complied with at Ameris Bank?

A Absolutely and that included Balboa Capital after it was a part of Ameris.

Q And what steps did you take as CFO of Ameris Bank to ensure that SOX or Sarbanes-Oxley would be complied with?

A Yes. So one of the things that we have is we have internal audit and we also have risk managers within all of our lines of business and also like within credit, within accounting, so I have a risk manager.

Balboa Capital did not have a risk manager and so we talked about that with Mr. Byrne about the fact that we were going to need a risk manager within Balboa and we talked about what internal controls were, we talked about how certain things would be changing, some processes, some procedures, all of that would be -- some of that would be changing and all of that was discussed with Mr. Byrne and Jacquie Emert and Heather Parker.

Q Did SOX apply to the Balboa Division post-acquisition?

**MS. VILLAGOMEZ:** Objection, calls for expert testimony.

**THE WITNESS:** I apologize, Your Honor.

**THE COURT:** That's okay.

**BY MS. FODE:**

Q And as your job as CFO of Ameris Bank, was it -- were you tasked with ensuring that Sarbanes-Oxley was complied with by Balboa, a division of Ameris?

**MS. VILLAGOMEZ:** Objection, leading.

**THE COURT:** Sustained.

Q Do you have any understanding if your team worked to ensure SOX was complied with at Balboa, the division?

A We did. We implemented internal controls. We looked through -- basically when you're looking at it, you look at all the risks, what could happen, what could go wrong and then what controls do you put in to mitigate those risks. That's called a mitigating risk and then you also have a detective risk which is after the fact, it's a look back, did something happen.

So there's different kinds of internal controls but we implemented all different types, both of those types were implemented at Balboa.

Q At some point, were you made aware that Ameris is -- was interested in potentially purchasing Balboa?

A Yes.

Q And were you involved at all in the acquisition of Balboa

Capital?
A So my team would have looked at the financial aspect of Balboa prior to acquisition.
Q And I think Mr. Byrne's counsel asked you if your team was involved in the due diligence of the purchase, in connection with the purchase.
**MS. VILLAGOMEZ:** Objection, leading, misstates prior testimony.
**THE COURT:** Sustained. Is there a question? You haven't really asked a question, so let's ask a question.
Q Were you involved or your team in the due diligence in connection with the purchase of Balboa Capital?
**MS. VILLAGOMEZ:** Objection, compound.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes.
**BY MS. FODE:**
Q And what is due diligence?
A The due diligence is where you go in and look at a company. So for us because Balboa had audited financial statements we were able to review the audited financial statements and then we rely on those audited financial statements but we also, you know, different divisions would have different, you know, credit would look at loan underwriting and then the quality of the loans.
HR would look to see what their policies are versus our

policies. IT would look at their security, you know, there's just every aspect, every part of the company would look at their piece. So we looked at the financial piece.

Q And was there anything concerning when you looked at Balboa's financials for the objection?

**MS. VILLAGOMEZ:** Objection, vague, argumentative.

**THE COURT:** Sustained.

Q Was there anything of note that you had concern as the CFO of Ameris which was acquiring Balboa when you did the due diligence?

**MS. VILLAGOMEZ:** Same objection, vague and ambiguous as to time.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Was there any -- let me back up.

Was there anything of note that your team brought to your attention regarding the due diligence of Balboa?

**MS. VILLAGOMEZ:** Objection, hearsay.

**THE COURT:** The objection is overruled, you can answer the question with a yes or a no.

**THE WITNESS:** Yes.

**BY MS. FODE:**

Q And what were those concerns?

**MS. VILLAGOMEZ:** Objection, hearsay.

**THE COURT:** The objection is overruled, you can

answer.

**THE WITNESS:** So as I spoke earlier about the implementation of different accounting guidance, there was an accounting guidance called ASC 842 that had to do with lease accounting. Ameris had already implemented that because we were publicly traded. We had to implement that in 2019, Balboa Capital had until 2022 to implement it. So at the time they had not implemented ASC 842, they had about one month before.

So they were preparing for implementation, but they had not actually implemented it. In the Pioneer model, that was not taken into the Pioneer model. So we brought it to their attention. This was favorable to the Pioneer model. This was favorable to Mr. Byrne. We brought it to his attention and he took the Pioneer model using his estimates of the implementation of 842 and he reduced his earnings before tax to his benefit, when we pointed that out in the due diligence process.

**BY MS. FODE:**

Q And would Balboa have to adopt the ASC 842 and CECL, I believe you call it, because it was being acquired by a public company.

**MS. VILLAGOMEZ:** Objection, speculative, calls for expert testimony, legal opinion.

**THE COURT:** Sustained.

Q As your job as CFO of Ameris and your involvement in the

due diligence of Balboa Capital's purchase, did you understand that Balboa would have to comply or adopt ASC 842 or CECL --

**MS. VILLAGOMEZ:** Objection.

Q -- because it was being acquired by a public company?

**MS. VILLAGOMEZ:** Apologies, same objections.

**THE COURT:** Sustained.

Q There's been some testimony talking about GAAP. I think we've heard that term a few times. What is GAAP in simple terms?

A So GAAP is -- it's G-A-A-P, two A's and it's Generally Accepted Accounting Principles, that's the accounting rules that the FASB issues. That's the set of rules that govern how we account for things.

Q And does Ameris utilize GAAP accounting?

A We do.

Q And are private companies required to use GAAP accounting?

**MS. VILLAGOMEZ:** Objection, calls for expert testimony, legal opinion.

**THE COURT:** Sustained.

**MS. VILLAGOMEZ:** Thank you.

**BY MS. FODE:**

Q Is it your job as CFO of Ameris Bank to understand if GAAP must be complied with?

**MS. VILLAGOMEZ:** Objection, leading.

**THE COURT:** Sustained.

Q Do you as CEO -- CFO of Ameris Bank have to understand GAAP and if it must be complied with at your company?

**MS. VILLAGOMEZ:** Objection, leading and compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Are there other accounting methods used besides GAAP?

A Yes. Some small companies might use like income tax and really small companies the way they may use tax basis, so that the way they do their tax return is also what they use. But like I said earlier, Balboa used GAAP. They issued GAAP financial statements because they did securitizations, because they sold loans and did securitizations, they had audited financial statements that said they were also in accordance with GAAP.

There were two differences between when we did the due diligence, there was a ASC 842 that we mentioned on the lease accounting and there was the CECL, C-E-C-L, having to do with the reserve, that was the second accounting guidance that we at Ameris had already implemented, because we were publicly traded and Balboa Capital would have had to implement in 2022 because they were privately held, but they did have to comply, their financials because they became a part of us, would have complied with us in our application of those rules.

**MS. VILLAGOMEZ:** Objection, Your Honor, move to strike as nonresponsive, lacks foundation and calls for expert

testimony.

**MS. FODE:** That's improper motion to strike.

**THE COURT:** The motion is granted, the objection is sustained and everything after yes is stricken from the record and the jury is instructed to disregard everything this witness said after the word yes.

**MS. FODE:** Your Honor, may I request a sidebar please?

**THE COURT:** We're almost at the noon hour. We can do that when we break for lunch.

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q How many bookkeepers or accountants does Ameris have?

A We have about 50.

Q And who do they report to?

A They report up to my team whether they report up to my controller or through my director of financial reporting.

Q How many employees does Ameris have?

A A little less than 3,000.

Q And how many employees did Balboa have at the time of acquisition?

A I think about 300 roughly, if I remember correctly.

Q Did Balboa have an obligation to comply with Ameris' internal controls once the acquisition was complete?

A Yes.

Q And to your knowledge was Mr. Byrne aware that he had a responsibility to comply with Ameris' internal controls post-acquisition?

**MS. VILLAGOMEZ:** Objection, speculative, excuse me, leading.

**THE COURT:** The objections are sustained. We're going to take our lunchbreak now. Ma'am, you can go ahead and step down.

**THE WITNESS:** Thank you, Your Honor. Do I just leave this?

**THE COURT:** Yes.

**THE WITNESS:** Thank you.

**THE COURT:** And we need you back here at 1 o'clock, okay?

To the jury, we are going to take our lunchbreak now. Please don't discuss this case amongst yourselves or with anyone else. Don't do any research about any aspect of the case that you've heard about so far and have a wonderful lunch. We'll see you at 1 o'clock.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 12:01 p.m.)**

**THE COURT:** Okay. Everyone can be seated. Okay. Ms. Fode.

**MS. FODE:** Thank you, Your Honor.

I want to address the improper motions to strike that

occurred yesterday but going forward I understand that I believe the objection today. Counsel not conducting the questioning has no standing to ask a question that's nonresponsive, for example, to the answer that's been stricken on the grounds of lack of responsiveness. And this is based on -- there's case law that I can cite for the record. U.S. Schneider (phonetic), 106 F.Supp. 897, 905, SD California 1952, for example.

**THE COURT:** Okay. Ms. Villagomez, would you like to be heard?

**MS. VILLAGOMEZ:** Yes, thank you, Your Honor. Our request to move to strike is based on the extensive expert testimony that Ms. Stokes has been providing. It's going far beyond her role as just CFO of Ameris Bank and she is providing legal opinions and invading the privy into expert testimony which is just entirely inappropriate and nonresponsive for those reasons.

**THE COURT:** That was the reason why I sustained the objections and granted the motions to strike today. I can't remember what -- I don't know which questions you're referring to from other witnesses on other days, but I can speak to this witness. She is not -- she has not been designated as an expert and the reason that I am granting these motions, these particular motions to strike, and there have been others that I have denied with respect to this particular witness is, she --

while she can testify concerning her role as CFO, she is not going to be permitted to testify as an expert in terms of any kind of accounting or legal issues, because she wasn't properly designated as an expert witness on those issues.

So you'll see, I hope you're noticing that I am letting her testify as to her applying her expertise and knowledge to her job functions as it relates to this case, but generally talking about what laws apply to different kinds of companies in a very general way is not appropriate and that's why I've granted the motions to strike that I have today.

**MS. FODE:** Okay. Well, we'll take it going forward, thank you, Your Honor, for hearing me.

**THE COURT:** Okay. Thank you very much.

All right. We'll see everybody at 1 o'clock.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 12:04 p.m.; reconvened at 1:02 p.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated (inaudible).

Ms. Stokes, just remember to watch your step going up.

**THE WITNESS:** Okay.

**THE CLERK:** Yeah.

**THE WITNESS:** Thank you so much.

**THE CLERK:** Thank you.

**(Pause from 1:03 p.m. to 1:05 p.m.)**

**THE CLERK:** All rise. This Court resumes in session.

**THE COURT:** Thank you, Ms. Jackson.

Everyone can be seated.

Okay. Ms. Stokes, you're still under oath, okay?

**THE WITNESS:** Yes, ma'am. Thank you.

**THE COURT:** Okay. Ms. Fode, you may proceed when you're ready.

**MS. FODE:** Thank you, Your Honor. I'd like to ask permission to publish Exhibit 301. It's the LTIP plan which has already been admitted.

**THE COURT:** I -- go ahead.

**(Pause)**

**DIRECT EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q Ms. Stokes, have -- were you involved at all in the LTIP?

A So I was not involved in the negotiations but I was involved in the review of the document.

Q Did you review the key assumptions of the LTIP before it was finalized?

A I did.

Q All right. And I'm -- have here on the screen Exhibit 301. It says, key assumptions; do you see that there?

A I do.

Q All right. And do you understand where the key

assumptions came from?

**MS. VILLAGOMEZ:** Objection, overbroad.

**THE COURT:** Overruled. You can answer.

A Yes. These are assumptions that were negotiated, most of which were at the request of Mr. Byrne.

Q If you see there, there's "A" through "F." I'd like to look at "A" there; do you see it?

A I do.

**MS. FODE:** Okay. And if you highlight it. All right.

Q It says initial direct costs will be calculated using GAAP methodology. Okay. What does that mean?

A So as I testified earlier, that Balboa Capital used GAAP. The Pioneer model used GAAP. And then going forward, we would use GAAP.

I don't know exactly why Mr. Byrne wanted the initial direct cost to be pointed out as GAAP but he did. And because it was not an issue, we agreed to it.

**MS. VILLAGOMEZ:** Objection, --

**MS. FODE:** And there's a --

**MS. VILLAGOMEZ:** -- move to strike as nonresponsive, the last portion --

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** -- of her response.

**THE COURT:** The objection is sustained. The motion

is denied.

But I -- what I need you to do is just focus on the question that's being asked and just answer that question. Ms. Fode will ask you follow-up questions. Or if there's additional information that she needs for her case, she'll ask you those questions, okay?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** Okay.

**MS. FODE:** It references footnote number two, if we could go down to that.

**BY MS. FODE:**

Q Can you read footnote number two, Ms. Stokes? Let me get a little bigger.

A It says, note to sellers, utilizing GAAP should be neutral to projected results since Balboa has been over-amortizing initial direct costs to catch up to past over-deferrals.

Q And what does that mean?

**MS. VILLAGOMEZ:** Objection, lacks foundation, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q When you read footnote number two, do you know why that was included?

**MS. VILLAGOMEZ:** Same objections.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And were you involved in finalizing these key assumptions and the footnote number two?

**MS. VILLAGOMEZ:** Objection, overbroad and same objections.

**THE COURT:** Overruled. You can answer.

A So this appears to be a note to the sellers from I don't know if this is the final -- why it was still in the final. But it was a note to the sellers I think between the attorneys about utilizing GAAP.

**MS. VILLAGOMEZ:** Objection, --

Q Okay. Let's go to number -- to letter --

**THE COURT:** I'm sorry, --

Q -- "B," please.

**THE COURT:** -- I didn't hear the objection.

**MS. FODE:** Oh.

**MS. VILLAGOMEZ:** Objection, move to strike, calls for speculation, nonresponsive.

**THE COURT:** The objection is overruled.

**MS. FODE:** Okay.

**BY MS. FODE:**

Q For letter "B" there it refers to the interests costs used will be one percent. What does that mean?

**MS. VILLAGOMEZ:** Objection, calls for speculation, lacks foundation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you know why letter "B" of the key assumptions was placed in the LTIP?

**MS. VILLAGOMEZ:** Same objections.

**THE COURT:** Overruled. You can answer.

A Yes. So as a part of doing business, Balboa Capital made loans. And you have to have funds to use to fund those loans, and so that's called your interest cost. And he wanted -- we agreed to keep it at one percent.

Q Was that as part of the LTIP negotiations with Mr. Byrne?

**MS. VILLAGOMEZ:** Objection, lacks foundation. Ms. Stokes has testified that she was not involved in the LTIP negotiations.

**THE COURT:** Sustained.

**MS. FODE:** Withdrawn.

**BY MS. FODE:**

Q For letter "B" there, do you see that? Will you read that into the record?

A The interest cost used will be one percent.

Q Oh, apologies, letter "C." Thank you.

A There will be no allocation of indirect company expenses to Balboa by the company, and there will be no transfer pricing between the company and Balboa.

Q And how did you interpret that?

**MS. VILLAGOMEZ:** Objection, calls for legal opinion, calls for expert testimony, irrelevant, lacks foundation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q As CFO of Ameris Bank, were you responsible to interpret the LTIP in responding to Mr. Byrne's concerns in this action?

**MS. VILLAGOMEZ:** Objection, overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I apologize. Could you repeat the question?

**MS. FODE:** Of course. And I'll restate it.

**BY MS. FODE:**

Q As CFO, were you responsible for interpreting and reviewing the LTIP in analyzing and responding to Mr. Byrne's complaints or concerns?

**MS. VILLAGOMEZ:** Objection, compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you have any involvement in looking at the LTIP in response to Mr. Byrne's concerns that were raised?

A Yes.

Q Okay. And in doing that, did you review the key assumptions?

A Yes.

Q And as far as your review of the key assumptions, prior to

them being finalized what steps did you take in that review?
A So in this, for this particular one, there was a conversation with Mr. Byrne about what an indirect versus direct.
And a indirect would be something like my salary or something that was a prior Ameris expense that was not there prior at Balboa, that was not included in the Pioneer model, so we would not continue to charge him.
But direct costs -- oh, I'm sorry. Then the second part of that was the transfer pricing. That is -- transfer pricing is something that we do between branches at the bank where you charge, and we agreed to not do that for the Balboa Division.
Q Okay. And what about letter "D;" can you read that into the record?
A For the performance period of this agreement, Balboa will not be charged for any other cost of capital other than the one percent cost of funds on the average outstanding balance on all earning assets.
Q And did you review this key assumption before it was finalized?
A I did.
Q And what did you understand it to mean?
A That means that we would not be charging for any other cost of capital other than the one percent interest cost on the loan -- the funding of the loans that's mentioned under "B."

**MS. FODE:** Okay. We're almost done. Two more.
Q What about "E?"
A Balboa will bear all --
**MS. VILLAGOMEZ:** Objection, --
**MS. FODE:** Yeah. Let me ask my question real quick.
**BY MS. FODE:**
Q I know it's long but do you mind reading it into the record, please?
A Balboa will bear all direct costs incurred in its operations. And the company will passthrough actual cost without markup any discounts relating to Balboa's operations that the company enjoys with suppliers and vendors.
Q All right. And did you review this subsection "E" prior -- and approve prior to it being finalized?
**MS. VILLAGOMEZ:** Objection, compound.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you review -- or let's just ask the approval to make it short. Did you approve the subsection "E" prior to it being finalized?
A I did.
Q Okay. And what did you understand it to mean?
A So that is that Balboa would and bear all those direct costs, so the things that were Balboa expenses before acquisition, the expenses that were in the Pioneer model, would

be continued to be charged with them, and that we would also -- the second part of that is actual cost without markup.

So, for example, Balboa had a Microsoft license. And then when they became a bigger part of Ameris, we would only charge Balboa for the Ameris cost. We would not increase that.

So if he had prior paid a higher rate than what we were paying, he would get the lower cost post-acquisition.

Q Okay. And subsection "F," will you please read that into the record?

A The allowance for loan loss calculation and expenses for Balboa will be the greater of little "I" actual net charge-offs or little "I" two 1.25 percent of net investment in direct financing leases.

