# EXHIBIT E

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| Plaintiff, | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, | ) Monday, June 8, 2026 |
| | ) (8:56 a.m. to 11:57 a.m.) |
| Defendant. | ) (1:01 p.m. to 2:32 p.m.) |

JURY TRIAL - DAY 4

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: T. Jackson

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff: MATTHEW THOMAS SESSIONS, ESQ.
ANDREW A. WOOD, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
2010 Main Street
8th Floor
Irvine, CA 92614

STACEY ANN VILLAGOMEZ, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
865 S. Figueroa Street
Suite 2800
Los Angeles, CA 90017

For Defendant: STACY L. FODE, ESQ.
NANA JIN YEE, ESQ.
Nukk-Freeman & Cerra
550 West C Street
Suite 910
San Diego, CA 92101

**INDEX**



| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JAMES LAHAISE | | 12/68 | 89 | |
| PALMER PROCTOR (VIA DEPO EXCERPTS) | 102 | | | |
| PHIL SILVA | 112 | | | |
| **DEFENSE WITNESS** | | | | |
| PHIL SILVA | 142/157 | | | |

| EXHIBITS | RECEIVED |
|---|---|
| 98 | 77 |
| 102 | 64 |
| 109 | 136 |
| 366 | 37 |
| 394 | 44 |
| 401 | 118 |
| 410 | 49 |
| 417 | 50 |
| 423 | 54 |
| 454 | 56 |
| 459 | 60 |
| 465 | 74 |
| 481 | 84 |
| 487 | 62 |
| 489 | 82 |

**Los Angeles, California; Monday, June 8, 2026; 8:56 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

**THE CLERK:** Calling item number 1, SA-cv-24-01989, Patrick Byrne versus Ameris Bank.

Counsel, please state your appearances, starting with plaintiff.

**MR. SESSIONS:** Good morning, Your Honor, Matt Sessions on behalf of the plaintiff.

**MR. WOOD:** Good morning, Your Honor, Andrew Wood on behalf of plaintiff.

**MS. VILLAGOMEZ:** Good morning, Your Honor, Stacey Villagomez for the plaintiff.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, Stacy Fode for defendant.

**MS. YEE:** Good morning, Your Honor, Nana Yee on behalf of defendant.

**THE COURT:** Good morning. I hope everyone had a good weekend. I know that you were working hard, because when I got here this morning I saw a bunch of documents that I need to review, so thank you if that.

And I understand that you would like to discuss something before the jury comes in.

**MR. SESSIONS:** Yes, Your Honor. So I believe defense has something as well. As for plaintiff really fast.

On Friday, and I checked the transcript to confirm, I recall the Court had mentioned at the end of the proceedings that according to the Court's time plaintiff had used 8 hours and 27 minutes so far of its time.

And I checked -- we -- just as a matter of course I always have your paralegal track time as well, and she had almost to the “T” the minutes, but she had us at 6 hours and 26 minutes as opposed to 6 hours and 26 or 27 minutes.

So I just wanted to see if -- one, to confirm if 8 was the number that the Court intended to read or if maybe you also had 6, 27, and if not, you know, I think I estimate we probably have 3 hours left of testimony that we need to get in, and that includes, you know, our ability to cross any of the remaining witnesses that defense has.

So to the extent the Court's view is that we have used 8 hours and 27 minutes, at this time I would ask for good cause shown that we be given an additional 2 hours, Your Honor.

**THE COURT:** So I just calculated again, you -- what I have here is that the plaintiff has used 507 minutes, which is 8 hours and 27 minutes.

**MR. SESSIONS:** Okay. Okay. Understood, Your Honor.

And so at this time then I think I would -- I would request indeed that for good cause shown and for diligence on our part that we would request the ability to have an additional two hours to make sure that we can get the testimony

in that we need.

**THE COURT:** Okay. Any objection to that?

**MS. FODE:** Yes, Your Honor, I have an objection to that.

The parties agreed, the Court approved ten hours per side, and it would be detrimental and prejudicial to the defense to now change that strategy.

We've had to limit our testimony as well as our witnesses to be able to called to meet within the Court's ten-hour rule.

**THE COURT:** Okay. And do you have a breakdown of what -- of your calculation for six hours as opposed to eight hours?

**MR. SESSIONS:** I do, Your Honor, I have it all right here, and I'm happy to provide it to the Court, if helpful, I believe it would be. I have a full breakdown by witness.

**THE COURT:** Okay, that would be helpful, because I have it broken down by witness and direct and cross-examination as well, so that way I can cross-reference to see if there -- if I maybe interposed a number or something like that.

**MR. SESSIONS:** Thank you.

**THE COURT:** So if you could give that to Ms. Jackson and I'll take a look at it on our break and then we can take this matter up again.

**MR. SESSIONS:** Thank you, Your Honor, appreciate it.

**THE COURT:** You're welcome. Thank you. Thank you.

Is this -- oh, I -- the reason I do everything electronically is because I'm really bad about writing on original documents that I should not be writing on.

So is this my copy or --

**MR. SESSIONS:** That is your copy, we have many copies.

**THE COURT:** Okay. I don't want to ruin it.

**MR. SESSIONS:** Thank you, Your Honor.

**THE COURT:** Okay. And Ms. Fode, you also have an issue that you'd like to raise?

**MS. FODE:** Very briefly. Ms. Yee does.

**THE COURT:** Yeah -- oh, yes, Ms. Yee, I'm sorry.

**MS. YEE:** Yes, Your Honor.

**THE COURT:** -- I never -- because the two of you are splitting everything 50/50 I never really know who to address this to. So far I've been wrong every single time.

**MS. YEE:** No problem, Your Honor.

Your Honor, we just want to -- we have objected to plaintiff's demonstratives they served last night, and we have put everything in the email to plaintiff's counsel to meet and confer, but the -- their slides are 42 slides included exhibits that have not been admitted in this trial, and then they have included content from the expert report, which is hearsay.

So we'd like to object to that.

**THE COURT:** So this is a demonstrative -- I can't speak -- a demonstrative that's going to be used today with a witness?

**MS. YEE:** Yes, I believe so.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** Your Honor, they're referring to the slides that we have provided them for our expert, Ms. Deborah Dickson.

Defense's objection rests on the mistaken premise that plaintiff intends to publish portions of Ms. Dickson's expert record, that is not correct. Plaintiff is not offering or projecting any portion of Ms. Dickson's report. And the challenge slides depict actually separate exhibits which have been marked as Exhibits 173 through 183.

Those exhibits are admissible, summary exhibits, under FRE 1006, and plaintiff intending to lay the foundation for and move each evidence (sic) into evidence before it is displayed to the jury, and plaintiff does not intend to publish any exhibit before admission.

To the extent that defendant maintains its objection, then the witness and myself will be forced to basically read these voluminous financial records, numbers, and spreadsheets into the record, which would be inefficient and highly wasteful of the jury's time and the Court's time.

So we would request that the over -- the objection be

overruled so that we can proceed expediently.

**THE COURT:** Okay. Ms. Yee?

**MS. YEE:** Your Honor, our objections remain the same, and I would like to also remind counsel --

**THE COURT:** I need you to speak into the microphone.

**MS. YEE:** Our objections remain the same, Your Honor. I would also like to remind the counsel that on day zero this Court has already ruled that expert reports can only be admitted for limited purposes, which is for impeachment or the refresh the memory of the witness.

**THE COURT:** But I just heard Ms. Villagomez say that they're not going to introduce the expert reports, or at least try to introduce the expert reports.

**MS. YEE:** Your Honor, they're including the data and the calculations from the expert report, and they intend to read it into the record. I think that's prejudicial and that's hearsay.

**THE COURT:** Okay. So right now I have nothing before me that I can make a ruling on.

I will -- I understand and I appreciate your raising this in advance so that I know that we are going to need to adjudicate this at the time that the expert is on the stand, if and when any of the slides are being proposed to be published to the jury.

But right now it's premature for me to make any kind

of ruling, because I don't have anything before me to rule upon.

**MS. YEE:** Understood, Your Honor.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** Thank you.

**THE COURT:** Thank you.

Ms. Jackson tells me that all of our jurors are here. She went to get them.

Is there anything else that we need to talk about before we bring in jury in?

**MR. SESSIONS:** Nothing from plaintiff.

**THE COURT:** Okay. From defendants?

**MS. YEE:** Nothing from defendant.

**THE COURT:** Okay. All right, we're ready whenever you are, Ms. Jackson.

**THE CLERK:** All rise.

**(Jurors enter courtroom at 9:04 a.m.)**

**THE COURT:** You're in the right --

**(Laughter)**

**THE CLERK:** Please be seated.

**THE COURT:** Good morning, ladies and gentlemen of the jury. I hope everyone had a restful weekend. Thank you all for being so punctual and returning this morning.

As I reminded you on Thursday and continue to emphasize to you today, it is important that you decide this

case based solely on the evidence and the law presented here. So you must not learn any additional information about the case from sources outside of the courtroom.

To ensure fairness to all parties in this trial I will now ask each of you whether you have learned about or shared any information about this case outside of the courtroom, even if it was accidental. If you think that you might have done so please let me know by now by raising your hand. I see no raised hands.

However, if you would prefer to talk to the Court privately in response to this question, please notify a member of the court staff at the next break.

Thank you so much for your careful adherence to this instruction.

Now we are going to resume with the testimony of Mr. LaHaise. You can come back to the witness stand.

**THE CLERK:** Please raise your right hand for me.

**JAMES LAHAISE, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Thank you.

Sir, just watch your step going up.

And sir, if you can state your name and spell your last name for the record.

**THE WITNESS:** James LaHaise, L-A, capital H-A-I-S-E.

**THE COURT:** Thank you, very much.

Ms. Fode, you may proceed when you're ready.

**MS. FODE:** Thank you so much.

**CROSS EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q Good morning, Mr. LaHaise. Thank you so much for being here.

We're going to just jump right in where we left off on Thursday.

**MS. FODE:** So I'd like to show the witness publish Exhibit 324, which has already been admitted.

**THE COURT:** It has been.

**BY MS. FODE:**

Q Have you seen this document before, sir?

A Yes, I have.

Q And what is it?

A It is the employment agreement for Mr. Byrne.

Q And who signed this agreement on behalf of Ameris?

A I did.

Q And who negotiated the agreement on behalf of Ameris?

A I did.

Q Were you involved in the drafting of the employment agreement?

A Yes.

Q And was Mr. Byrne involved in the negotiation of the employment agreement?

A Yes, he was.

Q And was he allowed to review the employment agreement and have counsel before he signed it?
A He was.
Q I'd like to direct your attention to Section 3.2, please, of the employment agreement.
**MS. FODE:** If you can go -- zoom out a little bit.
**BY MS. FODE:**
Q Would you describe Mr. Byrne's compensation structure there at Section 3?
A So at Section 3 there's an outline of the components of his compensation, one being base compensation of $350,000 a year at the starting point and a 3 percent annual increase going forward, and included it in was a bonus structure that was $150,000 per quarter based on hitting the LTIP targets, and then an incentive program associated with the LTIP.
Q All right. Let's talk a moment and look at 3.2, which is highlighted here. The section on bonus.
What exactly did Section 2 -- Section 3.2 provide for?
A It provided for $150,000 each quarter at the end of each quarter to be paid 30 days after the end of each quarter provided that the division hit its net profit EBT target per the operating model pioneer 1Q '21 operating model.
Q And why does was Section 3.2 provided in the employment agreement?
A So in the negotiations of the acquisition Mr. Byrne wanted

to be paid a million dollars a year to be the CEO of the division, and our compensation structure for division leaders is typically structured with a good base and then the rest of the compensation through some type of performance-based compensation.

So this structure was to put the $150,000 in some type of hurdle that had to be achieved in the profitability of the division. So it totaled for a total in the first year of $950,000.

Q And if you look at the last line after Exhibit B, the last clause, it says, regardless of what financial results may be achieved under the company's financial reporting methodologies or requirements. Did I read that correctly?

A You did.

Q Why was that clause added to Section 3.2?

A Ask that question again, when?

Q Why?

A Oh, why.

Yeah, so that was a request for Mr. Byrne as part of the negotiations.

Q And did Mr. Byrne receive his quarterly bonus throughout his employment at Ameris Bank?

A Yes, he did.

Q And did the Balboa Division always meet the LTIP target for the quarterly bonus?

A No, it did not.
Q Why then did Ameris pay Mr. Byrne the quarterly bonus if the quarterly targets were not always met?
A I agreed to make an exception and go ahead and pay it.
Q Why'd you do that?
A At the time the division was not meeting its goals and we were spending a lot of time, as we've discussed, on all of the LTIP calculations, and the division needed a lot of attention around asset quality and the losses that were happening in the division, and so I just waived that requirement for the bonus and made that payment so we could focus on the strategy of the company.
Q And was paying the quarterly bonus a concession that the LTIP target had been met?
A No, it was not.
Q And why not?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And you --

**MR. SESSIONS:** And I would move to strike the response, Your Honor.

**THE COURT:** The motion is granted.

//

**BY MS. FODE:**

Q In your mind when you were agreeing to pay -- to allow payment of the quarterly bonus did that mean to you that it had anything to do with the LTIP payments?

**MR. SESSIONS:** Same objection, Your Honor.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And with regard to Section 3.3 --

**MS. FODE:** Okay, let's turn to that now, it says incentive program.

Q Will you read that into the record, sir, and I'll ask you a couple questions?

A 3.3 incentive program. Concurrent with the start date the company has established a cash bonus long-term incentive program, parenthesis, the LTIP, and the executive is expected to participate in the LTIP. For avoidance of doubt the LTIP and the bonus are separate and distinct compensation programs.

Q So what does this provision provide for?

A That Mr. Byrne would be eligible to participate in the LTIP program as it was designed.

Q And the last line, for the avoidance of doubt, why was that clause included?

A Because as all employees in the division they had their base compensation and any incentive compensation that was based on their role within the company.

The LTIP program was based on the profitability -- the division achieving an exceptional profitability, which was the LTIP target, and then it was shared with all employees.

**MS. FODE:** All right. I'd like to now go to Exhibit 301, which has been admitted and ask to publish, please.

**THE COURT:** Go ahead.

**MS. FODE:** And if you'd go to the last page, please, JX-301-014.

**BY MS. FODE:**

Q All right, sir, the pioneer model was referenced in the employment agreement we just read.

Is -- what is this document in front of you?

A This is the pioneer -- project pioneer historic and projected income statement.

Q And what kind of information is included in the pioneer model?

A This document has the historical projected production, which it was called volume, the production, the amount of loans produced in that calendar year with some statistics around that deal size and things like that.

And then the revenue generated from those loans in the portfolio, and these incomes and those types of things.

An expense item for loan losses, which is called the provision for loan losses, and that's the expense for that.

And then all of the operates expenses associated with

operating the division, which is personnel office, all of the day-to-day operating direct expenses.

And then there's an indirect calculation of indirect costs deducted, and that came to an earnings before tax and interest in tax, and then a deduction for tax that comes to ultimately the earnings before tax.

Q And who prepared this -- or who provided this document and -- to Ameris Bank?

A Mr. Byrne.

Q And did he -- was it his document?

A Yes.

Q Okay. And what did you think about the projections that Mr. Byrne provided in the pioneer model?

A We thought they were, you know, good aggressive projections, but we accepted those.

Q And why did you accept them?

A Well Mr. Byrne had a lot of confidence in the performance of the division and we agreed and accepted them.

Q All right. And you talked about the earning before taxes, the EBT, and what is the EBT on the pioneer model in front of you?

A So for all years or for --

Q For '22, '23, and '24, please.

A So for '22 is $37 million, for 2023 is 48 million 500, and for 2024 is 57 million 200.

**MS. FODE:** All right. And I'd like to move up to Section 3.3 of the LTIP. Move up to page 3, please.

**BY MS. FODE:**

Q All right. So looking at the LTIP plan here, please read Section 3.3 into the record, sir.

A 3.3, committee decisions final. All decisions made by the committee, pursuant to the provisions of the plan, shall be final and binding on the company and the participants.

Q And what does this provision mean?

A It means that any decisions that are made relative to how the plan is operated that the committee was -- had the final say and it applied to the company and any participant in it.

Q And what is the committee?

A The committee is defined as the communicate -- the compensation committee for the bank, the board of directors.

Q And are -- how --

**MS. FODE:** Let's go actually to Section 3.4.

Q Will you read that into the record, please.

A 3.4, delegation. The committee in its sole discretion may delegate all or part of its authority and powers under the plan to one or more employees of the company.

Q And who was delegated with the authority to under 3.4?

**MR. SESSIONS:** Objection, lacks foundation, assumes facts not in evidence.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And is it -- what is your understanding of 3.4, sir?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q For the 3.4 that you just read into the record, were you delegated any authority?

**MR. SESSIONS:** Objection, same objection.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** They delegated the authority to me.

**BY MS. FODE:**

Q And what authority was that?

A To administer the plan and follow all of the conditions and rights and authorities and powers of the plan.

Q And what does that mean in a practical sense?

A Well --

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q How did -- what was -- what were you day-to-day functions with regard to this Section 3.4?

**MR. SESSIONS:** Objection, same objection.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Not a lot of day-to-day activity.

The administration of the plan and kind of the documentation of it was multiple people within the company, that's the accounting division, providing the financial data. We've got our human resource department that manages all of the compensation plans. If there was a decision to be made or interpretation that would fall to me.

**MS. FODE:** All right, let's go to Section 4, please.

**BY MS. FODE:**

Q Take a moment and read Section 4 to yourself, please, sir, and I'll just ask you a couple of questions.

**(Pause)**

Q Have you had a chance to review it?

A Yes.

Q All right. And will you read the first line into the record, please.

A For eligibility. The committee will, in its sole discretion, determine which participants will be eligible to receive cash bonus awards in respect to such performance period.

Q And what did that mean to you?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

//

**BY MS. FODE:**

Q When you -- let me back up.

Were you involved in drafting the LTIP?

A Yes.

Q And what was your involvement in drafting the LTIP agreement and plan?

A Initially provided the outline model and Excel spreadsheet with some general terms.

Q And then did you work with lawyers to prepare the LTIP agreement and plan?

**MR. SESSIONS:** Objection, leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Was there anything else -- did you have any other involvement in preparing the LTIP plan and agreement?

A There was a number of -- you know, multiple negotiations associated with the LTIP program and many versions back and forth that we worked with respective legal counsels to work through a final document.

Q How many drafts of the LTIP plan and agreement were there?

A There were several. Probably six or seven, maybe more.

