# EXHIBIT F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| Plaintiff, | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, | ) Tuesday, June 9, 2026 |
| | ) (9:08 a.m. to 11:58 a.m.) |
| Defendant. | ) (1:02 p.m. to 4:34 p.m.) |

JURY TRIAL - DAY 5

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: T. Jackson

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff:** | **MATTHEW THOMAS SESSIONS, ESQ.**<br>**ANDREW A. WOOD, ESQ.**<br>**MADISON LARSEN, ESQ.**<br>**SEAN K. BLOKS, ESQ.**<br>**Allen Matkins Leck Gamble Mallory & Natsis**<br>**2010 Main Street**<br>**8th Floor**<br>**Irvine, CA 92614** |
| | **STACEY ANN VILLAGOMEZ, ESQ.**<br>**Allen Matkins Leck Gamble Mallory & Natsis**<br>**865 S. Figueroa Street**<br>**Suite 2800**<br>**Los Angeles, CA 90017** |
| **For Defendant:** | **STACY L. FODE, ESQ.**<br>**NANA JIN YEE, ESQ.**<br>**Nukk-Freeman & Cerra**<br>**550 West C Street**<br>**Suite 910**<br>**San Diego, CA 92101** |

INDEX


| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JACQUELINE EMERT | 53 | 65 | 77 | |
| DEBORAH DICKSON | 78/105 | 121 | | |
| ANTHONY EDWARD READING | 144 | 168 | | |

| DEFENSE WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PHIL SILVA | 6 | | | |
| MARY ELLEN SEBOLD | 173 | 206 | | |
| DAVID LECHUGA | 222 | 228 | | |

| EXHIBITS | RECEIVED |
|---|---|
| 173 | 79 |
| 174 | 83 |
| 175 | 117 |
| 178 | 106 |
| 179 | 111 |
| 180 | 115 |
| 183 | 95 |
| 461 | 20 |

**Los Angeles, California; Tuesday, June 9, 2026; 9:08 a.m.**

**(Call to Order)**

**(Jurors enter courtroom)**

**THE CLERK:** Calling item number 1, SA-cv-24-01989, Patrick Byrne versus Ameris Bank.

Counsel, please state your appearances, starting with plaintiff.

**MR. SESSIONS:** Good morning, I'll go ahead and appear for the whole team. So, Matthew Sessions, Stacey Villagomez, Andrew Wood, Madison Larsen, and Sean Bloks.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, Your Honor, Stacy Fode appearing on behalf of defendant.

**THE COURT:** Good morning.

**MS. YEE:** Good morning, Your Honor, Nan Yee on behalf of defendant.

**THE COURT:** Good morning.

Okay, and good morning, ladies and gentlemen of the jury, I hope you had again a restful evening.

We are closing in on getting through this case expeditiously, so I really appreciate all of your patience.

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here. So you must not learn any additional information about the case from

sources outside of the courtroom.

To ensure fairness to all parties in this trial I will now ask each of you whether or not you have learned about or shared any information about this case outside of the courtroom, even if it was accidental.

If you think that you might have done so please let me know by raising your hand. I see no raised hands.

However, if you would prefer to talk to the Court privately in response to this question please notify a member of the court staff at the next break.

Thank you.

Okay, so now we're going to resume with testimony of Mr. Silva?

**MS. FODE:** Yes. Thank you.

**THE COURT:** Okay.

**(Pause)**

**THE COURT:** Good morning, Mr. Silva, you can come forward, you can come around this way. Ms. Jackson is going to readminister the oath since we're in a new day, and then you'll have a seat in the witness stand next to me.

**THE CLERK:** Please raise your right hand.

**PHIL SILVA, DEFENSE WITNESS, SWORN**

**THE CLERK:** And sir, just watch your step.

Okay, please state your name and spell your last name for the record.

**THE WITNESS:** My name is Phil Silva, S as in Sam, I-L V as in Victor, A.

**THE COURT:** Thank you.

Okay, Ms. Fode, you may proceed when you're ready.

**MS. FODE:** Thank you, Your Honor.

**DIRECT EXAMINATION (CONTINUED)**

**BY MS. FODE:**

Q Good morning, Mr. Silva.

A Good morning.

Q We're going to pick up right where we left off with Exhibit 100.

All right. I'd like to direct your attention to the highlighted portion of page 3 of Exhibit 100. Do you see that there that it's highlighted?

A I do.

Q And will you go ahead and read the first -- the highlighted paragraph into the record, please.

A The major points of contention are as follows, right? It's been hard for me to fully embrace it like you since I was not part of the negotiation of the purchase/LTIP agreement.

On the Ameris side I hear GAP is GAP, way higher trucking and working capital losses based on decisions we made, and of course we need to pay for IT, marketing, accounting, et cetera, since they are devoted to Balboa exclusively.

Q Thank you.

And why did you write this paragraph?

A Well do you mind if we go a little bit lower just to get some context, please.

Q Absolutely.

**(Pause)**

Q And to confirm for the record, when did you send this email to Mr. Byrne?

A April 12th, 2024.

Q Okay.

**MS. FODE:** We'll scroll down and I'll ask the question again.

**BY MS. FODE:**

Q Do you recall why you sent this email and the points that are highlighted?

A Sure. Do you mind if we could go just smidge lower too? I just want to make sure of something. I just want to see the email from Pat.

Okay. A little bit -- okay, no, we might as well go all the way to the bottom too, if you don't mind.

And then -- okay, there seems to be something in between, right, that -- but any way, you know, as many times that I did, you know, I wanted to kind of summarize where Pat and I were at that specific time, so I think it was a good summation of what it is.

As you can see in some of the bullets up top I was really,

you know, wholly committed to kind of soft landing this business so that it was good for our employees, it was good for Ameris, and all of the parties, and this LTIP thing kept coming up, and so I felt like that it was something that Pat had negotiated, he had intricate knowledge of the mechanics of the LTIP, and if I'm not mistaken, besides taking stock, I was trying to see if we could get everybody together to discuss it.
Q And when you say on the Ameris side, is that a summary of the issues that you're -- as you're seeing them?
A Well I think I was just more of taking stock in general.
But the LTIP issue had come up over and over and I just wanted to -- you know, I think in the -- below there was an exchange between myself and the leadership team and Pat and the leadership team.
Q So when you say in the second highlighted line, way higher trucking and working capital losses based on decisions we made, what did you mean by that?
A Well ultimately Pat and I were responsible for the results of the division, and even though there were some issues relating to accounting that he had -- that he was, you know, going back and forth with the bank, it was just very difficult to overcome 40 million in trucking losses.
And so, you know, again, we talked about my area of expertise, you can only control what you can control, and I felt like the LTIP was dead, at least for the 2023. We had to

kind of, you know, take -- acknowledge that and just move on.

That was my perspective at the time, and I communicated that to our senior team, and Pat had his own perspective too.

Q And for the second line where it says, and of course we need to pay for IT, marketing, accounting, et cetera, since they are devoted to Balboa exclusively.

A That's right.

Q Why did you include that?

A Well because the IT, marketing, and accounting and that whole overhead issue, those guys or those people were fully devoted to the Balboa Division, so if they were fully working for us then it was my perspective that we should pay for it as an expense.

Q And what did you understand Mr. Byrne's perspective to be on that point?

**MR. SESSIONS:** Objection, calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you know what Mr. Byrne's perspective was on that point?

A I did.

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

**MS. FODE:** Okay.

//

**BY MS. FODE:**

Q And did you believe that those functions were something that were important for the division?

A They were.

Q And it sounds like you said that your perspective was that then that those people, IT, marketing, accounting, etc. Will you explain how they were working for the Balboa Division?

A Well they're just like they are today. They dotted line into me. But they're still 100% devoted to us, to our Division.

Q And were those the departments that Mr. Byrne was in charge of when he was -- prior to the acquisition?

A Those were the areas that Pat, you know, I mean there were some other areas too -- but those were areas that Pat specialized in, yes.

Q And did you observe that it was difficult for Mr. Byrne to give up control over those departments?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you have any observations of Mr. Byrne with regard to control over those departments?

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

//

**BY MS. FODE:**

Q And did Mr. Byrne ever tell you that it was difficult for him to give up responsibility for those departments?

**MR. SESSIONS:** Objection. Leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you ever have a conversation with Mr. Byrne about these departments, IT, marketing and accounting?

A We had many discussions about this.

Q And did you ever have a conversation with him related to his concern that you're addressing here in your email?

A I'm sorry, could you ask that question again?

Q Sure. Did you have a conversation with Mr. Byrne about his concern about the departments, IT, marketing, and accounting around this timeframe?

A We did. I don't remember the date, or I mean these were central issues that Pat and I talked about a lot. And so part of my attempt here was to bring clarity to our conversations.

Q Will you scroll down, please below the highlighted or the dark box there? There we go. Will you read the last two sentences into the record, sir?

A Sure. "Lastly, it seems like it is getting late in the process. I would like to know, since we are not extended, what the offer is for 2025 and beyond."

Q And why did you write that?

A Well, you know, I think the first objective for me personally was I wanted to work through the employment agreement of three years. And like I said earlier, soft landed. Have everybody in a good place, you know, our employee base, the bank, our leadership team, so on and so forth. But after we were not renewed, it -- what that told me is it's not going to continue into the fourth year like it was in the first three. So you -- it's just natural that you kind of want to know, well after the three years what's the deal, right? And so that's what I meant by that.
Q And so when you say that we were not renewed, what do you mean by that?
A The -- I think we touched a little bit on it yesterday. It was just that -- it was just a notification that even when -- if and when you continue as an employee it's not going to be under the employment agreement that we signed. That's all.
Q And did you receive a notice of nonrenewal?
A I did.
Q And do you remember the timeframe you received that?
A I would say in and around March of '24.
Q And if you could please scroll up to page two? If can scroll up to Mr. Byrne's email. And you see the email in -- dated February -- dated Friday, April 12, 2024?
A I do.
Q And would you please scroll up further? Did Mr. Byrne

respond to your email that we just discussed? Scroll down, please. There you go.
A To -- did he?
Q Did Mr. Byrne respond to your email?
A Oh on Thursday, May 2nd to the April 12th? Yes.
Q And what did he say there?
A He says, "I have received no offers on the LTIP, nor have I heard anything on the 2025 compensation plan. Have you?"
Q Okay. Scroll up, please to your response. And is that your email dated May 2nd, 2024 at the top, Mr. Silva?
A It is.
Q And why don't you read that first line into the record, please?
A "Specific to the 2025 offer contract, I have not heard anything other than we should expect something in the next week or so after Jim speaks to Nicole, per the Monday's call with Jim."
Q And so had you spoken with Jim Lahaise and Mr. Byrne about the contract or 2025 offer?
A We talked about it often. We had a recurring Monday call at like 9:30, the three of us. So I think that it had, you know, we knew it was coming we just didn't know what the details were. So I was just referring to the most recent call on that Monday.
Q And then will you please read the last line into the

record as well?
A "After reading all of the emails, it is my opinion that the 2023 LTIP is dead and has been for some time."
Q I'll give you a moment to get your water.
A I'm good.
Q And why did you write that?
A Just because, you know, I -- one, I had faith and trust that, you know, I say it below GAAP versus GAAP, but I had trust that the company was heavily regulated, had a lot of oversight, and was, you know, legit in terms of from an accounting standpoint. The other thing that there were some areas that Pat was contending, and I was trying to get everybody together. But I felt it had been dead because of the $40 million in losses that we had encounter -- that wiped out any spread, if you will.
Q Okay. You can go to back, please. And what did you observe with Mr. Byrne's demeanor after the acquisition on --
**MR. SESSIONS:** Objection.
**BY MS. FODE:**
Q -- Ameris?
**MR. SESSIONS:** Objection. Over broad and calls for speculation.
**THE COURT:** The objection that it's over broad is sustained. Can you rein it in a little bit?
**MS. FODE:** Of course.

**BY MS. FODE:**

Q During this 2024 timeframe, what did you observe for Mr. Byrne's demeanor?

A Well it was different than in, say the 17 years before that we worked together on. Like I think I mentioned yesterday that was like one of the hardest working guys I'd ever met. I mean he set an incredible pace. But in this new environment it -- where he couldn't really just make the decisions, he had to work with people to come to conclusions. It was very difficult.

I think that he also was growingly frustrated with the LTIP scenario. And so it wasn't any one event it was just kind of, you know, I just didn't feel like over time he was as happy as he was. And so it created a lot of things like this --

Q And --

A -- conflicts and that kind of a thing.

Q And what conflicts are you referring to?

A Well you know, ultimately it was some difficulties in our relationship. And he had some difficult relationships or exchanges with Nicole Stokes, our CFO. And from time to time had some dust ups with Jim Lahaise. And then some others like Ross Creasy in IT, that revolved around IT's slowness and that kind of a thing. And certainly with Dave Mandel as well.

Q And are there any examples of conflict that you observed?

A Well I guess the seminal moment was with Dave. Dave was,

you know, credit was one of those dotted lines. And there was a time where Pat and Dave and I were on a Teams call. And it was -- I don't actually remember the specific issue, it was revolving around authority or that kind of a thing. And then Pat said, so Dave, you're effing me, right? I mean just admit it, you're effing me, just admit it, you're effing me.

And then Pat hung up off the Team's call. And Dave didn't see it coming. I mean it -- he's -- he didn't really know even from where that came from. And so it kind of resonated, it hit the Chief Risk Officer, it hit some other people. And I -- that was probably a very defining moment in how the breakage or lack of collaboration between Jim and a lot of key people within the bank.

Q And you said with Jim, did you mean Jim?

A Lahaise. Yes.

Q Okay. Thank you. And when -- did Mr. Byrne actually use the F word in that, the full F word in that call?

A Multiple times.

Q Okay, so you're abbreviating because we're in a Court of law, but he actually used the F word?

A That's right.

Q Okay. And were others on the call, other than you, Mr. Byrne, and Mr. Mandel?

A No, it was just the three of us.

Q And are there other examples that you observed of conflict

or contention with executives at the bank?

A Well the one that I remember, there were multiple people in the meeting. And, you know, I don't really know the root of it. But there was always this growing tension I guess between Pat and Nicole Stokes, our CFO. And so I remember another meeting that we were on and I think Pat said something to the effect like, every time I see you, it's like going to the principal's office or something like that. And then they proceeded to get into somewhat of a heated discussion.

So it was a lot, you know, it made a lot of people uncomfortable, but it -- to answer your question though, it just -- those types of things just kept happening a little bit more and more. So it -- to get back to the original question, it just seemed like he was unhappy, you know.

Q And do you have an understanding of why Mr. Byrne was having conflicts with so many Ameris executives?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** The objection is overruled, but you can answer with a yes or a no.

A Okay. It's hard for me, but could you ask the question again, please?

Q Yes. Do you know why Mr. Byrne -- or have an opinion why Mr. Byrne had conflicts with Ameris executives?

**MR. SESSIONS:** Objection. Compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Do you have an opinion why Mr. Byrne had conflicts with the Ameris executives?

**MR. SESSIONS:** Objection. Calls for lay opinion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you observe a reason for Mr. Byrne's conflicts with Ameris executives?

**MR. SESSIONS:** Objection. Vague.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you -- before the acquisition -- did -- what was the reporting structure?

A I was the -- Pat had one direct report and it was me.

Q And did that change after the acquisition?

A No, it didn't.

Q And did Mr. Byrne have more responsibilities to interact with others -- executives among the Ameris team?

A Oh certainly.

Q Okay. And did you observe that having any influence on Mr. Byrne?

A Well I think that, you know, when we were an independent and we weren't owned by Ameris, I was the only one that reported to Pat. And so everyone else reported up through me when it -- when we got purchased, it went -- it transitioned

from Pat having the ultimate decision-making ability to having to collaborate with a number of people in the bank. And sometimes he had the decision-making ability, sometimes he didn't. Sometimes he had to work through people and kind of build these relationships to kind of get stuff done. It's kind of like a combination of building friendships and business relationships. And it makes it more complex and more lengthy, honestly.

Q And how did you observe Mr. Bryne's -- if -- did he succeed in those -- in that environment?

A He struggled with it, in my opinion.

**MS. FODE:** All right. I'd like to turn now to Exhibit 461 which I do not believe has been admitted, so I'd like to show it on blackout to the witness, please.

**THE COURT:** Okay, go ahead.

**BY MS. FODE:**

Q Sir, can you take a look at the email at the top, dated February 18, 2024?

A Yes.

Q And is that an email to you?

A Yeah. Yes, along with some other folks.

Q Okay. And is that an email Mr. Bryne sent you?

A Yes.

**MS. FODE:** Okay. I'd like to ask that the document be admitted and published, please.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objection.

**THE COURT:** Okay. Exhibit 461 is admitted, and you may publish.

**(Exhibit Number 461 received in evidence)**

**BY MS. FODE:**

Q All right. If you would start at the bottom, please.

A You mean further down, right?

Q Further down. Yep.

A Yeah.

Q Okay. And scroll up a tad. Mr. Silva, is this an email that you sent on February 1st, 2024?

A February 1st, yes.

Q Okay.

A of '24.

Q And take a moment and orient yourself to the email, please. And who did you send this email to?

A This is mainly our senior management team within Equipment Finance.

Q And what is the topic of the email?

A There was some discussion at -- we have a standing leadership call on Wednesday mornings. And I wanted to make sure that I crystallized or summarized what we talked about. And I wanted to set the expectations for them that, based on the, you know, the mounting trucking losses, and there was

upheaval too in the economic marketplace, that I wanted them to know that the chance of additional bonuses it wasn't going to happen.

Q Okay. So will you read it into the record, the first line -- first two sentences of your email?

A Sure.

"Good morning. As a follow up to our conversation yesterday, it is my opinion that we will not be receiving additional bonuses this year like we have the last two years. After growing north of 60% in 2021"

A And I meant 2022.

"with very low losses, 2023 was much more challenging with the added costs of deposits, freezes on hiring, increased scrutiny with rates and high losses, primarily in trucking."

Q Okay. And what did you mean when you said there's high losses, primarily in trucking?

A Yeah, we were just encountering those after -- on those transactions to the tune of $40 million.

Q And what about the freezes on hiring? What did you --

A Yeah.

Q -- why did you mention that?

A Well it was -- it's probably some of you guys remember there was the Silicon Bank failure. And from there came

Republic Bank. And from there came Signature Bank. And you know, after a period of cost of funds at very, very low, all of a sudden all of the banks were tightening up. They were seeking deposits. Everybody really didn't know what was going to happen. So there were all kinds of things that we had to consider, including watching who we hired. It was just upheaval in the marketplace, not just Ameris.

Q And will you read the second paragraph into the record? The one line starting at "Ameris is very".

A "Ameris is very supportive of Equipment Finance, and I'm hoping we will be able to return to these types of bonuses in 2025."

Q And did you believe that statement when you wrote it?

A Oh, for sure.

Q And let's scroll up, please.

**(Pause)**

**BY MS. FODE:**

Q I can continue to question while you work on your mouse.

Do you remember if Mr. Byrne responded to your email?

A He did.

Q And --

A There it is.

Q -- if you could go to the top of this email.

Did Mr. Byrne agree with your sentiments in your email?

A You know, it -- like he writes here, "I agree with Phil on

most of the points below", in the top of the second paragraph.
Q And did you feel that Mr. Byrne was backing you in your email to the team?
A No, he wasn't.
Q And how did that feel?
A Well you know, I would tell you that over the years Pat had been very respectful of me, as we discussed yesterday. But as things started to get a little bit bristly, this was probably one of the times where he had -- I looked at this email as one kind of undermining me based on the message I had before which rooted in his calculation in the LTIP. And unfortunately it established somewhat of a wedge between me, my communication with our senior leadership team. And it just showed that Pat and I were in disagreement. A mixed messaging of sorts.
Q And did you talk with Mr. Byrne about his email, which sort of, as you said, made a wedge between you and him in front of the team?
A I really don't recall a specific conversation about this. But Pat and I talked fairly often about all of what we've been talking about.
Q And if you'd go to the first email of the chain, please, What does Mr. Byrne write on February 18, 2024?
A "Update, there has been no movement on Ameris' part to address the discrepancies in how the LTIP is calculated."

Q And do you recall Mr. Byrne providing updates on Ameris' movement or lack of movement on the LTIP to the senior team?
A I don't -- there may have been, I just don't recall. This -- but this was certainly one of them, for sure. Two of them, I guess now in this string.
Q Did anybody on this email chain ever complain to you that they were not receiving their 2023 LTIP payout?
A No.
Q Did the LTIP -- possibility of an LTIP payout, was that -- did that play any role in your decision to join Ameris?
A Not at all.
Q And did you receive an LTIP payout in 2023?
A Do you mean for the 2022 year or?
Q For the year we're talking about right now for 2023, when that was --
A Oh no.
**MS. FODE:** All right. Let's go please to Exhibit 425, which has been admitted.
Q All right, sir, can you tell me what the first email is -- what that is?
A Are you talking about --
Q Did you send the first email on the chain?
A Do you -- meaning at the bottom?
Q That's fine. Let's start at the bottom like we all read --

A All right.
Q -- email chains. Go ahead.
A Yeah. Excuse me, what was your question?
Q My question was, is that your -- was that an email that you sent on Sunday, December 17th, 2023
A It is.
Q And is it to Mr. Byrne?
A It is.
Q Okay. I'd like to walk through a couple of these comments. I know you were asked about it in the -- in Mr. Sessions' direct or examination.
If you would scroll down, I want to know overall why did you send this email?
A There are a number of things. But like I said yesterday, I just wanted to encourage Pat to be his best self. I cared a lot for him and I wanted him to be happy as I kind of say in the opening comments.
Q Would you go under my thoughts?
A Sure.
Q The first line, will you read that into the record, starting at "they"?
A Sure. "They do respect and trust you and recognize your unique talents. And they want you to be here. I have heard it many times independently."
Q Who is they in your email?

A The folks at Ameris Bank.
Q And did you believe that when you wrote that --
A I did.
Q -- sentence?
A I did.
Q And what about the next line in this email, starting at "it is different", can you read that into the record?
A Sure. "It's different when you're an employee. It's more collaborative, and relationship building is very important. Your --"
Q And what did you mean by that?
A I just, you know, kind of what we were visiting about before, it -- you're not able as the 100% owner to just make the -- have the ultimate decision-making ability. And when you work in a larger organization there's a lot of relationship building that's important, there's a lot of conversations that have to take place. You're kind of striving for a place of mutual benefit. But that's different than say when you're an independent company.
Q And did you observe Mr. Byrne acting in that collaborative and relationship-building way during this time frame?
A It depends when, you know, after the purchase to maybe in and around this time. In my opinion, he was perceiving things differently or -- than it was. And in my opinion, he was struggling with that soft skill aspect of relationship building

and collaboration. Especially when he didn't get his way, per se.
Q And we read the last -- the third and fourth lines there, "you are perceiving"?
A Yeah.

"You are perceiving things in the most negative way. In my opinion, they are not as ill-intentioned or manipulative as you think. Nobody has complete dominion in a large company. It's not just you that doesn't have it."

Q And what did you mean by that?
A That nobody has ultimate decision-making ability. It's relationship building, it's influence, it's collaboration. And everybody is -- has that maybe obstacle but at the same time opportunity.
Q All right. Let's scroll up, please, to the top email at the top. At page two. All right.
Did you send that email, sir, at the top of the page to -- dated December 18th, 2023?
A I did.
Q And did you send this to Mr. Byrne?
A I did.
Q Okay. And there were a lot of questions about this. I want you to take a moment and read it to yourself, and I'll ask you some questions.

**(Pause)**

**BY MS. FODE:**

A Okay.

Q Okay. If you would read the three lines starting with, "I" into the record, please?

A "I love you. I want you here, and want to do it with you as long as you can. We make a great team. And I was trying to give you the other side of things and encourage you. P.S., I don't want your job."

Q And did you mean the second line when you wrote it, "I want you to be here, and I want to" -- "I want to do it with you as long as you can. We make a great team."

A I did. I mean, we had been together for I guess maybe 17 of the 18 years at that time. We had a lot of history together. We fought very diligently to get to a midpoint.

Q And did you want Mr. Bryne's' job, sir?

A I didn't.

Q Why did you feel that you had to write that in your December 18th, 2023 email?

A You know, there were -- you know there was just this growing difficulty between Pat and me. And you know I think at the time, you know -- I don't -- I'd have to see some of the emails. But there was just this growing unhappiness with Pat. And we had many conversations -- many conversations of, you know, are you going to go, are you going to stay, what are you

going to do after the three years is up?

And you know one of the things that Pat had said was that, you know, we each have to make our individual decisions. And you know it had gone so well together just the two of us that I would have loved -- it would have been great if he was fully engaged, super happy. And that we could just go take on the marketplace together, along with our I think very talented team, but --

Q All right. Oh -- I'm sorry, sir.

A No, it's okay.

Q Did you have anything more?

A No. But it just, you know, there was just a -- unfortunately, just a growing conflict with Pat and me.

Q All right.

**MS. FODE:** I'd like to turn now to Exhibit 467 which has been admitted already. And we're going to start at the bottom email, JX0974, 004. Can we go up a bit, and then scroll slowly up, so Mr. Silva can get his bearings, please. Can you scroll slowly up? Okay. It's okay, we'll start here, for the sake of time. No, it's okay.

**BY MS. FODE:**

Q So, sir, is this an email that --

**MS. FODE:** If you can scroll down to page one. Okay. Start at the bottom, please. So we'll orient myself and the jurors, and Mr. Silva. Keep going, please. Okay.

**BY MS. FODE:**
Q So did Mr. Byrne email you on March 7th, 2024, saying -- with regard to the subject, Employment Contract?
A He did.
Q Okay. And will you read that first line into the record?
A Sure. "It looks like I am up next."
Q And the next sentence, please?
A "I assume you did not receive a similar non-renewal notice, and that you have already discussed it, in addition to many other things that you have not made me privy to with Jim."
Q What did you understand Mr. Byrne was emailing you about in this email?
A Well a couple of things. He received the non-renewal, but at that time when he wrote that email, he didn't know that I got the non-renewal notice as well. And then, you know, he's kind of throwing down the gloves here when he's starting to make accusations that I have been talking behind his back with Jim.
Q And had you been?
A No.
Q Okay. Let's scroll up, please, to your response. Okay. Did you email Mr. Bern back on March 7th, 2024 at around 12:34 p.m.?
A I did.
Q Okay. And what did you say?

A I said:

"You're probably right, Pat. We shouldn't talk. As I mentioned in my text to you, you are being incredibly disrespectful to me and I don't deserve it after all this time. You owe me an apology. I've kept you updated on everything. P.S., I got the same letter."

Q Okay. Why did you send this email?

A I was ticked, hurt, mad, all of those range of emotions. It's just, you know, it's just kind of a disassembling of a relationship that was so strong for a long time.

Q And let's scroll up and see Mr. Bryne's' response. It looks like Mr. Byrne said, "You are right. I owe you an apology".

Did he apologize to you, Mr. Silva?

A You know that -- this email is from him. I took it as kind of a sorry, not sorry email.

Q And why is that?

A Well it was because it was so qualifying, like what -- as it is written in the third paragraph.

Q And let's go ahead and read that into the record, please, sir.

A "You've told me that you're not letting me know of all of your conversations, which you're not disclosing to Jim anything we've discussed, unless we

agreed in advance. That you did not have any advance warning of my or your non-renewal notices. Therefore, I need to take you at your word."

Q And what was your perception of that paragraph?

A It just -- it was -- it's not an apology. I mean if you really felt sorry, just say, "I'm sorry for doing that. I just overreacted here". It sounded like a legal response.

