# EXHIBIT G

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, Plaintiff, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, Defendant. | ) Wednesday, June 10, 2026 |
| | ) ( 8:07 a.m. to 11:37 a.m.) |
| | ) (12:37 p.m. to 4:39 p.m.) |

JURY TRIAL - DAY 6

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: T. Jackson

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES:**

For Plaintiff:

MATTHEW THOMAS SESSIONS, ESQ.
ANDREW A. WOOD, ESQ.
MADISON LARSEN, ESQ.
SEAN K. BLOKS, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
2010 Main Street
8th Floor
Irvine, CA 92614

STACEY ANN VILLAGOMEZ, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
865 S. Figueroa Street
Suite 2800
Los Angeles, CA 90017

For Defendant:

STACY L. FODE, ESQ.
NANA JIN YEE, ESQ.
Nukk-Freeman & Cerra
550 West C Street
Suite 910
San Diego, CA 92101

# INDEX


| MODE | PAGE |
|---|---|
| MOTION TO AMEND COMPLAINT | |
| BY MR. WOOD | 5/24 |
| BY MS. YEE | 17/28 |
| RULING OF COURT | 29 |
| DEFENDANT'S JMOL MOTION | |
| BY MS. YEE | 36 |
| BY MS. VILLAGOMEZ | 41 |
| RULING OF COURT | 47 |
| PLAINTIFF'S JMOL MOTION | |
| BY MR. WOOD | 48/57 |
| BY MS. YEE | 56 |
| RULING OF COURT | 58 |
| DISCUSSION RE JURY INSTRUCTIONS/VERDICT FORM | 59 |
| JURY INSTRUCTIONS | 102 |
| CLOSING ARGUMENT | |
| BY MR. SESSIONS | 122/188 |
| BY MS. FODE | 152 |
| FURTHER INSTRUCTIONS TO JURORS | 195 |

**Los Angeles, California; Wednesday, June 10, 2026; 8:07 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

**THE CLERK:** Calling Item Number 1, SA CV 24-01989, Patrick Byrne versus America Bank.

Counsel, please state your appearances starting with Plaintiff.

**MR. SESSIONS:** Good morning, Matthew Sessions on behalf of Plaintiff.

**THE COURT:** Good morning.

**MS. VILLAGOMEZ:** Good morning. Stacey Villagomez on behalf of Plaintiff.

**MR. WOOD:** Good morning, your Honor. Andrew Wood on behalf of Plaintiff.

**MS. LARSEN:** Good morning, your Honor. Madison Larsen on behalf of Plaintiff.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, your Honor. Stacy Fode on behalf of Defendant.

**MS. YEE:** Good morning, your Honor. Nana Yee on behalf of Defendant.

**THE COURT:** Good morning. I hope everyone had a restful evening.

Okay so we have a lot to do before the jury comes back. Let's start -- well, what I have on my list of things

that we need to take care of this morning are the Plaintiff's Motion for Judgment -- Motion to Amend to Conform to Proof; Defendant's Rule 50 Motion, jury instructions and verdict form. Is there anything else in addition? That's a lot so is there anything else?

**MR. SESSIONS:** Not on our end, your Honor.

**MS. FODE:** Not on ours either.

**THE COURT:** Okay. So since I want to give the defendant an opportunity to encompass everything in the Rule 50 motion, I'm going to ask the plaintiff to go first because it might impact your argument on the Rule 50 motion.

**MS. FODE:** Understood, thank you.

**THE COURT:** Okay so who will be arguing?

**MR. WOOD:** I will, your Honor.

**THE COURT:** Okay. Mr. Wood, you may proceed.

**MR. WOOD:** Good morning again, your Honor.

**THE COURT:** Good morning.

**MR. WOOD:** I'll do my best to keep this straightforward.

**THE COURT:** We want to make sure that everyone has their opportunity to be heard so don't feel pressure.

**MR. WOOD:** I appreciate that, your Honor, I'll do my best.

So we do now formally request to amend the complaint under Rule 15(b) to add a claim for breach of contract but I

want to start by noting what we're not asking to do.

We're not standing here at the end of a car accident case asking to add a breach of contract claim. We're not standing here at the end of a neighbor dispute or a home invasion case saying, you know what? We want to add in this breach of contract claim. Instead, we're at the end of a case in which the entire evidence and basis for the claim that we want to add have been extensively litigated both before and throughout trial and that's precisely what Rule 15 allows in the situation in which Rule 15 allows the relief we request. So with that I'd like to start by being specific about what we wish the amended complaint to add.

Mr. Byrne requests that the Court permit amendment of his complaint to add a cause of action for breach of contract specifically the breaches are as follows:

One, the LTIP, which is Exhibit 301 was breached because Ameris did not calculate earnings before tax according to the terms of the LTIP; specifically it's key assumptions. Assumption A on indirect costs; Assumption C on indirect expenses; Assumption D on cost of funds; and Assumption F on loan losses.

Second, Ameris breached LTIP Section 3 which is the forfeiture risk provision. That provision provides -- that's again in Exhibit 301 -- that provision provides, quote:

"In the event of a termination without cause or a

resignation for good reason, the award for all outstanding performance periods shall be determined and paid out in accordance with Section 4 below and the plan, and the participant shall receive such award for each performance period that occurs during the year of the termination without cause or the resignation for good reason and each year thereafter, if any," unquote.

The termination letter, Exhibit 496, explain that Mr. Byrne was terminated without cause and confirms that Mr. Byrne would be entitled to a 2024 LTIP if the division met the earning threshold. The termination letter says, quote:

"In addition, notwithstanding the termination of your employment by the company without cause, you will remain eligible to participate in the Balboa Capital long-term cash incentive plan subject to its terms and conditions for the 2024 calendar year performance period."

So that's the second breach. This is LTIP Section 3.

We also just on that point though, your Honor, we also heard from Mr. LaHaise that there was indeed a 2024 LTIP award and that Mr. Byrne was not paid. That was on Day 4, on Monday, when during cross examination -- and that's in the transcript Page 90 from Line 16 through Page 91 at Line 8 where the end of that testimony he said:

"We did not pay him his bonus. He was eligible to pay but there was no bonus paid," unquote.

So the next breach that we allege is of the employment agreement which is Exhibit 324. By breaching the LTIP, Ameris also breached the employment agreement because it incorporated the LTIP by reference. Employment Agreement Section 3.3 -- again, that's in Exhibit 324 states:

"Incentive Program. Concurrent with the start date, the company has established a cash bonus long-term incentive program, the LTIP, and the executive is expected to participate in the LTIP. For the avoidance of doubt the LTIP and the bonus are separate and distinct compensation programs," unquote.

So those are the breaches that we wish to add just to be formal about it but again, in deciding this motion your Honor should keep in mind that the trial's central dispute is whether Ameris correctly calculated what it owed Mr. Byrne under the LTIP. The argument and evidence at trial have covered the material terms of the LTIP and the associated employment agreement, Ameris' breach of those terms and Mr. Byrne's resulting damages. And again, all of this was no surprise to Ameris. Indeed, we did a word search through Days 1 through 4 of the transcripts -- which is what we had available to us before today -- and there's over 650 references

to the LTIP throughout this trial. Ameris has vigorously litigated its defense that it complied in good faith with its contractual obligations. On Monday, Mr. LaHaise and Ms. Fode did a much better job than I ever could have in walking through the key contract provisions and presenting Ameris' interpretations and Ameris' position as to why they thought the LTIP awards were discretionary and why Ameris met its obligations under the agreement.

Ms. Stokes also testified extensively to her view that Ameris correctly calculated the Balboa Divisions earnings for LTIP purposes. Ameris' expert, Ms. Sebold, yesterday testified about her opinions on whether Ameris calculated the LTIP pool in accordance with the contract's terms.

And going even further back, that Ameris has always known that this is an issue is evident from its answer that it filed way back. In its answer it includes multiple affirmative defenses that all go towards a contract defense. So to allow Ameris to present compliance with the contracts in good faith as a defense but prevent Mr. Byrne from affirmatively alleging breach of contract would allow Ameris to use the contracts as a shield while denying Mr. Byrne the opportunity to use them as a sword just because of his prior counsel's inartful pleading at the inception of this case for failure to label a claim as breach of contract. That's the kind of form over substance gotcha-ism that Rule 15 does not allow. And that's again I'd

point the Court to Foman v. Davis which is a Supreme Court case, 371 U.S. 178.

Now, we anticipate, based on the briefing they included in the pretrial conference order, that Ameris' argument against the amendment is going to be to simply proclaim, well, we don't impliedly consent, therefore there can be no amendment. Well, that's not the standard. Rule 15 is a very liberal standard.

Rule 15(b)(1) -- I'll walk through these in just a moment but Rule 15(b)(1) allows amendment at trial even over an objection and Rule 15(b)(2) allows the Court to find implied consent even if a party like Ameris refuses to expressly consent. The key considerations are prejudice or lack thereof and whether the objecting party had fair notice of the substance of the amendment. And so what Ameris wants, if allowed, would eviscerate Rule 15's liberal standard, would eviscerate the meaning of the rule that says this can be done after judgment or at trial. The Court should not accede to that.

And here again to go to the notice -- actually let me just go very briefly to the legal standards. We've talked about the liberal standard. Talked about the words of Rule 15(b) itself which allow amendment of the pleadings to conform to evidence, quote, "at any time," unquote, including after judgment and just to talk about just a couple of the cases that

elucidate some of these standards.

The Ninth Circuit in a case called Green versus United States, 629 F.2d 581, 584 at Note 1, Ninth Circuit explained that the purpose of Rule 15(b) is to ensure the trial is held on the merits and that the parties are not "hamstrung," that's a quote, by, quote, "pleading technicalities."

There's a persuasive case from the Eighth Circuit -- which I can get into the facts in a moment if your Honor would like -- that's called American Family Mutual v. Hollander. That's from 2013, 705 F.3d 339, 348 where the Eighth Circuit explained, citing Foman, that, quote:

> "The goal of Rule 15(b) is to promote the objective of deciding cases on the merit rather than on -- merits, sorry, rather than on the relative pleading skills of counsel," unquote.

So there's two different pathways under Rule 15(b). The first is under Rule 15(b)(1) and that provides, quote:

"If at trial a party objects that evidence is not within the issues raised in the pleadings," unquote, the Court may nonetheless, quote, "permit the pleadings to be amended," unquote. Even in the fact of objection the Court, quote, "should freely permit an amendment when doing so will aid in presenting the merits," unquote, and the objecting party fails to demonstrate prejudice. So that raises begs question what does prejudice mean in this context?

Well, Green explained that by the Ninth Circuit explained there must be actual, not conjectural prejudice. So the opposing party can't just stand up and say, well, I don't consent, I'm prejudiced without identifying what that prejudice is.

Rule 15(b)(2) provides a second and independent basis for amending the pleadings at trial. Under that rule the Court may permit amendment of the pleadings, quote, "to conform them to the evidence and raise an unpled issue if the issue is tried by the parties' expressed or implied consent. So that in turn begs the question, what is implied consent?

Well, the Northern District, back in 2020 in a case called Wroth, W-r-o-t-h, v. City of Rohnert Park -- and that's R-o-h-n-e-r-t, citation is 2020 WL 13890301 at Star 3; and again, that's Northern District June 11th, 2020 explained that consent may be implied, quote, "when evidence is introduced without objection or when the party opposing the motion to amend actually produced evidence bearing on the new issue or offered arguments directly contesting the issue," unquote. And your Honor has seen over the last five days of testimony that's exactly what happened here.

And so that brings us back into a Ninth Circuit case, Galindo v. Stoody, 793 F.2d 1502, 1513 where the Ninth Circuit found that the district court properly found implied consent where the record was replete with direct references to the new

cause of action and replete with direct references is a quote. So those are the principles that underly this.

So in our view -- and we respectfully suggest the Court's view should be that Ameris is not prejudiced by this amendment. We've seen now that Ameris has put on whatever evidence it can in support of its position on breach of contract.

Again, there's two bookends to the case that your Honor can look at to see that that's the case. First is their answer where we showed again earlier that they pointed out all these affirmative defenses based on contract and the other bookend is that the closing slides we received this morning display -- or displayed Mr. LaHaise's testimony on the LTIP provisions and even include a placeholder for jury instructions on the contract if that's granted. They're fully prepared to meet that.

They've also had their witnesses testify extensively on the contracts. And as far as I can tell there's no other witnesses they would present on these issues. They couldn't have put on Mr. Proctor, for example, we saw in his video testimony that he didn't recall if Mr. Byrne even had an employment agreement or an LTIP. There's no other defenses we're aware of that they would have asserted that breach of contract been a pled cause of action and that's because the contractual obligations are what underly them. His unpaid

wages, for example, are based on the bonuses Ameris promised to pay him by contract.

So we've heard all about the LTIP and the employment agreement from Ameris' witnesses, from Mr. Byrne and his witnesses and Ameris' cross examinations of those. We've seen the countless emails discussing LTIP calculations. We've seen that both sides have put on experts on those calculations. There's nothing else Ameris can identify that it would have put on had this been done differently.

And again, if they're going to say, well, we would have done our discovery differently or we would have prepared our case differently, we would have called someone; well, again, if the Court were to deny on that basis, that would eviscerate Rule 15's allowance that this can even be done after judgment.

And again, Ameris put on all this evidence knowing that breach of contract was underlying Mr. Byrne's pled claims and knowing that Mr. Byrne was going to request to amend according to proof. That is implied consent.

Let's go back to the Eighth Circuit case of *American Family Mutual*. The Eighth Circuit found that the counter-defendant had actual notice of the unpled claim where the plaintiff had raised it at the final pretrial conference and in proposed jury instructions. That's again what happened here. There was motion practice earlier in the case. There was this

came up at the pretrial conference, came up at our pretrial conference order. Ameris placed an extensive opposition into their pretrial conference pleading. So that's what we have is the same situation as *American Family Mutual*.

And just to quickly go over what happened there, the Court had allowed amendment under Rule 15(b) in an ERISA case. Excuse me. The case was an employment case in which the employee pled claims for breach of contract and ERISA violations. An amendment was allowed under Rule 15(b) to add a claim under the Iowa Wage Payment Collection Statute and that was appropriate because one, the employer knew that the employee was going to seek leave to add this claim; and two, despite knowing this did not object to the evidence relevant to that claim and it asserted its defense throughout the litigation that it, quote, "did not owe Hollander extended earnings," unquote. Sound familiar.

So again, this is not a case of a party being blindsided by a last-minute change in strategy. The complaint itself alleges at Paragraphs 10 and 11 that Ameris failed to follow the LTIP. And Ameris's answer asserted a grand total of 49 affirmative defenses, including failure to mitigate, unclean hands, consent, no damages suffered, damages set off, failure to perform responsibilities. They said in their pretrial conference order that we're not entitled to relief because we didn't meet the conditions precedent. As your Honor noted at

the final pretrial status conference they included jury instructions that seemed to go to contract defenses that your Honor noted at the time was inconsistent with their position.

And again, Ameris can't negate all of this -- oh, unless I forget -- on Day 1 of the trial, Ameris agreed to preadmit and offered to preadmit, which we agreed to, the employment agreement and the LTIP and the number of the underlying documents.

So Ameris can't negate implied consent simply by stating I don't consent. If that was all the defendant needed to do to avoid amendment at this stage was just to say, I object and no, I'm prejudiced, no one would ever be able to amend the complaint on the standard.

So there's no question on the record and I'm happy to go into more detail if your Honor would like but there's no question they've had fair and actual notice of what's at issue here. They've had the opportunity to question the witnesses, they've taken full advantage of that. They've -- their behavior both before and after trial, including their exhibit list on which they listed the employment agreement and dozens of emails about LTIP calculations and adjustments as exhibits, we agreed that the LTIP, Exhibit 301, be preadmitted into evidence. You know that all points towards the implied consent.

And so on that point, I'd like to call the Court's

attention to another case which is from the District of Montana called Milanovich, M-i-l-a-n-o-v-i-c-h, v. Quantpost, Inc., that's Q-u-a-n-t-p-o-s-t, 2021 WL 1515563 at Star 2. What the District of Montana found implied consent under 15(b)(2) it said, quote, "While the defendant maintains that it does not consent to the present amendment, its trial stipulation undercuts that position," unquote. And there the Court examined the parties' pretrial stipulated facts and found implied consent.

Your Honor has been here through all five days of trial. You're very familiar -- I know your Honor has stated multiple times you're paying very close attention knowing that this motion is coming. So I've got pages of things that I can walk through, that I can walk through in addition to support our position but if that's not necessary I'll reserve that for any rebuttal.

**THE COURT:** Okay. Thank you. It's not necessary at this time.

**MR. WOOD:** Thank you, your Honor.

**THE COURT:** Thank you. Who's arguing? Okay, Ms. Yee. Again, you're 50/50 partners so I never know who's going to stand up. Ms. Yee, you may proceed.

**MS. YEE:** Thank you, your Honor.

Defendant Ameris opposes Plaintiff's motion to amend the pleadings during trial. Under Federal Rule of Civil

Procedure 15(b) to add a breach of contract claim. A claim that has already been denied by this court.

On December 1st, 2025, Plaintiff previously moved the Court to modify the civil trial order to allow him to file a first amended complaint asserting a breach of contract claim. On December 5th, 2025, the Court denied Plaintiff's request under FRCP 16 and 15.

First the Court found Plaintiff failed to establish good cause under Rule 16. Specifically the Court found that Plaintiff did not use the entire discovery period efficiently and did not diligently move to compel discovery earlier.

Although fact discovery was open from February 2025 to November 2025, Plaintiff did not notice motions to compel until August that would be heard in September 2025 and sought belated ex parte relief in November 2025, three days before the initial expert disclosure deadline.

Next, under FRCP 15, the Court found that evidence to conform the complaint to proof was not before this court but even if it were, Defendant would be prejudiced by amendment. In other words, this court rejected Plaintiff's argument that Ameris wouldn't be prejudiced and instead made an affirmative factual finding that Defendant would be prejudiced because fact discovery had just closed and the parties' dispositive motion deadlines were approaching.

Plaintiff's current motion does not cure either

concern. If anything, the prejudice to Ameris identified by the Court has substantially increased.

As the Court noted in its December 5th, 2025 order, denying Plaintiff's ex parte application, quote, "An amendment that seeks to conform the pleadings to proof introduced at trial is proper under Rule 15(b) unless it results in prejudice to one of the parties," cite to Galindo, G-a-l-i-n-d-o versus Stoody Company, 793 F.2d 1502 15113 Ninth Circuit, 1986. This court previously made an affirmative finding that Ameris would be prejudiced if Plaintiff were permitted to amend under Rule 15(b) based on the fact that the discovery has just closed; and two, approaching deadlines. And that's in December 5th -- that's on December 5th, 2025.

The prejudice to Ameris has only increased in the six month since the Court's December 5th, 2025 order. There are five reasons.

Discovery has long since closed. Had Plaintiff pleaded a breach of contract claim, Ameris would have pursued discovery directed to issues uniquely relevant to contract formation and interpretation, including the circumstances surrounding creation of the LTIP, the drafting history and evolution of the LTIP. And prior versions of the LTIP and the reasons for revisions.

Second, Ameris litigated and tried the case based on the claims actually pleaded. Plaintiff has possessed the LTIP

agreement, the award agreement, the employment agreement since before this lawsuit was filed and could have asserted a breach of contract claim from the outset.

After the Court denied Plaintiff's prior request to amend in December 2025, Ameris reasonably prepared its defense on the understanding that no breach of contract claim remained in the case. Had a breach of contract claim been pleaded from the start, Ameris would have developed its factual record differently. Ameris would have introduced additional documentary evidence such as prior LTIP versions and drafting materials. Ameris would have elicited testimony regarding contract formation, interpretation and the parties' intent. And Ameris would have obtained relevant expert discovery on contract formation and breach.

Third, Ameris lost dispositive motion and pretrial opportunities. Allowing amendment now would deprive Ameris of procedure rights that would have existed had the breach of contract claim been timely plead [sic]. Specifically, Ameris was denied the opportunity to move for summary judgment on the breach of contract claim, develop expert testimony on contract formation, parole evidence, interpretation and breach, file motions in limine to address contract interpretation disputes, litigate threshold legal issues concerning contract interpretation, parole evidence and/or ambiguity, and submit jury instructions and verdict forms tailored to a breach of

contract claim.

Number four, contract interpretation raises legal issues that cannot be fairly determined at the end of trial. Allowing Plaintiffs to submit a breach of contract claim at this extremely late stage of the proceedings would deprive Ameris the opportunity to litigate threshold legal issues through the normal pretrial process.

For example, a breach of contract claim raises legal issues related to what particular LTIP provisions or terms are ambiguous. What extrinsic parole evidence may be considered and how disputed terms should be construed. Those are issues that would ordinarily be resolved by the Court before the Court is submitted to the jury. However, since no breach of contract claim was previously pleaded or pending in this case, that has not occurred and Ameris has been denied the opportunity to meaningfully brief those issues.

Five, amendment would effectively circumvent this court's prior rulings. Specifically the Court's December 5th, 2025 order denying amendment and its February 13, 2026 summary judgment ruling. In its summary judgment order the Court held that the 2024 LTIP award was not available as a basis for Plaintiff's labor code claim, for unpaid wages as a matter of law. Plaintiff now seeks to (indisc.) the 2024 LTIP award into this case by adding an entirely new cause of action in which it is a focal point. Permitting amendment at this stage would

nullify the effect of the Court's prior rulings, two prior rulings.

Rule 15(b)(2) allows an issue not raised in the pleadings to be tried by the parties' expressed or implied consent. Here, Ameris has not consented under any circumstances to trying Plaintiff's breach of contract claim.

To establish implied consent, Plaintiff must demonstrate first that the defendant understood evidence had been introduced to prove the new issue. And second, that the new issue had been directed -- directly addressed, not merely inferentially raised by incidental evidence.

Quote, In Re Acequia, A-c-e-q-u-i-a, Incorporation, 34 F.3d 800 814 Ninth Circuit 1994. The Ninth Circuit in that case is clear that just because evidence is presented to establish an already pled claim could also technically be used to support a non-pled claim is not sufficient to establish implied consent. That does not give a party sufficient notice that new issues are entering the case.

The Ninth Circuit has also held that a failure to object to the admission of evidence on an unpled issue is not enough to establish implied consent. Lalonte, L-a-l-o-n-t-e, versus Davis, 879 F.2d 665 667, Ninth Circuit 1989.

Ameris has repeatedly objected both before the during this trial to Plaintiff's attempts to assert a breach of contract, including to any reference to damages for the 2024

LTIP award. The fact that the evidence Plaintiff has presented evidence to establish the claims actually pled in the operative complaint for this case could also in theory support a potential breach of contract claim does not mean that Ameris has impliedly consented to allow Plaintiff to try that claim. The Ninth Circuit is clear on that.

As I mentioned during Day 0 of this trial, we could only find one recent example in which the Central District permitted amendment under FRCP 15(b). Plaintiff earlier mentioned this specific case. However, what they did not mention is that in that case the parties stipulated to the new claim. Quote, Wroth, W-r-o-t-h, versus City of Rohnert Park, 2020 WL 13890301 at Page 3 ND Cal June 11, 2020.

We have done extensive research on this issue. Other recent -- and I would say last 15 years, Central District cases, there was no implied consent under FRCP 15(b) where the defendants expressly objected to plaintiff's attempts to amend their complaint to try new issues.

Martinez versus City of Los Angeles, 2024 WL 4438889 at 22 CD Cal June 2024; N-e-g-r-e-t versus Alliance Life Insurance Company of North America, 2011 WL 2909246 at Page 4 CD Cal July 18th, 2011; Spin Master Limited versus Z-o-b-m-o-n-d-o Enterprise, LLC, 2012 WL 8134012 at Page 11 CD Cal April 27, 2012.

Therefore, we ask this court to deny Plaintiff's

motion and not allow the breach of contract claim to be added. Thank you, your Honor.

**THE COURT:** Thank you. Mr. Wood, you get the last word.

**MR. WOOD:** Thank you, your Honor.

Well, your Honor, they raised exactly what I had predicted they would raise so my remarks will be fairly brief. The arguments that Counsel raises would all be perfectly valid if this were indeed a -- something like a car accident case where we're trying to bring in something completely unrelated at the last minute but what's striking here is that Counsel just argued that the way they would have done things differently is they would have presented prior versions of the contract, they would have done that kind of thing. They don't explain why they didn't do that for the wage claims which they admit require an interpretation of the contract.

And in fact, Mr. LaHaise stood up here and testified to exactly that. Testified to the contract, testified to its formation, testified to what it meant. It's not clear how introducing, quote/unquote, "drafting history" would show anything different or why they didn't ask Mr. LaHaise about that. Ms. Stokes and Mr. LaHaise again both testified extensively so what we're left with is simply conjectural prejudice that the Ninth Circuit has found is not enough to find prejudice.

Now, they also raised well we would have brought a motion for summary judgment on the contract claims. Well the Court's ruling on the wage claims and interpretation of the legal issues on that strongly suggests how that would have turned out but again, I don't want to engage in conjecture.

I do want to address two other quick points that they raised. One was the ex parte. Well the standard on the ex parte is not the standard that is present here. At that time as your Honor noted on Day 0 there was no evidence before the Court, it was just a very different issue and the Court's ruling was also based in part on the fact that there had not been shown an urgent need for ex parte relief.

Just because it was raised repeatedly I will note that -- two things. One there's a District of Alaska case, Nanouk, N-a-n-o-u-k, versus United States, 2023 WL 12144587 at Star 3. When ruling on a pretrial motion to amend the District of Alaska noted, quote:

> "Even if the Court were to deny the instant motion for lack of due diligence and/or prejudice to the defendant, the Court likely would be faced with a motion under Rule 15(b) after trial necessitating amendment of the pleadings to conform to the evidence," unquote.

I would also just simply remind the Court that Rule 15(b) says amendment can be at any time and that timing alone

is not sufficient to bar amendment. That's the *Milanovich v. Quantpost* case that I mentioned earlier from the District of Montana.

Next, just to address the Asaquina (phonetic) case that was raised in the pretrial briefing and that Ms. Yee raised again here, so there the Court, the Ninth Circuit as Ms. Yee noted, explained that to establish complied consent the plaintiff must demonstrate that the defendant understood evidence had been introduced to prove the new issue and that the new issue had been directly addressed not merely inferentially raised by incidental evidence," unquote. So it does talk about overlapping evidence being relevant to both pled claims the cause of action the party seeks to add and that that standing alone doesn't justify it doesn't show implied consent.

