# EXHIBIT I

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(SOUTHERN DIVISION - SANTA ANA)

| | |
|---|---|
| PATRICK BYRNE, | ) CASE NO: 8:24-cv-01989-MWC-JDEx |
| Plaintiff, | ) CIVIL |
| vs. | ) Los Angeles, California |
| AMERIS BANK, | ) Friday, June 12, 2026 |
| | ) (9:04 a.m. to 10:00 a.m.) |
| Defendant. | ) (1:04 p.m. to 1:23 p.m.) |

JURY TRIAL - DAY 8

(PHASE 2 - PUNITIVE)

BEFORE THE HONORABLE MICHELLE WILLIAMS COURT,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Court Reporter: Recorded; CourtSmart

Courtroom Deputy: Maria Lindaya

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Suite 1105, PMB 237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES**:

For Plaintiff:

MATTHEW THOMAS SESSIONS, ESQ.
ANDREW A. WOOD, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
2010 Main Street
8th Floor
Irvine, CA 92614

STACEY ANN VILLAGOMEZ, ESQ.
Allen Matkins Leck Gamble Mallory & Natsis
865 S. Figueroa Street
Suite 2800
Los Angeles, CA 90017

For Defendant:

STACY L. FODE, ESQ.
NANA JIN YEE, ESQ.
Nukk-Freeman & Cerra
550 West C Street
Suite 910
San Diego, CA 92101

INDEX


| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NICOLE STOKES | 16 | 29 | -- | -- |

| EXHIBITS | RECEIVED |
|---|---|
| 191 | 19 |
| 192 | 21 |
| 193 | 23 |

| MODE | PAGE |
|---|---|
| OPENING STATEMENT | |
| BY MR. WOOD | 10 |
| BY MS. FODE | 13 |
| CLOSING ARGUMENT | |
| BY MR. WOOD | 32 |
| BY MS. FODE | 39 |
| JURY INSTRUCTIONS | 40 |
| VERDICT | 48 |

**Los Angeles, California; Friday, June 12, 2026; 9:04 a.m.**

**(Call to Order)**

**(Outside the presence of the jury)**

**THE CLERK:** Calling case number 2, SA-cv-24-01989, Patrick Byrne versus Ameris Bank.

Counsel, please state your appearances, starting with the plaintiff.

**MR. WOOD:** Good morning, Your Honor, Andrew Wood on behalf of plaintiff.

**THE COURT:** Good morning.

**MR. SESSIONS:** Matt Sessions on behalf of plaintiff. Good morning.

**THE COURT:** Good morning.

**MS. VILLAGOMEZ:** Good morning, Your Honor, Stacey Villagomez for plaintiff.

**THE COURT:** Good morning.

**MS. FODE:** Good morning, Stacy Fode for defendant.

**THE COURT:** Good morning.

**MS. YEE:** Good morning, Your Honor, Nana Yee on behalf of defendant.

**THE COURT:** Good morning.

Okay. So we are here on phase 2. Just to make sure everybody is on the same page, I have a sentencing at 10 o'clock, so we need to be done by 10:00, and the defendant in that case is in custody, so you may see the marshals come in,

that's what that is.

I think yesterday we agreed on five minutes for each side for opening, ten minutes for presentation, and then five minutes for closing; is that right?

**MS. FODE:** Yes, Your Honor.

**MR. WOOD:** Yes, that's fine, Your Honor.

**THE COURT:** Okay. And I know Ms. Fode you had a motion that you wanted to discuss concerning the demonstratives, but because we don't need to decide that motion for the jury to start its deliberations I'm going to go ahead and defer that until after we get this case back to the jury.

**MS. FODE:** Understood, thank you.

**THE COURT:** Okay. Are there -- has everybody seen a copy of the jury instructions on punitive damages and the verdict form?

**MR. WOOD:** I'm not sure that we have, Your Honor.

**THE COURT:** Okay. Do we have that for counsel?

THE CLERK: Yes, Your Honor.

**(Pause)**

**THE CLERK:** Here you go, counsel.

**MS. FODE:** Thank you.

**THE COURT:** It's just one page each. It's the CACI on punitive damages and then one question on the verdict form. So take a look at it.

**(Pause)**

**THE COURT:** The only changes that I made to the CACI were to add the plaintiff's name instead of plaintiff in brackets, it says Patrick Byrne, but otherwise I don't think there were any other changes to this form, it's straight from the CACI.

And then the verdict form is just the one interrogatory, what amount of punitive damages, if any, do you award plaintiff, Patrick Byrne, from defendant, Ameris Bank, and that's it, since they already made the predicate finding.

**MR. WOOD:** This is acceptable to plaintiff.

**THE COURT:** Okay, thank you.

And for defendant?

**MS. FODE:** Just give me one minutes, I'm sure it's acceptable, but I'm just going to read it really quickly.

**MR. WOOD:** And just to keep things moving while Ms. Fode looks at that, we will have one evidentiary issue to raise with Your Honor.

**THE COURT:** Okay.

**MS. YEE:** We have an issue as well, Your Honor.

**THE COURT:** Okay.

**MS. FODE:** This works. Thank you, Your Honor.

**THE COURT:** Okay, thank you.

And now, Mr. Wood, what is the evidentiary issue?

**MR. WOOD:** Yes, Your Honor, just very briefly.

As required by the Court, the defendants did provide

us after the -- after we rested our case with a number of financial documents, albeit a little bit less what we asked for, but it's enough for these purposes, we think.

Yesterday we received add proposed Exhibit 547 from the defendant which is represented to us as a -- appears to be a shortened version of one of the other exhibits that was provided to us.

Under Federal Rules of Evidence 106, Rule of Completeness, we think that's inappropriate to introduce a truncated version of one of these exhibits, and we intend to use the full exhibits and object to introduction of the other one.

**THE COURT:** So it a truncated version of an exhibit that was already admitted?

**MR. WOOD:** I believe it's a truncated version of one of the financial documents that was provided to us earlier this week.

**THE COURT:** Oh, okay. So if you provided the document it needs to be provided -- presented in whole for the jury to consider.

**MS. FODE:** Understood, Your Honor.

**THE COURT:** Okay.

**MS. FODE:** These are the financial records that were produced pursuant to phase 2, as the witness will need them to be able to testify as to net worth.

**THE COURT:** Right, but if you're going to introduce them into evidence the jury needs to have the context of the entire document.

**MS. FODE:** Understood.

**THE COURT:** Okay, thank you.

And Ms. Yee?

**MS. YEE:** Yes, Your Honor. I have a quick issue.

So plaintiff has indicated that they intend to use phase 1 demonstratives in phase 2 by reserving the right to do so in an email that they sent to our office after amide night. So no demonstratives were actually transmitted by the 7 p.m. deadline per this Court's order.