Q And were you involved in proving little "F" of the key assumptions prior to finalization of the agreement?

A Yes.

Q And what did you understand it to mean?

A So when we talked earlier about two accounting guidances that had -- Ameris had already adopted but that Balboa had not been required to adopt yet, one of them was this allowance for loan loss was changing into this CECL, C-E-C-L model. And so Balboa is getting ready for that.

They had calculated it to be 1.25 percent was what was going to be the required reserve for loan losses. And they did not want -- they wanted to lock that in where we -- whatever

the Ameris number was, we would not use. We would use what the Balboa 1.25 estimate was. And we agreed to that.

**MS. FODE:** Okay. Thank you.

Moving on, I'd like to ask some foundational questions with regard to exhibit -- it's Plaintiff's Exhibit 34. It has not been admitted into evidence yet but it is on Plaintiff's exhibit list.

If you could show the witness. Particularly the attachment 34-B.

**THE COURT:** Just for the jury's information, exhibits are not Plaintiff's exhibits or Defendant's exhibits. They're just exhibits. So -- and you are -- as you were instructed at the very beginning of these deliberations, you're to consider the evidence regardless of who submitted it.

And I'm going to admonish counsel to stop referring to exhibits as belonging to one side or the other because really they belong to the jury.

**MS. FODE:** Understood. Thank you.

**THE COURT:** Go ahead.

**MS. FODE:** Yeah, blackout, please.

**THE COURT:** It's already blacked out.

**MS. FODE:** Thank you.

If you could show the witness, yeah.

//

//

**BY MS. FODE:**

Q Can you see that, Ms. Stokes?

A No. There it is.

**MS. FODE:** Okay. Perfect.

Q What is this document?

A This is the calculation of the 2022 LTIP.

Q And have you seen this document before?

A I have.

**MS. FODE:** Okay. I would like to ask that it be admitted into evidence.

**THE COURT:** Any objection?

**MS. VILLAGOMEZ:** No objection.

**THE COURT:** Okay. Exhibit 34 is admitted, and you may publish.

**(Exhibit Number 34 received in evidence)**

**MS. FODE:** Thank you, Your Honor.

**BY MS. FODE:**

Q What is this document, Ms. Stokes?

A This is the calculation of the 2022 LTIP accrual.

Q And do you know whether the Balboa Division met its target for the LTIP award in 2022?

A It did.

Q Okay. And how much was the LTIP award in 2022?

A Right at $9.1 million.

Q And do you know who determined how much each employee of

the Balboa Division would -- how much each employee would receive of the LTIP for 2022?

**MS. VILLAGOMEZ:** Objection, lacks foundation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you have the information -- do you know who decided who -- how the payment was made in the 2022 LTIP?

**MS. VILLAGOMEZ:** Same objection, overbroad.

**THE COURT:** Overruled. You can answer with a yes or a no.

A Yes.

Q And what is your understanding of that?

A Mr. Byrne came up with the allocation of the money among the participants. And then that went to Jim LaHaise for approval.

Q Did Mr. Byrne raise any complains or concerns to you about the 2022 LTIP?

A He did not prior to it being paid. It was paid in February. And he did bring complaints in July.

**MS. FODE:** Okay. And I'd like to now go to Exhibit 396. This will just be for the -- it is not admitted and I'd like the exhibit to go only to the witness.

**THE COURT:** Go ahead.

**(Pause)**

**MS. VILLAGOMEZ:** Ms. Fode -- or, Your Honor, may I

get clarification on which exhibit number it is?

**THE COURT:** It's Exhibit 396; is that correct?

**MS. FODE:** Three, nine, six, yeah.

**THE COURT:** Okay.

**(Pause)**

**BY MS. FODE:**

Q Have you seen this document before, Ms. Stokes?

A Yes.

Q And are you a recipient of an email on this chain?

**MS. FODE:** And, Ms. Ingall, if you would scroll to the bottom.

A Yes.

**MS. FODE:** Okay. I would ask that the Court allow it to be admitted.

**THE COURT:** Any objection?

**MS. VILLAGOMEZ:** This is a joint exhibit, no objection.

**THE COURT:** Okay. Exhibit 396 is admitted, and you may publish.

**(Exhibit Number 396 received in evidence)**

**MS. FODE:** Thank you.

All right. Let's go back to the top.

**BY MS. FODE:**

Q Ms. Stokes, what is the subject line of this email chain?

A Two thousand and twenty-two LTIP revisions.

**MS. FODE:** And if you scroll from the bottom up, we'll start with a couple emails. Little further up.

Q Do you know what this email is?

A Yes.

**MS. FODE:** Okay. And continue up.

Q Before we move up, what was the email from Mr. Byrne?

A This is the email in July of 2023 where he's -- has -- is providing two revisions that he would like to be made to the LTIP. And he's requesting a hundred percent of the overage to be paid to him.

Q Okay. And then if you look at the email chain above, what is happening in that email?

**MS. VILLAGOMEZ:** Objection, overbroad.

**THE COURT:** Overruled. You can answer.

**BY MS. FODE:**

A So Mr. Byrne responds to Sufhan, Jim LaHaise, and David Sparacio, and Laura Rodriguez. And then if we scroll up a little bit, I believe it is forwarded to me. There you go. Sufhan forwards it to me.

Q Okay. And then is that your email there on the page?

A Yes, about the middle of the page back, I respond to Sufhan and David and Matt Roux.

**MS. FODE:** Further down. All right.

Q And will you read that out loud?

A Why does he want to deduct appreciation for preacquisition

assets? And I don't understand the compensation either. Nothing needed on your end unless you know his reasoning behind it. Otherwise, Jim and I will chat about it and call him.

Q And what did you mean by that email?

A So I didn't understand his questions. And we -- I was letting my team, as they had raised it to my attention, that they didn't need to do anything and that I would talk to Jim LaHaise and that we would chat with Pat about -- call Pat about it.

Q Okay. So were you not copied on the original email?

A I was not.

Q And do you know why your team sent the email to you to involve you in it?

**MS. VILLAGOMEZ:** Objection, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you talk with Mr. Sparacio or Sufhan Majid -- let's back up. Who is Sufhan Majid, David Sparacio, and Matt Roux?

A So David Sparacio was our controller. Matt Roux is our director of financial reporting. And Sufhan Majid was a director of accounting.

Q And are they on your team?

A They are.

Q Okay. And do you understand going down to Mr. Byrne's email what his objections were?

A Yes.

**MS. FODE:** Scroll down, yeah.

Q And what were they?

A So the first objection is depreciation for preacquisition assets. So --

**THE COURT:** Go ahead. Yes.

**THE WITNESS:** Okay.

**THE COURT:** You were in the middle of responding, --

**THE WITNESS:** Yes. So, yes, --

**THE COURT:** -- right? There's no objection pending, is there?

**THE WITNESS:** I just don't want to make sure I'm not violating your --

**THE COURT:** No.

**THE WITNESS:** -- comments, so sorry.

A So this is where depreciation, you know, he has assets, so they depreciated them under Balboa. And then he still had those assets. These are things like a desk. And so they were included, that depreciation was included in the Pioneer model.

And then we continued to depreciate it after acquisition. And so this is where we have complied with the LTIP. But Mr. Byrne is trying to change it and asking us to take those assets out of the calculation.

Q And did you agree with that request?

A I did not.

Q And why not?
A Because those depreciation expense were a preacquisition Balboa expense. They were in the Pioneer model. And they were continued post-acquisition.
Q And if you look at number two of Mr. Byrne's request, what was he requesting there?
A So this is overhead compensation for accounting, IT, and marketing needs to be added back. See attached overhead spreadsheet.
Q And did you agree with Mr. Byrne's second dispute?
A I did not.
Q Why not?
A So this goes back to the direct and the indirect conversation. These people that he's asking for us to back out are all people that were preacquisition positions. They were included in the Pioneer model. And they were still accounted for and charged to his cost center.
Q And if the Balboa positions were previously -- if these were Balboa positions previously, and they were in the Pioneer model, do you know what the claim was for these indirect or direct costs?

**MS. VILLAGOMEZ:** Objection, foundation, speculative.

**THE COURT:** The objection is overruled. You can answer the question with a yes or a no.

**THE WITNESS:** Could you repeat the question?

**MS. FODE:** Certainly.

**BY MS. FODE:**

Q If these were Balboa positions previously and they were in the Pioneer model, do you know why Mr. Byrne was claiming they were indirect and not direct costs?

A Yes.

Q And what was your understanding?

A So these employees, we had talked about this prior to acquisition, that due to our internal controls, some of these people would no longer be reporting to Pat Byrne or through his organization they would report to me.

For example, accounting. I'm responsible for all of the books of record and so all of the accountants were on my accounting team. But they were a hundred percent doing Balboa accounting.

This is similar to what we do in our mortgage group, our SBA. We have this across other divisions of our company. And we explained that to him before the acquisition.

Q And why was that change made?

A The change, for example accounting, you know, there were multiple times where Mr. Byrne had instructed people to do things that were violating internal controls. So we had to move them out from under him and have them report. So similar to the marketing is an example of that.

Q And did you ever discuss with Mr. Byrne this direct versus

indirect cost issue?
A We did.
**MS. VILLAGOMEZ:** Object --
Q Okay. And when was that?
A So we talked to him preacquisition. We talked to him about internal controls. And specifically one of those items was the finance risk manager that we talked about earlier.
And we even had the conversation that Heather Parker, who was the prior CFO, would no longer have that CFO position, and that she would be a great person for this risk manager.
So he understood that these people, as well as accounting, that they would report to me but that they would still be a hundred percent and that -- would be hundred percent of Balboa, and that he would not be charged for the indirect cost which was a part of my time, a part of my controller's time, a part of our -- a part of Jim LaHaise's time, any of that overhead indirect would not be charged to Balboa.
But the people that are specifically working on Balboa would continue to be charged to Balboa irregardless (sic) of where they report.
And there's no mention in the LTIP. So then this again is where Mr. Byrne is trying to change from the Pioneer model, not us. We're trying to follow the Pioneer model.
Q So from --
**MS. VILLAGOMEZ:** Objection, --

**MS. FODE:** Oh, sorry.

**MS. VILLAGOMEZ:** -- move to strike as speculative as to what Mr. Byrne believed.

**THE COURT:** The objection is sustained and the motion is granted. To the extent that Ms. Stokes testified to what Mr. Byrne thought, that testimony is stricken from the record. But the rest of it remains.

**BY MS. FODE:**

Q For marketing, credit, IT, and accounting, who controlled their compensation?

**MS. VILLAGOMEZ:** Objection, --

A So their --

**MS. VILLAGOMEZ:** -- compound.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Apologies.

A So their compensation was controlled -- was -- like their annual raises went through the normal merit process. But all of these people were still included in the Balboa incentive plan. And Mr. Byrnes still had the discretion and the decision over their bonus plan.

And in 2023, generally all of them received their 2023 discretionary quarterly bonus as decided by Mr. Byrne. So for that purpose he included it as a direct report.

Q And do you know -- you talked a little bit about the accounting -- strike that.

Did these people do Balboa Division work?

A They did.

Q Okay. Did Mr. Byrne or other Balboa managers have authority over the employees' day-to-day work?

**MS. VILLAGOMEZ:** Objection, overbroad as to authority over.

**THE COURT:** I can't hear you.

**MS. VILLAGOMEZ:** Objection, overbroad.

**THE COURT:** The objection's overruled. You can answer.

**THE WITNESS:** I'm sorry, repeat the question, please.

**MS. FODE:** Are you able to read the question back? Is that possible?

**THE COURT:** Let me see if I have it.

**MS. FODE:** Okay.

**THE COURT:** Because we don't have -- we're not --

**MS. FODE:** Okay.

**THE COURT:** We don't have a court reporter here. I have something that's being transcribed electronically. So sometimes it's easy for me to remember and see what the question was and sometimes it's not.

**MS. FODE:** Your Honor, I don't want to burden you with that. I apologize. I'm used to when the court reporter's here. So let me just restate it.

//

**BY MS. FODE:**

Q Did Mr. Byrne or other Balboa managers have authority over the day-to-day work of those employees in the marketing, credit, IT, and accounting departments?

A So those employees reported up through their division. So accounting, they reported up to me because we needed that segregation of duties where, you know, loan operations reported to Mr. Byrne but accounting did not. So we had that crosscheck and we had that reconciliation process versus the doers.

So he continued to keep the day-to-day duties of like loan operations. But those accountants were a hundred percent dedicated to Balboa accounting, but they reported to me.

Q And going back to the exhibit on the screen, if you'd go to the top of the email, and it looks, right, that David Sparacio is sending you -- well, they're sending you emails to keep you in the loop; do you see that at the top?

A Yes.

Q Okay. And so why were you, Mr. Majid, Mr. Sparacio, and Mr. Roux, why were you emailing about this topic?

A So Sufhan Majid and -- Sufhan does the calculation. As director of accounting reported to David Sparacio, David Sparacio would review it.

And so, again, this was paid out February of '23. And now we've fast-forwarded to July of '23 when Mr. Byrne brought up these issues. And so they were elevating it to me as CFO

because it was kind of out of their responsibilities to make those decisions.

**(Pause)**

Q And there's some email correspondence with you and Mr. Sparacio. Were you -- what was -- was the purpose to try to not pay Mr. Byrne his LTIP?

**MS. VILLAGOMEZ:** Objection, --

A No, absolutely not. And he agreed to the February payment. This is not until July that he brings it up for these two things.

**THE COURT:** What was --

**MS. FODE:** Okay.

**THE COURT:** -- the objection?

**MS. VILLAGOMEZ:** Nothing, Your Honor. Thank you.

**BY MS. FODE:**

Q And did you ever discuss Mr. Byrne's concerns on this point with him?

A I tried to over phone. Again, our relationship had become strained. So I actually flew to California July, was there July 31 to August 1st with Mr. LaHaise to discuss it with Mr. Byrne in person.

Q And how did that meeting go?

A So with that meeting, he agreed to some of these. And I thought that's the meeting that we talked about that he asked me to fire him, you know. And I went back to his office

afterwards. We talked. I thought we were making progress. I thought we were getting better.

So I will say that in that meeting, he agreed to some of these. And he said he understood. But then as soon as we landed, within a week he had sent another email.

**MS. FODE:** All right. I'd like to turn to Exhibit 428, it's already admitted, and ask permission to publish the document.

**THE COURT:** I'm sorry, what was the exhibit number again?

**MS. FODE:** Four, two, eight.

**THE COURT:** I don't think that has been admitted. Ms. Jackson.

**MS. FODE:** Let's see.

**THE CLERK:** It has not.

**THE COURT:** Okay.

**MS. FODE:** Okay. Then I would ask -- this I believe is a joint exhibit. And I would ask to have the witness -- I can lay the foundation but it is joint.

**THE COURT:** Well, let's find out. Is there an objection to admitting this exhibit?

**MS. VILLAGOMEZ:** NO objection.

**THE COURT:** Okay. Exhibit 428 is admitted, and you may publish.

**(Exhibit Number 428 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q Ms. Stokes, have you seen this document before?

A Yes.

Q What is it?

A This is the 2023 LTIP calculation as of the end of the year.

Q And why wasn't there an LTIP bonus in 2023?

**MS. VILLAGOMEZ:** Objection, lacks foundation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you have an understanding why there was not an LTIP bonus in 2023?

A Yes.

Q And what is that understanding?

A So per the LTIP, their earnings before taxes needed to be 48.5 million. And their earnings before taxes was 46.6. They did not make the hurdle. They had 40 -- about 39 and a half to $40 million of bad loan expense.

Q And what do you mean by bad loan losses?

A So when a -- when you make a loan to a customer and the customer stops paying you, you have to charge that loan off. And so their charge-offs were much, much higher than expected.

Q And what was the amount of the charge-offs in 2023?

**MS. VILLAGOMEZ:** Objection, --

A Approximately 39 and a --

**MS. VILLAGOMEZ:** -- lacks foundation.

A -- half million dollars.

**MS. VILLAGOMEZ:** Sorry. Objection, lacks foundation.

**THE COURT:** Okay. So that objection is sustained. I'm going to ask you to ask it -- lay the foundation and ask the question again.

Again, you need to wait for just a beat so if there is an objection, I can rule on the objection before you answer.

**THE WITNESS:** My apologies.

**THE COURT:** No, there's nothing to apologize for. It's a very -- I said this to somebody else today. It's a very clunky way of having a conversation. And I admit that I'm challenged by it many times, too. So don't -- there's nothing to apologize for.

**THE WITNESS:** Thank you.

**THE COURT:** Okay. Ms. Fode, go ahead.

**MS. FODE:** Thank you so much.

**BY MS. FODE:**

Q So if you would look on the right corner that's highlighted there, what is that number that's highlighted?

A Yes. So that is the charge-offs that were recorded in the Balboa Division for 2023.

Q And how much was -- how many charge-offs or how much were the charge-offs in 2023?

A Approximately 39.5 million.
Q And is Mr. Byrne responsible for charge-offs or loan losses and for his division?
**MS. VILLAGOMEZ:** Objection, lacks foundation.
**THE COURT:** No, I heard you. I'm just --
**MS. VILLAGOMEZ:** I'm sorry.
**THE COURT:** -- thinking about the question. The objection is overruled. You can answer.
**MS. VILLAGOMEZ:** Thank you.
A So Mr. Byrne as the president of the division is responsible for the loans that were made in his division. And these loans are loans that were made where the customer stopped paying, so it was under his direction as the president of the division.
Q And do loan losses or bad loan losses, do those affect the profitability of the division?
A Absolutely. When you have to write the loan off, that's an expense to the company or to the division.
Q Did Ameris change the way the LTIP bonus was calculated so that there would not be an LTIP bonus in 2023?
A No, absolutely not. I don't understand why if -- you know, we had this Pioneer model that had the expectation of what the performance would be.
So as CFO, I would never want to have to go to my board or go to my CEO and say this acquisition that I thought was great

is actually doing really poorly and well below expectations. So I would absolutely not. I mean, it would hurt me just as much as it would hurt Mr. Byrne.

Q And does Mr. Byrne raise any issues with you about the calculation of the 2023 LTIP?