Q And were you involved in including which clauses would be put in the LTIP plan and agreement?

A Yes.

Q Okay. And for your understanding for Section 4, why was

Section 4 included in the agreement?
A Again, it's to make sure that this plan is 100 percent discretionary as it relates to how it works, as long as the funds would be put in -- if the division achieved its goal then a pool would be created, but that didn't give anybody any right to any portion of the pool until it was actually granted.
**MS. FODE:** And if you would move, please, down to Section 10.4.
**BY MS. FODE:**
Q Can you see that there, sir?
A Yes, I can.
Q And it's entitled, no right to a cash bonus award. Do you see that there?
A Yes, I do.
Q Will you read the first sentence into the record, please.
A A participant shall not have any right to any cash bonus award under the plan until cash bonus award has been paid in such participant -- and participation in the plan in one performance period does not connotate -- connote any right to become a participant in the plan of any future performance period.
Q Thank you.
And what did that clause mean to you?
**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Why was that clause included in the LTIP plan?

**MR. SESSIONS:** Same objection.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Again, to make sure that all participant -- or eligible participants were clear that again that there is no right to any of the awards until they're actually awarded.

**BY MS. FODE:**

Q And looking -- going up to Section 10.1, it states, compliance with legal requirements.

**MS. FODE:** If you could highlight that, please.

Q And do you know why that clause was included in the LTIP?

A Yes.

Q And what does that clause mean to you?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q What is your understanding of why that clause was placed in the LTIP?

A The -- that anything in any plan, in any compensation plan, we've got to adhere to all legal requirements whether that's regulatory, federal state laws, governmental agencies,

everything had to comply with whatever the prevailing law is.

**MS. FODE:** All right. Moving ahead in the document to the award agreement at JX-301-008, please.

**BY MS. FODE:**

Q And what is this document, sir?
A This is the actual Balboa Capital long-term incentive plan award agreement for Mr. Byrne.
Q And what IS the difference between the plan and the award agreement?
A So the plan just defines all of the key Characteristics and definitions within the plan, and then the award is specific to a participant having the ability to be eligible, and in this one it defined some key assumptions around the award agreement.
Q And was this Patrick Byrne's award agreement?
A Yes.
Q And what was the time period for this agreement?
A The agreement was a three-year plan. The LTIP program was a three-year program.
Q And What years were those?
A 2022, 2023, and 2024.

**MS. FODE:** All right, moving to the next page, 009.

Q There's highlighted on there the performance formula, but just above that it says, threshold for award. Do you see that there?
A Yes, I do.

Q And what does that clause mean?
A These were the goals for each year that the division had to exceed in order for a pool to be funded.
Q What was your understanding of what happened if the division did not meet this threshold?
A Then no pool would be created and therefore there was no funds to be distributed.
Q Does that mean that Balboa Division employees would not get a bonus that year?
A Not at all.
Q Can you explain?
A The -- there was really three components to -- or two components to employees' regular compensation for performing their role. One is their base salary, which everybody had in place. And then there was their incentive or commission-based plans, depending on what their role was in the company.
So if they were production people generating loans they were paid on a commission structure. And so everybody was paid for whatever their successes they had for the year.
And then in the other support areas of the company, of the division they all had their individual incentive plans.
So -- and then there was -- in addition to that there was discretionary incentive plans.
So everybody in the division was paid for their base compensation and their normal performance compensation at an

individual level, and then their ability to participate and their eligibility to participate in the LTIP was above the -- their normal day-to-day work compensation.

Q And is there anything in the agreement that you know about that says if you miss the target or the threshold for award by a small amount that you're still entitled to payment under the plan?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q What is your understanding if the division falls even $100,000 short of the threshold of the award?

**MR. SESSIONS:** Same objection, and vague.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Were you tasked with enforcing and providing the payments under the LTIP award agreement of Mr. Byrne?

**MR. SESSIONS:** Objection, compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Were you tasked with enforcing the LTIP award agreement for Mr. Byrne?

A I was the administrator of the plan, yes.

Q And were you -- did you ultimately decide if payment would

be made under the terms of the plan?

**MR. SESSIONS:** Objection, leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q What was your involvement with administering and payment under the plan?

**MR. SESSIONS:** Objection, compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q What is your understanding of your duties administering the plan?

A So administers there's a number of different things that go on as I said before.

The day-to-day tracking and those types of things were delegated to the various support parts of the company.

Mine was involved in either, you know, you know, approving eligibility and then ultimately the final payouts and forwarding those on, and also making if there was any interpretation or judgment that need to be made on it that was my area of responsibility.

Q And if the division did not meet the threshold for award would you issue payment under the plan?

A No.

Q I'd like to direct your attention for the next paragraph, the performance formula. And just tell me, what does this

paragraph mean to you?
A So this just defined the amount in excess of the EBT target for that whatever respective year that we would share 35 percent of the amount of EBT above that and we'd share that into the pool.
Q All right. And in the next section, please, cash bonus award. Will you read that into the record, sir?
A Cash bonus award, number in parentheses, percent, of the incentive pool, if any, established for each performance period.
Q Who determined the individual employee payouts from the LTIP pool?
A Mr. Byrne.
Q And why is the individual percentage left blank that's highlighted on the screen?
A The -- as we've discussed, there is no guarantee of any payout of the incentive plan, everybody -- you're only eligible to participate, and so at each performance period then it's determined what the payout will be at that time.
So there's no fixed -- there was never any fixed percentage amount due anybody -- any potential participant.
Q And looking ahead now to 2022, the first year, how did the Balboa Division performance in 2022?
A It was a very good year.
Q And how much money went into the 2022 LTIP pool?

A Approximately $9 million.
Q Did you try to find a way to reduce the amount of money that was paid into the LTIP pool in 2022?
A No.
Q Did anybody to your knowledge at Ameris Bank try to find a way to reduce the LTIP pool in 2022?
A No.
Q Do you know to your knowledge if anyone at Ameris Bank ever tried to reduce the LTIP pool?
A No.
Q And so back to the 9 million, who decided how the $9 million LTIP pool was divided?
A Mr. Byrne.
Q I'd like to direct your attention to Exhibit 371, which is admitted, and ask that that be published, please.

**THE COURT:** It's already published.

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q And sir, would you take a moment and just look at this email from Patrick Byrne to Laura Rodriguez with copy to you dated February 2nd, 2023? Have you seen this email before?
A Yes, I have.
Q Are you copied on the email?
A I am.
Q And what is this email?

A This is an email to -- from Mr. Byrne to Ms. Rodriguez, who was the incentive administrator for the -- in our HR department, and he's just providing his logic around how he calculated the distribution of the 2022 LTIP.

Q Did you have any involvement in the 2022 LTIP allocation?

A Other than approving, that's the only component.

Q How much of the LTIP pool in 2022 did Mr. Byrne take for himself?

A Approximately 62 percent of the pool.

Q And how much did the remaining non-executive Balboa Division employees receive?

A About 15 percent of the pool.

Q And do you remember how much that was each on average?

A Approximately $9,000 on average.

Q Did you have any discussion with Mr. Byrne about the LTIP calculation prior to the time the 2022 LTIP was paid out?

A We had no discussion prior to the worksheet being completed, no.

Q And after the LTIP was paid out in 2022 did Mr. Byrne raise any concerns to you about how the pool was calculated?

**MR. SESSIONS:** Objection, vague as to time.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q In 2022 did Mr. Byrne raise any concerns to you about how the 2022 LTIP pool was calculated?

A There was some early on understandings that we had to get clarity on in the LTIP pool on the very first time, the first quarter that we actually did the calculation, the company had just -- we had just, you know, merged the division -- the company into our -- into a division, and so we're just going through the logistics and making sure we have the logistics right on the calculations and who was going to perform what functions.

And so there was a few items that we just needed to make sure we all got clarity on, and we did, and then Mr. Majid was the person who did the tracking of that pool on a quarterly basis going forward.

Q And in this email that we're looking at, do -- did Mr. Byrne raise any concerns about how the LTIP pool was calculated?

A Not other than what I just talked about.

Q And I'd like to direct your attention to the last bullet point of this email. Will you read that into the record, please.

A We will let everyone know that something like this may be available next year, but there is no promises, and it would only occur if we were able to drive long-term profitability.

Q And what was your understanding of what this clause meant?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q When you read this, sir, as a cc on the email, what did this mean to you, this -- the last bullet point?

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you agree with Mr. Byrne's characterization in the final bullet point on the screen?

A Yes, I did.

Q How so?

A The -- as the plan is defined there is no guarantee and that there -- that each year it's stand-alone. If the division achieves its goal for that performance period then a pool is funded. And so there is no guarantee and that they've got to focus on long-term profitability.

Q And I'd like to now direct your attention to Exhibit 341, which is already admitted, and publish that.

And sir, take a look, please, at Exhibit 341, an email dated 4/28/2022. Did you prepare this email, sir?

A I did.

Q And why did you send this email?

A As I previously stated this is what I was referring to was the first quarter that the LTIP calculation was being performed, we just had to make sure -- you know, we'd go through a normal reconciliation process and audit to make sure

we've got things right, and so there was some adjustments need to be made just tracking, needed to be conformed to the LTIP program. So just letting Mr. Byrne know on the changes and that we were going to make in making the adjustments.
Q And was Mr. Byrne involved in -- did you discuss these changes with Mr. Byrne?
A Yes.
Q Tell me what your meeting schedule was like with Mr. Byrne.
A So once we -- we had a weekly standing meeting that was once a week that Mr. Byrne and Mr. Silva and I would just meet and we'd create an agenda on whatever the topics were that needed to be discussed and to make sure we're addressing everything and they're getting the support that they need to perform. And so that -- we just had regular schedule and an agenda was set in place.
And then we had normal monthly asset quality meetings, which we discussed, kind of the portfolio management and the performance of the loans on a monthly basis, and that was done with another group of people as well as Mr. Byrne and Mr. Silva. So we had a regular communication schedule.
Q And did you ever speak with Mr. Byrne on the phone?
A Oh, yes, multiple times.
Q Okay.
**MS. FODE:** I'd like to now turn to Exhibit 375,

please, which is admitted, and publish.

**BY MS. FODE:**

Q What is this document, sir?

A It's the performance review for Mr. Byrne for 2022.

Q And if you look in the middle of the document under ratings, how did you rate Mr. Byrne's -- Mr. Byrne in 2022?

A His overall rating was a 4.1, which equated to a met and frequently exceeds expectations.

Q Had you and Mr. Byrne had any conversations about the LTIP up to this point?

**MR. SESSIONS:** Objection, vague.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** There was -- yes, there was conversations around the LTIP.

**BY MS. FODE:**

Q And why did you give Mr. Byrne these ratings that you just read into the record?

A The division, as he was division CEO, and the division had an exceptionally good year on balance, and so accordingly I rated him in that manner.

Q And was this review given before or after Mr. Byrne raised those questions that we looked about -- that we looked at in the prior email about the LTIP collation?

A Well there was -- what was the date? I believe this would be before the LTIP conversations.

**MS. FODE:** Let's go back actually to the prior email. We'll -- there was a little bit of a trick, so we'll put it up for you, please. That was 342 -- I'm sorry -- 341.

**BY MS. FODE:**

Q So the date of this email is 4/28/2022.

**MS. FODE:** And then if you would please go to Exhibit 375.

**MR. SESSIONS:** Your Honor, leading. Objection, leading.

**THE COURT:** There is no question pending. What is the question?

**MS. FODE:** I would like you to please pull up the exhibit that we looked at, 375.

**BY MS. FODE:**

Q What is the date of the -- of this document, sir?

A Yeah, so I misunderstood that question.

So yes, we had had conversations prior to this performance review being completed.

**MS. FODE:** I'd like to now turn to Exhibit 366. This is a joint exhibit and ask for permission to show the witness 366 on blackout.

**THE COURT:** If it's a joint exhibit is there any objection to admitting it?

**MR. SESSIONS:** No objection.

//

**THE COURT:** Okay. Exhibit 366 is admitted, and you may publish.

**(Exhibit Number 366 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q All right, sir, this is an email that appears to be dated January 16th, 2023. Are you on this email chain?

A Yes, I am.

Q And what is this email?

A The email chain is in reference to in the -- at the end of 2022 there was one -- approximately $1.1 million of loan losses that were not expensed against the division, and there was a process that was -- didn't get followed properly. And Ms. Stokes is giving me a heads up that that had happened, and my comments to her were that these responsibilities fall within the division, the division's responsibility, and so -- and Mr. McKendry, who's our chief risk officer, concurred with that thought.

Q So is this your email that's being highlighted on the screen on January 16th, 2023?

A Yes, it is.

Q Will you read that into the record, please.

A I think it should be decisioned at the business level as well.

Q And what did -- why did you write that?

A Again, there was the process that broke down in the recording of loan losses as an expense item and so Mr. Byrne had complained that it was an accounting problem, and it was not an accounting problem, the accounting just records that information, it's the division who actually initiates the charge-off and that's what we're basically defining here is that, no, it falls within the business unit to perform that duty.

Q And in -- will you read the second line of this sentence as well -- of this email as well?

A We can incorporate that into our monthly asset quality meeting with John and Dave.

Q What did you mean by that?

A John Edwards is our -- was our chief credit officer for the entire company, and Dave Mandell (phonetic) was the regional credit officer who helped support Balboa Capital.

And we had a monthly regular scheduled asset quality meeting with the Balboa Division as well as the bank credit employees, that's John and Dave, and so we would make this -- it's something that we would discuss to make sure we got our numbers correctly.

Q And did you ever discuss this issue with Mr. Byrne yourself?

A Yes.

Q Do you know why Ms. Stokes forwarded this email to you and

Mr. McKendry?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q So in 2023 did the Balboa Division exceed the LTIP threshold?

A No, it did not.

Q And --

**MS. FODE:** You can take it down.

Q And why didn't the Balboa Division meet the 2023 threshold?

A The primary contributor --

**MR. SESSIONS:** Objection, calls for expert testimony.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you know why the Balboa Division didn't meet the 2022 LTIP threshold?

**MR. SESSIONS:** Objection, assumes facts not in evidence because I believe she said 2022. And same objection, calls for expert testimony.

**THE COURT:** Sustained.

**MS. FODE:** Let me make sure the record is clear.

**BY MS. FODE:**

Q Do you know why the Balboa Division did not meet the 2022 LTIP threshold?

**MR. SESSIONS:** Same objections.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you have an understanding of what loan losses are?

A Yes.

Q And what were the loan losses for the Balboa Division in 2023?

A Approximately $39.5 million.

Q And do you understand where the loan losses originated from?

A Yes.

Q And what was that?

A Well loan losses are part of the -- when a customer doesn't repay the note as per the terms and it's charged off once it exceeds a time limit.

In this case the division had really two components, one in the trucking industry and the other one in unsecured working capital loans.

Q What is that, an unsecured working capital loan?

A This is where the division would lend money to a business for short-term needs to bridge a gap for cash flow, and there was no collateral associated with it, it was on an unsecured basis.

Q And did you -- do you remember what the pioneer model estimates were for loan losses for 2023?

**MR. SESSIONS:** Objection, assumes facts not in evidence.

**THE COURT:** Sustained.

**MS. FODE:** I'd like to bring up, please, Exhibit 301, again. And please go to the last page.

**BY MS. FODE:**

Q Do you know, sir, if Mr. Byrne included estimates for loan losses in his pioneer model?

A Yes, he did.

Q And can you see on the screen where the loan losses are?

A Yes.

Q And can you read those into the record for 2023 time period, please.

A For 2023 it's 12,600,000.

Q And as Mr. Byrne's supervisor did you understand that the estimate for loan losses was not met?

A Correct.

**MS. FODE:** I'd like to now turn to Exhibit 395, please, which is admitted, and publish.

Q This dated -- this email is dated July 23rd, 2025. Are you copied on this email, sir?

A I am.

Q And if you need to review it let me know, but my question is, what does this email relate to?

A It relates to the LTIP calculation.

Q And was Mr. Byrne sending the email to Mr. Sufhan Majid?
A Yes.
Q Was this the first time that Mr. Byrne learned that the division was not on track to meet the 2023 LTIP target?
**MR. SESSIONS:** Objection, calls for speculation.
**THE COURT:** Sustained.
**MS. FODE:** Let's scroll out and we'll walk through the document.
**BY MS. FODE:**
Q What is Mr. Byrne saying in his email here, sir?
A There's a number of items on the LTIP calculation, approximately five items that Mr. Byrne is questioning on the LTIP calculation for the first quarter of 2023 and then for the second quarter of 2023.
**MS. FODE:** And if you will scroll down, please, to the original email.
Q And it's kind of in between the page.
Do you know in the original email what Mr. Sufhan Majid was saying?
A As I discussed earlier Mr. Majid was responsible for trading the LTIP calculation on a quarterly basis, and so this is just his normal process of sending the second quarter 2023 LTIP calculation to Mr. Byrne.
Q And do you know, was this the first time Mr. Majid was sending the LTIP calculation in the year 2023?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you have any conversations with Mr. Byrne about the LTIP calculation for quarter two 2023 that Mr. Majid is sending him?

A Yes, there would have been several.

Q At this point did Mr. Byrne, based on your discussions with him, understand that the division was not on track for meeting the 2023 LTIP threshold?

**MR. SESSIONS:** Objection, speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you ever have any conversations with Mr. Byrne in this time frame that the LTIP for the 2023 division would not be meeting the LTIP pool?

A At that time they had not met the performance targets for -- to fund the pool at that -- to that period.

Q And you had discussed that with Mr. Byrne?

A Yes.

**MS. FODE:** I'd like to now go to, please, Exhibit 394. This is -- I need to show the witness on blackout, please.

**THE COURT:** Go ahead.

**MR. SESSIONS:** Your Honor, I don't believe we have

any objection to this exhibit, for what it's worth.

**THE COURT:** Okay. Do you want to move it into evidence?

**MS. FODE:** Yes, please.

**THE COURT:** Okay. Exhibit 394 is admitted, and you may publish.

**(Exhibit Number 394 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q Sir, have you seen this email chain before?

A Yes.

Q And are you copied on the email?

A I am.

Q And what is the email saying?

A There is two items that Mr. Byrne is pointing out to Mr. Majid that -- on -- in reference to depreciation and again to the overhead calculation, which is an erroneous interpretation of the agreement.

Q And did you ever respond to Mr. Byrne's request?

A Many times.

Q If you'll look at the second to -- the second line from the paragraph starting there.

**MS. FODE:** Thank you.

//

//

**BY MS. FODE:**

Q Would you read that into the record?