Q All right. Let's scroll up, please.

Do you remember responding to Mr. Byrne?

A I did.

Q And this is March 9th, 2024. Is this your email?

A Yes.

Q Okay. And why did you write this response?

A You know, I think, you know, I always -- have always tried to summarize things to make sure that they're -- I not only do it with Pat but -- did it with Pat, but I usually try to summarize conversations so that if, by chance, there's some misunderstanding, that we can address it. So that was this too. It was kind of a summarization of things.

Q And did you accept Mr. Bryne's' apology?

A A qualified acceptance.

Q Will you read the second paragraph into the record, please?

A "If you don't implicitly trust me as a partner and friend after 17 years, there's nothing else I can do.

Without exception, I've consistently supported you without fail. Frankly, these every other week dust-ups are fatiguing me."

Q And were they fatiguing you?

A Oh yeah, they were.

Q Let's go down to below, "with regards to Jim and Ameris". I'm going to ask you a quick couple questions on bullet point one and two. Will you please read those into the record?

A "I have been very clear with them and you that we are a much better company with you. They want you to be here if you want to be here."

Q Okay. Did you mean that when you wrote it?

A For sure.

Q And who is they?

A Ameris, Ameris Bank.

Q And the fourth bullet point, I'm sorry, the third bullet -- fourth bullet point, "you are probably".

A Oh.

"You are probably up next with regards to a renewal, and they will attend to me after that based on the outcome with you."

Q What does that mean?

A Well you know, after all of the discussions that Pat and I had had over time, you know, are you going to stay, are you going to go, are we going to stay together? We both went, you

know, we talked about it a lot of times. But the net-net was that they had to figure out what -- where Pat was first. He was the CEO. He was the head of the Division. It didn't make sense to work with his subordinate, that being me, first.

Q So did you feel that you were tied to Mr. Byrne in -- for the next steps?

**MR. SESSIONS:** Objection. Leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q It's okay, we'll move on for time. Look at the last sentence, "I don't want to get in the middle". Just read that into the record, please.

A Oh. "I don't want to get in the middle. I'm not playing both sides, but I do want both to work in harmony. I'm just trying to do my job to the best of my ability."

Q And did you feel like you were in the middle?

A Yeah, I mean like I mentioned, I was really involved in trying to soft land, you know, attend to our employees, attend to our customers, continue to recruit talent in. Make sure that we hit our results. Have it be good for the Bank and for our people. And it just got -- I was just starting to get somewhat winded in terms of trying to be between that and Pat's growing unhappiness, and being agitated and being, you know, unhappy with me, and being paranoid about things. You know, it wasn't true. He came up with this. This was -- we had a lot

of stuff to do here.

Q When you said earlier in the email, "I got the same letter". What was that?

A It was the same non-renewal.

Q And what was your understanding of what the non-renewal notice was?

A Just that. That -- pardon, oh just that. That it was the -- it was a notification that they were not going to renew, based on the terms of the three year employment agreement. And that it was just up in the air. And that we would talk about it in time.

Q And was it a termination notice?

A Oh no, not at all.

Q Okay. And why do you say that?

**MR. SESSIONS:** Objection. Calls for a legal opinion.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Was it -- let's go on. Were you surprised that Ameris was sending you the notice of nonrenewal?

A No. I just looked at it as notice that we're going to have to talk. And we'd been talking about talking that we were going to talk about it later. So I just felt like there was a chain of events. And it started with Pat first.

I would just only add too that we had a lot of conversations about, you know, if we were going to continue

together. If I remained. And Pat was always -- and I was very thankful for this, he even said that if he had left, not that he said he was leaving, but if he did leave, that he would be more than happy, formally or informally, to help me. As if I was, you know, if I continued with the company.

Q And did you talk with Jim and Pat prior to receiving the non-renewal?

A I just looked at the non-renewal as notice.

Q Okay. And had you had any conversations with Jim and Pat in your weekly meeting about -- that the notice of non-renewal would be coming?

A I don't recall.

Q Okay.

**MS. FODE:** I'd like to turn to Exhibit 469, please. This is an admitted document. And the cover email, please. Okay.

**BY MS. FODE:**

Q This is an email dated March 11, 2024 from Jim Lahaise to you and Mr. Byrne. Do you remember receiving this email?

A I do.

Q And what does it say? Will you read that into the record?

A Sure. "Gentleman attached is our Senior Management Agreement for your review . upon"

Q All right. And please scroll to the attachment. Do you remember receiving the email as well as this attachment of the

Severance Protection and Restrictive Covenants Agreement?
A I do.
Q Okay. And let's read the first three whereases into the record, please.
A "Whereas, employee is an employee of the Bank Corp and/or of the -- or the bank; whereas, the expertise and experience of the employee in the financial institutions industry are valuable to employer; and whereas, it is in the best interest of employer to maintain an experienced and sound management team to manage employer, further employer's overall strategies and protect and enhance shareholder value."
Q Did the cover email indicate that your employment was terminated, sir?
**MR. SESSIONS:** Objection. Calls for legal opinion.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Let's go back and look at the email. Sir, anywhere in this email does it say that your employment's terminated?
**MR. SESSIONS:** Same objection.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q When you received this email, did you believe that your employment was terminated?

A No.
Q Okay. Let's go on to the document we were looking at just now. Did you -- what did you believe that the Severance Protection and Restrictive Covenants Agreement was?
**MR. SESSIONS:** Objection. Calls for speculation and legal opinion.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you have any understanding -- did you know that you would be receiving this Severance Protection and Restrictive Covenants Agreement?
**MR. SESSIONS:** Objection. Vague as to time.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you know you'd be receiving a Severance Protection and Restrictive Covenants Agreement at any time?
**MR. SESSIONS:** Same objection.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you know you'd be receiving a Severance Protection and Restrictive Covenants Agreement in 2024?
A I didn't. But you know, since I've had some variations of the same agreement over the last few years.
Q And when you reviewed the -- did you review the Severance -- the -- I'll just call it the Severance Agreement

for short. Did you review the Severance Agreement?
A I did.
Q And did you sign the Severance Agreement?
A I did.
Q And based on your review of the Severance Agreement that you signed, did your employment -- did you believe your employment was terminated?
**MR. SESSIONS:** Object --
**MS. FODE:** Hold on.
Q Did you believe that your employment with Ameris was being terminated?
**MR. SESSIONS:** Objection. Calls for speculation and calls for legal opinion.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q When you signed the agreement, sir, did your employment end?
A No.
Q Okay. Did you know if Mr. Byrne signed the agreement?
A I do not.
**MR. SESSIONS:** Objection. Calls for speculation.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Did you have any involvement in the decision to terminate Mr. Bryne's' employment?

A Absolutely not.
Q Okay. And did you have an understanding of why Mr. Byrne was terminated?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** The objection is overruled, but you can answer the question with a yes or a no.

A Could you ask that again?

**MS. FODE:** Sure.

**THE WITNESS:** If --

**BY MS. FODE:**

Q Did you have an understanding of why Mr. Byrne was terminated, yes or no?

**THE WITNESS:** Judge I don't know. Like timing of when and how to answer that with a yes or no.

**THE COURT:** Okay. So she'll ask another question.

**THE WITNESS:** Okay.

**BY MS. FODE:**

Q You could ask me.
A Oh okay.
Q No problem, I know she's friendly. So did you have a -- an understanding at this time in 2020, in June of 2024, I'm sorry, before June of 2024, why Mr. Byrne was terminated?
A No.
Q Okay. And did you have any communications with Mr. Byrne after he left Ameris?

A After he left I remember, because I got a message that his mom called. And I think I left him a voicemail. I didn't get him, And I think I called him like once or twice just to kind of put business aside and just wish him the best. And think I sent him a text, because he's a fan of where I'm from and -- but I didn't -- I don't us -- I don't remember us speaking. But I attempted to.
Q Where are you from?
A Hawaii.
Q I think we're all a fan of that. So backing up to the last six months before Mr. Byrne was let go. How would you describe his involvement at Ameris and working with the team?
A Yeah. I think it just got worse in the months leading up to him leaving. It -- there were many iterations of that LTIP, you know, those five areas that he sent to the leadership team. It didn't happen at the beginning. But then there was a -- which I had a real hard time with just the struggles with him and me, because I wasn't used to that.
And I think he was frustrated, not only in the absence of strong relationships within the Bank, I think he got more frustrated with his inability to effectuate decisions or change. And where he had been I think the hardest working guy, and I'm a hard worker but I mean he was a very hard worker. But he started to be not as present. A little bit vacant. Not as responsive. And -- but it, you know, it just got a little

bit worse over time.
Q And now that -- fast forwarding to post when Mr. Byrne was there, how is the retention with the employees?
A During which period?
Q After June of 2024.
A Oh it's been really good.
**MR. SESSIONS:** Objection. Vague.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q After June of 2024, have the employees -- how is the retention with the employees of Balboa Division?
**MR. SESSIONS:** Same objection.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q Have you lost any key leaders, sir, since 2024?
**MR. SESSIONS:** Objection. Vague and leading.
**THE COURT:** Sustained.
**BY MS. FODE:**
Q And are you -- you're currently President of the Balboa Division, correct?
A I am.
**MR. SESSIONS:** Objection. Leading.
**THE COURT:** Sustained.
//
//

**BY MS. FODE:**

Q Okay. And do you have an understanding of if you're -- the key leaders that were on the emails that we looked at, if any of them are still there?

**MR. SESSIONS:** Objection. Leading and relevance.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q As you, as current President of the Division, how would you say it's going?

**MR. SESSIONS:** Same objection. Vague.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q And as -- do you -- have you lost any of your key leadership post when Mr. Byrne is there?

**MR. SESSIONS:** Same objections.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Okay. What is the morale like at the Balboa Division now?

**MR. SESSIONS:** Same objections.

**THE COURT:** The objection's sustained.

**BY MS. FODE:**

Q Is this your first time testifying at trial, sir?

A It's not.

Q Okay. And when was the first time you testified at trial?

A I recall that the first time was with Pat in New

Hampshire.
Q Okay. And what was that?
A That was a long time ago. It's probably maybe north of 10 years ago.
Q And was that the only lawsuit Mr. Byrne was involved in while you were at Balboa Capital?

**MR. SESSIONS:** Objection. Relevance.

**THE COURT:** Sustained.

**MS. FODE:** And I request a sidebar, please.

**THE COURT:** Okay.

**(Begin Sidebar at 10:15 a.m.)**

**MS. FODE:** Okay, hi.

**THE COURT:** What is the offer?

**MS. FODE:** Yes, so they offered up bringing in the litigation history of my client. And so it's -- I believe that it's relevant and important for us to also bring up Mr. Bryne's' litigious nature. And Mr. Silva has personal knowledge of that. And it was only because they opened the door on that yesterday. And so I believe that it is relevant for us to be able to speak to that.

**THE COURT:** I sustained your objection.

**MS. FODE:** That's --

**THE COURT:** You objected, and I sustained the objection.

**MS. FODE:** I know, but I'm going to ask other

questions. And I wanted to have an opportunity to discuss it, rather than, you know, not have the opportunity to bring that in.

**THE COURT:** Okay, Mr. Sessions?

**MR. SESSIONS:** I disagree, Your Honor. As you beat me to it, but you did abstain the objection. I think if -- I would agree that it did open the door, if the information about other lawsuits that Ameris was involved in, if that had come in sure. But the objection was sustained. So at this point, I don't think it's relevant.

**THE COURT:** Okay. So I'm -- this is the objection with respect to these lawsuits, is also sustained.

**MS. FODE:** Okay. Understood. So then I'll be able to wrap up.

**THE COURT:** Okay.

**MS. FODE:** Pretty quickly, yes.

**THE COURT:** All right.

**MS. FODE:** Thanks.

**(End Sidebar 10:17 a.m.)**

**THE COURT:** Okay. You may proceed when you're ready.

**MS. FODE:** Thank you.

**BY MS. FODE:**

Q Just a couple more questions, Mr. Silva, and then we'll --

A Sure.

Q -- wrap up and have our break.

You mentioned Rob Rasmussen earlier today. How did you know Mr. Rasmussen?
A Rob and I worked together dating back to 1998-ish, at American Express.
Q Okay. And did you work with Mr. Rasmussen at Balboa Capital?
A I did.
Q Okay. And did you also work with Mr. Rasmussen while he was -- after the acquisition by Ameris Bank?
A I did.
Q And who was Mr. Rasmussen's supervisor after the acquisition?
A After the acquisition, he reported in to me. And then --
Q Okay.
A -- and then ultimately it was one of those dotted lines into the Bank.
Q And for how long were you, Mr. -- how long were you, Mr. Rasmussen's supervisor?
A Over 10 years.
Q And at -- after acquisition and during the time that Mr. Rasmussen reported to you, did you have concerns about his performance?
A I did.
Q Okay. And were those concerns shared by others in the leadership of the Balboa Division?

**MR. SESSIONS:** Objection. Vague. Leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Okay. Did you -- what were the concerns that you shared, sir?

A Just that --

**MR. SESSIONS:** I apologies. I'm going to object to the use of the word "shared" as speculative. But he -- I don't object to him answering the question itself.

**MS. FODE:** I can rephrase.

**BY MS. FODE:**

Q What were your concerns, sir, about Mr. Rasmussen's performance?

A Well it was something that Pat and I shared too. It was that at $100 million, you know, Rob was serviceable. At 700, he struggled with returning emails. He struggled with keeping meetings, having to reschedule meetings. He struggled with micromanaging. And the people that reported to him were very unhappy. And so we tried to accommodate, at some point we moved more of the operations. I took that on. He was amenable to that. And then he was solely devoted to credit.

Q Okay. And ultimately was the decision made to performance council, Mr. Rasmussen?

A Well it --

**MR. SESSIONS:** Objection. Vague and leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you work with Mr. Rasmussen or attempt to work with him to improve his performance?

**MR. SESSIONS:** Objection. Leading and compound.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you work with Mr. Rasmussen at all on his performance issues?

**MR. SESSIONS:** Objection. Leading and vague.

**THE COURT:** Sustained.

**MS. FODE:** All right.

**BY MS. FODE:**

Q Ultimately, did you have a role in Mr. Rasmussen leaving the company?

A I did not. He resigned.

Q Okay. And did Mr. Byrne have knowledge of Mr. Rasmussen's performance issues?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did you ever talk with Mr. Byrne about Mr. Rasmussen's performance issues?

A I did.

Q Okay. And did Mr. Byrne approve Mr. Rasmussen getting

zero on his bonus?

**MR. SESSIONS:** Objection. Calls for speculation.

**THE COURT:** Sustained. But you can ask questions to lay that foundation.

**MS. FODE:** Sure.

**MR. SESSIONS:** Okay.

**BY MS. FODE:**

Q Were you involved in Mr. Rasmussen's bonus in 2023?

A For the year 2023, yeah, there was -- it was a collaboration.

Q Okay. And --

A Because we have that dotted line thing, you know.

Q And for 2024, did you have any involvement in Mr. Rasmussen's bonus?

A Again, that was more the year he left so there were a lot of people involved in that decision.

Q Okay. And do you recall if Mr. Rasmussen got a bonus in 2024?

A He did.

Q Okay. And do you recall what Pat Bryne's opinion was on Mr. -- Mr. Bryne's -- Mr. Rasmussen getting a bonus?

**MR. SESSIONS:** Objection. Vague and calls for speculation.

**THE COURT:** Sustained.

//

**BY MS. FODE:**

Q Do you have any knowledge about Pat Bryne's' opinion if Mr. Rasmussen should get a bonus in 2024?

A I do.

Q Okay. And what was that?

A Zero.

**MR. SESSIONS:** Same objections.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Did Mr. Byrne tell you how much he thought Mr. Rasmussen's bonus should be?

**MR. SESSIONS:** Objection. Leading.

**THE COURT:** Sustained.

**BY MS. FODE:**

Q Okay. Did you have a conversation with Mr. Byrne about how much Mr. Rasmussen's bonus should be?

**MR. SESSIONS:** Same objection.

**THE COURT:** Overruled. You can answer the question.

A Many. We've had many conversate --

**(Coughing)**

Q And what --

A -- excuse me, many conversations about that.

Q And what did Mr. Byrne tell you his recommendation was for Mr. Rasmussen's bonus?

A He deserves zero.

Q Thank you, sir. Appreciate your time.

**THE COURT:** Okay.

Mr. Sessions, anything else?

**MR. SESSIONS:** No need, Your Honor. I mean no further questions.

**THE COURT:** Okay. Thank you very much.

Okay, Mr. Silvey, you can step down and --

**THE WITNESS:** Thank you.

**THE COURT:** -- you're excused.

And it's about -- it's 10:23 a.m., it's close to our time for our morning break, so we're going to take the morning break.

To -- go -- you can go ahead and step down, sir.

To our jurors, just a reminder, please don't discuss this case amongst yourselves or with anyone else. And don't do any research about any aspect of the case. And we'll see everyone back here at 10:40 a.m.

**(Jurors exit courtroom)**

**THE COURT:** Is anything that we need to talk about before I let you take a break?

**MR. SESSIONS:** Nothing from Plaintiff.

**MS. FODE:** No.

**THE COURT:** Okay. I'll see you in 15 minutes.

**MS. FODE:** I think they all feel that way.

**(Recessed at 10:24 a.m.; reconvened at 10:44 a.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Pause)**

**THE CLERK:** All rise. This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated. Okay. So many of you. Ms. Villagomez, who's your next witness?

**MS. VILLAGOMEZ:** Ms. Jacquie Emert. Thank you.

**THE COURT:** Okay, thank you.

**(Pause)**

**THE COURT:** Okay, Ms. Emert, you can come straight forward and you're going to come around this way, and when you get to Ms. Jackson over here by the exit sign, you'll stop, she'll swear you in, and then you'll come up to the witness stand and have a seat next to me.

**JACQUELINE EMERT, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Ma'am, please state your name and spell your last name for the record.

**THE WITNESS:** Jacqueline Emert, E-M-E-R-T.

**THE COURT:** Thank you very much. Ms. Villagomez, you may proceed when you're ready.

**MS. VILLAGOMEZ:** Thank you.

//

//

**DIRECT EXAMINATION**

**BY MS. VILLAGOMEZ:**

Q Good morning, Ms. Emert. Thank you for being here today. Were you employed by Balboa Capital?

A Yes.

Q And how long did you work there?

A Over 30 years.

Q What positions did you hold during your time at Balboa?

A I began as a receptionist, and I made it all the way up to the vice president of loan operations.

Q And was that your role when you left the company?

A Yes.

Q And do you know Patrick Byrne?

A I do.

Q How did you come to know him?

A I first met Patrick when I worked for a secretarial service down in Lido in Newport Beach, and he and his partner had taken space within the building, and I served as one of his secretaries.

A Approximately how long have you known him?

Q Since 1988.

A And over those years, did you become familiar with the members of Mr. Byrne's family?

A I did.

Q In what way?

A Oh, numerous ways. His wife used to work directly for me in our Arizona office. When she moved to California, she actually lived with my husband and myself for a short amount of time. His son was born on my birthday. I was Maid of Honor in his wedding. Just any number of ways.
Q And did you work closely with Mr. Byrne during your time at Balboa?
A I did.
Q And can you describe the capacity in which you worked with Mr. Byrne?
A Oh, gosh. A number of different ways. At one point, I was his personal assistant through the business, handled all of his day-to-day various things. I was a manager of a bunch of different departments that indirectly reported to Pat through Rob Rasmussen. He was one of my managers.
Q And after leaving Balboa, did you continue working with Mr. Byrne in any capacity?
A Not right away.
Q And what did you do after you left Balboa?
A I had the opportunity to work for a company called Laundry by Oasis.
Q And afterward, did you have any opportunity to work with Mr. Byrne in any capacity?
A Yes.
Q And what is that?

A I'm now his personal assistant.

Q Great. And how would you describe the culture at Balboa Capital before the Ameris acquisition?

A Oh, it was wonderful. It was a really great place to work. I know it sounds really hokey to say we were a family, but Patrick led by example, and Patrick treated everybody with such respect that he made an effort to know your anniversary, your birthdays, things like that. I personally would bake cakes for all of my employees on their birthdays. We had one gentleman who became a U.S. citizen and everybody got together and we bought a bunch of apple pies and we bought him his first American flag. We all signed a baseball and then we had a parade for him. So that was the kind of thing that would occur in the company.

Q And after Ameris acquired Balboa, did you observe any changes in the way the company operated?

**MS. YEE:** Irrelevant in 403?

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I can --

**THE COURT:** Yes, you can answer the question.

**THE WITNESS:** Thank you. So your question was, did I notice any changes?

**BY MS. VILLAGOMEZ:**

Q Yes, after Ameris acquired Balboa, did you observe any changes in the way the company operated?

A Well, naturally.
Q And can you describe those changes?
A It was a much larger organization and the intimacy of the relationships was very different.
Q And did you observe any changes in the reporting structures within the company?
A Almost immediately.

**MS. YEE:** Objection, leading.

**THE WITNESS:** I'm sorry.

**THE COURT:** After the question is finished, if you could just wait one beat. So if there is an objection, then counsel can state the objection and then I can rule on it and I'll tell you whether or not to answer.

**THE WITNESS:** I'll do my best.

**THE COURT:** Okay, let's start over because I don't remember the question now.

**BY MS. VILLAGOMEZ:**

Q Yes, did you observe any changes in the reporting structure after -- the reporting structures within the company after the Ameris acquisition?

**MS. YEE:** Objection, leading.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes, almost immediately.

Q And can you describe those changes?
A Well, first and foremost, the credit department became

absorbed by Ameris. The marketing department became absorbed by Ameris. HR, a good portion of our accounting department and the IT department.

Q And what affect, if any, did those changes have on the day-to-day operations of the business?

**MS. YEE:** Lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE COURT:** On the day-to-day, it was a little bit harder to get things -- the communication was a lot, what's the good word? The communication was strained.

**BY MS. VILLAGOMEZ:**

Q And how can you -- how is it strained?

A Because the reporting was solely through the Ameris management, it was difficult to get different reports, updates on progress, updates on what was happening within the department. These were all things that we were accustomed to having at our fingertips, and it wasn't at our fingertips any longer.

Q And, Ms. Emert, were you familiar with the LTIP during your employment at Balboa?

A At a high level, yes.

Q And did you personally receive compensation under the LTIP?

A Yes, I did.

Q Do you recall for which year you received LTIP

compensation?
A I want to say it was 2022.
**MS. VILLAGOMEZ:** And, Your Honor, plaintiff requests to publish Exhibit 461, which has already been moved into evidence.
**THE COURT:** Go ahead.
**BY MS. VILLAGOMEZ:**
Q Ms. Emert, were you copied on this February 1st, 2024 email from Phil Silva to a number of people?
**THE COURT:** Ms. Villagomez, I'm sorry. It was 461?
**MS. VILLAGOMEZ:** 461.
**THE COURT:** I don't have that as being admitted. Ms. Jackson, do you have it as being admitted?
**THE CLERK:** Yes, this morning.
**THE COURT:** It was just admitted. Okay, thank you. My apologies. Go ahead.
**MS. VILLAGOMEZ:** No worries.
Q Thank you, Ms. Emert. Do you see this email dated February 1st, 2024 from Phil Silva to a number of individuals?
A Yes.
Q And were you included in this email?
A Yes.
Q Okay. And can you please review this email and let me know when you've finished?
A I'm finished.

Q And after receiving this email, what did you understand regarding 2023 employee bonuses?
A We weren't getting one.
Q And before receiving this email, what had you expected regarding 2023 employee bonuses?
A To get a bonus.
Q And why did you have that expectation?
A We were a month and base business, so we always had a goal, right? The goal was always to knock it out of the park every month. And by doing so month over month over month, you knew that you were going to be rewarded because you were putting all your efforts into achieving.
Q And what was your reaction when you learned that bonuses would not be paid for 2023?
A I didn't love it.
Q And let's turn to the February 5th, 2024 email in the same thread. And this email is from Patrick Byrne. And do you see that you were copied in this email as well?
A Yes.
Q Can you please read the second paragraph beginning with, I agree with Phil?
A All of it?
Q Yes, please.
A I agree with Phil on most of the points below. Still, I would add that I thought we had a great year considering the

significant governors put on the growth of Balboa by Ameris in 2023, including but not limited to the restrictions on hiring, the limitation on portfolio purchases, the floors on interest rates and the reporting lines for key departments, credit, IT, accounting and marketing switched to reporting to Ameris.

Q This email references certain departments reporting directly to Ameris. Was that consistent with changes you had observed?

**MS. YEE:** Objection. Calls for speculation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Absolutely.

**BY MS. VILLAGOMEZ:**

Q And what changes did you observe?

A Well, just as stated, I noticed that obviously credit, IT, accounting and marketing were now all directly reporting to Ameris.

Q And if we could scroll down a little bit, keep going. And this highlighted portion, can you please read this portion of the email starting with I am sorry?

A I'm sorry I don't have better news, but hopefully this addresses your questions on the numbers. Please feel free to let me know if you have any questions. Onward and upward, Pat.

Q And what was your reaction to this portion of the email?

**MS. YEE:** Objection. Calls for speculation. Lacks foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I was disappointed.

**BY MS. VILLAGOMEZ:**

Q And can you describe why you were disappointed?

A Well, like I said, you know, we all worked really hard and, you know, it was in our best interest to achieve. And we did. And to find out that, you know, you put all these efforts in day after day. Yeah, your paycheck's great, but, you know, bonuses are really what drove people and we weren't getting one.

Q And -- if you could zoom back out to the first email, that email was sent by Mr. Phil Silva. The -- this email was sent by Phil Silva, correct? We just discussed this one.

A Yes.

Q And who was Phil Silva?

A He was our president.

Q And approximately how long did you work with him?

A I believe since about 2010.

Q And during late 2023 and early 2024, did you observe any changes in Mr. Silva?

**MS. YEE:** Objection. Vague. Overbroad.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** And what did you observe?

Q I noticed a change in Mr. Silva. It was emotional is a good way to describe it. He was always like the rest of us.

It was it was camaraderie. You were in it together. Everybody trying to reach a certain goal, looking for ways to better the business. It was very, very Balboa driven, right? Toward the end of 2023, heading into our third year as part of Ameris, the changes that I saw with Phil were like he had taken a step back. He was slowly kind of extricating himself from the relationships at Balboa.

Q And, Ms. Emert, are you aware that Mr. Byrne was fired from Ameris?

**MS. YEE:** Objection. Likes foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes.

**BY MS. VILLAGOMEZ:**

Q And how did you come to learn that he got fired?

A It was my habit to be in the office typically between 5:30 a.m. and 6 o'clock in the morning daily. As such, I was there when the instructions were provided to one of our IT members who worked in the office with me. And he happened to get the notice that it was -- he was supposed to turn off Patrick's access to all the systems. That's protocol. I get it. And then he came down to my office and eyes as big as saucers and wanted to know if I knew anything about this instruction he had received, and I didn't know. And that's essentially how I found out.

Q And what was your reaction to that news?