But subsequent cases -- but the issue was there in that case that although evidence of an unpled restitution theory had allegedly entailed exactly the same evidence as other claims, no showing was made that the restitution theory had been, quote/unquote, "directly addressed," unquote, or that defendant understood the evidence would bear on the unpled restitution theory. So quite different from what we have here. And subsequent cases confirm that fair notice not overlapping evidence is Asaquina's guiding principle.

So for example, in -- so for example, in a Third

Circuit case the Third Circuit cited *Asaquina* for the proposition that an issue has not been tried by implied consent if the evidence overlaps because the defendant doesn't have any notice. And again that case was Douglas v. Owens, 50 F.3d 1226 1236, Third Circuit, 1995. And then the Eighth Circuit case of *American Family Mutual v. Hollander* which I discussed earlier says:

"It's axiomatic that evidence bearing on both claims and the defenses to those claims may well overlap in a given case." And then it sent on to say, quote:

"Inevitability does not foreclose amendment under Rule 15(b)."

Then another quote:

"Rather the dispositive inquiry is whether the nonmoving party had actual notice of the unpleaded claim and an actual, and quote, "an adequate opportunity to cure any surprise resulting from the change of the pleadings," unquote.

And so again, we're replete with evidence -- which I'm more than happy to walk through for the record if that would be useful to the Court -- but we're replete with evidence from the answer to the pretrial filings to the opening statement to the testimony from Ameris' witnesses to the testimony Ameris elicited on cross examination to the testimony of Ameris' experts to all the way through the closing slides that we're going to see later today that they were fully

prepared to meet these issues and they met these issues. And now it should be for the jury to decide whether that states a breach of contract.

**THE COURT:** Okay.

**MR. WOOD:** Thank you, your Honor.

**THE COURT:** Thank you very much. Okay. Anything else, Ms. Yee?

**MS. YEE:** Maybe just briefly, your Honor, if I may?

**THE COURT:** Just very, very quickly. And Mr. Wood, I'm going to give you the last word but I'm going to let her --

**MR. WOOD:** Thank you, your Honor.

**THE COURT:** -- respond.

**MS. YEE:** Your Honor, this issue is about prejudice. This issue is about due process. And as you have heard from Plaintiff's table and Plaintiff's counsel, that they have not cited any specific case on point in Central District or Ninth Circuit. There's no case. This court would be creating new law. But there are no cases that the Court actually found that 15(b) was allowed unless the only one case that we have discussed is that in that case the parties actually stipulated to a new claim.

**THE COURT:** You've already argued this. Is there anything else that you'd like to argue that you haven't argued?

**MS. YEE:** That's it, your Honor.

**THE COURT:** Okay. Mr. Wood?

**MR. WOOD:** Unless there's anything your Honor would like me to address at this point. I also wasn't sure on our reading of the rule if we needed to provide an actual amended pleading.

**THE COURT:** I think you do.

**MR. WOOD:** Okay. We do have that ready if your Honor would like that.

**THE COURT:** Okay. And it's just one cause of action for breach of contract?

**MR. WOOD:** Yes, your Honor.

**THE COURT:** And I note that when we were talking about this, when the case is in a different posture that there were other claims. There's a request for adding a claim for breach of implied covenant of good faith and fair dealing and for accounting. That's not happening.

**MR. WOOD:** No.

**THE COURT:** Okay. So as you've both indicated that the standard -- the starting point for the analysis in this case is Federal Rule of Civil Procedure 15(b). The Court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the Court that the evidence would prejudice that party's action or defense on the merits. Parties must be allowed to amend their pleadings during or after trial so long as the opposing party has had actual notice of an unpleaded issue and adequate

opportunity to cure any surprise resulting from the change in pleadings.

I think it's also worth noting that Federal Rule of Civil Procedure 54(c) governs what relief can be awarded in a case and the standard there is whether the allegations properly pled and proven support an amount or type of relief that is not specified in the demand for judgment. Final judgment should grant the relief to which each party is entitled even if that party has not demanded that relief in its pleadings.

The Court makes the following findings that Ameris will not suffer substantial prejudice with this amendment because the facts relevant to the amendment were already known by or within the possession of Ameris.

The requested amendment here is to add a cause of action for breach of contract as specifically related to the LTIP and the employment agreement. The LTIP is at Exhibit 301 and was admitted early in the case and we had examination, extensive examination on the LTIP and the employment agreement which was admitted as Exhibit 324.

The Court also notes that the LTIP -- the employment agreement incorporates the LTIP by reference.

There's also Exhibit 496 which is the termination letter that supports the request for amendment of this claim, as well as testimony from several witnesses but most significantly from Mr. Byrne and Mr. LaHaise.

The central issue in this court is the interpretation of both the employment agreement and the LTIP and the related documents. I do find that Ameris has -- the plaintiff has established implied consent on behalf of Ameris. I just re-reviewed the answer in the case and the answer does state breach of contract, affirmative defenses. So this has been an issue from the very beginning of the case, it's the heart of the case.

The witnesses that testified, testified about both the LTIP and the employment agreement. Witnesses were deposed about both of those agreements.

There were voluminous emails that were introduced into evidence by both parties concerning the conversations surrounding the interpretation of both contracts.

There was a lot of testimony about the negotiation of the LTIP and negotiation of frankly the entire acquisition of Balboa Capital and the relevant terms to that negotiation including the negotiation over the LTIP and the employment agreement.

Specifically there was substantial testimony from Mr. Byrne, Ms. Stokes, Mr. LaHaise, Ms. Dickson and Ms. Sebold and then to a lesser extent Mr. Silva.

The Court finds that the defendant did have actual notice of the unpleaded claim and an opportunity to cure any surprise. This has not been a secret. This is something that

has been a live issue since the Court issues its ruling on the motion for summary judgment.

Both parties have noted that the plaintiff did file an ex parte application well before trial to amend the complaint. Because of the fact that the standard that the Court is to apply on an ex parte application as well as the fact that the Court did not have the benefit of hearing the evidence that actually came in, the Court made its ruling in that context. We're not in that same context anymore.

I have heard the evidence that was presented. Most of the evidence that the defense is arguing now that it would have proffered is in the control of the defense. It's not -- I don't think that there was a need for any additional discovery on either of the contracts or the negotiations in order to permit the defense to have an opportunity to cure any surprise that it had to the extent there was a surprise. And I don't think there was a surprise because the answer that was filed in the case asserts contract affirmative defenses. But to the extent that there was a surprise, the defendant had primary custody and control over the evidence that it seeks -- that it states that it needed to proffer and had the opportunity to depose the plaintiff concerning the plaintiff's understanding about the formation of that contract. And I don't know -- I haven't read the plaintiff's entire deposition but there certainly was not -- well there was -- there was some but was

limited attempts to elicit testimony concerning contract formation.

Also, the Court finds that the plaintiff has not engaged in undue delays or bad faith. The plaintiff discovered evidence supporting a claim of breach of contract in early 2025 and after uncovering this evidence the plaintiff did draft multiple versions of the proposed first-amended complaint and initiated the required Local 7.3 meet and confer processes and then continued that process into December when the plaintiff brought the ex parte application which was denied for the reasons that I stated in that order and have summarized this morning.

Finally, the Court finds that the proposed amendments are not futile and that this is Plaintiff's first request for leave to amend.

In order to state a breach of contract claim the plaintiff must establish, one, the existence of a contract. Two, Plaintiff's performance or excuse for non-performance. Three, the defendant's breach. And four, the resulting damages to the plaintiff. And we have evidence on both sides of all of those issues in this case.

So I am granting the motion to amend to conform to proof to amend a cause of action for breach of contract. And because of the fact that an objection has been made, I am going to require that the plaintiff file a formal amendment of --

formal amended pleading so that way the record is clear.

Okay. Let's move on to the Defendant's motion.

**MR. WOOD:** Just very briefly, your Honor.

**THE COURT:** Yes.

**MR. WOOD:** So we have a redline available. Do you want us just to file a clean copy?

**THE COURT:** Have you given it to the defense to see?

**MR. WOOD:** I have not but we have copies for them.

**THE COURT:** Okay so I need that exchange to occur before you file it.

**MR. WOOD:** Okay. We'll give them a redlined copy as well. And then one other housekeeping issue and I know we're very limited on time today so I hate to have to raise this.

**THE COURT:** No, I don't want you to feel rushed. That's why I had the jury come at 10:00. If they need to -- the jury room is very comfortable. They will not be sitting in the hallway. So if they need to wait, they need to wait.

**MR. WOOD:** I appreciate that, your Honor, and hopefully this will quick.

We did in preparing for the oral argument this morning, we did determine that we feel that if the amendment is granted -- which now it has been -- we feel that there's grounds on a very limited basis to bring our own motion for judgment as a matter of law on the aspect of the claim that touches on the 2024 LTIP agreement. So I'd like to address

that briefly but I certainly don't want to get in the way of Defendant's motion. So however your Honor would like to handle that.

**THE COURT:** Okay. So we're going to hear Defendant's motion first and then we'll come back to yours.

**MR. WOOD:** Thank you.

**MS. YEE:** Your Honor, may I please also address related issues regarding you know just given your ruling on Plaintiff's motion?

**THE COURT:** Sure.

**MS. YEE:** So the first one is, your Honor, you know that we have not prepared our own version of proposed jury instructions and verdict forms on the breach of contract claims so we would ask to be given the opportunity to do that.

**THE COURT:** You'll do that this morning. Like I said there is no surprise here. There are probably at least 10 instructions that we talked about at the first jury instruction conference that we said we were going to hold until we see how things turn out at trial. It's not unusual for that to happen. And to the extent that you wanted -- you have -- on jury instructions you needed to work on those. I'm not going to have the jury leave for the day and come back so that you can do this. This is something that should have been done already. You had plenty of notice.

**MS. YEE:** Understood. And then second issue, your

Honor, is that we would like to make sure that -- to request a limiting jury instruction in connection with CACI 2700 and 2704.

**THE COURT:** We're not talking about jury instructions right now. We can't get to that until after I hear your motion and rule on it.

**MS. YEE:** Thank you, your Honor. I'm ready to proceed.

**THE COURT:** Go ahead.

**MS. YEE:** Pursuant to FRCP 50(a), Defendant Ameris Bank respectfully moves for judgment as a matter of law on each of Plaintiff's claims.

**THE COURT:** 58?

**MS. YEE:** 50(a).

**THE COURT:** Okay. I just want to make sure that I'm understanding which rule you're moving under.

**MS. YEE:** Judgment as a matter of law is appropriate where even viewing the evidence in the light most favorable to the non-moving party. There's no legally sufficient basis for a reasonable jury to find for the non-moving party.

Krechman, K-r-e-c-h-m-a-n, versus County of Riverside, 723 F.3d 1104 1109, Ninth Circuit 2013.

Corbello, C-o-r-b-e-l-l-o, versus Valli, V-a-l-l-i, 974 F.3d 965 973, Ninth Circuit 2020.

A mere scintilla of evidence or evidence amounting to

pure speculation is not enough to defeat a motion for judgment as a matter of law.

Lakeside Scott versus Multnomah, M-u-l-t-n-o-m-a-h County, 556 F.3d 797 802-03 Ninth Circuit 2009.

Here, there's no legally sufficient basis for the jury to find for Mr. Byrne on any of his claims. And Ameris is therefore entitled to a judgment as a matter of law.

First, Plaintiff's failure to pay wages under Labor Code Section 201 and 203. There's no legally sufficient basis for the jury to find for Mr. Byrne on his claim for failure to pay wages under the labor code based on the 2022 and 2023 LTIP awards.

First, there is no evidence to support a jury finding that the LTIP awards were considered wages as opposed to discretionary bonuses. California law is clear that discretionary bonuses are not wages.

Frausto, F-r-a-u-s-t-o, versus Bank of America, N.A., Number 18-cv-01983LB 2019 WL F 5626640 at Pages 526 and 9, ND Cal October 31st 2019.

A bonus is discretionary if the employer maintains discretion to the fact of payment and the amount. Here, the evidence shows that all material aspects of the LTIP award including eligibility, calculation and even the existence and amount of payment were determined on a discretionary basis. There was no fixed allocation formula for Mr. Byrne or anyone

else. And Mr. Byrne cannot show that he earned an ascertainable amount of an LTIP award.

See Wentzo, W-e-n-t-z-o, versus Signavio (phonetic), Incorporation number CV 21-09968-TJH 2024 WL 3191228 at Page 5 CD Cal April 29th, 2024, holding that incentive payments are not earned wages under Labor Code 200 when the value is not, quote, "ascertainable," meaning fixed by any method of calculation at the time that they were granted.

In other words, the absence of an individualized calculation method combined with Ameris' broad authority and discretion under the LTIP plan confirms that Mr. Byrne had only a contingent expectation, not entitlement to an earned wage.

Plaintiff has not shown any evidence at trial that he was entitled to a specific percentage of the LTIP payout, testifying that he backed into a certain percentage in 2022 after calculating payouts for other eligible participants of the LTIP. This is not fixed by any method of calculation at the time the payment was granted and is therefore not an earned wage under the labor code.

Second, even if the LTIP award was a wage, there is no evidence to support a jury finding that Ameris failed to pay Mr. Byrne an amount that he actually earned. There is overwhelming evidence on the record that Ameris received Mr. Byrne's demands to be paid further on the 2022 LTIP and to receive a 2023 LTIP award but Ameris responded to his

complaints and concerns and explained in detail why his complaints did not follow the Pioneer model, the terms of the LTIP or Ameris' internal controls. Mr. Byrne's conclusory arguments that he should have received more money is not enough evidence to show that Ameris failed to pay him any earned wages.

Second claim, whistleblower retaliation.

There is no legally sufficient basis for the jury to find for Mr. Byrne on his whistleblower claim because Plaintiff has not established that he engaged in protected activity or that his complaint about the LTIP calculations were a contributing factor to Ameris' decision to terminate his employment.

First, regarding the alleged activity, a plaintiff must reasonably believe they're disclosing a violation of state or federal statute or local, state or federal regulation under California Labor Code 1102.5B. Mr. Byrne has failed to present any evidence to establish that he reasonably believed that he was disclosing a violation of law. When he challenged Ameris' LTIP calculations, Plaintiff's complaint centered on Ameris' calculations and accounting and he never expressed to Ameris that he believed Ameris' conduct to be unlawful. At most, he was concerned that Ameris had calculated incorrectly or straight from what he thought were the parties' agreement.

Plaintiff never reporter Ameris to any government

agency, Ameris' external audit hotline, the Ameris whistleblower reporting hotline or filed an HR complaint. He simply repeated his template, his words, the same internal disagreement to the same people.

Second, there is no evidence for the jury to find that Mr. Byrne's complaints were a contributing factor to Ameris' decision to terminate his employment. The overwhelming evidence shows that after Mr. Byrne first raised his concerns about the LTIP, he remained a CEO of the Balboa Division. He received all his quarterly bonuses and salary increases and was repeatedly assured that Ameris wanted him to continue in his role. Plaintiff has presented a mere scintilla of evidence that his termination occurred after his LTIP complaint even though his termination was two years after his first complaint or concern.

The only other evidence is Plaintiff's speculative testimony that he was terminated because Ameris didn't want to pay the LTIP. Plaintiff sent many many demands to be paid on the LTIP but Ameris responded and explained why his demands were not in line with Ameris' internal controls or the LTIP itself. Neither is enough to overcome a motion for judgment as a matter of law.

Third, wrongful termination claim; and fourth, unfair competition claim.

Plaintiff's wrongful termination claims and unfair

competition claims are derivative of his labor code claims. And because there's no legally sufficient basis for the jury to find for Plaintiff on his labor code claims, judgment as a matter of law is proper as to his remaining claims.

Therefore, the Court should grant judgment as a matter of law for Ameris Bank on all counts. Thank you, your Honor.

**THE COURT:** Thank you. And just for the record, based on your argument, I'm assuming that this is a motion that's being brought pursuant to Federal Rule of Civil Procedure 50 and not 58.

**MS. YEE:** No, yes, correct, your Honor.

**THE COURT:** Okay, thank you. Okay. Ms. Villagomez?

**MS. VILLAGOMEZ:** Thank you, your Honor.

**(Pause)**

Your Honor, under Rule 50(a), judgment as a matter of law is appropriate only when a reasonable jury would not have a legally sufficient evidentiary basis to find for the non-moving party. The Court must view the evidence in the light most favorable to the plaintiff here, Mr. Patrick Byrne, draw all inferences in Plaintiff's favor and may not weigh credibility, resolve conflicting testimony or choose between competing interpretations of the evidence.

With respect to Ms. Yee's argument regarding wrongful termination, the defense in this case has argued consistently

that LTIP awards are discretionary bonuses and not wages due upon termination under Labor Code Sections 201 through 203. Again, Labor Code Section 200 defines wages as all amounts for labor performed by employees of every description whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation. And *Shacter* (phonetic) *versus CitiGroup*, Incorporated; again, the California Supreme Court construed the term wages broadly to include not only periodic monetary earnings but also incentive compensation such as bonus and profit-sharing plans.

In *Neisendorf* (phonetic) versus Levy Strauss and Company, 143 Cal App 4th 509 522, year 2006, the Court stated:

> "Once a bonus has been promised as part of the compensation for service, an employee fulfils all of the agreed-to conditions, the promised bonus is considered wages and must be paid."

Under these two cases, your Honor, both *Shacter* and *Neisendorf*, the LTIP cash award is properly considered incentive compensation that if Plaintiff satisfied the conditions precedent to receiving the LTIP cash award needed to be paid upon termination.

During the trial, your Honor, there has been extensive evidence supporting this particular claim for wrongful termination. The parties presented competing evidence regarding whether the LTIP required application of historical

practices, whether Ameris properly applied the negotiated assumptions, the calculations of indirect expenses and loan losses. And there are disputes regarding whether or not that threshold was met but Plaintiff presented evidence that even if those assumptions were applied correctly, the threshold would have been met and a payout would have been owed.

In addition, with respect to discretionary piece, the general plan provisions must be read together with the specific award agreement provisions. The award agreement creates an individual contractual right that’s triggered by a defined event. Here, termination without cause.

Mr. LaHaise acknowledged this provision exists and that Mr. Byrne was terminated without cause. The termination letter itself which was drafted by Ameris also expressly stated that Mr. Byrne would remain eligible to participate in the LTIP in 2024. And Ameris cannot now disclaim that promise that it put in its own termination letter.

Also, your Honor, no witness testified as to any exercise of discretion which is a consistent argument that defense has raised. Mr. LaHaise stated, “I don't know,” in response to why Mr. Byrne was not paid and that is not a discretionary determination but it is a failure to comply with the contractual obligation called for under the contracts.

There was also argument by Ms. Yee regarding whether or not Mr. Byrne’s percentage was fixed and there was evidence,

as your Honor may recall, that there was a blank percentage in the award agreement which Defense has been relying on to suggest that no specific amount was owed. This goes to the ascertainability of the -- of Mr. Byrne's damages.

At the trial we saw evidence that established a course of dealing. For 2022 Mr. Byrne received approximate 62 percent of that pool and Mr. Rasmussen on day two testified that he was assigned seven percent and that the 2022 payout, quote, "aligned with the spreadsheet."

This motion, your Honor, Rule 50(a) motion does not require the Court to determine a precise percentage. It's sufficient to establish that Mr. Byrne was contractually entitled to some share of the 2024 pool and the prior pools under the award agreement's forfeiture risk provision and that amount can be determined by the jury of through further proceedings.

Even under Mr. LaHaise's testimony as well, when a threshold is met, 35 percent of EBT above the threshold is allocated to the pool and then, quote, "distributed to the LTIP's participants. LaHaise -- Mr. LaHaise confirmed that Mr. Byrne, quote, "was eligible" and he confirmed that no regulatory or legal impediment applied.

In connection with the retaliation claims, this claim also likewise presents classic jury issues. And with respect to protected activity, Plaintiff introduced evidence that

Mr. Byrne repeatedly complained that Ameris was improperly withholding compensation owed under the LTIP.

The defense argues that Mr. Byrne never used the specific terms "illegal" or "unlawful". But whether or not Mr. Byrne's complaints conveyed a reasonable belief that Ameris was violating the law is a factual question for the jury and California law does not require the magic words "illegal" or "unlawful" to support protected activity.

With respect to causation, the under retaliation, the jury heard evidence of repeated LTIP complaints, escalating disputes over compensation, the temporal proximity between those complaints and Mr. Byrne's non-renewal and termination. They heard Mr. Silva's testimony this week and last week regarding his contemporaneous statement that he was, quote, "guessing the LTIP one percent structure was the reason." There's also an absence of any contemporaneous documents identifying the reason for Mr. Byrne's termination. And a reasonable jury for those reasons could conclude that Mr. Byrne's complaints were a contributing factor to his termination.

As for pretext, Mr. LaHaise admitted that he was unaware of any documents identifying the reasons for Byrne's termination and even at the close of defense's presentation there were still no documents that were offered. A reasonable jury could view the absence of this documentation or any

documentation, combined with the timing of the events relating to Mr. Byrne's termination and the without cause designation by Ameris as evidence of pretext sufficient to support retaliation.

And your Honor, overall, Defendant's motion requires the Court to accept Defendant's witnesses, to reject Plaintiff's witnesses, reject Plaintiff's expert and draw all inferences in Defendant's favor. Rule 50 does not permit that. The record contains substantial evidence supporting each of Plaintiff's claims including its newly added breach of contract claim. At a minimum, reasonable jurors could disagree regarding the LTIP calculations, the reasons for Mr. Byrne's termination and the parties' competing explanations of the evidence. And for that reason Defendant's motion should be denied.

**THE COURT:** Thank you. Ms. Yee?

**MS. YEE:** Your Honor, I don't have any rebuttal but I just want to confirm that our motion was brought under FRCP 50, subsection (a).

**THE COURT:** Right.

**MS. YEE:** That's what -- yeah.

**THE COURT:** That's why I clarified it.

**MS. YEE:** Thank you.

**THE COURT:** Because I asked you if it was -- when you said 50(a) it sounded like you said 58. And that's why I asked

you, are you making your motion under Rule 58 and you said yes. Then I heard your argument and that's when I thought, no, she's making her argument under Rule 60 or 50, sorry.

**MS. YEE:** Rule 50, subsection (a).

**THE COURT:** I understand.

**MS. YEE:** Thank you.

**THE COURT:** Okay. So a motion for a judgment as a matter of law should be granted only if the facts and inferences construed in the light most favorable to the non-moving party points so strongly and overwhelmingly in favor of one party that there's only one reasonable conclusion. A judgment as a matter of law is proper when the record contains no proof beyond speculation to support a verdict.

Ms. Yee is correct when she says that a mere scintilla of evidence is generally insufficient to prevent entry of judgment as a matter of law. However, if reasonable minds could differ as to the import of the evidence, the judge -- a judge should deny a motion for judgment as a matter of law and submit the case to the jury.

This is not an instance of a court's discretion. It would require the Court to make a conclusion of law based upon a finding that there is sufficient evidence to create a question of fact for the jury. This particular case is replete with questions of fact for the jury on all of the causes of action. So for that reason the motion -- Defendant's Motion

for Judgment as a Matter of Law is denied.

Mr. Wood, do you have another motion?

**MR. WOOD:** I do, your Honor.

**THE COURT:** Go ahead.

**MR. WOOD:** Thank you, your Honor. Just to note so as noted again as we were preparing our argument on the last motion, we realized that some of the evidence here may support judgment as a matter of law on a portion of our contract claim. That portion is Ameris' failure to make any payment to Mr. Byrne for the 2024 LTIP performance period which breached both the LTIP and the employment agreement.

So Ms. Yee, Ms. Villagomez and then your Honor in your rulings walked through the standard on a JMOL so I will give that relatively shorter (indisc.) than I had planned. I just simply noted one of the things that popped out at me as I was preparing this is that, gosh, it feels a little unusual for a plaintiff to bring it so we --

**THE COURT:** I've had it happen before.

**MR. WOOD:** Okay. So I'm prepared to give you a cite if you'd like one but otherwise I'll move on.

Okay. So there's undisputed evidence of the following facts and I can go through these in more detail after the sur-review.

So first, nobody disputes that Mr. Byrne and Ameris entered into a contractual relationship. There's the LTIP,

Exhibit 301; Mr. Byrne's employment agreement, Exhibit 324, which incorporated the LTIP by reference, Employment Agreement Section 3.3.

Section 3 of the LTIP -- again, Exhibit 301 -- includes the forfeiture risk provision which I read earlier during my earlier argument. And that again just in summary entitled Mr. Byrne to be eligible for an LTIP award for outstanding performance periods if he was terminated without cause.

Third, the Balboa Division exceeded its LTIP EBT target for 2024 triggering an LTIP pool and distribution.

Four, Mr. Byrne was terminated on June 27th, 2024 and Ameris designated his termination as without cause. That's the termination letter, Exhibit 496.

Five, Mr. Byrne did not receive any 2024 LTIP award despite Ameris creating an LTIP pool and distributing LTIP awards to Balboa Division employees.

And six, Mr. Byrne was damaged by this breach.

So just to go in a little bit more detail -- again, I don't think there's really any dispute over the existence of the contractual relationship at this point. I can certainly cite to the additional evidence if your Honor would like me to. Otherwise I'll move on.

**THE COURT:** I don't need to but I am going to say for the record that it's not clear to me that that is not in

dispute because of the differences in the verdict forms that were submitted as well as the parties' positions as stated in the final pretrial conference order.

**MR. WOOD:** Okay. Appreciate that, your Honor, so I'll just again point back to Exhibits 301, which is preadmitted; Exhibit 496, which established the contractual relationship.

So to go to the point about the target for 2024, Mr. Silva and Mr. LaHaise both testified to this. So here is Mr. Silva on Day 4. The transcript is Page 129, Lines 9 through 19 and I'm going to skip over the overruled objections.

"Question: There was an LTIP accrual for the 2024 performance period, correct?

"Answer: Yes, there was.

"Question: And the total LTIP pool that Ameris had calculated for 2024 was approximately 3.6 million dollars, right?

"Answer: That from an approximation standpoint that was my understanding ma'am, yes.

And on Day 3 Mr. LaHaise testified extensively and I think I wrote an incorrect cite down in here but I believe it starts at Page 49, Line 25.