**THE COURT:** But you already saw them, they're not new demonstratives, they're things that have already been exchanged.

**MS. YEE:** Your Honor, we object to any such use. I have not reviewed it, I don't know which -- you know, exactly demonstrative they're going to use, and we will object for them to relitigating phase 1 liability issues in phase 2.

**THE COURT:** But if it's a demonstrative it's not even in evidence. The objection is overruled.

Okay, are we ready to have the jury come in?

**MR. WOOD:** Yes, Your Honor.

**MS. FODE:** Yes.

**THE COURT:** Okay.

**(Pause)**

**THE CLERK:** All rise for the jury.

**(Jurors enter courtroom at 9:14:32 a.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Thank you. Good morning, ladies and gentlemen.

As I reminded you yesterday and continue to emphasize to you today, it is important that you decide this case based solely on the evidence and the law presented here. So you must not learn any additional information about this case from sources outside of the courtroom.

To ensure fairness to all parties in this trial I will now ask each of you whether you've learned anything about or shared anything -- any information about the case outside of the courtroom, even if it was accidental. If you think that you might have done so please let me know by raising your hand.

Seeing no raised hands raised, but if you do prefer to speak with the Court privately in response to this question please notify a member of the court staff at the next break.

Thank you so much.

And with that we are going to start the second phase of this trial. Mr. Wood.

**(Pause)**

//

//

**OPENING STATEMENT ON BEHALF OF PLAINTIFF**

**BY MR. WOOD:** All right, thank you very much, Your Honor. And thank you again, ladies and gentlemen, I know it's been a long couple of weeks and we really appreciate you sticking around to do this second phase.

All right. So why are we here in a second phase? We're here because in the initial phase in your verdict yesterday you found that Mr. Byrne is entitled to -- potentially entitled to an award of punitive damages, and that's what you're here to decide today.

You found -- you made the requisite finding that Ameris Bank, when they wrongfully terminated Mr. Byrne, when they retaliated against him, they acted with malice, oppression, or fraud, and the law says that that's enough to award -- to consider awarding punitive damages.

So you may with asking yourselves why didn't we address this in the initial phase, why couldn't we all have done this at once? Well the answer is because this is just how it works sometimes under California law. Sometimes these trials are simply split up so that certain information doesn't unduly influence a -- the jury's determination in the first phase. So it's pretty common for trials to be split up in this way so if a jury returns a verdict, as you have, finding liability, then punitive damages are addressed in a separate minitrial that we're doing to right now simply to address the

consideration of whether punitive damages should be awarded and in what amount.

Now, in a few minutes you're going to be -- you're going to hear more from the Court about how you make that determination and how you fill in -- whether you're going to fill in -- you know, what we're looking at right now is again you've made a requisite findings for the award to be given, now what we're talking about is what dollar figure, if any, that you're going to fill in there.

And one of the factors that you're going to consider when you do that is the -- I'm sorry -- is Ameris's ability to pay and what their financial ability is, and so that's why you're going to hear from Ms. Stokes again in just a moment about what Ameris's financial condition is.

But in considering that you need to also consider -- and we'll take about this a little bit more when I come back and talk to you after Ms. Stokes testifies -- is what is the purpose of punitive damages? Well the purpose of punitive damages is to deter and punish the behavior that you have found is wrongful.

In the first phase of trial in the damages award that you gave yesterday you were giving compensatory damages, that was to bring Mr. Byrne back to the position that he should have been in all along had Ameris not done what it did, that was to make him whole.

Now what you're deciding is what amount, if any, do you need to impose in order to send a message to society that this conduct is not tolerated, and that Ameris and other companies need to not engage in this kind of behavior going to forward. That's why it's talking about to deter and to punish.

And so that's why punitive damages serve an important but distinctly different purpose in the damages that you've already awarded to Mr. Byrne, and so they're meant to provide a strong enough deterrent that companies can't just simply say, hey eh, cost of doing business, okay, we got hit with a verdict, we'll -- you know, we'll pay it, but you know what, we're going to do this again because if all we had to do was pay this verdict then, okay, that's cost of business, no problem. The question now is will you send a message to them that this cannot be tolerated?

And so with that I believe the defense may have an opening, and otherwise we'll be hearing from Ms. Stokes in just a moment.

**THE COURT:** Thank you very much.

Ms. Fode.

**MS. FODE:** Thank you.

**(Pause)**

//

//

//

**OPENING STATEMENT ON BEHALF OF DEFENDANT**

**BY MS. FODE:** Good morning.

Ameris respects the jurors' verdict and understands the jury's task, now is to determine an appropriate punitive damages amount.

You already sent a powerful message to Ameris with your approximately $16.5 million verdict and they heard it.

The purpose, as Mr. Wood said, of punitive damages is not to provide additional compensation, that was covered in your claims that you already ruled on, the purpose of punitive damages is to impose a punishment for malice, fraud, or oppression that is reasonable and proportional to the conduct.

The judge will instruct you on the legal standard to govern your decision for the amount of punitive damages, if any.

Here are some of the following factors for you to consider.

Number 1, the case arose from an employment dispute concerning compensation under a long-term incentive plan and contractual dispute.

Number 2, there was for physical injury for Mr. Byrne.

Number 3, there was no threat to public health and safety.

Number 4, the case involves an individual, not

conduct affecting a broad group of consumers or the public at large.

Number 5, the plaintiff, Patrick Byrne, is not financially weak or vulnerable, which is another factor.

Number 6, Ameris's conduct did not involve a pattern or practice, it involved a termination of one person in his negotiated agreement.

And number 7, this was a contract and employment dispute, not a case for fraud or intentional conduct.

An excessive punitive award would go beyond what is necessary to punish and deter the conduct at issue in this case.

If you award -- you already awarded Mr. Byrne what you deemed to fully compensate him for emotional distress and economic damages. You awarded Mr. Byrne approximately $3.5 million more than the $13 million he requested.

As the judge will instruct, you're not required to award any punitive damages. We respectfully can ask that you award nothing further.

Mr. Byrne has been made more than whole; however, if you deem an additional amount for punitive damages is warranted we would suggest a punitive damages award of 1.5 million --

**MR. WOOD:** Objection.

**MS. FODE:** -- which would double his --

**THE COURT:** This is --

**MS. FODE:** -- non --

**THE COURT:** Ms. Fode, this is argument. This is just an -- you're supposed to be giving an opening statement.

**MS. FODE:** All right.

We appreciate your consideration and your fairness as you consider the number.

Thank you.

**THE COURT:** Thank you.

Okay. Mr. Wood.