**MS. VILLAGOMEZ:** Objection, vague as to time.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q At any time during 2023 did Mr. Byrne raise any issues with the calculation of the 2023 LTIP?

A Yes.

**MS. FODE:** Okay. And I'd like to have Ms. Ingall show the witness Exhibit 400, please. I do not believe it's admitted. And it's not joint so I'll lay the foundation.

**THE COURT:** Okay. Go ahead.

**(Pause)**

**BY MS. FODE:**

Q All right. Ms. Stokes, if you see the emails on the screen and take a look at that. Have you seen this document before?

A Yes.

Q And are you a recipient on one of the emails on this email chain?

A I am.

**MS. FODE:** I would ask the Court to admit the Exhibit

400 into evidence.

**THE COURT:** Any objection?

**MS. VILLAGOMEZ:** No objection.

**THE COURT:** Okay. Exhibit 400 is admitted, and you may publish.

**(Exhibit Number 400 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q All right. What is the subject of this email?
A LTIP calculation. Oh, I'm sorry, subject, yes.

**MS. FODE:** Okay. And if you would go to the first page of DX-400, I'm sorry, and two, so go up one, page two.

Q Is this an email to you from David Sparacio?
A Yes.
Q Okay. And what is he saying there?
A So this is where in July of '23 Mr. Byrne asked Sufhan to make some changes to the LTIP calculation.
Q And will you read what Mr. Sparacio says in his email on the first two sentences?
A Nicole, not sure how you want us to handle this. I don't think Matt nor Sufhan nor I should be making these decisions on Pat's compensation interpretation of his agreement. And we certainly can't okay paying him 1.3 million M-M in the next week.
Q And was Mr. Byrne asking for 1.3 million dollars to be

paid in the next week in his request?
A Correct. Yes.
Q And did you agree with Mr. Sparacio's comment that he or Matt or Sufhan should not be making those decisions on Pat's compensation?
A Yes.

**MS. FODE:** And I'd like now to show admitted exhibit admitted. It's an admitted Exhibit 449, please.

**THE COURT:** Go ahead.

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q All right. Ms. Stokes, do you see that there's an email from you to Mr. LaHaise dated January 29th, 2024?
A Yes.

**MS. FODE:** And I think you were asked about this email earlier today.

I wanted to go down to the next page, please. All right.

Q What is this document, Ms. Stokes?
A Yes. So throughout 2023 Mr. Byrne sent multiple emails on different items that he wanted adjusted on the LTIP. But this is after the final Q4 '23 LTIP, his final six adjustment items.
And then he had sent them over. And so we put it in writing. So everything that is in red was my response. So the black would be what his LTIP revision was. And then the item

in red was my explanation as to why it was incorrect.

Q Why did you do that? Why did you write this?

A So I did it for documentation purposes. And I sent it to Jim LaHaise. At this point in the relationship, it was very strained with Mr. Byrne. He was no longer taking phone calls or agreeing to meetings with me.

Q And when you say for documentation purposes, why?

A So just to have it documented for Mr. LaHaise to be able to have the conversation with Pat and to be able to explain why these items were -- why we believe they were incorrect.

Q Okay. Let's walk through them now. For number one, there's no red behind number one. Did you not make a comment or response to section one that's highlighted there?

A So number one was one of those items that you saw in the prior email earlier today where it was item one and six, what the calculation would be.

So item one, we felt like there was a little bit of ambiguity and we wanted to discuss with Mr. Byrne.

Q And did you discuss with him at any time?

A I discussed it with -- I cannot recall if I -- I believe I discussed it. It may have been in that July meeting. I think it was in his July email, and so we talked about it in that July meeting.

Q Okay.

A What, you know, six months prior to this email.

Q And did you agree with Mr. Byrne's statement in number one?
A We did not.
Q And were you aware of this practice by Balboa prior to the acquisition?
A We were not aware.
Q And why didn't you agree with what he was requesting?
A So this is going to get a little technical. But when a bankruptcy -- when a customer stops making payments, you have to charge off that loan and a bad debt expense.
And then sometimes you go -- they file bankruptcy and you go to a Bankruptcy Court. And from the point that you've charged the loan off, any payments that are received on the loan after that should be taken in as cash.
What we identified that Balboa was doing is when they got a -- when the Bankruptcy Court ordered that -- let's say the loan was, you know, a hundred thousand dollars and the Bankruptcy Court ordered a $25,000 requirement for the customer to pay, Balboa would take the $25,000 and record it into income at the time that the Bankruptcy Court and record a loan for it, and then take payments and apply it to the loan instead of taking -- so they were basically taking the income for the entire stipulated judgment, which is what the Bankruptcy Court authorized, taking it up front.
So he was frontloading income. The issue with that is a

lot of times when somebody's already in bankruptcy and they have these stipulated judgments, they don't actually -- the company never gets that money back and the loan ends up going past due again and you end up charging it off again.

So what our discussion with Mr. Byrne was is that it was we didn't not know this was his practice. We can't account for it like that.

And the fact that he was -- the part that we wanted to discuss with him further is that he was taking the whole amount.

But in actuality, a portion of that would have been charged off in that year anyway because these bankruptcy clients or customers that had filed bankruptcy would not necessarily make those payments and they would have been charged off. And so we needed to look at that and determine a compromise, a common ground on that.

**MS. VILLAGOMEZ:** Objection, Your Honor, move to strike as improper expert testimony.

**THE COURT:** Motion is denied. The objection is overruled.

**BY MS. FODE:**

Q And did you have a discussion and come to a meeting of the minds with Mr. Byrnes (sic) on that topic?

A We I believe discussed this with him in the July meeting in California when Mr. LaHaise and I were there.

Q And was there a resolution reached?
A I don't recall. And that's -- I think that's part of why I did not have red here, because I was going -- like Jim had the notes from that meeting and what we had agreed.
**MS. FODE:** Fair enough.
Q All right. Let's move on to number two, please. And this is the issue depreciation for preacquisition assets has been erroneously deducted. That was Mr. Byrne's writing. And what was your response there in red?
A Ameris purchased assets at book value so Balboa never fully expensed the asset. The depreciation expense was included in Pioneer operating model, and no adjustments should be made for LTIP.
Q Okay. And did you agree with Mr. Byrne's request?
A I did not.
Q And why not?
A So this is the same request that he had in July at the same time that he retro backed -- he retro'ed back to '22. So these are those assets that he -- we were depreciating prior to acquisition. The depreciation was in the Pioneer model. And we continued to depreciate them.
Q Okay. Let's take a look at number three. And what did you understand the issue in number three to me that Mr. Byrne was raising?
A Yeah. This is the -- also the one that we just talked

about where in July he went back and tried to apply this to the 2022 LTIP.

And this is where we were talking about the accounting, credit, IT, and marketing personnel, that they were preacquisition, they were doing Balboa functions, they were in the Pioneer model as an expense. And post-acquisition they continued to do that. But it was not indirect.

Again, we never charged for my time, we never charged for, you know, Sufhan's time, Sparacio's time. We only charged for those accountants that were pre-Balboa, in the Pioneer model, and continued to be Balboa accountants.

Q And do you remember having a discussion with Mr. Byrne on this topic?

A Multiple times.

Q Okay. And if you'd take a look at number four, it says the tax benefits to Ameris were 407 some thousand. What is the issue here that Mr. Byrne is raising?

A So the LTIP is based on earnings before taxes. And Mr. Byrne is bringing -- there's a tax benefit of $400,000. And I said, well, that is -- does not matter because the LTIP is based on earnings before tax, and tax comes after that. So it was irrelevant.

Q And did you ever discuss this issue with Mr. Byrne?

A We did.

Q And was there any resolution reached?

A Yes. I believe he eventually removed this one.
Q And if you'd look at number five, please, it's talking about the accounting of interim rent; do you see that there?
A Yes.
Q What was the issue that Mr. Byrne was raising?
A So he says that the accounting of interim rent was changed, which was not consistent with past practice.
However, this is what we talked about earlier today the ASC 842, that lease accounting that they had to implement. And during the due diligence process, we identified this change.
And the Pioneer model was adjusted to Mr. Byrne's benefit. The income hurdle was lowered. It was to his benefit. So although it's not consistent with past practice, we had agreed.
And he adjusted the Pioneer model. So the way we were accounting for it matched the Pioneer model. This is where he's trying to change it back.
Q Okay. And did you have a discussion with Mr. Byrne about topic number five?
A So we had an ASC 842 meeting in October that he never showed up to, October of '23. My assistant tried to reschedule it, and he also stopped responding to her.
Q Okay. What about number six; did you understand what the issue that Mr. Byrne was raising here?
A Yes.
Q And what was it?

A So this is the way preacquisition that Balboa accounted for repossessions. And we identified -- we did not know how he was doing it. And so then this is where it was changed.

And, again, you'll notice this one has no red because there was also some ambiguity, and we needed some more information from Mr. Byrne.

Q So because there is ambiguity, did you talk to Mr. Byrne about the issue?

A We did.

Q And was a resolution reached?

A There was a resolution because the expense -- without getting too technical, the expense would have been an expense within the year. But the resolution I believe was halfway through the year.

It was in that July meeting when we went to meet with him. This is one of the ones that I believe we agreed to amortize over the year, so by the end of the year it's all in there. But it did -- we did amortize it, agree to him.

**MS. FODE:** Okay. Great.

Q If you would go, please, to Nicole's comments down below. I think you were asked about these earlier. So why did you include these three comments in the document?

A So as I said earlier, you could see that item one and six did not have anything in red. Item two, three, four, and five were very black and white.

Item one and six had some ambiguity to it. So I was asking through those prior emails as well that were earlier that, okay, if we agree to one and six, if we compromise on one and six, would we be able to accrue and be able to pay the LTIP.

But, unfortunately, when you have $40 million of charge-offs compared to an estimate of 12 million, you just can't get over that hurdle.

And so even if we had agreed to one and six, the hurdle would not have been met because there was $40 million of charge-offs.

Q So why did you -- why were you stating that?

A So I was saying for Jim's point when he was talking to Mr. Byrne that, listen, one and six, we think there's some ambiguity between one and six. If we agree to those, there's still no -- you're -- there's still no LTIP accrual because you can't overcome those charge-offs.

Q And if you look there at comment number two, will you read that into the record?

A We never charged the one million eight, eighty-six, nine, twenty-six for MHT charge-offs against the LTIP calculation. I believe the agreement shows that we should have charged for those.

Q And what were you meaning in the -- in -- for number two?

A So there was a loss on MHT. And prior to acquisition,

Mr. Byrne and the company was involved in a lawsuit with MHT. So we did incur a loss and we never charged him for that based on the resolution of that lawsuit that had been pending.

And so from my standpoint, I was looking at it I have to be fair to both sides. And so if -- you know, I have to -- again, by the time it's brought to me, I have Mr. Byrne on one side, I have my accounting team on one side, and I've got to figure out the right answer.

And the point is that my accounting team said, you know, there's also this other charge-off that we never did. So if we're going to open it up and adjust for everything that goes that way, we have to go this way. There's some other things that if we're going to reopen it.

Q And did -- do you know if Mr. Byrne ever repaid that 1.9 million?

A He did not.

Q And let's look at comment -- Nicole's comment number three. It says I believe the Pioneer model included 82,000 a quarter of auditor fees that were never charged for the LTIP calculation. What was your point in number three?

A Yes, so when we did the acquisition, our external audit fees were going up. We had some extra tax fees and we had some extra audit fees. Those were identified. And they were included in the Pioneer model.

However, when the invoice came through and it went through

accounts payable, the Balboa cost center was never charged for their portion. So, again, this was one saying well if we're going to reopen it, we've got to get it right on both sides.

Q And did you ever try to discuss the Pioneer model, the number three comment, with Mr. Byrne?

A No. At this point in time, by this date he was nonresponsive to me.

Q And why were you providing these materials to Mr. LaHaise?

A Because all -- Mr. Byrne had become nonresponsive to me, so any communication was going through Mr. LaHaise as his supervisor.

Q And did you ever ask Mr. Byrne -- were you ever able to talk with him about why he was not responding to you?

A No.

**MS. FODE:** All right. You can take the -- black the document out.

Q After Ameris's acquisition of Balboa, did the division apply with Ameris's internal controls?

A Can you repeat the question?

**MS. VILLAGOMEZ:** Objection -- oh, go ahead.

**MS. FODE:** Sure.

**BY MS. FODE:**

Q After Ameris's acquisition of Balboa, did the division comply with Ameris's internal controls?

A In general, yes. But there were some incidences that we

found that they were not.

Q Okay. Can you give me an example of a few that were not?

A So an example would be marketing, that we had a -- Mr. Byrne wanted to release a press release that had information, that had financial information in the press release about Balboa Capital as a division of Ameris.

And one of our internal controls is that any press release that goes out of the company has to go through my team because if it has any nonpublic financial information that we're making public, we have to file an 8K with the SEC.

And Mr. Byrne instructed his marketing department to issue a press release without going through those controls and without going through my department.

We ended up luckily somebody in marketing questioned -- our communication director got wind of it and found out about it. And he was not happy that we would -- I'm sorry, I'll stop there.

Would you like other -- more --

**THE COURT:** No.

A -- another example?

**THE COURT:** She's going to ask you another question.

**THE WITNESS:** Or should I -- that was one example. Would you like another example?

**MS. FODE:** That would be great. Thank you.

A Yes. So we also found where -- or we identified where

Jacquie Emert, we had told her prior to acquisition that you would not be able to write anymore checks out of the Balboa accounts to vendors, like accounts payable, like to pay your power bill or pay bills because from that point in time all reporting had to be on Ameris Bank's tax ID number to the IRS.

And on more than two occasions we found where she had written checks out of a Balboa checkbook that would have been 1099, and it put us out of compliance with the IRS rules.

We also -- he would -- there was an issue with the security deposits, the nonrefundable security deposits where he had -- I'm sorry, with refundable security deposits. He had refundable security deposits.

And at the end of the lease, they should be returned to the customer. And at the end of the lease, if the customer didn't ask for it, Mr. Byrne instructed accounting to take that into income.

And we can't do that. That was owed to the customer. And as a publicly traded bank, the Consumer and Finance Protection Bureau would have been all over us. We could not issue those checks to -- we could not take that into income to Mr. Byrne. We had to give the money back to the customer.

**MS. FODE:** Okay. And I'd like now to turn to Exhibit 486, which has been admitted, and ask that it be published.

**THE COURT:** Go ahead.

**MS. FODE:** All right.

**BY MS. FODE:**

Q Have you seen this email chain before?

**MS. FODE:** Why don't you scroll down so she can take a look. Thank you.

A I have.

Q And are you copied on David Sparacio's email of May 8th, 2024?

A Yes.

Q And what is your understanding that Mr. Sparacio is asking in this email?

A So this is where every quarter we would look at those indirect costs and we would do a recalculation of what the cost would be going forward. It was a quarterly control.

Q And if you see in the first paragraph, why don't you go ahead and read that to yourself, the first paragraph? And I'll ask you some questions.

And then the second line below that says, as we have analyzed the deferral process deeper, we've decided to make some following changes. So what was Mr. Sparacio saying in this email?

A Yes. So it's a little bit of a -- it's an accounting term that these indirect costs that you defer over the life of the loan.

So if it -- there's a cost to generate the loan. And you don't take that whole cost day one. You amortize it over the

life of the loan if you've originated the loan.

If you have purchased the loan, you are -- you don't do that. You don't defer those costs. You have to take the costs up front. And we -- this is the quarterly control to recalculate that cost and then to apply it into the system going forward.

Q And so this was a change that needed to be made.

A Well, the quarterly rate is the change.

Q Okay. And so what was Mr. Sparacio asking or advising Pat Byrne in the email?

A So this is where David Sparacio was giving Pat Byrne the new deferral rates on both purchase loans and originated loans.

**MS. FODE:** Okay. Will you go up on the email? Keep going to the email before. Yeah. Thank you.

Q All right. And does the -- did Mr. Byrne respond to Mr. Sparacio's email?

A He did.

Q And will you read the first line into the record, please?

A Hi, David. Will you please forward the specific language in ASC 310-20, open parentheses FAS 91, close parentheses which quote, open quote prohibits deferring internal costs on purchase loans, whether purchased as a single or group of loans, end quote. Please also include the specific language for purchase leases.

Q So was -- what was your understanding of what Mr. Byrne

was requesting here?
A Yes. He -- this ASC 310-20, that's accounting guidance. When I talked about earlier that the FASB, the Financial Accounting Standard Board issues accounting guidance, that's the kind of the index to be able to go find that accounting guidance.
Q And did -- was -- did Mr. Byrne want more information about the ASC 310-20?
A He did.
Q Okay. And why -- what was your understanding of why this change was coming about in David Sparacio's email?
A So the change was the quarterly assessment of what those costs were.
A And how -- what was the -- what was the ultimate change that needed to be made in the day-to-day practice.
A So the day-to-day practice is in the system -- in the loan system under the loan operations group reporting up to Balboa Capital. They would go into the loan system and they would change the rates to be the new rate.
Q Okay. And what is -- I noticed the reference purchase loans. What are purchase versus originated loans?
A So an originated loan is a loan that Balboa Capital originates, they create the loan, they know the customer, they make the loan.
A purchase loan is a loan that they would buy from maybe

another bank or they would buy a portion of, that is a purchase loan.

We did not originate the loan on our paper, somebody else originated the loan and we bought it, Balboa or Ameris bought it.

**MS. FODE:** Okay. If you could scroll up, please.

**BY MS. FODE:**

Q And is Mr. Sparacio -- what was he doing in his email? What was he saying in his email of Wednesday, May 8th at 10:33 a.m.?

A Sure. This is the email where David Sparacio sends that specific language of ASC 310-2030-5, and also instructed Mr. Byrne where he could look it up on FASB website if he wanted to.

Q Okay.

**MS. FODE:** Continue up, please.

**BY MS. FODE:**

Q And is this -- what is that email from Patrick Byrne to Phil?

A This is an email from Patrick Byrne to Phil Silva where he asks -- he asks Phil if we have any portfolio purchases, and if so, please book them as individual deals, meaning please book them as an originated loan instead of a portfolio purchase.