A Based on these rescissions, comma, there is $1,248,354 owed to me, so I ask that this money be paid out in the 7/30/2023 payroll.

Q And did you talk with Mr. Byrne about this demand after he sent this email?

A Yes.

Q And were you able to put the $1,248,000 into his payroll account on July 30th, 2023?

A No, we did not.

Q And why was that?

A Because his assumptions and interpretations were incorrect. And we communicated that to him.

Q Okay. I'd like to move to Exhibit 395, please, which has been admitted. Sir, can you see that e-mail there?

A Yes.

Q And this is dated July 23rd, 2023?

A Yes.

Q And what is this e-mail?

A Again, this is the same demands that Mr. Byrne is making to Mr. Majid on the LTIP calculation.

Q And will you scroll up, please? And did you believe that when you read this that Mr. Byrne's assumptions were correct?

A No.

Q And can you explain why?
A Well, there's a number of different ones. The interpretation of the LTIP definitions, that we were following all of the definitions and past practices of the division, and so there was no need for a change in the calculation.
Q And when you're saying we, who is we?
A Well, the administration and the accounting for all of the -- everything going on in the division was being done properly.
Q And did you work with anybody on responding to these demands?
A Yes.
Q Who was that?
A Ms. Stokes' team and the accounting team, Ms. Stokes and her team.
Q And how did you respond to these demands in Mr. Byrne's July 23rd, 2023 e-mail?
A I would respond in e-mails. I would respond in conversations. We would discuss them in our weekly meetings any number of ways.
Q And did you and Ms. Stokes ever meet with Mr. Byrne?
A Yes.
Q And tell me where that meeting took place.
A So that meeting took place in the Balboa Division Headquarters in Costa Mesa.

Q And do you remember the timeframe for your meeting with Mr. Byrne at the Balboa Division Headquarters?
A Yes, it would have been shortly after this. It was late July, early August of 2023.
Q And what was discussed at the meeting in Orange County with you and Ms. Stokes and Mr. Byrne?
A The whole purpose of the meeting to me was to discuss these items to make sure that we were clear with Mr. Byrne on these calculations. And so it was all of these items that show up on these demands.
Q All right. I'd like to go, please, to Exhibit 405, which has been admitted and published. All right. At the top, the date for this e-mail is August 4th, 2023. Do you see that there, sir?
A Yes, I do.
Q And are you copied on this e-mail?
A I believe I wrote this e-mail.
Q Thank you for the clarification. I see now. So what did you say in your first two sentences of this e-mail in the first paragraph?
A So these are the calculations from our discussion from when we met together the previous couple of days.
Q So when you say, as we discussed in our meeting together, what meeting was that?
A That was the meeting that Ms. Stokes and I in Costa Mesa

with Mr. Byrne and Mr. Silva.
Q So why did you send this e-mail?
A This is normal course of business, we would always respond to any requests or meetings, and just to make sure that we're all clear on what was discussed and what was decided and if there was any follow-up items that needed to be covered.
Q And would you scroll down, please? Are you stating these are open issues I had from our meeting on Tuesday? What did you mean by that, those bullet points?
A So there was still some, after our meeting and some discussion, research that maybe needed to be handled or we needed to maybe bring a different team involved to do some more due diligence to understand if there was any warranted adjustments.
Q And did you reach any agreements when you were at the meeting with Mr. Byrne?
A We felt like we had in some of my comments prior in the e-mail.
Q I'd like to now go to Exhibit 410, please.
**THE COURT:** That exhibit hasn't been admitted.
**MS. FODE:** Please show the -- I'd like to show the witness in Blackout, please.
**MR. SESSIONS:** There's no objection, though, Your Honor.
**THE COURT:** Okay, are you moving it into evidence?

**MS. FODE:** Yes, please.

**THE COURT:** Okay, Exhibit 410 is admitted and you may publish. Thank you very much, Mr. Sessions.

**(Exhibit Number 410 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q Take a minute to look at this document, please. Have you seen this document before?

A Yes, I have.

Q Okay, let's start down below at the bottom and work our way up. Scroll up, please, slowly. Okay, stop. What was this e-mail chain regarding?

A Again, Mr. Byrne was sending his demands for changes to the LTIP calculation to Mr. Majid, and Mr. Majid forwarded that on to Ms. Stokes, his supervisor and the CFO of the company. And then Ms. Stokes responded directly back to Mr. Byrne, letting him know that she did not agree with these adjustments and then happy to set up a time to meet.

Q And do you know, were you involved in any meetings with Ms. Stokes and Mr. Byrne to discuss this issue?

A No, I was not.

Q And will you continue up on the e-mail chain, please? Do you know if Mr. Byrne ever reached out to you or Ms. Stokes to discuss his November 3, 2023 e-mail?

**MR. SESSIONS:** Objection. Compound and calls for

speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did Mr. Byrne ever reach out to you to discuss the concerns he raised in his November 2023 e-mail?

A No, he did not.

Q And did you ever meet in November of 2023? Did Mr. Byrne ever reach out to meet with you in 2023 to discuss these LTIP demands or concerns?

A No, he did not.

**MS. FODE:** Okay. I'd like to show the witness Exhibit 417, which has not yet been admitted.

**MR. SESSIONS:** No objection.

**THE COURT:** No objection to admitting?

**MR. SESSIONS:** Yeah. Yes, Your Honor.

**THE COURT:** Thank you very much.

**MR. SESSIONS:** Apologies.

**THE COURT:** This is, I'm sorry, 417?

**MS. FODE:** 417. Yes.

**THE COURT:** 417 is admitted and you may publish.

**(Exhibit Number 417 received in evidence)**

**MS. FODE:** Thank you. Will you scroll down to the bottom, please?

//

//

**BY MS. FODE:**

Q Sir, have you seen this e-mail before?

A Yes.

Q And are you on the e-mail chain?

A Yes, I am.

Q And what is -- is the bottom e-mail, who is that from?

A From Mr. Byrne.

Q And what is Mr. Byrne telling you in his e-mail?

A He's stating that he has not -- he did not consent to what he perceived as changes in his authorities and responsibilities and reporting structures of division -- or of support areas of the company and believe that it diminishes authorities, duties and responsibilities. And then he made a comment reference to Mr. Silhouette attending meetings that were set up.

Q At the time of this email on November 3rd, 2023, or at any time at the end of 2023, were you trying to diminish Mr. Byrne's authority.

**MR. SESSIONS:** Objection. Leading and compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q During this time frame of the email, were you trying to diminish Mr. Byrne's authority?

**MR. SESSIONS:** Objection. Leading.

**THE COURT:** Sustained?

//

**BY MS. FODE:**

Q Were you trying to make any changes to Mr. Byrne's authority in the November of 2023 time frame?

**MR. SESSIONS:** Same objection.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** No, no changes.

**BY MS. FODE:**

Q And were any reporting lines changed in this November 2023 time frame?

A No.

Q Will you please scroll up and we can see your response? What are you saying there in your response?

A Well, I wasn't available to meet at that time or have a discussion, but that I'd be available on Monday.

Q And then did Mr. Burn ever reach out to you to discuss this -- his concerns in response to your email?

A No.

Q Will you go up, please? It looks like November 15th, 2023. What is this email?

A This is an email from Mr. Byrne to me, stating that they'd been a couple of weeks since his previous email and we hadn't had any conversation.

Q And again, did Mr. Byrne reach out to you to discuss this issue?

A Nothing other than this email.

Q And why were -- why was Mr. Silva invited to meetings with Mr. Byrne?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q When you had meetings with Mr. Byrne, did you ever invite Mr. Silva to attend?

A Yes.

Q And why did you do that?

A The only direct report that Mr. Byrne had was Mr. Silva and the rest of the organization reported to Mr. Silva. And when we were discussing whatever the topics were on the agenda, as we would typically do is, is we would have the reporting manager and as part of those discussions so that we made sure we were efficient in our communications.

Q Is this a practice you use in other divisions you were involved in?

A Yes.

**MS. FODE:** I'd like to show the witness exhibit 423 on blackout, please.

**MR. SESSIONS:** Your Honor, I have no objection to the admission of this exhibit.

**THE COURT:** Okay, thank you very much. And this is 423?

**MS. FODE:** Yes, Your Honor.

**THE COURT:** Exhibit 423 is admitted and you may publish.

**(Exhibit Number 423 received in evidence)**

**MS. FODE:** Thank you so much.

**BY MS. FODE:**

Q All right. I'd like to turn your attention to the email on the screen dated December 8th, 2023. Are you on this? Did you author this email, sir?

A Yes.

Q Okay, let's scroll down to start from the bottom and scroll up so Mr. LaHaise can see it, and the jury. And what is Mr. Byrne saying to you in this email on the screen on December 7th, 2023?

A He's responding to -- we're discussing the budgeting process and projections for the upcoming year and what that impact might have on the LTIP potential. And he's just asking for some components to be included in it, as well as some of the calculations of the LTIP.

Q Can you tell us what your practice is with regard to these planning meetings at the year end?

A So it's part of the normal planning process. And so we collaborate with the leadership of the division to make sure that our assumptions are correct and that we're all singing off the same page and expectations are aligned so that we perform at the level we expect.

Q Will you scroll up, please? Will you please read your first line of this -- of your email into the record?
A Pat, I hope we can focus on our discussions next week on business strategy and review the budget at GL level to see what additional research is needed.
Q And why did you write that?
A We had been spending more and more time on just the LTIP calculations that we had already decided on that we were doing those correctly and really just needed to focus on the business strategy.
Q And what do you mean when you say the business strategy? For what time frame?
A For the upcoming year of 2024.
Q And at the bottom, for the first paragraph in the last sentence, will you read that into the record?
A I'm sorry, which line?
Q In this same paragraph, the last sentence.
A We will also address the LTIP comments.
Q And why did you write that?
A Again, to focus on the business strategy and that we will continue to address, you know, any comments as needed.
Q And will you read the last sentence -- the last -- the next sentence into the record, please?
A The second to the last? Yeah. Okay. In the interim, comma, I will get some more detailed yield analysis so that we

can see what the portfolio turnover will do to yields.

Q And why did you write that?

A The portfolio is constantly maturing and loans that were made in the previous years were at maybe higher interest rates. And so there was going to be an impact to the amount of interest that we were going to accrue in the business strategy.

Q And was that for the following year, for 2024?

A Yes.

Q In the last sentence, what do you say there?

A Look forward to working through this together.

Q Did you mean that when you wrote it?

A Absolutely.

Q All right. I'd like to now turn to Exhibit 454 to show the witness on Blackout, please.

**MR. SESSIONS:** Your Honor, I have no objection to the admission.

**THE COURT:** Okay. This Exhibit 424 is admitted and you may publish.

**MS. FODE:** Apologies, Your Honor. 454.

**THE COURT:** I'm sorry. No, it's my fault. 454.

**(Exhibit Number 454 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q All right, sir. Have you seen this email before?

A Yes, I have.

Q And let's start at the bottom and scroll slowly up so Mr. LaHaise can get his bearings, please. What is this email that Mr. Byrne is sending to you, sir?
A This is, again, another demand that Mr. Byrne is making for him to be paid on three separate items, two associated with the LTIP and one with security deposits.
Q Will you read the last sentence above "thank you" into the record, please?
A Please remit the first two immediately and confirm the third will be paid out on February 15th.
Q What was Mr. Byrne asking you to do in this email?
**MR. SESSIONS:** Objection. Calls for speculation.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q What was your understanding of what Mr. Byrne was asking you to do in this email?
**MR. SESSIONS:** Same objection.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** That the changes that he was demanding on the LTIP calculation, that those get paid directly to him, as well as the calculation of the security deposits, which was based on already closed as part of the purchase agreement.
**BY MS. FODE:**
Q What was the total amount that Mr. Byrne was asking for you to deposit into his -- to pay by February 15th?

A Approximately $6.5 million.

Q And did Ameris pay Mr. Byrne $6.5 million by February 15th?

A No, we did not.

Q And why not?

A Because again, those calculations aren't correct and they weren't due.

Q All right. I'd like to turn to Exhibit 449, please, which has been admitted and published. Do you know what this email is, sir?

A Yes.

Q Okay. And what is this email?

A Ms. Stokes is forwarding me a document for -- in reference to have a conversation around the LTIP.

Q Let's scroll down, please, to the attachment. Is this the document Ms. Stokes forwarded to you in the email that we just looked at?

A It is.

Q And why was Ms. Stokes and her team involved?

**MR. SESSIONS:** Objection. Vague.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Why -- what was your understanding of why Ms. Stokes was sending you this document that's on the screen?

A The accounting department is responsible for all of the

calculations of the LTIP document, and she was just providing me her interpretation of all the calculations.
Q And did you review Ms. Stokes' responses to Mr. Byrne's demands?
A Yes.
Q And would you explain there's -- there's red on the screen and black text on the screen. What is the difference?
A The black portion of the print is the Mr. Byrne's demands, and the red is Ms. Stokes' responses.
Q And did you agree with Ms. Stokes' responses to Mr. Byrne's demands?
A Yes.
Q And did you ever discuss with Ms. Stokes her review and analysis of Mr. Byrne's demands?
A Yes.

**MS. FODE:** Okay. I'd like to turn now to Exhibit 459. Permission to show the witness on Blackout, please.

**THE COURT:** Go ahead.

**MR. SESSIONS:** And again, Your Honor, I will say we have no objection to the admission of this exhibit.

**THE COURT:** Okay. Exhibit 459 is -- that's correct, 459?

**MS. FODE:** Yes.

//

//

**THE COURT:** I have too many numbers in my head. 459 is admitted and you may publish.

**(Exhibit Number 459 received in evidence)**

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q All right, sir. Have you seen this document before?

A I have.

Q Are you a recipient of the email?

A I'm the -- I was the author of the email.

Q Apologies. The font is small. Will you go a little bit further down so Mr. LaHaise can see the email? Thank you. And why did you write this this email to Mr. Byrne?

A Again, in our response to his demands, we would always respond and go through the facts of the calculations. And so, again, just reiterating the same -- the responses that Ms. Stokes had provided me back to Mr. Byrne.

Q And why were you communicating with Mr. Byrne?

A I was his direct supervisor.

Q And what was the date of your response?

A February 5th, 2024.

**MS. FODE:** All right. I'd like to move, please, to Exhibit 459. Excuse me. This is the second page of it. Will you go down to the bottom? There we go.

//

//

**BY MS. FODE:**

Q Will you read that paragraph into the record, please? That's highlighted at the bottom of the page.

A To follow up on our conversation during your 2023 performance review, comma, you stated that you may not wish to continue in your role of CEO of the Balboa Capital Division. If this is still the case, it will require considerable coordination to assure no impact to the to the Balboa Capital Division's performance. Please confirm back to me your plans for remaining with the company or not by February 8th, '24.

Q Why did you write this paragraph in your email?

A The -- we had had that discussion as part of the performance review, and Mr. Byrne's continued to focus on the LTIP and really needed him to focus on the strategy of the business and spend our time on building that game plan. And if he did not want to continue to be in that role, we just need to discuss it and work through a nice, smooth transition of leadership.

Q Okay. And I'd like to please go to Exhibit 45 -- 482, which has been admitted. And what is this document, sir? Let us know if you need us to scroll down.

A It's an email chain between Mr. Byrne and myself in reference to the LTIP and compensation owed because of the LTIP calculation and other components.

Q And what is your email at the top dated?
A May 6th, 2024.
Q And will you scroll down to the bottom and then slowly scroll up, please? And did you -- did Mr. Byrne ever call you to discuss this email around May of 2024?
A No.
Q And did you have any further conversations with Mr. Byrne about the summary of compensation owed email that he included to you?
A No.
Q At this point, what was your mode -- your mode of communication with Mr. Byrne?
A Primarily through email.
Q All right. I'd like to move to Exhibit 487, please, on blackout.

**MR. SESSIONS:** Your Honor, we have no objection to the admission of 487.

**THE COURT:** Okay. Are you moving it into evidence?

**MS. FODE:** Yes.

**THE COURT:** Okay. Exhibit 487 is admitted and you may publish.

**(Exhibit Number 487 received in evidence)**

**MS. FODE:** Thank you. All right. If you'd go down to the bottom and scroll up, please. Okay, stop there.

//

**BY MS. FODE:**

Q Is that your email on May 6th, 2024?
A Yes.
Q And if you would go down and highlight what he wrote. Will you read that into the record, please, sir?
A Pat, comma, we did discuss it and I did reiterate that your assumptions were not correct on the LTIP adjustments and that matter was closed. I am confirming that you are not due and never have been due additional payments for 2022 and 2023 LTIP or the purchase price of the company.
Q Why did you write this email?
A To bring closure that we needed to move on and that the decision has been made and we needed to get focused on the company.
Q And what did you mean in the first line that you did discuss it?
A Over the last year and a half, we've been having multiple conversations and coming to the same conclusion after multiple reviews and it was time to move on.
Q And was there any other reason that you sent this email?
A No.
Q And why did you consider it -- why did you include that the matter was closed in your email?
A To make sure that there was no confusion with Mr. Byrne.
Q And why was that important to you?

A Because the same demand, we're on the constant treadmill of discussing the same thing over and over again when we come to the same conclusion.

**MS. FODE:** All right, I'd like to please show the witness Exhibit 102 on Blackout.

**THE COURT:** Go ahead.

**BY MS. FODE:**

Q All right, sir, have you seen this email dated May 6, 2024?

A Yes.

Q And is it an email that was from Mr. Byrne to you?

A Yes.

**MS. FODE:** May I have permission to admit and publish this exhibit?

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay, Exhibit 102 is admitted and you may publish.

**(Exhibit Number 102 received in evidence)**

**BY MS. FODE:**

Q Sir, was this the same -- was Mr. Byrne emailing you the same day on May 6th, 2024?

A Yes.

Q And what is Mr. Byrne saying in his email to you?