A I was shocked.
Q And why were you shocked?
A I didn't think there was any reason that he would ever be fired.
Q And have you spoken with Mr. Byrne since he was fired?
A I have.
Q And how frequently have you spoken with him?
A Daily.
Q Have you noticed any changes in Mr. Byrne since he was fired?
A Yes. I'm okay.
Q And what changes did you observe?
A I've known him for almost 40 years. Knowing him as I do, I know that he loves to be active. And that is completely gone. He doesn't do any of the activities that he's done in most of his life. The stress level is through the roof. The anxiety is through the roof. He's not doing any of the things that give him joy. He's not traveling with his family. He's not walking his dog. He's not happy. He's not sleeping. His health is suffering.
Q And was this different from the person that you had known for decades?
A Yes. Yes.
Q Thank you, Ms. Emert. Let's switch gears really quickly. After your employment with Ameris ended, did you request your

employment records from Ameris?
A Yes.
Q And why did you request them?
A I was curious.
Q And can you elaborate a little bit more?
A I was really interested to see what it contained. I don't have any of my records from having been an employee at Balboa, so I wanted to know if all of that was in there, too, because it's nice to reflect.
Q And did you retain counsel to assist you with that request?
A As a matter of fact, I did.
Q And who did you retain for that?
A You.
Q Thank you. And is Mr. Byrne paying your attorney's fees for that request?
A No.
Q And did Mr. Byrne have anything to do with your decision to request your employment records?
A Absolutely not.
Q A few final questions, Ms. Emert. Looking back on your time at Balboa, how would you describe your experience working there?
**MS. YEE:** Objection. Overbroad, vague, lacks foundation.

**THE COURT:** I need you to clarify. Are you talking pre-Ameris or after Ameris?

**MS. VILLAGOMEZ:** I'm talking about the whole time that she was with Ameris, or excuse me, with Balboa Capital, including post-acquisition.

**THE COURT:** Okay. The objection is overruled. You can answer.

**THE WITNESS:** I loved every minute of it. Was it easy? Was every day easy? No. But I wasn't there for ease. I was there to help my employees. I was there to help the company. I loved every minute of it.

**BY MS. VILLAGOMEZ:**

Q And final question, what role did Mr. Byrne play in creating that experience?

A He was my biggest supporter.

**MS. VILLAGOMEZ:** Thank you. No further questions.

**THE COURT:** Okay, Ms. Yee.

**MS. YEE:** Thank you, Your Honor. Your Honor, permission to treat the witness as an adverse witness?

**THE COURT:** You're on cross-examination.

**CROSS EXAMINATION**

**BY MS. YEE:**

Q Good morning, Ms. Emert. Is it Emert?

A Emert, yes, correct. Good morning.

Q You joined Balboa Capital, I believe you said, in 1988?

A No, I met Patrick in 1988. I joined Balboa Capital on April 22nd, 1989.
Q So just one year after Mr. Byrne founded Balboa Capital.
A Correct.
Q Correct? You were his first employee at Balboa Capital, right?
A My claim to fame.
Q And you mentioned you worked at Balboa Capital for more than three decades.
A Yes, ma'am.
Q When was the last time you worked for anyone other than Mr. Byrne?
A When I worked for Laundry by Oasis.
Q Who was the owner of that company?
A Anthony Byrne.
Q Was that Mr. Byrne's father?
A Correct.
Q Thank you. You were not happy about Mr. Byrne's decision to sell Balboa Capital to Ameris, correct?
A I was surprised. I don't want to say I was unhappy. It's just nobody likes change.
Q You were surprised because Mr. Byrne did not tell you in advance, correct?
A Correct.
Q Did you tell Ms. Nicole Stokes that Balboa was your

company that you started in Mr. Byrne's garage with him?
A No. I often would say that Balboa was my company. I laid claim to the organization because I loved it that much. Nothing was ever started in a garage. It would not be something that I would have said.
Q Mr. Byrne gave you $200,000 when he sold Balboa Capital; is that right?
A That is right.
Q Is it fair to say that you never planned to stay at Ameris if Mr. Byrne leaves?
A I had always said, I was very vocal about saying that I wouldn't work anywhere that Patrick wasn't. So it wasn't so much about Ameris. If any other company had purchased Balboa Capital, I would have said the same thing.
Q Understood. You sent a notice of resignation to Ameris in early May 2024, correct?
A May 4th, 2024.
Q And you described the reason for your departure as a retirement, correct?
A That was the intention.
Q And after your resignation, Ameris reached out to you and asked you to continue in a consulting basis because they value your historical knowledge of Balboa Capital.
A Correct.
**MS. VILLAGOMEZ:** Objection. Compound.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q After your resignation, Ameris reached out to you and asked you to continue in a consulting basis, correct?

A Correct.

Q Ameris wanted you to stay and work as a consultant because of your historical knowledge of Balboa Capital, correct?

**MS. VILLAGOMEZ:** Objection. Calls for speculation.

**THE COURT:** Sustained.

Q Why did you stay with Ameris on a consulting basis?

A Well, as I said before, that was my company. I would do anything to continue to help them.

Q So you agreed to stay with Ameris as a consultant for a period of time, correct?

A Yes.

Q Your consulting agreement ran from July 2024 through November 23rd, 2024, correct?

A Correct.

Q And you were paid pursuant to that consulting agreement, correct?

A Correct.

Q So until November 23rd, 2024, you had access to Ameris Computer Network, correct?

A No, ma'am.

**MS. VILLAGOMEZ:** Objection, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You told multiple people that Mr. Byrne was planning to leave Ameris after the first three years, didn't you?

**MS. VILLAGOMEZ:** Objection, relevance.

**THE COURT:** Sustained.

Q Did you ever say that to anyone about Ms. Byrne's departure?

**THE COURT:** The objection is sustained.

**MS. YEE:** Thank you, Your Honor. I'll move on.

**BY MS. YEE:**

Q You did not negotiate the long-term incentive plan with Ameris, correct?

A Correct.

Q You did not draft the long-term incentive plan?

A No, I did not.

Q You did not have your own LTIP award agreement, correct?

A No, I did not.

Q You did not decide the amount of any LTIP payment to any Balboa Division employee, correct?

A No, I did not.

Q And you did not attend every meeting between Mr. Byrne and Ameris personnel regarding LTIP calculations, correct?

A No, I did not.

Q After leaving Ameris, you mentioned you went to work for

Mr. Byrne at some point, correct?
A Correct.
Q And you're currently working as his personal assistant, correct?
A Yes, I am.
Q When did you first start working for Mr. Byrne after he left Ameris?

**MS. VILLAGOMEZ:** Objection, relevance.

**MS. YEE:** Your Honor, it goes to --

**THE COURT:** I do not want you to argue the objection. The objection is overruled. I'm going to give you some latitude.

**MS. YEE:** Thank you, Your Honor.

**THE COURT:** Go ahead.

**BY MS. YEE:**
Q Would you like me to ask again?
A I don't know what I'm supposed to do. I can answer?

**THE COURT:** You can answer. Yes.

**THE WITNESS:** Okay, thank you. Yes, I would like you to ask it again, please.

Q When did you first start working for Mr. Byrne after he left Ameris?
A October 28, 19 -- or 2024?
Q So you started working for Mr. Byrne while you were still under contract, the consulting agreement with Ameris, correct?

**MS. VILLAGOMEZ:** Objection, relevance.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** Yes.
**BY MS. YEE:**
Q Yes. Is it fair to say that you were helping Mr. Byrne sue Ameris, while you were still being paid by Ameris as a consultant?
**MS. VILLAGOMEZ:** Objection, argumentative, relevance.
**THE COURT:** Sustained. It's argumentative.
Q Were you helping Mr. Byrne sue Ameris while still being paid by Ameris as a consultant?
**MS. VILLAGOMEZ:** Objection, argumentative, relevance.
**THE COURT:** Sustained.
Q You did not tell Ameris that you were helping Mr. Byrne with his lawsuit while still being paid?
**MS. VILLAGOMEZ:** Same objections.
**THE COURT:** The objection is sustained.
**BY MS. YEE:**
Q Ameris continued paying you as a consultant through November 2024, as you testified earlier, correct?
A Correct.
Q And at that time, you were working for Mr. Byrne, correct?
A Can you ask that again, please?
Q And during that time, between October and November 2024, you were working for Mr. Byrne, correct?

A Correct.
Q Mr. Byrne currently pays you to work for him, correct?
**MS. VILLAGOMEZ:** Objection, cumulative.
**THE COURT:** The objection is overruled. You can answer.
**THE WITNESS:** Yes.
**BY MS. YEE:**
Q How much does he pay you?
A $134,000 annually.
Q As his personal assistant, correct?
A Yes, ma'am.
Q How does Mr. Byrne pay you? Was it hourly basis or salary basis?
A I'm sorry, say that again?
Q Was it a salary basis or hourly basis? How does he pay you?
**MS. VILLAGOMEZ:** Objection, relevance, argumentative.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Are you being paid as a W-2 or 1099 employee?
**MS. VILLAGOMEZ:** Same objections.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q You have assisted Mr. Byrne in connection with this lawsuit, correct?

**MS. VILLAGOMEZ:** Objection, argumentative, relevance.

**THE COURT:** I didn't understand the question. Can you state the question again?

Q You have assisted Mr. Byrne in connection with this lawsuit, correct?

**MS. VILLAGOMEZ:** Same objections.

**THE COURT:** You can answer the question if you can.

**THE WITNESS:** Yes.

**BY MS. YEE:**

Q You have attended meetings with Mr. Byrne's attorneys in this case, correct?

A Yes.

Q You have attended meetings with Mr. Byrne's accounting expert, Ms. Dickson, in this case, correct?

**MS. VILLAGOMEZ:** Objection, relevance.

**THE COURT:** sustained.

**MS. YEE:** Sidebar please, Your Honor.

**THE COURT:** No.

**BY MS. YEE:**

Q Do you recall that on November 7th, 2025, you met with Mr. Byrne's former counsel and Ms. Dickson?

**MS. VILLAGOMEZ:** Objection, relevance.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q You have corresponded with Mr. Byrne's accounting expert, Ms. Dickson, correct?

**MS. VILLAGOMEZ:** Same objections.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you recall sending confidential documents to Ms. Dickson's team?

**MS. VILLAGOMEZ:** Objection, argumentative, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you recall sending any documents to Ms. Dickson relating to this lawsuit?

**MS. VILLAGOMEZ:** Same objections, lacks foundation.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You're not a party to this lawsuit, correct?

A Correct.

Q Did you receive confidential documents to your unsecured or personal email that relates to this case?

**MS. VILLAGOMEZ:** Objection, argumentative, relevance, vague, legal opinion.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q Do you recall calling my office regarding Ms. Dickson in this case?

**MS. VILLAGOMEZ:** Objection, vague, argumentative, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you email yourself confidential documents while employed with Mr. Byrne.

**MS. VILLAGOMEZ:** Objection, vague, argumentative, relevance, legal opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Is it fair to say that you have a personal interest in the outcome of this lawsuit?

**MS. VILLAGOMEZ:** Objection, argumentative.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I don't think that's a fair statement.

Q You did testify earlier that you have retained counsel in connection with your own employment with Ameris, correct?

A With my file, correct.

Q And you have the same counsel as Mr. Byrne's counsel, correct?

A Correct.

Q You have retained counsel because you're preparing for

your own lawsuit against Ameris, correct?

**MS. VILLAGOMEZ:** Objection, argumentative, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Was Mr. Byrne a good boss to you?

A Yes.

Q And you were loyal to Mr. Byrne, correct?

A Yes.

Q And you are still loyal to him, correct?

A Yes.

Q And you've known Mr. Byrne well after working with him for decades, correct?

A I'd like to think so.

Q Are you surprised that Mr. Byrne filed this lawsuit?

**MS. VILLAGOMEZ:** Objection, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You knew that Mr. Byrne has filed a dozen of personal lawsuits against others, correct?

**MS. VILLAGOMEZ:** Objection, relevance, argumentative.

**THE COURT:** Sustained.

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay, any redirect?

**MS. VILLAGOMEZ:** No further questions.

**THE COURT:** Okay, thank you very much.

**MS. VILLAGOMEZ:** Oh, excuse me, Your Honor, one moment.

**THE COURT:** Okay.

**(Pause)**

**MS. VILLAGOMEZ:** Your Honor, just one more question.

**THE COURT:** Okay, go ahead.

**MS. VILLAGOMEZ:** Thank you.

**REDIRECT EXAMINATION**

**BY MS. VILLAGOMEZ:**

Q Hi, Ms. Emert. Did your loyalty to Mr. Byrne affect your ability to testify truthfully under oath today?

A No, ma'am.

**MS. VILLAGOMEZ:** Thank you, no further questions.

**THE COURT:** Okay, thank you very much. Anything else from -- Ms. Yee, anything else?

**MS. YEE:** No, Your Honor. Thank you.

**THE COURT:** Okay, thank you. You can go ahead and step down. You're excused. Thank you.

**(Witness excused)**

**THE COURT:** Okay, I need plaintiff to call the next witness.

**MS. VILLAGOMEZ:** Thank you, Your Honor. Plaintiff calls Deborah Dickson.

**THE COURT:** Okay. Okay, Ms. Dickson, you're going to come around here. When you get to Ms. Jackson, you can

stop. She'll swear you in, and then you can have a seat on the witness stand next to me.

**DEBORAH DICKSON, WITNESS, SWORN**

**THE CLERK:** I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** My name is Deborah Dickson, D-I-C-K-S-O-N.

**THE COURT:** Thank you very much. Ms. Villagomez, you may proceed when you're ready.

**MS. VILLAGOMEZ:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, what do you do for a living?

A I'm a CPA, certified public accountant.

Q And have you summarized your professional experience and licenses in a curriculum vitae or resume?

A Yes.

**MS. VILLAGOMEZ:** And, Your Honor, request to show Exhibit 173 to Ms. Dickson in black out.

**THE COURT:** Go ahead.

Q Ms. Dickson, I'm showing you what's been marked as Plaintiff's Exhibit 173. Do you recognize this document as your curriculum vitae or your resume?

A Yes.

Q Is this a true and accurate copy of that document?

A Yes.
Q And does it accurately reflect your education, background, certifications and experience?
A Yes.
**MS. VILLAGOMEZ:** Your Honor, plaintiff moves Exhibit 173 into evidence and requests to publish.
**THE COURT:** Any objection?
**MS. YEE:** Objection, hearsay.
**THE COURT:** The objection is overruled, Exhibit 173 is admitted and you may publish.
**(Exhibit Number 173 received in evidence)**
**BY MS. VILLAGOMEZ:**
Q Ms. Dickson, could you briefly walk the jury through your professional experience?
A Sure. After I graduated from college I went into the banking and I was an internal auditor for Union Bank. I conducted audits on banks in San Francisco, Los Angeles, Orange and Newport Beach.
After that I saw the light and became a CPA. I had a job with Deloitte as an auditor so I audited large public companies as well as smaller companies. And then I got the dream job after that with PricewaterhouseCoopers where I was the -- where I managed the entrepreneurial services division of Newport Beach of PWC which basically meant all the privately held middle market companies.

We prepared the financial statements and the tax returns and did all the consulting for these companies. So subsequent to that time I left PricewaterhouseCoopers, PWC and I started Smith Dickson CPA which is where I have been for a long time.

Q And what's your current role at Smith Dickson?

A My role at Smith Dickson CPA is managing partner, which basically means I'm the president of the company, I'm the founder and the president.

Q And what kind of matters do you typically work on there?

A So at Smith Dickson CPA the matters I work on are really the same type of matters that the firm as a whole handles. And so half of what we do is forensic accounting or expert witness work like we're doing here today and then the other half is exactly what I did at PWC, PricewaterhouseCoopers which is handle middle market companies and their CEOs. We do their financial statements, their taxes, lots of tax planning and help the companies grow their businesses.

Q And as part of your work, have you ever been involved in mergers and acquisitions or M&A deals?

A Yes, many times.

Q And can you describe that for us please?

A Sure. So M&A, merger and acquisition deals will be similar to what we're talking about in this trial. And so over the years a number of our clients have built their businesses to a size where private equity or public companies are

interested in buying them.

And so my partners and I will work along with the attorneys to help negotiate the deals, make sure that different metrics that they have to meet are embedded into the purchase and sale documents.

And afterward, almost every document has a component that where we have to true up what's called the working capital and later on we have to assist the selling client with whether they made certain bonuses in their earn out calculations. And earn out are basically like the LTIP agreement we're talking about here.

Q Thank you, Ms. Dickson. Have you testified as an expert witness before?
A Yes.
Q Approximately how many times?
A I would say at least 150 times.
Q Were you retained to provide accounting and financial opinions in this case?
A Yes.
Q And who retained you?
A I was initially retained by an attorney named Ms. Esperanza Cervantes Anderson.
Q And --
A Subsequent to that time I was retained by a law firm named Allen Matkins.

Q And at a high level, what were you asked to do in this case?
A At a high level I was asked to read and review the documents that were provided to me, make calculations in relation to the LTIP agreement that we've been hearing about and review and comment on Ms. Sebold's report.
Q And based on your education, training and expertise do you have expertise in forensic accounting?
A Oh, yes.
Q And did you apply that expertise in performing your work in this case?
A Yes.
**MS. VILLAGOMEZ:** Your Honor, plaintiff offers Ms. Dickson as an expert in forensic accounting.
**THE COURT:** Any objection?
**MS. YEE:** No objection.
**THE COURT:** Okay. Ms. Dickson is qualified as an expert witness in forensic accounting.
**MS. VILLAGOMEZ:** Thank you, Your Honor.
**BY MS. VILLAGOMEZ:**
Q After you were retained in this matter, what did you do to begin your analysis?
A Well, I read the documents, reviewed them, and I started making calculations based on the plain English that I read in the LTIP agreement.

Q Did you prepare expert reports in this case?
A Yes.
Q And when did you do that?
A I prepared a first report that was dated January 2nd, 2026 and then I prepared a supplemental report dated May 1st of 2026.
Q Did you prepare a schedule identifying the documents and information you considered in forming your opinions?
A Yes.

**MS. VILLAGOMEZ:** Ms. Perez, please show Exhibit 174 to the witness in black out.

Q And, Ms. Dickson, did you prepare this schedule?
A Yes.
Q And does it accurately summarize the documents and information you considered in forming your opinions?
A Yes.

**MS. VILLAGOMEZ:** Your Honor, plaintiff moves to admit Exhibit 174 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Yes, objection hearsay.

**THE COURT:** Objection is overruled, Exhibit 174 is admitted and you may publish.

**(Exhibit Number 174 received in evidence)**

**MS. VILLAGOMEZ:** Thank you, Your Honor.

Ms. Perez, can you please show Ms. Dickson the

demonstrative of Exhibit 174?

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, can you briefly walk us through the key materials you considered in forming your opinions?

A Sure. So the materials that I reviewed were, of course, the legal pleadings, they were the LTIP agreement and the LTIP award agreement that is attached to the LTIP agreement, something called the Pioneer model. I looked at LTIP workbooks, various depositions, historical audited financial statements of Balboa Capital prior to the acquisition and some -- let's see what else did I look at, let me look here. Byrne employment agreement, an employment agreement for Mr. Byrne, a stock purchase agreement between the parties and other items.

Q Thank you. And after reviewing those materials, did you prepare your opinions to a reasonable degree of financial certainty?

A Yes.

Q And are the opinions you'll offer your own independent opinions?

A Oh, yes.

Q Are you familiar with the LTIP?

A Yes.

Q Did you review it?

A Yes.

Q And can you explain for the jury how the LTIP worked generally?

A Sure. So as I was talking about when companies do merger and acquisition deals, frequently there's an agreed upon purchase price and for a period of time after usually one, three or five years, there are metrics that are agreed upon where the selling individuals have an opportunity to earn bonus awards, it's typically called an earn out. Here it's called an LTIP agreement.

And so essentially this agreement lays out formulas that are used to determine whether Mr. Byrne and other individuals earned those earn out bonuses over the next three years.

Q And what financial metric primarily drove the LTIP calculations?

A The main metric was something called EBT or earnings before taxes, which is similar to the net income or net profit of a company.

Q And can you explain in more detail to the jury what EBT means?

A Sure. All right. I prepared a little schedule here to be helpful. So many people may be familiar with what's called an income statement or a profit and loss statement or a P&L, which is a financial statement.

And essentially what that does is it tells someone how is the company doing for a certain period of time like a year, the

revenues minus the expenses intercompany equal the net income.

So if you look at my schedule here you'll see the items blocked out, you'll see revenues, I have an example minus a few items in red here, where we arrive at a gross profit. And then we deduct some more items in red and we arrive at a net profit which is the earnings before taxes. Then companies have to pay taxes on their earnings and so at the very bottom we have net profit after taxes.

May I continue?

Q Until you're done.

A All right. So we were talking about EBT. So in the LTIP agreement the EBT is the ultimate calculation, but it has a number of tweaks or adjustments to it. So you see that I have some red lines in here, those represent the various adjustments that we're going to be talking about today.

Q And, Ms. Dickson, are you aware of the Pioneer operating model?

A Yes.

Q And how did that factor into your analysis?

A The LTIP agreement has a number of requirements that these metrics must meet and one of the multiple requirements says that it should be based on what's included in the Pioneer model. So the Pioneer model is attached to the back of the LTIP award agreement. And what that does is it includes four years of actual historical financial statements for Balboa

Capital, so you can look back and see what actually happened. And then it includes five years going forward of projected numbers.

Q Thank you, Ms. Dickson. Let's look at the part of the LTIP agreement that talks about key assumptions. Did you review this section projected here as part of your analysis?

A Yes.

Q And can you walk the jury through at a high level of the key assumptions that are reflected here?

A Sure. Okay. This is really important and as you recall, I mentioned that there are a number of components in the LTIP agreement where the EBT or the net earnings before taxes have to be adjusted. These key assumptions are the primary components of that.

So I'll walk through them just very briefly. There's six of them. So the first one is A, so that's initial direct cost will be calculated using GAAP methodology.

So if you look on my schedule here you'll see that I've highlighted GAAP methodology in blue and we're going to talk about that in a minute, but that is really, really important to note that this is the only place in the entire agreement where it says GAAP methodology must be used.

Then the second item, so items B and D really relate to the same thing. And what that is saying is that there's going to be some interest expense included in this Balboa Capital

Division. And that interest expense is going to be limited to just 1 percent of charges from the parent company.

So essentially the parent company after the merger is going to be Ameris and they charge a percentage to Balboa Capital for interest. And so that is to be limited to 1 percent. So that's what items B and D tell us.

Then items C and E tell us another important factor which is there will be no allocation of indirect company expenses to Balboa. So what that means is parent company Ameris has a lot of indirect expenses we'll be talking about later, they don't allocate those to Balboa. They only allocate what's in item E, which says Balboa will bear all direct costs.

So parent company and then we have Balboa Capital. Parent company allocates direct cost, direct costs attributed to Balboa Capital but indirect costs from the parent company do not.

And then the last item on here is item F and that is a little more complex than the other concepts and this will be very important. So the last one is where I have to make a calculation and it's in reading the plain English language of this agreement I have to compare the actual net charge offs and what does that mean.

You heard Mr. Silva talk a lot about the way we use here is charge offs, I think he used another word talking about 40 million of charges. So charge offs basically mean bad debts.

And it basically means, you know, every company sells products and they have to collect on their sales. They collect the sales price but some customers don't pay their bills.

And so this company, this company makes loans, but sometimes the customers don't pay back those loans and so they're charged off. And so what it is, is I have to look at how many -- what were the bad loans, what were the charge offs in a particular year.

And I compare that to another calculation which is called 1.25 percent of net investment in direct financing leases. So essentially that means, remember this company its assets are leases that they make leases to customers. And so let's say the leases are a million dollars in any one period of time. We multiply the total of those assets, that million dollars times 1.25 percent.

And then we compare the charge off number to the 1.25 percent times all the leases the company has made. So that's how that calculation works.

Q Thank you, Ms. Dickson. You mentioned GAAP methodology earlier, can you explain to the jury very generally what GAAP is?

A Sure. You probably -- all of us are probably very aware that -- about the IRS and the IRS has all sorts of tax rules we have to follow when we file our tax returns. Well as CPAs we deal with taxes and we deal with financial statements for

companies. The financial statements are going to be, you know, the revenues minus the expenses to get to the net profit.

So like IRS rules, when we prepare formal financial statements for companies we follow another set of rules called generally accepted accounting principles, so those are GAAP, G-A-A-P. And so what I put together on this chart, said what is GAAP. So if we look at it's a standardized set of accounting rules used for consistency and transparency in financial statements. And when is it required? It's required when we prepare formal financial statements.

Q And thank you, Ms. Dickson. Are you familiar with the term ASC and how it relates to GAAP?

A Yes.

Q And can you -- what are ASC 842 and ASC 606 as shown on this slide generally speaking?

A It's probably more than anyone ever wanted to know about CPA work. So ASC -- these are a piece of our GAAP standards. And so ASC means accounting standards codification, meaning codes, these are our codes. And there are certain standards that are particularly important in this case and important to the particular business that we're discussing.

So the first one is 842, that has to do with leases because this company essentially provides leases and loans for customers. So -- and then -- so that's the top one 842. And then the bottom one she asked about was 606 and that's revenue

recognition and that just means under GAAP when do we post revenue in a particular year.

What's really interesting that I want to point out, if you see, let's jump up to the top line for a minute here. If you see ASC 842 leases, you see that for public companies the many rules under these GAAP guidelines had to be implemented for in public companies in the year 2019. But for private companies such as Balboa Capital, it was privately held by an individual and not by public stockholders. He did not have to comply with these GAAP rules until 2022 and that date was after the date he sold his company.

So he actually for this -- these rules and some others, he actually used different GAAP type standards than public companies at the time he sold his company.

Q And when you say he, you're referring to Mr. Byrne?

A Yes, he and of course, Balboa Capital, yes.

Q In your experience, is there a difference between audited GAAP financial statements and internal incentive compensation calculations?

A Yes, of course. Audited financial statements are always required to use the fancy GAAP codes that we looked at here. And when you look at internal incentive plans, earn outs, LTIP calculations, anything like that, they are not required to be on GAAP unless there's a specific agreement in a document that says it must be calculated on GAAP.

So, for instance, you think about any company that has sales targets or the lawyers and the CPAs we have to meet certain billable hours, those are all agreements that are set internally that might discuss whether compensation goals are met and whether someone earns a bonus, but they're not required to be under GAAP. GAAP only covers fancy financial statements.

Q Thank you, Ms. Dickson. And why was that distinction important in your analysis of the LTIP in this case?

A Well, it was actually really important, because remember the assumptions that I looked at, the six of those, only the first one said that particular calculation must be made on GAAP. The rest of them I believe the calculations are made on the plain English reading of the agreement itself.

Q And as part of your analysis, did you also review the language in the LTIP stating that calculations would quote materially follow past practice?

A Yes.

Q And what did you understand that language to mean from an accounting perspective?

A I'd like to read the sentence out of the LTIP agreement. It says here, the general premise of the LTIP is to materially follow past practice, which this calculation is maintaining.

So what that tells me is remember when we looked at those ASC standards, we saw that sometimes they apply to public companies, sometimes they apply to private companies. So when

I am making calculations on the LTIP I look at what standards was Balboa Capital using up through the date it was acquired. And I used those same standards to make my LTIP calculations. I don't convert those standards into new GAAP which Balboa Capital wasn't required to use.

Q Thank you.

**MS. VILLAGOMEZ:** And let's look at key assumption F, which is at issue in this case. Thank you.

Q Can you explain what key assumption F is in your opinion and describe what you are showing here in this slide?

**MS. YEE:** Calls for a legal conclusion.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Sure. You will remember that we looked at the six key assumptions, this was the bottom one and this is a complicated one. And so again, if you look at the top part, this is the exact language out of the LTIP agreement. This is how I made my calculation.

So I'm going to read it again, the allowance for loan loss calculations and expenses for Balboa will be the greater of the actual net charge offs, so those are the bad debts that happened in the year, the customers who defaulted, or 1.25 percent of net investment in direct payments and leases.