"Was there an LTIP bonus distribution in 2024?

"It was.

The question was, how much was it?

"I don't recall. I don't know.

"Was it more than three million dollars?

"I don't recall the number, I don't.

Fourth, Mr. Byrne was terminated on June 27th, 2024 and Ameris designated his termination as without cause.

Now, again, Exhibit 496 is in evidence. It states the termination is without cause and Mr. LaHaise confirmed this in his testimony.

Here's Day 4, Page 84, Line 7 to Page 86, Line 24.

"Question: Okay, sir, what is this email?

"Answer: This is the actual forwarding sending of the termination of employment to Mr. Byrne along with the employee that Mr. Byrne's employment agreement release which was part of the original employment contract that was provided at the closing of the purchase.

"Question: And when did you send this email?

"Answer: It was on June 27th in the evening."

Then it goes on to Day 4 at Page 88, lines 14 to 16.

"Question: And did Ameris characterize the termination with cause or without cause?

"Answer: Without cause.

Five. Fifth, Mr. Byrne did not receive any 2024 LTIP award even though there was a 2024 LTIP distribution and Mr. Byrne was eligible for 2024 award.

So we heard earlier that Mr. Silva confirmed that the

award existed. And in Mr. LaHaise's testimony he confirmed that Mr. Byrne was eligible but there was no bonus paid.

Here's Day 4. It's Page 91, Lines 1 through 8.

"Question: So I understand, is it your testimony that you simply decided not to pay him his bonus for the 2024 performance period?

"Witness: We did not pay him his bonus. He was eligible to pay but there was no bonus paid.

He then could not provide any reason why Mr. Byrne was not paid. So again, going back a little bit on Day 4, Page 90, Line 16 to 20.

"And do you remember testifying that Mr. Byrne did not receive an LTIP bonus payment for the 2024 period?

"Answer: I do recall that.

"Question: Why wasn't he paid?

"Answer: I don't know."

Lastly, Mr. Byrne was damaged by Ameris' breach.

Now, if the Court is so inclined based on what we've presented here so far, it could enter judgment as a matter of law on liability alone for the 2024 LTIP award and leave the specific damages number to the jury to determine. They can say, look, there's the evidence is replete here that it has been established that they breached this by not paying anything in 2024 and now the jury needs to decide what the amount of that damage is. But we submit that there is sufficient

evidence for the Court to enter judgment as to that amount.

First of all, the only opinion offered on this issue in this case as to Mr. Byrne's 2024 damages comes from Ms. Dickson. Ms. Sebold did not offer an opinion on 2024 damages. Ms. Dickson's opinion was that Mr. Byrne's 2024 LTIP award should have been $4,844,985. That's Exhibit 175 at PX-175-2 which was admitted yesterday.

Alternatively, the undisputed evidence at a minimum sets a floor for Mr. Byrne's 2024 damages. So to explain Exhibit 19, which was admitted on June 3rd, is an LTIP workbook that includes a line for a 2024 LTIP calculation of $3,656,709. And that's Exhibit 19 at Page PX 19-4.

And now, again, Mr. Silva, as I pointed out earlier, confirmed in his testimony that the total LTIP pool for 2024 was approximately 3.6 million. And again, so the question was:

"And the total LTIP pool that Ameris had calculated for 2024 was approximately 3.6 million dollars, right?.

"Answer: That, from an approximation standpoint that was my understanding, ma'am, yes.

So applying Mr. Byrne's percentage of 62.54 percent, the 2024 LTIP pool specified in Exhibit 19 we get $2,286,905 as the minimum of Mr. Byrne's 2024 damages. This would be Mr. Byrne's share even if we accept Ameris' document at face value for what the 2024 LTIP pool should be. So the Court could give the jury discretion to award Mr. Byrne more than

this 2.2 million dollar figure but not less.

So just to summarize, we have admissions from Ameris that Mr. Byrne was eligible for a 2024 award. That there was an LTIP pool for that year. That Mr. Byrne was not paid. That the documents underlying the contractual relationship established that Mr. Byrne was entitled to be paid in the circumstance and that Ameris witnesses could offer no explanation for why he didn't receive that award. And that's indisputably a breach of contract.

And with that I'm happy to answer any questions or allow opposing argument.

**THE COURT:** I don't have any questions. Thank you.

**MR. WOOD:** Thank you, your Honor.

**THE COURT:** Ms. Yee?

**MS. YEE:** Thank you, your Honor. First of all, your Honor, we --

**THE COURT:** She's tall.

**MS. YEE:** Thank you, your Honor. First of all, your Honor, I'd like to state for the record --

**THE COURT:** The podium rises so you don't -- I want to make sure that you're comfortable so there you go.

**MS. YEE:** Thank you, your Honor.

**THE COURT:** You're welcome.

**MS. YEE:** First of all, your Honor, I'd like to state for the record that obviously we preserve all rights under

Plaintiff's -- I understand you ruled in favor of Plaintiff's motion to amend for breach of contract and we reserve all rights. And second of all, we had no notice that Plaintiff is bringing a motion for judgment as a matter of law on the breach of contract claim that you ruled this morning.

None the less, I'd like to raise the prejudicial issue -- prejudicial issue to the defendant on the breach of contract and then due process so I'd like to just briefly address our opposition.

**THE COURT:** So what is the relevance of that on a motion for judgment as a matter of law?

**MS. YEE:** Well, your Honor, because this morning you just ruled that you will allow Plaintiff to amend the complaint and we have not had a chance to review the amended pleadings.

**THE COURT:** So are you going to respond to the motion for judgment as a matter of law arguments or are you going to reargue your arguments on the motion to amend to conform to proof?

**MS. YEE:** I'd like to reserve the right to address because this is the first notice we have that Plaintiff is moving for a motion for judgment as a matter of law on the breach of contract claim.

**THE COURT:** Right but that's not unusual. Usually these motions are -- usually it's the other, it's usually we're in the middle of trial. Plaintiff has rested its case and then

the defense makes an oral motion. So it's not unusual for this to be an oral motion. This is your time to make an argument because I am going to make a ruling on this motion. If you are telling me that you just want to reargue what I've already ruled on and you're not going to offer an argument in opposition to the Plaintiff's motion for judgment as a matter of law then I'm going to ask you to sit down.

**MS. YEE:** No, your Honor, I'm going to address briefly our opposition to Plaintiff's motion.

**THE COURT:** Okay, go ahead.

**MS. YEE:** Thank you.

So your Honor, Plaintiff's motion should be denied because there are material factual disputes exist. First off, the jury could find no breach occurred. For example, Plaintiff's motion ignores evidence showing that Defendant acted consistently with its understanding of the LTIP agreement, with the employment agreement, and the parties established a course of dealing. At a minimum, the evidence presents a factual dispute for the jury.

Second of all, the jury could find that Plaintiff actually is the one who failed to perform because there's evidence and testimony from the witnesses that Plaintiff violated company policies and Plaintiff failed to satisfy his condition under the contract and Plaintiff did not follow the LTIP agreement, did not follow the Pioneer model and Plaintiff

materially breached the contract and meet -- failure to meet the performance criteria.

And then third, jury could find no damages under the breach of contract claim and even if breach were assumed, damages are speculative and there's no competent proof of loss, including we also dispute causation and expert testimony is also disputed.

And lastly, the credibility determination are for the jury. Plaintiff's proof depends heavily on his own testimony and therefore the motion -- I think if Plaintiff is asking the Court to credit Plaintiff's and Plaintiff's witnesses and reject contradictory testimony and that's improper.

So to conclude, your Honor, Plaintiff has not established entitlement to judgment as a matter of law.

**THE COURT:** Thank you. Mr. Wood?

**MR. WOOD:** Very briefly, your Honor.

I admit I'm a little confused, your Honor, because I don't believe that Mr. Silva or Mr. LaHaise were -- I mean we did call them as adverse witnesses but they are affiliated with Ameris. There was nothing in the argument that contract that identified any specific contrary testimony to the clear admissions that we elicited from Mr. LaHaise and Mr. Silva on these points. So in that regard there still appears to be no dispute in this matter and we would reiterate our request.

//

**THE COURT:** Okay, thank you.

Okay. So I'm not going to go back over the governing standards for a motion for judgment as a matter of law. They are the same as I articulated on the Defendant's -- on the Plaintiff's -- Defendant's motion -- I'm getting confused. It's like looking into a mirror. The Court finds that there are significant credibility findings that the jury is going to have to make with respect to some of the testimony that has been offered in this case. And for that reason, reasonable minds could differ as to the import of the evidence.

So the motion for judgment as a matter of law on the Plaintiff's motion on the breach of contract claim is denied. Okay?

**MR. SESSIONS:** Thank you.

**MR. WOOD:** Thank you, your Honor.

**THE COURT:** Thank you. All right. Does anyone need a break before we start talking about jury instructions?

**MS. YEE:** I would like a break, your Honor.

**MR. SESSIONS:** I'll echo that.

**THE COURT:** All right. Ten minutes?

**MS. FODE:** Thank you. You read my mind.

**THE COURT:** We'll see everyone back here in 10 minutes.

**MS. YEE:** Thank you, your Honor.

**THE CLERK:** All rise.

**(Recessed at 9:32 a.m.; reconvened at 9:43 a.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated.

Okay.

**(Pause)**

Okay. So in light of the rulings on this morning's motions I need to tweak the jury instructions a bit. I also have a few questions that I need to ask you-all about some others. And so what I'd like to do is to have a conversation about those and then I will go back into chambers and make a few edits. I'll send the set of instructions to Ms. Jackson to give to you, give you a chance to look at them and then we'll have another conference about them just to finalize them. And then once that's done then we can finalize the jury verdict form.

Is that acceptable to Plaintiff?

**MR. SESSIONS:** That's acceptable, your Honor.

**THE COURT:** Okay. To Defendant?

**MS. YEE:** Yes, acceptable.

**THE COURT:** Okay. So the first question I have we're just going to start with the model instructions is on Instruction 2.17 which is evidence in electronic format. Do we need that instructions or are we going to be sending the -- are

we sending any evidence in electronic format back to the jury?

**MR. SESSIONS:** There are a couple of Excel native spreadsheets that did come into evidence, your Honor. And with that in mind -- and I don't know what the jury is going to want to look at so I do think that that instruction might be necessary given that those native Excels were put on the screen for some time with a couple of witnesses.

**THE COURT:** Okay. And it's your intention not to print them but to give them to the jury?

**MR. SESSIONS:** I mean frankly, your Honor, I think we could do either, whatever the Court thinks is more convenient for them and convenient for the Court. I'm frankly fine with --

**THE COURT:** Let's see here.

Ms. Jackson, what is going to be easier for us to do in terms of logistics?

**(Court and Clerk confer)**

Let's go off the record for a moment.

**(Recessed at 9:46 a.m.; reconvened at 9:48 a.m.)**

**(Outside the presence of the jury)**

**THE COURT:** I just had a conference with Ms. Jackson. And counsel, it sounds like there are probably two Excel spreadsheets that will be made available to the jury in electronic form. So we do need instruction 2.17 I believe. Is that correct?

**MS. VILLAGOMEZ:** Yes, your Honor.

**MS. YEE:** That's fine with us, your Honor.

**THE COURT:** Okay.

**(Pause)**

Okay. The next question I have is on CACI 314 which is interpretation disputed words. Do we need this instruction?

**(Pause)**

**MS. VILLAGOMEZ:** Your Honor, Plaintiff agreed to remove this from its proposed jury instructions.

**THE COURT:** I'm sorry, I didn't --

**MS. VILLAGOMEZ:** I'm sorry. Plaintiff agrees to remove this from its proposed jury instructions.

**THE COURT:** Okay. And from Defendant's perspective, do we need this one?

**MS. YEE:** No, your Honor, that's fine with us.

**THE COURT:** I didn't think so but I don't catch 100 percent of what gets testified to so I didn't want to take it out if we did need it.

And then CACI 2507 is something -- is a new instruction in the defendant's batch of instructions that we didn't discuss at the first jury instruction conference. Is there any objection from Plaintiff to adding this?

**MS. VILLAGOMEZ:** Your Honor, Plaintiff has no objection.

**THE COURT:** Okay. And do you have any objection to

the version that was proposed by the defense?

**MS. VILLAGOMEZ:** No objection.

**THE COURT:** Okay. So I will go ahead and insert that as well. Let's see.

All right. And those are the questions that I had before I send the batch of instructions to you to review. Is there anything else from the plaintiff's perspective?

**MS. VILLAGOMEZ:** No, thank you.

**THE COURT:** Anything else from Defendant's perspective?

**MS. YEE:** Your Honor, I want to clarify that there's CACI 2400. I want to clarify if that's on your Honor's list.

**THE COURT:** 2400 is not. We haven't talked about that.

**MS. YEE:** Your Honor, may I be heard on that one?

**THE COURT:** No one has proposed it. I do want to hear from you but this is the first that I think any of us are hearing about 2400.

**MS. YEE:** Your Honor, this is your Honor this is at-will jury instruction. I believe we discussed it.

**THE COURT:** Oh, we did discuss that and I decided that we're not going to -- that it's not going to get in.

**MS. YEE:** Your Honor, I believe you issued a tentative ruling on that.

**THE COURT:** I want to hear from you so go ahead.

**MS. YEE:** Okay. So your Honor the employment agreement between Ameris and Mr. Byrne does not condition termination on just cause. To the contrary, it expressly provides that Mr. Byrne may be terminated with or without cause. And that is a functional equivalent of at-will employment during the term. And California courts distinguish between fixed term contracts that are silent on termination where a just cause obligation may be implied. And fixed term contract that expressly address termination rights.

**THE COURT:** Right but you argued this already when we had our initial conference. So what has changed?

**MS. YEE:** I wanted to just state for the record because I've done further research and I found caselaw that's consistent with our position.

**THE COURT:** In this case there is a specified term of three years and that's why this instruction is not applicable.

**MS. YEE:** Your Honor, I believe the version that we submitted include -- it's a modified version and we have things proposed and I believe we submitted to include the full text of CACI 2400.

**THE COURT:** Okay. Ms. Villagomez?

**MS. VILLAGOMEZ:** Thank you, your Honor. We have nothing more to add truly but just to remind the Court from Day 0 we discussed that there is a specified term here and your Honor had proposed to defense counsel using the CACI

instructions that provided for a specified term including the one identified at CACI 2420 is one option. We did not receive any proposed versions of specified term CACI instructions from opposing counsel during our meet and confer.

**THE COURT:** Thank you. And I didn't receive any either. I actually looked at it last night because I did suggest that we take a look at 2420, 21 and 22 and no one proposed that.

Okay. Anything else? And I don't want to go over rulings that I've already made on the jury instructions.

**MS. YEE:** Yes, your Honor. And I'd also like to discuss CACI 2430. I think we submitted our revised proposed changes.

**THE COURT:** Right. And you're going to get that when I give you the package.

**MS. YEE:** May I be heard on that one, your Honor?

**THE COURT:** Not yet. What I want you to do is wait for -- I'm going to go back and make the tweaks to the instructions and then give you the package of instructions as a whole so you can see how things turned out based on the rulings that were made at the first jury instruction conference. I don't want you to -- right now you'd be arguing blind because you don't know what is in the current version. So I'm going to give everyone a copy of the current version and then we can talk about it again.

**MS. YEE:** Sounds good. Thank you, your Honor.

**THE COURT:** Are there any other instructions that we haven't talked about at either the initial jury instruction conference or today?

**MS. VILLAGOMEZ:** Nothing from Plaintiff.

**MS. YEE:** Nothing from Defendant.

**THE COURT:** Okay. I'm going to ask Ms. Jackson to let the jury know that we're not going to need them until 11:00 because it's going to take us a little bit of time to get through both of these things. And I will send Ms. Jackson the draft of the jury instructions as they stand right now in the next five or 10 minutes or so and then she'll send them to you. And then when you've had a chance to review them, I'll come back out and we can talk about them. Okay?

**MR. SESSIONS:** Thank you, your Honor.

**MS. YEE:** Thank you.

**THE COURT:** All right. Thank you.

**(Recessed at 9:55 a.m.; reconvened at 11:07 a.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** All rise. This court resumes in session.

**THE COURT:** Thank you, Ms. Jackson. Everyone can be seated. Okay. All right, starting with the plaintiff. Would you like to be heard on any of the jury instructions?

**MS. VILLAGOMEZ:** Yes, Your Honor. Just on 5.1 and

5.2 damages.

**THE COURT:** Right.

**MS. VILLAGOMEZ:** You'll recall that this morning the plaintiff's breach of contract cause of action was added, and we would just like to make that reference in this instruction and add a line in the damages description to state the reasonable value of any amount provided in the contract, as well as, in the second paragraph, a reference to plaintiff's breach of contract claim.

**THE COURT:** One moment. So the reasonable value of any amount in the contract?

**MS. VILLAGOMEZ:** Of any amount provided in the contract. Provided for in the contract.

**THE COURT:** Okay. And then also you said the second thing?

**MS. VILLAGOMEZ:** In the second paragraph, we'd request the first line to state, if you find for the plaintiff on the plaintiff's breach of contract, comma, wrongful termination, et cetera.

**THE COURT:** Okay. Ms. Yee, your response?

**MS. YEE:** Your Honor, I believe the damages section for breach of contract is also specifically referenced in the breach of contract CASI. So I think it would be confusing to include it here.

**THE COURT:** Okay. Anything else?

**MS. YEE:** That's it.

**THE COURT:** All right. I think it would be confusing not to include it here. So I'm going to make that change now. So just one moment. So I want to make sure I'm understanding, Ms. Villagomez, where do you want me to insert the language that says the reasonable value of any amount provided in the contract?

**MS. VILLAGOMEZ:** If we could add that. One moment, Your Honor. Just to keep it in line with the order, we would request that that be added before the line stating the emotional pain and suffering.

**THE COURT:** So after the colon but before the emotional pain and suffering?

**MS. VILLAGOMEZ:** Correct.

**THE COURT:** Okay. Okay. I've added that.

**MS. VILLAGOMEZ:** And just one more question, Your Honor. It appears that the punitive damages instruction for CACI 3946 came before the 1102.5 jury instruction, and we would just request that the punitive damages instruction come after the 1102.5 instruction and any related affirmative defenses.

**THE COURT:** Okay. So if I move it to right before the CACI 5030, is that acceptable? Right before the implicit or unconscious bias?

**MS. VILLAGOMEZ:** Yes, Your Honor. That's a good location.

**THE COURT:** Okay. And, Ms. Yee, would you like to be heard?

**MS. YEE:** That's fine, Your Honor.

**THE COURT:** Okay. So we'll do that. Okay.

**MS. VILLAGOMEZ:** And nothing further from plaintiff.

**THE COURT:** Okay. Anything further from defendant?

**MS. YEE:** Yes, Your Honor.

**THE COURT:** Go ahead.

**MS. YEE:** Your Honor, I noticed that the CACI 201 was not included, although I believe the parties have agreed on it, and then we addressed this issue with the Court on day zero, and Your Honor approved it.

**THE COURT:** Right, because it's already in there. I don't want to have two clear and convincing proof jury instructions, and there is a model, a Ninth Circuit model instruction for that. And right now, that is, it's Model Instruction 1.7.

**MS. YEE:** Give me a moment, Your Honor. Your Honor, I don't believe this one is specifically related to the punitive damages section.

**THE COURT:** But the punitive damages instruction says that the plaintiff has the burden of proving by clear and convincing evidence, and then there is this instruction that says, that defines what clear and convincing evidence is.

**MS. YEE:** Okay. We're fine with that, Your Honor.

Thank you.

**THE COURT:** Okay. Anything else?

**MS. YEE:** Yes. Your Honor, for wrongful termination, CACI 2430. Your Honor, we'd like to preserve our objections regarding our version of the changes to the CACI, because plaintiff's modifications to the CACI improperly intertwines his retaliation and I believe failure to pay wages claims in one instruction.

**THE COURT:** Okay. Do you have anything in addition to what you've already argued? Because we talked about this one extensively at the initial jury instruction conference.

**MS. YEE:** And, Your Honor, I'd also like to request that the jury instructions 2700 and 2704 be read before CACI 2430.

**THE COURT:** Okay.

**MS. YEE:** So the jury can understand the underlying claims.

**THE COURT:** Hold on for a second. Before we move on to those two, is there anything in addition concerning 2430 that you wanted to argue that you haven't already argued?

**MS. YEE:** No, Your Honor. I believe we've made the record.

**THE COURT:** Okay. And with respect to the others that you just mentioned, which are they again?

**MS. YEE:** I also would like to address --

**THE COURT:** You said you wanted to move some around.

**MS. YEE:** Oh, yes. So the jury instructions 2700 and 2704 should be read before CACI 2430 and 4603. So the jury can understand the underlying claims first.

**THE COURT:** Okay. Hold on. Ms. Villagomez, do you want to be heard?

**MS. VILLAGOMEZ:** Plaintiff has no objection.

**THE COURT:** I don't think it really matters what order these are in. So you want to move 2700 and 2704 before 2430. Is that right?

**MS. YEE:** And 460.

**THE COURT:** Hold on. So there's 24 before 2430 and before 4603.

**MS. YEE:** Correct.

**THE COURT:** Okay. That would make them before 4603 then.

**MS. YEE:** Okay.

**THE COURT:** That's fine. That moves them up.

**MS. YEE:** And, Your Honor, as to 2700, Labor Code Section 201, we'd like to -- first of all, I appreciate Your Honor made changes to that section, but we'd like to still preserve our objections and include the term ascertainable.

**THE COURT:** I don't understand. You have to tell me what you're -- which -- where -- what do you want me to do? You're asking me to edit it in what way?

**MS. YEE:** Under the wages definition to state that to be considered wages amount must be ascertainable, meaning fixed by a method of calculation at the time that it was granted.

**THE COURT:** I still don't understand. So what do you want that sentence to read? Right now it says, wages includes all amounts for labor employed -- labor performed by an employee whether the amount is calculated by time, task, piece, commission, or some other method. What is your suggested at it?

**MS. YEE:** I wanted to add that Your Honor proposed to add that to be considered wages the amount has to be as ascertainable.

**THE COURT:** Okay, Ms. Villagomez, any objection?

**MS. VILLAGOMEZ:** Yes, Your Honor. We discussed this at the day zero conference and that proposal was rejected and that also expands beyond CACI 2700 and we believe it's improper.

**THE COURT:** Okay, so Ms. Yee, you have -- you made that objection at the jury instruction conference, you've made it again. It's preserved for the record. Anything else?

**MS. YEE:** For CACI 2704, we'd like to request that Your Honor add the good faith belief under the willful definition.

**THE COURT:** And based on what authority?

**MS. YEE:** There's a case that we cited from the

sources and authorities of that particular CACI which states that employers reasonable good faith belief that wages are not owed may indicated a finding of willfulness.

**THE COURT:** That's argumentative, so unless you need to be heard Ms. Villagomez?

**MS. VILLAGOMEZ:** No, we agree with the Court.

**THE COURT:** Okay, so I'm not going to change 2704 but you're free to argue that in your closing argument.

**MS. YEE:** Thank you, Your Honor, understood. And for 4603, we just like to preserve the records that we wanted to -- we had you know previously proposed to include a special instruction 324 but I understand the Court has not included that in this particular instruction.

**THE COURT:** Okay, so what are you asking me to do with respect to 4603?

**MS. YEE:** To include those special instructions along with this CACI 2603.

**THE COURT:** Okay, and we've already litigated that as well, all of them, there were several, and the Court has already made its ruling on including those special instructions. Anything else?

**MS. YEE:** Yes, Your Honor for I want to go back to 2700 because Your Honor had previously instructed plaintiff to include the 2022 and 2023 LTIP awards, which plaintiff did include in their version that was sent on June 1st, but I don't

see that in Your Honors version.

**THE COURT:** Okay, again, I need you to point me specifically what you're talking about and what you want me to change.

**MS. YEE:** For 2700, we'd like to say that that Ameris Bank, you know, for one of the elements, we could say that Ameris Bank owes Mr. Byrne, a plaintiff earned wages under the terms of the LTIP for 2022 and 2023.

**THE COURT:** Okay, that's also argumentative which is why I didn't -- we talked about this at the first conference and why it's not included now. You're free to argue all of these things but the jury instructions are just to give the jury an outline of the law. It's not to argue your case for you. You can use the instructions to argue.

**MS. YEE:** Your Honor, with all due respect, you know the Court has already stated in its order granting Ameris's motion for summary judgment that the 2024 LTIP award was not available as a basis for plaintiff's Labor Code claims for unpaid wages.

**THE COURT:** All right. Are there any other instructions that you would like to discuss this morning?

**MS. YEE:** Your Honor, I'd like to request a limiting instruction.

**THE COURT:** Based on what?

**MS. YEE:** Based on the 2024 issue in connection with

the CACI 2700 and 2704.

**THE COURT:** Have you exchanged the instruction with plaintiff's counsel?

**MS. YEE:** No, but we have previously included that in our motion in limine.

**THE COURT:** I don't have it in front of me for jury instructions. Where is it?

**MS. YEE:** I can read it into the record, Your Honor.

**THE COURT:** Okay, tell me what you're proposing.

**MS. YEE:** Your Honor, we'd like to make sure the wage claim jury instructions for --

**THE COURT:** No, I need you to tell me what limiting instruction are you asking me to give to the jury?

**MS. YEE:** I'm asking that, you know, the jury is instructed that plaintiff is not entitled to any payment of compensation under the 2024 LTIP in connection with his wages claims.

**THE COURT:** Okay, Ms. Villagomez, would you like to respond?

**MS. VILLAGOMEZ:** Your Honor, we agree with the instruction as drafted.

**THE COURT:** Okay, so do we need to give a limiting -- what are we doing? Is it a limiting instruction? Are we amending CACI 2700? What are we going to do?

**MS. YEE:** Your Honor, I would request both. Revising

2700 to limit it to 2022 and 2023 LTIP award only.

**MS. VILLAGOMEZ:** Your Honor, plaintiff is agreeable with that proposal. However, we will not agree to the limiting instruction because that would be duplicative.

**THE COURT:** Okay, so how about if I edit it as follows? So Patrick Byrne claims that Ameris Bank owes him unpaid wages. To establish this claim, Patrick Byrne must prove all of the following. One, that Patrick Byrne performed work for Ameris Bank. Two, that Ameris Bank owes Patrick Byrne wages under the terms of the employment and the 2022 and 2023 LTIP agreements. And three, the amount of unpaid wages and then the rest of it would stay the same.