**MR. WOOD:** Right, yes, Your Honor, plaintiff calls Nicole Stokes.

**THE COURT:** Thank you.

**(Pause)**

**THE COURT:** Good morning, Ms. Stokes, you can come forward. You know the drill, come all the way around, we'll swear you in again, and then you can have a seat in the witness stand next to me.

**NICOLE STOKES, PLAINTIFF'S WITNESS, SWORN**

**THE CLERK:** Thank you. Please be seated.

For the record please state your full name and spell out your last name.

**THE WITNESS:** Nicole Stokes, S-T-O-K-E-S.

**THE COURT:** Thank you, very much.

Mr. Wood, you may proceed.

**MR. WOOD:** Yes, and permission to treat the witness

as hostile, Your Honor?

**THE COURT:** Granted.

**MR. WOOD:** Thank you.

**DIRECT EXAMINATION**

**BY MR. WOOD:**

Q All right, good morning, Ms. Stokes.

**THE COURT:** I'm going to just -- I'm going to stop for a second.

Just for the jury, when an attorney asks to treat a witness as hostile it doesn't mean that they think the witness is actually hostile to them, it's just that there are rules about how they can ask questions, and if they're -- if the witness is adverse to their client they ask to treat the witness as a hostile witness so that they can ask leading questions. That's all that means. It doesn't mean anything about the character of Ms. Stokes or anyone else, okay?

All right. Thank you, Mr. Wood, you may proceed.

**MR. WOOD:** And I certainly didn't mean to imply that.

**THE COURT:** No, I know you didn't mean to imply it, it's just one of those things that we talk about in the law and I wanted to make sure that everyone was clear that it just means that you have permission to ask leading questions.

**MR. WOOD:** Yes. Yeah, absolutely, and I think -- I agree it's very important that that be clear.

//

**BY MR. WOOD:**

Q All right. Good morning, Ms. Stokes.

A Good morning.

Q All right, you are Ameris's chief financial officer, correct?

A Yes.

Q Okay. And can you remind us how long have you served in the senior financial role at Ameris?

A So I've been the CFO of the bank since 2016, and the CFO of the holding company, Ameris Bank Corp. since 2018.

Q Thank you.

And as the CFO are you the principal accounting and financial officer of Ameris?

A Yes.

Q And in that role do you personally certify under penalty of perjury that Ameris's financial statements fairly present in all material respects the financial conditions and results of operations of Ameris?

A Yes.

Q Okay. As CFO do you have responsibility for, you know, designing, maintaining, and evaluating the effectiveness of the company's internal controls over financial reporting?

**MS. FODE:** Objection, irrelevant, outside the phase.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Yes.

**BY MR. WOOD:**

Q And do you report to the board of directors and its audit committee regarding the company's financial condition?

A Can you clarify like -- I report to our CEO, but did you -- do you mean report as in who my boss is or report in that I talk to them?

Q Either way, whichever is your understanding.

A So I report to our CEO, Palmer Proctor, but I do give financial updates to the board and to the audit committee.

Q Okay.

**MR. WOOD:** Ms. (indisc.), can you please pull up, I believe it's Exhibit 192 -- oh, Exhibit 191 for the witness, on blackout, please.

**THE COURT:** Just one moment, let's not pull it up yet.

**(Pause)**

**THE COURT:** Okay, go ahead.

**BY MR. WOOD:**

Q All right. Ms. Stokes, do you recognize this document?

A Can we flip through it?

Q Sure.

A That's the cover.

**(Pause)**

A And can we stop right -- can we go back two pages, please. Okay.

Q All right. Is this a true and correct copy of the Ameris 10-K for 2024?

A No.

Q What is it?

A This is a copy of the annual report for Ameris Bank Corp.

Q Okay. This is a -- so this a copy of the annual report for 2024 for Ameris Bank Corp.?

A Yes.

Q Okay.

**MR. WOOD:** And we'd like to -- at this time, Your Honor, we would like to move this into evidence as Exhibit 191.

**THE COURT:** Any objection?

**MS. FODE:** Objection, it's irrelevant, but that's it.

**THE COURT:** The objection is overruled, Exhibit 191 is admitted, and you may publish.

**(Exhibit Number 191 received in evidence)**

**MR. WOOD:** Can we go to -- can we move down to --

**THE WITNESS:** I apologize, I thought I could swipe the exhibit, my fault, and I put a blue line.

**BY MR. WOOD:**

Q Oh, no problem.

A I apologize.

Q I'm sure we can correct that, no problem.

**MR. WOOD:** Let's go to the signature page, please. The joys of technology.

**(Pause)**

**MR. WOOD:** Okay, let's move on. Let's pull up Exhibit 192.

**THE COURT:** Has that been admitted?

**MR. WOOD:** It is not, so we'd like to pull that up on -- oh, I apologize.

**BY MR. WOOD:**

Q While we're still on Exhibit 191, do you see here on the signature page, do you see your signature there?

A I do, it's my electronic signature, yes.

Q Yeah. And you authorized signature to be placed there, right?

A Yes.

Q Okay.

**MR. WOOD:** All right, so now let's move onto Exhibit 192, and on blackout for Ms. Stokes, please.

**THE COURT:** Okay. Go ahead.

**BY MR. WOOD:**

Q And I'll ask you to let us know when you're comfortable identifying what this document is for us.

A If we could stop and go back one page. Right there. Yes.

Q Okay. And what is this document?

A This is our 2025 annual report.

Q Okay. And were you involved in the creation of this report?

A In the 10-K portion of it.
Q Okay.

**MR. WOOD:** And let's go to the signature page, please.

**BY MR. WOOD:**

Q Okay. And do you see your signature on that page, your electronic signature that is?
A Yes.
Q Okay. And did you authorize your electronic signature to be placed there?
A Yes.
Q Okay.

**MR. WOOD:** Your Honor, we'd like to request that Exhibit 192 be moved into evidence and published to the jury.

**THE COURT:** Any objection?

**MS. FODE:** Objection, irrelevant and wasn't prior produced to us.

**THE COURT:** Okay. The objection is overruled, Exhibit 192 is admitted, and you may publish.

**(Exhibit Number 192 received in evidence)**

**MR. WOOD:** All right. Let's go onto Exhibit 193. On blackout, please. Thank you.

**THE COURT:** It's on, I got it.

**MR. WOOD:** Okay, yeah. No, just making sure.

**THE COURT:** Yeah, no, I don't think the technicians

can control it, either I or our courtroom deputy can control that.

**MR. WOOD:** Oh, okay. I apologize.

**THE COURT:** But so I just want to let you know it is on blackout.

**MR. WOOD:** All right. Apologize, Your Honor.

**THE COURT:** No. No.

**MR. WOOD:** Didn't have to deal with too many of these during the first phase.

**BY MR. WOOD:**

Q All right, let's -- Ms. Stokes, can you let us know when you recognize what this document is? We can -- let us know if you'd like us to keep scrolling through or if you can tell us.