Q Is -- does -- is that contrary to what Mr. Sparacio's email asked?

A So -- well this is actually where Mr. Byrne is asking Phil to book -- to incorrectly book purchased loans as originated loans so that he could defer additional costs thus increasing his revenue in his division.

Q And why are you saying that was an incorrect booking of the loans?

A Because a purchase loan --

**MS. VILLAGOMEZ:** Objection, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** A purchase loan -- and these had -- a purchase loan needs to be recorded as a purchase loan because you cannot defer as many costs.

By booking a purchase loan as an acquired loan he was deferring more cost which was raising his revenue.

**BY MS. FODE:**

Q And did it ever come to your attention that the change was made that Mr. Byrne was requesting here?

A It was.

Q And how did that come to your attention?

A So this email I believe is May of 2024, in the month end close process, so the very early part of June, I believe it was June 3rd one of our finance business partners in the Ameris accounting group was doing a detective control and identified that there were purchase loans incorrectly recorded as acquired loans, and that it misstated Mr. Byrne's revenue.

Q And did you ever try to discuss this issue with Mr. Byrne?
A I did, immediately.
Q And were you able to discuss it with him?
A I was not, he would not take my calls and he had Phil Silva contact men who brought in Heather Parker into the conversation, but Mr. Byrne would not discuss with me.
Q And so you had subsequent calls with Heather Parker about this issue?
A I did.
Q Okay. And did you have any other concerns regarding the practices or lack of internal controls at Balboa Division?

**MS. VILLAGOMEZ:** Objection, leading, argumentative.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Were there any other concerns that were raised to you about the Balboa Division?
A So I think I've mentioned there were other cases which is why we had to move marketing, IT, credit, and accounting, all of those things out of Mr. Byrne's direct supervision and over to the Ameris reporting lines for those -- to protect those internal controls.
Q And why didn't some of these irregularities or concerns, why weren't they raised in the due diligence process?

**MS. VILLAGOMEZ:** Objection, argumentative, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you know why these irregularities didn't come up in the due diligence process?

**MS. VILLAGOMEZ:** Objection, argumentative as to the word irregularities, and lacks foundation.

**THE COURT:** The objection is overruled, but the question can be answered with a yes or a no, she's asking if you know.

**THE WITNESS:** Yes.

**BY MS. FODE:**

Q And why was that?

A So they were not disclosed to us.

Q Okay. Did you speak with anyone else at Ameris regarding these internal control issues?

A I did.

Q And who did you speak with?

A So I raised it to Jim LaHaise, Patrick -- Mr. Byrne's direct supervisor, and I also brought it to the attention of Bill McKendry, our chief risk officer.

Q And why did you do that?

A Because as a senior leader of our company and leading the division of Balboa it was very important that every leader understands internal controls and how they affect financial reporting.

Q Okay.

**MS. FODE:** I'd like to now show the witness joint -- or let me just ask first. I'd like to ask to admit Joint Exhibit 364.

**THE COURT:** Any objection?

**MS. VILLAGOMEZ:** No objection.

**THE COURT:** Okay, Exhibit 364 is admitted, and you may publish.

**(Exhibit Number 364 received in evidence)**

**MS. FODE:** Thank you.

And if you would go to page 2 of the document. It's okay to show the first page first. Okay.

**BY MS. FODE:**

Q Okay, Ms. Stokes, what is this email chain at Exhibit 364?

A Yes. This is an email that I sent to Jim LaHaise and Bill McKendry.

Q And so you authored this email at Exhibit 364?

A I did.

Q And is it dated January 11th, 2023?

A It is.

Q What does this email relate to?

A So this is where there was about 1.1 million of loans that are 120 days past due, and the policy said they should have been charged off and they were not charged off by the end of the year, so they should have been charged off.

And Mr. Byrne -- there's a couple things wrong in his email that are incorrect that shows that he didn't quite understand roles -- different roles of the controls, and my team had already tried to talk to Mr. Byrne several times, and so this is me bringing it -- my team brought it to my attendance and then I brought it to Jim LaHaise, who was Mr. Byrne's supervisor, and also our chief risk officer with the discrepancies and the misunderstanding of the internal control and the process.

Q And for the first -- so you're raising these issues to Jim LaHaise and to Bill McKendry?

A Yes.

Q And why did you do that?

A So again, as a leader in our company, Mr. Byrne was saying that the charging off of loans was the accounting group and that control is not the actual charge-off.

The decisioning and the charge-off was done in loan operations that reported to him, but he is asking accounting to not make the mistake. But it was not an accounting, we don't have access to the loan system to charge those off.

Q Let's scroll down here. Did you copy Mr. Byrne's email into your email --

A I did.

Q -- where it says Sufhan --

**MS. FODE:** Go down a little bit.

**THE WITNESS:** I did.

So Mr. Byrne had emailed this so Sufhan, and then I took the email that he had sent to Sufhan and I put it in my email just -- and it says, here is the last email to Sufhan. So this is what Mr. Byrne had sent to Sufhan.

**BY MS. FODE:**

Q Okay.

**MS. FODE:** And then if you'd highlight the first two paragraphs -- or I'm sorry -- the first paragraph of the email, at the top.

**BY MS. FODE:**

Q I'd like you to read that into the record and then the following line on the second paragraph.

A Just to confirm, my email to Jim LaHaise and Mr. McKendry?

Q Yes, thank you.

A Jim and Bill, wanted to bring you in the loop here. We have an issue come up today with Balboa loans at the end of the year. There was approximately 1.1 million of 120 plus days past due Balboa loans that should have been charged off and were not processed.

Pat believes it is accounting's responsibility to decision and process charge-offs, which is a clear violation of our internal controls. Accounting is not responsible for charge-off decisioning.

We have pushed back on him and tried to clarify this, but

he is persistent.

I am not asking you -- for you to get involved, but I do think it is important for you to see the conversations and his lack of understanding of segregation of duties and responsibilities in loan operations, accounting, and credit.

Q And why did you make that statement in the last sentence?

A So it's very, very important for our senior leaders to understand internal controls.

Under Sarbanes-Oxley it goes to tone at the top as well as the actual understanding of the segregation of duties and the internal controls.

In this particular loan operations reported up to Mr. Byrne, accounting reported to me, and credit to our chief credit officer, so there was a segregation of those duties and he was getting them very confused as to who was responsible for what.

Q In the third paragraph it says, David Sparacio is patiently communicating with Pat to resolve this and continue to get his understanding of loan operations versus accounting. How did you know that?

A So Mr. Sparacio had told me. So he had been communicating with Pat to try to resolve this and understand it, he and Sufhan both, but Mr. Byrne would not agree.

He had also brought in Heather Parker, and Heather -- or I think Mr. Byrne brought in Heather Parker as his risk manager,

and Heather Parker agreed with us and was trying to explain it to Mr. Byrne.
Q And the last sentence says, on a side note, had these loans been charged off correctly his LTIP accrual would be $350,000 less. Why did you write that?
A So this -- the charging off of these loans were processed in loan operations that reported to Mr. Byrne, and these -- and again, this is January of '23, so this is the 2022 LTIP, so -- that was paid out, and so had those charge-offs been processed by the loan operations group under his supervision the -- there would have been additional bad loans, there would have been an additional expense and the LTIP payout would have been $350,000 less.
Q Okay. And did you ever discuss this issue with Mr. Byrne?
A I don't recall if it was a verbal conversation, but I know I talked to Heather.
Q And did -- was there ever a request for Mr. Byrne to amend the -- to -- let me strike that.
Was there ever a request for Mr. Byrne to you to adjust the 2022 pay out in light of these charge-offs?
A To adjust it down, no.
Q Okay. And --
**MS. FODE:** You can put it on black screen. Thank you.
//

**BY MS. FODE:**

Q So what were your interactions with Mr. Byrne like?

A At the beginning they were okay, but once kind of that marketing issue came up where I had told him he could not do that any longer it became very strained.

Q And did your relationship change over the course of time?

A It did. I mean it started out, it was fine during the process, he was very excited to be a part of Ameris, and it got more and more strained as -- like I said, when I would tell him no, you can't do this, or no, you can't do that, which is part of why I went out in July to talk to him and sat down with him and said, listen, I want you to be a part of this team, like you've built this company, I want you to be a part of this team, I want you to be part of Ameris, I want you to be a part of it, and in that meeting prior to that where I followed him back to his office in front of other people, he had said, Nicole, why don't you just fire me, that's what you want to do.

So I followed him to his room -- back to his office and I said, listen, if you ever feel that way let's talk about it, let's be adults. If you really don't want to be a part of this let's talk about I and let's figure out an amicable way to end the relationship.

And he kind of shunning his shoulders down and said, you're right, Nicole, I didn't mean that, I do want to be a part of this, I do, and I shouldn't have said that in front of

anybody, I don't want you to fire me.

Q So generally when you would have conversations with Mr. Byrne about these LTIP issues, what was the tone and tenor of those conversations?

A The tone of emails would get very curt and then eventually he stopped responding to emails, phone calls, meeting requests.

He also stop attending -- we have ALCO, which is the asset-liability committee meeting where we have probably 10 to 15 senior leaders once a month, it's a monthly call, he stopped attending. He said that it was because it was so early, because we were on eastern time, we're on Georgia time and he was on California time, and he said that, you know, based on the timing of the meetings it was obvious we didn't want him to attend. So we moved the meetings later in the day so that it would be during normal business hours for California employees, and he still didn't attend.

We had a similar situation, we have a NIC committee, which is a new initiative committee, he stopped attending that as well.

Q And did you ever hear anything -- did you ever hear Mr. Byrne call you a name?

A I don't know if I heard it specifically or I think we were on a call one time where Mr. Byrne did come to the call and he said, oh, call to the principal's office again. So he definitely -- I know he called me the principal.

Q I'd like to talk to you a little bit about turning to a new subject.
Were you consulted regarding Mr. Byrne's termination?
A When I identified this issue with him instructing loan ops to book loans -- purchased loans as acquired loans and to purposely overstate his revenue, I did bring my concerning to Jim LaHaise.
Q And why did you do that?
A Because he tried to -- I mean he tried to circumvent internal controls and he tried to misstate our financial statements, that could get me in a lot of trouble, and I had to communicate it to Pat's supervisor after Pat would not take my calls.
Q And why didn't you discuss the concerns directly with Mr. Byrne?
A He would not take my phone call. He actually diverted it to Phil Silva and had Phil Silva call me, and Phil got Heather involved where we could work through it.
Q And were -- did you have any other involvement in Mr. Byrne's termination?
A No.
Q And did you hear Mr. Byrne when he said, why don't you just fire me, were there any other witnesses around?
A In California when we said that to me Jim LaHaise was in the room, and I don't remember if Phil Silva was or not.

**(Pause)**

**MS. FODE:** I'd like to pull up Exhibit 319, please, which has already been admitted.

**THE COURT:** Go ahead.

**MS. FODE:** Thank you.

**MS. FODE:** We go the page 34, please.

All right, if you go to the top of the page so we can show the witness. All right.

**BY MS. FODE:**

Q Are you familiar with the company's whistleblower policy?

A Yes.

Q And are you involved -- were you involved in enforcing the whistleblower policy at the company?

A Was I responsible for enforcement?

Q Did you have any responsibility for -- strike that.

Did you have any input into preparing the whistleblower policy with regard to reporting to the external audit committee?

A So we do have a whistleblower policy, and that policy has a line that employees can call if they have any issues to be able to report it without going through your supervisor if it became so warranted, and then that I believe goes to our head of internal audit. The whistleblower call I believe goes to our head of internal audit and I think it goes to maybe our external -- our chair of our audit committee externally,

unfortunately we haven't ever had it.

I mean we've never had -- I think we've had like one one time, but we've -- so I don't know the exact who it goes to, but I think it goes to our general auditor and I think it goes to our chair of our audit committee, external chair.

Q And so there's a process in place if someone makes a whistleblower complaint that they can complain to outside -- a person outside of Ameris Bank; is that correct?

**MS. VILLAGOMEZ:** Objection, leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you have an understanding how the whistleblower reporting line is structured?

A I believe the whistleblower reports to -- if somebody were to call the whistleblower line it goes to our -- I believe it's our general auditor, which is our head of internal audit, and then I believe it also goes to the chairman of the audit committee, which is an external person.

Q And why is that?

A So that the person can be safe. So that there's no retaliation against anybody. That there's a way for them to safely report violations of law.

Q And do you have any understanding that -- or any knowledge that Mr. Byrne made a whistleblower complaint at Ameris Bank?

A I am not aware.

**MS. VILLAGOMEZ:** Objection, calls for a legal opinion, leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did Mr. Byrne call the Ameris whistleblower hotline?

A Not that I'm aware of.

Q Okay.

**MS. FODE:** Thank you.

**THE COURT:** Okay. Ms. Villagomez.

**MS. VILLAGOMEZ:** Thank you. Very briefly, Your Honor.

**THE COURT:** You may proceed when you're ready.

**MS. VILLAGOMEZ:** Thank you.

**CROSS EXAMINATION**

**BY MS. VILLAGOMEZ:**

Q Ms. Stokes, you're aware that Mr. Byrne's termination letter stated that he was fired without cause, right?

A I was not involved in his termination.

Q And are you aware that Mr. Byrne -- that his fire was determined to be without cause?

A Again, I was not a part of that.

**MS. FODE:** Belatedly, lacks foundation.

**MS. VILLAGOMEZ:** Thank you.

//

//

**BY MS. VILLAGOMEZ:**

Q Is it your testimony that Ameris seized Balboa's CECL model?

A No.

Q And another question.

Sufhan Majid was responsible for performing the LTIP calculations, correct?

A That's correct.

Q And do you recall signing a declaration in support of Ameris Bank's motion for summary judgment in this case?

A I don't recall specifically.

**MS. VILLAGOMEZ:** I'd like to pull up Exhibit 532. If I could publish to the witness, Your Honor.

**THE COURT:** To the witness only, yes. Go ahead. And this the 532?

**MS. VILLAGOMEZ:** Yes.

**BY MS. VILLAGOMEZ:**

Q And then Ms. Stokes, do you recognize this document that states declaration of Nicole Stokes in support of defendant Ameris Bank's motion for summary judgment or in the alternative for partial summary judgment as to each of plaintiff's claims?

A Yes. Thank you.

Q Thank you.

**MS. VILLAGOMEZ:** And, Your Honor, I'd like to move this into evidence and publish.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay, 532 is admitted, and you can may publish.

**(Exhibit Number 532 received in evidence)**

**MS. VILLAGOMEZ:** Thank you.

And Ms. Perez, if you could just scroll down slowly. Keep going. Thank you. Yeah, keep going, all the way.

**(Pause)**

**MS. VILLAGOMEZ:** Keep scrolling all the way to the bottom. Thank you.

**BY MS. VILLAGOMEZ:**

Q And Ms. Stokes --

**MS. VILLAGOMEZ:** Oh, if you could just scroll up a little bit, Ms. Perez.

Q Ms. Stokes, is this your signature at the bottom of the last page?

A Yes, it is.

Q And you signed this declaration under penalty of perjury, correct?

A Yes, I believe so.

Q Thank you.

**MS. VILLAGOMEZ:** No questions for me. Thank you.

**THE COURT:** Okay. Anything further from the defense?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay, thank you.

Okay, thank you, Ms. Stokes you can step down, you're excused.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Uh-huh.

Okay. So -- and you can just leave everything there, we'll take care of it.

It's time for our afternoon break, so we'll take a 15-minute break, and reconvene at 2:40.

To our jurors, please don't discuss the case amongst yourselves or with anyone else, and don't do any research about any aspect of the case.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 2:26 p.m.)**

**THE COURT:** Okay, everyone can be seated.

Okay. Who's next?

**MR. SESSIONS:** Your Honor, at this time we would ask, subject to the Court's approval, to play the designated video of Sufhan Majid, and then we would be calling Mr. Jim LaHaise to the stand.

**THE COURT:** Then you'd be calling who?

**MR. SESSIONS:** Mr. LaHaise.

**THE COURT:** Okay. Any objection to that?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay. All right. We'll see you in 15

minute.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 2:27:37 p.m.; reconvened at 2:43:17 p.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Pause)**

**THE CLERK:** All rise. This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson.

Everyone can be seated. Okay, our next witness.

**MR. SESSIONS:** Your Honor, at this time plaintiff would like to play designated video deposition testimony of Sufhan Majid.

**THE COURT:** Okay. Thank you very much. Please proceed.

**SUFHAN MAJID, PLAINTIFF'S WITNESS, BY VIDEO DEPOSITION**

**(Began playing video deposition at 2:45:33 p.m.)**

E X A M I N A T I O N

BY MR. UNIDENTIFIED:

Q "Would you please state your full name for the record?

A Yes, I'm Sufhan Majid.

Q Is your best estimate that you first became employed with Ameris Bank in the year 2020?

A Yes, it was in 2020.

Q What was your job title when you first became employed with Ameris Bank?
A Accounting manager.
Q And what is your current job title?
A Senior director of accounting.
Q All right. Let's talk about the LTIP calculation. How did you prepare the LTIP calculation?
A I pulled data from our reporting software team, TM-1 (phonetic).
Q Was TM-1 reporting software that Ameris Bank used or Balboa capital used, or both?
A Ameris Bank would use that.
Q Did Balboa Capital have its own accounting software that would feed into TM-1?
A No, it will not speak directly to TM-1.
Q The TM-1 software that Ameris Bank used, where did the data that you would pull from TM-1 come from?
A I actually don't know the full architecture of how the data flowed.
Q Would you prepare a calculation that determined Balboa Capital's earnings before taxes?
A Generally as part of LTIP.
Q Tell me how -- explain the calculation you would perform to me then, specific to earnings before

taxes?

A I don't recall the full details of the formula I was pulling.

Q Tell me what you do recall.

A I don't want to speculate.

Q Without guessing or speculating, can you explain to me generally how you prepared the earnings before taxes calculation, what was involved in that?

A Generally it was net income adding back taxes.

Q Do you still prepare the LTIP calculations when there's a new LTIP calculation needed for Balboa Capital?