A Again, more demands on changes in the calculation of the

LTIP.
Q And did Mr. Byrne ever call you to discuss his -- this May 6 or the other May 6, 2024 emails?
**MR. SESSIONS:** Objection, compound.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q I can separate it out. Did Mr. Byrne ever call you to discuss this May 6th email, which is Exhibit 102?
A No.
Q Did Mr. Byrne ever call you to discuss the May 6th email on Exhibit 487 that we looked at previously?
A No.
Q Did Mr. Byrne ever use the word illegal in any of the email correspondence to you?
A No.
Q Did he ever tell you that he believed that what Ameris was doing with regard to the LTIP was illegal?
A No.
Q Did he ever email the words unlawful in any of his emails to you?
A No.
Q Did he ever tell you that he believed that what Ameris was doing with regard to the LTIP was unlawful?
A No.
Q And lastly, did he ever email that he believed what Ameris

was doing with regard to the LTIP calculations as a violation of law?
A No.
Q And did he ever say that to you?
A No.
Q And --
**THE COURT:** Ms. Fode, it's 10:30. Is this a good time to take a break?
**MS. FODE:** Yes, this is great. Thank you.
**THE COURT:** Okay, so we're going to take our morning break. Sir, you can go ahead and step down. To our jurors, we're going to take a 15-minute break. Please do not discuss this case amongst yourselves or with anyone else, and don't do any research about any aspect of the case. We'll see you in 15 minutes.
**THE CLERK:** All rise.
**(Jurors exit courtroom at 10:30 a.m.)**
**THE COURT:** Okay, everyone can be seated. Before I let everyone take their break, I have gone over the time log that I received from plaintiff, and I have identified two places where the Court's log is incorrect. Well, there are a lot of very, very minor discrepancies, but there are two that are pretty big, and I went back and I checked to see where we were. The first is on the direct examination for Patrick Byrne. Initially, I had that as 50 minutes, but plaintiff's

counsel is correct that that was only 27 minutes because I inadvertently incorporated the break that we took. So that's what accounts for that time.

And then, like I said, there are some differences by a matter of a minute or two in many of the other calculations. The other big one is the plaintiff's direct examination for Mr. LaHaise. I had initially calculated that as 113 minutes, but really it should have been one hour and 13 minutes, and so that goes from -- I know that the plaintiff's estimate was 70 minutes. The Court's estimate is 73. So I recalculated the time that the plaintiff has used after making those corrections, and I come up with 7 hours and 24 minutes, and I think that's probably more in the ballpark of what the plaintiff believed -- the plaintiff's counsel believes that they have left in the case. Is that right?

**MR. SESSIONS:** Yes. Thank you, Your Honor.

**THE COURT:** Okay. All right. Thank you all very much. I'm going to let you all take your break. We'll see you in 15 minutes.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 10:33 a.m.; reconvened at 10:50 a.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Pause)**

**THE CLERK:** All rise. This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated. And, Ms. Fode, you may continue when you're ready.

**MS. FODE:** Thank you.

**CROSS EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q All right. Mr. Lahaise, welcome back. I'd like to turn please to Exhibit 453, which has already been admitted into evidence and published. Sir, what is this document?

A This is the 2023 performance review for Mr. Byrne.

Q Who completed this document?

A I completed the -- filled out the document.

Q And if you look at the ratings in the middle of the screen, what did you rate Mr. Byrne in his 2023 performance review?

A The calculation was a 3.0 which is a met expectations.

Q And what was the meet or met expectations ratings based on?

A The various components of the document has a rating that you can provide and then the final score is an aggregation of those scores, plus if you decide to make any other adjustments.

Q All right. And why did you give Mr. Byrne, a 3.0 met expectations rating?

A So the -- this is -- the review is a balance of -- in this document, it's just a summary of the year, some pretty basic

components overall, but there was some good news and bad news overall for the division and it was less than the previous year. And when I looked at the overall year there was some highlights that we noted in the review of some of the components of the division's performance and then there was -- the division had missed its -- our expectations both for the consolidated financial performance and for the LTIP. And so there was on balance the overall year was rated a meets.

**MS. FODE:** And let's scroll down please. Continue. Actually go back up, apologies. There we go.

Q And, sir, were you -- you wrote -- did you write this document yourself?

A Again, I completed the document in a system. It's an electronic document. I input all of the data in there.

Q And are those your comments that are written in the middle of the screen under performance objectives?

A They are.

**MS. FODE:** Okay. Further down please.

Q All right. And why did you include these comments 1 through 5 in Mr. Byrne's 2023 performance review?

A In order to highlight both the positive and negative and give some objective data associated with the rating.

Q And will you read number 4 to the record, please?

A 4, adjusted loan losses were $39.5 million or 3.4 percent of average year to date loan balances, which prevented the

division from exceeding the LTIP target.
Q And why did you include that in Mr. Byrne's performance review?
A Because those were the facts of how actually the division had performed.
Q And what about number 5, will you please read that into the record.
A So 5.0, with standard FTP pricing, the company did not make a profit for the year.
Q And why did you include that in Mr. Byrne's performance review?
A Because the division -- the actual calculation of profitability and funds transfer pricing has to do with how the prevailing interest rates are and the cost of funding loans during 2023 was dramatically different than the 1 percent that the LTIP called for which was a fixed funding cost. And the rates at that time fluctuated between 3.1 and 4.1 percent and when you applied that cost of funds, which would be normally the allocation that we'd allocate to divisions or any other part of the company, the overall division did not make a profit.
Q All right.
**MS. FODE:** I'd like to go down to the bottom of the document please.
Q At the bottom of the document which is 007, did you write

this comment please?
A I did.
Q And why did you include this?
A I wanted to make sure that it was documented in my conversation with Pat, Mr. Byrne, that he was not happy in his role and relationships were strained with other leaders in the company and that I really wanted to make sure that he decided if he wanted to be here, that he made that commitment and we could move on.
Q And did Mr. Byrne provide any comments in the performance review for 2023?
A Yes.
Q Would you direct your attention to the bottom of the first page of Exhibit 453? Are these Mr. Byrne's comments?
A Yes.
Q Okay. Take a moment to read those please and I'll ask you a question. What does Mr. -- what did you believe Mr. Byrne was stating with Ameris restricted him from purchasing loan portfolios from other banks?
**MR. SESSIONS:** Objection, calls for speculation.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you understand that Mr. Byrne was claiming that Ameris was restricting him from purchasing loan portfolios from other banks?

A Yes.
Q And was that accurate?
A No.
Q And why not?
A It was part of the business practice of purchasing loans is within the portfolio.
Q And did that restriction prevent Mr. Byrne's division from meeting the LTIP threshold?

**MR. SESSIONS:** Objection, calls for expert testimony.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you, as Mr. Byrne's manager, tasked with managing the LTIP plan, did you understand -- did you have an understanding that this claim if it had an impact one way or the other on Mr. Byrne's -- the division's pay out in 2023?

**MR. SESSIONS:** Objection, calls for expert testimony.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you respond to Mr. Byrne's concern that he raised about portfolio purchases in his performance review?
A No, I did not.
Q Did you ever have a conversation with Mr. Byrne about the -- his concern about these portfolio purchases at any time?
A Yes.
Q Okay. I'd like to --

**MS. FODE:** You can put it on black out.
Q I want to ask you a couple of questions overall. What was Mr. Byrne's professional relationship with other Ameris executives?
A At this time in early 2024 and late 2023, it had become strained.
Q And what was his relationship like with you during this time?
A It had also become strained.
Q And did you observe Mr. Byrne's relationship with any other executives become strained?
A Yes.
Q And who were those?
A Ms. Stokes, our CFO and Mr. Creasy, our CIO.
Q And what issues did you personally observe regarding that Mr. Byrne's relationship with Ms. Stokes?
A Well, there was the contention in Ms. Stokes in going through the LTIP calculations and not agreeing with Mr. Byrne and finding that following the rules Ms. Stokes enforcing the policies and procedures and controls became difficult.
Q And what was Mr. Byrne's demeanor that you observed during his final months of employment?
A Well, as time progressed he was either not attend meetings, regularly scheduled meetings or the asset quality meetings or different regularly scheduled meetings in the

division. If he did attend, he just did not participate as he had in the past and just observed and moved on.

Q And what was Phil Silva's performance like during this time?

A Mr. Silva really stepped up. There was a void in the leadership and direction of the division and Mr. Silva filled that void by taking a leadership role.

Q And fast forwarding, was Mr. Silva promoted to CEO after Mr. Byrne no longer worked at Balboa Division?

A No.

Q What is his position?

A Mr. Silva is the division president as he was prior to Mr. Byrne leaving.

Q Okay. I'd like to go now to Exhibit 465, which has not been admitted into evidence.

**MS. FODE:** Just show it on black out to the witness.

Q Do you see that there, sir?

A Yes.

**MR. SESSIONS:** Your Honor, plaintiff has no objection to the admission of this exhibit if that is the intent.

**THE COURT:** Okay. Are you moving to admit?

**MS. FODE:** Yes, moving to admit and publish.

**THE COURT:** Okay. Exhibit 465 is admitted and you may publish.

**(Exhibit Number 465 received in evidence)**

**BY MS. FODE:**

Q Sir, have you seen this exhibit before?

A Yes, I have.

Q And what is this exhibit?

A This is a response to Mr. Byrne in February of 2024 on the various demands that he had relative to his being paid on both the LTIP and on the purchase price and its explanation on our position on each one of those in response to his demands.

**MS. FODE:** And I'd like to now go to Exhibit 97 please. And this has not been admitted into evidence yet. If you could show it on black out please. Would you go down to the bottom please?

Q All right. Sir, have you seen this e-mail before?

A Yes.

Q And did you author this e-mail?

A Yes.

**MS. FODE:** I would ask that the exhibit be admitted and published.

**MR. SESSIONS:** Yes, objection, Your Honor. I believe the witness is only on the first e-mail on this chain.

**THE COURT:** Can you scroll up so I can see the rest of this chain? Okay. The objection is sustained.

**BY MS. FODE:**

Q In March of 2024 did you reach out to Mr. Byrne about his employment contract?

A Yes, I did.
Q And what were the next steps that you took with regard to that?
A So the employment agreement has a required notice to be given for nonrenewal and so I sent him a document giving him notice per the -- following the conditions of the agreement to provide him ample time on notifying that it was not being renewed.
Q Okay. And what happened when you sent that e-mail?
A I followed the e-mail with the new document, our change in control and severance and protection and covenant restriction document, which is our standard document that we use for all executive level positions and senior management positions.
**MS. FODE:** I'd like to please go to Exhibit 98 and show the witness on black out.
**THE COURT:** Go ahead.
**MS. FODE:** Thank you.
**BY MS. FODE:**
Q Sir, have you seen this document before?
A Yes.
Q And what is this?
A This is the severance protection and restrictive covenants agreement that I just referenced that we use as our standard documentation.
**MS. FODE:** I'd like to ask that the exhibit be

admitted and published please.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 98 is admitted and you may publish.

**(Exhibit Number 98 received in evidence)**

**BY MS. FODE:**

Q All right. Is -- just to refresh again, what is this document?

A So this document is the document we use for existing employees that are at the senior leadership level that we want to protect and provide them some rights as part of their employment with the company and it provides for severance protection as part of the agreement.

Q And is this -- has this agreement been used with any other executives in the company?

A Yes, it's our standard document, our C Suite executives all have this exact same document as well as other senior division leaders within the company.

Q And did you have one of these when you were employed at Ameris Bank?

A Yes, I did.

Q And did --

**MS. FODE:** I'd like to go to the clauses, the first three whereas clauses. Okay. You can highlight all three.

Q Can you read the first one into the record, sir?
A Whereas, employee is an employee of the bank corp and/or the bank.
Q And the next one please?
A Whereas, the expertise and experience of the employee in the financial institutions industry are valuable to employer.
Q Okay. And the third one.
A Whereas, it is in the best interest of employer to maintain an experienced and sound management team to manage employer. Further employer's overall strategies and protect -- strategies and protect and enhance shareholder value, semicolon.
Q So why did you provide this to Mr. Byrne?
A To provide that type of -- the severance protection and replace the employment agreement.
Q And did you provide this to Mr. Silva as well?
A We did.
Q And does the severance and protection and restricted covenants agreement offer employment at Ameris?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q How does the -- providing this agreement to Mr. Byrne, how does that impact his employment?

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did Mr. Byrne sign the severance and protection -- severance protection and restrictive covenant agreement?

A He did not.

Q Did the severance protection and restrictive covenant agreement indicate that Mr. Byrne or Mr. Silva's employment was terminated?

**MR. SESSIONS:** Objection, compound, calls for legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did the severance agreement provide that Mr. Byrne was terminated?

**MR. SESSIONS:** Objection, calls for a legal conclusion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q When you provided the severance agreement to Mr. Byrne, were you intending to terminate his employment?

A No.

Q And why did you provide this agreement to Mr. Byrne?

A To provide the benefits of the severance for -- as an employee.

Q And did Mr. Silva sign the severance protection and restrictive covenant agreement?
A Yes.
Q Just making sure I asked you, did Mr. Byrne, did he sign it?
A No, he did not.
Q Okay.

**MS. FODE:** I'd like to go to Exhibit 465. And this has not been -- I don't believe this has been admitted into evidence at this time. I would like to show the witness.

**MR. SESSIONS:** I think this was admitted earlier today, but I could be wrong, Your Honor.

**THE COURT:** 465 was not -- maybe it's another -- maybe it's a duplicate, but 465 has not been admitted.

**MR. SESSIONS:** Okay.

**BY MS. FODE:**

Q All right, sir. Have you seen this document before?
A Yes.
Q And --

**THE COURT:** Oh, I misspoke, it has been admitted, you're correct.

**MS. FODE:** Okay. Thank you. Will you scroll down please? Can you go further down? Okay. All right. If you could show then the document please?

Q Sir, is this an e-mail that you sent on March 7th, 2024?

A Yes.
Q And is -- what is this e-mail?
A It's an e-mail to Mr. Byrne to just -- showing him attached was the non-renewal notice that we previously discussed.
Q And why did you send a non-renewal notice on March 7th, 2024?
A Non -- the notice of non-renewal is required as part of the document, you must give notice ahead of time and this was roughly nine -- more than nine months ahead of the renewal period.
Q And were you intending to terminate Mr. Byrne's employment when you sent the notice of non-renewal?
A No.
Q All right. Moving along to Exhibit, please, 489. We're almost done.

**MS. FODE:** This has not been shown to -- this has not been admitted, I'd like to show it on black out please to the witness.

**THE COURT:** Go ahead.

**MS. FODE:** Thank you.

**BY MS. FODE:**
Q All right, sir. Would --

**MR. SESSIONS:** For the sake of time, Your Honor, I'd say we -- sorry, apologies.

**MS. FODE:** Go ahead.

**MR. SESSIONS:** Plaintiff does not object to the admission of the exhibit.

**THE COURT:** Thank you. Are you moving it into evidence?

**MS. FODE:** Yes, thank you, Your Honor.

**THE COURT:** Okay. Exhibit 489 is admitted and you may publish.

**(Exhibit Number 489 received in evidence)**

**MS. FODE:** Thank you. And will you start at the bottom, please, and slowly scroll up? Okay. Go up, please.

**BY MS. FODE:**

Q All right. What is -- is this an e-mail that you sent at the bottom of page 002?

A Yes.

Q And who did you send it to?

A To Mr. Byrne and Mr. Silva.

Q And what is the subject?

A Agenda tomorrow.

Q Why did you send this e-mail?

A We had a regularly scheduled weekly meeting and we would share agenda items that each of us had for discussion during the meeting.

**MS. FODE:** And will you scroll up please.

Q Did Mr. Byrne attend the meeting in June of 2024?

A No, he did not.

**MS. FODE:** Can we scroll up further?

Q Did -- what did you ask for there in your June 25th, 2024 e-mail?

A Since he could not attend, to please give some times on the following day for us to -- that would work for him for us to have the meeting.

Q And did Mr. Byrne send you those times to meet again?

A No, he did not.

Q And did Mr. Byrne meet with you in June of 2024?

A We ultimately did meet, yes.

Q Okay. All right. I'd like to now show Exhibit 491.

**MS. FODE:** This has not been admitted. I'll show it to the witness on black out please.

**THE COURT:** Go ahead.

**BY MS. FODE:**

Q Have you seen this document before, sir?

A Yes.

Q What is it?

A It is a Teams notification of a meeting that was scheduled with Mr. Byrne and myself on June 27th at -- scheduled for 1 -- to run from 1:30 to 2:30, that I was the organizer of the meeting.

**MS. FODE:** I ask that we be allowed to admit and publish this exhibit.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 481 is admitted and you may publish.

**(Exhibit Number 481 received in evidence)**

**BY MS. FODE:**

Q Okay. And what was this meeting for, sir?

A Well, the meeting was scheduled to notify him of the -- that we were indeed terminating him, his employment effective the end of the month June 30th.

Q And what steps had led to this meeting on June 27th?

A Prior to this meeting on the 26th we had finally been able to connect on the top items that we previously discussed that were part of the agenda items. And when Mr. Byrne and I were having that discussion, the conversation had become contentious again and Mr. Byrne again stated why don't you just fire me, and at that point, there had just been enough of this contention and the relationship had deteriorated and couldn't focus on the strategy of the business and so at that point I said, that's what we'll do.

Q And when you said again, he had asked you to fire him, were there other times that Mr. Byrne had asked you to or said, why don't you just fire me?

A Yes.

Q And when were those other times?

A Once was when Ms. Stokes and I were in Costa Mesa, when we had met in late July, early August to have a discussion around the LTIP demands was another time. And then another time was when he and I went together to try to work through the relationship and we had a restaurant to eat, it was Mr. Byrne and I, and again didn't get anywhere and he made the same comment that, why don't you just fire me.
Q Okay. And so leading up to this call, had you had any further conversations with Mr. Byrne prior to this call on June 27, 2024?
A Any conversations?
Q That we haven't discussed leading up to the timeline to this meeting on June 27th, 2024?
A No.
Q And what happened on the call on June 27, 2024?
A So the call was to follow up and confirm to Mr. Byrne on the termination notice. And in that discussion, Mr. Byrne asked me to forward a copy of the termination notice to his attorney and I didn't have that information, who his attorney was, and what his contact was. And so Mr. Byrne said he would forward me that information.
Q And what is this note on the calendar invite here, on page 002?
A It's a note that we -- Mr. Byrne -- I had notified him of the termination effective that date, access to the system would

stop at the end of the day, the following day of I guess the 28th and he asked again to send the notice to his attorney and send his personal notice to his Yahoo account.

**MS. FODE:** Let's scroll down please. All right.

Q And what is this e-mail, sir, on June 27th, a 2:55 p.m.?

A So this is just a few minutes after the termination -- the end of that call that was scheduled, it's the e-card for his attorney.

Q And did Mr. Byrne send that to you?

A Yes.

**MS. FODE:** If you'd go please to Exhibit 496 which has already been admitted.

Q Okay, sir. What is this e-mail?

A This is the actual forwarding -- sending of the termination of employment to Mr. Byrne along with the employee -- that Mr. Byrne's employment agreement release which was part of the original employment contract that was provided at the closing of the purchase.