So I find out what the total leases are on the balance sheet, I multiply it times 1.25 percent. Simple.

//

**BY MS. VILLAGOMEZ:**

Q Thank you. And can you describe the calculations that Ameris used?

A Yes. Ameris used the calculations that I have in red at the bottom. And what Ameris did is they computed the actual net charge offs as I did, and actually I used their numbers, because I didn't have access to all the calculations behind.

And then for some reason, they did not use what I read in the LTIP agreement, they did not use the second part of that item F. They did something different and I've been unable to identify why they did this. I can't find any documents anywhere.

But it's -- they took rather than all the loans, they're called direct financing leases that are posted as assets on the books of Balboa Capital, they took the difference between one year end and another year end and they looked at that as loan growth. So they took the growth, not the actual loan amount. And they added to that the actual net charge offs.

And it says, to maintain 1.25 on portfolio and I don't know where that came from, but that's what they did. So they made a calculation that's different than what I see in the LTIP agreement.

Q And did you ultimately perform your own calculations relating to this category?

A Yes, I did.

**MS. VILLAGOMEZ:** Ms. Perez, please show Exhibit 183 in black out.

**THE COURT:** Go ahead.

**BY MS. VILLAGOMEZ:**

Q And did you prepare this schedule as part of your analysis in this case, Ms. Dickson?

A Yes.

Q And does this schedule reflect the analysis you performed relating to the provision from loan losses category?

A Yes.

**MS. VILLAGOMEZ:** Your Honor, plaintiff moves Exhibit 183 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Yes, objection, irrelevant, 403, hearsay.

**THE COURT:** The --

**MS. YEE:** Outside the scope.

**THE COURT:** The objection is overruled. Exhibit 183 is admitted and you may publish.

**(Exhibit Number 183 received in evidence)**

**MS. VILLAGOMEZ:** Thank you, Your Honor.

**BY MS. VILLAGOMEZ:**

Q And, Ms. Dickson, if you can briefly discuss your calculations 1 and 2.

**MS. VILLAGOMEZ:** Oh, excuse me, Ms. Perez, let's move to the demonstrative.

Q And if you can please, Ms. Dickson, describe these calculations at a high level.
A Sure. So this is again the key assumption F that we've been talking about. So I had to compare the top part of the calculation are the actual net charge offs or the loans that went bad during that year. So you can see that in 2022, I'm going to round some numbers for ease here, there were about $8.2 million worth of charge offs. In 2023 there were about 39 million and that's the number that Mr. Silva was referring to, the almost 40 million there. And in 2024, there were 32 million.

So I compared those numbers now to my other calculation which is where I determined what was -- what were the net investments in direct financing leases. So let's '22 as an example. So we see literally $1,700,751,282 of assets or leases that Balboa Capital has financed. I make a small adjustment to that for a number that's embedded in that for deferred loan fees that has nothing to do with loan principal.

Then I multiply that number by 1.25 percent. I arrive at $12 million right here. Then as key assumption F asks me to do I compare the 2 numbers. The $12 million number is higher than the $8 million number, so I use the $12 million number in my calculation.

If we move to 2023 and '24 I used the same methodology, but you'll see that now in 2023 the actual charge offs were

higher than my other calculations, so I use the actual charge offs in '23 and again for 2024.

Q Thank you. And can you explain how Ameris' calculations differ as shown in the next slide?

A Sure. You can see, let's go back to 2022, we just looked at my numbers and we saw that I had to compare an $8 million number to a $12 million number. But Ameris using that calculation that I explained to you, they arrive at a much higher number of 13,500,000.

And then if we look in 2023 my choice of my two calculations was almost $40 million. You can see their calculation is almost $43 million, 42,950,000 and for 2024 my numbers would be the highest, would be 32 million versus Ameris' 42 million using their LTIP calculation.

Q And for Ameris' calculations, what impact would these numbers have on the EBT?

A What would happen is let's say the EBT is the net income I've calculated it's after revenues minus expenses it's right here. And in the LTIP calculation you have to compare the ultimate EBT number to a threshold number.

So if the EBT number goes lower because of Ameris' calculations, then the LTIP award either decreases or it may not meet the threshold at all. So these numbers are very important to determine for each year whether the LTIP agreement award has been earned.

Q Thank you. And did you analyze indirect costs?
A I did.
Q And can you explain for the jury what those are in plain English and how it relates to the LTIP?
A Sure. May I ask I need to go back to my EBT schedule for a moment. All right. Remember this schedule? Now, in calculation -- calculating an income statement we have costs, we have revenues and we have different kind of costs or expenses that we take away from revenues.
And so if you look at the top you see revenues minus a number of red items and those are going to be the direct costs. And so direct costs are costs that change, depending on the volume of business that happens.
So for instance, those might include -- right now they might include in this company legal fees or commissions that have to be paid on specifically obtaining deals. Whereas indirect costs are those kinds of costs that are more fixed, they're more level, such as accounting department, IT, HR, those costs don't change with every change in volume in a company.
And maybe an example to use would be say you own a pizza chain and you have 100 stores. So the direct costs are going to be, you go to a store and there are materials and direct labor. So materials will be what's the pizza made out of, you know, we've got cheese, we have dough, sauce and so forth.

That's direct material.

And then we have direct labor, we have the people making the pizza. So usually you go to -- you'd say revenues minus the direct costs equals gross profit and then you subtract the indirect costs, if we have the pizza group of a hundred stores, they usually have a corporate headquarters that's off site somewhere so the corporate headquarters then, that's where accounting lives and the IT people and the marketing people.

So those people are generally are on more of a fixed salary, fixed costs and those are typically considered indirect costs.

**MS. VILLAGOMEZ:** Thank you. And, Your Honor, I was about to start moving into a full calculation but I see that we're coming close to lunch.

**THE COURT:** Okay. So it is 11:57, it's time for lunch. Ms. Dickson, you can go ahead and step down, I need you back here at 1 o'clock. And to our jurors, please don't discuss this case amongst yourselves or with anyone else, don't do any research about any aspect of this case and we'll see you back here at 1 o'clock.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE COURT:** Okay. Thank you. Enjoy your lunch.

**THE CLERK:** Court is in recess.

//

**(Recessed at 11:58 a.m.; reconvened at 1:02 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** This Court resumes in service.

**THE COURT:** Thank you, Ms. Jackson.

Everyone can be seated.

Okay. I understand that counsel have something to discuss with the Court before we bring the jurors back.

**MR. WOOD:** Yes, Your Honor. Just -- this is Andrew Wood, just very briefly.

This has to do with how Your Honor would like to handle the motion for leave to amend. We had intended to bring it at the end of Ms. Dickson's testimony.

I think we had hoped that we would be in a position to be done with Ms. Dickson's testimony by the lunch hour, we could handle it then. But we do want to be respectful of the jury's time, so we wanted to see what your preference is.

Do we bring the motion when she's done? Do you prefer to wait until the end of the day? How do you want to handle that?

**THE COURT:** I think what would be best is if we could -- given where we are with this examination, I don't think -- I think that we've got a bit of time let with Ms. Dickson on both -- on direct and cross examination; is that right?

**MS. YEE:** Yes, Your Honor.

**THE COURT:** So my suggestion would be that every -- all the lawyers get here tomorrow at, I don't know, 8:15, 8:30, and we handle that motion in the morning.

But I don't know how -- I don't want to put a wrench into your case presentation. If you would prefer to do it immediately after Ms. Dickson's testimony is completed, we can do that. And depending on how late it is, I may just send the jury home for the day while we work on that.

**MS. VILLAGOMEZ:** Your Honor, I only have about 15 more minutes with Ms. Dickson.

**THE COURT:** Okay. So what is the Plaintiff's preference. Would you -- I mean, from a logistical point of view, from the Court's point of view, it's probably easier to do this either before or after the regular time that the jury is going to be here so that they don't even perceive that motions are being made.

But given the fact that we're going to have a few hours before we're ready to stop today, and I'm assuming so the Plaintiff -- so after Ms. Dickson, you have Mr. Kennedy; is that right?

**MR. WOOD:** Dr. Anthony Reading. And then --

**THE COURT:** Reading, sorry.

**MR. WOOD:** -- that is our last witness.

**THE COURT:** And he's pretty folksy so -- I've seen him testify before. How long do you think you have with him?

**MR. WOOD:** We had planned for about a half hour.

**THE COURT:** Okay. So we -- you could get him -- well, from the Defendant's perspective, how much time do you think you have for cross examination of that witness, Dr. Reading?

**MS. YEE:** Dr. Reading, probably ten to 15 minutes.

**THE COURT:** All right. So that will take us probably pretty close to 4:00 o'clock. And we could let the jury go -- and that's going to be -- and Dr. Kennedy's your last witness.

**MR. WOOD:** Yes.

**THE COURT:** Okay. So we could handle all of the motions. We could handle the Plaintiff's motion to amend according to proof, as well as the -- I'm assuming the defense is going to make a motion for judgment as a matter of law.

**MS. FODE:** We're going to make our motion at the end of the case.

**THE COURT:** At the very end of the case or at the end of Plaintiff's case, or both?

**MS. FODE:** We're going to make the motion at the end of the entire case, a 50(a) --

**THE COURT:** Okay.

**MS. FODE:** -- motion.

**THE COURT:** All right. So what I would propose to do is that we finish with Ms. Dickson, we have Dr. Reading.

And then when we're done with those two witnesses, we

go ahead and excuse the jury for the day and all of us stay here to adjudicate the motion for leave to amend. Is that acceptable to Plaintiff?

**MR. SESSIONS:** That is, Your Honor. I am curious at this point how many witnesses are left in Defendant's case in chief just to the extent Defendants were intending to call any today. I'm just wondering how many are left.

**MS. FODE:** Yes. And we -- I would like to be heard on the timing because we have both of our --

**THE COURT:** Okay.

**MS. FODE:** -- experts. We have Ms. Sebold and Dr. Lechuga here. They're --

**THE COURT:** Okay.

**MS. FODE:** -- ready to testify today. So -- and then those will be our only two witnesses to close out the case.

**THE COURT:** Okay. So Mr. McKendry's not testifying?

**MS. FODE:** No.

**THE COURT:** And let me see, the other witnesses that were on the list we have --

**MS. FODE:** It was also David --

**THE COURT:** David --

**MS. FODE:** -- Sparacio.

**THE COURT:** -- Sparacio. We had Heather Parker, we had Palmer Parker -- Proctor, we had Robert Rasmussen, Jackie Emert.

Okay. All right. So we'll go ahead and go forward with those two witnesses and just because it sounds like you're -- they're here and they're ready to testify.

And then we can handle -- how about if we handle the motion to -- for leave to amend at 8:30 tomorrow morning?

**MR. WOOD:** That's fine, Your Honor.

**THE COURT:** Okay.

**MS. FODE:** That works for us. Thank you.

**THE COURT:** Okay. I'm just --

**MR. WOOD:** We're --

**THE COURT:** -- trying to juggle everyone's schedule and also mindful of the jury's time, especially in --

**MR. WOOD:** Sure.

**THE COURT:** -- light of the fact that I inconvenienced them yesterday by sending home early because I was speaking on an ABA panel. So --

**MR. WOOD:** Sure. We're fully prepared to argue whenever Your Honor is.

**THE COURT:** Okay. All right. Ms. Jackson.

**(Pause)**

**THE CLERK:** All rise.

**(Jurors enter courtroom at 1:08 p.m.)**

Please be seated.

**THE COURT:** Okay. Welcome back, everyone. We are going to resume the testimony from Ms. Dickson.

Ms. Dickson, you can come back to the witness stand.

**(Witness Deborah Dickson retakes the stand.)**

And you're still under oath, okay?

**THE WITNESS:** Yes.

**THE COURT:** Thank you very much.

Okay. Ms. Villagomez, you may proceed when you're ready.

**MS. VILLAGOMEZ:** Thank you, Your Honor.

**DIRECT EXAMINATION (Continued)**

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, did you calculate the total incentive pool cash bonus award for 2022?

A Yes.

**MS. VILLAGOMEZ:** Ms. Perez can you please show Exhibit 178 in blackout to the witness? Thank you.

Q Ms. Dickson, is this the calculation and schedule you prepared for the cash bonus award for 2022?

A Yes.

Q And did you prepare this schedule as part of your analysis in this case?

A Yes.

Q Does this schedule accurately reflect the analysis you performed relating to the incentive pool cash bonus award for 2022?

A Yes.

**MS. VILLAGOMEZ:** Your Honor, Plaintiff moves Exhibit 178 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Irrelevant, 403, outside of the scope.

**THE COURT:** Exhibit -- the objections are overruled. Exhibit 178 is admitted. Is that the right number?

**MS. VILLAGOMEZ:** One seventy-eight, yes.

**THE COURT:** Okay, 178 is admitted, and you may publish.

**(Exhibit Number 178 received in evidence)**

**MS. VILLAGOMEZ:** Thank you, Your Honor.

And, Ms. Perez, actually I'll have you show Ms. Dickson the demonstrative of page -- of Exhibit 178.

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, can you please briefly discuss your adjustments to EBT relating to overhead department compensation?

A Sure. And you -- if you look in the second section of my calculations here, you see adjustments to EBT. And the first one I want to talk about is overhead.

You may recall with the key assumptions we talked about direct and indirect costs.

And remember my pizza example. Direct costs are the ones where it's the materials used in making in the pizza, the cheese, all that kind of stuff, and then the direct labor. So

those are direct expenses. They change with the volume.

Whereas indirect are the ones at the pizza corporate headquarters.

**THE WITNESS:** May I ask you to go to the next schedule, please?

**MS. VILLAGOMEZ:** Yes, Ms. Perez, go ahead.

A So while she's doing that, essentially what happened with the purchase of Balboa Capital is Balboa Capital operations stayed here in California. But corporate headquarters now became not California but they became Georgia.

So if you look at this schedule right here, these are various departments that were all included in California including, you know, on the righthand side sales, recruiting, legal, portfolio, operations-type departments, as well as the others on the left side, which are marketing, accounting, HR, IT.

Once the purchase happened, both departments on the left side, in particular IT, accounting, meaning the financial statements, and marketing all moved under the jurisdiction of Georgia, Ameris Bank in Georgia.

And so you've heard a lot of testimony about Mr. Byrne not having control and management over the accounting functions, in particular marketing.

I understand there's frustration about he was used to making press releases and things straight out of California.

He had to go to Ameris marketing department in Georgia and have them do his marketing and press releases for him.

IT, an example there would be before they had a computer problem, they could just run down the hall, get the computer guy to fix stuff for them.

And while they had one or two of the easy fix-it people on staff in California, all the big issues, the new software that had to be dealt with with Ameris Bank, the onboarding software, all of that all went through Ameris Bank in Georgia.

And sometimes it would take them rather than a few minutes to get an IT fix, it would take them up to three days. And --

Q And --

A -- so what I did is I adjusted out the marketing, the IT, and the accounting departments, quantified those as indirect costs under the new purchase model and adjusted those from the EBT calculation.

**MS. VILLAGOMEZ:** Thank you. And if we could go back to the demonstrative for Exhibit 178.

Q Ms. Dickson, did you also analyze interest paid on other borrowings?

A Yes.

Q in simple terms can you explain what that means and how it impacted your analysis?

A Sure. You can see the two yellow highlighted areas, the one on the top were the adjustments to the overhead departments

that moved to Georgia. And then the bottom one says interest paid on other borrowings.

Remember, in the key assumptions, items "B" and "D" related to just one percent of interest charged into Balboa Capital Division. So these were the excess amounts on top of the one percent of interest charged. So I used those as an adjustment as well.

**MS. VILLAGOMEZ:** Thank you, Ms. Dickson.

Q And now that we've discussed the EBT for 2022, can you please walk the jury through the remainder of this exhibit and your calculations?

A Sure. So the way this entire calculation works is you see the adjusted EBT at the top, the part is -- that is not highlighted, and that's where I made that calculation under key assumption "F."

Then I subtracted from it adjustments for the indirect costs and adjustments for the interest in connection with those key assumptions in the LTIP agreement.

I arrived at -- I need to move this so I can see it. I arrived at an adjusted EBT amount here of $67 million. I'm going to abbreviate.

The LTIP agreement provides for a threshold of $37 million. And so then I subtract the $37 million from the $67 million, and I can see that there's an adjusted EBT above the threshold amount of just over $30 million.

I multiply that by 35 percent, which is called for in the LTIP agreement, and I determine what the total LTIP cash incentive pool award is, which is $10,500,000.

From that I subtract what has already been paid -- thank you, now I can read it. From that I subtract what's been paid already, which is $9,098,000, and arrive at a total underpaid incentive cash pool bonus award of $1,424,000.

There's also an agreement that that amount should be multiplied by 62.54 percent, which I have done, therefore arriving at Mr. Byrne's portion of the underpaid cash incentive pool award of $890,858.

Q And that amount was for what year was this for?
A That was for 2022.

**MS. VILLAGOMEZ:** Thank you, Ms. Dickson.

Q And let's now turn to the next year, 2023. Did you prepare a schedule calculating the total incentive pool cash bonus award for 2023?
A Yes.

**MS. VILLAGOMEZ:** Can you please show Exhibit 179 to the witness in blackout?

Q And, Ms. Dickson, is this the schedule that you prepared for the incentive pool cash bonus award for 2023?
A Yes.
Q Does this exhibit reflect the analysis you performed relating to this award?

A Yes.

**MS. VILLAGOMEZ:** Your Honor, Plaintiff moves Exhibit 179 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Objection, hearsay, irrelevant, 403, outside of the scope.

**THE COURT:** The objections are overruled. Exhibit 179 is admitted, and you may publish.

**(Exhibit Number 179 received in evidence)**

**MS. VILLAGOMEZ:** Thank you, Your Honor.

And if we could show Ms. Dickson the demonstrative of Exhibit 179.

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, under the heading adjustment to EBT, there's a new category here that says stipulated judgments. Can you please explain in simple terms what that is for the jury?

A Sure. As we talked about, sometimes customers default on their loans, they don't pay those. And so Ameris or Balboa Capital Division contacts the customers. They come to an agreement on what they can pay.

Let's say they can't pay the whole $40,000 that's owed to Balboa but they can pay $20,000. So they take that agreement to the court. The court issues an order called a stipulated judgment. And that comes back. And then the EBT then should be adjusted by the amount of the stipulated judgments.

**MS. VILLAGOMEZ:** Thank you.

Q and did you review communications concerning stipulated judgments as part of your analysis?

A Yes.

**(Pause)**

Q And, Ms. Dickson, did you review this email from Mr. LaHaise to Mr. Byrne dated February 5th, 2024?

A Yes.

Q And how did this impact your analysis?

A This one says we -- so the meaning Ameris. We agree with your request to adjust the LTIP EBT by $554,191. And it is reflected in the final 2023 LTIP calculation.

So, therefore, the amount that I'm using was agreed upon by both Ameris and Balboa Capital.

**MS. VILLAGOMEZ:** Thank you. And if we could go back to the demonstrative for Exhibit 179.

Q Ms. Dickson, one of the other adjustments to EBT was the inconsistent accounting of interim rent. Can you describe your calculations here very briefly?

A Sure. Interim rent is when a company enters in a lease say on the 15th of a month, but then the lease doesn't start until the 1st of the next month. Just like when you move into an apartment and you have 15 or 16 days of rent before the month starts.

And so the past practice that Balboa Capital was doing for

interim rent was they were recording that short period of time as revenue.

Suddenly, in the middle of 2023, I review correspondence that showed that Ameris said, oh, you're not following GAAP, meaning their new GAAP, not the GAAP that Balboa Capital was required to follow on historical past practices.

And so Ameris changed all the numbers and essentially took away $1,974,000 worth of income. And so I have adjusted that to account for the interim rent correctly based on past practices and based on the GAAP that was applicable to Balboa Capital prior to acquisition.

Q And I see next here you have an adjustment for inconsistent accounting of repossessions. Can you explain briefly what your calculations were for this category?

A Sure. That's kind of a similar concept where repossessions, as we probably all know, are like repos, like repo on a car or something when someone doesn't pay a bill.

And so Ameris also was accounting for repossessions based on the new GAAP that they were required to use as a public company. They weren't using the past practice and historical methodology that Balboa Capital used.

And so I quantified that and also adjusted the EBT for that to make it in line with the LTIP requirements.

**MS. VILLAGOMEZ:** Thank you, Ms. Dickson.

Q And we saw your methodology for 2022. But taking us

through the end of this schedule, can you let us know what your ultimate calculations were in connection with the 2023 cash bonus award?

A Sure. So if you look at the two orange lines at the bottom, you'll see that the total underpaid incentive pool cash bonus award was -- let me see if I can see it -- $3,747,791.

And when I multiply that by the 62.54 percent, we arrive at Patrick Byrne's portion of underpaid incentive plan of $2,343,868.

**MS. VILLAGOMEZ:** Thank you.

Q And, Ms. Dickson, did you also perform an analysis relating to the 2024 LTIP?

A Yes.

Q And did you prepare a schedule regarding your 2024 analysis?

A Yes.

**MS. YEE:** Objection, irrelevant, outside of the scope.

**THE COURT:** The objection is overruled. You can answer the question.

**THE WITNESS:** Oh, I'm sorry, what was the question again, please?

**BY MS. VILLAGOMEZ:**

Q Yes, did you prepare a schedule regarding your 2024 analysis?

A Yes.

**MS. VILLAGOMEZ:** Ms. Perez, if we could please show the witness Exhibit 180 in blackout.

Q And, Ms. Dickson, is this schedule your 2024 analysis relating to the incentive pool cash bonus award for 2024?

A Yes.

Q Does this exhibit accurately reflect the analysis you performed for this analysis?

A Yes.

**MS. VILLAGOMEZ:** And, Your Honor, Plaintiff moves Exhibit 180 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Yes. Objections irrelevant, 403, hearsay, and outside of the scope.

**THE COURT:** The objections are overruled. Exhibit 180 is admitted, and you may publish.

**(Exhibit Number 180 received in evidence)**

**MS. VILLAGOMEZ:** Thank you, Your Honor.

And, Ms. Perez, if we could show Ms. Dickson the demonstrative of Exhibit 180.

**BY MS. VILLAGOMEZ:**

Q And, Ms. Dickson, can you just very high level and briefly describe your ultimate calculation for 2024?

A Sure. I was not furnished all the data I requested for 2024 and so I used essentially the one-page document that was

provided to me by Ameris to start at the revenue at the top.

I made the calculations as we've talked about. And I made various adjustments, as we've been also talking about, related to stipulated judgments, overhead, indirect costs, and so forth.

Because no data was provided to me, even though the revenues were higher in 2024, I used the same expenses as 2023, that's right, because that was the only data available to me.

By doing so, I arrived at an adjusted EBT of around $79 million. I subtracted the threshold for that year of $57,200,000. I multiplied the result by 35 percent, as the LTIP agreement calls.

And then I calculated that result by 62.54 percent, arriving at $4,844,985, which would be Patrick Byrne's portion of underpaid incentive pool cash bonus award.

**MS. VILLAGOMEZ:** Thank you, Ms. Dickson.

Q And did you prepare a schedule summarizing the LTIP amounts that you concluded were owed to Mr. Byrne for 2022, 2023, and 2024?

A Yes.

**MS. VILLAGOMEZ:** Ms. Perez, please show the witness Exhibit 175 in blackout.

Q And, Ms. Dickson, is this the schedule that you prepared summarizing the amounts owed to Mr. Byrne?

A Yes.

Q And does this exhibit accurately reflect the analysis you performed relating to the total underpaid LTIP pool bonuses?

**MS. YEE:** Objection, hearsay, relevant, 403.

**THE COURT:** The objections are overruled. You can answer.

**BY MS. VILLAGOMEZ:**

A Yes.

**MS. VILLAGOMEZ:** Your Honor, Plaintiff moves Exhibit 175 into evidence and requests to publish.

**THE COURT:** Any objection?

**MS. YEE:** Same objections, Your Honor.

**THE COURT:** The objections are overruled. Exhibit 175 is admitted, and you may publish.

**(Exhibit Number 175 received in evidence)**

**MS. VILLAGOMEZ:** Thank you.

And, Ms. Perez, if you could please show the demonstrative of this exhibit. Thank you.

**BY MS. VILLAGOMEZ:**

Q Ms. Dickson, can you please walk the jury at a high level through this exhibit and read these numbers into the record, please?

A Sure. So if we're going to go across, if we look at the first line or row, that's going to be calendar year 2022. The initial LTIP bonus pool calculation underpaid is $1,424,462. Of that, Mr. Byrne's share is $890,858.

For the next year, calendar year 2023, middle row, the entire LTIP pool bonus underpaid calculation is $3,747,791. And Mr. Byrne's share of that is $2,343,868.

And, finally, the calendar year on row three for 2024, the entire LTIP pool amount is $7,747,017, with Mr. Byrne's share at $4,844,985.

When I total those together, the total underpaid LTIP bonus pool is $12,919,270. And Mr. Byrne's share is $8,079,711.

**MS. VILLAGOMEZ:** Thank you.

Q Did Ameris's LTIP calculations understate or overstate EBT for Mr. Byrne's total compensation?

A They understated it by the amount that I just discussed.

**MS. VILLAGOMEZ:** Thank you.

Q And, Ms. Dickson, just wrapping this up, did you review Ms. Nicole Stokes's trial testimony?

A Yes.

Q Did you identify any changes in Ameris's accounting positions?

A I did.

Q And what were those changes?

A What was most apparent to me was when I reviewed Nicole Stokes's deposition, and I watched Ms. Sebold's deposition, and reviewed Ms. Sebold's report, all of those claimed that all of the LTIP calculations must be made using GAAP formulas.

And then what was interesting is in reading the trial transcript from Ms. Stokes, now she says, no, the LTIP calculation doesn't have to be based on GAAP, which is really a huge difference because the calculations, whether you apply GAAP or do not apply GAAP, they're materially different.

Q And do you recall Ms. Stokes's testimony regarding Sarbanes-Oxley?

A I do.

Q And what was your reaction to her testimony?

A Okay. So Sarbanes-Oxley is SOX, S-O-X. And what that is basically is informal accounting -- the SEC, Securities and Exchange Commission, requires that CFOs and CEOs of public companies actually certify their formal financial statements both as company officers and as individuals.

And what was interesting is Ms. Stokes said that all of these changes -- remember when I showed you the group of departments meaning, you know, IT and marketing and accounting, they moved over under jurisdiction of Georgia and Ameris, well, she said that had to be done specifically because of SOX and what's called segregation of duties so they can all kind of look at each other and make sure everybody's being truthful.

And so I believe that if those departments had been kept with Balboa Capital, you could still provide segregation of duties and internal controls the same.

So I thought that was interesting that she said they all

had to be moved over, only because of that reason is the way I read it.

**MS. VILLAGOMEZ:** Thank you, Ms. Dickson.

Q And did anything in Ms. Stokes's testimony cause you to change your analysis?

A No.

**MS. YEE:** Overbroad and vague.

**THE COURT:** I didn't understand you. I couldn't hear you.

**MS. YEE:** Overbroad and vague.

**THE COURT:** The objections are overruled.

**BY MS. VILLAGOMEZ:**

Q And final question, did anything in Ms. Stokes's testimony cause you to change your opinions in this case?

A No.

**MS. VILLAGOMEZ:** Thank you.

**THE COURT:** Okay. Ms. Yee, cross examination.

**MS. YEE:** Thank you, Your Honor. Your Honor, may I please proceed with my cross?

**THE COURT:** I just asked you to.

**MS. YEE:** Thank you.

Good afternoon, Ms. Dickson.