**MS. YEE:** That's fine, Your Honor. Thank you.

**MS. VILLAGOMEZ:** We agree with that, Your Honor.

**THE COURT:** Okay, under the terms of employment.

**MS. VILLAGOMEZ:** Your Honor, actually we would propose under the terms of the LTIP agreement for 2022 and 2023 as a revision just so there's no misunderstanding that there was only one LTIP.

**THE COURT:** Okay, so that Ameris Bank owes Patrick Byrne wages under the terms of, it should be an employment agreement, and the LTIP agreement for 2022 and 2023. Let me read it again. That Ameris Bank owes Patrick Byrne wages under the terms of the employment agreement and the LTIP agreement for 2022 and 2023.

**MS. VILLAGOMEZ:** Plaintiff agrees with that.

**THE COURT:** Ms. Yee?

**MS. YEE:** That's fine with us, Your Honor.

**THE COURT:** Okay, Ms. Yee, next.

**MS. YEE:** Thank you, Your Honor, for your patience. Given your, you know, Your Honor's ruling this morning on breach of contract, we'd also like to include CACI 312, 322, and 338.

**THE COURT:** Do you have them?

**MS. YEE:** Yes, Your Honor.

**THE COURT:** To submit -- have you exchanged them with plaintiff's counsel?

**MS. YEE:** We have not, Your Honor.

**THE COURT:** You need to do that.

**MS. YEE:** I'm happy to provide a copy to plaintiff's counsel.

**THE COURT:** Okay, so tell me again. It's three, which ones?

**MS. YEE:** 312, 322, and 338.

**(Pause)**

**MR. SESSIONS:** For clarity, was that 328 or 338?

**THE COURT:** Affirmative defense statute of limitations?

**MS. YEE:** Yes.

**THE COURT:** Okay. Okay, let's start with 312. Is

there any objection?

**MS. VILLAGOMEZ:** Your Honor, one moment. We're reviewing.

**THE COURT:** Sure, I am too.

**(Pause)**

**MS. VILLAGOMEZ:** Your Honor, Plaintiff does not agree with CACI 312 as written. It's argumentative and confusing.

**MS. YEE:** Your Honor, I just want to make the record clear. We're fine with using the CACI itself without modifications?

**THE COURT:** Okay, so the CACI itself without modifications would read, and I do need defendant to submit this to the Court so I can, if we're going to insert it, I need to have it. Ameris Bank contends that Patrick Byrne did not perform all of the things that Patrick Byrne was required to do under the contract, and therefore Ameris Bank did not have to perform its obligations under the contract. To overcome this contention, Patrick Byrne must prove both of the following, that one, that Patrick Byrne made a good-faith effort to comply with the contract, and two, that Ameris Bank received essentially what the contract called for because Patrick Byrne's failures, if any, were so trivial or unimportant that they could have been easily fixed or paid for.

**MS. VILLAGOMEZ:** Your Honor, CACI 312 provides under the directions for use that this instruction is not to be given

unless the defendant has testified or offered other evidence in support of the contention that plaintiff did not perform all of the things required under the contract. And we'd request that defendant give an offer of proof in support of this request for a jury instruction.

**THE COURT:** Thank you. I was just going to ask for that offer of proof because I don't -- unless, I don't remember any testimony like this. So what is the offer of proof to support giving this instruction?

**MS. YEE:** Your Honor, our witness, Mr. LaHaise, testified that plaintiff and Ms. Stokes all testified that plaintiff is the one that did not comply with the contract.

**THE COURT:** In what way?

**MS. YEE:** He did not follow the pioneer model and the LTIP agreement and the provisions.

**THE COURT:** But that's not the contract. So I'm not going to give CACI 312 based on the directions for use. It's not applicable in this case.

CACI 322, this is -- CACI 322 is occurrence of agreed condition precedent. I don't recall any testimony that would implicate this instruction either. Ms. Yee, what is your offer of proof?

**MS. YEE:** Your Honor, plaintiff has certain obligations under the employment agreement and the LTIP. And that's why this jury instruction applies.

**THE COURT:** I need you to give me an offer of proof. I understand your theory of the case, but the evidence, there's no evidence in this case of a condition precedent that would justify giving this instruction.

**MS. YEE:** Your Honor, we talk about plaintiff's job duties and his responsibilities as the division CEO during his testimony. And he has those responsibilities to perform under the employment agreement and the LTIP to reach the threshold of the LTIP.

**THE COURT:** The LTIP was, I mean, one of the reasons this case is a little bit more complicated is because the calculation under the LTIP is very complicated. But it's mathematical. It's math.

**MS. YEE:** Your Honor, I respectfully disagree because the LTIP has two parts. One is LTIP bonus pool, and then the second step of analysis is individual award. So it's a complicated issue, but plaintiff needs to prove that the first step under the math that he actually reached the threshold for it to even create a fund LTIP pool before the, you know, plaintiff is able to prove that he actually deserves the individual share under the LTIP pool.

**THE COURT:** Ms. Villagomez?

**MS. VILLAGOMEZ:** Your Honor, those are not the terms of the LTIP or the award agreement. And we agree with Your Honor that this does not apply.

**THE COURT:** Okay. I'm not going to give CACI 322 because it does not apply. There has been an insufficient offer of proof of how this instruction applies to the plaintiff's breach of contract claim.

And the last is CACI 3338, which is affirmative defense statute of limitations. This is a pretty straightforward instruction. Is there any objection?

**MS. VILLAGOMEZ:** Yes, Your Honor. Plaintiff objects to the inclusion of this statute of limitations instruction. Mr. Byrne filed this lawsuit within months of his termination, and there's no basis for any argument that an affirmative defense of statute of limitations would apply here.

**THE COURT:** Ms. Yee?

**MS. YEE:** Your Honor, plaintiff actually testified that, you know, when he entered into the LTIP agreement, defendant immediately breached it. And that would go back to 2021.

**THE COURT:** I don't remember a testimony that from Mr. Byrne that said that -- where he testified that of an immediate breach of contract in 2021.

**MS. YEE:** Or 2022, Your Honor.

**THE COURT:** Ms. Villagomez.

**MS. VILLAGOMEZ:** Your Honor, that's not our understanding of the evidence in the record. The breach occurred when Mr. Byrne was not paid his wages under the LTIP

in 2023. In addition, the amendment occurred today to add the breach of contract claim, which is now live, and it eliminates any statute of limitations issue that may exist, which does not, Your Honor.

**MS. YEE:** Your Honor, this is a --

**THE COURT:** Just hold on --

**MS. VILLAGOMEZ:** One more item. And because the amendment was made today, the addition of the breach of contract claim has been deemed to exist as of the date of the filing of the complaint. So this statute of limitations defense does not apply, and we object to the inclusion of this instruction.

**THE COURT:** Ms. Yee.

**MS. YEE:** Your Honor, this is a new claim, just like Ms. Villagomez said. It was just added this morning. I would like to preserve our statutory and affirmative defenses, which we also included in our answer.

**THE COURT:** Okay, but that would be an issue of law, not an issue of fact, for the jury to decide. I mean, the docket is pretty clear about when this case was filed. This claim does relate back to the time of the filing of the complaint, and the testimony in the case does not support giving the jury an affirmative defense -- or statute of limitations defense instruction. We can -- we may end up taking this up again after the jury's verdict, depending on

what the verdict is, but I don't think that it's -- it's called for by the nature of the evidence that's in the case so far. So I will not be giving CACI 3338. Any others?

**MS. YEE:** Just give me a second, Your Honor.

**(Pause)**

**MS. YEE:** That's all I have, Your Honor.

**THE COURT:** Okay. All right. So we will finalize the jury instructions. We need to talk about the verdict form. What I'm going to propose is to tell the jury that we're still working on preparing to get the case ready for the Court to give the instructions. Excuse them until 1:00, but I think I need all of you to be available to work on this jury verdict form. I was working on it while you were looking at the jury instructions, and it's getting a little tangled. So I definitely want to talk with all of you about it. It will probably -- it shouldn't take too much longer. But I do want to excuse the jury because we're not going to get to the jury -- to instruct the jury in the next 25 minutes.

So I am going to go back into chambers. I have maybe two minutes, three minutes left on the draft verdict form, and I do want to emphasize that because of the nature -- as all of you know, the nature of a jury verdict form is kind of like putting -- I don't know, trying to navigate your way through a haunted house sometimes. If you answered yes to question one, then go to question two. If you answered no to question one,

go to question 17. So I need all of us to have eagle eyes on all of that to make sure that we're all sure that everything is consistent.

So I am going to -- Ms. Jackson, if you could let the jury know, let's have them come back at 1:30 just to be safe, and I will email the draft that I have so far, the verdict form, to Ms. Jackson so she can distribute it to all of you, and then we can continue talking about that. Okay?

**MR. SESSIONS:** Thank you, Your Honor.

**MS. YEE:** Thank you, Your Honor.

**(Recessed at 11:37 a.m.; reconvened at 12:37 p.m.)**

**(Outside the presence of the jury)**

**(Call to Order)**

**THE COURT:** Everyone may be seated.

Okay. Let's see. Okay. So you have the draft of the verdict form. Starting with the plaintiff, would you like to be heard?

**MS. VILLAGOMEZ:** Yes, Your Honor, thank you. Just one minor edit to question 16.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** And to state that did Ameris Bank willfully fail to pay the full amount of wages earned by Patrick Byrne on his last day of employment.

**THE COURT:** Thank you.

**MS. VILLAGOMEZ:** And no further changes from

plaintiff.

**THE COURT:** Okay. Thank you. And from defense?

**MS. YEE:** Yes, Your Honor, first off, Your Honor, I'd like to -- I believe I addressed this similar issue in terms of the order of the claims. We'd like to request that the wrongful claim go after unpaid wages and whistleblower claim.

**THE COURT:** No, because that would require renumbering all of these. It would just be very confusing. It doesn't matter what order they address them, as long as they address everything.

**MS. YEE:** Understood, Your Honor. And then question 6(b), I don't believe 6(b) is in the jury instruction in your version that was provided earlier.

**THE COURT:** Okay. Ms. Villagomez?

**MS. VILLAGOMEZ:** Your Honor, we have no objection with 6(b).

**THE COURT:** Taking it out or leave?

**MS. VILLAGOMEZ:** With leaving it as is.

**THE COURT:** Right.

**MS. YEE:** This was not in the jury instruction.

**MR. SESSIONS:** May I ask what, as a reminder, what the jury instruction number is?

**THE COURT:** Ms. Yee, what is the number of the jury instruction?

**MS. YEE:** Your Honor, I'm trying to take a look.

I believe it's 4604.

4603.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** Thank you, Your Honor. Plaintiff's position is we are fine with 6(b) as it's currently drafted; however, we did compare it to the jury instructions and we did note that this 6(b) was omitted from the jury instructions. If Your Honor would not like to include or revise the jury instructions to capture this additional 6(b), we would just request that 6(b) be deleted from the verdict form.

**THE COURT:** Okay. 6(b) is, did Ameris Bank believe that Patrick Byrne disclosed to a person with the story over Patrick Byrne or an employee with authority as you investigate or discover correct, et cetera. So is plaintiff contending that Ameris Bank believed this? I think the reason I put this in here is it is in the model verdict form, but I don't -- I'm not clear on what plaintiff's theory of the case is for this particular --

**MS. VILLAGOMEZ:** Your Honor, we're fine taking out 6(b).

**THE COURT:** Okay. So 6(a) will just become 6. We'll delete 6(b). If your answer to question 6 is yes, then answer question 7. If you answered no to both -- no to question 6, answer question 17.

So hold on one second. So, Ms. Yee, right now -- so

6 now reads, did Patrick Byrne disclose to a person with authority over Patrick Byrne or an employee with authority to investigate, discover or correct legal violations that Ameris Bank had continuously failed to pay Patrick Byrne and other Balboa employees the earned compensation they were owed under the Balboa Capital LTIP, yes or no. And then if your answer to question 6 is yes, then answer question 7. If you answered no to question 6, answer question 17.

**MS. YEE:** Your Honor, I also want to note that under 6(a) plaintiff -- this form included not only Patrick Byrne but other Balboa employees --

**THE COURT:** Uh-huh.

**MS. YEE:** -- request to strike the other Balboa employees.

**THE COURT:** Ms. Villagomez?

**MS. VILLAGOMEZ:** Your Honor, let me compare this one moment just to the existing jury instruction.

**THE COURT:** The existing jury instruction I have it up, paragraph 2 does include other Balboa employees.

**MS. VILLAGOMEZ:** Your Honor, we agree with 6(a) as drafted.

**THE COURT:** Okay.

**MS. VILLAGOMEZ:** Or excuse me, what's now marked 6 as drafted.

**THE COURT:** Yeah, now is 6. Okay. We're going to

keep it that way. We're going to keep other employees in.

**MS. YEE:** Your Honor, this is an individual lawsuit as you know, and I think including that is highly prejudicial, because they're not part of this lawsuit.

**THE COURT:** This is the claim on whistleblower protection and the whistleblower statute encompasses this.

**MS. YEE:** We would just preserve our objections, thank you, Your Honor.

**THE COURT:** Okay. Anything else from defense?

**MS. YEE:** Yes, Your Honor, I believe this is question 13.

**THE COURT:** Okay.

**MS. YEE:** Then we'd like to request that it specifically states the damages under 2022 and 2023 LTIP.

**THE COURT:** So you're proposing -- what language, what specific language are you proposing?

**MS. YEE:** Did Ameris Bank, Patrick Byrne's wages under the terms of the employee agreement and the 2022 or 2023 LTIP. To match the jury instruction, Your Honor.

**THE COURT:** I understand. Ms. Villagomez.

**MS. VILLAGOMEZ:** Your Honor, we are agreeable with editing question 13, however, it should state, does Ameris Bank owe Patrick Byrne wages under the terms of the employee agreement and the LTIP for 2022 or 2023 to match the jury -- or under the terms of the employment and this proposal matches

what's included in the jury instructions.

**THE COURT:** Okay. So does Ameris Bank owe Patrick Byrne wages under the terms of the employment agreement and the 2022 or 2023 LTIP agreement? I just want to make sure --

**MS. VILLAGOMEZ:** Yes.

**THE COURT:** -- it matches. I don't have it up.

**MS. VILLAGOMEZ:** Yes, or, Your Honor.

**THE COURT:** And the -- okay. So what I have is, does Ameris Bank owe Patrick Byrne wages under the terms of the employment agreement and the 2022 or 2023 LTIP agreement or is it the other way around?

**MS. VILLAGOMEZ:** Under -- we would propose, under the terms of the employment agreement or the LTIP for 2022 or 2023.

**THE COURT:** Okay. So what I have, I'm just going to read it back, does Ameris Bank owe Patrick Byrne wages under the terms of the employment agreement or the LTIP for 2022 or 2023.

**MS. VILLAGOMEZ:** Agreed, Your Honor.

**THE COURT:** Okay. Ms. Yee?

**MS. YEE:** Agreed, Your Honor.

**THE COURT:** Okay.

**MS. YEE:** Your Honor, then for I believe it's question 22(b).

**THE COURT:** Okay.

**MS. YEE:** And we would request that that particular

question be stricken.

**THE COURT:** On what basis?

**MS. YEE:** On the verdict form. Because I stated Your Honor already has 22(a) and I don't think the jury is required to make two decision, like separate decisions under 22(a) and then 22(b).

**THE COURT:** Ms. Villagomez?

**MS. VILLAGOMEZ:** Your Honor, we would request that 22 remain as it matches what's included in the jury instructions for CACI 303.

**THE COURT:** Okay. So 22(b) will remain because there are two different ways that the jury can get to the next question and the two -- 22(a) and 22(b) are the mirror images of each other, it's not the same.

**MS. YEE:** Understood, Your Honor.

**THE COURT:** Okay. Anything else, Ms. Yee?

**MS. YEE:** Yes. And for question twenty -- this is 24 under the damages.

**THE COURT:** Uh-huh.

**MS. YEE:** I'd like to specify in addition to the economic loss, future economic loss I believe, you know, we should also add a specific damages under 2022, 2023 and 2024 LTIP under the breach of contract claims, so that they're expressly labeled.

**THE COURT:** Ms. Villagomez?

**MS. VILLAGOMEZ:** We object to that proposal, Your Honor, that would be too confusing and we think that 24 as drafted is straight forward.

**THE COURT:** Okay. 24 as drafted is straight out of the CACI and it's not uncommon to have issues like this where there is differentiation of damages. You're free to argue it in your closing arguments, but I don't want the jury verdict form to be argumentative in any way.

**MS. YEE:** Understood, Your Honor. And just give me a second, Your Honor.

And, Your Honor, I want to go back to -- I believe I wanted to add a question after, current existing question No. 11. And this is under the 4603, so this is the whistleblower claim. And there is one particular one, I believe it was omitted from the jury instruction is to add that has Ameris proven by clear and convincing evidence that it would have discharged plaintiff anyway at that time for legitimate and independent reasons.

**THE COURT:** Ms. Villagomez?

**MS. VILLAGOMEZ:** We have no objection to that, Your Honor, if Ms. Yee could just clarify the proposed language.

**THE COURT:** Right. I need to know what -- I know where, so you want it to go after existing question 11; is that right?

**MS. YEE:** Correct, Your Honor.

**THE COURT:** And I need to know specifically what you're proposing.

**MS. YEE:** Well, I'll just read it to the record. Has Ameris proven, by clear and convincing evidence, that it would have discharged plaintiff anyway at that time for legitimate, independent reasons?

**THE COURT:** I'm writing it down so I can -- I'm writing it down.

When you say anyway at that time, I don't know what that means?

**MS. YEE:** They would have discharged plaintiff --

**THE COURT:** Which CACI or which instruction are you -- it looks like you're reading from one of the instructions, which one is it?

**MS. YEE:** No, I'm not reading from my draft. This is from 4603. 4604, Your Honor.

**MS. VILLAGOMEZ:** I'm sorry, 4604?

**MS. YEE:** Yes.

**THE COURT:** But it doesn't make sense to put that question after question 11. Because that's after all the liability findings. And what you're suggesting is that I insert an affirmative defense into the liability findings. So shouldn't it come earlier?

**MS. YEE:** Let me take a look, Your Honor.

You know, I believe this is also the question 7 on

the CACI for 4602. So it goes right after the substantial factor of harm on the CACI.

**MR. SESSIONS:** Are we looking at CACI verdict form 4602, is that what we're looking at?

**MS. YEE:** Yes.

**MS. VILLAGOMEZ:** Your Honor, we would agree with Ms. Yee's proposal to include it in this specific area after question 11.

**MR. SESSIONS:** But we do recognize the difficulty with changing of all of the following numbers.

**THE COURT:** Well, that's, you know, that's neither here nor there, we want to make sure that we're getting it legally correct. I just want to make sure that I've got the right language.

Sorry, my computer is a little slow today.

So we'll go ahead and add that.

**MS. YEE:** Thank you, Your Honor. And I believe the last one I have on my list is the -- is under the damages section.

**THE COURT:** Okay.

**MS. YEE:** Let me just find it. So Section 5, damages. Your Honor, we would like to request that the Court add that after acquired evidence and mitigation.

**THE COURT:** How?

**MS. YEE:** So for example, we would propose that, has

Ameris proven that after discharging plaintiff it discovered evidence of misconduct by plaintiff that Ameris did not know at the time of discharge and that would have led Ameris to discharge plaintiff had it known.

**THE COURT:** In the damages section?

**MS. YEE:** Yeah, damages.

**THE COURT:** That's a liability question, isn't it, the way you've just stated it?

**MS. YEE:** Because after court evidence is going to limit the damages.

**THE COURT:** Okay. Ms. Villagomez?

**MS. VILLAGOMEZ:** Your Honor, the way that Ms. Yee had proposed it as drafted is not a limiting instruction with respect to the calculation of damages, so we would request new language for her proposal.

**MS. YEE:** And, Your Honor, I would also add that, you know, the date, you know, Ameris discovered the evidence because it goes to limiting the damages, for example, remove the front pay and then limiting it from the termination date and the discovery of misconduct.

**THE COURT:** Okay. But does that belong on the verdict form? The way the sentence that you just proposed to me doesn't sound like it's something that should be on a verdict form especially not in the damages section. What -- do you have a separate proposal to make?

**MS. YEE:** Well --

**THE COURT:** Because there's nothing that is preventing you from using the verdict form in your argument and arguing that Mr. Byrne's damages are lower because of --

**MS. YEE:** Because of the --

**THE COURT:** -- any number of affirmative defenses that the defendant has put forward.

**MS. YEE:** Your Honor, could we also add that the amount that Mr. Byrne could have earned from -- hold on. Your Honor, let me think of something.

**THE COURT:** My question is, why does it need to be on the verdict form?

**MS. YEE:** Because it limits the damages. You know, when the jury's return a verdict, you know, on the damages.

**THE COURT:** I understand what the law is, I just don't understand why it needs to be on the verdict form because you're going to argue it and if they agree with you, then they could find that the damages are zero, in which the case the jury would come back and say zero on all of these lines.

**MS. YEE:** But if the jury found that there are certain damages award, then you know, we would want the jury the limit that damages to certain amount of period of time.

**THE COURT:** Right.

**MS. YEE:** And then would that be an instruction that Your Honor would be giving to the jury?

**THE COURT:** It's already being given to the jury. It's already in the instructions. Do you have another proposal for the verdict form?

**MS. YEE:** I was also going to suggest, you know, the mitigation related question, for example, what amount has Mr. Byrne earned or could reasonably have earned from comparable employment since his discharge.

**THE COURT:** But that's not -- Ms. Villagomez, would you like to respond?

**MS. VILLAGOMEZ:** Your Honor, we agree with your position, both the proposals by Ms. Yee are too complicated and we know that there's no CACI verdict form on this and it's probably because it's too complicated. And we just would like to take the position and do take the position that not every jury instruction is required to end up on the jury form.

**THE COURT:** Right, because otherwise -- I mean, our jury instructions -- well, when I left chambers a few minutes ago, they were 57 pages long and they're going to be longer because we just added something, so we would end up with a verdict form that was completely unwieldly.

Okay. So I'm not going to make any other changes unless you have other things on your list, Ms. Yee.

**MS. YEE:** Just give me a second, Your Honor.

Your Honor, I did notice that for question 26 and 25, you know, the question is asking the jury to decide plaintiff's

wage rate at the time of his employment ended and I believe this instruction is usually given by the Court or the Court will decide on the wage rate and then provide that information to the jury.

**THE COURT:** I think that's incorrect. The actual instruction has exactly this language in it, so the jury is going to be instructed on this and the CACI verdict form also I took this word for word from the CACI verdict form, so this is something that the trier of fact must decide.

**MS. YEE:** Understood.

**THE COURT:** Whether or not the plaintiff proved it, I don't know. I don't know, we'll see what the jury thinks.

**MS. YEE:** Thank you, Your Honor, that's all I have.

**THE COURT:** Okay. Anything else from plaintiff?

**MS. VILLAGOMEZ:** Nothing from plaintiff.

**THE COURT:** Okay. So I'm going to go back into chambers and add the new number 12, renumber and get this formatted so you all have it as quickly as possible. And then our jury is scheduled to come back at 1:30.

Ms. Jackson, did you update counsel on our situation with our jury?

**THE CLERK:** No, I did not.

**THE COURT:** Okay. So at the lunch break we learned that Juror No. 7's mother in law passed away and he was distraught back in the jury room, so I excused him because I

just don't -- he's not going to be able to go forward. We're fine, because we just need to have six jurors to maintain the integrity of the verdict, but it was clear that there was no absolutely way he was going to be able to participate and focus on any of your arguments and it was clear that he needed, for his own mental health as well as supporting his family, that he needed to be excused, so I excused him.

**MR. SESSIONS:** Thank you for letting us know.

**MS. FODE:** And may I be heard, Your Honor?

**THE COURT:** Yes.

**MS. FODE:** Is it anticipated that Juror No. 7 will return or is --

**THE COURT:** No.

**MS. FODE:** Okay. I'd like to put on the record an objection to the jury being only seven members, that I believe it's insufficient and could be potentially prejudicial to the defendant and wanted to put that on the record. Thank you.

**THE COURT:** Okay. Thank you. According to the Federal Rules of Civil Procedure, in civil cases the jury must consist of at least six people and the verdict needs to be unanimous. We're still over that six threshold, that's why I chose eight because you never know when -- you know, what is going to happen in the lives of jurors. And as long as we still have six jurors, I'm satisfied that we can go forward. Your objection is noted for the record.

**MS. FODE:** Thank you.

**THE COURT:** Okay. Thank you. Okay. I'm going to go back and try to get this to you as quickly as possible. So if you want to incorporate it into your PowerPoints and your closing arguments, and you're able to do that. Ms. Yee, go ahead.

**MS. YEE:** Thank you, Your Honor. Your Honor, we served objections to plaintiff's demonstratives of their closing that we received this morning, so I just want to make that record, because usually I try not to object during the closing.

So first thing is, you know, plaintiff included Labor Code sections and legal standards, which you know, understanding that's the Court, Your Honor's arena, and not for counsel, which is highly prejudicial to us.

And then the second objection is their inclusion of expert calculations and opinions that are part of the expert report which is not admitted and it's hearsay. And then third is we object to plaintiff's inclusion of other irrelevant lawsuits against Ameris, which is again not admitted to this case and is highly prejudicial and basically invite jury to decide, you know, based on allegations of third party individuals rather than evidence in this court.

**THE COURT:** Okay. Thank you. Mr. Sessions?

**MR. SESSIONS:** Thank you, Your Honor. On the first

issue they raised I think there were two slides that did quote like California Labor Code 201 and 203 verbatim, we e-mailed -- I don't know if the e-mail has gone through, but a few minutes ago I was informed that we did e-mail counsel back and say we will remove those slides, so that should be resolved.

On the issue of the slides that purportedly contain information from the expert report, all that is contained are those schedules that did come into evidence yesterday that were 1006 exhibits that the Court allowed into evidence.

On the last piece of additional lawsuits, there's nothing mentioned in our slides or in our -- to be candid, in our planned closing about any additional lawsuits. What I believe counsel is referring to is reference to William Valarie who Mr. Lahaise did testify to, there was no mention of him filing a lawsuit that while that is true that Mr. Valarie did file a lawsuit as I understand against Ameris, that additional lawsuit did not come into evidence. The only thing that came into evidence was the fact that Mr. Valarie's company was bought, he was then dismissed and he was replaced by his second in command. And that is all the slide and our closing will represent.