A Yes, sir, I'm good.

This is our March 31, 2026 10-Q.

Q Okay. And so this is the -- this shows the financial results for the first quarter of 2026; is that right?

A Yes.

Q Okay. And --

**MR. WOOD:** Do we have a signature? Okay. I'd like to move 193 into evidence and publish it to the jury.

**THE COURT:** Any objection?

**MS. FODE:** No objection.

//

//

**THE COURT:** Okay, Exhibit 193 is admitted and you may publish.

**(Exhibit Number 193 received in evidence)**

**BY MR. WOOD:**

Q Okay. Now, Ms. Stokes, can you tell the jury the total assets of Ameris Bank Corp. as of the most recent reporting period, March 31st, 2026?

A Yes. Can we -- can I get a copy of the document to reference?

Q Yeah, we can go to page 3 of this document if that'd be helpful.

A Thank you.

So our total assets were 28,109,935,000. The financial statements are in thousands.

Q Okay. And do you recall what Ameris's year-end total assets were at the end of 2024?

A We could pull up the prior exhibit and it would be on there.

Q Sure.

**MR. WOOD:** Let's go back to that exhibit, it's at page 60. I believe that's 191. The 2024 report.

**(Pause)**

**BY MR. WOOD:**

Q Okay. So is it your understanding that the Ameris's year-end total assets at the end of 2024 were approximately $26.03

billion?
A This is actually not our balance sheet. If we could go to the page with our balance sheet?
Q Is that the -- but is that an accurate statement of what the average balance was as of 2024?
A Well you asked me what the 12/31 balance was, which would be on our balance sheet. This is their average balance for the year.
Q Yes, I apologize if I misspoke, Ms. Stokes, I meant to ask what the total assets were at the year-end of 2024.
A Correct, and that is not this.
Q Okay.
A This is not our balance sheet.
I think at the bottom it would be like an F-3 if that helps, a page number.
Q While we're looking for that, what are retained earnings, Ms. Stokes?
A Retained earnings is like our stockholders equity, that's the amount of earnings that have been retained on the balance sheet since the beginning of our -- the start of your company.
Q Okay. And as of March 31st, 2026 do you know what Ameris's retained earnings were?
A If you could pull the document up. And I see he pulled up F-3, it may be F-5, 6, if we just flip through I can tell you where the balance sheet is --

Q Oh, sure.
A -- if that helps.
Q All right. So we're back on the 2024 --
A Yep, right there.
Q -- assets
A Yep.
Q Okay.
A Perfect.
So the ending assets for 2024 was 26,262,000,000.
Q Okay.
**MR. WOOD:** All right, so let's -- now let's go back to 2026. I think we're back on Exhibit 193.
**(Pause)**
**MR. WOOD:** We're looking for the net income for the total -- for the -- I apologize.
We're looking for the retained earnings as of March 31st.
**BY MR. WOOD:**
Q Okay. Is it accurate that the retained earnings as of March 31st, 2026 were $2.3 billion?
A Could we flip to the -- can we just scroll where I can see the top, the column headers?
Q Sure.
A I just want to confirm I'm looking at the right page.
Yes, 2.3 is correct.

Q Okay. Let's talk about regulatory compliance just for a moment.

So would you agree that Ameris significantly exceeds all minimum regulatory capital requirements?

**MS. FODE:** Overbroad, vague and ambiguous.

**THE COURT:** Overruled, you can answer.

**THE WITNESS:** Will you repeat the question?

**BY MR. WOOD:**

Q Yes. Would you agree that Ameris significantly exceeds all minimum regulatory capital requirements?

A We do exceed the regulatory capital requirements, correct.

Q And as of March 31st of this year was Ameris's consolidated common equity Tier 1 ratio about 13 percent?

A Do you have that in the document for me to confirm?

Q If you could point us to where that would be in the document.

A Sure. I think if we jump to maybe about note maybe 9 or 10. And I apologize, which capital ratio did you say? There's multiple.

Q Sure. The consolidated common equity Tier 1 ratio.

**(Pause)**

A We can keep flipping.

Q While we're flipping through that, Ms. Stokes, what are U.S. treasury bonds?

A I apologize, I don't think that ratio is in this document.

It may only be a 10-K annual disclosure.
Q Okay.
A I didn't see it in this.
Q We'll move on.
What are U.S. treasury bonds, Ms. Stokes?
A Treasury bonds?
Q Yes.
A Those are bonds issued by the Treasury as -- that people can invest in.
Q Okay. And does Ameris own any U.S. treasury bonds?
A We do have a bond portfolio.
Q Okay. And bonds are considered pretty safe, right?
A They're -- if they're issued by the U.S. Treasury.
Q Yep. And Ameris had approximately $101 million in U.S. treasury bonds as of December 31st of 2025, right?
A Could we go back to the 10 -- the 2025 10-K?
Q Sure. But as the CFO, can you give an estimate if that's roughly accurate?
**MS. FODE:** Objection, vague and ambiguous and lacks foundation.
**THE COURT:** Overruled, you can answer.
**THE WITNESS:** Can we go to the document, Your Honor?
**THE COURT:** Yes.
**MR. WOOD:** Okay. All right that should be the 2025 annual report.

**BY MR. WOOD:**

Q And if you could help guide us to where in the document -- to which specific page you think would be useful for us to look at we're certainly happy to pull that up.

A Okay. And you said treasury bonds?

Q Yes.

A Okay, so we're going to need to go -- that's not on the face of the balance sheet, so we're going to have to go to the securities footnote for that.

Q Okay. Are you familiar with the amount of common stock that the bank has active as of today or as of say June 9th?

A The number of shares?

Q Yes.

A I do not know today, no, as of June 9th.

Q Okay. Do you know if as of March 31st it was somewhere in the range of 67,766,000?

A That would also be on the balance sheet.

Q Okay.

A If we could confirm it.

Q Just as an estimate does that sound approximately correct?

A I think that's reasonably close.

Q Okay. And as of the close of the market on June 9th Ameris's stock price was about $87.20 a share; is that right?

A I don't know specifically, but that is reasonably in the ballpark.

Q Okay.
A I just don't know the specifics to confirm.
Q Do you understand Ameris's enterprise value to currently be around $6 billion?
A I apologize, I'm not familiar with the term enterprise value.
Q Okay.

**MR. WOOD:** All right. Let's see if there's anything else.

All right, subject to any recross, I don't believe I have any further questions for this witness.

**THE COURT:** Okay. Thank you.

Ms. Fode.