A It is not part of my responsibility.

Q Does that responsibility get transferred to someone else? Is it your understanding that an LTIP calculation is still performed, you just don't know who it is?

A I don't work on the incentive plan, so I don't know what the current term of it are.

Q But you used to throughout the time that Patrick Byrne was working for Balboa Capital as the division of Ameris Bank, correct?

A Just for Balboa Capital.

Q Did you get your data when preparing that, the LTIP calculation, from any place else other than cost

centers for Balboa Capital?
A I don't recall.
Q Do you know what interim rent is?
A I have heard the term.
Q Interim rent is a partial monthly or quarterly payment billed to the customer by the Balboa Division of Ameris Bank, true?
A I'm not part of the invoicing team.
Q You understand who you the billing at Balboa worked at Balboa don't you?
A No, I was not over the billing team.
Q For interim rent the customer is billed 29 out of 30 days for a monthly payment and 89 out of 90 days for a quarterly payment, true?
A I don't do the billing. I am not part of the billing team.
Q What was the purpose of preparing the LTIP calculation?
A As stated, to calculate the LTIP.
Q And after -- the reason you calculate, what does LTIP stand for?
A It is the Long-Term Incentive Plan.
Q And the Long-Term Incentive Plan was a plan under which Balboa Capital employees were incentivized financially to perform, correct?

A That is not something I am aware of, what the purpose is.
Q Well, what is your understanding of why you were preparing an LTIP calculation?
A As stated in the name, it is the incentive plan.
Q I understand that. Incentive plan for who?
A In this case, Balboa.
Q And the LTIP calculations you prepared would determine whether or not Balboa had exceeded an Earnings Before Tax threshold, true?
A I don't recall the full details of the agreement.
Q If there was an LTIP accrual, where did the funds come from, from an accounting perspective?
A I am not sure what you mean by that question.
Q Well, in David Sparacio's email, he says, I confirm that we do not need an LTIP accrual. So my question to you is, if there was an accrual needed, describe the process of how an accrual is funded.
A Sorry, can you re-ask that? I forgot what you asked.
Q Yeah, when David Sparacio states that we do not need an LTIP accrual, what does that mean?
A As stated, there is no recording of the LTIP accrual.

Q If there would have been an LTIP accrual, where would the funds come from, from an accounting perspective?
A It is not within my realm to know where the funds come from.
Q How would you determine whether or not an accrual was needed?
A In what sense?
Q In the sense that you said, I don't believe we need an accrual. If an accrual was needed, how would you determine that?
A As stated on the email, based on the calculations.
Q Describe that calculation for me.
A I don't recall the full details of the calculation.
Q Well, in basic terms, describe the calculation for me.
A I don't recall all the details of it.
Q I understand you don't recall all the details, but certainly you must, as an accountant, recall the basic form of the calculation. What was the basic form of the calculation?
A I would need to see the spreadsheet to remind myself.

Q Did you prepare the spreadsheet?
A Which spreadsheet?
Q Well, you just told me I would need to see the spreadsheet, so I'm wondering. The spreadsheet that you would need to see, was that something that you prepared?
A Sorry, can you repeat that -- rephrase?
Q And you actually performed the LTIP calculation, true?
A Generally, I would be the preparer.
Q What was the interest credit error?
A I don't recall.
Q What was the 5K interest credit error?
A I honestly don't recall what it was related to.
Q So as you sit here today, you can't tell me the LTIP components, correct?
A Not to my recollection.
Q Can you or can you not identify the LTIP components for me today?
A I can recall some components.
Q Tell me the ones you recall.
A I recall earnings before tax, as previously mentioned. And then I don't recall verbatim what the other components are.
Q Well, do you recall any other components other

than earning before taxes?
A Not -- not per the agreement.
Q What are track leases?
A I don't -- truthfully don't know. I think they have a tax component, but I don't know what it means. Oh yeah. I don't recall what a track lease is. I know it has a tax component, but I don't know what it stands for.
Q Do track leases have depreciation benefits?
A I'm unsure. I'm not a tax accountant.
Q What types of expenses would decrease the LTIP calculation?
A Generally, is anything that would affect earnings before tax?
Q Such as?
A Just any non-interest expense category or interest expense, non-interest income, interest income. It could all have components to it.
Q What are the non-interest expense categories?
A I don't know all the different components.
Q Tell me the ones you do know.
A Salaries is a large part of it. Then there's components like building and occupancy, I think, just general administrative type costs are in the non-interest expense.

Q Give me examples of interest income.
A In what context?
Q In the context of the LTIP calculation.
A I did not negotiate the LTIP agreement.
Q Generally speaking, what is an LTIP target? Without looking at any LTIP, what is an LTIP target?
A I would assume it's a long-term incentive plan target.
Q It's the target in terms of earnings before tax that Balboa Capital would need to meet in order for there to be a cash incentive award pursuant to the LTIP to Balboa employees, correct?
A I don't know that detail."

**(Audio ended at 2:55 p.m.)**

**MR. SESSIONS:** Thank you, Your Honor. At this time, plaintiff calls Mr. Jim LaHaise to the stand.

**THE COURT:** Okay. Thank you. Mr. LaHaise, you know the drill. You're going to come all the way around to this side of the courtroom. When you get to Ms. Jackson, you'll stop. She'll swear you in, and then you can come up to the witness stand and have a seat next to me.

**JAMES LAHAISE, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** James LaHaise, L-A capital H-A-I-S-E.

**THE COURT:** Thank you. Okay, Mr. Sessions, you may proceed.

**DIRECT EXAMINATION**

**BY MR. SESSIONS:**

Q Thank you. So just so I get it right, is it LaHaise with the strong S?

A Yes.

Q Okay. Thank you. Thank you for being here. We've been sitting across from each other for a whole week. It's an honor to finally get a chance to speak with you. I'm Matt Sessions. We haven't met before, right?

A Correct.

Q But you've been sitting in this courtroom throughout the entirety of this trial, correct?

A Yes.

Q You've heard all the testimony given so far?

A Yes.

Q And you also heard the opening statements given by the attorneys, correct?

A Yes.

Q Do you recall also being deposed in this case?

A Yes.

Q And you were deposed once in your individual capacity, right?

A Correct.

Q And then do you recall hearing a term, Rule 30(b)(6)? Does that sound familiar?
A It sounds familiar.
Q Do you recall being deposed as a Rule 30(b)(6) witness in a deposition?
A I do.
Q And did you understand at that time that you were testifying on behalf of Ameris as a corporate representative?
A Yes.
Q You were Ameris Bank's chief strategy officer in 2022, right?
A Yes.
Q And you were the chief strategy officer in 2023?
A Yes.
Q And in 2024, right?
A Yes.
Q You're not a CPA, correct?
A No.
Q And you've never worked as an accountant for Ameris, right?
A Correct.
Q Okay. Ameris acquired Balboa Capital in December of 2021; did I get that right?
A Yes.
Q And you were the person at Ameris Bank who first suggested

acquiring Balboa by Ameris, correct?
A I don't know that I was the first person suggesting it, but I was involved in -- I was a chief strategy officer and that was one of my areas of responsibility.
Q If I showed you some deposition testimony that you, that we talked about you gave before, would that help refresh your recollection on that question?
A Certainly.
Q Okay. Let's just show to the witness, it's the 30(b)(6) depo, page 21, lines 11 to 14.
**THE COURT:** Go ahead.
**BY MR. SESSIONS:**
Q Go ahead and read that question and answer it to yourself and let me know when you're done. Okay. So I'm just going to ask the question one more time. You were the person at Ameris Bank who first suggested the acquisition of Balboa by Ameris, right?
A I believe I did.
Q Thank you. Ameris analyzed Balboa's financial statements and accounting records over several months, correct?
**MS. FODE:** Overbroad.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** I don't know what the exact timeline, but it was a number of months.
//

**BY MR. SESSIONS:**

Q Ameris's accounting department was involved in the due diligence process of acquiring Balboa, right?

**MS. FODE:** Lacks foundation, calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

Q And Ameris's information technology department was involved in the diligence process, right?

**MS. FODE:** Objection, calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

Q Ameris's legal department was involved too, right?

A Yes.

Q Ameris's enterprise risk department was also involved?

A Yes.

Q Ameris's human resources department was involved in due diligence as well, right?

A Correct.

Q And Ameris's corporate governance department was also involved in the due diligence, weren't they?

A I don't recall that one, but most likely.

Q Okay. In terms of third parties, CBIZ is a party that also assisted Ameris Bank in evaluating Balboa Capital, right?

A I believe so. I'm not very familiar with the accounting.

Q Okay. Once again, if I showed you deposition testimony on

this, do you think that might help refresh your recollection?
A Certainly.
Q Okay. Let's go ahead and show just to the witness, on Blackout, the 30(b)(6) deposition testimony, page 34, lines 6 to 12.
**THE COURT:** Go ahead.
**BY MR. SESSIONS:**
Q Forgive the bouncing around of the screen. Okay. Let me know when you've read that. So in terms of third parties, CBIZ also assisted Ameris Bank in evaluating Balboa Capital, right?
A They did.
Q Covington Law Firm also participated in the evaluation of Balboa?
A They did.
Q And Piper Jaffray Investment Bankers assisted in the evaluation as well, correct?
A Yes.
Q Ms. Perez, we can go ahead and take that down. You, Mr. LaHaise, were the primary person at Ameris Bank who negotiated the purchase of Balboa by Ameris, correct?
**MS. FODE:** Objection, vague and ambiguous.
**THE COURT:** Overruled. He can answer.
**THE WITNESS:** So for clarity, I coordinated the negotiation, but I wasn't the only one negotiating.
//

**BY MR. SESSIONS:**

Q Fair enough. But you were the primary person doing the negotiations, correct?

**MS. FODE:** Objection. Vague and ambiguous.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes.

Q Thank you. Now, as part of the acquisition of Balboa by Ameris, Pat Byrne and Ameris negotiated the written LTIP, correct?

A Ask that question again, please.

Q Sure. As part of the acquisition of Balboa by Ameris, Pat Byrne and Ameris together negotiated the written LTIP, right?

A Correct.

Q And you, Mr. LaHaise, were the person who first introduced the concept of offering an LTIP to Balboa employees, right?

A Correct.

Q You were the primary person responsible for the negotiation process of the LTIP at Ameris, weren't you?

A Correct.

Q And those negotiations would have been sometime in the fall of 2021, is that right?

A That's approximately right.

Q And the LTIP was intended to incentivize the employees of the Balboa Division, correct?

A Correct.

Q The LTIP's goals were presented to Patrick Byrne during the negotiations of the -- strike that. Let me ask that again. The LTIP's goals were presented to Patrick Byrne during the negotiation of the LTIP, correct?

**MS. FODE:** Objection. Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes.

**BY MR. SESSIONS:**

Q You prepared the initial written draft of the -- sorry, excuse me. Let me strike that and ask that again. You prepared the initial written draft outline of the LTIP plan, right?

A I'm not sure what you mean by outline.

Q Apologies. Let me ask the question one more time. You prepared the initial written draft of the LTIP plan itself, correct?

A Not the legal document.

Q Okay.

**MR. SESSIONS:** Your Honor, at this time I would like to read into the record for impeachment the 30(b)(6) testimony of this witness. It's on page 99, lines 3 to 7.

**THE COURT:** Any objection?

**MS. FODE:** If I may look at the testimony, please.

**MR. SESSIONS:** Happy to have Ms. Perez put it up on the screen for speed here.

**THE COURT:** Okay. That would be great.

**MS. FODE:** That would be great. Thank you.

**MR. SESSIONS:** So that was page 99, and I believe lines 3 to 7.

**THE COURT:** Okay. Any objection?

**MS. FODE:** Objection, vague.

**THE COURT:** The objection is overruled. Mr. Sessions, you may proceed.

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

"QUESTION: Who prepared the initial written draft of the LTIP plan?

ANSWER: I would have initially provided the outline."

Q You can go ahead and take that down. The terms of the LTIP never changed during the entire time Patrick Byrne worked for Balboa after Ameris' acquisition, right?

A Correct.

**MR. SESSIONS:** Excuse me. It's very dry.

**THE COURT:** It is.

Q Let's go ahead and look at an exhibit. This is already admitted. It's Exhibit 546. So we can go ahead and publish to the witness and the jury.

**THE COURT:** Go ahead.

Q Mr. LaHaise, you've seen this document several times this

week, right?
A Correct.
Q This is Patrick Byrne's individual LTIP award agreement, correct?
A Correct.
Q There's no other LTIP agreement between Patrick Byrne and Ameris Bank, right?
A Correct.
Q Let's go to the page here ending on 228, and we're going to look at the third paragraph on the page. It's just two lines, and I believe it starts with threshold for award. Do you see that?
A Yes.
Q These are the EBT, or earnings before tax, thresholds for awards that are listed in the LTIP, correct?
A Correct.
Q The threshold for an award under Pat Byrne's LTIP award agreement for 2022, Mr. LaHaise, was an EBT of $37 million. Did I get that right?
A You did.
Q And the award threshold for 2023 was an EBT of $48.5 million; is that right?
A Correct.
Q And the threshold award for 2024 was an EBT of $57.2 million; is that correct?

A Correct.

Q And then 35 percent of EBT above those thresholds was supposed to be allocated to the LTIP cash bonus pool. Excuse me, I'm going to ask that again just to make it clear. 35 percent of EBT above those thresholds was supposed to be allocated to the LTIP cash bonus award pool for that performance period, correct?

A Correct.

Q Let's go ahead and take that down. Mr. LaHaise, you personally completed Mr. Byrne's performance review for the year 2022, correct?

A Correct.

Q Let's go ahead and publish an exhibit that's already been admitted. This is Exhibit 9.

**THE COURT:** Exhibit 9 has not been admitted.

**MR. SESSIONS:** Oh. Apologies, Your Honor. Can we go ahead and just show it to the witness?

**THE COURT:** Right. Go ahead.

**BY MR. SESSIONS:**

Q Mr. LaHaise, is this a copy of the 2022 performance review you prepared for Patrick Byrne?

A Yes.

Q Thank you.

**MR. SESSIONS:** Your Honor, at this time I'd move to admit Exhibit 9 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** None.

**THE COURT:** Okay. Exhibit 9 is admitted and you may publish.

**(Exhibit Number 9 received in evidence)**

**MR. SESSIONS:** Thank you, Your Honor.

**BY MR. SESSIONS:**

Q All right. You created the context of this review, correct?

A The responses or the evaluation. I didn't create the actual document.

Q Fair enough. Let's go to the second page here and look at the line near the top that says manager ratings. Do you see that?

A I do.

Q Okay. And for here, you gave Mr. Byrne, and for competencies, you gave him a score of 4.10. Did I read that right?

A Yes, you did.

Q And that's met and frequently exceeded expectations, correct?

A Yes.

Q Then underneath that, it says Overall Rating, correct?

A Correct.

Q And then again, you gave a 4.1?

A Yes.
Q Which means met and frequently exceeded expectations?
A Correct.
Q Then your final score underneath, do you see that?
A Yes.
Q Once again, that was 4.1, met and frequently exceeded expectations, true?
A Yes.
Q Now, let's go to Section 1.1 of the -- sorry, excuse me. Let's go to Section 1.0 of the review. Do you see that?
A Yes.
Q Now here, if we look -- Ms. Perez, on that second part, can you just scroll that up? Yeah, there we go. Do you see near the bottom of the screen where it says met expectations?
A Yes.
Q Okay. And Category for 1.0 above is described as the Ameris approach, correct?
A Correct.
Q And again, this is evaluating Mr. Byrne's performance, correct?
A Correct.
Q Okay. Then let's go to Section 1.1. This section is called "Performance Objectives," right?
A Correct.
Q Okay. And right here, again, you now wrote, if you see on

the bottom of the page, that Mr. Byrne had a 5, exceeded expectations, correct?
A Correct.
Q And then if we go to Section 1.2, do you see where it says "Initiative and Reliability"?
A Yes.
Q And do you see where it says that you wrote he, excuse me, met expectations?
A Yes.
Q This category, oh, excuse me, we're going to go to the next category first, actually. Let's go to Section 2.0. Excuse me, it's a long document. Okay. Do you see Section 2.0, "Leading the Team"?
A Yes.
Q Okay. And then do you see your score near the bottom where it says 5, exceeded expectations?
A Yes.
Q Okay. Now, this category, this particular one, included a criterion that reads, quote, Coaches and developed staff to drive high performance provides ongoing constructive feedback as well as recognition for great work, correct?
A That's what that says.
Q This category also included a criterion that says makes time to be available for staff, correct?
A Yes.

Q And then do you see those comments next to the words exceeded expectations near the bottom?
A I do.
Q You wrote those comments, correct?
A Yes.
Q And those comments say, quote, the integration of the longtime private company into a publicly traded financial institution is challenging. Mr. Byrne exceeded expectations in his leadership of that difficult leadership task while leading the company to exceed our performance expectations for 2022, correct?
A Yes.
Q Then now going down to Section 3.0, I believe at the top it says, living the seven key leadership traits at Ameris, correct?
A Correct.
Q And you wrote there, near the bottom, four, met and frequently exceeded expectations, correct?
A Correct.
Q And on here, I'm just going to go ahead and read the seven key leadership traits. The first one is enthusiasm about our vision and strategy, correct?
A Correct.
Q The next is others first always, right?
A Correct.