Q And when did you send this e-mail?

A It was on the June 27th in the evening.

**MS. FODE:** And would you scroll down please?

Q Was there anything attached?

A It was, the two documents, the release document and the termination notice.

Q Okay. Is this the release agreement that was attached to

your e-mail?

A Yes, it was.

Q And what is the release agreement?

A So as part of the employment contract, there is a release that the employee signs in order to receive the severance benefits. It's all something that's disclosed ahead of time and negotiated ahead of time as part of the agreement when the agreement was first consummated.

Q And in your experience, are -- is it common for an executive to have a release agreement as part of their employment agreement?

A Yes.

Q Okay. And how much would Mr. Byrne have gotten paid under the release agreement had he signed it?

A The release agreement provides for their annual compensation to be paid at the time about $950,000, which is the base compensation plus the quarterly bonuses.

Q And who made the decision to terminate Mr. Byrne's employment?

A I did.

Q And what were the reasons for Mr. Byrne's termination?

A So the -- one of the reasons is just the strained relationships. We could not get to a productive place, the relationships with myself, with the other executives. We need a leader of a division that can collaborate and work with the

rest of the team so that we can achieve our goals. There's control related issues that came about. There's -- the division just not performing and us not being able to focus on that.
Q And when you say the division not performing, what does that mean?
A Well, that the 2023 was a very disappointing year and we really needed to make sure that we were focused on building the strategy and so we needed to make sure that the leadership was in place to be able to do that.
Q Were Mr. Byrne's LTIP demands part of the reason for termination?
A No.
Q And did Ameris characterize the termination with cause or without cause?
A Without cause.
Q And why was it -- why did you characterize it as without cause?
A It was to be able to protect Mr. Byrne's severance benefits that he had and also provide for a nice smooth and graceful exit from the company.
Q And what does that mean to protect his severance benefits?
A There are conditions within the employment agreement that change the severance benefits depending on the conditions from which an employee is terminated and this allowed for Mr. Byrne

to get the full -- all the benefits available to him.
Q And did Mr. Byrne accept the release agreement?
A No, he did not.
Q All right. After termination, did you learn that Mr. Byrne had sent company documents to his personal Yahoo account?
A Yes.
Q And if you had known when he was employed that he had sent the personal -- sent the company documents to his personal Yahoo account, would you have terminated him for that reason?
A Yes.
Q And why was that?
A Because that is our policy, to protect our customers' information or proprietary information, it's one of -- it's a breach of policy and our business is built on trust and we've got to be able to trust our employees.

**MS. FODE:** No further questions.

**THE COURT:** Thank you. Mr. Sessions.

**MR. SESSIONS:** Thank you, Your Honor.

Ms. Perez, can you pull up Exhibit 546 please?

**REDIRECT EXAMINATION**

**BY MR. SESSIONS:**

Q Mr. Lahaise, you just testified that Mr. Byrne's termination was characterized as without cause, correct?
A Yes, that's correct.

**MR. SESSIONS:** Okay. Can we, Ms. Perez, go to I believe it's paragraph 3 is the number.

Q Mr. Lahaise, you remember on Thursday we went over this paragraph 3 forfeiture risk together.

A Yes.

Q Okay. And then do you remember how we read the last sentence that starts with in the event of a termination without cause or resignation for good reason, the award for all outstanding performance periods shall be determined and paid out in accordance with Section 4 and the plan and the participant shall receive such award for each performance period that occurs during the year of the termination without cause or the resignation for good reason and each year thereafter, if any. Do you remember that?

A I do remember that.

Q And do you remember testifying that Mr. Byrne did not receive an LTIP bonus payment for the 2024 period?

A I do recall that.

Q Why wasn't he paid?

A I don't know.

Q Who made the decision to not pay Mr. Byrne his 2024 LTIP bonus?

A There was no -- if -- there's no guarantee that somebody is a participant, they're eligible to be paid, but that doesn't guarantee that they can get paid.

Q So I understand, is it your testimony that you simply decided not to pay him his bonus for the 2024 performance period?

**MS. FODE:** Objection, argumentative, misstates the testimony.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** We did not pay him his bonus. He was eligible to pay, but there was no bonus paid.

**BY MR. SESSIONS:**

Q Thank you.

**MR. SESSIONS:** Actually, Ms. Perez, you can keep that document up since we're on that topic. So if we can scroll to the first page.

Q Now this is Mr. Byrne's award agreement, correct?

A Yeah, that's correct.

**MR. SESSIONS:** And, Ms. Perez, is it possible to put two documents side-by-side?

**MS. PEREZ:** Uh-huh.

**MR. SESSIONS:** Can we put 545 and 546 next to each other? Thank you so much.

Q Mr. Lahaise, on the left here that's the LTIP plan, correct?

A Yes, that's correct.

Q You spent a little bit of time with Ameris' lawyer reading through different portions of this LTIP plan, correct?

A Yes, we did.
Q And this LTIP plan applied to all employees of Balboa who were participants in the LTIP plan, correct?
A All that were potentially eligible to be participants, that's correct.
Q And now on the award agreement on the right, do you see the name at the top there, says Patrick Byrne?
A I do.
Q No one else who was participating under the LTIP plan had an individual award agreement, correct?
**MS. FODE:** Lacks foundation, calls for speculation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** There was three individuals who had award.
**BY MR. SESSIONS:**
Q Thanks for reminding me. Those three individuals were -- we'll go through each of them one by one. First was Patrick Byrne, correct?
A Yes.
Q And then it was Phil Silva, correct?
A Yes.
Q And was the third Rob Rasmussen?
A Yes.
Q Thank you. And then no one else had an award agreement other than those three, correct?

**MS. FODE:** Overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** There were no other award agreements.

**MR. SESSIONS:** Thank you. We can take that down, Ms. Perez.

**BY MR. SESSIONS:**

Q Is it -- Ameris' lawyer a few minutes ago asked you whether Mr. Phil Silva had been promoted to Balboa's CEO, do you remember that?

A Yes, I do.

Q And you said no, correct?

A That's correct.

Q Why wasn't he promoted?

A There was -- we didn't have that position needed. We have division presidents and so Mr. Silva's division president.

Q So there -- to confirm, is there currently a CEO of the Balboa Division?

A No, there's not.

Q So who is in charge of running the Balboa Division or believe it's now called Ameris Equipment Finance; is that right?

**MS. FODE:** Vague and ambiguous.

**THE COURT:** Overruled, you can answer.

Q And just to clarify my question, who is currently in charge of running Ameris Equipment Finance?

A Mr. Silva.
Q Mr. Lahaise, on Thursday you testified to some of the cultural aspects at Ameris, do you remember that?
A Yes.
Q And you said when asked about the culture, quote, it's very much focused on the people side of things, right?
A Yes, that's what I said.
Q And focused on quote, relationships, right?
A We do focus on relationships.
Q And you said quote, having high integrity, right?
A Yes.
Q And you also said quote, having discipline in what Ameris does and really fairness, correct?
A Yes.
Q And as a person who was a senior executive at Ameris for 12 years, you're familiar with those values, correct?
A I am.
Q Okay. I'm going to ask you a couple of related questions. First, the last company you and Ameris purchased or strike that, I'll use a different word. The last company you and Ameris acquired before Balboa was previously known as P-1 or Premium Finance, correct?
**MS. FODE:** Objection, outside the scope, irrelevant.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** There was a company we purchased called

P-1.

**BY MR. SESSIONS:**

Q Was that the last company you had acquired prior to Balboa?

A Yes, I believe so.

Q And when you acquired P-1 or Premium Finance, Ameris kept the previous owner William Vallari as head of P-1 or Premium Finance, correct?

**MS. FODE:** Objection, outside the scope, irrelevant.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

Q Eventually Mr. Vallari had disagreements with Ameris after the acquisition, correct?

**MS. FODE:** Same objections.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No, that wasn't the case.

Q And Ameris terminated Mr. Vallari, correct?

**MS. FODE:** Objection, irrelevant, 403, outside the scope and a party privacy.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Mr. Vallari was terminated.

Q The previous second in command of Premium Finance prior to the acquisition was a man named Kurin Cocoa (phonetic), correct?

A Yes.

Q And after Mr. Vallari was terminated, Kurin Cocoa, the previous second in command replaced him as head of P-1 or Premium Finance, correct?
A Not as P-1. P-1 -- the company, the main company that we acquired was U.S. Premium Finance. P-1 was a small entity that also did very -- Premium Finance. So there was no division head of P-1, there was one division head, Mr. Cocoa was division head -- division president for U.S. Premium Finance.
Q Okay. Thank you for the clarification. And he did replace Mr. Vallari as head of U.S. Premium Finance, correct?
**MS. FODE:** Objection, irrelevant, 403, outside the scope.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes, he was.
**BY MR. SESSIONS:**
Q Mr. Lahaise, continuing on the people values of Ameris, are you aware that in October of 2023 the U.S. Department of Justice filed a lawsuit against Ameris Bank?
**MS. FODE:** Objection, outside the scope, irrelevant, 403.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** I'm not sure what you're referencing there.
Q Fair enough. Do you recall receiving training in and around October and November of 2023 about a consent order that

Ameris had entered into with the United States Department of Justice regarding allegations of redlining or refusing to provide mortgage financing services to blacks and Hispanic communities in Florida?

**MS. FODE:** Oh my, objection, 403, prejudicial, irrelevant, outside the scope.

**THE COURT:** Sustained.

**BY MR. SESSIONS:**

Q Mr. Lahaise, last question, during your testimony near the end, you provided reasons to Ameris' attorney as to why you terminated Mr. Byrne, correct?

A I did.

Q But you are not aware of any documents that exist that mention the reasons why Mr. Byrne was fired, correct?

**MS. FODE:** Lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I'm not aware of? I'm not sure I understand what that means. I'm not aware of any documents that exist.

Q To clarify it, is it your testimony that you aren't aware of any documents or you're just confused by my question, in which case I will rephrase.

A I'm confused by --

**MS. FODE:** Objection, argumentative, compound.

**THE COURT:** Overruled, he's refused, so you need to

ask a different question.

**MR. SESSIONS:** Thank you, Your Honor.

**BY MR. SESSIONS:**

Q Why don't we go ahead and pull up your deposition and we'll do it on black out so the jury doesn't see, and I will ask the question that was asked then.

**THE COURT:** Okay. Go ahead.

**MR. SESSIONS:** So we're going to go to the 30(b)(6) deposition page 198, lines 14 to 20.

Q Okay. So I'm going to read the question and I'll give you a chance to answer it before I, and hopefully won't have to read the full part.

So question,

"With regard to the reasons why Pat Byrne was fired, are there any documents that mention this?"

**MS. FODE:** Objection, vague, overbroad, assumes facts not in evidence and incomplete.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** So I'm making a statement here that --

**THE COURT:** No, he's just asking you -- he has this up to refresh your recollection, but he's just asking you the question right now, you don't need to read it.

**THE WITNESS:** Okay. I understand. So, no, I'm not aware.

**MR. SESSIONS:** No further questions.

**THE COURT:** Okay. Thank you very much. Ms. Fode?

**MS. FODE:** No redirect.

**THE COURT:** Okay. Thank you very much, sir, you can step down, you're excused.

Okay. Next witness.

**MR. WOOD:** Thank you, Your Honor. At this time, we'll be playing the designated deposition video of Palmer Proctor.

**THE COURT:** Okay. Any objection?

**MS. FODE:** Yes, Your Honor, we object that it's irrelevant and 403.

**THE COURT:** Okay. I need counsel to approach.

**(Begin sidebar at 11:41 a.m.)**

**THE COURT:** Thank you. So I've read the deposition, it's a lot of, I don't know, I don't know, I wasn't involved, I couldn't find very much of substance to that deposition that would be helpful for the jury.

**MR. WOOD:** Well, we've cut it down significantly, we think it is (inaudible) last week, we think it's important for the jury to understand it's been testified to that he was actively involved in this $186 million acquisition, that he was involved and as the CEO he ultimately approved or disapproved whatever LTIP payments were made. And it's highly probative, especially for establishing malice, oppression and fraud for the jury to understand that the CEO who directed this

acquisition claims to have no involvement and claims to know nothing about the process by which this happened. And I think we can accomplish that within -- I think we've cut it down to probably less than ten minutes at this point. It's not really going to take up much time.

**THE COURT:** So the focus is going to be on his involvement in the acquisition, not his involvement in Mr. --

**MR. WOOD:** No, no --

**THE COURT:** -- Byrne's termination.

**MR. WOOD:** I apologize, Your Honor.

**THE COURT:** That's okay.

**MR. WOOD:** The jury has already heard that he was involved in the acquisition and so I think it's probative for them to now hear that he -- despite this involvement that's been testified to that he claims to have no recollection of anything to do with this firing. And I think that's a question that the jury needs to ask in its mind, is why would this, after being involved in this acquisition and after directing this bank to acquire another bank -- another company for $186 million, why he wouldn't have had any involvement and what that shows about the intent and the motivation.

**THE COURT:** Okay. Would you like to respond?

**MS. FODE:** I would, thank you, yes. So we've held from the beginning that it is improper to bring him and bring in his testimony because it's irrelevant and it's prejudicial,

given his role and outweighed by the lack of really knowledge or probative value of what he would say. The testimony as I read it he really doesn't have actual knowledge of the termination, of the LTIP, he deferred the compensation of the committee was deferring it to Mr. Lahaise to make those decisions. And Mr. Proctor's deposition testimony bears that out.

I also will say before we had approved -- if they had cut certain portions of the transcript that is going to be played, that could potentially be prejudicial, because we have not reviewed cuts at this point before it was going to come all in and it showed to us the totality of it, that he didn't have personal knowledge of the relevant issues in the case.

**MR. WOOD:** We were trying to be mindful of the jury's time, Your Honor, but if Your Honor would prefer us to play the entire thing, we can, but I think it's important for the jury to be able to assess credibility based on what they see and what they've heard so far.

**THE COURT:** Okay. So my understanding is that the purpose for bringing this testimony in is to support the plaintiff's argument of malice, oppression or fraud.

**MR. WOOD:** Yes.

**THE COURT:** Okay. I'm going to go ahead and allow it to be played, but it's up to you, do you want all of it since you haven't seen the cut or how do you want to proceed?

**MS. FODE:** It's challenging because it wasn't provided to us before.

**THE COURT:** I understand.

**MS. FODE:** I think we can agree but over objection for sake of time that you can play your cuts. I will just -- I want to put one more thing on the record, I think that the connections that he's drawing I think state the risk of showing the testimony of the CEO wasn't actively involved and also it's, I don't believe necessary, it'd be cumulative, because there's another executive who's been involved in every single aspect that we just heard of for two hours, so just for the record.

**THE COURT:** Okay. Thank you. Thank you very much.

**(End sidebar at 11:45 a.m.)**

**THE COURT:** Okay. Mr. Wood, you may proceed.

**MR. WOOD:** All right. We'd like to go forward with the playing of the video testimony.

**PALMER PROCTOR, PLAINTIFF'S WITNESS, VIA DEPOSITION TESTIMONY**

E X A M I N A T I O N

BY MR. WOOD:

"Q Mr. Byrne, had been terminated after he had already been -- were you made aware that Mr. Byrne had been terminated after he had already been terminated?

A I was made aware that Mr. Byrne was being

terminated.
Q And who told you, who made you aware that Mr. Byrne was being -- that the decision had been made?
A Jim Lahaise.
Q Okay. And what did Mr. Lahaise tell you?
A He informed me that Mr. Byrne was being terminated.
Q And what did -- did Mr. Lahaise need your permission in order to terminate Mr. Byrne?
A No.
Q And did you respond to Mr. Lahaise's statements that he was going to terminate Mr. Byrne?
A No.
Q Did you have any reaction to Mr. Lahaise's -- to the information that he was going to terminate Mr. Byrne?
A No.
Q Did you -- if you had wanted to, could you have stopped Mr. Lahaise from terminating Mr. Byrne?
A No, the decision had already been made.
Q Right. But if -- as far as you are aware was Mr. Byrne still working at Ameris Bank when you

were informed?
A I don't require -- I don't recall the timing.
Q And so it's the same question, if you had wanted to, could you have prevented Mr. Lahaise from terminating Mr. Byrne?
A No, the decision had already been made.
Q Were you -- in terms of the chain of command were you superior to Mr. Lahaise?
A In terms of my title, yes.
Q Does Mr. Lahaise report to you?
A The answer to that is yes.
Q Thank you. Did Mr. Lahaise tell you why he had decided to terminate Mr. Byrne?
A I do not recall.
Q As you sit here today, do you think he would have explained to you the reasons why he was terminating Mr. Byrne?
A As stated earlier, I do not recall.
Q Did you have any discussions with Mr. Lahaise or anyone else, anyone other than Mr. Lahaise as to whether or not Mr. Byrne should be terminated?
A No.
Q Did you receive any information from anyone other than Mr. Lahaise as to whether or not Mr. Byrne should be terminated?

A No.

Q Now, we talked about the communication where Mr. Lahaise told you he had decided to terminate Mr. Byrne, had Mr. Lahaise had any other communications with you, right, whether it's face-to-face meetings, phone, e-mail, regarding concerns about Mr. Byrne?

A I do not recall.

Q Was it a surprise to you when Mr. Lahaise told you that he had decided to terminate Mr. Byrne?

A I do not recall.

Q Did you know Mr. Byrne?

A I had met Mr. Byrne.

Q Had you had any conversations with Mr. Lahaise about dissatisfaction with Mr. Byrne's job performance -- well in terms of hearing that Mr. Lahaise had decided to terminate Mr. Byrne my recollection is the deponent, Mr. Proctor said he didn't remember what was discussing, so I'm asking had you had any conversations with Mr. Lahaise about dissatisfaction with Mr. Byrne's job performance.

A I stated I do not recall.

Q Had you had any conversations with Mr. Lahaise about a perception that Mr. Byrne had

developed friction with any other members of Ameris' leadership?
A As stated, I do not recall.
Q Right. But were you satisfied with Mr. Bryne's job performance?
A I don't recall.
Q Do you recall making statements in 2024 that you were satisfied with the performance of the Balboa Division?
A No, I do not recall.
Q Okay. Do you recall, trying to make it more specific, that in or around the time that Mr. Byrne was terminated making statements to analysts during earnings call that you were satisfied with the performance of the Balboa Division?
A No, I do not recall.
Q Do you recall making statements that Balboa was obviously going to incur higher losses but it had much higher yields, so net Balboa was an extremely profitable business?
A No, I don't recall.
Q Do you deny that you made statements to analysts that you -- during -- in the middle of 2024 that you were satisfied with the performance of the Balboa Division?