**THE WITNESS:** Good afternoon.

//

//

**CROSS EXAMINATION**

**BY MS. YEE:**

Q We met before once when I took your deposition in January, correct?

A Yes, we met over Zoom.

Q And you were present in the courtroom yesterday and today.

A Yes.

Q Do you understand that an expert report is supposed to contain the opinions you tend to offer at trial, correct?

A Yes.

Q And it's also supposed to disclose the basis and reasons for those opinions, correct?

A That's my understanding, yes.

Q And it's supposed to be complete as of the date it's served, correct?

A I think, yes, complete, sure.

Q You issue two different report in this matter, correct?

A Yes.

Q You issued one report on January 2nd, 2026, correct?

A Yes.

Q And you issued a second report on May 1st, 2026, correct?

A Correct.

Q And, Ms. Dickson, would you like to go to your file or would you like me to show you on blackout your expert report?

**THE COURT:** You can -- this is your examination.

**MS. YEE:** If you could please look at your report on January 2nd, 2026. And I have some questions I want to ask.

**THE WITNESS:** Are you asking me to open my notebook and look at it?

**MS. YEE:** Yes, please.

**THE WITNESS:** Okay.

**THE COURT:** You're asking her questions about her report?

**MS. YEE:** Yes.

**THE COURT:** Okay. I need counsel to approach.

**(Begin sidebar at 1:35 p.m.)**

**THE COURT:** Expert reports are not admissible.

**MS. YEE:** Yes. But I --

**THE COURT:** You could ask her questions --

**MS. YEE:** I will ask her questions. But I wanted her to be able to refer to the report, so it might be easier for her.

**THE COURT:** But she doesn't -- you can't ask her questions about the report and use it to refresh to recollection if you haven't laid the foundation that she needs to have a report (inaudible) --

**MS. YEE:** Okay. Then I will just ask her opinions in her report.

**THE COURT:** Yeah. Just ask her --

**MS. YEE:** I'll just ask the question.

**THE COURT:** Just ask her her opinions and then she can say that.

**MS. YEE:** Okay. And if she wanted to refer to the report, I can use that to refresh her memory.

**THE COURT:** Well, it depends on how you do it. We'll see.

**MS. YEE:** Okay. And that's fine.

**THE COURT:** Okay.

**MS. YEE:** Thank you.

**MS. VILLAGOMEZ:** Thank you.

**THE COURT:** Thank you.

**(End sidebar at 1:36 p.m.)**

**THE COURT:** My apologies, Ms. Yee. You may continue.

**MS. YEE:** Thank you, Your Honor.

**BY MS. YEE:**

Q In your January 2nd, 2026 report, you gave a summary of what LTIP cash bonus are allegedly owed to Mr. Byrne for 2022 and 2023, correct?

A Correct.

Q And in that report, you stated that you computed that Plaintiff is due an additional approximately $1.486 million in underpaid cash bonus, correct?

A I'll have to look up the number there.

Q Would it be helpful to look at your report which it seems that you have a copy in front of you?

A I do have a copy. Just --

**THE COURT:** I'm going to ask counsel to approach again.

**(Begin sidebar at 1:37 p.m.)**

**THE COURT:** So you can ask her what her opinions are (inaudible) what's in the report is not relevant. It's hearsay. So what you have to do is ask her what her opinions are. Just ask.

**MS. YEE:** Okay, Your Honor.

**THE COURT:** It's not whether or not it's in the report (inaudible) --

**MS. YEE:** Okay. And if she doesn't remember then I can help her look at it.

**MS. VILLAGOMEZ:** I think that what you're trying to ask her is probably how her opinions changed from her supplemental report and her initial report.

**THE COURT:** Yeah.

**MS. VILLAGOMEZ:** So I probably would just ask her what changes did you make in your supplemental --

**THE COURT:** Yeah.

**MS. VILLAGOMEZ:** -- report.

**MS. YEE:** Okay.

**THE COURT:** Because it's her opinions that are -- that you're trying to get out and changes between --

**MS. YEE:** Okay.

**THE COURT:** -- the opinions, and not so much what's in the report, but just that her opinion changed.

**MS. YEE:** Okay. Yeah.

**THE COURT:** Okay. Thank you.

**(End sidebar at 1:38 p.m.)**

**THE COURT:** Okay. Please proceed.

**BY MS. YEE:**

Q Ms. Dickson -- and, again, we're talking about the -- at the time of January 2nd, 2026. What was your opinion in -- regarding the 2022 LTIP award that you allocated to Mr. Byrne?

A Well, I -- in that report I just calculated the entire LTIP pool award.

Q And you allocated a hundred percent of the collective LTIP pool in 2022 to Mr. Byrne, correct?

A Incorrect.

Q I'm sorry?

A Incorrect.

Q What is incorrect?

A Your statement.

Q So did you not allocate a hundred percent of the collective LTIP pool to Mr. Byrne?

A If you look at my Exhibit 3, right at the very bottom it says total underpaid incentive cash pool bonus award, $1,486,005. It says total pool award.

**MS. YEE:** Your Honor, permission to impeach the

witness.

**THE COURT:** No. You can ask her the next question.

**BY MS. YEE:**

Q Does it say that the Balboa Division employees are also --

A Excuse me, what?

Q Does your -- did you have an opinion regarding the Balboa Division employees' portion of the LTIP pool in your January 2nd, report?

A I'm not sure I understand your question. Could you please rephrase?

Q Okay. I'm going to ask it again. Did you allocate a hundred percent of the collective LTIP pool to Mr. Byrne for 2022?

A As I just explained, at the bottom, it says the total pool incentive award is XYZ. And the top, the header on my schedule also says calculation of total incentive pool cash bonus award for 2022. So I calculated the total pool, as we've been talking about.

Q How much money did you allocate to Mr. Byrne for 2022?

**MS. VILLAGOMEZ:** Objection, vague as to time. And I'm not sure where we are in --

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you allocate that same amount to Mr. Byrne for 2022 LTIP?

A No. I calculated the total pool in 2022. And then in my deposition testimony, I identified that Mr. Byrne would be 62.54 percent of that.
Q How did you locate that 62.54 percentage in your records?
A That number was given to me by the attorneys.
Q When did you receive that percentage?
A Sometime before my report. I don't recall when.
Q You did not receive that specific percentage at the time of your deposition in January, 2026, correct?
A That's correct.
Q So you received that percentage after your deposition and after your January 2nd report, correct?
A Incorrect.
**MS. VILLAGOMEZ:** Objection -- sorry, objection, compound, irrelevant, vague.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q You did not receive that percentage at the time of your January deposition, correct?
**MS. VILLAGOMEZ:** Same objections.
**THE COURT:** That objection's overruled. You can answer that question.
A As I recall, I identified right in my deposition transcript that Mr. Byrne was due a certain percentage, which I understood to be 62 percent.

Q I'm going to ask that question again. At the time of your deposition, --

**THE COURT:** Wait, hold on. She already answered that question. So if you have another question, let's ask the next one.

**BY MS. YEE:**

Q Did you receive that specific percentage at the time of your deposition in January?

**MS. VILLAGOMEZ:** Objection, cumulative.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q As of January, 2026, you did not include any opinions in your report regarding the allocations of the 2022 LTIP pool to other Balboa Division employees, correct?

A Correct.

Q Did you issue an opinion as of January, 2026 as to the specific allocation of the pool to Mr. Byrne?

A I think I've answered that multiple times. But the answer is I calculated the 100 percent LTIP pool calculation.

**(Pause)**

Q Is it correct that you did not perform a specific allocation analysis showing how much of the pool would go to Mr. Byrne versus other division employees?

**MS. VILLAGOMEZ:** Objection, cumulative.

**THE COURT:** I'm going to overrule the objection.

But you have asked this question several times. So I'm going to let her answer it one more time but then we need to move on.

**MS. YEE:** Thank you, Your Honor.

**THE COURT:** You're welcome. You can go ahead and answer the question.

A That is correct.

Q This lawsuit has one plaintiff, Mr. Byrne, correct?

**MS. VILLAGOMEZ:** Objection, legal opinion, irrelevant.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Who's the Plaintiff in this case?

**MS. VILLAGOMEZ:** Objection, legal opinion, irrelevant.

**THE COURT:** Sustained.

**(Pause)**

**BY MS. YEE:**

Q Let's talk about 2023. And just like in 2022, you allocated a hundred percent of the total LTIP pool to Mr. Byrne, correct?

A Are you talking about in my first report?

Q Yes, and for 2023 LTIP.

A No, that's incorrect.

Q What is the percentage of the total pool you allocated to

Mr. Byrne?
A I didn't calculate --
**MS. VILLAGOMEZ:** Objection, --
A -- an allocation.
**MS. VILLAGOMEZ:** Objection, vague as to time.
**THE COURT:** The objection's overruled.
**BY MS. YEE:**
Q Did you not have allocation percentage at the time of your January 2nd, 2026 report?
**MS. VILLAGOMEZ:** Objection, vague as to allocation percentage.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Were you aware of a specific individual percentage as to the 2023 LTIP pool to Mr. Byrne?
A That would be the same answer that I had for 2022, which was I calculated the 100 percent LTIP pool. I did not apply any percentages to Mr. Byrne. But I had been told it was somewhere around 62 percent at that time.
Q Yeah, but you did not include that 60 percent in your first report, correct?
A That's correct.
Q Your January 2nd -- as of January 2nd of 2026, you did not provide any opinion as to the 2024 LTIP payout, correct?
A That's correct.

Q And you couldn't provide that specific opinion regarding the 2024 LTIP because you stated that you had incomplete records at the time.
A I chose not to provide that because I was hoping that Ameris would provide the full set of documents that I needed to prepare an opinion for 2024, which is why I held off not providing a calculation at that point in time for 2024.
**MS. YEE:** Your Honor, Defendant moves to strike her response at Ameris did not produce 2024 documents as hearsay.
**THE COURT:** The objection's overruled.
**BY MS. YEE:**
Q Is it correct to say that you are -- you were unable to calculate any cash bonus towards allegedly owned LTIP for calendar year 2024?
**MS. VILLAGOMEZ:** Objection, vague. I'm not quite sure I'm following, Your Honor.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q As of January, 2026, is it correct to state that you were unable to calculate any cash bonus awards for calendar year 2024?
A I would say I was not unable to based on the information I had. But I chose not to, hoping that Ameris would choose to provide me the data that I requested and so therefore I could provide another report, prepare a supplemental report, and make

calculations based on a full set of data.
Q You signed an engagement letter with Mr. Byrnes's formal legal counsel, Espe Anderson, correct?
**MS. VILLAGOMEZ:** Objection, relevance.
**THE COURT:** Overruled. You can answer.
A Yes.
Q And you then signed an engagement letter with Mr. Byrnes's new counsel, Allen, Makins (sic) office, December 17th, 2026, correct?
A Yes.
Q So you signed an engagement letter with a new counsel before the old counsel withdrew from the case, correct?
A I don't know.
Q Did you know that Mr. Sessions's office did not file an attorney substitution request until December 22nd?
**MS. VILLAGOMEZ:** Objection, relevance.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Do you agree that recommending new counsel to Mr. Byrne in this way could affect your neutrality as an expert?
**MS. VILLAGOMEZ:** Objection, relevance, assumes facts not in evidence.
**THE COURT:** Sustained.
//
//

**BY MS. YEE:**
Q You served a supplemental expert report on May 1st, 2026, correct?
A Correct.
Q And in your May 1st supplemental report, you changed your 2022 total underpaid LTIP pool calculation, correct?
A Yes, I did.
Q So you now have a different number for the 2022 allegedly underpaid LTIP pool, correct?
A Yes, a reduced number actually.
Q But it's a different number, correct?
A Yes.
Q You also changed the number for 2023 allegedly underpaid LTIP pool, correct?
A Yes.
Q Would you agree that when a expert's numbers change from one report to the next, it becomes difficult to know which set of numbers to trust?
**MS. VILLAGOMEZ:** Objection, argumentative, legal opinion.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Would you agree that adding new opinions or calculations four months later without new information means original report was incomplete?

**MS. VILLAGOMEZ:** Same objections.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In your May 1st supplemental report, you provided a brand new calculation for the 2024 LTIP, correct?

A Yes.

Q And you had not included a calculation for the 2024 LTIP in your January 2nd report, correct?

**MS. VILLAGOMEZ:** Objection, cumulative.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you receive any additional documents or new documents after you issued the January 2nd report?

A Unfortunately Ameris did not provide the documents that I requested.

**MS. YEE:** Move to strike her response as nonresponsive and hearsay.

**THE COURT:** The motion is denied.

**BY MS. YEE:**

Q Despite stating in January that you didn't have enough information on May 1st, you went ahead and prepared calculations for the LTIP cash pool for 2024.

**MS. VILLAGOMEZ:** Objection, cumulative. We've gone through this.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You testified earlier that to prepare for the 2024 calculation, you used the most current LTIP workbook received, correct?

A I'm not really sure what you mean by the most current LTIP workbook received.

Q Do you have the full records for the 2024 LTIP in order to perform a full analysis?

A Ameris did not produce those to me.

Q So what records do you have in terms of the date?

**MS. VILLAGOMEZ:** Objection, argumentative.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Is it correct that you only have LTIP workbook and related records through August 31st, 2024?

**MS. VILLAGOMEZ:** Same objection.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You testified earlier that you annualized that figure to estimate for the full year for 2024, correct?

**MS. VILLAGOMEZ:** Objection, misstates testimony.

**THE COURT:** Overruled. You can answer.

A Actually I didn't testify to that.

Q Did you annualize the figure to estimate for the full year for 2024?

A For 2024, I annualized one component of one calculation, which I ultimately ended up not using.

Q Annualizing assumes the remaining month behaved just like the earlier month, right?

**MS. VILLAGOMEZ:** Objection, vague, legal opinion, relevance.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you know if your assumption accurately reflects the Balboa Division's financial results in 2024?

**MS. VILLAGOMEZ:** Objection, vague as to assumption.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you assume that 2024 had the same interim rent issue, same represession [sic] issue, same overhead issue, and same stipulated judgment issues?

**MS. VILLAGOMEZ:** Objection, compound.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You did not independently determine whether those 2023 issues occurred in 2024.

**MS. VILLAGOMEZ:** Objection, vague.

**THE COURT:** Sustained.

//

//

**BY MS. YEE:**

Q You did not quantify 2024 interim rent timing from underlying 2024 transactions, correct?

**MS. VILLAGOMEZ:** Same objection.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In fact, because you had insufficient information for 2024, you provided several alternative calculations for 2024, correct?

**MS. VILLAGOMEZ:** Objection, argumentative, misstates testimony, assumes facts not in evidence.

**THE COURT:** The -- that objection is overruled. You can answer, if you can.

**THE WITNESS:** Would you please restate the question?

**BY MS. YEE:**

Q Because you had insufficient information for 2024 LTIP, you provided several alternative calculations for 2024, correct?

A In my supplementary report, yes, I have some alternative calculations because Ameris failed to provide the documents that I needed.

**MS. YEE:** Again, Your Honor, move to strike her response as hearsay.

**THE COURT:** The motion is denied.

//

**BY MS. YEE:**

Q Is it correct that one of the first of your alternative calculation is that 2024 LTIP pool calculation is about around 7.7 million?

**MS. VILLAGOMEZ:** Objection, vague. I'm not following, Your Honor.

**THE COURT:** The objection's overruled. You can answer if you understand the question.

**THE WITNESS:** Could you please ask that more specifically?

**BY MS. YEE:**

Q Your first alternative calculation for 2024 LTIP is approximately 7.7 million, correct?

**(Pause)**

A I think you're talking about my initial calculation at -- with which I have provided testimony.

Q No, I'm talking about your Exhibit 6-S.

A Yes, that's the exhibit on which I've already provided testimony.

Q Is it correct, is it approximately 7.7 million for the 2024 LTIP pool?

A Yes. The amount is $7,747,017.

Q And then you have a different number thereafter. You have a different calculation where you have a number as 4.5 million, correct?

A That's an alternative calculation that I have not yet presented. But that is included in my report.

Q And you have another alternative number of approximately 3.6 million, correct?

**MS. VILLAGOMEZ:** Objection, Your Honor, hearsay.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q How many calculations did you have for 2024 LTIP pool?

A Which report are you referring to?

Q We're talking about the May 1st, 2026 report.

**MS. VILLAGOMEZ:** Same objection, Your Honor.

**THE COURT:** Sustained. The objection is sustained. If you have questions about her opinion, you can ask those questions. But for the reasons that we've already stated, questions about the report are not appropriate.

**BY MS. YEE:**

Q Is it correct, Ms. Dickson, that you offered three different 2024 LTIP pool calculations ranging from 3.6 million to 7.6 -- 7.7 million, correct?

**MS. VILLAGOMEZ:** Objection, Your Honor, hearsay.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did you include any other changes to your calculation your May 1st report that were not included in your January 2nd report?

**MS. VILLAGOMEZ:** Same objection.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q The single biggest change was that in the January 2nd report, you stated that Mr. Byrne was owed the entire pool. But then you changed that allocation to 62.54 percentage, correct?

A Incorrect.

**MS. VILLAGOMEZ:** Sorry, objection, hearsay.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Ms. Dickson, have you had a chance to review the LTIP and LTIP award agreement?

**MS. VILLAGOMEZ:** Objection, cumulative.

**THE COURT:** It's overruled. You can ask -- you can answer the question.

A Of course.

Q Do you recall that there is no 62.54 percentage in the LTIP or LTIP award agreement?

**MS. VILLAGOMEZ:** Objection, legal opinion.

**MS. YEE:** I'm asking what's --

**THE COURT:** No, just --

**MS. YEE:** -- if that number is --

**THE COURT:** Hold on. It's a long agreement. I'm just reviewing it in my head. The objection is sustained.

**BY MS. YEE:**

Q To your knowledge, does the 62.54 percentage appear in the LTIP and the LTIP award agreement?

**MS. VILLAGOMEZ:** Same objection.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Do you remember that there is -- under the cash bonus award in the LTIP, it does not provide any specific number, and it simply states that number percentage of the pool, if any, for each performance period?

**MS. VILLAGOMEZ:** Objection, hearsay, argumentative, legal opinion.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Ms. Yee, could you please restate that question?

**BY MS. YEE:**

Q In the LTIP and LTIP award agreement, do you recall seeing that under the cash bonus award it says number percentage of the pool, if any, for each performance period?

A I'm not sure I'm understanding your question. Perhaps you could help me.

**MS. YEE:** Would -- Your Honor, permission to publish admitted Exhibit 546.

**THE COURT:** It's already admitted. Go ahead.

**(Pause)**

**BY MS. YEE:**

Q If you could -- if I could please direct your attention to JX-546003. Ms. Dickson, if you want to look at it's starting from cash bonus award, so it's around the fourth or fifth paragraph. And you see the placeholder number percentage of the incentive pool. Can you read that into the record?

A You mean the yellow part --

Q Yes, please.

A Okay. Cash bonus award number percentage of the incentive pool, if any, established for each performance period.

Q This doesn't say any specific percentage, correct?

A That's correct.

Q And it's just a placeholder with the word number, correct?

**MS. VILLAGOMEZ:** Objection, argumentative.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q So this agreement does not state that Mr. Byrne personally receives 60 percent -- 62 percent of five, four percentage, correct?

**MS. VILLAGOMEZ:** Objection, argumentative, legal opinion.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q You do not see the 62.54 percentage in this document, correct?

**MS. VILLAGOMEZ:** Objection, argumentative, legal opinion.

**THE COURT:** Sustained.

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay. Ms. Villagomez, do you have any redirect?

**MS. VILLAGOMEZ:** I do not, Your Honor.

**THE COURT:** Okay. Thank you very much, Ms. Dickson. You are excused.

**THE WITNESS:** My pleasure.

**THE COURT:** You can go ahead and step down.

**(Witness steps down.)**

Okay. Your next witness.

**MS. LARSEN:** Plaintiff calls Dr. Anthony Reading.

**THE COURT:** Okay. Thank you.

Okay, Dr. Reading, you can come forward. Come around this way, straight forward. Come around there by the jury box. You're going to get to Ms. Jackson, you'll stop, she'll swear you in, and then you can come up and have a seat on the witness stand next to me.

**DR. READING:** Thank you so much.

**THE COURT:** Thank you.

//

//

//

**ANTHONY EDWARD READING, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Come this way.

**THE WITNESS:** Thank you.

**THE CLERK:** And just watch your step.

**THE WITNESS:** Thank you very much.

**THE COURT:** Good afternoon.

**THE WITNESS:** Good afternoon, your Honor.

**THE COURT:** You can go ahead and have a seat. Nice to see you.

**THE CLERK:** Please state your name and spell your last name for the record.

**THE WITNESS:** Okay. What did you say?

**THE CLERK:** State your name and spell your last name for the record.

**THE WITNESS:** Okay. So sorry. Anthony Edward Reading and Reading is spelled R-e-a-d-i-n-g.

**THE COURT:** Thank you very much, sir.

**THE WITNESS:** Thank you, your Honor.

**THE COURT:** Ms. Larsen, you may proceed.

**MS. LARSEN:** Thank you, your Honor.

**DIRECT EXAMINATION**

**BY MS. LARSEN:**

Q Good afternoon, Dr. Reading.

A Oh, good afternoon.

Q Thank you for being here today.

A Oh, my pleasure. Nice to come downtown --
Q What is your profession?
A -- see the sights.
Q What is your profession?
A I'm a licensed psychologist.
Q And can you please describe your educational background briefly?
A Briefly my education was in the United Kingdom, a degree in psychology in South Wales, University College of Swansea. My clinical psychology training was at the Institute of Psychiatry, which is one of the University of London's post-graduate training institutes. And then I went to King's College Hospital, one of London teaching -- London's teaching hospitals across the street and the first two years there I was in sort of internship training residency. And so I remained at King's for seven years providing care in the national health service to inpatient psychiatry, outpatient mental health, and the hospital as a whole. And while at King's I received a PhD from the University of London, which in England is a research degree. I had already done my training. And then I also received a faculty appointment and then I was recruited in 1981 to join the fulltime faculty at UCLA in the School of Medicine in the Department of Psychiatry and so I was on the fulltime faculty as an assistant professor and promoted to an associate professor and then in 1990 I went on the clinical voluntary

faculty where I remain as a full professor in the Department of Psychiatry at UCLA.

Q Thank you.

A Yeah.

Q You mentioned a little bit of your professional background there as well, but could you please elaborate on some more of your professional experience?

A Well, in England and at UCLA I ran research programs funded by various governmental agencies and so I ran a very large research program looking at various issues that are problematic in a general hospital, such as pain, new technology, and then at UCLA we studied depression and what happens when people become depressed. At UCLA I also was asked to take up an appointment at a center which had a mission to look at factors in the workplace that give rise to stress and impact mental and physical health. So the first ten years of my career I was very involved in research, I've always had a very large clinical practice until the pandemic, and I've performed in matters such as this since 1989.

Q What kind of patient evaluations do you typically do in your practice?

A Well now, since the pandemic I see some repeat or return private patients from my very large practice, but that's very small, and then I see patients at UCLA with trainees, so it's a training role where we deliver service. And those were

actually insomnia, they come in because they have a sleep disorder, and actually problems of behavioral approaches, which is a form of psychological treatment that actually developed when I was around in London and it was a first line treatment for many disorders, but it's the only evidence-based treatment for insomnia, interestingly enough.

Q And have you previously testified in court as an expert witness?

A Yes, I have.

Q How many times?

A Well, over 300 I would estimate.

Q All right.

A Since 1989.

Q Thank you.

A Yeah.

**MS. LARSEN:** Your Honor, at this time I'd like to offer Dr. Reading as an expert psychologist to testify regarding the emotional impact of the events at issue on Mr. Byrne.

**THE COURT:** Any objection?

**MS. YEE:** No objection, your Honor.

**THE COURT:** Okay. Dr. Reading is qualified as an expert witness and may testify as one.

**THE WITNESS:** Thank you, your Honor.

**MS. LARSEN:** Thank you, your Honor.

**THE COURT:** You're welcome.

**BY MS. LARSEN:**

Q Dr. Reading, were you retained in this case?

A Yes, I was.

Q And what were you retained for?

A Well, my understanding is there's a claim of an emotional injury arising from work experience and so my role was to evaluate whether those claims have any validity and, if so, to speak to how any psychiatric injury could have been caused, the nature of that, and whether Mr. Byrne was or is a candidate for treatment and how he may or may not be affected going forward.

Q And could you tell the jury what methods you used to prepare your opinions for today?

A Yes, I can. So a standard assessment in a setting such as this would be an extended interview in which I review Mr. Byrne's entire life, so I expanded the focus of inquiry beyond that which is being claimed. So in looking at whether there is evidence from a psychiatric injury or perturbation at any time in his life I looked at and tracked his emotions during that interview if there were any indications of a change in his emotional state and, if so, to track at what point in the interview that would have occurred. I administered standard psychological tests and I reviewed voluminous records. So those are four categories of data that I accrued in the course of this evaluation.

Q You mentioned you reviewed some records. Can you briefly tell us about the records you reviewed for this case?
A It would be hard to be brief, but there were six people whose depositions I read, Mr. Byrne, Mr. Silva, Ms. Stokes, Ms. Majid, Mr. Lahaise, and Ms. Parker, I believe, with all their exhibits and then a lot of emails on work-related issues, performance-related. So that would cover a lot of records.
Q And what is the significance of your review of these records?
A Well, the records are important because they provide an opportunity to establish whether the data that I am receiving from my interview with Mr. Byrne is consistent with other records and they also may be helpful in identifying other potential causal candidates which were not disclosed by Mr. Byrne. So there are a number of important reasons to review records.
Q All right. Earlier you also mentioned some psychological testing?
A Yes.
Q Could you please tell us which tests that Mr. Byrne completed?
A He completed three tests. Two of them are what we call broad-based tests that look at families, we look at a person in those tests over a broad range of psychological dimensions. And he also completed a more specific test because -- and that

was a test looking at symptoms distinctive to threat or trauma. And the reason for that was Mr. Byrne, in the course of the interview, expressed to me there were feelings of loss of safety, not loss of physical safety but loss of safety at work, so that's why. So there's one specific test and two broad-based tests.

Q And what are the names of those tests?

A The first two broad-based tests were the MMPI-3 and the PAI and the third test, the more specific test, was the TSI-2.

Q And can you explain how the tests are administered?

A They are automated by a computer. So one would sit in front of a computer, the computer presents a question, you answer true or false how it applies to these days (2:11:37), that question disappears, another one comes up, and then when the test is finished it's scored by the computer. So we don't do anything but I do have one of my staff proctor the test to ensure the person is actually doing it and not someone else and they're not on the phone, et cetera. So that's how they're administered.

Q Once the data is outputted, how do you review that data?

A Well, I review the data in terms of my background as a psychologist performing this work over 50 years and we're looking at, first of all, whether the tests are valid. In other words, those tests, all three of them, have scales that look at the pattern of responding which can raise concerns

about a person distorting the test in a direction that may be favorable to them. So one example of that would be over-reporting. So the first thing I look at is whether these tests are valid and whether they rule out a motivation to over or under-report. And having done so, then the tests quantify Mr. Byrne's scores on all of those scales by comparing his scores to the mean or average of a normal population. So just as in a blood pressure means nothing unless you can compare it to something, so you have normal blood pressure and you then have your blood pressure compared to the normal. And we do the same in psychological tests. We know what the average score for a normal population is and so we see if the person's scores on those scales depart significantly or not from the average. So that's it.

Q Thank you. And can you further explain what you mean by over-reporting?