**THE COURT:** Okay. Thank you. Anything else, Ms. Yee?

**MS. YEE:** We preserve our objections.

**THE COURT:** Okay. Thank you. Any objections from

the plaintiff that we should talk about right now?

**MR. SESSIONS:** No, I know that there was a number of placeholders in defendant's slide, subject to how things went this morning, so I will reserve that until we get their updated slides.

**THE COURT:** Okay. Wonderful, thank you. See you in a bit.

**MS. VILLAGOMEZ:** Thank you.

**THE CLERK:** All rise.

**(Recessed at 1:06 p.m.; reconvened at 1:34 p.m.)**

**THE CLERK:** All rise.

**(Jurors enter courtroom)**

Please be seated.

**(Pause; Call to Order)**

**THE COURT:** Thank you. Everyone can be seated. Thank you-all so much for your patience today. I've been working as a lawyer since 8:00 o'clock this morning so we've been working very hard and diligently to make sure that now that we're back in session that we're making the best use of the time that we all have together.

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here so you must not learn any additional information about the case from sources outside of the courtroom.

To ensure fairness to all parties in this trial, I will now ask each of you whether you have learned about or shared any information about this case outside of the courtroom even if it was accidental?

Seeing no hands. If you would prefer to talk about this privately in response -- talk to the Court privately in response to this question, please notify a member of the Court's staff and we'll make that happen. Okay. Thank you very much for your careful attention to our -- to this order.

As you-all know, both sides rested their cases yesterday. I've been working after hours yesterday as well as since 8:00 o'clock this morning with all of the lawyers on the jury instructions and the verdict form that you're going to get for deliberations. Now I am ready to give you the instructions that will govern your deliberations in the case and then after I do that the attorneys will have an opportunity to make their closing arguments to you and then you'll retire to start your deliberations.

There are certain instructions that I have in the packet -- and this is for counsel. The preliminary instructions that I've already instructed. I'm going to skip over most of them. Some of them I'll give again but some of them I'll skip over. For the jurors you'll see when you get this packet, it will have all of the instructions along with a table of contents. So if you want to refer back to any of the

instructions that I gave either at the beginning of the case or today, you'll be able to do that.

**JURY INSTRUCTIONS**

**THE COURT:** "Members of the jury, now that you've heard all of the evidence it's my duty to instruct you on the law that applies to the case. A copy of these instructions will be sent to the jury room for you to consult during your deliberations.

It is your duty to find the facts and all -- from all the evidence in the case. To those facts you will apply the law as I give it to you.

You must follow the law as I give it to you regardless whether or not you agree with it and you must not be influenced by any personal likes, dislikes, opinions, prejudices or sympathy. That means you must decide this case solely on the evidence before you. You will recall that you took an oath to do so. Please do not read into these instructions or anything that I may have said or done during the trial that I have an opinion regarding the evidence or what your verdict should be.

When a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence it means that you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true. You should base your decision on all of the evidence regardless of

which party presented it.

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means that the party must present evidence that leaves you with a firm belief or conviction that it is highly probable that the factual contentions of the claim or the defense are true. It is a higher standard of proof than preponderance of the evidence but it does not require proof beyond a reasonable doubt.

The evidence you are to consider in deciding what the facts are consist of sworn testimony of any witness, the exhibits that are admitted into evidence, any facts to which the lawyers have agreed and any facts I may instruct or have instructed you to accept.

In reaching your verdict you may only consider -- you may consider only the testimony and exhibits received into evidence. Certain things are not evidence and you may not consider them in deciding what the facts are. I will list them for you.

One: Arguments and statements by the lawyers are not evidence. The lawyers are not witnesses. What they say in their opening statements, closing arguments and at other times is intended to help you interpret the evidence but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections are not evidence. Attorneys

have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the Court's ruling on it.

Three: Testimony that is excluded, stricken or that you were instructed to disregard is not evidence and must not be considered. In addition, some evidence may be received only for a limited purpose. When I instruct you to consider evidence only for a limited purpose, you must do so and may not consider that evidence for any other purpose.

And four: Anything you may see or hear when court is not in session is not evidence. You are to decide this case solely on the evidence that is received at trial.

Some evidence may have been admitted only for a limited purpose. If I instructed you that an item of evidence was admitted only for a limited purpose, you must only consider it for that limited purpose and not for any other purpose.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you could find another fact. You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

In deciding what the facts -- in deciding the facts in this case you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, part of it or none of it. In considering the testimony of any witness you may take into account the opportunity and ability of the witness to see or hear or know the things that are testified to, the witness' memory, the witness' manner while testifying, the witness' interest in the outcome of the case, if any, the witness' bias or prejudice, if any, whether other evidence contradicted the witness' testimony, the reasonableness of the witness' testimony in light of all of the evidence and any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences but do not decide the testimony is untrue just because it differs from other testimony. However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others,

you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses are and how much weight you think their testimony deserves.

A deposition is a sworn testimony of a witness taken before trial. The witness is placed under oath to tell the truth and lawyers for each party may ask questions. The questions and answers are recorded. When a person is unavailable to testify at trial, the deposition of that person may be used at the trial. Insofar as possible, you should consider deposition testimony presented to you in court in lieu of live testimony in the same way as if the witness had been present to testify.

(Pause)

The evidence that a witness has been convicted of a crime or lied under oath on a prior occasion may be considered along with other evidence in deciding whether or not to believe the witness and how much weight to give the testimony of the witness and for no other purpose.

You have heard testimony from expert witnesses who testified about their opinions and reasons for these opinions. This opinion testimony is allowed because of the specialized knowledge, skill, experience, training or education of the witness. Such opinion testimony should be judged just like any

other testimony. You may accept it or reject it and give it as much weight as you think it deserves considering the witness' specialized knowledge, skill, experience, training or education, the reasons given for the opinion and all the other evidence in the case.

Certain charts and summaries not admitted into evidence have been shown to you to help explain the contents of books, records, documents or other evidence in the case. Charts and summaries are only as good as the underlying evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves. On the other hand, certain charts and summaries have been admitted into evidence to illustrate information brought out in trial. Charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should therefore give them only such weight as you think the underlying evidence deserves.

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form and you will be able to view them in the jury room. A computer, projector, printer and accessory equipment will be available for you in the jury room. A court technician will show you how to operate the computer and other equipment, how to locate and view the exhibits on the computer and how to print exhibits. You will be provided with a paper list of all

exhibits received into evidence. You may request a paper copy of any exhibit received in evidence by sending a note through the clerk. If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the clerk signed by your foreperson or by one or more members of the jury. Do not refer to or discuss any exhibit that you are attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the clerk present for the sole purpose of assuring that the only matter discussed is the technical problem. When the Court technician or any non-juror is in the jury room, the jury shall not deliberate. No juror may say anything to the Court technician or any non-juror other than to describe the technical problem or to seek information about operation of the equipment. Do not discuss any exhibit of any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view exhibits received in evidence in the case. You may not use the computer for any other purpose. At my direction, technicians have taken steps to ensure that the computer does not permit access to the internet or any outside website, database, directory, game or material. Do not attempt to alter the computer to obtain such access to those materials. If you discover that the computer

provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials. Do not remove the computer or any electronic data from the jury room and do not copy any such data.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the deputy, signed by your presiding juror, or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing. I will communicate with any member of the jury on anything concerning the case only in writing or here in open court. If you send out a question, I will consult with the parties before answering it which may take some time. You may continue your deliberations while waiting for the answer to any question.

Remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise, until after you have reached a unanimous verdict or has been discharged. Do not disclose any vote count in any note to the Court.

All parties are equal before the law and a corporation is entitled to the same, fair and conscientious consideration by you as any party.

It is the duty of the Court to instruct you about the measure of damages. By instructing you on damages, the Court does not mean to suggest for which party your verdict should be rendered. If you find for the plaintiff on the plaintiff’s

breach of contract, wrongful termination, retaliation and/or failure to pay wages claims, you must determine Plaintiff's damages.

The plaintiff has the burden of proving damages by a preponderance of the evidence. "Damages" means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant, Ameris. You should consider the following.

The reasonable value of any amount provided for in the contract. The emotional pain and suffering experienced and that with reasonably probability will be experienced in the future. The reasonable value of wages lost up to the present time, the reasonable value of wages that with a reasonable certainty will be lost in the future. It is for you to determine what damages, if any, have been proved. Your award must be based upon evidence and not speculation, guesswork or conjecture.

The plaintiff has a duty to use reasonable efforts to mitigate damages. "To mitigate" means to avoid or reduce damages. The defendant has the burden of proving by a preponderance of the evidence, first, that Plaintiff failed to use reasonable efforts to mitigate damages; and second, the amount by which damages would have been mitigated.

The law that applies to this case authorizes an award of nominal damages. If you find for the plaintiff but you find

that Plaintiff has failed to prove damages as defined in these instructions, you must award nominal damages. Nominal damages may not exceed one dollar.

Patrick Byrne claims that he and Ameris Bank entered into a contract which incorporates a long-term cash plan or LTIP for among other things, Patrick Byrne to serve as an employee of Ameris Bank and in return for Ameris Bank to pay Patrick Byrne a cash award at the end of each year should Patrick Byrne's division within Ameris Bank meet certain performance criteria. The contract also provides that should Patrick Byrne be terminated without cause before a year has ended, Patrick Byrne shall receive his full cash award from that year if Patrick Byrne's division within Ameris Bank meets its performance criteria at the end of the year.

Patrick Byrne claims that Ameris Bank breached this contract and the LTIP by applying the incorrect calculation method to Patrick Byrne's division's performance and consistently failing to pay Patrick Byrne his cash award for the years 2022, 2023 and 2024. Patrick Byrne also claims that Ameris Bank's breach of this contract caused him harm for which Ameris Bank should pay. Ameris Bank denies these claims.

To recover damages from Ameris Bank for breach of contract, Patrick Byrne must prove all of the following.

One: That Patrick Byrne and Ameris Bank entered into a contract.

Two: That Patrick Byrne did all or substantially all of the significant things that the contract required him to do or that Patrick Byrne was excused from having to do all or substantially all of the significant things that the contract required him to do.

Three: That all conditions required by the contract for Ameris Bank's performance occurred or that all of the required conditions that did not occur were excused or waived.

Four: That Ameris Bank failed to do something that the contract required it to do or that Ameris Bank did something that the contract prohibited it from doing.

Five: That Patrick Byrne was harmed;

And Six: That Ameris Bank's breach of contract was a substantial factor in causing Patrick Byrne's harm.

You should assume that the parties intended the words in their contract to have their usual and ordinary meaning unless you decide that the parties intended that the words to have a different -- a special meaning.

You should assume that the parties intended technical words used in the contract to have the meaning that is usually given to them by people who work in that technical field unless you decide that the parties clearly used the words in a different sense.

In deciding what the words of the contract meant to the parties, you should give effect and meaning to every word,

clause and provision in the contract and avoid an interpretation that renders any part of the contract redundant, superfluous or irrelevant and ensure that no provision is ignored.

In deciding what the words of the contract mean to the parties, you should consider the whole contract not just isolated parts. You should use each part to help you interpret the other so that all the parts make sense when taken together.

In deciding what the words in a contract mean to the parties, you may consider how the parties acted after the contract was created but before any disagreement between the parties arose.

In determining the meaning of the words of a contract, you must first consider all of the other instructions that I have given you. If after considering these instructions you still cannot agree on the meaning of the words, then you should interpret the contract against the party that drafted the disputed words.

To recover damages for a breach of a contract to pay money, Patrick Byrne must prove the amount due under the contract. Patrick Byrne claims that Ameris Bank owes him unpaid wages. To establish this claim, Patrick Byrne must prove all of the following:

One, that Patrick Byrne performed work for Ameris Bank. Two, that Ameris Bank owes Patrick Byrne wages under the

terms of the employment agreement and the LTIP agreement for 2022 and 2023; and three, the amount of unpaid wages.

Wages includes all amounts for labor performed by an employment whether the amount is calculated by time, task, piece, commission or some other method. Wages also includes incentive compensation such as bonuses and profit-sharing plans. Once a bonus has been promised as part of the compensation for service, the employee -- and the employee fulfills all of the agreed-to conditions, the promised bonus is considered wages that must be paid.

Patrick Byrne claims that he is entitled to recover a penalty based on Ameris Bank's failure to pay his wages when due after Patrick Byrne's employment ended. Ameris Bank was required to pay Patrick Byrne all of the wages it earned on the date that Patrick Byrne's employment ended. You must decide whether Patrick Byrne has proved he is entitled to recover a penalty. I will determine -- I will decide in the amount of the penalty, if any, to be imposed.

To recover this penalty, Patrick Byrne must prove both of the following:

One, that Patrick Byrne's employment with Ameris Bank ended; and two, that Ameris Bank willfully failed to pay Patrick Byrne all the wages when due.

The term "willfully" means only that the employer intentionally failed or refused to pay the wages. It does not

imply a need for any additional bad motive.

Patrick Byrne must also prove the following:

One, Patrick Byrne's daily wage rate at the time his employment with Ameris Bank ended; and two, the date on which Ameris Bank finally paid Patrick Byrne all wages due or that Ameris Bank never paid Patrick Byrne all wages.

The term "wages" includes all amounts for labor performed by an employment whether the amount is calculated by time, task, piece, commission or some other method.

Patrick Byrne claims he was discharged from employment for reasons that violate a public policy. California has a fundamental public policy delineated in statutory provisions governing the payment of earned wages to employees including prompt payment of wages due employees. It is a violation of public policy to discharge someone from employment for disclosing to their superiors the employer's potential violation of California labor law for failing to pay earned wages to its employees.

To establish this claim, Patrick Byrne must prove all of the following.

One, that Plaintiff Patrick Byrne was employed by Ameris Bank; two, that Ameris Bank discharged Patrick Byrne; three, that Ameris Bank reducing Patrick Byrne's job's responsibilities and terminating his employment for complaining about Ameris Bank's failure to pay earned wages was a

substantial motivating reason for Patrick Byrne's discharge; four, that Patrick Byrne was harmed; and five, that the discharge was a substantial factor in causing Patrick Byrne harm.

Ameris Bank claims that after it discharged Patrick Byrne, it discovered Patrick Byrne sent himself confidential Ameris Bank documents from his Ameris Bank email account to his personal email account in violation of Ameris Bank policies. Ameris Bank claims it would have discharged Patrick Byrne anyway if it had known he violated Ameris Bank policies. You must decide whether Ameris Bank has proved all of the following.

One, that Patrick Byrne took confidential trade secrets, proprietary Ameris Bank documents, including sending his personal -- including sending to his personal email address in violation of Ameris Bank's policies; two, that Patrick Byrne's misconduct was sufficiently severe that Ameris Bank would have discharged him because of that misconduct alone had Ameris Bank known of it; three, that Ameris Bank would have discharged Patrick Byrne for his misconduct as a matter of settled company policy.

If you find that Ameris Bank has proved that Patrick Byrne sent confidential Ameris Bank documents to his personal email address and that Ameris Bank -- and that had Ameris Bank known of the misconduct earlier, it would have discharged

Patrick Byrne as required by the elements above, then Patrick Byrne may recover damages only for the time before the date on which Ameris Bank discovered the misconduct.

A "substantial motivating reason" is a reason that actually contributed to the discharge. It must be more than a remote or trivial reason and it does not have to be the only reason for the discharge.

Patrick Byrne claims that Ameris Bank discharged him in retaliation for his disclosure of an unlawful act. To establish this claim, Patrick Byrne must prove the following are more likely true than not true.

One, that Ameris Bank was Patrick Byrne's employer; two, that Patrick Byrne disclosed to a person with authority over him or an employee with authority to investigate, discover or correct legal violations or noncompliance that Ameris Bank failed to pay Byrne and other Balboa employees the compensation that they were entitled to; that Patrick Byrne -- three, that Patrick Byrne had reasonable cause to believe that the information disclosed a violation of state or federal statute, a local, state or federal rule or regulation; four, that Ameris Bank discharged Patrick Byrne; five, that Patrick Byrne's disclosure of information was a contributing factor in Ameris Bank's decision to discharge him; six, that Patrick Byrne was harmed; and seven, that Ameris Bank's conduct was a substantial factor in causing Patrick Byrne's harm.

A contributing factor is any factor which alone or in connection with other factors tends to affect the outcome of a decision. A contributing factor can be proved even when other legitimate factors also contributed to the employer's decision.

The disclosure of policies that an employee believes to be merely unwise, wasteful, gross misconduct or the like are not protected. Instead, Patrick Byrne must have reasonably believed that Ameris Bank's policies violated federal, state or local statutes, rules or regulations.

It is not Patrick Byrne's motivation for his disclosure, but only the content of that disclosure that determines whether the disclosure is protected. A disclosure is protected even though disclosing the information may be part of Patrick Byrne's job duties.

A disclosure is protected even though the employer already knew about the information disclosed.

If Patrick Byrne proves that his disclosure of information of an unlawful act was a contributing factor to his discharge, Ameris Bank is not liable if it proves by clear and convincing evidence that it would have discharged Patrick Byrne anyway at that time for legitimate independent reasons.

If you decide that Ameris Bank's conduct caused Patrick Byrne harm, then you must decide whether that conduct justifies an award of punitive damages. The amount, if any, of punitive damages will be an issue to be decided later.

At this time, you must decide whether Patrick Byrne has proved that Ameris Bank engaged in that conduct with malice, oppression or fraud. To do this Patrick Byrne must prove one of the following by clear and convincing evidence.

One, that the conduct constituting malice, oppression or fraud was committed by one or more officers, directors or managing agents of Ameris Bank who acted on behalf of Ameris Bank, or two, that the conduct constituting malice, oppression or fraud was authorized by one or more officers, directors, or managing agents of Ameris Bank, or three, that one or more officers, directors, or managing agents of Ameris Bank knew of the conduct constituting malice, oppression or fraud and adopted or approved that conduct after it occurred.

Malice means that Ameris Bank acted with the intent to cause injury or that Ameris Bank's conduct was despicable and was done with a willful and knowing disregard of the rights or safety of another.

A person acts with knowing disregard when a person is aware of the probable dangers, consequences of the person's conduct and deliberately fails to avoid those consequences.

Oppression means that Ameris Bank's conduct was despicable and subjected Patrick Byrne to cruel and unjust hardship in knowing disregard of his rights.

Despicable conduct is conduct that is so vile, base or contemptable that it would be looked down upon and despised

by reasonable people.

Fraud means that Ameris Bank intentionally misrepresented or concealed a material fact and did so intending to harm Patrick Byrne.

An employee is a managing agent if the person exercises substantial independent authority and judgment in the person's corporate decision-making, such that the person's decisions ultimately determine corporate policy.

In your role as a juror, you must not let bias influence your assessment of the evidence or your decisions. I will now provide some information about how bias might affect decision-making. Our brains help us navigate and respond quickly to events by grouping and categorizing people, places and things, we all do this.

This mental short -- these mental shortcuts are helpful in some situations, but in the courtroom they may lead to bias decision-making. Bias can affect what we notice and pay attention to, what we see and hear, what we remember, how we perceive people, and how we make decisions.

We may favor or be more likely to believe people who we see as similar to us or with whom we identify. Conversely we may disfavor or be less likely to believe people whom we see is different from us.

Although we are aware of some of our biases, we may not be aware of all of them. We refer to biases, we are not

aware of, as implicit or unconscious bias. They may be based on stereotypes we would reject if they were brought to our attention.

Implicit or unconscious biases can affect how we perceive others and how we make decisions without our being aware of the effect of these biases on those decisions. To ensure that bias does not affect your decisions in this case, please consider the following steps.

Reflect carefully and thoughtfully about the evidence, think about why you were making each decision and examine it for bias. Resist the urge to jump to conclusions or to make judgments based on personal likes or dislikes, generalizations, prejudices, stereotypes or biases.

To consider your initial impressions of the people and the evidence of this case, would your impressions be different if any of the people were for example of a different age, gender, race, religion, sexual orientation, ethnicity or national origin? Was your opinion affected because the person has a disability or speaks in a language other than English or with an accent? Think about the people involved in this case as individuals. Focusing on individuals can help reduce the effect of biases or stereotypes on decision-making.

Listen to the other jurors. Their backgrounds, experiences and insights may be different from yours. Hearing and sharing different perspectives may help identify and

eliminate biased conclusions.

The law demands that jurors make unbiased decisions and these strategies can help you fulfill this important responsibility. You must base your decision solely on the evidence presented, your evaluation of the evidence, your common sense and experience, and these instructions.

I'm going to save the last two until after the closing arguments. I just have two very brief instructions to give you right before you go into the jury room. Now, I'm going to turn it over to the attorneys who will begin presenting their closing arguments, beginning with the plaintiff.

**CLOSING ARGUMENT ON BEHALF OF PLAINTIFF**

**BY MR. SESSIONS:** Thank you, Your Honor.

All right. I know you all are very excited about this, not to hear me or Ms. Fode to speak necessarily, but because we're the only thing standing between the seven of you from finally getting the chance to talk to each other about this case.

So I'm sure you're really excited and I'm excited for you. But before you get there, I do have to say, just as I said at the beginning, thank you so much sincerely, and not just for your time, though I know we've been here for a long time, it feels longer than it actually is, but I also want to thank you so much for your attention. As you've seen and

you've quickly come to see that this is a case that does warrant close attention.

At the beginning of this trial, I made you all some promises. I told you what would happen, what the evidence would show, what the witnesses would say, I told you this was a story about a man who built something over 30 years, who chose a particular buyer for his business because of a specific promise that was made and who suffered the consequences when that buyer, Ameris Bank, decided the promise was just too expensive to keep.

Ameris Bank used the LTIP, a term that you probably never heard before, but might be thinking of in your sleep now, they used the LTIP to get Pat to sell Balboa to them. But when Balboa started making Ameris a ton of money, Ameris didn't like that it had to give some of that up to Pat and Balboa's other hardworking employees.

So Ameris did whatever it could to keep the LTIP below the payout threshold. I told you the evidence would be clear. I told you the contract language would be clear and I told you we would ask you to hold Ameris to the agreement it made, because a contract is a contract.

You've now seen the evidence so let's talk about what you saw and what it means. First, let's talk about the standard you are required to apply as jurors. The Judge just explained it a little bit to you, I'd like to just add a little

color to it.

In a civil case like this one, the plaintiff's burden is to prove each element of its claims by, as you heard the Judge explain, a preponderance of the evidence. I know that sounds formal, but it just means more likely than not.

So if you think of it in terms of scales, like we have up on the screen, and if you think of them as, okay, they're exactly even Pat on one side and Ameris on the other side, if you just took a feather and had it weigh just that much down on Pat's side, that is meeting preponderance of the evidence.

It's more likely than not and it's not even 51 percent, it's 50.0001 percent, so just over 50. That's the standard. If you believe a fact is more likely true than not, then it's your job to find for Pat on that issue, that's it. You don't need to be certain, you don't need to be 90 percent sure, not in a civil case. You just need to believe when you weigh everything you've heard and seen that Pat's version of events is more probable than Ameris'. So keep that in mind as we walk through each claim together.

And when I say each claim, as you noticed the Judge just instructed on several of them, remember that this is not just a wrongful termination case as Ameris' lawyer told you in their opening statement, Mr. Byrne as you heard is bringing multiple claims against Ameris.

And those include breach of contract, nonpayment of wages, retaliation, and wrongful termination. These are separate and independent claims, although they're all related to the LTIP, so let's start there.

Specifically, let's start with the breach of contract claim, because the LTIP really is the foundation for everything else. For a breach of contract claim, because -- for the breach of claim you need to find that there was an agreement between Pat and Ameris to pay the LTIP award bonus if EBT thresholds were met and that Ameris failed to do so.

Ameris' witnesses do not dispute that the LTIP award agreement was entered into between them and Pat. And for what it's worth, the LTIP is also part of Pat's employment agreement, so it exists there too.

So where does that leave us? All you have to answer on the claim, and frankly it's probably the most important question in this case is this, did Ameris calculate EBT incorrectly under the LTIP agreement.

If Ameris didn't calculate EBT accurately, then that means the bonus pool was bigger, it means Pat's share under the LTIP pool was underpaid, meaning Ameris breached the contract and it did it for 2022, it did it for 2023 and 2024.

So did Ameris calculate EBT incorrectly under the agreement? Well, you saw the answer to that question multiple times was yes. And for multiple reasons, so let's walk through

them.

First, yeah, the LTIP as you saw mentioned GAAP exactly once in connection with key assumption A, initial direct costs. You saw that language with your own eyes, just like you see it now, five of the six assumptions say nothing about GAAP. Ameris agreed to calculate EBT using Balboa's past practices for everything else. And Balboa's past practices, the way the company ran its books for 30 years was not the same as GAAP in 2022 and 2023, because GAAP changes over time.

Ameris did not have to apply GAAP therefore, to the majority of the LTIP calculation, yet Ameris applied GAAP across the board anyway. And as you saw, Ameris told Pat it could not make his proposed changes to the LTIP calculation because Balboa's past practices in the Pioneer model didn't follow GAAP.

Mr. Sparacio says it right in this e-mail for example. He says, Pat continues to pound on the interim rent issue and he is incorrect, as the agreement clearly states it is based on GAAP financials, which is not consistent with his past practices.

And again with respect to stipulated deals, another calculation. You saw Sufhan Majid tell Pat they weren't going to follow past practices because quote, the new method, the one Ameris wanted to apply, recovery when cash received is GAAP compliant and the old method, or the past practice, is not.

You also saw Sufhan Majid testify on video and you'll remember he couldn't explain how he calculated the LTIP, what its purpose was, or identify any of its components, yet this was the person who was in charge of calculating it.

You heard Ms. Dickson explain why applying GAAP across the board was wrong, and why no law required it. She said, public companies are not required to apply GAAP to these types of internal calculations. And Ameris' own witnesses could not point you to a single line in the LTIP that authorized universal GAAP calculation, because there isn't one. Instead the LTIP requires EBT to be calculated using past practices which is what Pat and Ms. Dickson did.

You even heard Ms. Sebold, Ameris' own expert who sat right there yesterday afternoon and say, quote,

"There certainly can be a difference between GAAP and how a contract is interpreted."