**(Pause)**

**CROSS EXAMINATION**

**BY MS. FODE:**

Q Good morning, Ms. Stokes.
A Good morning.

**MS. FODE:** Would you be able to pull up that Exhibit 193? Thank you. Thank you. Could you go to next page, please. And the next. Thank you.

**BY MS. FODE:**

Q Ms. Stokes, what is this document on the screen?
A So this is our balance sheet as of March 31, 2026.
Q And does the balance sheet that we're looking at fairly

and accurately reflect the bank's financial condition as of March 31st, 2026?
A Yes.
Q Okay. And does it reflect the net income of the company?
A No.
Q Okay. Does it reflect cash flow of the company?
A No, this page does not.
Q Okay. Would the next page have that information?
A Yes, I believe the next page is the income statement, and then two pages later would be the cash flow statement.
Q Okay. And based on the document prior, the page prior --
**MS. FODE:** Thank you.
**BY MS. FODE:**
Q -- what is the net income reflected on the document?
A For the first quarter of '26?
Q Yes.
A 110 million.
Q And what was the reflected cash flow as of March 31st, 2026?
A So that would be two slides forward -- two pages forward, I believe. One more page.
So the cash flow statement on a bank, I don't exactly understand your question, but -- could you clarify your question?
Q Sure. Does this document reflect the cash flow for the

company as of March 31st, 2026?

A So this our cash flow statement, yes, and that is what it represents.

Q Okay.

**MS. FODE:** No further questions.

**THE COURT:** Okay. Any recross?

**MR. WOOD:** We're good, Your Honor.

**THE COURT:** Okay.

**MR. WOOD:** No further questions.

**THE COURT:** Thank you.

Ms. Stokes, you can step down.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Thank you.

Any other witnesses from the plaintiff?

**MR. WOOD:** No, Your Honor.

**THE COURT:** Any motions for defendant?

**MS. FODE:** No, Your Honor.

**THE COURT:** Any witnesses for defendant?

**MS. FODE:** No, Your Honor.

**THE COURT:** Okay, thank you very much.

So do both sides rest?

**MR. WOOD:** I'm sorry? Yes, we rest.

**THE COURT:** And Ms. Fode?

**MS. FODE:** Yes, we rest.

**THE COURT:** Okay. So the presentation of evidence in

this phase has concluded, now the lawyers will have one last chance to provide their arguments to you, and then I will give you the -- there's one instruction I need to read you, and then we'll send you back for the jury room to continue your deliberations.

**(Pause)**

**THE COURT:** Mr. Wood, you may proceed when you're ready.

**CLOSING ARGUMENT ON BEHALF OF PLAINTIFF**

**BY MR. WOOD:** All right, thank you, Your Honor, and I'll keep it brief.

Hello again, almost there.

Well you just heard from Ms. Fode and Ms. Stokes that in the first quarter of 2026 alone, the first quarter Ameris brought in a net of over $110 million. You've heard that end of the year 2024 and at the end of 2025 their net assets were around $26 billion.

So while you're back there ask yourself, is this a small community bank that can't afford to be deterred, or is this, as the LOI you saw in phase 1 indicated, the largest publicly traded bank headquartered in Atlanta?

And as you think about that think what is going to deter a bank of this size from doing what they did to Mr. Byrne again?

A couple of analogies might be helpful.

Imagine Jeff Bezos is speeding his Ferrari down PCH and he gets pulled over and he's given a $100 ticket. Is that going to stop him from speeding his Ferrari down PCH again or he is going to think, $100 for a joy road, eh, it's not too bad?

**MS. FODE:** Objection, 403.

**THE COURT:** Overruled.

**MR. WOOD:** Now imagine that you've got a college student with $100,000 in debt with a car they can barely afford and they're caught speeding going 100 miles an hour down PCH, are they going to do that again?

**MS. FODE:** Objection, 403.

**THE COURT:** Overruled.

**MR. WOOD:** Maybe a different example.

If you give your two year old a time out for two minutes it's probably going to be kind of the end of the world for them, right? They've never experienced that kind of thing before, they're just learning what time out is.

You give a 13 year old a 2 minute time out, okay, dad, whatever. Right?

That's the kind of thing we're thinking about here, that's what you need to be weighing, is what is going to be a meaningful award against Ameris?

And I want to walk you back through a couple of the issues that Ms. Fode raised that you're going to hear about in

the jury instructions in just a couple minutes. Now she read those all out to you and I'd like -- you know, and you certainly need to consider all of them, but I'd like you to focus on number 4 and number 5.

Four is whether the defendant's conduct involved a pattern or practice, and five is whether the defendant acted with trickery or deceit.

And as you think about this, you know, we're going to go through -- I'd like to go through just a couple of highlights on that point in just a moment -- but when we're thinking about the purpose of punishing and deterring keep in mind that $110 million figure for quarter one alone in 2026 that Ms. Fode elicited from Ms. Stokes.

Think about -- you'll see in the exhibits, and hopefully we can pull it up on the slide for 2024, that the net income in 2024 -- if we're ready -- was roughly -- and we'll pull it up on the screen here in a minute -- but you can certainly go back and check the documents for yourselves when you're back there -- it's about $358 million, that's about a million dollars a day, and think about what that means in this context.

You've been sitting here in this courtroom since June 2nd, it's now June 12th, based on those 2024 numbers and the time that you have been sitting here listening to this evidence, Ameris Bank made $10 million. So is $10 million

going to be enough to deter them from doing this again? No. We would submit that it's significantly more than that. An amount to deter them is more in a range of $100 million.

So let's go back and focus on four and five.

Whether the defendant's conduct involved a pattern or practice. You've already seen that it did. You heard about Mr. Valarie, you heard Mr. LaHaise sit there and tell you about Mr. Valarie and what the bank did to him. They acquired his company, they brought him in, they found a reason to terminate him, and then they promoted his number 2.

And then you saw again what they did to Mr. Byrne. They bought him in, they gave him a promise of the LTIP, then they manipulated the numbers, wrongfully terminated him, as you found, retaliated against him, as you found, and promoted his number 2 into his position.

We've already seen that if they're not stopped they'll do it again. They've done it twice already. It's up to you to send the message that that is not to be tolerated.

And just think about it, Ameris Bank was willing to willfully disregard the rights of one of its highest ranking employees and fire him for repeatedly standing up for his and his employees' rights, and if Ameris is willing to make these repeated, at least twice now, conscious decisions to underpay and in this case illegally terminate the CEO of a division that is by all accounts been nothing been a profitable enterprise

for Ameris, what else is it willing to do and to whom?

You heard from video testimony from Ameris's CEO, Palmer Proctor. Now he couldn't even be bothered to show up for this trial, Ameris didn't think it was important for you to hear from him.