Q Then it's high performing passion.
A Correct.
Q Serious about coaching and promoting staff.
A Correct.
Q Accountable for results, right?
**MS. FODE:** Vague and ambiguous.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Correct.
**BY MR. SESSIONS:**
Q It says experts always improving, right?
A Yes.
Q And then it says dedicated to customer service, doesn't it?
A Yes.
Q Okay. And then do you see the comments that start with the words, Pat maintains, near on the bottom right of the screen?
A Yes.
Q You wrote this, right?
A Correct.
Q It says Pat maintains a high level of passion for delivering high performing results and keeping his team focused on delivering on their core value proposition, correct?
A Correct.
Q Okay. Now, at the top of the next page, I believe, if we

can zoom in, can you see that okay, Mr. LaHaise?
A Yes.
Q Okay. Now, that's your name at the top left of the page, correct?
A Correct.
Q And it says manager?
A Correct.
Q Is that because you were Mr. Byrne's manager?
A Yes.
Q Okay. And then you wrote that comment that's on the top right of the page that starts with exceptional, correct?
A Yes.
Q And you wrote exceptional first year as part of Ameris Bank. Thank you for your leadership and continued support, says fo, but I believe you meant of, Ameris Bank's business banking strategy, correct?
A Correct.
Q Okay. We can go ahead and take that down. Mr. LaHaise, you know Sufhan Majid, correct?
A Yes.
Q He's the one who we just saw testimony of on the video screen?
A Yes.
Q Now, I'm going to go ahead and show an exhibit, which I believe is already admitted. It's Exhibit, no? Okay. Forgive

me.

**MR. SESSIONS:** Your Honor, I would like to admit into evidence a joint exhibit. It's Exhibit 341.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 341 is admitted and you may publish.

**(Exhibit Number 341 received in evidence)**

**MR. SESSIONS:** Thank you, Your Honor.

**BY MR. SESSIONS:**

Q Okay. If we can zoom in near the top to make it easier for him to read. Thank you. Do you see the date up top there, Mr. LaHaise, is April 28th, 2022?

A Yes.

Q This is an email you sent to Patrick Byrne, correct?

A Correct.

Q Okay. Can you please read the subject line of the email, I'll ask Ms. Perez to highlight it to make it easy?

A LTIP calculation.

Q Thank you. Now, do you see those bullet points at the beginning of the email?

A Yes.

Q Okay. Now, the first line of the email before we get into those bullet points say, Pat, attached is our reconciliation of the LTIP accrual. Here are adjustments and explanations,

correct?
A Correct.
Q And the first bullet says, we agree that we add back the actual provision for loan loss as charged and then apply the 1.25 percent per the agreement on the average balance of the loans, correct?
A Correct.
Q Then you wrote, there was a slightly different calculation in the tab within our worksheet as included, correct?
A Correct.
Q Okay. And then on the second bullet point you wrote, we agree that the merger charges be credit back, sorry, credited back, correct?
A Yes.
Q Okay. Now, moving to the bottom of this email, right there. No, you can scroll back up, Ms. Perez. Thank you. See that last line that starts with also going forward?
A Yes.
Q Okay. That line says, also going forward, we can have Sufhan prepare a quarterly calculation with backup to review. That way you will only need to review and approve, correct?
A Correct.
Q And again, Sufhan is Sufhan Majid?
A Correct.
Q Let's go ahead and take that down.

A Mr. LaHaise, you approved the LTIP payouts each year as a general protocol, correct?

**MS. FODE:** Compound, overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes.

**BY MR. SESSIONS:**

Q The LTIP payouts would also go to Palmer Proctor for his review, correct?

**MS. FODE:** Lacks foundation, overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** He was just the final approver because of the dollar amount.

**MR. SESSIONS:** Your Honor, at this time I'd like to read into the record a portion of Mr. LaHaise's individual deposition transcript. It's page 37, lines 8 to 17.

**THE COURT:** Okay.

**MR. SESSIONS:** We can go ahead and pull it up on the screen again on Blackout for speed here.

**THE COURT:** Go ahead. And before you do that, I'm going to ask if there are any objections.

**MS. FODE:** Can I please see it? And can I have a page line, counsel?

**MR. SESSIONS:** Yeah. It was 37, 8 to 17.

**MS. FODE:** No objection.

**THE COURT:** Okay. You may proceed.

**MR. SESSIONS:** Thank you, Your Honor. And permission to skip the objections?

**THE COURT:** Yes.

**MR. SESSIONS:** Thank you.

"QUESTION: Who approved the LTIP payouts? Palmer Proctor, James LaHaise, anybody else?

ANSWER: I approved the LTIP payouts as a general protocol across every single compensation plan that we have in the company. They go to Palmer Proctor for his review."

You can take that down.

**BY MR. SESSIONS:**

Q After Mr. Majid prepared LTIP calculations, any adjustments to the LTIP calculations needed to be recommended to you first, and then you would discuss internally with Nicole Stokes, correct?

**MS. FODE:** Objection. Lacks foundation, calls for a compound question.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** It would depend on what the request for an adjustment was.

**MR. SESSIONS:** Okay. Let's go ahead and pull up an exhibit. This one is a joint exhibit. It's Exhibit 59, and it is not yet admitted, but I would move to admit it into evidence.

**THE COURT:** Any objection?

**MS. FODE:** None, Your Honor.

**THE COURT:** Okay. Exhibit 59 is admitted, and you may publish.

**(Exhibit Number 59 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. This is an email chain between various individuals, Mr. LaHaise at Ameris Bank, correct?

A Correct.

Q The top email on the chain is from David Sparacio, correct?

A Correct.

Q And is it Sparacio or Sparacio?

A Sparacio.

Q Thank you. And the email is to you, correct?

A Correct.

Q Okay. And then if we can go to the page ending in 1710, which I think is the page we're on, but we're zoomed in, so it's a little tough to see. Okay. We are there. Okay. You can go back up. Okay. Do you see the second email on the page there that's from David Sparacio dated November 9th, 2023, at 11:34 a.m.?

A Yes.

Q And can you remind me again who David Sparacio is?

**MS. FODE:** Compound. Pardon me. Cumulative.

**THE COURT:** Overruled. You can answer the question. You confused me there for a second.

**THE WITNESS:** At the time, he was the controller of Ameris Bank.

**BY MR. SESSIONS:**

Q He's not the controller anymore?

A No.

Q Do you know what he does now?

A I believe he's the CFO of a bank in Birmingham, Alabama.

Q Okay. And in this email, he writes, Pat, good morning. We don't have the authority to make adjustments to the LTIP calculation. Any adjustments that you have need to be recommended to Jim, and he will discuss with Nicole. Sorry for the inconvenience. Correct?

**MS. FODE:** Lacks foundation. Argumentative.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** That's what that sentence says.

**MR. SESSIONS:** Thank you. You can go ahead and take that down.

**BY MR. SESSIONS:**

Q Now, in any given year, 2022, 2023, or 2024, if Balboa Capital exceeded the LTIP threshold, an accrual would result, correct?

**MS. FODE:** Compound. Overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Correct.

Q If the Balboa division exceeded the EBT, or earnings before taxes target, in a given year, then 35 percent of the amount before tax would be accrued in the LTIP pool, right?

A Correct.

Q And then that 35 percent would be distributed to the LTIP's participants, correct?

A Correct.

Q Patrick Byrne was a participant in the LTIP, right?

A He was eligible.

Q Can you explain by what you mean he was eligible?

A All participants from the plan are eligible to participate. It's, as the plan describes, you're not, the award is not actual until they actually are received. So everybody is eligible, but it's not necessarily that you're -- there is no guarantee that you can participate.

Q And what would cause an accrual to not be paid out if the threshold was met in a given year?

**MS. FODE:** Objection. Incomplete hypothetical.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** There are certain clauses within the agreement and within the plan overall that said if there was some type of regulatory control, if there was some -- or some kind of claim legally, any number of conditions that are in a section that says if that applies to an LTIP or to some

distribution of an incentive plan, then we would have to follow that law or that rule.

**BY MR. SESSIONS:**

Q Can you explain what those clauses that you're referring to mean?

A I'd have --

**MS. FODE:** Objection. Overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I'd have to look at each one of those, and if I have the knowledge of specifically what they are, I can explain it. But if I don't, I'd have to get somebody to do that.

Q Thank you. You've heard testimony in this court this week that there was no LTIP accrual paid out for the performance period 2023, correct?

**MS. FODE:** Objection. Misstates the testimony.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Correct.

**BY MR. SESSIONS:**

Q And is it your testimony, Mr. LaHaise, that the reason that no accrual was paid out was because of regulatory control issues?

**MS. FODE:** Objection. Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Are you asking me for 2023?

Q Correct.
A No.
Q Is it your testimony, to use your words, that no LTIP accrual was paid out in 2023 due to claims legally?
**MS. FODE:** Objection. Argumentative. Misstates the testimony.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** No.
Q Thank you. Now, if EBT surpasses the threshold specified in the LTIP during a performance period, Pat Byrne would stand to earn additional compensation under the LTIP program, save for any of those other issues that you just described to me, correct?
**MS. FODE:** Objection. Overbroad.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** He was eligible to participate.
Q In 2023, Mr. Byrne did not receive, excuse me, strike that, let me ask that again. For the performance period of 2023, Mr. Byrne did not receive an annual LTIP payout, correct?
A Correct.
Q Why didn't he receive an LTIP payout that year?
A Because the division did not exceed the threshold.
Q If the division had exceeded the threshold, would Mr. Byrne have received an LTIP payout that year?
**MS. FODE:** Objection. Calls for an incomplete

hypothetical. Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** He would have been eligible.

**BY MR. SESSIONS:**

Q Other than not exceeding the threshold, can you tell us what reasons could have prevented him from receiving an LTIP payout for that year?

A The circumstance would have had to be, I don't know. It's hard to speculate on what would cause that to happen.

Q I agree with that. You did Pat Byrne's performance review for 2023, correct?

A Correct.

Q Let's go ahead and put it up. This is exhibit number, forgive me, 453, which is a joint exhibit, and I do believe it's already in evidence.

**THE COURT:** It's already been admitted.

**MR. SESSIONS:** Thank you.

Q Okay. Is this the 2023 performance review you filled out for Mr. Byrne?

A Yes.

Q Okay. And then if we scroll down to the header that says final score, do you see that?

A Yes.

Q You wrote met expectations, correct?

A Correct.

Q Then going to the next page, looking at Section 1.0, do you see where it says the Ameris approach?
A Yes.
Q What is the Ameris approach? What does that mean?
A It is a cultural standard of how we expect our teammates to treat one another.
Q And if we look at the bottom of the page, do you see where it says met expectations?
A Yes.
Q You put that there, right?
A Correct.
Q Okay. And then do you see the comments next to it?
A Yes.
Q You wrote past leadership of the Balboa division is built on a value proposition of exceptional customer experience, solution oriented and high standards, correct?
A Correct.
Q Okay. Then if we go down to Section 1.1, do you see where it says performance objectives?
A Yes.
Q Okay. And then do you see where it says underneath your name, met expectations?
A Yes.
Q Now let's go to Section 1.2. Do you see the section that says initiative and reliability?

A Yes.
Q Okay. And then do you see where it says at the bottom met expectations?
A Yes.
Q You wrote that?
A I input the number that created that.
Q Okay. Fair enough. Do you see the comment next to it that says Pat is an active leader and strives every day to improve the division?
A Yes.
Q You wrote that, right?
A Correct.
Q Now let's go to Section 2.0. Do you see where it says leading the team?
A Yes.
Q Okay. And then do you see where it says met expectations?
A Yes.
Q Now let's go to Section 3.0. Do you see where it says, living the seven key leadership traits at Ameris?
A Yes.
Q I won't read all seven of them again, but if we can go down, do you see where it says met expectations?
A Yes.
Q And, again, you input the number that had it right, met expectations, correct?

A Correct.
Q We can go ahead and take that down.

**MR. SESSIONS:** At this point, I'd like to pull up Exhibit 79. This one is a joint exhibit, Your Honor, but it's not already admitted, so I would move to admit it into evidence.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 79 is admitted, and you may publish.

**(Exhibit Number 79 received in evidence)**

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

Q This is an email from Patrick Byrne to you, correct?
A Correct.
Q This is dated January 16th, 2024?
A Correct.
Q The subject is Re: 2023 Annual Performance Reviews, correct?
A Correct.
Q And Pat wrote, Hi, Jim, please include this in my review, correct?
A Correct.
Q And underneath, it says "2023 Strategic Plan Goals," correct?

A Correct.
Q And there's four goals listed here on the screen. Did I count those right?
A You did.
Q Okay. And underneath, there's four results listed, correct?
A Correct.
Q The first goal states, Long-Term Incentive Plan LTIP EBT of $48.5 million, correct?
A Correct.
Q And underneath, it says result Long-Term Incentive Plan LTIP EBT of 5, well, it says 57.2 full stop, correct?
**MS. FODE:** Objection. Document speaks for itself.
**THE COURT:** Objection is overruled.
**THE WITNESS:** That's what that sentence says.
**BY MR. SESSIONS:**
Q Do you understand the 57.2 to mean 57.2 million?
**MS. FODE:** Objection, calls for speculation.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** That would make sense.
**BY MR. SESSIONS:**
Q Thank you. Now, Mr. Byrne sent you these goals and results to include in his 2023 performance review, right?
A Yes.
Q Okay. Can you go ahead and read the second goal that's

listed there on the page? It starts with 10 percent.
A 10 percent growth in originations from top 50 brokers and vendor relationships.
Q And just for clarity, this is referring to goals that Mr. Byrne had to implement during the year of 2023, right?
**MS. FODE:** Objection. Lacks foundation.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** These were goals that he set for himself.
Q For 2023?
A Correct.
Q And can you read the result underneath?
A 31 percent growth in originations from top 50 brokers and vendor relationships.
Q Okay. Can you read the next goal, please?
A Originations growth of 8 percent over 2022, totaling $741 million.
Q Before I have you keep reading, do you know what an origination is?
A Yes.
Q Can you tell us what it is?
A Origination is the name of a loan. When we originate a loan, we just call it origination.
Q Okay. Can you go ahead and read the result underneath?
A 13 percent growth, totaling 778 million.

Q Okay. Can you read the last goal on the page?
A 90 percent retention of top 20 revenue producers.
Q And can you read the result?
A 95 percent retention of top 20 revenue producers.
Q Okay. At the risk of asking a simple question, can you tell us what revenue producers means?
A Revenue producers are the people who originate loans for the company.
Q Now, Mr. LaHaise, do you recall if you added these four goals and results to Mr. Byrne's performance review for 2023?
A I added three of the four.
Q You didn't add the top goal, the one regarding the LTIP, correct?
A Correct.
Q Okay. We can go ahead and take that down. You discussed Pat Byrne's proposed revisions to the 2022 and Q1 2023 LTIP with him, correct?
A Correct.
Q I'm going to go ahead and show you another email. This is Exhibit 399, and it is not admitted yet.

**MR. SESSIONS:** So, Your Honor, I would move to admit it into evidence.

**THE COURT:** Any objection?

**MR. SESSIONS:** It is a joint exhibit.

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 399 is admitted, and you may publish.

**(Exhibit Number 399 received in evidence)**

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

Q Okay. This is -- well, the top email is from you to David Sparacio, Patrick Byrne, and Sufhan Majid, correct?

A Correct.

Q Laura Rodriguez is cc'd?

A Correct.

Q Okay. We're going to go to the email dated July 24th, 2023 at 1:05 p.m. I think it's just right underneath. There we go. Do you see that?

A Yes.

Q Okay. And this is from David Sparacio?

A Correct.

Q Okay. He says, Pat, appreciate the feedback on the calculation. We in accounting can't make these decisions to exclude these items in the calculation. We will need to get direction from the executive team, correct?

A That's what that sentence says.

Q Are you part of the executive team? Well, strike that. I understand you're retired now, correct?

A Correct.

Q At this time in 2023, were you part of Ameris Bank's

executive team?
A Yes.
Q Then we scroll up to the next email. This is an email from you, correct?
A Correct.
Q You respond saying, David, thanks. I have it from here, and we'll follow up with Pat, correct?
A Correct.
Q Okay. You can take that down. Okay. I believe this exhibit is already into evidence.

**MR. SESSIONS:** I'd ask to publish Exhibit 405.

**THE COURT:** It has not been admitted yet.

**MR. SESSIONS:** Apologies, Your Honor. I would move to admit Exhibit 405 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 405 is admitted, and you may publish.

**(Exhibit Number 405 received in evidence)**

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

Q Okay. This is an email chain that you are on, correct, Mr. LaHaise?
A Correct.
Q Okay. And the email we're looking at right now, is that

dated August 4th, 2023?
A Correct.
Q And did Pat Byrne send that email?
A Yes.
Q Okay. And Nicole Stokes is on it too, correct?
A Yes.
Q As is Phil Silva?
A Correct.
Q Okay. And in the email on the first line, Pat Byrne writes, Jim, I need my bonus for Q1 and Q2 to be paid out. I have been more than patient here as the Q2 bonus has been withheld for several weeks and the Q1 bonus has been withheld for over three months, correct?
A That's what that sentence says.
Q Okay. Thank you. Now, if we scroll up, you responded that same day, correct?
A Yes.
Q Okay. And you wrote, Pat, here is our calculation. That's the first sentence, correct?
A Correct.
Q Okay. Now, if we scroll down to the bottom of this particular part, do you see after the bullet points where it starts with, I will get?
A Yes.
Q It says, I will get payroll to submit your quarterly

incentive on Monday, which should bring this open issue to a close, correct?

A Correct.

Q Okay. We can take that down. For the best of your knowledge, Mr. Byrne was eventually paid all of his quarterly bonuses while he was at Ameris, correct?

A Correct.

**MR. SESSIONS:** At this time, Your Honor, I'd move to admit Exhibit 68 as a joint exhibit into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 68 is admitted and you may publish.

**(Exhibit Number 68 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. If we can scroll down to the second page, there should be an e-mail. There we go. Do you see the e-mail from Mr. Byrne to you dated December 20, 2023?

A Yes.

Q He writes, hi, Jim. We want to use the LTIP to calculate the bonuses like we did last year, correct?

A Correct.

Q And then he wrote, as communicated consistently, often and for a very long period of time, we expect the LTIP to include the old method of accounting for interim rent and the tax

benefits for MFV contracts and exclude depreciation for pre-acquisition assets and compensation for departments not reporting to Balboa. Attached is the most recent correspondence. Nothing less is acceptable. Thank you, Pat. Correct?

A That's --

**MS. FODE:** Hold on. Lacks foundation, calls for speculation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** That's what that sentence says.

**BY MR. SESSIONS:**

Q Thank you. Okay. And then if we scroll up, excuse me, to the next e-mail. Now, it doesn't say your name at the top of the page, but do you understand looking at the signature block that you wrote this e-mail here?