A No, I don't deny that if it was in the transcript.

Q Did you have any conversations with Laura Rodriguez about Mr. Lahaise's decision to terminate Mr. Byrne?

A Not that I recall.

Q Did you receive any information from Ms. Laura Rodriguez that would have impacted your decision or your reaction upon hearing that Mr. Byrne had been terminated?

A Not that I recall.

Q Did you have any understanding when you were informed that Mr. Byrne was being terminate, did you have any understanding as to who was going to run the Balboa Division after he was terminated?

A Not that I recall.

Q Would that have been important for you to know when hearing about the decision to terminate Mr. Byrne?

A No, that would have been decided by Mr. Lahaise.

Q Would you -- would it have been important for you to make sure that Mr. Lahaise had considered who was going to run the division after Mr. Byrne's termination?

A As stated earlier, that would be Mr. Lahaise's

decision.
Q Up until the time that you were informed that Mr. Lahaise had decided to terminate Mr. Byrne were you under the impression that Mr. Lahaise was satisfied with Mr. Byrne's job performance?
A Can you please restate the question?
Q Okay. Up until the time that you were informed that Mr. Lahaise had decided to terminate Mr. Byrne, did you have the belief that Mr. Lahaise was satisfied with Mr. Byrne's job performance?
A I do not recall.
Q At the time that Mr. Byrne was terminated, did he have an employment agreement with Ameris Bank?
A I do not recall.
Q You're aware that Ameris offered a long term incentive compensation plan to Balboa when it acquired Balboa in December 2021?
A I do not recall.
Q Are you aware whether there was an LTIP?
A Based on your line of questioning, I would assume there was.
Q Right. And I don't want you to assume based on my line of questioning, I'm trying to get an understanding of your recollection. Yeah, are you aware that Balboa had an LTIP at the time Mr. Byrne

was still employed at Ameris Bank?

A I'm now aware that Mr. Byrne had a long term incentive plan.

Q Okay. Are you aware in connection with the compensation that Mr. Byrne was paid under the LTIP that he complained about the calculations of the LTIP?

A No, I do not recall.

Q What information are you provided when you review pay outs under the LTIP?

A As stated, I don't recall reviewing the LTIP.

Q Right. I'm talking about the payments.

A If I reviewed, it would have been an aggregate total."

**MR. SESSIONS:** Thank you, Your Honor.

**THE COURT:** Okay. Thank you very much. Okay. It's 11:55, are there -- is -- I was going to say we should break for lunch, is there any reason that we should continue on with -- for a bit before we break for lunch?

**MR. SESSIONS:** We can call our next witness after lunch, Your Honor, that's fine.

**THE COURT:** Okay.

**MS. FODE:** That works for us too.

**THE COURT:** Okay. So we'll go ahead and break for lunch. To our jury, please remember, do not discuss this case

amongst yourselves or with anyone else, don't do any research about any aspect of the case and we'll see everyone back here at 1 o'clock.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 11:55 a.m.)**

**THE COURT:** Okay. And -- everyone can be seated. For the record, Mr. Wood, was that the abbreviated version or was that the entire version because we talked about both at sidebar?

**MR. WOOD:** Yes, that was the abbreviated version.

**THE COURT:** And, Ms. Fode, did you want to have the entire version played now that you've seen what was actually played, are there additional parts of Mr. Proctor's deposition that you would like to play?

**MS. FODE:** I would just want to state for the record I do think it was misleading, but for the sake of time and moving this forward for the jury, we do not need the extra parts played.

**THE COURT:** Okay. And, of course, if you change your mind when we're in your case in chief and you decide that you want to play those extra parts, then we can talk about that then.

**MS. FODE:** Thank you.

**THE COURT:** All right. Thank you all very much, everyone. Enjoy your lunch and I'll see you at 1 o'clock.

**MR. SESSIONS:** Thank you, Your Honor.

**THE CLERK:** All rise. This court is in recess.

**(Recessed at 11:57 a.m.; reconvened at 1:01 p.m.)**

**THE CLERK:** Please be seated.

**(Pause; Jurors present)**

**THE CLERK:** All rise. This Court resumes in service.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated. I hope everyone had a nice lunch break.

Okay, Mr. Sessions, could you call your next witness, please?

**MR. SESSIONS:** Thank Your Honor. At this time, Plaintiff calls Phil Silva.

**THE COURT:** Okay. Thank you very much.

**(Pause)**

**THE COURT:** Good afternoon, Mr. Silva. You can come forward. You'll come around the table this way, and when you get to Ms. Jackson, you'll stop. She'll swear you in, and then you'll come up onto the witness stand and have a seat next to me. .

**PHIL SILVA, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** State your name and spell your last name for the record.

**THE WITNESS:** Okay. My name is Phil -- Philip Silva S, as in Sam, i-l-v, as in Victor, a.

MR. COMMONS: Thank you very much.

Mr. Sessions, you may proceed.

**MR. SESSIONS:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MR. SESSIONS:**

Q And thank you for being here, Mr. Silva. We haven't met before, correct?

A That's correct.

Q I'm Matt Sessions, Very nice to meet you. You took a deposition in this case, correct?

A I did.

Q And during that deposition, you took an oath to tell the truth, correct?

A Correct.

Q And the lawyers who are here on behalf of Ameris Bank, you've met them before, right?

A Yes.

Q Did you meet with them to prepare for your testimony today?

A I've met with them over many periods of time. I don't really understand the specifics of your question.

Q When was the last time you met with them?

**MS. FODE:** Objection. Attorney-client privilege.

**THE COURT:** Overruled. You can answer. And he's just asking for a date, he's not asking for what you discussed.

A The most recent, today.

Q How many times have you met with them to prepare for your testimony today, Mr. Silva?

**MS. FODE:** Objection. Attorney work-product, and attorney-client privilege.

**THE COURT:** The objection's overruled. You can answer.

A I -- I'm not familiar with how many it's been, Matt. I'm not sure.

Q Now you work at what was formerly known as the Balboa Division of Ameris Bank, correct?

A Yes.

Q And that's now called Ameris Bank Equipment Finance. Did I get that right?

A Right.

Q And before the Balboa Division was acquired by Ameris Bank, you were the President of Balboa, correct?

A That's correct.

Q And you remained the President of Balboa after it was acquired by Ameris Bank, right?

A Yes.

Q You know Patrick Byrne, correct?

A I do.

Q You've known him for a long time?

A A long time.

Q You met in 2006, is that right?

A That's correct.

Q And you know Robert Rasmussen as well, correct?

A I do.

Q You've known him for a while too, right?

A Longer.

Q And in fact, you were introduced to Mr. Byrne by Mr. Rasmussen, is that right?

A That's correct.

Q You were unemployed when you met Mr. Byrne, correct?

**MS. FODE:** Misstates the testimony.

**THE COURT:** Overruled. You can answer.

A That's entire -- not entirely correct. I was in between a position. But yes technically I was unemployed at the time.

Q And then after you met Mr. Byrne you started working at Balboa Capital, correct?

A That's not entirely true either. I, I consulted for Pat at Balboa Capital for about a year. And then from there started with them after that period of time. I don't remember if it was exactly 12 months but that was an approximate time.

Q Fair enough. Were you consulting for anyone else during that one year period?

A I was.

Q Who else were you consulting for?

**MS. FODE:** Irrelevant.

**THE COURT:** Overruled. You can answer.

A I worked with companies like -- it -- for some reason it's -- if we come back to it I'll remember, but I wasn't expecting the question, so I don't remember.
Q No problem. But then eventually Pat Byrne hired you to work full time at Balboa, correct?
A He did.
Q And you're aware that Mr. Byrne was terminated from Ameris Bank in 2024, correct?
**MS. FODE:** No explanation, calls for speculation.
**THE COURT:** Overruled. You can answer.
A That became my understanding.
Q Before you was terminated, you worked for Mr. Byrne for over 16 years, right?
A I, I think when you take all the years -- it was actually closer to 18. If you included the first year of consulting and thereafter.
Q Sure, sure.
A It'd been a long relationship.
Q And when you were President of Balboa, who did you report to?
A Pat.
Q But your first position at Balboa Capital was Executive Vice President of Sales. Did I get that right?
A Yes, you did.
Q Okay. But you were eventually promoted to President,

correct?
A I was.
Q That was approximately one year after starting at Balboa, right?
A It was.
Q You know what the Long Term Incentive Cash Plan of Balboa is, correct?
**MS. FODE:** Lacks foundation. Calls for speculation.
**THE COURT:** Overruled. You can answer.
A Could you ask that question again, please?
Q Sure. Are you familiar with the term Long Term and -- Long Term Cash Incentive Plan?
A That's -- specifically it was a Long Term Incentive Plan, or the LTIP. Is that the one that you're referring to?
Q Yes.
A Okay.
Q So you're familiar with the LTIP, correct?
**MS. FODE:** Overbroad.
**THE COURT:** Overruled. You can answer.
A Generally, yes.
Q The LTP was solely negotiated by Pat Byrne -- strike that. Let me ask one question before.
What's your understanding of what the LTIP is, Mr. Silva?
A Yeah. My understanding was Pat was 100% owner of the company. And he negotiated the purchase, and then ultimately

the LTIP.
Q Thank you.
A Sure.
Q And Mr. Byrne negotiated all of the details of the LTIP for Balboa, correct?
A The intricacies, for sure.
Q And so fair to say that Pat Byrne understood the LTIP more than anyone else at Balboa?
**MS. FODE:** Calls for speculation.
**THE COURT:** Overruled. You can answer.
A Specific to Balboa, he would have been the most -- had the most intimate knowledge of the LTIP specific to Balboa.
Q Now is it fair to say, Mr. Silva, you yourself had a financial interest in the LTIP?
A I did. The LTIP was discretionary but -- and recommended by Pat. But yes, I was the recipient or benefited from it.
Q Thank you.
**MR. SESSIONS:** Though, Your Honor, I'm going to object and move to strike as non-responsive to everything after the word, yes.
**MS. FODE:** Objection to improper motion to strike.
**THE COURT:** The motion -- the objection is sustained, and the motion to strike is granted.
//
//

**BY MR. SESSIONS:**

Q You received bonus payments under the LTIP for the performance period of 2022, correct, Mr. Silva?

A I did.

Q You personally received approximately $1 million in LTIP compensation for the performance period of 2022, right?

A I don't remember. But it -- that was the approximate amount, yes.

Q Does $1,455,687 sound approximately right to you?

A Again, I'm not -- I can't speak to the exact amount, Matt, but that is very close.

Q Go ahead and look at an email.

**MR. SESSIONS:** I'm going to go ahead and pull up Exhibit 401. This is not in evidence yet, Your Honor, but it is joint so I would move to admit it into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Exhibit 401 is admitted. And you may publish.

**(Exhibit Number 401 received in evidence)**

**MR. SESSIONS:** Thank you, Your Honor.

**BY MR. SESSIONS:**

Q Okay, Mr. Silva, this is an email chain, correct?

A It is.

Q Do you see on the cc line your name there, Silva, Phil?

A I do.
Q And that's your email address there on the cc line as well, correct?
A It is.
Q Okay. Do you also see a James Lahaise copied on the email chain?
A I do.
Q Okay. And that's Mr. Lahaise who's sitting right here, correct?
A It is.
Q Mr. Byrne wrote this email, correct, Mr. Silva?
A I can only see part of it, but if --
Q Oh sure, let's --
A -- you know I --
Q -- scroll here --
A -- I just prefer to see the whole --
**MR. SESSIONS:** Sorry, Ms. Perez, can you go?
**BY MR. SESSIONS:**
Q Do you see the from line --
A Well I can do this --
Q -- right there?
A Pardon?
Q Do you see the from line right there?
A Yes.
Q And what does that say?

A It's from Pat.
Q Okay.
**MR. SESSIONS:** Now go back to the email, Ms. Perez.
**BY MR. SESSIONS:**
Q Now in the second line of this email, Mr. Byrne writes, "in reviewing the LTIP a few items need to be revised", correct?
A That's since -- as I read it too.
Q Now you agree that there were many variations of this specific email sent over a number of months, correct?
**MS. FODE:** Lacks foundation.
**THE COURT:** Overruled. You can answer.
A That is my recollection.
Q And you agree that based on your observations, Pat Byrne was doing his level best to keep all interested persons appraised -- apprised and informed of his communications regarding the LTIP, Correct?
**MS. FODE:** Overbroad. Argumentative.
**THE COURT:** Overruled. You can answer.
A I didn't -- I don't really perceive it as that. I do know that some variation of this email was sent over and over. I can't really speak to Pat's objective beyond just continuing to send a variation of this email.
Q Fair enough. Pat Byrne was terminated at the end of June 2024, correct?

A That's my recollection, yes.

Q Before he was terminated, he was your direct supervisor, right?

A That's correct.

Q And Jim Lahaise was Pat Byrne's direct supervisor, correct?

A Yes, he was.

Q Now at least of as of March 2024, Mr. Lahaise would call you directly, occasionally to check in on things, correct?

**MS. FODE:** Vague and ambiguous. Lacks foundation.

**THE COURT:** Overruled. You can answer.

A Pat and I had many conversations together with Jim and separate. But the ones that I had separate of Pat, related to opportunity -- selling opportunities that were originated from the bank.

Q Okay. Let's go ahead and look at an email.

**MR. SESSIONS:** This is Exhibit 467 which is already in evidence.

Q Okay. Mr. Silva, do you see your name on the from line of this email?

A I do.

Q Okay. And then do you see Patrick Byrne on the to line?

A I do.

Q Okay. So we're going to scroll down a little bit. And do you see on the second to the last paragraph there, I'm going to

read a sentence. It says, "lastly, Jim calls me occasionally to check in". Correct?
A Correct.
Q Okay. And then when Pat -- in March of -- March of 2024, when Pat Byrne told you that he was having issues with Mr. Lahaise and the LTIP calculations, you told him in this email, "I don't want to get in the middle", correct?
**MS. FODE:** Lacks foundation.
**THE COURT:** Overruled. You can answer.
A That's what the email says, yes.
Q You wrote this email, right?
A I did.
Q Okay. Now also at that time you wrote --
**MR. SESSIONS:** We're going to highlight on the second set of bullet points, Ms. Perez, the third bullet point -- on the second set of bullet points. Thank you.
Q Now that part that you wrote says, "I didn't know about the non-renewal, but I'm guessing the LTIP 1% structure was the reason", correct?
A That's correct.
Q Okay. And then also in this email, the last bullet point in the first sent -- first set, you wrote, "the LTIP is your fight, you negotiated it, we agreed on this", correct?
A That's what I wrote, yes.
**MR. SESSIONS:** Okay, we can take that down.

Q When you started at Ameris Bank, you had a three year employment agreement, correct?
A I did.
Q It was set to expire at the end of 2024, right?
A It was.
Q After 2024, did you enter into a new employment agreement with Ameris Bank?
A No, I did not.
Q Do you currently have an employment agreement with Ameris Bank?
A I do not.
Q Is -- so is your current employment with Ameris, just to confirm, is your current employment with Ameris for an indefinite period of time?
**MS. FODE:** Calls for legal conclusion.
A I don't know exactly how it --
**THE COURT:** The objection is overruled. You can answer.
A I don't know exactly how to answer that. I'm sure that it is an arrangement that as long as I want to work here and they will have me, that it will continue.
Q Okay. So but there's no agreement that you currently have with Ameris that says it's for a set period of time. Do I understand that correctly?
A That's correct.

Q Now you got a monetary raise after Pat Byrne was fired, correct?

**MS. FODE:** Irrelevant. Third party privacy.

**THE COURT:** Overruled. You can answer.

A That's not entirely correct. I got as Pat -- when Pat left the company and I was chosen to essentially have both positions, my salary was ultimately increased, yes.

Q What's your salary now?

**MS. FODE:** Objection. Irrelevant. Third party privacy for all three.

**THE COURT:** Overruled. You can answer.

A Are you asking at the time when Pat -- soon after Pat left?

Q Sure, let's start there. Yeah, right after the time that Pat left, what was your salary?

**MS. FODE:** Same objections.

**THE COURT:** Overruled. You can answer.

A It was increased to $350,000.

Q What was your salary before Patrick Byrne was fired?

A Approximately $260,000.

Q Before. Apologies, I didn't mean to cut you off there.

A Its okay.

Q At what time did your salary increase to approximately $350,000?

A It would have been in and around weeks after Pat had left.

Q Who did you discuss -- well strike that. Did you have discussions with anyone at Ameris about your salary being raised after Mr. Byrne was terminated?
A It, it was more not focusing on Pat being terminated, it was more given the opportunity to run the Division. And that was my recollection weeks after Pat had left.
Q And did you have conversations with someone about that?
**MS. FODE:** Overbroad.
**THE COURT:** Overruled. You can answer.
A Any conversations that I've had regarding compensation would have been with Jim Lahaise.
Q Did you ask for the raise to $350,000 at that time?
A I did not.
Q Whose idea was it to give you the raise to $350,000?
A Because my only conversation would be with Jim, I don't want to assume, but I would have gathered that it would have originated with him and his and/or team.
Q Do you receive quarterly incentive bonuses, Mr. Lahaise, as President of Ameris Equipment Finance?
A You mean Mr. Silva?
Q Sorry, Mr. Silva.
A That's okay.
Q Getting my witnesses mixed up today.
**MR. SESSIONS:** I'm going to ask that again for the record. Mr. Lahaise, you do not have to answer that question.

Q Mr. Silva, do you get quarterly incentive bonuses as President of the Ameris Equipment Finance?
A I do --
**MS. FODE:** Objection. Hold on.
**THE WITNESS:** Oh, excuse me.
**MS. FODE:** Objection. Irrelevant, 403 and third party privacy.
**THE COURT:** The objection is overruled.
A I do. It's an opportunity for a quarterly bonus, yes, based on, based on performance.
Q And that performance metric is based on what?
**MS. FODE:** Same objections.
**THE COURT::** Overruled. You can answer.
A Some -- certain profit before tax.
Q Is it based on earnings before taxes?
A Yes, it is.
Q Is another word for that EBT?
A Yes.
Q Are your quarterly bonuses approximately $150,000 each quarter?
**MS. FODE:** Objection. Irrelevant, 403, third party privacy.
**THE COURT:** Overruled. You can answer.
A They are not.
Q What are they?