A Well, over-reporting would be an interpretation imposed upon the test data because those data indicate on those tests there's a -- there seems to be a pattern of endorsing what we call unusual or low frequency items or endorsing more extreme responses. So that may suggest a person has unusual or low frequency symptoms or it could mean they, in the absence of those symptoms, are over-reporting because there's some benefit to that, such as a mitigation.

Q Thank you.

A Yeah.
Q One of the first tests you mentioned was the MMPI-3. Can you explain what that's for?
A Well, the MMPI-3 is a test that has three objectives and that's alluded to. One would be it's broad-based, so it assesses a person across a broad range of psychological dimensions: anxiety, depression, helplessness, stress, worry, anger. And it quantifies distress. So in the old days in a clinical setting someone would say they felt depressed and that's as far as you'd go, but now we look at their score on a depression scale to see if it reaches what we call clinical significance, and that's the second. And the third objective of the test, the third reason is to look at the pattern to see if it raises concerns about motivation, which could undermine not just the validity of that test but it could have ramifications for my interview.
So the test could speak to a motivation that is in the test and also in the interview or other settings where a person may be cultivating complaints for benefit.
Q Did you evaluate the validity of Mr. Byrne's MMPI-3 results?
A Yes, I did.
Q And were they valid?
A Yes, they were. All three tests were entirely valid so we could rule out unequivocally any propensity or motivation to

over-report.
Q And what were your clinical findings based on the MMPI -- sorry, MMPI-3 scores?
A Well, on the MMPI-3, so this is Mr. Byrne and he showed significant elevations on one of the two depression scales, on a scale of -- and two scales of anxiety, and so what I would see is that this person is showing elevations that would raise a concern as to a clinical condition of depression and/or anxiety.
Q Thank you. The next test you mentioned was a Personality Assessment Inventory or PAI. Can you explain why you administered two broad tests?
A Well, I administered two broad tests because we have an opportunity there to see to what extent the results of one are consistent with the results of a second and, if so, that would be a more robust finding. So if two different measures and different ways they are constructed, if they come to the same conclusion then the confidence in the interpretation is enhanced. So that's a useful opportunity.
Q And what were your clinical findings based on the results of the PAI?
A Once again a valid test. There were three indices of over-reporting, all of those were in the normal unproblematic range. And he showed on that test once again a very specific profile. There was not a indiscriminate pattern of elevation.

He's elevated on the scale of depression and raised on the scale of anxiety. So the same sort of picture emerged on those two tests.

Q Okay. Now moving on to the last test that you mentioned. Can you explain the Trauma Symptom Inventory-2 or TSI and what it's used for?

A It's used to look at symptoms to see if it's a threat or trauma in the preceding six months, so it's a very specific test. Clearly Mr. Byrne has not experienced a trauma in the usual sense of the word but what he described to me as of 2023 until his termination was the emergence of symptoms of threat or loss of safety. And those are symptoms that are reflected in the TSI-2. That's the name of this test. And also he described as of 2023 summer he was encumbered with what we call intrusive thoughts. These are involuntary upsetting thoughts that tend to enter the person's mind at inopportune moments. And so he was describing that. And what is the effect of that? It disconnects the person from their normal life. These are intrusive thoughts. They're about negative experiences.

And so the TSI-2 is another opportunity to assess on specific scales on that test whether that pattern is continuing when I saw him and I saw him December 1st, 2025, so that's sometime since he was terminated and that test looks at increasing the six months whether these scales of threat are elevated or not.

Q And did you find that the TSI was elevated?
A Yeah, the TSI-2 was a valid profile and a number of the scales were elevated, anxiety, depression, which we saw in the broad-based tests, but what was instructive to me, there are two scales that are seen in the context of adverse events or threat, intrusive experiences, which he reported to me emerging summer of 2023 and continuing, and also defensive avoidance. Those two scales were elevated which speak to him being fairly encumbered with this experience of feeling adversely or unfairly treated and also relevant for the trajectory of a person's psychiatric disorder, if they have one.
So those are important with respect to what we call prognosis, how a person is going to do in the future, because if those scales are elevated and the clinical interview comports with that finding, then that's an engine, if you like, that can maintain negative emotions because those intrusive thoughts create a vicious cycle where the thought reinforces the negative emotion, the negative emotion reinforces the thought. So that was important with respect to my understanding of considerations of what we call prognosis.
Q Earlier you mentioned a clinical interview with Mr. Byrne. Do you remember how long that interview was?
A I don't remember. Usually it's about three hours standard. Not -- that's without the testing. The testing's separate.

Q How long does the testing usually take?
A The testing takes about two and a half hours.
Q During your clinical interview with Mr. Byrne what did you discuss?
A Well, it's standard. So we went over his life, his family life of origin, his schooling, his business life, which predominately was his own business, and the ups and downs in that, his marital or relationship history, family -- his own family history, legal history, social history, what he does for fun, what he does for enjoyment, medical history. And then he -- I invited him to tell me about what happened at his business.
Q And based on the clinical interview did you identify any psychiatric symptoms?
A Yes, in the interview he did -- he did -- so we found no evidence of prior psychiatric disorders. There was some I think situational anxieties. But in the interview he did report in the summer of 2023, which he related to issues at work, where he developed some psychiatric symptoms. As I mentioned, the intrusive thoughts and sleep difficulty, some anxiety, some uncertainty, and what was noteworthy for Mr. Byrne was his feeling of not being in control. And this is a person who had developed a business, run a business, and this was a departure from his usual customary feeling of being in control. If you look at the psychological research, which

includes self-report, epidemiologic studies, and brain imaging studies, control is important and very much protective and the absence of control is -- does introduce a risk of psychiatric injury in the context of adverse events.

Q During the interview did you discover if Mr. Byrne was suffering from any physical symptoms?

A Yes, I think he described some physical symptoms, some of which had been treated for in terms of he had some arrhythmia, cardiac arrhythmia, and I think he had a surgical procedure which seemed to calm that down.

Q All right. Earlier you also testified that Mr. Byrne had been terminated. Did you have any clinical findings regarding Mr. Byrne's termination?

A Well, they came as a shock to him, although he had some anticipatory concern, and he did report the onset of psychiatric symptoms. And we look at the chronology of onset of symptoms as a way of understanding potential causation and so it was clear from my interview and his report that he spoke about the emergence and enhancement of symptoms following his termination in terms of erosion of his self-worth, the onset of a depressed mood, difficulty being present and deriving pleasure from customary activities, loss of motivation to do things, social withdrawal, irritability, sleep difficulty, and difficulty with focus.

So he reported an enhancement or extension of

symptoms that he developed in 2023 so we see a significant uptick in both the range of symptoms and the severity of those symptoms which he reported to have developed following his termination, which he saw as a life-altering event and one that he saw as unfair.

Q In your practice do you also consider alternative stressors when conducting psychological evaluations?

A Yes. In my practice that's important and it's obligatory in a setting where a person may be motivated to present a version of events that's self-serving. So someone can say things that obviously serve their purpose so we look at a number of factors in order to examine that. Ultimately it's up to the jury, but one important consideration is to look at the universe of potential causal candidates, what other stressors existed at that time. And so I certainly reviewed those candidates that I identified or may have been in a deposition and once again I looked at whether they would be of sufficient severity to give rise to the symptoms claimed and also the chronology, whether the chronology of onset of those other stressors matched his report of the symptom onset chronology.

Q And what was your finding regarding causation in this case?

A Well, to a reasonable degree of psychiatric probability causation in terms of the chronology of onset, the significance of the adverse event, the life-altering nature of it, and most

importantly the feeling of Mr. Byrne that he was unfairly treated led me to see that the loss of his job set in motion the psychiatric symptoms. I ruled out his health issues, any family issues, any other stressors, and found that he developed these symptoms as a result of what happened at work, given the pivotal nature of work, and absent those events he would not have developed the psychiatric disorder that I found he developed at that time.

Q Thank you. Are you aware that there is a rebuttal expert that was hired by the Defendant in this case?

A What did you say?

Q Are you aware that there was a rebuttal expert hired by the Defendant in this case?

A Well, if you mean Dr. Lechuga, I knew Dr. Lechuga when he was a trainee when I was on the fulltime faculty at UCLA. A very nice man, a neuro psychologist and very earnest and well qualified. Yes, I am. And I liked him very much when he was a student.

Q And what is your understanding of Dr. Lechuga's findings in this case?

A Well, Dr. Lechuga raised a lot of issues in his report which really rose to a level of conjecture. He suggested family issues, he suggested health issues, he suggested maybe there were other issues, so it was really a report that suggested other issues rather than foundation and also didn't

seem to address the pivotal nature of work or the chronology of onset, all the documentation of findings in the interview and the testing that were consistent. So he raised a lot of issues and suggested I hadn't addressed them, whereas in the report all of those issues that he raised were addressed if there was any support for those.

Q So did any of Dr. Lechuga's findings change your mind?

A No, not at all. He didn't have any findings. I think he had conjecture. Which is below the standard in a clinical setting.

At UCLA I am a founding member of the Quality Assurance Committee in Reagan, the hospital, as of 1998 and so, you know, we require -- when I first was working at King's there was very much a tolerance, and also at UCLA when I first came, of what we call on-chair findings, it is because I say it is, and in 1998 we established this Quality Assurance Committee which required all findings to be documented by data. It's an empirical foundation. And, of course, we see that in national healthcare in terms of evidence-based treatments. Everyone wants evidence-based treatment and that's because we don't want nonevidence-based.

So we wouldn't accept that kind of -- those suggestions, they have to be backed up by data. There was no data that Dr. Lechuga included in his report and so that would not be -- we wouldn't accept that.

Q Based on everything that you reviewed, including the tests and then also the clinical interview, what is your overall diagnosis of Mr. Byrne?

A Yeah, I found that while working Mr. Byrne developed what we call an adjustment disorder. So it's emergence of psychiatric symptoms of anxiety, depression, in response to a stressor. So his work issues, the work changed in around summer of 2023, he started to develop these symptoms, so that would be an adjustment disorder. Then when he lost his job, that evolved into what we call a major depressive disorder with anxious mood. He had some symptoms of anxiety. He qualified for a major depressive disorder, which requires a consummation of symptoms to be present most of the day, nearly every day, for at least two weeks. But this is longer for Mr. Byrne. And those symptoms encompass depressed mood, what we call anhedonia, loss of pleasure, loss of motivation, erosion of self-worth, sleep, concentration. And so he had sufficient symptoms and he -- when I saw him, not only did the testing show he was still elevated on scales of depression, but he also became tearful during the concentration of discussing his sense of failure, his depression. And of course this disorder of depression, major depression, is involuntary. It's not as if someone chooses it. It takes over a person's mental landscape. It pushes them towards more negative views and also affects their physical feeling, their sense of joy and energy.

So that was my finding, a major depressive disorder with anxious mood, which would be a first episode and moderate to mild.

Q Thank you. Just to make the record clear, you mentioned summer of 2023 but Mr. Byrne was terminated in summer of 2024. Is that the time period that you meant to state?

A No, I mentioned summer of '23, that was when he started some symptoms, because the work issues were problematic. He got terminated I think June 2024. There's no confusion in my mind. So he started to develop some symptoms, and I think I told the Court and -- because this ongoing issue, which was abrading his feelings and also reflected his state of feeling out of control. He felt out of control in terms of conveying what he considered to be, well, his version of events which he considered to be reasonable to his employer.

Q Did Mr. Byrne report worsening symptoms after his termination?

A That's when his disorder raised to the level of a major depressive disorder. That's right. There was a uptick and expansion of symptoms, yes.

**MS. LARSEN:** Thank you.

No further questions, your Honor.

**THE WITNESS:** Okay.

**THE COURT:** Okay. So it's time for our afternoon break so I'm going to have you step down for about 15 minutes

and then we'll resume with cross examination.

**THE WITNESS:** Should I go now?

**THE COURT:** You can go down now, yes.

**THE WITNESS:** Thank you, your Honor.

**THE COURT:** Thank you.

**(Witness exits witness box)**

Okay, and to our jurors, please don't discuss this case amongst yourselves or with anyone else, don't do any research about any aspect of the case, and we'll see everyone back here at 2:45.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 2:32 p.m.)**

**THE COURT:** Okay, I'll see everyone in 15 minutes.

**MR. SESSIONS:** Thank you.

**THE COURT:** Thank you.

**THE CLERK:** Court is in recess.

**(Recessed at 2:33 p.m.; reconvened at 2:45 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated. Okay, Ms. Fode, Ms. Yee, I understand that you have an issue that you'd like to discuss.

**MS. FODE:** Yes, just very briefly, I wanted a time check. By our records, plaintiff is out of time as of 2:23, and I just wanted a time check so I didn't need to raise it in

front of the jury.

**THE COURT:** Let me check.

**MS. FODE:** Thank you.

**THE COURT:** That's correct. Plaintiff is out of time.

**MR. SESSIONS:** Well, thank you, Your Honor. One, I will state that regardless of what we're calculating on our end, which is different, we probably only have -- intend to do 10 to 15 minutes of cross with each of the two remaining experts. So for good cause, I would request that additional small bit of time, particularly --

**THE COURT:** Okay, out of curiosity, how much time do you have? I have your -- right now I have you at 10 hours and 8 minutes.

**MR. SESSIONS:** Well, I think we still have, under our calculations, we still have another hour.

**THE COURT:** Okay. I thought we had accounted for that yesterday. My time was not exact as to yours, but the ones that were off that we didn't talk about, the two big chunks, was just like a minute or two.

**MR. SESSIONS:** Yeah, I do understand, Your Honor. As I recall yesterday, our calculations when we came in were 6:27 and the Court's were 8:27, and then the Court did go back and add an extra or take off an extra hour and went down to 7:23. By our calculations, we still have that extra hour that wasn't

included in the Court's recalculation. But regardless, I think with the diligence that we've presented, the lack of cumulative evidence, and any delays having potentially been caused by having to deal with overruled objections, I would ask the Court for, you know, an additional 30 to 40 minutes, just so we may be able to cross the two experts that are remaining in defendant's case.

**THE COURT:** Okay. And the two experts that are remaining in defendant's case, it's Ms. Sebold, who I would imagine as the witness is going to take longer, and then Dr. -- I can't --

**MS. FODE:** Lechuga.

**THE COURT:** -- Lechuga, who we just heard about. Okay. So I am inclined to give you an extra 20 minutes for cross-examination of those two witnesses. There aren't any other witnesses in plaintiff's case-in-chief; is that correct?

**MR. SESSIONS:** No, Your Honor.

**THE COURT:** And the reason for that is because I do think that all counsel, both sides, have been very diligent and mindful of the time in this case and out of a sense of fairness, I do want to give you an opportunity to cross-examine the expert witnesses, but it will be limited to 20 minutes each.

**MR. SESSIONS:** We will make it work, Your Honor.

**THE COURT:** Okay.

**MS. FODE:** And I understand your ruling, Your Honor, but for the record, I had eight minutes to the T. I had the exact same time that you did, and we've been really mindful of being efficient on our time and have used our time wisely, and I do think it's prejudicial because plaintiff has gotten to the point now where they have used up all their time and have, in playing by the rules that we both agreed to and the Court ordered, they now really should not have the ability to cross these witnesses based on their lack of timing and just strategic decisions, and I do think it's prejudicial to our client to allow that at this point.

**THE COURT:** Well, part of the reason that this situation exists is because of the fact that because all of you have been so professional and so courteous with each other, we've done some direct examination, and I understand I am compartmentalizing it out in terms of time, but the fact that the direct examination for at least two of the defense-identified witnesses took place in the Plaintiff's case, I think it made it take longer to redirect for those witnesses than it ordinarily would have, and so that's why I'm doing this, but I agree with you that the defense has been very vigilant in minding its time, but I do think out of a sense of fairness that I do owe the Plaintiff the opportunity to at least cross-examine the two expert witnesses. I'm giving brief -- I mean, very rarely have I limited cross-examination

of an expert witness to 20 minutes, especially in a case like this, and the extra time is not going to allow the plaintiff to put on any more of its own witnesses just to cross-examine yours.

**MS. FODE:** Understood, and one other timing issue is our experts are both here. They have things going on tomorrow, so to the extent that we can complete them today, that is our strong preference as well.

**THE COURT:** Okay.

**MS. FODE:** Thank you.

**THE COURT:** I think that given the fact that we're at a place where the plaintiff is essentially done putting on its case in terms of witnesses, I've limited the plaintiff's time for cross-examination. Defense has more time left, so to the extent that the witnesses need to come back tomorrow, I see that largely as a function of how you decide that you want to examine those witnesses.

**MS. FODE:** Understood.

**THE COURT:** Okay. Thank you.

**MS. FODE:** Thank you.

**MR. SESSIONS:** Thank you.

**THE COURT:** Okay. Ms. Jackson, are they here?

**THE CLERK:** Yes.

**THE COURT:** Okay. Let's go.

**THE CLERK:** All rise.

**(Jurors enter courtroom at 2:51 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Okay. Is Dr. Reading in the courtroom? I don't see him. Okay, Doctor, you can come back to the witness stand. You're welcome. And you're still under oath, okay? Thank you.

Ms. Yee, you may proceed when you're ready.

**MS. YEE:** Thank you, Your Honor.

**CROSS EXAMINATION**

**BY MS. YEE:**

Q Good afternoon, Dr. Reading.
A Good afternoon.
Q Before you issued your expert report, you spoke to Mr. Byrne on one occasion, correct?
A Yes, I did. Thank you.
Q How long was that conversation?
A I think about three hours.
Q And it was a remote session, correct?
A Remote.
Q Was it via Zoom or Teams?
A Yes.
Q You have never observed Mr. Byrne in a clinical setting, correct?
A I'm not sure what you mean by that. I observed him. You'd have to define clinical setting. I didn't see him

in a clinical office, I suppose. I saw him in my office, although he wasn't physically there.

Q You're not treating Mr. Byrne?

A Correct.

Q Take your time. You have not monitored or evaluated Mr. Byrne's symptoms over time, correct?

A Correct.

Q To your knowledge, has Mr. Byrne ever treated with a therapist, psychologist, or psychiatrist for his emotional distress?

A Not to my knowledge.

**MS. LARSEN:** Objection. Sorry. Objection. Compound.

**THE COURT:** Sustained.

**THE WITNESS:** Okay.

**BY MS. YEE:**

Q To your knowledge, has Mr. Byrne ever treated with a therapist?

A Pardon?

Q To your knowledge, has Mr. Byrne ever treated with a therapist for his emotional distress?

A Not for the latter. That's correct.

Q What about a psychologist?

A No, not for the latter.

Q What about a psychiatrist?

A No.
Q Thank you. Your diagnosis of Mr. Byrne was based on information provided by Mr. Byrne in your single remote interview, correct?
A Based on my review of the records, my interview, and the psychological testing, and my observations of Mr. Byrne's affect during the consultation. So those were the data upon which I relied.
Q Did you interview Mr. Byrne's family members or friends?
A No, I did not.
Q Did you review any medical or therapy records in connection with your interview with Mr. Byrne?
A No.
Q So you relied exclusively on Mr. Byrne's self-reported symptoms, correct?
**MS. LARSEN:** Objection. Argumentative.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Did you conclude that Mr. Byrne alleged emotional distress related to his termination by Ameris?
A Yes, that's correct. That was my finding to a reasonable degree of psychiatric probability. He developed a psychiatric disorder arising from his termination. Absent his termination, he would not have developed that disorder. That's correct.
Q Did you look at any of Mr. Byrne's medical records?

A No, I did not.
Q Did Mr. Byrne have any history of treating with a psychological or psychiatric professional?
A Yes.
**MS. LARSEN:** Objection. Objection. Lacks foundation.
**THE COURT:** Sustained.
**THE WITNESS:** Sorry.
**BY MS. YEE:**
Q Were you aware at the time you spoke to Mr. Byrne that he was involved in multiple lawsuits?
A Yes. Well --
**MS. LARSEN:** Objection.
**THE COURT:** Hold on for one second.
**THE WITNESS:** Yes, thank you, Your Honor. Sorry, I'm a little quick off the mark. I don't know what's wrong with me. So sorry. I'll try to hold myself back here.
**THE COURT:** What's wrong is it's late in the afternoon, and I'm sure you're anxious to get back.
**THE WITNESS:** Well, only to see my dog, Dinky, who I didn't realize left so long. And I told Dinky I wouldn't be this long. But other than that, I'm entirely yours. Sorry.
**THE COURT:** Okay. All right.
**MS. LARSEN:** Sorry. Objection. Relevance. Lacks foundation.

**THE COURT:** The objection is sustained.

**BY MS. YEE:**

Q Last question. Did you discuss the lawsuits that Mr. Byrne is involved as a possible alternative cause for his emotional distress?

**MS. LARSEN:** Objection. Relevance, lacks Foundation.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** Yes, I did. Of course.

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay. Thank you. Any redirect?

**MS. LARSEN:** I'm good, Your Honor.

**THE COURT:** Okay.

**MS. LARSEN:** No further questions.

**THE COURT:** Thank you.

**THE WITNESS:** Oh, thank you, Your Honor. Nice to meet you.

**THE COURT:** You can step down and get back to your dog, Dinky.

**THE WITNESS:** He's not used to being left, you know. Thank you, Your Honor.

**THE COURT:** Well, thank you. Good to see you.

**(Witness excused)**

**THE COURT:** Okay. Any further witnesses from the plaintiff?

**MR. SESSIONS:** Your Honor, Plaintiff Patrick Byrne

rests.

**THE COURT:** Thank you very much. Any motions from the defense at this time?

**MS. FODE:** None at this time, Your Honor.

**THE COURT:** Okay. Thank you very much. The defense can call your first witness.

**MS. YEE:** The defense would like to call Ms. MaryEllen Sebold.

**THE COURT:** Okay. Ms. Sebold, you can come around this way. When you get to Ms. Jackson, she'll swear you in, and then you can come up and have a seat next to me on the witness stand.

**MARYELLEN SEBOLD, DEFENSE WITNESS, SWORN**

**THE CLERK:** I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** MaryEllen Seabold, S-E-B-O-L-D.

**THE COURT:** Thank you very much. Ms. Yee, you may proceed when you're ready.

**MS. YEE:** Thank you, Your Honor.

**DIRECT EXAMINATION**

**BY MS. YEE:**

Q Good afternoon, Ms. Sebold.

A Good afternoon.

Q What is the name of your current employer?

A Resolution Economics.

Q And what do you do at Resolution Economics?

A I am a partner there. Most of my work is doing litigation consulting, kind of like what I'm doing today, forensic investigations, and some bankruptcy work.

Q Can you please describe your educational background?

A Yes. I grew up in New York, so I ended up at Ithaca College, originally as a classical organ and piano major. Quickly changed my major to accounting. When -- I graduated with a Bachelor of Science in accounting, began working every year, of course, I get a ton of continuing education classes, 40, 80, whatever hours a year. And over the years, I have also done teaching with the CalCPA, which is our professional organization in California, as well as at UCSB as a guest lecturer and at various other organizations. And as kind of part of my, I call it education, and my giving back to my profession, I was on the AICPA Council. That's the American Institute of Certified Public Accountants for six years. I was also on the board of CalCPA's Education Foundation, which is CalCPA, which is, again, the professional organization for CPAs here in California. It's the group that deals with their educational offerings to their thousands of constituents. And I was also on CalCPA's board.

Q Tell us about your past work experiences.

A So when I got out of college, changing my major to accounting, I worked for Arthur Young, which back then was

called one of the big eight public accounting firms. So it's aging me. I left there after about two years, moved to California, and started working for a small public accounting firm that was started by ex-FBI agents. They were bankruptcy trustees here in the Central District as well as other places. And there, I learned how to be a forensic accountant. I learned how to trace funds. I did all sorts of fun things. I also did a lot of litigation consulting. And being that the partners at the firm were bankruptcy trustees, I was very involved in the bankruptcy space.

From that firm that was called Nielsen, Elgin, Durkin & Company, they ended up selling the practice in, I want to say, '97 or '98 to another very large public accounting firm, which you've all heard of, called Arthur Anderson. I was at Anderson -- the group supplemented their bankruptcy restructuring practice. And then I left with one of the partners to go to FTI, where I continued in the bankruptcy space doing mostly restructuring. A lot of our clients were very large banks where we were helping them with troubled loans.

I'll get through the rest quickly. I was at Heming Morris as a partner for nine years. I had my own firm for a bit, and I was at BDO for about six years. I was at RSM for seven and a half, and I started with this firm in August of this year.

Q Do you have any certifications?

A I do. I am a CPA, certified public accountant. I mentioned my bankruptcy experience, so I have what's called a CIRA, which is certified insolvency and restructuring advisor certification. And I'm also certified in financial forensics.

Q How does your experience as a CPA relate to the litigation consulting you do?

A Well, most people are fighting about money. CPAs, our world is numbers. So a combination of my experience as a CPA, the opportunities it's provided me to be involved with various businesses, companies, business owners, et cetera, all of that together, along with my training over the years, it's kind of married the two.

Q Have you been previously qualified as an expert witness?

A Yes.

Q How many times have you testified as an expert witness?

A I want to say that today is the hundredth time I've testified as an expert between federal and state court depositions, arbitrations, trials.

Q Did Ameris engage you to provide expert testimony in this case?

A Yes.

Q And as an expert witness, do you always provide testimony on behalf of a defendant?

A No. Before I testify, I always go through my CV to get a sense of plaintiff-defendant, and my experience testifying is

pretty even between plaintiffs and defendants.

**MS. YEE:** Your Honor, at this time I'd like to offer Ms. Sebold as an expert in this case in forensic accounting, economic damages, and financial analysis.

**THE COURT:** Any objection?

**MR. SESSIONS:** No objections.

**THE COURT:** Okay. Ms. Sebold is qualified as an expert witness in this case on the issues just stated.

**BY MS. YEE:**

Q Ms. Sebold, what were you hired to do in this case?

A I was brought in. There was a lawsuit Mr. Byrne had filed against Ameris Bank. I was asked to evaluate the claims that were being made by Mr. Byrne and determine -- you know, take a look at those claims and potentially rebut them or offer my own opinions.

Q What analysis did you do in this case?

A I did a lot of analysis. I looked at a lot of documents. So to perform the analysis, I took a look at the LTIP agreement, which you've all heard many times in this case. I also reviewed the LTIP workbook, which was the underlying documents, the underlying support schedules related to the LTIP. I had various conversations, interviews with executives at Ameris Bank and then considered the whole host of other documents that I received in the matter. And in doing so, you know, to get to the point, formulated opinions that I'm here to

render.

Q You mentioned the LTIP and LTIP award agreement. So what annual performance periods were included in the LTIP?

A Well, the opportunities for performance awards were '22 -- 2022, 2023, and 2024.

Q And why is that important or relevant to your analysis?

A Well, I needed to know what period of time I was evaluating. So the LTIP lays out a three-year window with options to renew that agreement.

Q What is the primary performance metric for the LTIP?

A It is earnings before tax.

Q Can you explain earnings before tax or EBT?

A Yes. So earnings before tax is basically what a company is making before it's paying taxes. So it's revenue less the expenses prior to applying any taxes.

Q What is the relevance of the LTIP in this matter?

**MR. SESSIONS:** Objection, vague.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q How did you calculate the EBT?

A I looked at the books and records of the LTIP underlying documents, underlying schedules, I should say, along with, you know, the various financial information that I had to be able to determine what the earnings before tax number was.