And remember when I spoke to you all in our opening statement, I told you GAAP was Ameris' excuse before, but that Ameris might change their story. Do you remember that? Well, guess what, at least in their opening statement and in a statement of a lot of their witnesses they sure did.

Let's look right here, December 19th, 2025. Ameris CFO, Nicole Stokes who you heard from signed a declaration under penalty of perjury saying quote, as a division of Ameris, the Balboa Division is required to follow generally accepted

accounting principles, GAAP, the accounting standards that govern the preparation of financial statements.

She then stated in that same declaration in the summer of 2023 that Jim Lahaise and I flew to California to meet with Byrne in person to request his requested LTIP adjustments and revisions and explained to him in detail that his proposed changes were not GAAP compliant.

And then in Nicole Stokes' deposition on November 3rd, 2025 she testified under oath, quote,

"The LTIP calculation is based on earnings before tax and they are part of the bank, and that's part of a publicly traded company that has to follow GAAP."

You saw in an e-mail that Phil Silva sent to Pat on April 12th, 2024 and he said, on the Ameris side, I hear GAAP is GAAP. But during this very trial Ameris and Nicole Stokes changed their story. You might have noticed, Ameris avoided the term GAAP completely in their opening statements. And then Nicole Stokes sat right there and told you still under penalty of perjury, that suddenly it was not her position that the LTIP had to be calculated using GAAP because Ameris is a publicly traded company.

Nicole Stokes though signed that declaration you just saw under penalty of perjury, but she did it in connection as Mr. Byrne explained, with Ameris' motion that they filed earlier this year to try to get the case thrown out before it

could go to trial.

GAAP was part of Ameris' argument for that motion but Ameris lost. So Ameris tried a new story on you, but what is that story frankly? It's become a convoluted tale as I can tell about Sarbanes-Oxley and internal controls, but you didn't really hear any clear testimony about it.

Sebold, Ms. Sebold couldn't articulate it, and you didn't see any receipts for this new story. But regardless of what Ameris told you in this trial, you saw that excuse they gave to Pat Byrne, you saw it in e-mail after e-mail after e-mail. They incorrectly applied GAAP to calculate EBT each year, they told Pat he was wrong for using past practices, but as you saw in the actual LTIP agreement and as Ms. Dickson explained past practices should have been applied.

Second, Ameris willfully and incorrectly charged overhead expenses to lower Balboa's EBT. Assumption C of the LTIP says it in plain English. It says, there will be no allocation of indirect company expenses to Balboa, period, no exceptions. Ameris took employees who were originally reported to Balboa, moved them over to report to Ameris, and then yet still charged them back as if they were Balboa expenses. And then lowered EBT accordingly.

You heard Pat tell you that accounting, credit, information services, and marketing departments were all transferred to the control of Ameris. Pat and Ms. Dickson

explained to you why this was unfair.

Balboa's EBT was charged for all of these department's expenses, that's millions of dollars. But Pat didn't have any control over these departments after Ameris took them over. You heard Pat, he said he was happy to be responsible for management and expenses of these departments, but removing his management authority, while leaving behind all of the expenses that's just inherently unfair to the EBT.

You heard Phil Silva who told you, Pat runs a tight ship. Those were his words. So naturally Pat would have gotten these department's expenses under control had he been given the opportunity, but Ameris never gave him that opportunity and yet it charged them to Balboa's EBT anyway.

You saw that Pat raised this in writing starting on July 24th, 2023 and you saw the e-mail and Nicole Stokes sent to Jim Lahaise that day, saying she didn't agree with the overhead charge adjustment Pat was asking for.

Now note what that e-mail doesn't contain. It doesn't contain any reference to the LTIP's actual language, any analysis, any engagement with the contract. Her position and Ameris' position was set before the analysis, that is not an accounting judgment as they might try to tell you. That's a predetermined conclusion, one designed to keep EBT down.

Third, interest. Key assumption D as you saw limits Balboa's capital charges to 1 percent cost of funds. That's

it, nothing else. But Ameris deducted interest paid on other borrowings from EBT, a separate charge of the LTIP does not authorize. Stokes and Lahaise admitted that this was a key assumption that needed to be applied to the LTIP, they admitted it.

And here's a detail I want you to hold on to. Pat raised this key assumption with Jim Lahaise directly. Lahaise told Pat he would take the charge out of the 2022 EBT calculation. It shows it right here. But he didn't remove it, just as Pat and Ms. Dickson explained. So that was another broken promise by Ameris.

Fourth, loan losses and this is the one that gets to me the most. The LTIP gives a specific formula for calculating the allowance for loan losses, and it's the greater of actual net charge offs or 1.25 percent of net investment in direct financing leasing. It says it right there, it cannot be mistaken.

But Ameris still used a different formula, not the one you see on the screen. And it was a deliberately more aggressive formula as Ms. Dickson explained to you and, of course, it resulted in bigger charge off numbers, and therefore lowered EBT.

Rather than use the greater of actual net charge offs or 1.25 and net -- percent of net investment, you heard Ms. Sebold explained, Ameris used 1.25 percent of loan growth

plus actual net charge offs to maintain 1.25 percent on portfolio.

You can see for yourselves, I don't even need to say it to you, those are not the same two formulas. But nobody could tell you where that formula came from, even though Ms. Stokes told you she has a team of some odd 50 accountants at Ameris, including Sufhan Majid. But everyone admits it's the formula Ameris applied. That is clearly not what the LTIP said, yet Ameris did it anyway.

And as I said, Ameris' own expert Ms. Sebold admitted that she did not apply the formula in the LTIP, she applied this one instead.

You also saw that Ameris breached this key assumption in one other way. Ameris was required, as you can see here, to apply Balboa's established CECL model is what it says. Ameris was required, as you can see to apply that, but Nicole Stokes told you Ameris did not apply the CECL model when calculating the LTIP. And, of course, when a contract says to do something and you do the opposite that's what we call a breach. It's that simple.

Now here's what ties all four of these deviations together. Every time Pat pointed to a specific error, every time Ameris either acknowledged or denied it, or even maybe offered to make some correction here and there, the corrected number still came out just below the EBT threshold. Not once,

not a single time did any adjustment Ameris offered or conceded to make result in a bonus being owed.

Now think about the probability of that. Four separate deviations, each pushing EBT in the same direction. Each concession landing, I'll do it again, just short of the line. That is not a coincidence, that's a pattern, that's a choice. And the only explanation that fits that pattern is that the result was predetermined and the methodology was constructed around it.

And frankly, you saw Ameris doing just that in the e-mails. You saw, for example, here Nicole Stokes and her accounting team remove Pat from e-mail threads and discuss LTIP calculations behind his back. Picking and choosing just the right adjustments to keep Balboa's EBT below the payout threshold.

Remember this e-mail chain in particular? This is the one where they took Pat off the chain, and then they grappled with his adjustments. And came to the conclusion that hey, if we do one plus six, that's not going to be enough to come over the hurdle, but hey, if we do one plus five plus six, Nicole, that will put us over the hurdle, so what should we do.

And well I'll show you what they did. Even when Nicole Stokes was told that if they made too many concessions, like right here, one plus five plus six, they would put the EBT above the threshold. She found and asked for the perfect

calculation to still give EBT one more time just below the threshold. And then when Sufhan Majid and David Sparasio told her that her plan would work, how did she respond? Well, I'll show you. She said enthusiastically, thank you.

You know what this sounds like to me? Two analogies have come to my mind throughout this trial, I hope you'll indulge me. One is Hollywood math and we are in Los Angeles, so I do think it's appropriate. You know, the way the studios can make it look like a movie isn't profitable, just by calculating the numbers a certain way, the other one that comes to mind is you often think of an insurance company, right, and the feel is, they'll do whatever they can to avoid having to pay out a claim. That's the two things that come to mind to me here.

Now also ask yourself this question. If Ameris truly believed that calculations were correct from the get go, why would they agree to make any adjustments at all at any point, if they were wrong the first time they calculated the numbers, how can we be sure they were right the second time?

Ms. Dickson, in contrast, gave you the correct calculations. She explained that for 2022, Pat was underpaid by $890,000. Ms. Dickson also explained to you that for 2023 when Ameris paid him nothing at all, Pat was actually owed and I'm going to abbreviate, $2.34 million. Ms. Dickson also explained to you that for 2024 Pat was owed over $4.8 million.

You heard a lot of testimony about 2024, even though Ameris' lawyer didn't tell you a think about it in their opening. You heard Mr. Lahaise, you saw Pat's termination letter. He was eligible for the 2024 LTIP payment, but nobody could tell you why Pat wasn't paid. LaHaise didn't know. Silva didn't know. Because it's straightforward. Pat was owed this money for 2024, plain and simple.

Now, with respect to all these numbers, Ameris will stand up in a minute and tell you to trust its own expert, Sebold, over Ms. Dickson. But here's the question I'd ask you to sit with when you compare them. Ms. Dickson applied the LTIP as written. Ms. Sebold, I believe there's supposed to be a photo of her here. There it is. Ms. Sebold, Ameris's expert, told you she didn't. She applied GAAP, even though the LTIP says it applies to one key assumption. She also applied that different formula that no one could figure out where it came from instead of key assumption F. And when you ask whose math you believe, you're really being asked this question. Do you believe the contract means what it says? If you do, and you believe that the past practices requirement applies across the board, then Ms. Dickson's numbers are the right ones. If you agree with that, Ameris breached the LTIP. That's breach of contract.

Now, let's talk about some of the other claims. First, let's start with the California Labor Code. So this

wage claim, it's based pretty much on the same facts we just walked through for breach of contract. It's just an alternative way that you can award damages to Pat for the unpaid LTIP bonuses. Under California Labor Code Sections 201 and 203, when an employer terminates an employee like Ameris did to Pat, all wages that are earned and unpaid at the time of being fired must be paid immediately, that same day. And as you know, PAT was fired in June of 2024 before the end of the year. So the 2024 LTIP, while it comes under the breach of contract claim, it's not applicable to this claim. It's just for 2022 and 2023, because by the time PAT was fired, those had been past due.

Now, to establish the unpaid wages claims for '22 and '23, you need to find that the LTIP's amounts were earned wages that Ameris failed to pay. That's the same calculation as the one we just discussed for breach of contract. If you agree with Ms. Dickson's calculations when applying past practices, then Mr. Byrne is owed wages for '22 and '23. Again, overlaps with the contract claim. Additionally, you may have heard the Judge instruct, if an employer willfully fails to make those wages, this is a willful decision, the employee, Pat, is also entitled to additional what's called waiting time penalties on top of the unpaid amounts. And those penalties pile up on each other every day for 30 days, so long as the wages aren't paid. This here comes out to, we calculate, $112,000 or about

$3,734 per day. That, of course, happened here because, as you heard from the testimony of nearly every witness, Ameris still hasn't paid Pat those earned wages for '22 and '23.

Okay, now let's talk about PAT being fired, why it happened, and the laws that Ameris broke. To put it simply, as the Judge just explained to you, you cannot fire someone for complaining about a violation of the law, which is what Pat did. California Labor Code Section 1102.5 is the governing law here, and as the Judge explained in the jury instructions, just to pull a piece out, it prevents firing someone for complaining about a violation of law. And as it says right here, quote, it is a violation of public policy to discharge someone from employment for disclosing to their superiors the employer's potential violation of California labor law for failing to pay earned wages to its employees.

You saw that Pat did just that. He complained to Ameris, he complained to LaHaise and others in writing repeatedly and specifically that Ameris was manipulating the LTIP calculations to withhold earned compensation from him and his employees. He believed that Ameris was violating the law. Ameris knew about every complaint, and Ameris fired him because of it. You might recall what Pat said sitting right there on the second day of this trial. He said, I believe it's unlawful to have somebody do the work and not get paid for it.

Ameris knew about every complaint, Ameris fired him

because of it, so now let's walk through what you've now seen. Pat started his complaints by raising the overhead charge issues first in writing on July 24, 2023. That same day, and we're making a little timeline for you here, Nicole Stokes forwarded the issue to Jim LaHaise and told him privately she didn't agree with what Pat was asking for. Pat continued to raise his concerns through November, December, and into January '24. You all saw the emails. November 3rd, Pat attached a detailed Q3 LTIP recalculation. That same day, Pat asked Ameris to set up a discussion. He was told by the people he was talking to that they didn't have authority to make changes without LaHaise.

Okay, then December 16th, Pat wrote to LaHaise saying his Q3 bonus wasn't in his paycheck for the second consecutive quarter. LaHaise told him, as we have discussed on the LTIP and your Q3 incentive, they are based on the division achieving the agreed to target pre-tax income. The adjustments you are referencing are not consistent with the language of the LTIP agreement. But then, this is where it gets interesting. You saw, and LaHaise even admitted on the stand that Ameris paid Pat at LaHaise's direction that same quarterly bonus payment and with interest for being late. And even though that was based on the exact same threshold as the LTIP bonus, Ameris never paid the LTIP payments, the full annual ones, that Pat and the other employees deserved.

Then again, January 31st, 2024, Pat summarized every mathematical discrepancy in writing for '22 and '23. Then three months later, LaHaise told Pat he was not being renewed as CEO, even though, as Ms. Stokes told you, Pat did want to continue as CEO. This was his company he had built up for so many years. And then came May 6th, 2024, Jim LaHaise's email to Pat. You saw it. In the same email, on the same page, LaHaise tells Pat the matter is, quote, closed, that his assumptions were wrong, that he was not owed anything for '22 or '23. And then he says, quote, I do want you to continue as CEO.

Now read that sentence for what it is. Hey, stop complaining, stay quiet, and then we'll let you keep running your company or else you're gone. And of course, six weeks later, Pat was fired, quote, without cause. That is what California law, as you just heard in the jury instructions, calls retaliation. It's what California calls wrongful termination. Importantly, the termination documents say without cause because Ameris couldn't put in writing what the actual cause was. Ask yourself, what has Ameris offered you as a legitimate reason to fire Patrick Byrne? Nothing. Pat wasn't underperforming. You heard Jim LaHaise's own words in Pat's performance reviews. You heard Mr. Rasmussen and even Mr. Silva tell you that Pat was the hardest working employee at Balboa. You saw that Balboa was producing results and making

tens of millions of dollars for Ameris each year. You even heard that from Palmer Proctor on Ameris's earnings calls who said, quote, Balboa is great and equipment finance in general. It's just a great opportunity for us. Ms. Parker even told you that revenue dropped after Pat was terminated. The only thing Pat was doing that Ameris didn't like was insisting that a contract it had signed meant what it said.

Now Ameris will say that Pat simply became obsessed with the LTIP. That's their word or their insinuation for a man who ran his own numbers, found a discrepancy worth millions of dollars, and repeatedly asked the largest publicly traded bank headquartered in Atlanta with a little less than 3,000 employees, as you heard testified to, to honor a contract it had signed. If that's obsession, it's the kind of obsession the law is designed to protect.

And consider the timing one more time. By firing Pat in June of 2024 instead of December of 2024 when his contract was actually set to expire anyway, Ameris was trying to eliminate his 2024 LTIP entirely. That's not a coincidence either. Every financial benefit of Pat's termination flowed to Ameris. Every financial consequence flowed to Patrick Byrne.

The 2024 LTIP is also, just so you know, a component of Pat's retaliation claims as future lost earnings. Jim LaHaise and Phil Silva told you there was an LTIP payout for 2024. Here's the calculation. Applying the same corrected

methods Ms. Dickson used for '22 and '23, the 2024 LTIP Pat was owed and never received is about $4.8 million. You heard LaHaise tell you that there was an LTIP bonus for that year. Ameris just didn't pay it. Even though, in his own words, Pat was eligible because he was terminated without cause.

Now speaking about the at-cause language, Ameris told you that terminating Pat without cause, and they might say it again in a minute, was an act of generosity, that they were doing him a favor so that he could collect severance. Now, look what actually happened, though.

Ameris fired him six months before his contract expired. Ameris never paid him any severance. And they never paid him a dollar of that 2024 LTIP he was entitled to, even though they paid it to Phil Silva, the guy who assumed Pat's role, salary, and bonuses after he was fired. That's not generosity. That is a company that used the without cause label to avoid putting the real reason in writing. And remember how much Ameris wanted Pat to give up in order to just give him a little bit of severance. Ameris would only pay Pat if he signed this release agreement that's up here on the screen, the same one Ameris forced Rob Rasmussen, who you heard from, to sign after Mr. Silva and Ameris discriminated against him, which would require Pat to give up any right to bring suit against Ameris.

Now, ask yourself this. If there was a legitimate

reason to fire Pat Byrne, what was it? Why did Ameris label his firing without cause? Ameris has had this entire presentation to tell you. They've had every opportunity to identify a single legitimate business reason to terminate a CEO who, by their own performance reviews, was exceeding expectations. Remember what I told you at the beginning of this trial, that there wouldn't be any receipts? Well, that certainly came true. Ameris doesn't have any receipts showing that Pat stopped doing his job, that he went on strike, because that isn't true. There are no emails or any writings that say why Pat was terminated.

This especially doesn't line up with Mr. LaHaise's story, who told you that his and Pat's primary mode of communication was email. Do you remember that? So where are the emails? Jim LaHaise, in fact, told you, quote, there are no documents with regards to the reasons why Pat Byrne was fired, admitting there are no receipts. The only thing Pat did that Ameris didn't like, folks, was refuse to let them walk away from a contract they had signed when they tried to illegally withhold LTIP bonuses from him and other Balboa employees.

Ameris also tried to explain to you how strained relationships were a reason why Pat was fired. But Phil Silva put it best. He told Pat on April 12th, 2024, quote, the LTIP seems to have been the impetus for the breakage of our

relationship. So if there was any strain in relationships between Pat and Ameris, Phil said it right here. It was because Pat kept raising the LTIP issues because a contract is a contract and then Ameris retaliated against him, fired him because of it.

Ameris also tried to tell you, at least in their opening, that Pat chose to sue Ameris rather than stay. You remember that? But you heard Ms. Stokes, who told Pat -- Pat told her he wanted to continue as CEO. She admitted that and Ameris fired him anyway. He wasn't given a choice, so he had to bring this lawsuit to protect his rights under this contract and to recover what was owed to him under the LTIP. You heard the truth. Rob Rasmussen, Jacquie Emert, and even Phil Silva told you how hard of a worker Pat was and what he meant to Balboa. You saw Phil Silva's email listing out all of the unique ways Pat helped Balboa. Does this look like someone who went on strike?

Now, while we're talking about Ameris' motives, let's talk again about the separate lawsuit Ameris filed against Pat after he brought this case. Do you remember the timing of that? Let me help you remember. Pat explained to you that at the beginning of this year, six months before the case was set to go to trial that we're in right now, Ameris tried to get the whole case thrown out. It failed. Six days later, Jim LaHaise announced his retirement. The next day, Ameris filed their

lawsuit against Pat. Ameris claimed in that lawsuit Pat violated confidentiality obligations by emailing himself documents while he was still employed. You now know what those documents were. They were LTIP calculations, internal communications, the evidence that forms the basis of this very case. Ameris sued Pat for gathering the proof.

You saw that Jim LaHaise, in fact, you saw that Jim LaHaise also sent emails about the LTIP to David Sparacio's Gmail account. But neither of them were fired or sued for that. You heard Pat during this trial. He said on the stand, he'd be willing to return the documents if Ameris had just asked. But that's not what Ameris wants. Ameris wanted to intimidate Pat after they failed to get the case thrown out to keep him from trying to bring this case to trial. Well, here we are. It didn't work.

Now, beyond the financial harm you heard about, you also heard about what this experience has done to Pat personally. You'll remember Dr. Reading yesterday, a clinical psychologist who actually met with Pat. I swear this is -- this is his photo from the UCLA website. I don't know why he's not smiling. But Dr. Reading actually examined Pat, actually assessed him, testified that Pat is suffering from a, quote, major depressive disorder and adjustment disorder. That finding is not a surprise, folks, when you consider what happened. Dr. Reading put it in very simple terms. A person

goes through -- when a person goes through what Pat went through at Ameris and then gets fired from a company they started, heck, add on for 30 years he built it up, they naturally would start feeling the way Pat has been feeling. Pat spent 30 years building that company. It was his life's work. He sold Balboa to Ameris because of the promises Ameris made. He stayed on to lead it because he still cared. He fought for the LTIP because he had convinced his employees to stay after the acquisition, and he had made a promise to them that they would be taken care of. And then Ameris fired him in front of those same employees, replaced him with his longtime colleague and supposed friend, Phil Silva, and then filed a lawsuit against him for gathering the evidence to fight back.

Ameris' own expert, Dr. Lechuga, told you he never examined Pat, never met the guy, never interviewed him, never sat in the same room with him or even a Zoom call. He reviewed records and rendered an opinion about a man he never met. And frankly, those records were just Dr. Reading's report. And he even agreed that Dr. Reading's findings were valid. You heard that testimony. You can weigh it accordingly.

Now, because of this, you have the power to award, in addition to the LTIP bonuses and anything else, emotional distress damages. And it can be in whatever amount you believe is fair and supported by the evidence. We ask that you award at least one year of additional wages Pat would have received

at Ameris. What I would propose to you is an additional amount equal to his last year of employment, had he not been fired, which is his base salary, his quarterly bonuses, and his LTIP award, which is, we'll even it out at $5 million.

Dr. Reading's assessment, Dr. Lechuga's agreement on that assessment, Pat's own testimony, and the testimony of his colleagues all support a substantial award.

And then there is one more category of damages available to you. Punitive damages. These are not a measure of Pat's harm. They are the law's response to conduct that is willful, malicious, or oppressive. Conduct so deliberate that a simple amount of punitive -- that a simple amount of damages award isn't enough to stop it from happening again. So your job right now is to decide not the amount of punitive damages, but just whether Ameris's conduct warrants punitive damages. Whether Ameris's conduct was so intentional and malicious that additional damages are needed to send it a message so it won't engage in this conduct again. I hardly need to lay those facts out to you, but I have the time, so I will.

Think about what you saw. Ameris didn't make an honest accounting mistake. Every deviation from the LTIP pushed EBT in the exact same direction. Every adjustment Ameris offered still left Balboa below the threshold. Ameris's own internal emails show a company that made up its mind and then coordinated a response. Not an honest company that got

confused by a complex contract. You saw Stokes tell LaHaise she didn't agree with Pat's position before doing a single analysis. You saw Sparacio circulate an internal email mischaracterizing what the LTIP required to everyone except Pat. You saw LaHaise tell Pat the matter was closed while Ameris was privately preparing to remove him. You also saw how flippant and careless Ameris's executives were about the LTIP.

Mr. Silva referred to it as this LTIP thing. Palmer Proctor, Ameris's CEO, pretended to not even know what the LTIP was. Mr. Silva and Mr. LaHaise couldn't tell you why Pat wasn't paid in 2024, and they frankly pointed the finger at each other, you might remember. Mr. LaHaise said, quote, Pat was eligible to pay, but there was no bonus paid. Ameris tried to hide that the 2024 LTIP bonus existed after Pat was fired. As Ms. Parker told you, it's now called a management bonus.

You also saw that what Ameris did to Pat was a pattern. Remember when Mr. LaHaise was testifying, he talked about a man named William Vallari. Mr. LaHaise admitted that the last company he and Ameris purchased before Balboa was Premium Finance. Remember that? A company that had been started by Mr. Vallari. Ameris bought the company, brought him into Ameris to continue leading Premium Finance, and then fired him. And then Ameris replaced Mr. Vallari with his second in command, a man named Curran Coco. That sound familiar? Of course, because that's exactly what happened to Pat.

You saw it in Mr. Silva's very own testimony. Ameris bought Balboa, brought on Pat as its CEO, and then brought on Silva as president. Then Pat started having disagreements with Ameris over the LTIP, and frankly, only over the LTIP. And then Ameris fired him and replaced him with Phil Silva. And while we're on Mr. Silva, can we please talk about the absurdity of it all? Mr. Silva sat right there and admitted to you that after Pat was fired, he, Phil Silva, got a big raise. Nearly a 25 percent raise. And it ended up being, coincidentally, the exact same annual salary as Pat before he was fired. $350,000. And they didn't stop there, folks. In exchange for his loyalty to Ameris, Mr. Silva now gets quarterly bonuses, just like Pat did. He also gets to decide who gets bonuses under the LTIP. And he got $1.25 million under the 2024 LTIP.

And why did Ameris do this? Well, you saw it yourself. Phil Silva was willing to play along, and he was awarded for it. He said to Pat in May, right before he was fired, the LTIP is dead, and it has been for some time. That, folks, is willful conduct. Ameris entered into contracts it didn't intend to honor, manipulated the calculations to avoid paying what it was owed, and then fired the one man who called it out. Even after this lawsuit was filed, and Ameris couldn't get rid of it, it turned around and sued him for gathering the evidence. These are not the actions of a company that made a

mistake. These are the actions of a company that made a decision that breaking the contract was cheaper than keeping it, and acted accordingly.

Punitive damages exist to make sure that Ameris doesn't find it cheap enough or a good enough calculation to do this again. So the message you need to send is, don't do this again, or else Pat and William Vallari will not be the last time this happens.

Now, the Judge talked about a verdict form. I actually have a copy right here that you're so excited to get your hands on it. You'll receive it in just a little bit, which will guide you through your findings in this case. I want to talk briefly with you how to complete it.

The verdict form is broken up into separate sections, you'll see, and it has these little areas where you can check the box, says yes, no, pretty easy to follow. The first section will ask whether Pat proved that Ameris wrongfully terminated him. The second asks whether Ameris retaliated against him. It also asks if Ameris failed to pay Pat his bonus at termination, and it will also ask if a contract was breached. Each section contains one or more yes or no questions. If you answer yes, it'll tell you to move to this question. If you answer no, it'll tell you to go to the next one.

Now, if you find that Ameris Bank is liable for all

these actions, you will then answer the damages questions. That's a section in here. There's a little chart in there that has you fill it in. And it'll ask you to write in the amount that will fairly compensate Pat for everything except for punitive damages. That's to be decided later. All you have to decide now is does this warrant punitive damages.

The verdict form will also identify different damages categories. It will give you past economic damages, like LTIPs that should have been paid in the past, future economic damages, like those that should have been paid going forward, and the same for the non-economic damages, like the emotional distress.

Now, to ensure you have everything you need to fill out the form, let me pull these numbers back up just in case you want to write them down. Ms. Dickson has provided a complete damages calculation broken down by year. For 2022, she says Ameris underpaid Pat by $890,858. For 2023, Ameris should have paid Pat $2,343,868. And for 2024, Pat should have been paid $4,844,985. Under Ms. Dickson's full calculation, that total is $8,079,711 of bonuses that Pat should have been paid.