**MS. FODE:** Objection, 403.

**THE COURT:** Overruled.

**MR. WOOD:** So you had to watch his testimony -- you had to -- and hopefully we can pull that up on the screen -- but you had to listen to his video testimony because he wouldn't show up.

You heard other witnesses tell you about how he was in charge -- how he approved this one hundred million -- $186 million acquisition for Balboa, even stopping and starting the sale in order to ensure he got the timing just right for Ameris.

You heard testimony that he had ultimate approval over the LTIP distributions because of the numbers involved.

And then you saw in his videotaped deposition, you had -- again, you had to watch him testify prerecorded, you couldn't hear from him live because Ameris wouldn't bring him -- that he denied knowing anything at all about the LTIP. You saw him smirk at the camera that he only assumed that an LTIP existed --

**MS. FODE:** Objection, misstates the testimony.

**THE COURT:** Overruled.

**MR. WOOD:** -- merely because he was being asked about it.

He claimed to have no other recollection at his company's decision to summarily and wrongfully, as you found, fire the man who from the ground up built the company Proctor had his company acquire.

You saw him refuse to take any responsibility for what his officers did and pretend to know nothing about -- remember nothing about it.

This is the time to make him as Ameris's head stand up and remember it.

You heard begin from Ms. Stokes this morning. Ms. Stokes, who has extensive experience as a CFO, who's been preparing to be an accountant since she was 6 years old, with a team of 50 people underneath her who talks about internal controls this, internal controls that, and yet you saw her on the screen manipulating the documents, you saw her leading the manipulation to keep things just below that LTIP threshold. You saw that with your own eyes, you've made that decision.

So ask yourselves as you -- so ask yourself in light of the that behavior, in light of the degree of reprehensibility of that conduct, what are you going to do to punish Ameris for that conduct and deter them?

Banks are some of the pillars of our societies, we

look to them to do the right thing, and you found that this one did not, so send that message.

And I'll close by noting one thing. When Mr. Byrne was fired wrongfully, when he was retaliated against, he had six months left on his employment deal. Between the end of -- 6 months, roughly 180 days, you've just heard, and again you can go back and check the evidence for yourself, but you've just heard that Ameris was making about a million dollars a day during that period and this income.

So think about if you take away that six months of profit from Ameris for what they did, if you take away the six months of profit that they got, that they got including from the Balboa Division, which again you heard from Mr. Proctor a month after Mr. Byrne was fired, Mr. Byrne was proud to tell his shareholders, that you know, net/net, it's a -- you know, it's an extremely profitable business to be in, profiting from the 30 years of work that Mr. Byrne put into this company before Ameris acquired it, and continuing to profit from that 30 years of work.

So think about it, will $10 million be enough? Again, you've heard that's ten days. Will $100 million, roughly 6 months of profit for the period that -- during which they earned profit while Mr. Byrne was fired, will that be just? That is what is up to you to decide.

Thank you.

**THE COURT:** Thank you.

Ms. Fode.

**(Pause)**

**CLOSING ARGUMENT ON BEHALF OF DEFENDANT**

**BY MS. FODE:** Ladies and gentlemen, your task is not an easy one, the punitive damages are an extraordinary remedy.

We respectfully ask that as you deliberate on this phase you remember the significance of what you've already done, awarding Mr. Byrne over 3.5 million above what he was seeking in the case.

Again, we respect your verdict and understand. The question now is not whether the plaintiff prevailed, but how much is necessary to accomplish what you're hearing about the punitive damages for punishment and deterrence, not additional compensation.

Several features of this case were -- support a restrained award, not $100 million.

It was an employment dispute arising from an executive's compensation and here the harm found by the jury was economic, it's not a threat to safety or harm of the public, it's not a physical harm to him, and Mr. Byrne is not financially viable or vulnerable.

Punitive damages should not be imposed in an amount greater than necessary to accomplish their purpose. An award that exceeds a reasonably necessary it ceases to be corrective

in nature and would become excessive.

While the jury found that punitive damages are appropriate, we humbly request that you use restraint. Respectfully ask that you award Mr. Byrne nothing further as you've made him whole -- more than whole already. But if you deem an additional amount for punitive damages is warranted, we would suggest an award of 1.5 million, which would be double his non-economic damages that you awarded him and provide a total of 5 times his annual salary over the that he asked for.

And while the jury has found punitive damages appropriate, we respectfully ask that you still use restraint and fairness.

We respectfully put it in your hands now and thank you for your time.

**THE COURT:** Thank you, Ms. Fode.

Okay. Is there any rebuttal?

**MR. WOOD:** None needed, Your Honor. Thank you.

**JURY INSTRUCTIONS**

**THE COURT:** Okay. Okay, ladies and gentlemen of the jury, all of the instructions that I gave you yesterday continue to apply to this case, including the instructions concerning the evaluation of evidence and witnesses and things of that nature that are not specific to the substance of the claims that you've already rendered your verdict on.

You must now decide the amount, if any, that you

should award Patrick Byrne in punitive damages.

The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the plaintiff and to discourage similar conduct in the future.

There is no fixed formula for determining the amount of punitive damages and you are not required to award any punitive damages.

If you decide to award punitive damages you should consider all of the following factors separately in determining the amount.

A, how reprehensible was the defendant's conduct? In deciding how reprehensible a defendant's conduct was you may consider, among other factors, 1, whether the conduct caused physical harm; 2, whether the defendant disregarded the health or safety of others; 3, whether Patrick Byrne was financially weak or vulnerable and knew -- and the defendant knew that Patrick Byrne was financially weak or vulnerable and took advantage of him; 4, whether the defendant's conduct involved a pattern or practice; and 5, whether the defendant acted with trickery or deceit.

B, is there a reasonable relationship between the amount of punitive damages and Patrick Byrne's harm?

And C, in view of that defendant's financial condition, what amount is necessary to punish it and discourage future wrongful conduct?

You may not increase the punitive award above an amount that is otherwise appropriate merely because the defendant has substantial financial resources. Any award you impose must not exceed that defendant's ability to pay.

So with that we are going to escort you back to the jury room so you can resume your deliberations.

Just like yesterday there is a verdict form, this one only has one question on it for you to answer, and when you've answered that question let us know and we'll have you come back so we can receive the verdict. Okay.

Ms. Lindaya?

**THE CLERK:** All rise.

**THE COURT:** Okay, go -- sorry. Go ahead.

**(Jurors exit courtroom)**

**THE COURT:** Okay. Everyone can be seated.

I saw the marshals here so I know that I'm not -- and I don't know if the lawyers were here yet, but I'm going to need everybody to clear off counsel table so that I can do the sentencing, and then if the jury comes back while we're still on the sentencing then we'll just go from the sentencing directly into receiving the verdict, and if not we'll do what we did yesterday.