**MS. FODE:** Objection, lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I do.

**BY MR. SESSIONS:**

Q You wrote, Pat, as we have discussed on the LTIP and your Q3 incentive, they are based on the division achieving the agreed to target pre-tax income. The adjustments you are referencing are not consistent with the language of the LTIP agreement, correct?

A Correct.

Q Now, in this trial, Mr. LaHaise, you have seen that that Q3 LTIP bonus was eventually paid to Mr. Byrne, right?

**MS. FODE:** Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Correct.

Q That was the one that Mr. Byrne was paid 4 percent interest on with the payment, correct?

A I don't recall that one specific, but we did pay him an interest at 4 percent interest on one of them.

Q Fair enough. Let's go ahead and look at Exhibit 69. It's already admitted. Okay. This is an email from you, Mr. LaHaise, right?

A Correct.

Q It's dated December 22nd, 2023?

A Correct.

Q It says, Pat, we will be remitting your Q3 incentive payment that should be in the 12/30/2023 payroll. In addition, I have included an interest payment of $1,003, 4 percent interest for 61 days, which is missing -- which is for the missing -- excuse me, which is for missing the 30-day post-quarter end payment date in your employment agreement, correct?

A Correct.

Q Then you wrote, happy holidays, and I look forward to a great 2024, right?

A Correct.

Q You can take that down. Now going into 2024, Mr. Byrne continued to ask for adjustments to the LTIP calculations, correct?

**MS. FODE:** Objection, overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** There was continued discussions.

**BY MR. SESSIONS:**

Q Continued discussions with whom?

A With Mr. Byrne.

**MR. SESSIONS:** Now let's go ahead and I'd move to admit Joint Exhibit 74 into evidence at this time.

**THE COURT:** It's already been admitted. 74?

**MR. SESSIONS:** Yes, Your Honor, apologies.

**THE COURT:** That's okay.

**MR. SESSIONS:** Permission to publish?

**THE COURT:** You may.

**MR. SESSIONS:** Thank you.

Q Do you see the document on the screen?

A Yes.

Q Okay. Now if we scroll down, there should be an email dated January 4th, 2024. Do you see that?

**MS. FODE:** Objection, misstates the document.

**BY MR. SESSIONS:**

Q Apologies if I misread. It says January 4th, 2024, correct?

A Correct.
Q This is an email from Patrick Byrne?
A Correct.
Q And it says in the email, do you see the, I'll read that line that appears under the full paragraph. It says, for the LTIP, interim rent should be recognized when the cash is received, which is consistent with past practices, correct?
A Correct.
Q Now if we scroll up, there should be a response from David Sparacio. Do you see that?
A Yes.
Q Can you tell me who the other participants on this part of the email are?
A Sufhan Majid, Nicole Stokes.
Q And yourself?
A And myself.
Q Mr. Byrne is not on this part of the email, right?
A No.
Q Mr. Sparacio took him off the chain, correct?

**MS. FODE:** Objection, lacks -- calls for speculation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I don't know who did it, but he's not on the chain.

//

//

**BY MR. SESSIONS:**
Q Okay, let's pull it up just so we can see the email. Okay, do you see Mr. Byrne is on the email immediately below this one?
A Yes.
Q Okay. And then the next one is that email we just looked at from Mr. Sparacio, right?
A Correct.
Q Is it your testimony right now, you're not sure if Mr. Sparacio is the one who removed Mr. Byrne from the email chain?
**MS. FODE:** Calls for speculation, lacks foundation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** No, you just didn't have that pulled up before, so now that I see it, clearly.
Q Perfect. Okay. In that email from Mr. Sparacio, he says, forgive me. I'll go down. There we go. Just hard to see. He says, Jim, Nicole mentioned that you and her discussed any possible manual adjustments to Pat's LTIP calculation, and the message was we were not going to make any. Pat continues to pound on the interim rent issue, and he is correct. As the agreement clearly states, it is based on GAAP financials, which is not consistent with his past practices, as he has historically accounting for interim rent on a cash basis. I've also told him in the past that we are in accounting -- that we

in accounting can't make adjustments to the LTIP unless the message comes from you and Nicole. I don't know why he keeps bringing this up, but if you could remind him of this issue, we would appreciate it. Thanks, D.S., correct?
A That's what that sentence says.
Q Mr. Sparacio wrote this, correct?
A Yes.
Q Then if we go up to your response, this was on January 5th, 2024, right?
A Correct.
Q One day after Mr. Sparacio sent his email?
A Correct.
Q And you said, you are correct. I will address again, correct?
A Yes.

**MR. SESSIONS:** Okay. At this time, Your Honor, I'm going to take this down, and I'd move to admit into evidence joint Exhibit 77.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 77 is admitted, and you may publish.

**(Exhibit Number 77 received in evidence)**

//

//

**BY MR. SESSIONS:**

Q Okay. This is an email where if we look at the top one, it's from Mr. Sparacio to Sufhan Majid, correct?

**MS. FODE:** Objection. Document speaks for itself, lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes.

Q Okay. Then if we go down to the email below it, the one on January 10th, 2024, you see that?

A Yes.

Q Okay. And then below that, there's an email that's on the same day at 10:18 a.m., right?

A Correct.

Q And that email, Sufhan Majid, says, "Pat, thanks is -- he says:

> "Pat, attached is the final LTIP based on the financials as of 12/31/2023 now that the books are officially closed," right?

**MS. FODE:** Calls for speculation, lacks foundation.

**THE COURT:** Overruled, you can answer.

A That's what that sentence says.

Q And then if we scroll up, Mr. Byrne in this email says:

> "Hi Sufhan, as previously and consistently stated, these figures grossly understate the earnings before tax for the LTIP," correct?

A That's what that sentence says.

Q And the next sentence says:

"Once you send me the December financials, I will prepare the accurate earnings before taxes," correct?

A That's what that sentence says.

Q Thank you. And then if we scroll up to the next email, Mr. Sparacio replies internally and says:

"Please don't respond to Pat on this" --

**MR. SESSIONS:** Strike that, I'm going to ask two questions here.

Q Mr. Byrne is not on this portion of the email chain, correct?

A Correct.

Q Okay. And in this email David Sparacio just says to Sufhan Majid:

"Please don't respond to Pat on this. I've talked with Nicole and she agrees any adjustments need to go through Jim," correct?

**MS. FODE:** Objection, lacks foundation, calls for speculation.

**THE COURT:** Overruled, he can answer.

A That's what that sentence says.

**MR. SESSIONS:** Okay. We can take that down.

Now I would move to admit -- okay. At this time I'd like to show an exhibit just to the witness. It is Exhibit 99.

It is not yet admitted into evidence.

**THE COURT:** Go ahead.

**BY MR. SESSIONS:**

Q Okay. Mr. Lahaise, this is an email chain from David -- at the top there's an email with David Sparacio, correct?

A Correct.

Q Sufhan Majid is on the email?

A Correct.

Q Laura Rodriguez is there too, right?

A Correct.

Q These are all Ameris Bank employees, correct?

A Yes.

Q And the subject is LTIP accrual?

A Yes.

**MR. SESSIONS:** And then if we scroll down to the bottom of the page, little further, Ms. Perez, little further, just go down just so we can see the Bates stamp.

Do you see the bottom right it says, "Ameris 002073"?

A Yes.

**MR. SESSIONS:** Okay. At this time, your Honor, I'd move to admit this document into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

//

//

**THE COURT:** Okay. Exhibit 99 is admitted and you may publish.

**(Exhibit Number 99 received in evidence)**

**MR. SESSIONS:** Thank you.

**BY MR. SESSIONS:**

Q Can you remind me what Ms. Rodriguez's job was at Ameris?

A She's the incentive -- responsible for incentive coordination.

Q Does she still work at Ameris per your knowledge?

A When I left the company she was still employed.

Q Okay. And then there's an email dated April 4th, 2024 at 9:53 a.m. Do you see that on the screen?

A Yes.

Q And in this one Sufhan Majid writes:

"Hey, Laura. Please see attached LTIP cal -- please see attached calculation for the LTIP. I assumed 1MM --

Which I assume means million.

"-- for commission, please incentive, which hasn't been posted yet," correct?

**MS. FODE:** Document speaks for itself, lacks foundation.

**THE COURT:** Overruled, he can answer.

A That's what the sentence says.

Q Is it your understanding that "MM" typically means

million?
A Correct.
Q He then continues:

"But LTIP is below the target by about 1 point MM so no accrual is needed unless we missed anything material from an income statement perspective," correct?

A That's what the sentence says.
Q And then he writes, "Let me know if you have any questions," with an exclamation point, correct?
A That's what the sentence says.

**MR. SESSIONS:** Okay and scroll up to the next April 4th email.

Q Ms. Rodriguez responds, "Thank you" -- this time with two exclamation points, correct?

**MS. FODE:** Calls for speculation.

**THE COURT:** Overruled, he can answer.

A That is correct.
Q She then writes:

"Based on my review we will book about 350-K dollars to the accrual. It'll be close but still below target," correct?

A Correct.
Q Okay. And then if we go to the next email, looks like again this is from Ms. Rodriguez, right?

A Correct.

Q Okay and she wrote, "Hah," with an exclamation point, right?

A Yes.

Q "Now that I'm reading what I wrote, I see just how confusing it is."

Two exclamation points and a smiley face emoji. Is that what it shows on the screen?

A Yes.

Q And then she says:

"I meant we were going to book about 350-K dollars for commissions/incentives (dot, dot, dot), not LTIP," exclamation point, correct?

A That's what that sentence says.

Q And it says:

"Sufhan and I discussed earlier today in the accrual for commission/slash incentives will come in closer to 650-K dollars," correct?

**MS. FODE:** Objection, hearsay.

**THE COURT:** Overruled, he can answer.

A That's what that sentence says.

Q Then she writes and that sentence says below:

"We are not booking anything for LTIP," correct?

A That's what the sentence says.

Q And then she writes, "Sorry for the confusion," right?

A That's what the sentence says.

**MR. SESSIONS:** Okay let's take that down.

At this time, your Honor, I would ask to show just to the witness Exhibit 95.

**THE COURT:** Go ahead.

Q Okay. This is an email chain between you and Mr. Byrne, correct?

A Correct.

Q Dated March 7, 2024?

A Correct.

**MR. SESSIONS:** Move to admit into evidence, your Honor.

**THE COURT:** I believe 95 has -- yes, 95 has already been admitted.

**MR. SESSIONS:** Apologies, your Honor.

**THE COURT:** That's okay.

**MR. SESSIONS:** My number is mixed up today and my apologies for the delays that is causing. We'll go ahead and just publish this.

**THE COURT:** Okay, go ahead.

**BY MR. SESSIONS:**

Q Okay. Now, if we go to page 3, okay and we zoom in, this is a non-renewal letter you sent to Mr. Byrne, right?

A Correct.

Q It says:

"This letter shall serve as notice pursuant to Section 1 of the agreement that Ameris Bank has determined to not renew the agreement beyond the expiration of its initial term as defined in the agreement on December 31, 2024," correct?
A Correct.
Q So you personally made the decision not to renew Patrick Byrne's employment contract, right?
A Correct.
**MR. SESSIONS:** Okay, take this down.
Q You told Mr. Byrne in his review for the year 2023 you wanted him to continue as CEO, right?
A Correct.
Q And then when you were asked in your deposition whether Mr. Byrne himself said in his 2023 performance review that he may not want to continue in the role of CEO of the Balboa Capital Division, you said at that time you didn't recall, right?
**MS. FODE:** Lacks foundation.
**THE COURT:** Overruled, he can answer.
A I don't recall exactly those in the deposition but I don't have that document in front of me.
Q Do you recall now if Mr. Byrne said those words to you?
A Which words?
Q That he may not want to continue in the role of CEO of the

Balboa Capital Division?
A I don’t -- I don't recall it in the deposition but we did have a discussion about whether or not he wanted to continue in his role.
Q And are you saying that your testimony right now is that he did say to you he didn’t want to continue in his role?
**MS. FODE:** Objection, vague and ambiguous.
**THE COURT:** Overruled, he can answer.
A No, that’s not what I said.
**MR. SESSIONS:** Okay. Thank you for clarifying. Okay. Let’s go ahead and put back up Exhibit 95.
Q Okay. Let’s look at the cover email here. It says:
“Pat, attached is the non-renewal notice. Want to give us plenty of time to work through our long-term plan together,” correct?
A Correct.
Q And with respect to the long-term plan you referred to here, Ameris also provided a new severance and protection agreement to Mr. Byrne, correct?
A Correct.
**MR. SESSIONS:** Let’s go ahead and take a look at Exhibit 469 which is not admitted into evidence but it is joint so I would move to admit.
**THE COURT:** Any objection?
**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 469 is admitted and you may publish.

**(Exhibit Number 469 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. This is a cover email that's dated March 11, 2024, right?

A Correct.

Q It's from you to Pat Byrne and Phil Silva?

A Correct.

Q Okay. You write:

"Gentlemen, attached is our senior management agreement for your review," correct?

A Correct.

Q And it just says, "Upon, right?

A Yes.

Q Do you know why it says that?

A I don't know if this was just a draft and never sent or if it was actual -- the actual email, so I don't know.

Q Do you think you didn't send this to Mr. Byrne?

A I did send him a notice but I don't know if this version of the email may have been a draft before the final document was complete.

Q Sure. Let's scroll down and look at the attachment. Do you see the heading says:

"Severance protection and restrictive convenance

agreement," correct?

A Correct.

Q Now, this document is not an offer of future employment at Ameris, correct?

**MS. FODE:** Objection, lacks foundation, calls for speculation.

**THE COURT:** Overruled, he can answer.

A It's a document provided for somebody who is employed.

Q Just to clarify, regardless of what you just said it is -- strike that.

**MR. SESSIONS:** Ask the question again just for the clear record.

Q It's not an offer of future employment, correct?

**MS. FODE:** Objection, argumentative.

**THE COURT:** Overruled, he can answer.

A That's correct.

**MR. SESSIONS:** Okay. Let's go ahead and look again at Exhibit 103 which I believe is already admitted.

**THE COURT:** It has not been admitted.

**MR. SESSIONS:** Okay. Well I would move --

**THE COURT:** There are some documents that have been admitted twice because they're duplicates in the list so this might be one of them.

**MR. SESSIONS:** Yeah, I think that's true, your Honor, but for the sake of time so we don't have to go back and figure

out what number it is I would ask that Exhibit 103 be admitted.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay. Exhibit 103 is admitted and you may publish.

**(Exhibit Number 103 received in evidence)**

**BY MR. SESSIONS:**

Q Okay. This is an email chain that you wrote, correct?

A Correct.

Q And it's to Mr. Byrne?

A Correct.

Q Dated May 6, 2024?

A Correct.

Q Okay. And the subject line is:

"Summary of compensation owed," correct?

A Correct.

Q And in this email you wrote:

"Pat, we did discuss it and I did reiterate that your assumptions were not correct on the LTIP adjustments and that that matter was closed. I am confirming that you were not due and never have been due additional payments for 2022 and 2023 LTIP or the purchase price of the company," correct?

**MS. FODE:** Objection, argumentative, tone.

**THE COURT:** Overruled, he can answer the question.

A That's what that says.
Q You wrote that, right?
A Correct.
Q Are any of the words that you wrote not true?
A No.
**MR. SESSIONS:** Now let's go ahead and look at Exhibit 496 and this one is already admitted.
**THE COURT:** Yes, it is.
Q This is an email from you attaching Mr. Byrne's termination letter, correct?
A Correct.
Q Jodie Spencer is also on this email, right?
A Correct.
Q Who's Jodie Spencer?
A He's our in counsel, legal counsel.
Q He's in this courtroom, right?
**MS. FODE:** Objection, relevant.
**THE COURT:** Overruled, he can answer.
A Yes.
Q Who's Ben Phelps?
A Ben Phelps at the time was the HR coordinator for the lines of business.
**MR. SESSIONS:** Now if we scroll down to the attached termination notice.
Q This is the termination notice, correct?

A Correct.
Q Now in this document I can read or highlight the first sentence of the second paragraph. It says:

"As provided in Section 2 of the agreement, termination of your employment by the company without cause as defined in the agreement entitles you to certain severance benefits," correct?

A Correct.
Q Who wrote this letter?
A I'm not sure. I would assume it was our HR department.
Q Now if we scroll down, do you see the paragraph at the bottom that starts with "In addition"? Do you see that?
A Yes.
Q It says:

"In addition, notwithstanding the termination of your employment by the company without cause, you will remain eligible to participate in the Balboa Capital long-term cash incentive plan subject to its terms and conditions," correct?

A Correct.
Q And then it says:

"For the 2024 calendar year performance period," right?

A Correct.
Q Was there an LTIP bonus distribution in 2024?

**MS. FODE:** Objection, irrelevant. Calls for legal conclusion.

**THE COURT:** Overruled, he can answer.

A It was.

Q How much was it?

**MS. FODE:** Same objections.

**THE COURT:** Overruled, he can answer.

A I don't know.

Q Was it more than three million dollars?

A I don't recall the number, I don't.

Q Was it more than a million dollars?

**MS. FODE:** Objection. Asked and answered.

**THE COURT:** The objection is overruled, he can answer.

A Again, I don't know what the number was.

Q Was Mr. Byrne paid an LTIP bonus for the year 2024?

**MS. FODE:** Objection, irrelevant.

**THE COURT:** Overruled, he can answer.

A No.

Q Do you know who Phil Silva is?

A Yes.

Q Who's Phil Silva?

A He's the division president of Ameris Bank Equipment Finance, formerly Balboa Capital.

Q There's nobody currently -- well strike that because

you're now retired.

At the time of your retirement was there anybody above Phil Silva in terms of hierarchy within the Ameris Bank Equipment Finance Division?

**MS. FODE:** Objection, overbroad.

**THE COURT:** Overruled, he can answer.

A There was nobody above Phil Silva.

Q At the time of your retirement did Phil Silva report to you?

A Yes.

Q And you worked with Phil Silva for assigning the 2024 LTIP distribution, correct?