**MS. FODE:** Same objections.

**THE COURT:** Object -- the objections are overruled. You can answer.

A It could be up to $110,000 per quarter.

Q What's your annual salary to date at Ameris?

A It would have been --

**MS. FODE:** Hold on, real quick. Objection. Relevance, 403, third party privacy.

**THE COURT:** Overruled. You can answer.

A I don't know the exact amount, but it would have been the $350,000 mat plus 3% on an annual basis.

Q Just so I can be clear, is it your testimony you don't know exactly what your annual salary is to date?

A You don't --

**MS. FODE:** Misstates the testimony.

**THE COURT:** Overruled. You can answer.

A I was just saying that I don't know the exact amount, because there have been some adjustments that have been made. But it's in -- its exactly 3% on an annual basis since then.

Q Three percent of what?

A Three -- of the $350,000.

Q So it increases 3%?

A Yeah, yes.

Q Thank you for that.

A Sure.

Q You understand what the term LTIP accrual means, correct?

**MS. FODE:** Calls for legal conclusion. Lacks foundation.

**THE COURT:** Overruled. You can answer.

A I do.

Q If there is an LTIP accrual is it your understanding that that means that the Balboa Division's EBT -- strike that. Let me go back a little bit.

For the performance period of say 2023, is it your understanding that if there were an LTIP accrual, that would mean that a Balboa Division's EBT had exceeded the EBT threshold for that performance period?

**MS. FODE:** Lacks foundation. Improper hypothetical.

**THE COURT:** Overruled. You can answer.

A Excuse me, could you ask that again, please?

Q I hope so. For the 2023 performance period, is it your understanding that if there was an LTIP accrual that would mean that the Balboa Division's EBT that year had exceeded the EBT threshold?

**MS. FODE:** Lacks foundation. Improper hypothetical, and expert opinion required.

**THE COURT:** Overruled. You can answer.

A That was my understanding, yes.

Q And is it your understanding that there was an LTIP accrual for the performance period of 2022?

A Yes.

Q Is it your understanding that at least Ameris's position was there was no LTIP accrual for the performance period of 2023?

**MS. FODE:** Lacks foundation.

**THE COURT:** Overruled. You can answer.

A Is my understanding that there wasn't an accrual in 2023? Yes.

Q There was an LTIP accrual for the 2024 performance period, correct?

**MS. FODE:** Irrelevant, 403.

**THE COURT:** Overruled. You can answer.

A Yes, there was.

Q And the total LTIP pool that Ameris had calculated for 2024 was approximately $3.6 million, right?

**MS. FODE:** That's irrelevant and 403.

**THE COURT:** Overruled. You can answer.

A That -- from an approximation standpoint that was my understanding, ma'am, yes.

Q Now the distribution of the LTIP accrual for 2024 that would have occurred sometime in 2025, correct?

A That's correct.

Q And you testified previously that the LTIP pool distribution at the beginning of 2025 followed the same principles that had been followed for the two previous LTIP

periods, correct?

**MS. FODE:** Lacks foundation.

**THE COURT:** Overruled. He can answer.

A Generally speaking, we did follow the same parameters specific to our employee base, yes.

Q And you were partially responsible for assigning the 2024r LTIP distribution, right?

A Yes, that -- I, I followed and worked with Jim, similar to the way that Pat and I had worked on it in -- for 2022.

Q You collaborated with Mr. Lahaise on determining the 2024 LTIP distribution, correct?

A I did.

Q And you yourself received an LTIP bonus for the 2024 performance period, right, Mr. Silva?

**MS. FODE:** Calls for third-party privacy, and it's irrelevant.

**THE COURT:** Overruled. You can answer.

A Yes, I did.

Q What was your distribution, Mr. Silva, for the 2024 performance period?

**MS. FODE:** It calls for third party privacy, 403 and it's irrelevant.

**THE COURT:** Overruled. You can answer.

A It is my recollection that it was $1,250,000.

Q Whose decision, Mr. Silva, was it to award you that

specific amount for the 2024 performance period?
A That would be Jim Lahaise.
Q Pat Byrne did not get an LTIP distribution for 2024, correct?
**MS. FODE:** Lacks foundation.
**THE COURT:** Overruled. You can answer.
A I would not think so since he wasn't with the company. But that's not something that I would be privy to.
Q Just for clarity what would you have not been privy to?
A Anything between if there was a distribution or pay to Pat, I would not be involved in that.
Q But it is your testimony that you collaborated with Mr. Lahaise on determining who received an LTIP distribution for the performance period of 2024, correct?
A Of our existing employee base, yes.
Q So whose --
A And, and excluding myself.
Q Do you know whose decision it was to not give Mr. Byrne an LTIP distribution for 2024?
**MS. FODE:** Lacks foundation. Calls for speculation.
**THE COURT:** overruled. He can answer.
A I don't know.
Q When Pat Bern was being fired, did someone at Ameris tell you he was getting fired?
A Not leading up to, no.

Q How did you find out that he'd been fired?
A I don't recall. I -- it might, it might have been Jim Lahaise, after the fact. But I don't recall. It was something that I became aware of. But I don't remember the exact -- I don't remember the exact communique.
Q You don't remember who told you that he was being fired, right?
A I don't.
Q You don't remember when you were told that he was being fired, isn't that right?
A It was definitely after the fact, for sure.
Q Again, you remember taking a deposition in this case, Mr. Silva?
A Yeah, yes I do.
Q Do you recall that during that deposition, when asked the timing of finding out if Mr. Byrne had been terminated, you said you don't recall the timing or the chain of events?

**MS. FODE:** That lacks foundation.

**THE COURT::** Overruled. You can answer.

A I, I don't -- I'd probably have to see a copy of the, the deposition. But I did not know about Pat's termination until after the fact.

**MR. SESSIONS:** Okay at this time, Your Honor, I would ask to read into the record deposition testimony from Mr. Silva. It's from -- he had an a.m. and a p.m. session is

how it's divided. This is from the a.m. session, and it's pages 82 line 6 to 14. For impeachment.

**THE COURT:** Any objection?

**MS. FODE:** One moment, please.

**(Pause)**

**MR. SESSIONS:** And apologies, I should say, I'm happy to offer to have Ms. Perez put it up on the screen on blackout.

**THE COURT:** Okay. That would be good if you could do that. And I think it would help --

**MS. FODE:** Thank you.

**THE COURT:** -- Defense Counsel as well.

**(Pause)**

**MS. FODE:** No objections.

**THE COURT:** Okay, go ahead.

**MR. SESSIONS:** Permission to skip the -- well there's no objections. Strike that, Your Honor.

QUESTION: "I want to back up for a second, when did you first learn that Pat Byrne was going to be terminated?"

ANSWER: "I don't recall."

QUESTION: "Best estimate."

ANSWER: "I know that his last day was the end of June of last year. I don't recall all of the -- how it all went down. I don't remember the chain of events or any of that."

Okay, we can take that down, Ms. Perez, thank you.

**BY MR. SESSIONS:**

Q Is the truth, Mr. Silva, that you in fact knew for some time before Mr. Byrne was fired that he was going to get fired?

**MS. FODE:** Asked an answer.

**THE COURT:** Overruled. You can answer.

A Absolutely not true.

Q You didn't warn him that he was going to get fired, did you?

A I didn't know, so I couldn't warn him.

Q What was your involvement in his termination, Mr. Silva?

A I had no involvement,

Q And in fact, during your deposition when asked what your involvement was in his termination, you said, "I'm offended by that question". Do you remember that?

A I don't, but I would have been, yes.

Q Were you offended by the manner in which Mr. Byrne was fired from the company he started?

A No, I was offended that you were at -- that I was asked if I was involved in that.

Q Well I'm going to ask you now though. Were you offended by the manner in which Mr. Byrne was fired from the company he started?

A That doesn't relate. That was not why I was using that term. And I wasn't aware that or involved in Pat's

termination.

Q Okay, let's go ahead and look at another exhibit. This one is not admitted or joint, so at this time, I'd ask that it be shown to the witness on blackout. It's Exhibit 109.

**THE COURT:** Go ahead.

**MR. SESSIONS:** I'm going to have Ms. Perez just scroll through this very quickly so you can see the entire chain. I think you can scroll down to the next page, too, Ms. Perez. Okay, we're going to stop right here on this email dated June 28, 2024.

**BY MR. SESSIONS:**

Q Do you see that?

A Uh-huh.

Q Sorry, was that a yes, Mr. Silva?

A Yes.

Q And is that email from you, PhilS@balboacapital.com?

A It is.

Q Okay, and are you sending this email to various individuals with Balboa Capital and Ameris Bank email addresses?

A I am.

**MR. SESSIONS:** Okay, Your Honor, at this time, I'd move to admit Exhibit 109 into evidence.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

**THE COURT:** Okay, Exhibit 109 is admitted, and you may publish.

**(Exhibit Number 109 received in evidence)**

**BY MR. SESSIONS:**

Q Mr. LaHaise is cc'd on this email, correct?

A Yes.

Q Okay, then the recipients, these are generally senior leadership individuals at Balboa as of June 2024, correct?

A Yes.

Q And is it your recollection that this email was sent right around the time Patrick Byrne was fired?

A It's my recollection that it was sent after he had been let go.

Q Now if we scroll down, I'm going to go ahead and read the first paragraph. It says, good afternoon. I want to share that effective June 30th, Pat Byrne will be leaving his employment with Ameris Bank and as CEO of Balboa Capital. I will continue as Balboa Capital's president and will assume sole responsibility for the division. That's what that says, correct?

A Yes.

Q In this email, you didn't tell the Balboa employees that Mr. Byrne had been fired, correct?

A No.

Q Just for the record, the no is that, to confirm, are you

saying no, you did not tell them that he was fired?
A In this email?
Q Correct.
A Correct.
Q You wanted these individuals to think that Mr. Byrne had quit, didn't you, Mr. Silva?
**MS. FODE:** Lacks foundation.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** Could you ask the question again, please?
**BY MR. SESSIONS:**
Q You wanted these individuals on this email to think that Mr. Byrne had quit, correct?
A That wasn't my intent. It was just a communication that -- to let them know that Pat wasn't here -- going to be here any longer.
Q Mr. Byrne never told you he wanted to --
A I'm sorry, I didn't have any double meaning or anything like that. It was just more of a communication.
Q Mr. Byrne never told you he wanted to quit, right?
A I don't have any recollection of Pat saying that to me.
Q Pat Byrne, in fact, called you Friday morning, June 28th, after learning he had been fired, correct?
A It's hard for me to say. Our communication after he left the company has been very minimal, so I can't really recollect

that. I wouldn't be surprised if he did.
Q So you probably don't -- strike that, you don't recall calling him back that day, do you?
A I do know -- I do remember calling him. I don't remember the date.
Q Okay. We're going to look at one more document. Let's pull up Exhibit 425, which is already admitted. Okay. Mr. Silva, this is an email from you to Patrick Byrne, correct?
A Yes.
Q Okay. This was sent on December 17th, 2023, right?
A Yes.
Q Okay. Now, we're going to go through it a little bit. Near the bottom of this specific email, in the middle of it, there's an underlying heading that says, you uniquely help us in a number of ways. Do you see that?
A I do.
Q You refers to Mr. Byrne, correct?
A Yes.
Q And one of those items here includes, quote, saving money and generating profits, correct?
A Yes.
Q And another is, quote, a deep understanding of the direct business, correct?
A Yes.
Q And then right below that, it says, you free me to do what

I do best, correct?
A Yes.
Q And you wrote this, right?
A I did.
Q Okay. And then below, on the next page, you said, quote, you are my brother and always will be, right?
A I did. I did.
Q And the next sentence you said, what we have has been developed and nurtured into something special that cannot be duplicated, correct?
A Yes.
Q And then if you go up to the email on this chain, dated December 18th, 2023, at 6:44 p.m., Ms. Perez, here you wrote, I love you, I want you here, and want to do it with you as long as you can. We make a great team. I was trying to give you the other side of things and encourage you. P.S., I don't want your Joe. I assume that means job. I read that correctly, yes?
A That's correct.
Q Now, the subject line of this email chain is stay gold Ponyboy, correct?
A It is.
Q I'm so curious, were you referencing the Outsiders when you wrote the email?
A I was.

Q I love that book.
A It's a good movie too.
Q Were you referencing the book or the movie?
A Yeah, the movie.
Q I like the movie, too. Now, in that movie, you realize Ponyboy was wrongly accused of murder, correct?

**MS. FODE:** Irrelevant. 403.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I don't recall the story now.

**BY MR. SESSIONS:**

Q In the Outsiders, Johnny Cade is Ponyboy's best friend, right?

**MS. FODE:** Irrelevant.

**THE WITNESS:** Like I said, it's been --

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yeah. It's been a long time since the movie. It was more to encourage Pat.

Q Well, in fact, in the Outsiders, stay gold is what Johnny Cade's dying words are to Ponyboy, right?

**MS. FODE:** Objection. Irrelevant. 403.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** My motivation for the movie --

**BY MR. SESSIONS:**

Q Mr. Silva, I'm sorry to cut you off, but just yes or no, please.

A I don't recall the movie, so it's hard for me to comment. I was just trying to encourage Pat to be his best self.

Q Just like Johnny Cade to Ponyboy, you wanted Pat to hold on to who he was, right?

**MS. FODE:** It calls for speculation. Irrelevant.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I was just trying to encourage Pat.

Q Because when Johnny Cade says stay gold to Ponyboy, he wants him to hold on to his sense of wonder, correct?

**MS. FODE:** Lacks foundation, calls for speculation, and irrelevant.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I just mentioned, I don't remember the movie. I was just trying to encourage Pat to be his best self.

Q After you sent this email, Mr. Silva, you did nothing to warn Mr. Byrne that his job was in jeopardy, correct? Yes or no?

A It's hard for me to answer that question because I didn't realize his job was in jeopardy, per se, that I reported to Pat.

Q You did nothing to stop what was coming to him, correct?

**MS. FODE:** It lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I think it's been well documented that I encouraged Pat that we were a better company if he was

engaged and wanted to be here. It's all over my email communication.

**BY MR. SESSIONS:**

Q But within months of this email, Mr. Byrne was fired, right?

A Yes, in about six months or so after this, he was no longer with us. That's right.

Q And then you took his job, correct?

A I don't think that's entirely true. I didn't take anybody's job.

**MR. SESSIONS:** No further questions.

**THE COURT:** Okay, thank you. Okay, Ms. Fode, you may examine when you're ready.

**MS. FODE:** Thank you. Mr. Sessions is much taller.

**DIRECT EXAMINATION**

**BY MS. FODE:**

Q Good afternoon, Mr. Silva.

A Hello, Ms. Fode.

Q Thank you for being here.

A Sure.

Q All right, let's start at the beginning here. And for the record, this is the direct of Defendant Ameris Bank of Mr. Silva.

**THE COURT:** Thank you.

//

**BY MS. FODE:**

Q Mr. Silva, can you please tell the jury what your current position is at Ameris?

A I am the president of Ameris Bank Equipment Finance.

Q And how many years did you work at Balboa Capital?

A Including that one consulting year, this would make 20.

Q And how long have you been in the equipment financing industry?

A Right. I spent 20 years prior to Balboa, so a total of 40 years.

Q Let's talk a little bit about your educational background.

A Sure. I have a business management degree from Whitworth University.

Q And a little bit about your background and personal self.

A Well, it's all about decades. Probably my crowning accomplishment is that I married up to my bride of 42 years. I've lived in the same house for 32 years. I have almost four cars that are over 20 years old, and none of them are worth that much. But other than that, I would say just generally, I really feel like I'm doing what I was born to do. I love what I do, and I love who I do it with.

Q So tell me a little bit about your employment experience before you came to Balboa Capital.

A Yeah. Out of those 40 years, 38 of them were comprised 10 years within a Dana Commercial Credit, eight years with

American Express Business Finance before we got bought by Key Bank, and then the last 20 with Balboa/Ameris Bank.
Q And how did you first come to work with Patrick Byrne?
A Yep. I was -- right after the acquisition by Key, I spent a year there helping them move the business to Colorado. And then after that, I was introduced to Pat through Rob.
Q And how did you come to work at Balboa Capital?
A Yep. You know, Pat had been a very classic entrepreneur. He had been very successful in developing his direct side business. Pat knows that very well. And he had aspired to get into the vendor national account business that I represented. So soon after we met, and what I think we both learned is that we would be able to develop the direct or continue to develop the direct business as well as the vendor business.
Q And what is the difference between direct sales and the vendor business?
A Don't get me started. Let me explain the direct business. If you have salespeople, they're going to -- our salespeople make about 100 calls a day when they first start. And they're making telephone calls to small businesses, anywhere, a small business from zero to $10 million. And they're calling that individual small business owner who wears 16 hats and asks them, do you need any equipment? And if you do, can we provide financing for you? So that's the direct side of the business. On the other hand, you have the vendor broker business. And

one of our best accounts is a company by the name of Ritchie Brothers. Ritchie Brothers is one of the largest auctioneers in the world.

Well, Pat built a very profitable business. But when you layer in the vendor business, an account like Ritchie Brothers can bring hundreds of applications a month. So we can fund hundreds of loans per month. So it was just a very good mixing of backgrounds. Pat being a classic entrepreneur, my background in the vendor business, and together we went about building the business.

The other thing that I think benefited this relationship between the direct and vendor, as well as Pat and me, is that it is the classic definition of diversity, diversity of talents, diversity of skills, and diversity of business. So for the time that we worked together, while it wasn't easy, we experienced a lot of success and developed a lot of mutual respect for each other.

Q When you joined Balboa Capital, what were the revenues?

A Well, looking back, in 2006, Balboa Capital was doing about $90 million in originations. Let me say that again, 2007, the year that I started. And then we went through the recession, which was very difficult for everybody, and we came out of that year doing about $38 million. And then in 2026, we'll end up at about $711 million, so that's a significant difference with total receivables of about $1.7 billion. And

about today, I still value the direct business. It's very profitable, but it's hard to scale up. And in 2026, we'll be at about $1.7 billion, with 86 percent of the business comprised of the vendor business.

Q And so you had experience in the vendor business prior to coming to Balboa Capital.

A I did.

Q And then what was the offer that Mr. Byrne made for you to join Balboa Capital?

A Yeah, you're speaking about position, right?

Q Yes. Thank you.

A Yeah, so he had a test drive, right? I worked with Rob and Pat for the first, in 2006, as a consultant, as we put the plans together to launch a vendor program. And it was soon after, about a year, Pat extended an offer to me, after we got to know each other, to come in as the executive vice president of sales, with the understanding that if it was of mutual benefit to both of us, that I would then assume the president's role after 12 months. And so it wasn't always easy, but it was a relationship of mutual benefit, and that is the time that I became president.