Q What steps did you take to understand how Ameris applied

the LTIP in practice?
A A lot of what I did was take a look at, again, going back to these same documents, the core documents, what did the LTIP say? What did the underlying LTIP workbook say? I spoke with Mr. LaHaise. I spoke with Ms. Stokes. And, you know, together with the other information that I looked at, I was able to make determinations as to the LTIP calculations.
Q Why did you speak to Mr. LaHaise and Ms. Stokes?
A Well, they were both senior executives at Ameris Bank, were very knowledgeable about the LTIP itself, had direct dealings with Mr. Byrne. And, you know, they were the logical people to be talking to about these numbers.
Q What information did you learn from speaking to Mr. LaHaise and Ms. Stokes?
A I learned, you know, a lot of information. Number one, when there were questions that were raised as far as adjustments to be made to the LTIP, working with them to understand were those adjustments reasonable? What were the processes in place at Ameris? What accounting processes did they follow at Ameris? What did they understand to be processes that had been followed at Balboa? So those were some of the things that we discussed.
Q And how was the LTIP calculated?
A So the LTIP was calculated starting with the earnings before tax, and then there was a provision for loan losses that

needed to be considered and added into that number. And then from that, there was a -- what they had to be backed out was a provision for, like an adjusted provision at 1.25 percent.

Q You mentioned LTIP workbooks earlier. What workbooks did you review?

A Well, the LTIP itself was a narrative document. The LTIP workbooks were, it was a very large spreadsheet that included information, balance sheets, income statements. And the information was captured on, I believe, monthly, quarterly, yearly basis. So it was a detailed level relating to the numbers that were important in -- to be considered in the LTIP.

Q Did you submit a report in connection with your analysis?

A I did.

Q Did you have an opinion regarding the accuracy of Ameris's calculation of the LTIP for 2022?

A I did.

Q What is that opinion?

A My opinion is that Ameris properly calculated the LTIP in the year 2022.

Q Do you know how much was paid into the 2022 LTIP pool?

A The amount that was actually paid in was about $9,098,000, which was actually $385,000 more than what the calculation called for.

Q How do you know that?

A Well, I looked at the -- I looked at the LTIP calculation for 2022, determined that the amount should have been $8,713,045. But instead, the amount that was actually paid out was $9,098,000 and change.
Q Do you have an opinion regarding the accuracy of Ameris's calculation of the LTIP for 2023?
A I believe that Ameris calculated the LTIP correctly in 2023.
Q How did you reach that opinion?
A Again, I -- looking at the same documents, that LTIP workbook was very helpful. Discussions with Ms. Stokes, Mr. LaHaise, et cetera. And then considering any of the adjustments that were being requested by Mr. Byrne, pulling all of that together to determine what the LTIP should have been as compared to what Ameris said it was.
Q You testified earlier that you reviewed some emails. What emails did you review?
A I reviewed a bunch of emails. Some -- all of these related to this matter, of course. Most were involving Mr. Byrne, whether he was the sender of the emails or recipient, or there were discussions about requests that he had made. Those emails were, if I remember correctly, anywhere from 2022 through 2024 or so.
Q Are you familiar with Sarbanes-Oxley or SOX?
A I am.

Q How are you familiar with that?
A Well, every accountant is generally aware of Sarbanes-Oxley. Sarbanes-Oxley, otherwise known as SOX, S-O-X, is a federal law that was implemented in 2002. And it was a law that was enacted as, basically as a result of the Enron debacle, which was one of the biggest frauds in history. Enron, the company, went down as a result. Arthur Anderson, the auditor, went down as a result. And Sarbanes-Oxley was put in place to really help create a better sense of internal controls, put requirements on CFOs or people that are in charge of the numbers at public companies, and also to do some more oversight of auditors.

**MR. SESSIONS:** Your Honor, I'll object and move to strike. All of that is outside the scope and offering a legal opinion.

**THE COURT:** The objection is sustained.

**MR. SESSIONS:** And how about the motion to strike?

**THE COURT:** The motion is granted.

**MR. SESSIONS:** Thank you.

**MS. YEE:** Sidebar, Your Honor?

**THE COURT:** Pardon me?

**MS. YEE:** Sidebar?

**THE COURT:** No.

//

//

**BY MS. YEE:**
Q Are you familiar with the generally accepted accounting principles or GAAP?
A Yes.
Q What is it?
A Generally accepted accounting principles are essentially accountants' bible. They are a set of rules that help us in how assets are booked, liabilities are booked, revenue is booked, expenses are booked. So it's kind of our guidance.
Q Why is it important?
**MR. SESSIONS:** Objection, vague.
**THE COURT:** Sustained.
Q How do you use it as a CPA?
**MR. SESSIONS:** Objection, overbroad.
**THE COURT:** Sustained.
Q Did Ameris use GAAP accounting principles?
**MR. SESSIONS:** Objection, overbroad and vague as to time.
**THE COURT:** Overruled. You can answer.
**THE WITNESS:** Yes, Ameris used or followed GAAP in their financial statement reporting.
Q Why is that?
A Well, Ameris is a bank, and they're required to follow GAAP as a public company. I'll finish my answer.
**THE COURT:** Hold on. I think the objection was to

your answer. So what's the objection?

**MR. SESSIONS:** Objection. Move to strike. The answer is offering a legal opinion and in violation of the Court's prior ruling.

**THE COURT:** The objection is sustained and the motion is granted.

**MS. YEE:** Your Honor, improper motion to strike.

**THE COURT:** You can ask the next question, please.

**BY MS. YEE:**

Q Did you consider GAAP in your analysis in rendering your opinions in this case?

A Yes.

Q In this case, why did you consider GAAP guidance when evaluating the LTIP?

**MR. SESSIONS:** Object to the extent that it calls for a legal opinion.

**THE COURT:** The objection is overruled. You can answer.

**THE WITNESS:** A couple of reasons -- well, many reasons, one being that the LTIP agreement does mention GAAP. It also talks about rules and regulations that are to be followed. And in addition, Ameris followed GAAP. Also, Balboa was audited by RSM, and there, in discovery, I was able to review some of their financial statements that were issued, and Balboa also followed GAAP.

**BY MS. YEE:**

Q Ms. Sebold, did you include your professional opinions in your expert report?

A Yes.

Q Did you include a summary of opinions in your report?

A Yes.

Q How many opinions did you render in that report?

A On my December 5th report, I rendered four opinions.

Q Let's talk about your opinion regarding the requested adjustments. What is it?

A So my third opinion is that Byrne's requested adjustments were not supported by GAAP or the terms of the LTIP agreement.

Q Why did you reach that opinion?

A After reviewing the various adjustments that Mr. Byrne requested for both the '22 LTIP and the '23 LTIP, I determined that those adjustments were improper, so I needed to take a look at them and understand what he was requesting before I could make that determination.

Q Yes, please. Can you please go through each of them whenever you're ready?

A Sure. I'm going to start with 2023. So in 2023, there were several emails from Mr. Byrne, and ultimately in January of 2024, there was an email that was dated January 15th, and in that email, Mr. Byrne requested that there be six adjustments made to the LTIP calculation. So remember, this is January of

2024, so he's talking about the prior year's LTIP. And the first adjustment he was asking about and requesting an adjustment of $554,191 was relating to stipulated judgments.

Q What is a stipulated judgment?

A A stipulated judgment is basically a court judgment. The court has decided on an amount.

Q And was Mr. Byrne correct in requesting this particular adjustment?

A No. What Mr. Byrne did was he provided a schedule that showed these various stipulated judgments, so basically listed out amounts that were owed to Balboa. And from that, he knew how much of that had been paid. And there was another $554,000 that was unpaid, so I think the total was about 900-some odd thousand dollars. What Balboa would do in the past or had done in the past was to, if they were paid a portion of an amount that was due, they would take the rest of it into income also. So basically recognizing revenue that they were never going to receive. An example would be kind of in a bankruptcy, you hear things about in a bankruptcy, the creditor got 5 cents on the dollar, they didn't get the other 95 cents. But Mr. Byrne's position was that that should all, that 95 cents should be taken into revenue. This is completely contrary to accounting guidance, and so upon my review of that, I determined that that should not be an amount to add back to increase the LTIP.

Q Did the LTIP agreement discuss anything related to

stipulated judgments?

**MR. SESSIONS:** Objection. It calls for interpretation of the LTIP in violation of the Court's prior ruling.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q Did the term "stipulated judgment" appear in the LTIP agreement?

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

Q What is your opinion on the LTIP agreement regarding stipulated judgments?

**MR. SESSIONS:** Same objection.

**THE COURT:** Sustained.

Q Did Mr. Byrne provide any support regarding his position on stipulated judgments?

A Yes. As I mentioned before, he provided a schedule where he listed out the line items of all of the items that equaled about $900,000 and change, and then showed on that schedule what had been paid, as I recall. And then the difference was the $554,000 that he's requesting be added back to the LTIP.

Q Ms. Sebold, are you familiar with Ms. Dickson's opinions?

A Yes.

Q How are you familiar with Ms. Dickson's opinions?

A I've reviewed both of her reports, the one that was filed

in January, I think it was January 2nd, and the other report, her second report, that was filed in May of this year. I've also reviewed her deposition transcript and, of course, sat here today while she testified.

Q What did Ms. Dickson conclude on stipulated judgments?

A Ms. Dickson, in her reports, agreed with Mr. Byrne and included the $554,000.

Q Do you agree with Ms. Dickson's conclusion?

A No. As I just stated before, I don't agree that the stipulated judgment amount should be included in the LTIP. The collectability is doubtful. It should not be recognized as revenue.

Q Can you tell us what's the next adjustment that Mr. Byrne requested?

A So, again, this is talking about 2023. The next requested adjustment related to depreciation.

Q What is depreciation?

A So depreciation is a way of recognizing costs over time. So as an example, if a company buys all new furniture for the fifth floor of the building they're renting and it costs them $100,000, they don't have to recognize that entire $100,000 in expense that year. It gets allocated over a course of several years.

Q What was Mr. Byrne's demand?

A So there's been discussion over the course of this trial

about the stock purchase agreement and about the sale of Balboa to Ameris. One of the other things that, in addition of course to stock, one of the things that Ameris purchased were some of the assets of Balboa. And some of the assets included things like furniture, like laptops, like computers, like signage. Some of that equipment, I'll call it equipment in general, was fully depreciated and some of it wasn't. When Ameris purchased that equipment, there's a remaining period of time to depreciate those assets. Meaning that Ameris -- meaning that the expense associated with that equipment would be allocated to Balboa and backed out of any LTIP calculation. Mr. Byrne did not agree with that. He, for whatever reason, thought that once that equipment went over to Ameris, he was not responsible for depreciation. That equipment was still being used by Balboa. Ameris had every right to continue depreciating that equipment, which is what they did. That amount is about $145,741 and Mr. Byrne wanted to add that back to the LTIP calculation.

Q What was your conclusion regarding his depreciation request?

A My conclusion was that it was improper. I had looked at a listing of equipment. I had seen the -- you've heard about the Pioneer Model. Even in the Pioneer Model, there is evidence of furniture and equipment, et cetera, that was not fully depreciated and that it was projected to continue to be

depreciated into the future once it was post-acquisition. So, reviewing all of those things, I just -- there's no reason to add that depreciation back into the calculation.

Q Did Ms. Dickson offer her opinion on this subject?

A Again, Ms. Dickson agreed with Mr. Byrne and backed out depreciation in 2023.

Q What is the next adjustment that Mr. Byrne requested?

A The next adjustment has to do with overhead and there was discussion about overhead before and the overhead that we're talking about here is salaries for employees that were associated with Balboa and continue to do work for Balboa and Balboa initiatives after the acquisition.

Q What was Mr. Byrne's request regarding overhead compensation?

A So, in 2023, Mr. Byrne was requesting that $6.5 million in overhead be added back into the LTIP, claiming that the employees did not work directly for Balboa once the acquisition happened and wanted that money added back in.

Q Was Mr. Byrne correct?

A No.

Q Why not?

A Well, a couple of reasons. One, as part of the stock purchase agreement, there was a -- I think they called it employee census maybe, I can't remember the exact name, that listed out the employees that were Balboa employees. There was

also obviously a list of employees at Ameris that -- Ameris had a whole list of employees that worked for Ameris. I compared some of the names that were on the stock purchase census document to determine whether or not -- what their position was, whether they were working for Balboa.

In addition, I had conversations with Mr. LaHaise, who was very close to HR and understood the role of each of the employees and what they were doing. I also had conversations with Ms. Stokes. And these employees were directly involved with Balboa and therefore were part of expenses that Balboa was responsible for paying. And there was no reason to instead turn around and add that back into the LTIP.

Q What was your conclusion regarding the overhead compensation adjustment made by Ms. Byrne?

A That it was improper.

Q Did you review Ms. Dickson's opinion on this subject?

A I did.

Q What is it?

A So Ms. Dickson adjusted, I can't remember if it was in her first or second report, but adjusted the overhead down. So she did not agree with Mr. Byrne. His number, as I said, was $6.5 million. Ms. Dickson's number was, I think, $5,210,000. And that's the amount that she believes should be backed out of the LTIP in 2023.

Q What is the next adjustment by Mr. Byrne for 2023?

A Mr. Byrne also wanted an adjustment for tax benefits.
Q Can you explain what that means?
A Yes. So we talked before about earnings before tax. And it was mentioned that the -- that means don't back taxes out of revenue expenses, don't think about taxes yet. And so, it kind of goes both ways. You're not going to be backing taxes out in earnings before tax calculation. And you're also not going to be adding in a tax benefit. So, Mr. Byrne, there was some sort of tax benefit that related to Balboa. And Mr. Byrne wanted to add that back in, in what was clearly an earnings before tax basis LTIP. So I disagree with that.
Q What did you conclude regarding that particular request?
A That it's improper and it's wrong.
Q What did Ms. Dickson conclude related to this adjustment?
A Well, there were two conclusions. The first, or two changes of opinion, I guess I should, or one change of opinion, I should say. Her first opinion was that the tax benefit should be added in. And that was in her January of '26 report. In her May of '26 report, she did not include the tax benefit. So I think realized that, I can't speak for her, but she did not include the tax benefit in her second report.
Q What is the next adjustment made by Mr. Byrne?
A So the next adjustment is interim rent.
Q And for all of us, what is interim rent?
A So interim rent, I think someone just explained it before.

It's basically rent that is owed for the period between when a piece of equipment is delivered and when the lease actually starts. So, it's, you know, could be a day, could be 15 days, could be whatever it is. So it's that interim period rent.

Q And what was Mr. Byrne's request regarding the interim rent?

A Sure, and Mr. Byrne requested that $1,974,174 be added back to the LTIP relating to interim rent.

Q And what was your conclusion regarding Mr. Byrne's request?

A That that is improper. So I disagree.

Q Is it improper under GAAP?

A I believe during Ms. Dickson's testimony, she was showing some of the accounting standards code sections, one of which relates to interim rent. Basically, in -- I think sometime in about 2020 or so, there was more specific accounting guidance around interim rent. What should happen with interim rent is it should be considered part of the entire lease payments over the term of the lease. So if you're in a five-year lease and there's 15 days of interim rent, it should be really added into the entire payments due under the lease.

What Mr. Byrne was doing at Balboa was taking that interim rent into income immediately, so counting it as revenue, which is improper under GAAP. Ameris, on the other hand, would follow the regulations and would include it as part of the

lease payments over time. And when I looked at, I mentioned before the Pioneer Model, when I looked at the Pioneer Model, the Pioneer Model really anticipated that there was going to be compliance with this, it's ASC-842. And the Pioneer Model built that in on a going-forward basis in the projected future periods.

Q What materials did Mr. Byrne provide to support his position?

A He, as far as I know, did not provide anything. I didn't see any documents.

Q Did Ms. Dickson offer her opinion on this?

A Yes, and she agreed with Mr. Byrne.

Q What was Ms. Dickson's conclusion for interim rent?

A She added interim rent back into the LTIP calculation.

Q How did she conclude on that amount?

A Well, her conclusion was that $1,974,000 should be added back to the LTIP.

Q What is your opinion of Ms. Dickson's adjustment?

A Well, I don't agree with Ms. Dickson's adjustment. I don't agree with Mr. Byrne's demand. I don't think it's proper.

Q What is the next adjustment Mr. Byrne requested?

A One of the other adjustments he requested related to repossessions.

Q And what is repossession?

A So repossession is when there's been a lease of equipment, for example, and the lessee stops paying on the lease, they take the asset back, the equipment back.
Q And what was Mr. Byrne's request on repossession?
A Mr. Byrne requested that $1,457,448 in 2023 be added back to the LTIP.
Q Was he correct?
A No, my opinion is he's not.
Q Why not?
A So if you -- so with repossessions, what Mr. Byrne under Balboa was doing was if, for example, a backhoe, somebody's renting a backhoe, and it costs them $50,000, and they pay $5,000 toward the lease over time. There's still $45,000 owing on it, and they stop paying. And so Balboa goes in, and I'm sure they themselves, but they hire somebody to repossess that property. Oftentimes it then goes to auction, and you've heard of these big equipment auctions that are out there. And in the auction, as much as the original cost of the equipment was $50,000, there's $45,000 remaining owed on that piece of equipment. But when they sell it, they get $15,000. So there's going to be -- what should happen is that -- and what Ameris would do is that they would take that $15,000 that they received at the auction into revenue right away because the equipment's gone. And then they would write off the difference between what they were owed and what they got for the piece of

equipment. What Mr. Byrne did was different. He would -- through Balboa, he would take that money, that let's say -- what did I say -- $15,000 that he received, and he would book it as prepaid rent. Well, that makes no sense. Number one, he doesn't have the equipment anymore. He has now sold it at auction, so he's not renting anything. Number two, he then would -- from that prepaid rent, he would every month take something out of that as though another rent payment was being paid, so that that prepaid rent goes down, he's taking that into income over time. But all that does is delay him writing off the rest of that loss essentially and it makes it looks like he had a, you know, a good loan still, which he didn't.

So it was improper on many levels. So I don't agree with that adjustment at all.

Q Did Ms. Dickson offer her opinion on this proposed adjustment?

A Yes. Ms. Dickson's opinion was that it should -- the 1,457,000 should be added back into the LTIP calculation.

Q Do you agree with that?

A No.

Q Ms. Sebold, we just finished discussing all adjustments for 2023. Were there any adjustments for 2022?

A Yes, there were adjustments requested or demanded for 2022.

Q What adjustments did Mr. Byrne ask for?

A I just talked about six different adjustments. In '22, there were three different adjustments. This again was from an e-mail dated January 29th of 2024, at which time he requested that overhead compensation for accounting, IT and marketing be added back, tax benefits in 2022 be added back, and again a depreciation fee added back in 2022.
Q Were his requested adjustments proper?
A No. I don't agree with any of those adjustments for the same reasons I just described relating to 2023. The overhead adjustment he was requesting was $3.3 million. The tax benefit amount he was requesting was 596,000 and the depreciation that he was requesting was $210,000.
Q So after reviewing Mr. Byrne's e-mails and the categories of 2022 and 2023 adjustments he requested, what was your overall conclusion?
A That his adjustments requested were improper.
Q Ms. Sebold, do you have another opinion?
A I do. I have an opinion regarding security deposits.
Q What was that opinion?
A Ameris' recording of unclaimed security deposits that were acquired in the Balboa transaction are supported by GAAP and accounting principles.
Q What is security deposit?
A Security deposit is an amount of money that, for example, a landlord you're going to rent your first apartment and the

landlord requires a first months' rent as a security deposit, so you've found an apartment with your friend, it's $2,000 a month and you have to come up with $2,000 that the landlord is going to keep until such time as you -- your lease is up.

So it's essentially a liability to the landlord. They have an obligation to pay it back, unless of course there's damage to the property or anything like that, they have the right to take monies out of that.

Q What was Mr. Byrne's request for a security deposit?

A So Mr. Byrne requested that he be paid -- this was separate from the LTIP. The security deposit request that he was making was a separate item from the LTIP. It basically was a request to increase the purchase price that Ameris paid for Balboa.

So what he did was he claimed that there were, I think it was $653,000 in security deposits and he wanted that multiplied by 3.1 percent -- I'm sorry, 3.1 which was the multiple that was applied when Balboa was sold to Ameris.

Q Was his request proper?

A No, it wasn't proper and I can tell you why. When I described before the apartment, so let's say you rent the apartment, you're there for two years and you leave, and you go and buy your first house. And three months later, you go oh, my gosh, I forgot to ask for my security deposit back. And you go back to the landlord and they say too bad, not going to give

it to you because you forgot to ask me. That's essentially what Mr. Byrne was doing.

If the lessee did not ask for their security deposit back, he included it as revenue. That is -- it's not revenue, it's a liability on the part of the lessor or the -- in my example, the landlord to hold that and return anything that is due back to the party that rented the property.

Q What is your conclusion regarding Ameris' methodology for security deposits?

A Well, I -- the way Ameris did it was that if they leased property and they requested a security deposit in the course of that lease, they would refund that security deposit less if there's any damage, as I described before. And that is in accordance with GAAP, that is what's supposed to be done.

Q What is Ms. Dickson's conclusion on security deposits?

A In Ms. Dickson's first report, she agreed with Mr. Byrne and included the security deposit as an additional damage that would increase the purchase price. And in her second report, she did not include security deposits.

Q So she removed it from her conclusions in the second report?

A Yes.

Q What is your opinion regarding the security deposit?

**MR. WOOD:** Based on testimony, I'll object and move to strike because all this discussion is irrelevant.

**THE COURT:** Sustained, the motion is granted.

**BY MS. YEE:**

Q Let's turn to your next opinion, what is that?

A So one of my other opinions relates to the 2022 LTIP. The calculation was $8,713,045 and this was based on the performance formula for the '22 performance period and that calculation, according to my analysis, it was no additional payment due to Mr. Byrne in 2022.

Q How did you come to this conclusion?

A So in arriving at that conclusion, the idea here was to, you know, come up with -- you know, what is the amount that's actually -- could potentially be owed as an additional kicker, a bonus under the LTIP.

So what I did was I looked at the -- their earnings before tax or the income before tax for 2022, pulled that number from the financials and that number was -- and just to clarify, this all relates to Balboa and the Balboa results.

So the income before taxes for 2022, let me get to the right year, hang on one second. For 2022 it was $53,414,000 rounding, so they had seemed to have done very well. In doing the calculation to that number, the provision for loan losses had to be added back, so that number was $21,992,000 and then from that, there is an adjustment for 1.25 percent and that number is $13,512,000.

So in 2022 the calculation per Ameris which I confirmed

was that the LTIP earnings before tax number, which is a combination of those three figures I just mentioned was $61,894,000.

Remember in 2022, the threshold or the goal that Balboa had to exceed was 37 million. So the difference between almost 62 million and 37 million was $25 million. So on 35 percent of $25 million would then be allocated to the performance pool and that number is $8,713,000. So that money was available and distributed as part of the 2022 LTIP.

And I think I mentioned earlier that Ameris actually paid in addition to that another $385,000. So the total amount that was paid out in the '22 pool exceeded even the amount called for in the calculation and that amount was $9,098,000.

Q What is your next opinion, Ms. Sebold?

A My next opinion is relating to 2023, again with respect to the LTIP and my opinion is that the '23 LTIP calculation did not meet the threshold for award for the '23 performance period resulting in zero payment due to Byrne.

Q How did you come to that conclusion?

**MR. WOOD:** Objection, cumulative.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** So in getting to that conclusion again I followed the same formula as I did in 2022. I looked at the income before tax as of 12/31 of '23. I added to that the provision for loan losses and this is where the LTIP workbook

came in handy because it had these numbers available.

I backed out of that the adjusted provision of 42 -- almost $43 million, resulting in the -- what is called the LTIP earnings before tax of $46,600,000.

When I then compared that to the 2023 benchmark that had to be exceeded before Mr. Byrne would be entitled to any percentage, the 35 percent, I should be more specific, that target in 2023 went up to $48,500. So remember in '22 -- yeah, '22, it was 37 million was the benchmark. Come 2023 it's now 48 million 5, that's another 11 plus million.

So comparing the LTIP calculation that I made of 46 million 6 to the 48 million 5, the LTIP calculation was lower than what was the benchmark, therefore there was no opportunity for a performance bonus that year.

**BY MS. YEE:**

Q Thank you, Ms. Sebold. You just walked through each of your opinions in this case and I want to make sure that I understand that. Can you please explain your ultimate conclusion regarding those requested adjustments by Mr. Byrne.

**MR. WOOD:** Objection, cumulative.

**THE COURT:** Sustained.

Q Ms. Sebold, you -- can you explain to us regarding the past practice?

**MR. WOOD:** Objection, vague.

**THE COURT:** Sustained. Whose past practice are you

talking about?
Q Ms. Sebold, have you reviewed the LTIP agreement in this case?
A Yes.
Q Do you recall a term called past practice in the LTIP agreement?
A I recall seeing past practice mentioned, yes.
Q What is your understanding of that term?
**MR. WOOD:** Objection, calling for the witness to interpret the LTIP.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Ms. Sebold, what is your opinion regarding Ms. Dickson's conclusion of past practice?
**MR. WOOD:** Objection to the extent misstates prior testimony, vague.
**THE COURT:** The objection that the question is vague is sustained. If you have -- you can ask her about her opinions but on the case, but not opinions about testimony.
Q Do you have an opinion regarding Ms. Dickson's conclusion on past practice?
**MR. WOOD:** Same objection.
**THE COURT:** Sustained.
Q What is your opinion regarding past practice?
**MR. WOOD:** Same objections, calls for a legal opinion

and calls for the witness to interpret the contract.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q In your opinion as an expert, what is the proper way to establish past practice?

**MR. WOOD:** Objection, vague and calls for interpretation of the LTIP.

**THE COURT:** Sustained. Counsel, approach please.

**(Begin sidebar at 3:55 p.m.)**

**THE COURT:** So I'm not quite sure what you're trying to get at. If you're talking about Ameris' past practice or Balboa's past practice or if there's something specific with outline that you need to ask a specific question about that; otherwise, I don't know what --

**MR. WOOD:** If I may, Your Honor, I think what Ms. Yee's referring to is the contract says the past practices are to be applied and so I think she's asking the witness to interpret what that means, which is improper.

**THE COURT:** Right.

**MS. YEE:** Well, Your Honor, plaintiff's expert testified about past practice even though that term is never defined in the agreement, so I'd like to know what our expert's opinion on that past practice.

**THE COURT:** That's not relevant to this case. If she -- to the extent that she incorporated a past practice

analysis she has and can testify to that, but she can't testify as to what past practice means in the LTIP because she's not a legal expert.

**MS. YEE:** That's fine, Your Honor. I don't have other questions.

**THE COURT:** Oh, okay. I just wanted -- I mean I don't --

**MS. YEE:** No, no.

**THE COURT:** -- want to cut you off, I just want to --

**MS. YEE:** Oh, no, I appreciate that.

**THE COURT:** -- make sure that to the extent that to the extent I can direct you to where you need to go I can do that.

**MS. YEE:** Yeah, that's fine, thank you.

**(End sidebar at 3:57 p.m.)**

**MS. YEE:** I don't have any questions for Ms. Sebold, thank you.

**THE COURT:** All right. Thank you. Cross-examination, Mr. Wood, when you're ready.

**MR. WOOD:** Very briefly, Your Honor. I'm going to make sure I'm as brief as possible.

**THE COURT:** Okay. Thank you.

**MR. WOOD:** All right.

//

//

**CROSS EXAMINATION**

**BY MR. WOOD:**

Q All right. Good afternoon, Ms. Sebold, my name is Andrew Wood. It's a pleasure to meet you.

A Thank you, you too.

Q Thank you for being here today.

I just want to confirm a couple of things. So you were brought into this matter after the dispute had already arisen, right?