Now, at the beginning of this case, I told you that it begins and ends with the LTIP, and it does. A contract was negotiated, terms were agreed to. The contract said EBT would be calculated using Balboa's past practices. Ameris told Pat

in the LTIP that GAAP would apply to one assumption. It said there would be no allocation of indirect expenses to Balboa. It said loan losses would be calculated a specific way. It said capital charges would be limited to one percent. Ameris broke every one of those promises, just like it broke promises to you from its opening statement. It broke its promises to Pat in ways that consistently and exclusively benefited Ameris. And when the man who built the business it acquired had the nerves to say so, in writing, with the math to back it up, Ameris fired him.

You have listened closely during this trial and considered the evidence. You now have three things to do. Find that Ameris miscalculated the LTIP, find that Ameris fired Pat for speaking up about it, and award Pat full relief, economic, emotional, and punitive that reflects what Ameris actually did. A contract is a contract. Ameris agreed to its terms. We ask that you hold them to it. Thank you for your time. I reserve the remainder for rebuttal, and we'll talk to you all again in a little bit.

**THE COURT:** Okay, thank you very much, Mr. Sessions. To avoid doing a start and stop, we're going to take our afternoon break now. So we'll break until 3:15. And when we come back, Ms. Fode and Ms. Yee will have an opportunity to present the defendant's closing argument.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE COURT:** Okay, anything before we break? Okay, I'll see everyone in 15 minutes.

**(Recessed at 2:58 p.m.; to reconvene at 3:17 p.m.)**

**(Jurors enter courtroom)**

**THE CLERK:** Please be seated.

**(Pause)**

**THE CLERK:** All rise. This court resumes in session.

**THE COURT:** Everyone can be seated. Okay. Ms. Fode, you may proceed when you're ready.

**CLOSING ARGUMENT ON BEHALF OF DEFENDANT**

**BY MS. FODE:** Thank you, Your Honor.

Ladies and gentlemen of the jury, I want to start with how I started last time. Thank you. Thank you for being away from your families. Thank you for being away for your jobs, for the service that you're providing. You battled L.A. traffic to get here, and we really appreciate it. I'm proud to represent the people of Ameris, along with Nana Yee and the Nukk-Freeman Cerra team, but I wanted to start with that moment of gratitude, even if you think it's a little cheesy.

So we've come to the end of this evidence portion of the trial, and now it's time for us to piece the case together. It's now my turn to review the evidence and tell you what I believe that the evidence shows in this case and how it relates to the law and the verdict questions that you will get to

answer shortly. And you can imagine, we have a different story. And if I was sitting in your shoes right now, I think some of you might be a little bit confused because you're listening to two completely different stories.

**MR. SESSIONS:** Your Honor, I'm -- hesitantly, I will object to this.

**THE COURT:** Okay, Ms. Fode, I think you understand what the objection is. Let's not do that again, okay?

**MS. FODE:** Yeah. Some of you may even feel some confusion because it seems like there's two completely different cases. But your job as jurors is to sort that out, listening to the evidence, listening to the witness testimony that you heard, and reviewing the documents. And there are a lot of documents in this case. And also, what I think is the most important part of your job is to bring some common sense into the jury room.

So you've been asked in this trial to absorb a tremendous amount of information, and a lot of it was technical, a lot of it was numerical, and much of it was presented with experts and things that really could be complicated for anybody, especially for lawyers. We always say that that's why we go to law school, so we don't have to do math, really. But I saw many of you taking notes and being so diligent, so we appreciate that. Now, hopefully, I can make things a little bit clearer.

If you're sitting and thinking about what your role is, that's part of my job is to walk through that. You don't have to be an expert in accounting. It's going to be something you're going to use your real life experience and common sense. And as the Court instructed you, Mr. Byrne has the burden of proof. And we talk about that a lot because it's really important. He has to meet this threshold to be able to establish his claim.

Now, it's very common, the plaintiff lawyers will say the feather, right? They say, oh, you only need a tiny feather to adjust the scales. But actually, Mr. Byrne has to prove from zero above 50 percent. So he has to establish with evidence, not with lawyer objections, not with argument, but with actual evidence, the documents and the people that testify to get above that 50 percent threshold.

So we think this case -- we think this case begins and ends with something different than plaintiff. They think that the case begins and ends with the LTIP, but we think it begins and ends with Mr. Byrne's choices and his conduct. And Mr. Byrne's decision to go on strike as the Balboa CEO and to withdraw -- withdraw with his communications from his colleagues. And I believe that the evidence has shown, the evidence from Mr. Byrne's mouth himself, as well as from the testimony of Ameris's witnesses, that there's no doubt that this actually happened and Mr. Byrne stopped participating in

meetings and communications with other senior executives, and stopped doing his job at the Balboa division as CEO, which is a big job.

You heard Jim LaHaise testify that in 2024, he was concerned about the performance of Balboa because of the $39.5 million in bad loan losses experienced. And he was focused on making course corrections and getting the division back on track. But Mr. Byrne was not. He was focused on his grievances around the LTIP and making demands without listening to the responses from Nicole Stokes and the other accounting team, which we can all admit were very, very detailed.

And so why does this matter so much? Because your job is not to be an accountant. It's to decide if Ameris terminated Mr. Byrne because he complained that he was not being paid properly under the LTIP or whether -- and whether he -- we breached a contract with him. I'm going to take you through the evidence and the law to show why the answer to both of those questions is no. But certainly we're here because Pat believes that, you know, this case is about the LTIP. So we've talked a lot about the LTIP, which I do agree you'll probably be dreaming about that term now.

So when you're in the jury room, I would -- I would suggest that you take a look at the LTIP. You're going to have it there, pull it out and it's exhibit 301 and just read it, read through the terms of that agreement, which we've talked

about so much and which was highly negotiated, lawyers involved, and eight different copies and read through it and see if it says the things that I am saying and Mr. Sessions saying on behalf of our clients.

Now, during the opening, I told you that in 2024, Mr. Byrne just simply stopped doing his job in favor of prosecuting a one-man campaign against Ameris over the company's calculation of this LTIP. When things were great for the Balboa division in 2022, Mr. Byrne requested revisions to the LTIP calculations, but you saw the communications were respectful and collaborative. This was part of the integration process of having a new newly acquired company. Certainly Mr. Byrne did not complain months later when Ameris calculated the LTIP pool in 2022 for $9 million. And Mr. Byrne didn't complain when he awarded himself $5.6 million while the remaining non-executives got 9,000 each. But even in early 2023, Mr. Byrne was doling out the LTIP bonuses, he noted in his own email that we will let everyone know that something like this may be available next year, but there are no promises and it would only occur if we're able to drive long-term profitability.

In his own words, he knew that they had to achieve the thresholds and they had to have this excessive profitability and extreme profitability. Unfortunately, Mr. Byrne and Mr. Silva's fears about a poor 2023 were

accurate. By the time the second quarter of 2023 numbers were released, Mr. Byrne knew that there would not be an LTIP bonus for 2023. By October 2023, Mr. Byrne acknowledged that the Balboa division was in a death spiral, his own words. And that's when Mr. Byrne became focused and, frankly, we say obsessed with finding a way to calculate or manufacture a profit for 2023 when there just wasn't one.

I think it's interesting that plaintiff's counsel talks about the funny money because I think that that is a theme that works for us as well when Mr. Byrne was trying to manufacture that profit. Ultimately, Mr. Byrne even claimed that the purchase price itself should be renegotiated to include income from refundable security deposits and improperly failed to be repaid to customers. But the reason there was no LTIP in 2023 is simple. The Balboa Division had $39.5 million in bad loan losses or charge-offs. These were loans that had been written off because the customer stopped paying. You heard about that.

You heard testimony from Nicole Stokes, the chief financial officer, and Mr. LaHaise, the chief strategy officer, and Phil Silva, the president of the Balboa Division. And they all talked about the $39.5 million in loan losses. And a moment just to talk about Phil Silva, because there's been really extreme personal attacks on Mr. Silva. And I was trying to think about it last night, like, why? Why did that play in

here? And I think it's because Mr. Silva is an important witness. He was at the Balboa Division before, worked with Mr. Byrne for so long, 17 years. And then he was also thereafter. So he's that one key witness that goes over the both and was an executive with him.

Also, you read Mr. Silva's contemporaneous emails. He put in those emails, sounds like he likes to summarize things in emails. And he put in those emails exactly what the company is saying was happening at the time. And for him, when he talked about the LTIP is dead, you heard his testimony that he said, it's because we had almost $40 million in charge-offs. That wasn't going to happen.

As Ms. Stokes testified, you can't hit the earnings before taxes target of $48.5 million when you have losses of $39.5 million. That's even math that lawyers can do. As Mr. Silva put in May of 2024, as I said, the LTIP is dead and has been for some time. For his part, Mr. Byrne took no responsibility whatever for those loan losses, even though he was the CEO of the division. And you heard him testify that he understood that he was responsible for the financial stability of his division. The buck stops with the CEO. I think we all understand that.

The $35 million number was based on yet another unsubstantiated claim by Mr. Byrne that several million dollars of the loan losses shouldn't have been charged to the Balboa

Division. In short, when the division did well, Mr. Byrne took the credit, and when the money and the division did poorly, it was Ameris's fault.

And a moment just to talk about your common sense. Mr. Byrne's lawyer said that, in essence, their theory is that Mr. Byrne was let go because -- and wasn't paid the LTIP because the company suddenly didn't want to pay him. It doesn't make sense to me that the company would have paid him $186 million for the purchase of the company, as well as $7.8 million total in the time that he worked there. Why would they pay him over almost $200 million and then suddenly in 2023 say they're not going to pay him? That just doesn't make sense to me.

So backing up, Mr. Byrne sent at least, and I do mean at least because there were a lot, 22 emails over the course of the two years, claiming that various LTIP calculations were incorrect. You've seen a lot of those email chains in this case. At the beginning of the case, Mr. Byrne's counsel told you that nobody responded to his demands. Well, you now know that's not true. Ameris responded to Mr. Byrne repeatedly and substantively with patient explanations as to why he was wrong, and you have those emails in the jury room and you can take a look at them. I would encourage you to do that.

You've also heard testimony from both Ms. Stokes who reviewed Mr. Byrne's calculations and determined that Ameris

followed proper accounting practices and the LTIP in each instance. Remember that email where Ms. Stokes puts the red highlighting and she responds to every single one of Mr. Byrne's concerns? That's really important because she took the time to go through that. And then Mr. LaHaise sent that response directly to Mr. Byrne.

And Mr. Byrne was due nothing further. That was her calculation. You heard from Ameris's accounting expert, MaryEllen Sebold, who also reviewed Mr. Byrne's demands and opined that Ameris followed proper accounting practices and the LTIP in each instance and that Mr. Byrne was owed nothing further on his LTIP demands. And they both seemed very detailed in their analysis and very serious about getting to the right answer. As Ms. Stokes testified, Balboa Capital followed GAAP, the Pioneer model followed GAAP, and then we, which is Ameris, followed GAAP.

Mr. Byrne's allegations that there was some alternative non-GAAP methodology that applied is just that, allegations not supported by the evidence. And frankly, a red herring, I think. Ameris was trying to work with Mr. Byrne in good faith. And in fact, Ms. Stokes testified in two instances where she thought the calculation was unclear, she gave the Balboa division a credit. They now try to say that that was something bad, but I think that she was trying to make a compromise there.

For his part, Mr. Byrne never responded at all. And you can look and you can test me on these emails. But I didn't see where he responded at all into the substance of the responses. Instead, he repeatedly cut and pasted the exact same email, which he himself in this Court called a template email. And he would cut and paste it, responding over and over again. And he says there, yeah, it's almost a template at this point. But I'm laying out all, you know, the issues where they're not following the key assumptions in the LTIP. And then I asked him, what did you mean that it's almost a template at this point? And he says, I mean, they're all the same arguments. I keep bringing this up in terms of, you know, they're the same arguments in terms of, yeah, not following the LTIP document.

So it's this repeated over and over again that really was a voluminous response for over a period of two years, which we'll look at. It was Mr. Byrne that took the position, really, that it was all or nothing and he wasn't going to give. And we are still here today talking about those same concerns or demands that he raised because there has been no give.

I'd like to show you this timeline that we prepared of some of these 22 template demands. And if you'll see, they spanned a period starting April 29th, 2022, all the way up until May 2024. This is going to be an important point when we talk about the whistleblower claim. I want to ask you a couple

of questions for you to ask yourself. Did Ameris use its discretion reasonably and in good faith in responding to these concerns? Yes. Did Ameris listen to Pat Byrne's concerns? Yes. Did Ameris respond to Pat Byrne's many emails, calls, and in-person demands? Remember, they talked about that weekly meeting that Mr. LaHaise, Mr. Silva, and Mr. Byrne had. And did Ameris make adjustments to the books that Pat Byrne requested that seemed reasonable to them? Yes. Did Ameris explain why it was calculating the performance goal the way it was? Yes. Did Ameris invite Pat Byrne to respond in kind and give concrete references to accounting rules, regulations, and laws to explain why he thought Ameris was wrong? And yes is the answer to that. Did Pat Byrne choose to respond to Ameris's invitations? No. Did Pat Byrne choose to engage with Ameris colleagues to find a resolution? No. And did Pat Byrne ever tell Ameris that they were breaking the law by failing to pay him a guaranteed and lawfully earned wage? No.

But Ameris didn't just respond to Mr. Byrne in writing. They tried, mostly without success, to schedule calls and review the calculations. And counsel now says there's no proof of that, but I heard ample testimony on that and saw emails and calendar invites as well.

**MR. SESSIONS:** Your Honor, I think this is objectionable.

**THE COURT:** Yeah. So I'm going to ask counsel to

come to sidebar.

**(Begin sidebar at 3:37 p.m.)**

**MR. SESSIONS:** I do want to say for the record that I do not like making objections in closing arguments.

**THE COURT:** I know. That's why I asked you -- I didn't -- I asked you to come to sidebar. But this is, I think, at least the fourth or fifth time that you've injected your opinion about a witness or evidence and that's improper argument, and it needs to stop. Otherwise, I'm going to start interrupting you.

**MS. FODE:** Okay. Understood.

**THE COURT:** All right. Thank you.

**(End sidebar at 3:37 p.m.)**

**MS. FODE:** Pardon the interruption. When emails and conference calls didn't work, Ms. Stokes and Mr. LaHaise flew from Atlanta to Orange County in late July 2023 to meet with Mr. Byrne in person, and you heard the testimony, to review and explain the LTIP calculations. Mr. Byrne responded to this olive branch by telling Ms. Stokes and Mr. LaHaise to fire him.

You heard the testimony. He said, two people heard it, why don't you just fire me? His behavior towards Ms. Stokes and Mr. LaHaise was disrespectful and utterly inappropriate for a senior leader of the company. But Ameris did not fire him in July of 2023. And this is an important point. Mr. Byrne claims that he was fired in retaliation for

making demands about additional LTIP payments, but he wasn't terminated until two years after that first email regarding the LTIP calculation, which he sent in April 28th, 2022.

In fact, after 19 of Mr. Byrne's 22 emails regarding the LTIP on March 1st, 2024, Mr. LaHaise told Mr. Byrne in no uncertain terms, Ameris wanted to retain him and he was offered a new contract. In fact, the same contract that other Ameris executives, including Mr. LaHaise, had.

Now, Mr. Byrne's counsel showed Mr. LaHaise the severance protection restrictive covenants agreement, which is what that contract was. And then tried to insinuate that it was some kind of termination document that didn't offer Mr. Byrne new employment. But you now know from Mr. LaHaise and Mr. Silva, that the severance protection and restrictive covenant agreement was not a termination document. To the contrary, that was the very language of the agreement that states it was Ameris's desire to retain the services of Mr. Byrne. But Ameris wanted him to sign the same document that the other Ameris executives had signed too.

And you'll have a copy of the severance protection and restrictive covenants agreement exhibit in your jury room. And I would encourage you to look at it. And Mr. Silva did sign the agreement, and he's still with Ameris. And as we know, Mr. Byrne did not.

So returning to the timeline, eight days after

Mr. LaHaise told Mr. Byrne that he wanted him to stay with Ameris as the CEO of the Balboa Division, Mr. Byrne crashed out on his friend and business partner of 17 years, Mr. Silva, over the non-renewal notice. And my 14-year-old son said not to use that term crash out, but you can tell me if it fell flat.

You saw the emails where Mr. Byrne accused Mr. Silva of getting the non-renewal notice when Mr. Byrne didn't. And you heard Mr. Silva's testimony about that. The claim by Mr. Byrne and his counsel that this was a termination would have been a lot more compelling had Mr. LaHaise not sent the agreement to both Mr. Silva and Mr. Byrne. They sent it four days later, the very, very same agreement.

On June 26th, 2024, when Mr. LaHaise tried to speak with Mr. Byrne about some of the accounting controls issues, Mr. Byrne once again told Mr. LaHaise, why don't you just fire me? You heard that testimony. Mr. Byrne's employment was terminated the next day, exactly two years and 60 days after his first LTIP email demands. Mr. LaHaise testified that he finally took him up on it and moved forward with the termination.

Ask yourself, does it make sense that Ameris would offer Mr. Byrne a new executive contract in March of 2024 and then terminate his employment in June 2024 for LTIP emails that started in April 2022? This is where the common sense will come in play when you're in the jury room. We submit it just

doesn't make sense. Mr. Byrne's counsel had little to no alternative by simply claiming that the new contract was a termination, which we know the evidence shows it's not. What makes sense is what actually happened, which is that after the trip in late July to California with Ms. Stokes and Mr. LaHaise, during which Mr. Byrne asked to be fired, Mr. Byrne decided to go on strike from his own job and started treating his fellow executives with really incredible disrespect and animosity, and Ameris had little choice but to fire him as he was an executive within the company, leading an entire division.

Mr. Byrne stopped attending meetings and stopped responding to emails from his supervisor. There's testimony on that that you heard in trial. He even picked fights with his number two and friend, Mr. Silva. And when Ms. Stokes tried to explain why Mr. Byrne's math was wrong on the LTIP, he ignored her, the CFO of the entire company, and then tried to end run her by emailing Mr. Majid, her subordinate.

You heard testimony that Mr. Byrne would repeatedly call Ms. Stokes the principal and say he felt like he was being called to the principal's office. Mr. Byrne testified that he never went on strike. He kept doing his job like he always had, and that is what we expected him to say. He's not going to admit that Mr. Silva had to start picking up the slack. No, not any more than he's going to admit that Mr. Silva helped him

build Balboa Capital and scale it for acquisition.

You heard it from Mr. Byrne and Mr. Rasmussen that Mr. Byrne was a visionary that built the company from scratch. Really, it seemed to me, well, really without any other help. The fact of the matter is Mr. Byrne never gave credit to Mr. Silva for helping him build the company and scale it. And it was sold to Ameris for $186 million, which Mr. Byrne profited from personally.

Finally, we ask you to consider that all of the Balboa Division employees and the Ameris employees, there were only two people who Mr. Byrne had testify here in court. One is Mr. Rasmussen, who had also sued Ameris. And one was Ms. Emert, who now has retained a lawyer and appears to be preparing to sue Ameris.

Even towards the very end, Mr. LaHaise tried extending another olive branch to Mr. Byrne, even inviting him to come to Georgia to meet with Mr. LaHaise and the CEO, Palmer Proctor. This was dismissed by Mr. Byrne as, in writing, he said, a waste of time. As we know, there's only one response for Ameris that was going to satisfy Mr. Byrne, complete capitulation to demands on the LTIP that were not right according to Ms. Stokes' calculations. Rather than meet with his boss and the CEO, Mr. Byrne spent time and energy attempting to manufacture the appearance of a profit for a division in 2023 that was not profitable.

You heard from Ms. Stokes that in May of 2024, Pat Byrne directed his employees to take steps to evade the bank's internal controls after being specifically instructed to comply by the controller who's responsible for that job. Those internal controls were in place to ensure that Ameris complied with federal laws and regulations. Rather than comply with the direction from accounting, Mr. Byrne instructed his employees to book certain transactions in a way that would be that would artificially inflate the revenue and profit numbers for the Balboa Division. And that would increase the LTIP pool, which he would get a portion of. And you'll see that email, it's in your exhibits as well.

To be clear, Mr. Byrne was asking for payment to be made to him. The emails do not have a reference to asking for payment for his team. These are all of the emails we went through and pulled out where he says, please deposit it into my account. Please put in my payroll. And I would encourage you to look at the emails yourself and make that determination.

You also heard Heather Parker testify regarding this email that I was talking about, which is Exhibit 486, in which she tried to explain to Mr. Byrne that Ameris was correct in its interpretation of the accounting rule that Mr. Byrne was asking his people not to comply with. Suffice it to say that Mr. Byrne was not going to accept direction from these women, Ms. Stokes or Ms. Parker, or anyone else in Ameris' accounting

department for that matter. You also saw Ms. Stokes' email to Mr. LaHaise in which she expressed concern about Mr. Byrne's lack of understanding of segregation of duties and failure to comply with internal controls, and that's Exhibit 364.

You heard Ms. Stokes also testify about other troubling practices, such as the practice of keeping refundable security deposits because customers did not remember to ask for their return. Those were types of things that Ms. Stokes was trying to talk to Mr. Byrne about to improve on.

Finally, let's turn to Mr. Byrne's termination. In short, Mr. Byrne's testimony was that he was blindsided by his termination, but this is not true. We showed you Mr. LaHaise's meeting invite for June 27th, 2024 at 1:30 p.m., along with Mr. Byrne's email in response at 2:22 p.m., telling Mr. LaHaise to send the termination notice to his lawyer. Both of those preceded the termination notice that was sent via email on June 27th at 8:21 p.m. Those are Exhibits 491 and 496. So when Mr. Byrne said that that email took him by surprise, the evidence doesn't play out that way.

When turning to Mr. Byrne's requests, he says that he is suffering from emotional distress. You've heard testimony from his experts on that point. However, you heard from our expert, Dr. Lechuga, who was here yesterday, and he took issue with Mr. Byrne's expert, Dr. Reading, although he did have a great accent, didn't he? He said that he had a one-time

cursory telehealth meeting with Mr. Byrne and that Dr. Reading only considered partial data in making his conclusions about Mr. Byrne's mental state. The findings of one of those three tests that Dr. Reading administered were so skewed that if believed, Mr. Byrne would not be able to function, let alone handle the stress of appearing in court, and you've been able to observe him over the course of the trial in the gallery.

And when asked by his counsel about his emotional distress, Mr. Byrne himself said, with some emotion, we remember, but to create so much value for Ameris to tell me that I was wrong, right? To gaslight me in front of everybody, right? In front of everybody that I work with, right? Because they didn't know I was the one who was really deep into the calculations. Those were the reasons he was upset, because he didn't like being told that he was not right.

And you can remember Mr. Byrne's demeanor throughout this trial. All right, we talked a little bit about living up to promises, and you heard Mr. Sessions talk about that as well. At the beginning of this case and during his opening, Mr. Byrne's counsel stated that the evidence would show the following things. Let's review these and see if they played out. I would put to you that he did not live up to his promises.

First, he said that Ms. Stokes did whatever necessary to prevent Balboa from hitting the LTIP threshold. And let's

talk through that. Ms. Stokes, you met her. Her team calculated the $9 million LTIP bonus in 2022 pursuant to the LTIP and the Pioneer Model. You've been asked to believe that Ms. Stokes and her team did whatever was necessary to not do that in 2023. Ms. Stokes explained convincingly, we believe, that her team reviewed the LTIP calculations for 2022 and 2023 and concluded --

**MR. SESSIONS:** Your Honor, sorry, I just need to object one more time for the record.

**THE COURT:** Yes, that objection is sustained. Ms. Fode, your opinions and your beliefs or your firm's beliefs or your client's beliefs are not at issue and it's not proper for you to argue that to the jury as we discussed.

**MS. FODE:** Understood. We concluded -- let's see -- most of -- Ms. Stokes concluded that most of Mr. Byrne's request modifications were inconsistent with the LTIP and the Pioneer Model, which you heard.

Next, plaintiff's counsel stated Ameris did not respond to his demands regarding the LTIP calculations. Ladies and gentlemen, you've seen at least 20 demands by Mr. Byrne for more LTIP money and that doesn't count the conference calls and responses in email from Mr. LaHaise and Ms. Stokes, also with them flying to Orange County to meet with Mr. Byrne. Next, Mr. Byrne's lawyer stated that Ameris failed to follow the LTIP. This one is strike three. Ms. Stokes explained

methodically and Ameris's accounting expert why Ameris did apply the key assumptions from the LTIP and why Mr. Byrne's analysis was not correct. Mr. Byrne offered nothing further except to say the same template email over and over again in response. And finally, Mr. Byrne claimed that he was never given notice before being terminated. I just reviewed that with you and I would ask that you look at the evidence when you're in the jury room on that chain of timing.

Now, what's good for the goose is good for the gander. So defendant Ameris Bank also made promises during the opening. And let's see if the Ameris Bank lived up to those promises.

Ameris treated Mr. Byrne fairly and with respect. The evidence is clear that when Mr. Byrne brought the demands regarding the LTIP, when Mr. Byrne raised concerns, Ameris didn't ignore them and Ameris reviewed the calculations and responded most of the time, you have email chains on that. The evidence showed a good faith disagreement over how the LTIP should be calculated and Ameris sought to treat Mr. Byrne fairly.

Next, the LTIP does not guarantee any specific amount or any amount at all. Mr. Byrne has shown you no evidence that there was a specific guarantee of the LTIP payout that he should receive each year. When asked if he had a fixed percentage, he said in court, I just backed into the 2022 after

allocating monies to Mr. Silva, Mr. Rasmussen and other eligible employees and came to 62.54 percent. That's different than Ameris granting him an amount of 62.54 percent of the LTIP and his own testimony explained that he set that amount for himself.

And make sure you review the documents in front of you because Ameris has seen no document where the agreement of a certain percentage is codified. In fact, Mr. Byrne's LTIP agreement, which you've seen several times, states blank where that percentage should be.

Next, in May of 2024, Mr. Byrne instructed Balboa employees to evade the bank's internal controls. Again, you heard from Ms. Stokes and Ms. Parker on this point. Next, Mr. Byrne told management three times, why don't you go ahead and fire me? The testimony was clear by Ms. Stokes and Mr. LaHaise on the three times and they contained details which I would encourage you to see if they're credible in your analysis.