**MS. FODE:** Thank you.

**MR. WOOD:** Thank you.

**THE COURT:** Thank you. Thank you.

**MR. SESSIONS:** Thank you.

**THE CLERK:** This court is in recess.

**(Recessed at 10:00:00 a.m.; reconvened at 1:04 p.m.)**

**(Outside the presence of the jury)**

**THE CLERK:** All rise. This court is again in session.

**THE COURT:** Thank you. Everyone can be seated.

Okay. We do have a verdict.

We also received a note from a juror about 20 minutes ago. Has everybody seen a copy of the note?

**MR. WOOD:** Yes, Your Honor.

**MS. FODE:** Yes.

**THE COURT:** Okay.

**(Pause)**

**THE COURT:** Does anyone want to be heard?

**MR. WOOD:** Nothing from plaintiffs, Your Honor.

**MS. FODE:** The only thing I would ask is if Your Honor would ask if either side knows, has any knowledge about the photo and the black SUV.

**THE COURT:** Okay. Plaintiff counsel, do you have any knowledge of this?

**MR. WOOD:** We have no knowledge of this, Your Honor.

**THE COURT:** Okay. And defense counsel?

**MS. FODE:** No, we don't.

**THE COURT:** So there are a few trials going to on in

this courthouse right now, one of them is a very high-profile case, and I have a feeling it's probably related to that case.

I don't think there's anything for her to be concerned about. She did say I wanted to know if I think should be concerned, which I think is -- means whether or not we think she could be concerned.

The incident did not have or effect on our deliberations, but I thought it was odd.

Do you -- I think -- I don't want this to go unanswered, I want her to know that we heard her and that we considered that, so what I would propose is that we bring her out separately now to let her know that we did get the note, that it wasn't surveillance that was being conducted by any of the parties or attorneys in this case, and that if she is feeling concerned for her safety that she's free to contact the Court and that we will provide whatever services the Court has to assist her in the future.

**MR. WOOD:** I think that sounds great, Your Honor.

**MS. FODE:** Sounds great.

**THE COURT:** Okay. So we'll just go ahead and get jury number 3 for right now. And let me the other jurors know that we're going to be calling them very, very soon after.

**THE CLERK:** Sure, Your Honor.

**THE COURT:** Okay.

**(Pause)**

**(Juror No. 3 enters at 1:08:29 p.m.)**

**THE CLERK:** All rise. Please be seated.

**THE COURT:** Good afternoon, Ms. Braud, how are you?

**JUROR NO. 3:** I didn't expect all this, but I'm good.

**THE COURT:** Well you know, ordinarily I would have sent a note back, but because we're just about to take the verdict I thought it was probably better to do it this way, and I also didn't want to leave your note unanswered, I wanted you to know that I have read it, the lawyers have read it, we had a brief conversation.

The photographer was not hired by any of the lawyers or any of the parties in this case.

We do have several trials going on in the courthouse right now, one of them is a very high-profile case, and I have a feeling that it's probably somehow connected to that, but I don't -- I didn't want you to feel that we didn't take this seriously.

And if you are feeling like you're being surveilled or if you see something like that happening again feel free to contact our courtroom and we will connect you with the marshal service so we can make sure that if there is surveillance going to on that it's stopped. Okay?

Do you feel like it had any impact on your deliberations today?

**JUROR NO. 3:** No, absolutely not. I -- the main

reason why I -- we were talking in the room and I thought -- I specifically I thought it was odd because it was a long lensed camera and it wasn't in the front, but my -- as I told you my ex-husband is deputy chief and I did mention, like, do you think I should be concerned, and he told me that I should contact you.

**THE COURT:** That was absolutely.

**JUROR NO. 3:** Yes.

**THE COURT:** -- the right the thing to do.

**JUROR NO. 3:** Yes.

**THE COURT:** Because I'm confident that this -- that your chances are it was just somebody --

**JUROR NO. 3:** Yeah.

**THE COURT:** -- pictures of everybody coming in and out of the building, but just in case it's not I think that it was -- it's important for have reported it so that way we'll be on the lookout if you contact our courtroom and let us know that it's continuing then we can jump right in and the marshal service can take care of it.

**JUROR NO. 3:** I appreciate it.

**THE COURT:** So I appreciate your candor and your honesty.

**JUROR NO. 3:** Yes, plus the jurors were adamant that I should let you know today, so.

**THE COURT:** You're -- sounds like your fellow jurors

are very protective of you.

**JUROR NO. 3:** Yes. Yes. Yes. Thank you so much.

**THE COURT:** You're very welcome.

Okay, so we're going to bring the rest of the jury back so we can hear your verdict now, and you can go back if you want to or you can stay -- you can move over to your seat.

**JUROR NO. 3:** I'll walk with them.

**THE COURT:** Okay. Thank you, ma'am.

**JUROR NO. 3:** Thank you so much. I appreciate it.

**(Pause)**

**THE CLERK:** All rise for the jury.

**(Jurors enter courtroom at 1:13:24 p.m.)**

**THE CLERK:** Please be seated.

**THE COURT:** Thank you.

Good afternoon, ladies and gentlemen of the jury. I understand, Mr. Le, that you have a verdict.

**THE FOREPERSON:** Yes, Your Honor.

**THE COURT:** Okay, could you hand it to your courtroom attendant? Thank you.

**(Pause)**

**THE COURT:** Okay.

**(Pause)**

//

//

//

**VERDICT**

**THE CLERK:** United States District Court Central District of California, Patrick Byrne, an individual, plaintiff, versus Ameris Bank, a Georgia corporation, defendant, case number 8:24-cv-01989, verdict.

Judge, Honorable Michelle Williams' Court, Courtroom 6A.

We the jury return this unanimous answer as our verdict in this case.

One, what amount of punitive damages, if any, do you award plaintiff, Patrick Byrne from defendant, Ameris Bank? Amount, $62,906,613. Dated June 12, 2026, signed by the presiding juror.

**THE COURT:** Would anyone like the jury polled?

**MR. WOOD:** Plaintiff is okay foregoing polling.

**THE COURT:** Okay. And Ms. Fode?

**MS. FODE:** Yes, Your Honor.

**THE COURT:** Yes, you would like the jury polled?

**MS. FODE:** Yes.

**THE COURT:** Okay. Thank you.

Will you please proceed.