**MS. FODE:** Calls for speculation.

**THE COURT:** Overruled, he can answer.

A Mr. Silva was involved in the calculation.

Q How was he involved?

A He made recommendations.

Q What do you mean by that?

A He made recommendations on the -- who would receive payment.

Q Did he recommend that he himself receive a payment?

**MS. FODE:** Objection, irrelevant, third-party privacy.

**THE COURT:** Overruled, he can answer.

A He did not.

Q Did he recommend that Pat Byrne receive a payment?
A He did not.
Q Did Mr. Silva receive a payment for a 2024 LTIP distribution?
**MS. FODE:** Objection, irrelevant, outside the scope and third-party privacy.
**THE COURT:** Overruled, he can answer.
A He did.
Q How much did he receive?
**MS. FODE:** Objection, irrelevant, outside the scope and third-party privacy.
**THE COURT:** Overruled, he can answer.
A I don't know.
Q Was it the same percentage that Mr. Byrne would have received had he still been employed at Ameris?
A Like I said, I don't know.
Q You retired from Ameris effective April 30th, 2026. Did I get the date right?
A You did.
Q You weren’t fired, correct?
**MS. FODE:** Objection, third-party privacy, irrelevant and prejudicial.
**THE COURT:** Overruled, he can answer.
A No.
Q Were you asked to retire?

**MS. FODE:** Same objections.

**THE COURT:** Overruled, he can answer.

A No.

Q You entered into a retirement agreement with Ameris at the time of your retirement, right?

**MS. FODE:** Objection. Document was late filed and irrelevant.

**THE COURT:** Overruled, he can answer.

A I signed an agreement just like all executives when they retire.

Q Sure. And in that agreement you agreed to make yourself available for quote:

"Any judicial proceeding upon request of Ameris," correct?

A Correct.

Q That would include this case, right?

A Correct.

**MR. SESSIONS:** I have no further questions.

**THE COURT:** Okay, Ms. Fode? You may proceed when you're ready.

**MS. FODE:** Thank you, your Honor. Pardon me. Bad setup. Thank you.

//

//

//

**CROSS EXAMINATION**

**BY MS. FODE:**

Q All right. Mr. Lahaise, thank you so much for your time. Really appreciate it.

Now, first question, are you forced to be here?

A No.

Q And did you want to be here?

A Yes.

Q Why?

A Well first off is some very -- the company is very important to me and the teammates that are there at the bank and Balboa Capital and so I want to be here to support them. Also having been involved in all of the negotiations from the beginning through to the end, I'm the most eligible person for that.

Q All right. Let's go back a little bit.

Tell me a little bit about your educational background, please.

A So my undergraduate degree is a bachelor's in business from the Citadel.

Q What did you study?

A It was business and accounting.

Q And how long have you worked in banking?

A Thirty-nine years.

Q When did you start?

A In 1987.

Q Tell me a little bit about your professional experience over the years.

A So I started in banking in 1987 as a management associate at a bank in Florida called Barnett Bank, went through their associate program then through all of their training programs, came out was in the branching network, then in the commercial banking, then went to work for a bank called First Union Bank which is again a commercial bank, did private banking and commercial banking. And then from there I got into community banking and so the last 25 years have been in community banking, banks like Ameris Bank.

Q What's a community bank?

A A community bank is a bank that's oriented towards the local communities. They call them community banks because they typically are founded or very centrally managed through -- within each community and so that we can be better connected with the local customers, make better decisions, be more relationship driven.

Q And how did you come to join Ameris Bank?

A In 2014 I was the CEO of a bank called The Coastal Bank in Savannah, Georgia. And we had made a strategic decision that it was time to partner with a larger bank to have more opportunities for our customers and our employees and we sold the bank to Ameris Bank in 2014.

Q And for Ameris Bank, for those of us who weren't familiar with it, tell me a little bit about its banking model.
A So as we -- it's a community bank so we're a bank that focuses on the local communities. We can do all of the normal banking services that you would get in any of the larger banks just with a delivery model that's much more local and so allows us to reorganize in that way so it allows us to put our leadership and our decisionmakers closer to the customer and more involved with the customer. And then allows us to serve the community and grow the community, help the community grow because as the community grows, we grow.
Q So tell me, what was your first position at Ameris Bank?
A My first position was chief revenue officer for the company.
Q And then how did that -- did it change over time?
A That role evolved into the chief strategy officer which I was when I retired.
Q What were your responsibilities as a chief strategy officer?
A There were three components to it. One was I was responsible for what we called our lines of business of which Balboa Capital was one of those. We had -- they have an insurance premium finance business, a mortgage company, SBA business. Those businesses tended to be more national in their footprint versus the bank which was more focused on the local

communications. That was one component.

Another component was obviously strategy so I assisted the leadership team in developing strategy for the company overall. And then lastly was dealing with mergers and acquisitions and doing the evaluation process and determining helping the team go through the process if we decide to move forward.

Q So you were at Ameris Bank for 12 years; is that right?

A That's correct.

Q And why did you work at the bank for so long?

A The people, the teammates that we have at the bank are the reason for me to -- why I work and why I enjoyed what I did because your waking days are with mostly with the people you work with and if you really enjoy those folks and you're committed to each other and you work hard together, it really makes the work really rewarding.

Q There's been a couple of questions about the culture of Ameris. Would you describe it please for us?

A So it's very much the -- focused on the people side of things and relationships that we have and having high integrity, discipline in what we do and really fairness. And if we do those things right we know then the customers will be taken care of in the same way and things will get done the way we expect.

Q And why did you focus on the acquisition side of banking

for your career?
A Well it was kind of a natural fit for me having been in the community bank world and with a number of partnerships where we did a lot of acquisitions. I really enjoyed the energy in the focus that entrepreneurs bring to a company and so it always -- I got the same amount of energy from them as they had and entrepreneurs tend to have that and it's fun to be around.
Q How many acquisitions did you participate in over your career?
A Sixteen acquisitions.
Q And were all of those for companies such as Balboa Capital operating companies?
A A couple of them were but the bulk of them were other banks.
Q So tell us a little bit about how the acquisition process usually works at Ameris Bank.
A So it's as you determine it's something you want to do and you want to pursue growing the bank through an acquisition strategy, whether that's another bank or through another operating company, there are lots of investment bankers that go around and represent either the bank or the small business or the company that's looking to sell. And you typically get what they call the pitch deck which is we heard called the SIM or the document that's just the brochure about here's an

opportunity. And that gets nicknamed just like Pioneer was the nickname for the Balboa Capital One because you're doing it in a blind approach. You don't really know who the company is you just know the characteristics of the company. Same thing goes for a bank. And once you determine that that's something that interests you then you typically progress that along with some meetings and get to know the principals and it's typically highly confidential.

And once you go through that process there's usually multiple bidders and so there's a competitive nature to that that you have to compete to win the relationship. And once you go through that process that's where the LOI process comes in where you make you basically your letter of interest and that's really just that hey, we'd love to do something -- figure something out with you guys and here's some general terms. It's just it gives you your focused talking points around what you're trying to do.

Then once if an LOI is accepted, then you get into what's called a definitive agreement and that's where it's a document that you're going through full due diligence, you're doing all the analysis and it's a very complete process but it's not a perfect process. You really focus on kind of the material things within the organization, within the company or the bank.

And then once you if you completed that and everybody

agrees then you go into a purchase agreement and ultimately close on the transaction.

Q And for Ameris, what's its most important aspects when you're looking at an acquisition?

A Depending on the company but mostly it has to do with the people. That's what drives the business is that the people who do it every day and if we feel strongly about the team is there, they can deliver on what the expectations are, what the projections are and we can align to what it takes to make that happen, that's the most important component.

Q So how is a purchase price generally structured for an acquisition?

A So in the banking world as it relates to a bank, on a bank there are kind of industry norms that happen with banks and it all has to do with general economy, the supply and demand, how many banks are available and who wants to do them. And so they can get more expensive or less expensive. And it also has to do with the condition of the company.

For private companies such as Balboa Capital, they're typically built on either some type of multiple to the amount of equity that the company has which is the retained earnings over a period of time or it can be a multiple of the net income that the company generates or it can be in multiple sales. It just depends on the industry and what the purchaser however they're trying to evaluate the transaction.

Q And is there sometimes what's called an "earnout"?
A There are in operating companies such as Balboa Capital it is common for there to be an earnout transaction, yes.
Q And was the acquisition of Balboa, was there an earnout involved?
A No, there's not.
Q And why not?
A We -- our initial approach to the transaction was our initial bid there was multiple phases in the negotiation for Balboa Capital and it started with a large group of competitors and then it kept getting narrowed down as we would go through this timeline, this timeline and this timeline to ultimately get to the ultimate winner of the bidding process. And so our bid initially was for a purchase price at a certain dollar amount and then an earnout over time.
Q And ultimately was it a hundred percent of the purchase price paid upfront?
A That's correct.
Q How did Ameris first learn about Balboa Capital?
A Through an investment banker at KBW.
Q And there was some testimony about there was an initial start with the sale and then a second -- a pause and then a second part of that sale. Would you give us a little bit of background on the transition of the sale process?
A Yes. So the initial we first met Mr. Byrne in would have

been probably 2018 I believe. I don't have my dates exactly right. And it was part -- he was marketing the company and we were interested and we began that initial process of just meeting the leadership and understanding the business model and going through that process. And at the same time we were in negotiations in to acquire a bank in Atlanta, Georgia and it was a fairly large transaction. And so it's very difficult to manage those two transactions at the same time. And so as we were moving down the process with each of those and it really became time that we really needed to respond to Mr. Byrne on his sale, we decided that we would just postpone that process with Balboa Capital and Mr. Byrne so that we could focus on finishing up the transaction on the bank.

Q And what exactly was your role in the acquisition?

A So as chief strategy officer for the company, my role was as I talked about is to assist the team through the entire process that's both that's the negotiation process, that's the analysis process, coordinate that. I was typically the primary contact for all of the activities just so that really just so that we keep everybody singing on the same page and we've got one voice going forward so everybody's working on it at the same time.

Q And what timeframe did the negotiations about the Balboa acquisition pick back up?

A So it would have been probably the spring of 2021.

Q And were there other companies interested in Balboa Capital?
A Yes, there was.
Q And do you know why Mr. Byrne chose Ameris?
**MR. SESSIONS:** Objection, calls for speculation.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did Mr. Byrne ever tell you why he picked Ameris?
A I don't recall.
Q How many of the Balboa employees remained with Ameris after the acquisition?
A A vast majority.
Q And how much did Ameris pay Pat Byrne in connection with the acquisition?
A Approximately 186 million dollars.
Q And was that paid in cash?
A Yes.
Q And was there a reason it was paid all at once rather than an earnout?
A Yes because that’s what Mr. Byrne’s preference was and in order to win the transaction it had to be 100 percent of the consideration paid upfront.
Q And is that common for the owner to be paid all upfront in your experience doing these acquisitions?
A Like I stated before it is -- transactions are done all

different ways. Some of them are in 100 percent compensation upfront and some of them do have earnouts, just depends on the desire of both parties.

Q And were there any other financial components of the transaction?

A The financial components there was the LTIP was part of the outcome of the negotiations. It wasn't part of the consideration in the sale but it was part of a benefit that the bank proposed to Mr. Byrne in the negotiations.

Q And was there also money put towards a retention bonus pool?

A There was. So in addition to the LTIP program and obviously the consideration for the sale, Ameris Bank put up 1.2 million dollars of what we call a retention pool that was distributed to the employees of Balboa Capital in a structured way. Fifty percent of it was paid at closing and 50 percent was paid one year later and it was to incent the employees to -- we understand that an acquisition and a transition is very difficult and it can be very stressful and this is a way for us to recognize that that's a lot of hard work and we really appreciated going into it and that if they'll hang in there with us through the process then we'll reward them.

Q And after the acquisition did the Balboa employees become Ameris employees?

A Yes.

Q And did Balboa Capital then become a division of Ameris Bank?
A Correct.
Q And who did he report to?
A He reported to me.
Q And based on your own observations, how did Mr. Byrne handle the transition from owning his own company, coming into a large publicly traded bank?

**MR. SESSIONS:** Objection, vague.

**THE COURT:** The objection is sustained and it's 4:30 so is this a good time for a break?

**MS. FODE:** It works great. Thank you.

**THE COURT:** Okay. So we are going to stop for the day.

Sir, you can go ahead and step down.

**(Witness stepped down)**

**THE COURT:** So we're not going to be in session tomorrow because tomorrow is the day that I handle the motions on my criminal cases and other civil cases. On Monday it's going to be a little bit different. I have a scheduling conflict, it's my conflict, it's not the lawyers or any of the witnesses so blame me if you're not happy with it. We'll do what we usually do, we'll go from 9:00 until noon and then 1:00 but we're going to end at 2:30 on Monday so that I can make this other commitment that I have.

As I indicated to you before this trial started, you, as jurors, will decide this case based solely on the evidence presented in this courtroom. This means that after you leave here for the night you must not conduct any independent research about this case, the matters in the case, the legal issues in the case or the individuals or other entities involved in the case. This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers. You must also not communicate with anyone in any way about this case and you must ignore any information about this case that you might see while browsing the internet or on your social media feeds.

So thank you-all very much for your punctuality and your attention. I know it's been a very long day, a long week for all of you. I hope you have a wonderful weekend and we'll see you on Monday.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE COURT:** Okay. Everyone can be seated. Let's see here. Just one second. I'm going to give you calculations of how much time you've all used.

**(Pause)**

Okay. So the plaintiff has used eight hours and 27 minutes of your 10 hours and Defendants have used three hours

and 52 minutes of your 10 hours. It's starting to feel like we're getting close to the end of the case because we have taken a few witnesses in the defense case during the Plaintiff's case so that way our witnesses only have to testify once including with Mr. Lahaise.

So let me ask you, Ms. Fode. How much time do you think you have left with Mr. Lahaise?

**MS. FODE:** I would say an hour and a half.

**THE COURT:** Okay. And how much time is there for the rest of the plaintiff's presentation concerning Mr. Lahaise?

**MR. SESSIONS:** Depending -- it all depends, your Honor, on the scope of the direct but I can't imagine it'd be any more than 10 minutes.

**THE COURT:** Okay. So it sounds like we'll finish with Mr. Lahaise on Monday. Are there any other witnesses? Who's on deck for Monday?

**MR. SESSIONS:** On deck for Monday right now, your Honor, is Mr. Silva, Jacquie Emert and the video of Palmer Proctor. And subject to time I can just tell you that our remaining witnesses would be Deborah Dickson and Dr. Anthony Reading.

**THE COURT:** Okay.

**MR. SESSIONS:** And all of the remaining will be pretty tight.

**THE COURT:** Okay, I got it. So it's starting to feel

like we're probably going to wind up finishing this case and getting it to the jury sometime Tuesday afternoon. Does that sound reasonable?

**MS. FODE:** Sounds about right.

**MR. SESSIONS:** I mean I would love that, your Honor. I had been guessing Wednesday but Tuesday would be great.

**THE COURT:** Okay well I don't know, I know I'm looking at my list of witnesses and the only witness that's on the defendant's witness list that hasn't been called yet is Bill McKendry so --

**MS. FODE:** We have David Sparacio and then our two experts, Maryellen Sebold and --

**THE COURT:** Okay.

**MS. FODE:** -- Dr. Lechuga.

**THE COURT:** I see them. I see them on my list. It's just the way the witness list was presented it looked like those were going to be in Plaintiff's case but I get it.

And this is interesting because yeah, this will be interesting. I think it's going to go really fast, the rest of the case.

So I am going to be working on the jury instructions tomorrow and over the weekend. You may or may not get a draft from me over the weekend but this is the point in the trial that my radar starts going off because once the case accelerates, it's going to accelerate really fast and I want to

make sure that everyone has ample time to be able to consider jury instructions so that we can talk about the verdict form and be ready for a smooth landing once we get to that place.

Anything from the plaintiff's perspective that you would like to discuss?

**MR. SESSIONS:** I think, your Honor, continuing from our discussion yesterday afternoon, I think after the testimony that's been presented today, Plaintiff is ready to move for -- to amend according to proof and I think we intend to file a motion to that effect tomorrow.

**THE COURT:** Okay. So you're going to file the motion before your experts testify?

**MR. SESSIONS:** Yes, your Honor.

**THE COURT:** Okay. I wasn't sure if you were going to wait or not but I do -- I understand what you're saying. Anything else from Plaintiff's perspective?

**MR. SESSIONS:** No, your Honor.

**THE COURT:** Okay. From the defendant's perspective?

**MS. FODE:** My only question would be the response time to the motion. It sounds like it'll be a written motion and we would need time to respond.

**THE COURT:** Well I was thinking it was going to be an oral motion. If you want to submit it in writing I'm happy to take that and consider it as well. I was going to treat -- my plan was to treat this just like any other midtrial or end of

trial motion and do it orally. I'm assuming that the defendant is planning on file a motion for judgment as a matter of law. Were you planning on doing that in writing or orally?

**MS. FODE:** In all candidness, we hadn't decided yet.

**THE COURT:** Okay. So I'm going to ask that everybody meet and confer about whether or not the motions -- all of those motions will be in writing. Typically they're not. Especially with respect to the motion to amend to conform to proof, because of the fact that that has already been partially briefed on that ex parte, unless there are new arguments, I don't need anything but I do want you to meet and confer so that way if it turns out that it's better to have some pleadings in writing ahead of time that's fine but we're not going to have the jury wait for days for me to get briefing and then and make a ruling on that motion.

**MR. SESSIONS:** Understood, your Honor. And I think with that in mind, we will meet and confer. I think that we might change and just make the motion orally and we'll be prepared to do that Monday morning if that is the case.

**THE COURT:** Okay.

**MS. FODE:** Sounds good. Thank you.

**THE COURT:** All right. Anything else before I let you go for the weekend?

**MR. SESSIONS:** Not from us.

**MS. FODE:** None from Defendant.

**THE COURT:** Okay. All right. Well I hope you-all have a great weekend and we will see you on Monday.

**THE CLERK:** All rise.

**(Proceeding adjourned at 4:37 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 7, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***