Q So after a year, you became president.

A That's correct.

Q And what were your job duties and responsibilities as president of Balboa Capital?

A Yeah, well, first of all, I would say that in the first year, as I mentioned earlier, Pat is very good at the direct business. In fact, he's still better at it than me now. But he took the time to kind of teach and acclimate me to that legacy side of the business. And then at the same time, we made plans to launch the vendor and ultimately the broker initiative, which is very similar. But speaking to the diversity of skills and talents, as I mentioned in that email that we were just reviewing, Pat is an operator. I mean, he is a very talented -- excuse me.

**MS. FODE:** May Mr. Silva have a moment?

**THE COURT:** Yes, of course.

**MS. FODE:** Do you have any tissue, Madam Clerk?

**THE COURT:** Ms. Jackson, do we have --

**THE WITNESS:** I'm good.

**THE COURT:** There should be Kleenex up there.

**THE WITNESS:** I'm well stocked.

**THE COURT:** Yeah, I thought so.

**THE WITNESS:** Thank you.

**THE COURT:** You're not the first witness to need it, so.

**THE WITNESS:** Yeah.

**BY MS. FODE:**

Q Mr. Silva, hold on. Hold on. Let's take a moment.

A Okay.

Q Can you --
A I'm almost good.
Q Hold on. Hold on. Yeah. Can you tell us why you're upset?
A I mourn the friendship and the relationship that we both shared for a long time. That was not my intent. But anyway.
Q Are you ready to proceed?
A Yeah.
Q Let me ask another question just because I forgot the question too.
A No, no. I remember the question.
Q Okay. Okay. I think -- well, let me ask.
A If you're okay with it.
Q Let me just make sure. I believe you were talking, let me just say it this way. What were your job duties and Pat's job duties at Balboa Capital?
A Yeah. Like I said, he was and is a skilled operator. He was very good at accounting. He was very good at legal collections. And the direct side of the business involved a lot of not only direct calling, but marketing. You know, digital marketing, that kind of a thing. And my responsibilities, and that's why I said they mesh so well, is I'm a communicator. I'm the one that is the voice to our employees. I'm the one that spends a lot of time with our top accounts and closing them and further penetrating or helping

them get bigger.

And then the other thing that I spend a lot of time on is the recruiting of talent. Now, if you look at our senior management team, many of them date back to the mid to late '90s at American Express and some others that have been layered in. If you look at our elite performers, much of that was the recruiting of elite talent into the company that could further us into the vendor and the broker business. So Pat and I were in many ways opposite. And it was pretty difficult at the beginning as we kind of got our mojo going, but when it worked, it was special. But it wasn't easy, even over the 18 years that we worked together, but it was definitely worthwhile.

Q Since you're speaking about your relationship with Mr. Byrne, how would you describe the relationship prior to the acquisition?

A First of all, I would consider Pat a very good friend. I wouldn't consider Pat buddy-buddy because I think you understand that kind of friendship, but it was definitely based with mutual respect.

Q And did you socialize outside of work?

A You know, we tried. That was something that I yearned for. It was something that I wanted to be, especially at the beginning, buddy-buddy with him, but we didn't socialize other than with company-sponsored events.

Q And in 17 years in working with Mr. Byrne, did you ever go

to his home? Were you invited to his home?
A I was not.
Q And in talking about the vendor relationships, how do you think that played into making Balboa an attractive target for acquisition?
A Yeah, and I don't want to make this all about me, but what I would tell you is that Pat had grown a very successful direct business. And like I had mentioned, in 2007, it was about $90 million, and it would have continued profitably just by the nature of it. But really, when you -- if you're going to sell the company like we did, it has to have some scale, right? You know, he probably could sell it at $90 million, but when we got up into the $700 million area, it became more on the radar of an Ameris bank. It's just scale, right? It's just the economies of scale.
And as I mentioned earlier, you know, it wasn't overnight, but now it's about 85, 86 percent, which got us up to a certain scale, up to a certain level of receivables that made it attractive to Ameris Bank.
Q So as president of Balboa Capital prior to the acquisition, what did you observe of how the employees were being treated?
A Prior to?
Q Yes.
A Yeah, I think they were, you know, Pat was, like I

mentioned, a classic entrepreneur. He had his hands in everything, had made a lot of the decisions, and then over time he ceded some of that responsibility to me. He was very respectful of me. But, you know, like any small or medium business, we didn't really have performance appraisals. We didn't have annual merit increases. We didn't have, like, a matching 401K.

You know, and in many cases, you know, in this competitive environment, you know, it was very difficult to increase your compensation at the time. Pat ran a tight ship, and at the same time, candidly, he was very tight-fisted. And I remember even in my case, there were times when it got fairly uncomfortable and bristly between Pat and me.

Q And did the employees of Balboa Capital receive yearly raises?

A No, that was not commonplace. There were times when accommodations were made, but there were also many times where when the accommodations were made, you know, a lot of times the threat to leave is what kind of prompted those increases. Unfortunately, some other people left if we didn't accommodate or it wasn't enough. I mean, Pat was 100 percent owner of the company and treated it as such.

Q And what did you mean when you said he was tight-fisted with his money? Do you have an example of that?

A Well, there were some times where even in my own

compensation, we would have these long, drag-out meetings and emails and conversations, and it wasn't very easy, and at times we would be, still both of us would be working very hard, but not speaking for a while. We got a little bit estranged, and so you kind of had to, I don't know, it didn't happen all the time, but it was difficult.

Q Any other examples with employee compensation?

A Well, maybe this provides a little bit of color. You know, one of the guys that I recruited to the company, and who is still now our SVP of sales, I recruited him from New Jersey to move out to Orange County, and part of the negotiation was to pay for his moving expenses, and so we made that part of the offer, I talked to Pat about it, and I mean, these are in the early days, and then Patrick, another Pat, Patrick moved out and wanted reimbursement of the moving expenses, and Pat denied it, and so we had this long, drawn-out, I don't know, it was a combination of emails and conversations, and then in the end, I just wrote a personal check to Patrick to pay him for his moving expenses because Pat wouldn't relent, and I had promised Patrick to move him out.

Well, it was, as you can imagine, a very difficult scenario, but in the end, Pat relented, and so we reimbursed him instead of me paying him a personal check, the company reimbursed him, but it was a very difficult situation, but that's an example, I guess, to answer your question.

Q I'd like to go to Exhibit 100, please, which has already been admitted, and ask you a couple questions about this email.

**THE COURT:** Okay. We're going to take a quick break for about 10 minutes. We'll reconvene at 2:15. To the jurors, please don't discuss the case amongst yourselves or with anyone else, and don't do any research about any aspect of the case.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE COURT:** Sir, you can go ahead and step down. For counsel, I'm not sure if Ms. Jackson told you, Juror Number 4 is having stomach issues, and I told him if he feels like he needs to take a quick break to raise his hand, he raised his hand, so that's why I did that.

**MS. FODE:** Oh, my.

**THE COURT:** Yeah. He's quite a trooper. All right, I'll see everybody in about 10 minutes.

**MR. SESSIONS:** Your Honor, we are still concluding at 2:30 today?

**THE COURT:** At 2:30, yes.

**MR. SESSIONS:** Thank you.

**(Recessed at 2:05 p.m.; reconvened at 2:14 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** This court resumes in service.

**THE COURT:** Okay, everyone can be seated.

Okay, while we wait for your jurors I understand

there's an issue that someone wants to raise with the Court.

**MS. FODE:** There is, Your Honor, and I would request that we discuss at sidebar with counsel as well.

**THE COURT:** Sidebar with counsel?

**MS. FODE:** And with you, please.

**THE COURT:** Okay.

**MS. FODE:** If possible.

**THE COURT:** Okay.

**(Begin sidebar conference)**

**THE COURT:** Ms. Jackson, there's a chair here, can you move it? Thank you. We're running out of space. Sure.

**MS. FODE:** Thank you, appreciate it.

**THE COURT:** Of course.

**MS. FODE:** There's been -- it's been brought to my attention that Mr. Byrne is saying things to the witnesses. He just told Jim Lahaise to burn in hell. And he talked to my law clerk in the bathroom and he makes sounds in the gallery, and I haven't wanted to raise it to you, but I am afraid because Mr. Silva is obviously emotional and I don't want Mr. Byrne to say anything, and I think he should be instructed not to approach witnesses, or really it feels like intimidation of the witnesses.

**THE COURT:** Okay. Mr. Sessions?

**MR. SESSIONS:** So I have no issue with a broad instruction that witnesses should not be engaging with each

other. I don't believe this is true frankly, this has not been addressed. I have been with Mr. Byrne during the breaks most of this trial, I have not seen him be rude to any of the witnesses. This is the first time I'm hearing any of this.

**THE COURT:** Okay. And Mr. Wood, go ahead.

**MR. WOOD:** Well only that there was a brief overlap between Mr. Byrne and myself in the bathroom, I saw no interaction but we will (inaudible).

**THE COURT:** Okay.

**MR. WOOD:** (inaudible) I find it difficult to believe, but I'm also fine with the (inaudible) instruction.

**THE COURT:** Okay. So we will say something, we usually don't have to give instructions on because I do as officers of the court I depend on all of you to communicate all of this to your witnesses, but if you could, I don't -- I'm not going to do it now, but I do want you to admonish Mr. Byrne or just remind him and remind all of the witnesses, all those people who are here that they're not to interact with each other on breaks or to address each other in any way.

**MR. SESSIONS:** Absolutely.

**THE COURT:** Okay.

**MS. FODE:** Thank you so much.

**THE COURT:** All right, thank you.

**(End sidebar conference)**

**(Pause)**

**THE CLERK:** All rise.

**(Jurors enter courtroom at 2:18 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Okay. Welcome back, ladies and gentlemen of the jury. We're going to resume with the testimony from Mr. Silva.

As I indicated on Thursday we are going to be ending today at 2:30, so we have about 12 minutes left of testimony, but I want to use all the time that we have.

Okay, if someone could bring Mr. Silva back.

Hello, Mr. Silva.

**THE WITNESS:** Hi.

**THE COURT:** You can come back up to the witness stand.

**(Pause)**

**THE COURT:** And you're still under oath, okay?

**THE WITNESS:** Okay.

**THE COURT:** All right. All right, Ms. Fode, you may proceed when you're ready.

**MS. FODE:** Thank you, Your Honor.

I'd like to publish trial Exhibit 100.

**THE COURT:** Okay.

**MS. FODE:** Which has already been admitted into evidence.

**THE COURT:** It has.

**DIRECT EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q Sir, have you seen this document before?
A I did. I have.
**MS. FODE:** And let's move down to page 3 of the exhibit. A little higher up, please. A little higher up. We'll just give you some context. There we go.
Q Do you see at the bottom of --
**MS. FODE:** There we go.
Q Do you see at the bottom of this page, sir, that there's an email that has been sent from Patrick Byrne to you on April 12th, 2024?
A I do. Which part are you talking -- oh, the April 12th at 7:14 a.m.?
Q Yes.
A Yes.
Q And did Mr. Byrne send you that email?
A He did.
Q And what does it say?
A It says, good morning, Phil, do you see any significant LTIP payout this year, do you care?
Q Okay. And then did you respond to this email?
A I did.
Q Okay.
**MS. FODE:** We'll scroll up, please, to the beginning

of the email. To the top.

**BY MS. FODE:**

Q Do you -- did you respond to him in this email dated --

**MS. FODE:** If you scroll down a little.

Q -- April 12th, 2024?

A Yes.

Q Okay. And let's walk through this email, please.

A Okay.

Q First you say to answer your questions, no and yes. What did you mean by that?

A It seems like I'm going to elaborate in the rest of the email, but I would probably need to go to the bottom to just center myself on the no and yes part.

Q Fair enough. Let's go -- let's move down 'til you can email. Take a look at it.

A Oh, okay. Could you go down a little more, please. Oh, he -- I'm answering his question, but I don't -- I can't see it right here.

**MS. FODE:** Let's go back to the bullet points --

**THE WITNESS:** Yeah.

**MS. FODE:** -- at the bottom of page 2, please.

**THE WITNESS:** Right. Right. Right.

**MS. FODE:** There we go.

**THE WITNESS:** Okay.

**MS. FODE:** And a little higher up, please.

**THE WITNESS:** Okay. Yeah.
**MS. FODE:** There we go.
**THE WITNESS:** Now I know.
**BY MS. FODE:**
Q All right. And will you please read the bullet points at the bottom of the page, read bullet point number 1 into the record.
A Starting with the first bullet?
Q Yes.
A Yes. The LTIP seems to have been the impetus for the breakage of our relationship.
Q And what did you mean by that?
A Well Pat's contention was the calculation of the LTIP amount, and the breakage related to that he didn't feel that I was backing him in that.
Q And look at bullet point number 2, please, and read that into the record.
A Sure. Since the purchase our people have regular performance reviews, regular raises, paid commensurate with the marketplace, and great benefits/vacation.
Q And the second -- will you read the third line as well?
A Off cycle salary increases have really brought people into line.
Q And why are you writing this in your email?
A Well I feel very -- well one I was speaking to kind of the

state of where Pat and I were, but at the same time I really felt like this was -- not to be longwinded -- but my main objective after the purchase was to soft land this purchase. It's good for Pat, I felt it was really good for our employees, but if you don't soft land it everybody is unended.

And so I really felt like there was some, you know, difficulties with Pat and me, but I felt like this was really good for our employees.

Q And in the fourth bullet point --

A Sure.

Q -- you said that, correct?

A I -- yeah, I believed that after we leave this will be a good place for them to retire from or continue and grow in their careers.

Q And what do you mean when you tried to help soft land the transition?

A Well, you know, I don't think it's just specific to equipment finance, there's a -- when a company buys another company it can be difficult, there's a clashing of cultures, compensation, egos, positions, titles, and all of that, and I felt as the people guy, based on my skill set, I felt like it was a big part of my responsibility to make sure it was good for Ameris and good for Pat and good for our employee base, and that's really what made me so busy.

Q And the next bullet point, will you read that into the

record with the Balboa?
A Yeah. The Balboa management team has come together, fused together, and is very cohesive.
Q And what did you mean by that?
A Yeah. You know, I was really excited, because like I mentioned, many of them I had worked together since the late '90s at American Express, some of them had been layered in later, but they were just jiving, they were liking being part of Ameris, they felt that their roles would define, they felt empowered to make decisions and at the same time had a level of trust with each other to collaborate together. That's what I meant by that.
Q And is that something that was new when they came to Ameris?
A It's just -- you know, it's just different. I mean that empowerment, that collaborating kind of approach is very similar to how it is at Ameris.
Q And if you'll look down to the next paragraph, please, it's highlighted, and you say in the first line, I'm busy with the normal and the upcoming townhall today and this weekend, but I plan to review the LTIP emails once again to better brief myself for our upcoming meeting with Jim.
Were you going to be meeting with Jim to talk about the LTIP and with Pat as well?
A Well, you know, as Matt had mentioned, there were just a

number of emails going back and forth that summarized kind of how Pat felt that the LTIP calculation was incorrect, and you know, I wanted to try and -- you know, because Pat was so unhappy and maybe there was some -- I just wanted to get the parties together, okay? Well let's not just keep beating each other up about this, let's see if we can get together and see if there's a midpoint. But --
Q Is that what you meant in the second following sentence? It says --
**MR. SESSIONS:** Objection. Objection, leading.
**MS. FODE:** Sorry. Let me strike that.
**BY MS. FODE:**
Q If you'd look at the next sentence where it starts with, I would like.
A Yeah.
Q Would you read that into the record?
A I would like to schedule some time, the three of us, so that we can come to come agreement or never talk about it at the conclusion of the meeting.
Q And what did you mean by that?
A Well -- because you know, I wanted -- you know, we're building, we're soft landing, we're collaborating, we're trying to get this thing going and it was some -- it was really a big bone of contention, and I was hoping to kind of see if we could get the parties together and talk it out, because it was just

devolving with the constant emails about it.
Q And do you remember meeting with Jim, Pat, and you following this email?
A I don't.
Q Okay. And --
A They were -- you know, we kind of talked about it and around it. I'm -- I know that Jim and I believe Nicole had talked about it or had responded, but I don't think that Pat agreed.
Q And I'm going to ask about the next paragraph, but I'm afraid I'll be out of time.

**THE COURT:** I was just going to ask you is this a good time to break?

**MS. FODE:** I think it would be.

**THE COURT:** Okay.

**MS. FODE:** Thank you.

**THE COURT:** All right. Thank you very much, Ms. Fode.

And Mr. Silva you can go ahead and step down to the day.

**THE WITNESS:** Okay.

**THE COURT:** We're going to recon screen tomorrow morning at 9 o'clock, so I need you back here and ready to testify at 9:00, okay?

//

All right, ladies and gentlemen of the jury, as I indicated before the trial started, you as jurors will decide this case based solely on the evidence that is presented in the courtroom.

That means that after you leave here for the night you must not conduct any independent research about the case, the matters in this case, the legal issues in the case, or the individuals or other entities involved in the case.

This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as television and newspapers.

You also must not communicate with anyone in any way about this case, and you must ignore any information about the case that you might see while browsing the internet or your social media feeds.

Thank you so much for your attention and time today, we'll see you tomorrow morning at 9 o'clock.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 2:30 p.m.)**

**THE COURT:** Okay, everyone can be seated.

Do we have anything that we need to discuss before -- tomorrow morning, anything -- I guess I meant to say it this way.

Is there any reason that you should -- we should all

convene before 8:45 or 9 o'clock tomorrow morning to handle any business?

**MR. SESSIONS:** Nothing from plaintiff, Your Honor.

Just as a preview I will say pursuant to our discussion we had on Thursday, as far as moving to amend goes we have decided that we will make that motion orally, and our intention is to do it after our expert, Deborah Dickson, testifies.

**THE COURT:** Okay. I had a feeling. Okay, thank you.

And from the defense perspective?

**MS. FODE:** No, and we'll pre-prepare to orally oppose it.

**THE COURT:** Okay. And to all of the parties in the case and any witnesses who are currently here in the courtroom, I want to remind you that you're not to address in any way either verbally or non-verbally any other party or witness in this case. Okay?

All right, we will see everyone here tomorrow at 9 o'clock.

**(A chorus of thank you)**

**THE COURT:** Thank you.

**THE CLERK:** All rise. This court is adjourned.

**(This hearing was adjourned at 2:32 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 9, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***