A Of course.

Q And you're not Ameris' outside auditor, right?

A No.

Q You've never been Ameris' outside auditor; is that right?

A No, I'm not.

Q So you've never issued an audit opinion regarding Ameris' calculations under the LTIP, right?

A Correct.

Q And a lot of the work that was performed in this engagement was completed by some of the other personnel at your firm, right?

**MS. YEE:** Vague.

**THE WITNESS:** I work with my staff on all of my cases, yes.

Q Yes, you didn't personally perform all of the work reflected on your firm's billing records, for example, right?

**MS. YEE:** Argumentative.

**THE COURT:** Overruled. You can answer.

**THE WITNESS:** I did not perform all of the work. I had a team of people helping me with this case.

**BY MR. WOOD:**

Q Okay. And for your analysis, you relied on the numbers and financial information that Ameris provided to you, right?

A No, I relied on the LTIP workbook, I relied on the LTIP agreement, I relied on conversations with Ms. Stokes, Mr. Lahaise, I relied on the other documents that are listed in my report as being documents I considered. So it's a host of things.

Q All of that information was provided by Ameris, right?

A Well, all that information was through discovery whether it was Ameris document or a Balboa document, of course it came to me through counsel through discovery.

**MR. WOOD:** All right. Your Honor, at this time, I'd like to impeach the witness with lines -- with page 10, lines 2 through 9 of her deposition.

**THE COURT:** Do you have it electronically?

**MR. WOOD:** I believe we do.

**THE COURT:** Okay.

**MS. YEE:** What lines, counsel?

**MR. WOOD:** Page 10, lines 2 through 9.

**THE COURT:** Any objection?

**MS. YEE:** No objection.

**THE COURT:** Okay. Go ahead.

**BY MR. WOOD:**

Q All right. The question in the deposition -- and you recall taking your deposition, Ms. Sebold?

A I didn't take it, but I attended it, yes.

Q Correct, you gave your deposition, right?

A Yes.

Q Okay. And you swore to tell the truth in that deposition, right?

A Yes.

Q Okay. So the question here was,

"For purposes of your analysis did you assume that the accounting inputs that were provided to you by Ameris were accurate?

"A Yes."

**MR. WOOD:** Okay. We can take that down.

Q All right. So you were not independently auditing all of that information yourself, right?

A No.

**MS. YEE:** Vague, overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I was not asked to audit. I was reviewing the information, conducting forensic analysis as appropriate and, you know, looking at a host of information to

be able to determine and come to the conclusions that I did and opinions.

**BY MR. WOOD:**

Q Yeah, so you didn't recreate the LTIP workbooks you reviewed, you didn't recreate -- I apologize, strike that.

So for the LTIP workbooks you've talked about reviewing, you didn't recreate those from the underlying general ledger transactions, right?

A There was no reason to, no, I didn't.

Q Okay. You didn't go through all of the underlying transactions yourself?

**MS. YEE:** Vague.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No, I did not go through all of the underlying documents.

**BY MR. WOOD:**

Q Okay. Thank you. And you also did not independently verify every charge off that was reflected in the materials you reviewed, right?

A No, I did not.

Q And you also did not independently verify the loan growth figures from the underlying source documents?

A My job was not to audit the loan growth, my job was to evaluate the information that was available.

Q Right. So to answer my --

A And the LTIP workbook included a high level of detail, much of which was analyzed by me and my team, verified as to the calculations being accurate.

**MR. WOOD:** Move to strike the answer as non-responsive.

**MS. YEE:** Improper motion.

**THE COURT:** The motion is granted and the response is stricken.

**BY MR. WOOD:**

Q So to answer my question, you also did not independently verify the loan growth figures from the underlying source documents, right?

**MS. YEE:** Vague, lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I did not.

Q Okay. Instead you recalculated the figures using information provided to you by Ameris, right?

A Again I used information that I received from Ameris in discovery which included the LTIP workbook and other documents.

Q Okay. If I were to give you the underlying documents and ask you to do an independent in-depth forensic analysis of those documents, there's a chance your opinions could change?

A Of course.

**MS. YEE:** Incomplete hypothetical.

**THE COURT:** Overruled.

Q Okay. Your answer was of course, did I hear that right?
A Yes, my opinion -- my answer was, yes.
Q Yeah. So your opinions are only as reliable as the information you were given, right?
A My information is as reliable as the information given along with the testing that I had done of the information that I received in this case. This is what I do as a forensic accountant all the time.

**MR. WOOD:** Okay. Move to strike everything after -- actually move to strike the entire answer as nonresponsive.

**MS. YEE:** Improper motion.

**THE COURT:** The motion is granted and the entire answer is stricken, but I do want you to ask her the question again because part of it was responsive.

**MR. WOOD:** Sure.

**BY MR. WOOD:**

Q So your opinions are only as reliable as the information you were given, correct?

**MS. YEE:** Vague.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I really can't say yes to that but I'm given information and then that information is tested. So it's not only as reliable as the information I'm given.

Q But at the end of the day your opinions are based on the information you're given, and not anything other than that,

right?
A No, no.
**MS. YEE:** Argumentative.
Q Okay. In forming your opinions, you also interviewed some Ameris personnel, right?
A Yes, I did.
Q You interviewed Nicole Stokes?
A Yes.
Q You interviewed James Lahaise?
A Yes.
Q And those are the only fact witnesses you interviewed to form your opinions, right?
A I know I talked to Jody Spencer also. I don't think I talked to anybody else. I'm not sure what capacity Mr. Spencer's in, so.
Q You understand that Mr. Spencer is Ameris' in-house lawyer, right?
A Yes.
Q But you didn't interview Mr. Byrne, right?
A I did not.
Q And you didn't interview former, any other former Balboa Capital accounting personnel?
A No, I did not.
Q You didn't interview Balboa Division personnel outside of Ameris management?

A No, I did not.
Q Some of the opinions you're offering here involve, you know, accounting treatment issues, right?
**MS. YEE:** Vague.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes.
**BY MR. WOOD:**
Q And in forming those opinions, you applied some accounting principles and methodologies?
**MS. YEE:** Vague, overbroad.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yes.
Q And that involved some degree of professional judgment, right?
A Well, there's rules to follow and then there's a certain level of professional judgment that needs to be applied, yes.
Q All right. Applying GAAP would often involve the exercise of professional judgment, right?
A Yes.
Q So accounting isn't always just plugging numbers into a formula, right?
A So it is not.
Q Okay.
**MR. WOOD:** So I'd like to pull up Exhibit, I think it's 546, which has previously been admitted into evidence.

I'd like to publish that please.

**THE COURT:** Go ahead.

**MR. WOOD:** So let's go to assumption F please

**BY MR. WOOD:**

Q Okay. So this says the allowance for loan losses calculations and expenses for Balboa will be the greater of one actual net charge offs or two, 1.25 percent of net investment and direct financing leases. Do you see that?

A I do.

Q And in your analysis, you didn't apply this, right?

A I explained before how I applied the figures to come up with the LTIP calculation.

Q So to answer the question, you didn't apply this provision, right?

A I think the -- not specifically what it says here.

Q And you believe the Pioneer model correctly calculates the provision for losses on direct financing leases as shown in the Pioneer model and defined in the agreement, correct?

A I'm sorry, you'll have to repeat that.

Q Sure. So you -- one of your beliefs in forming your opinion is that the Pioneer model correctly calculates the provision for losses on direct financing leases as shown in the Pioneer model and defined in the agreement, right?

A One of my opinions?

Q No, that's one of the things that you assumed when you

were forming your opinions, right?

**MS. YEE:** Vague, overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I'm sorry, would you mind repeating the question.

**BY MR. WOOD:**

Q We'll go on. But in reaching your opinions, you applied a calculation that you describe as quote, based on the greater of 1.25 percent of loan growth plus actual net charge offs to maintain 1.25 percent on portfolio or actual net charge offs, right?

A Yes.

Q And that doesn't apply key assumption F, right?

**MS. YEE:** Vague, lacks foundation.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** No.

Q No, I'm not right or no, it doesn't apply to key assumption F.

A No, it does not apply to key assumption F. The calculation that -- what I'm looking at is the charge offs, any time there's charge offs we have to bring that -- the bank would have to bring that number back up to where it should be.

Q Okay.

A So to that charge off number, the growth in loan value year over year was multiplied by 1.25 percent and that was

done, designed to be able to keep their allowance at 1.25 percent of the overall loan.

Q Okay.

**MR. WOOD:** And move to strike everything after no.

**THE COURT:** Motion is granted.

**BY MR. WOOD:**

Q All right. Loan growth and net investment in direct financing leases are different concepts, right?

A Yes.

Q They're different financial metrics?

A I guess you could call them that.

Q And they involve different calculations.

**MS. YEE:** Vague.

**THE COURT:** Overruled.

**THE WITNESS:** They involve using many of the same figures but they are different calculations.

Q Okay. All right. And key assumption F that we just looked at does not reference loan growth, correct?

A If you want to put it up on the screen for me again I can look at it.

Q Sure.

A Thanks. No, the word growth is not there.

Q Okay. Thank you.

**MR. WOOD:** You can take that down.

Q Your opinion is also based on a $1.1 million dollar charge

off adjustment for 2022, right?
A Yes, it is.
Q Okay. And again, you did not independently calculate that figure from the underlying source transactions, right?
A No, I did not.
Q Your calculation also included a $1.887 million reduction for 2023, right?
A That's correct.
Q Okay. And you understood that adjustment to relate to the MHD recovery identified in the stock purchase agreement.
A Yes.
Q And that figure was based on -- but you didn't -- I apologize. But you didn't independently audit or verify every component of that reduction, right?
A No, it did not seem necessary considering it had been specifically outlined in the stock purchase agreement.
**MR. WOOD:** I'll move to strike everything after no.
**THE COURT:** Motion is granted.
**BY MR. WOOD:**
Q All right. Let's walk through some of the other adjustments that you looked at. So you rejected Mr. Byrne's proposed interim rent adjustment, right?
A That's right.
Q Okay. And your analysis of interim rent relied on ASC 842, right?

A I believe so, yes.
Q Okay.
A Yes, 842.
Q All right. But you didn't independently determine how Balboa Capital historically accounted for interim rent before the Ameris acquisition, right?
A Well, part of the problem with that was that requests for evidence of how Balboa had accounted for things in the past was never provided. There was talk about past practice without any evidence of what that past practice was.
Q Well you talked with -- well, you testified earlier you spoke with Mr. Lahaise, right?
A I did.
Q You spoke with Ms. Stokes, right?
A Right.
Q Right?
A Yes.
Q And you spoke with in house counsel, Mr. Spencer, right?
A I did.
Q And even based on those -- all those conversations, you didn't have an understanding of what this meant?
A Of what this meant? Of course, I have an understanding of what it meant.
Q So you did have an understanding of what the historic accounting practices of Balboa were.

A What I -- I think you're misconstruing what I'm saying.
Q Okay.
A You asked me whether or not about past practice and what I'm saying to you is I was able to talk to Ameris personnel, et cetera to understand what their interpretation of Balboa's past practice was as represented by Mr. Byrne. But with respect to provide -- Mr. Byrne providing specific evidence, you're talking about evidence before, specific evidence as to what that past practice actually was, I didn't see anything.
Q Okay. I think I'm a little confused, because I think I'm asking about something different. So what I had just asked was about the historic -- so you didn't independently determine how Balboa Capital historically accounted for interim rent before the Ameris acquisition, right?
A I didn't because I don't -- I never received that information through discovery from Mr. Byrne.
Q And you didn't receive that information through all the communications you had with Ameris, right? That's a yes or no.
A Through communications, no, I mean I had conversations, but again with respect to documents being received to be able to see for myself to see what the past practice was, I -- that was never produced by Mr. Byrne.

**MR. WOOD:** Thank you. I'll move to strike everything after no, and Your Honor, I'm doing my best here with the long answers.

**THE COURT:** I know. The motion is granted.

**BY MR. WOOD:**

Q All right. And you've testified that you believe that certain adjustments that Mr. Byrne requested were inconsistent with GAAP, right?

A Yes.

Q Okay. But whether an accounting treatment complies with GAAP is a different question from what compensation formula the parties agree to use, right?

A I think that seems like a legal question, but you know, my opinion is based on looking at the documents, looking at how things were treated, using my opinion to determine how I think things should have been treated.

Q So to the answer to that question is yes then, right?

A Well, there certainly can be a difference between GAAP and how, you know, another contract or something is interpreted.

Q Okay. And an incentive compensation plan can incorporate metrics that differ from GAAP measures, can't they?

A I -- I mean, again I think that's a legal question, but Mr. Byrne seems to have taken that position.

Q Okay. And you're not saying that Ameris' methodology is the only possible way to calculate the LTIP, right?

A Well, I'm reviewing these documents as an expert and perhaps there's different ways to interpret the LTIP, but my calculations are what I described earlier as being what I

believe the LTIP calculation to be.

**MR. WOOD:** All right. No further questions.

**THE COURT:** Okay. Any redirect?

**MS. YEE:** No, Your Honor.

**THE COURT:** Okay. Thank you, Ms. Sebold.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Okay. Next defense witness, Ms. Yee.

**MS. YEE:** Dr. Lechuga.

**THE COURT:** Thank you.

**(Pause)**

**THE COURT:** Okay. Doctor, you can come forward. You're going to come around this way and when you get to Ms. Jackson she'll swear you in. And then you're going to come around and have a seat on the witness stand next to me.

**THE CLERK:** Would you please raise your right hand?

**DAVID LECHUGA, DEFENSE WITNESS, SWORN**

**THE CLERK:** And I'm going to ask that you state your name and spell your last name for the record.

**THE WITNESS:** Sure, David Michael Lechuga, regular spelling, last name is L-E-C-H-U-G-A.

**THE COURT:** Thank you. Ms. Yee, you may proceed when you're ready.

**MS. YEE:** Thank you, Your Honor.

//

//

**DIRECT EXAMINATION**

**BY MS. YEE:**

Q Good afternoon, Dr. Lechuga. Where are you currently employed?

A I'm self-employed, I have my own practice, ma'am.

Q Can you describe briefly your work for the Neurobehavioral Clinic and Counseling Center?

A Sure. I'm the director of the clinic. We work with patients who have traumatic injuries, ranging from the brain, psychological, physical and in that practice, and do extra witness work and I also take care of professional athletes who have sustained concussions.

Q Can you briefly describe your educational background and training as a psychologist?

A Yeah, I'll keep it brief. So undergraduate degree at Long Beach State, research in psychology and Ph.D. from UCLA and post-doctoral training in rehabilitation, neuropsychology, clinical psychology and board certified in clinical psychological, rehabilitation psychology and neuropsychology.

Q Are you a licensed psychologist?

A Pardon me?

Q Are you a licensed psychologist?

A Yes, California, Hawaii and Arizona.

Q Have you long practiced in the field of psychology?

A Oh, it'll be -- it's 39 years this month.

Q Can you describe your experience in psychological evaluations in the forensic of psychology?
A Yes, I mean that's --
**MR. BLOKS:** Objection, compound.
**THE WITNESS:** -- how we're trained.
**THE COURT:** Hold on for one second.
**MR. BLOKS:** Objection, compound.
**THE COURT:** Sustained.
**BY MS. YEE:**
Q Can you describe your experience in the psychological evaluations?
A Yes, extensive. This is something we're trained to do and I've been doing that since I've been a psychologist since 1987.
Q Can you also describe your experience in forensic psychology?
A The assessment, started doing forensic working in 1994 and then more in the last 20 to 25 years or so.
Q Have you conducted forensic evaluations and reviewed psychological reports in connection with this -- with litigations?
A I have, yes.
**MR. BLOKS:** Objection, compound.
**THE COURT:** The objection is sustained.
//
//

**BY MS. YEE:**

Q Have you conducted forensic evaluations in connection with litigations?

A I have.

Q Have you previously been qualified as an expert in court?

A Yes.

Q How many times?

A Hundreds of times.

**MS. YEE:** Your Honor, at this time I offer Dr. Lechuga as an expert in forensic psychology.

**THE COURT:** Any objection?

**MR. BLOKS:** No objection, Your Honor.

**THE COURT:** Okay. Dr. Lechuga is qualified as an expert witness in this case on the issues that were just stated. Ms. Yee, go ahead.

**BY MS. YEE:**

Q Dr. Lechuga, why are you here today?

A I'm here as a rebuttal expert.

Q What is the scope of your retention?

A One of my colleagues, Dr. Reading, who I believe you heard from today evaluated Mr. Byrne and offered opinions in his report and I was retained to review those opinions and then to offer my own opinions based on that review.

Q What materials did you review in connection with your retention?

A I reviewed my colleague's report and his deposition transcript. I also took a step back and looked at the data that were used to comprise his opinions, so the actual psychological test data, rescored that, and then I took a step back and looked at the research that pertains to similar situations just to make sure I was current.
Q What is the purpose of your testimony today?
A Well, it's just to offer opinions based on what I know now after reviewing all the records, including Dr. Reading's report and deposition and then what makes sense clinically.
Q Did you review the methodology used by Mr. Byrne's expert, Dr. Reading?
A Yes.
Q Do you have any concerns regarding the reliability of the methodology employed by Mr. Byrne's expert?
A Just briefly. These are big words, but we look for consistency in the psychological test data, so I do have some concerns. There's three major tests administered, two are similar, but the third was really extreme and that's one point of concern I have about drawing a conclusion when you have three tests, one is extremely different than the other two and that should have been spoken to.
Q Any other concerns?
A Yeah, I think mainly what we're trained to do is to really understand what are the causes and to explore all potential

causes for a person's report of psychological distress and I don't think that was done completely by my colleague.

Q Did you identify any methodology concerns with Mr. Reading's report?

A Those are basically it. So he interviewed and administered tests, this is all done via telehealth, by the way, not in person and he drew conclusions that I think have to be thought through a little bit more for alternative explanations.

Q Anything else?

A No, those are primarily the main points.

Q Is Dr. Reading's approach consistent with accepted forensic practice?

A I think it could be, but I was a little surprised. He and I teach and supervise at the same institution UCLA and we're taught to have our students entertain alternative explanations and Dr. Reading seemed to go down one path, kind of confirming a hypothesis as opposed to trying to disconfirm that hypothesis.

Q Is that important in a forensic psychological evaluation?

A Absolutely or else you're taking a person down a particular strategy and you really need to be objective and look at all possible explanations.

Q Does that have any impact on the conclusions Dr. Reading reached?

A I would and I'm not offering a conjecture, I'm just saying that really an expert should look at all possible explanations and explain if there's inconsistency in their data and Dr. Reading didn't pay attention to the inconsistency, he kind of pushed it to the side.

Q How do these methodological issues you discussed impact an individual's ability to rely on the conclusions in the report?

A Well, it just means that you have to really look at the conclusions carefully and with a high degree of suspicion because I'm not sure they're completely fully informed.

Q Do these issues reduce the reliability of the opinions offered?

**MR. BLOKS:** Objection, leading.

**THE COURT:** Sustained.

**BY MS. YEE:**

Q What is your opinion regarding the reliability of the opinions of Dr. Reading?

A Yeah, I think you just have to take a step back and say, does this really make sense, is it really a reliable finding.

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay. Any cross-examination?

**MR. BLOKS:** Yes, Your Honor.

**THE COURT:** Okay. Go ahead.

**THE WITNESS:** Everybody's all smiles at the end of the day, I'm sorry I have to keep you so late, but I'm

surprised the attorneys are so, you know, jubilant, go ahead. It must be a nice courtroom.

**THE COURT:** We do our best.

**CROSS EXAMINATION**

**BY MR. BLOKS:**

Q Dr. Lechuga, it's nice to meet you. My name is Sean Bloks.

A Good to meet you, sir.

Q You were retained for the sole purpose of rebutting Dr. Reading's expert report, correct?

A Yes, and to just help the attorneys think through what makes sense clinically in this case above and beyond what Dr. Reading put forth, but just in general.

Q You know Dr. Reading, correct?

A I know of him generally, yes, we've been in the same circles for about 30 or 40 years.

Q Dr. Reading lectured at UCLA while you were a graduate student at UCLA, correct?

A Oh, my gosh you brought that up. Yes, he came to one class and gave one lecture and I'm embarrassed to say, I have no recall of it, I just liked his accent.

Q You've worked on cases together with Dr. Reading numerous times, correct?

A That's correct, together and opposed.

Q And you know him currently as a faculty member at UCLA in

the medical school, correct?
A Yes, we're both volunteer faculty members.
Q And it's your opinion that Dr. Reading is an experienced clinical psychologist, correct?
A Yes, that's correct.
Q And he's been doing clinical work for many years; is that right?
A He has, yes.
Q Is it your understanding that Dr. Reading reviewed other records that you had not reviewed --
**MS. YEE:** Calls for --
Q -- in preparing his report?
**MS. YEE:** Calls for speculation.
**THE WITNESS:** I --
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Yeah, I'm just not sure what records you're referring to if you could help me, I'd appreciate that.
**MR. BLOKS:** Absolutely. Ms. Perez, can we please pull up on black out Exhibit 544, page 7 of the report please.
**THE WITNESS:** Oh, yes, I see that, multiple depositions.
**BY MR. BLOKS:**
Q You didn't review any of those records, correct?
A I did not, no.
Q You didn't look at any communications between any parties

in this case; is that right?

**MS. YEE:** Vague, overbroad.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** I looked at some communications, but I think they were primarily between the attorney firm that retained me and myself.

Q You didn't look at any communications between Mr. Byrne and Ameris, correct?

A No, some of that is beyond my expertise.

Q You didn't review any of Mr. Byrne's health records, right?

A No, I did not.

Q You never met Mr. Byrne before, have you?

A I have not.

Q You weren't retained to do any sort of examination of Mr. Byrne; is that right?

A That's correct, I was simply to look at Dr. Reading's report and rationale.

Q You're familiar with the three psychological questionnaires that Dr. Reading had used to evaluate Mr. Byrne; is that right?

A Yes, I am.

Q And you regularly administer those tests yourself as part of your work, true?

A I do, that's why I'm a little surprised.

Q You actually had the opportunity to input and produce a report regarding Dr. Reading's MMPI three findings for Mr. Byrne, correct?
A Yes.
Q And you had determined that the result and profile from that test is valid, right?
A On two of the measures, yes.
Q Which two measures were those?
A That would be the MMPI 3 long questionnaire and the PAI which is also a long psychological questionnaire, both of those were valid.
Q With respect to Dr. Reading's third test, the TSI-2 that's the test that you didn't find or that's the other test, correct?
A Yes, that's what you administer when someone has suspected posttraumatic stress disorder.
Q And your opinion is if the TSI-2 results are to be believed they suggest that Mr. Byrne is highly affected psychological and probably non-functional, right?
A Yes, his scores are above the 99 percentile, it's just higher than what you'd expect in someone who's gone through a traumatic event like an assault or witness death or serious injury, so these are untenable findings.
**MR. BLOKS:** And, Your Honor, I would object and move to strike everything after yes.

**MS. YEE:** Improper motion.

**THE COURT:** The motion is granted.

**BY MR. BLOKS:**

Q Dr. Lechuga, you have in your career dealt with patients on a clinical basis who feel that they are suffering from some sort of psychological trauma related to job loss, right?

A Absolutely, yes.

Q It's your understanding that Mr. Byrne has not received any type of mental health care as a result of his job loss, right?

A That's my understanding.

Q And your belief is if he were indeed that distressed, a reasonable person would seek care for this, to include psychological counseling, psychiatry therapy and perhaps even a consultation with a psychiatrist or psychiatric nurse practitioner for consideration of psychotropic management, right?

**MS. YEE:** Vague, compound.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** It's a lot of words, yes, basically he should have mental health care and I outlined that in my report.

**BY MR. BLOKS:**

Q Right. And I believe you said in your deposition, correct me if I'm wrong, I believe you said,

"Mr. Byrne is right in line with the exact person for whom mental health services are designed in western society."

Didn't you say that?

A Yes.

Q And your opinion is that clearly Mr. Byrne is complaining of vegetative signs, which could reflect the significant depressive disorder, right?

A That's what the psychological tests would suggest if you look at those two that we mentioned MMPI-3 and the PAI.

**MR. BLOKS:** Thank you. No further questions, Your Honor.

**THE COURT:** Okay. Any redirect?

**MS. YEE:** No, Your Honor.

**THE COURT:** Okay. Thank you very much, Dr. Lechuga, you are excused, you can step and down.

**THE WITNESS:** Short and sweet, thank you. Good afternoon.

**THE COURT:** You have a great afternoon.

Okay. Any other witnesses from the defense?

**MS. FODE:** No further witnesses, Your Honor.

**THE COURT:** Okay. Any rebuttal from the plaintiff?

**MR. SESSIONS:** No, Your Honor.

**THE COURT:** Okay. And it is 4:30 so it's time for us to take our break for the day. Ladies and gentlemen of the

jury, I'm going to do a lot of work with the lawyers in the morning before you get here, so I'm going to ask that you get here and be ready to go at 10 o'clock instead of 9 o'clock and then we'll be ready for you so we can pick up the proceedings where we are leaving off right now.

As I indicated before the trial started, you as jurors will decide this case based solely on the evidence presented in this courtroom. This means that after you leave here for the night, you must not conduct any independent research about this case, the matters in this case, the legal issues in the case, or the individuals or other entities involved in the case.

This is important for the same reasons that jurors have long been instructed to limit their exposure to traditional forms of media information such as newspapers and television.

You also must not communicate with anyone in any way about this case and you must ignore any information about this case that you might see while browsing the internet or on your social media feeds. With that, I wish you a restful evening and we'll see everyone back here tomorrow at 10 a.m.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 4:32 p.m.)**

**THE COURT:** Okay. Everyone can be seated. We have a lot of work we need to do before we resume with the jury so my

suggestion is that everyone come at 8 and we will talk about the plaintiff's motions, the defense motion, the jury instructions and the verdict form, so that way we can be ready to instruct the jury and you can present your closing arguments tomorrow morning. Okay?

**MR. SESSIONS:** Yes, Your Honor, thank you. And since we're all here, counsel and the Court, I want to suggest, I know up until today our agreement and the Court's approval has been to exchange demonstratives by 7 p.m. the night before the next day, but because we probably won't have today's transcript until late tonight, if opposing counsel and the Court would be amenable to agreeing that we exchange them in the morning before we come in.

**THE COURT:** Ms. Fode?

**MS. FODE:** We're amenable to that. Can we pick a time please though?

**THE COURT:** What time would you -- he's raised it, so you get to suggest the time that you'd like.

**MS. FODE:** Yes, 7 a.m.

**MR. SESSIONS:** Perfect.

**THE COURT:** Okay. Wonderful. You can look at it right before you leave your house, or actually all of you are traveling from a long way -- well, you are, are you staying in LA?

**MS. FODE:** Yes, we're staying right nearby.

**THE COURT:** Good for you, I had trouble with my commute this morning and I live seven miles from here, so LA traffic is terrible. Okay. All right. So we'll see everyone back here tomorrow at 8 and I'll be working late into the night as well on the jury instructions and the verdict forms, and hopefully I'll be able to get electronic copies out to you either -- it'll probably be tomorrow morning right before you get here, but I'll do my best to get them to you sooner.

**MR. SESSIONS:** Thank you, Your Honor.

**MS. FODE:** Thank you.

**THE COURT:** Okay. Thank you all very much, have a nice evening.

**THE CLERK:** All rise. This court is in recess -- I'm sorry, adjourned.

**(Proceeding adjourned at 4:34 p.m.)**

*** * * * ***

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 10, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***