First, Mr. LaHaise and Ms. Stokes went to California to meet with Mr. Byrne in July of 2023. During a contentious conversation, Mr. Byrne said, Nicole, why don't you just fire me if that's what you want to do? Number two, Mr. LaHaise took Mr. Byrne to a restaurant when he was visiting in Orange County to try to work through the relationship. And once the conversation went awry, Mr. Byrne said, why don't you just fire

me?

And lastly Mr. Lahaise met with Mr. Byrne on June 26th, 2024 to discuss some issues that had been previously discussed on the internal controls. And once the conversation got heated, Mr. Byrne said for a third time, why don't you just fire me. At that point Mr. Lahaise agreed to Mr. Byrne's request.

Next in our opening we said that Mr. Byrne went on strike. In the 12 month period from June 2023 until his termination in June 2024 Mr. Byrne sent a myriad of different e-mails with demands. As Mr. Byrne realized that he would not be getting his way and the bank would not be changing its mind, he began to disassociate from his role as CEO. You heard that testimony from Ms. Stokes and you heard the testimony from Mr. Lahaise and from Mr. Silva.

Next Mr. Byrne broke Ameris' rules by forwarding Ameris confidential documents and files to his personal Yahoo account and never returned them. Mr. Byrne admitted in this trial that he forwarded Ameris' confidential documents to his personal Yahoo e-mail account, kept those materials after his employment ended, never returned them, and was -- and took them to use in this lawsuit.

He's raised another lawsuit that Ameris has brought to get the documents back. And in open court, he told the bank that he would return those documents. Which they're happy to

hear.

He further admitted that he did not obtain permission from anybody at Ameris to retain those documents after his departure, in direct violation of defendant's policies, which were introduced into evidence and Mr. Ross Creasy testified to.

Mr. Byrne said that Mr. Creasy told him, the director of -- the chief information officer of the entire bank that Mr. Creasy told him he could send e-mails to his personal Yahoo account, containing documents and confidential information. But you heard Mr. Ross Creasy whose entire job it is to uphold these policies and the protection of confidential information state affirmatively, no, he did not say that.

Mr. Lahaise, you heard confirmed that had he known plaintiff was forwarding confidential company documents to his personal Yahoo account, he would have terminated plaintiff immediately because such conduct violated company policies and breached defendant's trust with its clients and employees. This will come into play when you go into a defense and we go through the verdict form.

In sum, Ameris established the evidence that it stated it would in its opening. Mr. Byrne did not act like a whistleblower at the time. And how do we know this? Mostly from his own admissions. Mr. Byrne's demands related to the interpretation or accounting roles, the interpretation of the LTIP or accounting. In fact, when we looked at the words that

Mr. Byrne had in his e-mails, they're really about, you know, bonus accruals, tax benefits for Ameris, adding back overhead, interim rent, adjusted provision, a lot of accounting jargon and requests.

You will see under the -- when you go to the whistleblower special verdict form that this will not meet the standard. Mr. Byrne never once pointed to a law or a government regulation that Ameris was supposedly violating in the LTIP calculations. He never once said in his communication that Ameris was withholding wages from him as the lawyers would like to tell you now.

He never pointed to a statute or a labor department of regulation and if you look at the LTIP itself that the claim makes no sense, because Ameris had absolutely no reason to believe in that exercising a contractual right under the LTIP or having a discussion about accounting issues would make him a whistleblower, or even give rise to that.

Because the LTIP pay outs were offered above and beyond ordinary wages, salaries, commissions paid to Balboa employees they were not guaranteed and it had to be that way, for -- to make yourself a whistleblower under California law, you have to be complaining about violation of policy or illegal conduct, which we'll talk about.

Also there were many ways that Mr. Byrne could have acted like a whistleblower and could have, if you really

believed that there was something illegal happening, call the employee hotline, contact the external auditors and complain to the chairman of the audit committee, there's a lot of steps that we went through and Ms. Stokes testified that one could complain if they felt that there was an illegality.

Now, before we go into the verdict form, which is really important because that's what you're going to be filling out, I want to address a couple of things. You heard Mr. Byrne's counsel claim that this case was similar to a case brought by William Valarie, that is something that was -- is not something that is before you in this case, but I want to just give you some background. Mr. --

**MR. SESSIONS:** Objection, Your Honor.

**THE COURT:** Counsel, approach.

**(Begin sidebar at 4:03 p.m.)**

**THE COURT:** Do you want to state your objection before I address this?

**MR. SESSIONS:** Sure. I did not mention any lawsuit regarding Mr. Valarie. I only stated the facts as Mr. Lahaise testified to.

**THE COURT:** Right. And it sounded like you were going to go into a recitation of something that's completely outside of the evidence in this case and not relevant.

**MS. FODE:** Okay. Well, I just wanted to respond to what he said.

**THE COURT:** He testified -- I mean, the argument was just about Mr. Lahaise's testimony. If you want to talk about what any of the witnesses testified to, that's fine, but you're not going to go into something that isn't even before -- the facts weren't even in evidence in this case.

**MS. FODE:** Understood.

**(End sidebar at 4:04 p.m.)**

**MS. FODE:** All right. Pardon the second interruption.

Let's talk a little bit about the verdict forms that you're going to fill out because I think this will be helpful in what your job is today.

All right. First, I wanted to show you, there's the verdict form that I think Mr. Sessions held up and showed you. The first one is verdict form relating to the wage claim. So you're hearing about the different claims that Mr. Byrne has brought.

Now, there's different questions that you're going to have to answer here and the first is did Mr. Byrne perform work. Yes, he did. Okay. That one's a given. So that's easy.

Number 2, does Ameris owe Mr. Byrne wages under the terms of the employment agreement 20 -- and the 2022, 2023 LTIP agreement? Okay. Now, I want to point out here because you've heard about 2024. For this wage claim, 2024 does not come into

play. That's why the agreement -- the verdict form only says 2022 and 2023.

Now, think carefully about what is actually in dispute in this case. Mr. Byrne does not claim that Ameris failed to pay him his annual salary. He does not claim that Ameris failed to pay him his quarterly bonuses. The only dispute is Mr. Byrne's contention that his 2022 LTIP payment should have been higher, more than 5.6 million and that he should have been paid millions under the LTIP pay out from 2023. Because he believes that using his numbers, the Balboa Division surpassed the profit threshold set by Mr. Byrne himself.

As you've heard, the LTIP in the past it's an incentive plan, and you heard a lot of testimony about this, based on how the company performs. It is not a specific wage, like working at Starbucks and getting an hourly wage or working in an office and getting a yearly salary. Here, the incentive payment is not wages like that under this rule.

Next, the Balboa Division exceeded the LTIP threshold in 2022, as we talked about, and Mr. Byrne had his share of 5.6 million. There's no additional payment due to him.

For 2023 the Balboa Division did not perform as required under the LTIP. Did not exceed the LTIP threshold and therefore the Division did not earn the LTIP pool in 2023 under Mr. Byrne's leadership. Therefore very simply, no LTIP pool

was created or funded in 2023.

More importantly where the LTIP is created or funded, there's no way to ascertain an amount that would be due to Mr. Byrne specifically, because everything in the LTIP agreement makes it clear that the LTIP payout is contingent on performance.

100 percent under the discretion of Ameris, remember all those provisions we went through talking about discretion, and no specific individual allocation or percentage is guaranteed to any eligible participant under the LTIP, including Mr. Byrne. So this is where that came up that we spoke about Mr. Byrne did not have an agreement to a specific percentage.

I want to encourage you to look at Exhibit No. 301, the LTIP when you're in the jury room and for the sake of time, we will move through the provisions quickly, but just to highlight the ones that are important to Ameris.

First is the eligibility and it says that the designation of the participant eligible to receive the cash bonus award shall not be in any manner entitled to participant to receive payment under -- in respect to the cash bonus award for such a period. I know, that's a lot of lawyer language.

But basically the plan doesn't guarantee you an LTIP pay out in any given year. So Pat Byrne was not entitled in any manner to receive 2023 pay out because there were no

guarantees.

And again, Mr. Byrne understood that when he told the team in his e-mail, which is at Exhibit 371, there would be no promises that this would occur again.

Additionally, they -- paragraph 5 says, a participant will not receive a cash bonus award with respect to a performance period, if the performance is below the threshold. Okay. I'd like to also direct your attention to paragraph 6.

The committee is authorized in its sole discretion to adjust or modify the calculations and the goal for the performance period. We talked about who's the committee and that they delegated to Mr. Lahaise who testified to that.

And you've -- we've talked a lot about EBT and the nitty gritty numbers, which we will not go through again, except to say that the percentage was blank in the LTIP.

Skipping ahead to paragraph 11, it states, no right to cash bonus award and it basically says that Pat Byrne has no right to any cash bonus award under the agreement until that award, if any, is paid to him, not before.

Also Section 3.3 all committee decisions are final and the provisions of the plan are final and binding on the company and the participant. It gives this committee who delegated to the power to Mr. Lahaise very broad powers, that include reconciling any inconsistencies in the plan and anything that needed to be done.

So the evidence is clear, you should answer no to the question of whether the LTIP pay out would be an ascertainable wage. And in your question, no, on the verdict form as to whether payment should be due.

As to the next question, ask -- question 25 asks you to determine the amount of unpaid wages. Okay. This is another problem that Mr. Byrne has because his own evidence didn't establish a reliable amount. You heard differing calculations. You heard Mr. Byrne's expert who submitted two different reports and then revised her opinions extensively multiple times.

The claim damages shifted throughout the case and came back to the end number. If Mr. Byrne himself cannot and a paid expert cannot identify with certainty the amount that he is claimed owed, then he has not met his burden of unpaid wages under the labor code.

The evidence does not establish that Ameris owed Mr. Byrne any additional wages. The evidence does not establish that there was a fixed amount of earned or unpaid wages. And it doesn't establish any damages with reasonable certainty. These are all things that you will consider when you're in the jury room.

Skip through. Oh, to the waiting time penalties, you heard about that. That's under the labor code. The big question for you is, did Ameris willfully pay, fail to pay the

full amount of wages earned by Mr. Byrne on his last day of employment. The key word there is willfully.

So in employment law, the Court has instructed you that failure to pay is willful only if the employer intentionally failed or refused to pay wages that were owed.

Ask yourself if Pat Byrne's request for more money under the LTIP falls as a willful withholding of labor code wages.

Mr. Byrne was paid 186 million for the company and almost $8 million in wages and discretionary bonuses for his 2.5 years of work at Ameris. The evidence in this case does not support a finding that Ameris willfully withheld anything from Mr. Byrne, at most it represents that Ameris had a good faith belief that wages were not owed, which negates that finding of willfulness.

And moving along, you may agree or disagree with Ameris' position, but disagreement is not willfulness. That's a good faith dispute over whether a discretionary bonus or plan or discussion of the payment is due under the LTIP plan, which by -- as you will find in your jury instructions, that does not equal willful conduct.

Now, moving along to this whistleblower claim. The first thing to pay attention to is the timeline. As we discussed, the first complaint was raised in 2022 and his termination was over two years later. Also look at the

evidence with the e-mails and the communications that the bank continued to engage and continued to try to reach a resolution on these issues.

If Ameris wanted to silence Byrne because it feared its complaints, why wait two years? Instead, Ameris did the opposite, it continued to employ him, continued to compensate him, and offer him a path forward.

And if Mr. Byrne genuinely believed that Ameris was violating the law and wanted to ensure compliance, then why did he ignore the very contract that was offered to him that could have kept him now?

The next thing to consider is what Mr. Byrne was complaining about, which we put that word bubble up. Mr. Byrne disagrees how Ameris calculated the LTIP. That is not an illegality. That is a conversation about methodology and accounting and interpretation of a contract.

In fact, Mr. Byrne's own counsel confirmed this by now adding a breach of contract claim to this case, a claim that was not pled prior to --

**MR. SESSIONS:** Objection, Your Honor.

**THE COURT:** Sustained.

**MS. FODE:** If Mr. Byrne's complaints were truly about breaking the law, now we're going to be talking about if the contract was violated under breach of contact.

So the verdict question that reads, did Mr. Byrne

have reasonable cause to believe that the information disclosed a violation of state, federal law or a violation or noncompliance with local, state or federal rules or regulations. That is really, really important, okay. Because it has to be a reasonable belief. And I would ask you to look at the jury instructions and see if the reasonable belief could be established, when you look at the evidence and hear the witness testimony.

Mr. Byrne knew the dispute was over the LTIP and he knew or should have known that under the contract the LTIP was not a wage, and the dispute over the LTIP threshold was not Ameris breaking the law.

All right. Moving along. The next question asked, whether Mr. Byrne's disclosure of information was a contributing factor in Ameris' decision to terminate him, the evidence established that Mr. Byrne was terminated because he stopped performing critical aspects of his job, and repeatedly refused to work collaboratively with the senior leaders.

He went on strike, even though he continued to receive compensation of $950,000 a year. You heard testimony that Mr. Byrne refused meetings with key leaders, in short, he stopped doing his job when he didn't get his way. This is not about retaliation, this is about accountability.

Next, there's the question whether Ameris provided clear and convincing evidence that it would have terminated

Mr. Byrne for legitimate independent reasons anyways. And we went through the evidence that would support this conclusion.

Moving on to the wrongful termination claim. The key question there was, was Mr. Byrne's complaint about the failure to pay wages a substantial motiving reason for Ameris' decision to discharge Mr. Byrne. Answer, no.

Next as to Mr. Byrne's breach of contract claim. You have to start with the question of did Mr. Byrne do or all substantially all of the significant things that the contract required him to do. The evidence that was presented clearly goes against Mr. Byrne's allegations.

Mr. Byrne began disputing the interpretation of the LTIP in 2022 and despite that, Ameris kept him on, and gave him a salary and after months of disengagement when it reasonably concluded that Mr. Byrne had lost interest in continuing employment, Mr. Byrne terminated his -- Mr. Byrne was terminated in June of 2024, after saying, why don't you just fire me.

**THE COURT:** Ms. Fode, you're at time, so if you could wrap it up.

**MS. FODE:** No problem, thank you.

In closing, any marriage therapist will tell you that the surest way to destroy a marriage is to give someone the silent treatment.

**MR. SESSIONS:** Objection, Your Honor.

**MS. FODE:** Well, that's what Pat Byrne did to Ameris.

**THE COURT:** The objection is sustained.

**MS. FODE:** It -- what?

**THE COURT:** There was an objection and I sustained it.

**MS. FODE:** Okay. Pat Byrne gave Ameris the silent treatment. It wasn't that he complained too much, it was that he withdrew. He stopped listening, he stopped showing up, and he stopped participating. This is a man who is used to running the show and getting his way. He gave up that control when he was paid 186 million in cash for his company and plus another 7.4 million over the next two and a half years.

The evidence in this trial has shown that far from seeking to retaliate against Pat Byrne or cheat him out of money earned, Ameris was all in on the relationship and did everything it could to make it work. Ameris was a full yes, but Pat Byrne was a no. And ultimately Ameris terminated him because it needed a leader who would say yes. Thank you for listening, thank you for waiting to make up your minds, thank you for keeping my voice in your ear as plaintiff has the opportunity to rebut and the final word.

We turn this case over to you now and trust that you will follow the evidence and the law in making your decisions. Thank you so much.

**THE COURT:** Thank you. Okay. Mr. Sessions.

**REBUTTAL ARGUMENT ON BEHALF OF PLAINTIFF**

**BY MR. SESSIONS:** Thank you. All right. Well, there is an old adage in trial practice that's very common to us lawyers, you all may be hearing it for the first time, I don't know. It's if the law is not on your side, argue the facts. If the facts are not on your side, argue the law. What do you do if neither are on your side?

Try to confuse and confuse and confuse. And I'll let you decide for yourselves if that's what just happened now. What I will say is, thank goodness you will get a copy of the verdict form and jury instructions that the Judge gave you because a number of statements that were made in terms of things that you'd see in the jury instructions and in the verdict form that you heard just now, you will see for yourself are neither in the jury instructions or the verdict form.

I just want to show you one example. If we can pull up the fifth slide that Ms. Fode showed. This is an example of one. Beyond a reasonable doubt, she showed you a slide about this. But do you remember the Judge instructing on what the burden of proof is in this case? This is for criminal cases. Burden of proof in this case, as I explained, is preponderance of the evidence. Remember the feather? Just over 50 percent. You can take that down, thank you.

All right. I only have a few minutes and there was a lot to cover. Let me hit on just a couple that seemed to be

the most important.

So first, Jaz, can you pull up Exhibit 545? Ameris referred to this exhibit as Exhibit 301 and I think you may have noticed that there are probably some exhibits that appeared twice in this case.

So this is -- here's the first thing. This is the Balboa Capital long term incentive plan. Now, don't get confused, because Ms. Fode just walked you through all of these specific provisions in it, ones that she said that touched on the discretionary nature of the bonus, that somehow Mr. Lahaise had the discretion to decide whether he was going to give it or not.

Okay. Here's what she didn't show you, but what Mr. Lahaise testified about. Jaz, go ahead and pull up Exhibit 546.

This is the LTIP agreement. And you see the name at the top there, Patrick Byrne? Remember when Mr. Lahaise sat right there and I asked him about the difference between the plan and the LTIP agreement? The plan applies to everybody else. Mr. Byrne, as CEO of the company and its founder had a specific LTIP agreement.

Now, while we're on the -- Jaz, you can take that down.

Now, while we're on the topic of what you just heard about the bonus being discretionary, let's talk about that for

a second. You heard Ameris argue that the LTIP bonus was not guaranteed or was discretionary, that's what she kept saying. That the company retained the right to decide to pay it at all, regardless of Balboa's performance.

Now, take a close look at that argument and a very important thing that's missing from it. Notably, Ameris never argues, in fact I asked Mr. Lahaise about this, and he denied it, Ameris never argues that it actually exercised any sort of discretion, even if it did exist.

Ameris doesn't stand up here and say to you, you know what, we considered the circumstances, we weighed the factors, and we just decided we didn't want to pay. They didn't say it back then because it would have required them to tell Mr. Byrne and the 150 other Balboa employees, great job, everyone, you made us a ton of money but we just decided not to pay the bonuses this year. Remember, it's not guaranteed, we exercised our discretion, and of course, they don't say that to you now because they can't.

What they actually did was manipulate the EBT calculations as you saw, so that Balboa appeared not to meet the threshold in the first place. That is not the exercise of discretion, that's rigging of the formula.

Think about it this way. If the bonus truly were discretionary, there would have been no need to manipulate the calculation in the first place. You exercise discretion by

making a decision. You rig the numbers when you want to avoid having to make one.

Now, of course, beyond that the discretionary argument runs head long into what Pat himself was actually promised and what the witnesses actually testified to. The LTIP which again, the LTIP agreement which Ms. Fode did not put on the screen once, has a specific formula.

Specific thresholds. Go ahead and pull up 546 again. I'll put it up for you. Right here, here they are, here's the key assumptions and how's the explanation of how it's supposed to be calculated.

Pat's award agreement sets out exactly what he would receive when those thresholds were met. The contract says, it's a contract that says, you will receive X if Y happens. That's not a discretionary bonus, it is a contractual entitlement. Ameris negotiated those terms, signed the agreement and accepted the benefit of past performance under it.

They don't get to call it discretionary now that the bill has come due. And like I said, thank goodness for the verdict form, because you'll see when you're looking at the verdict form it doesn't discretionary nature or no guarantee on there at all. You'll see that for yourselves.

Now, on the point of 62.54 percent. This -- and this really goes to a theme, a broader theme of what you just heard.

Remember when I stood up here in the opening and I stood up here just about an hour ago and I told you, hey, you haven't seen a single receipt backing up what Ameris has said in this case and you're not going to see a receipt during their closing.

Well, I echo it one more time, there are no receipts. You saw a lot of charts and checklists up there that Ameris' counsel made, but they didn't actually go back and show you the documents like we did. That's because they don't have any.

Now, let's talk about this $40 million in loan losses that Ameris likes to talk about so much. Ameris likes to flag, because it sounds like a big deal, that in 2023 Ameris had $40 million in loan losses. Note though that Ameris never told you what that meant or why it mattered. Ameris just wants you to look at that number and be surprised by it.

That's because the loan losses, as you'll remember are baked into the LTIP. It anticipates loan losses. If we go to slide 76.

Right here, key assumption F. It says, the allowance for loan losses calculations and expenses for Balboa will be the greater of one actual net charge offs or two, 1.25 percent of net investment in direct financing leasing. Yes, this is the same thing as the thing they keep bringing up to you, allowance means that the LTIP anticipated loan losses and accounted for them.

Now remember this, greater of means we're going to account for those loan losses in a specific way. And remember, Ameris inflated those losses by swapping the word or in the sentence for a plus sign or the word and. Also remember that even under Ameris' own calculations, Balboa's EBT wasn't negative $40 million, which is what they keep wanting you to think.

They keep wanting you to think that Ameris was unprofitable to a loss of $40 million 2023. The $40 million that Mr. Byrne testified to you was just a sliver of Balboa's 1 billion dollar portfolio for 2023. Less than 4 percent of the total portfolio.

Let's go to slide 77. Even under Ameris' own calculations, Balboa's EBT was still well in the black, even though they say you didn't meet the threshold for a bonus, Ameris admitted that EBT was high. Palmer Proctor, Ameris' CEO admitted this on an earnings call with Ameris investors, Slide 78.

He said, quote, it's obvious you do incur higher losses, but you've got, as we all know, much higher yields too, so net/net it is an extremely profitable business to be in. Ameris calculated Balboa's 2023 EBT, meaning after you take into account all the money that came in and all the money that went out and they still found that it was over $46 million of profit. Of course, as Ms. Dickson showed you that number

should be even higher and it should actually be 58 million.

Now, there's one thing importantly that you might have noticed was missing from Ms. Fode's slides and it's the complete absence of any discussion of the 2024 LTIP and the promise that's in Mr. Byrne's LTIP agreement, which we can pull up, Exhibit 546 again. Paragraph 3. If you'd go to the next page, please, Jaz.

See where it says forfeiture risk? Remember that last full sentence in that paragraph, it says, in the event of a termination without cause or a resignation for good reason, the award for all outstanding performance periods shall be determined and paid out in accordance with Section 4 below in the plan and the participants shall receive such award for each performance period that occurs during the year of the termination without cause or the resignation for good reason and each year thereafter, if any. Okay?

What does that say? It says, if we terminate you, Mr. Byrne, without cause in the middle of the year, once an LTIP becomes due the next year, you get that payment. That is exactly what the contract says and you heard Mr. Lahaise and Mr. Silva both admit that there was a 2024 LTIP payment that was made, but they didn't make one to Mr. Byrne.

Ameris' lawyer just now stood up here for over an hour and did not address this at all. So at a minimum, at the bare minimum, this is a breach of contract and Mr. Byrne should

be paid the over $4 million he is due for 2024.

I'll wrap it up. In closing, Ameris tried to give themselves several easy ways out in this case. Ameris told you that Pat went on strike and that's why he was fired. Ameris didn't show you any evidence of that and remember the reason Pat was fired has no bearing for what it's worth on the breach of contract claim or the unpaid wages claim. You will see that for yourself, when you look at the jury instructions and the verdict form.

Pat's entitlement to payments under the LTIP exist regardless of why he was fired. And, of course, we trust you to consider what the contract actually says. Ameris did not explain to you, has never explained to you just as they've never explained to Pat why every single adjustment Ameris was willing to make still left Balboa just below the threshold.

They didn't explain why Nicole Stokes decided Pat was wrong before she had done any analysis. That didn't explain why Lahaise told Pat the matter was closed and then fired him six weeks later.

But you know what, you have the LTIP, you've read its language, you can read it again, and you've seen the e-mails and you can see those again. You've heard the witnesses, you know what Ameris did. Hold it to the agreement it made. Thank you so much.

**THE COURT:** Thank you, Mr. Sessions.

Okay. Just a couple of brief instructions before I let you go. I do want to remind you that as members of this jury, it's your duty to find the facts from all of the evidence in the case and to those facts you apply the law as I give it to you in these instructions.

Before you begin your deliberations you'll need to elect one member of the jury as your presiding juror, the presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all the other jurors if you can do so and your verdict must be unanimous. Each of you must decide the case for yourself, but you should do so only after having considered all the evidence, discussed it fully with the other jurors and listen to their views.

It is important that you attempt to reach a unanimous verdict, but of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should.

But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.

A verdict form has been prepared for you. After you have reached unanimous agreement on the verdict, the presiding

juror should complete the verdict form and according to your deliberations, sign and date it and advise the clerk that you are ready to return to the courtroom. Ms. Jackson. Oh, there she is.

**THE CLERK:** Can I have the Court security officer step forward. Please raise your right hand.

**(Bailiff sworn)**

**THE CLERK:** Thank you.

**THE COURT:** Okay.

**THE CLERK:** All rise.

**(Jurors exit courtroom at 4:37 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Okay. So it's 4:37, so I'm anticipating that the jury is going to leave for the day and then they'll come back tomorrow morning to start their deliberations. Because of the fact that they'll be coming back tomorrow at 9, if all of you could be here at 8:30 to go over the exhibits with Ms. Jackson, we're not going to do that this afternoon, we'll just do it first thing in the morning, that would be great.

And also if you haven't done so already, I need to -- I want to make sure that Ms. Jackson has your cell phone contact information so that if we get jury questions or there's any other activity that we need to discuss while the jury is deliberating that I'm able to get in contact with you.

I need you to be, or at least have one attorney from each side be available to come to court within ten minutes of getting that call, so that way we don't have the jury waiting for any longer than they have to. Sometimes they have to wait because we have to discuss something that was unforeseen, but I don't want that waiting time to be because somebody's driving across the city to get here.

Okay. Mr. Sessions, anything else from the plaintiff today?

**MR. SESSIONS:** Nothing else, thank you, Your Honor.

**THE COURT:** Okay. And, Ms. Fode?

**MS. FODE:** Nothing, thank you, Your Honor.

**THE COURT:** All right. Congratulations to everyone. You got to this point, which that's where all the heavy lifting was, so congratulations to everyone and we'll see you tomorrow morning at 8:30.

**THE CLERK:** All rise. This court is adjourned.

**(Proceedings adjourned at 4:39 p.m.)**

*** * * * ***

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 11, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***