**THE CLERK:** Juror number 1, is the verdict as presented and read your verdict?

**JUROR NO. 1:** Yes.

**THE CLERK:** Juror number 2, is the verdict --

**(Pause)**

**THE CLERK:** Your Honor, may I start again?

**THE COURT:** Yes, please do.

**THE CLERK:** Juror number 1, is the verdict as presented and read your verdict?

**JUROR NO. 1:** Yes.

**THE CLERK:** Juror number 2, is the verdict as presented and read your verdict?

**JUROR NO. 2:** Yes.

**THE CLERK:** Juror number 3, is the verdict as presented and read your verdict?

**JUROR NO. 3:** Yes.

**THE CLERK:** Juror number 4, is the verdict as presented and read your verdict?

**JUROR NO. 4:** Yes.

**THE CLERK:** Juror number 5, is the verdict as presented and read your verdict?

**JUROR NO. 5:** Yes.

**THE CLERK:** Juror number 6, is the verdict as presented and read your verdict?

**JUROR NO. 6:** Yes.

**THE CLERK:** Juror number 7, is the verdict as presented and read your verdict?

**JUROR NO. 7:** Yes.

**THE CLERK:** Juror number 7, is the verdict as

presented and read your verdict?

**JUROR NO. 8:** I'm sorry, I'm juror number 8.

**THE COURT:** There is no juror number 7.

**JUROR NO. 8:** There is no juror number 7.

**THE CLERK:** Juror number 8, is the verdict as presented and read your verdict?

**JUROR NO. 8:** Yes.

**THE CLERK:** Thank you.

**THE COURT:** Okay, thank you very much.

Okay, now that the case has been concluded some of you may have questions about the confidentiality of the proceedings.

Now that the case is over you are free to discuss this case with any person you choose. By the same token however I would advise you that you are under no obligation to discuss this case with any person.

If you do decide to discuss the case with anyone I would suggest that you treat it with the same degree -- with the decree of solemn that in whatever you do decide to say you would be willing to say in the presence of the other jurors or under oath here in open court in the presence of all of the parties.

Always bear in mind that if you do decide to discuss the case, the other jurors fully and freely stated their opinions with the understanding that they were being expressed

in confidence. Please respect the privacy of the views of the other jurors.

Finally, if you would prefer not to discuss this case with anyone but are feeling undue pressure to do so, please feel free to contact the courtroom deputy who will notify me and I will assist.

Thank you all for much for your time and attention and punctuality in this case. I know that I and the parties truly appreciate the sacrifice that you all made in order to be here and to participate in these proceedings, we really appreciate it, thank you so much.

That concludes your jury service and you are excused. Have a great weekend.

**THE CLERK:** All rise.

**(Jurors exit courtroom)**

**THE COURT:** Okay, everyone can be seated.

We have some issues that we need to discuss.

First, Ms. Fode, I haven't forgotten your request about lodging the demonstratives, we can talk about that.

We also need to talk about how we want to handle the 17200 cause of action that is in the case, we can't enter judgment in this case until we get that piece of it done.

And those were the two main things that I had that I needed to talk to you about.

Is there anything else from the plaintiff's

perspective?

**MR. SESSIONS:** Other than those two items, no, Your Honor.

**THE COURT:** Okay. From the defendant's perspective?

**MS. FODE:** No, nothing further.

**THE COURT:** Okay. So let's take up the issue of motion to lodge.

It's not clear to me -- I don't -- you don't need leave of court to lodge anything, and it's up to the Court of Appeal to determine whether or not it's going -- if you want to include it in the record whether or not it's part of the record, you just need to comply with Federal Rule of Civil Procedure 5 and Local Rule 5.1 if you're going to lodge anything.

Would you like to be heard?

**MS. YEE:** Yes, please, Your Honor.

**THE COURT:** Go ahead.

**MS. YEE:** Your Honor, we -- obviously you already know that we are going to move the Court for the parties -- you know, order the parties to produce and file with the court copies of all the presentations or demonstratives used during this entire trial.

I mean we do not have specific slides that plaintiff actually used during the trial.

**THE COURT:** Okay, but that's not before the Court

right now. So if you make that motion then we'll adjudicate it when it's before the Court.

**MS. YEE:** Okay. Thank you, Your Honor.

**THE COURT:** Okay. Anything else from plaintiff on that issue?

**MR. SESSIONS:** No, Your Honor.

**THE COURT:** Okay. So as to 17200 claim I did review the amended complaint that was just filed after the Court granted the motion for leave to amend to conform to proof, and my understanding is the plaintiff is asking for restitution, disgorgement of unlawful profits and an injunction preventing Ameris from engaging in certain practices; is that right?

**MR. SESSIONS:** That is correct, Your Honor.

**THE COURT:** Does the plaintiff intend to present any additional evidence on that claim?

**MR. SESSIONS:** No, Your Honor, I believe all the evidence has been presented.

What I've done in prior cases on both sides of the room is usually after the judge has now heard -- Your Honor has heard all of the evidence that was presented in the trial the parties then would brief --

**THE COURT:** Right.

**MR. SESSIONS:** -- the 17200 issue.

**THE COURT:** That's what I have usually done, but I also like to -- you know, you may have other ideas. So that

what I've done and that's what I would intend to do here.

Ms. Fode, what would you suggest?

**MS. FODE:** We'll agree to that. Thank you.

**THE COURT:** Okay. So I think that especially because everything is so fresh in everyone's mind and the Court would be bound by the factual determinations that the jury has already made, that we can do this on a fairly truncated schedule.

My proposal would be to give each side ten pages to brief, the plaintiff's brief due next Wednesday the 17th, defense brief due on the 24th, which is a week later, and then if the plaintiff has a reply that the plaintiff can file a reply no more than five pages by the 26th, which is Friday, and then the Court would issue a ruling and then issue a schedule in terms of getting the judgment submitted, exchanged, and then entered.

**MR. SESSIONS:** That is acceptable to Plaintiff. Thank you.

**THE COURT:** Okay. Ms. Fode?

**MS. FODE:** That's acceptable to defendant.

**THE COURT:** Okay. So plaintiff's brief due filed and served by June 17, 2026, ten-page page limit, defense brief due filed and served June 24, 2026, ten-page page limit, and plaintiff's reply brief due filed and served June 26, 2026, and there's a five-page page limit on that.

Okay. Anything else that we need to talk about this afternoon before I let you go?

**MR. SESSIONS:** Nothing on our end. Thank you.

**MS. FODE:** Nothing on defendant's end.

**THE COURT:** Okay. Thank you very much. And with that proceedings are concluded.

**MR. WOOD:** Thank you, Your Honor, we appreciate it.

**THE COURT:** Thank you.

**MR. SESSIONS:** Thank you, Your Honor.

**THE COURT:** Thank you.

**MS. YEE:** Thank you.

**THE CLERK:** All rise. Court is in recess.

**MS. FODE:** Thank you.

**(This hearing was adjourned at 1:23 p.m.)**

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**June 14, 2026**

**Signed** **Dated**

***TONI HUDSON, TRANSCRIBER***